1  **PANAKOS LAW, APC**
   Aaron D. Sadock  (SBN 282131)
2  555 West Beech Street, Ste. 500
   San Diego, California 92101
3  Telephone:  (619) 800-0529
   Facsimile:   (866) 365-4856
4  Email: asadock@panakoslaw.com

5  Attorney for Plaintiff ENSOURCE INVESTMENTS LLC

6

7

8                    **UNITED STATES DISTRICT COURT**

9
                     **SOUTHERN DISTRICT OF CALIFORNIA**
10

11  ENSOURCE INVESTMENTS LLC, a        Case No.  **'17 CV 0079 H    JMA**
    Delaware limited liability company,
12                                      **COMPLAINT FOR:**
                          Plaintiff,
13  v.                                      1. **Violation of Section 10(b) of**
                                               **The Exchange Act and Rule**
14  THOMAS P. TATHAM, an                      **10b-5(b) Promulgated**
    individual; MARK A. WILLIS, an            **Thereunder**
15  individual; PDP MANAGEMENT            2. **Conversion**
    GROUP, LLC, a Texas limited
16  liability company; TITLE ROVER,
    LLC, a Texas limited liability
17  company; BEYOND REVIEW, LLC,
    a Texas limited liability company;    **(Jury Trial Requested)**
18  IMAGE ENGINE, LLC, a Texas
    limited liability company; WILLIS
19  GROUP, LLC, a Texas limited
    liability company; and DOES 1-50,
20
                          Defendants.
21

22

23

24

25
         NOW COMES the Plaintiff, EnSource Investments LLC ("EnSource"), by
26
    and through its undersigned counsel, and for its Complaint against Thomas P.
27
    Tatham, Mark A. Willis, PDP Management Group, LLC, Title Rover, LLC,
28

---

Beyond Review, LLC, Imagine Engine, LLC and Willis Group, LLC (collectively, the "Defendants"), states as follows:

## I.   INTRODUCTION

1.     This litigation arises from a scheme to defraud the Plaintiff in connection with the purchase and sale of securities of Defendant Hopewell – Pilot Project, LLC ("Hopewell").  The scheme was propagated and otherwise conducted by two main ring leaders:  Defendants Thomas P. Tatham ("Tatham") and Mark A. Willis ("Willis").

2.     As set forth more particularly *infra*, Defendants Tatham and Willis solicited investment from the Plaintiff in exchange for an interest in Hopewell (the "Hopewell Interest") as well as a warrant to convert the Hopewell Interest into an interest in Defendant Title Rover, LLC ("Title Rover") (the "Title Rover Warrant") (the Hopewell Interest and Title Rover Warrant shall be collectively referred to herein as the "Securities") and, in connection therewith, failed to disclose material fact, as well as committed omissions of material fact.

3.     In particular, Defendants Tatham and Willis: (a) failed to disclose the insolvency of Hopewell to the Plaintiff, notwithstanding inquiries thereof by the Plaintiff, and actively engaged in acts to conceal the insolvency and otherwise dire and bankrupt financial condition of Hopewell; (b) made misrepresentations to the Plaintiff that its investment would be used for go-forward oil, gas and mineral exploration activities of Hopewell when, in fact, Defendants Tatham and Willis had planned to use and, in fact, actually used nearly all of the proceeds of the investment of the Plaintiff to pay themselves, related entities and even relatives for previously-incurred amounts allegedly owed but never disclosed to the Plaintiffs, thereby leaving next to nothing of the investment of the Plaintiff available for the go-forward oil, gas and mineral exploration activities of Hopewell; (c) made misrepresentations with respect to the progress of Hopewell with respect to its then-current oil, gas and mineral exploration activities as well as potential payoff

in connection therewith at the time they solicited the investment from the Plaintiff; and (d) made misrepresentations concerning the efficacy of the technology licensed to Defendant Hopewell by Defendant Title Rover, an entity owned and controlled directly and indirectly by Defendants Tatham and Willis, which technology was crucial to the oil, gas and mineral exploration activities of Hopewell.

4.     While Defendants Tatham and Willis were actively and consciously squandering nearly every dollar invested into Hopewell by the Plaintiff in order to line their own pockets through direct payments to themselves as well as payments to their affiliated companies and relatives, neither one ever provided the Plaintiff with any information concerning the financial affairs of Hopewell and, in fact, lead the Plaintiff to believe that all was going well – until Defendant Tatham sent the Plaintiff an electronic mail on December 7, 2016 (the "December 7th E-Mail") essentially stating that Hopewell was out of money, insolvent and in need of immediate cash infusion in order to be able to continue business activities.

