**EXHIBIT 3**

**THIRD AMENDED AND RESTATED
COMPANY AGREEMENT**

**OF**

**HOPEWELL - PILOT PROJECT, LLC**

**A Texas Limited Liability Company**

**September 1, 2016**

THE LIMITED LIABLITY COMPANY INTERESTS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES EXCHANGE COMMISSION OR UNDER ANY SECURITIES LAWS OF ANY STATE. THE TRANSFERABILITY OF SUCH INTERESTS IS RESTRICTED. SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, OR TRANSFERRED, NOR WILL ANY ASSIGNEE, VENDEE, TRANSFEREE, OR ENDORSEE THEREOF BE RECOGNIZED AS HAVING ACQUIRED ANY SUCH INTERESTS BY THE ISSUER FOR ANY PURPOSE, UNLESS, AMONG OTHER THINGS, (1) A REGISTRATION STATEMENT FILED WITH THE SEC UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WITH RESPECT TO SUCH INTERESTS SHALL THEN BE IN EFFECT AND SUCH TRANSFER HAS BEEN QUALIFIED UNDER ALL APPLICABLE STATE SECURITIES LAWS, OR (2) THE AVAILABILITY OF AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION SHALL BE ESTABLISHED TO THE SATISFACTION OF COUNSEL TO HOPEWELL - PILOT PROJECT, LLC.

**THIRD AMENDED AND RESTATED**
**COMPANY AGREEMENT**
**OF**
**HOPEWELL - PILOT PROJECT, LLC**
**A Texas Limited Liability Company**

This THIRD AMENDED AND RESTATED COMPANY AGREEMENT OF **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company (the "Agreement"), dated as of September 1, 2016 ("Effective Date"), is adopted by the undersigned as the Managers and Members of the Company.

## Background Statements

WHEREAS, the initial Member of the Company executed a certain Company Agreement for the Company dated as of March 30, 2016 ("Original Company Agreement"), providing for certain rights and obligations with respect to the Company;

WHEREAS, effective June 10, 2016, the Company admitted certain Persons as Founding Members and as new Members of the Company and the Members amended and restated the Original Company Agreement in its entirety in the form of the Amended and Restated Company Agreement on the terms therein provided in order to reflect the admission of the new Members to the Company and to make certain other amendments; and

WHEREAS, effective July 31, 2016 the Company admitted Initial New Members as Members of the Company and further amended and restated the Amended and Restated Company Agreement in its entirety in the form of the Second Amended and Restated Company Agreement on the terms therein provided in order to reflect the admission of the Initial New Members to the Company;

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and agreements contained herein, the Members do hereby agree that the Second Amended and Restated Company Agreement shall be amended and restated in its entirety in the form of this Third Amended and Restated Company Agreement as of the Effective Date.

## ARTICLE I
### Definitions

***Section 1.1 Certain Definitions.*** As used in this Agreement, the following terms shall have the meanings indicated:

"Affiliate" means, with respect to a Person, any other Person that: (i) directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the specified Person; or (ii) is related by birth or marriage to such Person; and "control" (including, with the correlative meaning, the term "controlled" and "is under common control") means the possession, directly or indirectly, of the power to direct or cause the

direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning given that term in the introductory paragraph to this document.

"Area of Mutual Interest" means the agreed area of mutual interest for the Company Business covering Madison County, Texas, Houston County, Texas; Walker County, Texas; Leon County, Texas; and Grimes County, Texas.

"Assignee" means any Person that acquires any portion of a Membership Interest through a Disposition who has not been admitted as a Member pursuant to Section 3.4.

"Business Day" means any day other than a Saturday, Sunday, or a holiday on which national banking associations in the State of Texas are closed.

"Capital Accounts" means the capital accounts established and maintained for each Member and Assignee pursuant to Section 4.4.

"Capital Contribution" means any contribution by a Member to the capital of the Company.

"Certificate" has the meaning given that term in Section 2.1.

"Code" means the Texas Business Organizations Code and any successor statute, as amended from time to time.

"Company" means **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company.

"Company Business" means to acquire and own oil, gas and mineral leases, mineral interests, royalty interests, top leases, and options related to the foregoing in Madison County, Texas and to develop a land management, legal and technical team capable of implementing a similar broader strategy to finance and acquire oil, gas and mineral leases, mineral interests, royalty interests, top leases, and options in the Area of Mutual Interest.

"Dispose," "Disposing," or "Disposition" means a sale, assignment, transfer, exchange, mortgage, pledge, grant of a security interest, or other disposition or encumbrance (including, without limitation, by operation of law) of a Membership Interest in the Company.

"Founding Members" means those Members that receive Founders Shares as set forth on Schedule A.

"Initial Additional Equity Shares" means those shares issued as provided in Section 3.2(a)(ii). Initial Additional Equity Shares shall have a priority right to cash distributions and shall receive all cash distributions made by the Company until such time as the holders of such

shares have received $2.00 per share.  Once the holders of the Initial Additional Equity Shares have received $2.00 per share in cash distributions, then all cash distributions thereafter shall be made uniformly on a per share basis to all shares then outstanding.

"Majority Interest" means Members holding among them more than 50% of the sum of all Membership Percentages.

"Managers" means the Persons named in this Agreement as Managers of the Company and any Persons hereafter elected as Managers of the Company as provided in this Agreement, but does not include any Person who has ceased to be a manager of the Company.

"Member" means any Person executing this Agreement as of the date of this Agreement as a member or hereafter admitted to the Company as a member as provided in this Agreement, but does not include any Person who has ceased to be a member in the Company.

"Membership Interest" means the Shares of the Company owned by a Member.

"Membership Percentage" means the result derived by dividing the number of Shares held by a Member by the total number of Shares which are issued and outstanding. The initial Membership Percentages of the Members as of the Effective Date are set forth on Schedule A.

"Officers" means the officers appointed pursuant to Article VII.

"Person" has the meaning given that term in Section 1.002(69-b) of the Code.

"Proceeding" has the meaning given that term in Section 9.1.

"Quarterly Operating Budget" has the meaning given that term in Section 6.7.

"Securities Act" means the Securities Act of 1933, as amended from time to time.

"Shares" means the shares into which the ownership of Membership Interests in the Company are denominated, including all rights and interests of a Member with respect to the Shares issued under this Agreement including (i) the right of a Member to receive distributions under this Agreement by virtue of the Member's ownership of interests as a Member under this Agreement and (ii) all associated management rights, voting rights or rights to consent. The Shares held by the Members as of the Effective Date are set forth on Schedule A.

"Supermajority Interest" means Members holding among them more than 75% of the sum of all Membership Percentages.

"Tax Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"Treasury Regulations" means the Treasury Regulations promulgated under Subchapter

K of the Tax Code, as amended from time to time.

## ARTICLE II
## Organization

**Section 2.1 Formation**. The Company has been organized as a Texas limited liability company by the filing of Certificate of Formation (the *"Certificate"*) under and pursuant to the Code and the issuance of a certificate of formation for the Company by the Secretary of State of Texas.

**Section 2.2 Name**. The name of the Company is "**HOPEWELL - PILOT PROJECT, LLC**", and all Company business must be conducted in that name or such other names that comply with applicable law as the Board may select from time to time.

