SULLIVAN HILL REZ & ENGEL
A Professional Law Corporation
Shannon D. Sweeney, SBN 204868
E-mail: Sweeney@sullivanhill.com
600 B Street, Suite 1700
San Diego, California 92101
Telephone: (619) 233-4100
Fax Number: (619) 231-4372

Attorneys for Defendants,
MARK A. WILLIS; BEYOND REVIEW, LLC;
IMAGE ENGINE, LLC; and WILLIS GROUP, LLC

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENSOURCE INVESTMENTS LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> THOMAS P. TATHAM, an individual; MARK A. WILLIS, an individual; PDP MANAGEMENT GROUP, LLC, a Texas limited liability company; TITLE ROVER, LLC, a Texas limited liability company; BEYOND REVIEW, LLC, a Texas limited liability company; IMAGE ENGINE, LLC, a Texas limited liability company; WILLIS GROUP, LLC, a Texas limited liability company; and DOES 1-50, <br><br> Defendants. | CASE NO. 17CV0079 H LL <br><br> **DECLARATION OF MARK A WILLIS IN SUPPORT OF WILLIS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION** <br><br> DATE:     December 9, 2019 <br> TIME:      10:30 a.m. <br> JUDGE:    Hon. Marilyn L. Huff |

I, Mark A. Willis, declare as follows:

1.    I am the principal at the Willis Group, and I was one of the managers of both Hopewell-Pilot Project, LLC ("Hopewell") and Title Rover, LLC before they both went bankrupt. I make this declaration based on matters within my personal

1  knowledge, and if called, would and could testify to the matters stated herein.

2      2.    In early 2016, I was presented with an interesting potential business

3  opportunity from a well-known oil and gas title expert named Greg Kane. Greg Kane

4  is a former partner at Sigmund Kane & Hatch, a prominent oil and gas exploration and

5  development company. Greg and I had been acquaintances for nearly two decades

6  when he approached me with the oil and gas leasing opportunity that we are in

7  litigation over today. The opportunity arose because there was a tremendous downturn

8  in the pricing of oil and gas in 2015, it was believed that there might be an opportunity

9  to pick up oil and gas leases in a very prolific oil field in Texas. In the area, title was

10 complicated because it was so highly fragmented. We realized that there were pockets

11 of land and mineral leases inside existing oil and gas units that had not actually been

12 leased. We believed such pockets of land were primarily unleased because of

13 complicated title issues, or perhaps title mistakes or defects. The idea was that if we

14 could identify the open leases, and since the oil and gas company already drilled the

15 well and formed a legal oil and gas unit, and we could purchase the open acreage

16 within that unit, then we could join the active unit for the cost of the land opposed to

17 the actual drilling cost. We believed once we aggregated enough acreage, we could

18 sell it back to the operator of the unit, participate in the exploration of the unit, or sell

19 to a 3rd Party.  Upon learning about this opportunity, I, Thomas Tatham ("Tatham"),

20 and several oil and gas landmen, did extensive research about the proposed oil field,

21 the infrastructure already on such land, and the process for identifying title and title

22 defects. I believe I was qualified to assess this opportunity because of my background.

23     3.    Among other things, I have extensive experience in the oil and gas

24 industry. Starting in 1997, I was the chairman of an oil and gas company called Core

25 Energy. The company did traditional oil and gas exploration, and were working with

26 new 3D seismic technology to locate oil. I used the experience I gleaned at Core

27 Energy to also evaluate other oil and gas companies. I identified and acquired dozens

28

of parcels and helped companies permit an oil well on such parcels before I would sell the land. I was successful in identifying and purchasing productive oil-rich land for about a decade, including spending a year and a half focused on nothing except land plays, acquiring minerals, royalty interests and lease interests, and data analysis of other company's permitted wells. Thereafter, in 2007, I formed the Willis Group, and shifted my interests to staffing services whereby Willis Group managed and owned a handful of niche companies including IT, Engineering, Accounting and Finance, Energy Upstream and Downstream, and Legal and e-discovery consulting and services.

