<u>Ensource Investments, LLC. v. Thomas P. Tatham, et al.</u>
CASE NO. 17CV0079 H LL

## **<u>TABLE OF CONTENTS OF EXHIBITS</u>**
## **<u>TO DECLARATION OF SHANNON SWEENEY</u>**

| **<u>EXHIBIT</u>** | **<u>PAGES</u>** |
|---|---|
| Exhibit A | 1-10 |
| Exhibit B | 11-30 |
| Exhibit C | 31-64 |
| Exhibit D | 65-105 |
| Exhibit E | 106-107 |
| Exhibit F | 108-142 |
| Exhibit G | 143-209 |
| Exhibit H | 210-227 |
| Exhibit I | 228-233 |
| Exhibit J | 234-239 |
| Exhibit K | 240-247 |
| Exhibit L | 248-279 |
| Exhibit M | 280-295 |
| Exhibit N | 296-303 |
| Exhibit O | 304-306 |

| **EXHIBIT** | **PAGES** |
| --- | --- |
| Exhibit P | 307-311 |
| Exhibit Q | 312-316 |
| Exhibit R | 317-320 |
| Exhibit S | 321-323 |
| Exhibit T | 324-342 |
| Exhibit U | 343-346 |
| Exhibit V | 347-350 |
| Exhibit W | 351-415 |
| Exhibit X | 416-419 |
| Exhibit Y | 420-436 |
| Exhibit Z | 437-441 |
| Exhibit AA | 442-462 |
| Exhibit BB | 463-489 |
| Exhibit CC | 490-491 |
| Exhibit DD | 492-501 |
| Exhibit EE | 502-505 |
| Exhibit FF | 506-508 |
| Exhibit GG | 509-514 |
| Exhibit HH | 515-520 |

| **EXHIBIT** | **PAGES** |
| --- | --- |
| Exhibit II | 521-523 |
| Exhibit JJ | 524-528 |
| Exhibit KK | 529-531 |
| Exhibit LL | 532-534 |
| Exhibit MM | 535-674 |

**EXHIBIT A**

# PRIVATE PLACEMENT MEMORANDUM

## HOPEWELL-PILOT PROJECT, LLC

### PRIVATE PLACEMENT OF UP TO 1,000,000 INITIAL ADDITIONAL EQUITY SHARES

THE OFFERING OF SECURITIES DESCRIBED HEREIN HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION.  THIS OFFERING IS MADE PURSUANT TO REGULATION S OR REGULATION D UNDER SECTION 4(a)(2) OF SAID ACT, WHICH EXEMPTS FROM SUCH REGISTRATION CERTAIN TRANSACTIONS. FOR THIS REASON, THESE SECURITIES WILL BE SOLD ONLY TO INVESTORS WHO MEET CERTAIN MINIMUM SUITABILITY QUALIFICATIONS DESCRIBED HEREIN.

A PROSPECTIVE INVESTOR SHOULD BE PREPARED TO BEAR THE ECONOMIC RISK OF AN INVESTMENT IN THE COMPANY FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE SHARES OR MEMBER'S INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE LAWS OF ANY OTHER JURISDICTION, AND, THEREFORE, CANNOT BE SOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.   THERE IS NO OBLIGATION OF THE ISSUER TO REGISTER THE SHARES OR MEMBER'S INTERESTS UNDER THE SECURITIES ACT OR THE LAWS OF ANY OTHER JURISDICTION. TRANSFER OF THE SHARES OR MEMBER'S INTERESTS IS ALSO RESTRICTED BY THE TERMS OF THE AMENDED AND RESTATED COMPANY AGREEMENT RELATING THERETO.

## TABLE OF CONTENTS

I.      Executive Summary

II.     Term Sheet

III.    Technology

IV.     Risk Factors

V.      Previously Distributed Offering Materials

VI.     Subscription Booklet

VII.    Amended and Restated Company Agreement

I.    EXECUTIVE SUMMARY

The Hopewell – Pilot Project, LLC ("Hopewell" or the "Company") was formed in March 2016 for the purpose of demonstrating "Proof of Concept" involving the refinement, use, and application of a new proprietary software technology which can geographically sort and analyze land and mineral title records and related digital data for the purpose of acquiring Oil, Gas & Mineral interests in the most contemporary "tight sands" and "shale" plays.

The business concept behind the formation and funding of Hopewell depends upon five basic premises!  They are:

1.  The more contemporary "tight sands" and "shale" plays are more commercially rewarding as the industry continues to refine and apply new horizontal completion and frac techniques to the areas best suited for the application of such technology.
2.  The best contemporary "tight sands" and "shale" plays were initiated 2010-2013 in a very competitive environment and the initial leasing effort was undertaken on a "trend basis" which provided less than 100% title review by contract land personnel.  Legal title opinions were generally only undertaken on "drill site" tracts.
3.  Operators tried to hold the maximum amount of leased acreage by forming large pooled units for the drilling and completion of lower cost vertical wells.  Many of such pooled units were formed without contemporary survey of leased acreage included.  In the past two years since mid 2014, as the cash flow to most Operators declined due to falling oil and gas prices, many pooled units were hastily formed and contain numerous irregularities.
4.  Most of the new initial leases taken in the contemporary "tight sands" and "shale" plays, unless "held by production", will expire in the 2016 -2017 time frame.  Many of the existing pooled units contain unleased acreage or have leased tracts that would have expired if not for a "pooled unit" designation.
5.  The most lucrative opportunities for Hopewell will occur in contemporary "tight sands" and "shale" plays located in geographical areas where significant land title problems exist .

Hopewell has identified four initial target areas in Madison County, Texas which it believes will optimize investment returns as well as provide "Proof of Concept".  The areas selected have multiple proven hydrocarbon pay zones which have demonstrated significant commercial production in recently completed horizontal wells.  Initial evaluation of the prospective areas indicate that there are unleased tracts in many of the existing Pooled or Declared Units.  Based upon recent field discussions, Hopewell believes that it can acquire new leases in the four areas for initial bonus and lease acquisitions costs of $1,000 per acre or less and by providing traditional lease royalty burdens to the related mineral owners.  In addition to open acreage, many of the existing Pooled or Declared Units and underlying pooled leases appear to have possible deficiencies.  Hopewell plans to continue detailed legal evaluation of these identified Units and underlying leases.  If warranted, upon conclusion of Hopewell's legal evaluation, Hopewell will seek to arrange additional financing for Company to pursue an aggressive "top lease" strategy for the purchase of new leases in the affected areas.  Hopewell has retained certain Financial Advisors to assist in obtaining up to $25,000,000 of prospective financing for the Company's possible execution of the top lease strategy.

Hopewell is seeking qualified debt and equity investors to provide up to $2,000,000 in new funds from the placement of up to 1,000,000 Initial Additional Equity Shares for the purpose of acquiring new lease and mineral interest acquisitions in the four initial target areas and for working capital to continue the Company's operations and evaluation of lease acquisition opportunities.

New leases acquired by the Company will be held for resale to Operators seeking to organize multi well horizontal drilling & completion programs or to provide the Company with working interest particpation in such development.  The Company's leasing activities will also likely provide opportunity to purchase term royalty and mineral interests on commercially favorable terms.

II.    TERM SHEET

THE INITIAL PRIVATE PLACEMENT:  <mark>Hopewell-Pilot Project LLC ("Hopewell" or the "Company") is seeking to privately arrange the placement of 1,000,000 shares ("Initial Additional Equity Shares) of the Company for $2,000,000, the proceeds of which are to be used to fund all operating overhead of the Company through December 31, 2016, and for the acquisition of Mineral Interests, primarily new Oil and Gas leases,</mark> in an agreed Area of Mutual Interest ("AMI") covering Madison County, TX and the Buda Rose play ("Buda Rose" play).

Threshold Placement Amounts - Initial Additional Equity Shares:

Minimum Subscription Amount:  $250,000 – 125,000 shares
Maximum Subscription Amount:  $2,000,000 – 1,000,000 shares

Pricing of Initial Additional Equity Shares:

The price per share for all Initial Additional Equity Shares subscribed prior to June 15, 2016 shall be $2.00 per share.  The minimum price per share for all Initial Additional Equity Shares subscribed after June 15, 2016 until the Maximum Amount is reached shall be $2.50 per share.

Priority Rights to Distributions:

Initial Additional Equity Shares shall have a priority right to cash distributions.  The Amended and Restated Company Agreement provides that the holders of Initial Additional Equity Shares shall receive all cash distributions made by the Company until such time as they have received $2.00 per share in distributions.  Once the holders of the Initial Additional Equity Shares have received $2.00 per share in cash distributions, then all additional cash distributions made by the Company shall be paid uniformly on a per share basis.

Financial Advisors:

The Company has retained Meridian Circle Advisors and may retain other financial advisors (collectively "Financial Advisors") to assist the Company in obtaining additional capital if needed for the acquisition of additional Oil, Gas & Mineral interests within the AMI.  Additional capital may involve the issuance of debt, convertible debt, preferred equity or the formation of a Limited Partnership involving the Company.

Shares Authorized and Outstanding:

The Company has 5,000,000 authorized shares of which 1,000,000 have been issued to Founders and are currently outstanding.

Other Terms and Conditions:

As provided in the Subscription Agreement and the Amended and Restated Company Agreement.

III.    TECHNOLOGY

The Founders have arranged and provided a cost based contract to Hopewell for the exclusive use of new proprietary software technology owned by Title Rover, LLC, an affiltiate of the Founders.  Hopewell will pay only for the direct costs of digital data purchase, direct operations and traning of Hopewell personnel related to use of Title Rover's proprietary software in an agreed AMI covering Madison County, TX.  Direct costs are currently running $17,500 per month in addition to the purchase or acquisition of digital data.  Either party may terminate the contract beginning January 1, 2017 by providing 30 days prior written notice to the other.  The Company believes that the use of Title Rover technology in the evaluation of OG&M title will result in significant savings in both time and costs.

IV.    RISK FACTORS

A.    Although the Company has identified open or unleased acreage in many existing Pooled or Declared Units there is no certainty that leases of such acreage can be timely obtained or that leases can be obtained at the Company's estimated cost.

B.    Even if the Company is successful in obtaining new leases within existing Pooled or Declared Units there is no assurance that Operators of such Units will include the leases acquired by the Company in the Pooled or Declared Units without a legal action requiring "forced pooling" brought on behalf of the Company and the Lessor of the new leases.

C.    Even if the Company is successful in obtaining new leases within existing Pooled or Declared Units and the Company succeeds to include the new leases in the Pooled or Declared Units, the leasehold interests owned by the Company may not be sufficient to assure that new horizontal wells are drilled and completed and that such activity will be timely undertaken by the Operator.

D.    If the Company is not able to acquire a significant leased acreage position in the identified prospect areas, they Company may not be able to sell or consolidate its lease position with other operators undertaking development of the Buda Rose play.

E.    If oil and gas prices decline significantly, current Operators in the Buda Rose play may defer all horizontal development drilling until such time as prices recover.  If this proves to be the case then the Company may not realize any value for the leases it acquires for a prolonged period of time.

F.    Investment in oil, gas and mineral leases is a speculative undertaking with a high degree of risk.  Investors that cannot afford substantial risk and the entire loss of their invested capital should not undertake the proposed investment.

G.    There is no ready market for the shares of the Company. A prospective investor should be prepared to bear the economic risk of an investment in the Company for an indefinite period of time because the shares or Member's interests have not been registered under the Securities Act or the laws of any other jurisdiction, and, therefore, cannot be sold unless they are subsequently registered of an exemption from registration is available.  There is no obligation of the Company to register the shares or Member's interests under the Securities Act or the Laws of any other jurisdiction.

V.    PREVIOUSLY DISTRIBUTED OFFERING MATERIALS

     A.  Hopewell Executive Summary Teaser – Copy Attached

     B.  Hopewell Project Highlights – Copy Attached

     C.  Prospect Area Maps – Copies Attached


VI.    SUBSCRIPTION BOOKLET - ATTACHED


VII.    AMENDED AND RESTATED COMPANY AGREEMENT - ATTACHED

# Hopewell- Pilot Project, LLC

## Executive Summary

The Hopewell – Pilot Project, LLC ("Pilot") was formed in March 2016 for the purpose of demonstrating "Proof of Concept" involving the refinement, use and application of a new proprietary software technology which can geographically sort and analyze land and mineral title interests for the purpose of acquiring Oil, Gas & Mineral interests in the most contemporary "tight sands" and "shale" plays.

The business concept behind the formation and funding of Pilot depends upon five basic premises! They are:

1. The more contemporary "tight sands" and "shale" plays are more lucrative as the industry continues to refine and apply new horizontal completion and frac techniques to the areas best suited for the application of such technology.
2. The best contemporary "tight sands" and "shale" plays were leased initially (2011-2013) in a very competitive environment and the initial leasing effort was undertaken on a "trend basis" which provided less than 100% title review by contract land personnel.  Legal title opinions were generally only undertaken on "drill site" tracts.
3. Operators tried to hold the maximum amount of leased acreage by forming large pooled units for the drilling of lower cost vertical wells.  Many of such pooled units were formed without contemporary survey of leased acreage included.  In the past two years, as the cash flow to most Operators declined due to falling oil and gas prices, many pooled units were hastily formed and contain numerous irregularities.
4. Most of the new initial leases taken in the contemporary "tight sands" and "shale" plays, unless "held by production", will expire in the 2016 -2017 time frame.  Many of the existing pooled units contain unleased acreage or have leased tracts that would have expired if not for a "pooled unit" designation.
5. The most lucrative opportunities for Pilot will occur in contemporary "tight sands" and "shale" plays located geographical areas where there are the most prospective land title problems.

Pilot has identified an initial target area which it believes will optimize investment returns as well as provide "Proof of Concept".  The area selected has multiple proven pays which have proven highly commercial in recently completed horizontal wells.  Several of the small to mid-cap participants in the subject play have recently sold their entire interests to larger operators for $39,071/net acre and $5,421/net acre.  Pilot believes that through the use of new proprietary software that it can acquire substantial leased acreage in areas comparable to those sold for $400 to $500/net acre with competitive royalty burden.  Initial evaluation undertaken over the past six weeks has indicated almost 18,000 acres of prospective opportunity.

Pilot is seeking qualified debt and equity investors to provide funding of lease and mineral interest acquisitions in the initial target area and for evaluation of three selected follow on projects.  For further information please contact Mark Willis or Tom Tatham at 713 547-4500.

## Project Highlights

### Initial Target Acreage:

**Ft. Trinidad East (Buda) (Georgetown) (Edwards) (Glen Rose) Field:**
- **Approximately 80,000 acres under review – 4 areas**
- **Existing Producing Pooled Units cover almost 100% acreage**
- **Significant Open Acreage in Existing Declared Units held by Vertical Producing Wells**
- **Significant Prospective Title Issues Identified**

**Sales of Comparable or Offsetting Acreage to Ft. Trinidad East Field:**
- **Treadstone to Energy & Exploration Partners – June 2014 E. Madison & Houston Counties 18,300 Net Acres for $715MM**
- **Halcon to New Gulf Resources – May 2014 – Madison, Grimes & Leon Counties – 83,000 Net Acres for $450MM**
- **Navidad Resources to Sequitur Energy Management LLC – Feb 2013 – Madison & Houston Counties – 83,000 Net Acres – Undisclosed Price – Sequitur Privately Held**
- **Bluestone to EOG Resources - Aug 2013 – Terms not disclosed**

### Use of Title Rover Software Technology
- **Revolutionary new search technology cuts time & costs**
- **Hopewell has exclusive use of Title Rover in "Buda Rose" AMI**

### Attractive Area for Application of Latest Horizontal Well Completion Technology
- **Compelling RRC Testimony – 2,500bbl/d per zone IP**
- **High EUR Areas**
- **Project GRE study underway**

### Project Founders Participating in Founding Round One
- **See Accompanying Term Sheet**
- **Option to participate in CV Debt Financing Round**



# HOPEWELL PILOT PROJECT LLC
## MADISON COUNTY
## UNITS MAP

### Area 1

| Name | Operator | Acres |
|---|---|---|
| BANKHEAD | BURK | 693.644 |
| BARRETT | EOG | 1604.88 |
| BRAZELL | BURK | 700 |
| CONNOR PLACE | EOG | 529.88 |
| DIANA VICK UNIT | EOG | 640 |
| DOUBLE GIBBS | EOG | 920.36 |
| EDMUNDS | EOG | 1450.91 |
| GIBBS BROS | BURK | 700.82755 |
| GIBBS BROTHERS | EOG | 704 |
| GIBSON UNIT | EOG | 624 |
| HARDY | BURK | 893.89 |
| JETT | BURK | 694.1355 |
| MARCELLA UNIT | BURK | 40 |
| MISS SALLIE | EOG | 332.595 |
| MCADAMS UNIT | BURK | 690.72 |
| SAMUEL GAS UNIT | BURK | 1083.265 |
| THORNBERRY | BURK | 664.5373 |
| THREE AMIGOS | EOG | 1324.36 |
| TURNER UNIT | BURK | 1211.31 |
| TURNER | BURK | 661.67 |
| VICK B UNIT | EOG | 1278.96 |
| VICK UNIT | EOG | 640 |
| WORD | BURK | 703.7321 |

### Area 2

| Name | Operator | Acres |
|---|---|---|
| BAKER | EOG | 698.774 |
| BURKE GAS UNIT | BLUESTONE | 704 |
| CANANT | BURK | 692.2698 |
| CHARMLESS | BURK | 701.067 |
| CULBRETH | EOG | 652.285 |
| EVANS | EOG | 657.87 |
| FLYSHATER | NSW GULF | 89.72 |
| FOSTER | ALLTEX | 228.02 |
| GRIDHAM | EOG | 655.4 |
| HEATH C | LLEWELIN | 943.585 |
| HENRY | BURK | 695.087 |
| HENSARLING | EOG | 642.4299 |
| IRON DUKE | NSW GULF | 373.45 |
| JEFA | FLAMINGO | 303 |
| JEFE-CHARMLESS | FLAMINGO | 678.2 |
| KNIGHT | BURK | 699.427 |
| LAURA UNIT | BURK | 595.22 |
| MANNING DU | EOG | 650.86 |
| MANNING | BURK | 700.657 |
| NGR BARRETT | NSW GULF | 427.05 |
| NRG RED STAG | NSW GULF | 1018.06 |
| SANTA ELENA | BURK | 694.227 |
| SAVELL UNIT | BURK | 698.984 |
| STRATS | BURK | 704 |
| TINSLEY | BURK | 643.1568 |
| VIVIENNE | BURK | 709.884 |
| WORSHAM UNIT | EOG | 1303.05 |

### Area 3

| Name | Operator | Acres |
|---|---|---|
| BARR | BURK | 696.00 |
| BATES | BURK | 404.09 |
| BERTHA HARPER | BURK | 640 |
| CAROLYN UNIT | ENERGY EXP | 343.45 |
| CARTER-STARNS UNIT | ENERGY EXP | 174.85 |
| ELIJAH CARTER A | ENERGY EXP | 422.5 |
| ELKWOOD | SEM | 40 |
| EVANS | EOG | 657.87 |
| FINNEY | BURK | 660.2872 |
| FLORENCE | BURK | 700.041 |
| FORREST A | ENERGY EXP | 310.29 |
| FORREST C | ENERGY EXP | 3175.5 |
| FORREST D STATE | ENERGY EXP | 514.99 |
| FORREST | BURK | 503 |
| FORREST | ENERGY EXP | 546.08 |
| GERALD WAKEFIELD | CORDILLERA | 850.36 |
| GOREE | PALMER | 400 |
| GOULD MYRA | RUSELL | 295.1 |
| HARRISON-FOREST | ENERGY EXP | 638.43 |
| HENDERSON | BURK | 700.041 |
| IVEY-RICHARDSON | PARTEN | 633.208 |
| JEANETTE | ENERGY EXP | 220.94 |
| JOYCE | BURK | 700.041 |
| LEGGETT | BURK | 40 |
| MOIMY SWD | BURK | 20.38 |
| MORGAN UNIT | SEM | 368.809 |
| MOSBER | BURK | 40 |
| MUNSON | BURK | 690.042 |
| NGR FORREST | NEW GULF | 1061.93 |
| NGR FORREST | NEW GULF | 100 |
| PARTEN | BURK | 701 |
| RADER | BURK | 40 |
| ROSCOE BAYLESS 1 | PARTEN | 40.938 |
| SAMUEL GAS UNIT | BURK | 1083.265 |
| SHELTON | BURK | 40 |
| SMITH | BURK | 40 |
| STARNES | PALMER | 360 |
| STERLING | BURK | 701.75 |
| THOMPSON S | BURK | 652.375 |
| THOMPSON | BURK | 700.06 |
| TROCHEL | BURK | 700.82 |
| W FORREST | ENERGY EXP | 698.77 |
| WAKEFIELD | BURK | 688.330 |
| WAKEFIELD-JONES UNIT | ENERGY EXP | 640 |
| WOOTEN | PALMER | 40 |

### Area 4

| Name | Operator | Acres |
|---|---|---|
| BELL | BURK | 690.215 |
| BYRD | BURK | 700 |
| CHARMLESS | BURK | 678.1 |
| DAWN THIENRY | BURK | 773.68 |
| FARRIS | BURK | 694.295 |
| GAYLOR | BURK | 700.577 |
| GRAY | BURK | 40 |
| GREEN | BURK | 698.2436 |
| HAGAMAN | BURK | 702.57 |
| LOE | BURK | 680.515 |
| POSTEL | BURK | 694.873 |
| ROBERTSON | BURK | 960 |
| ROGERS | BURK | 691.052 |
| SHOEMAKER | BURK | 701.42 |
| SLAUGHTER | BURK | 702.486 |
| THOMAS 1 | SEM | 447 |
| THOMAS S | SEM | 698.7 |
| TOMMIE JO MANNING | BURK | 704 |

### Multi Areas

| Name | Operator | Acres |
|---|---|---|
| Area 1-2 | | |
| BRYAN | EOG | 704 |
| DICKENS UNIT A-251 | EOG | 2021.33 |
| HEATH | EOG | 699.83 |
| THOMAS | EOG | 988.9 |
| Area 1-3 | | |
| YORK | BURK | 691.019 |
| Area 1-3-4 | | |
| STIVER | BURK | 695.969 |
| Area 2-4 | | |
| BOYD | EOG | 703.3 |
| CANNON | BURK | 693.2879 |
| HARGRAVE GAS UNIT | BURK | 700 |
| Area 3-4 | | |
| GRACE | BURK | 697.610 |
| STERLING T HARRISON | BURK | 704 |
| SWANSON | BURK | 698.483 |
| WEBB | BURK | 687.016 |

MADISON

HOUSTON

WALKER

### Symbols
- Permitted Location
- Dry Hole
- Oil
- Gas
- Oil / Gas
- Plugged Oil
- Plugged Gas
- Canceled / Abandoned Location
- Plugged Oil / Gas
- Injection / Disposal
- Core Test
- Sulfur Test
- Storage from Oil
- Storage from Gas
- Shut-In Oil
- Shut-In Gas
- Injection / Disposal from Oil
- Injection / Disposal from Gas
- Water Supply from Oil / Gas
- Directional Surface
- Horizontal Drainhole
- Sidetrack Surface

### Legend
- TX County Limit
- Areas
- Units Outline
- Abstract

**Units Layer**
**Operator**
- BURK
- ENERGY EXP
- EOG
- FLAMINGO
- NEW GULF
- OTHER
- PALMER
- SEM

**EXHIBIT B**

**HOPEWELL – PILOT PROJECT, LLC**

**SUBSCRIPTION BOOKLET**
**FOR**
**INITIAL ADDITIONAL EQUITY SHARES**

**May 31, 2016**

WIL_00000812

## INSTRUCTIONS TO SUBSCRIPTION AGREEMENT

**1.**     Any person desiring to subscribe for Initial Additional Equity Shares in Hopewell-Pilot Project, LLC, a Texas limited liability company (the "Company"), should be either (i) an "accredited investor" within the meaning of Regulation D of the U.S. Securities Act of 1933, as amended (the "Securities Act") or (ii) a "non-U.S. Person" within the meaning of Regulation S of the Securities Act, *and* must:

      **(a)**     complete and execute the attached Subscription Agreement (the "Agreement");

      **(b)**     execute the attached copy of the signature page of the Company's Amended and Restated Company Agreement;

      **(c)**     provide the Company's Managers with the evidence of authority to invest, such as resolutions if the Investor is a corporation (please contact Thomas P. Tatham or Mark A. Willis for further details);

      **(d)**     provide the Company with additional KYC documents as the Company reasonably requests; and

      **(e)**     complete *Annex 1, Part 1* in the case of individual investors or *Annex 1, Part 2* in the case of entity investors.

Copies of all completed and executed originals referred to above should be sent by e-mail to the Company's Managers at TTatham@HopewellTX.com and MWillis@HopewellTX.com. The executed originals of the Agreement and other required documents should be received by Hopewell-Pilot Project, LLC (on behalf of the Company) as soon as possible at the following address: Hopewell-Pilot Project, LLC, c/o Willis Group, 1400 Post Oak Blvd. Suite 200 Houston, TX 77056, Attn: Tom Tatham (Tel: (713) 547-4531). All subscription documents must be completed correctly and thoroughly. Failure to do so may result in delay of acceptance of your subscription until properly completed documents have been received, processed and approved.

**2.**     The Company will advise each subscriber promptly of its acceptance of any offer to become a New Member of the Company, *provided* that the Company shall be entitled to refuse any subscriber's offer to become a New Member for any reason whatsoever in the sole discretion of the Company.

**3.**     Please contact the Company's Managers if you have any questions regarding the above

-ii-

*Inquiries Related to the Subscription Procedures*:

Inquiries related to the subscription procedures should be directed to the Company's Managers and or the counsel for the Company at:

>    Hopewell-Pilot Project, LLC
>    1400 Post Oak Blvd. Suite 200
>    Houston, TX 77056
>    Attention: Thomas P. Tatham
>    Telephone: (713) 547-4531
>    E-mail:  TTatham@HopewellTX.com

>    and

>    Hopewell-Pilot Project, LLC
>    1400 Post Oak Blvd. Suite 200
>    Houston, TX 77056
>    Attention: Mark A. Willis
>    Telephone:  (713) 547-4502
>    E-mail:  MWillis@HopewellTX.com

>    or to the counsel for the Company at:

>    Doherty & Doherty LLP
>    1717 St James Place, Suite 520
>    Houston, TX 77056
>    Attention: Pat Doherty
>    Telephone:  (713) 572-1000
>    E-mail:  Pat@Doherty-law.com

*Payment of subscription*

The Capital Commitment shall be drawn down by the Company pursuant to one or more capital call notices that will be issued and made by the Managers in accordance with terms set forth in the Amended and Restated Company Agreement.  Funding details  (including payment amounts) and wire instructions will be provided by the Managers.

-iii-

**HOPEWELL-PILOT PROJECT, LLC**

**INITIAL ADDITIONAL EQUITY SHARES**

**SUBSCRIPTION AGREEMENT**

THE OFFERING OF SECURITIES DESCRIBED HEREIN HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION.  THIS OFFERING IS MADE PURSUANT TO REGULATION S OR REGULATION D UNDER SECTION 4(a)(2) OF SAID ACT, WHICH EXEMPTS FROM SUCH REGISTRATION CERTAIN TRANSACTIONS.  FOR THIS REASON, THESE SECURITIES WILL BE SOLD ONLY TO INVESTORS WHO MEET CERTAIN MINIMUM SUITABILITY QUALIFICATIONS DESCRIBED HEREIN.

A PROSPECTIVE INVESTOR SHOULD BE PREPARED TO BEAR THE ECONOMIC RISK OF AN INVESTMENT IN THE COMPANY FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE SHARES OR MEMBER'S INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE LAWS OF ANY OTHER JURISDICTION, AND, THEREFORE, CANNOT BE SOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.  THERE IS NO OBLIGATION OF THE ISSUER TO REGISTER THE SHARES OR MEMBER'S INTERESTS UNDER THE SECURITIES ACT OR THE LAWS OF ANY OTHER JURISDICTION.  TRANSFER OF THE SHARES OR MEMBER'S INTERESTS IS ALSO RESTRICTED BY THE TERMS OF THE AMENDED AND RESTATED COMPANY AGREEMENT RELATING THERETO.

-1-

# HOPEWELL-PILOT PROJECT, LLC

## A TEXAS LIMITED LIABILITY COMPANY

Hopewell-Pilot Project, LLC
c/o Willis Group
1400 Post Oak Blvd. Suite 200
Attention: Tom Tatham
Telephone: (713) 547-4531
E-mail:  TTatham@HopewellTX.com

Ladies & Gentlemen:

This **SUBSCRIPTION AGREEMENT** (the "Agreement") is entered into as of the Closing Date specified on the signature page hereto by and among **HOPEWELL-PILOT PROJECT, LLC**, a Texas limited liability company (the "Company"), and the investor identified on the signature page hereto (the "Investor").  Investor seeks admission to the Company as a New Member and the acquisition of Shares representing Member's Interest in the Company (the "Interest") in accordance with the Company's Amended and Restated Company Agreement (the "Company Agreement").  Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Company Agreement.

1.      **Capital Commitment.**  In accordance with the terms of the Company Agreement and this Agreement, the Investor agrees to contribute to the Company the amount of capital specified under the heading "Capital Commitment" set forth on the signature page hereto, or such lesser amount as the Company shall accept as determined by the Company's Managers in their sole and absolute discretion.

2.      **Adoption.**  If the Investor is accepted as a New Member pursuant to paragraph 3 below, the Investor hereby agrees to adhere to and be bound by all terms and provisions of the Company Agreement and to perform all obligations therein imposed upon a New Member with respect to the Interest.

3.      **Acceptance of Subscription; Delivery of Company Agreement.**  The Investor understands and agrees that this subscription is made subject to the following terms and conditions:

(a)      The Managers jointly reserve the right to review the suitability of any person desiring to acquire an Interest and, in connection with such review, to waive such suitability standards as to such person as the Managers jointly deem appropriate under applicable law;

(b)      The Managers may accept or reject the Investor's subscription, in whole or in part, and the Investor's subscription shall be deemed to be accepted by the Managers only when both of the Company's Managers have executed Investor's Agreement and Investor has been admitted to the Company as a New Member in accordance with the terms of the Company Agreement;

(c)      The Managers shall have no obligation to accept subscriptions in the order received;

(d)      The Interest to be created on account of this subscription shall be created only in the name of the Investor, and the Investor agrees to comply with the terms of the Company Agreement

-1-

28ML-207663

and to execute any and all further documents necessary in connection with becoming a New Member of the Company;

        **(e)**    The Investor hereby requests and authorizes the Managers to enter Investor's name on the Schedule of Members as holder of the Interest;

        **(f)**    The Investor has consulted to the extent deemed appropriate by the Investor with the Investor's own advisers as to the financial, tax, legal and related matters concerning an investment in Interests and on that basis believes that an investment in the Interests is suitable and appropriate for the Investor;

        **(g)**    The Investor is aware of and understands each of the risks and potential conflicts of interest inherent of an investment in the Company as set forth in the Memorandum;

        **(h)**    The Managers, acting jointly, may transfer proceeds into an account in the name of the Company, and in such event, the Managers shall not be liable for any losses arising from such transfer and shall be fully indemnified by the Company out of the assets of the Company to the fullest extent permitted by law for any and all actions, costs, claims, damages, demands or expenses (including any reasonable attorneys' fees) suffered or incurred by the Managers as a result of such transfer;

        **(i)**    The Investor hereby undertakes in respect of the Interest that the Investor: (i) shall comply with the restrictions on transfer of the Interest contained in the Company Agreement; and (ii) acknowledges and agrees that, in the event that Investor defaults on its capital contribution obligation to the Company, the Interest may be subject to forfeiture and other consequences as specified in the Company Agreement; and

        **(j)**    The Investor hereby declares that the Investor is not in the course of winding up or under liquidation or judicial management.

    **4.**    **Conditions to Closing.**  The Company's obligations hereunder are subject to acceptance by the Managers of the Investor's subscription, and to the fulfillment at the time of, or prior to, the Closing Date of each of the following conditions:

        **(a)**    The representations and warranties of the Investor contained in this Agreement shall be true and correct as of the Closing Date; and

        **(b)**    All proceedings in connection with the transactions contemplated hereby and all documents and instruments incident to such transactions shall be satisfactory in substance and form to the Managers, and the Company shall have received all such counterpart originals or certified or other copies of such documents as the Managers may request.

    **5.**    **Investor Representations.**  In connection with the Investor's acquisition of the Interest as of the Closing Date, the Investor makes the following representations and warranties on which the Managers and the Company are entitled to rely:

        **(a)**    The Interest will be held under the type of ownership identified on the signature page hereto.

        **(b)**    If the Investor has checked that the Investor is not a "U.S. Person," as such term is used in Internal Revenue Service Form W-9, under the subheading "Tax Jurisdiction" below, the Investor hereby represents, under penalties of perjury, that the Investor (i) is a "non-U.S. Person" (as defined below); (ii) will not transfer or deliver any interest in the Interests except in accordance with the

WIL_00000817

restrictions set forth in the Company Agreement; (iii) will notify the Managers immediately if the Investor becomes a U.S. Person at any time during which the Investor holds or owns any Interests; (iv) is not subscribing on behalf of or funding its Capital Contribution with funds obtained from U.S. Persons; and (v) it was not in the United States at the time that the Interests were offered to it, and it was not in the United States at the time such offer was accepted; and (vi) it is not acting on behalf of, and it will not fund any portion of its subscription with assets of, any entity that is a "benefit plan investor" within the meaning of the United States Department of Labor Reg. Section 2510-101.3.  For purposes of this section 5(b), a "non-U.S. Person" is an individual who is not a citizen or resident of the United States or a corporation, partnership, estate or trust which is not a U.S. entity.  Except for offers and sales to discretionary or similar accounts held for the benefit or account of a non-U.S. person by a U.S. dealer or other professional fiduciary, all offers to sell and offers to buy the Interests were made to or by the Investor while the Investor was outside the United States and at the time that the Investor's order to buy the Interests was originated the Investor was outside the United States.

(c)     The Investor is an "accredited investor" within the meaning of Regulation D of the U.S. Securities Act of 1933, as amended (the "Securities Act") and a "qualified client" as defined in the Investment Advisers Act of 1940, as amended, on the basis identified by checking the box adjacent to the applicable representation on *Schedule 2, Part 1* in the case of an individual investors and on *Schedule 2, Part 2* in the case of entity investors; and in the case of entity investors, represents to such further matters by checking the boxes adjacent to the applicable further representations on *Schedule 2, Part 2* (which checked representations in *Schedule 2, Parts 1 and 2* are hereby incorporated by reference).  The Investor (i) is not subject to any of the "Bad Actor" disqualifications (each, a "Disqualification Event") described in Rule 506(d)(1) under the Securities Act and (ii) will, subsequent to the date hereof, notify the Company's Managers of (A) any Disqualification Event relating to the Investor not previously disclosed and (B) any event that would, with the passage of time, become a Disqualification Event relating to the Investor. The Investor is acquiring the Interest solely for the Investor's own account and not directly or indirectly for the account of any other person whatsoever for investment and not with a view to, or for sale in connection with, any distribution of the Interest.  The Investor does not have any contract, undertaking or arrangement with any person to sell, transfer or grant a participation to any person with respect to the Interest. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of the investment evidenced by the Investor's acquisition of the Interest, and the Investor is able to bear the economic risk of such investment.

(d)     No representations or warranties have been made to the Investor by the Company, the Company's Managers, or any agent thereof, other than as set forth in the Company Agreement, and this Agreement.  The Investor has had access to such information concerning the Company as the Investor deems necessary to enable the Investor to make an informed decision concerning the acquisition of the Interest.  The Investor has had access to the designated representatives of the Company, its Managers and the opportunity to ask questions of, and receive answers satisfactory to the Investor from, the Managers and or such designated representatives concerning the offering of Interests in the Company generally.  The Investor has obtained all additional information requested by the Investor to verify the accuracy of all information furnished in connection with the offering of Interests in the Company.

(e)     The Investor understands that the Interest has not been registered under the Securities Act, or any securities law of any state of the United States or any other jurisdiction in reliance on an exemption for private offerings, and the Investor acknowledges that it has received and carefully read the Confidential Private Placement Memorandum of the Company (the "Memorandum"), the Company Agreement and this Agreement. The Investor understands that Doherty & Doherty LLP acts as counsel for the Company, the Company's Managers.  No separate counsel has been retained to act on behalf of the Investors.  No attorney-client relationship exists with any other person by reason of such

-3-

person making an investment in the Company.  The Investor has received and reviewed all such other information of the Company as the Investor or its representatives and advisers have requested.

**(f)**     The Investor is aware that the Investor must bear the economic risk of investment in the Interest for an indefinite period of time, possibly until final winding up of the Company, because the Interest has not been registered under the Securities Act, there is currently no public market therefor, and the Interest cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is available.  The Investor understands that the Company is under no obligation, and does not intend, to effect any such registration at any time.  The Investor also understands that sales or transfers of the Interest are further restricted by the provisions of the Company Agreement and, as applicable, securities laws of other jurisdictions and the states of the United States, and that the Interest will not be transferred or disposed of except in accordance with the terms of this Agreement, the Company Agreement and registration under the Securities Act, or pursuant to an applicable exemption therefrom.

**(g)**     The execution and delivery of the Company Agreement and this Agreement, the consummation of the transactions contemplated thereby and the performance of the obligations thereunder will not conflict with or result in any violation of or default under any provision of any other agreement or instrument to which the Investor is a party or any license, permit, franchise, judgment, order, writ or decree, or any statute, rule or regulation, applicable to the Investor.

**(h)**     The Investor has full power and authority to make the representations referred to in this Agreement, to acquire the Interest pursuant to this Agreement and the Company Agreement and to deliver the Company Agreement and this Agreement.  The Company Agreement and this Agreement create valid and binding obligations of the Investor and are enforceable against the Investor in accordance with their terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar laws affecting creditors' rights, and subject to general equity principles and to limitations on availability of equitable relief, including specific performance.

**(i)**     The Investor confirms that the Investor has been advised to consult with the Investor's attorney regarding legal matters concerning the Company and to consult with independent tax advisers regarding the tax consequences of investing in the Company.  The Investor acknowledges that it understands that any anticipated United States federal or state income tax benefits may not be available and, further, may be adversely affected through adoption of new laws or regulations or amendments to existing laws or regulations.  The Investor acknowledges and agrees that the Company has made no warranty or assurance regarding the ultimate availability of any tax benefits to the Investor by reason of the Investor's investment in the Company.

**(j)**     The Investor acknowledges and agrees that (i) information relating to the identity of the Investor shall appear on the Schedule of Members and may appear on the financial statements of the Company, and (ii) other Members shall receive such information and may share such information with their advisors and other parties pursuant to the terms of the Company's Confidentiality Agreement.

**(k)**     The Investor is knowledgeable and experienced in evaluating investments and experienced in financial and business matters and is capable of evaluating the merits and risks of investing in the Interests.  The Investor has evaluated the risks of investing in the Interests, and has determined that the Interests are a suitable investment for the Investor.  In evaluating the suitability of an investment in the Interests, the Investor has not relied upon any representations or other information (whether oral or written) other than as set forth herein, in the Memorandum, the Company Agreement, the other agreements and independent investigations made by the Investor or representative(s) of the Investor.  With respect to its investment in the Company, the Investor is not relying upon any other information,

-4-

representation or warranty by the Company, the Managers of the Company or any designated representatives of the Company.

   **(l)**   The Investor is aware and acknowledges that (i) the Company has limited or no significant operating history; (ii) there is no assurance of any income from an investment in the Company; (iii) any federal and/or state income tax benefits which may be available to the Investor may be lost through the adoption of new laws or regulations or changes to existing laws and regulations or differing interpretations of existing laws and regulations, in certain circumstances with retroactive effect; and (iv) the Investor, in making this investment, is relying, if at all, solely upon the advice of such Investor's personal tax advisor with respect to the tax aspects of an investment in the Company.

   **6.**   **Company's and Manager's Representations.**  The Company and the Company's Managers make the following representations and warranties on which the Investor and its counsel are entitled to rely:

   **(a)**   The execution and delivery of the Company Agreement and this Agreement, the consummation of the transactions contemplated thereby and the performance of the obligations thereunder will not conflict with or result in any violation of or default under any provision of any other agreement or instrument to which the Company is a party or any judgment, order, writ or decree applicable to the Company.

   **(b)**   No suit, action, claim, investigation or other proceeding is pending or, to the best of the Company's or the Manager's knowledge, is threatened in writing against the Company which questions the validity of the Company Agreement or this Agreement or any action taken or to be taken pursuant to the Company Agreement or this Agreement, or which could otherwise have a material adverse effect on the Company.

   **(c)**   The Company Agreement and this Agreement create valid and binding obligations of the Company and are enforceable against the Company in accordance with their terms.

   **7.**   **Trustee, Agent, Representative or Nominee.**  If the natural person or entity completing this Agreement is acting as trustee, agent, representative or nominee for the Investor (such person or entity, the "Agent"), the Agent agrees that the representations, warranties and agreements made herein are made by such Agent (a) in respect of such Agent and (b) in respect of the underlying subscriber on whose behalf the Agent is acting. The Agent represents and warrants that such Agent has all requisite power and authority to execute this Agreement and perform the obligations under this Agreement on the underlying Investor's behalf. The Agent agrees to provide any additional documents and information that the Company reasonably requests relating to itself or the underlying Investor.

   **8.**   **Survival of Agreements, Representations and Warranties; Indemnification.**

   **(a)**   All agreements, representations and warranties contained herein or made in writing by or on behalf of the Investor, the Company or the Managers of the Company in connection with the transactions contemplated by this Agreement shall survive the execution of this Agreement and the Company Agreement, any investigation at any time made by the Investor, the Company or the Managers of the Company or on behalf of any of them and the sale and acquisition of the Interest and payment therefor.

   **(b)**   The Investor acknowledges that the Investor understands the meaning and legal consequences of the representations and warranties made by the Investor herein. Such representations and warranties are complete and accurate, shall be complete and accurate as of the Closing Date and may be relied upon by the Company's Managers and the Company. If there should be any material change in

WIL_00000820
Page 20

any of the representations or warranties or other information regarding the Investor set forth herein, including at any time following the Closing Date, the Investor agrees to notify the Company's Managers in writing as promptly as reasonably practicable.

       **(c)**    The Investor agrees that the foregoing representations and warranties, and all other information regarding the Investor set forth herein, may be used as a defense in any actions relating to the Company, the Managers of the Company or the private placement of the Interest, and that it is only on the basis of such representations, warranties and other information that the Company's Managers may be willing to accept this Agreement on behalf of the Company.  The Investor acknowledges that the Company, and the Managers of the Company shall rely on such information, representations and warranties on an ongoing basis.

       **9.**    **Binding Effect.**  This Agreement shall be binding upon the Investor and the heirs, personal representatives, successors and assigns of the Investor.  The Investor agrees that neither this Agreement nor any rights which may accrue to the Investor hereunder may be transferred or assigned without the consent of the Company's Managers, which may be granted or withheld in its sole discretion or otherwise as provided in the Company Agreement.  This Agreement shall survive the admission of the Investor to the Company and shall, if the Investor consists of more than one person, be the joint and several obligations of all such persons.

       **10.**    **Severability.**  If any provision of this Agreement is held to be invalid or unenforceable in any jurisdiction, such provision shall be deemed modified to the minimum extent necessary so that such provision, as so modified, shall no longer be held to be invalid or unenforceable. Any such modification, invalidity or unenforceability shall be strictly limited both to such provision and to such jurisdiction, and in each case to no other. Furthermore, in the event of any such modification, invalidity or unenforceability, this Agreement shall be interpreted so as to achieve the intent expressed herein to the greatest extent possible in the jurisdiction in question and otherwise as set forth herein.

       **11.**    **Confidentiality.**  The Investor has carefully read the Company's Confidentiality Agreement and by execution thereof understands, including without limitation the confidentiality and non-solicitation undertakings set forth therein which shall apply to the Investor, whether or not this Agreement is accepted by the Company.

       **12.**    **Counterparts.** his Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

       **13.**    **Amendments.**  Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated orally, but only with the written consent of the Investor and the Company.

       **14.**    **Governing Law.**  The interpretation and enforceability of this Agreement and the rights and liabilities of the parties hereto shall be governed by the laws of the State of Texas. To the extent permitted by the Act and other applicable law, the provisions of this Agreement shall supersede any contrary provisions of the Act or other applicable law.

WIL_00000821

THE UNDERSIGNED INVESTOR HEREBY REPRESENTS THAT (I) THE UNDERSIGNED INVESTOR HAS CAREFULLY READ AND IS FAMILIAR WITH THIS AGREEMENT AND THE COMPANY AGREEMENT, (II) THE INFORMATION CONTAINED HEREIN IS COMPLETE AND ACCURATE AND MAY BE RELIED UPON, AND (III) THE EXECUTION OF THE FOLLOWING SIGNATURE PAGE SHALL CONSTITUTE THE EXECUTION OF THIS AGREEMENT AND THE COMPANY AGREEMENT BY THE INVESTOR IN THE EVENT THAT THE INVESTOR IS ADMITTED TO THE COMPANY AS A NEW MEMBER.

**IN WITNESS WHEREOF,** the undersigned has executed this Subscription Agreement as of this _____ day of _____, 20__.

**THE COMPANY:**

**HOPEWELL-PILOT PROJECT, LLC**

_____
By: **THOMAS P. TATHAM**
Its:  Manager

_____
BY: **MARK A. WILLIS**
Its:  Manager

**INDIVIDUAL INVESTOR:**

_____
(Signature)

_____
(Signature)

_____
(Print Name As It Will Be Registered With This Investment)

**ENTITY INVESTOR:**
[Legal Name of Entity to be provided]
(Name of Entity As It Will Be Registered With This Investment)

By: _____

Name: _____

Title: _____

**Closing Date:  June 15, 2016 or earlier_____**
(To be completed by the Company)

**Capital Commitment: $_____**
(To be completed by Investor)

Please provide the following information:

|   |   |   |   |
|---|---|---|---|
| ☐ | Individual | ☐ | Irrevocable Trust |
| ☐ | Community Property | ☐ | Living Trust or Revocable Trust w/ ___grantors. |
| ☐ | Partnership | ☐ | Corporation |
| ☐ | Limited Liability Company | ☐ | Other:_____. |

If the Investor is an entity, as of the Closing Date, there are _____ holders of its outstanding securities (other than short-term paper) (*please fill in the blank specifying the number of beneficial owners*).

Primary contact person:_____

   Telephone Number:_____ Fax Number: _____

-7-

WIL_00000822

E-mail Address:_____

☐   Social Security or Taxpayer I.D. Number_____
☐   U.S. Investor / U.S. Person             ☐   Non-U.S. Investor / Foreign Person
☐   Exempt under Code Section 401(a)        ☐   Exempt under Code Section 892
☐   Exempt under Code Section 501(c)3

Residential/Business Address (Domicile for Blue Sky filing purposes):

_____

_____

Registered Address (if applicable):

_____

_____

_____

Mailing Address *(select one)*:

[ ]     Please use the Subscriber's Residential/Business Address as the Mailing Address

[ ]     Please use the Subscriber's Registered Address as the Mailing Address

[ ]     Please use the following as the Subscriber's Mailing Address:

_____

_____

_____

**METHOD OF DELIVERY OF ACCOUNT COMMUNICATIONS.** Account Communications may be delivered via the e-mail address provided on this page. Should this means of transmission be unacceptable, Account Communications will be delivered via facsimile or physical delivery if the following box is checked:

☐   E-mail transmission is <u>declined</u>, please send Account Communications via facsimile or physical delivery

-8-

WIL_00000823

IN WITNESS WHEREOF, this Amended and Restated Company Agreement has been entered into by the parties as of this _____ day of _____, 2016.

<u>THE COMPANY</u>

HOPEWELL-PILOT PROJECT, LLC

By:_____
     MANAGER

By: _____
     MANAGER

<u>NEW MEMBERS</u>

**INDIVIDUAL:**

By: _____

By: _____

Name:_____

**ENTITY:**

_____
 (Name of Entity)

By: _____

Name: _____

Title: _____

**ANNEX 1**

**PART 1**

**Individual Investor Representations.**

All defined terms have the meanings provided to them in the Agreement; the following representations are incorporated by reference into the Agreement.

The Investor makes the following representations regarding the Investor's status as an Accredited Investor and a Qualified Client *by checking the box adjacent to each representation below*:

☐    **(a)**    <u>Accredited Investor</u>:  The Investor is an individual and has a net worth, either individually or upon a joint basis with the Investor's spouse, that exceeds $1,000,000, excluding the net equity value of such individual's primary residence, if any, but including as a liability the amount by which any indebtedness secured by such residence exceeds the value of such residence (within the meaning of such terms as used in Rule 501 under the Securities Act),[1] *or* has had an individual income in excess of $200,000 for each of the two most recent years, or a joint income with the Investor's spouse in excess of $300,000 in each of those years, and has a reasonable expectation of reaching the same income level in the current year.

☐    **(b)**    <u>Qualified Client</u>:  The Investor is an individual that (i) has a net worth, together with assets held jointly with the Investor's spouse, of more than $2,000,000, excluding the net equity value of such individual's primary residence, if any, but including as a liability the amount by which any indebtedness secured by such residence exceeds the value of such residence (within the meaning of such terms as used in Rule 501 under the Securities Act),[2] or (ii) is a Qualified Purchaser.

---

[1] Any indebtedness secured by such primary residence that the Investor incurred within the 60 day period preceding the date of the sale of securities pursuant to this Agreement (other than indebtedness incurred as a result of the acquisition of the primary residence) will be included as a liability for purposes of this calculation, even if the total amount of indebtedness securing such primary residence does not exceed the value of such residence.

-1-

WIL_00000825

ANNEX 1

PART 2

**Entity Investor Representations.**

All defined terms have the meanings provided to them in the Agreement; the following representations are incorporated by reference into the Agreement.

The Investor makes the representations regarding the Investor's status as an Accredited Investor and a Qualified Client *by checking the box adjacent to the each representation below*:

**ACCREDITED INVESTOR REPRESENTATION** (*check the box adjacent to* **at least one** *applicable representation below*):

☐ **(i)** The Investor is a corporation, partnership

, business trust or limited liability company, **not** formed for the purpose of acquiring an Interest, or an organization described in section 501(c)(3) of the Code, in each case with total assets in excess of $5,000,000.

☐ **(ii)** The Investor is an entity in which **all** of the equity owners (or *a living trust or other revocable trust* in which **all** of the grantors to such trust) qualify under Annex 1, Part 1, clause (a) or (b), or clause (i), (iii), (iv), (v) or this clause (ii) of this Annex 1, Part 2.

☐ **(iii)** The Investor is an employee benefit plan and *either* all investment decisions are made by a bank, savings and loan association, insurance company, or registered investment advisor, *or* the Investor has total assets in excess of $5,000,000 *or*, if such plan is a self-directed plan, investment decisions are made solely by persons who are Accredited Investors.

☐ **(iv)** The Investor is an *irrevocable* trust with total assets in excess of $5,000,000 whose acquisition is directed by a person with such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of the prospective investment.

☐ **(v)** The Investor is a bank, insurance company, investment company registered under the Investment Company Act, a broker or dealer registered pursuant to Section 15 of the United States Securities Exchange Act of 1934, as amended, a business development company, a Small Business Investment Company licensed by the United States Small Business Administration, a plan with total assets in excess of $5,000,000 established and maintained by a state for the benefit of its employees, or a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act.

☐ **(vi)** The Investor cannot make any of the representations set forth in clauses (i) through (v) above.

-1-

WIL_00000826

**QUALIFIED CLIENT REPRESENTATION** (*check the box adjacent to* **at least one** *applicable representation below*):

☐    **(i)**    The Investor is a corporation, partnership, association, joint-stock company, trust, or any organized group of persons, whether incorporated or not, that has a net worth of more than $2,000,000. *If the Investor belongs to this investor category, please either check clause (iii) below, if applicable, or affirmatively deny the applicability of clause (iii) below.*

☐    **(ii)**    The Investor is a corporation, partnership, association, joint stock company, trust, or any organized group of persons, whether incorporated or not, that is a Qualified Purchaser. *If the Investor belongs to this investor category, please either check clause (iii) below, if applicable, or affirmatively deny the applicability of clause (iii) below.*

☐    **(iii)**    The Investor is a corporation, partnership, association, joint-stock company, trust, or any organized group of persons, whether incorporated or not, that is an Excluded Company, and all of the Investor's equity owners (and all of their respective equity owners) are Qualified Clients.

☐    The Investor has checked either or both of clauses (i) or (ii) above and affirmatively denies applicability of this clause (iii).

☐    **(vi)**    The Investor cannot make any of the representations set forth in clauses (i) through (iii) above.

## FURTHER ENTITY INVESTOR REPRESENTATIONS

The Investor makes the following representations *by checking the box adjacent to the correct response to each representation below*:

☐ True    ☐ False    The Investor is **neither** an "investment company" under the Investment Company Act **nor** does the Investor rely upon the exclusions from the definition of "investment company" provided for in Section 3(c)(1) or 3(c)(7) of the Investment Company Act.

☐ True    ☐ False    The Investor was **not** organized for the purpose of acquiring the Interest.

☐ True    ☐ False    The Investor has made investments prior to the date hereof or intends to make investments in the near future and each beneficial owner of interests in the Investor has and will share in the same proportion to each such investment.

☐ True    ☐ False    The Investor's investment in the Company will **not** constitute more than 40% of the assets of the Investor (including any capital commitments that may be drawn upon demand by the Investor).

☐ True    ☐ False    The governing documents of the Investor require that each beneficial owner of the Investor, including, but not limited to, shareholders, partners and beneficiaries, participate through their interest in the Investor in all of the Investor's investments and that the profits and losses from each such investment are shared among such beneficial owners in the same proportions as all other investments of the Investor. No such beneficial owner may vary the Investor's share of the profits and losses or the amount of the Investor's contribution for any investment made by the Investor.

-2-

WIL_00000827

If any of the above statements are marked "False," then the Investor will have, as of the Closing Date, _____ holders of its outstanding securities (other than short-term paper) (*please fill in the blank specifying the number of beneficial owners*).

The Investor is:

☐ True   ☐ False   **(1)**   an "employee welfare benefit plan" or an "employee pension benefit plan" as defined in sections 3(1) and 3(2), respectively, of ERISA; or

☐ True   ☐ False   **(2)**   a plan described in section 4975(e)(1) of the Code; or

☐ True   ☐ False   **(3)**   an entity that is deemed to be a "benefit plan investor" under the DOL Regulations because all or part of its underlying assets include "plan assets" by reason of a plan's investment in the entity (including, by way of example only, a partnership not qualifying as an operating company within the meaning of the DOL Regulations, which is 25% or more owned by entities described in (1) or (2) above); or

☐ True   ☐ False   **(4)**   subject to any rules or regulations similar to the fiduciary provisions of ERISA and/or the prohibited transaction provisions of Section 4975 of the Code.

If clause (3) above is marked "True," please provide the percentage that the Investor's "plan assets" holdings bear to its aggregate asset holdings (based upon value as of the Closing Date): _____% (the "Plan Asset Percentage").

☐ True   ☐ False   The Investor is a "private foundation" as described in Section 509 of the Code.

☐ True   ☐ False   The Investor is subject to the Bank Holding Company Act of 1956, as amended.

☐ True   ☐ False   To the best of the Investor's knowledge, the Investor does **not** control nor is it controlled by or under common control with, any other Investor.

*Please check the box next to each applicable statement and provide appropriate information in response to each such statement:*

☐ True   ☐ False   The Investor is subject to federal or state freedom of information (FOIA) statutes or other similar statutes in each of the following jurisdictions. (*If a similar statute is applicable, please specify the applicable statute along with the applicable jurisdiction, to the extent known*):

_____

☐ True   ☐ False   One or more of the Investor's beneficial owners is subject to federal or state FOIA statutes or other similar statutes in each of the following jurisdictions. (*If a similar statute is applicable, please specify the applicable statute along with the applicable jurisdiction, to the extent known*):

_____

-3-

☐ True   ☐ False      The Investor is a public agency, department, office or pension plan. *(Please specify type and applicable jurisdiction.)*:

_____

☐ True   ☐ False      One or more of the Investor's beneficial owners is a public agency, department, office or pension plan. (*If known, please specify type of owner and applicable jurisdiction below*.):

_____

-4-

# PRIVATE PLACEMENT MEMORANDUM
# & PREVIOUSLY DISTRIBUTED OFFERING MATERIALS

[All attached separately with Amended and Restated Company Agreement]

-5-

WIL_00000830

**EXHIBIT C**

**AMENDED AND RESTATED
COMPANY AGREEMENT**

**OF**

**HOPEWELL - PILOT PROJECT, LLC**

**A Texas Limited Liability Company**

_____, 2016

THE LIMITED LIABLITY COMPANY INTERESTS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES EXCHANGE COMMISSION OR UNDER ANY SECURITIES LAWS OF ANY STATE. THE TRANSFERABILITY OF SUCH INTERESTS IS RESTRICTED.  SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, OR TRANSFERRED, NOR WILL ANY ASSIGNEE, VENDEE, TRANSFEREE, OR ENDORSEE THEREOF BE RECOGNIZED AS HAVING ACQUIRED ANY SUCH INTERESTS BY THE ISSUER FOR ANY PURPOSE, UNLESS, AMONG OTHER THINGS, (1) A REGISTRATION STATEMENT FILED WITH THE SEC UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WITH RESPECT TO SUCH INTERESTS SHALL THEN BE IN EFFECT AND SUCH TRANSFER HAS BEEN QUALIFIED UNDER ALL APPLICABLE STATE SECURITIES LAWS, OR (2) THE AVAILABILITY OF AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION SHALL BE ESTABLISHED TO THE SATISFACTION OF COUNSEL TO HOPEWELL - PILOT PROJECT, LLC.

**AMENDED AND RESTATED**
**COMPANY AGREEMENT**
**OF**
**HOPEWELL - PILOT PROJECT, LLC**
**A Texas Limited Liability Company**

This AMENDED AND RESTATED COMPANY AGREEMENT OF **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company (the "Agreement"), dated as of _____, 2016 ("Effective Date"), is adopted by the undersigned as the Managers and Members of the Company.

### Background Statements

WHEREAS, the initial Member of the Company executed a certain Company Agreement for the Company dated as of March 30, 2016 ("Original Company Agreement"), providing for certain rights and obligations with respect to the Company; and

WHEREAS, the Company wishes to admit certain Persons as new Members of the Company as of the Effective Date and the Members hereby desire to amend and restate the Original Company Agreement in its entirety in the form of this Company Agreement on the terms herein provided in order to reflect the admission of the new Members to the Company and to make certain other amendments.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and agreements contained herein, the Members do hereby agree that the Original Company Agreement shall be amended and restated in its entirety in the form of this Company Agreement as of the Effective Date:

### ARTICLE I
### Definitions

*Section 1.1  Certain Definitions*.  As used in this Agreement, the following terms shall have the meanings indicated:

"*Area of Mutual Interest*" means the agreed area of mutual interest for the Company Business covering Madison County, Texas, Houston County, Texas; Walker County, Texas; Leon County, Texas; and Grimes County, Texas.

"*Company*" means **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company.

"*Company Business*" means to acquire and own oil, gas and mineral leases, mineral interests, royalty interests, top leases, and options related to the foregoing in Madison County, Texas and to develop a land management, legal and technical team capable of implementing a similar broader

1

strategy to finance and acquire oil, gas and mineral leases, mineral interests, royalty interests, top leases, and options in the Area of Mutual Interest.

*"Deadlock"* has the meaning set forth in Section 6.2 of this Agreement.

*"Directors"* means the Persons named in this Agreement as Directors of the Company and any Persons hereafter elected as Directors of the Company as provided in this Agreement, but does not include any Person who has ceased to be a director of the Company.

*"Dispose," "Disposing," or "Disposition"* means a sale, assignment, transfer, exchange, mortgage, pledge, grant of a security interest, or other disposition or encumbrance (including, without limitation, by operation of law) of a Membership Interest in the Company.

*"Founding Members"* means those Members that receive Founders Shares as set forth on Schedule A.

*"Initial Additional Equity Shares"* means those shares issued as provided in Section 4.1. Initial Additional Equity Shares shall have a priority right to cash distributions and shall receive all cash distributions made by the Company until such time as the holders of such shares have received $2.00 per share. Once the holders of the Initial Additional Equity Shares have received $2.00 per share in cash distributions, then all cash distributions thereafter shall be made uniformly on a per share basis to all shares then outstanding.

*"Majority Interest"* means Members holding among them at least a majority of all Ownership Percentages.

*"Managers"* means the Persons named in this Agreement as Managers of the Company and any Persons hereafter elected as Managers of the Company as provided in this Agreement, but does not include any Person who has ceased to be a manager of the Company.

*"Member"* means any Person executing this Agreement as of the date of this Agreement as a member or hereafter admitted to the Company as a member as provided in this Agreement, but does not include any Person who has ceased to be a member in the Company.

*"New Members"* means those Members other than Founding Members that purchase Initial Additional Equity Shares as provided in Section 3.2 and Section 4.1.

*"New Additional Members"* means those Members other than Founding Members or New Members that purchase additional Shares as provided in Section 3.2.

*"Ownership Percentage"* means the result derived by dividing the number of Shares held by a Member by the total number of Shares which are issued and outstanding. The initial Ownership Percentages of the Members as of the Effective Date are set forth on Schedule A.

WIL_00000833
Page 34

*"Quarterly Operating Budget"* means the quarterly operating budget from time to time in effect as described in Section 6.8 of this Agreement.

*"Shares"* means the shares into which the ownership of Membership Interests in the Company are denominated, including all rights and interests of a Member with respect to the Shares issued under this Agreement including (i) the right of a Member to receive distributions under this Agreement by virtue of the Member's ownership of interests as an Member under this Agreement and (ii) all associated management rights, voting rights or rights to consent. The Shares held by the Members as of the Effective Date are set forth on Schedule A.

**Section 1.2  Other Definitions**.  The definitions of certain other capitalized terms used in this Agreement are set forth in Article XII.

**ARTICLE II**
**Organization**

**Section 2.1   Formation**.  The Company has been organized as a Texas limited liability company by the filing of Certificate of Formation (the *"Certificate"*) under and pursuant to the Code and the issuance of a certificate of formation for the Company by the Secretary of State of Texas.

**Section 2.2   Name**.  The name of the Company is "**HOPEWELL - PILOT PROJECT, LLC**", and all Company business must be conducted in that name or such other names that comply with applicable law as the Managers may select from time to time.

**Section 2.3   Registered Office; Registered Agent; Principal Office in the United States; Other Offices**.  The registered office of the Company required by the Code to be maintained in the State of Texas shall be the office of the registered agent of the Company.  The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate or such other Person or Persons as the Managers may designate from time to time in the manner provided by law.  The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by Section 3.151 of the Code.  The Company may have such other offices as the Managers may designate from time to time.

**Section 2.4   Purposes**.  The sole purpose of the Company shall be to conduct the Company Business and all activities incidental to the Company Business in accordance with the applicable provisions of the Code, including, but not limited to: (i) entering into, performing, enforcing, and carrying out contracts of any kind necessary or desirable to, or in connection with, or incidental to the Company Business or, accomplishing the general purposes of the Company, (ii) acquiring oil, gas and mineral leases, mineral interests, royalty interests, top leases, and options in the Area of Mutual Interest and (iii) borrowing money and issuing evidence of indebtedness, and securing the same by mortgage, deed of trust, pledge, or other lien, in furtherance of the Company Business.

3

*Section 2.5  Term*.  The existence of the Company commenced on the date the Secretary of State of Texas issued a certificate of formation for the Company and shall continue in existence for the period fixed in the Certificate for the duration of the Company, or such earlier time as this Agreement may specify.

*Section 2.6  Foreign Qualification*.  Prior to the Company's conducting business in any jurisdiction other than Texas, the Managers, if required by the laws of such jurisdiction, shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Managers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction.  At the request of the Managers, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

*Section 2.7  Mergers and Exchanges*.  The Company may be a party to: (a) a merger, or (b) an exchange or acquisition of the type described in the Code, if approved by a Majority Interest.

## ARTICLE III
## Membership

*Section 3.1  Authorization of Shares*.  There shall be 5,000,000 Shares authorized for issuance by the Company.  Additional Shares may be authorized from time to time with the consent of the Board of Directors and a Majority Interest.

*Section 3.2  Additional Membership Interests*.  Except for authorized Shares to be issued as described in Section 4.1, additional authorized Shares or other Membership Interests may be created and issued by the Company only with the consent of the Board of Directors and a Majority Interest. The terms of admission or issuance must specify the Ownership Percentages applicable thereto and may provide for the creation of different classes or groups of Members having different rights, powers, and duties.  The creation of any new class or group shall be reflected in an amendment to this Agreement indicating the different rights, powers, and duties.

At any time the Company proposes to issue additional Shares or other Membership Interests, the Company shall give written notice of the offering to the Members, setting forth the purchase price, rights and limitations of such Shares or other Membership Interests and the terms and conditions upon which they are proposed to be issued.  Each Member shall have the preemptive right (based upon its then current Ownership Percentage) to acquire its share of such Shares or other Membership Interests.  Each Member must exercise such preemptive rights by purchasing, within ten (10) Business Days of receiving the written notice of offering from the Company, its share (based upon its then current Ownership Percentage) of the Shares or other Membership Interests upon the terms and conditions and for the purchase price set forth in the written notice of offering from the Company.  If any Member does not elect to purchase its full share of the Shares or other Membership Interests, the balance of the Shares or other Membership Interests may be sold by the Company to Members or one or more third parties, but only upon the terms and conditions and for the purchase

4

price set forth in the written notice of offering from the Company or upon more economically favorable terms to the Company and the existing Members. The price per Share of any additional Shares offered by the Company under this Section 3.2 shall be $2.50 per Share unless the Board of Directors shall determine otherwise.

**Section 3.3  Liability to Third Parties**.  No Member shall be liable for the debts, obligations or liabilities of the Company, including debts, obligations, or liabilities which are imposed under a judgment decree or order of a court.

**Section 3.4  Admission of Assignees or Members**.  Except as provided in the next sentence of this Section 3.4, a disposition, sale, assignment or other transfer of a Membership Interest shall not entitle the transferee to become a Member of the Company, but instead shall entitle the transferee to the right to receive distributions, allocations and other economic benefits from the Company which are attributable to the purchased Interest.  Assignees may be admitted as Members only with the consent of a Majority Interest and a majority of the Managers.

**Section 3.5  Withdrawal**.  A Member does not have the right or power to withdraw from the Company as a Member.

**Section 3.6  Compensation for Members**.  No Member shall receive any compensation from the Company in such Member's capacity as a Member.  However, any Member may be employed in the business of the Company at the discretion of the Managers and, in connection therewith, may receive reasonable compensation for services rendered.

**Section 3.7  Restrictions on the Disposition of an Interest**.

(a)      Except as specifically provided in this Section 3.7, a Disposition of all or any part of a Membership Interest may not be effected without the consent of a Majority Interest. Any attempted Disposition by a Person of an interest or right, or any part thereof, in or with respect to the Company other than in accordance with this Section 3.7 shall be, and is hereby declared, null and void *ab initio*.

(b)      Provided that the consent of a Majority Interest to such Disposition has been obtained, a Member or an Assignee may Dispose of all or a portion of his Membership Interest if he, prior to making such Disposition, first offers (an "Offer") such portion of the Membership Interest (the "Offered Interest") for sale to the Company and the other Members (the "Remaining Members").  The Offer shall be made for the price and upon the terms at which the proposed Disposition is to occur (the "Proposed Price"). The Offer shall be made by written notice which shall state that the Offer is being made pursuant to this Section and which shall set forth the Ownership Percentage attributable to the Offered Interest, the name or names of the proposed purchaser or purchasers of the Offered Interest, the Proposed Price, method of payment of the Proposed Price (the "Proposed Terms"), and the scheduled date of consummation of the proposed sale.  A copy of the written offer, and any proposed sales agreement, from or with the proposed purchaser shall be attached to the Offer.  The Company shall have the option exercisable during the ensuing thirty (30) day period to accept the

5

Offer.  If the Company does not accept the Offer, then the Remaining Members shall have the option for ten (10) days from the date of the termination of such thirty (30) day period to elect to collectively purchase all, but not less than all, of the Offered Interest, pro rata, in accordance with their relative Ownership Percentages.  Any two or more Remaining Members may agree among themselves to reallocate the portions of the Offered Interest to be purchased by them from their respective pro rata portions.  The payment of the respective purchase price shall be payable pursuant to the Proposed Terms.  If neither the Company nor the Remaining Members elect to purchase all of the Offered Interest in accordance with this Section 3.7(b), then the Selling Member may sell not less than all of the Offered Interest at any time within, but not subsequent to, sixty (60) days after the lapse of the options granted pursuant to this Section; provided, however, that such sale must be made to the third party purchaser and for the price and in accordance with the terms specified in the Offer notice.

(c)     The Company may not recognize for any purpose any purported Disposition of all or part of a Membership Interest unless and until the other applicable provisions of this Section 3.7 have been satisfied and the Company has received a document which:

i)     has been executed by both the Member effecting the Disposition (or if the transfer is on account of the death or incapacity of the transferor, its representative) and the Person to which the Membership Interest or part thereof is Disposed;

ii)     includes the notice address of the transferee and his or its agreement to be bound by this Agreement in respect of the Membership Interest or part thereof being acquired;

iii)     sets forth the Ownership Percentages which will be effective after the Disposition of the Member effecting the Disposition and the Person to which the Membership Interest or part thereof is Disposed (which together must total the Ownership Percentage of the Member effecting the Disposition before the Disposition); and

iv)     the Disposition was made in accordance with all applicable laws and regulations (including securities laws), including the following:

(1) the Member effecting the Disposition and the Person to which the Membership Interest or part thereof is Disposed acknowledge and agree that the Membership Interest has not been registered under the Securities Act or applicable state securities laws and are being sold pursuant to the exemptions from registration offered by the Securities Act and by applicable state law provisions; and

(2) the Person to which the Membership Interest or part thereof is Disposed must acknowledge and agree his understanding that, as a result of paragraph (1), immediately above, (i) he must bear the economic risk of

6

investment in the Membership Interest for an indefinite period of time; (ii) the Membership Interest may not be sold, assigned, or transferred, nor will any assignee, vendee, transferee, or endorsee thereof be recognized as having acquired any such interests by the issuer for any purpose, unless, among other things, (x) a registration statement under the Securities Act, with respect to such Membership Interest shall then be in effect (and such transfer has been qualified under all applicable state securities laws), or (y) the availability of an exemption from such registration and qualification shall be established to the satisfaction of counsel to the Company.

Each Disposition and, if applicable, admission into membership complying with the provisions of this Section 3.7(c) is effective as of the first day of the calendar month immediately succeeding the month in which the Company receives the notification of Disposition and the other requirements of this Section 3.7 have been met.

(d)     The Member effecting a Disposition and any Person admitted to the Company in connection therewith shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the Disposition or admission on or before the tenth day after the receipt by that person of the Company's invoice for the amount due.  If payment is not made by the date due, the Person owing that amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the maximum rate allowed by law.

**Section 3.8 Other Activities.**  The Members acknowledge that the Members and Managers are engaged in activities other than the activities of the Company and that neither Members nor the Managers shall be expected or required to devote their full time to the management of the Company except as provided in any separate agreement or instrument.  Except as otherwise provided in this Agreement or any other agreement or instrument, participation in the Company shall not in any way act as a restraint on the other present or future business activities or investments of any Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member.  Except as otherwise provided in this Agreement or any other agreement or instrument, no Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member shall, under any circumstances, be obligated or bound to offer or present to the Company or any of the other Members any business opportunity presented or offered to them or the Company as a prerequisite to the acquisition of or investment in such business opportunity by such Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member for its account or the account of others.  The provisions of this Section shall not serve to waive or limit the provisions of any other written agreement or instrument binding upon any Member or Manager.

Each Member shall be required to execute and deliver to the Company a Confidentiality and Non-Competition Agreement as a condition of acquiring any Shares of the Company.

**Section 3.9     Purchase Options Upon the Occurrence of Certain Events**. In the event (i) a Member dies or becomes legally incapacitated, (ii) a Member institutes or there is instituted against a Member any proceeding under the United States Bankruptcy Code or any other foreign, federal or

7

state bankruptcy, receivership, insolvency or other similar law affecting the rights of creditors generally or (iii) the spouse of a Member becomes entitled to any interest in the Shares of such Member by virtue of a divorce or property settlement agreement executed in connection with such divorce, then for a period of ninety (90) days following the date of such event, the Company shall have the right to purchase the Shares registered in the name of the deceased, incapacitated, bankrupt or divorced Member, as the case may be ("Affected Member"). The Company shall exercise its purchase right by giving written notice of such exercise to the Affected Member (or its representative) within such ninety (90) day period. If the Company does not elect to exercise its first right to purchase the Shares registered in the name of the Affected Member, for a period of thirty (30) days following the expiration of the Company first right to purchase such Shares, the Remaining Members shall have the right to purchase such Shares. The Remaining Members shall exercise their purchase right by giving written notice of such exercise to the Affected Member (or its representative) within such thirty (30) day period.

The purchase price shall be an amount equal to the fair market value of the Shares determined by agreement of the Affected Member (or its representative) and the purchaser of the Shares ("Purchaser"); however, if the Purchaser and the Affected Member (or its representative) do not agree on such fair market value on or before fifteen (15) days following the exercise of the purchase right, then the fair market value of each share of Shares shall be equal to the Appraised Value of each Share of the Company as determined by an appraisal of the Shares (the "Appraised Value") by an accounting firm or any other qualified appraiser selected by the Manager.

The appraisal shall determine the Appraised Value of the Shares as of the end of the most recently completed calendar quarter. The Appraised Value shall be the maximum amount that would be distributed in respect of the Shares in any Distribution Event if (i) all of the Company's assets were sold at their fair market value, (ii) the Company was liquidated and all liabilities and obligations of the Company are paid, including, without limitation, liabilities and obligations to Members, and (iii) the proceeds of such liquidation were distributed to the Members pursuant to this Agreement. A "Distribution Event" means (i) any winding up or liquidation of Company and (ii) any merger, consolidation or other transaction pursuant to which all of the Company's Shares are converted into or exchanged for cash, securities of another entity, real or other property or any other consideration. The cost of the appraisal shall be divided equally between the Purchaser and the Affected Member.

The sale and purchase of Shares under this Section shall be closed within sixty (60) days from the date of the receipt by the Affected Member (or its representative) of the last notice from the Purchaser and the Affected Member (or its representative) shall deliver a written assignment of the Shares at the closing of the sale and purchase of the Shares, free and clear of all liens. The Purchaser shall pay the purchase price for the Shares by making a down payment of 25% of the purchase price at the closing of the sale and purchase of the Shares, with the balance to be paid in three equal cash installments, (together with accumulated interest on the amount unpaid at the interest rate of 5% per annum) due on each of the first three anniversaries of the closing.

**Section 3.10   Buy-Sell Procedure Upon a Deadlock.** Following a Deadlock and as long as such Deadlock remains unresolved, in the event that any Member should desire to purchase all of the

8

interest of another Member in the Company or to sell to another Member all of such Member's interest in the Company, such Member ("Offeror Member") shall give written notice to such other Member ("Offeree Member") that the Offeror Member intends to exercise its right under this Section 3.10, setting forth the price, terms and conditions for which the Offeror Member will purchase the interest of the Offeree Member in the Company.   The consideration for any such purchase or sale under this Section 3.10 shall be only in the form of cash, and the purchasing Member shall be required to obtain the release of the selling Member for any liability for money borrowed by the Company.   Such notice shall constitute an irrevocable offer by the Offeror Member to purchase the interest of the Offeree Member in the Company or, in the alternative, and at the option of the Offeree Member, an irrevocable offer to sell the interest of the Offeror Member in the Company to the Offeree Member, for the price per Share and on the terms and conditions set forth in the written notice.   Within fifteen (15) days after the receipt of such written notice, the Offeree Member shall be required to give the Offeror Member written notice of such Offeree Member's acceptance of the Offeror Member's offer to either (i) purchase the interest of the Offeree Member in the Company or (ii) sell to the Offeree Member the interest of the Offeror Member in the Company.   If the Offeree Member shall not reply to the written notice from the Offeror Member within such fifteen (15) day period, the Offeree Member shall be deemed to have accepted the Offeror Member's offer to purchase the interest of the Offeree Member in the Company for the price and on the same terms and conditions as that contained in the written notice.   The closing of any such transaction shall take place within ten (10) days following the expiration of such fifteen (15) day period at the principal place of business of the Company.

### ARTICLE IV
### Capital Contributions

**Section 4.1  Initial Capital Contributions**.

The Founding Members have been issued Founders Shares as set forth on Schedule A and will be issued the number of Initial Additional Equity Shares as set forth on Schedule A according to that Founding Member's Capital Commitment for Initial Additional Equity Shares. Each Founding Member and each New Member will make additional capital contributions to the Company equal to its Capital Commitment for Initial Additional Equity Shares on or before June 15, 2016, or, if sooner, within ten (10) days following a call for such amounts are made by the Managers.  Each of the Initial Additional Equity Shares shall be issued based upon a $2.00 subscription price per share.

The Company will apply the proceeds of the Capital Contributions made as of the Effective Date in accordance with Exhibit A.

**Section 4.2  Return of Contributions**.  A Member is not entitled to the return of any part of its Capital Contribution.  An unpaid Capital Contribution is not a liability of the Company or of any Member. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

**Section 4.3  Advances by Members**.  If the Company does not have sufficient cash to pay its obligations, any Member(s) that may agree to do so with the consent of the Managers may advance

WIL_00000840

all or part of the needed funds to or on behalf of the Company under such terms and conditions as shall be agreed to by the Managers and the advancing Member.

Section 4.4  Capital Accounts.  The provisions of this Section 4.4 shall apply whenever the Company is treated as a partnership for federal income tax purposes.  A Capital Account shall be established and maintained for each Member.  Each Member's Capital Account:

(a)     shall be increased by:

i)      the amount of money contributed by that Member to the Company,

ii)     the agreed value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Tax Code), and

iii)    allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treasury Regulation Section 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation Section 1.704-(b)(4)(i); and

(b)     shall be decreased by:

i)      the amount of money distributed to that Member by the Company,

ii)     the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under Section 752 of the Tax Code),

iii)    allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Tax Code, and

iv)     allocations of Company losses and deductions (or items thereof), including losses and deductions described in Treasury Regulation Section 1.704-1(b)(2)(iv)(g), but excluding items described in clause (b)(iii) above and losses or deductions described in Treasury Regulation Section 1.704-1(b)(4)(i) or Section 1.704(b)(4)(iii).

The Members' Capital Accounts also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation Section 1.704-(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation Sections 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Treasury Regulation Section 1.704-1(b)(2)(iv)(g).  A Member that has more than one Membership Interest shall have a single Capital Account that reflects all its Membership Interests, regardless of the class of Membership Interests owned by that Member and regardless of

WIL_00000841

the time or manner in which those Membership Interests were acquired. On the transfer of all or part of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(l).

## ARTICLE V
## Allocations and Distributions

**Section 5.1    Allocations**. Subject to Section 5.3, net income (and items thereof) and net loss (and items thereof) for any fiscal year shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after giving effect to such allocation, is, as nearly as possible, equal (proportionately) to the amount of the distributions that would be made to such Member during such fiscal year pursuant to Section 5.2, determined as if (i) the Company were dissolved and terminated; (ii) its affairs were wound up and each Company asset was sold for cash equal to its book value; (iii) all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the book value of the assets securing such liability); and (iv) the net assets of the Company were distributed in accordance with Section 5.2 to the Members.

**Section 5.2    Distributions**. Distributions shall be made to the Members at such times as determined by the Managers in the following priority:

(a)    If the Members have taxable income attributable to their ownership of any Shares for a taxable year, the Company shall distribute to the Members, in accordance with their Ownership Percentages, subject to any contractual restrictions, limitations or conditions affecting the Company, an amount of distributions ("Tax Distributions") equal to the estimated maximum federal and state income and (if applicable) franchise and margin tax rates applicable to the Members and their equity interest owners times the aggregate taxable income of the Members from the Company for that taxable year. Any Tax Distributions shall be applied to reduce subsequent distributions to such Member under Section 5.2(b).

(b)    Thereafter, all remaining cash of the Company shall be distributed to the Members in accordance with their respective Ownership Percentages as of such distribution date.

**Section 5.3 Special Allocations and Tax Allocations.**

(a)    Special Allocations. The following special allocations shall be made in the following order:

(i)    Minimum Gain Chargeback. Notwithstanding any other provision of this Article, if there is a net decrease in partnership minimum gain (as defined in Treasury Regulations Section 1.704-2(b)(2) and (d)) during any fiscal year, the Members shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in partnership minimum gain, determined in accordance with Treasury Regulations Section 1.704-2(f) and (g). This Section

11

5.3(a)(i) is intended to comply with the minimum gain chargeback requirement in such section of the Treasury Regulations and shall be interpreted consistently therewith.

(ii)   Member Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 5, if there is a net decrease in Member nonrecourse debt minimum gain attributable to a Member nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(i)) during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Member nonrecourse debt minimum gain attributable to such Member's nonrecourse debt, determined in accordance with Treasury Regulations Section 1.704-2(i).  This Section 5.3(a)(ii) is intended to comply with the minimum gain chargeback requirement in such section of the Treasury Regulations and shall be interpreted consistently therewith.

(iii)   Qualified Income Offset.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit, if any, in such Member's capital account (as determined under Treasury Regulations Section 1.704-1) as quickly as possible; *provided that* an allocation pursuant to this Section 5.3(a)(iii) shall be made only if and to the extent that such Member would have such capital account deficit after all other allocations provided for in Section 5.3(a) have been tentatively made as if this Section 5.3(a)(iii) were not in this Agreement.  This Section 5.3(a)(iii) is intended to comply with the qualified income offset provisions in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(iv)   Gross Income Allocation.  In the event any Member has a deficit balance in such Member's capital account (as determined after crediting such capital account for any amounts that such Member is obligated to restore or is deemed obligated to restore pursuant to Treasury Regulations Section 1.704-2), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such deficit (as so determined) of such Member's capital account as quickly as possible; *provided that* an allocation pursuant to this Section 5.3(a)(iv) shall be made only if and to the extent that such Member would have such capital account deficit (as so determined) after all other allocations provided for in Section 5.3(a) (other than Section 5.3(a)(iii)) have been tentatively made as if this Section 5.3(a)(iv) were not in this Agreement.

(v)   Loss Allocation Limitation.  No allocation of net loss (or items thereof) shall be made to any Member to the extent that such allocation would create or increase a deficit in such Member's capital account (as determined after debiting such capital account for the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) and crediting such capital account for any amounts that such Member is obligated to restore or is deemed obligated to restore pursuant to Treasury Regulations Section 1.704-2).

12

(b)     Tax Allocations

(i)     General Rules.  Except as otherwise provided in Section 5.3(b)(ii), for each fiscal period, items of Company income, gain, loss, deduction and expense shall be allocated, for federal, state and local income tax purposes, among the Members in the same manner as the net income (and items thereof) or net loss (and items thereof) of which such items or components were allocated pursuant to Section 5.1.

(ii)     Section 704(c) of the Tax Code.  Income, gains, losses and deductions with respect to any property (other than cash) contributed or deemed contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of the contribution or deemed contribution in accordance with Section 704(c) of the Tax Code and the Treasury Regulations promulgated thereunder.

If there is a revaluation of Company property, subsequent allocations of income, gains, losses or deductions with respect to such property shall be allocated among the Members so as to take account of any variation between the adjusted tax basis of such property to the Company for federal income tax purposes and its fair market value in accordance with Section 704(c) of the Tax Code and the Treasury Regulations promulgated thereunder.

(iii)     Capital Accounts Not Affected.  Allocations pursuant to this Section 5.3(b) are solely for federal, state and local tax purposes and shall not affect, or in any way be taken into account in computing, any Member's capital account or allocable share of net income (or items thereof) or net loss (or items thereof).

## ARTICLE VI
### Board of Directors

*Section 6.1 Board of Directors*.  Except for situations in which approval of the Members is required by this Agreement or by nonwaivable provisions of applicable law, the powers of the Company shall be exercised under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Board of Directors of the Company. The Board of Directors of the Company shall have with respect to the Company the powers and duties of the Board of Directors of a corporation formed under the Code

*Section 6.2 Number of Directors;  Qualification and Election.*  The Company shall initially have two Directors, whose names are set forth on Schedule B to this Agreement.  The number of Directors may be changed from time to time by resolution of the Directors. The Directors shall be elected at the annual meeting of the Members or at a special meeting of the Members called for that purpose, beginning with the 2017 annual meeting of the Members. Cumulative voting shall be allowed in the election of Directors, and each Member shall have one vote for each Share held by such Member, multiplied by the number of Directors to be elected. A Member shall be entitled to

13

accumulate his votes and distribute his votes among any number of Director nominees. Each Director elected shall hold office until a successor shall be elected and shall qualify, or until his death, resignation, or removal in the manner herein provided. Any Director may be removed as such, either with or without cause, by action of the Members who voted for the election of such Director.

In the event of a tie vote by the Board of Directors with respect any matters to be decided by the Board of Directors that continues for a period of five (5) business days, the Board of Directors shall endeavor to unanimously appoint an independent fifth Director to the Board of Directors. In the event the parties cannot agree to the appointment of the independent Director to the Board of Directors within 5 business days, a "Deadlock" shall be deemed to have occurred, and the provisions of Section 3.10 shall apply

**Section 6.3  Vacancy**.  Any vacancy occurring among the Directors shall be filled by a vote of a Majority Interest.  A Director elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office and until his successor is elected, or his earlier death, resignation or removal.

**Section 6.4  Action by the Directors**. The Directors shall act as a Board, and each Director shall have one vote with respect to all matters to be decided by the Board of Directors. The act of a majority of the Directors then serving shall be the act of the Directors. No Director or Member shall take any action with respect to the management of the Company or act as an agent of the company for purposes of carrying out the Company's business and affairs, without the consent or authorization of Board of Directors, except as provided in this Agreement.

**Section 6.5  Annual Meetings**.  The annual meeting of the Board of Directors shall be held immediately following the annual meeting of Members, and at the same place at which the annual meeting of Members is held.

**Section 6.6  Special Meetings**.  Special meetings of the Board of Directors may be called by the Directors or any Member.  The Person calling the meeting may fix any place for holding the meeting.  Notice of each special meeting of the Board of Directors shall be given to each Director at least three days before the date of the meeting, in writing.  Except as may be otherwise provided by law, the Certificate, or this Agreement, neither the business to be transacted at, nor the purpose of, any special meeting need be specified in the notice or waiver of notice of such meeting.

**Section 6.7  Written Consent**.  Any action required or permitted to be taken at a meeting of the Directors may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by at least the minimum number of Directors necessary to take action at a meeting at which all Directors were present and voted.

**Section 6.8  Quarterly Operating Budgets**.  No later than fifteen (15) days prior to the end of each calendar quarter, the Board of Directors shall approve and adopt a quarterly operating budget ("Quarterly Operating Budget") setting forth the estimated receipts and expenditures of the Company for the succeeding calendar quarter. No expenditures exceeding a 10% variance from the approved Budget may be made by the Company without the approval of the Board of Directors. The initial

WIL_00000845

Quarterly Operating Budget for the second calendar quarter of 2016 is attached as Exhibit B to this Agreement.

**Section 6.9   Title Rover Services Agreement.** The Company is authorized to enter into a services agreement with Title Rover, LLC, a company owned and controlled by Mark A. Willis, and any renewals, modifications and replacements of such agreement.

## ARTICLE VII
## Managers and Officers

**Section 7.1   Appointment.**   The Company shall initially have two (2) Managers, whose names are set forth on the signature pages to this Agreement.   The number of Managers may be changed from time to time by resolution of the Managers. The Managers shall be appointed from time to time by the Majority Interest. The Managers shall be authorized to manage and conduct the day to day business of the Company, subject to the directives of the Board of Directors and the Majority Interest. Each Manager may act as an agent of the company for purposes of carrying out the Company's business. The Managers may but shall not be required to designate individuals to serve as officers of the Company as the Managers shall determine from time to time, including but not limited to a President and one or more Vice Presidents.   The initial President of the Company shall be Mark A. Willis. No officer need be a resident of the state of Texas, a Member or a Manager.   Any officers so designated shall have such authority to perform such duties as the Managers may, from time to time, delegate to them.   The Managers may assign titles to particular officers.   Unless the Managers decide otherwise, if the title is one commonly used for officers of a corporation formed under the Code, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Managers pursuant to the third sentence of this Section 7.1.   Each officer shall hold office until his successor shall be duly designated and shall qualify or until his death or until he shall resign or shall have been removed in the manner hereinafter provided.   Any number of offices may be held by the same individual.   The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Managers.

**Section 7.2   Resignation.**   Any officer may resign as such at any time.   Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Managers.   The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.   Any officer may be removed as such, either with or without cause, by the Managers whenever in their judgment the best interests of the Company will be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the Person so removed.   Designation of an officer shall not be deemed of itself to create contract rights on the part of any person.   Any vacancy occurring in any office of the Company (other than Managers) may be filled by the Managers.

15

## ARTICLE VIII
## Meetings of Members

*Section 8.1  Meetings*.

(a)    A quorum shall be present at a meeting of Members if the holders of a Majority Interest are represented at the meeting in person or by proxy.  Except as specifically provided herein, with respect to any matter considered at such a meeting the affirmative vote of a Majority Interest shall be the act of the Members.

(b)    All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or without the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meeting by means of conference telephone or similar communications equipment pursuant to Section 8.5.

(c)    Notwithstanding the other provisions of the Certificate or this Agreement, the chairman of the meeting appointed pursuant to Section 8.4 or the holders of a Majority Interest shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the remainder of the adjourned meeting.  If such meeting is adjourned, such time and place shall be determined by a vote of the holders of a Majority Interest.  Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d)    An annual meeting of the Members shall be held at such place, within or without the state of Texas, on such date and at such time as a Majority Interest shall fix and set forth in the notice of the meeting, which date shall be within thirteen (13) months subsequent to the date of formation of the Company or the last annual meeting of Members (whichever most recently occurred.)

(e)    Special meetings of the Members for any proper purpose or purposes may be called at any time by the owners of Membership Interests holding at least twenty percent (20%) of the Ownership Percentages of all Members.  If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

16

(f)      Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) days nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the Member calling the meeting, to each Member entitled to vote at such meeting. If mailed, any such notice shall be deemed to be delivered when deposited in the mail, addressed to the Member at his address provided for in Section 13.2, with postage thereon prepaid.

*Section 8.2  Voting List*. The Managers shall make, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of and the Ownership Percentages held by each, which list, for a period of ten (10) days prior to such meeting, shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting. The original membership records shall be prima facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members. Failure to comply with the requirements of this Section shall not affect the validity of any action taken at the meeting.

*Section 8.3  Proxies*. A Member may vote either in person or by proxy executed in writing by the Member. A telegram, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Members, before or at the time of the meeting or execution of the written consent, as the case may be. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest.

*Section 8.4  Conduct of Meetings*. All meetings of the Members shall be presided over by the chairman of the meeting, who shall be a Member (or representative thereof) designated by a Majority Interest. The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him in order.

*Section 8.5  Action by Written Consent or Telephone Conference*.

(a)      Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing setting forth the action so taken, shall be signed by the holder or holders of not less than the minimum Ownership Percentages that would be necessary to take such action at a meeting at which the holders of all Membership Interests entitled to vote on the action were present and voted. Every written consent shall bear the date of signature of each Member who signs the consent. No written consent shall be effective to take the

17

action that is the subject to the consent unless, within sixty (60) days after the date of the earliest dated consent delivered to the Company in the manner required by this Section, a consent or consents signed by the holder or holders of not less than the minimum Ownership Percentages that would be necessary to take the action that is the subject of the consent are delivered to the Company by delivery to its registered office or its principal place of business. Delivery shall be by hand or certified or registered mail, return receipt requested. A telegram, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member shall be regarded as signed by the Member for purposes of this Section. Prompt notice of the taking of any action by Members without a meeting by less than unanimous written consent shall be given to those Members who did not consent in writing to the action.

(b)     The record date for determining Members entitled to consent to an action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office or its principal place of business. Delivery shall be by hand or by certified or registered mail, return receipt requested.

(c)     Members may participate in and hold a meeting by means of conference, telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

## ARTICLE IX
### Indemnification

**Section 9.1  Exculpation.** Neither any Manager, any Director, any Member nor any Person appointed to act as liquidator under Article XI (each a "Covered Person") shall be liable to the Company or any Member under any theory of law, including tort, contract or otherwise (INCLUDING A COVERED PERSON'S OWN NEGLIGENCE) for any loss, damage or claim incurred by reason of any act or omission by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, including any such loss, damage or claim attributable to errors in judgment, negligence or other fault of such Covered Person, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of gross negligence or willful misconduct of such Covered Person. A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

18

*Section 9.2  Right to Indemnification*.  Subject to the limitations and conditions as provided in this Article IX, each Manager or Director who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a "*Proceeding*"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she is acting on behalf of the Company or was serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise, shall be indemnified by the Company to the fullest extent permitted by the Code, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorneys' fees) actually incurred by such Manager in connection with such Proceeding, and indemnification under this Article IX shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder.  The rights granted pursuant to this Article IX shall be deemed contract rights, and no amendment, modification or repeal of this Article IX shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal.  **It is expressly acknowledged that the indemnification provided in this Article IX could involve indemnification for negligence of the Manager or under theories of strict liability.**

*Section 9.3  Advance Payment*.  The right to indemnification conferred in this Article IX shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by the Manager of the type entitled to be indemnified under Section 9.1 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Manager's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Manager in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such Manager of his or her good faith belief that he has met the standard of conduct necessary for indemnification under this Article IX and a written undertaking, by or on behalf of such Manager, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Manager is not entitled to be indemnified under this Article IX or otherwise.

*Section 9.4  Indemnification of Officers, Employees and Agents*.  The Company, by adoption of a resolution of a Majority Interest, may indemnify and advance expenses to any other manager, officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Managers under this Article IX; and, the Company may indemnify and advance expenses to Persons who are not or were not Managers, officers, employees or agents of the Company but who are or were serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent of similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against

19

any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a Person to the same extent that it may indemnify and advance expenses to Managers under this Article IX.

Section 9.5  Nonexclusivity of Rights.  The right to indemnification and the advancement and payment of expenses conferred in this Article IX shall not be exclusive of any other right which a Manager or other Person indemnified pursuant to this Article IX may have or hereafter acquire under any law (common or statutory), provision of the Certificate or this Agreement, agreement or vote of Manager or disinterested Members or otherwise.

Section 9.6  Insurance.  The Company may purchase and maintain insurance, at its expense, to protect itself and any Person who is or was entitled to indemnification pursuant to this Article IX.

Section 9.7  Member Notification.  To the extent required by law, any indemnification of or advance of expenses to a Person in accordance with this Article IX shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the 12-month period immediately following the date of the indemnification or advance.

Section 9.8  Savings Clause.  If this Article IX or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Person indemnified pursuant to this Article IX as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative, to the full extent permitted by any applicable portion of this Article IX that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE X
## Books, Records, Reports, and Bank Accounts

Section 10.1  Maintenance of Books.  The Company shall keep books and records of account and shall keep minutes of the proceedings of its Managers and Members.

Section 10.2  Reports.  On or before the 120th day following the end of each fiscal year during the term of the Company, the Managers of the Company shall cause the Company to provide such financial information regarding the Company as the Majority Interest shall reasonably request.

## ARTICLE XI
## Event Requiring A Winding Up, Liquidation, and Termination

Section 11.1  Event Requiring A Winding Up.  The Company shall wind up its affairs on the first to occur of the following (a "Event Requiring A Winding Up"):

> (a)    the written consent of the Board of Directors and a Majority Interest;

20

(b)     the date the Company has no Members; or

(c)     the entry of a decree of an Event Requiring A Winding Up of the Company under Section 11.301 of the Code.

**Section 11.2  Liquidation and Termination**.   Upon the occurrence of an Event Requiring A Winding Up of the Company, a Majority Interest shall elect one or more Members as liquidator.  The liquidator shall proceed to diligently wind up the affairs of the Company and make final distributions as provided herein and in the Code.   The costs of liquidation shall be borne as a Company expense.  Until final distribution, the liquidator shall continue to operate the Company properties.  The steps to be accomplished by the liquidator are as follows:

(a)     as promptly as possible after an Event Requiring A Winding Up and again after final liquidation, the liquidator shall cause a proper accounting to be made of the Company's assets, liabilities, and operations through the last day of the calendar month in which the winding up occurs or the final liquidation is completed, as applicable;

(b)     the liquidator shall cause the notice described in the Code to be mailed to each known creditor of and claimant against the Company in the manner described in the Code;

(c)     the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d)     all remaining assets of the Company shall be distributed to the Members as provided in this Agreement.

**Section 11.3  Certificate of Termination**.   On completion of the distribution of Company assets as provided herein, the Company is terminated, and the liquidator (or such other Person or Persons as the Code may require or permit) shall file a Certificate of Termination with the Secretary of State of Texas, and take such other actions as may be necessary to terminate the legal existence of the Company.

**Section 11.4  Deficit Capital Accounts**.   Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, the deficit, if any, in the Capital Account of any Member shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

21

## ARTICLE XII
### Definitions

**Section 12.1  Definitions**.  As used in this Agreement, the following terms shall have the following meanings:

"*Agreement*" has the meaning given that term in the introductory paragraph to this document.

"*Assignee*" means any Person that acquires any portion of a Membership Interest through a Disposition who has not been admitted as a Member pursuant to Section 3.4.

"*Business Day*" means any day other than a Saturday, Sunday, or a holiday on which national banking associations in the State of Texas are closed.

"*Capital Accounts*" means the capital accounts established and maintained for each Member and Assignee pursuant to Section 4.4.

"*Capital Contribution*" means any contribution by a Member to the capital of the Company.

"*Certificate*" has the meaning given that term in Section 2.1.

"*Code*" means the Texas Business Organizations Code and any successor statute, as amended from time to time.

"*Membership Interest*" or "*Interest*" means the interest of a Member in the Company and his or her rights with respect to the same, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information, and to consent or approve acts or transactions.

"*Officers*" means the officers appointed pursuant to Article VII.

"*Person*" has the meaning given that term in Section 1.002(69-b) of the Code.

"*Proceeding*" has the meaning given that term in Section 9.1.

"*Securities Act*" means the Securities Act of 1933, as amended from time to time.

"*Tax Code*" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"*Treasury Regulations*" means the Treasury Regulations promulgated under Subchapter K of the Tax Code, as amended from time to time.

Other terms defined herein have the meanings so given them.

WIL_00000853

*Section 12.2  Construction*.  Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter.  Except to the extent the context specifically indicates otherwise, all references to Certificate and Sections refer to articles and sections of this Agreement, and all references to Exhibits refer to Exhibits attached hereto, each of which is made a part hereof for all purposes.

## ARTICLE XIII
## General Provisions

*Section 13.1  Offset*.  Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

*Section 13.2  Notices*.  Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the Person to receive it.  All notices, requests, and consents to be sent to a Member must be sent to or made at the address or telefax number for that Member set forth in the records of the Company, or such other address or telefax number as that Member may specify by notice to the other Members.  Any notice, request, or consent to the Company must be sent to or made at the address or telefax number for that Member as set forth in the records of the Company or such other address for as the Company may specify by notice to the Members. Whenever a notice is required to be given by law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

*Section 13.3  Entire Agreement*.  This Agreement and any agreements referenced herein constitute the entire agreement of the Members relating to the Company, the Company Business and the Area of Mutual Interest and supersedes all prior contracts or agreements with respect to the Company,the Company Business and the Area of Mutual Interest, whether oral or written.

*Section 13.4  Effect of Waiver or Consent*.  A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.  Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

*Section 13.5  Amendment or Modification*.  This Agreement may be amended or modified from time to time only by a written instrument adopted by the Managers and executed and agreed to by a Majority Interest.

WIL_00000854

**Section 13.6  Binding Effect**.  Subject to the restrictions on Dispositions set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.

**Section 13.7  Governing Law; Severability**.   THIS COMPANY AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, U.S.A., EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS COMPANY AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.  In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Certificate, or (b) any mandatory provision of the Code, the applicable provision of the Certificate or the Code shall control.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances it not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

**Section 13.8  Further Assurances**.  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

**Section 13.9  Waiver of Certain Rights**.  Each Member irrevocably waives any right it may have to maintain an action for the winding up of the Company or for partition of the property of the Company.

**Section 13.10  Indemnification**.  To the fullest extent permitted by law, each Member shall indemnify the Company, and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement or on account of any business activities conducted by that Member or its affiliates prior to the Effective Date of this Agreement.

**Section 13.11  Notice to Members of Provisions of this Agreement**.  By executing this Agreement, each member acknowledges that it has actual notice of (a) all of the provisions of this Agreement, including, without limitation, the restrictions on the transfer of Membership Interests set forth in Article III, and (b) all of the provisions of the Certificate.  Each Member hereby agrees that this Agreement constitutes adequate notice of all such provisions, and each Member hereby waives any requirement that any further notice thereunder be given.

**Section 13.12  Counterparts**.  This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document.  All counterparts shall be construed together and constitute the same instrument.

24

**Section 13.13   Cross-references**.   References in this Agreement to Articles, Sections, Exhibits, or Schedules shall be deemed to be references to Articles, Sections, Exhibits, and Schedules of this Agreement unless the context specifically and expressly requires otherwise.

**Section 13.14   Legal Representation.**   Each Member hereby acknowledges that the Members have been advised that the Members should seek and have had the opportunity to seek independent legal counsel to review this Agreement and all related documents on the Member's behalf and to obtain the advice of such legal counsel relating to such documentation.  Each Member further acknowledges and agrees that the law firm of Doherty & Doherty LLP are legal counsel solely to *[Willis Energy LLC]* with respect to this Agreement.

*[Signature Pages Follow]*

25

IN WITNESS WHEREOF, the Managers and Members have executed this Agreement as of Effective Date.

MANAGERS:

_____
Mark A. Willis

_____
Thomas P. Tatham

Member Signatures Follow:
MEMBERS:

HOPEWELL WILLIS HOLDINGS LLC

By:_____
_____

WILLIS GROUP, LLC

By:_____
_____

HOPEWELL TATHAM HOLDINGS LLC

By:_____
_____

LNG PARTNERS, LLC

By:_____
_____

26

WIL_00000857

**SCHEDULE A**
**Member Information**

| Name and Address of Each Member | Founders Shares | Initial Additional Equity Shares | Initial Ownership Percentage | Initial Capital Contribution Paid on Effective Date for Additional Equity Shares | $ Amount to be paid by June 15, 2016 or within 10 days of call*** |
|---|---|---|---|---|---|
| **Willis Group Members:** | | | | | |
| **Hopewell Willis Holdings, LLC** 1400 Post Oak Blvd., Suite 200 Houston, TX 77056 | 500,000 | | | | |
| **Willis Group LLC** 1400 Post Oak Blvd., Suite 200 Houston,TX 77056 | 250,000 | | [___%] | [$_____] | [$_____] |
| **Tatham Group Members:** | | | | | |
| **Hopewell Tatham Holdings LLC** 1400 Post Oak Blvd., Suite 200 Houston, TX 77056 | 125,000 | | | | |
| **LNG Partners, LLC** 600 Travis St. Suite 5900 Houston, TX | 125,000 | | | | |

27

WIL_00000858

| 77002 **New Members:** | | | | | |
|---|---|---|---|---|---|
| _____ | | ** | | | |
| Total | 1,000,000 | | 100% | $_____ | $_____ |

\* 1,000,000 Founders Shares allocated among Willis Group Members, and Tatham Group Members

\*\* Initial Additional Equity Shares subscribed by Founding Members and New Members

\*\*\* Capital Commitment for Initial Additional Equity Shares to be paid on or before June 15, 2016, or if sooner, within ten (10) days following a call for such amounts are made by the Managers

28

**SCHEDULE B**
**Board of Directors**

**Mark A. Willis**

**Thomas P. Tatham**

29

WIL_00000860
Page 61

**EXHIBIT A**

**Application of Proceeds of Capital Contributions for Initial Additional Equity Shares**

Approximately $125,000 to $175,000 per month to be spent as per Exhibit B covering estimated current operating requirements through the end of calendar 2016; the balance of the Proceeds will be used for the purchase of Oil, Gas, and Mineral Interests within Prospect Areas with early emphasis on Areas One and Two.

30

**EXHIBIT B**

**Description of Initial Activities**
**And**
**2016 Cash Forecast & Budget**

**Description of Initial Activities:**

The Company will continue to evaluate opportunities for the purchase of Oil, Gas & Mineral Interests in four adjacent prospect areas located in Madison County, Texas. <mark>Evaluation will consist of title review by both contract legal and land personnel in addition to the exclusive utilization of proprietary computer software and specialized IT services.</mark> The Company will prioritize its activities in the four prospect areas according to the latest geological, geophysical, production and scout information available to the Company. The four prospect areas cover over 80,000 acres and 128 producing units. The emphasis initially will be on the acquisition of new OG&M leases on unleased acreage and/or acreage where significant prospective title flaws or legal issues have been identified with respect to existing pooled leases and/or pooled units. The Company will also seek to purchase mineral ownership and or term royalty when commercially favorable opportunities are presented or identified by the Company's title review and contract land activities.

[2016 Cash Forecast & Budget to be Inserted]

31

**2016 Cash Forecast - Hopewell-Pilot Project, LLC**

| Description | Estimated Expenditures/mo | $ Amount/Totals | June | July | August | September | October | November | December | 7 Month Cum |
|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash** | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Contract Land Services: | | | | | | | | | | |
| Steve Ervi @$400/d | 20 days/mo @ $400/d | | $8,000.00 | $8,000.00 | $8,000.00 | $8,000.00 | | | | |
| Expansion | 3 man crew @ $500/d | | | | | | $30,000.00 | $30,000.00 | $30,000.00 | $30,000.00 |
| Beyond Review - WG | 2 contract title lawyers 360hr/mo@$45/hr | | $16,200.00 | $16,200.00 | $16,200.00 | $16,200.00 | $16,200.00 | $16,200.00 | $16,200.00 | $16,200.00 |
| Mileage@$.55/mi | $ | 1,000.00 | $550.00 | $550.00 | $550.00 | $550.00 | $550.00 | $550.00 | $550.00 | $550.00 |
| Total Contract Land Services | | | | $24,750.00 | $24,750.00 | $24,750.00 | $46,750.00 | $46,750.00 | $46,750.00 | $46,750.00 | $261,250.00 |
| IT Services: | | | | | | | | | | |
| Title Rover, LLC | $ | 17,500.00 | | | | | | | | |
| Data Processing/Purhase | $ | 5,000.00 | | | | | | | | |
| Image Engine - WG | $ | 5,000.00 | | | | | | | | |
| Total IT Services | | $ | 27,500.00 | $27,500.00 | $27,500.00 | $27,500.00 | $27,500.00 | $27,500.00 | $27,500.00 | $27,500.00 | $192,500.00 |
| Legal: | | | | | | | | | | |
| Sullivan, et al | building to 40 hours per month | | $10,000.00 | | $10,000.00 | $10,000.00 | $15,000.00 | $20,000.00 | | |
| Dan Elwood | building to 40 hours per month | | | $5,000.00 | $5,500.00 | $5,500.00 | $7,750.00 | $11,000.00 | $11,000.00 | |
| Pat Doherty | Review financing docs as needed | | | | $7,500.00 | | | | | |
| Total Legal | | | $10,000.00 | $5,000.00 | $23,000.00 | $15,500.00 | $22,750.00 | $31,000.00 | $11,000.00 | $118,250.00 |
| GG&RE: | | | | | | | | | | |
| Schubarth Inc. - GRE | 15hrs/mo@300/hr | | $4,500.00 | $4,500.00 | $4,500.00 | $4,500.00 | | | | |
| Ryder Scott & Company | Field Report for Financing | | | | | $25,000.00 | | | | |
| Total GG&RE | | | $4,500.00 | $4,500.00 | $4,500.00 | $29,500.00 | $0.00 | $0.00 | $0.00 | $43,000.00 |
| Management: | | | | | | | | | | |
| Mark Willis - Manager | | | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $84,000.00 |
| PDP Management Group LLC @$1,500/d | Includes Tom Tatham - Manager 15 to 20 days per month as required | | $22,500.00 | $22,500.00 | $22,500.00 | $30,000.00 | $30,000.00 | $30,000.00 | $30,000.00 | $187,500.00 |
| **General & Administrative** | | | | | | | | | | |
| Bank Charges | $150/mo | | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | |
| Meals- Business | $1,000/mo-primarily lunches | | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | |
| Office Supplies/Maps | $3,000/mo | | $3,000.00 | $3,000.00 | $3,000.00 | $3,000.00 | $3,000.00 | $3,000.00 | $3,000.00 | |
| Houston Office - WG Allocation | $5,000/mo | | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | |
| Lodging: | | | | | | | | | | |
| Huntsville | Month Suite @ Holiday Inn Express or GQ | | | | $2,400.00 | $2,400.00 | $2,400.00 | $2,400.00 | | |
| Houston | 4 nights/mo @ $150 | | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | |
| Total G&A | | | $9,750.00 | $9,750.00 | $12,150.00 | $12,150.00 | $12,150.00 | $12,150.00 | $9,750.00 | $77,850.00 |
| **Total Monthly "Burn" Prior to Acquisition of Mineral Interests** | | | $111,000.00 | $106,000.00 | $126,400.00 | $173,400.00 | $151,150.00 | $159,400.00 | $137,000.00 | $964,350.00 |
| Proceeds from Equity Placemen | Needed to be cash neutral | | $125,000.00 | $125,000.00 | $126,400.00 | $173,400.00 | $151,150.00 | $159,400.00 | $137,000.00 | $997,350.00 |
| Application to A/P and Advances | | | $14,000.00 | $19,000.00 | | | | | | $33,000.00 |
| Ending Cash | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Acquisition of OG&M Leases | requires new financing or additionalt placeement of Initial Additional Equity Shares | | | $250,000.00 | $250,000.00 | $250,000.00 | $250,000.00 | | | $1,000,000.00 |

**EXHIBIT D**

**THIRD AMENDED AND RESTATED**
**COMPANY AGREEMENT**

**OF**

**HOPEWELL - PILOT PROJECT, LLC**

**A Texas Limited Liability Company**

**September 1, 2016**

THE LIMITED LIABLITY COMPANY INTERESTS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES EXCHANGE COMMISSION OR UNDER ANY SECURITIES LAWS OF ANY STATE. THE TRANSFERABILITY OF SUCH INTERESTS IS RESTRICTED.  SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, OR TRANSFERRED, NOR WILL ANY ASSIGNEE, VENDEE, TRANSFEREE, OR ENDORSEE THEREOF BE RECOGNIZED AS HAVING ACQUIRED ANY SUCH INTERESTS BY THE ISSUER FOR ANY PURPOSE, UNLESS, AMONG OTHER THINGS, (1) A REGISTRATION STATEMENT FILED WITH THE SEC UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WITH RESPECT TO SUCH INTERESTS SHALL THEN BE IN EFFECT AND SUCH TRANSFER HAS BEEN QUALIFIED UNDER ALL APPLICABLE STATE SECURITIES LAWS, OR (2) THE AVAILABILITY OF AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION SHALL BE ESTABLISHED TO THE SATISFACTION OF COUNSEL TO HOPEWELL - PILOT PROJECT, LLC.

### THIRD AMENDED AND RESTATED
### COMPANY AGREEMENT
### OF
### HOPEWELL - PILOT PROJECT, LLC
### A Texas Limited Liability Company

This THIRD AMENDED AND RESTATED COMPANY AGREEMENT OF **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company (the "Agreement"), dated as of September 1, 2016 ("Effective Date"), is adopted by the undersigned as the Managers and Members of the Company.

#### Background Statements

WHEREAS, the initial Member of the Company executed a certain Company Agreement for the Company dated as of March 30, 2016 ("Original Company Agreement"), providing for certain rights and obligations with respect to the Company;

WHEREAS, effective June 10, 2016, the Company admitted certain Persons as Founding Members and as new Members of the Company and the Members amended and restated the Original Company Agreement in its entirety in the form of the Amended and Restated Company Agreement on the terms therein provided in order to reflect the admission of the new Members to the Company and to make certain other amendments; and

WHEREAS, effective July 31, 2016 the Company admitted Initial New Members as Members of the Company and further amended and restated the Amended and Restated Company Agreement in its entirety in the form of the Second Amended and Restated Company Agreement on the terms therein provided in order to reflect the admission of the Initial New Members to the Company;

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and agreements contained herein, the Members do hereby agree that the Second Amended and Restated Company Agreement shall be amended and restated in its entirety in the form of this Third Amended and Restated Company Agreement as of the Effective Date.

### ARTICLE I
### Definitions

*Section 1.1  Certain Definitions.*  As used in this Agreement, the following terms shall have the meanings indicated:

"Affiliate" means, with respect to a Person, any other Person that: (i) directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the specified Person; or (ii) is related by birth or marriage to such Person; and "control" (including, with the correlative meaning, the term "controlled" and "is under common control") means the possession, directly or indirectly, of the power to direct or cause the

1

direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning given that term in the introductory paragraph to this document.

"Area of Mutual Interest" means the agreed area of mutual interest for the Company Business covering Madison County, Texas, Houston County, Texas; Walker County, Texas; Leon County, Texas; and Grimes County, Texas.

"Assignee" means any Person that acquires any portion of a Membership Interest through a Disposition who has not been admitted as a Member pursuant to Section 3.4.

"Business Day" means any day other than a Saturday, Sunday, or a holiday on which national banking associations in the State of Texas are closed.

"Capital Accounts" means the capital accounts established and maintained for each Member and Assignee pursuant to Section 4.4.

"Capital Contribution" means any contribution by a Member to the capital of the Company.

"Certificate" has the meaning given that term in Section 2.1.

"Code" means the Texas Business Organizations Code and any successor statute, as amended from time to time.

"Company" means **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company.

"Company Business" means to acquire and own oil, gas and mineral leases, mineral interests, royalty interests, top leases, and options related to the foregoing in Madison County, Texas and to develop a land management, legal and technical team capable of implementing a similar broader strategy to finance and acquire oil, gas and mineral leases, mineral interests, royalty interests, top leases, and options in the Area of Mutual Interest.

"Dispose," "Disposing," or "Disposition" means a sale, assignment, transfer, exchange, mortgage, pledge, grant of a security interest, or other disposition or encumbrance (including, without limitation, by operation of law) of a Membership Interest in the Company.

"Founding Members" means those Members that receive Founders Shares as set forth on Schedule A.

"Initial Additional Equity Shares" means those shares issued as provided in Section 3.2(a)(ii). Initial Additional Equity Shares shall have a priority right to cash distributions and shall receive all cash distributions made by the Company until such time as the holders of such

2

shares have received $2.00 per share.  Once the holders of the Initial Additional Equity Shares have received $2.00 per share in cash distributions, then all cash distributions thereafter shall be made uniformly on a per share basis to all shares then outstanding.

"Majority Interest" means Members holding among them more than 50% of the sum of all Membership Percentages.

"Managers" means the Persons named in this Agreement as Managers of the Company and any Persons hereafter elected as Managers of the Company as provided in this Agreement, but does not include any Person who has ceased to be a manager of the Company.

"Member" means any Person executing this Agreement as of the date of this Agreement as a member or hereafter admitted to the Company as a member as provided in this Agreement, but does not include any Person who has ceased to be a member in the Company.

"Membership Interest" means the Shares of the Company owned by a Member.

"Membership Percentage" means the result derived by dividing the number of Shares held by a Member by the total number of Shares which are issued and outstanding. The initial Membership Percentages of the Members as of the Effective Date are set forth on Schedule A.

"Officers" means the officers appointed pursuant to Article VII.

"Person" has the meaning given that term in Section 1.002(69-b) of the Code.

"Proceeding" has the meaning given that term in Section 9.1.

"Quarterly Operating Budget" has the meaning given that term in Section 6.7.

"Securities Act" means the Securities Act of 1933, as amended from time to time.

"Shares" means the shares into which the ownership of Membership Interests in the Company are denominated, including all rights and interests of a Member with respect to the Shares issued under this Agreement including (i) the right of a Member to receive distributions under this Agreement by virtue of the Member's ownership of interests as a Member under this Agreement and (ii) all associated management rights, voting rights or rights to consent. The Shares held by the Members as of the Effective Date are set forth on Schedule A.

"Supermajority Interest" means Members holding among them more than 75% of the sum of all Membership Percentages.

"Tax Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"Treasury Regulations" means the Treasury Regulations promulgated under Subchapter

3

K of the Tax Code, as amended from time to time.

## ARTICLE II
## Organization

*Section 2.1 Formation*. The Company has been organized as a Texas limited liability company by the filing of Certificate of Formation (the *"Certificate"*) under and pursuant to the Code and the issuance of a certificate of formation for the Company by the Secretary of State of Texas.

*Section 2.2 Name*. The name of the Company is "**HOPEWELL - PILOT PROJECT, LLC**", and all Company business must be conducted in that name or such other names that comply with applicable law as the Board may select from time to time.

*Section 2.3 Registered Office; Registered Agent; Principal Office in the United States; Other Offices*. The registered office of the Company required by the Code to be maintained in the State of Texas shall be the office of the registered agent of the Company. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate from time to time in the manner provided by law. The principal office of the Company in the United States shall be at such place as the Board may designate from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by Section 3.151 of the Code. The Company may have such other offices as the Board may designate from time to time.

*Section 2.4 Purposes*. The sole purpose of the Company shall be to conduct the Company Business and all activities incidental to the Company Business in accordance with the applicable provisions of the Code, including, but not limited to: (i) entering into, performing, enforcing, and carrying out contracts of any kind necessary or desirable to, or in connection with, or incidental to the Company Business or, accomplishing the general purposes of the Company, (ii) acquiring oil, gas and mineral leases, mineral interests, royalty interests, top leases, and options in the Area of Mutual Interest and (iii) borrowing money and issuing evidence of indebtedness, and securing the same by mortgage, deed of trust, pledge, or other lien, in furtherance of the Company Business.

*Section 2.5 Term*. The existence of the Company commenced on the date the Secretary of State of Texas issued a certificate of formation for the Company and shall continue in existence for the period fixed in the Certificate for the duration of the Company, or such earlier time as this Agreement may specify.

*Section 2.6 Foreign Qualification*. Prior to the Company's conducting business in any jurisdiction other than Texas, the Board, if required by the laws of such jurisdiction, shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Board, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Board, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify,

4

continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

### ARTICLE III
### Membership

*Section 3.1 Authorization of Shares. .*   There shall be Five Million (5,000,000) Shares authorized for issuance by the Company ("Initial Share Authorization").   Changes to the Initial Share Authorization may be made by the Board with the approval of a Supermajority Interest.

*Section 3.2 Issuance of Shares.*

(a)   Issuance of Shares Comprising the Initial Share Authorization. The Shares comprising the Initial Share Authorization shall be issued only as follows:

(i)   One Million (1,000,000) Shares issued to the Founding Members effective June 10, 2016 in the amounts and to the parties specified in Schedule A.

(ii)   There are reserved for issuance up to One Million (1,000,000) Shares issued in exchange for cash consideration in connection with the private placement activities of the Company (such Shares are referred to herein as the "Initial Additional Equity Shares").   One Hundred Ninety-Five Thousand (195,000) Initial Equity Shares were issued on or before July 31, 2016 pursuant to that certain resolution of the Board dated July 29, 2016 in exchange for cash as set forth in Schedule A.   One Hundred Two Thousand Five Hundred (102,500) Initial Additional Equity Shares have been reserved for issuance pursuant to certain Bridge Loan Documentation which was finalized and executed on September 13, 2016 (the "Bridge Loan").   As of the Effective Date, Two Hundred Twelve Thousand Five Hundred (212,500) Initial Additional Equity Shares have been reserved for issue pursuant to the subscription of the Bridge Loan provider.

(iii)   Three Hundred Thousand (300,000) Initial Additional Equity Shares have been reserved for issuance pursuant to that certain Term Sheet for Oil, Gas, and Mineral Lease Acquisition Facility dated August 26, 2016. Of the remaining available and unissued Initial Additional Equity Shares, as of the Effective Date, up to One Hundred Thousand (100,000) Initial Additional Equity Shares may be reserved on October 30, 2016 for issue pursuant to that certain Term Sheet for Oil, Gas, and Mineral Lease Acquisition Facility dated August 26, 2016, if Initial Additional Equity Shares have not been subscribed for issue and are available for issue on October 30, 2016,

(b)   Issuance of Shares for Recapitalization Events. If and whenever at any time, the Company shall (i) subdivide the outstanding Shares into a greater number of shares, (ii) consolidate the outstanding Shares into a smaller number of shares, or (iii) issue Shares (or other securities convertible into or exchangeable for Shares) to the holders of all or substantially all of the outstanding Shares by way of a stock dividend on the Shares, the number of unissued Shares comprising the Initial Share Authorization shall be adjusted accordingly. The adjustments

5

provided for herein are cumulative and shall apply to successive subdivisions, consolidations, distributions, issues or other events resulting in any adjustment.

(c)     Issuance of Shares in Exchange for Cash Consideration.  In the event the Board resolves that Shares shall be issued in exchange for cash consideration (a "Share Issuance for Cash"), it shall provide to all of the Members a copy of such resolution which shall, at minimum, specify: (i) the number of Shares to be issued; (ii) the price per Share; (iii) the valuation of the Company at the time of such resolution as well as reasonable support therefor; and (iv) all other relevant terms of the proposed Share issuance for cash consideration (the "Share Issuance for Cash Notice").

Each Member shall have the preemptive right to purchase Shares subject to the Share Issuance for Cash on the same terms and conditions as such Shares are to be offered to third-parties (including such terms and conditions described in the Share Issuance for Cash Notice); provided, however, that: (i) the maximum number of Shares that a Member can purchase in connection with the Share Issuance for Cash shall equal the product obtained by multiplying (A) such Membership Interest of such Member, by (B) the number of Shares subject to the Share Issuance for Cash; and (ii) each Member desiring to participate in such Share Issuance for Cash must notify the Board within fourteen (14) days of receipt of the Share Issuance for Cash Notice. To the extent that any Member does not elect to purchase its maximum number of Shares in connection with the Share Issuance for Cash (as calculated pursuant to subpart (i) of this paragraph), then the balance of the Shares not purchased by such Member may be sold by the Company to third parties, but only upon the terms and conditions and for the purchase price set forth in the Share Issuance for Cash Notice.

The provisions of this Section 3.2(c) shall not apply to the issuance of Shares that are reserved for issuance as provided in Section 3.2(a)(ii) and Section 3.2(a)(iii) above. .

(d)     Issuance of Shares in Exchange for Non-Cash Consideration.  In the event the Board resolves that Shares shall be issued in exchange for consideration other than cash (a "Share Issuance for Non-Cash Consideration"), it shall provide to all of the Members a copy of such resolution which shall, at minimum, specify: (i) the number of Shares to be issued; (ii) the non-cash consideration to be received for the Shares; (iii) the valuation of the Company at the time of such resolution as well as reasonable support therefor; and (iv) all other relevant terms of the proposed Share issuance for non-cash consideration (the "Share Issuance for Non-Cash Consideration Notice").  If, within fourteen (14) days of receipt of the Share Issuance for Non-Cash Consideration Notice, any Member objects to the Share Issuance for Non-Cash Consideration, then the Shares subject to such Share Issuance for Non-Cash Compensation shall be issued only if such issuance has been approved by a Supermajority Interest.  Notwithstanding anything in this Section 3(d) or Agreement to the contrary, the Company shall not issue any Shares to any Affiliates in exchange for non-cash consideration.

**Section 3.3   Liability to Third Parties.**   No Member shall be liable for the debts, obligations or liabilities of the Company, including debts, obligations, or liabilities which are imposed under a judgment decree or order of a court.

6

*Section 3.4   Admission of Assignees or Members.*  Except as provided in the next sentence of this Section 3.4, a disposition, sale, assignment or other transfer of a Membership Interest shall not entitle the transferee to become a Member of the Company, but instead shall entitle the transferee to the right to receive distributions, allocations and other economic benefits from the Company which are attributable to the purchased Interest.  Assignees may be admitted as Members only with the consent of a Majority Interest and a majority of the Board.

*Section 3.5   Withdrawal.*  A Member does not have the right or power to withdraw from the Company as a Member.

*Section 3.6   Compensation for Members.*  No Member shall receive any compensation from the Company in such Member's capacity as a Member.  However, any Member may be employed in the business of the Company at the discretion of the Board and, in connection therewith, may receive reasonable compensation for services rendered.

*Section 3.7   Restrictions on the Disposition of an Interest.*

(a)     Except as specifically provided in this Section 3.7, a Disposition of all or any part of a Membership Interest may not be effected without the consent of a Majority Interest.  Any attempted Disposition by a Person of an interest or right, or any part thereof, in or with respect to the Company other than in accordance with this Section 3.7 shall be, and is hereby declared, null and void *ab initio*.

(b)     Provided that the consent of a Majority Interest to such Disposition has been obtained, a Member or an Assignee may Dispose of all or a portion of his Membership Interest if he, prior to making such Disposition, first offers (an "Offer") such portion of the Membership Interest (the "Offered Interest") for sale to the Company and the other Members (the "Remaining Members").  The Offer shall be made for the price and upon the terms at which the proposed Disposition is to occur (the "Proposed Price"). The Offer shall be made by written notice which shall state that the Offer is being made pursuant to this Section 3.7 and which shall set forth the Membership Percentage attributable to the Offered Interest, the name or names of the proposed purchaser or purchasers of the Offered Interest, the Proposed Price, method of payment of the Proposed Price (the "Proposed Terms"), and the scheduled date of consummation of the proposed sale.  A copy of the written offer, and any proposed sales agreement, from or with the proposed purchaser shall be attached to the Offer.  The Company shall have the option exercisable during the ensuing thirty (30) day period to accept the Offer.  If the Company does not accept the Offer, then the Remaining Members shall have the option for ten (10) days from the date of the termination of such thirty (30) day period to elect to collectively purchase all, but not less than all, of the Offered Interest, pro rata, in accordance with their relative Membership Percentages.  Any two or more Remaining Members may agree among themselves to reallocate the portions of the Offered Interest to be purchased by them from their respective pro rata portions.  The payment of the respective purchase price shall be payable pursuant to the Proposed Terms.  If neither the Company nor the Remaining Members elect to purchase all of the Offered Interest in accordance with this Section 3.7(b), then the Selling Member may sell not less than all of

7

the Offered Interest at any time within, but not subsequent to, sixty (60) days after the lapse of the options granted pursuant to this Section; provided, however, that such sale must be made to the third party purchaser and for the price and in accordance with the terms specified in the Offer notice.

(c)     The Company may not recognize for any purpose any purported Disposition of all or part of a Membership Interest unless and until the other applicable provisions of this Section 3.7 have been satisfied and the Company has received a document which:

(i)     has been executed by both the Member effecting the Disposition (or if the transfer is on account of the death or incapacity of the transferor, its representative) and the Person to which the Membership Interest or part thereof is Disposed;

(ii)     includes the notice address of the transferee and his or its agreement to be bound by this Agreement in respect of the Membership Interest or part thereof being acquired;

(iii)     sets forth the Membership Percentages which will be effective after the Disposition of the Member effecting the Disposition and the Person to which the Membership Interest or part thereof is Disposed (which together must total the Membership Percentage of the Member effecting the Disposition before the Disposition); and

(iv)     the Disposition was made in accordance with all applicable laws and regulations (including securities laws), including the following:

(1)     the Member effecting the Disposition and the Person to which the Membership Interest or part thereof is Disposed acknowledge and agree that the Membership Interest has not been registered under the Securities Act or applicable state securities laws and are being sold pursuant to the exemptions from registration offered by the Securities Act and by applicable state law provisions; and

(2)     the Person to which the Membership Interest or part thereof is Disposed must acknowledge and agree his understanding that, as a result of paragraph (1), immediately above, (i) he must bear the economic risk of investment in the Membership Interest for an indefinite period of time; (ii) the Membership Interest may not be sold, assigned, or transferred, nor will any assignee, vendee, transferee, or endorsee thereof be recognized as having acquired any such interests by the issuer for any purpose, unless, among other things, (x) a registration statement under the Securities Act, with respect to such Membership Interest shall then be in effect (and such transfer has been qualified under all applicable state securities laws), or (y) the availability of an exemption from such

8

registration and qualification shall be established to the satisfaction of counsel to the Company.

Each Disposition and, if applicable, admission into membership complying with the provisions of this Section 3.7(c) is effective as of the first day of the calendar month immediately succeeding the month in which the Company receives the notification of Disposition and the other requirements of this Section 3.7 have been met.

(d)     The Member effecting a Disposition and any Person admitted to the Company in connection therewith shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the Disposition or admission on or before the tenth day after the receipt by that person of the Company's invoice for the amount due. If payment is not made by the date due, the Person owing that amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the maximum rate allowed by law.

**Section 3.8 Other Activities.** The Members acknowledge that the Members and Managers are engaged in activities other than the activities of the Company and that neither Members nor the Managers shall be expected or required to devote their full time to the management of the Company except as provided in any separate agreement or instrument. Except as otherwise provided in this Agreement or any other agreement or instrument, participation in the Company shall not in any way act as a restraint on the other present or future business activities or investments of any Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member. Except as otherwise provided in this Agreement or any other agreement or instrument, or to the extent required in order to not breach a Member's or Manager's duty of loyalty to the Company, no Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member shall, under any circumstances, be obligated or bound to offer or present to the Company or any of the other Members any business opportunity presented or offered to them or the Company as a prerequisite to the acquisition of or investment in such business opportunity by such Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member for its account or the account of others. The provisions of this Section shall not serve to waive or limit the provisions of any other written agreement or instrument binding upon any Member or Manager. The Members are advised that Willis Group, LLC is involved in, and shall continue to be involved in, the business of providing information technology temporary staffing and employment services and related businesses and the Members disclaim any interest in any such businesses.

Notwithstanding anything in this Section 3.8 or any other provision in this Agreement to the contrary, under no circumstance shall any Member or Manager, or any of their respective Affiliates, engage or otherwise participate, directly or indirectly, in any business or other activity that is, or may become, competitive to the Company Business.

Each Member shall be required to execute and deliver to the Company a Confidentiality and Non-Competition Agreement as a condition of acquiring any Shares of the Company.

9

*Section 3.9    Purchase Options Upon the Occurrence of Certain Events.* In the event (i) a Member dies or becomes legally incapacitated, (ii) a Member institutes or there is instituted against a Member any proceeding under the United States Bankruptcy Code or any other foreign, federal or state bankruptcy, receivership, insolvency or other similar law affecting the rights of creditors generally or (iii) the spouse of a Member becomes entitled to any interest in the Shares of such Member by virtue of a divorce or property settlement agreement executed in connection with such divorce, then for a period of ninety (90) days following the date of such event, the Company shall have the right to purchase the Shares registered in the name of the deceased, incapacitated, bankrupt or divorced Member, as the case may be ("Affected Member"). The Company shall exercise its purchase right by giving written notice of such exercise to the Affected Member (or its representative) within such ninety (90) day period. If the Company does not elect to exercise its first right to purchase the Shares registered in the name of the Affected Member, for a period of thirty (30) days following the expiration of the Company first right to purchase such Shares, the Remaining Members shall have the right to purchase such Shares. The Remaining Members shall exercise their purchase right by giving written notice of such exercise to the Affected Member (or its representative) within such thirty (30) day period.

The purchase price shall be an amount equal to the fair market value of the Shares determined by agreement of the Affected Member (or its representative) and the purchaser of the Shares ("Purchaser"); however, if the Purchaser and the Affected Member (or its representative) do not agree on such fair market value on or before fifteen (15) days following the exercise of the purchase right, then the fair market value of each share of Shares shall be equal to the Appraised Value of each Share of the Company as determined by an appraisal of the Shares (the "Appraised Value") by an accounting firm or any other qualified appraiser selected by the Manager.

The appraisal shall determine the Appraised Value of the Shares as of the end of the most recently completed calendar quarter. The Appraised Value shall be the maximum amount that would be distributed in respect of the Shares in any Distribution Event if (i) all of the Company's assets were sold at their fair market value, (ii) the Company was liquidated and all liabilities and obligations of the Company are paid, including, without limitation, liabilities and obligations to Members, and (iii) the proceeds of such liquidation were distributed to the Members pursuant to this Agreement. A "Distribution Event" means (i) any winding up or liquidation of Company and (ii) any merger, consolidation or other transaction pursuant to which all of the Company's Shares are converted into or exchanged for cash, securities of another entity, real or other property or any other consideration. The cost of the appraisal shall be divided equally between the Purchaser and the Affected Member.

The sale and purchase of Shares under this Section shall be closed within sixty (60) days from the date of the receipt by the Affected Member (or its representative) of the last notice from the Purchaser and the Affected Member (or its representative) shall deliver a written assignment of the Shares at the closing of the sale and purchase of the Shares, free and clear of all liens. The Purchaser shall pay the purchase price for the Shares by making a down payment of 25% of the purchase price at the closing of the sale and purchase of the Shares, with the balance to be paid in

10

three equal cash installments, (together with accumulated interest on the amount unpaid at the interest rate of 5% per annum) due on each of the first three anniversaries of the closing.

## ARTICLE IV
## Capital Contributions

### Section 4.1  Initial Capital Contributions.

The initial Members of the Company and the number of Shares held by the initial Members are as set forth on Schedule A to this Agreement. New Members shall be added to Schedule A from time-to-time in exchange for their initial Capital Contribution. No Member shall be obligated to make any further Capital Contributions to the Company other than their initial Capital Contribution.

**Section 4.2  Return of Contributions.** A Member is not entitled to the return of any part of its Capital Contribution. An unpaid Capital Contribution is not a liability of the Company or of any Member. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

**Section 4.3  Advances by Members.** If the Company does not have sufficient cash to pay its obligations, any Member(s) that may agree to do so with the consent of the Board may advance all or part of the needed funds to or on behalf of the Company under such terms and conditions as shall be agreed to by the Board and the advancing Member.

**Section 4.4  Capital Accounts.** The provisions of this Section 4.4 shall apply whenever the Company is treated as a partnership for federal income tax purposes. A Capital Account shall be established and maintained for each Member. Each Member's Capital Account:

      (a)    shall be increased by:

          i)    the amount of money contributed by that Member to the Company,

          ii)    the agreed value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Tax Code), and

          iii)    allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treasury Regulation Section 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation Section 1.704-(b)(4)(i); and

      (b)    shall be decreased by:

          i)    the amount of money distributed to that Member by the Company,

11

> ii)     the fair market value of property distributed to that Member by the
> Company (net of liabilities secured by the distributed property that the Member is
> considered to assume or take subject to under Section 752 of the Tax Code),
>
> iii)    allocations to that Member of expenditures of the Company
> described in Section 705(a)(2)(B) of the Tax Code, and
>
> iv)     allocations of Company losses and deductions (or items thereof),
> including losses and deductions described in Treasury Regulation
> Section 1.704-1(b)(2)(iv)(g), but excluding items described in clause (b)(iii)
> above and losses or deductions described in Treasury Regulation Section 1.704-
> 1(b)(4)(i) or Section 1.704(b)(4)(iii).

The Members' Capital Accounts also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation Section 1.704-(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation Sections 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Treasury Regulation Section 1.704-1(b)(2)(iv)(g). A Member that has more than one Membership Interest shall have a single Capital Account that reflects all its Membership Interests, regardless of the class of Membership Interests owned by that Member and regardless of the time or manner in which those Membership Interests were acquired. On the transfer of all or part of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(l).

## ARTICLE V
## Allocations and Distributions

**Section 5.1     Allocations.** Subject to Section 5.3, net income (and items thereof) and net loss (and items thereof) for any fiscal year shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after giving effect to such allocation, is, as nearly as possible, equal (proportionately) to the amount of the distributions that would be made to such Member during such fiscal year pursuant to Section 5.2, determined as if (i) the Company were dissolved and terminated; (ii) its affairs were wound up and each Company asset was sold for cash equal to its book value; (iii) all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the book value of the assets securing such liability); and (iv) the net assets of the Company were distributed in accordance with Section 5.2 to the Members.

**Section 5.2     Distributions.** Distributions shall be made to the Members at such times as determined by the Board in the following priority:

(a)     If the Members have taxable income attributable to their ownership of any Shares for a taxable year, the Company shall distribute to the Members, in accordance with their

12

Membership Percentages, subject to any contractual restrictions, limitations or conditions affecting the Company, an amount of distributions ("Tax Distributions") equal to the estimated maximum federal and state income and (if applicable) franchise and margin tax rates applicable to the Members and their equity interest owners times the aggregate taxable income of the Members from the Company for that taxable year. Any Tax Distributions shall be applied to reduce subsequent distributions to such Member under Section 5.2(b).

(b) Thereafter, all remaining cash of the Company shall be distributed to the Members in accordance with their respective Membership Percentages as of such distribution date.

### Section 5.3 Special Allocations and Tax Allocations.

(a) Special Allocations. The following special allocations shall be made in the following order:

(i) Minimum Gain Chargeback. Notwithstanding any other provision of this Article, if there is a net decrease in partnership minimum gain (as defined in Treasury Regulations Section 1.704-2(b)(2) and (d)) during any fiscal year, the Members shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in partnership minimum gain, determined in accordance with Treasury Regulations Section 1.704-2(f) and (g). This Section 5.3(a)(i) is intended to comply with the minimum gain chargeback requirement in such section of the Treasury Regulations and shall be interpreted consistently therewith.

(ii) Member Minimum Gain Chargeback. Notwithstanding any other provision of this Article 5, if there is a net decrease in Member nonrecourse debt minimum gain attributable to a Member nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(i)) during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Member nonrecourse debt minimum gain attributable to such Member's nonrecourse debt, determined in accordance with Treasury Regulations Section 1.704-2(i). This Section 5.3(a)(ii) is intended to comply with the minimum gain chargeback requirement in such section of the Treasury Regulations and shall be interpreted consistently therewith.

(iii) Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit, if any, in such Member's capital account (as determined under Treasury Regulations Section 1.704-1) as quickly as possible; *provided that* an allocation pursuant to this Section 5.3(a)(iii) shall be made only if and to the extent that such Member would have such capital account deficit after all other allocations provided for in Section 5.3(a) have been tentatively made as if this Section 5.3(a)(iii) were not in this Agreement. This Section

13

5.3(a)(iii) is intended to comply with the qualified income offset provisions in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(iv)     Gross Income Allocation. In the event any Member has a deficit balance in such Member's capital account (as determined after crediting such capital account for any amounts that such Member is obligated to restore or is deemed obligated to restore pursuant to Treasury Regulations Section 1.704-2), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such deficit (as so determined) of such Member's capital account as quickly as possible; *provided that* an allocation pursuant to this Section 5.3(a)(iv) shall be made only if and to the extent that such Member would have such capital account deficit (as so determined) after all other allocations provided for in Section 5.3(a) (other than Section 5.3(a)(iii)) have been tentatively made as if this Section 5.3(a)(iv) were not in this Agreement.

(v)     Loss Allocation Limitation. No allocation of net loss (or items thereof) shall be made to any Member to the extent that such allocation would create or increase a deficit in such Member's capital account (as determined after debiting such capital account for the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) and crediting such capital account for any amounts that such Member is obligated to restore or is deemed obligated to restore pursuant to Treasury Regulations Section 1.704-2).

(b)     Tax Allocations

(i)     General Rules. Except as otherwise provided in Section 5.3(b)(ii), for each fiscal period, items of Company income, gain, loss, deduction and expense shall be allocated, for federal, state and local income tax purposes, among the Members in the same manner as the net income (and items thereof) or net loss (and items thereof) of which such items or components were allocated pursuant to Section 5.1.

(ii)     Section 704(c) of the Tax Code. Income, gains, losses and deductions with respect to any property (other than cash) contributed or deemed contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of the contribution or deemed contribution in accordance with Section 704(c) of the Tax Code and the Treasury Regulations promulgated thereunder.

If there is a revaluation of Company property, subsequent allocations of income, gains, losses or deductions with respect to such property shall be allocated among the Members so as to take account of any variation between the adjusted tax basis of such property to the Company for federal income tax purposes and its fair market value in accordance with Section 704(c) of the Tax Code and the Treasury Regulations promulgated thereunder.

(iii)     Capital Accounts Not Affected. Allocations pursuant to this Section 5.3(b) are solely for federal, state and local tax purposes and shall not affect, or in any way be taken into account in computing, any Member's capital account or allocable share of net income (or items thereof) or net loss (or items thereof).

14

## ARTICLE VI
## Board of Managers

*Section 6.1 Board of Managers; Qualification and Election; General Powers.* The Board of Managers of the Company ("Board") shall initially be comprised of two (2) Managers, whose names are set forth on Schedule B to this Agreement. The number of Managers may be changed from time to time by resolution of the Board. The Managers shall be elected at the annual meeting of the Members or at a special meeting of the Members called for that purpose, beginning with the 2017 annual meeting of the Members. Cumulative voting shall be allowed in the election of Managers, and each Member shall have one vote for each Share held by such Member, multiplied by the number of Managers to be elected. A Member shall be entitled to accumulate his votes and distribute his votes among any number of Managers nominees. Each Manager elected shall hold office until a successor shall be elected and shall qualify, or until his death, resignation, or removal in the manner herein provided. Any Manager may be removed as such, either with or without cause, by action of the Members who voted for the election of such Manager. The Managers shall have full, exclusive and complete discretion in the management and control of the business of the Company and may bind the Company based on the signature of a duly authorized individual acting on behalf of the Board. Except for situations in which approval of the Members is required by this Agreement or by non-waivable provisions of applicable law, the powers of the Company shall be exercised under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Board of the Company

*Section 6.2 Vacancy.* Any vacancy occurring among the Managers shall be filled by a vote of a Majority Interest. A Manager elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office and until his successor is elected, or his earlier death, resignation or removal.

*Section 6.3 Action by the Managers.* The Managers shall act as a Board, and each Manager shall have one vote with respect to all matters to be decided by the Board. The act of a majority of the Managers then serving shall be the act of the Managers. No Manager or Member shall take any action with respect to the management of the Company or act as an agent of the company for purposes of carrying out the Company's business and affairs, without the consent or authorization of Board, except as provided in this Agreement.

*Section 6.4 Annual Meetings.* The annual meeting of the Board shall be held immediately following the annual meeting of Members, and at the same place at which the annual meeting of Members is held.

*Section 6.5 Special Meetings.* Special meetings of the Board may be called by the Managers or any Member. The Person calling the meeting may fix any place for holding the meeting. Notice of each special meeting of the Board shall be given to each Manager at least three days before the date of the meeting, in writing. Except as may be otherwise provided by law, the Certificate, or this Agreement, neither the business to be transacted at, nor the purpose of, any special meeting need be specified in the notice or waiver of notice of such meeting.

15

*Section 6.6    Written Consent.*   Any action required or permitted to be taken at a meeting of the Board may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by at least the minimum number of Managers necessary to take action at a meeting at which all Managers were present and voted.

*Section 6.7    Quarterly Operating Budgets.* Beginning October 1, 2016 and no later than fifteen (15) days prior to the end of each calendar quarter thereafter, the Board shall approve and adopt a quarterly operating budget ("Quarterly Operating Budget") setting forth the estimated receipts and expenditures of the Company for the succeeding calendar quarter. No expenditures exceeding a 10% variance from the approved Budget may be made by the Company without the approval of the Board.

## ARTICLE VII
### Officers

*Section 7.1    Appointment.* .   The Board may but shall not be required to designate individuals to serve as officers of the Company as the Board shall determine from time to time, including but not limited to a President and one or more Vice Presidents. The initial President of the Company shall be Mark A. Willis. No officer need be a resident of the state of Texas, a Member or a Manager. Any officers so designated shall have such authority to perform such duties as the Board may, from time to time, delegate to them. The Board may assign titles to particular officers. Unless the Board decides otherwise, if the title is one commonly used for officers of a corporation formed under the Code, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Board pursuant to the third sentence of this Section 7.1.   Each officer shall hold office until his successor shall be duly designated and shall qualify or until his death or until he shall resign or shall have been removed in the manner hereinafter provided.   Any number of offices may be held by the same individual.   The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Board.

*Section 7.2 Resignation.*   Any officer may resign as such at any time.   Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Board.   The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.   Any officer may be removed as such, either with or without cause, by the Board whenever in their judgment the best interests of the Company will be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the Person so removed.   Designation of an officer shall not be deemed of itself to create contract rights on the part of any person.   Any vacancy occurring in any office of the Company (other than Managers) may be filled by the Managers.

16

## ARTICLE VIII
## Meetings of Members

*Section 8.1 Meetings.*

(a)     A quorum shall be present at a meeting of Members if the holders of a Majority Interest are represented at the meeting in person or by proxy. Except as specifically provided herein, with respect to any matter considered at such a meeting the affirmative vote of a Majority Interest shall be the act of the Members.

(b)     All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or without the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meeting by means of conference telephone or similar communications equipment pursuant to Section 8.5.

(c)     Notwithstanding the other provisions of the Certificate or this Agreement, the chairman of the meeting appointed pursuant to Section 8.4 or the holders of a Majority Interest shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the remainder of the adjourned meeting. If such meeting is adjourned, such time and place shall be determined by a vote of the holders of a Majority Interest. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d)     An annual meeting of the Members shall be held at such place, within or without the state of Texas, on such date and at such time as a Majority Interest shall fix and set forth in the notice of the meeting, which date shall be within thirteen (13) months subsequent to the date of formation of the Company or the last annual meeting of Members (whichever most recently occurred.)

(e)     Special meetings of the Members for any proper purpose or purposes may be called at any time by the owners of Membership Interests holding at least twenty percent (20%) of the Membership Percentages of all Members. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

17

(f)     Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) days nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the Member calling the meeting, to each Member entitled to vote at such meeting. If mailed, any such notice shall be deemed to be delivered when deposited in the mail, addressed to the Member at his address provided for in Section 13.2, with postage thereon prepaid.

**Section 8.2     Voting List.** The Board shall make, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of and the Membership Percentages held by each, which list, for a period of ten (10) days prior to such meeting, shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting. The original membership records shall be prima facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members. Failure to comply with the requirements of this Section shall not affect the validity of any action taken at the meeting.

**Section 8.3     Proxies.** A Member may vote either in person or by proxy executed in writing by the Member. A telegram, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Members, before or at the time of the meeting or execution of the written consent, as the case may be. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest.

**Section 8.4     Conduct of Meetings.** All meetings of the Members shall be presided over by the chairman of the meeting, who shall be a Member (or representative thereof) designated by a Majority Interest. The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him in order.

**Section 8.5     Action by Written Consent or Telephone Conference.**

(a)     Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing setting forth the action so taken, shall be signed by the holder or holders of not less than the minimum Membership Interests that would be necessary to take such action at a meeting at which the holders of all Membership Interests entitled to vote on the action were present and voted. Every written consent shall bear the date of signature of each Member who signs the consent. No written consent shall be effective to take the action that is the subject to the consent unless,

18

within sixty (60) days after the date of the earliest dated consent delivered to the Company in the manner required by this Section, a consent or consents signed by the holder or holders of not less than the minimum Membership Interests that would be necessary to take the action that is the subject of the consent are delivered to the Company by delivery to its registered office or its principal place of business. Delivery shall be by hand or certified or registered mail, return receipt requested. A telegram, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member shall be regarded as signed by the Member for purposes of this Section. Prompt notice of the taking of any action by Members without a meeting by less than unanimous written consent shall be given to those Members who did not consent in writing to the action.

(b)     The record date for determining Members entitled to consent to an action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office or its principal place of business. Delivery shall be by hand or by certified or registered mail, return receipt requested.

(c)     Members may participate in and hold a meeting by means of conference, telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

## ARTICLE IX
### Indemnification

*Section 9.1     Exculpation.* Neither any Manager, any Member nor any Person appointed to act as liquidator under Article XII (each a "Covered Person") shall be liable to the Company or any Member under any theory of law, including tort, contract or otherwise (INCLUDING A COVERED PERSON'S OWN NEGLIGENCE) for any loss, damage or claim incurred by reason of any act or omission by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, including any such loss, damage or claim attributable to errors in judgment, negligence or other fault of such Covered Person, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of gross negligence, willful misconduct, intentional misrepresentation or breach of duty of loyalty of such Covered Person. A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

WIL_00001230

**Section 9.2**    *Right to Indemnification.*   Subject to the limitations and conditions as provided in this Article IX, each Manager who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a "*Proceeding*"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she is acting on behalf of the Company or was serving at the request of the Company as a manager, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise, shall be indemnified by the Company to the fullest extent permitted by the Code, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorneys' fees) actually incurred by such Manager in connection with such Proceeding, and indemnification under this Article IX shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder.   The rights granted pursuant to this Article IX shall be deemed contract rights, and no amendment, modification or repeal of this Article IX shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal.   **It is expressly acknowledged that the indemnification provided in this Article IX could involve indemnification for negligence of the Manager or under theories of strict liability.**

**Section 9.3**    *Advance Payment.*   The right to indemnification conferred in this Article IX shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by the Manager of the type entitled to be indemnified under Section 9.1 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Manager's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Manager in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such Manager of his or her good faith belief that he has met the standard of conduct necessary for indemnification under this Article IX and a written undertaking, by or on behalf of such Manager, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Manager is not entitled to be indemnified under this Article IX or otherwise.

**Section 9.4**    *Indemnification of Officers, Employees and Agents.*   The Company, by adoption of a resolution of a Majority Interest, may indemnify and advance expenses to any other manager, officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Managers under this Article IX; and, the Company may indemnify and advance expenses to Persons who are not or were not Managers, officers, employees or agents of the Company but who are or were serving at the request of the Company as a manager, officer, partner, venturer, proprietor, trustee, employee, agent of similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other

20

WIL_00001231

enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a Person to the same extent that it may indemnify and advance expenses to Managers under this Article IX.

**Section 9.5** *Nonexclusivity of Rights.* The right to indemnification and the advancement and payment of expenses conferred in this Article IX shall not be exclusive of any other right which a Manager or other Person indemnified pursuant to this Article IX may have or hereafter acquire under any law (common or statutory), provision of the Certificate or this Agreement, agreement or vote of Manager or disinterested Members or otherwise.

**Section 9.6** *Insurance.* The Company may purchase and maintain insurance, at its expense, to protect itself and any Person who is or was entitled to indemnification pursuant to this Article IX.

**Section 9.7** *Member Notification.* To the extent required by law, any indemnification of or advance of expenses to a Person in accordance with this Article IX shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the 12-month period immediately following the date of the indemnification or advance.

**Section 9.8** *Savings Clause.* If this Article IX or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Person indemnified pursuant to this Article IX as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative, to the full extent permitted by any applicable portion of this Article IX that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE X
### Books, Records, Fiscal Year, Accounting and Reports

**Section 10.1** *Books and Records.* The Board shall keep proper and complete records and books of account, in which shall be entered fully and accurately all transactions and other matters relative to the Company's business as are usually entered into records and books of account maintained by Persons engaged in business of a like character. The books and records of the Company shall at all times be maintained at the principal office of the Company and shall be open to the reasonable inspection and examination of any Member or his duly authorized representative during normal business hours for any proper purpose upon not less than five Business Days advance written notice to the Board.

**Section 10.2** *List of Members.* As part of its books and records, the Board shall maintain a current, alphabetical and readily readable list of the names, addresses and business telephone numbers of the Members, along with the number of Shares held by Members and all other information required to be maintained to reflect transfers of the Shares.

21

*Section 10.3   Fiscal Year.*  The fiscal year of the Company shall be the calendar year.

*Section 10.4   Method of Accounting.*  The books of the Company shall be kept in accordance with the method of accounting used for federal income tax reporting purposes.

*Section 10.5   Reports to Investor Members.*  Within One Hundred Twenty (120) days after the end of each fiscal year, the Board shall use its best efforts to distribute to all Members an annual report containing:

    (a)    Unaudited financial statements of the Company (consisting of a balance sheet, statement of income, statement of members' capital and a statement of cash flow); and

    (b)    A report of the activities of the Company during the period covered by the report, including distributions to the Members for the period covered thereby.

## ARTICLE XI
## Tax Returns, Tax Elections and Audits

*Section 11.1   Filing of Company Tax Returns.*  The Company shall file income tax returns required by the Code and all returns required to be filed by the jurisdictions in which the Company does business or derives income.

*Section 11.2   Filing of Members' Tax Returns.*  Each Member shall be responsible for the preparation and filing of their own federal, state and local tax returns. Within ninety (90) days of the close of each fiscal year of the Company, the Board shall use its best efforts to furnish all Members all information pertaining to the Company necessary for the preparation of their tax returns for the year then ended.

*Section 11.3   Tax Elections.*

    (a)    The Board shall not elect to exclude the Company from the provisions of Subchapter K of Chapter 1 of Subtitle A of the Tax Code.

    (b)    If any Member's interest in the Company is transferred, in whole or in part, the Company may elect, in the Board's sole discretion, to adjust the basis of the Company's property under Tax Code Section 754. Each Member shall furnish the Company any information necessary to give effect to such election.

    (c)    All elections required or permitted to be made by the Company under the Code and the Treasury Regulations shall be made by the Manager in such manner as will, in the opinion of the Accountants, be most advantageous to the Members.

*Section 11.4   Designation of Tax Matters Partner.*  Willis Group, LLC is hereby designated as Tax Matters Partner pursuant to Tax Code Section 6231(a)(6). In the event that Willis Group, LLC   transfers or conveys its entire interest in the Company or resigns or

22

withdraws, the Manager shall appoint a new Tax Matters Partner; provided, however, that no appointment shall be effective if, in the opinion of counsel for the Company, such appointment shall have the effect of causing the Company to be classified for federal income tax purposes as an association taxable as a corporation or shall have the effect of causing the Company to be classified as a general partnership under the laws of Texas or any jurisdiction in which the Company is conducting business.

**Section 11.5    Commencement of Administrative Proceedings.**  Pursuant to Tax Code Section 6223(c)(3), upon receipt of notice from the Internal Revenue Service of the beginning of an administrative proceeding with respect to the Company, the Tax Matters Partner shall furnish the Internal Revenue Service the names, addresses and profit interests of each of the Members.

**Section 11.6    Settlement Agreements; Judicial Review.**  The Tax Matters Partner shall not enter into a settlement agreement pursuant to Tax Code Section 6224 without providing all other Members at least thirty (30) days' prior written notice of the terms of the proposed settlement.  If the Tax Matters Partner receives from the Internal Revenue Service a "final partnership administrative adjustment" pursuant to Tax Code Section 6223, and if the Tax Matters Partner determines to seek judicial review pursuant to Tax Code Section 6226, the Tax Matters Partner shall select the forum for judicial review.

**Section 11.7    Indemnification of Tax Matters Partner.**  The Company shall indemnify and hold the Tax Matters Partner harmless against any claim, loss, liability, cost or expense resulting from its serving as Tax Matters Partner hereunder, provided that such claim, loss, liability, cost or expense does not result from willful misconduct.

## ARTICLE XII
### Event Requiring A Winding Up, Liquidation, and Termination

**Section 12.1    Event Requiring A Winding Up.**  The Company shall wind up its affairs on the first to occur of the following (a "Event Requiring A Winding Up"):

       (a)    the written consent of the Board and a Majority Interest;

       (b)    the date the Company has no Members; or

       (c)    the entry of a decree of an Event Requiring A Winding Up of the Company under Section 11.301 of the Code.

**Section 12.2    Liquidation and Termination.**    Upon the occurrence of an Event Requiring A Winding Up of the Company, a Majority Interest shall elect one or more Members as liquidator.  The liquidator shall proceed to diligently wind up the affairs of the Company and make final distributions as provided herein and in the Code.   The costs of liquidation shall be borne as a Company expense.  Until final distribution, the liquidator shall continue to operate the Company properties.  The steps to be accomplished by the liquidator are as follows:

(a)     as promptly as possible after an Event Requiring A Winding Up and again after final liquidation, the liquidator shall cause a proper accounting to be made of the Company's assets, liabilities, and operations through the last day of the calendar month in which the winding up occurs or the final liquidation is completed, as applicable;

(b)     the liquidator shall cause the notice described in the Code to be mailed to each known creditor of and claimant against the Company in the manner described in the Code;

(c)     the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d)     all remaining assets of the Company shall be distributed to the Members as provided in this Agreement.

**Section 12.3   Certificate of Termination.**   On completion of the distribution of Company assets as provided herein, the Company is terminated, and the liquidator (or such other Person or Persons as the Code may require or permit) shall file a Certificate of Termination with the Secretary of State of Texas, and take such other actions as may be necessary to terminate the legal existence of the Company.

**Section 12.4   Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, the deficit, if any, in the Capital Account of any Member shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

**Section 12.5   Accounting.**   The liquidating trustee shall provide the Members with a proper accounting of the assets, liabilities and operations of the Company through the last day of the month in which the final liquidating distribution occurs.

## ARTICLE XIII
### General Provisions

**Section 13.1   Offset.**   Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company shall be deducted from that sum before payment.

**Section 13.2   Notices.**   Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a

24

notice, request, or consent given under this Agreement is effective on receipt by the Person to receive it. All notices, requests, and consents to be sent to a Member must be sent to or made at the address or telefax number for that Member set forth in the records of the Company, or such other address or telefax number as that Member may specify by notice to the other Members. Any notice, request, or consent to the Company must be sent to or made at the address or telefax number for that Member as set forth in the records of the Company or such other address for as the Company may specify by notice to the Members. Whenever a notice is required to be given by law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

**Section 13.3   *Entire Agreement*.** This Agreement and any agreements referenced herein constitute the entire agreement of the Members relating to the Company, the Company Business and the Area of Mutual Interest and supersedes all prior contracts or agreements with respect to the Company, the Company Business and the Area of Mutual Interest, whether oral or written.

**Section 13.4   *Effect of Waiver or Consent*.** A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

**Section 13.5   *Amendment or Modification*.** This Agreement may be amended or modified from time to time only by a written instrument adopted by the Board and executed and agreed to by a Majority Interest.

**Section 13.6   *Binding Effect*.** Subject to the restrictions on Dispositions set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.

**Section 13.7   *Governing Law; Severability*.** THIS COMPANY AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, U.S.A., EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS COMPANY AGREEMENT TO THE LAW OF ANOTHER JURISDICTION. In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Certificate, or (b) any mandatory provision of the Code, the applicable provision of the Certificate or the Code shall control. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances it not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

25

**Section 13.8   Further Assurances.**   In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

**Section 13.9   Waiver of Certain Rights.**   Each Member irrevocably waives any right it may have to maintain an action for the winding up of the Company or for partition of the property of the Company.

**Section 13.10   Indemnification.**   To the fullest extent permitted by law, each Member shall indemnify the Company, and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement or on account of any business activities conducted by that Member or its affiliates prior to the Effective Date of this Agreement.

**Section 13.11   Notice to Members of Provisions of this Agreement.**   By executing this Agreement, each member acknowledges that it has actual notice of (a) all of the provisions of this Agreement, including, without limitation, the restrictions on the transfer of Membership Interests set forth in Article III, and (b) all of the provisions of the Certificate.  Each Member hereby agrees that this Agreement constitutes adequate notice of all such provisions, and each Member hereby waives any requirement that any further notice thereunder be given.

**Section 13.12   Counterparts.**   This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document.  All counterparts shall be construed together and constitute the same instrument.

**Section 13.13   Cross-references.**   References in this Agreement to Articles, Sections, Exhibits, or Schedules shall be deemed to be references to Articles, Sections, Exhibits, and Schedules of this Agreement unless the context specifically and expressly requires otherwise.

**Section 13.14   Legal Representation.**   Each Member hereby acknowledges that the Members have been advised that the Members should seek and have had the opportunity to seek independent legal counsel to review this Agreement and all related documents on the Member's behalf and to obtain the advice of such legal counsel relating to such documentation.  Each Member further acknowledges and agrees that the law firm of Doherty & Doherty LLP are legal counsel solely to Willis Group, LLC with respect to this Agreement.

**Section 13.15   Construction.**   Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter.  Except to the extent the context specifically indicates otherwise, all references to Certificate and Sections refer to articles and sections of this Agreement, and all references to Exhibits refer to Exhibits attached hereto, each of which is made a part hereof for all purposes.

*[Signature Pages Follow]*

26

27

IN WITNESS WHEREOF, the Managers and Members have executed this Agreement as of Effective Date.

MANAGERS:

_____
Mark A. Willis

_____
Thomas P. Tatham

Member Signatures Follow:

FOUNDING MEMBERS:

HOPEWELL WILLIS HOLDINGS LLC

By: _____

WILLIS GROUP, LLC

By: _____

HOPEWELL TATHAM HOLDINGS LLC

By: _____

LNG PARTNERS, LLC

By: _____
Managing Director

_____
MARK BUSH

28

## MEMBER SIGNATURE PAGE

The undersigned Member of **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company (the "Company"), does hereby execute this signature page to be attached to that certain Third Amended and Restated Company Agreement for the Company and agrees to be bound by all of the terms and provisions of such Agreement.

Hopewell Willis Holdings, LLC

By: _____

Mark A. Willis

*Address:* 1400 Post Oak Blvd. Suite 200
Houston, TX 77027

1

## MEMBER SIGNATURE PAGE

The undersigned Member of **HOPEWELL - PILOT PROJECT, LLC,** a Texas limited liability company (the "Company"), does hereby execute this signature page to be attached to that certain Third Amended and Restated Company Agreement for the Company and agrees to be bound by all of the terms and provisions of such Agreement.

By: _____

Gil Lopez III

*Address:* 16522 Champions Cove Circle
Spring, TX 77379

1

WIL_00001241

## MEMBER SIGNATURE PAGE

The undersigned Member of **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company (the "Company"), does hereby execute this signature page to be attached to that certain Third Amended and Restated Company Agreement for the Company and agrees to be bound by all of the terms and provisions of such Agreement.

By: _____

Michael Casey Foran

*Address:* 200 Lamont Ave.
San Antonio, TX 78209

## MEMBER SIGNATURE PAGE

The undersigned Member of **HOPEWELL – PILOT PROJECT, LLC**, a Texas limited liability company (the "Company"), does hereby execute this signature page to be attached to that certain Third Amended and Restated Company Agreement for the Company and agrees to be bound by all of the terms and provisions of such Agreement.

Foran Ltd.

By: _____

Michael C. Foran, President

*Address:* 200 Lamont Ave.
San Antonio, TX 78209

1

WIL_00001243

## MEMBER SIGNATURE PAGE

The undersigned Member of **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company (the "Company"), does hereby execute this signature page to be attached to that certain Third Amended and Restated Company Agreement for the Company and agrees to be bound by all of the terms and provisions of such Agreement.

*Name:* Michael T Willis

*Address:* 1400 Post Oak Blvd
Suite 200
Houston, Tx 77056

33

## MEMBER SIGNATURE PAGE

The undersigned Member of **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company (the "Company"), does hereby execute this signature page to be attached to that certain Third Amended and Restated Company Agreement for the Company and agrees to be bound by all of the terms and provisions of such Agreement.

South Padre Gas Partners, L.P.

By: _____

Thomas P. Tatham, Managing Director

*Address:* 1400 Post Oak Blvd. Suite 200
Houston, TX 77056

## MEMBER SIGNATURE PAGE

The undersigned Member of **HOPEWELL - PILOT PROJECT, LLC,** a Texas limited liability company (the "Company"), does hereby execute this signature page to be attached to that certain Third Amended and Restated Company Agreement for the Company and agrees to be bound by all of the terms and provisions of such Agreement.

Name: THOMAS TRENT STOUT

Address: 701 BRIN WAUR CIR
HOUSTON TX 77024

29

## MEMBER SIGNATURE PAGE

The undersigned Member of **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company (the "Company"), does hereby execute this signature page to be attached to that certain Third Amended and Restated Company Agreement for the Company and agrees to be bound by all of the terms and provisions of such Agreement.

EnSource Investments, LLC

By: _____

Justin Pannu, Manager

*CLIFF SHARD*

*Address:*  700 W. E Street, #3804
San Diego, CA 92101

1

WIL_00000913
Page 102

## SCHEDULE A
## Member Information

| Name and Address of Each Member | Founders Shares | Initial Ownership Percentage | Initial Additional Equity Shares** | Capital Contribution Paid for Initial Additional Equity Shares | Adjusted Ownership Percentage after issue of Initial Additional Equity Shares*** |
|---|---|---|---|---|---|
| **Willis Group Members:** | | | | | |
| **Hopewell Willis Holdings, LLC** 1400 Post Oak Blvd. Suite 200 Houston, TX 77056 | 450,000 | 45% | 50,000 | $100,000 | 34.25% |
| **Willis Group LLC** 1400 Post Oak Blvd. Suite 200 Houston, TX 77056 | 225,000 | 22.5% | | | 15.41% |
| **Tatham Group Members:** | | | | | |
| **Hopewell Tatham Holdings LLC** 1400 Post Oak Blvd. Suite 200 Houston, TX 77056 | 112,500 | 11.25% | | | 7.71% |
| **LNG Partners, LLC** 600 Travis St. Suite 5900 Houston, TX 77002 | 112,500 | 11.25% | | | 7.71% |
| **Mark A. Bush** 5868 Westheimer, Apt 458 Houston, TX 77057 | 100,000 | 10% | | | 6.84% |

| Initial New Members: | | | | | | |
|---|---|---|---|---|---|---|
| Gil Lopez III<br>16522 Champions Cove Circle<br>Spring, TX  77379 | | | 25,000 | $50,000 | 1.71% | |
| Michael Casey Foran<br>200 Lamont Ave.<br>San Antonio, TX  78209 | | | 17,500 | $35,000 | 1.20% | |
| Foran Ltd.<br>200 Lamont Ave.<br>San Antonio, TX  78209 | | | 12,500 | $25,000 | 0.86% | |
| Michael T. Willis<br>1400 Post Oak Blvd.<br>Suite 200<br>Houston, TX  77056 | | | 15,000 | $30,000 | 1.03% | |
| South Padre Gas Partners, L.P.<br>10 S. Briar Hollow Ln., #30<br>Houston, TX  77027 | | | 25,000 | $50,000 | 1.71% | |
| Thomas Trent Stout<br>231 Bryn Mawr Cir.<br>Houston, TX  77024 | | | 50,000 | $100,000 | 3.42% | |
| EnSource Investments, LLC | | | 265,000 | $530,000 | 18.15% | |
| Totals | 1,000,000 | 100% | 460,000 | $920,000 | 100% | |
| | | | | | | |

\* 1,000,000 Founders Shares allocated among Willis Group Members, Tatham Group Members and Mark A. Bush

\*\* Initial Additional Equity Shares subscribed by Founding Members and Initial New Members

\*\*\* Rounded to nearest 1/100th of one per cent (.01%)

**SCHEDULE B**
**Board of Managers**

Mark A. Willis

Thomas P. Tatham

32

**EXHIBIT E**

**Hopewell-Pilot Project, LLC**
**Schedule of Consulting and Contractor Agreements**
**(excludes legal counsel)**

**Hopewell:**

**Beyond Review (Willis Group affiliate) - provides contract land/O,G&M title attorneys, Jennifer Burkhardt & Lauren         Messer, on as needed basis; $45/hr**

**Carlos Manrique – drafting – as per purchase order; $200/d**

**Image Engine (Willis Group affiliate) – provides copying and  imaging services as per approved purchase orders**

**Linda Meiske – contract land services as needed - $375/d        plus travel allowance @ $.10/mi**

**Mark Bush – GRE services - $1,500/d (above 4 days per  month as per Consulting Services Agreement)**

**PDP Management Group, LLC – provides executive          management services including Thomas P. Tatham  - $1,500/d**

**Schubarth Inc. – Reservoir engineering and well production    analysis – as per approved purchase order**

**Steve Ervi/SDE Ventures – contract land services as needed -  $400/d plus travel allowance @ $.10/mi**

**Title Rover, LLC (Willis Group Affiliate) - $17,500/mo plus all direct expenses of TR related to AMI as per MoA**

**EXHIBIT F**

Justin Pannu  10/29/2018

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   ENSOURCE INVESTMENTS, LLC, a        )
     Delaware limited liability company, )
 5                                       )
                 Plaintiff,              )
 6                                       )
         v.                              )
 7                                       )Case No.:
                                         )17CV0079 H JMA
 8   THOMAS P. TATHAM, an individual;    )
     MARK A. WILLIS, an individual; PDP  )
 9   MANAGEMENT GROUP, LLC, a Texas      )
     limited liability company; TITLE    )
10   ROVER, LLC, a Texas limited liability)
     company; BEYOND REVIEW, LLC, a Texas )
11   limited company; IMAGE ENGINE, LLC, a)
     WILLIS GROUP, LLC, a Texas limited   )
12   liability company; and DOES 1-50,    )
                                          )
13                 Defendants.            )
     ─────────────────────────────────────)

14

15        VIDEOTAPED DEPOSITION OF JUSTIN PANNU

16              SAN DIEGO, CALIFORNIA

17               OCTOBER 29, 2018

18

19   REPORTED BY BRIDGET L. MASTROBATTISTA, CSR NO. 7715,
               REGISTERED PROFESSIONAL REPORTER
20              REGISTERED MERIT REPORTER
               CERTIFIED REALTIME REPORTER
21

22

23

24

25
```

Justin Pannu  10/29/2018

```
 1              Do you understand that?

 2        A    I am generally knowledgeable about these

 3    18 topics, but if we're getting into the minutia,

 4    there are other members where Willis made

 5    representations or to whom Willis made

 6    representations to, and for a complete record,

 7    you'll need to ask the other members about the

 8    details of these topics as well, but generally, yes,

 9    there -- I'm knowledgeable of -- on a high level of

10    these topics.

11        Q    So as a general rule going forward for

12    today, let's -- let's say that if we get to a topic

13    and you believe there is somebody within the

14    EnSource organization that has more knowledge than

15    you, that you will tell me.

16        A    Yes.

17        Q    Can you do that?

18        A    I can do that.

19        Q    And if you don't tell me, I'm going to

20    assume that you gave is the answer on behalf of

21    EnSource.  Okay?

22             MR. SADOCK:  Justin, do you understand the

23    condition?

24             THE WITNESS:  I think I do.  Okay.

25             MR. SADOCK:  If you're not sure, ask her
```

```
1    to rephrase it.
2              THE WITNESS:  Could you just repeat it one
3    more time.
4    BY MS. SWEENEY:
5         Q    Sure.  Because you've been designated as
6    the spokesperson for EnSource today --
7         A    Right.
8         Q    -- and the person who has the most
9    knowledge --
10        A    Got you.
11        Q    -- for this entity, if you don't tell me
12   that somebody else has more knowledge than you and
13   you give me an answer, I'm going to assume that that
14   answer is the best answer on behalf of EnSource.
15   Okay?
16        A    I'll -- okay.  I will try to do that.
17        Q    Well, I need -- I actually need you to
18   commit to that, because that's the whole point of
19   today is that you are the spokesperson of EnSource,
20   and so if you don't tell me otherwise, I'm going to
21   assume that the answer that you're giving is on
22   behalf of EnSource.
23        A    I will try to let you know about the
24   answers.  I will -- I'll -- you know, there are a
25   number of other investors involved in this and there
```

Justin Pannu  10/29/2018

```
 1   is -- in the due diligence aspects of it.  So when

 2   you ask me a question, I will think carefully as to

 3   whether I know that answer.

 4        Q    I appreciate that.  And I want you to

 5   think carefully and I want you to be sure about the

 6   answers that you are giving, but going forward, if

 7   you do not tell me that somebody else has more

 8   information, I am entitled, because of the type of

 9   deposition that this is, to assume and rely on the

10   fact that that information is being given on behalf

11   of EnSource.

12        A    Okay.  You can do that.

13        Q    Okay.  Thank you.

14             Before we get into the substance, can you

15   tell me a little bit about you.  I would like to

16   know about your education background.

17        A    I have a Bachelor's in business from the

18   University of Victoria in British Columbia, Canada.

19   Bachelor's in commerce.  Sorry.  That's the

20   Bachelor's in commerce.  And then an MBA from

21   Queen's University in Kingston, Ontario, Canada.

22        Q    And that's the highest level of education

23   you've --

24        A    Yes.

25        Q    -- attained?
```

1   **Kilimanjaro?**

2       A    I don't know if it was Kilimanjaro at that

3   time.  I don't think it was.

4       **Q    And when you say Jerry's group, do you**

5   **mean the group that includes James Dibble and**

6   **Jeff Merola?**

7       A    Yeah.  And maybe other people that I don't

8   know about.

9       **Q    They were involved in the Fantasy Hub?**

10      A    Yes.

11      **Q    Okay.  When you formed EnSource, was there**

12  **any sort of requirement for someone to become a**

13  **member?**

14          MR. SADOCK:  Objection.  Vague as to time.

15  Ambiguous as to "requirement."

16          THE WITNESS:  Other than we were friends,

17  I don't remember being any requirement.

18  BY MS. SWEENEY:

19      **Q    There wasn't a requirement that somebody**

20  **had a certain amount of net worth or a certain**

21  **amount of money to invest?**

22      A    Oh, yes, I'd asked -- because the Hopewell

23  subscription agreement had asked for a net worth, I

24  had asked if everybody was accredited.  And I got a

25  yes from everybody.

Justin Pannu  10/29/2018

1      **Q      Did you ask it just like that, "Are you**

2    **accredited?"**

3      A    Yes.  "Are you accredited?"  That's it.

4      **Q    What do you understand accredited to mean?**

5           MR. SADOCK:  Objection.  Calls for a legal

6    conclusion.

7           THE WITNESS:  I believe it was over -- I

8    believe it was a SEC definition at the time, and I

9    don't remember what that was, but I just asked if

10   they were accredited.

11   BY MS. SWEENEY:

12     **Q    Do you have a appreciation as to what it**

13   **means?  Does it require a certain net worth?  Does**

14   **it require --**

15     A    Yeah, I didn't ask exactly what -- it just

16   said -- everyone seemed to know what that meant.

17   And they just said yes.  So I -- for me, I don't

18   remember the amounts, but I think it was 200- or

19   250- for the last two years, and a million dollars

20   net of your residence or something like that.

21     **Q    Were you an accredited investor?**

22     A    I'm an accredited investor.

23     **Q    You are now?**

24     A    I am now as well.

25     **Q    You were in 2016?**

Justin Pannu  10/29/2018

```
 1      A    Okay.

 2      Q    So your testimony is that Mark Willis told

 3  you that in person during a meeting in San Diego,

 4  correct?

 5      A    Yes.  When I asked what the basis of his

 6  valuation was.

 7      Q    And was there ever another time when

 8  Mark Willis personally told you that there was

 9  $3 million invested into Title Rover technology?

10      A    I don't remember Willis telling me that,

11  but Tatham told me that, that the Willis Group

12  entities had invested, in an email, I believe.

13      Q    Okay.  And again, I am trying to limit the

14  questions and the answers into what Mark Willis told

15  you.

16           Was there ever an email or a written

17  communication, text, email, where Mark Willis told

18  you that $3 million was invested into Title Rover

19  technology?

20      A    There was not.  I don't believe.

21      Q    So it was just that one time during that

22  first meeting?

23      A    Yes.

24      Q    Okay.  And was that statement something

25  that you relied upon when you ultimately made an
```

Justin Pannu  10/29/2018

1    **investment into Hopewell?**

2       _A_     _The reason why I relied upon that_

3    _statement is because he said it was cutting-edge_

4    _technology.   And it was -- it was a manual effort to_

5    _find these leases and that technology is something_

6    _that he just needed to refine._   So, yes, the

7    investment in the technology was relied upon.

8       **Q     Did you rely on that specific number, the**

9    **$3 million that he told you supposedly or was it**

10   **just that some amount of money had been invested?**

11      A     If he had told me 100,000 --

12            MR. SADOCK:  Objection.  Calls for

13   speculation.  Incomplete hypothetical.

14            THE WITNESS:  I just trusted Willis that

15   he told me that he'd spent $3 million on that.

16   BY MS. SWEENEY:

17      **Q     Did you ever ask any other questions, you**

18   **meaning EnSource right now, related to the**

19   **three-million-dollar investment into Title Rover**

20   **technology?**

21      A     I don't remember.

22            MR. SADOCK:  Objection.  Calls for

23   speculation as it pertains to every other member.

24   BY MS. SWEENEY:

25      **Q     Did you ever ask to see any proof that**

Justin Pannu  10/29/2018

1    **$3 million had been invested into Title Rover**

2    **technology?**

3         A    Given Chad's endorsement -- well, while I

4    did not ask for any proof but given Chad's

5    endorsement of Mark Willis and their deep

6    relationship and the trust that developed between

7    Mark Willis and I, I just went on his word.

8         **Q    At your first meeting in San Diego when**

9    **you first met Mark, that was the first time you met**

10   **him, right?**

11        A    Yes.

12        **Q    Did you have a deep level of trust with**

13   **him at that first meeting?**

14        A    Yes.  Because Chad endorsed their deep

15   relationship and before Chad really trusted and

16   endorsed Mark and said he'd known him for a long

17   time, that their families knew each other, that they

18   were neighbors, close -- close neighbors.  So, yes,

19   I -- what was your question?

20        **Q    You developed a deep trust in Mark Willis?**

21        A    So, yes, I developed one probably before I

22   had met him.

23        **Q    Had you decided to invest in Hopewell**

24   **before you met Mark Willis?**

25        A    No.  I just trusted him.

Justin Pannu  10/29/2018

1      **Q      Did you decide to invest in Hopewell after**

2   **that first meeting?**

3      A      No, I just decided I trusted him.

4      **Q      Did you ever ask for any financial**

5   **documents that might have provided information**

6   **related to investments into the Title Rover**

7   **technology?**

8            MR. SADOCK:  Objection.  Vague as to you,

9   as it pertains to Justin or EnSource.

10           THE WITNESS:  I don't know if I personally

11   did, but you'd have to ask the other members of

12   EnSource.

13   BY MS. SWEENEY:

14      **Q      Okay.  Let me ask it because I want a**

15   **clearer record.**

16           **Did you personally ever ask for financial**

17   **documents that would have provided information**

18   **related to investments that had been made into**

19   **Title Rover technology, you personally?**

20      A      I don't believe I did, but I just took

21   Mark on his word based on the relationship that him

22   and Chad had and the trust that we had with him.

23      **Q      Do you have a specific understanding that**

24   **anybody at EnSource asked for financial documents**

25   **that would have shown investments into Title Rover**

Justin Pannu  10/29/2018

1    representation that $3 million had been invested

2    into Title Rover technology was false?

3         A    I don't know what other representations

4    that were made to other members, so I can't really

5    speak on behalf of EnSource, but personally, I don't

6    know.

7         Q    So moving on to the next representation

8    that you claim Mr. Willis made to you.  You claim he

9    said that Hopewell was oversubscribed, but he wanted

10   to give Chad and his friends an opportunity to

11   invest.

12        A    Yes.

13        Q    When did Mr. Willis make that

14   representation to you?

15        A    He made that representation in San Diego.

16        Q    In person?

17        A    In person, at the beach or at Tower 23.

18        Q    Did he ever make that representation to

19   you personally in any other way at any other time?

20        A    I believe either Tatham or Willis -- and I

21   don't remember which -- stated that there was

22   another investor that they were looking at, that

23   wanted to take our subscription agreement if we

24   didn't invest in time.

25        Q    When Mr. Willis made the representation

Justin Pannu  10/29/2018

1    that Hopewell was oversubscribed, what did you

2    understand that to mean?

3        A    That there was a lot of demand for -- that

4    they had a lot of demand for people who wanted to

5    invest into Hopewell.

6        Q    Did you take it to mean that there was a

7    commitment by other people to invest?

8        A    I don't know what I thought at the time.

9        Q    Did you ask him what he meant by

10   "oversubscribed"?

11       A    I don't remember.

12       Q    Do you know he specifically used that

13   word, "oversubscribed"?

14       A    Yes.

15       Q    Did you do anything to try and

16   substantiate that representation?

17       A    Other than take his word on it, no.

18       Q    During the course of your due diligence,

19   did you have the opportunity to get information

20   related to other investors in Hopewell?

21            MR. SADOCK:  Objection.  Vague as to "you"

22   whether you're talking about Justin or EnSource.

23            THE WITNESS:  Say it again?

24   BY MS. SWEENEY:

25       Q    Let's do it two ways.

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:

 2       Q    Did you personally form the conclusion at

 3   any point that that was not a true statement?

 4       A    Well, I haven't seen anything.  So I don't

 5   think there is.

 6       Q    Did you ask for anything?

 7       A    I didn't ask.  I just took Mark on his

 8   word for it.

 9       Q    The next statement that Mark represented

10   that he had used the core technology with BP in a

11   case dealing with e-discovery.

12       A    Yes.

13       Q    When did that representation get made?

14       A    That was made to myself at the -- at the

15   Beach House.  And then I believe it was made to

16   Jerry.  And it may have been made to Chad.  I'm not

17   sure.

18       Q    Do you have a specific memory or knowledge

19   that it was made to Jerry or Chad?

20       A    I remember Jerry talking about it that

21   that technology -- that Willis represented to them

22   that that technology was used in an e-discovery

23   case.

24       Q    And what --

25       A    Or BP case regarding e-discovery.
```

Justin Pannu  10/29/2018

1       Q       Did Mr. Willis make that representation to

2  you personally at any other time?

3       A       He may have, yes.  I do remember sometime

4  during the due diligence he could have.  He did say

5  something like that.

6       Q       Was that in writing?

7       A       I don't remember.

8       Q       And what was it about that representation

9  that -- what did you think about that

10 representation?

11      A       I thought it was --

12              MR. SADOCK:  Objection.  Vague as to time.

13              THE WITNESS:  What did I think?

14 BY MS. SWEENEY:

15      Q       Uh-huh.

16      A       I -- personally I thought -- and I don't

17 know what other members thought -- that that was --

18 you know, Willis represented that it -- you know, it

19 was the technology that just needed to be refined

20 for the use of finding problem areas for any of the

21 chain of title issues.  So it -- you know, it was

22 something that was very convincing to us.

23      Q       It's something that you relied on in

24 making the investment?

25      A       Definitely we relied on that one.

Justin Pannu  10/29/2018

1      Q      You personally?

2      A      I -- me personally.

3      Q      And EnSource as well?

4             MR. SADOCK:  Objection.  Calls for

5      speculation.

6             THE WITNESS:  I don't know about the other

7      members, but me personally for sure.

8      BY MS. SWEENEY:

9      Q      And as a representative of EnSource today,

10     is that something that EnSource relied upon?

11            MR. SADOCK:  Objection.  Calls for

12     speculation.

13            THE WITNESS:  I think so.

14     BY MS. SWEENEY:

15     Q      Did you ever ask, you personally ask for

16     any proof that the technology had been used for

17     e-discovery purposes?

18     A      Me personally, no.  That wasn't my area of

19     expertise and that's why we brought Jerry in.

20     Q      That is Jerry's area of expertise?

21     A      Jerry.  And James Dibble.

22     Q      Do you know if Jerry ever asked for any

23     proof that the technology had been used for

24     e-discovery?

25     A      There was a webinar and there were a

Justin Pannu  10/29/2018

1    number of phone calls between -- I don't know who it

2    was, between either the CTO or Willis or Tatham.

3    And there were a numbers of questions asked.

4              And I'm not a technology person;

5    therefore, you know, that when they got into the

6    technology discussions, I was -- I guess I could say

7    I was in and out of that discussion even though I

8    was on the webinar.

9         Q    Do you know if Jerry ever satisfied

10   himself that the representation that the technology

11   had been used in e-discovery was true?

12             MR. SADOCK:  Objection.  Calls for

13   speculation.

14             THE WITNESS:  I don't know for that

15   specific purpose or if it was that specific -- for

16   that specific event.  I wouldn't know.

17   BY MS. SWEENEY:

18        Q    Is it true that the technology of

19   Title Rover was important to EnSource when deciding

20   to make the investment in Hopewell?

21        A    Yes.

22        Q    Is it true that EnSource did whatever due

23   diligence needed to be done to satisfy itself that

24   the representations being made about the technology

25   were accurate?

Justin Pannu  10/29/2018

```
 1        A     No, but the circumstances and the events

 2   that occurred throughout the due diligence process

 3   on having to move to a higher level when we're

 4   negotiating just -- it felt like that Mark was the

 5   person who was in -- Mark was -- Willis was the one

 6   that was involved throughout the process and that he

 7   was in charge.  That's just the general feeling that

 8   I had.

 9        Q     So going back to -- circling back to where

10   I was.  At any point prior to making the investment,

11   did you personally ask for the bank statements of

12   Hopewell?

13             MR. SADOCK:  Objection.  Asked and

14   answered.

15             THE WITNESS:  During the due diligence

16   process?

17   BY MS. SWEENEY:

18        Q     Any time prior to your investment.

19        A     Any time prior to my investment.  I don't

20   believe we did.

21        Q     At any time prior to your investment, did

22   you personally ask for accounts receivable of

23   Hopewell?

24        A     From either Tatham or Willis?

25        Q     Correct.
```

Justin Pannu  10/29/2018

```
 1    vague as to "these documents."

 2              THE WITNESS:  I personally, and not on

 3    behalf of EnSource, would have reviewed things that

 4    I was signing on behalf of EnSource, but briefly

 5    because I trusted my attorney.

 6    BY MS. SWEENEY:

 7         Q    You understood that you were being

 8    solicited to make an investment of Hopewell,

 9    correct?

10         A    Right.

11         Q    So is it fair to say that EnSource was

12    interested in learning what that investment was all

13    about?

14         A    Yes.

15         Q    And that would be important to discover

16    prior to actually making the investment, correct?

17         A    Correct.

18         Q    And so is it fair to say that somebody at

19    EnSource reviewed these documents prior to them

20    being signed in order to make a decision to make the

21    investment?

22              MR. SADOCK:  Vague.  Calls for

23    speculation.  Incomplete hypothetical.

24              THE WITNESS:  I personally relied on what

25    Willis and Tatham were telling me in emails or by
```

Justin Pannu  10/29/2018

1    text or by verbal communication.

2              Yes, but it is fair that somebody would

3    have thoroughly reviewed these documents to say that

4    on behalf of EnSource prior to our investment.

5    BY MS. SWEENEY:

6        Q    So your -- you personally, your sole

7    calculus in entering into the subscription agreement

8    and making an investment in Hopewell was relying on

9    the words of Mark Willis and Tom Tatham; is that

10   accurate?

11             MR. SADOCK:  Objection.  Misstates

12   testimony.

13             THE WITNESS:  Not solely on, but mostly

14   on.  And there were -- there was certain things that

15   I had read such as the -- what the capital -- what

16   the PPM stated in the sense that the working capital

17   was going to be used to continue.  I remember that.

18   I don't know when I specifically read that, but that

19   was at some point before it was signed.

20   BY MS. SWEENEY:

21       Q    So looking at Exhibit 7, if you scroll

22   through it, please, it's the thicker one in front of

23   you.  I believe it's the one that you've already

24   turned over.

25       A    Okay.

Justin Pannu  10/29/2018

```
 1    BY MS. SWEENEY:

 2         Q    Okay.  I just handed you what we'll mark

 3    as Exhibit 11, which is an email at the top from you

 4    to Mr. Tatham dated August 17, 2016.  The subject

 5    line is "Due diligence List - Dropbox or Online Data

 6    Room."

 7              Do you see that?

 8         A    I do.

 9         Q    And then there are two documents listed.

10    One is called a due diligence request list for

11    Title Rover, and the other is called a due diligence

12    request list for Hopewell-Pilot.

13              Do you see that?

14         A    I do.

15         Q    I think if you turn the page to the email

16    that originated the email chain, it's dated

17    August 16, 2016.  Again, it's a email from you.

18              It says, I hope this note -- or "Hope this

19    note finds you well.  Attached are due diligence

20    lists for both Hopewell-Pilot Project, LLC and

21    Title Rover, LLC."

22              Do you see that?

23         A    I do.

24         Q    So if you just flip the page through the

25    various due diligence checklists, are those the
```

Justin Pannu  10/29/2018

1    **checklists that you provided to Tom Tatham?**

2        A    Yes.  I believe so, yes.

3        **Q    And this is the information that EnSource**

4    **wanted to learn about Hopewell prior to making the**

5    **investment in Hopewell, correct?**

6        A    Correct.

7        **Q    Who created the due diligence list?**

8        A    I don't believe it was any of the EnSource

9    members.

10       **Q    It was your lawyer?**

11           THE WITNESS:  Is that attorney-client

12   privilege?

13           MR. SADOCK:  No.

14           THE WITNESS:  Yes.

15   BY MS. SWEENEY:

16       **Q    Had you ever used this due diligence**

17   **checklist before?**

18           MR. SADOCK:  Objection.  Vague as to

19   "you," and vague as to time.

20           THE WITNESS:  I don't remember if I had.

21   BY MS. SWEENEY:

22       **Q    In connection with other investments that**

23   **you personally are involved in, did you use a due**

24   **diligence list similar to this?**

25       A    It's possible.

Justin Pannu 10/29/2018

```
 1   BY MS. SWEENEY:
 2       Q    And Mr. Tatham's response to you, which is
 3   just directly above on this email chain, it says,
 4   "Okay.  Please send me the executed subscription
 5   agreements that were effective on Friday, August 26,
 6   2016."
 7            So Mr. Tatham appears to think that there
 8   were subscription agreements that had been entered
 9   the day previous.
10            Were there subscription agreements that
11   had been entered on August 26, 2016?
12            MR. SADOCK:  Objection.  Lacks foundation.
13   Vague as to time.  Calls for speculation.
14            THE WITNESS:  I don't remember.
15   BY MS. SWEENEY:
16       Q    I'm marking this next one Exhibit 23.
17            (Exhibit 23 was marked.)
18   BY MS. SWEENEY:
19       Q    The email is dated August 30th, 2016.
20   It's from Mr. Tatham to you, but it's in response to
21   a lengthy email that you sent to Tom related to
22   revisions of the amended and restated operating
23   agreement of Title Rover.
24            Do you remember that at some point there
25   was a precondition to investment to have the
```

Justin Pannu  10/29/2018

1    **Title Rover and Hopewell operating agreements**

2    **amended?**

3        A    <u>I do remember that.</u>  Generally.

4            MR. SADOCK:  Objection.

5    BY MS. SWEENEY:

6        Q    **Do you see --**

7            MR. SADOCK:  Sorry.  Just objection.

8    Compound.  Calls for a legal conclusion.

9    BY MS. SWEENEY:

10       Q    **Do you see in the email at the top of the**

11   **page from Mr. Tatham, it says, "Please have Rich**

12   **give me a call in the morning as we need to resolve**

13   **whether your group or the individuals involved have**

14   **made subscriptions."**

15           **So as of August 30th, 2016, had anybody**

16   **communicated to Mr. Tatham that subscriptions had**

17   **already been entered by your group?**

18           MR. SADOCK:  Objection.  Misstates the

19   email.  Calls for speculation.

20           THE WITNESS:  I don't remember.  This was

21   two years ago.

22   BY MS. SWEENEY:

23       Q    **Do you recall an instance where EnSource**

24   **executed subscriptions but held them back from**

25   **delivery to Hopewell pending resolution of**

Justin Pannu  10/29/2018

1   transfer no later than 3:00 p.m. CST tomorrow,

2   Friday, September 2nd."

3           Did you have any understanding as to why

4   there was a time sensitivity for the investment?

5           MR. SADOCK:  Objection.  Calls for

6   speculation.

7           THE WITNESS:  I don't remember any at the

8   time.

9   BY MS. SWEENEY:

10      Q    Did you -- as of September 1st, 2016, did

11  you, EnSource, have a feeling like you were being

12  rushed into making this investment?

13          MR. SADOCK:  Objection.  Calls for

14  speculation.

15          THE WITNESS:  I believe as a group we

16  weren't going to invest -- I don't know if we felt

17  rushed or not -- until we were comfortable.

18  BY MS. SWEENEY:

19      Q    What were you still waiting for as of that

20  time to feel comfortable?

21      A    I was just telling you our general

22  feeling, but at the time I don't remember.

23      Q    I'm handing you a document that I'm going

24  to mark as Exhibit 27.

25          (Exhibit 27 was marked.)

Justin Pannu  10/29/2018

1     Q     And you understood that at the time that

2   you signed this document?

3          MR. SADOCK:  Objection.  Calls for a legal

4   conclusion.

5   BY MS. SWEENEY:

6     Q     Sir, I'm only asking about the first

7   sentence of Subsection D.

8     A     I read that and that's what it says.

9     Q     Do you understand what that says?

10    A     That no representations or warranties have

11  been made to the investor by the company, the

12  company's manager or agent thereof other than as set

13  forth in the company agreement in this agreement.

14    Q     Do you understand that?

15    A     I believe so.

16          It doesn't say anything about omissions.

17    Q     You understand that it says that the only

18  thing that the company is warrantying is that which

19  is in the company agreement and in this agreement?

20    A     Represent warranties but nothing about

21  omissions.

22    Q     The next sentence goes on to say, "The

23  Investor has had access to such information

24  concerning the Company, as the Investor deems

25  necessary to enable the Investor to make an informed

Justin Pannu  10/29/2018

1    <u>decision concerning the acquisition of the</u>

2    <u>Interest."</u>

3              <u>Is there anything about that sentence that</u>

4    <u>you disagree with?</u>

5              MR. SADOCK:  Objection.  Calls for a legal

6    conclusion.

7              <u>THE WITNESS:   That's what that sentence</u>

8    <u>says.</u>

9    <u>BY MS. SWEENEY:</u>

10       <u>Q    And as of the time that you signed the</u>

11   <u>subscription agreement, did you disagree with that</u>

12   <u>sentence?</u>

13             MR. SADOCK:  Objection.  Calls for a legal

14   conclusion.

15             <u>THE WITNESS:  We had a -- there were a</u>

16   <u>number of representations that Willis made to us</u>

17   <u>such as the -- the fact that we trusted Willis on</u>

18   <u>the information that -- and Tatham on the</u>

19   <u>information that they had provided to us</u>.

20   <u>BY MS. SWEENEY:</u>

21       <u>Q    So --</u>

22       <u>A    So having --</u>

23       <u>Q    I'm asking a yes-or-no question.   As of</u>

24   <u>the date that you signed the subscription agreement,</u>

25   <u>did you disagree with that sentence?</u>

Justin Pannu  10/29/2018

```
 1      A     As of that date, no, I don't believe so.
 2      Q     The next sentence says, "The Investor has
 3   had access to the designated representatives of the
 4   Company, its Managers, and the opportunity to ask
 5   questions of, and receive answers satisfactory to
 6   the Investor from, the Managers and/or such
 7   designated representatives concerning the offering
 8   of Interests in the Company generally."
 9            As of the time you signed the subscription
10   agreement, did you disagree with that sentence?
11      A     We believed at the time that the
12   representations that were made to us, based on a
13   personal relationship with Willis and Chad, we were
14   satisfied without having to strain that personal
15   relationship without asking any further -- for
16   further information.
17      Q     Okay.  I'm going to ask -- I'm asking just
18   a simple yes-or-no question.  As of the date that
19   you signed this subscription agreement, did you
20   disagree with anything in that last sentence that we
21   just discussed?
22            MR. SADOCK:  Objection.  Calls for a legal
23   conclusion.  Asked and answered.
24            THE WITNESS:  I'm unaware of any concerns
25   that we had at that point in time.
```

Justin Pannu  10/29/2018

1  BY MS. SWEENEY:

2  **Q    You understand that this is in a section**

3  **that's entitled "Investor representation" that you**

4  **are, by signing the agreement, representing that you**

5  **had not relied on any representations oral or**

6  **written other than those inside here.  That's what**

7  **you were representing when you signed the agreement.**

8          MR. SADOCK:  Calls for a legal conclusion.

9          THE WITNESS:  I agree that's what I

10  signed.

11  BY MS. SWEENEY:

12      **Q    The next paragraph --**

13      A    It doesn't make any mention about

14  omissions though.

15      **Q    The next sentence of that paragraph says,**

16  **"With respect to its investment in the Company, the**

17  **Investor is not relying on any other information,**

18  **representation or warranty by the Company, the**

19  **Managers of the Company, or any designated**

20  **representatives of the Company."**

21          **Do you see that that's also what you were**

22  **attesting to when you signed the subscription**

23  **agreement?**

24          MR. SADOCK:  Objection.  Calls for a legal

25  conclusion.

Justin Pannu  10/29/2018

1    BY MS. SWEENEY:

2        Q    Sir, I'm only asking you about the last

3    sentence of paragraph K and I'm running out of time,

4    so...

5        A    On "K"?  Okay.

6        Q    "K."

7        A    I was reading it -- okay.  So what --

8        Q    "With respect to its investment in the

9    Company, the Investor is not relying upon any other

10   information, representation or warranty by the

11   Company, the Managers of the Company, or any

12   designated representatives of the Company."

13       A    I agree that's why I signed, but it

14   doesn't make any mention about omissions.

15       Q    Down in paragraph 7 it talks about signing

16   as the agent of an entity.

17            Did you understand at the time that you

18   were signing on behalf of EnSource that you were the

19   designated representative of EnSource for this

20   investment?

21            MR. SADOCK:  Objection.  Calls for a legal

22   conclusion.

23   BY MS. SWEENEY:

24       Q    I'm asking you a question that doesn't

25   involve reading.

Justin Pannu  10/29/2018

```
 1              MR. SADOCK:  Objection.  Calls for a legal
 2    conclusion.  Vague as to "representations" and calls
 3    for speculation.
 4              THE WITNESS:  Okay.  So your question was
 5    again?
 6    BY MS. SWEENEY:
 7       Q    Did you understand that Hopewell was
 8    relying on the representations that EnSource was
 9    making in this subscription agreement?
10              MR. SADOCK:  Objection.  Vague as to
11    "representations."  Calls for speculation and a
12    legal conclusion.
13              THE WITNESS:  I had my attorney look at
14    this specific agreement and I -- we sought his
15    assessment on that.  So if that is the
16    representation that we made based on our attorney's
17    assessment and opinion, then that's the
18    representation that we did make.
19    BY MS. SWEENEY:
20       Q    You understood that EnSource had the
21    option to convert the Hopewell shares to an interest
22    in Title Rover at some point, correct?
23              MR. SADOCK:  Objection.  Lacks foundation.
24    Vague as to time.
25              THE WITNESS:  I understood at some point
```

Justin Pannu  10/29/2018

1    we had the right to convert for a period of time.

2    BY MS. SWEENEY:

3        Q    And that right was set forth in an

4    exchange warrant?

5        A    Yes.

6        Q    Did EnSource ever exercise that right?

7        A    No.

8        Q    Why?

9        A    Because while EnSource was -- when

10   EnSource -- EnSource's trust was broken with

11   Hopewell, Willis and Tatham after we had seen what

12   happened to the funds.  And therefore while Willis

13   continued to say that this was still a good

14   opportunity, it didn't matter to us.

15       Q    Because you weren't interested in having

16   an investment in Title Rover at that point?

17       A    Because the trust was broken.

18       Q    Did you -- strike that.

19            I'm giving you a document I'm going to

20   label Exhibit 35.

21            (Exhibit 35 was marked.)

22   BY MS. SWEENEY:

23       Q    It's an email chain again, this one dated

24   December 8th, 2016.

25            If you follow it to the third page of the

Justin Pannu  10/29/2018

1      **Q      And to the best of your recollection and**
2      **on behalf, speaking as the person most knowledgeable**
3      **of EnSource, who was the member who first expressed**
4      **that they were worried about the investment?**
5      **A      It wasn't a member.**
6      **Q      Who was it?**
7          MR. SADOCK:  Do not discuss any
8      communications with your attorney.
9      BY MS. SWEENEY:
10     **Q      Are you able to answer that question**
11     **without divulging your discussion with your**
12     **attorney?**
13     **A      No.**
14     **Q      Are you going to follow your counsel's**
15     **advice and not answer the question?**
16     **A      Yes.**
17     **Q      In your complaint against Mr. Willis and**
18     **the other defendants, you allege that Mr. Willis**
19     **took acts to conceal the insolvency of Hopewell.**
20     **      What acts did Mr. Willis take to conceal**
21     **the insolvency of Hopewell?**
22         MR. SADOCK:  Objection.  Don't answer
23     anything as it pertains to discussions with your
24     attorney or attorney work product.
25         THE WITNESS:  My attorney wrote that.

Justin Pannu  10/29/2018

1    State of California      )

2                            )      ss

3    County of San Diego      )

4

5         I, BRIDGET L. MASTROBATTISTA, CSR No. 7715,

6    RPR, RMR, CRR, duly licensed and qualified in and

7    for the State of California, do hereby certify that

8    there came before me on the 29th day of October,

9    2018, at 530 B Street, Suite 350, San Diego,

10   California, the following named person, to-wit

11   JUSTIN PANNU, who was duly sworn to testify the

12   truth, the whole truth, and nothing but the truth of

13   knowledge touching and concerning the matters in

14   controversy in this case; and that he was thereupon

15   examined under oath and his examination reduced to

16   typewriting under my supervision; that the

17   deposition is a true record of the testimony given

18   by the witness.

19           I further certify that pursuant to FRCP

20   Rule 30(e)(1) that the signature of the deponent:

21           (x) Was requested by the deponent or a

22   party before the completion of the deposition;

23           ( ) Was not requested by the deponent of a

24   party before the completion of the deposition.

25           I further certify that I am neither

Justin Pannu, 10/29/2018

1    attorney or counsel for, nor related to or employed          06:20
2    by any of the parties to the action in which this
3    deposition is taken, and further that I am not a
4    relative, employee of any attorney or counsel
5    employed by the parties hereto, or financially             06:20
6    interested in the action.
7              CERTIFIED TO BY ME on this 12th day of
8    November, 2018.
9
10                                                               06:20
11             _____
               BRIDGET L. MASTROBATTISTA
               CSR No. 7715, RPR, RMR, CRR
12
13
14
15                                                               06:20
16
17
18
19
20
21
22
23
24
25

**307**

**EXHIBIT G**

**Sent:**      Tue, 7 Jun 2016 09:22:06 -0500
**Subject:**   FW: Documents for 4PM meeting with Chad Martin
**From:**      Tom  Tatham <tpt@lngpartners.com>
**To:**        Michelle Johnson <mjohnson@willisgroupus.com>
**Cc:**        Mark Willis <Mark@willisgroupus.com>
Confidentiality Agreement-Hopewell & Chad Martin - June 1, 2016.doc
PRIVATE PLACEMENT MEMORANDUM - 5-31-16 Final[2].pdf
Hopewell - Subscription Booklet - 5-31-16 Final[1].pdf
Amended_Restated Company Agreement - 5-31-16 Final Pre Subscription Draft[1].pdf

Michelle,
Please print out one copy of the attached docs for the 4pm meeting with Chad Martin.
Thanks,
Tom

PS:  We need to replace the CA that Chad returned as it contains an incorrect reference.  Please have he and Mark
resign the attached copy.

---

**From:** Mark Willis <Mark@willisgroupus.com>
**Date:** Monday, June 6, 2016 at 7:45 PM
**To:** Tom Tatham <tpt@lngpartners.com>
**Cc:** Michelle Johnson <mjohnson@willisgroupus.com>
**Subject:** Re: Touch Base

Tom,

I have a friend coming by tomorrow at 4pm, chad Martin to discuss the opportunity. Are you available?

Sent from my iPhone

On Jun 6, 2016, at 5:19 PM, Tom Tatham <tpt@lngpartners.com> wrote:

> Mark,
> As per our call, here is my first pass at an agreement based upon the details Mark W gave me!  Take
> a look and call me in the morning with comments or suggestions.  I am free until about 10:30am
> and again after 2PM.
> Thanks,
> Tom
> 713 574-4531 (office direct
> 713 504-7199 (mobile

---

**From:** Tom Tatham <tpt@lngpartners.com>
**Date:** Monday, June 6, 2016 at 3:14 PM
**To:** Mark Bush <mark@southoil.net>
**Subject:** Re: Touch Base

Mark,
I'll call you at 4PM.  Sorry I missed you at WF!
Talk soon,
Tom

---

**From:** Mark Bush <mark@southoil.net>

**Date:** Monday, June 6, 2016 at 1:32 PM
**To:** Tom Tatham <tpt@lngpartners.com>
**Subject:** RE: Touch Base

I just saw you at whole foods looked again missed you. Probably 4ish.

Mark A. Bush
President & CEO
South Oil, Inc.
5858 Westheimer, Ste. 688
Houston, Texas 77057
Tel:  (713) 739-7695
Fax: (713) 885-9842
Email:  mark@southoil.net
Skype: markbush5

**From:** Tom Tatham [mailto:tpt@lngpartners.com]
**Sent:** Monday, June 06, 2016 12:48 PM
**To:** Mark Bush <Mark@southoil.net>
**Subject:** Touch Base
**Importance:** High

Hi Mark,
Do you have a few minutes to talk this afternoon?  Mark Willis mentioned to me that the two of you have struck a deal regarding the Hopewell project and asked that I put together a draft agreement.  I just have a few questions when you have a chance to visit.  We look forward to working with you.
Thanks,
Tom
713 547-4531 (office direct
713 504-7199 (mobile
<Share Transfer Agreement - Mark Bush & Hopewell Founders - 6-6-16.docx>

## CONFIDENTIALITY AND NON-COMPETITION AGREEMENT

This **CONFIDENTIALITY and NON-COMPETITION AGREEMENT** is dated June ___, 2016 (this "Agreement"), and is entered into by and between **Hopewell-Pilot Project, LLC**, a Texas limited liability company (the "Company"), and Chad Martin, an individual residing in _____ , Texas and all affiliates and subsidiaries owned or controlled by Chad Martin (collectively "Recipient"), each of which may be referred to as "Party" and, together, as the "Parties".

**WHEREAS**, Recipient may be receiving from the Company certain financial, technical and other information regarding the Company, its assets and properties of a confidential and/or non-public nature for use by Recipient in evaluating a possible investment in the Company (the "Transaction"), and the Parties desire to protect the confidentiality of such information in accordance with the terms of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants contained in this Agreement, the Parties hereby agree as follows:

**1.** **Confidential Information Defined.** Recipient may receive certain non-public and confidential information from the Company, including but not limited to financial, technical and other confidential or proprietary information regarding the Company, its assets and properties. All such information thus supplied and designated in writing by the Company as "Confidential" is hereinafter called the "Confidential Information". Information conveyed orally also shall be covered hereunder to the extent designated as Confidential at the time of such oral conveyance. "Confidential Information" shall further include the fact that certain non-public and confidential information has been provided to the Recipient and its representatives, that discussions or negotiations are taking place concerning a possible Transaction or any of the terms, conditions or other facts with respect thereto (including the status thereof).

**2.** **Nondisclosure Obligation.** The Recipient shall keep all Confidential Information received by Recipient confidential and shall not disclose such information, in whole or in part, to any person. For the purpose of complying with the obligations set forth herein, the Recipient shall use efforts commensurate with those Recipient employs for the protection of comparable sensitive information of its own, but in no case less than a reasonable degree of care.

**3.** **Exceptions to Confidentiality.** (a) This Agreement imposes no obligation upon the Recipient with respect to any Confidential Information disclosed under this Agreement that:

    (i)    was in the Recipient's possession before receipt from the Company provided that such information is not known by Recipient to be subject to another confidentiality agreement or other obligation of confidence to the Company;

    (ii)    is or becomes a matter of public knowledge through no fault or violation of the Recipient;

    (iii)    is rightfully received by the Recipient from a third party who, to the Recipient's knowledge, is not under a duty of confidentiality to the Company; or

    (iv)    is independently developed by the Recipient.

WIL_00000800

(b)     The Recipient may disclose Confidential Information to the extent such disclosure is required by law, rule (including any stock exchange rule), regulation or legal process; *provided however*, that, to the extent practicable, the Recipient shall give prompt written notice of any such request for such information to the Company, and agrees to cooperate with the Company, at the Company's expense, to the extent permissible and practicable, to challenge the request or limit the scope of such request, as the Company may reasonably deem appropriate.

**4.     Use of Confidential Information.**   The Confidential Information shall be used by the Recipient solely in connection with monitoring and evaluating the Transaction and shall not be used for the Recipient's own benefit or for any other purpose. Upon the written request of the Company, the Recipient shall destroy all documents containing any of the Confidential Information.

**5.     Recipient's Agreement Not to Compete in Designated Area.**   The Confidential Information includes information relating to the Company's activities in Madison County, Texas, Houston County, Texas and Walker County, Texas (the "Designated Area") Recipient agrees, in order to protect the Confidential Information, that Recipient will not, directly or indirectly, acquire or solicit the acquisition of, or assist any other person to own, acquire or solicit the acquisition of any oil, gas and mineral leases, mineral interests, royalty interests, top leases, and options with respect to any properties located in the Designated Area at any time within twenty four (24) months following the date of this Agreement. The parties to this Agreement agree that the limitations contained in this Section with respect to time, geographical area, and scope of activity are reasonable.  However, if any court shall determine that the time, geographical area, or scope of activity of any restriction contained in this Section is unenforceable, it is the intention of the parties that such restrictive covenants set forth herein shall not thereby be terminated but shall be deemed amended to the extent required to render them valid and enforceable.

**6.     No Representations.**   All disclosures of Confidential Information made hereunder to Recipient are at the sole discretion of the Company.  The Company does not make any covenants, warranties or representations with respect to the accuracy or completeness of any Confidential Information disclosed hereunder, and the Company shall have no liability to the Recipient arising out of the use of Confidential Information supplied under this Agreement. It is understood that this Agreement does not obligate the Company or the Recipient to enter into any further agreements or to proceed with the Transaction or any other possible relationship or other transaction.

**7.     Termination.**   The Recipient's obligations with respect to the Confidential Information received under this Agreement expire on the 2nd anniversary of the date of this Agreement.  In addition, the Parties may terminate their obligations hereunder upon a date mutually agreed in writing.

**8.     Miscellaneous.**   All additions or modifications to this Agreement must be made in writing and must be signed by both Parties.  This Agreement is made under, and shall be construed and enforced in accordance with, the laws of the State of Texas.  The Recipient acknowledges that money damages would not be a sufficient remedy for any breach of this Agreement, and that, accordingly, in the event of any such breach or threatened breach, the Company shall be entitled to equitable relief, including an injunction or specific performance.  Nothing contained herein shall in any way limit the rights or activities of either Party to deal directly with any third party so long as Recipient complies with its obligations hereunder.  If any one or more provisions of this Agreement are determined to be invalid, illegal or unenforceable in any respect, the remaining provisions of this Agreement shall remain in effect and shall not be affected by such invalidity, illegality or unenforceability. This Agreement (a) constitutes the entire agreement of the Parties with respect to the subject matter and (b) may be executed in counterparts.

2

**IN WITNESS WHEREOF**, the Parties have executed this Confidentiality and Non-Competition Agreement on the date and year first above written.

**HOPEWELL-PILOT PROJECT, LLC**          **Chad Martin**

By: _____
    Mark Willis, President & Co-Manager          _____

3

# PRIVATE PLACEMENT MEMORANDUM

## HOPEWELL-PILOT PROJECT, LLC

### PRIVATE PLACEMENT OF UP TO 1,000,000 INITIAL ADDITIONAL EQUITY SHARES

THE OFFERING OF SECURITIES DESCRIBED HEREIN HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION.   THIS OFFERING IS MADE PURSUANT TO REGULATION S OR REGULATION D UNDER SECTION 4(a)(2) OF SAID ACT, WHICH EXEMPTS FROM SUCH REGISTRATION CERTAIN TRANSACTIONS. FOR THIS REASON, THESE SECURITIES WILL BE SOLD ONLY TO INVESTORS WHO MEET CERTAIN MINIMUM SUITABILITY QUALIFICATIONS DESCRIBED HEREIN.

A PROSPECTIVE INVESTOR SHOULD BE PREPARED TO BEAR THE ECONOMIC RISK OF AN INVESTMENT IN THE COMPANY FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE SHARES OR MEMBER'S INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE LAWS OF ANY OTHER JURISDICTION, AND, THEREFORE, CANNOT BE SOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.    THERE IS NO OBLIGATION OF THE ISSUER TO REGISTER THE SHARES OR MEMBER'S INTERESTS UNDER THE SECURITIES ACT OR THE LAWS OF ANY OTHER JURISDICTION. TRANSFER OF THE SHARES OR MEMBER'S INTERESTS IS ALSO RESTRICTED BY THE TERMS OF THE AMENDED AND RESTATED COMPANY AGREEMENT RELATING THERETO.

## TABLE OF CONTENTS

I.      Executive Summary

II.     Term Sheet

III.    Technology

IV.     Risk Factors

V.      Previously Distributed Offering Materials

VI.     Subscription Booklet

VII.    Amended and Restated Company Agreement

I.      EXECUTIVE SUMMARY

The Hopewell – Pilot Project, LLC ("Hopewell" or the "Company") was formed in March 2016 for the purpose of demonstrating "Proof of Concept" involving the refinement, use, and application of a new proprietary software technology which can geographically sort and analyze land and mineral title records and related digital data for the purpose of acquiring Oil, Gas & Mineral interests in the most contemporary "tight sands" and "shale" plays.

The business concept behind the formation and funding of Hopewell depends upon five basic premises! They are:

1.  The more contemporary "tight sands" and "shale" plays are more commercially rewarding as the industry continues to refine and apply new horizontal completion and frac techniques to the areas best suited for the application of such technology.
2.  The best contemporary "tight sands" and "shale" plays were initiated 2010-2013 in a very competitive environment and the initial leasing effort was undertaken on a "trend basis" which provided less than 100% title review by contract land personnel.  Legal title opinions were generally only undertaken on "drill site" tracts.
3.  Operators tried to hold the maximum amount of leased acreage by forming large pooled units for the drilling and completion of lower cost vertical wells.  Many of such pooled units were formed without contemporary survey of leased acreage included.  In the past two years since mid 2014, as the cash flow to most Operators declined due to falling oil and gas prices, many pooled units were hastily formed and contain numerous irregularities.
4.  Most of the new initial leases taken in the contemporary "tight sands" and "shale" plays, unless "held by production", will expire in the 2016 -2017 time frame.  Many of the existing pooled units contain unleased acreage or have leased tracts that would have expired if not for a "pooled unit" designation.
5.  The most lucrative opportunities for Hopewell will occur in contemporary "tight sands" and "shale" plays located in geographical areas where significant land title problems exist .

Hopewell has identified four initial target areas in Madison County, Texas which it believes will optimize investment returns as well as provide "Proof of Concept".  The areas selected have multiple proven hydrocarbon pay zones which have demonstrated significant commercial production in recently completed horizontal wells.  Initial evaluation of the prospective areas indicate that there are unleased tracts in many of the existing Pooled or Declared Units.  Based upon recent field discussions, Hopewell believes that it can acquire new leases in the four areas for initial bonus and lease acquisitions costs of $1,000 per acre or less and by providing traditional lease royalty burdens to the related mineral owners.  In addition to open acreage, many of the existing Pooled or Declared Units and underlying pooled leases appear to have possible deficiencies. Hopewell plans to continue detailed legal evaluation of these identified Units and underlying leases. If warranted, upon conclusion of Hopewell's legal evaluation, Hopewell will seek to arrange additional financing for Company to pursue an aggressive "top lease" strategy for the purchase of new leases in the affected areas.  Hopewell has retained certain Financial Advisors to assist in obtaining up to $25,000,000 of prospective financing for the Company's possible execution of the top lease strategy.

Hopewell is seeking qualified debt and equity investors to provide up to $2,000,000 in new funds from the placement of up to 1,000,000 Initial Additional Equity Shares for the purpose of acquiring new lease and mineral interest acquisitions in the four initial target areas and for working capital to continue the Company's operations and evaluation of lease acquisition opportunities.

New leases acquired by the Company will be held for resale to Operators seeking to organize multi well horizontal drilling & completion programs or to provide the Company with working interest particpation in such development.  The Company's leasing activities will also likely provide opportunity to purchase term royalty and mineral interests on commercially favorable terms.

II.    TERM SHEET

THE INITIAL PRIVATE PLACEMENT:  Hopewell-Pilot Project LLC ("Hopewell" or the "Company") is seeking to privately arrange the placement of 1,000,000 shares ("Initial Additional Equity Shares) of the Company for $2,000,000, the proceeds of which are to be used to fund all operating overhead of the Company through December 31, 2016, and for the acquisition of Mineral Interests, primarily new Oil and Gas leases, in an agreed Area of Mutual Interest ("AMI") covering Madison County, TX and the Buda Rose play ("Buda Rose" play).

Threshold Placement Amounts - Initial Additional Equity Shares:

    Minimum Subscription Amount:  $250,000 – 125,000 shares
    Maximum Subscription Amount:  $2,000,000 – 1,000,000 shares

Pricing of Initial Additional Equity Shares:

    The price per share for all Initial Additional Equity Shares subscribed prior to June 15, 2016 shall be $2.00 per share.  The minimum price per share for all Initial Additional Equity Shares subscribed after June 15, 2016 until the Maximum Amount is reached shall be $2.50 per share.

 Priority Rights to Distributions:

          Initial Additional Equity Shares shall have a priority right to cash distributions.  The Amended and Restated Company Agreement provides that the holders of Initial Additional Equity Shares shall receive all cash distributions made by the Company until such time as they have received $2.00 per share in distributions. Once the holders of the Initial Additional Equity Shares have received $2.00 per share in cash distributions, then all additional cash distributions made by the Company shall be paid uniformly on a per share basis.

Financial Advisors:

    The Company has retained Meridian Circle Advisors and may retain other financial advisors (collectively "Financial Advisors") to assist the Company in obtaining additional capital if needed for the acquisition of additional Oil, Gas & Mineral interests within the AMI.  Additional capital may involve the issuance of debt, convertible debt, preferred equity or the formation of a Limited Partnership involving the Company.

Shares Authorized and Outstanding:

    The Company has 5,000,000 authorized shares of which 1,000,000 have been issued to Founders and are currently outstanding.

Other Terms and Conditions:

    As provided in the Subscription Agreement and the Amended and Restated Company Agreement.

III.     TECHNOLOGY

The Founders have arranged and provided a cost based contract to Hopewell for the exclusive use of new proprietary software technology owned by Title Rover, LLC, an affiltiate of the Founders.  Hopewell will pay only for the direct costs of digital data purchase, direct operations and traning of Hopewell personnel related to use of Title Rover's proprietary software in an agreed AMI covering Madison County, TX.  Direct costs are currently running $17,500 per month in addition to the purchase or acquisition of digital data.  Either party may terminate the contract beginning January 1, 2017 by providing 30 days prior written notice to the other.  The Company believes that the use of Title Rover technology in the evaluation of OG&M title will result in significant savings in both time and costs.

IV.     RISK FACTORS

A.   Although the Company has identified open or unleased acreage in many existing Pooled or Declared Units there is no certainty that leases of such acreage can be timely obtained or that leases can be obtained at the Company's estimated cost.

B.   Even if the Company is successful in obtaining new leases within existing Pooled or Declared Units there is no assurance that Operators of such Units will include the leases acquired by the Company in the Pooled or Declared Units without a legal action requiring "forced pooling" brought on behalf of the Company and the Lessor of the new leases.

C.   Even if the Company is successful in obtaining new leases within existing Pooled or Declared Units and the Company succeeds to include the new leases in the Pooled or Declared Units, the leasehold interests owned by the Company may not be sufficient to assure that new horizontal wells are drilled and completed and that such activity will be timely undertaken by the Operator.

D.   If the Company is not able to acquire a significant leased acreage position in the identified prospect areas, they Company may not be able to sell or consolidate its lease position with other operators undertaking development of the Buda Rose play.

E.   If oil and gas prices decline significantly, current Operators in the Buda Rose play may defer all horizontal development drilling until such time as prices recover.  If this proves to be the case then the Company may not realize any value for the leases it acquires for a prolonged period of time.

F.   Investment in oil, gas and mineral leases is a speculative undertaking with a high degree of risk.  Investors that cannot afford substantial risk and the entire loss of their invested capital should not undertake the proposed investment.

G.   There is no ready market for the shares of the Company. A prospective investor should be prepared to bear the economic risk of an investment in the Company for an indefinite period of time because the shares or Member's interests have not been registered under the Securities Act or the laws of any other jurisdiction, and, therefore, cannot be sold unless they are subsequently registered of an exemption from registration is available.  There is no obligation of the Company to register the shares or Member's interests under the Securities Act or the Laws of any other jurisdiction.

V.      PREVIOUSLY DISTRIBUTED OFFERING MATERIALS

      A.  Hopewell Executive Summary Teaser – Copy Attached

      B.  Hopewell Project Highlights – Copy Attached

      C.  Prospect Area Maps – Copies Attached


VI.      SUBSCRIPTION BOOKLET - ATTACHED


VII.     AMENDED AND RESTATED COMPANY AGREEMENT - ATTACHED

WIL_00000807

# Hopewell- Pilot Project, LLC

## Executive Summary

The Hopewell – Pilot Project, LLC ("Pilot") was formed in March 2016 for the purpose of demonstrating "Proof of Concept" involving the refinement, use and application of a new proprietary software technology which can geographically sort and analyze land and mineral title interests for the purpose of acquiring Oil, Gas & Mineral interests in the most contemporary "tight sands" and "shale" plays.

The business concept behind the formation and funding of Pilot depends upon five basic premises!  They are:

1.  The more contemporary "tight sands" and "shale" plays are more lucrative as the industry continues to refine and apply new horizontal completion and frac techniques to the areas best suited for the application of such technology.
2.  The best contemporary "tight sands" and "shale" plays were leased initially (2011-2013) in a very competitive environment and the initial leasing effort was undertaken on a "trend basis" which provided less than 100% title review by contract land personnel.  Legal title opinions were generally only undertaken on "drill site" tracts.
3.  Operators tried to hold the maximum amount of leased acreage by forming large pooled units for the drilling of lower cost vertical wells.  Many of such pooled units were formed without contemporary survey of leased acreage included.  In the past two years, as the cash flow to most Operators declined due to falling oil and gas prices, many pooled units were hastily formed and contain numerous irregularities.
4.  Most of the new initial leases taken in the contemporary "tight sands" and "shale" plays, unless "held by production", will expire in the 2016 -2017 time frame.  Many of the existing pooled units contain unleased acreage or have leased tracts that would have expired if not for a "pooled unit" designation.
5.   The most lucrative opportunities for Pilot will occur in contemporary "tight sands" and "shale" plays located geographical areas where there are the most prospective land title problems.

Pilot has identified an initial target area which it believes will optimize investment returns as well as provide "Proof of Concept".  The area selected has multiple proven pays which have proven highly commercial in recently completed horizontal wells.  Several of the small to mid-cap participants in the subject play have recently sold their entire interests to larger operators for $39,071/net acre and $5,421/net acre.  Pilot believes that through the use of new proprietary software that it can acquire substantial leased acreage in areas comparable to those sold for $400 to $500/net acre with competitive royalty burden.  Initial evaluation undertaken over the past six weeks has indicated almost 18,000 acres of prospective opportunity.

Pilot is seeking qualified debt and equity investors to provide funding of lease and mineral interest acquisitions in the initial target area and for evaluation of three selected follow on projects.  For further information please contact Mark Willis or Tom Tatham at 713 547-4500.

# Project Highlights

## Initial Target Acreage:

**Ft. Trinidad East (Buda) (Georgetown) (Edwards) (Glen Rose) Field:**
- Approximately 80,000 acres under review – 4 areas
- Existing Producing Pooled Units cover almost 100% acreage
- Significant Open Acreage in Existing Declared Units held by Vertical Producing Wells
- Significant Prospective Title Issues Identified

**Sales of Comparable or Offsetting Acreage to Ft. Trinidad East Field:**
- Treadstone to Energy & Exploration Partners – June 2014 E. Madison & Houston Counties 18,300 Net Acres for $715MM
- Halcon to New Gulf Resources – May 2014 – Madison, Grimes & Leon Counties – 83,000 Net Acres for $450MM
- Navidad Resources to Sequitur Energy Management LLC – Feb 2013 – Madison & Houston Counties – 83,000 Net Acres – Undisclosed Price – Sequitur Privately Held
- Bluestone to EOG Resources - Aug 2013 – Terms not disclosed

## Use of Title Rover Software Technology
- Revolutionary new search technology cuts time & costs
- Hopewell has exclusive use of Title Rover in "Buda Rose" AMI

## Attractive Area for Application of Latest Horizontal Well Completion Technology
- Compelling RRC Testimony – 2,500bbl/d per zone IP
- High EUR Areas
- Project GRE study underway

## Project Founders Participating in Founding Round One
- See Accompanying Term Sheet
- Option to participate in CV Debt Financing Round



**HOPEWELL – PILOT PROJECT, LLC**

**SUBSCRIPTION BOOKLET**
**FOR**
**INITIAL ADDITIONAL EQUITY SHARES**

**May 31, 2016**

WIL_00000812

### INSTRUCTIONS TO SUBSCRIPTION AGREEMENT

**1.**    Any person desiring to subscribe for Initial Additional Equity Shares in Hopewell-Pilot Project, LLC, a Texas limited liability company (the "Company"), should be either (i) an "accredited investor" within the meaning of Regulation D of the U.S. Securities Act of 1933, as amended (the "Securities Act") or (ii) a "non-U.S. Person" within the meaning of Regulation S of the Securities Act, *and* must:

   **(a)**    complete and execute the attached Subscription Agreement (the "Agreement");

   **(b)**    execute the attached copy of the signature page of the Company's Amended and Restated Company Agreement;

   **(c)**    provide the Company's Managers with the evidence of authority to invest, such as resolutions if the Investor is a corporation (please contact Thomas P. Tatham or Mark A. Willis for further details);

   **(d)**    provide the Company with additional KYC documents as the Company reasonably requests; and

   **(e)**    complete *Annex 1, Part 1* in the case of individual investors or *Annex 1, Part 2* in the case of entity investors.

Copies of all completed and executed originals referred to above should be sent by e-mail to the Company's Managers at TTatham@HopewellTX.com and MWillis@HopewellTX.com.    The executed originals of the Agreement and other required documents should be received by Hopewell-Pilot Project, LLC (on behalf of the Company) as soon as possible at the following address: Hopewell-Pilot Project, LLC, c/o Willis Group, 1400 Post Oak Blvd. Suite 200 Houston, TX 77056, Attn: Tom Tatham (Tel: (713) 547-4531). All subscription documents must be completed correctly and thoroughly. Failure to do so may result in delay of acceptance of your subscription until properly completed documents have been received, processed and approved.

**2.**    The Company will advise each subscriber promptly of its acceptance of any offer to become a New Member of the Company, *provided* that the Company shall be entitled to refuse any subscriber's offer to become a New Member for any reason whatsoever in the sole discretion of the Company.

**3.**    Please contact the Company's Managers if you have any questions regarding the above

-ii-

*Inquiries Related to the Subscription Procedures*:

Inquiries related to the subscription procedures should be directed to the Company's Managers and or the counsel for the Company at:

> Hopewell-Pilot Project, LLC
> 1400 Post Oak Blvd. Suite 200
> Houston, TX 77056
> Attention: Thomas P. Tatham
> Telephone: (713) 547-4531
> E-mail: TTatham@HopewellTX.com

> and

> Hopewell-Pilot Project, LLC
> 1400 Post Oak Blvd. Suite 200
> Houston, TX 77056
> Attention: Mark A. Willis
> Telephone: (713) 547-4502
> E-mail: MWillis@HopewellTX.com

> or to the counsel for the Company at:

> Doherty & Doherty LLP
> 1717 St James Place, Suite 520
> Houston, TX 77056
> Attention: Pat Doherty
> Telephone: (713) 572-1000
> E-mail: Pat@Doherty-law.com

*Payment of subscription*

The Capital Commitment shall be drawn down by the Company pursuant to one or more capital call notices that will be issued and made by the Managers in accordance with terms set forth in the Amended and Restated Company Agreement. Funding details (including payment amounts) and wire instructions will be provided by the Managers.

-iii-

WIL_00000814

**HOPEWELL-PILOT PROJECT, LLC**

**INITIAL ADDITIONAL EQUITY SHARES**

**SUBSCRIPTION AGREEMENT**

THE OFFERING OF SECURITIES DESCRIBED HEREIN HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION. THIS OFFERING IS MADE PURSUANT TO REGULATION S OR REGULATION D UNDER SECTION 4(a)(2) OF SAID ACT, WHICH EXEMPTS FROM SUCH REGISTRATION CERTAIN TRANSACTIONS. FOR THIS REASON, THESE SECURITIES WILL BE SOLD ONLY TO INVESTORS WHO MEET CERTAIN MINIMUM SUITABILITY QUALIFICATIONS DESCRIBED HEREIN.

A PROSPECTIVE INVESTOR SHOULD BE PREPARED TO BEAR THE ECONOMIC RISK OF AN INVESTMENT IN THE COMPANY FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE SHARES OR MEMBER'S INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE LAWS OF ANY OTHER JURISDICTION, AND, THEREFORE, CANNOT BE SOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THERE IS NO OBLIGATION OF THE ISSUER TO REGISTER THE SHARES OR MEMBER'S INTERESTS UNDER THE SECURITIES ACT OR THE LAWS OF ANY OTHER JURISDICTION. TRANSFER OF THE SHARES OR MEMBER'S INTERESTS IS ALSO RESTRICTED BY THE TERMS OF THE AMENDED AND RESTATED COMPANY AGREEMENT RELATING THERETO.

WIL_00000815
Page 161

# HOPEWELL-PILOT PROJECT, LLC

## A TEXAS LIMITED LIABILITY COMPANY

Hopewell-Pilot Project, LLC
c/o Willis Group
1400 Post Oak Blvd. Suite 200
Attention: Tom Tatham
Telephone: (713) 547-4531
E-mail: TTatham@HopewellTX.com

Ladies & Gentlemen:

This **SUBSCRIPTION AGREEMENT** (the "Agreement") is entered into as of the Closing Date specified on the signature page hereto by and among **HOPEWELL-PILOT PROJECT, LLC**, a Texas limited liability company (the "Company"), and the investor identified on the signature page hereto (the "Investor"). Investor seeks admission to the Company as a New Member and the acquisition of Shares representing Member's Interest in the Company (the "Interest") in accordance with the Company's Amended and Restated Company Agreement (the "Company Agreement"). Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Company Agreement.

1.        **Capital Commitment.**  In accordance with the terms of the Company Agreement and this Agreement, the Investor agrees to contribute to the Company the amount of capital specified under the heading "Capital Commitment" set forth on the signature page hereto, or such lesser amount as the Company shall accept as determined by the Company's Managers in their sole and absolute discretion.

2.        **Adoption.**  If the Investor is accepted as a New Member pursuant to paragraph 3 below, the Investor hereby agrees to adhere to and be bound by all terms and provisions of the Company Agreement and to perform all obligations therein imposed upon a New Member with respect to the Interest.

3.        **Acceptance of Subscription; Delivery of Company Agreement.**  The Investor understands and agrees that this subscription is made subject to the following terms and conditions:

(a)        The Managers jointly reserve the right to review the suitability of any person desiring to acquire an Interest and, in connection with such review, to waive such suitability standards as to such person as the Managers jointly deem appropriate under applicable law;

(b)        The Managers may accept or reject the Investor's subscription, in whole or in part, and the Investor's subscription shall be deemed to be accepted by the Managers only when both of the Company's Managers have executed Investor's Agreement and Investor has been admitted to the Company as a New Member in accordance with the terms of the Company Agreement;

(c)        The Managers shall have no obligation to accept subscriptions in the order received;

(d)        The Interest to be created on account of this subscription shall be created only in the name of the Investor, and the Investor agrees to comply with the terms of the Company Agreement

-1-

28ML-207663

WIL_00000816
Page 162

and to execute any and all further documents necessary in connection with becoming a New Member of the Company;

> **(e)** The Investor hereby requests and authorizes the Managers to enter Investor's name on the Schedule of Members as holder of the Interest;

> **(f)** The Investor has consulted to the extent deemed appropriate by the Investor with the Investor's own advisers as to the financial, tax, legal and related matters concerning an investment in Interests and on that basis believes that an investment in the Interests is suitable and appropriate for the Investor;

> **(g)** The Investor is aware of and understands each of the risks and potential conflicts of interest inherent of an investment in the Company as set forth in the Memorandum;

> **(h)** The Managers, acting jointly, may transfer proceeds into an account in the name of the Company, and in such event, the Managers shall not be liable for any losses arising from such transfer and shall be fully indemnified by the Company out of the assets of the Company to the fullest extent permitted by law for any and all actions, costs, claims, damages, demands or expenses (including any reasonable attorneys' fees) suffered or incurred by the Managers as a result of such transfer;

> **(i)** The Investor hereby undertakes in respect of the Interest that the Investor: (i) shall comply with the restrictions on transfer of the Interest contained in the Company Agreement; and (ii) acknowledges and agrees that, in the event that Investor defaults on its capital contribution obligation to the Company, the Interest may be subject to forfeiture and other consequences as specified in the Company Agreement; and

> **(j)** The Investor hereby declares that the Investor is not in the course of winding up or under liquidation or judicial management.

> **4.** **Conditions to Closing.** The Company's obligations hereunder are subject to acceptance by the Managers of the Investor's subscription, and to the fulfillment at the time of, or prior to, the Closing Date of each of the following conditions:

> **(a)** The representations and warranties of the Investor contained in this Agreement shall be true and correct as of the Closing Date; and

> **(b)** All proceedings in connection with the transactions contemplated hereby and all documents and instruments incident to such transactions shall be satisfactory in substance and form to the Managers, and the Company shall have received all such counterpart originals or certified or other copies of such documents as the Managers may request.

> **5.** **Investor Representations.** In connection with the Investor's acquisition of the Interest as of the Closing Date, the Investor makes the following representations and warranties on which the Managers and the Company are entitled to rely:

> **(a)** The Interest will be held under the type of ownership identified on the signature page hereto.

> **(b)** If the Investor has checked that the Investor is not a "U.S. Person," as such term is used in Internal Revenue Service Form W-9, under the subheading "Tax Jurisdiction" below, the Investor hereby represents, under penalties of perjury, that the Investor (i) is a "non-U.S. Person" (as defined below); (ii) will not transfer or deliver any interest in the Interests except in accordance with the

-2-

WIL_00000817
**Page 163**

restrictions set forth in the Company Agreement; (iii) will notify the Managers immediately if the Investor becomes a U.S. Person at any time during which the Investor holds or owns any Interests; (iv) is not subscribing on behalf of or funding its Capital Contribution with funds obtained from U.S. Persons; and (v) it was not in the United States at the time that the Interests were offered to it, and it was not in the United States at the time such offer was accepted; and (vi) it is not acting on behalf of, and it will not fund any portion of its subscription with assets of, any entity that is a "benefit plan investor" within the meaning of the United States Department of Labor Reg. Section 2510-101.3.  For purposes of this section 5(b), a "non-U.S. Person" is an individual who is not a citizen or resident of the United States or a corporation, partnership, estate or trust which is not a U.S. entity.  Except for offers and sales to discretionary or similar accounts held for the benefit or account of a non-U.S. person by a U.S. dealer or other professional fiduciary, all offers to sell and offers to buy the Interests were made to or by the Investor while the Investor was outside the United States and at the time that the Investor's order to buy the Interests was originated the Investor was outside the United States.

>   (c)   The Investor is an "accredited investor" within the meaning of Regulation D of the U.S. Securities Act of 1933, as amended (the "Securities Act") and a "qualified client" as defined in the Investment Advisers Act of 1940, as amended, on the basis identified by checking the box adjacent to the applicable representation on *Schedule 2, Part 1* in the case of an individual investors and on *Schedule 2, Part 2* in the case of entity investors; and in the case of entity investors, represents to such further matters by checking the boxes adjacent to the applicable further representations on *Schedule 2, Part 2* (which checked representations in *Schedule 2, Parts 1 and 2* are hereby incorporated by reference).  The Investor (i) is not subject to any of the "Bad Actor" disqualifications (each, a "Disqualification Event") described in Rule 506(d)(1) under the Securities Act and (ii) will, subsequent to the date hereof, notify the Company's Managers of (A) any Disqualification Event relating to the Investor not previously disclosed and (B) any event that would, with the passage of time, become a Disqualification Event relating to the Investor. The Investor is acquiring the Interest solely for the Investor's own account and not directly or indirectly for the account of any other person whatsoever for investment and not with a view to, or for sale in connection with, any distribution of the Interest.  The Investor does not have any contract, undertaking or arrangement with any person to sell, transfer or grant a participation to any person with respect to the Interest. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of the investment evidenced by the Investor's acquisition of the Interest, and the Investor is able to bear the economic risk of such investment.

>   (d)   No representations or warranties have been made to the Investor by the Company, the Company's Managers, or any agent thereof, other than as set forth in the Company Agreement, and this Agreement.  The Investor has had access to such information concerning the Company as the Investor deems necessary to enable the Investor to make an informed decision concerning the acquisition of the Interest.  The Investor has had access to the designated representatives of the Company, its Managers and the opportunity to ask questions of, and receive answers satisfactory to the Investor from, the Managers and or such designated representatives concerning the offering of Interests in the Company generally.  The Investor has obtained all additional information requested by the Investor to verify the accuracy of all information furnished in connection with the offering of Interests in the Company.

>   (e)   The Investor understands that the Interest has not been registered under the Securities Act, or any securities law of any state of the United States or any other jurisdiction in reliance on an exemption for private offerings, and the Investor acknowledges that it has received and carefully read the Confidential Private Placement Memorandum of the Company (the "Memorandum"), the Company Agreement and this Agreement. The Investor understands that Doherty & Doherty LLP acts as counsel for the Company, the Company's Managers.  No separate counsel has been retained to act on behalf of the Investors.  No attorney-client relationship exists with any other person by reason of such

-3-

person making an investment in the Company.  The Investor has received and reviewed all such other information of the Company as the Investor or its representatives and advisers have requested.

        **(f)**      The Investor is aware that the Investor must bear the economic risk of investment in the Interest for an indefinite period of time, possibly until final winding up of the Company, because the Interest has not been registered under the Securities Act, there is currently no public market therefor, and the Interest cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is available.  The Investor understands that the Company is under no obligation, and does not intend, to effect any such registration at any time.  The Investor also understands that sales or transfers of the Interest are further restricted by the provisions of the Company Agreement and, as applicable, securities laws of other jurisdictions and the states of the United States, and that the Interest will not be transferred or disposed of except in accordance with the terms of this Agreement, the Company Agreement and registration under the Securities Act, or pursuant to an applicable exemption therefrom.

        **(g)**      The execution and delivery of the Company Agreement and this Agreement, the consummation of the transactions contemplated thereby and the performance of the obligations thereunder will not conflict with or result in any violation of or default under any provision of any other agreement or instrument to which the Investor is a party or any license, permit, franchise, judgment, order, writ or decree, or any statute, rule or regulation, applicable to the Investor.

        **(h)**      The Investor has full power and authority to make the representations referred to in this Agreement, to acquire the Interest pursuant to this Agreement and the Company Agreement and to deliver the Company Agreement and this Agreement.  The Company Agreement and this Agreement create valid and binding obligations of the Investor and are enforceable against the Investor in accordance with their terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar laws affecting creditors' rights, and subject to general equity principles and to limitations on availability of equitable relief, including specific performance.

        **(i)**      The Investor confirms that the Investor has been advised to consult with the Investor's attorney regarding legal matters concerning the Company and to consult with independent tax advisers regarding the tax consequences of investing in the Company.  The Investor acknowledges that it understands that any anticipated United States federal or state income tax benefits may not be available and, further, may be adversely affected through adoption of new laws or regulations or amendments to existing laws or regulations.  The Investor acknowledges and agrees that the Company has made no warranty or assurance regarding the ultimate availability of any tax benefits to the Investor by reason of the Investor's investment in the Company.

        **(j)**      The Investor acknowledges and agrees that (i) information relating to the identity of the Investor shall appear on the Schedule of Members and may appear on the financial statements of the Company, and (ii) other Members shall receive such information and may share such information with their advisors and other parties pursuant to the terms of the Company's Confidentiality Agreement.

        **(k)**      The Investor is knowledgeable and experienced in evaluating investments and experienced in financial and business matters and is capable of evaluating the merits and risks of investing in the Interests.  The Investor has evaluated the risks of investing in the Interests, and has determined that the Interests are a suitable investment for the Investor.  In evaluating the suitability of an investment in the Interests, the Investor has not relied upon any representations or other information (whether oral or written) other than as set forth herein, in the Memorandum, the Company Agreement, the other agreements and independent investigations made by the Investor or representative(s) of the Investor. With respect to its investment in the Company, the Investor is not relying upon any other information,

WIL_00000819
Page 165

representation or warranty by the Company, the Managers of the Company or any designated representatives of the Company.

(l)     The Investor is aware and acknowledges that (i) the Company has limited or no significant operating history; (ii) there is no assurance of any income from an investment in the Company; (iii) any federal and/or state income tax benefits which may be available to the Investor may be lost through the adoption of new laws or regulations or changes to existing laws and regulations or differing interpretations of existing laws and regulations, in certain circumstances with retroactive effect; and (iv) the Investor, in making this investment, is relying, if at all, solely upon the advice of such Investor's personal tax advisor with respect to the tax aspects of an investment in the Company.

6.     **Company's and Manager's Representations.**   The Company and the Company's Managers make the following representations and warranties on which the Investor and its counsel are entitled to rely:

(a)     The execution and delivery of the Company Agreement and this Agreement, the consummation of the transactions contemplated thereby and the performance of the obligations thereunder will not conflict with or result in any violation of or default under any provision of any other agreement or instrument to which the Company is a party or any judgment, order, writ or decree applicable to the Company.

(b)     No suit, action, claim, investigation or other proceeding is pending or, to the best of the Company's or the Manager's knowledge, is threatened in writing against the Company which questions the validity of the Company Agreement or this Agreement or any action taken or to be taken pursuant to the Company Agreement or this Agreement, or which could otherwise have a material adverse effect on the Company.

(c)     The Company Agreement and this Agreement create valid and binding obligations of the Company and are enforceable against the Company in accordance with their terms.

7.     **Trustee, Agent, Representative or Nominee.**   If the natural person or entity completing this Agreement is acting as trustee, agent, representative or nominee for the Investor (such person or entity, the "Agent"), the Agent agrees that the representations, warranties and agreements made herein are made by such Agent (a) in respect of such Agent and (b) in respect of the underlying subscriber on whose behalf the Agent is acting.  The Agent represents and warrants that such Agent has all requisite power and authority to execute this Agreement and perform the obligations under this Agreement on the underlying Investor's behalf.   The Agent agrees to provide any additional documents and information that the Company reasonably requests relating to itself or the underlying Investor.

8.     **Survival of Agreements, Representations and Warranties; Indemnification.**

(a)     All agreements, representations and warranties contained herein or made in writing by or on behalf of the Investor, the Company or the Managers of the Company in connection with the transactions contemplated by this Agreement shall survive the execution of this Agreement and the Company Agreement, any investigation at any time made by the Investor, the Company or the Managers of the Company or on behalf of any of them and the sale and acquisition of the Interest and payment therefor.

(b)     The Investor acknowledges that the Investor understands the meaning and legal consequences of the representations and warranties made by the Investor herein.  Such representations and warranties are complete and accurate, shall be complete and accurate as of the Closing Date and may be relied upon by the Company's Managers and the Company. If there should be any material change in

-5-

WIL_00000820
Page 166

any of the representations or warranties or other information regarding the Investor set forth herein, including at any time following the Closing Date, the Investor agrees to notify the Company's Managers in writing as promptly as reasonably practicable.

      **(c)**    The Investor agrees that the foregoing representations and warranties, and all other information regarding the Investor set forth herein, may be used as a defense in any actions relating to the Company, the Managers of the Company or the private placement of the Interest, and that it is only on the basis of such representations, warranties and other information that the Company's Managers may be willing to accept this Agreement on behalf of the Company. The Investor acknowledges that the Company, and the Managers of the Company shall rely on such information, representations and warranties on an ongoing basis.

      **9.**    **Binding Effect.** This Agreement shall be binding upon the Investor and the heirs, personal representatives, successors and assigns of the Investor. The Investor agrees that neither this Agreement nor any rights which may accrue to the Investor hereunder may be transferred or assigned without the consent of the Company's Managers, which may be granted or withheld in its sole discretion or otherwise as provided in the Company Agreement. This Agreement shall survive the admission of the Investor to the Company and shall, if the Investor consists of more than one person, be the joint and several obligations of all such persons.

      **10.**    **Severability.** If any provision of this Agreement is held to be invalid or unenforceable in any jurisdiction, such provision shall be deemed modified to the minimum extent necessary so that such provision, as so modified, shall no longer be held to be invalid or unenforceable. Any such modification, invalidity or unenforceability shall be strictly limited both to such provision and to such jurisdiction, and in each case to no other. Furthermore, in the event of any such modification, invalidity or unenforceability, this Agreement shall be interpreted so as to achieve the intent expressed herein to the greatest extent possible in the jurisdiction in question and otherwise as set forth herein.

      **11.**    **Confidentiality.** The Investor has carefully read the Company's Confidentiality Agreement and by execution thereof understands, including without limitation the confidentiality and non-solicitation undertakings set forth therein which shall apply to the Investor, whether or not this Agreement is accepted by the Company.

      **12.**    **Counterparts.** his Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

      **13.**    **Amendments.** Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated orally, but only with the written consent of the Investor and the Company.

      **14.**    **Governing Law.** The interpretation and enforceability of this Agreement and the rights and liabilities of the parties hereto shall be governed by the laws of the State of Texas. To the extent permitted by the Act and other applicable law, the provisions of this Agreement shall supersede any contrary provisions of the Act or other applicable law.

WIL_00000821

THE UNDERSIGNED INVESTOR HEREBY REPRESENTS THAT (I) THE UNDERSIGNED INVESTOR HAS CAREFULLY READ AND IS FAMILIAR WITH THIS AGREEMENT AND THE COMPANY AGREEMENT, (II) THE INFORMATION CONTAINED HEREIN IS COMPLETE AND ACCURATE AND MAY BE RELIED UPON, AND (III) THE EXECUTION OF THE FOLLOWING SIGNATURE PAGE SHALL CONSTITUTE THE EXECUTION OF THIS AGREEMENT AND THE COMPANY AGREEMENT BY THE INVESTOR IN THE EVENT THAT THE INVESTOR IS ADMITTED TO THE COMPANY AS A NEW MEMBER.

**IN WITNESS WHEREOF,** the undersigned has executed this Subscription Agreement as of this _____ day of _____, 20__.

**THE COMPANY:**

**HOPEWELL-PILOT PROJECT, LLC**

_____
By: **THOMAS P. TATHAM**
Its: Manager

_____
BY: **MARK A. WILLIS**
Its: Manager

**INDIVIDUAL INVESTOR:**

_____
(Signature)

_____
(Signature)

_____
(Print Name As It Will Be Registered With This Investment)

**ENTITY INVESTOR:**
[Legal Name of Entity to be provided]
(Name of Entity As It Will Be Registered With This Investment)

By: _____

Name: _____

Title: _____

**Closing Date:  June 15, 2016 or earlier_____**
(To be completed by the Company)

**Capital Commitment: $_____ ___**
(To be completed by Investor)

Please provide the following information:

☐   Individual                        ☐   Irrevocable Trust
☐   Community Property                 ☐   Living Trust or Revocable Trust w/ ___grantors.
☐   Partnership                        ☐   Corporation
☐   Limited Liability Company          ☐   Other:_____.

If the Investor is an entity, as of the Closing Date, there are _____ holders of its outstanding securities (other than short-term paper) (*please fill in the blank specifying the number of beneficial owners*).

Primary contact person:_____

   Telephone Number:_____ Fax Number: _____

-7-

WIL_00000822
Page 168

E-mail Address:_____

☐ Social Security or Taxpayer I.D. Number_____
☐ U.S. Investor / U.S. Person       ☐ Non-U.S. Investor / Foreign Person
☐ Exempt under Code Section 401(a)       ☐ Exempt under Code Section 892
☐ Exempt under Code Section 501(c)3

Residential/Business Address (Domicile for Blue Sky filing purposes):

_____

_____

Registered Address (if applicable):

_____

_____

_____

Mailing Address *(select one)*:

[ ]     Please use the Subscriber's Residential/Business Address as the Mailing Address

[ ]     Please use the Subscriber's Registered Address as the Mailing Address

[ ]     Please use the following as the Subscriber's Mailing Address:

_____

_____

_____

**METHOD OF DELIVERY OF ACCOUNT COMMUNICATIONS.** Account Communications may be delivered via the e-mail address provided on this page. Should this means of transmission be unacceptable, Account Communications will be delivered via facsimile or physical delivery if the following box is checked:

☐ E-mail transmission is <u>declined</u>, please send Account Communications via facsimile or physical delivery

-8-

IN WITNESS WHEREOF, this Amended and Restated Company Agreement has been entered into by the parties as of this _____ day of _____, 2016.

THE COMPANY

HOPEWELL-PILOT PROJECT, LLC

By:_____
     MANAGER


By: _____
     MANAGER


NEW MEMBERS

**INDIVIDUAL:**

By: _____

By: _____

Name:_____


**ENTITY:**

_____
 (Name of Entity)

By: _____

Name: _____

Title: _____

*Signature Page to the Amended and Restated Company Agreement of*
*Hopewell-Pilot Project, LLC*

WIL_00000824

ANNEX 1

PART 1

**Individual Investor Representations.**

All defined terms have the meanings provided to them in the Agreement; the following representations are incorporated by reference into the Agreement.

The Investor makes the following representations regarding the Investor's status as an Accredited Investor and a Qualified Client *by checking the box adjacent to each representation below*:

☐   **(a)**   <u>Accredited Investor</u>:  The Investor is an individual and has a net worth, either individually or upon a joint basis with the Investor's spouse, that exceeds $1,000,000, excluding the net equity value of such individual's primary residence, if any, but including as a liability the amount by which any indebtedness secured by such residence exceeds the value of such residence (within the meaning of such terms as used in Rule 501 under the Securities Act),[1] *or* has had an individual income in excess of $200,000 for each of the two most recent years, or a joint income with the Investor's spouse in excess of $300,000 in each of those years, and has a reasonable expectation of reaching the same income level in the current year.

☐   **(b)**   <u>Qualified Client</u>:  The Investor is an individual that (i) has a net worth, together with assets held jointly with the Investor's spouse, of more than $2,000,000, excluding the net equity value of such individual's primary residence, if any, but including as a liability the amount by which any indebtedness secured by such residence exceeds the value of such residence (within the meaning of such terms as used in Rule 501 under the Securities Act),[2] or (ii) is a Qualified Purchaser.

---

[1] Any indebtedness secured by such primary residence that the Investor incurred within the 60 day period preceding the date of the sale of securities pursuant to this Agreement (other than indebtedness incurred as a result of the acquisition of the primary residence) will be included as a liability for purposes of this calculation, even if the total amount of indebtedness securing such primary residence does not exceed the value of such residence.

WIL_00000825
Page 171

ANNEX 1

PART 2

**Entity Investor Representations.**

All defined terms have the meanings provided to them in the Agreement; the following representations are incorporated by reference into the Agreement.

The Investor makes the representations regarding the Investor's status as an Accredited Investor and a Qualified Client *by checking the box adjacent to the each representation below*:

**ACCREDITED INVESTOR REPRESENTATION** (*check the box adjacent to **at least one** applicable representation below*):

☐   **(i)**   The Investor is a corporation, partnership

, business trust or limited liability company, **not** formed for the purpose of acquiring an Interest, or an organization described in section 501(c)(3) of the Code, in each case with total assets in excess of $5,000,000.

☐   **(ii)**   The Investor is an entity in which **all** of the equity owners (or *a living trust or other revocable trust* in which **all** of the grantors to such trust) qualify under Annex 1, Part 1, clause (a) or (b), or clause (i), (iii), (iv), (v) or this clause (ii) of this Annex 1, Part 2.

☐   **(iii)**   The Investor is an employee benefit plan and *either* all investment decisions are made by a bank, savings and loan association, insurance company, or registered investment advisor, *or* the Investor has total assets in excess of $5,000,000 *or*, if such plan is a self-directed plan, investment decisions are made solely by persons who are Accredited Investors.

☐   **(iv)**   The Investor is an *irrevocable* trust with total assets in excess of $5,000,000 whose acquisition is directed by a person with such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of the prospective investment.

☐   **(v)**   The Investor is a bank, insurance company, investment company registered under the Investment Company Act, a broker or dealer registered pursuant to Section 15 of the United States Securities Exchange Act of 1934, as amended, a business development company, a Small Business Investment Company licensed by the United States Small Business Administration, a plan with total assets in excess of $5,000,000 established and maintained by a state for the benefit of its employees, or a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act.

☐   **(vi)**   The Investor cannot make any of the representations set forth in clauses (i) through (v) above.

-1-

**QUALIFIED CLIENT REPRESENTATION** (*check the box adjacent to* **at least one** *applicable representation below*):

☐     **(i)**     The Investor is a corporation, partnership, association, joint-stock company, trust, or any organized group of persons, whether incorporated or not, that has a net worth of more than $2,000,000. *If the Investor belongs to this investor category, please either check clause (iii) below, if applicable, or affirmatively deny the applicability of clause (iii) below.*

☐     **(ii)**    The Investor is a corporation, partnership, association, joint stock company, trust, or any organized group of persons, whether incorporated or not, that is a Qualified Purchaser. *If the Investor belongs to this investor category, please either check clause (iii) below, if applicable, or affirmatively deny the applicability of clause (iii) below.*

☐     **(iii)**   The Investor is a corporation, partnership, association, joint-stock company, trust, or any organized group of persons, whether incorporated or not, that is an Excluded Company, and all of the Investor's equity owners (and all of their respective equity owners) are Qualified Clients.

☐             The Investor has checked either or both of clauses (i) or (ii) above and affirmatively denies applicability of this clause (iii).

☐     **(vi)**    The Investor cannot make any of the representations set forth in clauses (i) through (iii) above.


**FURTHER ENTITY INVESTOR REPRESENTATIONS**

The Investor makes the following representations *by checking the box adjacent to the correct response to each representation below*:

☐ True   ☐ False     The Investor is **neither** an "investment company" under the Investment Company Act **nor** does the Investor rely upon the exclusions from the definition of "investment company" provided for in Section 3(c)(1) or 3(c)(7) of the Investment Company Act.

☐ True   ☐ False     The Investor was **not** organized for the purpose of acquiring the Interest.

☐ True   ☐ False     The Investor has made investments prior to the date hereof or intends to make investments in the near future and each beneficial owner of interests in the Investor has and will share in the same proportion to each such investment.

☐ True   ☐ False     The Investor's investment in the Company will **not** constitute more than 40% of the assets of the Investor (including any capital commitments that may be drawn upon demand by the Investor).

☐ True   ☐ False     The governing documents of the Investor require that each beneficial owner of the Investor, including, but not limited to, shareholders, partners and beneficiaries, participate through their interest in the Investor in all of the Investor's investments and that the profits and losses from each such investment are shared among such beneficial owners in the same proportions as all other investments of the Investor. No such beneficial owner may vary the Investor's share of the profits and losses or the amount of the Investor's contribution for any investment made by the Investor.

-2-

WIL_00000827

If any of the above statements are marked "False," then the Investor will have, as of the Closing Date, _____ holders of its outstanding securities (other than short-term paper) (*please fill in the blank specifying the number of beneficial owners*).

The Investor is:

☐ True   ☐ False   **(1)**   an "employee welfare benefit plan" or an "employee pension benefit plan" as defined in sections 3(1) and 3(2), respectively, of ERISA; or

☐ True   ☐ False   **(2)**   a plan described in section 4975(e)(1) of the Code; or

☐ True   ☐ False   **(3)**   an entity that is deemed to be a "benefit plan investor" under the DOL Regulations because all or part of its underlying assets include "plan assets" by reason of a plan's investment in the entity (including, by way of example only, a partnership not qualifying as an operating company within the meaning of the DOL Regulations, which is 25% or more owned by entities described in (1) or (2) above); or

☐ True   ☐ False   **(4)**   subject to any rules or regulations similar to the fiduciary provisions of ERISA and/or the prohibited transaction provisions of Section 4975 of the Code.

If clause (3) above is marked "True," please provide the percentage that the Investor's "plan assets" holdings bear to its aggregate asset holdings (based upon value as of the Closing Date): _____% (the "Plan Asset Percentage").

☐ True   ☐ False   The Investor is a "private foundation" as described in Section 509 of the Code.

☐ True   ☐ False   The Investor is subject to the Bank Holding Company Act of 1956, as amended.

☐ True   ☐ False   To the best of the Investor's knowledge, the Investor does **not** control nor is it controlled by or under common control with, any other Investor.

*Please check the box next to each applicable statement and provide appropriate information in response to each such statement:*

☐ True   ☐ False   The Investor is subject to federal or state freedom of information (FOIA) statutes or other similar statutes in each of the following jurisdictions. (*If a similar statute is applicable, please specify the applicable statute along with the applicable jurisdiction, to the extent known)*:

_____

☐ True   ☐ False   One or more of the Investor's beneficial owners is subject to federal or state FOIA statutes or other similar statutes in each of the following jurisdictions. (*If a similar statute is applicable, please specify the applicable statute along with the applicable jurisdiction, to the extent known)*:

_____

-3-

WIL_00000828

☐ True   ☐ False      The Investor is a public agency, department, office or pension plan. *(Please specify type and applicable jurisdiction.)*:

_____

☐ True   ☐ False      One or more of the Investor's beneficial owners is a public agency, department, office or pension plan. *(If known, please specify type of owner and applicable jurisdiction below.)*:

_____

-4-

WIL_00000829

**PRIVATE PLACEMENT MEMORANDUM
& PREVIOUSLY DISTRIBUTED OFFERING MATERIALS**


[All attached separately with Amended and Restated Company Agreement]

-5-

**AMENDED AND RESTATED**
**COMPANY AGREEMENT**

**OF**

**HOPEWELL - PILOT PROJECT, LLC**

**A Texas Limited Liability Company**

_____, 2016

THE LIMITED LIABLITY COMPANY INTERESTS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES EXCHANGE COMMISSION OR UNDER ANY SECURITIES LAWS OF ANY STATE. THE TRANSFERABILITY OF SUCH INTERESTS IS RESTRICTED.  SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, OR TRANSFERRED, NOR WILL ANY ASSIGNEE, VENDEE, TRANSFEREE, OR ENDORSEE THEREOF BE RECOGNIZED AS HAVING ACQUIRED ANY SUCH INTERESTS BY THE ISSUER FOR ANY PURPOSE, UNLESS, AMONG OTHER THINGS, (1) A REGISTRATION STATEMENT FILED WITH THE SEC UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WITH RESPECT TO SUCH INTERESTS SHALL THEN BE IN EFFECT AND SUCH TRANSFER HAS BEEN QUALIFIED UNDER ALL APPLICABLE STATE SECURITIES LAWS, OR (2) THE AVAILABILITY OF AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION SHALL BE ESTABLISHED TO THE SATISFACTION OF COUNSEL TO HOPEWELL - PILOT PROJECT, LLC.

**AMENDED AND RESTATED**
**COMPANY AGREEMENT**
**OF**
**HOPEWELL - PILOT PROJECT, LLC**
**A Texas Limited Liability Company**

This AMENDED AND RESTATED COMPANY AGREEMENT OF **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company (the "Agreement"), dated as of _____, 2016 ("Effective Date"), is adopted by the undersigned as the Managers and Members of the Company.

### Background Statements

WHEREAS, the initial Member of the Company executed a certain Company Agreement for the Company dated as of March 30, 2016 ("Original Company Agreement"), providing for certain rights and obligations with respect to the Company; and

WHEREAS, the Company wishes to admit certain Persons as new Members of the Company as of the Effective Date and the Members hereby desire to amend and restate the Original Company Agreement in its entirety in the form of this Company Agreement on the terms herein provided in order to reflect the admission of the new Members to the Company and to make certain other amendments.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and agreements contained herein, the Members do hereby agree that the Original Company Agreement shall be amended and restated in its entirety in the form of this Company Agreement as of the Effective Date:

### ARTICLE I
### Definitions

*Section 1.1  Certain Definitions*.  As used in this Agreement, the following terms shall have the meanings indicated:

"*Area of Mutual Interest*" means the agreed area of mutual interest for the Company Business covering Madison County, Texas, Houston County, Texas; Walker County, Texas; Leon County, Texas; and Grimes County, Texas.

"*Company*" means **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company.

"*Company Business*" means to acquire and own oil, gas and mineral leases, mineral interests, royalty interests, top leases, and options related to the foregoing in Madison County, Texas and to develop a land management, legal and technical team capable of implementing a similar broader

1

strategy to finance and acquire oil, gas and mineral leases, mineral interests, royalty interests, top leases, and options in the Area of Mutual Interest.

*"Deadlock"* has the meaning set forth in Section 6.2 of this Agreement.

*"Directors"* means the Persons named in this Agreement as Directors of the Company and any Persons hereafter elected as Directors of the Company as provided in this Agreement, but does not include any Person who has ceased to be a director of the Company.

*"Dispose," "Disposing," or "Disposition"* means a sale, assignment, transfer, exchange, mortgage, pledge, grant of a security interest, or other disposition or encumbrance (including, without limitation, by operation of law) of a Membership Interest in the Company.

*"Founding Members"* means those Members that receive Founders Shares as set forth on Schedule A.

*"Initial Additional Equity Shares"* means those shares issued as provided in Section 4.1. Initial Additional Equity Shares shall have a priority right to cash distributions and shall receive all cash distributions made by the Company until such time as the holders of such shares have received $2.00 per share. Once the holders of the Initial Additional Equity Shares have received $2.00 per share in cash distributions, then all cash distributions thereafter shall be made uniformly on a per share basis to all shares then outstanding.

*"Majority Interest"* means Members holding among them at least a majority of all Ownership Percentages.

*"Managers"* means the Persons named in this Agreement as Managers of the Company and any Persons hereafter elected as Managers of the Company as provided in this Agreement, but does not include any Person who has ceased to be a manager of the Company.

*"Member"* means any Person executing this Agreement as of the date of this Agreement as a member or hereafter admitted to the Company as a member as provided in this Agreement, but does not include any Person who has ceased to be a member in the Company.

*"New Members"* means those Members other than Founding Members that purchase Initial Additional Equity Shares as provided in Section 3.2 and Section 4.1.

*"New Additional Members"* means those Members other than Founding Members or New Members that purchase additional Shares as provided in Section 3.2.

*"Ownership Percentage"* means the result derived by dividing the number of Shares held by a Member by the total number of Shares which are issued and outstanding. The initial Ownership Percentages of the Members as of the Effective Date are set forth on Schedule A.

WIL_00000833

*"Quarterly Operating Budget"* means the quarterly operating budget from time to time in effect as described in Section 6.8 of this Agreement.

*"Shares"* means the shares into which the ownership of Membership Interests in the Company are denominated, including all rights and interests of a Member with respect to the Shares issued under this Agreement including (i) the right of a Member to receive distributions under this Agreement by virtue of the Member's ownership of interests as an Member under this Agreement and (ii) all associated management rights, voting rights or rights to consent. The Shares held by the Members as of the Effective Date are set forth on Schedule A.

**Section 1.2  Other Definitions**.  The definitions of certain other capitalized terms used in this Agreement are set forth in Article XII.

## ARTICLE II
## Organization

**Section 2.1  Formation**.  The Company has been organized as a Texas limited liability company by the filing of Certificate of Formation (the *"Certificate"*) under and pursuant to the Code and the issuance of a certificate of formation for the Company by the Secretary of State of Texas.

**Section 2.2  Name**.  The name of the Company is "**HOPEWELL - PILOT PROJECT, LLC**", and all Company business must be conducted in that name or such other names that comply with applicable law as the Managers may select from time to time.

**Section 2.3  Registered Office; Registered Agent; Principal Office in the United States; Other Offices**.  The registered office of the Company required by the Code to be maintained in the State of Texas shall be the office of the registered agent of the Company.  The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate or such other Person or Persons as the Managers may designate from time to time in the manner provided by law.  The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by Section 3.151 of the Code.  The Company may have such other offices as the Managers may designate from time to time.

**Section 2.4  Purposes**.  The sole purpose of the Company shall be to conduct the Company Business and all activities incidental to the Company Business in accordance with the applicable provisions of the Code, including, but not limited to: (i) entering into, performing, enforcing, and carrying out contracts of any kind necessary or desirable to, or in connection with, or incidental to the Company Business or, accomplishing the general purposes of the Company, (ii) acquiring oil, gas and mineral leases, mineral interests, royalty interests, top leases, and options in the Area of Mutual Interest and (iii) borrowing money and issuing evidence of indebtedness, and securing the same by mortgage, deed of trust, pledge, or other lien, in furtherance of the Company Business.

WIL_00000834
Page 180

***Section 2.5  Term***.  The existence of the Company commenced on the date the Secretary of State of Texas issued a certificate of formation for the Company and shall continue in existence for the period fixed in the Certificate for the duration of the Company, or such earlier time as this Agreement may specify.

***Section 2.6  Foreign Qualification***.  Prior to the Company's conducting business in any jurisdiction other than Texas, the Managers, if required by the laws of such jurisdiction, shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Managers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction.  At the request of the Managers, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

***Section 2.7  Mergers and Exchanges***.  The Company may be a party to: (a) a merger, or (b) an exchange or acquisition of the type described in the Code, if approved by a Majority Interest.

**ARTICLE III**
**Membership**

***Section 3.1  Authorization of Shares***.  There shall be 5,000,000 Shares authorized for issuance by the Company.  Additional Shares may be authorized from time to time with the consent of the Board of Directors and a Majority Interest.

***Section 3.2  Additional Membership Interests***.  Except for authorized Shares to be issued as described in Section 4.1, additional authorized Shares or other Membership Interests may be created and issued by the Company only with the consent of the Board of Directors and a Majority Interest. The terms of admission or issuance must specify the Ownership Percentages applicable thereto and may provide for the creation of different classes or groups of Members having different rights, powers, and duties.  The creation of any new class or group shall be reflected in an amendment to this Agreement indicating the different rights, powers, and duties.

At any time the Company proposes to issue additional Shares or other Membership Interests, the Company shall give written notice of the offering to the Members, setting forth the purchase price, rights and limitations of such Shares or other Membership Interests and the terms and conditions upon which they are proposed to be issued.  Each Member shall have the preemptive right (based upon its then current Ownership Percentage) to acquire its share of such Shares or other Membership Interests.  Each Member must exercise such preemptive rights by purchasing, within ten (10) Business Days of receiving the written notice of offering from the Company, its share (based upon its then current Ownership Percentage) of the Shares or other Membership Interests upon the terms and conditions and for the purchase price set forth in the written notice of offering from the Company.  If any Member does not elect to purchase its full share of the Shares or other Membership Interests, the balance of the Shares or other Membership Interests may be sold by the Company to Members or one or more third parties, but only upon the terms and conditions and for the purchase

4

price set forth in the written notice of offering from the Company or upon more economically favorable terms to the Company and the existing Members. The price per Share of any additional Shares offered by the Company under this Section 3.2 shall be $2.50 per Share unless the Board of Directors shall determine otherwise.

**Section 3.3  Liability to Third Parties**.  No Member shall be liable for the debts, obligations or liabilities of the Company, including debts, obligations, or liabilities which are imposed under a judgment decree or order of a court.

**Section 3.4  Admission of Assignees or Members**.  Except as provided in the next sentence of this Section 3.4, a disposition, sale, assignment or other transfer of a Membership Interest shall not entitle the transferee to become a Member of the Company, but instead shall entitle the transferee to the right to receive distributions, allocations and other economic benefits from the Company which are attributable to the purchased Interest.  Assignees may be admitted as Members only with the consent of a Majority Interest and a majority of the Managers.

**Section 3.5  Withdrawal**.  A Member does not have the right or power to withdraw from the Company as a Member.

**Section 3.6  Compensation for Members**.  No Member shall receive any compensation from the Company in such Member's capacity as a Member.  However, any Member may be employed in the business of the Company at the discretion of the Managers and, in connection therewith, may receive reasonable compensation for services rendered.

**Section 3.7  Restrictions on the Disposition of an Interest**.

(a)     Except as specifically provided in this Section 3.7, a Disposition of all or any part of a Membership Interest may not be effected without the consent of a Majority Interest. Any attempted Disposition by a Person of an interest or right, or any part thereof, in or with respect to the Company other than in accordance with this Section 3.7 shall be, and is hereby declared, null and void *ab initio*.

(b)     Provided that the consent of a Majority Interest to such Disposition has been obtained, a Member or an Assignee may Dispose of all or a portion of his Membership Interest if he, prior to making such Disposition, first offers (an "Offer") such portion of the Membership Interest (the "Offered Interest") for sale to the Company and the other Members (the "Remaining Members").  The Offer shall be made for the price and upon the terms at which the proposed Disposition is to occur (the "Proposed Price"). The Offer shall be made by written notice which shall state that the Offer is being made pursuant to this Section and which shall set forth the Ownership Percentage attributable to the Offered Interest, the name or names of the proposed purchaser or purchasers of the Offered Interest, the Proposed Price, method of payment of the Proposed Price (the "Proposed Terms"), and the scheduled date of consummation of the proposed sale.  A copy of the written offer, and any proposed sales agreement, from or with the proposed purchaser shall be attached to the Offer.  The Company shall have the option exercisable during the ensuing thirty (30) day period to accept the

5

WIL_00000836

Offer. If the Company does not accept the Offer, then the Remaining Members shall have the option for ten (10) days from the date of the termination of such thirty (30) day period to elect to collectively purchase all, but not less than all, of the Offered Interest, pro rata, in accordance with their relative Ownership Percentages. Any two or more Remaining Members may agree among themselves to reallocate the portions of the Offered Interest to be purchased by them from their respective pro rata portions. The payment of the respective purchase price shall be payable pursuant to the Proposed Terms. If neither the Company nor the Remaining Members elect to purchase all of the Offered Interest in accordance with this Section 3.7(b), then the Selling Member may sell not less than all of the Offered Interest at any time within, but not subsequent to, sixty (60) days after the lapse of the options granted pursuant to this Section; provided, however, that such sale must be made to the third party purchaser and for the price and in accordance with the terms specified in the Offer notice.

(c)      The Company may not recognize for any purpose any purported Disposition of all or part of a Membership Interest unless and until the other applicable provisions of this Section 3.7 have been satisfied and the Company has received a document which:

i)      has been executed by both the Member effecting the Disposition (or if the transfer is on account of the death or incapacity of the transferor, its representative) and the Person to which the Membership Interest or part thereof is Disposed;

ii)      includes the notice address of the transferee and his or its agreement to be bound by this Agreement in respect of the Membership Interest or part thereof being acquired;

iii)      sets forth the Ownership Percentages which will be effective after the Disposition of the Member effecting the Disposition and the Person to which the Membership Interest or part thereof is Disposed (which together must total the Ownership Percentage of the Member effecting the Disposition before the Disposition); and

iv)      the Disposition was made in accordance with all applicable laws and regulations (including securities laws), including the following:

(1) the Member effecting the Disposition and the Person to which the Membership Interest or part thereof is Disposed acknowledge and agree that the Membership Interest has not been registered under the Securities Act or applicable state securities laws and are being sold pursuant to the exemptions from registration offered by the Securities Act and by applicable state law provisions; and

(2) the Person to which the Membership Interest or part thereof is Disposed must acknowledge and agree his understanding that, as a result of paragraph (1), immediately above, (i) he must bear the economic risk of

6

investment in the Membership Interest for an indefinite period of time; (ii) the Membership Interest may not be sold, assigned, or transferred, nor will any assignee, vendee, transferee, or endorsee thereof be recognized as having acquired any such interests by the issuer for any purpose, unless, among other things, (x) a registration statement under the Securities Act, with respect to such Membership Interest shall then be in effect (and such transfer has been qualified under all applicable state securities laws), or (y) the availability of an exemption from such registration and qualification shall be established to the satisfaction of counsel to the Company.

Each Disposition and, if applicable, admission into membership complying with the provisions of this Section 3.7(c) is effective as of the first day of the calendar month immediately succeeding the month in which the Company receives the notification of Disposition and the other requirements of this Section 3.7 have been met.

(d)     The Member effecting a Disposition and any Person admitted to the Company in connection therewith shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the Disposition or admission on or before the tenth day after the receipt by that person of the Company's invoice for the amount due. If payment is not made by the date due, the Person owing that amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the maximum rate allowed by law.

*Section 3.8 Other Activities.* The Members acknowledge that the Members and Managers are engaged in activities other than the activities of the Company and that neither Members nor the Managers shall be expected or required to devote their full time to the management of the Company except as provided in any separate agreement or instrument. Except as otherwise provided in this Agreement or any other agreement or instrument, participation in the Company shall not in any way act as a restraint on the other present or future business activities or investments of any Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member. Except as otherwise provided in this Agreement or any other agreement or instrument, no Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member shall, under any circumstances, be obligated or bound to offer or present to the Company or any of the other Members any business opportunity presented or offered to them or the Company as a prerequisite to the acquisition of or investment in such business opportunity by such Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member for its account or the account of others. The provisions of this Section shall not serve to waive or limit the provisions of any other written agreement or instrument binding upon any Member or Manager.

Each Member shall be required to execute and deliver to the Company a Confidentiality and Non-Competition Agreement as a condition of acquiring any Shares of the Company.

*Section 3.9     Purchase Options Upon the Occurrence of Certain Events.* In the event (i) a Member dies or becomes legally incapacitated, (ii) a Member institutes or there is instituted against a Member any proceeding under the United States Bankruptcy Code or any other foreign, federal or

7

state bankruptcy, receivership, insolvency or other similar law affecting the rights of creditors generally or (iii) the spouse of a Member becomes entitled to any interest in the Shares of such Member by virtue of a divorce or property settlement agreement executed in connection with such divorce, then for a period of ninety (90) days following the date of such event, the Company shall have the right to purchase the Shares registered in the name of the deceased, incapacitated, bankrupt or divorced Member, as the case may be ("Affected Member"). The Company shall exercise its purchase right by giving written notice of such exercise to the Affected Member (or its representative) within such ninety (90) day period. If the Company does not elect to exercise its first right to purchase the Shares registered in the name of the Affected Member, for a period of thirty (30) days following the expiration of the Company first right to purchase such Shares, the Remaining Members shall have the right to purchase such Shares.  The Remaining Members shall exercise their purchase right by giving written notice of such exercise to the Affected Member (or its representative) within such thirty (30) day period.

The purchase price shall be an amount equal to the fair market value of the Shares determined by agreement of the Affected Member (or its representative) and the purchaser of the Shares ("Purchaser"); however, if the Purchaser and the Affected Member (or its representative) do not agree on such fair market value on or before fifteen (15) days following the exercise of the purchase right, then the fair market value of each share of Shares shall be equal to the Appraised Value of each Share of the Company as determined by an appraisal of the Shares (the "Appraised Value") by an accounting firm or any other qualified appraiser selected by the Manager.

The appraisal shall determine the Appraised Value of the Shares as of the end of the most recently completed calendar quarter.  The Appraised Value shall be the maximum amount that would be distributed in respect of the Shares in any Distribution Event if (i) all of the Company's assets were sold at their fair market value, (ii) the Company was liquidated and all liabilities and obligations of the Company are paid, including, without limitation, liabilities and obligations to Members, and (iii) the proceeds of such liquidation were distributed to the Members pursuant to this Agreement.  A "Distribution Event" means (i) any winding up or liquidation of Company and (ii) any merger, consolidation or other transaction pursuant to which all of the Company's Shares are converted into or exchanged for cash, securities of another entity, real or other property or any other consideration.  The cost of the appraisal shall be divided equally between the Purchaser and the Affected Member.

The sale and purchase of Shares under this Section shall be closed within sixty (60) days from the date of the receipt by the Affected Member (or its representative) of the last notice from the Purchaser and the Affected Member (or its representative) shall deliver a written assignment of the Shares at the closing of the sale and purchase of the Shares, free and clear of all liens. The Purchaser shall pay the purchase price for the Shares by making a down payment of 25% of the purchase price at the closing of the sale and purchase of the Shares, with the balance to be paid in three equal cash installments, (together with accumulated interest on the amount unpaid at the interest rate of 5% per annum) due on each of the first three anniversaries of the closing.

**Section 3.10   Buy-Sell Procedure Upon a Deadlock.**  Following a Deadlock and as long as such Deadlock remains unresolved, in the event that any Member should desire to purchase all of the

8

interest of another Member in the Company or to sell to another Member all of such Member's interest in the Company, such Member ("Offeror Member") shall give written notice to such other Member ("Offeree Member") that the Offeror Member intends to exercise its right under this Section 3.10, setting forth the price, terms and conditions for which the Offeror Member will purchase the interest of the Offeree Member in the Company.  The consideration for any such purchase or sale under this Section 3.10 shall be only in the form of cash, and the purchasing Member shall be required to obtain the release of the selling Member for any liability for money borrowed by the Company.  Such notice shall constitute an irrevocable offer by the Offeror Member to purchase the interest of the Offeree Member in the Company or, in the alternative, and at the option of the Offeree Member, an irrevocable offer to sell the interest of the Offeror Member in the Company to the Offeree Member, for the price per Share and on the terms and conditions set forth in the written notice.  Within fifteen (15) days after the receipt of such written notice, the Offeree Member shall be required to give the Offeror Member written notice of such Offeree Member's acceptance of the Offeror Member's offer to either (i) purchase the interest of the Offeree Member in the Company or (ii) sell to the Offeree Member the interest of the Offeror Member in the Company.  If the Offeree Member shall not reply to the written notice from the Offeror Member within such fifteen (15) day period, the Offeree Member shall be deemed to have accepted the Offeror Member's offer to purchase the interest of the Offeree Member in the Company for the price and on the same terms and conditions as that contained in the written notice.  The closing of any such transaction shall take place within ten (10) days following the expiration of such fifteen (15) day period at the principal place of business of the Company.

### ARTICLE IV
### Capital Contributions

*Section 4.1  Initial Capital Contributions*.

The Founding Members have been issued Founders Shares as set forth on Schedule A and will be issued the number of Initial Additional Equity Shares as set forth on Schedule A according to that Founding Member's Capital Commitment for Initial Additional Equity Shares. Each Founding Member and each New Member will make additional capital contributions to the Company equal to its Capital Commitment for Initial Additional Equity Shares on or before June 15, 2016, or, if sooner, within ten (10) days following a call for such amounts are made by the Managers.  Each of the Initial Additional Equity Shares shall be issued based upon a $2.00 subscription price per share.

The Company will apply the proceeds of the Capital Contributions made as of the Effective Date in accordance with Exhibit A.

*Section 4.2  Return of Contributions*.  A Member is not entitled to the return of any part of its Capital Contribution.  An unpaid Capital Contribution is not a liability of the Company or of any Member. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

*Section 4.3  Advances by Members*.  If the Company does not have sufficient cash to pay its obligations, any Member(s) that may agree to do so with the consent of the Managers may advance

WIL_00000840
Page 186

all or part of the needed funds to or on behalf of the Company under such terms and conditions as shall be agreed to by the Managers and the advancing Member.

   *Section 4.4  Capital Accounts*.  The provisions of this Section 4.4 shall apply whenever the Company is treated as a partnership for federal income tax purposes.  A Capital Account shall be established and maintained for each Member.  Each Member's Capital Account:

   (a)      shall be increased by:

      i)      the amount of money contributed by that Member to the Company,

      ii)      the agreed value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Tax Code), and

      iii)      allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treasury Regulation Section 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation Section 1.704-(b)(4)(i); and

   (b)      shall be decreased by:

      i)      the amount of money distributed to that Member by the Company,

      ii)      the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under Section 752 of the Tax Code),

      iii)      allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Tax Code, and

      iv)      allocations of Company losses and deductions (or items thereof), including losses and deductions described in Treasury Regulation Section 1.704-1(b)(2)(iv)(g), but excluding items described in clause (b)(iii) above and losses or deductions described in Treasury Regulation Section 1.704-1(b)(4)(i) or Section 1.704(b)(4)(iii).

The Members' Capital Accounts also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation Section 1.704-(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation Sections 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Treasury Regulation Section 1.704-1(b)(2)(iv)(g).  A Member that has more than one Membership Interest shall have a single Capital Account that reflects all its Membership Interests, regardless of the class of Membership Interests owned by that Member and regardless of

WIL_00000841

the time or manner in which those Membership Interests were acquired.  On the transfer of all or part of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(l).

## ARTICLE V
## Allocations and Distributions

**Section 5.1     Allocations.** Subject to Section 5.3, net income (and items thereof) and net loss (and items thereof) for any fiscal year shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after giving effect to such allocation, is, as nearly as possible, equal (proportionately) to the amount of the distributions that would be made to such Member during such fiscal year pursuant to Section 5.2, determined as if (i) the Company were dissolved and terminated; (ii) its affairs were wound up and each Company asset was sold for cash equal to its book value; (iii) all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the book value of the assets securing such liability); and (iv) the net assets of the Company were distributed in accordance with Section 5.2 to the Members.

**Section 5.2     Distributions.** Distributions shall be made to the Members at such times as determined by the Managers in the following priority:

(a)     If the Members have taxable income attributable to their ownership of any Shares for a taxable year, the Company shall distribute to the Members, in accordance with their Ownership Percentages, subject to any contractual restrictions, limitations or conditions affecting the Company, an amount of distributions ("Tax Distributions") equal to the estimated maximum federal and state income and (if applicable) franchise and margin tax rates applicable to the Members and their equity interest owners times the aggregate taxable income of the Members from the Company for that taxable year. Any Tax Distributions shall be applied to reduce subsequent distributions to such Member under Section 5.2(b).

(b)     Thereafter, all remaining cash of the Company shall be distributed to the Members in accordance with their respective Ownership Percentages as of such distribution date.

**Section 5.3 Special Allocations and Tax Allocations.**

(a)     Special Allocations.  The following special allocations shall be made in the following order:

(i)     Minimum Gain Chargeback.  Notwithstanding any other provision of this Article, if there is a net decrease in partnership minimum gain (as defined in Treasury Regulations Section 1.704-2(b)(2) and (d)) during any fiscal year, the Members shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in partnership minimum gain, determined in accordance with Treasury Regulations Section 1.704-2(f) and (g). This Section

11

5.3(a)(i) is intended to comply with the minimum gain chargeback requirement in such section of the Treasury Regulations and shall be interpreted consistently therewith.

(ii)     Member Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 5, if there is a net decrease in Member nonrecourse debt minimum gain attributable to a Member nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(i)) during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Member nonrecourse debt minimum gain attributable to such Member's nonrecourse debt, determined in accordance with Treasury Regulations Section 1.704-2(i).  This Section 5.3(a)(ii) is intended to comply with the minimum gain chargeback requirement in such section of the Treasury Regulations and shall be interpreted consistently therewith.

(iii)     Qualified Income Offset.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit, if any, in such Member's capital account (as determined under Treasury Regulations Section 1.704-1) as quickly as possible; *provided that* an allocation pursuant to this Section 5.3(a)(iii) shall be made only if and to the extent that such Member would have such capital account deficit after all other allocations provided for in Section 5.3(a) have been tentatively made as if this Section 5.3(a)(iii) were not in this Agreement.  This Section 5.3(a)(iii) is intended to comply with the qualified income offset provisions in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(iv)     Gross Income Allocation.  In the event any Member has a deficit balance in such Member's capital account (as determined after crediting such capital account for any amounts that such Member is obligated to restore or is deemed obligated to restore pursuant to Treasury Regulations Section 1.704-2), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such deficit (as so determined) of such Member's capital account as quickly as possible; *provided that* an allocation pursuant to this Section 5.3(a)(iv) shall be made only if and to the extent that such Member would have such capital account deficit (as so determined) after all other allocations provided for in Section 5.3(a) (other than Section 5.3(a)(iii)) have been tentatively made as if this Section 5.3(a)(iv) were not in this Agreement.

(v)     Loss Allocation Limitation.  No allocation of net loss (or items thereof) shall be made to any Member to the extent that such allocation would create or increase a deficit in such Member's capital account (as determined after debiting such capital account for the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) and crediting such capital account for any amounts that such Member is obligated to restore or is deemed obligated to restore pursuant to Treasury Regulations Section 1.704-2).

12

WIL_00000843

(b)     Tax Allocations

(i)     General Rules.  Except as otherwise provided in Section 5.3(b)(ii), for each fiscal period, items of Company income, gain, loss, deduction and expense shall be allocated, for federal, state and local income tax purposes, among the Members in the same manner as the net income (and items thereof) or net loss (and items thereof) of which such items or components were allocated pursuant to Section 5.1.

(ii)     Section 704(c) of the Tax Code.  Income, gains, losses and deductions with respect to any property (other than cash) contributed or deemed contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of the contribution or deemed contribution in accordance with Section 704(c) of the Tax Code and the Treasury Regulations promulgated thereunder.

If there is a revaluation of Company property, subsequent allocations of income, gains, losses or deductions with respect to such property shall be allocated among the Members so as to take account of any variation between the adjusted tax basis of such property to the Company for federal income tax purposes and its fair market value in accordance with Section 704(c) of the Tax Code and the Treasury Regulations promulgated thereunder.

(iii)     Capital Accounts Not Affected.  Allocations pursuant to this Section 5.3(b) are solely for federal, state and local tax purposes and shall not affect, or in any way be taken into account in computing, any Member's capital account or allocable share of net income (or items thereof) or net loss (or items thereof).

## ARTICLE VI
## Board of Directors

**Section 6.1  Board of Directors**.  Except for situations in which approval of the Members is required by this Agreement or by nonwaivable provisions of applicable law, the powers of the Company shall be exercised under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Board of Directors of the Company. The Board of Directors of the Company shall have with respect to the Company the powers and duties of the Board of Directors of a corporation formed under the Code

**Section 6.2  Number of Directors;  Qualification and Election.**  The Company shall initially have two Directors, whose names are set forth on Schedule B to this Agreement.  The number of Directors may be changed from time to time by resolution of the Directors. The Directors shall be elected at the annual meeting of the Members or at a special meeting of the Members called for that purpose, beginning with the 2017 annual meeting of the Members. Cumulative voting shall be allowed in the election of Directors, and each Member shall have one vote for each Share held by such Member, multiplied by the number of Directors to be elected. A Member shall be entitled to

13

accumulate his votes and distribute his votes among any number of Director nominees. Each Director elected shall hold office until a successor shall be elected and shall qualify, or until his death, resignation, or removal in the manner herein provided. Any Director may be removed as such, either with or without cause, by action of the Members who voted for the election of such Director.

In the event of a tie vote by the Board of Directors with respect any matters to be decided by the Board of Directors that continues for a period of five (5) business days, the Board of Directors shall endeavor to unanimously appoint an independent fifth Director to the Board of Directors. In the event the parties cannot agree to the appointment of the independent Director to the Board of Directors within 5 business days, a "Deadlock" shall be deemed to have occurred, and the provisions of Section 3.10 shall apply

**Section 6.3  Vacancy**.  Any vacancy occurring among the Directors shall be filled by a vote of a Majority Interest.  A Director elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office and until his successor is elected, or his earlier death, resignation or removal.

**Section 6.4  Action by the Directors**. The Directors shall act as a Board, and each Director shall have one vote with respect to all matters to be decided by the Board of Directors. The act of a majority of the Directors then serving shall be the act of the Directors. No Director or Member shall take any action with respect to the management of the Company or act as an agent of the company for purposes of carrying out the Company's business and affairs, without the consent or authorization of Board of Directors, except as provided in this Agreement.

**Section 6.5  Annual Meetings**.  The annual meeting of the Board of Directors shall be held immediately following the annual meeting of Members, and at the same place at which the annual meeting of Members is held.

**Section 6.6  Special Meetings**.  Special meetings of the Board of Directors may be called by the Directors or any Member.  The Person calling the meeting may fix any place for holding the meeting.  Notice of each special meeting of the Board of Directors shall be given to each Director at least three days before the date of the meeting, in writing.  Except as may be otherwise provided by law, the Certificate, or this Agreement, neither the business to be transacted at, nor the purpose of, any special meeting need be specified in the notice or waiver of notice of such meeting.

**Section 6.7  Written Consent**.  Any action required or permitted to be taken at a meeting of the Directors may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by at least the minimum number of Directors necessary to take action at a meeting at which all Directors were present and voted.

**Section 6.8  Quarterly Operating Budgets**.  No later than fifteen (15) days prior to the end of each calendar quarter, the Board of Directors shall approve and adopt a quarterly operating budget ("Quarterly Operating Budget") setting forth the estimated receipts and expenditures of the Company for the succeeding calendar quarter. No expenditures exceeding a 10% variance from the approved Budget may be made by the Company without the approval of the Board of Directors. The initial

14

Quarterly Operating Budget for the second calendar quarter of 2016 is attached as Exhibit B to this Agreement.

**Section 6.9   Title Rover Services Agreement.** The Company is authorized to enter into a services agreement with Title Rover, LLC, a company owned and controlled by Mark A. Willis, and any renewals, modifications and replacements of such agreement.

## ARTICLE VII
## Managers and <u>Officers</u>

**Section 7.1   Appointment.**   The Company shall initially have two (2) Managers, whose names are set forth on the signature pages to this Agreement.   The number of Managers may be changed from time to time by resolution of the Managers. The Managers shall be appointed from time to time by the Majority Interest. The Managers shall be authorized to manage and conduct the day to day business of the Company, subject to the directives of the Board of Directors and the Majority Interest. Each Manager may act as an agent of the company for purposes of carrying out the Company's business. The Managers may but shall not be required to designate individuals to serve as officers of the Company as the Managers shall determine from time to time, including but not limited to a President and one or more Vice Presidents.  The initial President of the Company shall be Mark A. Willis. No officer need be a resident of the state of Texas, a Member or a Manager.  Any officers so designated shall have such authority to perform such duties as the Managers may, from time to time, delegate to them.  The Managers may assign titles to particular officers.  Unless the Managers decide otherwise, if the title is one commonly used for officers of a corporation formed under the Code, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Managers pursuant to the third sentence of this Section 7.1.  Each officer shall hold office until his successor shall be duly designated and shall qualify or until his death or until he shall resign or shall have been removed in the manner hereinafter provided.  Any number of offices may be held by the same individual.  The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Managers.

**Section 7.2   Resignation.**   Any officer may resign as such at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time is specified, at the time of its receipt by the Managers.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.  Any officer may be removed as such, either with or without cause, by the Managers whenever in their judgment the best interests of the Company will be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the Person so removed.  Designation of an officer shall not be deemed of itself to create contract rights on the part of any person.  Any vacancy occurring in any office of the Company (other than Managers) may be filled by the Managers.

15

**ARTICLE VIII**
**Meetings of Members**

*Section 8.1  Meetings*.

(a)     A quorum shall be present at a meeting of Members if the holders of a Majority Interest are represented at the meeting in person or by proxy.  Except as specifically provided herein, with respect to any matter considered at such a meeting the affirmative vote of a Majority Interest shall be the act of the Members.

(b)     All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or without the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meeting by means of conference telephone or similar communications equipment pursuant to Section 8.5.

(c)     Notwithstanding the other provisions of the Certificate or this Agreement, the chairman of the meeting appointed pursuant to Section 8.4 or the holders of a Majority Interest shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the remainder of the adjourned meeting.  If such meeting is adjourned, such time and place shall be determined by a vote of the holders of a Majority Interest.  Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d)     An annual meeting of the Members shall be held at such place, within or without the state of Texas, on such date and at such time as a Majority Interest shall fix and set forth in the notice of the meeting, which date shall be within thirteen (13) months subsequent to the date of formation of the Company or the last annual meeting of Members (whichever most recently occurred.)

(e)     Special meetings of the Members for any proper purpose or purposes may be called at any time by the owners of Membership Interests holding at least twenty percent (20%) of the Ownership Percentages of all Members.  If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting.  Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

16

(f)      Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) days nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the Member calling the meeting, to each Member entitled to vote at such meeting.  If mailed, any such notice shall be deemed to be delivered when deposited in the mail, addressed to the Member at his address provided for in Section 13.2, with postage thereon prepaid.

*Section 8.2   Voting List*.  The Managers shall make, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of and the Ownership Percentages held by each, which list, for a period of ten (10) days prior to such meeting, shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours.  Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting.  The original membership records shall be prima facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members.  Failure to comply with the requirements of this Section shall not affect the validity of any action taken at the meeting.

*Section 8.3   Proxies*.  A Member may vote either in person or by proxy executed in writing by the Member.  A telegram, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section.  Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Members, before or at the time of the meeting or execution of the written consent, as the case may be.  No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy.  A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest.

*Section 8.4   Conduct of Meetings*.  All meetings of the Members shall be presided over by the chairman of the meeting, who shall be a Member (or representative thereof) designated by a Majority Interest.  The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him in order.

*Section 8.5   Action by Written Consent or Telephone Conference*.

(a)      Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing setting forth the action so taken, shall be signed by the holder or holders of not less than the minimum Ownership Percentages that would be necessary to take such action at a meeting at which the holders of all Membership Interests entitled to vote on the action were present and voted.  Every written consent shall bear the date of signature of each Member who signs the consent.  No written consent shall be effective to take the

17

WIL_00000848
Page 194

action that is the subject to the consent unless, within sixty (60) days after the date of the earliest dated consent delivered to the Company in the manner required by this Section, a consent or consents signed by the holder or holders of not less than the minimum Ownership Percentages that would be necessary to take the action that is the subject of the consent are delivered to the Company by delivery to its registered office or its principal place of business. Delivery shall be by hand or certified or registered mail, return receipt requested. A telegram, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member shall be regarded as signed by the Member for purposes of this Section. Prompt notice of the taking of any action by Members without a meeting by less than unanimous written consent shall be given to those Members who did not consent in writing to the action.

(b)     The record date for determining Members entitled to consent to an action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office or its principal place of business. Delivery shall be by hand or by certified or registered mail, return receipt requested.

(c)     Members may participate in and hold a meeting by means of conference, telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

## ARTICLE IX
### Indemnification

**Section 9.1  Exculpation.** Neither any Manager, any Director, any Member nor any Person appointed to act as liquidator under Article XI (each a "Covered Person") shall be liable to the Company or any Member under any theory of law, including tort, contract or otherwise (INCLUDING A COVERED PERSON'S OWN NEGLIGENCE) for any loss, damage or claim incurred by reason of any act or omission by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, including any such loss, damage or claim attributable to errors in judgment, negligence or other fault of such Covered Person, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of gross negligence or willful misconduct of such Covered Person. A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

18

*Section 9.2  Right to Indemnification*.  Subject to the limitations and conditions as provided in this Article IX, each Manager or Director who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a "*Proceeding*"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she is acting on behalf of the Company or was serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise, shall be indemnified by the Company to the fullest extent permitted by the Code, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorneys' fees) actually incurred by such Manager in connection with such Proceeding, and indemnification under this Article IX shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder.  The rights granted pursuant to this Article IX shall be deemed contract rights, and no amendment, modification or repeal of this Article IX shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal.  **It is expressly acknowledged that the indemnification provided in this Article IX could involve indemnification for negligence of the Manager or under theories of strict liability.**

*Section 9.3  Advance Payment*.  The right to indemnification conferred in this Article IX shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by the Manager of the type entitled to be indemnified under Section 9.1 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Manager's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Manager in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such Manager of his or her good faith belief that he has met the standard of conduct necessary for indemnification under this Article IX and a written undertaking, by or on behalf of such Manager, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Manager is not entitled to be indemnified under this Article IX or otherwise.

*Section 9.4  Indemnification of Officers, Employees and Agents*.  The Company, by adoption of a resolution of a Majority Interest, may indemnify and advance expenses to any other manager, officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Managers under this Article IX; and, the Company may indemnify and advance expenses to Persons who are not or were not Managers, officers, employees or agents of the Company but who are or were serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent of similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against

19

WIL_00000850

any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a Person to the same extent that it may indemnify and advance expenses to Managers under this Article IX.

**Section 9.5  *Nonexclusivity of Rights*.**  The right to indemnification and the advancement and payment of expenses conferred in this Article IX shall not be exclusive of any other right which a Manager or other Person indemnified pursuant to this Article IX may have or hereafter acquire under any law (common or statutory), provision of the Certificate or this Agreement, agreement or vote of Manager or disinterested Members or otherwise.

**Section 9.6  *Insurance*.**  The Company may purchase and maintain insurance, at its expense, to protect itself and any Person who is or was entitled to indemnification pursuant to this Article IX.

**Section 9.7  *Member Notification*.**  To the extent required by law, any indemnification of or advance of expenses to a Person in accordance with this Article IX shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the 12-month period immediately following the date of the indemnification or advance.

**Section 9.8  *Savings Clause*.**  If this Article IX or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Person indemnified pursuant to this Article IX as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative, to the full extent permitted by any applicable portion of this Article IX that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE X
## Books, Records, Reports, and Bank Accounts

**Section 10.1  *Maintenance of Books*.**  The Company shall keep books and records of account and shall keep minutes of the proceedings of its Managers and Members.

**Section 10.2  *Reports*.**  On or before the 120th day following the end of each fiscal year during the term of the Company, the Managers of the Company shall cause the Company to provide such financial information regarding the Company as the Majority Interest shall reasonably request.

## ARTICLE XI
## Event Requiring A Winding Up, Liquidation, and Termination

**Section 11.1  *Event Requiring A Winding Up*.**  The Company shall wind up its affairs on the first to occur of the following (a *"Event Requiring A Winding Up"*):

(a)      the written consent of the Board of Directors and a Majority Interest;

WIL_00000851
Page 197

(b)    the date the Company has no Members; or

(c)    the entry of a decree of an Event Requiring A Winding Up of the Company under Section 11.301 of the Code.

**Section 11.2  *Liquidation and Termination*.**   Upon the occurrence of an Event Requiring A Winding Up of the Company, a Majority Interest shall elect one or more Members as liquidator.  The liquidator shall proceed to diligently wind up the affairs of the Company and make final distributions as provided herein and in the Code.   The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties.  The steps to be accomplished by the liquidator are as follows:

(a)    as promptly as possible after an Event Requiring A Winding Up and again after final liquidation, the liquidator shall cause a proper accounting to be made of the Company's assets, liabilities, and operations through the last day of the calendar month in which the winding up occurs or the final liquidation is completed, as applicable;

(b)    the liquidator shall cause the notice described in the Code to be mailed to each known creditor of and claimant against the Company in the manner described in the Code;

(c)    the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d)    all remaining assets of the Company shall be distributed to the Members as provided in this Agreement.

**Section 11.3  *Certificate of Termination*.**   On completion of the distribution of Company assets as provided herein, the Company is terminated, and the liquidator (or such other Person or Persons as the Code may require or permit) shall file a Certificate of Termination with the Secretary of State of Texas, and take such other actions as may be necessary to terminate the legal existence of the Company.

**Section 11.4  *Deficit Capital Accounts*.**   Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, the deficit, if any, in the Capital Account of any Member shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

21

WIL_00000852

# ARTICLE XII
## Definitions

**Section 12.1  Definitions**.  As used in this Agreement, the following terms shall have the following meanings:

"*Agreement*" has the meaning given that term in the introductory paragraph to this document.

"*Assignee*" means any Person that acquires any portion of a Membership Interest through a Disposition who has not been admitted as a Member pursuant to Section 3.4.

"*Business Day*" means any day other than a Saturday, Sunday, or a holiday on which national banking associations in the State of Texas are closed.

"*Capital Accounts*" means the capital accounts established and maintained for each Member and Assignee pursuant to Section 4.4.

"*Capital Contribution*" means any contribution by a Member to the capital of the Company.

"*Certificate*" has the meaning given that term in Section 2.1.

"*Code*" means the Texas Business Organizations Code and any successor statute, as amended from time to time.

"*Membership Interest*" or "*Interest*" means the interest of a Member in the Company and his or her rights with respect to the same, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information, and to consent or approve acts or transactions.

"*Officers*" means the officers appointed pursuant to Article VII.

"*Person*" has the meaning given that term in Section 1.002(69-b) of the Code.

"*Proceeding*" has the meaning given that term in Section 9.1.

"*Securities Act*" means the Securities Act of 1933, as amended from time to time.

"*Tax Code*" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"*Treasury Regulations*" means the Treasury Regulations promulgated under Subchapter K of the Tax Code, as amended from time to time.

Other terms defined herein have the meanings so given them.

WIL_00000853

*Section 12.2  Construction*.  Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter.  Except to the extent the context specifically indicates otherwise, all references to Certificate and Sections refer to articles and sections of this Agreement, and all references to Exhibits refer to Exhibits attached hereto, each of which is made a part hereof for all purposes.

## ARTICLE XIII
## General Provisions

*Section 13.1  Offset*.  Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

*Section 13.2  Notices*.  Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the Person to receive it.  All notices, requests, and consents to be sent to a Member must be sent to or made at the address or telefax number for that Member set forth in the records of the Company, or such other address or telefax number as that Member may specify by notice to the other Members.  Any notice, request, or consent to the Company must be sent to or made at the address or telefax number for that Member as set forth in the records of the Company or such other address for as the Company may specify by notice to the Members. Whenever a notice is required to be given by law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

*Section 13.3  Entire Agreement*.  This Agreement and any agreements referenced herein constitute the entire agreement of the Members relating to the Company, the Company Business and the Area of Mutual Interest and supersedes all prior contracts or agreements with respect to the Company, the Company Business and the Area of Mutual Interest, whether oral or written.

*Section 13.4  Effect of Waiver or Consent*.  A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.  Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

*Section 13.5  Amendment or Modification*.  This Agreement may be amended or modified from time to time only by a written instrument adopted by the Managers and executed and agreed to by a Majority Interest.

WIL_00000854
Page 200

**Section 13.6  Binding Effect**.  Subject to the restrictions on Dispositions set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.

**Section 13.7  Governing Law; Severability**.   THIS COMPANY AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, U.S.A., EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS COMPANY AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.  In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Certificate, or (b) any mandatory provision of the Code, the applicable provision of the Certificate or the Code shall control.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances it not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

**Section 13.8  Further Assurances**.  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

**Section 13.9  Waiver of Certain Rights**.  Each Member irrevocably waives any right it may have to maintain an action for the winding up of the Company or for partition of the property of the Company.

**Section 13.10  Indemnification**.  To the fullest extent permitted by law, each Member shall indemnify the Company, and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement or on account of any business activities conducted by that Member or its affiliates prior to the Effective Date of this Agreement.

**Section 13.11  Notice to Members of Provisions of this Agreement**.  By executing this Agreement, each member acknowledges that it has actual notice of (a) all of the provisions of this Agreement, including, without limitation, the restrictions on the transfer of Membership Interests set forth in Article III, and (b) all of the provisions of the Certificate.  Each Member hereby agrees that this Agreement constitutes adequate notice of all such provisions, and each Member hereby waives any requirement that any further notice thereunder be given.

**Section 13.12  Counterparts**.  This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document.  All counterparts shall be construed together and constitute the same instrument.

WIL_00000855

**Section 13.13   Cross-references**.   References in this Agreement to Articles, Sections, Exhibits, or Schedules shall be deemed to be references to Articles, Sections, Exhibits, and Schedules of this Agreement unless the context specifically and expressly requires otherwise.

**Section 13.14   Legal Representation.**   Each Member hereby acknowledges that the Members have been advised that the Members should seek and have had the opportunity to seek independent legal counsel to review this Agreement and all related documents on the Member's behalf and to obtain the advice of such legal counsel relating to such documentation.  Each Member further acknowledges and agrees that the law firm of Doherty & Doherty LLP are legal counsel solely to *[Willis Energy LLC]* with respect to this Agreement.

*[Signature Pages Follow]*

WIL_00000856

IN WITNESS WHEREOF, the Managers and Members have executed this Agreement as of Effective Date.

MANAGERS:

_____

Mark A. Willis

_____

Thomas P. Tatham

Member Signatures Follow:
MEMBERS:

HOPEWELL WILLIS HOLDINGS LLC

By:_____

_____

WILLIS GROUP, LLC

By:_____

_____

HOPEWELL TATHAM HOLDINGS LLC

By:_____

_____

LNG PARTNERS, LLC

By:_____

_____

26

**SCHEDULE A**
**Member Information**

| Name and Address of Each Member | Founders Shares | Initial Additional Equity Shares | Initial Ownership Percentage | Initial Capital Contribution Paid on Effective Date for Additional Equity Shares | $ Amount to be paid by June 15, 2016 or within 10 days of call*** |
|---|---|---|---|---|---|
| **Willis Group Members:** | | | | | |
| **Hopewell Willis Holdings, LLC** 1400 Post Oak Blvd., Suite 200 Houston, TX 77056 | 500,000 | | | | |
| **Willis Group LLC** 1400 Post Oak Blvd., Suite 200 Houston,TX 77056 | 250,000 | | [___%] | [$_____] | [$_____] |
| **Tatham Group Members:** | | | | | |
| **Hopewell Tatham Holdings LLC** 1400 Post Oak Blvd., Suite 200 Houston, TX 77056 | 125,000 | | | | |
| **LNG Partners, LLC** 600 Travis St. Suite 5900 Houston, TX | 125,000 | | | | |

27

| 77002 **New Members:** | | | | | |
|---|---|---|---|---|---|
| _____ | | ** | | | |
| Total | 1,000,000 | | 100% | $_____ | $_____ |

\* 1,000,000 Founders Shares allocated among Willis Group Members, and Tatham Group Members

\** Initial Additional Equity Shares subscribed by Founding Members and New Members

\*** Capital Commitment for Initial Additional Equity Shares to be paid on or before June 15, 2016, or if sooner, within ten (10) days following a call for such amounts are made by the Managers

WIL_00000859

**SCHEDULE B**
**Board of Directors**

**Mark A. Willis**

**Thomas P. Tatham**

29

WIL_00000860

## EXHIBIT A

### Application of Proceeds of Capital Contributions for Initial Additional Equity Shares

**Approximately $125,000 to $175,000 per month to be spent as per Exhibit B covering estimated current operating requirements through the end of calendar 2016; the balance of the Proceeds will be used for the purchase of Oil, Gas, and Mineral Interests within Prospect Areas with early emphasis on Areas One and Two.**

30

**EXHIBIT B**

**Description of Initial Activities**
**And**
**2016 Cash Forecast & Budget**

**Description of Initial Activities:**

   The Company will continue to evaluate opportunities for the purchase of Oil, Gas & Mineral Interests in four adjacent prospect areas located in Madison County, Texas. Evaluation will consist of title review by both contract legal and land personnel in addition to the exclusive utilization of proprietary computer software and specialized IT services. The Company will prioritize its activities in the four prospect areas according to the latest geological, geophysical, production and scout information available to the Company.  The four prospect areas cover over 80,000 acres and 128 producing units. The emphasis initially will be on the acquisition of new OG&M leases on unleased acreage and/or acreage where significant prospective title flaws or legal issues have been identified with respect to existing pooled leases and/or pooled units.  The Company will also seek to purchase mineral ownership and or term royalty when commercially favorable opportunities are presented or identified by the Company's title review and contract land activities.


   **[2016 Cash Forecast & Budget to be Inserted]**

31

**2016 Cash Forecast - Hopewell-Pilot Project, LLC**

| Description | Estimated Expenditures/mo | | $ Amount/Totals | June | July | August | September | October | November | December | 7 Month Cum |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash | | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Contract Land Services: | | | | | | | | | | | |
| Steve Ervi @$400/d | 20 days/mo @ $400/d | | $8,000.00 | $8,000.00 | $8,000.00 | $8,000.00 | | | | | |
| Expansion | 3 man crew @ $500/d | | | | | | $30,000.00 | $30,000.00 | $30,000.00 | $30,000.00 | |
| Beyond Review - WG | 2 contract title lawyers 360hr/mo@$45/hr | | $16,200.00 | $16,200.00 | $16,200.00 | $16,200.00 | $16,200.00 | $16,200.00 | $16,200.00 | $16,200.00 | |
| Mileage@$.55/mi | $ | 1,000.00 | $550.00 | $550.00 | $550.00 | $550.00 | $550.00 | $550.00 | $550.00 | $550.00 | |
| Total Contract Land Services | | | | $24,750.00 | $24,750.00 | $24,750.00 | $46,750.00 | $46,750.00 | $46,750.00 | $46,750.00 | $261,250.00 |
| IT Services: | | | | | | | | | | | |
| Title Rover, LLC | $ | 17,500.00 | | | | | | | | | |
| Data Processing/Purhase | $ | 5,000.00 | | | | | | | | | |
| Image Engine - WG | $ | 5,000.00 | | | | | | | | | |
| Total IT Services | | $ | 27,500.00 | $27,500.00 | $27,500.00 | $27,500.00 | $27,500.00 | $27,500.00 | $27,500.00 | $27,500.00 | $192,500.00 |
| Legal: | | | | | | | | | | | |
| Sullivan, et al | building to 40 hours per month | | | $10,000.00 | | $10,000.00 | $10,000.00 | $15,000.00 | $20,000.00 | | |
| Dan Elwood | building to 40 hours per month | | | | $5,000.00 | $5,500.00 | $5,500.00 | $7,750.00 | $11,000.00 | $11,000.00 | |
| Pat Doherty | Review financing docs as needed | | | | | $7,500.00 | | | | | |
| Total Legal | | | | $10,000.00 | $5,000.00 | $23,000.00 | $15,500.00 | $22,750.00 | $31,000.00 | $11,000.00 | $118,250.00 |
| GG&RE: | | | | | | | | | | | |
| Schubarth Inc. - GRE | 15hrs/mo@300/hr | | | $4,500.00 | $4,500.00 | $4,500.00 | $4,500.00 | | | | |
| Ryder Scott & Company | Field Report for Financing | | | | | | $25,000.00 | | | | |
| Total GG&RE | | | | $4,500.00 | $4,500.00 | $4,500.00 | $29,500.00 | $0.00 | $0.00 | $0.00 | $43,000.00 |
| Management: | | | | | | | | | | | |
| Mark Willis - Manager | | | | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $12,000.00 | $84,000.00 |
| PDP Management Group LLC @$1,500/d | Includes Tom Tatham - Manager 15 to 20 days per month as required | | | $22,500.00 | $22,500.00 | $22,500.00 | $30,000.00 | $30,000.00 | $30,000.00 | $30,000.00 | $187,500.00 |
| **General & Administrative** | | | | | | | | | | | |
| Bank Charges | $150/mo | | | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | $150.00 | |
| Meals- Business | $1,000/mo-primarily lunches | | | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | |
| Office Supplies/Maps | $3,000/mo | | | $3,000.00 | $3,000.00 | $3,000.00 | $3,000.00 | $3,000.00 | $3,000.00 | $3,000.00 | |
| Houston Office - WG Allocation | $5,000/mo | | | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | $5,000.00 | |
| Lodging: | | | | | | | | | | | |
| Huntsville | Month Suite @ Holiday Inn Express or GQ | | | | | $2,400.00 | $2,400.00 | $2,400.00 | $2,400.00 | | |
| Houston | 4 nights/mo @ $150 | | | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | | |
| Total G&A | | | | $9,750.00 | $9,750.00 | $12,150.00 | $12,150.00 | $12,150.00 | $12,150.00 | $9,750.00 | $77,850.00 |
| Total Monthly "Burn" Prior to Acquisition of Mineral Interests | | | | $111,000.00 | $106,000.00 | $126,400.00 | $173,400.00 | $151,150.00 | $159,400.00 | $137,000.00 | $964,350.00 |
| Proceeds from Equity Placement | Needed to be cash neutral | | | $125,000.00 | $125,000.00 | $126,400.00 | $173,400.00 | $151,150.00 | $159,400.00 | $137,000.00 | $997,350.00 |
| Application to A/P and Advances | | | | $14,000.00 | $19,000.00 | | | | | | $33,000.00 |
| Ending Cash | | | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Acquisition of OG&M Leases | requires new financing or additionalt placeement of Initial Additional Equity Shares | | | | $250,000.00 | $250,000.00 | $250,000.00 | $250,000.00 | | | $1,000,000.00 |

**EXHIBIT H**

From: **Justin Pannu** justinpannu1503@gmail.com
Subject: Fwd: Due Diligence List
Date: August 16, 2016 at 8:08 AM
To: Tom Tatham tpt@lngpartners.com
Cc: Jeff Merola jeff.merola@intelometry.com, Chad Martin chadlandmark@hotmail.com, jerry johns jerry.johns@intelometry.com,
James P. Dibble james.dibble@intelometry.com, Mark Willis Mark@willisgroupus.com

Tom,

Hope this note finds you well. Attached are due diligence lists for both Hopewell-Pilot Project, LLC ("Hopewell") and Title Rover, LLC ("Title Rover").

We need to undertake diligence on both companies because the investment in Hopewell may ultimately become an equity stake in Title Rover if the warrant is exercised.

The due diligence lists are fairly comprehensive. To that end, the best way for you to complete the requests may be to provide information and/or material responsive to the diligence requests on a rolling basis (as well as indicating, on the attached lists, if no such information and/or material exist with respect to any particular request).

It was a pleasure to meet with both you and Mark in San Diego and we appreciate the opportunity to invest in this project with you.

Please contact me with any questions.

Thanks,

Justin

Due Diligence
Reques...ot).doc

Due Diligence
Reques...er).doc

LEGAL DUE DILIGENCE CHECKLIST

## PRELIMINARY LEGAL DUE DILIGENCE CHECKLIST

In connection with our due diligence review of Hopewell-Pilot Project, LLC (the "Company"), we would be grateful if you would make available to us and our representatives the following documents or information relating to the Company. We recognize that certain of the requested items will not be applicable to your business and, to such extent, you may just indicate to us that they are not applicable and then ignore them.  This list is intended to address key issues regarding business and operations.  Please understand that this is a preliminary list, and we are certain to have follow-up requests once we review the information supplied.  Where appropriate please provide copies of documents requested.

| Copy provided to Counsel | Status |
|---|---|

**LEGAL:**

**1 Basic Corporate Documents for the Company and each of its Subsidiaries**

| | | | |
|---|---|---|---|
| (a) | Organizational chart for the Company and its subsidiaries. | | |
| (b) | All incorporation documents, articles or certificates of incorporation, bylaws, operating agreements and other organizational documents, board and shareholder minutes and written resolutions. | | |
| (c) | List of directors and officers. | | |
| (d) | Stock books and stock transfer ledgers. | | |
| (e) | Schedule of all option holders and warrant holders. | | |
| (f) | List of states, provinces and/or foreign countries in which qualified to do business, operations are conducted or property is owned or leased. | | |
| (g) | Good standing and tax certificates. | | |
| (h) | Stockholder rights and voting agreements and any other agreements relating to the securities of the Company or its subsidiaries. | | |

**2 Contracts, Agreements and Related Information**

| | | | |
|---|---|---|---|
| (a) | List all distributors and resellers & provide contracts with same. | | |
| (b) | List all major customers & provide contracts with same. | | |
| (c) | Open agreements with investment bankers (or those with tail periods still in effect). | | |
| (d) | All licensing or technology agreements. | | |
| (e) | All partnership or joint venture agreements. | | |
| (f) | All agreements with consultants. | | |
| (g) | Loan agreements, including those with officers, directors or employees. | | |
| (h) | Asset purchase, merger or other acquisition agreements. | | |
| (i) | Licenses or permits. | | |
| (j) | Title reports or opinions for any real property owned by the Company. | | |
| (k) | Inventorship agreements. | | |

PLTF_000914

**LEGAL DUE DILIGENCE CHECKLIST**

| | | Copy provided to Counsel | Status |
|---|---|---|---|
| (l) | Summary of real property lease commitments with leases attached. | | |
| (m) | Summary of equipment leases. | | |
| (n) | Non-competition agreements. | | |
| (o) | Confidentiality and stand-still agreements. | | |
| (p) | List of all intellectual property, including patents, copyrights, trademarks/servicemarks & tradenames (both domestic & foreign). | | |
| (q) | Copies of all patents, trademark/servicemarks or copyright registrations or pending applications (both domestic & foreign). | | |
| (r) | Government loan & assistance program documentation. | | |
| (s) | Any other outstanding contracts. (Discuss those truly immaterial in value and importance.) | | |
| (t) | Sales representative and distributorship agreements. | | |
| (u) | Contracts with suppliers and lists of suppliers. | | |
| (v) | Mortgages, indentures, security agreements and guarantees and any other contracts or agreements creating encumbrances, options, restrictions and claims affecting any property. | | |
| (w) | Installment and other types of sales agreements creating encumbrances, options, restrictions and claims affecting any property. | | |
| (x) | Standard forms (i.e., invoices, purchase orders, etc.). | | |
| (y) | Product warranty agreements. | | |
| (z) | Agreements with affiliates, or descriptions of all affiliate arrangements. | | |

**3  Intellectual Property**

| | | | |
|---|---|---|---|
| (a) | Schedule listing and describing patents, trademarks or trade names, copyrights or other similar intangible assets held by the Company or used by it in the conduct of its business, and patent and trademark registrations and applications. (Refer to 2 (p)) | | |
| (b) | Schedule of domain names and registrations, if any, thereof. | | |
| (c) | Description of proprietary and other software programs used in the Company's business. | | |
| (d) | Licensing agreements, merchandising agreements (naming the Company as licensee or licensor) or assignments relating to patents, technology, trademarks or trade names, copyrights, or other similar intangible assets, including software and systems. | | |
| (e) | Manuals or other written documents detailing the procedures for maintaining the secrecy of trade secrets. | | |
| (f) | Communications to or from third parties relating to the validity or infringement of the Company's patents, trademarks, trade names, copyrights | | |

PLTF_000915

**LEGAL DUE DILIGENCE CHECKLIST**

| | Copy provided to Counsel | Status |
|---|---|---|

and other intangible assets, including software and systems.

(g)   Studies or reports relating to the validity or value of the Company's patents, technology, trademarks or trade names, copyrights, or other similar intangible assets, and the licensing or merchandising thereof.

**4   Licenses and Permits**

(a)   Any licenses, permits and registrations issued by U.S. federal, state or local authorities and any foreign counterparts thereto.

(b)   Documents relating to compliance with, and filings and orders under, various U.S. federal and state acts and regulations and municipal ordinances applicable to the Company, and any foreign counterparts of the foregoing, including:

   (i)   The Occupational Safety and Health Act and all regulations promulgated thereunder;

   (ii)   The Employee Retirement Income Security Act of 1974, as amended;

   (iii)   Equal Employment Opportunities Act;

   (iv)   Labor practices regulation;

   (v)   The Age Discrimination in Employment Act of 1967, as amended;

   (vi)   Title VII of the Civil Rights Act of 1964, as amended;

   (vii)   Protection of the environment.

(c)   List of all filings with state regulatory commissions (including insurance regulators), including expiration and renewal dates, copies of all certificates issued in connection therewith and copies of filings.

**5   Insurance**

(a)   Schedule of all insurance policies currently in effect, indicating (i) provider(s), (ii) risk exposure covered, (iii) coverage limits and (iv) deductibles.

(b)   Copies of all insurance policies covering the Company or its employees.

(c)   List of all outstanding insurance claims and of all claims made in the past five (5) years.

**6   Litigation**

(a)   Documentation relating to any lawsuits, including administrative proceedings, governmental investigations, tax proceedings and arbitrations and correspondence and pleadings relating thereto.

(b)   Correspondence, memoranda or notes concerning any dispute with any employees, suppliers, competitors, or customers regarding any claim for an amount in excess of $10,000.

(c)   List and summary of all litigation (real and threatened) since inception,

PLTF_000916

**LEGAL DUE DILIGENCE CHECKLIST**

| | Copy provided to Counsel | Status |
|---|---|---|
| including the resolution thereof (excluding proceedings described pursuant to Item 6 (a) above). | | |
| (d) Correspondence with auditors regarding threatened or pending litigation, assessments or claims. | | |
| (e) Consent decrees, injunctions, settlements, judgments and orders. | | |
| (f) Correspondence, memoranda or notes concerning inquiries from federal, state or provincial authorities regarding:<br><br>1) Occupational safety and hazard violations.<br>2) Human rights code or pay equity violations.<br>3) Environmental violations.<br>4) Any other law, rule or regulation. | | |
| (g) Correspondence, memoranda or notes concerning any threatened or pending litigation involving a key supplier, distributor, manufacturer or customer which may have a material impact on the Company. | | |
| (h) Any pending complaints or charges filed by an employee/former employee with a government agency, including, but not limited to, discrimination charges, wage and hour complaints, OSHA complaints, NLRB charges, and the Company's response thereto. | | |
| (i) Any government complaints regarding the Company's compliance with employment and labor laws and the Company's response thereto. | | |
| (j) Lawyers' response letters to auditors in connection with audits. | | |
| (k) Lawyers' opinion letters to Company concerning the potential effects of any significant proposed or pending changes in any provincial or federal law, rule or regulation. | | |
| (l) Lawyers' letters to management on status of lawsuits. | | |
| (m) Description of actual or claimed errors, omissions or breaches of contract involving services to clients of which the Company is aware. | | |

PLTF_000917

**LEGAL DUE DILIGENCE CHECKLIST**

| | Copy provided to Counsel | Status |
|---|---|---|

**HUMAN RESOUCES:**

**1 Management**

  (a) Key employee listing with salary, title and function, supervisor, date of hire, location, and target cash incentive.

  (b) Management organization chart by function.

  (c) Schedule of current officers and directors of the Company & subsidiaries.

  (d) List of consultants and independent contractors and for each:

     1) Initial date of the engagement,
     2) Whether the engagement is active or inactive,
     3) If inactive, whether the engagement has been terminated by written notice by either party.

  (e) Indemnification agreements. (Only a listing of the names of directors and officers is necessary with respect to such persons who have executed and delivered the Company's form of Indemnification Agreement for Officers and Directors.)

  (f) All employment agreements.

**2 Benefits and Guidelines**

  (a) Employment handbook, policies & procedures.

  (b) Vacation plans.

  (c) Incentive bonus plan documents and an indication of payment history vs. targets for the past 3 years.

  (d) Other fringe benefits.

  (e) Documents relating to employee benefit plans, pension and profit sharing plans, deferred compensation and stock option plans, covering any employee of the Company, including plan documents and summary plan descriptions.

  (f) Employee offer letters and forms of non-officer employment contracts/agreements/offer letters.

  (g) Forms of employment/service contracts/agreements used by each foreign subsidiary with its employees.

  (h) Contracts/agreements with consultants and independent contractors that have NOT been terminated by written notice.

  (i) Commission, Bonus and other Incentive Compensation Plans.

  (j) Expense and accrual (Y, L) for the following:

     1) Commission

     2) Vacation expense

     3) Incentive and/or Bonus Plan

  (k) List of involuntarily terminated employees and any severance payments

PLTF_000918

**LEGAL DUE DILIGENCE CHECKLIST**

|  | Copy provided to Counsel | Status |
|---|---|---|
| made. | | |
| (l) Standard confidentiality, non-competition or inventions agreements between | | |
|     1) Employee/consultants & the Company | | |
|     2) Employee/consultants & their prior employers | | |
| Please provide a list of those subject to such agreements as well as those who fit this category, but have not signed such an agreement. | | |
| (m) Special or nonstandard confidentiality, non-competition or inventions agreements (and a list of employees/consultants subject thereto). | | |
| (n) Agreements and insurance policies providing for the indemnification of any officers or directors of the Company. | | |
| (o) Any resolved administrative complaints or charges in the past year and the document reflecting disposition. | | |
| (p) Any threatened employment/labor related claims other than pending lawsuits made in the past year and the Company's response thereto. | | |
| (q) Summary of liability for termination payments to directors, officers and employees. | | |

PLTF_000919

**LEGAL DUE DILIGENCE CHECKLIST**

| | Copy provided to Counsel | Status |
|---|---|---|
| (r) If Company has made any special bonus commitments to employees, list the name(s) of such employee(s) and the bonus terms. | | |
| (s) List of employees who have requested but not yet commenced a leave of absence, including the date such leave will commence and the terms of such leave. | | |
| (t) For each employee on a leave of absence, status and terms of the leave and whether commitment has been made for reinstatement | | |
| (u) Loans to and guarantees for the benefit of any employee (including officers or directors). | | |

**3  Employee Benefits and Pensions**

| | Copy provided to Counsel | Status |
|---|---|---|
| (a) Employee pension and/or retirement plan documents (including all amendments to the plans, correspondence concerning plan registration and summary plan descriptions). | | |
| (b) Employee welfare benefit plan documents (including health, long-term and short-term disability and life insurance plans) and summary plan descriptions. | | |
| (c) Regulatory filings for each pension or retirement plan, last two years. | | |
| (d) Verification as to whether the health plan is insured or self-funded. | | |
| (e) Verification as to whether the employer maintains retiree health benefits. | | |
| (f) Form 5500 for the last three years for each ERISA Plan. | | |
| (g) Pension and/or retirement plan IRS favorable determination letter and IRS Opinion Letter. | | |
| (h) Discrimination test for the past two years for the pension and/or retirement plan | | |
| (i) Contract between third party administrator for the pension and/or retirement plan and welfare plans. | | |
| (j) Forms for distributions and plan loans for the pension and/or retirement plan. | | |
| (k) Plan trust statements | | |
| (l) Prior year's ending payroll register | | |
| (m) COBRA notices and election forms, including a list of individuals currently receiving COBRA benefits. | | |
| (n) Contract between third party administrator for the pension and/or retirement plan and welfare plans. | | |
| (o) Forms for distributions and plan loans for the pension and/or retirement plan. | | |
| (p) Plan trust statements | | |
| (q) Prior year's ending payroll register | | |

PLTF_000920

**LEGAL DUE DILIGENCE CHECKLIST**

| | Copy provided to Counsel | Status |
|---|---|---|
| (r)  COBRA notices and election forms, including a list of individuals currently receiving COBRA benefits. | | |

### 4 Workers' Compensation

| | | |
|---|---|---|
| (a)    Insured or self-insured. | | |
| (b)    Loss experience. | | |
| (c)    Summary of active and potential material claims. | | |

### 5 Compliance

| | | |
|---|---|---|
| (a)    Copies of EEO-1 reports for the past five (5) years. | | |
| (b)    Copies of VETS 100 reports for the past five (5) years. | | |
| (c)    Copies of affirmative action plan. | | |
| (d)    OSHA 200 reports for the past five (5) years. | | |

### OTHER:

### 1 Operational Matters

| | | |
|---|---|---|
| (a)    Copies of sales, advertising and promotional materials and documentation. | | |
| (b)    Copies of manuals, etc. | | |

### 2 Miscellaneous

| | | |
|---|---|---|
| (a)    Any documents or information which are significant to any portion of the business of the Company or any subsidiary, or which should be considered & reviewed in light of other disclosures made regarding the business and financial condition of the Company and its subsidiaries. | | |
| (b)    Associations and organizations to which the Company belongs. | | |

PLTF_000921

LEGAL DUE DILIGENCE CHECKLIST

## PRELIMINARY LEGAL DUE DILIGENCE CHECKLIST

In connection with our due diligence review of Title Rover, LLC (the "Company"), we would be grateful if you would make available to us and our representatives the following documents or information relating to the Company. We recognize that certain of the requested items will not be applicable to your business and, to such extent, you may just indicate to us that they are not applicable and then ignore them.  This list is intended to address key issues regarding business and operations.  Please understand that this is a preliminary list, and we are certain to have follow-up requests once we review the information supplied.  Where appropriate please provide copies of documents requested.

| | Copy provided to Counsel | Status |
|---|---|---|

**LEGAL:**

**1 Basic Corporate Documents for the Company and each of its Subsidiaries**

| | | Copy provided to Counsel | Status |
|---|---|---|---|
| (a) | Organizational chart for the Company and its subsidiaries. | | |
| (b) | All incorporation documents, articles or certificates of incorporation, bylaws, operating agreements and other organizational documents, board and shareholder minutes and written resolutions. | | |
| (c) | List of directors and officers. | | |
| (d) | Stock books and stock transfer ledgers. | | |
| (e) | Schedule of all option holders and warrant holders. | | |
| (f) | List of states, provinces and/or foreign countries in which qualified to do business, operations are conducted or property is owned or leased. | | |
| (g) | Good standing and tax certificates. | | |
| (h) | Stockholder rights and voting agreements and any other agreements relating to the securities of the Company or its subsidiaries. | | |

**2 Contracts, Agreements and Related Information**

| | | Copy provided to Counsel | Status |
|---|---|---|---|
| (a) | List all distributors and resellers & provide contracts with same. | | |
| (b) | List all major customers & provide contracts with same. | | |
| (c) | Open agreements with investment bankers (or those with tail periods still in effect). | | |
| (d) | All licensing or technology agreements. | | |
| (e) | All partnership or joint venture agreements. | | |
| (f) | All agreements with consultants. | | |
| (g) | Loan agreements, including those with officers, directors or employees. | | |
| (h) | Asset purchase, merger or other acquisition agreements. | | |
| (i) | Licenses or permits. | | |
| (j) | Title reports or opinions for any real property owned by the Company. | | |
| (k) | Inventorship agreements. | | |

PLTF_000922

Page 220

**LEGAL DUE DILIGENCE CHECKLIST**

| | Copy provided to Counsel | Status |
|---|---|---|
| (l) Summary of real property lease commitments with leases attached. | | |
| (m) Summary of equipment leases. | | |
| (n) Non-competition agreements. | | |
| (o) Confidentiality and stand-still agreements. | | |
| (p) List of all intellectual property, including patents, copyrights, trademarks/servicemarks & tradenames (both domestic & foreign). | | |
| (q) Copies of all patents, trademark/servicemarks or copyright registrations or pending applications (both domestic & foreign). | | |
| (r) Government loan & assistance program documentation. | | |
| (s) Any other outstanding contracts. (Discuss those truly immaterial in value and importance.) | | |
| (t) Sales representative and distributorship agreements. | | |
| (u) Contracts with suppliers and lists of suppliers. | | |
| (v) Mortgages, indentures, security agreements and guarantees and any other contracts or agreements creating encumbrances, options, restrictions and claims affecting any property. | | |
| (w) Installment and other types of sales agreements creating encumbrances, options, restrictions and claims affecting any property. | | |
| (x) Standard forms (i.e., invoices, purchase orders, etc.). | | |
| (y) Product warranty agreements. | | |
| (z) Agreements with affiliates, or descriptions of all affiliate arrangements. | | |

**3 Intellectual Property**

| | | |
|---|---|---|
| (a) Schedule listing and describing patents, trademarks or trade names, copyrights or other similar intangible assets held by the Company or used by it in the conduct of its business, and patent and trademark registrations and applications. (Refer to 2 (p)) | | |
| (b) Schedule of domain names and registrations, if any, thereof. | | |
| (c) Description of proprietary and other software programs used in the Company's business. | | |
| (d) Licensing agreements, merchandising agreements (naming the Company as licensee or licensor) or assignments relating to patents, technology, trademarks or trade names, copyrights, or other similar intangible assets, including software and systems. | | |
| (e) Manuals or other written documents detailing the procedures for maintaining the secrecy of trade secrets. | | |
| (f) Communications to or from third parties relating to the validity or infringement of the Company's patents, trademarks, trade names, copyrights | | |

PLTF_000923

LEGAL DUE DILIGENCE CHECKLIST

| | Copy provided to Counsel | Status |
|---|---|---|

| | | Copy provided to Counsel | Status |
|---|---|---|---|
| | and other intangible assets, including software and systems. | | |
| (g) | Studies or reports relating to the validity or value of the Company's patents, technology, trademarks or trade names, copyrights, or other similar intangible assets, and the licensing or merchandising thereof. | | |

## 4 Licenses and Permits

| | | Copy provided to Counsel | Status |
|---|---|---|---|
| (a) | Any licenses, permits and registrations issued by U.S. federal, state or local authorities and any foreign counterparts thereto. | | |
| (b) | Documents relating to compliance with, and filings and orders under, various U.S. federal and state acts and regulations and municipal ordinances applicable to the Company, and any foreign counterparts of the foregoing, including: | | |
| | (i)   The Occupational Safety and Health Act and all regulations promulgated thereunder; | | |
| | (ii)  The Employee Retirement Income Security Act of 1974, as amended; | | |
| | (iii) Equal Employment Opportunities Act; | | |
| | (iv)  Labor practices regulation; | | |
| | (v)   The Age Discrimination in Employment Act of 1967, as amended; | | |
| | (vi)  TitleVII of the Civil Rights Act of 1964, as amended; | | |
| | (vii) Protection of the environment. | | |
| (c) | List of all filings with state regulatory commissions (including insurance regulators), including expiration and renewal dates, copies of all certificates issued in connection therewith and copies of filings. | | |

## 5 Insurance

| | | Copy provided to Counsel | Status |
|---|---|---|---|
| (a) | Schedule of all insurance policies currently in effect, indicating (i) provider(s), (ii) risk exposure covered, (iii) coverage limits and (iv) deductibles. | | |
| (b) | Copies of all insurance policies covering the Company or its employees. | | |
| (c) | List of all outstanding insurance claims and of all claims made in the past five (5) years. | | |

## 6 Litigation

| | | Copy provided to Counsel | Status |
|---|---|---|---|
| (a) | Documentation relating to any lawsuits, including administrative proceedings, governmental investigations, tax proceedings and arbitrations and correspondence and pleadings relating thereto. | | |
| (b) | Correspondence, memoranda or notes concerning any dispute with any employees, suppliers, competitors, or customers regarding any claim for an amount in excess of $10,000. | | |
| (c) | List and summary of all litigation (real and threatened) since inception, | | |

PLTF_000924

**LEGAL DUE DILIGENCE CHECKLIST**

| | Copy provided to Counsel | Status |
|---|---|---|
| including the resolution thereof (excluding proceedings described pursuant to Item 6 (a) above). | | |
| (d)  Correspondence with auditors regarding threatened or pending litigation, assessments or claims. | | |
| (e)  Consent decrees, injunctions, settlements, judgments and orders. | | |
| (f)  Correspondence, memoranda or notes concerning inquiries from federal, state or provincial authorities regarding:<br>  1)  Occupational safety and hazard violations.<br>  2)  Human rights code or pay equity violations.<br>  3)  Environmental violations.<br>  4)  Any other law, rule or regulation. | | |
| (g)  Correspondence, memoranda or notes concerning any threatened or pending litigation involving a key supplier, distributor, manufacturer or customer which may have a material impact on the Company. | | |
| (h)  Any pending complaints or charges filed by an employee/former employee with a government agency, including, but not limited to, discrimination charges, wage and hour complaints, OSHA complaints, NLRB charges, and the Company's response thereto. | | |
| (i)  Any government complaints regarding the Company's compliance with employment and labor laws and the Company's response thereto. | | |
| (j)  Lawyers' response letters to auditors in connection with audits. | | |
| (k)  Lawyers' opinion letters to Company concerning the potential effects of any significant proposed or pending changes in any provincial or federal law, rule or regulation. | | |
| (l)  Lawyers' letters to management on status of lawsuits. | | |
| (m)  Description of actual or claimed errors, omissions or breaches of contract involving services to clients of which the Company is aware. | | |

PLTF_000925

**LEGAL DUE DILIGENCE CHECKLIST**

| | Copy provided to Counsel | Status |
|---|---|---|

**HUMAN RESOUCES:**

**1 Management**

    (a)  Key employee listing with salary, title and function, supervisor, date of hire, location, and target cash incentive.

    (b)  Management organization chart by function.

    (c)  Schedule of current officers and directors of the Company & subsidiaries.

    (d)  List of consultants and independent contractors and for each:

        1)  Initial date of the engagement,
        2)  Whether the engagement is active or inactive,
        3)  If inactive, whether the engagement has been terminated by written notice by either party.

    (e)  Indemnification agreements.  (Only a listing of the names of directors and officers is necessary with respect to such persons who have executed and delivered the Company's form of Indemnification Agreement for Officers and Directors.)

    (f)  All employment agreements.

**2 Benefits and Guidelines**

    (a)  Employment handbook, policies & procedures.

    (b)  Vacation plans.

    (c)  Incentive bonus plan documents and an indication of payment history vs. targets for the past 3 years.

    (d)  Other fringe benefits.

    (e)  Documents relating to employee benefit plans, pension and profit sharing plans, deferred compensation and stock option plans, covering any employee of the Company, including plan documents and summary plan descriptions.

    (f)  Employee offer letters and forms of non-officer employment contracts/agreements/offer letters.

    (g)  Forms of employment/service contracts/agreements used by each foreign subsidiary with its employees.

    (h)  Contracts/agreements with consultants and independent contractors that have NOT been terminated by written notice.

    (i)  Commission, Bonus and other Incentive Compensation Plans.

    (j)  Expense and accrual (Y, L) for the following:

        1)  Commission

        2)  Vacation expense

        3)  Incentive and/or Bonus Plan

    (k)  List of involuntarily  terminated employees and any severance payments

PLTF_000926

**LEGAL DUE DILIGENCE CHECKLIST**

| | Copy provided to Counsel | Status |
|---|---|---|
| made. | | |
| (l) Standard confidentiality, non-competition or inventions agreements between | | |
|     1) Employee/consultants & the Company | | |
|     2) Employee/consultants & their prior employers | | |
| Please provide a list of those subject to such agreements as well as those who fit this category, but have not signed such an agreement. | | |
| (m) Special or nonstandard confidentiality, non-competition or inventions agreements (and a list of employees/consultants subject thereto). | | |
| (n) Agreements and insurance policies providing for the indemnification of any officers or directors of the Company. | | |
| (o) Any resolved administrative complaints or charges in the past year and the document reflecting disposition. | | |
| (p) Any threatened employment/labor related claims other than pending lawsuits made in the past year and the Company's response thereto. | | |
| (q) Summary of liability for termination payments to directors, officers and employees. | | |

PLTF_000927

**LEGAL DUE DILIGENCE CHECKLIST**

| | Copy provided to Counsel | Status |
|---|---|---|
| (r) If Company has made any special bonus commitments to employees, list the name(s) of such employee(s) and the bonus terms. | | |
| (s) List of employees who have requested but not yet commenced a leave of absence, including the date such leave will commence and the terms of such leave. | | |
| (t) For each employee on a leave of absence, status and terms of the leave and whether commitment has been made for reinstatement | | |
| (u) Loans to and guarantees for the benefit of any employee (including officers or directors). | | |
| **3 Employee Benefits and Pensions** | | |
| (a) Employee pension and/or retirement plan documents (including all amendments to the plans, correspondence concerning plan registration and summary plan descriptions). | | |
| (b) Employee welfare benefit plan documents (including health, long-term and short-term disability and life insurance plans) and summary plan descriptions. | | |
| (c) Regulatory filings for each pension or retirement plan, last two years. | | |
| (d) Verification as to whether the health plan is insured or self-funded. | | |
| (e) Verification as to whether the employer maintains retiree health benefits. | | |
| (f) Form 5500 for the last three years for each ERISA Plan. | | |
| (g) Pension and/or retirement plan IRS favorable determination letter and IRS Opinion Letter. | | |
| (h) Discrimination test for the past two years for the pension and/or retirement plan | | |
| (i) Contract between third party administrator for the pension and/or retirement plan and welfare plans. | | |
| (j) Forms for distributions and plan loans for the pension and/or retirement plan. | | |
| (k) Plan trust statements | | |
| (l) Prior year's ending payroll register | | |
| (m) COBRA notices and election forms, including a list of individuals currently receiving COBRA benefits. | | |
| (n) Contract between third party administrator for the pension and/or retirement plan and welfare plans. | | |
| (o) Forms for distributions and plan loans for the pension and/or retirement plan. | | |
| (p) Plan trust statements | | |
| (q) Prior year's ending payroll register | | |

PLTF_000928

**LEGAL DUE DILIGENCE CHECKLIST**

| | Copy provided to Counsel | Status |
|---|---|---|
| (r) COBRA notices and election forms, including a list of individuals currently receiving COBRA benefits. | | |

**4 Workers' Compensation**

| | | |
|---|---|---|
| (a) Insured or self-insured. | | |
| (b) Loss experience. | | |
| (c) Summary of active and potential material claims. | | |

**5 Compliance**

| | | |
|---|---|---|
| (a) Copies of EEO-1 reports for the past five (5) years. | | |
| (b) Copies of VETS 100 reports for the past five (5) years. | | |
| (c) Copies of affirmative action plan. | | |
| (d) OSHA 200 reports for the past five (5) years. | | |

**OTHER:**

**1 Operational Matters**

| | | |
|---|---|---|
| (a) Copies of sales, advertising and promotional materials and documentation. | | |
| (b) Copies of manuals, etc. | | |

**2 Miscellaneous**

| | | |
|---|---|---|
| (a) Any documents or information which are significant to any portion of the business of the Company or any subsidiary, or which should be considered & reviewed in light of other disclosures made regarding the business and financial condition of the Company and its subsidiaries. | | |
| (b) Associations and organizations to which the Company belongs. | | |

PLTF_000929

**EXHIBIT I**

**From:** Justin Pannu <justinpannu1503@gmail.com>
**Date:** Tuesday, August 23, 2016 at 8:59 PM
**To:** Tom Tatham <tpt@ingpartners.com>
**Cc:** Mark Willis <Mark@willisgroupus.com>, Chad Martin <chadlandmark@hotmail.com>,
"James P. Dibble" <james.dibble@intelometry.com>, Jeff Merola
<jeff.merola@intelometry.com>, jerry johns <jerry.johns@intelometry.com>, Cliff Sharp
<ecsharp111@gmail.com>, Brent Stanley <bgstanley60@gmail.com>
**Subject:** Re: Follow Up Diligence Queries - Intellecutual Property

Thanks Tom. We have some in our group just catching up after arriving back in the US. We will get back to you soon.

Sent from my iPhone

On Aug 23, 2016, at 8:32 AM, Tom Tatham <tpt@ingpartners.com> wrote:

> Justin,
> See answers below!  Later today, Brent Stanley will provide a more
> detailed description of Title Rover's proprietary intellectual property
> together with the credentials of collaborating consultants.  Please give
> me a call if you have any questions.
> Thanks,
> Tom
>
> **From:** Justin Pannu <justinpannu1503@gmail.com>
> **Date:** Monday, August 22, 2016 at 1:58 PM
> **To:** Tom Tatham <tpt@ingpartners.com>
> **Cc:** Mark Willis <Mark@willisgroupus.com>, Chad Martin
> <chadlandmark@hotmail.com>, "James P. Dibble"
> <james.dibble@intelometry.com>, Jeff Merola
> <jeff.merola@intelometry.com>, jerry johns <jerry.johns@intelometry.com>,
> Cliff Sharp <ecsharp111@gmail.com>
> **Subject:** Follow Up Diligence Queries - Intellecutual Property
>
> Hi Tom,
>
> Thank you for taking time to populate the respective Data Rooms over
> the weekend. We appreciate the time you have taken to respond to our
> Due Diligence efforts. A few of us have had a chance to look through
> the Data Room and as result, below are additional diligence queries
> concerning intellectual property issues.
>
> 1.  Please list all of the intellectual property necessary in order for
> Hopewell to conduct the activities set forth in its private placement
> memorandum (the "Necessary Intellectual Property") and, for each,
> state:

a.  Whether Hopewell is the owner of such item of Necessary Intellectual Property; Hopewell has the exclusive right to use Title Rover's proprietary software and all digital data acquired for Hopewell's purposes in an Area of Mutual Interest as set forth in the Memorandum of Agreement dated April 4, 2016 by and between Hopewell-Pilot Project, LLC and Title Rover, LLC. A copy of this agreement is contained in the Contract and Agreements section of both the Hopewell and Title Rover data rooms.  While use of this proprietary software is not absolutely necessary for Hopewell to acquire, oil, gas & mineral leases or purchase mineral interests in Hopewell's target areas, it is nevertheless commercially advantageous to utilize this IT capability in identifying mineral ownership and evaluating legal title as opposed to implementing current "best available" industry practices.  With regard to the lease title evaluation necessary to quantify risks associated with the "Top Lease" play, it is doubtful that this could be economically or commercially accomplished utilizing conventional industry practices.

b.  If Hopewell is not the owner of such item of Necessary Intellectual Property, state the party that does own such item of Necessary Intellectual Property and the rights to such item of Necessary Intellectual Property that is licensed to Hopewell as well as provide copies of the documents providing such rights.  Please note:  If there are multiple levels of licensing (i.e., the owner of an item of Necessary Intellectual Property licenses it to Title Rover, LLC ("Title Rover") and Title Rover, in turn, licenses such item of Necessary Intellectual Property to Hopewell), then documents evidencing each level of licensing must be produced. Title Rover has developed the proprietary software code and portal operating format representing the technology being licensed to Hopewell in the AMI.  Title Rover has direct ownership of the code pursuant its internal activities and agreements with collaborating consultants which are available to review in Contracts

and Agreements sections of both the Title Rover and Hopewell data rooms. Title Rover is also evaluating additional technology which has been developed by Beyond Recognition, LLC. under a Development Plan/ Statement of Work ("SOW") agreement. The scope of work under the SOW provides initially for the indexing of Madison County digital data for Hopewell's purposes. A copy of this SOW agreement is also provided in the Contracts and Agreements section of the Title Rover data room. Rights for Non-Exclusive or Exclusive use of BR technology for Oil, Gas & Mineral applications have been obtained for the benefit of Title Rover, LLC as part of that certain Settlement Agreement dated June 24, 2016 by and between Willis Group, LLC and Beyond Recognition, LLC which is, by agreement of the parties thereto, confidential. [Note: Title Rover will seek permission to file a suitably redacted copy of the Settlement Agreement in the Title Rover data room.]

[Additional technical description of Title Rover proprietary intellectual property to be provided by Brent Stanley, Chief Technology Officer]

2.  Please describe all intellectual property owned by Hopewell (inclusive of all items of Necessary Intellectual Property). The only non-licensed proprietary information or intellectual property owned by Hopewell consists of its legal work product created for evaluation of oil, gas and mineral interest ownership within the Area of Mutual interest.

3.  Please describe all intellectual property owned by Title Rover (inclusive of all items of Necessary Intellectual Property).

[Additional technical description of Title Rover proprietary intellectual property to be provided by Brent Stanley, Chief Technology Officer]

4.  Please describe all of the services provided to Hopewell by Beyond Review and, for each such service, provide copies of the contract between Hopewell and Beyond Review for such service. Beyond Review has provided two contract employees, Jennifer Burkhardt and Lauren Messer, for document review, preparation of legal files, and oil, gas, & mineral ownership title review. All referenced work tasks undertaken to date have been for the benefit of Hopewell. These services have been billed to Hopewell by agreement at $45/hour for actual time worked and have averaged approximately $2,000 per week per contract employee since April 2016.. All time worked, is at the request and direction of Hopewell and/or Title Rover and all time charges are reviewed and approved by Hopewell (T.Tatham, Manager). Jennifer Burkhardt and Lauren Messer are both currently licensed attorneys in the state of Texas. At the direction of Hopewell, they have assisted Title Rover and its technical consultants in modifying portal display and providing unique search criteria for Hopewell's specific application. A copy of the Willis Group master service agreement will be provided to the Hopewell data room.

5.  Please describe all of the services provided to Hopewell by Image Engine and, for each such service, provide copies of the contract between Hopewell and Image Engine for such service. To date, Image Engine has performed bulk copying services and digital imaging of Madison County Deed Records for Hopewell and or Title Rover. All services provided to Hopewell by Image Engine have been provided under mutually agreed terms or approved purchase orders. A copy of the Willis Group master service agreement will be provided to the Hopewell data room.

6.  Please describe all of the services provided to Title Rover by Beyond Review and, for each such service, provide copies of the contract between Title Rover and Beyond Review for such service. To date, no services have been contracted by Title Rover from Beyond Review.

7.  Please describe all of the services provided to Title Rover by Image Engine and, for each such service, provide copies of the contract between Title Rover and Image Engine for such service. To date, Image Engine has performed digital imaging of Madison County Deed Records for Hopewell at the direction of Title Rover. In addition, a test indexing operation to be performed by Image Engine is being considered to benchmark conventional indexing costs and quality control against costs incurred and accuracy of indices developed and prepared utilizing Beyond Recognition technology which is currently in process under the SOW with BR. All services provided to Hopewell by Image Engine have been provided under mutually agreed terms or

approved purchase orders. A copy of the Willis Group master service agreement and related purchase orders will be provided to the Hopewell data room.

If you require any clarification or if you have any questions please reply all to this email or call me with any concerns.

Thank you,

Justin

**EXHIBIT J**

a.    Whether Hopewell is the owner of such item of Necessary Intellectual Property;

Hopewell has the exclusive right to use Title Rover's proprietary software and all digital data acquired for Hopewell's purposes in an Area of Mutual Interest as set forth in the Memorandum of Agreement dated April 4, 2016 by and between Hopewell-Pilot Project, LLC and Title Rover, LLC. A copy of this agreement is contained in the Contract and Agreements section of both the Hopewell and Title Rover data rooms. While use of this proprietary software is not absolutely necessary for Hopewell to acquire, oil, gas & mineral leases or purchase mineral interests in Hopewell's target areas, it is nevertheless commercially advantageous to utilize this IT capability in identifying mineral ownership and evaluating legal title as opposed to implementing current "best available" industry practices. With regard to the lease title evaluation necessary to quantify risks associated with the "Top Lease" play, it is doubtful that this could be economically or commercially accomplished utilizing conventional industry practices.

b.    If Hopewell is not the owner of such item of Necessary Intellectual Property, state the party that does own such item of Necessary Intellectual Property and the rights to such item of Necessary Intellectual Property that is licensed to Hopewell as well as provide copies of the documents providing such rights. Please note: If there are multiple levels of licensing (i.e., the owner of an item of Necessary Intellectual Property licenses it to Title Rover, LLC ("Title Rover") and Title Rover, in turn, licenses such item of Necessary Intellectual Property to Hopewell), then documents evidencing each level of licensing must be produced. Title Rover has developed the proprietary software code and portal operating format representing the technology being licensed to Hopewell in the AMI. Title Rover has direct ownership of the code pursuant its internal activities and agreements with collaborating consultants which are available to review in Contracts and Agreements sections of both the Title Rover and Hopewell data rooms. Title Rover is also evaluating additional technology which has been developed by Beyond Recognition, LLC under a Development Plan/ Statement of Work ("SOW") agreement. The scope of work under the SOW provides initially for the indexing of Madison County digital data for Hopewell's purposes. A copy of this SOW agreement is also provided in the Contracts and Agreements section of the Title Rover data room. Rights for Non-Exclusive or Exclusive use of BR technology for Oil, Gas & Mineral applications have been obtained for the benefit of Title Rover, LLC as part of that certain Settlement Agreement dated July 24, 2016 by and between Willis Group, LLC and Beyond Recognition, LLC which is, by agreement of the parties thereto, confidential. [Note; Title Rover will seek permission to file a suitably redacted copy of the Settlement Agreement in the Title Rover data room.]

3.    Please describe all intellectual property owned by Title Rover (inclusive of all items of Necessary Intellectual Property).

[Additional technical description of Title Rover proprietary intellectual property to be provided by Brent Stanley, Chief Technology Officer]

**Commented [R1]:** What exactly is the "proprietary software"? It isn't described in any detail in the agreement. How is this proprietary software difference from that of beyond Recognition and/or Beyond Review? Is it based at all on the intellectual property of these other companies and, if so, in what manner?

**Commented [R2]:** What exactly is "all digital data acquired for Hopewell's purposes in an Area of Mutual Interest"? Is it sufficient to expect reasonably good results when used with the "proprietary software"? How were such rights acquired? Were these part of the assignment by Mark Bush? Has anyone else been granted access or rights to use such digital data? Why is the data not owned by Hopewell?

**Commented [R3]:** We will need to verify this statement.

**Commented [R4]:** The AMI is stated in the PPM as covering Madison County, Texas. Need further explanation on what exactly is contemplated by the PPM's statement that the AMI covers Madison County versus this statement that suggest that more effort need to be made with respect to the indexing of Madison County (which the PPM suggests already been completed).

Also, what exactly is being developed by Beyond Recognition? The PPM suggests – as well as the answer to the preceding question – suggests that TR has all of the necessary technology to conduct analysis of the AMI.

**Commented [R5]:** We need a copy of this – an important item to understand. Also, since there appears to have been a dispute that settled between TR and BR (settlement agreement is only a month old), how is the relationships between the companies? This is important because from this answer, it appears that TR is relying on BR to produce some additional technology that is necessary to achieve the purposes in the PPM.

**Commented [R6]:** Status?

PLTF_000561

a.   Whether Hopewell is the owner of such item of Necessary Intellectual Property;

Hopewell has the exclusive right to use Title Rover's proprietary software and all digital data acquired for Hopewell's purposes in an Area of Mutual Interest as set forth in the Memorandum of Agreement dated April 4, 2016 by and between Hopewell-Pilot Project, LLC and Title Rover, LLC. A copy of this agreement is contained in the Contract and Agreements section of both the Hopewell and Title Rover data rooms. While use of this proprietary software is not absolutely necessary for Hopewell to acquire, oil, gas & mineral leases or purchase mineral interests in Hopewell's target areas, it is nevertheless commercially advantageous to utilize this IT capability in identifying mineral ownership and evaluating legal title as opposed to implementing current "best available" industry practices. With regard to the lease title evaluation necessary to quantify risks associated with the "Top Lease" play, it is doubtful that this could be economically and commercially accomplished utilizing conventional industry practices.

b.   If Hopewell is not the owner of such item of Necessary Intellectual Property, state the party that does own such item of Necessary Intellectual Property and the rights to such item of Necessary Intellectual Property that is licensed to Hopewell as well as provide copies of the documents providing such rights. Please note: If there are multiple levels of licensing (i.e., the owner of an item of Necessary Intellectual Property licenses it to Title Rover, LLC ("Title Rover") and Title Rover, in turn, licenses such item of Necessary Intellectual Property to Hopewell), then documents evidencing each level of licensing must be produced. Title Rover has developed the proprietary software code and portal operating format representing the technology being licensed to Hopewell in the AMI. Title Rover has direct ownership of the code pursuant its internal activities and agreements with collaborating consultants which are available to review in Contracts and Agreements sections of both the Title Rover and Hopewell data rooms. Title Rover is also evaluating additional technology which has been developed by Beyond Recognition, LLC. under a Development Plan/ Statement of Work ("SOW") agreement. The scope of work under the SOW provides initially for the indexing of Madison County digital data for Hopewell's purposes. A copy of this SOW agreement is also provided in the Contracts and Agreements section of the Title Rover data room. Rights for Non-Exclusive or Exclusive use of BR technology for Oil, Gas & Mineral applications have been obtained for the benefit of Title Rover, LLC as part of that certain Settlement Agreement dated July 24, 2016 by and between Willis Group, LLC and Beyond Recognition, LLC which is, by agreement of the parties thereto, confidential. [Note; Title Rover will seek permission to file a suitably redacted copy of the Settlement Agreement in the Title Rover data room.]

3.   Please describe all intellectual property owned by Title Rover (inclusive of all items of Necessary Intellectual Property).

[Additional technical description of Title Rover proprietary intellectual property to be provided by Brent Stanley, Chief Technology Officer]

---

**Richard 8/25/16 8:46 AM**
Comment: What exactly is the "proprietary software? It isn't described in any detail in the agreement. How is this proprietary software difference from that of beyond Recognition and/or Beyond Review? Is it based at all on the intellectual property of these other companies and, if so, in what manner?

**Tom Tatham 8/25/16 10:07 AM**
Comment: A Description of TR's proprietary software, TitleRover IP is included in the TR data room in the Technology Folder. It has been developed by TR and Willis Group predecessor entities. The unique features are the Portal application or user interface used together with a digital database. Beyor ... [1]

**Richard 8/24/16 1:22 PM**
Comment: What exactly is "all digital data acquired for Hopewell's purposes in an Area of Mutual Interest"? Is it sufficient to ex ... [2]

**Tom Tatham 8/25/16 10:13 AM**
Comment: Digital Data acquired to date for Hopewell's purposes include Madison County Deed Records (digital images from 1985 ... [3]

**Richard 8/24/16 1:35 PM**
Comment: We will need to verify this statement.

**Tom Tatham 8/25/16 9:18 AM**
Comment: Please refer to Technology folder in Title Rover data room

**Richard 8/24/16 1:35 PM**
Comment: The AMI is stated in the PPM as covering Madison County, Texas. Need further explanation on what exactly is ... [4]

**Tom Tatham 8/25/16 10:15 AM**
Comment: The AMI covers Madison County and adjacent counties being Houston County, Walker County, Leon County and Grime ... [5]

**Richard 8/24/16 1:42 PM**
Comment: We need a copy of this – an important item to understand. Also, since there appears to have been a dispute tl ... [6]

**Tom Tatham 8/25/16 9:41 AM**
Comment: A General Summary of Pertinent Terms affecting Title Rover has been included in the Contracts and Agreements folder ... [7]

**Tom Tatham 8/25/16 9:40 AM**
Comment: With regard to question below, see TitleRover IP in Technology folder in the Title Rover data room as the technical ... [8]

**Richard 8/24/16 1:45 PM**
Comment: Status?

PLTF_000562

a.   Whether Hopewell is the owner of such item of Necessary Intellectual Property;

Hopewell has the exclusive right to use Title Rover's proprietary software and all digital data acquired for Hopewell's purposes in an Area of Mutual Interest as set forth in the Memorandum of Agreement dated April 4, 2016 by and between Hopewell-Pilot Project, LLC and Title Rover, LLC. A copy of this agreement is contained in the Contract and Agreements section of both the Hopewell and Title Rover data rooms. While use of this proprietary software is not absolutely necessary for Hopewell to acquire, oil, gas & mineral leases or purchase mineral interests in Hopewell's target areas, it is nevertheless commercially advantageous to utilize this IT capability in identifying mineral ownership and evaluating legal title as opposed to implementing current "best available" industry practices. With regard to the lease title evaluation necessary to quantify risks associated with the "Top Lease" play, it is doubtful that this could be economically or commercially accomplished utilizing conventional industry practices.

b.   If Hopewell is not the owner of such item of Necessary Intellectual Property, state the party that does own such item of Necessary Intellectual Property and the rights to such item of Necessary Intellectual Property that is licensed to Hopewell as well as provide copies of the documents providing such rights. Please note: If there are multiple levels of licensing (i.e., the owner of an item of Necessary Intellectual Property licenses it to Title Rover, LLC ("Title Rover") and Title Rover, in turn, licenses such item of Necessary Intellectual Property to Hopewell), then documents evidencing each level of licensing must be produced. Title Rover has developed the proprietary software code and portal operating format representing the technology being licensed to Hopewell in the AMI. Title Rover has direct ownership of the code pursuant its internal activities and agreements with collaborating consultants which are available to review in Contracts and Agreements sections of both the Title Rover and Hopewell data rooms. Title Rover is also evaluating additional technology which has been developed by Beyond Recognition, LLC. under a Development Plan/ Statement of Work ("SOW") agreement. The scope of work under the SOW provides initially for the indexing of Madison County digital data for Hopewell's purposes. A copy of this SOW agreement is also provided in the Contracts and Agreements section of the Title Rover data room. Rights for Non-Exclusive or Exclusive use of BR technology for Oil, Gas & Mineral applications have been obtained for the benefit of Title Rover, LLC as part of that certain Settlement Agreement dated July 24, 2016 by and between Willis Group, LLC and Beyond Recognition, LLC which is, by agreement of the parties thereto, confidential. [Note; Title Rover will seek permission to file a suitably redacted copy of the Settlement Agreement in the Title Rover data room.]

3.   Please describe all intellectual property owned by Title Rover (inclusive of all items of Necessary Intellectual Property).

[Additional technical description of Title Rover proprietary intellectual property to be provided by Brent Stanley, Chief Technology Officer]

**Commented [R1]:** What exactly is the "proprietary software? It isn't described in any detail in the agreement. How is this proprietary software difference from that of beyond Recognition and/or Beyond Review? Is it based at all on the intellectual property of these other companies and, if so, in what manner?

**Commented [TT2]:** A Description of TR's proprietary software, TitleRover IP is included in the TR data room in the Technology Folder. It has been developed by TR and Willis Group predecessor entities. The unique features are the Portal application or user interface used together with a unique document or text recognition technology believed to be far superior to OCR. BR technology is being tested to complete Madison County indexing of pre 1922 digital images of hand written records and the results will be benchmarked against OCR and present practices. Beyond Review is a Willis Group company that provides personnel services and in the case of Hopewell, contract oil and gas ... [1]

**Commented [R3]:** What exactly is "all digital data acquired for Hopewell's purposes in an Area of Mutual Interest"? Is it sufficient to expect reasonably good results when used with the "proprietary software"? How were such rights ... [2]

**Commented [TT4]:** Digital Data acquired to date for Hopewell's purposes include Madison County Deed Records (digital images from 1988 to present including periodic updates) purchased directly from Madison County Clerk... [3]

**Commented [R5]:** We will need to verify this statement.

**Commented [TT6]:** Please refer to Technology folder in Title Rover data room

**Commented [R7]:** The AMI is stated in the PPM as covering Madison County, Texas. Need further explanation on what exactly is contemplated by the PPM's statement that the AMI covers Madison County versus this statement [4]

**Commented [TT8]:** The AMI covers Madison County and adjacent counties being Houston County, Walker County, Leon County and Grimes County. The core area of the Buda Rose play is in Eastern Madison County which has been ... [5]

**Commented [R9]:** We need a copy of this – an important item to understand. Also, since there appears to have been a dispute that settled between TR and BR (settlement agreement is only a month old), how is the relationships. [6]

**Commented [TT10]:** A General Summary of Pertinent Terms affecting Title Rover has been included in the Contracts and Agreements folder of the Title Rover data room.

**Commented [TT11]:** With regard to question below, see TitleRover IP in Technology folder in the Title Rover data room as the technical description requested has been provided.

**Commented [R12]:** Status?

PLTF_000563

| Page 1: [1] Commented [TT2] | Tom Tatham | 8/25/16 10:07:00 AM |
|---|---|---|

A Description of TR's proprietary software, TitleRover IP is included in the TR data room in the Technology Folder. It has been developed by TR and Willis Group predecessor entities. The unique features are the Portal application or user interface used together with a digital database. Beyond Recognition technology represents a unique document or text recognition technology believed to be far superior to OCR. BR technology is being tested to complete Madison County indexing of pre 1922 digital images of hand written records and the results will be benchmarked against OCR and present practices. Beyond Review is a Willis Group company that provides personnel services and in the case of Hopewell, contract oil and gas title lawyers as required by Hopewell at the rate of $45/hr. Beyond Review owns no proprietary software.

| Page 1: [2] Commented [R3] | Richard | 8/24/16 1:22:00 PM |
|---|---|---|

What exactly is "all digital data acquired for Hopewell's purposes in an Area of Mutual Interest"? Is it sufficient to expect reasonably good results when used with the "proprietary software"? How were such rights acquired? Were these part of the assignment by Mark Bush? Has anyone else been granted access or rights to use such digital data? Why is the data not owned by Hopewell?

| Page 1: [3] Commented [TT4] | Tom Tatham | 8/25/16 10:13:00 AM |
|---|---|---|

Digital Data acquired to date for Hopewell's purposes include Madison County Deed Records (digital images from 1988 to present including periodic updates) purchased directly from Madison County Clerk, Madison County appraisal district digital records purchased from BIS Consulting, well permit and production data in digital format purcased under license from the Texas Railroad Commission and GIS data in digital format from P2 Energy Solutions. In addition, Title Rover undertook the complete diigital imaging of Madison County Deed Records from 1988 to patent with the assistance of Image Engine. Indices of the digital images of Madison County Deed Records have been prepared or acquired from 1922 to present and are being completed for pre 1922 period where all Deed Records were hand written. Hopewell has also acquired digital images for Houston County Deed Records directly from the Houston County Clerk. Houston County digital images have yet to be indexed. Mark Bush has nothing to do with digital data acquisition, he has provided Geological, Geophysical , Well Completion & Engineering data for Hopewell's Area of Interest. No parties other than Hopewell have been granted access rights to use TitleRover's technology or digital data. Title Rover, LLC maintains and owns all digital data acquired for client use. Purchasers of IAE Shares have the right to exchange all or part of their investment in Hopewell for equity in Title Rover, LLC pursuant to the Share Exchange Warrant a copy of which has been included int the Title Rover data room in the Organization Documents folder. This Share Exchange Warrant was provided as part of the IAE Share investment to address and ameliorate any concerns about transfer pricing of services between Title Rover and Hopewell.

| Page 1: [4] Commented [R7] | Richard | 8/24/16 1:36:00 PM |
|---|---|---|

The AMI is stated in the PPM as covering Madison County, Texas. Need further explanation on what exactly is contemplated by the PPM's statement that the AMI covers Madison County versus this statement that suggest that more effort need to be made with respect to the indexing of Madison County (which the PPM suggests has already been completed).

Also, what exactly is being developed by Beyond Recognition? The PPM suggests – as well as the answer to the preceding question – suggests that TR has all of the necessary technology to conduct analysis of the AMI.

| Page 1: [5] Commented [TT8] | Tom Tatham | 8/25/16 10:15:00 AM |
|---|---|---|

The AMI covers Madison County and adjacent counties being Houston County, Walker County, Leon County and Grimes County. The core area of the Buda Rose play is in Eastern Madison County which has been Hopewell's focus area to date. The focus area has been divided into four areas representing varying levels of contemporary well development and production data. Digital images of Madison County Deed Records have not been completely indexed and TitleRover is seeking to complete indexing of pre 1922 periods. See Technology folder in

PLTF_000564

Title Rover data room for a description of BR technology and refer to the SOW betwee BR and Title Rover covering the Development Plan  and Madison County indexing which is located in the Contracts and Agreements folder in the Title Rover data room.  TR does possess all of the necessary technology to  conduct analysis of digital data covering the AMI, however TR is seeking to significantly lower costs of this analysis by verifying the accuracy of BR technology which is believed preferable to  utilizing OCR.

| Page 1: [6] Commented [R9] | Richard | 8/24/16 1:42:00 PM |
|---|---|---|

We need a copy of this – an important item to understand.  Also, since there appears to have been a dispute that settled between TR and BR (settlement agreement is only a month old), how is the relationships between the companies?  This is important because from this answer, it appears that TR is relying on BR to produce some additional technology that is necessary to achieve the purposes in the PPM.

PLTF_000565

**EXHIBIT K**

**To:**     Richard E. Nawracaj[rich.nawracaj@nawracaj-law.com]
**Cc:**     Mark Willis[Mark@willisgroupus.com]; 'Justin Pannu'[justinpannu1503@gmail.com]; 'Chad Martin'[chadlandmark@hotmail.com]
**From:**   Tom Tatham
**Sent:**    Mon 9/12/2016 11:37:16 AM
**Subject:**  Re: Revised Company Agreements
PROMISSORY NOTE - HopewellWillis Bridge Loan-[$TBD].doc

Rich,
Your comments below are consistent with my discussion with Mark this morning. Mark asked me to prepare a Promissory Note with Hopewell & Mark as joint Makers which may be easier than adding a guarantee from Mark. I attach the preliminary draft for your review and use if you find helpful.
Thanks,
Tom

---

**From:** "Richard E. Nawracaj" <rich.nawracaj@nawracaj-law.com>
**Date:** Monday, September 12, 2016 at 11:15 AM
**To:** Tom Tatham <tpt@lngpartners.com>
**Cc:** 'Mark Willis' <Mark@willisgroupus.com>, 'Justin Pannu' <justinpannu1503@gmail.com>, 'Chad Martin' <chadlandmark@hotmail.com>
**Subject:** RE: Revised Company Agreements

Tom,

Here is my understanding as to where we[1]re at with this deal:

1. A convertible promissory note will be issued for $205,000 - convertible into 102,500 units of Hopewell - with a maturity date of 9/26/16. The note will be personally guaranteed by Mark.
2. In between now and 9/26/16, we get the Company Agreements for both Hopewell and Title Rover amended and enacted by the limited liability companies.
3. EnSooure is looking at a total of $610,000 to invest. $205,000 in connection with the convertible note immediately - then another $205,000 in 30 days and then finally another $200,00 when Chad is able to fund.

The convertible promissory note ad guaranty will be sent to you as soon as possible.

Please contact me with any questions.

Thanks,
Rich

Richard E. Nawracaj
Law Offices of Richard E. Nawracaj
155 N. Wacker Drive, Suite 4250
Chicago, Illinois 60606
Phone: (312) 803-4837
Cell: (773) 255-4541
Fax: (312) 873-4640
rich.nawracaj@nawracaj-law.com

WIL_00001394

**From:** Tom Tatham [mailto:tpt@lngpartners.com]
**Sent:** Monday, September 12, 2016 10:22 AM
**To:** Richard E. Nawracaj <rich.nawracaj@nawracaj-law.com>
**Cc:** Mark Willis <Mark@willisgroupus.com>; 'Justin Pannu' <justinpannu1503@gmail.com>; 'Chad Martin' <chadlandmark@hotmail.com>
**Subject:** Re: Revised Company Agreements

Thanks, RichŠI just spoke with Mark and if I understand the latest concept correctly, the current thinking between Mark and Justin is that once we have resolved the open issues with you and further amended the Title Rover Company Agreement accordingly; and conformed the Hopewell Company Agreement to be further amended with agreed language; that your client's will provide a 14 day bridge loan (not sure of the $ amount) to Hopewell (with Mark's personal liability as co-maker of note) while the revised Hopewell Agreement is circulated and fully executed.  Once the amended Hopewell Company Agreement is fully executed, the bridge loan would be exchanged for IAE Shares of Hopewell as agreed.  Is this your understanding as well?
Please let me know.
Thanks,
Tom

PS:  The Bears played better than you might think.  Except for Kevin White running a bad route which gave the Texans a cheap score, the game was pretty even!  It would appear that this is the Cubs[1] year however!

**From:** "Richard E. Nawracaj" <rich.nawracaj@nawracaj-law.com>
**Date:** Monday, September 12, 2016 at 9:28 AM
**To:** Tom Tatham <tpt@lngpartners.com>
**Subject:** RE: Revised Company Agreements

Tom,

Thanks for the e-mail.  I just sent my client an e-mail concerning the revised Company Agreement for Title Rover, LLC that was received on Friday and, generally, thoughts on trying to wrap this deal up.  I[1]ll reach out to you once there is something substantive to report - please do the same.

I didn[1]t get a chance to watch either - probably a good thing considering the results of the Bears game - although my expectations for the team are way low.

Thanks,
Rich

Richard E. Nawracaj
Law Offices of Richard E. Nawracaj
155 N. Wacker Drive, Suite 4250
Chicago, Illinois 60606
Phone: (312) 803-4837
Cell: (773) 255-4541
Fax: (312) 873-4640
rich.nawracaj@nawracaj-law.com

**From:** Tom Tatham [mailto:tpt@lngpartners.com]
**Sent:** Monday, September 12, 2016 9:17 AM

**To:** Richard E. Nawracaj <rich.nawracaj@nawracaj-law.com>
**Subject:** Re: Revised Company Agreements

Thanks, RichŠI wasn¹t able to connect with Mark on Friday as he went to SMU for the Arkansas game and was out of pocket.  He should be back this morning and I will check with him.  I trust you enjoyed the Cubs/Astros series better than the Bears game!
Talk soon,
Tom

**From:** "Richard E. Nawracaj" <rich.nawracaj@nawracaj-law.com>
**Date:** Monday, September 12, 2016 at 9:07 AM
**To:** Tom Tatham <tpt@lngpartners.com>
**Cc:** Pat Doherty <Pat@Doherty-Law.com>, 'Mark Willis' <Mark@willisgroupus.com>
**Subject:** RE: Revised Company Agreements

Tom,

Thank you for the e-mail.  Let me touch base with my client and respond to you.  I believe that Justin had sent Mark and e-mail expressing some issues Friday afternoon.

Thanks,
Rich

Richard E. Nawracaj
Law Offices of Richard E. Nawracaj
155 N. Wacker Drive, Suite 4250
Chicago, Illinois 60606
Phone: (312) 803-4837
Cell: (773) 255-4541
Fax: (312) 873-4640
rich.nawracaj@nawracaj-law.com

**From:** Tom Tatham [mailto:tpt@lngpartners.com]
**Sent:** Monday, September 12, 2016 8:55 AM
**To:** Richard E. Nawracaj <rich.nawracaj@nawracaj-law.com>
**Cc:** Pat Doherty <Pat@Doherty-Law.com>; Mark Willis <Mark@willisgroupus.com>
**Subject:** Re: Revised Company Agreements

Good morning Rich,
Sorry to have missed you Friday afternoon.  Please let us know if you would like to organize a conference call to discuss our proposed revisions or any open issues.
Thanks,
Tom

**From:** Tom Tatham <tpt@lngpartners.com>
**Date:** Friday, September 9, 2016 at 4:14 PM
**To:** "Richard E. Nawracaj" <rich.nawracaj@nawracaj-law.com>
**Subject:** Re: Revised Company Agreements

Do you have time now to discuss any remaining open issues?

**From:** "Richard E. Nawracaj" <rich.nawracaj@nawracaj-law.com>
**Date:** Friday, September 9, 2016 at 1:02 PM
**To:** Tom Tatham <tpt@lngpartners.com>, Pat Doherty <Pat@Doherty-Law.com>
**Subject:** RE: Revised Company Agreements

Just got to my desk.  Open rest of day.

Richard E. Nawracaj
Law Offices of Richard E. Nawracaj
155 N. Wacker Drive, Suite 4250
Chicago, Illinois 60606
Phone: (312) 803-4837
Cell: (773) 255-4541
Fax: (312) 873-4640
rich.nawracaj@nawracaj-law.com

**From:** Tom Tatham [mailto:tpt@lngpartners.com]
**Sent:** Friday, September 9, 2016 11:54 AM
**To:** Richard E. Nawracaj <rich.nawracaj@nawracaj-law.com>; Pat Doherty <Pat@Doherty-Law.com>
**Subject:** FW: Revised Company Agreements

Rich, Pat,
Are you guys available for a call this afternoon?  If so, please let me know the time that best suits!
Thanks,
Tom

**From:** "Richard E. Nawracaj" <rich.nawracaj@nawracaj-law.com>
**Date:** Thursday, September 8, 2016 at 9:31 PM
**To:** Tom Tatham <tpt@lngpartners.com>, 'Mark Willis' <Mark@willisgroupus.com>
**Cc:** "'Jerome E. Johns'" <jerry.johns@intelometry.com>, 'Justin Pannu' <justinpannu1503@gmail.com>, 'Chad Martin' <chadlandmark@hotmail.com>, 'Cliff Sharp' <ecsharp111@gmail.com>
**Subject:** Revised Company Agreements

Tom and Mark,

Attached is a revised Company Agreement for Title Rover, LLC, in both unmarked as well as marked formats.  The marked version illustrates the modifications made to the draft Tom sent to me yesterday.

Also attached is a revised Company Agreement for Hopewell - Pilot Project, LLC.  It is only in unmarked format because it had not been last revised by Tom.  That said, if you want it to be compared to any draft in particular, please let me know and I[1]ll be happy to do so.

As a heads up, I[1]m completely unavailable (i.e., no ability to monitor or respond to texts, e-mails or calls) tomorrow until about noon CST due to a morning-long meeting that starts at 8:00 a.m.  After it, I[1]m fairly available.

Please contact me with any questions.

Thanks,
Rich

Richard E. Nawracaj
Law Offices of Richard E. Nawracaj
155 N. Wacker Drive, Suite 4250
Chicago, Illinois 60606
Phone: (312) 803-4837
Cell: (773) 255-4541
Fax: (312) 873-4640
rich.nawracaj@nawracaj-law.com

**PROMISSORY NOTE**

[$TBD]                    HOUSTON, HARRIS COUNTY, TEXAS                    August 13, 2016

FOR VALUE RECEIVED, the undersigned, Mark A. Willis, an individual residing in Houston, Texas and Hopewell- Pilot Project, LLC, a Texas Limited Liability Company, ("Makers"), do hereby promise to pay to the order of EnSource Investments, LLC, a Texas Limited Liability Company, ("Payee") at their registered office at [TBD], Harris County, Texas, in lawful money of the United States of America, the principle sum of [TO BE DETERMINED] ($TBD), together with interest on the outstanding principle balance from day to day remaining at a rate equal to TWELVE percent (12%) per annum.  All past due principle and interest shall bear interest at the Default Rate, which equals to EIGHTEEN percent (18 %).

This is an Interest Only note and unless earlier accelerated, pursuant to the provisions hereof, the principle and interest to accrue hereon shall be payable as follows:

This loan shall be for 14 days only, the total amount of principal and interest shall be due in full on or before September 30, 2016 provided however Payee agrees to accept [#TBD] Initial Additional Equity Shares of Hopewell-Pilot Project, LLC as full satisfaction of all amounts due from Makers under this Promissory Note upon full execution by all Members of the Third Amended and Restated Company Agreement of Hopewell- Pilot Project, LLC in the form agreed and attached hereto as Exhibit A.

Makers shall have the right to prepay, at any time and form time to time without premium or penalty, the entire unpaid balance of this note.

Upon the occurrence of any Event of Default [Need definitions of Event of Default], the holder hereof may, at its option, declare the entire unpaid principal of and accrued interest on this Note immediately due and payable without notice, demand or presentment, all of which are hereby waived, and upon such declaration, the same become and shall be immediately due and payable.

To the Fullest extent permitted by applicable law, Makers hereby irrevocably and expressly waives all right to a trial by jury in any action, proceeding, or counterclaim (whether based upon contract, tort or otherwise)

arising out of or relating to this Note or the transactions contemplated hereby or the actions of Payee in the negotiation, administration, or enforcement thereof.

_____        Dated: _____
Mark Willis, as an individual person

**Hopewell-Pilot Project, LLC**

_____        Dated: _____
By:  Thomas P. Tatham, Manager