**EXHIBIT L**

**SECOND AMENDED AND RESTATED
COMPANY AGREEMENT**

**OF**

**TITLE ROVER, LLC**

**A Texas Limited Liability Company**

**Effective: September 1, 2016**

THE LIMITED LIABLITY COMPANY INTERESTS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES EXCHANGE COMMISSION OR UNDER ANY SECURITIES LAWS OF ANY STATE. THE TRANSFERABILITY OF SUCH INTERESTS IS RESTRICTED.  SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, OR TRANSFERRED, NOR WILL ANY ASSIGNEE, VENDEE, TRANSFEREE, OR ENDORSEE THEREOF BE RECOGNIZED AS HAVING ACQUIRED ANY SUCH INTERESTS BY THE ISSUER FOR ANY PURPOSE, UNLESS, AMONG OTHER THINGS, (1) A REGISTRATION STATEMENT FILED WITH THE SEC UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WITH RESPECT TO SUCH INTERESTS SHALL THEN BE IN EFFECT AND SUCH TRANSFER HAS BEEN QUALIFIED UNDER ALL APPLICABLE STATE SECURITIES LAWS, OR (2) THE AVAILABILITY OF AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION SHALL BE ESTABLISHED TO THE SATISFACTION OF COUNSEL TO TITLE ROVER, LLC.

**SECOND AMENDED AND RESTATED**
**COMPANY AGREEMENT**
**OF**
**TITLE ROVER, LLC**
**A Texas Limited Liability Company**

This SECOND AMENDED AND RESTATED COMPANY AGREEMENT OF TITLE ROVER, LLC, a Texas limited liability company (the "<u>Agreement</u>") is adopted by the undersigned as the Managers and Members of the Company as of September 1, 2016 ("<u>Effective Date</u>").

### Recitals

WHEREAS, the initial Member of the Company executed a certain Company Agreement for the Company dated as of April 4, 2016 ("<u>Original Company Agreement</u>"), providing for certain rights and obligations with respect to the Company;

WHEREAS, the Original Company Agreement was amended and restated in its entirety by an Amended and Restated Company Agreement bearing an effective date of June 30, 2016 ("<u>First Amended Company Agreement</u>"); and

WHEREAS, the Company wishes to provide for the admission of certain Persons as new Members of the Company as of the Effective Date and the Members hereby desire to amend and restate the First Amended Company Agreement in its entirety in the form of this Second Amended and Restated Company Agreement on the terms herein provided in order to reflect the admission of the new Members to the Company and to make certain other amendments.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and agreements contained herein, the Members do hereby agree that the First Amended Company Agreement shall be superseded and replaced in its entirety by this Agreement as of the Effective Date.

### ARTICLE I
### Definitions

*Section 1.1    Certain Definitions.* As used in this Agreement, the following terms shall have the meanings indicated:

"<u>Affiliate</u>" means, with respect to a Person, any other Person that: (i) directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the specified Person; or (ii) is related by birth or marriage to such Person; and "<u>control</u>" (including, with the correlative meaning, the term "<u>controlled</u>" and "<u>is under common control</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

1

"Agreement" has the meaning given that term in the introductory paragraph to this document.

"Assignee" means any Person that acquires any portion of a Membership Interest through a Disposition who has not been admitted as a Member pursuant to Section 3.4.

"Business Day" means any day other than a Saturday, Sunday, or a holiday on which national banking associations in the State of Texas are closed.

"Capital Accounts" means the capital accounts established and maintained for each Member and Assignee pursuant to Section 4.4.

"Capital Contribution" means any contribution by a Member to the capital of the Company.

"Certificate" has the meaning given that term in Section 2.1.

"Code" means the Texas Business Organizations Code and any successor statute, as amended from time to time.

"Company" means **TITLE ROVER, LLC**, a Texas limited liability company.

"Company Business" means the development of proprietary information technology ("TR IT") for use in evaluating, acquiring and owning oil, gas & mineral interests ("OG&M Interests"); use in the review and interpretation of land title records, deed records, and other public records to verify legal title and ownership of OG&M Interests; the acquisition and development of a digital data base ("TR DDB") suitable for the Company's commercial purposes; and commercial exploitation of TR IT and TR DDB by providing exclusive or non-exclusive use of TR IT and or TR DDB and or specialized services to the oil and gas industry and or oil and gas industry investors.

"Dispose," "Disposing," or "Disposition" means a sale, assignment, transfer, exchange, mortgage, pledge, grant of a security interest, or other disposition or encumbrance (including, without limitation, by operation of law) of a Membership Interest in the Company.

"Majority Interest" means Members holding among them more than 50% of the sum of all Membership Percentages.

"Managers" means the Persons named in this Agreement as Managers of the Company and any Persons hereafter elected as Managers of the Company as provided in this Agreement, but does not include any Person who has ceased to be a manager of the Company.

"Member" means any Person executing this Agreement as of the date of this Agreement as a member or hereafter admitted to the Company as a member as provided in this Agreement, but does not include any Person who has ceased to be a member in the Company.

2

WIL_00001252
Page 251

"Membership Interest" means the Shares of the Company owned by a Member.

"Membership Percentage" means the result derived by dividing the number of Shares held by a Member by the total number of Shares which are issued and outstanding. The initial Membership Percentages of the Members as of the Effective Date are set forth on Schedule A.

"Officers" means the officers appointed pursuant to Article VII.

"Person" has the meaning given that term in Section 1.002(69-b) of the Code.

"Proceeding" has the meaning given that term in Section 9.1.

"Restrained Party" means (i) Mark A. Willis, Thomas P. Tatham, Willis Group, LLC, LNG Partners; and (ii) all Affiliates of such Persons.

"Securities Act" means the Securities Act of 1933, as amended from time to time.

"Shares" means the shares into which the ownership of Membership Interests in the Company are denominated, including all rights and interests of a Member with respect to the Shares issued under this Agreement including (i) the right of a Member to receive distributions under this Agreement by virtue of the Member's ownership of interests as a Member under this Agreement and (ii) all associated management rights, voting rights or rights to consent. The Shares held by the Members as of the Effective Date are set forth on Schedule A.

"Share Exchange Warrant" means that certain right of holders of Initial Additional Equity Shares ("IAE Shares") of Hopewell-Pilot Project, LLC to, on or before June 30, 2017, exchange one IAE Share for two Shares of Title Rover, LLC as provided and set forth in that certain resolution of the Board of Title Rover, LLC dated effective June 30, 2016.

"Supermajority Interest" means Members holding among them more than 75% of the sum of all Membership Percentages.

"Tax Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"Treasury Regulations" means the Treasury Regulations promulgated under Subchapter K of the Tax Code, as amended from time to time.

"WG Options" means those options to purchase Shares from the Willis Group, LLC which are held by the parties set forth in Exhibit A.  WG Options and the resulting transfer of any shares pursuant to the exercise thereof are not subject to the provisions of Section 3.7 hereof.

3

## ARTICLE II
### Organization

**Section 2.1    Formation.**  The Company has been organized as a Texas limited liability company by the filing of Certificate of Formation (the "Certificate") under and pursuant to the Code and the issuance of a certificate of formation for the Company by the Secretary of State of Texas.

**Section 2.2    Name.**  The name of the Company is "**TITLE ROVER, LLC**", and all Company business must be conducted in that name or such other names that comply with applicable law as the Board may select from time to time.

**Section 2.3    Registered Office; Registered Agent; Principal Office in the United States; Other Offices.**  The registered office of the Company required by the Code to be maintained in the State of Texas shall be the office of the registered agent of the Company. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board may designate from time to time in the manner provided by law. The principal office of the Company in the United States shall be at such place as the Board may designate from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by Section 3.151 of the Code. The Company may have such other offices as the Board may designate from time to time.

**Section 2.4    Purposes.**  The sole purpose of the Company shall be to conduct the Company Business and all activities incidental to the Company Business in accordance with the applicable provisions of the Code, including, but not limited to: (i) entering into, performing, enforcing, and carrying out contracts, exclusive and non-exclusive use and services agreements, of any kind necessary or desirable to, or in connection with, or incidental to the Company Business or, accomplishing the general purposes of the Company, (ii) acquiring oil, gas and mineral leases, mineral interests, royalty interests, top leases, and options in commercially desirable areas suited for application of TR IT and use of TR DDB, (iii) acquiring or leasing any other real or personal property to further or related to the Company Business and (iv) borrowing money and issuing evidence of indebtedness, and securing the same by mortgage, deed of trust, pledge, or other lien, in furtherance of the Company Business.

**Section 2.5    Term.**  The existence of the Company commenced on the date the Secretary of State of Texas issued a certificate of formation for the Company and shall continue in existence for the period fixed in the Certificate for the duration of the Company, or such earlier time as this Agreement may specify.

**Section 2.6    Foreign Qualification.**  Prior to the Company's conducting business in any jurisdiction other than Texas, the Board, if required by the laws of such jurisdiction, shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Board, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Board, each Member shall execute, acknowledge, swear to, and deliver all certificates and other

4

instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

## ARTICLE III
## Membership

*Section 3.1    Authorization of Shares.*   There shall be Six Million Five Hundred Thousand (6,500,000) Shares authorized for issuance by the Company ("Initial Share Authorization"). Changes to the Initial Share Authorization may be made by the Board with the approval of a Supermajority Interest.

*Section 3.2    Issuance of Shares.*

(a)    Issuance of Shares Comprising the Initial Share Authorization. The Shares comprising the Initial Share Authorization shall be issued only as follows:

(i)    Three Million (3,000,000) Shares issued in the amounts and to the parties specified in Schedule A.

(ii)    There are reserved for issuance up to Two Million (2,000,000) Shares issued in connection with the exercise of warrants by owners of the "Initial Additional Equity Shares" of Hopewell-Pilot Project, LLC.

(iii)    There are reserved for issuance up to One Million (1,000,000) Shares issued in connection with the employment and/or independent contractor agreements to be executed with Brent Stanley, Joe Haynes and Susan Willard.

(iv)    There are reserved for issuance up to Five Hundred Thousand (500,000) Shares issued in connection with employee stock options to be issued by the Company.

(b)    Issuance of Shares for Recapitalization Events. If and whenever at any time, the Company shall (i) subdivide the outstanding Shares into a greater number of shares, (ii) consolidate the outstanding Shares into a smaller number of shares, or (iii) issue Shares (or other securities convertible into or exchangeable for Shares) to the holders of all or substantially all of the outstanding Shares by way of a stock dividend on the Shares, the number of unissued Shares comprising the Initial Share Authorization shall be adjusted accordingly. The adjustments provided for herein are cumulative and shall apply to successive subdivisions, consolidations, distributions, issues or other events resulting in any adjustment.

(c)    Issuance of Shares in Exchange for Cash Consideration. In the event the Board resolves that Shares shall be issued in exchange for cash consideration (a "Share Issuance for Cash"), it shall provide to all of the Members a copy of such resolution which shall, at minimum, specify: (i) the number of Shares to be issued; (ii) the price per Share; (iii) the valuation of the Company at the time of such resolution as well as reasonable support therefor; and (iv) all other

5

relevant terms of the proposed Share issuance for cash consideration (the "Share Issuance for Cash Notice").

Each Member shall have the preemptive right to purchase Shares subject to the Share Issuance for Cash on the same terms and conditions as such Shares are to be offered to third-parties (including such terms and conditions described in the Share Issuance for Cash Notice); provided, however, that: (i) the maximum number of Shares that a Member can purchase in connection with the Share Issuance for Cash shall equal the product obtained by multiplying (A) such Membership Interest of such Member, by (B) the number of Shares subject to the Share Issuance for Cash; and (ii) each Member desiring to participate in such Share Issuance for Cash must notify the Board within fourteen (14) days of receipt of the Share Issuance for Cash Notice. To the extent that any Member does not elect to purchase its maximum number of Shares in connection with the Share Issuance for Cash (as calculated pursuant to subpart (i) of this paragraph), then the balance of the Shares not purchased by such Member may be sold by the Company to third parties, but only upon the terms and conditions and for the purchase price set forth in the Share Issuance for Cash Notice.

The provisions of this Section 3.2(c) shall not apply to (i) the issuance of Shares that are reserved for issuance as provided in Section 3.2(a) above or (ii) the issuance of an additional number of Shares issued not exceeding an aggregate amount of the greater of (A) 325,000 Shares and (B) five percent (5%) of the then issued Shares.

(d) Issuance of Shares in Exchange for Non-Cash Consideration. In the event the Board resolves that Shares shall be issued in exchange for consideration other than cash (a "Share Issuance for Non-Cash Consideration"), it shall provide to all of the Members a copy of such resolution which shall, at minimum, specify: (i) the number of Shares to be issued; (ii) the non-cash consideration to be received for the Shares; (iii) the valuation of the Company at the time of such resolution as well as reasonable support therefor; and (iv) all other relevant terms of the proposed Share issuance for non-cash consideration (the "Share Issuance for Non-Cash Consideration Notice"). If, within fourteen (14) days of receipt of the Share Issuance for Non-Cash Consideration Notice, any Member objects to the Share Issuance for Non-Cash Consideration, then the Shares subject to such Share Issuance for Non-Cash Compensation shall be issued only if such issuance has been approved by a Supermajority Interest. Notwithstanding anything in this Section 3(d) or Agreement to the contrary, the Company shall not issue any Shares to any Affiliates in exchange for non-cash consideration prior to an initial public offering of the Shares of the Company.

The provisions of this Section 3.2(d) shall not apply to (i) the issuance of Shares that are reserved for issuance as provided in Section 3.2(a) above or (ii) the issuance of an additional number of Shares not exceeding an aggregate amount of the greater of (A) 325,000 Shares and (B) five percent (5%) of the then issued Shares.

**Section 3.3 *Liability to Third Parties*.** No Member shall be liable for the debts, obligations or liabilities of the Company, including debts, obligations, or liabilities which are imposed under a judgment decree or order of a court.

**Section 3.4    *Admission of Assignees or Members*.**  Except as provided in the next sentence of this Section 3.4, a disposition, sale, assignment or other transfer of a Membership Interest shall not entitle the transferee to become a Member of the Company, but instead shall entitle the transferee to the right to receive distributions, allocations and other economic benefits from the Company which are attributable to the purchased Interest.  Assignees may be admitted as Members only with the consent of a Majority Interest and a majority of the Board.

**Section 3.5    *Withdrawal*.**  A Member does not have the right or power to withdraw from the Company as a Member.

**Section 3.6    *Compensation for Members*.**    No Member shall receive any compensation from the Company in such Member's capacity as a Member.  However, any Member may be employed in the business of the Company at the discretion of the Board and, in connection therewith, may receive reasonable compensation for services rendered.

### Section 3.7    *Restrictions on the Disposition of an Interest*.

(a)      Except as specifically provided in this Section 3.7, a Disposition of all or any part of a Membership Interest may not be effected without the consent of a Majority Interest.  Any attempted Disposition by a Person of an interest or right, or any part thereof, in or with respect to the Company other than in accordance with this Section 3.7 shall be, and is hereby declared, null and void *ab initio*. Any shares purchased pursuant to the exercise of WG Options as set forth in Schedule A and any subsequent transfers thereof for a period of thirty (30) days shall be exempt from the provisions of this Section 3.7. Further, the provisions of this Section 3.7 shall not apply to the Disposition of Shares by a Member to an Affiliate.

(b)      Provided that the consent of a Majority Interest to such Disposition has been obtained, a Member or an Assignee may Dispose of all or a portion of his Membership Interest if he, prior to making such Disposition, first offers (an "Offer") such portion of the Membership Interest (the "Offered Interest") for sale to the Company and the other Members (the "Remaining Members").  The Offer shall be made for the price and upon the terms at which the proposed Disposition is to occur (the "Proposed Price"). The Offer shall be made by written notice which shall state that the Offer is being made pursuant to this Section 3.7 and which shall set forth the Membership Percentage attributable to the Offered Interest, the name or names of the proposed purchaser or purchasers of the Offered Interest, the Proposed Price, method of payment of the Proposed Price (the "Proposed Terms"), and the scheduled date of consummation of the proposed sale.  A copy of the written offer, and any proposed sales agreement, from or with the proposed purchaser shall be attached to the Offer.  The Company shall have the option exercisable during the ensuing thirty (30) day period to accept the Offer.  If the Company does not accept the Offer, then the Remaining Members shall have the option for ten (10) days from the date of the termination of such thirty (30) day period to elect to collectively purchase all, but not less than all, of the Offered Interest, pro rata, in accordance with their relative Membership Percentages.  Any two or more Remaining

7

Members may agree among themselves to reallocate the portions of the Offered Interest to be purchased by them from their respective pro rata portions. The payment of the respective purchase price shall be payable pursuant to the Proposed Terms. If neither the Company nor the Remaining Members elect to purchase all of the Offered Interest in accordance with this Section 3.7(b), then the Selling Member may sell not less than all of the Offered Interest at any time within, but not subsequent to, sixty (60) days after the lapse of the options granted pursuant to this Section; provided, however, that such sale must be made to the third party purchaser and for the price and in accordance with the terms specified in the Offer notice.

(c)     The Company may not recognize for any purpose any purported Disposition of all or part of a Membership Interest unless and until the other applicable provisions of this Section 3.7 have been satisfied and the Company has received a document which:

(i)     has been executed by both the Member effecting the Disposition (or if the transfer is on account of the death or incapacity of the transferor, its representative) and the Person to which the Membership Interest or part thereof is Disposed;

(ii)    includes the notice address of the transferee and his or its agreement to be bound by this Agreement in respect of the Membership Interest or part thereof being acquired;

(iii)   sets forth the Membership Percentages which will be effective after the Disposition of the Member effecting the Disposition and the Person to which the Membership Interest or part thereof is Disposed (which together must total the Membership Percentage of the Member effecting the Disposition before the Disposition); and

(iv)    the Disposition was made in accordance with all applicable laws and regulations (including securities laws), including the following:

(1)     the Member effecting the Disposition and the Person to which the Membership Interest or part thereof is Disposed acknowledge and agree that the Membership Interest has not been registered under the Securities Act or applicable state securities laws and are being sold pursuant to the exemptions from registration offered by the Securities Act and by applicable state law provisions; and

(2)     the Person to which the Membership Interest or part thereof is Disposed must acknowledge and agree his understanding that, as a result of paragraph (1), immediately above, (i) he must bear the economic risk of investment in the Membership Interest for an indefinite period of time; (ii)   the Membership Interest may not be sold, assigned, or

8

transferred, nor will any assignee, vendee, transferee, or endorsee thereof be recognized as having acquired any such interests by the issuer for any purpose, unless, among other things, (x) a registration statement under the Securities Act, with respect to such Membership Interest shall then be in effect (and such transfer has been qualified under all applicable state securities laws), or (y) the availability of an exemption from such registration and qualification shall be established to the satisfaction of counsel to the Company.

Each Disposition and, if applicable, admission into membership complying with the provisions of this Section 3.7(c) is effective as of the first day of the calendar month immediately succeeding the month in which the Company receives the notification of Disposition and the other requirements of this Section 3.7 have been met.

(v)      The Member effecting a Disposition and any Person admitted to the Company in connection therewith shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the Disposition or admission on or before the tenth day after the receipt by that person of the Company's invoice for the amount due. If payment is not made by the date due, the Person owing that amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the maximum rate allowed by law.

**Section 3.8 Other Activities.**      The Members acknowledge that the Members and Managers are engaged in activities other than the activities of the Company and that neither Members nor the Managers shall be expected or required to devote their full time to the management of the Company except as provided in any separate agreement or instrument. Except as otherwise provided in this Agreement or any other agreement or instrument, participation in the Company shall not in any way act as a restraint on the other present or future business activities or investments of any Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member.  Except as otherwise provided in this Agreement or any other agreement or instrument, or to the extent required in order to not breach a Member's or Manager's duty of loyalty to the Company, no Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member shall, under any circumstances, be obligated or bound to offer or present to the Company or any of the other Members any business opportunity presented or offered to them or the Company as a prerequisite to the acquisition of or investment in such business opportunity by such Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member for its account or the account of others.  The provisions of this Section shall not serve to waive or limit the provisions of any other written agreement or instrument binding upon any Member or Manager. The Members are advised that Willis Group, LLC is involved in, and shall continue to be involved in, the business of providing information technology temporary staffing and employment services and related businesses and the Members disclaim any interest in any such businesses.

9

Notwithstanding anything in this Section 3.8 or any other provision in this Agreement to the contrary, under no circumstance shall any Restrained Party engage or otherwise participate, directly or indirectly, in any business or other activity that is, or may become, competitive to the Company Business.

**Section 3.9     Purchase Options Upon the Occurrence of Certain Events.** In the event (i) a Member dies or becomes legally incapacitated, (ii) a Member institutes or there is instituted against a Member any proceeding under the United States Bankruptcy Code or any other foreign, federal or state bankruptcy, receivership, insolvency or other similar law affecting the rights of creditors generally or (iii) the spouse of a Member becomes entitled to any interest in the Shares of such Member by virtue of a divorce or property settlement agreement executed in connection with such divorce, then for a period of ninety (90) days following the date of such event, the Company shall have the right to purchase the Shares registered in the name of the deceased, incapacitated, bankrupt or divorced Member, as the case may be ("Affected Member"). The Company shall exercise its purchase right by giving written notice of such exercise to the Affected Member (or its representative) within such ninety (90) day period. If the Company does not elect to exercise its first right to purchase the Shares registered in the name of the Affected Member, for a period of thirty (30) days following the expiration of the Company first right to purchase such Shares, the Remaining Members shall have the right to purchase such Shares. The Remaining Members shall exercise their purchase right by giving written notice of such exercise to the Affected Member (or its representative) within such thirty (30) day period.

The purchase price shall be an amount equal to the fair market value of the Shares determined by agreement of the Affected Member (or its representative) and the purchaser of the Shares ("Purchaser"); however, if the Purchaser and the Affected Member (or its representative) do not agree on such fair market value on or before fifteen (15) days following the exercise of the purchase right, then the fair market value of each share of Shares shall be equal to the Appraised Value of each Share of the Company as determined by an appraisal of the Shares (the "Appraised Value") by an accounting firm or any other qualified appraiser selected by the Manager.

The appraisal shall determine the Appraised Value of the Shares as of the end of the most recently completed calendar quarter. The Appraised Value shall be the maximum amount that would be distributed in respect of the Shares in any Distribution Event if (i) all of the Company's assets were sold at their fair market value, (ii) the Company was liquidated and all liabilities and obligations of the Company are paid, including, without limitation, liabilities and obligations to Members, and (iii) the proceeds of such liquidation were distributed to the Members pursuant to this Agreement. A "Distribution Event" means (i) any winding up or liquidation of Company and (ii) any merger, consolidation or other transaction pursuant to which all of the Company's Shares are converted into or exchanged for cash, securities of another entity, real or other property or any other consideration. The cost of the appraisal shall be divided equally between the Purchaser and the Affected Member.

The sale and purchase of Shares under this Section shall be closed within sixty (60) days from the date of the receipt by the Affected Member (or its representative) of the last notice from

WIL_00001260
Page 259

the Purchaser and the Affected Member (or its representative) shall deliver a written assignment of the Shares at the closing of the sale and purchase of the Shares, free and clear of all liens. The Purchaser shall pay the purchase price for the Shares by making a down payment of 25% of the purchase price at the closing of the sale and purchase of the Shares, with the balance to be paid in three equal cash installments, (together with accumulated interest on the amount unpaid at the interest rate of 5% per annum) due on each of the first three anniversaries of the closing.

## ARTICLE IV
## Capital Contributions

### Section 4.1    Initial Capital Contributions.

The initial Members of the Company and the number of Shares held by the initial Members are as set forth on Schedule A to this Agreement. The Members have made Capital Contributions to the Company as reflected in the books and records of the Company as set forth on Schedule A. No Member shall be obligated to make any further Capital Contributions to the Company.

**Section 4.2    Return of Contributions.**  A Member is not entitled to the return of any part of its Capital Contribution. An unpaid Capital Contribution is not a liability of the Company or of any Member. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

**Section 4.3    Advances by Members.**  If the Company does not have sufficient cash to pay its obligations, any Member(s) that may agree to do so with the consent of the Board may advance all or part of the needed funds to or on behalf of the Company under such terms and conditions as shall be agreed to by the Board and the advancing Member.

**Section 4.4    Capital Accounts.**  The provisions of this Section 4.4 shall apply whenever the Company is treated as a partnership for federal income tax purposes. A Capital Account shall be established and maintained for each Member. Each Member's Capital Account:

    (a)    shall be increased by:

        (i)    the amount of money contributed by that Member to the Company,

        (ii)    the agreed value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Tax Code), and

        (iii)    allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain

11

described in Treasury Regulation Section 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation Section 1.704-(b)(4)(i); and

(b)     shall be decreased by:

(i)     the amount of money distributed to that Member by the Company,

(ii)     the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under Section 752 of the Tax Code),

(iii)     allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Tax Code, and

(iv)     allocations of Company losses and deductions (or items thereof), including losses and deductions described in Treasury Regulation Section 1.704-1(b)(2)(iv)(g), but excluding items described in clause (b)(iii) above and losses or deductions described in Treasury Regulation Section 1.704-1(b)(4)(i) or Section 1.704(b)(4)(iii).

The Members' Capital Accounts also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation Section 1.704-(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation Sections 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Treasury Regulation Section 1.704-1(b)(2)(iv)(g). On the transfer of all or part of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(l).

## ARTICLE V
## Allocations and Distributions

*Section 5.1    Allocations.* Subject to Section 5.3, net income (and items thereof) and net loss (and items thereof) for any fiscal year shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after giving effect to such allocation, is, as nearly as possible, equal (proportionately) to the amount of the distributions that would be made to such Member during such fiscal year pursuant to Section 5.2, determined as if (i) the Company were dissolved and terminated; (ii) its affairs were wound up and each Company asset was sold for cash equal to its book value; (iii) all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the book value of the assets securing such liability); and (iv) the net assets of the Company were distributed in accordance with Section 5.2 to the Members.

WIL_00001262
Page 261

**Section 5.2    *Distributions*.** Distributions shall be made to the Members at such times as determined by the Board in the following priority:

(a)    If the Members have taxable income attributable to their ownership of any Shares for a taxable year, the Company shall distribute to the Members, in accordance with their Membership Percentages, subject to any contractual restrictions, limitations or conditions affecting the Company, an amount of distributions ("Tax Distributions") equal to the estimated maximum federal and state income and (if applicable) franchise and margin tax rates applicable to the Members and their equity interest owners times the aggregate taxable income of the Members from the Company for that taxable year. Any Tax Distributions shall be applied to reduce subsequent distributions to such Member under Section 5.2(b).

(b)    Thereafter, all remaining cash of the Company shall be distributed to the Members in accordance with their respective Membership Percentages as of such distribution date.

**Section 5.3 Special Allocations and Tax Allocations.**

(a)    Special Allocations.  The following special allocations shall be made in the following order:

(i)    Minimum Gain Chargeback.  Notwithstanding any other provision of this Article, if there is a net decrease in partnership minimum gain (as defined in Treasury Regulations Section 1.704-2(b)(2) and (d)) during any fiscal year, the Members shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in partnership minimum gain, determined in accordance with Treasury Regulations Section 1.704-2(f) and (g). This Section 5.3(a)(i) is intended to comply with the minimum gain chargeback requirement in such section of the Treasury Regulations and shall be interpreted consistently therewith.

(ii)    Member Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 5, if there is a net decrease in Member nonrecourse debt minimum gain attributable to a Member nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(i)) during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Member nonrecourse debt minimum gain attributable to such Member's nonrecourse debt, determined in accordance with Treasury Regulations Section 1.704-2(i).  This Section 5.3(a)(ii) is intended to comply with the minimum gain chargeback requirement in such section of the Treasury Regulations and shall be interpreted consistently therewith.

13

(iii)     Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit, if any, in such Member's capital account (as determined under Treasury Regulations Section 1.704-1) as quickly as possible; *provided that* an allocation pursuant to this Section 5.3(a)(iii) shall be made only if and to the extent that such Member would have such capital account deficit after all other allocations provided for in Section 5.3(a) have been tentatively made as if this Section 5.3(a)(iii) were not in this Agreement. This Section 5.3(a)(iii) is intended to comply with the qualified income offset provisions in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(iv)     Gross Income Allocation. In the event any Member has a deficit balance in such Member's capital account (as determined after crediting such capital account for any amounts that such Member is obligated to restore or is deemed obligated to restore pursuant to Treasury Regulations Section 1.704-2), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such deficit (as so determined) of such Member's capital account as quickly as possible; *provided that* an allocation pursuant to this Section 5.3(a)(iv) shall be made only if and to the extent that such Member would have such capital account deficit (as so determined) after all other allocations provided for in Section 5.3(a) (other than Section 5.3(a)(iii)) have been tentatively made as if this Section 5.3(a)(iv) were not in this Agreement.

(v)     Loss Allocation Limitation. No allocation of net loss (or items thereof) shall be made to any Member to the extent that such allocation would create or increase a deficit in such Member's capital account (as determined after debiting such capital account for the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) and crediting such capital account for any amounts that such Member is obligated to restore or is deemed obligated to restore pursuant to Treasury Regulations Section 1.704-2).

(b)     Tax Allocations

(i)     General Rules. Except as otherwise provided in Section 5.3(b)(ii), for each fiscal period, items of Company income, gain, loss, deduction and expense shall be allocated, for federal, state and local income tax purposes, among the Members in the same manner as the net income (and items thereof) or net loss (and items thereof) of which such items or components were allocated pursuant to Section 5.1.

(ii)     Section 704(c) of the Tax Code. Income, gains, losses and deductions with respect to any property (other than cash) contributed or deemed contributed to the capital of the Company shall, solely for income tax purposes,

14

be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of the contribution or deemed contribution in accordance with Section 704(c) of the Tax Code and the Treasury Regulations promulgated thereunder.

If there is a revaluation of Company property, subsequent allocations of income, gains, losses or deductions with respect to such property shall be allocated among the Members so as to take account of any variation between the adjusted tax basis of such property to the Company for federal income tax purposes and its fair market value in accordance with Section 704(c) of the Tax Code and the Treasury Regulations promulgated thereunder.

(iii)    Capital Accounts Not Affected.    Allocations pursuant to this Section 5.3(b) are solely for federal, state and local tax purposes and shall not affect, or in any way be taken into account in computing, any Member's capital account or allocable share of net income (or items thereof) or net loss (or items thereof).

## ARTICLE VI
## Board of Managers

**Section 6.1    Board of Managers; Qualification and Election; General Powers.**  The Board of Managers of the Company ("Board") shall initially be comprised of two (2) Managers, whose names are set forth on Schedule B to this Agreement.  The number of Managers may be changed from time to time by resolution of the Board.  The Managers shall be elected at the annual meeting of the Members or at a special meeting of the Members called for that purpose, beginning with the 2017 annual meeting of the Members. Cumulative voting shall be allowed in the election of Managers, and each Member shall have one vote for each Share held by such Member, multiplied by the number of Managers to be elected. A Member shall be entitled to accumulate his votes and distribute his votes among any number of Managers nominees. Each Manager elected shall hold office until a successor shall be elected and shall qualify, or until his death, resignation, or removal in the manner herein provided. Any Manager may be removed as such, either with or without cause, by action of the Members who voted for the election of such Manager. The Managers shall have full, exclusive and complete discretion in the management and control of the business of the Company and may bind the Company based on the signature of a duly authorized individual acting on behalf of the Board. Except for situations in which approval of the Members is required by this Agreement or by non-waivable provisions of applicable law, the powers of the Company shall be exercised under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Board of the Company

**Section 6.2    Vacancy.**  Any vacancy occurring among the Managers shall be filled by a vote of a Majority Interest.  A Manager elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office and until his successor is elected, or his earlier death, resignation or removal.

WIL_00001265
Page 264

**Section 6.3** *Action by the Managers*. The Managers shall act as a Board, and each Manager shall have one vote with respect to all matters to be decided by the Board. The act of a majority of the Managers then serving shall be the act of the Managers. No Manager or Member shall take any action with respect to the management of the Company or act as an agent of the company for purposes of carrying out the Company's business and affairs, without the consent or authorization of Board, except as provided in this Agreement.

**Section 6.4** *Annual Meetings*. The annual meeting of the Board shall be held immediately following the annual meeting of Members, and at the same place at which the annual meeting of Members is held.

**Section 6.5** *Special Meetings*. Special meetings of the Board may be called by the Managers or any Member. The Person calling the meeting may fix any place for holding the meeting. Notice of each special meeting of the Board shall be given to each Manager at least three days before the date of the meeting, in writing. Except as may be otherwise provided by law, the Certificate, or this Agreement, neither the business to be transacted at, nor the purpose of, any special meeting need be specified in the notice or waiver of notice of such meeting.

**Section 6.6** *Written Consent*. Any action required or permitted to be taken at a meeting of the Board may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by at least the minimum number of Managers necessary to take action at a meeting at which all Managers were present and voted.

**Section 6.7** *Quarterly Operating Budgets*. Beginning September 15, 2016 and no later than fifteen (15) days prior to the end of each calendar quarter thereafter, the Board shall approve and adopt a quarterly operating budget ("Quarterly Operating Budget") setting forth the estimated receipts and expenditures of the Company for the succeeding calendar quarter. No expenditures exceeding a 10% variance from the approved Budget may be made by the Company without the approval of the Board.

## ARTICLE VII
### Officers

**Section 7.1** *Appointment*. The Board may but shall not be required to designate individuals to serve as officers of the Company as the Board shall determine from time to time, including but not limited to a President and one or more Vice Presidents. The initial President of the Company shall be Mark A. Willis. No officer need be a resident of the state of Texas, a Member or a Manager. Any officers so designated shall have such authority to perform such duties as the Board may, from time to time, delegate to them. The Board may assign titles to particular officers. Unless the Board decides otherwise, if the title is one commonly used for officers of a corporation formed under the Code, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Board pursuant to the third sentence of this Section 7.1. Each officer shall hold office until his successor shall be duly designated and shall qualify or until his death or until he shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be

WIL_00001266
Page 265

held by the same individual. The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Board.

**Section 7.2    Resignation.**  Any officer may resign as such at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Board.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.  Any officer may be removed as such, either with or without cause, by the Board whenever in their judgment the best interests of the Company will be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the Person so removed. Designation of an officer shall not be deemed of itself to create contract rights on the part of any person.  Any vacancy occurring in any office of the Company (other than Managers) may be filled by the Managers.

## ARTICLE VIII
## Meetings of Members

### Section 8.1  Meetings.

(a)    A quorum shall be present at a meeting of Members if the holders of a Majority Interest are represented at the meeting in person or by proxy.  Except as specifically provided herein, with respect to any matter considered at such a meeting the affirmative vote of a Majority Interest shall be the act of the Members.