## II.   JURISDICTION AND VENUE

5.     The claims of the Plaintiff arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78(j)(b) and 78(t), and Rule 10b-5 promulgated thereunder; and under §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act".

6.     Jurisdiction is conferred by §27 of the Exchange Act, and 28 U.S.C. §1331, as well as by §22 of the Securities Act.

7.     Venue is proper in the United States District Court for the Southern District of California (the "District") pursuant to §27 of the Exchange Act because acts and practices complained of herein occurred in part in the District. Alternatively, venue is proper in the United States District Court for the Southern District of California (the "District") pursuant to 28 U.S.C. § 1391(b)(2).

1

### III.   THE PARTIES

2      8.     The Plaintiff, EnSource Investments LLC, is a Delaware limited

3   liability company that maintains its principal place of business at 216 Centerview

4   Drive, Suite 160, Brentwood, Tennessee 37027.  The Plaintiff lost Four Hundred

5   Thirty Thousand Dollars ($430,000) in connection with the purchase of the

6   Hopewell Interest.

7      9.     Defendant Tatham is an individual who, on information and belief,

8   resides in Houston, Texas.  Defendant Tatham had, in connection with the

9   purchase and sale of the Hopewell Interest to the Plaintiff, touted himself as an

10   expert in the oil, gas and mineral exploration industry having decades of relevant

11   experience and numerous successful past transactions and business dealings.

12   Defendant Tatham is a manager of Hopewell and represented to the Plaintiff that

13   he would undertake and successfully and faithfully fulfill the duties of a manager

14   of Hopewell as well as maintain an officer position whereby he would be an

15   integral part of day-to-day operations of Hopewell.  As noted *infra*, combined with

16   Defendant Willis, Defendant Tatham syphoned no less than Three Hundred

17   Ninety-Nine Thousand Dollars ($399,000) out of the Four Hundred Thirty

18   Thousand Dollars ($430,000) – nearly ninety-three

19   percent (93%) -- that was invested into Hopewell by the Plaintiff through entities

20   that he owed and controlled.

21      10.    Defendant Willis is an individual who, on information and belief,

22   resides in Houston, Texas.  Defendant Willis had, in connection with the purchase

23   and sale of the Hopewell Interest to the Plaintiff, represented himself as a

24   successful businessman and serial entrepreneur having started, grown and sold

25   companies many times for profits in the millions of dollars.  Defendant Tatham is a

26   manager of Hopewell and represented to the Plaintiff that he would undertake and

27   successfully and faithfully fulfill the duties of a manager of Hopewell as well as

28   maintain an officer position whereby he would be an integral part of day-to-day

operations of Hopewell.  As noted *infra*, combined with Defendant Tatham, Defendant Willis syphoned no less than Three Hundred Ninety-Nine Thousand Dollars ($399,000) out of the Four Hundred Thirty Thousand Dollars ($430,000) – nearly ninety-three percent (93%) -- that was invested into Hopewell by the Plaintiff through entities that he owed and controlled

11.    Defendant PDP Management Group, LLC ("PDP Management") is a Texas limited liability company with its principal place of business at 800 Brazos Street, Suite 400, Austin, Texas 78701.  Defendant Tatham is the sole manager of PDP Management.   PDP Management syphoned, as bogus management and related services fees, no less than One Hundred Fifty-Nine Thousand Two Hundred Fifty Dollars ($159,250) in the less than three (3) month period from the initial investment by the Plaintiff in Hopewell to the December 7th E-mail.   In reality, PDP Management was merely a conduit by which the funds invested by the Plaintiff into Hopewell could land in the pocket of Defendant Tatham.

12.    Defendant Title Rover is a Texas limited liability company with its principal place of business at 1400 Post Oak Boulevard, Suite 200, Houston, Texas 77056.  Title Rover is owned and controlled, directly and indirectly, by Defendants Tatham and Willis and was represented to hold a license to revolutionary software that would perform title work for land ownership in a manner that is at least ten (10) times quicker than any other software available and discover all errors in connection with the chain of title with respect to land ownership.  Title Rover syphoned no less than One Hundred Fifty Thousand Five Hundred Ninety Dollars ($150,590) in the less than three (3) month period from the initial investment by the Plaintiff in Hopewell to the December 7th E-mail.  In reality, Title Rover was merely a conduit by which the funds invested by the Plaintiff into Hopewell could land in the pocket of Defendants Tatham and Willis.