**Section 2.3 Registered Office; Registered Agent; Principal Office in the United States; Other Offices**. The registered office of the Company required by the Code to be maintained in the State of Texas shall be the office of the registered agent of the Company. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate from time to time in the manner provided by law. The principal office of the Company in the United States shall be at such place as the Board may designate from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by Section 3.151 of the Code. The Company may have such other offices as the Board may designate from time to time.

**Section 2.4 Purposes**. The sole purpose of the Company shall be to conduct the Company Business and all activities incidental to the Company Business in accordance with the applicable provisions of the Code, including, but not limited to: (i) entering into, performing, enforcing, and carrying out contracts of any kind necessary or desirable to, or in connection with, or incidental to the Company Business or, accomplishing the general purposes of the Company, (ii) acquiring oil, gas and mineral leases, mineral interests, royalty interests, top leases, and options in the Area of Mutual Interest and (iii) borrowing money and issuing evidence of indebtedness, and securing the same by mortgage, deed of trust, pledge, or other lien, in furtherance of the Company Business.

**Section 2.5 Term**. The existence of the Company commenced on the date the Secretary of State of Texas issued a certificate of formation for the Company and shall continue in existence for the period fixed in the Certificate for the duration of the Company, or such earlier time as this Agreement may specify.

**Section 2.6 Foreign Qualification**. Prior to the Company's conducting business in any jurisdiction other than Texas, the Board, if required by the laws of such jurisdiction, shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Board, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Board, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify,

continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

## ARTICLE III
## Membership

**Section 3.1 Authorization of Shares.** .   There shall be Five Million (5,000,000) Shares authorized for issuance by the Company ("Initial Share Authorization").  Changes to the Initial Share Authorization may be made by the Board with the approval of a Supermajority Interest.

**Section 3.2 Issuance of Shares.**

(a)    Issuance of Shares Comprising the Initial Share Authorization. The Shares comprising the Initial Share Authorization shall be issued only as follows:

(i)    One Million (1,000,000) Shares issued to the Founding Members effective June 10, 2016 in the amounts and to the parties specified in Schedule A.

(ii)    There are reserved for issuance up to One Million (1,000,000) Shares issued in exchange for cash consideration in connection with the private placement activities of the Company (such Shares are referred to herein as the "Initial Additional Equity Shares").  One Hundred Ninety-Five Thousand (195,000) Initial Equity Shares were issued on or before July 31, 2016 pursuant to that certain resolution of the Board dated July 29, 2016 in exchange for cash as set forth in Schedule A.  One Hundred Two Thousand Five Hundred (102,500) Initial Additional Equity Shares have been reserved for issuance pursuant to certain Bridge Loan Documentation which was finalized and executed on September 13, 2016 (the "Bridge Loan").  As of the Effective Date, Two Hundred Twelve Thousand Five Hundred (212,500) Initial Additional Equity Shares have been reserved for issue pursuant to the subscription of the Bridge Loan provider.

(iii)    Three Hundred Thousand (300,000) Initial Additional Equity Shares have been reserved for issuance pursuant to that certain Term Sheet for Oil, Gas, and Mineral Lease Acquisition Facility dated August 26, 2016. Of the remaining available and unissued Initial Additional Equity Shares, as of the Effective Date, up to One Hundred Thousand (100,000) Initial Additional Equity Shares may be reserved on October 30, 2016 for issue pursuant to that certain Term Sheet for Oil, Gas, and Mineral Lease Acquisition Facility dated August 26, 2016, if Initial Additional Equity Shares have not been subscribed for issue and are available for issue on October 30, 2016,

(b)    Issuance of Shares for Recapitalization Events.  If and whenever at any time, the Company shall (i) subdivide the outstanding Shares into a greater number of shares, (ii) consolidate the outstanding Shares into a smaller number of shares, or (iii) issue Shares (or other securities convertible into or exchangeable for Shares) to the holders of all or substantially all of the outstanding Shares by way of a stock dividend on the Shares, the number of unissued Shares comprising the Initial Share Authorization shall be adjusted accordingly. The adjustments

5

provided for herein are cumulative and shall apply to successive subdivisions, consolidations, distributions, issues or other events resulting in any adjustment.

(c)     <u>Issuance of Shares in Exchange for Cash Consideration</u>.  In the event the Board resolves that Shares shall be issued in exchange for cash consideration (a "<u>Share Issuance for Cash</u>"), it shall provide to all of the Members a copy of such resolution which shall, at minimum, specify: (i) the number of Shares to be issued; (ii) the price per Share; (iii) the valuation of the Company at the time of such resolution as well as reasonable support therefor; and (iv) all other relevant terms of the proposed Share issuance for cash consideration (the "<u>Share Issuance for Cash Notice</u>").

Each Member shall have the preemptive right to purchase Shares subject to the Share Issuance for Cash on the same terms and conditions as such Shares are to be offered to third-parties (including such terms and conditions described in the Share Issuance for Cash Notice); <u>provided</u>, <u>however</u>, that: (i) the maximum number of Shares that a Member can purchase in connection with the Share Issuance for Cash shall equal the product obtained by multiplying (A) such Membership Interest of such Member, by (B) the number of Shares subject to the Share Issuance for Cash; and (ii) each Member desiring to participate in such Share Issuance for Cash must notify the Board within fourteen (14) days of receipt of the Share Issuance for Cash Notice.  To the extent that any Member does not elect to purchase its maximum number of Shares in connection with the Share Issuance for Cash (as calculated pursuant to subpart (i) of this paragraph), then the balance of the Shares not purchased by such Member may be sold by the Company to third parties, but only upon the terms and conditions and for the purchase price set forth in the Share Issuance for Cash Notice.

The provisions of this Section 3.2(c) shall not apply to the issuance of Shares that are reserved for issuance as provided in Section 3.2(a)(ii) and Section 3.2(a)(iii) above. .

(d)     <u>Issuance of Shares in Exchange for Non-Cash Consideration</u>.  In the event the Board resolves that Shares shall be issued in exchange for consideration other than cash (a "<u>Share Issuance for Non-Cash Consideration</u>"), it shall provide to all of the Members a copy of such resolution which shall, at minimum, specify: (i) the number of Shares to be issued; (ii) the non-cash consideration to be received for the Shares; (iii) the valuation of the Company at the time of such resolution as well as reasonable support therefor; and (iv) all other relevant terms of the proposed Share issuance for non-cash consideration (the "<u>Share Issuance for Non-Cash Consideration Notice</u>").  If, within fourteen (14) days of receipt of the Share Issuance for Non-Cash Consideration Notice, any Member objects to the Share Issuance for Non-Cash Consideration, then the Shares subject to such Share Issuance for Non-Cash Compensation shall be issued only if such issuance has been approved by a Supermajority Interest.  Notwithstanding anything in this Section 3(d) or Agreement to the contrary, the Company shall not issue any Shares to any Affiliates in exchange for non-cash consideration.

***Section 3.3   Liability to Third Parties***.  No Member shall be liable for the debts, obligations or liabilities of the Company, including debts, obligations, or liabilities which are imposed under a judgment decree or order of a court.

***Section 3.4   Admission of Assignees or Members***.  Except as provided in the next sentence of this Section 3.4, a disposition, sale, assignment or other transfer of a Membership Interest shall not entitle the transferee to become a Member of the Company, but instead shall entitle the transferee to the right to receive distributions, allocations and other economic benefits from the Company which are attributable to the purchased Interest.  Assignees may be admitted as Members only with the consent of a Majority Interest and a majority of the Board.