4.      After researching the potential opportunity, we formed Hopewell Pilot-Project, LLC on March 29, 2016 to test its potential for success. There were four founding members of Hopewell, and Tatham and I were both Managers. The company was organized to identify unleased oil and gas interest as well as title defects in areas rich with oil and gas reserves. We hoped to prove that we could identify and acquire open leases more efficiently than the traditional method, which involved going to various county courthouses and manually reviewing complicated title records. We formed Title Rover, LLC in April 2016 to build a web based portal whereby we could index title records so that they could be electronically searchable. Tatham and I were both Managers of Title Rover. The hope was that the technology, which had previously been used to assist with legal document review, could be applied to oil, gas and mineral interest lease plays and related mineral ownership title review. If such technology was applicable, title review could be automated instead of being manual. This would save tremendous expense incurred for both time and travel, and would allow Landmen and attorneys to review title directly from their computer. Title Rover hired technical experts to help build the portal and index the data, along with refining and testing the technology, which would be exclusively used by Hopewell throughout the Pilot Project, which was budgeted and planned to last only through 2016.

5.     I was very excited and optimistic about the opportunity. Thus, I and my affiliates invested $130,000 in Hopewell. For such investment, we were provided founders shares. In order for the pilot project to have a chance of success, Hopewell needed to raise money from outside investors. In order to do so, it held an initial private placement of up to 1,000,000 Additional Equity Shares for $2,000,000. At that time, it was budgeted that roughly $1,000,000 would be spent on operating expenses (approximately $125,000-$175,000 per month). In the offering, the share price was $2. In addition to receiving an interest in Hopewell, investors were also given an option to exchange a portion or all of their Hopewell shares into Title Rover shares. Hopewell's lawyers created the Private Placement Memorandum and the other solicitation documents.

6.     While Tatham was responsible to day-to-day management of Hopewell, I took a lead role in soliciting potential investors in Hopewell. I approached friends, family and colleagues with the opportunity, and received a lot of strong interest. In all, Hopewell secured eight investors. I spoke with Chad Martin about the investment in June 2016. At that point, he and I had been close friends for over ten years. In addition to our social interactions, he and I frequently shared business ideas and opportunities. When he learned about Hopewell, he expressed an interest to invest, and I was happy to share the potential opportunity with a friend. When Chad learned more about the opportunity, and my desire to raise capital for the test project, he explained that he had several other friends with whom he sometimes invested, who also might also like to invest. He referred me to Justin Pannu and suggested he might also be interested in the opportunity. It just so happened that I was meeting my niece at a summer camp in San Diego, where Mr. Pannu resides, so I agreed to meet with Mr. Pannu and have a discussion regarding the opportunity. I met with Mr. Pannu in San Diego in August 2016 and told him about the project. We met for about an hour at a beach bar and I provided a high-level overview of the business plan and proposed investment. While

in San Diego, he and I met two other times after 10pm, and those gatherings were
purely social.

7.    Mr. Pannu and Chad Martin are the only members of Ensource with
whom I have ever met. I also spoke with Jerome Johns telephonically. I did not solicit
any other member of Ensource personally.

8.    During the June-August 2016 timeframe, when I was talking with Chad
Martin and Mr. Pannu, Hopewell had little to no money in the bank, and ongoing
monthly operating expenses due and accruing. Hopewell provided a Cash Forecast to
Chad Martin that disclosed a $0 cash balance in June 2016.

9.    Once Ensource members were interested in a potential investment,
Tatham was responsible for responding to their questions and due diligence process.
He created two online data rooms—one for Hopewell and one for Title Rover—and
populated them with information for the Ensource investors. I know that he also made
himself available to answer any questions that arose and to facilitate Ensource's
contact with Title Rover's technical experts (which they took advantage of). I never
logged into the data rooms and had no involvement with deciding what information was
placed therein. Ensource's due diligence process appeared to be robust and took more
than 45 days to complete.