(b)    All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or without the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meeting by means of conference telephone or similar communications equipment pursuant to Section 8.5.

(c)    Notwithstanding the other provisions of the Certificate or this Agreement, the chairman of the meeting appointed pursuant to Section 8.4 or the holders of a Majority Interest shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the remainder of the adjourned meeting.  If such meeting is adjourned, such time and place shall be determined by a vote of the holders of a Majority Interest.  Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d)    An annual meeting of the Members shall be held at such place, within or without the state of Texas, on such date and at such time as a Majority Interest shall fix and set forth in the notice of the meeting, which date shall be within thirteen (13) months subsequent to the date of formation of the Company or the last annual meeting of Members (whichever most recently occurred.)

17

(e)     Special meetings of the Members for any proper purpose or purposes may be called at any time by the owners of Membership Interests holding at least twenty percent (20%) of the Membership Percentages of all Members. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

(f)     Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) days nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the Member calling the meeting, to each Member entitled to vote at such meeting. If mailed, any such notice shall be deemed to be delivered when deposited in the mail, addressed to the Member at his address provided for in Section 14.2, with postage thereon prepaid.

**Section 8.2     Voting List.** The Board shall make, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of and the Membership Percentages held by each, which list, for a period of ten (10) days prior to such meeting, shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting. The original membership records shall be prima facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members. Failure to comply with the requirements of this Section shall not affect the validity of any action taken at the meeting.

**Section 8.3     Proxies.** A Member may vote either in person or by proxy executed in writing by the Member. A telegram, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Members, before or at the time of the meeting or execution of the written consent, as the case may be. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest.

**Section 8.4     Conduct of Meetings.** All meetings of the Members shall be presided over by the chairman of the meeting, who shall be a Member (or representative thereof) designated by a Majority Interest. The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him in order.

18

**Section 8.5     Action by Written Consent or Telephone Conference.**

(a)     Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing setting forth the action so taken, shall be signed by the holder or holders of not less than the minimum Membership Interests that would be necessary to take such action at a meeting at which the holders of all Membership Interests entitled to vote on the action were present and voted. Every written consent shall bear the date of signature of each Member who signs the consent. No written consent shall be effective to take the action that is the subject to the consent unless, within sixty (60) days after the date of the earliest dated consent delivered to the Company in the manner required by this Section, a consent or consents signed by the holder or holders of not less than the minimum Membership Interests that would be necessary to take the action that is the subject of the consent are delivered to the Company by delivery to its registered office or its principal place of business. Delivery shall be by hand or certified or registered mail, return receipt requested. A telegram, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member shall be regarded as signed by the Member for purposes of this Section. Prompt notice of the taking of any action by Members without a meeting by less than unanimous written consent shall be given to those Members who did not consent in writing to the action.

(b)     The record date for determining Members entitled to consent to an action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office or its principal place of business. Delivery shall be by hand or by certified or registered mail, return receipt requested.

(c)     Members may participate in and hold a meeting by means of conference, telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

## ARTICLE IX
### Indemnification

**Section 9.1     Exculpation.**     Neither any Manager, any Member nor any Person appointed to act as liquidator under Article XII (each a "Covered Person") shall be liable to the Company or any Member under any theory of law, including tort, contract or otherwise (INCLUDING A COVERED PERSON'S OWN NEGLIGENCE) for any loss, damage or claim incurred by reason of any act or omission by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, including any such loss, damage or claim attributable to

19

errors in judgment, negligence or other fault of such Covered Person, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of gross negligence, willful misconduct, intentional misrepresentation or breach of duty of loyalty of such Covered Person. A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

**Section 9.2    *Right to Indemnification*.** Subject to the limitations and conditions as provided in this Article IX, each Manager who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a "Proceeding"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she is acting on behalf of the Company or was serving at the request of the Company as a manager, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise, shall be indemnified by the Company to the fullest extent permitted by the Code, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorneys' fees) actually incurred by such Manager in connection with such Proceeding, and indemnification under this Article IX shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The rights granted pursuant to this Article IX shall be deemed contract rights, and no amendment, modification or repeal of this Article IX shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal. **It is expressly acknowledged that the indemnification provided in this Article IX could involve indemnification for negligence of the Manager or under theories of strict liability.**

**Section 9.3    *Advance Payment*.** The right to indemnification conferred in this Article IX shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by the Manager of the type entitled to be indemnified under Section 9.1 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Manager's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Manager in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such Manager of his or her good faith belief that he has met the standard of conduct necessary for indemnification under this Article IX and a written undertaking, by or on behalf of such Manager, to repay all amounts so

20

advanced if it shall ultimately be determined that such indemnified Manager is not entitled to be indemnified under this Article IX or otherwise.

**Section 9.4** *Indemnification of Officers, Employees and Agents.* The Company, by adoption of a resolution of a Majority Interest, may indemnify and advance expenses to any other manager, officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Managers under this Article IX; and, the Company may indemnify and advance expenses to Persons who are not or were not Managers, officers, employees or agents of the Company but who are or were serving at the request of the Company as a manager, officer, partner, venturer, proprietor, trustee, employee, agent of similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a Person to the same extent that it may indemnify and advance expenses to Managers under this Article IX.

**Section 9.5** *Nonexclusivity of Rights.* The right to indemnification and the advancement and payment of expenses conferred in this Article IX shall not be exclusive of any other right which a Manager or other Person indemnified pursuant to this Article IX may have or hereafter acquire under any law (common or statutory), provision of the Certificate or this Agreement, agreement or vote of Manager or disinterested Members or otherwise.

**Section 9.6** *Insurance.* The Company may purchase and maintain insurance, at its expense, to protect itself and any Person who is or was entitled to indemnification pursuant to this Article IX.

**Section 9.7** *Member Notification.* To the extent required by law, any indemnification of or advance of expenses to a Person in accordance with this Article IX shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the 12-month period immediately following the date of the indemnification or advance.

**Section 9.8** *Savings Clause.* If this Article IX or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Person indemnified pursuant to this Article IX as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative, to the full extent permitted by any applicable portion of this Article IX that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE X
### Books, Records, Fiscal Year, Accounting and Reports

**Section 10.1** *Books and Records.* The Board shall keep proper and complete records

21

and books of account, in which shall be entered fully and accurately all transactions and other matters relative to the Company's business as are usually entered into records and books of account maintained by Persons engaged in business of a like character. The books and records of the Company shall at all times be maintained at the principal office of the Company and shall be open to the reasonable inspection and examination of any Member or his duly authorized representative during normal business hours for any proper purpose upon not less than five Business Days advance written notice to the Board.

*Section 10.2  List of Members.* As part of its books and records, the Board shall maintain a current, alphabetical and readily readable list of the names, addresses and business telephone numbers of the Members, along with the number of Shares held by Members and all other information required to be maintained to reflect transfers of the Shares.

*Section 10.3  Fiscal Year.* The fiscal year of the Company shall be the calendar year.

*Section 10.4  Method of Accounting.* The books of the Company shall be kept in accordance with the method of accounting used for federal income tax reporting purposes.

*Section 10.5  Reports to Investor Members.* Within One Hundred Twenty (120) days after the end of each fiscal year, the Board shall use its best efforts to distribute to all Members an annual report containing:

(a)  Unaudited financial statements of the Company (consisting of a balance sheet, statement of income, statement of members' capital and a statement of cash flow); and

(b)  A report of the activities of the Company during the period covered by the report, including distributions to the Members for the period covered thereby.

## ARTICLE XI
## Tax Returns, Tax Elections and Audits

*Section 11.1  Filing of Company Tax Returns.* The Company shall file income tax returns required by the Code and all returns required to be filed by the jurisdictions in which the Company does business or derives income.

*Section 11.2  Filing of Members' Tax Returns.* Each Member shall be responsible for the preparation and filing of their own federal, state and local tax returns. Within ninety (90) days of the close of each fiscal year of the Company, the Board shall use its best efforts to furnish all Members all information pertaining to the Company necessary for the preparation of their tax returns for the year then ended.

*Section 11.3  Tax Elections.*

(a)  The Board shall not elect to exclude the Company from the provisions of Subchapter K of Chapter 1 of Subtitle A of the Tax Code.

22

(b)     If any Member's interest in the Company is transferred, in whole or in part, the Company may elect, in the Board's sole discretion, to adjust the basis of the Company's property under Tax Code Section 754.  Each Member shall furnish the Company any information necessary to give effect to such election.

(c)     All elections required or permitted to be made by the Company under the Code and the Treasury Regulations shall be made by the Manager in such manner as will, in the opinion of the Accountants, be most advantageous to the Members.

*Section 11.4   Designation of Tax Matters Partner.*   Willis Group, LLC is hereby designated as Tax Matters Partner pursuant to Tax Code Section 6231(a)(6).  In the event that Willis Group, LLC  transfers or conveys its entire interest in the Company or resigns or withdraws, the Manager shall appoint a new Tax Matters Partner; provided, however, that no appointment shall be effective if, in the opinion of counsel for the Company, such appointment shall have the effect of causing the Company to be classified for federal income tax purposes as an association taxable as a corporation or shall have the effect of causing the Company to be classified as a general partnership under the laws of Texas or any jurisdiction in which the Company is conducting business.

*Section 11.5   Commencement of Administrative Proceedings.*   Pursuant to Tax Code Section 6223(c)(3), upon receipt of notice from the Internal Revenue Service of the beginning of an administrative proceeding with respect of the Company, the Tax Matters Partner shall furnish the Internal Revenue Service the names, addresses and profit interests of each of the Members.

*Section 11.6   Settlement Agreements; Judicial Review.*   The Tax Matters Partner shall not enter into a settlement agreement pursuant to Tax Code Section 6224 without providing all other Members at least thirty (30) days' prior written notice of the terms of the proposed settlement.  If the Tax Matters Partner receives from the Internal Revenue Service a "final partnership administrative adjustment" pursuant to Tax Code Section 6223, and if the Tax Matters Partner determines to seek judicial review pursuant to Tax Code Section 6226, the Tax Matters Partner shall select the forum for judicial review.

*Section 11.7   Indemnification of Tax Matters Partner.*   The Company shall indemnify and hold the Tax Matters Partner harmless against any claim, loss, liability, cost or expense resulting from its serving as Tax Matters Partner hereunder, provided that such claim, loss, liability, cost or expense does not result from willful misconduct.

## ARTICLE XII
## Event Requiring A Winding Up, Liquidation, and Termination

*Section 12.1   Event Requiring A Winding Up.*   The Company shall wind up its affairs on the first to occur of the following (a "Event Requiring A Winding Up"):

- (a)     the written consent of the Board and a Majority Interest;

- (b)     the date the Company has no Members; or

23

(c)     the entry of a decree of an Event Requiring A Winding Up of the Company under Section 11.301 of the Code.

**Section 12.2   Liquidation and Termination.**     Upon the occurrence of an Event Requiring A Winding Up of the Company, a Majority Interest shall elect one or more Members as liquidator. The liquidator shall proceed to diligently wind up the affairs of the Company and make final distributions as provided herein and in the Code.   The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties. The steps to be accomplished by the liquidator are as follows:

(a)     as promptly as possible after an Event Requiring A Winding Up and again after final liquidation, the liquidator shall cause a proper accounting to be made of the Company's assets, liabilities, and operations through the last day of the calendar month in which the winding up occurs or the final liquidation is completed, as applicable;

(b)     the liquidator shall cause the notice described in the Code to be mailed to each known creditor of and claimant against the Company in the manner described in the Code;

(c)     the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d)     all remaining assets of the Company shall be distributed to the Members as provided in this Agreement.

**Section 12.3   Certificate of Termination.**     On completion of the distribution of Company assets as provided herein, the Company is terminated, and the liquidator (or such other Person or Persons as the Code may require or permit) shall file a Certificate of Termination with the Secretary of State of Texas, and take such other actions as may be necessary to terminate the legal existence of the Company.

**Section 12.4   Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, the deficit, if any, in the Capital Account of any Member shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

**Section 12.5   Accounting.**     The liquidating trustee shall provide the Members with a proper accounting of the assets, liabilities and operations of the Company through the last day of the month in which the final liquidating distribution occurs.

24

## ARTICLE XIII
### General Provisions

**Section 13.1   Offset.**   Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company shall be deducted from that sum before payment.

**Section 13.2   Notices.**   Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the Person to receive it. All notices, requests, and consents to be sent to a Member must be sent to or made at the address or telefax number for that Member set forth in the records of the Company, or such other address or telefax number as that Member may specify by notice to the other Members. Any notice, request, or consent to the Company must be sent to or made at the address or telefax number for that Member as set forth in the records of the Company or such other address for as the Company may specify by notice to the Members. Whenever a notice is required to be given by law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

**Section 13.3   Entire Agreement.**   This Agreement and any agreements referenced herein constitute the entire agreement of the Members relating to the Company and the Company Business and supersedes all prior contracts or agreements with respect to the Company and the Company Business, whether oral or written.

**Section 13.4   Effect of Waiver or Consent.**   A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

**Section 13.5   Amendment or Modification.**   This Agreement may be amended or modified from time to time only by a written instrument adopted by the Board and executed and agreed to by a Majority Interest.

**Section 13.6   Binding Effect.**   Subject to the restrictions on Dispositions set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.

25

*Section 13.7   Governing Law; Severability.*   THIS COMPANY AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, U.S.A., EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS COMPANY AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.   In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Certificate, or (b) any mandatory provision of the Code, the applicable provision of the Certificate or the Code shall control.   If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances it not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

*Section 13.8   Further Assurances.*   In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

*Section 13.9   Waiver of Certain Rights.*   Each Member irrevocably waives any right it may have to maintain an action for the winding up of the Company or for partition of the property of the Company.

*Section 13.10   Indemnification.*   To the fullest extent permitted by law, each Member shall indemnify the Company, and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement or on account of any business activities conducted by that Member or its affiliates prior to the Effective Date of this Agreement.

*Section 13.11   Notice to Members of Provisions of this Agreement.*   By executing this Agreement, each member acknowledges that it has actual notice of (a) all of the provisions of this Agreement, including, without limitation, the restrictions on the transfer of Membership Interests set forth in Article III, and (b) all of the provisions of the Certificate.   Each Member hereby agrees that this Agreement constitutes adequate notice of all such provisions, and each Member hereby waives any requirement that any further notice thereunder be given.

*Section 13.12   Counterparts.*   This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document.   All counterparts shall be construed together and constitute the same instrument.

*Section 13.13   Cross-references.*   References in this Agreement to Articles, Sections, Exhibits, or Schedules shall be deemed to be references to Articles, Sections, Exhibits, and Schedules of this Agreement unless the context specifically and expressly requires otherwise.

WIL_00001276
Page 275

**Section 13.14 Legal Representation.**   Each Member hereby acknowledges that the Members have been advised that the Members should seek and have had the opportunity to seek independent legal counsel to review this Agreement and all related documents on the Member's behalf and to obtain the advice of such legal counsel relating to such documentation. Each Member further acknowledges and agrees that the law firm of Doherty & Doherty LLP are legal counsel solely to Willis Group, LLC with respect to this Agreement.

**Section 13.15 Construction.**   Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter. Except to the extent the context specifically indicates otherwise, all references to Certificate and Sections refer to articles and sections of this Agreement, and all references to Exhibits refer to Exhibits attached hereto, each of which is made a part hereof for all purposes.

*[Signature Pages Follow]*

27

WIL_00001277

IN WITNESS WHEREOF, the Managers and Members have executed this Agreement as of Effective Date.

MANAGERS:

_____

Mark A. Willis

_____

Thomas P. Tatham

Member Signatures Follow:

MEMBERS:

WILLIS GROUP, LLC

By: _____

_____

_____

Mark A. Willis

28

## SCHEDULE A
## Member Information

| Name and Address of Each Member | Initial Shares* | Initial Ownership Percentage | Shares Acquired by exercise of Share Exchange Warrants, Options, or issued under Employee Service Contracts | New or Additional Shares Acquired | Adjusted Ownership Percentage |
|---|---|---|---|---|---|
| Willis Group, LLC** 1400 Post Oak Blvd. Suite 200 Houston, TX 77056 | 1,500,000 | | | | |
| Mark A. Willis** 1400 Post Oak Blvd. Suite 200 Houston, TX 77056 | 1,500,000 | | | | |
| Deborah Willis Tatham** Option from WG and Mark A. Willis for 250,000 Shares each | | | | | |
| LNG Partners, LLC** Option from WG and Mark A. Willis for 150,000 Shares each | | | | | |
| PDP Management Group, LLC** Option from WG and Mark A. Willis for 100,000 Shares each | | | | | |
| | | | | | |
| Total | 3,000,000 | | | | |

\* As of the Effective Date, 3,000,000 Shares are to be issued to Willis Group ("WG") and Mark A. Willis as set forth in the table above in consideration of: 1) prior investment in IT document search technology and related software ("IT") and contribution to Title Rover, LLC by WG and its affiliates of all intellectual property and knowledge as such IT relates to oil and gas application; 2) Execution of Confidentiality and Non-Compete Agreements from each party or entity receiving Shares; 3) assignment of license rights under certain Settlement Agreement between Willis Group, LLC and Beyond Recognition, LLC dated June 24, 2016; and 4) a First Right of Refusal for the purchase of Image Engine, LLC or a majority interest therein.

\*\* 1,000,000 Shares out of the 3,000,000 Shares issued to Willis Group, LLC and Mark A. Willis as stated above are subject to WG Options as follows: Deborah Willis Tatham holds an option to purchase 250,000 Shares from Willis Group, LLC and 250,000 Shares from Mark A. Willis; LNG Partners, LLC holds an option to purchase 150,000 Shares from Willis Group, LLC and 150,000 Shares from Mark A. Willis; PDP Management Group, LLC holds an option to purchase 100,000 Shares from Willis Group, LLC and 100,000 Shares from Mark A. Willis. All such options are referred to as WG Options and any and all Shares purchased as a result of the exercise of such WG Options are exempt from the provisions of Section 3.7 as set forth therein. In the event any WG Option is exercised, an appropriate notation will be made in this Schedule A reflecting the transfer of such Shares.

29

**SCHEDULE B**

**Board of Managers**

Mark A. Willis

Thomas P. Tatham

WIL_00001280

**EXHIBIT M**

# HOPEWELL-PILOT PROJECT, LLC

## INITIAL ADDITIONAL EQUITY SHARES

### SUBSCRIPTION AGREEMENT

THE OFFERING OF SECURITIES DESCRIBED HEREIN HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION. THIS OFFERING IS MADE PURSUANT TO REGULATION S OR REGULATION D UNDER SECTION 4(a)(2) OF SAID ACT, WHICH EXEMPTS FROM SUCH REGISTRATION CERTAIN TRANSACTIONS. FOR THIS REASON, THESE SECURITIES WILL BE SOLD ONLY TO INVESTORS WHO MEET CERTAIN MINIMUM SUITABILITY QUALIFICATIONS DESCRIBED HEREIN.

A PROSPECTIVE INVESTOR SHOULD BE PREPARED TO BEAR THE ECONOMIC RISK OF AN INVESTMENT IN THE COMPANY FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE SHARES OR MEMBER'S INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE LAWS OF ANY OTHER JURISDICTION, AND, THEREFORE, CANNOT BE SOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THERE IS NO OBLIGATION OF THE ISSUER TO REGISTER THE SHARES OR MEMBER'S INTERESTS UNDER THE SECURITIES ACT OR THE LAWS OF ANY OTHER JURISDICTION. TRANSFER OF THE SHARES OR MEMBER'S INTERESTS IS ALSO RESTRICTED BY THE TERMS OF THE AMENDED AND RESTATED COMPANY AGREEMENT RELATING THERETO.

-1-

WIL_00000935

## HOPEWELL-PILOT PROJECT, LLC

### A TEXAS LIMITED LIABILITY COMPANY

Hopewell-Pilot Project, LLC
c/o Willis Group
1400 Post Oak Blvd. Suite 200
Attention: Tom Tatham
Telephone: (713) 547-4531
E-mail: TTatham@HopewellTX.com

Ladies & Gentlemen:

This SUBSCRIPTION AGREEMENT (the "Agreement") is entered into as of the Closing Date specified on the signature page hereto by and among HOPEWELL-PILOT PROJECT, LLC, a Texas limited liability company (the "Company"), and the investor identified on the signature page hereto (the "Investor"). Investor seeks admission to the Company as a New Member and the acquisition of Shares representing Member's Interest in the Company (the "Interest") in accordance with the Company's Amended and Restated Company Agreement (the "Company Agreement"). Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Company Agreement.

1.      Capital Commitment. In accordance with the terms of the Company Agreement and this Agreement, the Investor agrees to contribute to the Company the amount of capital specified under the heading "Capital Commitment" set forth on the signature page hereto, or such lesser amount as the Company shall accept as determined by the Company's Managers in their sole and absolute discretion.

2.      Adoption. If the Investor is accepted as a New Member pursuant to paragraph 3 below, the Investor hereby agrees to adhere to and be bound by all terms and provisions of the Company Agreement and to perform all obligations therein imposed upon a New Member with respect to the Interest.

3.      Acceptance of Subscription; Delivery of Company Agreement.   The Investor understands and agrees that this subscription is made subject to the following terms and conditions:

(a)      The Managers jointly reserve the right to review the suitability of any person desiring to acquire an Interest and, in connection with such review, to waive such suitability standards as to such person as the Managers jointly deem appropriate under applicable law;

(b)      The Managers may accept or reject the Investor's subscription, in whole or in part, and the Investor's subscription shall be deemed to be accepted by the Managers only when both of the Company's Managers have executed Investor's Agreement and Investor has been admitted to the Company as a New Member in accordance with the terms of the Company Agreement;

(c)      The Managers shall have no obligation to accept subscriptions in the order received;

(d)      The Interest to be created on account of this subscription shall be created only in the name of the Investor, and the Investor agrees to comply with the terms of the Company Agreement

-1-

28ML-207663

WIL_00000936

and to execute any and all further documents necessary in connection with becoming a New Member of the Company;

(e)     The Investor hereby requests and authorizes the Managers to enter Investor's name on the Schedule of Members as holder of the Interest;

(f)     The Investor has consulted to the extent deemed appropriate by the Investor with the Investor's own advisers as to the financial, tax, legal and related matters concerning an investment in Interests and on that basis believes that an investment in the Interests is suitable and appropriate for the Investor;

(g)     The Investor is aware of and understands each of the risks and potential conflicts of interest inherent of an investment in the Company as set forth in the Memorandum;

(h)     The Managers, acting jointly, may transfer proceeds into an account in the name of the Company, and in such event, the Managers shall not be liable for any losses arising from such transfer and shall be fully indemnified by the Company out of the assets of the Company to the fullest extent permitted by law for any and all actions, costs, claims, damages, demands or expenses (including any reasonable attorneys' fees) suffered or incurred by the Managers as a result of such transfer;

(i)     The Investor hereby undertakes in respect of the Interest that the Investor: (i) shall comply with the restrictions on transfer of the Interest contained in the Company Agreement; and (ii) acknowledges and agrees that, in the event that Investor defaults on its capital contribution obligation to the Company, the Interest may be subject to forfeiture and other consequences as specified in the Company Agreement; and

(j)     The Investor hereby declares that the Investor is not in the course of winding up or under liquidation or judicial management.

4.     **Conditions to Closing.**  The Company's obligations hereunder are subject to acceptance by the Managers of the Investor's subscription, and to the fulfillment at the time of, or prior to, the Closing Date of each of the following conditions:

(a)     The representations and warranties of the Investor contained in this Agreement shall be true and correct as of the Closing Date; and

(b)     All proceedings in connection with the transactions contemplated hereby and all documents and instruments incident to such transactions shall be satisfactory in substance and form to the Managers, and the Company shall have received all such counterpart originals or certified or other copies of such documents as the Managers may request.

The Investor's obligations hereunder are subject to the fulfillment at the time of, or prior to, the Closing Date of the following condition:  an Amended and Restated Company Agreement of Title Rover, LLC reasonably acceptable to Investor.

5.     **Investor Representations.**  In connection with the Investor's acquisition of the Interest as of the Closing Date, the Investor makes the following representations and warranties on which the Managers and the Company are entitled to rely:

(a)     The Interest will be held under the type of ownership identified on the signature page hereto.

-2-

WIL_00000937

(b)     If the Investor has checked that the Investor is not a "U.S. Person," as such term is used in Internal Revenue Service Form W-9, under the subheading "Tax Jurisdiction" below, the Investor hereby represents, under penalties of perjury, that the Investor (i) is a "non-U.S. Person" (as defined below); (ii) will not transfer or deliver any interest in the Interests except in accordance with the restrictions set forth in the Company Agreement; (iii) will notify the Managers immediately if the Investor becomes a U.S. Person at any time during which the Investor holds or owns any Interests; (iv) is not subscribing on behalf of or funding its Capital Contribution with funds obtained from U.S. Persons; and (v) it was not in the United States at the time that the Interests were offered to it, and it was not in the United States at the time such offer was accepted; and (vi) it is not acting on behalf of, and it will not fund any portion of its subscription with assets of, any entity that is a "benefit plan investor" within the meaning of the United States Department of Labor Reg. Section 2510-101.3. For purposes of this section 5(b), a "non-U.S. Person" is an individual who is not a citizen or resident of the United States or a corporation, partnership, estate or trust which is not a U.S. entity. Except for offers and sales to discretionary or similar accounts held for the benefit or account of a non-U.S. person by a U.S. dealer or other professional fiduciary, all offers to sell and offers to buy the Interests were made to or by the Investor while the Investor was outside the United States and at the time that the Investor's order to buy the Interests was originated the Investor was outside the United States.

(c)     The Investor is an "accredited investor" within the meaning of Regulation D of the U.S. Securities Act of 1933, as amended (the "Securities Act") and a "qualified client" as defined in the Investment Advisers Act of 1940, as amended, on the basis identified by checking the box adjacent to the applicable representation on *Schedule 2, Part 1* in the case of an individual investors and on *Schedule 2, Part 2* in the case of entity investors; and in the case of entity investors, represents to such further matters by checking the boxes adjacent to the applicable further representations on *Schedule 2, Part 2* (which checked representations in *Schedule 2, Parts 1 and 2* are hereby incorporated by reference). The Investor (i) is not subject to any of the "Bad Actor" disqualifications (each, a "Disqualification Event") described in Rule 506(d)(1) under the Securities Act and (ii) will, subsequent to the date hereof, notify the Company's Managers of (A) any Disqualification Event relating to the Investor not previously disclosed and (B) any event that would, with the passage of time, become a Disqualification Event relating to the Investor. The Investor is acquiring the Interest solely for the Investor's own account and not directly or indirectly for the account of any other person whatsoever for investment and not with a view to, or for sale in connection with, any distribution of the Interest. The Investor does not have any contract, undertaking or arrangement with any person to sell, transfer or grant a participation to any person with respect to the Interest. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of the investment evidenced by the Investor's acquisition of the Interest, and the Investor is able to bear the economic risk of such investment.

(d)     No representations or warranties have been made to the Investor by the Company, the Company's Managers, or any agent thereof, other than as set forth in the Company Agreement, and this Agreement. The Investor has had access to such information concerning the Company as the Investor deems necessary to enable the Investor to make an informed decision concerning the acquisition of the Interest. The Investor has had access to the designated representatives of the Company, its Managers and the opportunity to ask questions of, and receive answers satisfactory to the Investor from, the Managers and or such designated representatives concerning the offering of Interests in the Company generally. The Investor has obtained all additional information requested by the Investor to verify the accuracy of all information furnished in connection with the offering of Interests in the Company.

(e)     The Investor understands that the Interest has not been registered under the Securities Act, or any securities law of any state of the United States or any other jurisdiction in reliance on an exemption for private offerings, and the Investor acknowledges that it has received and carefully

-3-

read the Confidential Private Placement Memorandum of the Company (the "Memorandum"), the Company Agreement and this Agreement. The Investor understands that Doherty & Doherty LLP acts as counsel for the Company, the Company's Managers. No separate counsel has been retained to act on behalf of the Investors. No attorney-client relationship exists with any other person by reason of such person making an investment in the Company. The Investor has received and reviewed all such other information of the Company as the Investor or its representatives and advisers have requested.

(f)    The Investor is aware that the Investor must bear the economic risk of investment in the Interest for an indefinite period of time, possibly until final winding up of the Company, because the Interest has not been registered under the Securities Act, there is currently no public market therefor, and the Interest cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is available. The Investor understands that the Company is under no obligation, and does not intend, to effect any such registration at any time. The Investor also understands that sales or transfers of the Interest are further restricted by the provisions of the Company Agreement and, as applicable, securities laws of other jurisdictions and the states of the United States, and that the Interest will not be transferred or disposed of except in accordance with the terms of this Agreement, the Company Agreement and registration under the Securities Act, or pursuant to an applicable exemption therefrom.

(g)    The execution and delivery of the Company Agreement and this Agreement, the consummation of the transactions contemplated thereby and the performance of the obligations thereunder will not conflict with or result in any violation of or default under any provision of any other agreement or instrument to which the Investor is a party or any license, permit, franchise, judgment, order, writ or decree, or any statute, rule or regulation, applicable to the Investor.

(h)    The Investor has full power and authority to make the representations referred to in this Agreement, to acquire the Interest pursuant to this Agreement and the Company Agreement and to deliver the Company Agreement and this Agreement. The Company Agreement and this Agreement create valid and binding obligations of the Investor and are enforceable against the Investor in accordance with their terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar laws affecting creditors' rights, and subject to general equity principles and to limitations on availability of equitable relief, including specific performance.

(i)    The Investor confirms that the Investor has been advised to consult with the Investor's attorney regarding legal matters concerning the Company and to consult with independent tax advisers regarding the tax consequences of investing in the Company. The Investor acknowledges that it understands that any anticipated United States federal or state income tax benefits may not be available and, further, may be adversely affected through adoption of new laws or regulations or amendments to existing laws or regulations. The Investor acknowledges and agrees that the Company has made no warranty or assurance regarding the ultimate availability of any tax benefits to the Investor by reason of the Investor's investment in the Company.

(j)    The Investor acknowledges and agrees that (i) information relating to the identity of the Investor shall appear on the Schedule of Members and may appear on the financial statements of the Company, and (ii) other Members shall receive such information and may share such information with their advisors and other parties pursuant to the terms of the Company's Confidentiality Agreement.

(k)    The Investor is knowledgeable and experienced in evaluating investments and experienced in financial and business matters and is capable of evaluating the merits and risks of investing in the Interests. The Investor has evaluated the risks of investing in the Interests, and has determined that the Interests are a suitable investment for the Investor. In evaluating the suitability of an

-4-

investment in the Interests, the Investor has not relied upon any representations or other information (whether oral or written) other than as set forth herein, in the Memorandum, the Company Agreement, the other agreements and independent investigations made by the Investor or representative(s) of the Investor. With respect to its investment in the Company, the Investor is not relying upon any other information, representation or warranty by the Company, the Managers of the Company or any designated representatives of the Company.

        (l)    The Investor is aware and acknowledges that (i) the Company has limited or no significant operating history; (ii) there is no assurance of any income from an investment in the Company; (iii) any federal and/or state income tax benefits which may be available to the Investor may be lost through the adoption of new laws or regulations or changes to existing laws and regulations or differing interpretations of existing laws and regulations, in certain circumstances with retroactive effect; and (iv) the Investor, in making this investment, is relying, if at all, solely upon the advice of such Investor's personal tax advisor with respect to the tax aspects of an investment in the Company.

        6.    **Company's and Manager's Representations.**  The Company and the Company's Managers make the following representations and warranties on which the Investor and its counsel are entitled to rely:

        (a)    The execution and delivery of the Company Agreement and this Agreement, the consummation of the transactions contemplated thereby and the performance of the obligations thereunder will not conflict with or result in any violation of or default under any provision of any other agreement or instrument to which the Company is a party or any judgment, order, writ or decree applicable to the Company.

        (b)    No suit, action, claim, investigation or other proceeding is pending or, to the best of the Company's or the Manager's knowledge, is threatened in writing against the Company which questions the validity of the Company Agreement or this Agreement or any action taken or to be taken pursuant to the Company Agreement or this Agreement, or which could otherwise have a material adverse effect on the Company.

        (c)    The Company Agreement and this Agreement create valid and binding obligations of the Company and are enforceable against the Company in accordance with their terms.

        7.    **Trustee, Agent, Representative or Nominee.**  If the natural person or entity completing this Agreement is acting as trustee, agent, representative or nominee for the Investor (such person or entity, the "Agent"), the Agent agrees that the representations, warranties and agreements made herein are made by such Agent (a) in respect of such Agent and (b) in respect of the underlying subscriber on whose behalf the Agent is acting.  The Agent represents and warrants that such Agent has all requisite power and authority to execute this Agreement and perform the obligations under this Agreement on the underlying Investor's behalf.  The Agent agrees to provide any additional documents and information that the Company reasonably requests relating to itself or the underlying Investor.

        8.    **Survival of Agreements, Representations and Warranties; Indemnification.**

        (a)    All agreements, representations and warranties contained herein or made in writing by or on behalf of the Investor, the Company or the Managers of the Company in connection with the transactions contemplated by this Agreement shall survive the execution of this Agreement and the Company Agreement, any investigation at any time made by the Investor, the Company or the Managers of the Company or on behalf of any of them and the sale and acquisition of the Interest and payment therefor.

-5-

WIL_00000940

(b)      The Investor acknowledges that the Investor understands the meaning and legal consequences of the representations and warranties made by the Investor herein. Such representations and warranties are complete and accurate, shall be complete and accurate as of the Closing Date and may be relied upon by the Company's Managers and the Company. If there should be any material change in any of the representations or warranties or other information regarding the Investor set forth herein, including at any time following the Closing Date, the Investor agrees to notify the Company's Managers in writing as promptly as reasonably practicable.

(c)      The Investor agrees that the foregoing representations and warranties, and all other information regarding the Investor set forth herein, may be used as a defense in any actions relating to the Company, the Managers of the Company or the private placement of the Interest, and that it is only on the basis of such representations, warranties and other information that the Company's Managers may be willing to accept this Agreement on behalf of the Company. The Investor acknowledges that the Company, and the Managers of the Company shall rely on such information, representations and warranties on an ongoing basis.

9.      **Binding Effect.** This Agreement shall be binding upon the Investor and the heirs, personal representatives, successors and assigns of the Investor. The Investor agrees that neither this Agreement nor any rights which may accrue to the Investor hereunder may be transferred or assigned without the consent of the Company's Managers, which may be granted or withheld in its sole discretion or otherwise as provided in the Company Agreement. This Agreement shall survive the admission of the Investor to the Company and shall, if the Investor consists of more than one person, be the joint and several obligations of all such persons.