13. Defendant Beyond Review, LLC ("Beyond Review") is a Texas limited liability company with its principal place of business at 1400 Post Oak

Boulevard, Suite 200, Houston, Texas 77056.   Defendant Willis is the sole manager of Beyond Review.  Beyond Review syphoned, as bogus services fees, no less than Fifty Thousand Five Hundred Forty-Eight Dollars ($50,548) in the less than three (3) month period from the initial investment by the Plaintiff in Hopewell to the December 7th E-mail.  In reality, Beyond Review was merely a conduit by which the funds invested by the Plaintiff into Hopewell could land in the pocket of Defendant Willis.

14.   Defendant Image Engine, LLC ("Image Engine") is a Texas limited liability company with its principal place of business at 1400 Post Oak Boulevard, Suite 200, Houston, Texas 77056.  Defendant Willis is the sole manager of Image Engine.  Image Engine syphoned, as bogus services fees, no less than Twenty-Four Thousand Dollars ($24,000) in the less than three (3) month period from the initial investment by the Plaintiff in Hopewell to the December 7th E-mail.  In reality, Image Engine was merely a conduit by which the funds invested by the Plaintiff into Hopewell could land in the pocket of Defendant Willis.

15.   Defendant Willis Group, LLC ("Willis Group") is a Texas limited liability company with its principal place of business at 1400 Post Oak Boulevard, Suite 200, Houston, Texas 77056.  Defendant Willis is the sole manager of Willis Group.   Willis Group syphoned, as bogus services fees, no less than Fifteen Thousand Dollars ($15,000) in the less than three (3) month period from the initial investment by the Plaintiff in Hopewell to the December 7th E-mail.  In reality, Willis Group was merely a conduit by which the funds invested by the Plaintiff into Hopewell could land in the pocket of Defendant Willis.

## IV.   GENERAL ALLEGATIONS

### A.   HOPEWELL'S UNDISCLOSED DIRE FINANCIAL CONDITION

16.   Defendants Tatham and Willis began soliciting the Plaintiff for an investment in July 2016.  In connection with the solicitation activities, Defendants Tatham and Willis provided certain information and material to the Plaintiff,

among which was a "Private Placement Memorandum – Hopewell Pilot – Project, LLC" (the "Private Placement Memorandum").  A true and correct copy of the Private Placement Memorandum is attached hereto and incorporated herein as Exhibit A.

17.    In the Private Placement Memorandum, it is stated that "…Hopewell is seeking qualified debt and equity investors to provide up to $2,000,000 in new funds from the placement of up to 1,000,000 Initial Additional Equity Shares *for the purpose of acquiring new lease and mineral interest acquisitions in the four target areas and for working capital to continue the Company's operations and evaluation of lease acquisition opportunities.*"  *See* "Executive Summary" in Exhibit A,

18.    The Private Placement Memorandum mentions no aspect of the financial condition of Hopewell, even though during the time period of the solicitation of investment from the Plaintiff, Hopewell: (a) had less than Ten Thousand Dollars ($10,000) and, at times, had a negative balance in its one and only checking account; and (b) was at all times insolvent and on the verge of bankruptcy.

19.    Further, at no time during the solicitation of the investment from the Plaintiff did either of Defendants Tatham and Willis even remotely mention the insolvency of Hopewell or the dire financial position of the company and its verge of bankruptcy, even though they were both fully aware of such condition.

20.    When questioned about the financial strength of Hopewell, both Defendants Tatham and Willis failed to disclose: (a) Hopewell's pathetically low (and sometimes negative) cash balance, insolvency and near bankrupt condition; (b) the fact that Hopewell was running at a huge loss each month since its inception; and (c) any financial statement of Hopewell including, without limitation, any income statement, balance sheet, statement of cash flows or statement of stockholders' equity.

21.     Instead, Defendants Tatham and Willis would affirm the viability of Hopewell to the Plaintiff, even though they both knew of its dire financial condition and near bankrupt state and notwithstanding the fact that both Defendants Tatham and Willis maintained the duty *to disclose the precarious and near bankrupt state of Hopewell to the Plaintiff*.

22.     Further, when the initial tranche of the investment of the Plaintiff into Hopewell was delayed and Defendants Tatham and Willis knew that the discontinuation of the company's operations was imminent, instead of disclosing such precarious state of Hopewell, Defendants Tatham and Willis requested a bridge loan from the Plaintiff through the issuance of a convertible promissory note (the "Convertible Note").     Defendants Tatham and Willis conducted themselves in the aforementioned manner to further hide the truth of Hopewell's desperate financial condition.

### B.   MISREPRESENTATIONS CONCERNING THE USE OF THE INVESTMENT PROCEEDS

23.     Throughout the entire solicitation period, Defendants Tatham and Willis stated, on numerous occasions, that the use of the investment proceeds would be for go-forward working capital requirements and for acquiring new lease and mineral interest acquisitions in the four target areas.  In fact, such use of funds was stated in the Private Placement Memorandum.