***Section 3.5   Withdrawal***.  A Member does not have the right or power to withdraw from the Company as a Member.

***Section 3.6   Compensation for Members***.  No Member shall receive any compensation from the Company in such Member's capacity as a Member.  However, any Member may be employed in the business of the Company at the discretion of the Board and, in connection therewith, may receive reasonable compensation for services rendered.

***Section 3.7  Restrictions on the Disposition of an Interest***.

(a)      Except as specifically provided in this Section 3.7, a Disposition of all or any part of a Membership Interest may not be effected without the consent of a Majority Interest.  Any attempted Disposition by a Person of an interest or right, or any part thereof, in or with respect to the Company other than in accordance with this Section 3.7 shall be, and is hereby declared, null and void *ab initio*.

(b)      Provided that the consent of a Majority Interest to such Disposition has been obtained, a Member or an Assignee may Dispose of all or a portion of his Membership Interest if he, prior to making such Disposition, first offers (an "Offer") such portion of the Membership Interest (the "Offered Interest") for sale to the Company and the other Members (the "Remaining Members").  The Offer shall be made for the price and upon the terms at which the proposed Disposition is to occur (the "Proposed Price"). The Offer shall be made by written notice which shall state that the Offer is being made pursuant to this Section 3.7 and which shall set forth the Membership Percentage attributable to the Offered Interest, the name or names of the proposed purchaser or purchasers of the Offered Interest, the Proposed Price, method of payment of the Proposed Price (the "Proposed Terms"), and the scheduled date of consummation of the proposed sale.  A copy of the written offer, and any proposed sales agreement, from or with the proposed purchaser shall be attached to the Offer.  The Company shall have the option exercisable during the ensuing thirty (30) day period to accept the Offer.  If the Company does not accept the Offer, then the Remaining Members shall have the option for ten (10) days from the date of the termination of such thirty (30) day period to elect to collectively purchase all, but not less than all, of the Offered Interest, pro rata, in accordance with their relative Membership Percentages.  Any two or more Remaining Members may agree among themselves to reallocate the portions of the Offered Interest to be purchased by them from their respective pro rata portions.  The payment of the respective purchase price shall be payable pursuant to the Proposed Terms.  If neither the Company nor the Remaining Members elect to purchase all of the Offered Interest in accordance with this Section 3.7(b), then the Selling Member may sell not less than all of

the Offered Interest at any time within, but not subsequent to, sixty (60) days after the lapse of the options granted pursuant to this Section; provided, however, that such sale must be made to the third party purchaser and for the price and in accordance with the terms specified in the Offer notice.

(c)   The Company may not recognize for any purpose any purported Disposition of all or part of a Membership Interest unless and until the other applicable provisions of this Section 3.7 have been satisfied and the Company has received a document which:

(i)   has been executed by both the Member effecting the Disposition (or if the transfer is on account of the death or incapacity of the transferor, its representative) and the Person to which the Membership Interest or part thereof is Disposed;

(ii)   includes the notice address of the transferee and his or its agreement to be bound by this Agreement in respect of the Membership Interest or part thereof being acquired;

(iii)   sets forth the Membership Percentages which will be effective after the Disposition of the Member effecting the Disposition and the Person to which the Membership Interest or part thereof is Disposed (which together must total the Membership Percentage of the Member effecting the Disposition before the Disposition); and

(iv)   the Disposition was made in accordance with all applicable laws and regulations (including securities laws), including the following:

(1)   the Member effecting the Disposition and the Person to which the Membership Interest or part thereof is Disposed acknowledge and agree that the Membership Interest has not been registered under the Securities Act or applicable state securities laws and are being sold pursuant to the exemptions from registration offered by the Securities Act and by applicable state law provisions; and

(2)   the Person to which the Membership Interest or part thereof is Disposed must acknowledge and agree his understanding that, as a result of paragraph (1), immediately above, (i) he must bear the economic risk of investment in the Membership Interest for an indefinite period of time; (ii) the Membership Interest may not be sold, assigned, or transferred, nor will any assignee, vendee, transferee, or endorsee thereof be recognized as having acquired any such interests by the issuer for any purpose, unless, among other things, (x) a registration statement under the Securities Act, with respect to such Membership Interest shall then be in effect (and such transfer has been qualified under all applicable state securities laws), or (y) the availability of an exemption from such

8

**EX. 3 - 36**

registration and qualification shall be established to the satisfaction of counsel to the Company.

Each Disposition and, if applicable, admission into membership complying with the provisions of this Section 3.7(c) is effective as of the first day of the calendar month immediately succeeding the month in which the Company receives the notification of Disposition and the other requirements of this Section 3.7 have been met.

(d)    The Member effecting a Disposition and any Person admitted to the Company in connection therewith shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the Disposition or admission on or before the tenth day after the receipt by that person of the Company's invoice for the amount due.  If payment is not made by the date due, the Person owing that amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the maximum rate allowed by law.

**Section 3.8 Other Activities.** The Members acknowledge that the Members and Managers are engaged in activities other than the activities of the Company and that neither Members nor the Managers shall be expected or required to devote their full time to the management of the Company except as provided in any separate agreement or instrument.  Except as otherwise provided in this Agreement or any other agreement or instrument, participation in the Company shall not in any way act as a restraint on the other present or future business activities or investments of any Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member.  Except as otherwise provided in this Agreement or any other agreement or instrument, or to the extent required in order to not breach a Member's or Manager's duty of loyalty to the Company, no Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member shall, under any circumstances, be obligated or bound to offer or present to the Company or any of the other Members any business opportunity presented or offered to them or the Company as a prerequisite to the acquisition of or investment in such business opportunity by such Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member for its account or the account of others.  The provisions of this Section shall not serve to waive or limit the provisions of any other written agreement or instrument binding upon any Member or Manager. The Members are advised that Willis Group, LLC is involved in, and shall continue to be involved in, the business of providing information technology temporary staffing and employment services and related businesses and the Members disclaim any interest in any such businesses.

Notwithstanding anything in this Section 3.8 or any other provision in this Agreement to the contrary, under no circumstance shall any Member or Manager, or any of their respective Affiliates, engage or otherwise participate, directly or indirectly, in any business or other activity that is, or may become, competitive to the Company Business.

Each Member shall be required to execute and deliver to the Company a Confidentiality and Non-Competition Agreement as a condition of acquiring any Shares of the Company.

***Section 3.9     Purchase Options Upon the Occurrence of Certain Events***. In the event (i) a Member dies or becomes legally incapacitated, (ii) a Member institutes or there is instituted against a Member any proceeding under the United States Bankruptcy Code or any other foreign, federal or state bankruptcy, receivership, insolvency or other similar law affecting the rights of creditors generally or (iii) the spouse of a Member becomes entitled to any interest in the Shares of such Member by virtue of a divorce or property settlement agreement executed in connection with such divorce, then for a period of ninety (90) days following the date of such event, the Company shall have the right to purchase the Shares registered in the name of the deceased, incapacitated, bankrupt or divorced Member, as the case may be ("Affected Member"). The Company shall exercise its purchase right by giving written notice of such exercise to the Affected Member (or its representative) within such ninety (90) day period. If the Company does not elect to exercise its first right to purchase the Shares registered in the name of the Affected Member, for a period of thirty (30) days following the expiration of the Company first right to purchase such Shares, the Remaining Members shall have the right to purchase such Shares.  The Remaining Members shall exercise their purchase right by giving written notice of such exercise to the Affected Member (or its representative) within such thirty (30) day period.