10.   Once Ensource decided it wanted to invest, it conditioned such
investment on Hopewell's and Title Rover's willingness to negotiate and amend their
company agreements. Ensource's attorney handled the negotiation for Ensource, and
Tatham handled the negotiation for Hopewell and Title Rover. The negotiations lasted
several weeks. While the negotiations were underway, I pushed Ensource to make its
investment because Hopewell had operational obligations that couldn't be paid until cash
was infused in Hopewell. I informed Ensource of this in multiple communications.

11.   The operational expenses included payments owed to Title Rover,
Tatham, Beyond Review and Image Engine. The latter two are companies affiliated

DEC. OF MARK A. WILLIS IN SUPPORT OF WILLIS DEFENDANTS' MSJ

with the Willis Group. Beyond Review is an entity that provided contract, land, and oil, gas and mineral contract title attorneys to Hopewell. Image Engine was an entity that provided copying and imaging services to Hopewell. Both service providers performed work for Hopewell, issued invoices for such work, and were only partially paid for such work. *See* Exhibit MM to the Declaration of Shannon Sweeney (Beyond Review and Image Engine invoices to Hopewell). Ensource claims that Beyond Review was paid $50,548 from Hopewell. Exhibit MM shows that it billed Hopewell $112,630.50. Ensource claims that Image Engine was paid $24,000 from Hopewell. Exhibit MM shows that it billed Hopewell $56,023.17. Their involvement (and their affiliation to the Willis Group) was disclosed to Ensource in multiple documents, and was explained by Tatham, prior its decision to invest.

12. The Willis Group was an entity that provided office space, IT support and phone services to Hopewell and Title Rover. The Willis Group also invested in, and lent money to, Hopewell. Hopewell did pay back a $15,000 loan the Willis Group made to Hopewell.

13. Ensource ultimately decided to invest $530,000 in Hopewell. In actuality, it only invested $430,000 (wired to Hopewell's bank account in three separate payments in September and October 2016). Ensource did not invest $100,000 that it promised in the Subscription Agreement.

14. I was excited about Hopewell's potential and wanted it to be successful. I believed that it could be successful because of the due diligence we performed when the opportunity was first presented. I also had invested a lot of money into the technology that I hoped could be used to automate the title search process. Such technology had been useful in other applications, and the technical experts I relied upon believed that its prospects for title searching were viable. In addition, Hopewell retained technical experts to develop, refine and test the technology. Throughout 2016, they continued to tell me that progress was being made and was possible. In addition, Beyond

1  Review's contract attorneys reported that having digital title records, and a way to search
2  them, was a far faster and superior then doing so manually. All of these reports made me
3  believe that technical progress was being made. In addition, I knew that Tatham was also
4  having some success purchasing land after title defects had been revealed. By the end
5  of November 2016, Hopewell had closed over 125 net acres and had pending offers
6  for 657.54 more net acres. Had 400 of those net acres closed, Hopewell would have
7  been an economic success and the pilot project would have been deemed successful.
8  The acres did not close, however, partially because Hopewell ran out of money (and
9  Ensource's $100,000 did not come in). Hopewell was unable to seek additional
10  funding because Ensource threatened, then carried through with, litigation within two
11  and a half months of making its investment. I did not expect Hopewell or Title Rover
12  to fail. If I had such expectation, I would not have invested my money, hired
13  contractors to perform work, allowed my affiliated companies to perform work at a
14  loss, and spent considerable time, money and reputational capital in the test pilot.

15        15.   I was never paid to manage Hopewell or Title Rover. I received no
16  salary. I lost my entire capital contribution and did not receive a return on investment.

17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28

16.   All of the Hopewell, Title Rover, Beyond Review and Image Engine documents attached to the Declaration of Shannon Sweeney, filed concurrently herewith, are business records of their respective companies and were prepared in the ordinary course of such business, at or near the events described in such documents. As a former manager of Hopewell and Title Rover I am familiar with the business operations of both companies and have personal knowledge of what was their ordinary course of business. Because Beyond Review and Image Engine are affiliates of the Willis Group, I am also familiar with the business operations of both companies and have personal knowledge of what was their ordinary course of business.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 29th day of October 2019 at Houston, Texas.


Mark A. Willis

DEC. OF MARK A. WILLIS IN SUPPORT OF WILLIS DEFENDANTS' MSJ