10.      **Severability.** If any provision of this Agreement is held to be invalid or unenforceable in any jurisdiction, such provision shall be deemed modified to the minimum extent necessary so that such provision, as so modified, shall no longer be held to be invalid or unenforceable. Any such modification, invalidity or unenforceability shall be strictly limited both to such provision and to such jurisdiction, and in each case to no other. Furthermore, in the event of any such modification, invalidity or unenforceability, this Agreement shall be interpreted so as to achieve the intent expressed herein to the greatest extent possible in the jurisdiction in question and otherwise as set forth herein.

11.      **Confidentiality.** The Investor has carefully read the Company's Confidentiality Agreement and by execution thereof understands, including without limitation the confidentiality and non-solicitation undertakings set forth therein which shall apply to the Investor, whether or not this Agreement is accepted by the Company.

12.      **Counterparts.** his Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

13.      **Amendments.** Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated orally, but only with the written consent of the Investor and the Company.

14.      **Governing Law.** The interpretation and enforceability of this Agreement and the rights and liabilities of the parties hereto shall be governed by the laws of the State of Texas. To the extent permitted by the Act and other applicable law, the provisions of this Agreement shall supersede any contrary provisions of the Act or other applicable law.

-6-

WIL_00000941

THE UNDERSIGNED INVESTOR HEREBY REPRESENTS THAT (I) THE UNDERSIGNED INVESTOR HAS CAREFULLY READ AND IS FAMILIAR WITH THIS AGREEMENT AND THE COMPANY AGREEMENT, (II) THE INFORMATION CONTAINED HEREIN IS COMPLETE AND ACCURATE AND MAY BE RELIED UPON, AND (III) THE EXECUTION OF THE FOLLOWING SIGNATURE PAGE SHALL CONSTITUTE THE EXECUTION OF THIS AGREEMENT AND THE COMPANY AGREEMENT BY THE INVESTOR IN THE EVENT THAT THE INVESTOR IS ADMITTED TO THE COMPANY AS A NEW MEMBER.

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement as of this 29th day of September, 2016.

THE COMPANY:                                          INDIVIDUAL INVESTOR:

HOPEWELL-PILOT PROJECT, LLC

_____                      _____
                                                     (Signature)

By: THOMAS P. TATHAM                                 _____
Its:  Manager                                        (Signature)

_____                      _____
By: MARK A. WILLIS                                   (Print Name As It Will Be Registered With This
Its:  Manager                                        Investment)

                                                     ENTITY INVESTOR:
                                                     EnSource Investments LLC

                                                     By: _____

                                                     Name: __JUSTIN  PANNU__

                                                     Title: __MANAGER__

Closing Date:                                        Capital Commitment: $530,000.00*
(To be completed by the Company)                     *$205,000.00 through exercise of convertible
                                                     promissory note; $20,000 on or before
                                                     September 30, 2016; $205,000 on or before
                                                     October 28, 2016; $100,000 on or before
                                                     December 31, 2016.

Please provide the following information:

   ☐  Individual             ☐  Irrevocable Trust  
   ☐  Community Property   ☐  Living Trust or Revocable Trust w/ ___grantors.  
   ☐  Partnership          ☐  Corporation  
   ☐  Limited Liability Company  ☐  Other:_____.

If the Investor is an entity, as of the Closing Date, there are four (4) holders of its outstanding securities (other than short-term paper) (*please fill in the blank specifying the number of beneficial owners*).

-7-

WIL_00000942

Page 288

Primary contact person:___ Justin Pannu _____

Telephone Number:___ (619) 318-2607 _____ Fax Number: _____

E-mail Address:_____ justinpannu1503@gmail.com _____

    ■   Social Security or Taxpayer I.D. Number___ 81 - 377 3197 _____

    ☐   U.S. Investor / U.S. Person        ☐  Non-U.S. Investor / Foreign Person

    ☐   Exempt under Code Section 401(a)     ☐  Exempt under Code Section 892

    ☐   Exempt under Code Section 501(c)3

Residential/Business Address (Domicile for Blue Sky filing purposes):

    700 W. E Street, Unit 3804
    San Diego, California 92101

Registered Address (if applicable):

Mailing Address *(select one)*:

[X]    Please use the Subscriber's Residential/Business Address as the Mailing Address

[ ]     Please use the Subscriber's Registered Address as the Mailing Address

[ ]     Please use the following as the Subscriber's Mailing Address:

METHOD OF DELIVERY OF ACCOUNT COMMUNICATIONS.  Account Communications may be delivered via the e-mail address provided on this page.  Should this means of transmission be unacceptable, Account Communications will be delivered via facsimile or physical delivery if the following box is checked:

☐  E-mail transmission is declined, please send Account Communications via facsimile or physical delivery

**For all account communications, please send via e-mail as well as physical delivery.**

-8-

IN WITNESS WHEREOF, this Amended and Restated Company Agreement has been entered into by the parties as of this 29th day of September, 2016.

THE COMPANY

HOPEWELL-PILOT PROJECT, LLC

By: _____
    MANAGER

By: _____
    MANAGER


NEW MEMBERS

INDIVIDUAL:

By: _____

By: _____

Name:_____


ENTITY:


EnSource Investments LLC
_____
By: _____
Name: JUSTIN PANNU
Title: MANAGER


*Signature Page to the Amended and Restated Company Agreement of*
*Hopewell-Pilot Project, LLC*

WIL_00000944

ANNEX 1

PART 1

**Individual Investor Representations.**

All defined terms have the meanings provided to them in the Agreement; the following representations are incorporated by reference into the Agreement.

The Investor makes the following representations regarding the Investor's status as an Accredited Investor and a Qualified Client *by checking the box adjacent to each representation below:*

☐   (a)   Accredited Investor:  The Investor is an individual and has a net worth, either individually or upon a joint basis with the Investor's spouse, that exceeds $1,000,000, excluding the net equity value of such individual's primary residence, if any, but including as a liability the amount by which any indebtedness secured by such residence exceeds the value of such residence (within the meaning of such terms as used in Rule 501 under the Securities Act),[1] *or* has had an individual income in excess of $200,000 for each of the two most recent years, or a joint income with the Investor's spouse in excess of $300,000 in each of those years, and has a reasonable expectation of reaching the same income level in the current year.

☐   (b)   Qualified Client:  The Investor is an individual that (i) has a net worth, together with assets held jointly with the Investor's spouse, of more than $2,000,000, excluding the net equity value of such individual's primary residence, if any, but including as a liability the amount by which any indebtedness secured by such residence exceeds the value of such residence (within the meaning of such terms as used in Rule 501 under the Securities Act),[2] or (ii) is a Qualified Purchaser.

---

[1] Any indebtedness secured by such primary residence that the Investor incurred within the 60 day period preceding the date of the sale of securities pursuant to this Agreement (other than indebtedness incurred as a result of the acquisition of the primary residence) will be included as a liability for purposes of this calculation, even if the total amount of indebtedness securing such primary residence does not exceed the value of such residence.

-1-

WIL_00000945

ANNEX 1

PART 2

**Entity Investor Representations.**

All defined terms have the meanings provided to them in the Agreement; the following representations are incorporated by reference into the Agreement.

The Investor makes the representations regarding the Investor's status as an Accredited Investor and a Qualified Client *by checking the box adjacent to the each representation below*:

**ACCREDITED INVESTOR REPRESENTATION** (*check the box adjacent to at least one applicable representation below*):

☐ (i) The Investor is a corporation, partnership, business trust or limited liability company, not formed for the purpose of acquiring an Interest, or an organization described in section 501(c)(3) of the Code, in each case with total assets in excess of $5,000,000.

☒ (ii) The Investor is an entity in which all of the equity owners (or *a living trust or other revocable trust* in which all of the grantors to such trust) qualify under Annex 1, Part 1, clause (a) or (b), or clause (i), (iii), (iv), (v) or this clause (ii) of this Annex 1, Part 2.

☐ (iii) The Investor is an employee benefit plan and *either* all investment decisions are made by a bank, savings and loan association, insurance company, or registered investment advisor, *or* the Investor has total assets in excess of $5,000,000 *or*, if such plan is a self-directed plan, investment decisions are made solely by persons who are Accredited Investors.

☐ (iv) The Investor is an *irrevocable* trust with total assets in excess of $5,000,000 whose acquisition is directed by a person with such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of the prospective investment.

☐ (v) The Investor is a bank, insurance company, investment company registered under the Investment Company Act, a broker or dealer registered pursuant to Section 15 of the United States Securities Exchange Act of 1934, as amended, a business development company, a Small Business Investment Company licensed by the United States Small Business Administration, a plan with total assets in excess of $5,000,000 established and maintained by a state for the benefit of its employees, or a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act.

☐ (vi) The Investor cannot make any of the representations set forth in clauses (i) through (v) above.

-1-

WIL_00000946

**QUALIFIED CLIENT REPRESENTATION** (*check the box adjacent to at least one applicable representation below*):

☐  (i)  The Investor is a corporation, partnership, association, joint-stock company, trust, or any organized group of persons, whether incorporated or not, that has a net worth of more than $2,000,000. *If the Investor belongs to this investor category, please either check clause (iii) below, if applicable, or affirmatively deny the applicability of clause (iii) below.*

☒  (ii)  The Investor is a corporation, partnership, association, joint stock company, trust, or any organized group of persons, whether incorporated or not, that is a Qualified Purchaser. *If the Investor belongs to this investor category, please either check clause (iii) below, if applicable, or affirmatively deny the applicability of clause (iii) below.*

☐  (iii)  The Investor is a corporation, partnership, association, joint-stock company, trust, or any organized group of persons, whether incorporated or not, that is an Excluded Company, and all of the Investor's equity owners (and all of their respective equity owners) are Qualified Clients.

☒  The Investor has checked either or both of clauses (i) or (ii) above and affirmatively denies applicability of this clause (iii).

☐  (vi)  The Investor cannot make any of the representations set forth in clauses (i) through (iii) above.

## FURTHER ENTITY INVESTOR REPRESENTATIONS

The Investor makes the following representations *by checking the box adjacent to the correct response to each representation below*:

| | | |
|---|---|---|
| ☒ True ☐ False | The Investor is neither an "investment company" under the Investment Company Act nor does the Investor rely upon the exclusions from the definition of "investment company" provided for in Section $3(c)(1)$ or $3(c)(7)$ of the Investment Company Act. |
| ☐ True ☒ False | The Investor was not organized for the purpose of acquiring the Interest. |
| ☒ True ☐ False | The Investor has made investments prior to the date hereof or intends to make investments in the near future and each beneficial owner of interests in the Investor has and will share in the same proportion to each such investment. |
| ☐ True ☒ False | The Investor's investment in the Company will not constitute more than 40% of the assets of the Investor (including any capital commitments that may be drawn upon demand by the Investor). |
| ☒ True ☐ False | The governing documents of the Investor require that each beneficial owner of the Investor, including, but not limited to, shareholders, partners and beneficiaries, participate through their interest in the Investor in all of the Investor's investments and that the profits and losses from each such investment are shared among such beneficial owners in the same proportions as all other investments of the Investor. No such beneficial owner may vary the Investor's share of the profits and losses or the amount of the Investor's contribution for any investment made by the Investor. |

-2-

WIL_00000947

If any of the above statements are marked "False," then the Investor will have, as of the Closing Date, four (4) holders of its outstanding securities (other than short-term paper) (*please fill in the blank specifying the number of beneficial owners*).

The Investor is:

☐ True  ■ False  (1)  an "employee welfare benefit plan" or an "employee pension benefit plan" as defined in sections 3(1) and 3(2), respectively, of ERISA; or

☐ True  ■ False  (2)  a plan described in section 4975(e)(1) of the Code; or

☐ True  ■ False  (3)  an entity that is deemed to be a "benefit plan investor" under the DOL Regulations because all or part of its underlying assets include "plan assets" by reason of a plan's investment in the entity (including, by way of example only, a partnership not qualifying as an operating company within the meaning of the DOL Regulations, which is 25% or more owned by entities described in (1) or (2) above); or

☐ True  ■ False  (4)  subject to any rules or regulations similar to the fiduciary provisions of ERISA and/or the prohibited transaction provisions of Section 4975 of the Code.

If clause (3) above is marked "True," please provide the percentage that the Investor's "plan assets" holdings bear to its aggregate asset holdings (based upon value as of the Closing Date): _____% (the "Plan Asset Percentage").

☐ True  ■ False  The Investor is a "private foundation" as described in Section 509 of the Code.

☐ True  ■ False  The Investor is subject to the Bank Holding Company Act of 1956, as amended.

■ True  ☐ False  To the best of the Investor's knowledge, the Investor does not control nor is it controlled by or under common control with, any other Investor.

*Please check the box next to each applicable statement and provide appropriate information in response to each such statement:*

☐ True  ■ False  The Investor is subject to federal or state freedom of information (FOIA) statutes or other similar statutes in each of the following jurisdictions. (*If a similar statute is applicable, please specify the applicable statute along with the applicable jurisdiction, to the extent known)*:

_____

☐ True  ■ False  One or more of the Investor's beneficial owners is subject to federal or state FOIA statutes or other similar statutes in each of the following jurisdictions. (*If a similar statute is applicable, please specify the applicable statute along with the applicable jurisdiction, to the extent known)*:

_____

-3-

WIL_00000948

☐ True ⊠ False      The Investor is a public agency, department, office or pension plan. *(Please specify type and applicable jurisdiction.)*:

_____

☐ True ⊠ False      One or more of the Investor's beneficial owners is a public agency, department, office or pension plan. *(If known, please specify type of owner and applicable jurisdiction below.)*:

_____

-4-

WIL_00000949

**EXHIBIT N**

## SHARE EXCHANGE WARRANT

To Exchange Initial Additional Equity Shares of Hopewell-Pilot Project, LLC
for Common Shares of

### TITLE ROVER, LLC
(incorporated under the laws of the State of Texas)

(void after June 30, 2017)

No. EW- 8 for the acquisition of up to 530,000                September 29, 2016
Common Shares of Title Rover, LLC

**THIS IS TO CERTIFY** that, for value received, EnSource Investments, LLC (the "**Holder**") is entitled, subject to the terms and conditions hereinafter set forth, to receive from the Company by way of exchange of Initial Additional Equity Shares of Hopewell-Pilot Project, LLC held by Holder as at the Exercise Date up to that number of Common Shares provided above as specified in Exchange Form & Holder's Notice and in accordance with the terms in Section 2 below. Holder, as herein provided, may receive two Common Shares of the Company for each 1 Initial Additional Equity Share so exchanged after exercise of this Exchange Warrant by surrendering to the Company at the address set forth in Section 4 below, this Exchange Warrant, together with an Exchange Form & Holder's Notice, duly completed and executed, and the certificates representing the Initial Additional Equity Shares of Hopewell-Pilot Project, LLC to be exchanged pursuant to the terms of this Exchange Warrant.

1.    **Definitions.** In this Exchange Warrant, including the preamble, unless there is something in the subject matter or context inconsistent herewith, the following terms shall have the following meanings, respectively:

"**Affiliate**" means an affiliate within the meaning of the *Texas Business Corporations Act*;

"**Business Day**" means any day except Saturday, Sunday or any day on which banks are generally not open for business in Houston, Texas;

"**Common Shares**" means the common shares or members interests in the capital of the Company as the same are constituted on the date hereof;

"**Company**" means Title Rover, LLC, a limited liability company organized under the laws and jurisdiction of the state of Texas;

"**Company Reorganization**" means any reclassification of the Common Shares of the Company at any time outstanding or change of the Common Shares into other shares, including in connection with (i) the consolidation, amalgamation or merger of the Company with or into any other company or (ii) any transfer of the undertaking or assets

1

of the Company as an entirety or substantially as an entirety to another person or any exchange of Common Shares into securities of another company;

"**Exchange Form & Holder's Notice**" means the exchange form attached hereto as Schedule "A";

"**Exchange Warrant**" means this exchange warrant to acquire Common Shares and any deed or instrument supplemental or ancillary hereto and any schedules hereto or thereto;

"**Exercise Date**" means the date on which the Exchange Warrants are exercised;

"**Expiry Date**" means June 30, 2017; and

"**Initial Additional Equity Shares**" means Initial Additional Equity Shares in the capital of Hopewell-Pilot Project, LLC;

2.  **Exchange Warrant Conditions**.  This Exchange Warrant entitles the Holder, upon its exercise, to receive up to such number of Common Shares as set forth above from the Company by way of exchange of the Exchange Warrant and either:

    2.1  Electing to transfer and assign 100% of the Initial Additional Equity Shares held by Holder as at the Exercise Date, free from any and all taxes, liens and charges, which assignment will provide for the issuance by the Company to the Holder of the maximum number of Common Shares as stated herein; or

    2.2  Electing to transfer and assign a specified number of Initial Additional Equity Shares (being less than all of the Initial Additional Equity Shares held by Holder), free from any and all taxes, liens and charges, for each two Common Shares to be issued by the Company pursuant to the timely exercise of this Exchange Warrant,

(such Common Shares issuable to the Holder on exercise of this Exchange Warrant referred to as the "**Exchange Warrant Shares**").

3.  **Expiration of Exchange Warrants**.  Notwithstanding any other provision of this Exchange Warrant, all rights under this Exchange Warrant to exercise such Exchange Warrant or part thereof and to acquire Exchange Warrant Shares shall wholly cease and terminate and this Exchange Warrant shall be wholly void and of no valid or binding effect as at 5:00 p.m. (Houston time) on the Expiry Date.

4.  **Exercise of Exchange Warrants**.  Any exercise of this Exchange Warrant by the Holder must be in respect of all Exchange Warrant Shares issuable pursuant to the terms of this Exchange Warrant and no subsequent exercises will be permitted. The rights represents by this Exchange Warrant may be exercised by the Holder, by the surrender of this Exchange Warrant, with the attached Exchange Form duly executed, together with duly endorsed certificates for the Initial Additional Equity Shares to be exchanged pursuant to this Exchange Warrant at Suite 200, 1400 Post Oak Blvd, Houston Texas, 77056 Attn: Thomas P. Tatham (or such other office or agency of the Company as it may designate by

2

notice in writing to the Holder at the address of the Holder appearing on the books of the Company at any time during the period within which the rights represented by this Exchange Warrant may be exercised). The Company agrees that the Exchange Warrant Shares acquired on exercise of this Exchange Warrant shall be and be deemed to be issued to the Holder as the registered owner of such shares as of the close of business on the date on which this Exchange Warrant shall have been surrendered and payment made for such shares by surrender of Initial Additional Equity Shares as aforesaid. Certificates for the Exchange Warrant Shares so issuable shall be delivered to the Holder within a reasonable time, not exceeding thirty (30) Business Days, after the rights represented by this Exchange Warrant shall have been so exercised.

5.    **Not a Shareholder**. Nothing in this certificate or in the holding of an Exchange Warrant evidenced hereby shall be construed as conferring upon the Holder any right or interest whatsoever as a shareholder of the Company.

6.    **No Fractional Shares**.   Notwithstanding any provisions to the contrary herein, the Company shall not be required to issue any fractional Common Shares (unless such fractional shares arise from a consolidation of shares) in connection with any exercise of the right to convert this Exchange Warrant into Common Shares, and in the event that the calculation of the number of Common Shares issuable upon such exercise results in a number which includes a fraction of whole shares, then the Company shall be required to issue the largest number of whole shares into which this Exchange Warrant is exercisable.

7.    **Covenants of the Corporation**. The Company hereby agrees as follows:

7.1    All Common Shares that may be issued upon the exercise of the rights represented by this Exchange Warrant will, upon issuance, be validly issued as fully paid and non-assessable and shall be free from any and all liens and charges with respect to the issue thereof.

7.2    As long as this Exchange Warrant remains outstanding, the Company shall reserve and there shall remain unissued out of its capital a sufficient number of its Common Shares to satisfy the right of purchase herein provided for should the Holder determine to exercise its rights in respect of the Common Shares for the time being called for and represented by this Exchange Warrant.

8.    **Adjustment of Subscription Rights**.

8.1    If at any time prior to the Expiry Time there shall be a Company Reorganization, and the Holder thereafter exercises the right to purchase Common Shares hereunder, the Holder shall be entitled to receive, and shall accept, in lieu of the number of Common Shares to which the Holder was theretofore entitled upon such exercise, the kind and amount of shares and other securities or property which the Holder would have been entitled to receive as a result of such Company Reorganization if, on the effective date thereof, the Holder had been the registered holder of the number of Common Shares to which the Holder was theretofore

3

entitled upon exercise. The subdivision or consolidation of the Common Shares at any time outstanding into a greater or lesser number of Common Shares shall be deemed not to be a Company Reorganization for the purposes of this Section 8.1.

8.2   If and whenever at any time prior to the Expiry Time, the Company shall (i) subdivide the outstanding Common Shares into a greater number of shares, (ii) consolidate the outstanding Common Shares into a smaller number of shares, or (iii) issue Common Shares (or other securities convertible into or exchangeable for Common Shares) to the holders of all or substantially all of the outstanding Common Shares by way of a stock dividend on the Common Shares, the number of Common Shares issuable by the Company upon exercise by Holder of this Exchange Warrant shall be adjusted accordingly. The adjustments provided for herein are cumulative and shall apply to successive subdivisions, consolidations, distributions, issues or other events resulting in any adjustment. Nothing herein shall obligate the Company to make adjustments for any additional Common Shares issued by the Company for "fair value" as determined in good faith by the Directors of the Company.

8.3   Any question arising with respect to the adjustments provided herein shall be conclusively determined by any firm of certified public accountants of national recognition that the Company may designate and who will have access to all appropriate records, and such determination will be binding upon the Company and the Holder.

8.4   The Company shall from time to time immediately after the occurrence of any event which requires an adjustment or readjustment as provided herein, notify the Holder by specifying the nature of the event requiring the same and the amount of the adjustment necessitated thereby and setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based and the adjustment specified therein shall be verified by an opinion of the auditors of the Company and shall be conclusive and binding on all parties in interest. The Company shall, except with respect to any subdivision or consolidation of the Common Shares, forthwith give notice to the Holder specifying the event requiring such adjustment or readjustment and the results thereof.

9.   **Exchange of Exchange Warrant**.  This Exchange Warrant is exchangeable, upon the surrender hereof by the Holder at the office or agency of the Company referred to in Section 4 hereof, for new exchange warrants of like tenor representing in the aggregate the right to subscribe for and purchase the number of Common Shares that may be subscribed for and purchased hereunder. **Mutilated or Missing Warrants.**  Upon receipt of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of this Exchange Warrant and, in the case of any such loss, theft or destruction, upon delivery of a bond or indemnity satisfactory to the Company, acting reasonably, or, in the case of any such mutilation, upon surrender or cancellation of this Exchange Warrant, the Company will issue to the Holder a new warrant of like tenor, in lieu of this Exchange Warrant,

4

representing the right to subscribe for and purchase the number of Common Shares which may be subscribed for and purchased hereunder.

10. **Governing Law**. This Exchange Warrant shall be governed by and construed in accordance with the laws of the State of Texas applicable therein. The reference to such laws shall not, by conflict of laws rules or otherwise, require the application of the law of any jurisdiction other than the State of Texas. The Parties hereby irrevocably attorns to the exclusive jurisdiction of the courts of the State of Texas.

11. **Severability**. If any one or more of the provisions or parts thereof contained in this Exchange Warrant should be or become invalid, illegal or unenforceable in any respect in any jurisdiction, the remaining provisions or parts thereof contained herein shall be and shall be conclusively deemed to be, as to such jurisdiction, severable therefrom and:

   11.1   the validity, legality or enforceability of such remaining provisions or parts thereof shall not in any way be affected or impaired by the severance of the provisions or parts thereof severed; and

   11.2   the invalidity, illegality or unenforceability of any provision or part thereof contained in this Exchange Warrant in any jurisdiction shall not affect or impair such provision or part thereof or any other provisions of this Exchange Warrant in any other jurisdiction.

12. **Headings**. The headings of the sections, subsections, paragraphs, subparagraphs and clauses of this Exchange Warrant have been inserted for convenience of reference only and do not define, limit, alter or enlarge the meaning of any provision of this Exchange Warrant.

13. **Numbering of Articles, etc.** Unless otherwise stated, a reference herein to a numbered or lettered section, subsection, paragraph, subparagraph or schedule refers to the section, subsection, paragraph, subparagraph or schedule bearing that number or letter in this Exchange Warrant.

14. **Gender**. Whenever used in this Exchange Warrant, words importing the singular number only shall include the plural, and vice versa, and words importing the masculine gender shall include the feminine gender.

15. **Day not a Business Day**. In the event that any day on or before which any action is required to be taken hereunder is not a Business Day, then such action shall be required to be taken on or before the requisite time on the next succeeding day that is a Business Day. If the payment of any amount is deferred for any period, then such period shall be included for purposes of the computation of any interest payable hereunder.

16. **Binding Effect; Assignability**. This Exchange Warrant and all of its provisions shall enure to the benefit of the Holder and its successors and permitted assigns and shall be binding upon the Company and its successors and permitted assigns. This Exchange Warrant is not assignable by the Holder without the prior written consent of the Company.

5

PLTF_001948

**IN WITNESS WHEREOF** the Company has caused this Exchange Warrant to be signed by its duly authorized officers and this Exchange Warrant to be dated the _29ᵗʰ_ day of _September_, 2016.

**TITLE ROVER, LLC**

By: _Thomas P Hill_

*Authorized Signing Officer*

PLTF_001949

**SCHEDULE "A"**
**EXCHANGE FORM & HOLDER'S NOTICE**

(To be signed only upon exercise of this Warrant)

The undersigned hereby exercises the within Exchange Warrant for the purchase of _____ Common Shares issuable pursuant to such Exchange Warrant in accordance with the terms and conditions thereof, and herewith tenders [_____] Initial Additional Equity Shares of Hopewell-Pilot Project, LLC.

The undersigned hereby certifies that it is the registered and beneficial holder of _____ Initial Additional Equity Shares of Hopewell-Pilot Project, LLC.

The Company is instructed to issue a certificate for the Common Shares in the name of the undersigned and to deliver the same to the address indicated.

_____
**Name**

_____
**Street and Number**          **City and State**

**Date:**_____          _____
                                 **Purchaser's Signature**
                                 [Signature must conform
                                 exactly with the name of the
                                 registered owner on the form
                                 of this Warrant.]

PLTF_001950

**EXHIBIT O**

From: **Tom Tatham** tpt@lngpartners.com 📎
Subject: Re: Oct 28 Subscription Payment
Date: October 27, 2016 at 8:18 AM
To: Richard E. Nawracaj rich.nawracaj@nawracaj-law.com
Cc: Mark Willis Mark@willisgroupus.com, justinpannu1503@gmail.com, chadlandmark@hotmail.com, ecsharp111@gmail.com, jerry.johns@intelometry.com

Rich,

Attached is a copy of the fully executed Exchange Warrant covering the full subscription of Hopewell IAE Shares by EnSource Investments, LLC. I will forward the original to you or as you direct upon receipt of the $205,000 subscription payment due tomorrow.

Thanks,
Tom

PS: Great win last night!  Go Cubs!

On 10/26/16, 7:21 PM, "Tom Tatham" <tpt@lngpartners.com> wrote:

> Rich,
> No need!  If Friday payment is made promptly on time.  I will forward
> Exchange Warrant for full Subscription and we will trust that final
> payment is made.  No need for extra legal; we trust you guys!
> Thanks,
> Tom
>
> Sent from my iPhone
>
>> On Oct 26, 2016, at 6:49 PM, Richard E. Nawracaj
>> <rich.nawracaj@nawracaj-law.com> wrote:
>>
>> My client has rekindled the desire to have warrants issued for each
>> tranche.
>>
>> I'll prepare the warrants for the past tranche and the one for Thursday
>> and forward to you for execution.  They will be prepared from the form
>> of warrant forwarded to me previously.
>>
>> Thanks,
>> Rich
>>
>> Richard E. Nawracaj
>> Law Offices of Richard E. Nawracaj
>> 155 N. Wacker Drive, Suite 4250
>> Chicago, Illinois 60606
>> Phone: (312) 803-4837
>> Cell: (773) 255-4541
>> Fax: (312) 873-4640
>> rich.nawracaj@nawracaj-law.com
>>
>> -----Original Message-----
>> From: Mark Willis [mailto:Mark@willisgroupus.com]
>> Sent: Wednesday, October 26, 2016 5:27 PM
>> To: Justin Pannu <justinpannu1503@gmail.com>; Tom Tatham
>> <tpt@lngpartners.com>
>> Cc: Cliff Sharp <ecsharp111@gmail.com>; Chad Martin
>> <chadlandmark@hotmail.com>; Richard E. Nawracaj
>> <rich.nawracaj@nawracaj-law.com>; Jerome E. Johns
>> <jerry.johns@intelometry.com>
>> Subject: RE: Oct 28 Subscription Payment
>>
>> Gents,
>>
>> Please try and coordinate this for timely payment as we currently have
>> commitments that we have budgeted for accordingly.
>>
>> Thanks,  Mark
>>
>> Mark Willis  CEO & President
>> O 713-547-4510 | M 713-248-1555 | mark@willisgroupus.com |

PLTF_001942

O 713 547-4531 | M 713 243-1630 | mark@willisgroupus.com |
www.linkedin.com/pub/mark-willis
1400 Post Oak Boulevard, Suite 200 | Houston, TX 77056 |
www.wgcompanies.com Willis Group  Family of Companies Professional
ServicesPIIProject + Process DeliveryPIITalent Acquisition + Flexible
Workforce Solutions T THIS ELECTRONIC MESSAGE, INCLUDING ANY
ACCOMPANYING DOCUMENTS, IS CONFIDENTIAL and may contain information that
is privileged and exempt from disclosure under applicable law. If you
are neither the intended recipient nor responsible for delivering the
message to the intended recipient, please note that any dissemination,
distribution, copying or the taking of any action in reliance upon the
message is strictly prohibited. If you have received this communication
in error, please notify the sender immediately.

-----Original Message-----
From: Justin Pannu [mailto:justinpannu1503@gmail.com]
Sent: Tuesday, October 25, 2016 10:08 PM
To: Tom Tatham <tpt@lngpartners.com>
Cc: Cliff Sharp <ecsharp111@gmail.com>; Mark Willis
<Mark@willisgroupus.com>; Chad Martin <chadlandmark@hotmail.com>;
Richard E. Nawracaj <rich.nawracaj@nawracaj-law.com>; Jerome E. Johns
<jerry.johns@intelometry.com>
Subject: Re: Oct 28 Subscription Payment

Hi Tom,

Thanks for the reminder! I am in New York until Sunday. I will
coordinate with our group and get back to you.

Justin

Sent from my iPhone

> On Oct 25, 2016, at 2:30 PM, Tom Tatham <tpt@lngpartners.com> wrote:
>
> Hi Justin,
> I hope you are doing well!  As I will be out Friday at our first lease
> acquisition closing in Madisonville, I wanted to confirm with you the
> details of the $205,000 Subscription Payment from EnSource Investments,
> LLC which is due on Friday.  Wire transfer instructions are as follows:
> Financial Institution  Amegy Bank, N.A.; ABA# 113011258; Account#
> 5793018168;  Account Holder- Hopewell-Pilot Project, LLC; Reference-For
> the benefit of EnSource Investments, LLC.  Please let me know as soon
> as possible if we can rely on the payment being made promptly on Friday
> as we have included in our cash forecast and have a number of
> obligations coming due by the end of the month in addition to payment
> for the purchase of the new O,G&M leases.  It would be a big help and
> greatly appreciated if you could get the payment processed early in the
> day.  Please give me a call if you have any questions.  Thanks for
> your help!
> Best regards,
> Tom
> 713 547-4531 (office direct
> 713 504-7199 (mobile



Title Rover, LLC-
Share...rce.pdf

PLTF_001943

**EXHIBIT P**



**From:** **Justin Pannu** justinpannu1503@gmail.com
**Subject:** Fwd: Hopewell-Pilot Project, LLC - Progress report as of November 30, 2016
**Date:** December 7, 2016 at 1:27 PM
**To:** Chad Martin chadlandmark@hotmail.com

---------- Forwarded message ----------
From: **Tom Tatham** <tpt@lngpartners.com>
Date: Wed, Dec 7, 2016 at 1:48 PM
Subject: Hopewell-Pilot Project, LLC - Progress report as of November 30, 2016
To: Gil Lopez <gil@lopezbiz.com>, "trentstout413@gmail.com" <trentstout413@gmail.com>, "mmcf34@sbcglobal.net"
<mmcf34@sbcglobal.net>, Justin Pannu <justinpannu1503@gmail.com>, "jerry.johns@intelometry.com"
<jerry.johns@intelometry.com>, Jeff Merola <jeff.merola@intelometry.com>, "ecsharp111@gmail.com" <ecsharp111@gmail.com>,
Chad Martin <ChadMartin@bgcpartners.com>
Cc: Mark Willis <Mark@willisgroupus.com>, Mike Willis <mike@willisgroupus.com>, "Richard E. Nawracaj"
<rich.nawracaj@nawracaj-law.com>, Mark Bush <mark@southoil.net>, Deborah Tatham <dwtatham@att.net>

Gentlemen,

I have attached a short report summarizing Hopewell's progress to date in acquiring Oil, Gas, and
Mineral leases and mineral interest ownership in the Company's primary focus areas. While we have
had some good success to date, I quite frankly had hoped to have more completed transactions prior to
sending our initial progress report. The bottom line is that we need to complete a good portion or at
least 50% of the pending transactions for our initial pilot project to be considered successful from an
economic standpoint. While we have identified a number of commercially attractive opportunities and
the use of the Title Rover technology has significantly cut our costs; progress has been slow in
completing lease and mineral purchase transactions as potential counter parties have been both difficult
to deal with and in some cases "hard to locate". This was our initial expectation, however we believed
that the current prevailing lower commodity prices would make negotiations somewhat easier which
has not so far proved the case. Too many optimistic mineral owners in Texas!!!