24.     In reality, Defendants Tatham and Willis had covertly planned to use the investment proceeds to line their pockets for alleged amount owed to them as well as companies that they owned and controlled.  Neither of Defendants Tatham or Willis had any intention of using the investment proceeds for either go-forward working capital needs or the acquisition of new lease and mineral interest acquisitions in the four target areas.

25.     In fact, on September 13, 2016 – the very day the first tranche of investment from the Plaintiff was received in the amount of Two Hundred Five

Thousand Dollars ($205,000) pursuant to the Convertible Note (the "First Tranche") – One Hundred Eleven Thousand Dollars ($111,000), over half of the amount of the initial tranche, was immediately wire transferred to companies owned and controlled by Defendants Tatham and Willis.

26.   Then, in just a three (3) day period thereafter from September 14, 2016 through September 16, 2016, Defendants Tatham and Willis drained the remaining Ninety-Four Thousand Dollars ($94,000) and even managed to create an overdraw in the checking account of Hopewell in excess of Three Thousand Dollars ($3,000) by, among other things, wire transferring over Fifty-Seven Thousand Dollars ($57,000) into the accounts of companies they owed and controlled.  In the course of just four (4) days, Defendants Tatham and Willis put over One Hundred Sixty-Eight Thousand Dollars ($168,000) – over Eighty Percent (80%) – into their own pocket through transfer of such amount to companies they owned and controlled.  Not only did such amount not be used for either go-forward working capital needs or the acquisition of new lease and mineral interest acquisitions in the four target areas as represented by Defendants Tatham and Willis, but none of the remaining amount of the First Tranche was used for either such purposes.

27.   After draining the First Tranche from the coffers of Hopewell for their own individual benefits and against their expressed representations of the use of such funds – and once again creating an undisclosed, negative cash balance in the sole bank account of Hopewell, Defendants Tatham and Willis did not stop there. Specifically, on September 30, 2016, Defendants Tatham and Willis received the second tranche of the investment from the Plaintiff in the amount of Twenty Thousand Dollars ($20,000) (the "Second Tranche") and spent such funds consistent as how they spent the funds of the First Tranche – without any of such funds actually used for either go-forward working capital needs or the acquisition of new lease and mineral interest acquisitions in the four target areas, as

1   represented by Defendants Tatham and Willis.

2       28.    On October 28, 2016, the third tranche of the investment from the

3   Plaintiff in the amount of Two Hundred Five Thousand Dollars ($205,000) (the

4   "Third Tranche") was received into the coffers of Hopewell.  Instead of using such

5   funds for either go-forward working capital needs or the acquisition of new lease

6   and mineral interest acquisitions in the four target areas as represented by

7   Defendants Tatham and Willis, they used such amount to, once again, line their

8   own pockets and, in the process, putting Hopewell in yet another round of

9   insolvency and negative cash balance in its checking account – and Defendants

10  Tatham and Willis did it in much the same ways as they had squandered the prior

11  tranches.

12      29.    Specifically, on the very day the Third Tranche was received, nearly

13  Seventy-Seven Thousand Dollars ($77,000) – over Thirty-Seven Percent (37%) –

14  of the Third Tranche was wire transferred to companies owned and controlled by

15  Defendants Tatham and Willis.  Then, in the period from October 29, 2016 through

16  November 1, 2016 – just four (4) days – Defendants Tatham and Willis wire

17  transferred another near Eighty-Three Thousand Dollars ($83,000) to companies

18  they owned and controlled, thereby making their five (5) day pillage total of the

19  Third Tranche to over One Hundred Sixty Thousand Dollars ($160,000) – over

20  Seventy-Eight Percent (78%) – of the amount of the Third Tranche.   As with the

21  two prior tranches, none of such funds for either go-forward working capital needs

22  or the acquisition of new lease and mineral interest acquisitions in the four target

23  areas as represented by Defendants Tatham and Willis.  Further, reminiscent of the

24  First Tranche, the remainder of the Third Tranche steadily was spent on items

25  other than the stated use of funds and in such a haphazard fashion to eventually

26  create a negative balance in the sole checking account of Hopewell of **_over Thirty-_**

27  **_Six Thousand Dollars ($36,000)_**.

28      30.    Meanwhile, while Defendants Tatham and Willis pillage and plunder

1  the investment of the Plaintiff the second it hit the account of Hopewell to line
2  their own pockets and to eventually drive Hopewell into a desperate financial
3  crisis, neither one makes any communication whatsoever to any representative of
4  the Plaintiff.  In fact and to the contrary, Defendants Tatham and Willis proceeded
5  to interface with representatives of the Plaintiff in a manner that creates the
6  intended illusion that the business of Hopewell is proceeding as planned.  Until, of
7  course, Defendant Tatham sends the December 7th E-mail to the Plaintiff noting the
8  insolvency and imminent bankruptcy of Hopewell – without any plan to reverse
9  the situation except, of course, to ask for the Plaintiff to invest more money into
10 Hopewell.