The purchase price shall be an amount equal to the fair market value of the Shares determined by agreement of the Affected Member (or its representative) and the purchaser of the Shares ("Purchaser"); however, if the Purchaser and the Affected Member (or its representative) do not agree on such fair market value on or before fifteen (15) days following the exercise of the purchase right, then the fair market value of each share of Shares shall be equal to the Appraised Value of each Share of the Company as determined by an appraisal of the Shares (the "Appraised Value") by an accounting firm or any other qualified appraiser selected by the Manager.

The appraisal shall determine the Appraised Value of the Shares as of the end of the most recently completed calendar quarter.  The Appraised Value shall be the maximum amount that would be distributed in respect of the Shares in any Distribution Event if (i) all of the Company's assets were sold at their fair market value, (ii) the Company was liquidated and all liabilities and obligations of the Company are paid, including, without limitation, liabilities and obligations to Members, and (iii) the proceeds of such liquidation were distributed to the Members pursuant to this Agreement.  A "Distribution Event" means (i) any winding up or liquidation of Company and (ii) any merger, consolidation or other transaction pursuant to which all of the Company's Shares are converted into or exchanged for cash, securities of another entity, real or other property or any other consideration. The cost of the appraisal shall be divided equally between the Purchaser and the Affected Member.

The sale and purchase of Shares under this Section shall be closed within sixty (60) days from the date of the receipt by the Affected Member (or its representative) of the last notice from the Purchaser and the Affected Member (or its representative) shall deliver a written assignment of the Shares at the closing of the sale and purchase of the Shares, free and clear of all liens. The Purchaser shall pay the purchase price for the Shares by making a down payment of 25% of the purchase price at the closing of the sale and purchase of the Shares, with the balance to be paid in

three equal cash installments, (together with accumulated interest on the amount unpaid at the interest rate of 5% per annum) due on each of the first three anniversaries of the closing.

**ARTICLE IV**
**Capital Contributions**

*Section 4.1  Initial Capital Contributions.*

The initial Members of the Company and the number of Shares held by the initial Members are as set forth on Schedule A to this Agreement.  New Members shall be added to Schedule A from time-to-time in exchange for their initial Capital Contribution.  No Member shall be obligated to make any further Capital Contributions to the Company other than their initial Capital Contribution.

*Section 4.2  Return of Contributions.*  A Member is not entitled to the return of any part of its Capital Contribution.  An unpaid Capital Contribution is not a liability of the Company or of any Member. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

*Section 4.3  Advances by Members.*  If the Company does not have sufficient cash to pay its obligations, any Member(s) that may agree to do so with the consent of the Board may advance all or part of the needed funds to or on behalf of the Company under such terms and conditions as shall be agreed to by the Board and the advancing Member.

*Section 4.4  Capital Accounts.*  The provisions of this Section 4.4 shall apply whenever the Company is treated as a partnership for federal income tax purposes.  A Capital Account shall be established and maintained for each Member.  Each Member's Capital Account:

    (a)    shall be increased by:

        i)    the amount of money contributed by that Member to the Company,

        ii)    the agreed value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Tax Code), and

        iii)    allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treasury Regulation Section 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation Section 1.704-(b)(4)(i); and

    (b)    shall be decreased by:

        i)    the amount of money distributed to that Member by the Company,

**EX. 3 - 39**

ii)      the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under Section 752 of the Tax Code),

iii)     allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Tax Code, and

iv)     allocations of Company losses and deductions (or items thereof), including losses and deductions described in Treasury Regulation Section 1.704-1(b)(2)(iv)(g), but excluding items described in clause (b)(iii) above and losses or deductions described in Treasury Regulation Section 1.704-1(b)(4)(i) or Section 1.704(b)(4)(iii).

The Members' Capital Accounts also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation Section 1.704-(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation Sections 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Treasury Regulation Section 1.704-1(b)(2)(iv)(g).  A Member that has more than one Membership Interest shall have a single Capital Account that reflects all its Membership Interests, regardless of the class of Membership Interests owned by that Member and regardless of the time or manner in which those Membership Interests were acquired.  On the transfer of all or part of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(l).

## ARTICLE V
## Allocations and Distributions

**Section 5.1     Allocations**. Subject to Section 5.3, net income (and items thereof) and net loss (and items thereof) for any fiscal year shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after giving effect to such allocation, is, as nearly as possible, equal (proportionately) to the amount of the distributions that would be made to such Member during such fiscal year pursuant to Section 5.2, determined as if (i) the Company were dissolved and terminated; (ii) its affairs were wound up and each Company asset was sold for cash equal to its book value; (iii) all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the book value of the assets securing such liability); and (iv) the net assets of the Company were distributed in accordance with Section 5.2 to the Members.

**Section 5.2     Distributions**. Distributions shall be made to the Members at such times as determined by the Board in the following priority:

(a)      If the Members have taxable income attributable to their ownership of any Shares for a taxable year, the Company shall distribute to the Members, in accordance with their

Membership Percentages, subject to any contractual restrictions, limitations or conditions affecting the Company, an amount of distributions ("Tax Distributions") equal to the estimated maximum federal and state income and (if applicable) franchise and margin tax rates applicable to the Members and their equity interest owners times the aggregate taxable income of the Members from the Company for that taxable year. Any Tax Distributions shall be applied to reduce subsequent distributions to such Member under Section 5.2(b).

(b)     Thereafter, all remaining cash of the Company shall be distributed to the Members in accordance with their respective Membership Percentages as of such distribution date.

### Section 5.3 Special Allocations and Tax Allocations.

(a)     Special Allocations.   The following special allocations shall be made in the following order:

(i)     Minimum Gain Chargeback.   Notwithstanding any other provision of this Article, if there is a net decrease in partnership minimum gain (as defined in Treasury Regulations Section 1.704-2(b)(2) and (d)) during any fiscal year, the Members shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in partnership minimum gain, determined in accordance with Treasury Regulations Section 1.704-2(f) and (g).  This Section 5.3(a)(i) is intended to comply with the minimum gain chargeback requirement in such section of the Treasury Regulations and shall be interpreted consistently therewith.

(ii)     Member Minimum Gain Chargeback.   Notwithstanding any other provision of this Article 5, if there is a net decrease in Member nonrecourse debt minimum gain attributable to a Member nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(i)) during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Member nonrecourse debt minimum gain attributable to such Member's nonrecourse debt, determined in accordance with Treasury Regulations Section 1.704-2(i).  This Section 5.3(a)(ii) is intended to comply with the minimum gain chargeback requirement in such section of the Treasury Regulations and shall be interpreted consistently therewith.