Because of the sensitive nature of the geographical location and pricing for pending transactions, I have
not included these details in the attached report. Suffice it to say that we have done somewhat better
than expected from a price standpoint with respect to transactions completed and agreed. My concern
at this point is mainly about achieving critical volume. Our initial goal was to lease 1,000 net acres
collectively in our four focus areas. At this juncture, we may get close to that figure, but 400 to 500 net
acres is probably a more realistic estimate at this point. We have acquired a lease covering an undivided
interest in a drill site tract in an existing producing unit and have a very favorable mineral purchase
pending, so hopefully we have made up in quality what we lack in volume.
I will try to provide an additional update prior to the end of the year together with notice of a Hopewell
shareholders meeting to be held in January. As our initial pilot project was set up and budgeted for 2016
operations only, we will endeavor to provide and discuss the relative merits of continued Hopewell
operations VS a hold and sell exploitation of the existing portfolio of interests. Please do not hesitate to
call me if you have any questions. I send my very best wishes to you and your families for the holidays!
Sincerely,

Tom Tatham
Manager

Hopewell-Pilot Project, LLC
713 547-4531 (office direct
713 504-7199 (mobile



Hopewell –
Investo...6.docx

PLTF_001955

**Hopewell-Pilot Project, LLC**
**Progress Report to Investors and Lenders**
**As of November 30, 2016**

**Oil, Gas, & Mineral Lease and Purchase activities:**

**Leased to date**:

Area 2; 207.43 gross acres, 19.64 net acres, 77%NRI
Area 4; 195.20 gross acres, 21.39 net acres, 77%NRI
Totals; 402.63 gross acres, 41.03 net acres, 77%NRI

**Leases agreed/pending documentation**:

Area 1; 101.30 gross acres, 16.88 net acres, 77%NRI

**Offers to Lease/pending acceptance**:

Area 1; 14.8325 gross acres, 8.83 net acres, 75%NRI
Area 2; 140.88 gross acres, 46.90 net acres, 75%NRI
Area 3; 60.00 gross acres, 30.00 net acres, 75%NRI
Area 4; 207.95 gross acres, 116.07 net acres, 75%NRI
Adjacent Area 4; 582.67 gross acres, 455.74 net acres, 75%NRI
Totals; 1,006.33 gross acres, 656.24 net acres, 75%NRI

**Offers to Top Lease/pending acceptance**:

Area 1; 155.72 gross acres, 60.67 net acres, 75%NRI
Area 3; 230.17 gross acres, 48.77 net acres, 75%NRI
Area 4; 16.66 gross acres, 16.66 net acres, 75% NRI
Totals; 402.55 gross acres, 126.05 net acres, 75%NRI

**Offers to Purchase mineral interests agreed/pending documentation**:

Area 2; 1/6 of 207.43 gross acres, 34.57 net mineral acres
Area 4; 1/6 of 195.20 gross acres, 32.53 net mineral acres

PLTF_001956

**Accounting and Tax Information:**  Hopewell received $920,000 in subscriptions for Initial Additional Equity shares of which $820,000 has been received and expended as of November 30, 2016.  Payment for the remaining $100,000 in subscriptions is due on or before December 31, 2016 and is considered sufficient to satisfy December operating expenses and outstanding accounts payable.  Hopewell has an Oil, Gas, and Mineral Lease and Purchase Acquisition credit facility in the amount of $1,000,000 of which $500,000 was drawn on November 4, 2016 for completion of pending transactions.  Subsequent to November 4, 2016, $86,000 has been funded for completed or escrowed transactions.

Advances under the Hopewell credit facility are repayable with interest at the rate of nine (9) per cent per anum on or before 6 months from the date of each advance unless the term and maturity date is extended by the Lender or the advances are converted to equity in either Hopewell-Pilot Project, LLC or Title Rover, LLC.  Additional advances under the credit facility will be required to fund all pending Hopewell lease and mineral purchase transactions if all currently pending offers are accepted and all transactions are successfully completed.

Unaudited year end financial statements will be available for distribution in mid to late January together with copies of the Form 1065 and K-1s.  As the acquisition of substantially all of the capital assets of Hopewell has been funded through advances under Hopewell's credit facility, it is expected that each IAE shareholder will be distributed a pro rata share of the Company's expected operating loss roughly equal to their investment.

**Title Rover Exchange Warrants:**  Each holder of Hopewell Initial Additional Equity Shares has the right on or prior to June 30, 2017 to exchange each Hopewell share for two shares of Title Rover, LLC.  Prior to December 31, 2016, Title Rover will provide a report to all of the holders of Share Exchange Warrants summarizing the work and services provided to Hopewell during 2016, together with its business plan for 2017 which will include providing services similar to those provided to Hopewell to new customers and joint ventures to be formed.

PLTF_001957

**EXHIBIT Q**

**To:**        Justin Pannu[justinpannu1503@gmail.com]; jerry johns[jerry.johns@intelometry.com]; Martin, Chad[ChadMartin@bgcpartners.com]; Chad Martin[chadlandmark@hotmail.com]; Mark Willis[Mark@willisgroupus.com]; Cliff Sharp[ecsharp111@gmail.com]; Richard E. Nawracaj (rich.nawracaj@nawracaj-law.com)[rich.nawracaj@nawracaj-law.com]
**From:**    Tom Tatham
**Sent:**    Thur 12/8/2016 10:45:17 AM
**Subject:**    Re: Hopewell-Pilot Project, LLC - Progress report as of November 30, 2016
Hopewell - InvestorLender Progress Report - 11-30-16.docx

Hi Justin,
See answers below!  Sorry, for the math & rounding errors in the totals; I did attach the wrong exhibit with several typos as you noted.  The final corrected copy is attached.  Please give me a call today if you would like to discuss.
All the best,
Tom

**From:** Justin Pannu <justinpannu1503@gmail.com>
**Date:** Wednesday, December 7, 2016 at 9:10 PM
**To:** Tom Tatham <tpt@lngpartners.com>, jerry johns <jerry.johns@intelometry.com>, "Martin, Chad" <ChadMartin@bgcpartners.com>, Chad Martin <chadlandmark@hotmail.com>, Mark Willis <Mark@willisgroupus.com>, Cliff Sharp <ecsharp111@gmail.com>, "Richard E. Nawracaj (rich.nawracaj@nawracaj-law.com)" <rich.nawracaj@nawracaj-law.com>
**Subject:** Re: Hopewell-Pilot Project, LLC - Progress report as of November 30, 2016

Hi Tom,
I have a few questions off the cuff, without having conferred with the group.

1) From what I understand you have 98.94 net acres pretty much closed? A bit more actually,  41.03 net acres for which we have executed original lease documents; 16.88 net acres of leases for which we are waiting on documents; and 67.1 net mineral acres of mineral interests to be purchased which are waiting on various documents.
2) You have pending offers for leases for 657.54/656.24 net acres? (The attachment indicates 656.24 but the sum of the pending offers add to 657.54, I assume its a typo? Yes, I attached the wrong copy which had several minor typos and rounding errors.  See correct version attached hereto.
3) Please correct me if I'm wrong, myy understanding is that you currently require 50% of the 657.54/656.24 net acres to call this an economic success?  I would like to see Hopewell's acquisition of sufficient lease and mineral ownership so that the investors will receive at least [15-20%] annualized rate of return upon liquidation of the portfolio.  Our original premise was that once horizontal well development activity recommences in our focus areas that we should be able to exit or liquidate our portfolio at the low end of the historical price range for HBP  ([3]held by production[2]) leases acquired [approximately $5,000/net leasehold acres] in these areas.   Given that we have or will have expended $920,000 of IAE Share subscription proceeds and will also need to repay the cost of lease and mineral interest purchases with interest, my best guess is that we will need around 400 net acres of leaseholds to accomplish this.  Hopefully, we will get there in the next few weeks.

Thanks!

Justin

On Wed, Dec 7, 2016 at 1:48 PM, Tom Tatham <tpt@lngpartners.com> wrote:

Gentlemen,
I have attached a short report summarizing Hopewell's progress to date in acquiring Oil, Gas, and Mineral leases and mineral interest ownership in the Company's primary focus areas.  While we have had some good success to date, I quite frankly had hoped to have more completed transactions prior to sending our initial progress report.

The bottom line is that we need to complete a good portion or at least 50% of the pending transactions for our initial pilot project to be considered  successful from an economic standpoint.  While we have identified a number of commercially attractive opportunities and the use of the Title Rover technology has significantly cut our costs; progress has been slow in completing lease and mineral purchase transactions as potential counter parties have been both difficult to deal with and in some cases [3]hard to locate[2].  This was our initial expectation, however we believed that the current prevailing lower commodity prices would make negotiations somewhat easier which has not so far proved the case.  Too many optimistic mineral owners in Texas!!!

  Because of the sensitive nature of the geographical location and pricing for pending transactions, I have not included these details in the attached report.  Suffice it to say that we have done somewhat better than expected from a price standpoint with respect  to transactions completed and agreed.  My concern at this point is mainly about achieving critical volume.  Our initial goal was to lease 1,000 net acres collectively in our four focus areas.  At this juncture, we may get close to that figure, but 400 to 500 net acres is probably a more realistic estimate at this point.  We have acquired a lease covering an undivided interest in a drill site tract in an existing producing unit and have a very favorable mineral purchase pending, so hopefully we have made up in quality what we lack in volume.

I will try to provide an additional update prior to the end of the year together with notice of a Hopewell shareholders meeting to be held in January.  As our initial pilot project was set up and budgeted for 2016 operations only, we will endeavor to provide and discuss the relative merits of continued Hopewell operations VS a hold and sell exploitation of the existing portfolio of interests.  Please do not hesitate to call me if you have any questions.  I send my very best wishes to you and your families for the holidays!

Sincerely,


Tom Tatham
Manager


Hopewell-Pilot Project, LLC
713 547-4531 (office direct
713 504-7199 (mobile

WIL_00000903

# Hopewell-Pilot Project, LLC
## Progress Report to Investors and Lenders
### As of November 30, 2016

## Oil, Gas, & Mineral Lease and Purchase activities:

### Leased to date:

Area 2; 207.43 gross acres, 19.64 net acres, 77%NRI
Area 4; 195.20 gross acres, 21.39 net acres, 77%NRI
Totals; 402.63 gross acres, 41.03 net acres, 77%NRI

### Leases agreed/pending documentation:

Area 1; 101.30 gross acres, 16.88 net acres, 77%NRI

### Offers to Lease/pending acceptance:

Area 1; 14.8325 gross acres, 8.34 net acres, 75%NRI
Area 2; 140.88 gross acres, 46.90 net acres, 75%NRI
Area 3; 60.00 gross acres, 30.00 net acres, 75%NRI
Area 4; 207.95 gross acres, 116.07 net acres, 75%NRI
Adjacent Area 4; 582.67 gross acres, 455.14 net acres, 75%NRI
Totals; 1,006.33 gross acres, 656.45 net acres, 75%NRI

### Offers to Top Lease/pending acceptance:

Area 1; 155.72 gross acres, 60.67 net acres, 75%NRI
Area 3; 230.17 gross acres, 48.71 net acres, 75%NRI
Area 4; 16.66 gross acres, 16.66 net acres, 75% NRI
Totals; 402.55 gross acres, 126.04 net acres, 75%NRI

### Offers to Purchase mineral interests agreed/pending documentation:

Area 2; 1/6 of 207.43 gross acres, 34.57 net mineral acres
Area 4; 1/6 of 195.20 gross acres, 32.53 net mineral acres
Total; 67.1 net mineral acres

**Accounting and Tax Information:**   Hopewell received $920,000 in subscriptions for Initial Additional Equity shares of which $820,000 has been received and expended as of November 30, 2016.  Payment for the remaining $100,000 in subscriptions is due on or before December 31, 2016 and is considered sufficient to satisfy December operating expenses and outstanding accounts payable.  Hopewell has an Oil, Gas, and Mineral Lease and Purchase Acquisition credit facility in the amount of $1,000,000 of which $500,000 was drawn on November 4, 2016 for completion of pending transactions.  Subsequent to November 4, 2016, $86,000 has been funded for completed or escrowed transactions.

Advances under the Hopewell credit facility are repayable with interest at the rate of nine (9) per cent per anum on or before 6 months from the date of each advance unless the term and maturity date is extended by the Lender or the advances are converted to equity in either Hopewell-Pilot Project, LLC or Title Rover, LLC.  Additional advances under the credit facility will be required to fund all pending Hopewell lease and mineral purchase transactions if all currently pending offers are accepted and all transactions are successfully completed.

Unaudited year end financial statements will be available for distribution in mid to late January together with copies of the Form 1065 and K-1s.  As the acquisition of substantially all of the capital assets of Hopewell has been funded through advances under Hopewell's credit facility, it is expected that each IAE shareholder will be distributed a pro rata share of the Company's expected operating loss roughly equal to their investment.

**Title Rover Exchange Warrants:**   Each holder of Hopewell Initial Additional Equity Shares has the right on or prior to June 30, 2017 to exchange each Hopewell share for two shares of Title Rover, LLC.  Prior to December 31, 2016, Title Rover will provide a report to all of the holders of Share Exchange Warrants summarizing the work and services provided to Hopewell during 2016, together with its business plan for 2017 which will include providing services similar to those provided to Hopewell to new customers and joint ventures to be formed.

**EXHIBIT R**

**To:**    Mark Willis[Mark@willisgroupus.com]
**From:**  Justin Pannu
**Sent:**  Thur 12/8/2016 12:59:18 PM
**Subject:**  Re: Hopewell-Pilot Project, LLC - Progress report as of November 30, 2016

==Thanks Mark! Tom clarified some things in the last email. I'm ok. Was just trying to understand the math.==
Hope you're doing well and happy holidays.

Sent from my iPhone

On Dec 8, 2016, at 10:55 AM, Mark Willis <Mark@willisgroupus.com> wrote:

> Just call me anytime via cell if you need to discuss anything.
>
> THx
>
> Mark Willis – CEO & President
> **O** 713-547-4510 | **M** 713-248-1555 | mark@willisgroupus.com | www.linkedin.com/pub/mark-willis
> 1400 Post Oak Boulevard, Suite 200 | Houston, TX 77056 | www.wgcompanies.com
> <image001.png>
> Professional Services | Project + Process Delivery | Talent Acquisition + Flexible Workforce Solutions
> THIS ELECTRONIC MESSAGE, INCLUDING ANY ACCOMPANYING DOCUMENTS, IS CONFIDENTIAL
> and may contain information that is privileged and exempt from disclosure under applicable law. If you are neither the intended recipient nor responsible for delivering the message to the intended recipient, please
> note that any dissemination, distribution, copying or the taking of any action in reliance upon the message is strictly prohibited. If you have received this communication in error, please notify the
> sender immediately.
>
> **From:** Justin Pannu [mailto:justinpannu1503@gmail.com]
> **Sent:** Thursday, December 08, 2016 10:49 AM
> **To:** Tom Tatham <tpt@lngpartners.com>
> **Cc:** jerry johns <jerry.johns@intelometry.com>; Martin, Chad <ChadMartin@bgcpartners.com>; Chad
> Martin <chadlandmark@hotmail.com>; Mark Willis <Mark@willisgroupus.com>; Cliff Sharp
> <ecsharp111@gmail.com>; Richard E. Nawracaj (rich.nawracaj@nawracaj-law.com)
> <rich.nawracaj@nawracaj-law.com>
> **Subject:** Re: Hopewell-Pilot Project, LLC - Progress report as of November 30, 2016
>
>> Thanks Tom. This helps.
>>
>> On Thu, Dec 8, 2016 at 8:45 AM, Tom Tatham <tpt@lngpartners.com> wrote:
>>> Hi Justin,
>>> See answers below!  Sorry, for the math & rounding errors in the totals; I did attach the wrong
>>> exhibit with several typos as you noted.  The final corrected copy is attached.  Please give me a call
>>> today if you would like to discuss.
>>> All the best,
>>> Tom
>>>
>>> **From:** Justin Pannu <justinpannu1503@gmail.com>
>>> **Date:** Wednesday, December 7, 2016 at 9:10 PM
>>> **To:** Tom Tatham <tpt@lngpartners.com>, jerry johns <jerry.johns@intelometry.com>, "Martin, Chad"
>>> <ChadMartin@bgcpartners.com>, Chad Martin <chadlandmark@hotmail.com>, Mark Willis
>>> <Mark@willisgroupus.com>, Cliff Sharp <ecsharp111@gmail.com>, "Richard E. Nawracaj
>>> (rich.nawracaj@nawracaj-law.com)" <rich.nawracaj@nawracaj-law.com>
>>> **Subject:** Re: Hopewell-Pilot Project, LLC - Progress report as of November 30, 2016

Hi Tom,

I have a few questions off the cuff, without having conferred with the group.

1) From what I understand you have 98.94 net acres pretty much closed? A bit more actually, 41.03 net acres for which we have executed original lease documents; 16.88 net acres of leases for which we are waiting on documents; and 67.1 net mineral acres of mineral interests to be purchased which are waiting on various documents.

2) You have pending offers for leases for 657.54/656.24 net acres? (The attachment indicates 656.24 but the sum of the pending offers add to 657.54, I assume its a typo? Yes, I attached the wrong copy which had several minor typos and rounding errors. See correct version attached hereto.

3) Please correct me if I'm wrong, myy understanding is that you currently require 50% of the 657.54/656.24 net acres to call this an economic success? I would like to see Hopewell's acquisition of sufficient lease and mineral ownership so that the investors will receive at least [15-20%] annualized rate of return upon liquidation of the portfolio. Our original premise was that once horizontal well development activity recommences in our focus areas that we should be able to exit or liquidate our portfolio at the low end of the historical price range for HBP ("held by production") leases acquired [approximately $5,000/net leasehold acres] in these areas. Given that we have or will have expended $920,000 of IAE Share subscription proceeds and will also need to repay the cost of lease and mineral interest purchases with interest, my best guess is that we will need around 400 net acres of leaseholds to accomplish this. Hopefully, we will get there in the next few weeks.

Thanks!

Justin

On Wed, Dec 7, 2016 at 1:48 PM, Tom Tatham <tpt@lngpartners.com> wrote:
Gentlemen,
I have attached a short report summarizing Hopewell's progress to date in acquiring Oil, Gas, and Mineral leases and mineral interest ownership in the Company's primary focus areas. While we have had some good success to date, I quite frankly had hoped to have more completed transactions prior to sending our initial progress report. The bottom line is that we need to complete a good portion or at least 50% of the pending transactions for our initial pilot project to be considered successful from an economic standpoint. While we have identified a number of commercially attractive opportunities and the use of the Title Rover technology has significantly cut our costs; progress has been slow in completing lease and mineral purchase transactions as potential counter parties have been both difficult to deal with and in some cases "hard to locate". This was our initial expectation, however we believed that the current prevailing lower commodity prices would make negotiations somewhat easier which has not so far proved the case. Too many optimistic mineral owners in Texas!!!

  Because of the sensitive nature of the geographical location and pricing for pending transactions, I have not included these details in the attached report. Suffice it to say that we have done somewhat better than expected from a price standpoint with respect  to transactions completed and agreed. My concern at this point is mainly about achieving critical volume. Our initial goal was to lease 1,000 net acres collectively in our four focus areas. At this juncture, we may get close to that figure, but 400 to 500 net acres is probably a more realistic estimate at this point. We have acquired a lease covering an undivided interest in a drill site tract in an existing producing unit and have a very favorable mineral purchase pending, so hopefully we have made up in quality what we lack in volume.
I will try to provide an additional update prior to the end of the year together with notice of a Hopewell shareholders meeting to be held in January. As our initial pilot project was set up and

WIL_00001479

budgeted for 2016 operations only, we will endeavor to provide and discuss the relative merits of continued Hopewell operations VS a hold and sell exploitation of the existing portfolio of interests.  Please do not hesitate to call me if you have any questions.  I send my very best wishes to you and your families for the holidays!

Sincerely,

Tom Tatham
Manager

Hopewell-Pilot Project, LLC
713 547-4531 (office direct
713 504-7199 (mobile

WIL_00001480

**EXHIBIT S**

**From:** Justin Pannu justinpannu1503@gmail.com
**Subject:** Re: Hopewell-Pilot Project, LLC - Progress report as of November 30, 2016
**Date:** December 8, 2016 at 7:57 AM
**To:** Cliff Sharp ecsharp111@gmail.com



Yes. The attachment is there. Seems like he is taking low end estimates (which is what Tom does). His personality is the type to under promise and over deliver. I'm not so worried.

On Thu, Dec 8, 2016 at 8:54 AM, Cliff Sharp <ecsharp111@gmail.com> wrote:
Was there a " new " attachment ? I didn't see it

Sent from my iPhone

On Dec 8, 2016, at 10:49 AM, Justin Pannu <justinpannu1503@gmail.com> wrote:

Thanks Tom. This helps.

On Thu, Dec 8, 2016 at 8:45 AM, Tom Tatham <tpt@lngpartners.com> wrote:
Hi Justin,

See answers below!  Sorry, for the math & rounding errors in the totals; I did attach the wrong exhibit with several typos as you noted.  The final corrected copy is attached.  Please give me a call today if you would like to discuss.
All the best,
Tom

**From:** Justin Pannu <justinpannu1503@gmail.com>
**Date:** Wednesday, December 7, 2016 at 9:10 PM
**To:** Tom Tatham <tpt@lngpartners.com>, jerry johns <jerry.johns@intelometry.com>, "Martin, Chad" <ChadMartin@bgcpartners.com>, Chad Martin <chadlandmark@hotmail.com>, Mark Willis <Mark@willisgroupus.com>, Cliff Sharp <ecsharp111@gmail.com>, "Richard E. Nawracaj (rich.nawracaj@nawracaj-law.com)" <rich.nawracaj@nawracaj-law.com>
**Subject:** Re: Hopewell-Pilot Project, LLC - Progress report as of November 30, 2016

Hi Tom,

I have a few questions off the cuff, without having conferred with the group.

1) From what I understand you have 98.94 net acres pretty much closed? A bit more actually, 41.03 net acres for which we have executed original lease documents; 16.88 net acres of leases for which we are waiting on documents; and 67.1 net mineral acres of mineral interests to be purchased which are waiting on various documents.
2) You have pending offers for leases for 657.54/656.24 net acres? (The attachment indicates 656.24 but the sum of the pending offers add to 657.54, I assume its a typo? Yes, I attached the wrong copy which had several minor typos and rounding errors.  See correct version attached hereto.
3) Please correct me if I'm wrong, myy understanding is that you currently require 50% of the 657.54/656.24 net acres to call this an economic success? I would like to see Hopewell's acquisition of sufficient lease and mineral ownership so that the investors will receive at least [15-20%] annualized rate of return upon liquidation of the portfolio.  Our original premise was that once horizontal well development activity recommences in our focus areas that we should be able to exit or liquidate our portfolio at the low end of the historical price range for HBP ("held by production") leases acquired [approximately $5,000/net leasehold acres] in these areas.  Given that we have or will have expended $920,000 of IAE Share subscription proceeds and will also need

to repay the cost of lease and mineral interest purchases with interest, my best guess is that we will need around 400 net acres of leaseholds to accomplish this.  Hopefully, we will get there in the next few weeks.

Thanks!

Justin

On Wed, Dec 7, 2016 at 1:48 PM, Tom Tatham <tpt@lngpartners.com> wrote:

Gentlemen,

I have attached a short report summarizing Hopewell's progress to date in acquiring Oil, Gas, and Mineral leases and mineral interest ownership in the Company's primary focus areas.  While we have had some good success to date, I quite frankly had hoped to have more completed transactions prior to sending our initial progress report.  The bottom line is that we need to complete a good portion or at least 50% of the pending transactions for our initial pilot project to be considered  successful from an economic standpoint.  While we have identified a number of commercially attractive opportunities and the use of the Title Rover technology has significantly cut our costs; progress has been slow in completing lease and mineral purchase transactions as potential counter parties have been both difficult to deal with and in some cases "hard to locate".  This was our initial expectation, however we believed that the current prevailing lower commodity prices would make negotiations somewhat easier which has not so far proved the case.  Too many optimistic mineral owners in Texas!!!

 Because of the sensitive nature of the geographical location and pricing for pending transactions, I have not included these details in the attached report.  Suffice it to say that we have done somewhat better than expected from a price standpoint with respect  to transactions completed and agreed.  My concern at this point is mainly about achieving critical volume.  Our initial goal was to lease 1,000 net acres collectively in our four focus areas.  At this juncture, we may get close to that figure, but 400 to 500 net acres is probably a more realistic estimate at this point.  We have acquired a lease covering an undivided interest in a drill site tract in an existing producing unit and have a very favorable mineral purchase pending, so hopefully we have made up in quality what we lack in volume.

I will try to provide an additional update prior to the end of the year together with notice of a Hopewell shareholders meeting to be held in January.  As our initial pilot project was set up and budgeted for 2016 operations only, we will endeavor to provide and discuss the relative merits of continued Hopewell operations VS a hold and sell exploitation of the existing portfolio of interests.  Please do not hesitate to call me if you have any questions.  I send my very best wishes to you and your families for the holidays!

Sincerely,

Tom Tatham
Manager

Hopewell-Pilot Project, LLC
713 547-4531 (office direct
713 504-7199 (mobile

**EXHIBIT T**

**To:**   Robert Humphrey III[bobbyh3@gmail.com]
**Cc:**   Justin Pannu[justinpannu1503@gmail.com]; Mark Willis[Mark@willisgroupus.com]
**From:**  Tom Tatham
**Sent:**  Mon 8/8/2016 4:08:45 PM
**Subject:**  Re: Hopewell-Pilot Project, LLC - Private Placement of Initial Additional Equity Shares ("IAE Shares") -
Confidential Information
Hopewell- Pilot Project - EXECUTIVE SUMMARY - July 2016.pdf
Hopewell Project - Units Map by Area with Survey-Abstract reference[2].pdf
Hopewell - Pilot Project -Term Sheet - IAE Shares - Revised for EW - July 2016.pdf
Title Rover - Business & Expoitation Plan-v1.pdf
TitleRover Exploitation Plan.pdf

Bobby/Robert,
Do you prefer to go by Bobby or Robert?
To answer your question, Hopewell was formed to test and refine new IT software in an existing contemporary oil
and gas play for which development drilling and related activity was halted or severely affected by the low
prevailing commodity prices you refer to in your message below.  While prices have improved somewhat since
March, this particular play and area of interest probably needs $70/bbl oil and $3.00/mmbtu gas to return to fully
robust well development and aggressive M&A activities.  We wanted to test our new IT software in a down cycle
price environment in order to fully exploit the commercial opportunities identified which we expected and were
predicted for this area.  While your assumption is correct that lease and mineral acquisition costs will generally
increase with increased oil & gas prices,  this relationship is not entirely linear and the majority of the commercial
opportunities for new entrants will occur when oil & gas prices are distressed or well below the prices required for
full on horizontal well development and attendant competition.
 Let's have a good conversation, once you have reviewed the attached private placement materials.  I will be in the
San Diego area later this week and would be happy to get together for a visit if you have the time.  I will look
forward to meeting you or speaking further.  As I understand you are acquainted with Justin Pannu, maybe we could
all get together for a drink while I am in your area?
Best regards,
Tom Tatham
Manger
Hopewell-Pilot Project, LLC
713 547-4531 (office direct
713 504-7199 (mobile

**From:** Robert Humphrey III <bobbyh3@gmail.com>
**Date:** Monday, August 8, 2016 at 3:17 PM
**To:** Tom Tatham <tpt@lngpartners.com>
**Subject:** Re: Hopewell-Pilot Project, LLC - Private Placement of Initial Additional Equity Shares ("IAE Shares")

Hi Tom,
Thanks for the summary. I'm no expert in gas and oil by any means, however I do trade the futures and options in
my own personal account. I noticed Hopewell was formed in March, soon after oil prices bottomed in late February.
Whether this bottom holds is yet to be seen. Can I assume if prices move higher, acquisition costs will be higher as
well?  Looking forward to reviewing the docs.
Thanks again
Robert Humphrey


On Mon, Aug 8, 2016 at 10:00 AM, Tom Tatham <tpt@lngpartners.com> wrote:

  Hi Bobby,
  Attached for your review is our standard form CA and Non-Compete Agreement.  Please give me a cal if you have

any questions.  Once we have received an executed copy of the CA, we will forward the relevant offering documents.  I have also attached our Teaser/Executive Summary for your review in the meantime.  We look forward to speaking.
Best regards,
Tom Tatham
Manager
Hopewell-Pilot Project, LLC
713 547-4531 (office direct
713 504-7199 (mobile

**From:** Mark Willis <Mark@willisgroupus.com>
**Date:** Monday, August 8, 2016 at 11:40 AM
**To:** Justin Pannu <justinpannu1503@gmail.com>, Robert Humphrey III <bobbyh3@gmail.com>
**Cc:** Tom Tatham <tpt@lngpartners.com>
**Subject:** RE: Hopewell

Bobby,


Was a real pleasure meeting you. I have copied my Partner, Tom Tatham to this email so that he can send you the NDA. Once executed and received we will immediately forward you all the investor materials for your review. I am also happy to give you a call later this afternoon or at your convenience to walk you through the opportunity.


Truly,


Mark Willis -CEO & President
O 713-547-4510  |  M 713-248-1555  |  mark@willisgroupus.com  |  www.linkedin.com/pub/mark-willis
1400 Post Oak Boulevard, Suite 200  |  Houston, TX 77056  |  www.wgcompanies.com

Professional Services  |  Project + Process Delivery  |  Talent Acquisition + Flexible Workforce Solutions

THIS ELECTRONIC MESSAGE, INCLUDING ANY ACCOMPANYING DOCUMENTS, IS CONFIDENTIAL and................................................................................................................................................please note that any dissemination, distribution, copying or the taking of any action in reliance upon the message is strictly prohibited. If you have received this communication in error, please notify the sender immediately.


**From:** Justin Pannu [mailto:justinpannu1503@gmail.com]
**Sent:** Monday, August 08, 2016 11:36 AM
**To:** Mark Willis <Mark@willisgroupus.com>; Robert Humphrey III <bobbyh3@gmail.com>
**Subject:** Hopewell


Hi Mark,

I've cc'd Bobby's email. Please email him the NDA and he will sign and return for the materials.Thanks for coming out this weekend, it was definitely a pleasure to meet and chat with you.


Regards,


Justin

EXECUTIVE SUMMARY

The Hopewell – Pilot Project, LLC ("Hopewell" or the "Company") was formed in March 2016 for the purpose of demonstrating "Proof of Concept" involving the refinement, use, and application of a new proprietary software technology which can geographically sort and analyze land and mineral title records and related digital data for the purpose of acquiring Oil, Gas & Mineral interests in the most contemporary "tight sands" and "shale" plays.

The business concept behind the formation and funding of Hopewell depends upon five basic premises! They are:

1. The more contemporary "tight sands" and "shale" plays are more commercially rewarding as the industry continues to refine and apply new horizontal completion and frac techniques to the areas best suited for the application of such technology.
2. The best contemporary "tight sands" and "shale" plays were initiated 2010-2013 in a very competitive environment and the initial leasing effort was undertaken on a "trend basis" which provided less than 100% title review by contract land personnel.  Legal title opinions were generally only undertaken on "drill site" tracts.
3. Operators tried to hold the maximum amount of leased acreage by forming large pooled units for the drilling and completion of lower cost vertical wells.  Many of such pooled units were formed without contemporary survey of leased acreage included.  In the past two years since mid 2014, as the cash flow to most Operators declined due to falling oil and gas prices, many pooled units were hastily formed and contain numerous irregularities.
4. Most of the new initial leases taken in the contemporary "tight sands" and "shale" plays, unless "held by production", will expire in the 2016 -2017 time frame.  Many of the existing pooled units contain unleased acreage or have leased tracts that would have expired if not for a "pooled unit" designation.
5. The most lucrative opportunities for Hopewell will occur in contemporary "tight sands" and "shale" plays located in geographical areas where significant land title problems exist .

Hopewell has identified four initial target areas in Madison County, Texas which it believes will optimize investment returns as well as provide "Proof of Concept".  The areas selected have multiple proven hydrocarbon pay zones which have demonstrated significant commercial production in recently completed horizontal wells.  Initial evaluation of the prospective areas indicate that there are unleased tracts in many of the existing Pooled or Declared Units.  Based upon recent field discussions, Hopewell believes that it can acquire new leases in the four areas for initial bonus and lease acquisitions costs of $1,000 per acre or less and by providing traditional lease royalty burdens to the related mineral owners.  In addition to open acreage, many of the existing Pooled or Declared Units and underlying pooled leases appear to have possible deficiencies. Hopewell plans to continue detailed legal evaluation of these identified Units and underlying leases. If warranted, upon conclusion of Hopewell's legal evaluation, Hopewell will seek to arrange additional financing for Company to pursue an aggressive "top lease" strategy for the purchase of new leases in the affected areas.  Hopewell has retained certain Financial Advisors to assist in obtaining up to $25,000,000 of prospective financing for the Company's possible execution of the top lease strategy.

Hopewell is seeking qualified debt and equity investors to provide up to $2,000,000 in new funds from the placement of up to 1,000,000 Initial Additional Equity Shares.  Proceeds from the private placement will be used to acquire new leases and mineral interests in the four initial target areas, for working capital to continue the Company's operations, and for the legal evaluation of additional lease and mineral interest acquisition opportunities within the Area of Mutual Interest.

New leases acquired by the Company will be held for resale to Operators seeking to organize multi well horizontal drilling & completion programs or to provide the Company with working interest participation in such development.  The Company's leasing activities will also likely provide opportunity to purchase term royalty and mineral interests on commercially favorable terms.

WIL_00000887

WIL_00000888



# HOPEWELL PILOT PROJECT LLC
## MADISON COUNTY
## UNITS MAP

# Hopewell – Pilot Project, LLC
## Term Sheet
## For the Private Placement of Initial Additional Equity Shares
## July 2016

**Issuer:**  Hopewell-Pilot Project, LLC, a Texas Limited Liability Company ("Hopewell");

**Offering Amount:**  Up to 1,000,000 of Initial Additional Equity Shares ("IAE Shares") Common Shares/Member Interests (with preferential rights to revenue and share exchange rights);

**Minimum Subscription:**  25,000 shares (for accredited investors only);

**Offering Price:**  $2.00 per share;

**Preferential Rights to Distributions:**  IAE Shares will receive all cash distributions of Hopewell until they have received $2.00 per share in distributions; following which all cash distributions of Hopewell shall be made pro-rata to all shareholders including holders of Founders Shares and any Additional Shares issued;

**IAE Share Exchange Rights:**  Purchasers of IAE Shares shall be issued Share Exchange Warrants for the rights to exchange, on or before June 30, 2017 up to all IAE Shares held on the basis of 1 IAE share for two (2) shares of Title Rover, LLC ("TR").  A copy of the Share Exchange agreement is attached as Exhibit A;

**Closing Period:**  On or before July 30, 2016 or upon the receipt of minimum subscriptions of 125,000 shares and for 20 days thereafter.