### C.   MISREPRESENTATIONS CONCERNING THE PROGRESS AND BUSINESS STATE OF HOPEWELL

31.   In the Private Placement Memorandum, it is stated that "…Hopewell
is seeking qualified debt and equity investors to provide up to $2,000,000 in new
funds from the placement of up to 1,000,000 Initial Additional Equity Shares *for
the purpose of acquiring new lease and mineral interest acquisitions in the four
target areas and for working capital to continue the Company's operations and
evaluation of lease acquisition opportunities.*"

32.   Such   aforementioned   statement   in   the   Private   Placement
Memorandum implies that Hopewell had current lease and mineral acquisitions,
which it did not at the time of the solicitation of the investment from the Plaintiff.

33.   Further, at all times since the initial solicitation of the investment from
the Plaintiff through the December 7th E-Mail, both in the Private Placement
Memorandum and otherwise, Defendants Tatham and Willis continuously and
consciously misrepresented the payoff potential of the lease and mineral
acquisitions as well as the relative ease of conducting negotiations and actually
procuring such lease and mineral acquisitions.

34.   In fact, notwithstanding their representations of ease-of-closing and

moon-shot profits with respect to the lease and mineral acquisitions, Defendants Tatham and Willis merely closed a fraction of the amount needed to achieve commercial critical mass. Phrased differently, Defendants Tatham and Willis intentionally misrepresented the profit potential as well as the probability of such profit potential of the lease and mineral acquisitions of Hopewell in connection with the solicitation of the investment from the Plaintiff.

### D. MISREPRESENTATIONS CONCERNING THE TECHNOLOGY AND KNOW-HOW OF TITLE ROVER AND HOPEWELL

35. Defendants Tatham and Willis represented that the primary advantage that Hopewell maintained in its efforts to procure oil, gas and mineral interests was the proprietary title-searching technology of Title Rover, which such technology had been licensed to Hopewell (the "Title Rover Technology").

36. Defendants Tatham and Willis represented that the Title Rover Technology could search data related to property transfers and discover, without any human intervention, any and all defects concerning the chain of title of property transfers in a fraction of the time that it would take humans to perform the same activities.

37. In fact, the Title Rover Technology was not nearly as robust or automated as represented by Defendants Tatham and Willis. Nor did it maintain any automation to discover defects concerning the chain of title of property transfers.

38. The Title Rover Technology produced no results for Hopewell in connection with viable potential transactions for oil, gas and/or mineral rich properties for which defects in the chain of title were present.

///

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FIRST CLAIM**
**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND**
**RULE 10b-5(b) PROMULGATED THEREUNDER**
**(Against Defendants Tatham and Willis)**

39.     The Plaintiff re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.   This count is directly to Defendants Tatham and Willis solely.

40.     Defendants Tatham and Willis deceived Plaintiff, and in so doing cause the Plaintiff to purchase the Hopewell interest, by; (a) failing to disclose the insolvency of Hopewell to the Plaintiff, notwithstanding inquiries thereof by the Plaintiff, and actively engaged in acts to conceal the insolvency and otherwise dire and bankrupt financial condition of Hopewell; (b) making misrepresentations to the Plaintiff that its investment would be used for go-forward oil, gas and mineral exploration activities of Hopewell when, in fact, Defendants Tatham and Willis had planned to use and, in fact, actually used nearly all of the proceeds of the investment of the Plaintiff to pay themselves, related entities and even relatives for previously-incurred amounts allegedly owed but never disclosed to the Plaintiffs, thereby leaving next to nothing of the investment of the Plaintiff available for the go-forward oil, gas and mineral exploration activities of Hopewell; (c) making misrepresentations with respect to the progress of Hopewell with respect to its then-current oil, gas and mineral exploration activities as well as potential payoff in connection therewith at the time they solicited the investment from the Plaintiff; and (d) making misrepresentations concerning the efficacy of the technology licensed to Defendant Hopewell by Defendant Title Rover, an entity owned and controlled directly and indirectly by Defendants Tatham and Willis, which technology was crucial to the oil, gas and mineral exploration activities of Hopewell.