(iii)     Qualified Income Offset.   In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit, if any, in such Member's capital account (as determined under Treasury Regulations Section 1.704-1) as quickly as possible; *provided that* an allocation pursuant to this Section 5.3(a)(iii) shall be made only if and to the extent that such Member would have such capital account deficit after all other allocations provided for in Section 5.3(a) have been tentatively made as if this Section 5.3(a)(iii) were not in this Agreement.  This Section

5.3(a)(iii) is intended to comply with the qualified income offset provisions in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(iv)    Gross Income Allocation.  In the event any Member has a deficit balance in such Member's capital account (as determined after crediting such capital account for any amounts that such Member is obligated to restore or is deemed obligated to restore pursuant to Treasury Regulations Section 1.704-2), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such deficit (as so determined) of such Member's capital account as quickly as possible; *provided that* an allocation pursuant to this Section 5.3(a)(iv) shall be made only if and to the extent that such Member would have such capital account deficit (as so determined) after all other allocations provided for in Section 5.3(a) (other than Section 5.3(a)(iii)) have been tentatively made as if this Section 5.3(a)(iv) were not in this Agreement.

(v)    Loss Allocation Limitation.  No allocation of net loss (or items thereof) shall be made to any Member to the extent that such allocation would create or increase a deficit in such Member's capital account (as determined after debiting such capital account for the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) and crediting such capital account for any amounts that such Member is obligated to restore or is deemed obligated to restore pursuant to Treasury Regulations Section 1.704-2).

(b)    Tax Allocations

(i)    General Rules.  Except as otherwise provided in Section 5.3(b)(ii), for each fiscal period, items of Company income, gain, loss, deduction and expense shall be allocated, for federal, state and local income tax purposes, among the Members in the same manner as the net income (and items thereof) or net loss (and items thereof) of which such items or components were allocated pursuant to Section 5.1.

(ii)    Section 704(c) of the Tax Code.  Income, gains, losses and deductions with respect to any property (other than cash) contributed or deemed contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of the contribution or deemed contribution in accordance with Section 704(c) of the Tax Code and the Treasury Regulations promulgated thereunder.

If there is a revaluation of Company property, subsequent allocations of income, gains, losses or deductions with respect to such property shall be allocated among the Members so as to take account of any variation between the adjusted tax basis of such property to the Company for federal income tax purposes and its fair market value in accordance with Section 704(c) of the Tax Code and the Treasury Regulations promulgated thereunder.

(iii)    Capital Accounts Not Affected.  Allocations pursuant to this Section 5.3(b) are solely for federal, state and local tax purposes and shall not affect, or in any way be taken into account in computing, any Member's capital account or allocable share of net income (or items thereof) or net loss (or items thereof).

## ARTICLE VI
## Board of Managers

**Section 6.1 Board of Managers; Qualification and Election; General Powers.** The Board of Managers of the Company ("Board") shall initially be comprised of two (2) Managers, whose names are set forth on Schedule B to this Agreement. The number of Managers may be changed from time to time by resolution of the Board. The Managers shall be elected at the annual meeting of the Members or at a special meeting of the Members called for that purpose, beginning with the 2017 annual meeting of the Members. Cumulative voting shall be allowed in the election of Managers, and each Member shall have one vote for each Share held by such Member, multiplied by the number of Managers to be elected. A Member shall be entitled to accumulate his votes and distribute his votes among any number of Managers nominees. Each Manager elected shall hold office until a successor shall be elected and shall qualify, or until his death, resignation, or removal in the manner herein provided. Any Manager may be removed as such, either with or without cause, by action of the Members who voted for the election of such Manager. The Managers shall have full, exclusive and complete discretion in the management and control of the business of the Company and may bind the Company based on the signature of a duly authorized individual acting on behalf of the Board. Except for situations in which approval of the Members is required by this Agreement or by non-waivable provisions of applicable law, the powers of the Company shall be exercised under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Board of the Company

**Section 6.2 Vacancy.** Any vacancy occurring among the Managers shall be filled by a vote of a Majority Interest. A Manager elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office and until his successor is elected, or his earlier death, resignation or removal.

**Section 6.3 Action by the Managers.** The Managers shall act as a Board, and each Manager shall have one vote with respect to all matters to be decided by the Board. The act of a majority of the Managers then serving shall be the act of the Managers. No Manager or Member shall take any action with respect to the management of the Company or act as an agent of the company for purposes of carrying out the Company's business and affairs, without the consent or authorization of Board, except as provided in this Agreement.

**Section 6.4 Annual Meetings.** The annual meeting of the Board shall be held immediately following the annual meeting of Members, and at the same place at which the annual meeting of Members is held.

**Section 6.5 Special Meetings.** Special meetings of the Board may be called by the Managers or any Member. The Person calling the meeting may fix any place for holding the meeting. Notice of each special meeting of the Board shall be given to each Manager at least three days before the date of the meeting, in writing. Except as may be otherwise provided by law, the Certificate, or this Agreement, neither the business to be transacted at, nor the purpose of, any special meeting need be specified in the notice or waiver of notice of such meeting.

**Section 6.6    Written Consent**.   Any action required or permitted to be taken at a meeting of the Board may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by at least the minimum number of Managers necessary to take action at a meeting at which all Managers were present and voted.

**Section 6.7    Quarterly Operating Budgets**. Beginning October 1, 2016 and no later than fifteen (15) days prior to the end of each calendar quarter thereafter, the Board shall approve and adopt a quarterly operating budget ("Quarterly Operating Budget") setting forth the estimated receipts and expenditures of the Company for the succeeding calendar quarter. No expenditures exceeding a 10% variance from the approved Budget may be made by the Company without the approval of the Board.

# ARTICLE VII
## Officers

**Section 7.1   Appointment**. .   The Board may but shall not be required to designate individuals to serve as officers of the Company as the Board shall determine from time to time, including but not limited to a President and one or more Vice Presidents.  The initial President of the Company shall be Mark A. Willis. No officer need be a resident of the state of Texas, a Member or a Manager.   Any officers so designated shall have such authority to perform such duties as the Board may, from time to time, delegate to them.   The Board may assign titles to particular officers.   Unless the Board decides otherwise, if the title is one commonly used for officers of a corporation formed under the Code, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Board pursuant to the third sentence of this Section 7.1.   Each officer shall hold office until his successor shall be duly designated and shall qualify or until his death or until he shall resign or shall have been removed in the manner hereinafter provided.   Any number of offices may be held by the same individual.   The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Board.

**Section 7.2  Resignation**.  Any officer may resign as such at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Board.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.  Any officer may be removed as such, either with or without cause, by the Board whenever in their judgment the best interests of the Company will be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the Person so removed.  Designation of an officer shall not be deemed of itself to create contract rights on the part of any person.  Any vacancy occurring in any office of the Company (other than Managers) may be filled by the Managers.

## ARTICLE VIII
## Meetings of Members

*Section 8.1 Meetings.*

(a)     A quorum shall be present at a meeting of Members if the holders of a Majority Interest are represented at the meeting in person or by proxy. Except as specifically provided herein, with respect to any matter considered at such a meeting the affirmative vote of a Majority Interest shall be the act of the Members.

(b)     All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or without the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meeting by means of conference telephone or similar communications equipment pursuant to Section 8.5.

(c)     Notwithstanding the other provisions of the Certificate or this Agreement, the chairman of the meeting appointed pursuant to Section 8.4 or the holders of a Majority Interest shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the remainder of the adjourned meeting.  If such meeting is adjourned, such time and place shall be determined by a vote of the holders of a Majority Interest.  Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d)     An annual meeting of the Members shall be held at such place, within or without the state of Texas, on such date and at such time as a Majority Interest shall fix and set forth in the notice of the meeting, which date shall be within thirteen (13) months subsequent to the date of formation of the Company or the last annual meeting of Members (whichever most recently occurred.)