**Existing Capital Structure:**  There are 1,000,000 shares of Founders Shares currently outstanding of 5,000,000 shares authorized and available for issue.  Hopewell has no other shares, equity interests or options for the purchase of Hopewell shares or equity interests currently outstanding.  A copy of the current holders of Founders Shares representing all Hopewell shares currently outstanding is attached as Exhibit B;

**Use of Proceeds:**  All proceeds from the offering and subscription of IAE Shares will be used for: 1) purchase of oil, gas, & mineral leases; oil, gas & mineral "top" leases; oil, gas & mineral interests including non-participating and term royalty interests; all within the Hopewell Area of Mutual Interest ("AMI") covering Madison County, Texas and adjacent counties; 2) funding of Hopewell general and administrative overhead including maintenance of the service contract with TR; and 3) procurement of suitable legal opinions and memorandums regarding validity of existing Designated Pooled Units and underlying pooled leases within the AMI;

**Exclusive Use of Title Rover Technology:**  Hopewell has the exclusive right pursuant to an evergreen contract ("TR Service Contract") to use Title Rover proprietary technology within the AMI for payment of all of TR's direct costs of providing personnel and acquiring digital and other data specific to use by Hopewell in the AMI.  The TR Service Contract is cancellable by Hopewell upon 30 day prior written notice to TR beginning January 1, 2017;

**Other Terms and Conditions:**  As provided in final Subscription Documents.

1

# Exhibit A

### SHARE EXCHANGE WARRANT

To Exchange Initial Additional Equity Shares of Hopewell-Pilot Project, LLC
for Common Shares of

### TITLE ROVER, LLC

(incorporated under the laws of the State of Texas)

(void after June 30, 2017)

No. EW-____ for the acquisition of up to _____          July_____,_____
Common Shares of Title Rover, LLC

**THIS IS TO CERTIFY** that, for value received, _____ (the "**Holder**") is entitled, subject to the terms and conditions hereinafter set forth, to receive from the Company by way of exchange of Initial Additional Equity Shares of Hopewell-Pilot Project, LLC held by Holder as at the Exercise Date up to that number of Common Shares provided above as specified in Exchange Form & Holder's Notice and in accordance with the terms in Section 2 below. Holder, as herein provided, may receive two Common Shares of the Company for each 1 Initial Additional Equity Share so exchanged after exercise of this Exchange Warrant by surrendering to the Company at the address set forth in Section 4 below, this Exchange Warrant, together with an Exchange Form & Holder's Notice, duly completed and executed, and the certificates representing the Initial Additional Equity Shares of Hopewell-Pilot Project, LLC to be exchanged pursuant to the terms of this Exchange Warrant.

1.    **Definitions**.  In this Exchange Warrant, including the preamble, unless there is something in the subject matter or context inconsistent herewith, the following terms shall have the following meanings, respectively:

  "**Affiliate**" means an affiliate within the meaning of the *Texas Business Corporations Act*;

  "**Business Day**" means any day except Saturday, Sunday or any day on which banks are generally not open for business in Houston, Texas;

  "**Common Shares**" means the common shares or members interests in the capital of the Company as the same are constituted on the date hereof;

  "**Company**" means Title Rover, LLC, a limited liability company organized under the laws and jurisdiction of the state of Texas;

  "**Company Reorganization**" means any reclassification of the Common Shares of the Company at any time outstanding or change of the Common Shares into other shares, including in connection with (i) the consolidation, amalgamation or merger of the

WIL_00000891

Company with or into any other company or (ii) any transfer of the undertaking or assets of the Company as an entirety or substantially as an entirety to another person or any exchange of Common Shares into securities of another company;

"**Exchange Form & Holder's Notice**" means the exchange form attached hereto as Schedule "A";

"**Exchange Warrant**" means this exchange warrant to acquire Common Shares and any deed or instrument supplemental or ancillary hereto and any schedules hereto or thereto;

"**Exercise Date**" means the date on which the Exchange Warrants are exercised;

"**Expiry Date**" means June 30, 2017; and

"**Initial Additional Equity Shares**" means Initial Additional Equity Shares in the capital of Hopewell-Pilot Project, LLC;

2.     **Exchange Warrant Conditions**.  This Exchange Warrant entitles the Holder, upon its exercise, to receive up to such number of Common Shares as set forth above from the Company by way of exchange of the Exchange Warrant and either:

    2.1     Electing to transfer and assign 100% of the Initial Additional Equity Shares held by Holder as at the Exercise Date, free from any and all taxes, liens and charges, which assignment will provide for the issuance by the Company to the Holder of the maximum number of Common Shares as stated herein; or

    2.2     Electing to transfer and assign a specified number of Initial Additional Equity Shares (being less than all of the Initial Additional Equity Shares held by Holder), free from any and all taxes, liens and charges, for each two Common Shares to be issued by the Company pursuant to the timely exercise of this Exchange Warrant,

(such Common Shares issuable to the Holder on exercise of this Exchange Warrant referred to as the "**Exchange Warrant Shares**").

3.     **Expiration of Exchange Warrants**.  Notwithstanding any other provision of this Exchange Warrant, all rights under this Exchange Warrant to exercise such Exchange Warrant or part thereof and to acquire Exchange Warrant Shares shall wholly cease and terminate and this Exchange Warrant shall be wholly void and of no valid or binding effect as at 5:00 p.m. (Houston time) on the Expiry Date.

4.     **Exercise of Exchange Warrants**.  Any exercise of this Exchange Warrant by the Holder must be in respect of all Exchange Warrant Shares issuable pursuant to the terms of this Exchange Warrant and no subsequent exercises will be permitted. The rights represents by this Exchange Warrant may be exercised by the Holder, by the surrender of this Exchange Warrant, with the attached Exchange Form duly executed, together with duly endorsed certificates for the Initial Additional Equity Shares to be exchanged pursuant to this Exchange Warrant at Suite 200, 1400 Post Oak Blvd, Houston Texas, 77056 Attn:

WIL_00000892
Page 333

Thomas P. Tatham (or such other office or agency of the Company as it may designate by notice in writing to the Holder at the address of the Holder appearing on the books of the Company at any time during the period within which the rights represented by this Exchange Warrant may be exercised). The Company agrees that the Exchange Warrant Shares acquired on exercise of this Exchange Warrant shall be and be deemed to be issued to the Holder as the registered owner of such shares as of the close of business on the date on which this Exchange Warrant shall have been surrendered and payment made for such shares by surrender of Initial Additional Equity Shares as aforesaid. Certificates for the Exchange Warrant Shares so issuable shall be delivered to the Holder within a reasonable time, not exceeding thirty (30) Business Days, after the rights represented by this Exchange Warrant shall have been so exercised.

5.     **Not a Shareholder**.  Nothing in this certificate or in the holding of an Exchange Warrant evidenced hereby shall be construed as conferring upon the Holder any right or interest whatsoever as a shareholder of the Company.

6.     **No Fractional Shares**.  Notwithstanding any provisions to the contrary herein, the Company shall not be required to issue any fractional Common Shares (unless such fractional shares arise from a consolidation of shares) in connection with any exercise of the right to convert this Exchange Warrant into Common Shares, and in the event that the calculation of the number of Common Shares issuable upon such exercise results in a number which includes a fraction of whole shares, then the Company shall be required to issue the largest number of whole shares into which this Exchange Warrant is exercisable.

7.     **Covenants of the Corporation**.  The Company hereby agrees as follows:

7.1     All Common Shares that may be issued upon the exercise of the rights represented by this Exchange Warrant will, upon issuance, be validly issued as fully paid and non-assessable and shall be free from any and all liens and charges with respect to the issue thereof.

7.2     As long as this Exchange Warrant remains outstanding, the Company shall reserve and there shall remain unissued out of its capital a sufficient number of its Common Shares to satisfy the right of purchase herein provided for should the Holder determine to exercise its rights in respect of the Common Shares for the time being called for and represented by this Exchange Warrant.

8.     **Adjustment of Subscription Rights**.

8.1     If at any time prior to the Expiry Time there shall be a Company Reorganization, and the Holder thereafter exercises the right to purchase Common Shares hereunder, the Holder shall be entitled to receive, and shall accept, in lieu of the number of Common Shares to which the Holder was theretofore entitled upon such exercise, the kind and amount of shares and other securities or property which the Holder would have been entitled to receive as a result of such Company Reorganization if, on the effective date thereof, the Holder had been the registered

4

holder of the number of Common Shares to which the Holder was theretofore entitled upon exercise.  The subdivision or consolidation of the Common Shares at any time outstanding into a greater or lesser number of Common Shares shall be deemed not to be a Company Reorganization for the purposes of this Section 8.1.

8.2   If and whenever at any time prior to the Expiry Time, the Company shall (i) subdivide the outstanding Common Shares into a greater number of shares, (ii) consolidate the outstanding Common Shares into a smaller number of shares, or (iii) issue Common Shares (or other securities convertible into or exchangeable for Common Shares) to the holders of all or substantially all of the outstanding Common Shares by way of a stock dividend on the Common Shares, the number of Common Shares issuable by the Company upon exercise by Holder of this Exchange Warrant shall be adjusted accordingly. The adjustments provided for herein are cumulative and shall apply to successive subdivisions, consolidations, distributions, issues or other events resulting in any adjustment.  Nothing herein shall obligate the Company to make adjustments for any additional Common Shares issued by the Company for "fair value" as determined in good faith by the Directors of the Company.

8.3   Any question arising with respect to the adjustments provided herein shall be conclusively determined by any firm of certified public accountants of national recognition that the Company may designate and who will have access to all appropriate records, and such determination will be binding upon the Company and the Holder.

8.4   The Company shall from time to time immediately after the occurrence of any event which requires an adjustment or readjustment as provided herein, notify the Holder by specifying the nature of the event requiring the same and the amount of the adjustment necessitated thereby and setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based and the adjustment specified therein shall be verified by an opinion of the auditors of the Company and shall be conclusive and binding on all parties in interest.  The Company shall, except with respect to any subdivision or consolidation of the Common Shares, forthwith give notice to the Holder specifying the event requiring such adjustment or readjustment and the results thereof.

9.   **Exchange of Exchange Warrant**.  This Exchange Warrant is exchangeable, upon the surrender hereof by the Holder at the office or agency of the Company referred to in Section 4 hereof, for new exchange warrants of like tenor representing in the aggregate the right to subscribe for and purchase the number of Common Shares that may be subscribed for and purchased hereunder. **Mutilated or Missing Warrants.**  Upon receipt of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of this Exchange Warrant and, in the case of any such loss, theft or destruction, upon delivery of a bond or indemnity satisfactory to the Company, acting reasonably, or, in the case of any such mutilation, upon surrender or cancellation of this Exchange Warrant, the Company will issue to the Holder a new warrant of like tenor, in lieu of this Exchange Warrant,

WIL_00000894

representing the right to subscribe for and purchase the number of Common Shares which may be subscribed for and purchased hereunder.

10. **Governing Law**.  This Exchange Warrant shall be governed by and construed in accordance with the laws of the State of Texas applicable therein.  The reference to such laws shall not, by conflict of laws rules or otherwise, require the application of the law of any jurisdiction other than the State of Texas.  The Parties hereby irrevocably attorns to the exclusive jurisdiction of the courts of the State of Texas.

11. **Severability**.  If any one or more of the provisions or parts thereof contained in this Exchange Warrant should be or become invalid, illegal or unenforceable in any respect in any jurisdiction, the remaining provisions or parts thereof contained herein shall be and shall be conclusively deemed to be, as to such jurisdiction, severable therefrom and:

    11.1 the validity, legality or enforceability of such remaining provisions or parts thereof shall not in any way be affected or impaired by the severance of the provisions or parts thereof severed; and

    11.2 the invalidity, illegality or unenforceability of any provision or part thereof contained in this Exchange Warrant in any jurisdiction shall not affect or impair such provision or part thereof or any other provisions of this Exchange Warrant in any other jurisdiction.

12. **Headings**.  The headings of the sections, subsections, paragraphs, subparagraphs and clauses of this Exchange Warrant have been inserted for convenience of reference only and do not define, limit, alter or enlarge the meaning of any provision of this Exchange Warrant.

13. **Numbering of Articles, etc.**  Unless otherwise stated, a reference herein to a numbered or lettered section, subsection, paragraph, subparagraph or schedule refers to the section, subsection, paragraph, subparagraph or schedule bearing that number or letter in this Exchange Warrant.

14. **Gender**.  Whenever used in this Exchange Warrant, words importing the singular number only shall include the plural, and vice versa, and words importing the masculine gender shall include the feminine gender.

15. **Day not a Business Day**.  In the event that any day on or before which any action is required to be taken hereunder is not a Business Day, then such action shall be required to be taken on or before the requisite time on the next succeeding day that is a Business Day.  If the payment of any amount is deferred for any period, then such period shall be included for purposes of the computation of any interest payable hereunder.

16. **Binding Effect; Assignability**.  This Exchange Warrant and all of its provisions shall enure to the benefit of the Holder and its successors and permitted assigns and shall be binding upon the Company and its successors and permitted assigns.  This Exchange Warrant is not assignable by the Holder without the prior written consent of the Company.

6

**IN WITNESS WHEREOF** the Company has caused this Exchange Warrant to be signed by its duly authorized officers and this Exchange Warrant to be dated the _____ day of _____, 2016.

**TITLE ROVER, LLC**

By:_____
*Authorized Signing Officer*

## Exhibit B
### Hopewell-Pilot Project, LLC
### Currently Outstanding Shares
### July 1, 2016

| Founders Shares: | Shares Held |
|---|---|
| Hopewell Willis Holdings, LLC | 450,000 |
| Willis Group, LLC | 225,000 |
| Hopewell Tatham Holdings, LLC | 112,500 |
| LNG Partners, LLC | 112,500 |
| Mark A. Bush | 100,000 |
| Total Outstanding | 1,000,000 |

Note:  No other shares, equity interests, or options for the purchase of equity interests in Hopewell-Pilot Project, LLC are currently outstanding.

2

# Title Rover, LLC
## Preliminary Business & Exploitation Plan
### June 2016

**Background:** Title Rover, LLC (the "Company") was formed in April 2016 for the purpose of refining and modifying proprietary information technology which was developed and utilized by the Willis Group and its strategic partners in legal document review for various contract clients over the past five or six years. The Company's business plan is to adapt, refine this unique proprietary "search and sort" technology for application and use in oil, gas and mineral interest lease plays and related mineral ownership title review. Significant time, cost and efficiency gains over presently considered "best industry practices" have been established and are being validated and benchmarked through a "proof of concept" pilot program, the Hopewell-Pilot Project, which was commenced in March 2016. The Company is now seeking to leverage and exploit its expertise and significant commercial advantage by expanding its digital data base to those areas and U.S. counties which present the best strategic opportunities for application and use of the technology. The Company will seek individual contract arrangements in geographically specific areas with established oil and gas operators and energy investors seeking to have "first mover advantage" in emerging or reemerging oil, gas & mineral lease plays. Six prospective areas have been identified and the Company is in the process of completing detailed budgets for compiling and or acquiring the required digital data.

**Plan Execution:**

**Phase One – Validation, Refinement, Benchmarking and Portal Use Training through Pilot Project:** The Company has provided exclusive use of its technology initially to Hopewell-Pilot Project, LLC ("Hopewell") in an area of mutual interest covering Madison County, Texas and certain adjacent lands in an effort to refine its application and use and to document and benchmark time, cost and data efficiencies over present industry practices. In addition to providing oil, gas and mineral interest ownership title chains and mineral ownership reports, the technology is being modified and expanded so as to be able to provide customized search of land and mineral title records so as to identify lease play specific information, such as unleased oil, gas, & mineral interests; leases held by production or unitization; lease composition of pooled units; leases with depth limitations and or unique commercial terms; expiry of current leases not held by production and leases or pooled Unit Designations with prospective legal or compliance deficiencies. User friendly web portals have been established which has permitted training of industry land and legal professionals in the use of Title Rover's proprietary technology. Phase One activities should be completed by the end of Q3 2016.

**Phase Two - Expansion of Digital Data Base to Selected Areas Providing Highest and Best Commercial Opportunity**: Most counties in the United States have yet to fully or completely digitize their official county records from current time back to sovereignty. The Company will seek to generate or acquire complete digital data from sovereignty to present day in selected United States counties where significant oil and gas lease activity is expected to occur or reemerge with oil and gas price improvement. This activity should fully position the Company to commercially exploit its unique technological advantage by negotiating joint venture arrangements or commercially favorable contracts with established oil and gas operators or financial investors seeking to obtain oil and gas leaseholds or oil, gas & mineral interest ownership in geographically specific areas. The Company will focus initially on areas with proven "shale and tight sands" plays that have slowed or been suspended due to the declines in oil and gas prices that have occurred since mid 2014. The Company will seek to finance the acquisition of the required digital data through either the private placement of Title Rover equity or by forming strategic joint ventures with selected industry or financial partners. The Company is currently preparing detailed data acquistion budgets for six selected areas. Image Engine, an affiliate and prospective subsidiary of the Company, has benchmarked its costs of obtaining and indexing images of Madison County records in the Pilot Project and such benchmarked costs will form in part the basis for the Company's budgetary estimates in the areas of prospective opportunity.

**Phase Three – Commercial Exploitation – High Benefit Areas:** Once detailed budgets have been established for the selected areas, the Company will approach selected financial investors and prospective industry joint venture partners, which have operating expertise in such areas or in shale and tight sands plays in general, to provide a demonstration of Title Rover's capabilities and to propose one of several alternative commercial arrangements for the application and use of Title Rover's technology in the agreed area of mutual interest ("AMI"). The Company believes that by offering exclusive use of Title Rover technology in an agreed AMI or in return for providing periodic data reports in agreed form to such counter parties that the Company will be able to enter into Joint Venture or contract agreements which provide the Company with an opportunity to:  a) receive "ground floor" options to own an agreed percentage of all oil, gas, & mineral leases acquired in the AMI by paying its pro rata share of actual costs; and/or b) receive an agreed override or royalty interest on all leases acquired in the AMI; and/or c) receive an agreed carried ownership interest in all oil, gas and mineral interests or term royalty interests acquired in the AMI. The Company believes that there are at least six areas with existing shale and tight sand plays in the United States in which the Company can apply the use of Title Rover technology in exchange for direct ownership rights in the oil, gas & mineral leases and oil, gas, & mineral interests acquired in such areas. Acquisition of new leases in these identified areas will likely be highly competitive in the appropriate oil and gas commodity price environment or at the appropriate time given expiry of the majority of the oil, gas & mineral leases currently in force.

WIL_00000899

**Phase Four – Commercial Exploitation – Lower Benefit Areas**:  Once the Company has achieved market penetration and oil, gas, & mineral lease and mineral interest ownership in the high benefit areas where it has provided exclusive use of its proprietary technology within agreed AMIs, the Company believes it can generate further additional revenue by providing access to its technology under service agreements providing for periodic contract payments in exchange for limited term use of Title Rover technology in areas not covered by exclusive AMIs. This activity could be undertaken directly by the Company or under master license agreements with other industry information & technology providers such as Drilling Information Services, Accenture, Synoptek, etc.



# EXHIBIT U

**To:** Tom Tatham[tpt@lngpartners.com]
**Cc:** Chad Martin[chadlandmark@hotmail.com]; Mark Willis[Mark@willisgroupus.com]; jerry johns[jerry.johns@intelometry.com]; Cliff Sharp[ecsharp111@gmail.com]
**From:** Justin Pannu
**Sent:** Tue 8/30/2016 1:02:39 PM
**Subject:** Re: Amended and Restated OA - Title Rover - Comments

we are dialing in soon..

On Tue, Aug 30, 2016 at 10:05 AM, Tom Tatham <tpt@lngpartners.com> wrote:

> Justin,
> In advance of our 1pm CST call, I thought I would clarify a few of your comments or assumptions below [see highlights in red].  I have asked our Counsel to participate if possible to address legal points that you have brought up.  I look forward to speaking at 1pm.
> Thanks,
> Tom

**From:** Justin Pannu <justinpannu1503@gmail.com>
**Date:** Monday, August 29, 2016 at 9:51 PM
**To:** Tom Tatham <tpt@lngpartners.com>
**Cc:** Chad Martin <chadlandmark@hotmail.com>, Mark Willis <Mark@willisgroupus.com>, jerry johns <jerry.johns@intelometry.com>, Cliff Sharp <ecsharp111@gmail.com>
**Subject:** Amended and Restated OA - Title Rover - Comments

Hi Tom,

I have received some preliminary feedback on the Amended and Restated Operating Agreement of Title Rover, LLC ("Title Rover") with respect to the issue of anti-dilution and have the following comments:

1. The Operating Agreement [ are you referring to the  Amended and Restated Company Agreement] authorizes issuance of up to 6,500,000 units (units are the equivalent of shares in a corporation) ("Authorized Units").

2. The allotment [are you referring to the reservations provided in Section 3.2 a, b, & c of the Amended and Restated Company Agreement] of the Authorized Units are stated to be as follows:

>> a. Up to 2,000,000 units Shares for the conversion of the warrants issued in connection with Hopewell-Pilot Program, LLC ("Hopewell")

>> b. Up to 1,000,000 units Shares for performance and milestone events included in the employment agreements of  Brent Stanley, Joey  Joe Haynes and Susan Willard

    c.   Up to 500,000 units Shares for employee stock options [employee stock option for 500,000 Shares to be issued to Thomas P. Tatham, Manager with exercise price of $1 per Share with term of option to expire June 30, 2018 in consideration of time commitment of a minimum of 15 days per month]

    d.   3,000,000 units Shares; 1,500,000 to Mark Willis subject to WG Options and 1,500,000 to Willis Group, LLC subject to WG Options;

[Note: Shares and WG Options are defined terms]
    *Some comments on this issue:*

> *1.   Would you be able to produce the  Employment Agreements or Independent Contractor Agreements for Brent Stanley, Joey Haynes and Susan Willard - we have attached a copy of the high-level deal points you have produced that was the result of an e-mail exchange (see attached).  These individuals seemingly are important because a non-compete clause is one of the deal points; however, one does not appear to be in place. [The Binding Memorandum of Agreement between these parties is in the process of being drafted. TR will seek to provide confirmation of acceptance of basic terms if warranted]  Is there are non-disclosure agreement with the individuals that you would be able to produce?. [TR is covered by the terms of the existing agreements with Brent Stanley and SLX]  **Also, although the e-mail contemplates that these individuals may own up to 25% of Title Rover, only 1,000,000/6,500,000 = 15.38% has been set aside for them**. [The percentages cited were based upon the 3,000,000 Shares currently outstanding, I.e. 400,000 Shares, 200,000 Shares and 400,000 Shares for the milestone events.]  What happens if they fully earn all of their equity? [Authorized Shares have been fully reserved for issuance pursuant to Section 3.2 (b) of the Amended and Restated Company Agreement.]  Will more units authorized to be issued? [Not necessary for the agreed transaction.]  Lastly, from the attached e-mail, it appears that whatever these individuals are developing currently is critically important to the success of the Madison County and Buda Rosa plays - but that such items are not yet developed. [Indexing of pre 1922 digital data remains to be completed]  Is the seemingly vital technology still a work-in-process? [The technology is currently working, the Madison County digital data base needs to be fully indexed, appropriate filters need to be developed for the [3]Top Lease Play[2] based upon legal analysis to be completed]*

3.   In order to for more than 6,500,000 units to be authorized to be issued, the Board of Managers and the Directors must pass the appropriate resolution and a majority vote of the then-currently outstanding units must approve such resolution (*Side Note: the Operating Agreement [there is no Operating Agreement only the Amended and Restated Company Agreement]  maintains misnomers throughout - there are no directors of a limited liability company, only managers - and, as well, there is a Board of Managers, not a Board of Directors. [Title Rover, LLC has both Directors and Managers as set forth in the Amended and Restated Company Agreement]  Further, there is reference to [3]Membership Interest[2] term, which is not defined, and there is a consistently incorrect reference to units as [3]Shares[2]) [This point to be taken up by Counsel].*  There are two managers of Title Rover and since Mark Willis will

necessarily own a majority interest in Title Rover until more than 6,000,000 of the 6,500,000 units [this statement is not true] are issued (and, thereafter, may represent a majority ownership interest along with a friendly party who need only own 250,001 units), it seems that whether more units are authorized is just a matter of procedure.  We would feel comfortable if there was a  unanimous vote of the then-current unit holders to approve authorization for more shares to be issued to protect our interests. [Your suggestion here would allow small ownership interests to hold the Company hostage if their approval was needed to achieve unanimous consent to a critical or desirable transaction.  In some cases a super majority of equity owners is required for approval of certain special or unique transactions, however in no case is unanimous approval practical]

Further, there is no provisions around how additional units can be issued by the Board of Managers (even if the amount is under the cap of the authorized numbers to be issued.  For example, up to 500,000 units are set aside for employee stock options. [Details of the employee stock option are provided above]  Who is going to get these?  Thomas P. Tatham  How many? [500,000 Shares]Under what thresholds and objectives?  [The employee stock option will be exercisable any time on or before June 30, 2018 provided employee has fulfilled employment obligations.]  The common theme is that there is virtually no parameters around the Board of Managers ability to issue shares for any reason and, if the shares run out, to simply authorize a higher cap on the number of units that can be issued.  [This statement is not true as authorization of additional Shares will take approval by the Managers, Directors and a majority of the Ownership Percentage.  In addition each Member is provided a preemptive right to purchase any additional shares offered as set forth in Section 3.2 of the Amended and Restated Company Agreement.]

These are our initial thoughts.  We probably will have more comments as we sort through the Amended and Restated Operating [Company] Agreement.  Also, most of the discussion above is applicable to the Amended and Restated Operating Agreement for Hopewell-Pilot Project, LLC - the two agreements are very much alike and contain many of the exact same provisions.

Let us know if you'd still prefer Rich to give you a call tomorrow.

Thanks!

Justin

**EXHIBIT V**

# Title Rover, LLC
# Preliminary Business & Exploitation Plan
# June 2016

**Background:** Title Rover, LLC (the "Company") was formed in April 2016 for the purpose of refining and modifying proprietary information technology which was developed and utilized by the Willis Group and its strategic partners in legal document review for various contract clients over the past five or six years. The Company's business plan is to adapt, refine this unique proprietary "search and sort" technology for application and use in oil, gas and mineral interest lease plays and related mineral ownership title review. Significant time, cost and efficiency gains over presently considered "best industry practices" have been established and are being validated and benchmarked through a "proof of concept" pilot program, the Hopewell-Pilot Project, which was commenced in March 2016. The Company is now seeking to leverage and exploit its expertise and significant commercial advantage by expanding its digital data base to those areas and U.S. counties which present the best strategic opportunities for application and use of the technology. The Company will seek individual contract arrangements in geographically specific areas with established oil and gas operators and energy investors seeking to have "first mover advantage" in emerging or reemerging oil, gas & mineral lease plays. Six prospective areas have been identified and the Company is in the process of completing detailed budgets for compiling and or acquiring the required digital data.

**Plan Execution:**

**Phase One – Validation, Refinement, Benchmarking and Portal Use Training through Pilot Project:** The Company has provided exclusive use of its technology initially to Hopewell-Pilot Project, LLC ("Hopewell") in an area of mutual interest covering Madison County, Texas and certain adjacent lands in an effort to refine its application and use and to document and benchmark time, cost and data efficiencies over present industry practices. In addition to providing oil, gas and mineral interest ownership title chains and mineral ownership reports, the technology is being modified and expanded so as to be able to provide customized search of land and mineral title records so as to identify lease play specific information, such as unleased oil, gas, & mineral interests; leases held by production or unitization; lease composition of pooled units; leases with depth limitations and or unique commercial terms; expiry of current leases not held by production and leases or pooled Unit Designations with prospective legal or compliance deficiencies. User friendly web portals have been established which has permitted training of industry land and legal professionals in the use of Title Rover's proprietary technology. Phase One activities should be completed by the end of Q3 2016.

**Phase Two - Expansion of Digital Data Base to Selected Areas Providing Highest and Best Commercial Opportunity**:  Most counties in the United States have yet to fully or completely digitize their official county records from current time back to sovereignty.  The Company will seek to generate or acquire complete digital data from sovereignty to present day in selected United States counties where significant oil and gas lease activity is expected to occur or reemerge with oil and gas price improvement.  This activity should fully position the Company to commercially exploit its unique technological advantage by negotiating joint venture arrangements or commercially favorable contracts with established oil and gas operators or financial investors seeking to obtain oil and gas leaseholds or oil, gas & mineral interest ownership in geographically specific areas.  The Company will focus initially on areas with proven "shale and tight sands" plays that have slowed or been suspended due to the declines in oil and gas prices that have occurred since mid 2014.  The Company will seek to finance the acquisition of the required digital data through either the private placement of Title Rover equity or by forming strategic joint ventures with selected industry or financial partners.  The Company is currently preparing detailed data acquistion budgets for six selected areas.  Image Engine, an affiliate and prospective subsidiary of the Company, has benchmarked its costs of obtaining and indexing images of Madison County records in the Pilot Project and such benchmarked costs will form in part the basis for the Company's budgetary estimates in the areas of prospective opportunity.

**Phase Three – Commercial Exploitation – High Benefit Areas:**  Once detailed budgets have been established for the selected areas, the Company will approach selected financial investors and prospective industry joint venture partners, which have operating expertise in such areas or in shale and tight sands plays in general, to provide a demonstration of Title Rover's capabilities and to propose one of several alternative commercial arrangements for the application and use of Title Rover's technology in the agreed area of mutual interest ("AMI").  The Company believes that by offering exclusive use of Title Rover technology in an agreed AMI or in return for providing periodic data reports in agreed form to such counter parties that the Company will be able to enter into Joint Venture or contract agreements which provide the Company with an opportunity to:  a) receive "ground floor" options to own an agreed percentage of all oil, gas, & mineral leases acquired in the AMI by paying its pro rata share of actual costs; and/or b) receive an agreed override or royalty interest on all leases acquired in the AMI; and/or c) receive an agreed carried ownership interest in all oil, gas and mineral interests or term royalty interests acquired in the AMI.  The Company believes that there are at least six areas with existing shale and tight sand plays in the United States in which the Company can apply the use of Title Rover technology in exchange for direct ownership rights in the oil, gas & mineral leases and oil, gas, & mineral interests acquired in such areas.  Acquisition of new leases in these identified areas will likely be highly competitive in the appropriate oil and gas commodity price environment or at the appropriate time given expiry of the majority of the oil, gas & mineral leases currently in force.

**Phase Four – Commercial Exploitation – Lower Benefit Areas**:  Once the Company has achieved market penetration and oil, gas, & mineral lease and mineral interest ownership in the high benefit areas where it has provided exclusive use of its proprietary technology within agreed AMIs, the Company believes it can generate further additional revenue by providing access to its technology under service agreements providing for periodic contract payments in exchange for limited term use of Title Rover technology in areas not covered by exclusive AMIs. This activity could be undertaken directly by the Company or under master license agreements with other industry information & technology providers such as Drilling Information Services, Accenture, Synoptek, etc.

**EXHIBIT W**

**From:** **Tom Tatham** tpt@lngpartners.com
**Subject:** Hopewell-Pilot Project, LLC - Private Placement of Initial Additional Equity Shares ("IAE Shares") - Subscription Documents
**Date:** August 2, 2016 at 10:57 AM
**To:** Martin, Chad ChadMartin@bgcpartners.com, Justin Pannu justinpannu1503@gmail.com, Jerome E. Johns
jerry.johns@intelometry.com, James Dibble james.dibble@intelometry.com
**Cc:** Mark Willis Mark@willisgroupus.com, Michelle Johnson mjohnson@willisgroupus.com

Gents,

Chad Martin advised that you all are considering forming a special purpose entity in the form of a
limited liability company for purposes of investing and the purchase of Hopewell IAE Shares. I have
attached our Subscription Booklet and attachments for your review. Please give me a call if you have any
questions or let me know if I can assist in your process.

Thanks & best regards,

Tom Tatham

Manager

Hopewell-Pilot Project, LLC

713 547-4531 (office direct

713 504-7199 (mobile

   

| Hopewell - | PRIVATE | Amended & | Title Rover LLC |
| Subscr...sw.doc | PLACE...sw.pdf | Restat...inal.pdf | - Share...[1].pdf |

**HOPEWELL – PILOT PROJECT, LLC**

**SUBSCRIPTION BOOKLET**
**FOR**
**INITIAL ADDITIONAL EQUITY SHARES**

**June 25, 2016**

-i-

## INSTRUCTIONS TO SUBSCRIPTION AGREEMENT

**1.**     Any person desiring to subscribe for Initial Additional Equity Shares in Hopewell-Pilot Project, LLC, a Texas limited liability company (the "Company"), should be either (i) an "accredited investor" within the meaning of Regulation D of the U.S. Securities Act of 1933, as amended (the "Securities Act") or (ii) a "non-U.S. Person" within the meaning of Regulation S of the Securities Act, *and* must:

    **(a)**     complete and execute the attached Subscription Agreement (the "Agreement");

    **(b)**     execute the attached copy of the signature page of the Company's Amended and Restated Company Agreement;

    **(c)**     provide the Company's Managers with the evidence of authority to invest, such as resolutions if the Investor is a corporation (please contact Thomas P. Tatham or Mark A. Willis for further details);

    **(d)**     provide the Company with additional KYC documents as the Company reasonably requests; and

    **(e)**     complete *Annex 1, Part 1* in the case of individual investors or *Annex 1, Part 2* in the case of entity investors.

Copies of all completed and executed originals referred to above should be sent by e-mail to the Company's Managers at TTatham@HopewellTX.com and MWillis@HopewellTX.com.     The executed originals of the Agreement and other required documents should be received by Hopewell-Pilot Project, LLC (on behalf of the Company) as soon as possible at the following address: Hopewell-Pilot Project, LLC, c/o Willis Group, 1400 Post Oak Blvd. Suite 200 Houston, TX 77056, Attn: Tom Tatham (Tel: (713) 547-4531). All subscription documents must be completed correctly and thoroughly. Failure to do so may result in delay of acceptance of your subscription until properly completed documents have been received, processed and approved.

**2.**     The Company will advise each subscriber promptly of its acceptance of any offer to become a New Member of the Company, *provided* that the Company shall be entitled to refuse any subscriber's offer to become a New Member for any reason whatsoever in the sole discretion of the Company.