41.     Defendant Tatham and Willis made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not

misleading, and/or substantially participated in the creation of the alleged misrepresentations, which operated as a fraud and deceit upon the Plaintiff in connection with its purchase of the Hopewell Interest and in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

42.    Defendants Tatham and Willis, directly and indirectly, by the use of means and instrumentalities of interstate commerce and/or the mails, made, or substantially participated in the creation of, untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made about the Hopewell in light of the circumstances under which they were made, not misleading, as set forth herein.

43.    Defendants Tatham and Willis had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were unavailable to them.

44.    The facts alleged herein set forth a strong inference that each of Defendants Tatham and Willis acted with scienter.

45.    Each of Defendants Tatham and Willis had a strong motive to engage in the fraudulent scheme set forth herein.  Namely, to pilfer the investment funds for their own personal gain.

46.    By reason of the foregoing, the Defendants Tatham and Willis have violated Section 10(b) of the Exchange Act and Rule 10b-5(b), promulgated thereunder and are liable to the Plaintiff for damages which they suffered in connection with their purchases of the Hopewell Interest.

## SECOND CLAIM
## CONVERSION
### (Against Defendants Tatham, Willis, PDP Management, Title Rover, Beyond Review, Imagine Engine and Willis Group)

47.    The Plaintiff re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  This count is directly to

Defendants Tatham, Willis, PDP Management, Title Rover, Beyond Review, Imagine Engine and Willis Group (the "Conversion Defendants").

48.     Through Defendants Tatham and Willis' orchestrated efforts to defraud the Plaintiff in connection with the purchase and sale of the Hopewell Interest, the Conversion Defendants have possession, control and dominion over funds not rightfully owned by them.

49.     Due to such possession, control and dominion over funds not rightfully owned by them, the Conversion Defendants damaged the Plaintiff to the extent that such funds were derived from the investment from the Plaintiff.

50.     The possession, control and dominion over funds not rightfully owned by the Conversion Defendants continues as of the date of the filing of this Complaint.

## JURY REQUEST

51.     The Plaintiff hereby requests a trial by jury on all claims so triable.

## PRAYER

**WHEREFORE,** the Plaintiff prays for relief and judgment, as follows:

a.      Awarding compensatory damages against all of the defendants, jointly and severally, in favor of the Plaintiffs for all losses and damages suffered as a result of defendants' wrongdoing alleged herein, in an amount to be determined at trial, together with interest thereon;

b.      Awarding the Plaintiff its reasonable costs and expenses incurred in this action; and

c.      Awarding the Plaintiff such other and further relief as the Court may deem just and proper.

DATED: January 13, 2017              PANAKOS LAW, APC


                                     By: /s/ Aaron D. Sadock
                                     Aaron D. Sadock Esq. Attorney for Plaintiff
                                     ENSOURCE INVESTMENTS LLC

Exhibit A

# PRIVATE PLACEMENT MEMORANDUM

## HOPEWELL-PILOT PROJECT, LLC

### PRIVATE PLACEMENT OF UP TO 1,000,000 INITIAL ADDITIONAL EQUITY SHARES

THE OFFERING OF SECURITIES DESCRIBED HEREIN HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION.  THIS OFFERING IS MADE PURSUANT TO REGULATION S OR REGULATION D UNDER SECTION 4(a)(2) OF SAID ACT, WHICH EXEMPTS FROM SUCH REGISTRATION CERTAIN TRANSACTIONS. FOR THIS REASON, THESE SECURITIES WILL BE SOLD ONLY TO INVESTORS WHO MEET CERTAIN MINIMUM SUITABILITY QUALIFICATIONS DESCRIBED HEREIN.

A PROSPECTIVE INVESTOR SHOULD BE PREPARED TO BEAR THE ECONOMIC RISK OF AN INVESTMENT IN THE COMPANY FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE SHARES OR MEMBER'S INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE LAWS OF ANY OTHER JURISDICTION, AND, THEREFORE, CANNOT BE SOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.  THERE IS NO OBLIGATION OF THE ISSUER TO REGISTER THE SHARES OR MEMBER'S INTERESTS UNDER THE SECURITIES ACT OR THE LAWS OF ANY OTHER JURISDICTION. TRANSFER OF THE SHARES OR MEMBER'S INTERESTS IS ALSO RESTRICTED BY THE TERMS OF THE AMENDED AND RESTATED COMPANY AGREEMENT RELATING THERETO.

TABLE OF CONTENTS

I.      Executive Summary

II.     Term Sheet

III.    Technology

IV.     Risk Factors

V.      Previously Distributed Offering Materials

VI.     Subscription Booklet

VII.    Amended and Restated Company Agreement

I.     EXECUTIVE SUMMARY

The Hopewell – Pilot Project, LLC ("Hopewell" or the "Company") was formed in March 2016 for the purpose of demonstrating "Proof of Concept" involving the refinement, use, and application of a new proprietary software technology which can geographically sort and analyze land and mineral title records and related digital data for the purpose of acquiring Oil, Gas & Mineral interests in the most contemporary "tight sands" and "shale" plays.