(e)     Special meetings of the Members for any proper purpose or purposes may be called at any time by the owners of Membership Interests holding at least twenty percent (20%) of the Membership Percentages of all Members.  If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting.  Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

(f)     Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) days nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the Member calling the meeting, to each Member entitled to vote at such meeting.  If mailed, any such notice shall be deemed to be delivered when deposited in the mail, addressed to the Member at his address provided for in Section 13.2, with postage thereon prepaid.

**Section 8.2     *Voting List*.** The Board shall make, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of and the Membership Percentages held by each, which list, for a period of ten (10) days prior to such meeting, shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours.  Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting.  The original membership records shall be prima facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members.  Failure to comply with the requirements of this Section shall not affect the validity of any action taken at the meeting.

**Section 8.3     *Proxies*.** A Member may vote either in person or by proxy executed in writing by the Member.  A telegram, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section.  Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Members, before or at the time of the meeting or execution of the written consent, as the case may be.  No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy.  A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest.

**Section 8.4     *Conduct of Meetings*.** All meetings of the Members shall be presided over by the chairman of the meeting, who shall be a Member (or representative thereof) designated by a Majority Interest.  The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him in order.

**Section 8.5     *Action by Written Consent or Telephone Conference*.**

(a)     Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing setting forth the action so taken, shall be signed by the holder or holders of not less than the minimum Membership Interests that would be necessary to take such action at a meeting at which the holders of all Membership Interests entitled to vote on the action were present and voted.  Every written consent shall bear the date of signature of each Member who signs the consent.  No written consent shall be effective to take the action that is the subject to the consent unless,

within sixty (60) days after the date of the earliest dated consent delivered to the Company in the manner required by this Section, a consent or consents signed by the holder or holders of not less than the minimum Membership Interests that would be necessary to take the action that is the subject of the consent are delivered to the Company by delivery to its registered office or its principal place of business. Delivery shall be by hand or certified or registered mail, return receipt requested. A telegram, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member shall be regarded as signed by the Member for purposes of this Section. Prompt notice of the taking of any action by Members without a meeting by less than unanimous written consent shall be given to those Members who did not consent in writing to the action.

(b)     The record date for determining Members entitled to consent to an action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office or its principal place of business. Delivery shall be by hand or by certified or registered mail, return receipt requested.

(c)     Members may participate in and hold a meeting by means of conference, telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

## ARTICLE IX
## Indemnification

**Section 9.1     Exculpation.**     Neither any Manager, any Member nor any Person appointed to act as liquidator under Article XII (each a "Covered Person") shall be liable to the Company or any Member under any theory of law, including tort, contract or otherwise (INCLUDING A COVERED PERSON'S OWN NEGLIGENCE) for any loss, damage or claim incurred by reason of any act or omission by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, including any such loss, damage or claim attributable to errors in judgment, negligence or other fault of such Covered Person, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of gross negligence, willful misconduct, intentional misrepresentation or breach of duty of loyalty of such Covered Person. A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

**Section 9.2    *Right to Indemnification*.**    Subject to the limitations and conditions as provided in this Article IX, each Manager who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a "*Proceeding*"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she is acting on behalf of the Company or was serving at the request of the Company as a manager, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise, shall be indemnified by the Company to the fullest extent permitted by the Code, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorneys' fees) actually incurred by such Manager in connection with such Proceeding, and indemnification under this Article IX shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder.  The rights granted pursuant to this Article IX shall be deemed contract rights, and no amendment, modification or repeal of this Article IX shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal.  **It is expressly acknowledged that the indemnification provided in this Article IX could involve indemnification for negligence of the Manager or under theories of strict liability.**

**Section 9.3    *Advance Payment*.**    The right to indemnification conferred in this Article IX shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by the Manager of the type entitled to be indemnified under Section 9.1 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Manager's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Manager in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such Manager of his or her good faith belief that he has met the standard of conduct necessary for indemnification under this Article IX and a written undertaking, by or on behalf of such Manager, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Manager is not entitled to be indemnified under this Article IX or otherwise.

**Section 9.4    *Indemnification of Officers, Employees and Agents*.**    The Company, by adoption of a resolution of a Majority Interest, may indemnify and advance expenses to any other manager, officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Managers under this Article IX; and, the Company may indemnify and advance expenses to Persons who are not or were not Managers, officers, employees or agents of the Company but who are or were serving at the request of the Company as a manager, officer, partner, venturer, proprietor, trustee, employee, agent of similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other

enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a Person to the same extent that it may indemnify and advance expenses to Managers under this Article IX.

**Section 9.5    *Nonexclusivity of Rights*.**    The right to indemnification and the advancement and payment of expenses conferred in this Article IX shall not be exclusive of any other right which a Manager or other Person indemnified pursuant to this Article IX may have or hereafter acquire under any law (common or statutory), provision of the Certificate or this Agreement, agreement or vote of Manager or disinterested Members or otherwise.

**Section 9.6    *Insurance*.**    The Company may purchase and maintain insurance, at its expense, to protect itself and any Person who is or was entitled to indemnification pursuant to this Article IX.

**Section 9.7    *Member Notification*.**    To the extent required by law, any indemnification of or advance of expenses to a Person in accordance with this Article IX shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the 12-month period immediately following the date of the indemnification or advance.

**Section 9.8    *Savings Clause*.**    If this Article IX or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Person indemnified pursuant to this Article IX as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative, to the full extent permitted by any applicable portion of this Article IX that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE X
## Books, Records, Fiscal Year, Accounting and Reports

**Section 10.1    *Books and Records*.**    The Board shall keep proper and complete records and books of account, in which shall be entered fully and accurately all transactions and other matters relative to the Company's business as are usually entered into records and books of account maintained by Persons engaged in business of a like character. The books and records of the Company shall at all times be maintained at the principal office of the Company and shall be open to the reasonable inspection and examination of any Member or his duly authorized representative during normal business hours for any proper purpose upon not less than five Business Days advance written notice to the Board.

**Section 10.2    *List of Members*.**    As part of its books and records, the Board shall maintain a current, alphabetical and readily readable list of the names, addresses and business telephone numbers of the Members, along with the number of Shares held by Members and all other information required to be maintained to reflect transfers of the Shares.

**EX. 3 - 49**

*Section 10.3   Fiscal Year*.  The fiscal year of the Company shall be the calendar year.

*Section 10.4   Method of Accounting*.  The books of the Company shall be kept in accordance with the method of accounting used for federal income tax reporting purposes.

*Section 10.5   Reports to Investor Members*.  Within One Hundred Twenty (120) days after the end of each fiscal year, the Board shall use its best efforts to distribute to all Members an annual report containing:

      (a)     Unaudited financial statements of the Company (consisting of a balance sheet, statement of income, statement of members' capital and a statement of cash flow); and

      (b)     A report of the activities of the Company during the period covered by the report, including distributions to the Members for the period covered thereby.

## ARTICLE XI
### Tax Returns, Tax Elections and Audits

*Section 11.1   Filing of Company Tax Returns*.  The Company shall file income tax returns required by the Code and all returns required to be filed by the jurisdictions in which the Company does business or derives income.