**3.**     Please contact the Company's Managers if you have any questions regarding the above.

-ii-

PLTF_000765

*Inquiries Related to the Subscription Procedures:*

Inquiries related to the subscription procedures should be directed to the Company's Managers and or the counsel for the Company at:

> Hopewell-Pilot Project, LLC
> 1400 Post Oak Blvd. Suite 200
> Houston, TX 77056
> Attention: Thomas P. Tatham
> Telephone: (713) 547-4531
> E-mail: TTatham@HopewellTX.com

> and

> Hopewell-Pilot Project, LLC
> 1400 Post Oak Blvd. Suite 200
> Houston, TX 77056
> Attention: Mark A. Willis
> Telephone: (713) 547-4502
> E-mail: MWillis@HopewellTX.com

> or to the counsel for the Company at:

> Doherty & Doherty LLP
> 1717 St James Place, Suite 520
> Houston, TX 77056
> Attention: Pat Doherty
> Telephone: (713) 572-1000
> E-mail: Pat@Doherty-law.com

*Payment of subscription*

The Capital Commitment shall be drawn down by the Company pursuant to one or more capital call notices that will be issued and made by the Managers in accordance with terms set forth in the Amended and Restated Company Agreement. Funding details (including payment amounts) and wire instructions will be provided by the Managers.

-iii-

PLTF_000766

**HOPEWELL-PILOT PROJECT, LLC**

**INITIAL ADDITIONAL EQUITY SHARES**

**SUBSCRIPTION AGREEMENT**

THE OFFERING OF SECURITIES DESCRIBED HEREIN HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION.   THIS OFFERING IS MADE PURSUANT TO REGULATION S OR REGULATION D UNDER SECTION 4(a)(2) OF SAID ACT, WHICH EXEMPTS FROM SUCH REGISTRATION CERTAIN TRANSACTIONS.  FOR THIS REASON, THESE SECURITIES WILL BE SOLD ONLY TO INVESTORS WHO MEET CERTAIN MINIMUM SUITABILITY QUALIFICATIONS DESCRIBED HEREIN.

A PROSPECTIVE INVESTOR SHOULD BE PREPARED TO BEAR THE ECONOMIC RISK OF AN INVESTMENT IN THE COMPANY FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE SHARES OR MEMBER'S INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE LAWS OF ANY OTHER JURISDICTION, AND, THEREFORE, CANNOT BE SOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.  THERE IS NO OBLIGATION OF THE ISSUER TO REGISTER THE SHARES OR MEMBER'S INTERESTS UNDER THE SECURITIES ACT OR THE LAWS OF ANY OTHER JURISDICTION.   TRANSFER OF THE SHARES OR MEMBER'S INTERESTS IS ALSO RESTRICTED BY THE TERMS OF THE AMENDED AND RESTATED COMPANY AGREEMENT RELATING THERETO.

-1-

PLTF_000767

**HOPEWELL-PILOT PROJECT, LLC**

**A TEXAS LIMITED LIABILITY COMPANY**

Hopewell-Pilot Project, LLC
c/o Willis Group
1400 Post Oak Blvd. Suite 200
Attention: Tom Tatham
Telephone: (713) 547-4531
E-mail: TTatham@HopewellTX.com

Ladies & Gentlemen:

This SUBSCRIPTION AGREEMENT (the "Agreement") is entered into as of the Closing Date specified on the signature page hereto by and among HOPEWELL-PILOT PROJECT, LLC, a Texas limited liability company (the "Company"), and the investor identified on the signature page hereto (the "Investor"). Investor seeks admission to the Company as a New Member and the acquisition of Shares representing Member's Interest in the Company (the "Interest") in accordance with the Company's Amended and Restated Company Agreement (the "Company Agreement"). Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Company Agreement.

1.    **Capital Commitment.** In accordance with the terms of the Company Agreement and this Agreement, the Investor agrees to contribute to the Company the amount of capital specified under the heading "Capital Commitment" set forth on the signature page hereto, or such lesser amount as the Company shall accept as determined by the Company's Managers in their sole and absolute discretion.

2.    **Adoption.** If the Investor is accepted as a New Member pursuant to paragraph 3 below, the Investor hereby agrees to adhere to and be bound by all terms and provisions of the Company Agreement and to perform all obligations therein imposed upon a New Member with respect to the Interest.

3.    **Acceptance of Subscription; Delivery of Company Agreement.** The Investor understands and agrees that this subscription is made subject to the following terms and conditions:

(a)    The Managers jointly reserve the right to review the suitability of any person desiring to acquire an Interest and, in connection with such review, to waive such suitability standards as to such person as the Managers jointly deem appropriate under applicable law;

(b)    The Managers may accept or reject the Investor's subscription, in whole or in part, and the Investor's subscription shall be deemed to be accepted by the Managers only when both of the Company's Managers have executed Investor's Agreement and Investor has been admitted to the Company as a New Member in accordance with the terms of the Company Agreement;

(c)    The Managers shall have no obligation to accept subscriptions in the order received;

(d)    The Interest to be created on account of this subscription shall be created only in the name of the Investor, and the Investor agrees to comply with the terms of the Company Agreement

-1-

28ML-207663

and to execute any and all further documents necessary in connection with becoming a New Member of the Company;

(e)     The Investor hereby requests and authorizes the Managers to enter Investor's name on the Schedule of Members as holder of the Interest;

(f)     The Investor has consulted to the extent deemed appropriate by the Investor with the Investor's own advisers as to the financial, tax, legal and related matters concerning an investment in Interests and on that basis believes that an investment in the Interests is suitable and appropriate for the Investor;

(g)     The Investor is aware of and understands each of the risks and potential conflicts of interest inherent of an investment in the Company as set forth in the Memorandum;

(h)     The Managers, acting jointly, may transfer proceeds into an account in the name of the Company, and in such event, the Managers shall not be liable for any losses arising from such transfer and shall be fully indemnified by the Company out of the assets of the Company to the fullest extent permitted by law for any and all actions, costs, claims, damages, demands or expenses (including any reasonable attorneys' fees) suffered or incurred by the Managers as a result of such transfer;

(i)     The Investor hereby undertakes in respect of the Interest that the Investor: (i) shall comply with the restrictions on transfer of the Interest contained in the Company Agreement; and (ii) acknowledges and agrees that, in the event that Investor defaults on its capital contribution obligation to the Company, the Interest may be subject to forfeiture and other consequences as specified in the Company Agreement; and

(j)     The Investor hereby declares that the Investor is not in the course of winding up or under liquidation or judicial management.

4.     **Conditions to Closing.**  The Company's obligations hereunder are subject to acceptance by the Managers of the Investor's subscription, and to the fulfillment at the time of, or prior to, the Closing Date of each of the following conditions:

(a)     The representations and warranties of the Investor contained in this Agreement shall be true and correct as of the Closing Date; and

(b)     All proceedings in connection with the transactions contemplated hereby and all documents and instruments incident to such transactions shall be satisfactory in substance and form to the Managers, and the Company shall have received all such counterpart originals or certified or other copies of such documents as the Managers may request.

5.     **Investor Representations.**  In connection with the Investor's acquisition of the Interest as of the Closing Date, the Investor makes the following representations and warranties on which the Managers and the Company are entitled to rely:

(a)     The Interest will be held under the type of ownership identified on the signature page hereto.

(b)     If the Investor has checked that the Investor is not a "U.S. Person," as such term is used in Internal Revenue Service Form W-9, under the subheading "Tax Jurisdiction" below, the Investor hereby represents, under penalties of perjury, that the Investor (i) is a "non-U.S. Person" (as defined below); (ii) will not transfer or deliver any interest in the Interests except in accordance with the

-2-

PLTF_000769

restrictions set forth in the Company Agreement; (iii) will notify the Managers immediately if the Investor becomes a U.S. Person at any time during which the Investor holds or owns any Interests; (iv) is not subscribing on behalf of or funding its Capital Contribution with funds obtained from U.S. Persons; and (v) it was not in the United States at the time that the Interests were offered to it, and it was not in the United States at the time such offer was accepted; and (vi) it is not acting on behalf of, and it will not fund any portion of its subscription with assets of, any entity that is a "benefit plan investor" within the meaning of the United States Department of Labor Reg. Section 2510-101.3. For purposes of this section 5(b), a "non-U.S. Person" is an individual who is not a citizen or resident of the United States or a corporation, partnership, estate or trust which is not a U.S. entity. Except for offers and sales to discretionary or similar accounts held for the benefit or account of a non-U.S. person by a U.S. dealer or other professional fiduciary, all offers to sell and offers to buy the Interests were made to or by the Investor while the Investor was outside the United States and at the time that the Investor's order to buy the Interests was originated the Investor was outside the United States.

(c)     The Investor is an "accredited investor" within the meaning of Regulation D of the U.S. Securities Act of 1933, as amended (the "Securities Act") and a "qualified client" as defined in the Investment Advisers Act of 1940, as amended, on the basis identified by checking the box adjacent to the applicable representation on *Schedule 2, Part 1* in the case of an individual investors and on *Schedule 2, Part 2* in the case of entity investors; and in the case of entity investors, represents to such further matters by checking the boxes adjacent to the applicable further representations on *Schedule 2, Part 2* (which checked representations in *Schedule 2, Parts 1 and 2* are hereby incorporated by reference). The Investor (i) is not subject to any of the "Bad Actor" disqualifications (each, a "Disqualification Event") described in Rule 506(d)(1) under the Securities Act and (ii) will, subsequent to the date hereof, notify the Company's Managers of (A) any Disqualification Event relating to the Investor not previously disclosed and (B) any event that would, with the passage of time, become a Disqualification Event relating to the Investor. The Investor is acquiring the Interest solely for the Investor's own account and not directly or indirectly for the account of any other person whatsoever for investment and not with a view to, or for sale in connection with, any distribution of the Interest. The Investor does not have any contract, undertaking or arrangement with any person to sell, transfer or grant a participation to any person with respect to the Interest. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of the investment evidenced by the Investor's acquisition of the Interest, and the Investor is able to bear the economic risk of such investment.

(d)     No representations or warranties have been made to the Investor by the Company, the Company's Managers, or any agent thereof, other than as set forth in the Company Agreement, and this Agreement. The Investor has had access to such information concerning the Company as the Investor deems necessary to enable the Investor to make an informed decision concerning the acquisition of the Interest. The Investor has had access to the designated representatives of the Company, its Managers and the opportunity to ask questions of, and receive answers satisfactory to the Investor from, the Managers and or such designated representatives concerning the offering of Interests in the Company generally. The Investor has obtained all additional information requested by the Investor to verify the accuracy of all information furnished in connection with the offering of Interests in the Company.

(e)     The Investor understands that the Interest has not been registered under the Securities Act, or any securities law of any state of the United States or any other jurisdiction in reliance on an exemption for private offerings, and the Investor acknowledges that it has received and carefully read the Confidential Private Placement Memorandum of the Company (the "Memorandum"), the Company Agreement and this Agreement. The Investor understands that Doherty & Doherty LLP acts as counsel for the Company, the Company's Managers. No separate counsel has been retained to act on behalf of the Investors. No attorney-client relationship exists with any other person by reason of such

-3-

person making an investment in the Company.  The Investor has received and reviewed all such other information of the Company as the Investor or its representatives and advisers have requested.

       **(f)**     The Investor is aware that the Investor must bear the economic risk of investment in the Interest for an indefinite period of time, possibly until final winding up of the Company, because the Interest has not been registered under the Securities Act, there is currently no public market therefor, and the Interest cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is available.  The Investor understands that the Company is under no obligation, and does not intend, to effect any such registration at any time.  The Investor also understands that sales or transfers of the Interest are further restricted by the provisions of the Company Agreement and, as applicable, securities laws of other jurisdictions and the states of the United States, and that the Interest will not be transferred or disposed of except in accordance with the terms of this Agreement, the Company Agreement and registration under the Securities Act, or pursuant to an applicable exemption therefrom.

       **(g)**     The execution and delivery of the Company Agreement and this Agreement, the consummation of the transactions contemplated thereby and the performance of the obligations thereunder will not conflict with or result in any violation of or default under any provision of any other agreement or instrument to which the Investor is a party or any license, permit, franchise, judgment, order, writ or decree, or any statute, rule or regulation, applicable to the Investor.

       **(h)**     The Investor has full power and authority to make the representations referred to in this Agreement, to acquire the Interest pursuant to this Agreement and the Company Agreement and to deliver the Company Agreement and this Agreement.  The Company Agreement and this Agreement create valid and binding obligations of the Investor and are enforceable against the Investor in accordance with their terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar laws affecting creditors' rights, and subject to general equity principles and to limitations on availability of equitable relief, including specific performance.

       **(i)**     The Investor confirms that the Investor has been advised to consult with the Investor's attorney regarding legal matters concerning the Company and to consult with independent tax advisers regarding the tax consequences of investing in the Company.  The Investor acknowledges that it understands that any anticipated United States federal or state income tax benefits may not be available and, further, may be adversely affected through adoption of new laws or regulations or amendments to existing laws or regulations.  The Investor acknowledges and agrees that the Company has made no warranty or assurance regarding the ultimate availability of any tax benefits to the Investor by reason of the Investor's investment in the Company.

       **(j)**     The Investor acknowledges and agrees that (i) information relating to the identity of the Investor shall appear on the Schedule of Members and may appear on the financial statements of the Company, and (ii) other Members shall receive such information and may share such information with their advisors and other parties pursuant to the terms of the Company's Confidentiality Agreement.

       **(k)**     The Investor is knowledgeable and experienced in evaluating investments and experienced in financial and business matters and is capable of evaluating the merits and risks of investing in the Interests.  The Investor has evaluated the risks of investing in the Interests, and has determined that the Interests are a suitable investment for the Investor.  In evaluating the suitability of an investment in the Interests, the Investor has not relied upon any representations or other information (whether oral or written) other than as set forth herein, in the Memorandum, the Company Agreement, the other agreements and independent investigations made by the Investor or representative(s) of the Investor. With respect to its investment in the Company, the Investor is not relying upon any other information,

-4-

representation or warranty by the Company, the Managers of the Company or any designated representatives of the Company.

(l) The Investor is aware and acknowledges that (i) the Company has limited or no significant operating history; (ii) there is no assurance of any income from an investment in the Company; (iii) any federal and/or state income tax benefits which may be available to the Investor may be lost through the adoption of new laws or regulations or changes to existing laws and regulations or differing interpretations of existing laws and regulations, in certain circumstances with retroactive effect; and (iv) the Investor, in making this investment, is relying, if at all, solely upon the advice of such Investor's personal tax advisor with respect to the tax aspects of an investment in the Company.

6. **Company's and Manager's Representations.** The Company and the Company's Managers make the following representations and warranties on which the Investor and its counsel are entitled to rely:

(a) The execution and delivery of the Company Agreement and this Agreement, the consummation of the transactions contemplated thereby and the performance of the obligations thereunder will not conflict with or result in any violation of or default under any provision of any other agreement or instrument to which the Company is a party or any judgment, order, writ or decree applicable to the Company.

(b) No suit, action, claim, investigation or other proceeding is pending or, to the best of the Company's or the Manager's knowledge, is threatened in writing against the Company which questions the validity of the Company Agreement or this Agreement or any action taken or to be taken pursuant to the Company Agreement or this Agreement, or which could otherwise have a material adverse effect on the Company.

(c) The Company Agreement and this Agreement create valid and binding obligations of the Company and are enforceable against the Company in accordance with their terms.

7. **Trustee, Agent, Representative or Nominee.** If the natural person or entity completing this Agreement is acting as trustee, agent, representative or nominee for the Investor (such person or entity, the "Agent"), the Agent agrees that the representations, warranties and agreements made herein are made by such Agent (a) in respect of such Agent and (b) in respect of the underlying subscriber on whose behalf the Agent is acting. The Agent represents and warrants that such Agent has all requisite power and authority to execute this Agreement and perform the obligations under this Agreement on the underlying Investor's behalf. The Agent agrees to provide any additional documents and information that the Company reasonably requests relating to itself or the underlying Investor.

8. **Survival of Agreements, Representations and Warranties; Indemnification.**

(a) All agreements, representations and warranties contained herein or made in writing by or on behalf of the Investor, the Company or the Managers of the Company in connection with the transactions contemplated by this Agreement shall survive the execution of this Agreement and the Company Agreement, any investigation at any time made by the Investor, the Company or the Managers of the Company or on behalf of any of them and the sale and acquisition of the Interest and payment therefor.

(b) The Investor acknowledges that the Investor understands the meaning and legal consequences of the representations and warranties made by the Investor herein. Such representations and warranties are complete and accurate, shall be complete and accurate as of the Closing Date and may be relied upon by the Company's Managers and the Company. If there should be any material change in

-5-

any of the representations or warranties or other information regarding the Investor set forth herein, including at any time following the Closing Date, the Investor agrees to notify the Company's Managers in writing as promptly as reasonably practicable.

        **(c)**     The Investor agrees that the foregoing representations and warranties, and all other information regarding the Investor set forth herein, may be used as a defense in any actions relating to the Company, the Managers of the Company or the private placement of the Interest, and that it is only on the basis of such representations, warranties and other information that the Company's Managers may be willing to accept this Agreement on behalf of the Company. The Investor acknowledges that the Company, and the Managers of the Company shall rely on such information, representations and warranties on an ongoing basis.

        **9.**    **Binding Effect.**  This Agreement shall be binding upon the Investor and the heirs, personal representatives, successors and assigns of the Investor. The Investor agrees that neither this Agreement nor any rights which may accrue to the Investor hereunder may be transferred or assigned without the consent of the Company's Managers, which may be granted or withheld in its sole discretion or otherwise as provided in the Company Agreement. This Agreement shall survive the admission of the Investor to the Company and shall, if the Investor consists of more than one person, be the joint and several obligations of all such persons.

        **10.**   **Severability.**  If any provision of this Agreement is held to be invalid or unenforceable in any jurisdiction, such provision shall be deemed modified to the minimum extent necessary so that such provision, as so modified, shall no longer be held to be invalid or unenforceable. Any such modification, invalidity or unenforceability shall be strictly limited both to such provision and to such jurisdiction, and in each case to no other. Furthermore, in the event of any such modification, invalidity or unenforceability, this Agreement shall be interpreted so as to achieve the intent expressed herein to the greatest extent possible in the jurisdiction in question and otherwise as set forth herein.

        **11.**   **Confidentiality.**  The Investor has carefully read the Company's Confidentiality Agreement and by execution thereof understands, including without limitation the confidentiality and non-solicitation undertakings set forth therein which shall apply to the Investor, whether or not this Agreement is accepted by the Company.

        **12.**    **Counterparts.** his Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

        **13.**   **Amendments.**  Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated orally, but only with the written consent of the Investor and the Company.

        **14.**   **Governing Law.**  The interpretation and enforceability of this Agreement and the rights and liabilities of the parties hereto shall be governed by the laws of the State of Texas. To the extent permitted by the Act and other applicable law, the provisions of this Agreement shall supersede any contrary provisions of the Act or other applicable law.

PLTF_000773

THE UNDERSIGNED INVESTOR HEREBY REPRESENTS THAT (I) THE UNDERSIGNED INVESTOR HAS CAREFULLY READ AND IS FAMILIAR WITH THIS AGREEMENT AND THE COMPANY AGREEMENT, (II) THE INFORMATION CONTAINED HEREIN IS COMPLETE AND ACCURATE AND MAY BE RELIED UPON, AND (III) THE EXECUTION OF THE FOLLOWING SIGNATURE PAGE SHALL CONSTITUTE THE EXECUTION OF THIS AGREEMENT AND THE COMPANY AGREEMENT BY THE INVESTOR IN THE EVENT THAT THE INVESTOR IS ADMITTED TO THE COMPANY AS A NEW MEMBER.

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement as of this _____ day of _____, 20___.

THE COMPANY:                                              INDIVIDUAL INVESTOR:

HOPEWELL-PILOT PROJECT, LLC                    _____
                                                                          (Signature)

_____                          _____
By: THOMAS P. TATHAM                                (Signature)
Its:  Manager
                                                                          _____
                                                                          (Print Name As It Will Be Registered With This
_____                          Investment)
BY: MARK A. WILLIS
Its:  Manager                                               ENTITY INVESTOR:
                                                                          [Legal Name of Entity to be provided]
                                                                          (Name of Entity As It Will Be Registered With
                                                                          This Investment)

                                                                          By: _____

                                                                          Name: _____

                                                                          Title: _____

Closing Date:  August 15, 2016 or earlier_____       Capital Commitment: $_____ ___
(To be completed by the Company)                         (To be completed by Investor)

Please provide the following information:

☐   Individual                          ☐   Irrevocable Trust
☐   Community Property            ☐   Living Trust or Revocable Trust w/ ___grantors.
☐   Partnership                         ☐   Corporation
☐   Limited Liability Company    ☐   Other:_____.

If the Investor is an entity, as of the Closing Date, there are _____ holders of its outstanding securities (other than short-term paper) (*please fill in the blank specifying the number of beneficial owners*).

Primary contact person:_____

   Telephone Number:_____   Fax Number: _____

-7-

E-mail Address:_____

     ☐ Social Security or Taxpayer I.D. Number_____

     ☐ U.S. Investor / U.S. Person      ☐ Non-U.S. Investor / Foreign Person

     ☐ Exempt under Code Section 401(a)   ☐ Exempt under Code Section 892

     ☐ Exempt under Code Section 501(c)3

Residential/Business Address (Domicile for Blue Sky filing purposes):

_____

_____

Registered Address (if applicable):

_____

_____

_____

Mailing Address *(select one)*:

[ ]    Please use the Subscriber's Residential/Business Address as the Mailing Address

[ ]    Please use the Subscriber's Registered Address as the Mailing Address

[ ]    Please use the following as the Subscriber's Mailing Address:

          _____

          _____

          _____

**METHOD OF DELIVERY OF ACCOUNT COMMUNICATIONS.**  Account Communications may be delivered via the e-mail address provided on this page.  Should this means of transmission be unacceptable, Account Communications will be delivered via facsimile or physical delivery if the following box is checked:

☐  E-mail transmission is <u>declined</u>, please send Account Communications via facsimile or physical delivery

PLTF_000775

IN WITNESS WHEREOF, this Amended and Restated Company Agreement has been entered into by the parties as of this _____ day of _____, 2016.

<u>THE COMPANY</u>

HOPEWELL-PILOT PROJECT, LLC

By:_____
     MANAGER

By: _____
     MANAGER

<u>NEW MEMBERS</u>

**INDIVIDUAL:**

By: _____

By: _____

Name:_____

**ENTITY:**

_____
 (Name of Entity)

By: _____

Name: _____

Title: _____

*Signature Page to the Amended and Restated Company Agreement of*
*Hopewell-Pilot Project, LLC*

**ANNEX 1**

**PART 1**

**Individual Investor Representations.**

All defined terms have the meanings provided to them in the Agreement; the following representations are incorporated by reference into the Agreement.

The Investor makes the following representations regarding the Investor's status as an Accredited Investor and a Qualified Client *by checking the box adjacent to each representation below*:

☐ **(a)** <u>Accredited Investor</u>: The Investor is an individual and has a net worth, either individually or upon a joint basis with the Investor's spouse, that exceeds $1,000,000, excluding the net equity value of such individual's primary residence, if any, but including as a liability the amount by which any indebtedness secured by such residence exceeds the value of such residence (within the meaning of such terms as used in Rule 501 under the Securities Act),[1] *or* has had an individual income in excess of $200,000 for each of the two most recent years, or a joint income with the Investor's spouse in excess of $300,000 in each of those years, and has a reasonable expectation of reaching the same income level in the current year.

☐ **(b)** <u>Qualified Client</u>: The Investor is an individual that (i) has a net worth, together with assets held jointly with the Investor's spouse, of more than $2,000,000, excluding the net equity value of such individual's primary residence, if any, but including as a liability the amount by which any indebtedness secured by such residence exceeds the value of such residence (within the meaning of such terms as used in Rule 501 under the Securities Act),[2] or (ii) is a Qualified Purchaser.

---

[1] Any indebtedness secured by such primary residence that the Investor incurred within the 60 day period preceding the date of the sale of securities pursuant to this Agreement (other than indebtedness incurred as a result of the acquisition of the primary residence) will be included as a liability for purposes of this calculation, even if the total amount of indebtedness securing such primary residence does not exceed the value of such residence.

-1-

ANNEX 1

PART 2

**Entity Investor Representations.**

All defined terms have the meanings provided to them in the Agreement; the following representations are incorporated by reference into the Agreement.

The Investor makes the representations regarding the Investor's status as an Accredited Investor and a Qualified Client *by checking the box adjacent to the each representation below*:

**ACCREDITED INVESTOR REPRESENTATION** (*check the box adjacent to **at least one** applicable representation below*):

☐ **(i)** The Investor is a corporation, partnership

, business trust or limited liability company, **not** formed for the purpose of acquiring an Interest, or an organization described in section 501(c)(3) of the Code, in each case with total assets in excess of $5,000,000.

☐ **(ii)** The Investor is an entity in which **all** of the equity owners (or *a living trust or other revocable trust* in which **all** of the grantors to such trust) qualify under Annex 1, Part 1, clause (a) or (b), or clause (i), (iii), (iv), (v) or this clause (ii) of this Annex 1, Part 2.

☐ **(iii)** The Investor is an employee benefit plan and *either* all investment decisions are made by a bank, savings and loan association, insurance company, or registered investment advisor, *or* the Investor has total assets in excess of $5,000,000 *or*, if such plan is a self-directed plan, investment decisions are made solely by persons who are Accredited Investors.

☐ **(iv)** The Investor is an *irrevocable* trust with total assets in excess of $5,000,000 whose acquisition is directed by a person with such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of the prospective investment.

☐ **(v)** The Investor is a bank, insurance company, investment company registered under the Investment Company Act, a broker or dealer registered pursuant to Section 15 of the United States Securities Exchange Act of 1934, as amended, a business development company, a Small Business Investment Company licensed by the United States Small Business Administration, a plan with total assets in excess of $5,000,000 established and maintained by a state for the benefit of its employees, or a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act.

☐ **(vi)** The Investor cannot make any of the representations set forth in clauses (i) through (v) above.

-1-

PLTF_000778

**QUALIFIED CLIENT REPRESENTATION** (*check the box adjacent to **at least one** applicable representation below*):

☐     **(i)**     The Investor is a corporation, partnership, association, joint-stock company, trust, or any organized group of persons, whether incorporated or not, that has a net worth of more than $2,000,000. *If the Investor belongs to this investor category, please either check clause (iii) below, if applicable, or affirmatively deny the applicability of clause (iii) below.*

☐     **(ii)**     The Investor is a corporation, partnership, association, joint stock company, trust, or any organized group of persons, whether incorporated or not, that is a Qualified Purchaser. *If the Investor belongs to this investor category, please either check clause (iii) below, if applicable, or affirmatively deny the applicability of clause (iii) below.*

☐     **(iii)**     The Investor is a corporation, partnership, association, joint-stock company, trust, or any organized group of persons, whether incorporated or not, that is an Excluded Company, and all of the Investor's equity owners (and all of their respective equity owners) are Qualified Clients.

☐        The Investor has checked either or both of clauses (i) or (ii) above and affirmatively denies applicability of this clause (iii).

☐     **(vi)**     The Investor cannot make any of the representations set forth in clauses (i) through (iii) above.


**FURTHER ENTITY INVESTOR REPRESENTATIONS**

The Investor makes the following representations *by checking the box adjacent to the correct response to each representation below*:

☐ True    ☐ False      The Investor is **neither** an "investment company" under the Investment Company Act **nor** does the Investor rely upon the exclusions from the definition of "investment company" provided for in Section 3(c)(1) or 3(c)(7) of the Investment Company Act.

☐ True    ☐ False      The Investor was **not** organized for the purpose of acquiring the Interest.

☐ True    ☐ False      The Investor has made investments prior to the date hereof or intends to make investments in the near future and each beneficial owner of interests in the Investor has and will share in the same proportion to each such investment.

☐ True    ☐ False      The Investor's investment in the Company will **not** constitute more than 40% of the assets of the Investor (including any capital commitments that may be drawn upon demand by the Investor).

☐ True    ☐ False      The governing documents of the Investor require that each beneficial owner of the Investor, including, but not limited to, shareholders, partners and beneficiaries, participate through their interest in the Investor in all of the Investor's investments and that the profits and losses from each such investment are shared among such beneficial owners in the same proportions as all other investments of the Investor. No such beneficial owner may vary the Investor's share of the profits and losses or the amount of the Investor's contribution for any investment made by the Investor.

-2-

If any of the above statements are marked "False," then the Investor will have, as of the Closing Date, _____ holders of its outstanding securities (other than short-term paper) (*please fill in the blank specifying the number of beneficial owners*).

The Investor is:

☐ True   ☐ False   **(1)**   an "employee welfare benefit plan" or an "employee pension benefit plan" as defined in sections 3(1) and 3(2), respectively, of ERISA; or

☐ True   ☐ False   **(2)**   a plan described in section 4975(e)(1) of the Code; or

☐ True   ☐ False   **(3)**   an entity that is deemed to be a "benefit plan investor" under the DOL Regulations because all or part of its underlying assets include "plan assets" by reason of a plan's investment in the entity (including, by way of example only, a partnership not qualifying as an operating company within the meaning of the DOL Regulations, which is 25% or more owned by entities described in (1) or (2) above); or

☐ True   ☐ False   **(4)**   subject to any rules or regulations similar to the fiduciary provisions of ERISA and/or the prohibited transaction provisions of Section 4975 of the Code.

If clause (3) above is marked "True," please provide the percentage that the Investor's "plan assets" holdings bear to its aggregate asset holdings (based upon value as of the Closing Date): _____% (the "Plan Asset Percentage").

☐ True   ☐ False   The Investor is a "private foundation" as described in Section 509 of the Code.

☐ True   ☐ False   The Investor is subject to the Bank Holding Company Act of 1956, as amended.

☐ True   ☐ False   To the best of the Investor's knowledge, the Investor does **not** control nor is it controlled by or under common control with, any other Investor.

*Please check the box next to each applicable statement and provide appropriate information in response to each such statement:*

☐ True   ☐ False   The Investor is subject to federal or state freedom of information (FOIA) statutes or other similar statutes in each of the following jurisdictions. (*If a similar statute is applicable, please specify the applicable statute along with the applicable jurisdiction, to the extent known)*:

_____

☐ True   ☐ False   One or more of the Investor's beneficial owners is subject to federal or state FOIA statutes or other similar statutes in each of the following jurisdictions. (*If a similar statute is applicable, please specify the applicable statute along with the applicable jurisdiction, to the extent known)*:

_____

-3-

PLTF_000780

☐ True   ☐ False   The Investor is a public agency, department, office or pension plan.  *(Please specify type and applicable jurisdiction.)*:

_____

☐ True   ☐ False   One or more of the Investor's beneficial owners is a public agency, department, office or pension plan.  (*If known, please specify type of owner and applicable jurisdiction below.*):

_____

-4-

PLTF_000781

# PRIVATE PLACEMENT MEMORANDUM
# & PREVIOUSLY DISTRIBUTED OFFERING MATERIALS


[All attached separately with Amended and Restated Company Agreement]

-5-

PLTF_000782

# PRIVATE PLACEMENT MEMORANDUM

## HOPEWELL-PILOT PROJECT, LLC

**PRIVATE PLACEMENT OF UP TO 1,000,000 INITIAL ADDITIONAL EQUITY SHARES**

THE OFFERING OF SECURITIES DESCRIBED HEREIN HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION.  THIS OFFERING IS MADE PURSUANT TO REGULATION S OR REGULATION D UNDER SECTION 4(a)(2) OF SAID ACT, WHICH EXEMPTS FROM SUCH REGISTRATION CERTAIN TRANSACTIONS. FOR THIS REASON, THESE SECURITIES WILL BE SOLD ONLY TO INVESTORS WHO MEET CERTAIN MINIMUM SUITABILITY QUALIFICATIONS DESCRIBED HEREIN.

A PROSPECTIVE INVESTOR SHOULD BE PREPARED TO BEAR THE ECONOMIC RISK OF AN INVESTMENT IN THE COMPANY FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE SHARES OR MEMBER'S INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE LAWS OF ANY OTHER JURISDICTION, AND, THEREFORE, CANNOT BE SOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.  THERE IS NO OBLIGATION OF THE ISSUER TO REGISTER THE SHARES OR MEMBER'S INTERESTS UNDER THE SECURITIES ACT OR THE LAWS OF ANY OTHER JURISDICTION. TRANSFER OF THE SHARES OR MEMBER'S INTERESTS IS ALSO RESTRICTED BY THE TERMS OF THE AMENDED AND RESTATED COMPANY AGREEMENT RELATING THERETO.

TABLE OF CONTENTS

I.      Executive Summary

II.     Term Sheet

III.    Technology

IV.     Risk Factors

V.      Previously Distributed Offering Materials

VI.     Subscription Booklet

VII.    Amended and Restated Company Agreement

PLTF_000783

I.      EXECUTIVE SUMMARY

The Hopewell – Pilot Project, LLC ("Hopewell" or the "Company") was formed in March 2016 for the purpose of demonstrating "Proof of Concept" involving the refinement, use, and application of a new proprietary software technology which can geographically sort and analyze land and mineral title records and related digital data for the purpose of acquiring Oil, Gas & Mineral interests in the most contemporary "tight sands" and "shale" plays.

The business concept behind the formation and funding of Hopewell depends upon five basic premises! They are:

1.  The more contemporary "tight sands" and "shale" plays are more commercially rewarding as the industry continues to refine and apply new horizontal completion and frac techniques to the areas best suited for the application of such technology.
2.  The best contemporary "tight sands" and "shale" plays were initiated 2010-2013 in a very competitive environment and the initial leasing effort was undertaken on a "trend basis" which provided less than 100% title review by contract land personnel.  Legal title opinions were generally only undertaken on "drill site" tracts.
3.  Operators tried to hold the maximum amount of leased acreage by forming large pooled units for the drilling and completion of lower cost vertical wells.  Many of such pooled units were formed without contemporary survey of leased acreage included.  In the past two years since mid 2014, as the cash flow to most Operators declined due to falling oil and gas prices, many pooled units were hastily formed and contain numerous irregularities.
4.  Most of the new initial leases taken in the contemporary "tight sands" and "shale" plays, unless "held by production", will expire in the 2016 -2017 time frame.  Many of the existing pooled units contain unleased acreage or have leased tracts that would have expired if not for a "pooled unit" designation.
5.   The most lucrative opportunities for Hopewell will occur in contemporary "tight sands" and "shale" plays located in geographical areas where significant land title problems exist .

Hopewell has identified four initial target areas in Madison County, Texas which it believes will optimize investment returns as well as provide "Proof of Concept".  The areas selected have multiple proven hydrocarbon pay zones which have demonstrated significant commercial production in recently completed horizontal wells.  Initial evaluation of the prospective areas indicate that there are unleased tracts in many of the existing Pooled or Declared Units.  Based upon recent field discussions, Hopewell believes that it can acquire new leases in the four areas for initial bonus and lease acquisitions costs of $1,000 per acre or less and by providing traditional lease royalty burdens to the related mineral owners.  In addition to open acreage, many of the existing Pooled or Declared Units and underlying pooled leases appear to have possible deficiencies.  Hopewell plans to continue detailed legal evaluation of these identified Units and underlying leases.  If warranted, upon conclusion of Hopewell's legal evaluation, Hopewell will seek to arrange additional financing for Company to pursue an aggressive "top lease" strategy for the purchase of new leases in the affected areas.  Hopewell has retained certain Financial Advisors to assist in obtaining up to $25,000,000 of prospective financing for the Company's possible execution of the top lease strategy.