The business concept behind the formation and funding of Hopewell depends upon five basic premises!  They are:

1.  The more contemporary "tight sands" and "shale" plays are more commercially rewarding as the industry continues to refine and apply new horizontal completion and frac techniques to the areas best suited for the application of such technology.
2.  The best contemporary "tight sands" and "shale" plays were initiated 2010-2013 in a very competitive environment and the initial leasing effort was undertaken on a "trend basis" which provided less than 100% title review by contract land personnel.  Legal title opinions were generally only undertaken on "drill site" tracts.
3.  Operators tried to hold the maximum amount of leased acreage by forming large pooled units for the drilling and completion of lower cost vertical wells.  Many of such pooled units were formed without contemporary survey of leased acreage included.  In the past two years since mid 2014, as the cash flow to most Operators declined due to falling oil and gas prices, many pooled units were hastily formed and contain numerous irregularities.
4.  Most of the new initial leases taken in the contemporary "tight sands" and "shale" plays, unless "held by production", will expire in the 2016 -2017 time frame.  Many of the existing pooled units contain unleased acreage or have leased tracts that would have expired if not for a "pooled unit" designation.
5.   The most lucrative opportunities for Hopewell will occur in contemporary "tight sands" and "shale" plays located in geographical areas where significant land title problems exist .

Hopewell has identified four initial target areas in Madison County, Texas which it believes will optimize investment returns as well as provide "Proof of Concept".  The areas selected have multiple proven hydrocarbon pay zones which have demonstrated significant commercial production in recently completed horizontal wells.  Initial evaluation of the prospective areas indicate that there are unleased tracts in many of the existing Pooled or Declared Units.  Based upon recent field discussions, Hopewell believes that it can acquire new leases in the four areas for initial bonus and lease acquisitions costs of $1,000 per acre or less and by providing traditional lease royalty burdens to the related mineral owners.  In addition to open acreage, many of the existing Pooled or Declared Units and underlying pooled leases appear to have possible deficiencies. Hopewell plans to continue detailed legal evaluation of these identified Units and underlying leases. If warranted, upon conclusion of Hopewell's legal evaluation, Hopewell will seek to arrange additional financing for Company to pursue an aggressive "top lease" strategy for the purchase of new leases in the affected areas.  Hopewell has retained certain Financial Advisors to assist in obtaining up to $25,000,000 of prospective financing for the Company's possible execution of the top lease strategy.

Hopewell is seeking qualified debt and equity investors to provide up to $2,000,000 in new funds from the placement of up to 1,000,000 Initial Additional Equity Shares for the purpose of acquiring new lease and mineral interest acquisitions in the four initial target areas and for working capital to continue the Company's operations and evaluation of lease acquisition opportunities.

New leases acquired by the Company will be held for resale to Operators seeking to organize multi well horizontal drilling & completion programs or to provide the Company with working interest particpation in such development.  The Company's leasing activities will also likely provide opportunity to purchase term royalty and mineral interests on commercially favorable terms.

## II.   TERM SHEET

THE INITIAL PRIVATE PLACEMENT:  Hopewell-Pilot Project LLC ("Hopewell" or the "Company") is seeking to privately arrange the placement of 1,000,000 shares ("Initial Additional Equity Shares) of the Company for $2,000,000, the proceeds of which are to be used to fund all operating overhead of the Company through December 31, 2016, and for the acquisition of Mineral Interests, primarily new Oil and Gas leases, in an agreed Area of Mutual Interest ("AMI") covering Madison County, TX and the Buda Rose play ("Buda Rose" play).

Threshold Placement Amounts - Initial Additional Equity Shares:

> Minimum Subscription Amount:  $250,000 – 125,000 shares
> Maximum Subscription Amount:  $2,000,000 – 1,000,000 shares

Pricing of Initial Additional Equity Shares:

> The price per share for all Initial Additional Equity Shares subscribed prior to closing shall be $2.00 per share.

Priority Rights to Distributions:

> Initial Additional Equity Shares shall have a priority right to cash distributions.  The Amended and Restated Company Agreement provides that the holders of Initial Additional Equity Shares shall receive all cash distributions made by the Company until such time as they have received $2.00 per share in distributions. Once the holders of the Initial Additional Equity Shares have received $2.00 per share in cash distributions, then all additional cash distributions made by the Company shall be paid uniformly on a per share basis.