*Section 11.2   Filing of Members' Tax Returns*.  Each Member shall be responsible for the preparation and filing of their own federal, state and local tax returns.  Within ninety (90) days of the close of each fiscal year of the Company, the Board shall use its best efforts to furnish all Members all information pertaining to the Company necessary for the preparation of their tax returns for the year then ended.

*Section 11.3   Tax Elections*.

      (a)     The Board shall not elect to exclude the Company from the provisions of Subchapter K of Chapter 1 of Subtitle A of the Tax Code.

      (b)     If any Member's interest in the Company is transferred, in whole or in part, the Company may elect, in the Board's sole discretion, to adjust the basis of the Company's property under Tax Code Section 754.  Each Member shall furnish the Company any information necessary to give effect to such election.

      (c)     All elections required or permitted to be made by the Company under the Code and the Treasury Regulations shall be made by the Manager in such manner as will, in the opinion of the Accountants, be most advantageous to the Members.

*Section 11.4   Designation of Tax Matters Partner*.  Willis Group, LLC is hereby designated as Tax Matters Partner pursuant to Tax Code Section 6231(a)(6).  In the event that Willis Group, LLC  transfers or conveys its entire interest in the Company or resigns or

withdraws, the Manager shall appoint a new Tax Matters Partner; provided, however, that no appointment shall be effective if, in the opinion of counsel for the Company, such appointment shall have the effect of causing the Company to be classified for federal income tax purposes as an association taxable as a corporation or shall have the effect of causing the Company to be classified as a general partnership under the laws of Texas or any jurisdiction in which the Company is conducting business.

**Section 11.5    Commencement of Administrative Proceedings**.  Pursuant to Tax Code Section 6223(c)(3), upon receipt of notice from the Internal Revenue Service of the beginning of an administrative proceeding with respect of the Company, the Tax Matters Partner shall furnish the Internal Revenue Service the names, addresses and profit interests of each of the Members.

**Section 11.6    Settlement Agreements; Judicial Review**.  The Tax Matters Partner shall not enter into a settlement agreement pursuant to Tax Code Section 6224 without providing all other Members at least thirty (30) days' prior written notice of the terms of the proposed settlement.  If the Tax Matters Partner receives from the Internal Revenue Service a "final partnership administrative adjustment" pursuant to Tax Code Section 6223, and if the Tax Matters Partner determines to seek judicial review pursuant to Tax Code Section 6226, the Tax Matters Partner shall select the forum for judicial review.

**Section 11.7    Indemnification of Tax Matters Partner**.  The Company shall indemnify and hold the Tax Matters Partner harmless against any claim, loss, liability, cost or expense resulting from its serving as Tax Matters Partner hereunder, provided that such claim, loss, liability, cost or expense does not result from willful misconduct.

## ARTICLE XII
## Event Requiring A Winding Up, Liquidation, and Termination

**Section 12.1    Event Requiring A Winding Up**.  The Company shall wind up its affairs on the first to occur of the following (a "Event Requiring A Winding Up"):

(a)    the written consent of the Board and a Majority Interest;

(b)    the date the Company has no Members; or

(c)    the entry of a decree of an Event Requiring A Winding Up of the Company under Section 11.301 of the Code.

**Section 12.2    Liquidation and Termination**.    Upon the occurrence of an Event Requiring A Winding Up of the Company, a Majority Interest shall elect one or more Members as liquidator.  The liquidator shall proceed to diligently wind up the affairs of the Company and make final distributions as provided herein and in the Code.    The costs of liquidation shall be borne as a Company expense.  Until final distribution, the liquidator shall continue to operate the Company properties.  The steps to be accomplished by the liquidator are as follows:

(a)      as promptly as possible after an Event Requiring A Winding Up and again after final liquidation, the liquidator shall cause a proper accounting to be made of the Company's assets, liabilities, and operations through the last day of the calendar month in which the winding up occurs or the final liquidation is completed, as applicable;

(b)      the liquidator shall cause the notice described in the Code to be mailed to each known creditor of and claimant against the Company in the manner described in the Code;

(c)      the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d)      all remaining assets of the Company shall be distributed to the Members as provided in this Agreement.

**Section 12.3   Certificate of Termination.**   On completion of the distribution of Company assets as provided herein, the Company is terminated, and the liquidator (or such other Person or Persons as the Code may require or permit) shall file a Certificate of Termination with the Secretary of State of Texas, and take such other actions as may be necessary to terminate the legal existence of the Company.

**Section 12.4   Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, the deficit, if any, in the Capital Account of any Member shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

**Section 12.5   Accounting.**   The liquidating trustee shall provide the Members with a proper accounting of the assets, liabilities and operations of the Company through the last day of the month in which the final liquidating distribution occurs.

## ARTICLE XIII
## General Provisions

**Section 13.1   Offset.**   Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company shall be deducted from that sum before payment.

**Section 13.2   Notices.**   Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a

notice, request, or consent given under this Agreement is effective on receipt by the Person to receive it. All notices, requests, and consents to be sent to a Member must be sent to or made at the address or telefax number for that Member set forth in the records of the Company, or such other address or telefax number as that Member may specify by notice to the other Members. Any notice, request, or consent to the Company must be sent to or made at the address or telefax number for that Member as set forth in the records of the Company or such other address for as the Company may specify by notice to the Members. Whenever a notice is required to be given by law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

**Section 13.3   *Entire Agreement*.** This Agreement and any agreements referenced herein constitute the entire agreement of the Members relating to the Company, the Company Business and the Area of Mutual Interest and supersedes all prior contracts or agreements with respect to the Company, the Company Business and the Area of Mutual Interest, whether oral or written.

**Section 13.4   *Effect of Waiver or Consent*.** A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

**Section 13.5   *Amendment or Modification*.** This Agreement may be amended or modified from time to time only by a written instrument adopted by the Board and executed and agreed to by a Majority Interest.

**Section 13.6   *Binding Effect*.** Subject to the restrictions on Dispositions set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.

**Section 13.7   *Governing Law; Severability*.** THIS COMPANY AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, U.S.A., EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS COMPANY AGREEMENT TO THE LAW OF ANOTHER JURISDICTION. In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Certificate, or (b) any mandatory provision of the Code, the applicable provision of the Certificate or the Code shall control. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances it not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

*Section 13.8   Further Assurances*.   In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

*Section 13.9   Waiver of Certain Rights*.   Each Member irrevocably waives any right it may have to maintain an action for the winding up of the Company or for partition of the property of the Company.

*Section 13.10  Indemnification*.   To the fullest extent permitted by law, each Member shall indemnify the Company, and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement or on account of any business activities conducted by that Member or its affiliates prior to the Effective Date of this Agreement.

*Section 13.11 Notice to Members of Provisions of this Agreement*.   By executing this Agreement, each member acknowledges that it has actual notice of (a) all of the provisions of this Agreement, including, without limitation, the restrictions on the transfer of Membership Interests set forth in Article III, and (b) all of the provisions of the Certificate.  Each Member hereby agrees that this Agreement constitutes adequate notice of all such provisions, and each Member hereby waives any requirement that any further notice thereunder be given.

*Section  13.12  Counterparts*.   This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document.  All counterparts shall be construed together and constitute the same instrument.