Hopewell is seeking qualified debt and equity investors to provide up to $2,000,000 in new funds from the placement of up to 1,000,000 Initial Additional Equity Shares for the purpose of acquiring new lease and mineral interest acquisitions in the four initial target areas and for working capital to continue the Company's operations and evaluation of lease acquisition opportunities.

New leases acquired by the Company will be held for resale to Operators seeking to organize multi well horizontal drilling & completion programs or to provide the Company with working interest particpation in such development.  The Company's leasing activities will also likely provide opportunity to purchase term royalty and mineral interests on commercially favorable terms.

PLTF_000784

II.    TERM SHEET

THE INITIAL PRIVATE PLACEMENT:  Hopewell-Pilot Project LLC ("Hopewell" or the "Company") is seeking to privately arrange the placement of 1,000,000 shares ("Initial Additional Equity Shares) of the Company for $2,000,000, the proceeds of which are to be used to fund all operating overhead of the Company through December 31, 2016, and for the acquisition of Mineral Interests, primarily new Oil and Gas leases, in an agreed Area of Mutual Interest ("AMI") covering Madison County, TX and the Buda Rose play ("Buda Rose" play).

Threshold Placement Amounts - Initial Additional Equity Shares:

    Minimum Subscription Amount:  $250,000 – 125,000 shares
    Maximum Subscription Amount:  $2,000,000 – 1,000,000 shares

Pricing of Initial Additional Equity Shares:

    The price per share for all Initial Additional Equity Shares subscribed prior to closing shall be $2.00 per share.

Priority Rights to Distributions:

    Initial Additional Equity Shares shall have a priority right to cash distributions.  The Amended and Restated Company Agreement provides that the holders of Initial Additional Equity Shares shall receive all cash distributions made by the Company until such time as they have received $2.00 per share in distributions. Once the holders of the Initial Additional Equity Shares have received $2.00 per share in cash distributions, then all additional cash distributions made by the Company shall be paid uniformly on a per share basis.

Financial Advisors:

    The Company has retained Meridian Circle Advisors and may retain other financial advisors (collectively "Financial Advisors") to assist the Company in obtaining additional capital if needed for the acquisition of additional Oil, Gas & Mineral interests within the AMI.  Additional capital may involve the issuance of debt, convertible debt, preferred equity or the formation of a Limited Partnership involving the Company.

Shares Authorized and Outstanding:

    The Company has 5,000,000 authorized shares of which 1,000,000 have been issued to Founders and are currently outstanding.

Other Terms and Conditions:

    As provided in the Subscription Agreement and the Amended and Restated Company Agreement.

PLTF_000785

III.   TECHNOLOGY

The Founders have arranged and provided a cost based contract to Hopewell for the exclusive use of new proprietary software technology owned by Title Rover, LLC, an affiliate of the Founders.  Hopewell will pay only for the direct costs of digital data purchase, direct operations and traning of Hopewell personnel related to use of Title Rover's proprietary software in an agreed AMI covering Madison County, TX.  Direct costs are currently running $17,500 per month in addition to the purchase or acquisition of digital data.  Either party may terminate the contract beginning January 1, 2017 by providing 30 days prior written notice to the other.  The Company believes that the use of Title Rover technology in the evaluation of OG&M title will result in significant savings in both time and costs.

IV.   RISK FACTORS

A.   Although the Company has identified open or unleased acreage in many existing Pooled or Declared Units there is no certainty that leases of such acreage can be timely obtained or that leases can be obtained at the Company's estimated cost.

B.   Even if the Company is successful in obtaining new leases within existing Pooled or Declared Units there is no assurance that Operators of such Units will include the leases acquired by the Company in the Pooled or Declared Units without a legal action requiring "forced pooling" brought on behalf of the Company and the Lessor of the new leases.

C.   Even if the Company is successful in obtaining new leases within existing Pooled or Declared Units and the Company succeeds to include the new leases in the Pooled or Declared Units, the leasehold interests owned by the Company may not be sufficient to assure that new horizontal wells are drilled and completed and that such activity will be timely undertaken by the Operator.

D.   If the Company is not able to acquire a significant leased acreage position in the identified prospect areas, they Company may not be able to sell or consolidate its lease position with other operators undertaking development of the Buda Rose play.

E.   If oil and gas prices decline significantly, current Operators in the Buda Rose play may defer all horizontal development drilling until such time as prices recover.  If this proves to be the case then the Company may not realize any value for the leases it acquires for a prolonged period of time.

F.   Investment in oil, gas and mineral leases is a speculative undertaking with a high degree of risk.  Investors that cannot afford substantial risk and the entire loss of their invested capital should not undertake the proposed investment.

G.   There is no ready market for the shares of the Company. A prospective investor should be prepared to bear the economic risk of an investment in the Company for an indefinite period of time because the shares or Member's interests have not been registered under the Securities Act or the laws of any other **jurisdiction, and, therefore, cannot be sold unless they are subsequently registered of an exemption from registration is available.  There is no obligation of the Company to register the shares or Member's interests under the Securities Act or the Laws of any other** jurisdiction.

V.     PREVIOUSLY DISTRIBUTED OFFERING MATERIALS

      A.  Hopewell Executive Summary Teaser

      B.  Hopewell Project Highlights

      C.  Prospect Area Maps

VI.    SUBSCRIPTION BOOKLET - ATTACHED

VII.   AMENDED AND RESTATED COMPANY AGREEMENT - ATTACHED

PLTF_000787

**AMENDED AND RESTATED
COMPANY AGREEMENT**

**OF**

**HOPEWELL - PILOT PROJECT, LLC**

**A Texas Limited Liability Company**

_____, 2016

THE LIMITED LIABLITY COMPANY INTERESTS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES EXCHANGE COMMISSION OR UNDER ANY SECURITIES LAWS OF ANY STATE. THE TRANSFERABILITY OF SUCH INTERESTS IS RESTRICTED.  SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, OR TRANSFERRED, NOR WILL ANY ASSIGNEE, VENDEE, TRANSFEREE, OR ENDORSEE THEREOF BE RECOGNIZED AS HAVING ACQUIRED ANY SUCH INTERESTS BY THE ISSUER FOR ANY PURPOSE, UNLESS, AMONG OTHER THINGS, (1) A REGISTRATION STATEMENT FILED WITH THE SEC UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WITH RESPECT TO SUCH INTERESTS SHALL THEN BE IN EFFECT AND SUCH TRANSFER HAS BEEN QUALIFIED UNDER ALL APPLICABLE STATE SECURITIES LAWS, OR (2) THE AVAILABILITY OF AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION SHALL BE ESTABLISHED TO THE SATISFACTION OF COUNSEL TO HOPEWELL - PILOT PROJECT, LLC.

PLTF_000788

## AMENDED AND RESTATED
## COMPANY AGREEMENT
## OF
## HOPEWELL - PILOT PROJECT, LLC
### A Texas Limited Liability Company

This AMENDED AND RESTATED COMPANY AGREEMENT OF **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company (the "Agreement"), dated as of _____, 2016 ("Effective Date"), is adopted by the undersigned as the Managers and Members of the Company.

### Background Statements

WHEREAS, the initial Member of the Company executed a certain Company Agreement for the Company dated as of March 30, 2016 ("Original Company Agreement"), providing for certain rights and obligations with respect to the Company; and

WHEREAS, the Company wishes to admit certain Persons as Founding Members and as new Members of the Company as of the Effective Date and the Members hereby desire to amend and restate the Original Company Agreement in its entirety in the form of this Company Agreement on the terms herein provided in order to reflect the admission of the new Members to the Company and to make certain other amendments.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and agreements contained herein, the Members do hereby agree that the Original Company Agreement shall be amended and restated in its entirety in the form of this Company Agreement as of the Effective Date:

### ARTICLE I
### Definitions

*Section 1.1 Certain Definitions.* As used in this Agreement, the following terms shall have the meanings indicated:

"*Area of Mutual Interest*" means the agreed area of mutual interest for the Company Business covering Madison County, Texas; Houston County, Texas; Walker County, Texas; Leon County, Texas; and Grimes County, Texas.

"*Company*" means **HOPEWELL - PILOT PROJECT, LLC**, a Texas limited liability company.

"*Company Business*" means to acquire and own oil, gas and mineral leases, mineral interests, royalty interests, top leases, and options related to the foregoing in Madison County, Texas and to develop a land management, legal and technical team capable of implementing a similar

1

broader strategy to finance and acquire oil, gas and mineral leases, mineral interests, royalty interests, top leases, and options in the Area of Mutual Interest.

*"Deadlock"* has the meaning set forth in Section 6.2 of this Agreement.

*"Directors"* means the Persons named in this Agreement as Directors of the Company and any Persons hereafter elected as Directors of the Company as provided in this Agreement, but does not include any Person who has ceased to be a director of the Company.

*"Dispose," "Disposing," or "Disposition"* means a sale, assignment, transfer, exchange, mortgage, pledge, grant of a security interest, or other disposition or encumbrance (including, without limitation, by operation of law) of a Membership Interest in the Company.

*"Founding Members"* means those Members that receive Founders Shares as set forth on Schedule A.

*"Initial Additional Equity Shares"* means those shares issued as provided in Section 4.1. Initial Additional Equity Shares shall have a priority right to cash distributions and shall receive all cash distributions made by the Company until such time as the holders of such shares have received $2.00 per share.  Once the holders of the Initial Additional Equity Shares have received $2.00 per share in cash distributions, then all cash distributions thereafter shall be made uniformly on a per share basis to all shares then outstanding.

*"Majority Interest"* means Members holding among them at least a majority of all Ownership Percentages.

*"Managers"* means the Persons named in this Agreement as Managers of the Company and any Persons hereafter elected as Managers of the Company as provided in this Agreement, but does not include any Person who has ceased to be a manager of the Company.

*"Member"* means any Person executing this Agreement as of the date of this Agreement as a member or hereafter admitted to the Company as a member as provided in this Agreement, but does not include any Person who has ceased to be a member in the Company.

*"New Members"* means those Members other than Founding Members that purchase Initial Additional Equity Shares as provided in Section 3.2 and Section 4.1.

*"New Additional Members"* means those Members other than Founding Members or New Members that purchase additional Shares as provided in Section 3.2.

*"Ownership Percentage"* means the result derived by dividing the number of Shares held by a Member by the total number of Shares which are issued and outstanding. The initial Ownership Percentages of the Members as of the Effective Date are set forth on Schedule A.

*"Quarterly Operating Budget"* means the quarterly operating budget from time to time in effect as described in Section 6.8 of this Agreement.

PLTF_000790

*"Shares"* means the shares into which the ownership of Membership Interests in the Company are denominated, including all rights and interests of a Member with respect to the Shares issued under this Agreement including (i) the right of a Member to receive distributions under this Agreement by virtue of the Member's ownership of interests as an Member under this Agreement and (ii) all associated management rights, voting rights or rights to consent. The Shares held by the Members as of the Effective Date are set forth on Schedule A.

**Section 1.2  Other Definitions**.  The definitions of certain other capitalized terms used in this Agreement are set forth in Article XII.

## ARTICLE II
## Organization

**Section 2.1  Formation**.  The Company has been organized as a Texas limited liability company by the filing of Certificate of Formation (the *"Certificate"*) under and pursuant to the Code and the issuance of a certificate of formation for the Company by the Secretary of State of Texas.

**Section 2.2  Name**.  The name of the Company is "**HOPEWELL - PILOT PROJECT, LLC"**, and all Company business must be conducted in that name or such other names that comply with applicable law as the Managers may select from time to time.

**Section 2.3  Registered Office; Registered Agent; Principal Office in the United States; Other Offices**.  The registered office of the Company required by the Code to be maintained in the State of Texas shall be the office of the registered agent of the Company.  The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate or such other Person or Persons as the Managers may designate from time to time in the manner provided by law.  The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by Section 3.151 of the Code.  The Company may have such other offices as the Managers may designate from time to time.

**Section 2.4  Purposes**.  The sole purpose of the Company shall be to conduct the Company Business and all activities incidental to the Company Business in accordance with the applicable provisions of the Code, including, but not limited to: (i) entering into, performing, enforcing, and carrying out contracts of any kind necessary or desirable to, or in connection with, or incidental to the Company Business or, accomplishing the general purposes of the Company, (ii) acquiring oil, gas and mineral leases, mineral interests, royalty interests, top leases, and options in the Area of Mutual Interest and (iii) borrowing money and issuing evidence of indebtedness, and securing the same by mortgage, deed of trust, pledge, or other lien, in furtherance of the Company Business.

**Section 2.5  Term**.  The existence of the Company commenced on the date the Secretary of State of Texas issued a certificate of formation for the Company and shall continue in existence for

PLTF_000791

the period fixed in the Certificate for the duration of the Company, or such earlier time as this Agreement may specify.

**Section 2.6  Foreign Qualification**.  Prior to the Company's conducting business in any jurisdiction other than Texas, the Managers, if required by the laws of such jurisdiction, shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Managers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction.  At the request of the Managers, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

**Section 2.7  Mergers and Exchanges**.  The Company may be a party to: (a) a merger, or (b) an exchange or acquisition of the type described in the Code, if approved by a Majority Interest.

### ARTICLE III
### Membership

**Section 3.1  Authorization of Shares**.  There shall be 5,000,000 Shares authorized for issuance by the Company.  Additional Shares may be authorized from time to time with the consent of the Board of Directors and a Majority Interest.

**Section 3.2  Additional Membership Interests**.  Except for authorized Shares to be issued as described in Section 4.1, additional authorized Shares or other Membership Interests may be created and issued by the Company only with the consent of the Board of Directors and a Majority Interest. The terms of admission or issuance must specify the Ownership Percentages applicable thereto and may provide for the creation of different classes or groups of Members having different rights, powers, and duties.  The creation of any new class or group shall be reflected in an amendment to this Agreement indicating the different rights, powers, and duties.

At any time the Company proposes to issue additional Shares or other Membership Interests, the Company shall give written notice of the offering to the Members, setting forth the purchase price, rights and limitations of such Shares or other Membership Interests and the terms and conditions upon which they are proposed to be issued.  Each Member shall have the preemptive right (based upon its then current Ownership Percentage) to acquire its share of such Shares or other Membership Interests.  Each Member must exercise such preemptive rights by purchasing, within ten (10) Business Days of receiving the written notice of offering from the Company, its share (based upon its then current Ownership Percentage) of the Shares or other Membership Interests upon the terms and conditions and for the purchase price set forth in the written notice of offering from the Company.  If any Member does not elect to purchase its full share of the Shares or other Membership Interests, the balance of the Shares or other Membership Interests may be sold by the Company to Members or one or more third parties, but only upon the terms and conditions and for the purchase price set forth in the written notice of offering from the Company or upon more economically favorable terms to the Company and the existing Members. The price per Share of any

PLTF_000792

additional Shares offered by the Company under this Section 3.2 shall be $2.50 per Share unless the Board of Directors shall determine otherwise.

**Section 3.3  Liability to Third Parties**.  No Member shall be liable for the debts, obligations or liabilities of the Company, including debts, obligations, or liabilities which are imposed under a judgment decree or order of a court.

**Section 3.4  Admission of Assignees or Members**.  Except as provided in the next sentence of this Section 3.4, a disposition, sale, assignment or other transfer of a Membership Interest shall not entitle the transferee to become a Member of the Company, but instead shall entitle the transferee to the right to receive distributions, allocations and other economic benefits from the Company which are attributable to the purchased Interest.  Assignees may be admitted as Members only with the consent of a Majority Interest and a majority of the Managers.

**Section 3.5  Withdrawal**.  A Member does not have the right or power to withdraw from the Company as a Member.

**Section 3.6  Compensation for Members**.  No Member shall receive any compensation from the Company in such Member's capacity as a Member.  However, any Member may be employed in the business of the Company at the discretion of the Managers and, in connection therewith, may receive reasonable compensation for services rendered.

**Section 3.7  Restrictions on the Disposition of an Interest**.

(a)    Except as specifically provided in this Section 3.7, a Disposition of all or any part of a Membership Interest may not be effected without the consent of a Majority Interest. Any attempted Disposition by a Person of an interest or right, or any part thereof, in or with respect to the Company other than in accordance with this Section 3.7 shall be, and is hereby declared, null and void *ab initio*.

(b)    Provided that the consent of a Majority Interest to such Disposition has been obtained, a Member or an Assignee may Dispose of all or a portion of his Membership Interest if he, prior to making such Disposition, first offers (an "Offer") such portion of the Membership Interest (the "Offered Interest") for sale to the Company and the other Members (the "Remaining Members").  The Offer shall be made for the price and upon the terms at which the proposed Disposition is to occur (the "Proposed Price"). The Offer shall be made by written notice which shall state that the Offer is being made pursuant to this Section and which shall set forth the Ownership Percentage attributable to the Offered Interest, the name or names of the proposed purchaser or purchasers of the Offered Interest, the Proposed Price, method of payment of the Proposed Price (the "Proposed Terms"), and the scheduled date of consummation of the proposed sale.  A copy of the written offer, and any proposed sales agreement, from or with the proposed purchaser shall be attached to the Offer.  The Company shall have the option exercisable during the ensuing thirty (30) day period to accept the Offer.  If the Company does not accept the Offer, then the Remaining Members shall have the option for ten (10) days from the date of the termination of such thirty (30) day period to elect to collectively purchase all, but not less than all, of the Offered Interest, pro

PLTF_000793

rata, in accordance with their relative Ownership Percentages. Any two or more Remaining Members may agree among themselves to reallocate the portions of the Offered Interest to be purchased by them from their respective pro rata portions. The payment of the respective purchase price shall be payable pursuant to the Proposed Terms. If neither the Company nor the Remaining Members elect to purchase all of the Offered Interest in accordance with this Section 3.7(b), then the Selling Member may sell not less than all of the Offered Interest at any time within, but not subsequent to, sixty (60) days after the lapse of the options granted pursuant to this Section; provided, however, that such sale must be made to the third party purchaser and for the price and in accordance with the terms specified in the Offer notice.

(c)      The Company may not recognize for any purpose any purported Disposition of all or part of a Membership Interest unless and until the other applicable provisions of this Section 3.7 have been satisfied and the Company has received a document which:

i)      has been executed by both the Member effecting the Disposition (or if the transfer is on account of the death or incapacity of the transferor, its representative) and the Person to which the Membership Interest or part thereof is Disposed;

ii)      includes the notice address of the transferee and his or its agreement to be bound by this Agreement in respect of the Membership Interest or part thereof being acquired;

iii)      sets forth the Ownership Percentages which will be effective after the Disposition of the Member effecting the Disposition and the Person to which the Membership Interest or part thereof is Disposed (which together must total the Ownership Percentage of the Member effecting the Disposition before the Disposition); and

iv)      the Disposition was made in accordance with all applicable laws and regulations (including securities laws), including the following:

(1) the Member effecting the Disposition and the Person to which the Membership Interest or part thereof is Disposed acknowledge and agree that the Membership Interest has not been registered under the Securities Act or applicable state securities laws and are being sold pursuant to the exemptions from registration offered by the Securities Act and by applicable state law provisions; and

(2) the Person to which the Membership Interest or part thereof is Disposed must acknowledge and agree his understanding that, as a result of paragraph (1), immediately above, (i) he must bear the economic risk of investment in the Membership Interest for an indefinite period of time; (ii) the Membership Interest may not be sold, assigned, or transferred, nor will any assignee, vendee, transferee, or endorsee thereof be recognized as having acquired any such interests by the issuer for any purpose, unless, among other

6

things, (x) a registration statement under the Securities Act, with respect to such Membership Interest shall then be in effect (and such transfer has been qualified under all applicable state securities laws), or (y) the availability of an exemption from such registration and qualification shall be established to the satisfaction of counsel to the Company.

Each Disposition and, if applicable, admission into membership complying with the provisions of this Section 3.7(c) is effective as of the first day of the calendar month immediately succeeding the month in which the Company receives the notification of Disposition and the other requirements of this Section 3.7 have been met.

(d)     The Member effecting a Disposition and any Person admitted to the Company in connection therewith shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the Disposition or admission on or before the tenth day after the receipt by that person of the Company's invoice for the amount due.  If payment is not made by the date due, the Person owing that amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the maximum rate allowed by law.

*Section 3.8 Other Activities.*  The Members acknowledge that the Members and Managers are engaged in activities other than the activities of the Company and that neither Members nor the Managers shall be expected or required to devote their full time to the management of the Company except as provided in any separate agreement or instrument.  Except as otherwise provided in this Agreement or any other agreement or instrument, participation in the Company shall not in any way act as a restraint on the other present or future business activities or investments of any Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member.  Except as otherwise provided in this Agreement or any other agreement or instrument, no Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member shall, under any circumstances, be obligated or bound to offer or present to the Company or any of the other Members any business opportunity presented or offered to them or the Company as a prerequisite to the acquisition of or investment in such business opportunity by such Member or Manager or any employee, officer, manager, director, member, partner or shareholder of such Member for its account or the account of others.  The provisions of this Section shall not serve to waive or limit the provisions of any other written agreement or instrument binding upon any Member or Manager.

Each Member shall be required to execute and deliver to the Company a Confidentiality and Non-Competition Agreement as a condition of acquiring any Shares of the Company.

*Section 3.9     Purchase Options Upon the Occurrence of Certain Events*. In the event (i) a Member dies or becomes legally incapacitated, (ii) a Member institutes or there is instituted against a Member any proceeding under the United States Bankruptcy Code or any other foreign, federal or state bankruptcy, receivership, insolvency or other similar law affecting the rights of creditors generally or (iii) the spouse of a Member becomes entitled to any interest in the Shares of such Member by virtue of a divorce or property settlement agreement executed in connection with such divorce, then for a period of ninety (90) days following the date of such event, the Company shall have the right to purchase the Shares registered in the name of the deceased, incapacitated, bankrupt or

7

divorced Member, as the case may be ("Affected Member"). The Company shall exercise its purchase right by giving written notice of such exercise to the Affected Member (or its representative) within such ninety (90) day period. If the Company does not elect to exercise its first right to purchase the Shares registered in the name of the Affected Member, for a period of thirty (30) days following the expiration of the Company first right to purchase such Shares, the Remaining Members shall have the right to purchase such Shares. The Remaining Members shall exercise their purchase right by giving written notice of such exercise to the Affected Member (or its representative) within such thirty (30) day period.

The purchase price shall be an amount equal to the fair market value of the Shares determined by agreement of the Affected Member (or its representative) and the purchaser of the Shares ("Purchaser"); however, if the Purchaser and the Affected Member (or its representative) do not agree on such fair market value on or before fifteen (15) days following the exercise of the purchase right, then the fair market value of each share of Shares shall be equal to the Appraised Value of each Share of the Company as determined by an appraisal of the Shares (the "Appraised Value") by an accounting firm or any other qualified appraiser selected by the Manager.

The appraisal shall determine the Appraised Value of the Shares as of the end of the most recently completed calendar quarter. The Appraised Value shall be the maximum amount that would be distributed in respect of the Shares in any Distribution Event if (i) all of the Company's assets were sold at their fair market value, (ii) the Company was liquidated and all liabilities and obligations of the Company are paid, including, without limitation, liabilities and obligations to Members, and (iii) the proceeds of such liquidation were distributed to the Members pursuant to this Agreement. A "Distribution Event" means (i) any winding up or liquidation of Company and (ii) any merger, consolidation or other transaction pursuant to which all of the Company's Shares are converted into or exchanged for cash, securities of another entity, real or other property or any other consideration. The cost of the appraisal shall be divided equally between the Purchaser and the Affected Member.

The sale and purchase of Shares under this Section shall be closed within sixty (60) days from the date of the receipt by the Affected Member (or its representative) of the last notice from the Purchaser and the Affected Member (or its representative) shall deliver a written assignment of the Shares at the closing of the sale and purchase of the Shares, free and clear of all liens. The Purchaser shall pay the purchase price for the Shares by making a down payment of 25% of the purchase price at the closing of the sale and purchase of the Shares, with the balance to be paid in three equal cash installments, (together with accumulated interest on the amount unpaid at the interest rate of 5% per annum) due on each of the first three anniversaries of the closing.

**Section 3.10   Buy-Sell Procedure Upon a Deadlock.**  Following a Deadlock and as long as such Deadlock remains unresolved, in the event that any Member should desire to purchase all of the interest of another Member in the Company or to sell to another Member all of such Member's interest in the Company, such Member ("Offeror Member") shall give written notice to such other Member ("Offeree Member") that the Offeror Member intends to exercise its right under this Section 3.10, setting forth the price, terms and conditions for which the Offeror Member will purchase the interest of the Offeree Member in the Company.  The consideration for any such purchase or sale under this Section 3.10 shall be only in the form of cash, and the purchasing Member shall be required to obtain

PLTF_000796

the release of the selling Member for any liability for money borrowed by the Company.  Such notice shall constitute an irrevocable offer by the Offeror Member to purchase the interest of the Offeree Member in the Company or, in the alternative, and at the option of the Offeree Member, an irrevocable offer to sell the interest of the Offeror Member in the Company to the Offeree Member, for the price per Share and on the terms and conditions set forth in the written notice.  Within fifteen (15) days after the receipt of such written notice, the Offeree Member shall be required to give the Offeror Member written notice of such Offeree Member's acceptance of the Offeror Member's offer to either (i) purchase the interest of the Offeree Member in the Company or (ii) sell to the Offeree Member the interest of the Offeror Member in the Company.  If the Offeree Member shall not reply to the written notice from the Offeror Member within such fifteen (15) day period, the Offeree Member shall be deemed to have accepted the Offeror Member's offer to purchase the interest of the Offeree Member in the Company for the price and on the same terms and conditions as that contained in the written notice.  The closing of any such transaction shall take place within ten (10) days following the expiration of such fifteen (15) day period at the principal place of business of the Company.

### ARTICLE IV
### Capital Contributions

*Section 4.1  Initial Capital Contributions*.

The Founding Members have been issued Founders Shares as set forth on Schedule A and will be issued the number of Initial Additional Equity Shares as set forth on Schedule A according to that Founding Member's Capital Commitment for Initial Additional Equity Shares. Each Founding Member and each New Member will make additional capital contributions to the Company equal to its Capital Commitment for Initial Additional Equity Shares on or before July 30, 2016, or, if sooner, within ten (10) days following a call for such amounts are made by the Managers.  Each of the Initial Additional Equity Shares shall be issued based upon a $2.00 subscription price per share.

The Company will apply the proceeds of the Capital Contributions made as of the Effective Date in accordance with Exhibit A.

*Section 4.2  Return of Contributions*.  A Member is not entitled to the return of any part of its Capital Contribution.  An unpaid Capital Contribution is not a liability of the Company or of any Member. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

*Section 4.3  Advances by Members*.  If the Company does not have sufficient cash to pay its obligations, any Member(s) that may agree to do so with the consent of the Managers may advance all or part of the needed funds to or on behalf of the Company under such terms and conditions as shall be agreed to by the Managers and the advancing Member.

*Section 4.4  Capital Accounts*.  The provisions of this Section 4.4 shall apply whenever the Company is treated as a partnership for federal income tax purposes.  A Capital Account shall be established and maintained for each Member.  Each Member's Capital Account:

      (a)      shall be increased by:

9

      i)     the amount of money contributed by that Member to the Company,

      ii)     the agreed value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under Section 752 of the Tax Code), and

      iii)     allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treasury Regulation Section 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treasury Regulation Section 1.704-(b)(4)(i); and

(b)     shall be decreased by:

      i)     the amount of money distributed to that Member by the Company,

      ii)     the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under Section 752 of the Tax Code),

      iii)     allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Tax Code, and

      iv)     allocations of Company losses and deductions (or items thereof), including losses and deductions described in Treasury Regulation Section 1.704-1(b)(2)(iv)(g), but excluding items described in clause (b)(iii) above and losses or deductions described in Treasury Regulation Section 1.704-1(b)(4)(i) or Section 1.704(b)(4)(iii).

The Members' Capital Accounts also shall be maintained and adjusted as permitted by the provisions of Treasury Regulation Section 1.704-(b)(2)(iv)(f) and as required by the other provisions of Treasury Regulation Sections 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Treasury Regulation Section 1.704-1(b)(2)(iv)(g). A Member that has more than one Membership Interest shall have a single Capital Account that reflects all its Membership Interests, regardless of the class of Membership Interests owned by that Member and regardless of the time or manner in which those Membership Interests were acquired. On the transfer of all or part of a Membership Interest, the Capital Account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(l).

PLTF_000798

# ARTICLE V
## Allocations and Distributions

***Section 5.1     Allocations***. Subject to Section 5.3, net income (and items thereof) and net loss (and items thereof) for any fiscal year shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after giving effect to such allocation, is, as nearly as possible, equal (proportionately) to the amount of the distributions that would be made to such Member during such fiscal year pursuant to Section 5.2, determined as if (i) the Company were dissolved and terminated; (ii) its affairs were wound up and each Company asset was sold for cash equal to its book value; (iii) all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the book value of the assets securing such liability); and (iv) the net assets of the Company were distributed in accordance with Section 5.2 to the Members.

***Section 5.2     Distributions***. Distributions shall be made to the Members at such times as determined by the Managers in the following priority:

(a)     If the Members have taxable income attributable to their ownership of any Shares for a taxable year, the Company shall distribute to the Members, in accordance with their Ownership Percentages, subject to any contractual restrictions, limitations or conditions affecting the Company, an amount of distributions ("Tax Distributions") equal to the estimated maximum federal and state income and (if applicable) franchise and margin tax rates applicable to the Members and their equity interest owners times the aggregate taxable income of the Members from the Company for that taxable year. Any Tax Distributions shall be applied to reduce subsequent distributions to such Member under Section 5.2(b).

(b)     Thereafter, all remaining cash of the Company shall be distributed to the Members in accordance with their respective Ownership Percentages as of such distribution date.

***Section 5.3 Special Allocations and Tax Allocations.***

(a)     Special Allocations.  The following special allocations shall be made in the following order:

(i)     Minimum Gain Chargeback.  Notwithstanding any other provision of this Article, if there is a net decrease in partnership minimum gain (as defined in Treasury Regulations Section 1.704-2(b)(2) and (d)) during any fiscal year, the Members shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in partnership minimum gain, determined in accordance with Treasury Regulations Section 1.704-2(f) and (g).  This Section 5.3(a)(i) is intended to comply with the minimum gain chargeback requirement in such section of the Treasury Regulations and shall be interpreted consistently therewith.

(ii)     Member Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 5, if there is a net decrease in Member nonrecourse debt minimum gain attributable to a Member nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(i)) during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal

11

year (and, if necessary, subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in Member nonrecourse debt minimum gain attributable to such Member's nonrecourse debt, determined in accordance with Treasury Regulations Section 1.704-2(i).  This Section 5.3(a)(ii) is intended to comply with the minimum gain chargeback requirement in such section of the Treasury Regulations and shall be interpreted consistently therewith.

(iii)    Qualified Income Offset.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit, if any, in such Member's capital account (as determined under Treasury Regulations Section 1.704-1) as quickly as possible; *provided that* an allocation pursuant to this Section 5.3(a)(iii) shall be made only if and to the extent that such Member would have such capital account deficit after all other allocations provided for in Section 5.3(a) have been tentatively made as if this Section 5.3(a)(iii) were not in this Agreement.  This Section 5.3(a)(iii) is intended to comply with the qualified income offset provisions in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(iv)    Gross Income Allocation.  In the event any Member has a deficit balance in such Member's capital account (as determined after crediting such capital account for any amounts that such Member is obligated to restore or is deemed obligated to restore pursuant to Treasury Regulations Section 1.704-2), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such deficit (as so determined) of such Member's capital account as quickly as possible; *provided that* an allocation pursuant to this Section 5.3(a)(iv) shall be made only if and to the extent that such Member would have such capital account deficit (as so determined) after all other allocations provided for in Section 5.3(a) (other than Section 5.3(a)(iii)) have been tentatively made as if this Section 5.3(a)(iv) were not in this Agreement.

(v)    Loss Allocation Limitation.  No allocation of net loss (or items thereof) shall be made to any Member to the extent that such allocation would create or increase a deficit in such Member's capital account (as determined after debiting such capital account for the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6) and crediting such capital account for any amounts that such Member is obligated to restore or is deemed obligated to restore pursuant to Treasury Regulations Section 1.704-2).

(b)    Tax Allocations

(i)    General Rules.  Except as otherwise provided in Section 5.3(b)(ii), for each fiscal period, items of Company income, gain, loss, deduction and expense shall be allocated, for federal, state and local income tax purposes, among the Members in the same manner as the net income (and items thereof) or net loss (and items thereof) of which such items or components were allocated pursuant to Section 5.1.

(ii)    Section 704(c) of the Tax Code.  Income, gains, losses and deductions with respect to any property (other than cash) contributed or deemed contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take

12

account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of the contribution or deemed contribution in accordance with Section 704(c) of the Tax Code and the Treasury Regulations promulgated thereunder.

If there is a revaluation of Company property, subsequent allocations of income, gains, losses or deductions with respect to such property shall be allocated among the Members so as to take account of any variation between the adjusted tax basis of such property to the Company for federal income tax purposes and its fair market value in accordance with Section 704(c) of the Tax Code and the Treasury Regulations promulgated thereunder.

(iii)    Capital Accounts Not Affected.  Allocations pursuant to this Section 5.3(b) are solely for federal, state and local tax purposes and shall not affect, or in any way be taken into account in computing, any Member's capital account or allocable share of net income (or items thereof) or net loss (or items thereof).

## ARTICLE VI
## Board of Directors

*Section 6.1  Board of Directors*.  Except for situations in which approval of the Members is required by this Agreement or by nonwaivable provisions of applicable law, the powers of the Company shall be exercised under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Board of Directors of the Company. The Board of Directors of the Company shall have with respect to the Company the powers and duties of the Board of Directors of a corporation formed under the Code

*Section 6.2  Number of Directors;  Qualification and Election.*  The Company shall initially have two Directors, whose names are set forth on Schedule B to this Agreement.  The number of Directors may be changed from time to time by resolution of the Directors. The Directors shall be elected at the annual meeting of the Members or at a special meeting of the Members called for that purpose, beginning with the 2017 annual meeting of the Members. Cumulative voting shall be allowed in the election of Directors, and each Member shall have one vote for each Share held by such Member, multiplied by the number of Directors to be elected. A Member shall be entitled to accumulate his votes and distribute his votes among any number of Director nominees. Each Director elected shall hold office until a successor shall be elected and shall qualify, or until his death, resignation, or removal in the manner herein provided. Any Director may be removed as such, either with or without cause, by action of the Members who voted for the election of such Director.