Financial Advisors:

> The Company has retained Meridian Circle Advisors and may retain other financial advisors (collectively "Financial Advisors") to assist the Company in obtaining additional capital if needed for the acquisition of additional Oil, Gas & Mineral interests within the AMI.  Additional capital may involve the issuance of debt, convertible debt, preferred equity or the formation of a Limited Partnership involving the Company.

Shares Authorized and Outstanding:

> The Company has 5,000,000 authorized shares of which 1,000,000 have been issued to Founders and are currently outstanding.

Other Terms and Conditions:

> As provided in the Subscription Agreement and the Amended and Restated Company Agreement.

Ex. A_003

III.    TECHNOLOGY

The Founders have arranged and provided a cost based contract to Hopewell for the exclusive use of new proprietary software technology owned by Title Rose, LLC, an affiltiate of the Founders.  Hopewell will pay only for the direct costs of digital data purchase, direct operations and traning of Hopewell personnel related to use of Title Rover's proprietary software in an agreed AMI covering Madison County, TX.  Direct costs are currently running $17,500 per month in addition to the purchase or acquisition of digital data.  Either party may terminate the contract beginning January 1, 2017 by providing 30 days prior written notice to the other.  The Company believes that the use of Title Rover technology in the evaluation of OG&M title will result in significant savings in both time and costs.

IV.    RISK FACTORS

A.    Although the Company has identified open or unleased acreage in many existing Pooled or Declared Units there is no certainty that leases of such acreage can be timely obtained or that leases can be obtained at the Company's estimated cost.

B.    Even if the Company is successful in obtaining new leases within existing Pooled or Declared Units there is no assurance that Operators of such Units will include the leases acquired by the Company in the Pooled or Declared Units without a legal action requiring "forced pooling" brought on behalf of the Company and the Lessor of the new leases.

C.    Even if the Company is successful in obtaining new leases within existing Pooled or Declared Units and the Company succeeds to include the new leases in the Pooled or Declared Units, the leasehold interests owned by the Company may not be sufficient to assure that new horizontal wells are drilled and completed and that such activity will be timely undertaken by the Operator.

D.    If the Company is not able to acquire a significant leased acreage position in the identified prospect areas, they Company may not be able to sell or consolidate its lease position with other operators undertaking development of the Buda Rose play.

E.    If oil and gas prices decline significantly, current Operators in the Buda Rose play may defer all horizontal development drilling until such time as prices recover.  If this proves to be the case then the Company may not realize any value for the leases it acquires for a prolonged period of time.

F.    Investment in oil, gas and mineral leases is a speculative undertaking with a high degree of risk.  Investors that cannot afford substantial risk and the entire loss of their invested capital should not undertake the proposed investment.

G.    There is no ready market for the shares of the Company. A prospective investor should be prepared to bear the economic risk of an investment in the Company for an indefinite period of time because the shares or Member's interests have not been registered under the Securities Act or the laws of any other jurisdiction, and, therefore, cannot be sold unless they are subsequently registered of an exemption from registration is available.  There is no obligation of the Company to register the shares or Member's interests under the Securities Act or the Laws of any other jurisdiction.

V.  PREVIOUSLY DISTRIBUTED OFFERING MATERIALS

    A.  Hopewell Executive Summary Teaser

    B.  Hopewell Project Highlights

    C.  Prospect Area Maps


VI.  SUBSCRIPTION BOOKLET - ATTACHED


VII.  AMENDED AND RESTATED COMPANY AGREEMENT - ATTACHED

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

ENSOURCE INVESTMENTS LLC

**(b)** County of Residence of First Listed Plaintiff   Williamson County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
PANAKOS LAW, APC, Aaron D. Sadock  (SBN 282131)
555 West Beech Street, Ste. 500, San Diego CA 92101
Telephone: (619) 800-0529

**DEFENDANTS**

THOMAS P. TATHAM, MARK A. WILLIS, PDP MANAGEMENT GROUP, LLC, TITLE ROVER, LLC, BEYOND REVIEW, LLC, IMAGE ENGINE, LLC, WILLIS GROUP, LLC

County of Residence of First Listed Defendant   Harris County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

'17CV0079 H   JMA

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                 *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation |

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§78; Rule 10b 5; 15 U.S.C.§§11, 12(a)(2), and 15

Brief description of cause:
1. Violation of Section 10(b) of The Exchange Act and Rule 10b 5(b) Promulgated Thereunder 2. Conversion

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
To be determined at trial

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

**VIII. RELATED CASE(S) IF ANY**   *(See instructions)*

JUDGE _____   DOCKET NUMBER _____

DATE
01/13/2017

SIGNATURE OF ATTORNEY OF RECORD
/s/Aaron D. Sadock

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____