*Section 13.13 Cross-references*.   References in this Agreement to Articles, Sections, Exhibits, or Schedules shall be deemed to be references to Articles, Sections, Exhibits, and Schedules of this Agreement unless the context specifically and expressly requires otherwise.

*Section 13.14 Legal Representation.*   Each Member hereby acknowledges that the Members have been advised that the Members should seek and have had the opportunity to seek independent legal counsel to review this Agreement and all related documents on the Member's behalf and to obtain the advice of such legal counsel relating to such documentation.  Each Member further acknowledges and agrees that the law firm of Doherty & Doherty LLP are legal counsel solely to Willis Group, LLC with respect to this Agreement.

*Section 13.15 Construction*.   Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter.  Except to the extent the context specifically indicates otherwise, all references to Certificate and Sections refer to articles and sections of this Agreement, and all references to Exhibits refer to Exhibits attached hereto, each of which is made a part hereof for all purposes.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the Managers and Members have executed this Agreement as of Effective Date.

MANAGERS:

_____
Mark A. Willis

_____
Thomas P. Tatham

Member Signatures Follow:

FOUNDING MEMBERS:

HOPEWELL WILLIS HOLDINGS LLC

By:_____

WILLIS GROUP, LLC

By:_____

HOPEWELL TATHAM HOLDINGS LLC

By:_____

LNG PARTNERS, LLC

By:_____
    Managing Director

_____
MARK BUSH

## MEMBER SIGNATURE PAGE

The undersigned Member of **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company (the "Company"), does hereby execute this signature page to be attached to that certain Third Amended and Restated Company Agreement for the Company and agrees to be bound by all of the terms and provisions of such Agreement.

Hopewell Willis Holdings, LLC

By: _____
    Mark A. Willis

*Address:* 1400 Post Oak Blvd. Suite 200
          Houston, TX 77027

## MEMBER SIGNATURE PAGE

  The undersigned Member of **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company (the "Company"), does hereby execute this signature page to be attached to that certain Third Amended and Restated Company Agreement for the Company and agrees to be bound by all of the terms and provisions of such Agreement.

By: _____

  Gil Lopez III

*Address:* 16522 Champions Cove Circle
     Spring, TX 77379

## MEMBER SIGNATURE PAGE

The undersigned Member of **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company (the "Company"), does hereby execute this signature page to be attached to that certain Third Amended and Restated Company Agreement for the Company and agrees to be bound by all of the terms and provisions of such Agreement.

*By:* _____
Michael Casey Foran

*Address:* 200 Lamont Ave.
San Antonio, TX 78209

## MEMBER SIGNATURE PAGE

The undersigned Member of **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company (the "Company"), does hereby execute this signature page to be attached to that certain Third Amended and Restated Company Agreement for the Company and agrees to be bound by all of the terms and provisions of such Agreement.

Foran Ltd.

By: _____
    Michael C. Foran, President

*Address:* 200 Lamont Ave.
         San Antonio, TX 78209

## MEMBER SIGNATURE PAGE

The undersigned Member of **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company (the "Company"), does hereby execute this signature page to be attached to that certain Third Amended and Restated Company Agreement for the Company and agrees to be bound by all of the terms and provisions of such Agreement.

*Name:* Michael J. Willis

*Address:* 1400 Post Oak Blvd
Suite 200
Houston, Tx 77056

## MEMBER SIGNATURE PAGE

The undersigned Member of **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company (the "Company"), does hereby execute this signature page to be attached to that certain Third Amended and Restated Company Agreement for the Company and agrees to be bound by all of the terms and provisions of such Agreement.

South Padre Gas Partners, L.P.

By: _____

Thomas P. Tatham, Managing Director

*Address:* 1400 Post Oak Blvd. Suite 200
Houston, TX 77056

## MEMBER SIGNATURE PAGE

The undersigned Member of **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company (the "Company"), does hereby execute this signature page to be attached to that certain Third Amended and Restated Company Agreement for the Company and agrees to be bound by all of the terms and provisions of such Agreement.

Name: THOMAS TRENT STOUT

Address: 701 BRIN WALR CIR
HOUSTON TX, 77024

29

## MEMBER SIGNATURE PAGE

The undersigned Member of **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company (the "Company"), does hereby execute this signature page to be attached to that certain Third Amended and Restated Company Agreement for the Company and agrees to be bound by all of the terms and provisions of such Agreement.

EnSource Investments, LLC

By: _____

Justin Pannu, Manager

*CLIFF SHARP*

*Address:* 700 W. E Street, #3804
San Diego, CA 92101

1

**EX. 3 - 64**

**SCHEDULE A**
**Member Information**

| Name and Address of Each Member | Founders Shares | Initial Ownership Percentage | Initial Additional Equity Shares** | Capital Contribution Paid for Initial Additional Equity Shares | Adjusted Ownership Percentage after issue of Initial Additional Equity Shares*** |
|---|---|---|---|---|---|
| **Willis Group Members:** | | | | | |
| **Hopewell Willis Holdings, LLC** 1400 Post Oak Blvd. Suite 200 Houston, TX 77056 | 450,000 | 45% | 50,000 | $100,000 | 34.25% |
| **Willis Group LLC** 1400 Post Oak Blvd. Suite 200 Houston, TX 77056 | 225,000 | 22.5% | | | 15.41% |
| **Tatham Group Members:** | | | | | |
| **Hopewell Tatham Holdings LLC** 1400 Post Oak Blvd. Suite 200 Houston, TX 77056 | 112,500 | 11.25% | | | 7.71% |
| **LNG Partners, LLC** 600 Travis St. Suite 5900 Houston, TX 77002 | 112,500 | 11.25% | | | 7.71% |
| **Mark A. Bush** 5868 Westheimer, Apt 458 Houston, TX 77057 | 100,000 | 10% | | | 6.84% |

| Initial New Members: | | | | | |
|---|---|---|---|---|---|
| Gil Lopez III<br>16522 Champions Cove Circle<br>Spring, TX 77379 | | | 25,000 | $50,000 | 1.71% |
| Michael Casey Foran<br>200 Lamont Ave.<br>San Antonio, TX 78209 | | | 17,500 | $35,000 | 1.20% |
| Foran Ltd.<br>200 Lamont Ave.<br>San Antonio, TX 78209 | | | 12,500 | $25,000 | 0.86% |
| Michael T. Willis<br>1400 Post Oak Blvd.<br>Suite 200<br>Houston, TX 77056 | | | 15,000 | $30,000 | 1.03% |
| South Padre Gas Partners, L.P.<br>10 S. Briar Hollow Ln., #30<br>Houston, TX 77027 | | | 25,000 | $50,000 | 1.71% |
| Thomas Trent Stout<br>231 Bryn Mawr Cir.<br>Houston, TX 77024 | | | 50,000 | $100,000 | 3.42% |
| EnSource Investments, LLC | | | 265,000 | $530,000 | 18.15% |
| Totals | 1,000,000 | 100% | 460,000 | $920,000 | 100% |

\* 1,000,000 Founders Shares allocated among Willis Group Members, Tatham Group Members and Mark A. Bush

\*\* Initial Additional Equity Shares subscribed by Founding Members and Initial New Members

\*\*\* Rounded to nearest 1/100th of one per cent (.01%)

**EX. 3 - 66**

**SCHEDULE B**
**Board of Managers**


Mark A. Willis

Thomas P. Tatham