In the event of a tie vote by the Board of Directors with respect any matters to be decided by the Board of Directors that continues for a period of five (5) business days, the Board of Directors shall endeavor to unanimously appoint an independent fifth Director to the Board of Directors.  In the event the parties cannot agree to the appointment of the independent Director to the Board of Directors within 5 business days, a "Deadlock" shall be deemed to have occurred, and the provisions of Section 3.10 shall apply

PLTF_000801

***Section 6.3  Vacancy***.  Any vacancy occurring among the Directors shall be filled by a vote of a Majority Interest.  A Director elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office and until his successor is elected, or his earlier death, resignation or removal.

***Section 6.4  Action by the Directors***. The Directors shall act as a Board, and each Director shall have one vote with respect to all matters to be decided by the Board of Directors. The act of a majority of the Directors then serving shall be the act of the Directors. No Director or Member shall take any action with respect to the management of the Company or act as an agent of the company for purposes of carrying out the Company's business and affairs, without the consent or authorization of Board of Directors, except as provided in this Agreement.

***Section 6.5  Annual Meetings***.  The annual meeting of the Board of Directors shall be held immediately following the annual meeting of Members, and at the same place at which the annual meeting of Members is held.

***Section 6.6  Special Meetings***.  Special meetings of the Board of Directors may be called by the Directors or any Member.  The Person calling the meeting may fix any place for holding the meeting.  Notice of each special meeting of the Board of Directors shall be given to each Director at least three days before the date of the meeting, in writing.  Except as may be otherwise provided by law, the Certificate, or this Agreement, neither the business to be transacted at, nor the purpose of, any special meeting need be specified in the notice or waiver of notice of such meeting.

***Section 6.7  Written Consent***.  Any action required or permitted to be taken at a meeting of the Directors may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by at least the minimum number of Directors necessary to take action at a meeting at which all Directors were present and voted.

***Section 6.8  Quarterly Operating Budgets***.  No later than fifteen (15) days prior to the end of each calendar quarter, the Board of Directors shall approve and adopt a quarterly operating budget ("Quarterly Operating Budget") setting forth the estimated receipts and expenditures of the Company for the succeeding calendar quarter. No expenditures exceeding a 10% variance from the approved Budget may be made by the Company without the approval of the Board of Directors. The initial Quarterly Operating Budget for the second calendar quarter of 2016 is attached as Exhibit B to this Agreement.

***Section 6.9  Title Rover Services Agreement***. The Company is authorized to enter into a services agreement with Title Rover, LLC, a company owned and controlled by Mark A. Willis, and any renewals, modifications and replacements of such agreement.

PLTF_000802

# ARTICLE VII
## Managers and <u>Officers</u>

*Section 7.1  Appointment*.  The Company shall initially have two (2) Managers, whose names are set forth on the signature pages to this Agreement.  The number of Managers may be changed from time to time by resolution of the Managers. The Managers shall be appointed from time to time by the Majority Interest. The Managers shall be authorized to manage and conduct the day to day business of the Company, subject to the directives of the Board of Directors and the Majority Interest. Each Manager may act as an agent of the company for purposes of carrying out the Company's business. The Managers may but shall not be required to designate individuals to serve as officers of the Company as the Managers shall determine from time to time, including but not limited to a President and one or more Vice Presidents.  The initial President of the Company shall be Mark A. Willis. No officer need be a resident of the state of Texas, a Member or a Manager.  Any officers so designated shall have such authority to perform such duties as the Managers may, from time to time, delegate to them.  The Managers may assign titles to particular officers.  Unless the Managers decide otherwise, if the title is one commonly used for officers of a corporation formed under the Code, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Managers pursuant to the third sentence of this Section 7.1.  Each officer shall hold office until his successor shall be duly designated and shall qualify or until his death or until he shall resign or shall have been removed in the manner hereinafter provided.  Any number of offices may be held by the same individual.  The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Managers.

*Section 7.2  Resignation*.  Any officer may resign as such at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Managers.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.  Any officer may be removed as such, either with or without cause, by the Managers whenever in their judgment the best interests of the Company will be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the Person so removed.  Designation of an officer shall not be deemed of itself to create contract rights on the part of any person.  Any vacancy occurring in any office of the Company (other than Managers) may be filled by the Managers.

# ARTICLE VIII
## Meetings of Members

*Section 8.1 Meetings*.

(a)  A quorum shall be present at a meeting of Members if the holders of a Majority Interest are represented at the meeting in person or by proxy.  Except as specifically provided herein, with respect to any matter considered at such a meeting the affirmative vote of a Majority Interest shall be the act of the Members.

PLTF_000803

(b)     All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or without the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meeting by means of conference telephone or similar communications equipment pursuant to Section 8.5.

(c)     Notwithstanding the other provisions of the Certificate or this Agreement, the chairman of the meeting appointed pursuant to Section 8.4 or the holders of a Majority Interest shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the remainder of the adjourned meeting.  If such meeting is adjourned, such time and place shall be determined by a vote of the holders of a Majority Interest.  Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d)     An annual meeting of the Members shall be held at such place, within or without the state of Texas, on such date and at such time as a Majority Interest shall fix and set forth in the notice of the meeting, which date shall be within thirteen (13) months subsequent to the date of formation of the Company or the last annual meeting of Members (whichever most recently occurred.)

(e)     Special meetings of the Members for any proper purpose or purposes may be called at any time by the owners of Membership Interests holding at least twenty percent (20%) of the Ownership Percentages of all Members.  If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting.  Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

(f)     Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) days nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the Member calling the meeting, to each Member entitled to vote at such meeting.  If mailed, any such notice shall be deemed to be delivered when deposited in the mail, addressed to the Member at his address provided for in Section 13.2, with postage thereon prepaid.

***Section 8.2 Voting List***.  The Managers shall make, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of and the Ownership Percentages held by each, which list, for a period of ten (10) days prior to such meeting, shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours.  Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting.  The original membership records shall be prima facie evidence as to who are the Members entitled to examine such list or transfer records or to vote

16

at any meeting of Members.  Failure to comply with the requirements of this Section shall not affect the validity of any action taken at the meeting.

*Section 8.3  Proxies*.  A Member may vote either in person or by proxy executed in writing by the Member.  A telegram, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section.  Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Members, before or at the time of the meeting or execution of the written consent, as the case may be.  No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy.  A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest.

*Section 8.4  Conduct of Meetings*.  All meetings of the Members shall be presided over by the chairman of the meeting, who shall be a Member (or representative thereof) designated by a Majority Interest.  The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him in order.

*Section 8.5  Action by Written Consent or Telephone Conference*.

(a)     Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing setting forth the action so taken, shall be signed by the holder or holders of not less than the minimum Ownership Percentages that would be necessary to take such action at a meeting at which the holders of all Membership Interests entitled to vote on the action were present and voted.  Every written consent shall bear the date of signature of each Member who signs the consent.  No written consent shall be effective to take the action that is the subject to the consent unless, within sixty (60) days after the date of the earliest dated consent delivered to the Company in the manner required by this Section, a consent or consents signed by the holder or holders of not less than the minimum Ownership Percentages that would be necessary to take the action that is the subject of the consent are delivered to the Company by delivery to its registered office or its principal place of business.  Delivery shall be by hand or certified or registered mail, return receipt requested.  A telegram, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member shall be regarded as signed by the Member for purposes of this Section.  Prompt notice of the taking of any action by Members without a meeting by less than unanimous written consent shall be given to those Members who did not consent in writing to the action.

(b)     The record date for determining Members entitled to consent to an action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office or its principal place of business.  Delivery shall be by hand or by certified or registered mail, return receipt requested.

PLTF_000805

(c)     Members may participate in and hold a meeting by means of conference, telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

## ARTICLE IX
## Indemnification

*Section 9.1  Exculpation.*  Neither any Manager, any Director, any Member nor any Person appointed to act as liquidator under Article XI (each a "Covered Person") shall be liable to the Company or any Member under any theory of law, including tort, contract or otherwise (INCLUDING A COVERED PERSON'S OWN NEGLIGENCE) for any loss, damage or claim incurred by reason of any act or omission by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, including any such loss, damage or claim attributable to errors in judgment, negligence or other fault of such Covered Person, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of gross negligence or willful misconduct of such Covered Person.  A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

*Section 9.2  Right to Indemnification.*  Subject to the limitations and conditions as provided in this Article IX, each Manager or Director who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a "*Proceeding*"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she is acting on behalf of the Company or was serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise, shall be indemnified by the Company to the fullest extent permitted by the Code, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorneys' fees) actually incurred by such Manager in connection with such Proceeding, and indemnification under this Article IX shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder.  The rights granted pursuant to this Article IX shall be deemed contract rights, and no amendment, modification

18

or repeal of this Article IX shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal.  **It is expressly acknowledged that the indemnification provided in this Article IX could involve indemnification for negligence of the Manager or under theories of strict liability.**

    *Section 9.3  Advance Payment*.  The right to indemnification conferred in this Article IX shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by the Manager of the type entitled to be indemnified under Section 9.1 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Manager's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Manager in advance of the final disposition of a Proceeding, shall be made only upon delivery to the Company of a written affirmation by such Manager of his or her good faith belief that he has met the standard of conduct necessary for indemnification under this Article IX and a written undertaking, by or on behalf of such Manager, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Manager is not entitled to be indemnified under this Article IX or otherwise.

    *Section 9.4  Indemnification of Officers, Employees and Agents*.  The Company, by adoption of a resolution of a Majority Interest, may indemnify and advance expenses to any other manager, officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Managers under this Article IX; and, the Company may indemnify and advance expenses to Persons who are not or were not Managers, officers, employees or agents of the Company but who are or were serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent of similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such capacity or arising out of his status as such a Person to the same extent that it may indemnify and advance expenses to Managers under this Article IX.

    *Section 9.5  Nonexclusivity of Rights*.  The right to indemnification and the advancement and payment of expenses conferred in this Article IX shall not be exclusive of any other right which a Manager or other Person indemnified pursuant to this Article IX may have or hereafter acquire under any law (common or statutory), provision of the Certificate or this Agreement, agreement or vote of Manager or disinterested Members or otherwise.

    *Section 9.6  Insurance*.  The Company may purchase and maintain insurance, at its expense, to protect itself and any Person who is or was entitled to indemnification pursuant to this Article IX.

    *Section 9.7 Member Notification*.  To the extent required by law, any indemnification of or advance of expenses to a Person in accordance with this Article IX shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting and, in any case, within the 12-month period immediately following the date of the indemnification or advance.

PLTF_000807

*Section 9.8  Savings Clause*.  If this Article IX or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Person indemnified pursuant to this Article IX as to costs, charges and expenses (including attorneys' fees) judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative, to the full extent permitted by any applicable portion of this Article IX that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE X
## Books, Records, Reports, and Bank Accounts

*Section 10.1  Maintenance of Books*.  The Company shall keep books and records of account and shall keep minutes of the proceedings of its Managers and Members.

*Section 10.2  Reports*.  On or before the 120th day following the end of each fiscal year during the term of the Company, the Managers of the Company shall cause the Company to provide such financial information regarding the Company as the Majority Interest shall reasonably request.

## ARTICLE XI
## Event Requiring A Winding Up, Liquidation, and Termination

*Section 11.1  Event Requiring A Winding Up*.  The Company shall wind up its affairs on the first to occur of the following (a *"Event Requiring A Winding Up"*):

    (a)    the written consent of the Board of Directors and a Majority Interest;

    (b)    the date the Company has no Members; or

    (c)    the entry of a decree of an Event Requiring A Winding Up of the Company under Section 11.301 of the Code.

*Section 11.2  Liquidation and Termination*.  Upon the occurrence of an Event Requiring A Winding Up of the Company, a Majority Interest shall elect one or more Members as liquidator.  The liquidator shall proceed to diligently wind up the affairs of the Company and make final distributions as provided herein and in the Code.  The costs of liquidation shall be borne as a Company expense.  Until final distribution, the liquidator shall continue to operate the Company properties.  The steps to be accomplished by the liquidator are as follows:

    (a)    as promptly as possible after an Event Requiring A Winding Up and again after final liquidation, the liquidator shall cause a proper accounting to be made of the Company's assets, liabilities, and operations through the last day of the calendar month in which the winding up occurs or the final liquidation is completed, as applicable;

    (b)    the liquidator shall cause the notice described in the Code to be mailed to each known creditor of and claimant against the Company in the manner described in the Code;

PLTF_000808

(c)     the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d)     all remaining assets of the Company shall be distributed to the Members as provided in this Agreement.

**Section 11.3  Certificate of Termination**.  On completion of the distribution of Company assets as provided herein, the Company is terminated, and the liquidator (or such other Person or Persons as the Code may require or permit) shall file a Certificate of Termination with the Secretary of State of Texas, and take such other actions as may be necessary to terminate the legal existence of the Company.

**Section 11.4  Deficit Capital Accounts**.  Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, the deficit, if any, in the Capital Account of any Member shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

## ARTICLE XII
### Definitions

**Section 12.1  Definitions**.  As used in this Agreement, the following terms shall have the following meanings:

"*Agreement*" has the meaning given that term in the introductory paragraph to this document.

"*Assignee*" means any Person that acquires any portion of a Membership Interest through a Disposition who has not been admitted as a Member pursuant to Section 3.4.

"*Business Day*" means any day other than a Saturday, Sunday, or a holiday on which national banking associations in the State of Texas are closed.

"*Capital Accounts*" means the capital accounts established and maintained for each Member and Assignee pursuant to Section 4.4.

"*Capital Contribution*" means any contribution by a Member to the capital of the Company.

"*Certificate*" has the meaning given that term in Section 2.1.

"*Code*" means the Texas Business Organizations Code and any successor statute, as amended from time to time.

PLTF_000809

"*Membership Interest*" or "*Interest*" means the interest of a Member in the Company and his or her rights with respect to the same, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information, and to consent or approve acts or transactions.

"*Officers*" means the officers appointed pursuant to Article VII.

"*Person*" has the meaning given that term in Section 1.002(69-b) of the Code.

"*Proceeding*" has the meaning given that term in Section 9.1.

"*Securities Act*" means the Securities Act of 1933, as amended from time to time.

"*Tax Code*" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"*Treasury Regulations*" means the Treasury Regulations promulgated under Subchapter K of the Tax Code, as amended from time to time.

Other terms defined herein have the meanings so given them.

**Section 12.2  Construction**.  Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter.  Except to the extent the context specifically indicates otherwise, all references to Certificate and Sections refer to articles and sections of this Agreement, and all references to Exhibits refer to Exhibits attached hereto, each of which is made a part hereof for all purposes.

## ARTICLE XIII
### General Provisions

**Section 13.1  Offset**.  Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

**Section 13.2  Notices**.  Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the Person to receive it.  All notices, requests, and consents to be sent to a Member must be sent to or made at the address or telefax number for that Member set forth in the records of the Company, or such other address or telefax number as that Member may specify by notice to the other Members.  Any notice, request, or consent to the Company must be sent to or made at the address or telefax number for that Member as set forth in the records of the Company or such other address for as the Company may specify by notice to the Members. Whenever a notice is required to be given by law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

22

**Section 13.3  Entire Agreement**.  This Agreement and any agreements referenced herein constitute the entire agreement of the Members relating to the Company, the Company Business and the Area of Mutual Interest and supersedes all prior contracts or agreements with respect to the Company, the Company Business and the Area of Mutual Interest, whether oral or written.

**Section 13.4  Effect of Waiver or Consent**.  A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.  Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

**Section 13.5  Amendment or Modification**.  This Agreement may be amended or modified from time to time only by a written instrument adopted by the Managers and executed and agreed to by a Majority Interest.

**Section 13.6  Binding Effect**.  Subject to the restrictions on Dispositions set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.

**Section 13.7  Governing Law; Severability**.    THIS COMPANY AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, U.S.A., EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS COMPANY AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.  In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Certificate, or (b) any mandatory provision of the Code, the applicable provision of the Certificate or the Code shall control.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances it not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

**Section 13.8  Further Assurances**.  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

**Section 13.9  Waiver of Certain Rights**.  Each Member irrevocably waives any right it may have to maintain an action for the winding up of the Company or for partition of the property of the Company.

**Section 13.10  Indemnification**.  To the fullest extent permitted by law, each Member shall indemnify the Company, and each other Member and hold them harmless from and against all

PLTF_000811

losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement or on account of any business activities conducted by that Member or its affiliates prior to the Effective Date of this Agreement.

   ***Section 13.11 Notice to Members of Provisions of this Agreement***. By executing this Agreement, each member acknowledges that it has actual notice of (a) all of the provisions of this Agreement, including, without limitation, the restrictions on the transfer of Membership Interests set forth in Article III, and (b) all of the provisions of the Certificate. Each Member hereby agrees that this Agreement constitutes adequate notice of all such provisions, and each Member hereby waives any requirement that any further notice thereunder be given.

   ***Section 13.12 Counterparts***. This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

   ***Section 13.13 Cross-references***. References in this Agreement to Articles, Sections, Exhibits, or Schedules shall be deemed to be references to Articles, Sections, Exhibits, and Schedules of this Agreement unless the context specifically and expressly requires otherwise.

   ***Section 13.14 Legal Representation.*** Each Member hereby acknowledges that the Members have been advised that the Members should seek and have had the opportunity to seek independent legal counsel to review this Agreement and all related documents on the Member's behalf and to obtain the advice of such legal counsel relating to such documentation. Each Member further acknowledges and agrees that the law firm of Doherty & Doherty LLP are legal counsel solely to ***[Willis Energy LLC]*** with respect to this Agreement.

*[Signature Pages Follow]*

24

IN WITNESS WHEREOF, the Managers and Members have executed this Agreement as of Effective Date.

MANAGERS:

_____

Mark A. Willis

_____

Thomas P. Tatham

Member Signatures Follow:

FOUNDING MEMBERS:

HOPEWELL WILLIS HOLDINGS LLC

By:_____

_____

WILLIS GROUP, LLC

By:_____

_____

HOPEWELL TATHAM HOLDINGS LLC

By:_____

_____

LNG PARTNERS, LLC

By:_____

_____

25

MARK BUSH

By:_____

**NEW MEMBERS:**

[To be added upon receipt of Subscription Docs]

26

PLTF_000814

**SCHEDULE A**
**Member Information**

| Name and Address of Each Member | Founders Shares | Initial Additional Equity Shares** | Initial Ownership Percentage | Initial Capital Contribution Paid on Effective Date for Additional Equity Shares | $ Amount to be paid by July 30, 2016 or within 10 days of call*** |
|---|---|---|---|---|---|
| **Willis Group Members:** | | | | | |
| **Hopewell Willis Holdings, LLC** 1400 Post Oak Blvd., Suite 200 Houston, TX 77056 | 450,000 | | | | |
| **Willis Group LLC** 1400 Post Oak Blvd., Suite 200 Houston,TX 77056 | 225,000 | | | | |
| **Tatham Group Members:** | | | | | |
| **Hopewell Tatham Holdings LLC** 1400 Post Oak Blvd., Suite 200 Houston, TX 77056 | 112,500 | | | | |
| **LNG Partners, LLC** 600 Travis St. Suite 5900 Houston, TX 77002 | 112,500 | | | | |

27

PLTF_000815

Page 404

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| **MARK A. BUSH**<br>5868 Westheimer,<br>Apt. 458<br>Houston, Tx 77057<br><br>**New Members**:<br><br>[to be added upon receipt of executed subscriptions and payment therefore] | 100,000 | | | | |
| Total | 1,000,000 | | 100% | $_____ | $_____ |

\*  1,000,000 Founders Shares allocated among Willis Group Members, Tatham Group Members and Mark Bush

\*\* Initial Additional Equity Shares subscribed by Founding Members and New Members

\*\*\* Capital Commitment for Initial Additional Equity Shares to be paid on or before August 15, 2016, or if sooner, within ten (10) days following a call for such amounts are made by the Managers

28

**SCHEDULE B**
**Board of Directors**

**Mark A. Willis**

**Thomas P. Tatham**

PLTF_000817

## EXHIBIT A

**Application of Proceeds of Capital Contributions for Initial Additional Equity Shares**

**Approximately $125,000 to $175,000 per month to be spent as per Exhibit B covering estimated current operating requirements through the end of calendar 2016; the balance of the Proceeds will be used for the purchase of Oil, Gas, and Mineral Interests within Prospect Areas with early emphasis on Areas One and Two.**

30

PLTF_000818

**EXHIBIT B**

**2016 Cash Forecast & Budget**
**And**
**Description of Initial Activities**

**Description of Initial Activities:**

    The Company will continue to evaluate opportunities for the purchase of Oil, Gas & Mineral Interests in four adjacent prospect areas located in Madison County, Texas. Evaluation will consist of title review by both contract legal and land personnel in addition to the exclusive utilization of proprietary computer software and specialized IT services. The Company will prioritize its activities in the four prospect areas according to the latest geological, geophysical, production and scout information available to the Company.  The four prospect areas cover over 80,000 acres and 128 producing units. The emphasis initially will be on the acquisition of new OG&M leases on unleased acreage and/or acreage where significant prospective title flaws or legal issues have been identified with respect to existing pooled leases and/or pooled units.  The Company will also seek to purchase mineral ownership and or term royalty when commercially favorable opportunities are presented or identified by the Company's title review and contract land activities.

**[2016 Cash Forecast & Budget to be Inserted at closing]**

31

PLTF_000819

Page 408

## SHARE EXCHANGE WARRANT

To Exchange Initial Additional Equity Shares of Hopewell-Pilot Project, LLC
for Common Shares of

## TITLE ROVER, LLC

(Incorporated under the laws of the State of Texas)

(Void after June 30, 2017)

No. EW-___ for the acquisition of up to _____                    July_____,_____
Common Shares of Title Rover, LLC

**THIS IS TO CERTIFY** that, for value received, _____ (the
"**Holder**") is entitled, subject to the terms and conditions hereinafter set forth, to receive from the
Company by way of exchange of Initial Additional Equity Shares of Hopewell-Pilot Project, LLC
held by Holder as at the Exercise Date up to that number of Common Shares provided above as
specified in Exchange Form & Holder's Notice and in accordance with the terms in Section 2
below. Holder, as herein provided, may receive two Common Shares of the Company for each 1
Initial Additional Equity Share so exchanged after exercise of this Exchange Warrant by
surrendering to the Company at the address set forth in Section 4 below, this Exchange Warrant,
together with an Exchange Form & Holder's Notice, duly completed and executed, and the
certificates representing the Initial Additional Equity Shares of Hopewell-Pilot Project, LLC to be
exchanged pursuant to the terms of this Exchange Warrant.

1.      **Definitions**.  In this Exchange Warrant, including the preamble, unless there is something
        in the subject matter or context inconsistent herewith, the following terms shall have the
        following meanings, respectively:

        "**Affiliate**" means an affiliate within the meaning of the *Texas Business Corporations Act*;

        "**Business Day**" means any day except Saturday, Sunday or any day on which banks are
        generally not open for business in Houston, Texas;

        "**Common Shares**" means the common shares or members interests in the capital of the
        Company as the same are constituted on the date hereof;

        "**Company**" means Title Rover, LLC, a limited liability company organized under the laws
        and jurisdiction of the state of Texas;

        "**Company Reorganization**" means any reclassification of the Common Shares of the
        Company at any time outstanding or change of the Common Shares into other shares,
        including in connection with (i) the consolidation, amalgamation or merger of the
        Company with or into any other company or (ii) any transfer of the undertaking or assets
        of the Company as an entirety or substantially as an entirety to another person or any
        exchange of Common Shares into securities of another company;

1

27708.110401.GMC.3926301.5

"**Exchange Form & Holder's Notice**" means the exchange form attached hereto as Schedule "A";

"**Exchange Warrant**" means this exchange warrant to acquire Common Shares and any deed or instrument supplemental or ancillary hereto and any schedules hereto or thereto;

"**Exercise Date**" means the date on which the Exchange Warrants are exercised;

"**Expiry Date**" means June 30, 2017; and

"**Initial Additional Equity Shares**" means Initial Additional Equity Shares in the capital of Hopewell-Pilot Project, LLC;

2.     **Exchange Warrant Conditions**.  This Exchange Warrant entitles the Holder, upon its exercise, to receive up to such number of Common Shares as set forth above from the Company by way of exchange of the Exchange Warrant and either:

    2.1     Electing to transfer and assign 100% of the Initial Additional Equity Shares held by Holder as at the Exercise Date, free from any and all taxes, liens and charges, which assignment will provide for the issuance by the Company to the Holder of the maximum number of Common Shares as stated herein; or

    2.2     Electing to transfer and assign a specified number of Initial Additional Equity Shares (being less than all of the Initial Additional Equity Shares held by Holder), free from any and all taxes, liens and charges, for each two Common Shares to be issued by the Company pursuant to the timely exercise of this Exchange Warrant,

(Such Common Shares issuable to the Holder on exercise of this Exchange Warrant referred to as the "**Exchange Warrant Shares**").

3.     **Expiration of Exchange Warrants**.  Notwithstanding any other provision of this Exchange Warrant, all rights under this Exchange Warrant to exercise such Exchange Warrant or part thereof and to acquire Exchange Warrant Shares shall wholly cease and terminate and this Exchange Warrant shall be wholly void and of no valid or binding effect as at 5:00 p.m. (Houston time) on the Expiry Date.

4.     **Exercise of Exchange Warrants**.  Any exercise of this Exchange Warrant by the Holder must be in respect of all Exchange Warrant Shares issuable pursuant to the terms of this Exchange Warrant and no subsequent exercises will be permitted. The rights represents by this Exchange Warrant may be exercised by the Holder, by the surrender of this Exchange Warrant, with the attached Exchange Form duly executed, together with duly endorsed certificates for the Initial Additional Equity Shares to be exchanged pursuant to this Exchange Warrant at Suite 200, 1400 Post Oak Blvd, Houston Texas, 77056 Attn: Thomas P. Tatham (or such other office or agency of the Company as it may designate by notice in writing to the Holder at the address of the Holder appearing on the books of the Company at any time during the period within which the rights represented by this Exchange Warrant

2

may be exercised).  The Company agrees that the Exchange Warrant Shares acquired on exercise of this Exchange Warrant shall be and be deemed to be issued to the Holder as the registered owner of such shares as of the close of business on the date on which this Exchange Warrant shall have been surrendered and payment made for such shares by surrender of Initial Additional Equity Shares as aforesaid.  Certificates for the Exchange Warrant Shares so issuable shall be delivered to the Holder within a reasonable time, not exceeding thirty (30) Business Days, after the rights represented by this Exchange Warrant shall have been so exercised.

5.   **Not a Shareholder**.  Nothing in this certificate or in the holding of an Exchange Warrant evidenced hereby shall be construed as conferring upon the Holder any right or interest whatsoever as a shareholder of the Company.

6.   **No Fractional Shares**.  Notwithstanding any provisions to the contrary herein, the Company shall not be required to issue any fractional Common Shares (unless such fractional shares arise from a consolidation of shares) in connection with any exercise of the right to convert this Exchange Warrant into Common Shares, and in the event that the calculation of the number of Common Shares issuable upon such exercise results in a number which includes a fraction of whole shares, then the Company shall be required to issue the largest number of whole shares into which this Exchange Warrant is exercisable.

7.   **Covenants of the Corporation**.  The Company hereby agrees as follows:

7.1   All Common Shares that may be issued upon the exercise of the rights represented by this Exchange Warrant will, upon issuance, be validly issued as fully paid and non-assessable and shall be free from any and all liens and charges with respect to the issue thereof.

7.2   As long as this Exchange Warrant remains outstanding, the Company shall reserve and there shall remain unissued out of its capital a sufficient number of its Common Shares to satisfy the right of purchase herein provided for should the Holder determine to exercise its rights in respect of the Common Shares for the time being called for and represented by this Exchange Warrant.

8.   **Adjustment of Subscription Rights**.

8.1   If at any time prior to the Expiry Time there shall be a Company Reorganization, and the Holder thereafter exercises the right to purchase Common Shares hereunder, the Holder shall be entitled to receive, and shall accept, in lieu of the number of Common Shares to which the Holder was theretofore entitled upon such exercise, the kind and amount of shares and other securities or property which the Holder would have been entitled to receive as a result of such Company Reorganization if, on the effective date thereof, the Holder had been the registered holder of the number of Common Shares to which the Holder was theretofore entitled upon exercise.  The subdivision or consolidation of the Common Shares at any time outstanding into a greater or lesser number of Common Shares shall be deemed not to be a Company Reorganization for the purposes of this Section 8.1.

3

8.2     If and whenever at any time prior to the Expiry Time, the Company shall (i) subdivide the outstanding Common Shares into a greater number of shares, (ii) consolidate the outstanding Common Shares into a smaller number of shares, or (iii) issue Common Shares (or other securities convertible into or exchangeable for Common Shares) to the holders of all or substantially all of the outstanding Common Shares by way of a stock dividend on the Common Shares, the number of Common Shares issuable by the Company upon exercise by Holder of this Exchange Warrant shall be adjusted accordingly. The adjustments provided for herein are cumulative and shall apply to successive subdivisions, consolidations, distributions, issues or other events resulting in any adjustment. Nothing herein shall obligate the Company to make adjustments for any additional Common Shares issued by the Company for "fair value" as determined in good faith by the Directors of the Company.

8.3     Any question arising with respect to the adjustments provided herein shall be conclusively determined by any firm of certified public accountants of national recognition that the Company may designate and who will have access to all appropriate records, and such determination will be binding upon the Company and the Holder.

8.4     The Company shall from time to time immediately after the occurrence of any event which requires an adjustment or readjustment as provided herein, notify the Holder by specifying the nature of the event requiring the same and the amount of the adjustment necessitated thereby and setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based and the adjustment specified therein shall be verified by an opinion of the auditors of the Company and shall be conclusive and binding on all parties in interest. The Company shall, except with respect to any subdivision or consolidation of the Common Shares, forthwith give notice to the Holder specifying the event requiring such adjustment or readjustment and the results thereof.

9.     **Exchange of Exchange Warrant**. This Exchange Warrant is exchangeable, upon the surrender hereof by the Holder at the office or agency of the Company referred to in Section 4 hereof, for new exchange warrants of like tenor representing in the aggregate the right to subscribe for and purchase the number of Common Shares that may be subscribed for and purchased hereunder. **Mutilated or Missing Warrants.** Upon receipt of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of this Exchange Warrant and, in the case of any such loss, theft or destruction, upon delivery of a bond or indemnity satisfactory to the Company, acting reasonably, or, in the case of any such mutilation, upon surrender or cancellation of this Exchange Warrant, the Company will issue to the Holder a new warrant of like tenor, in lieu of this Exchange Warrant, representing the right to subscribe for and purchase the number of Common Shares which may be subscribed for and purchased hereunder.

10.     **Governing Law**. This Exchange Warrant shall be governed by and construed in accordance with the laws of the State of Texas applicable therein. The reference to such laws shall not, by conflict of laws rules or otherwise, require the application of the law of

4

PLTF_000823

any jurisdiction other than the State of Texas.  The Parties hereby irrevocably attorns to the exclusive jurisdiction of the courts of the State of Texas.

11.   **Severability**.  If any one or more of the provisions or parts thereof contained in this Exchange Warrant should be or become invalid, illegal or unenforceable in any respect in any jurisdiction, the remaining provisions or parts thereof contained herein shall be and shall be conclusively deemed to be, as to such jurisdiction, severable therefrom and:

    11.1   the validity, legality or enforceability of such remaining provisions or parts thereof shall not in any way be affected or impaired by the severance of the provisions or parts thereof severed; and

    11.2   the invalidity, illegality or unenforceability of any provision or part thereof contained in this Exchange Warrant in any jurisdiction shall not affect or impair such provision or part thereof or any other provisions of this Exchange Warrant in any other jurisdiction.

12.   **Headings**.  The headings of the sections, subsections, paragraphs, subparagraphs and clauses of this Exchange Warrant have been inserted for convenience of reference only and do not define, limit, alter or enlarge the meaning of any provision of this Exchange Warrant.

13.   **Numbering of Articles, etc.**  Unless otherwise stated, a reference herein to a numbered or lettered section, subsection, paragraph, subparagraph or schedule refers to the section, subsection, paragraph, subparagraph or schedule bearing that number or letter in this Exchange Warrant.

14.   **Gender**.  Whenever used in this Exchange Warrant, words importing the singular number only shall include the plural, and vice versa, and words importing the masculine gender shall include the feminine gender.

15.   **Day not a Business Day**.  In the event that any day on or before which any action is required to be taken hereunder is not a Business Day, then such action shall be required to be taken on or before the requisite time on the next succeeding day that is a Business Day. If the payment of any amount is deferred for any period, then such period shall be included for purposes of the computation of any interest payable hereunder.

16.   **Binding Effect; Assignability**.  This Exchange Warrant and all of its provisions shall endure to the benefit of the Holder and its successors and permitted assigns and shall be binding upon the Company and its successors and permitted assigns.  This Exchange Warrant is not assignable by the Holder without the prior written consent of the Company.

5

PLTF_000824

**IN WITNESS WHEREOF** the Company has caused this Exchange Warrant to be signed by its duly authorized officers and this Exchange Warrant to be dated the _____ day of _____, 2016.

**TITLE ROVER, LLC**

By: _____
*Authorized Signing Officer*

27708.110401.GMC.3926301.5

PLTF_000825

**SCHEDULE "A"**
**EXCHANGE FORM & HOLDER'S NOTICE**

(To be signed only upon exercise of this Warrant)

The undersigned hereby exercises the within Exchange Warrant for the purchase of _____ Common Shares issuable pursuant to such Exchange Warrant in accordance with the terms and conditions thereof, and herewith tenders [_____] Initial Additional Equity Shares of Hopewell-Pilot Project, LLC.

The undersigned hereby certifies that it is the registered and beneficial holder of _____ Initial Additional Equity Shares of Hopewell-Pilot Project, LLC.

The Company is instructed to issue a certificate for the Common Shares in the name of the undersigned and to deliver the same to the address indicated.

_____

**Name**

_____

**Street and Number**                         **City and State**

**Date:**_____        _____

                                        **Purchaser's Signature**
                                        [Signature must conform
                                        exactly with the name of the
                                        registered owner on the form
                                        of this Warrant.]

27708.110401.GMC.3926301.5