1  SULLIVAN HILL REZ & ENGEL
   A Professional Law Corporation
2  Shannon D. Sweeney, SBN 204868
   Sweeney@sullivanhill.com
3  600 B Street, Suite 1700
   San Diego, California 92101
4  Telephone:  (619) 233-4100
   Fax Number: (619) 231-4372
5
   Attorneys for Defendants:
6  MARK A. WILLIS; BEYOND REVIEW, LLC; IMAGE ENGINE, LLC; and
   WILLIS GROUP, LLC
7

8                  UNITED STATES DISTRICT COURT

9                SOUTHERN DISTRICT OF CALIFORNIA

10 ENSOURCE INVESTMENTS LLC,        )  CASE NO. 17CV0079 H LL
   a Delaware limited liability company, )
11                                   )  **AMENDED WILLIS DEFENDANTS'**
                 Plaintiff,          )  **MEMORANDUM OF**
12                                   )  **CONTENTIONS OF FACT AND LAW**
   v.                                )  **(AND AMENDED EXHIBIT A)**
13                                   )
   THOMAS P. TATHAM, an              )  Local Rule 16.1(f)(2) and Federal Rule
14 individual; MARK A. WILLIS, an    )  of Civil Procedure 26(a)(3)
   individual; PDP MANAGEMENT        )
15 GROUP, LLC, a Texas limited       )
   liability company; TITLE ROVER,   )
16 LLC, a Texas limited liability    )
   company; BEYOND REVIEW, LLC,      )  Magistrate Judge: Hon. Linda Lopez
17 a Texas limited liability company; )  District Judge: Hon. Marilyn L. Huff
   IMAGE ENGINE, LLC, a Texas        )  Courtroom: 15A
18 limited liability company; WILLIS )  Action filed:  January 13, 2017
   GROUP, LLC, a Texas limited       )
19 liability company; and DOES 1-50, )
                                     )
20               Defendants.         )
                                     )
21 _____ )

22        TO THE HONORABLE MARILYN L. HUFF, UNITED STATES DISTRICT

23 COURT JUDGE, AND TO ALL COUNSEL OF RECORD:

24        PLEASE TAKE NOTICE THAT Defendants MARK A. WILLIS; BEYOND

25 REVIEW, LLC; IMAGE ENGINE, LLC; and WILLIS GROUP, LLC (collectively

26 Willis Defendants) hereby submit the following Memoranda of Contentions of Fact

27 and Law, pursuant to Local Rule 16.1(f)(2) and Federal Rule of Civil Procedure

28 26(a)(3):

**<u>INTRODUCTION</u>**

The claims asserted against Mark Willis ("Willis"); Image Engine; Beyond Review; and the Willis Group (collectively, "the Willis Defendants") by Ensource Investments LLC ("Ensource") for fraud, conversion and unfair competition lack support and fail as a matter of law. Ensource cannot prove that it was defrauded by the Willis Defendants in connection with its decision to invest in Hopewell-Pilot Project LLC ("Hopewell"), a risky startup company formed to test a potential opportunity to find and purchase oil and gas leaseholds in Texas. There is no evidence that the Willis Defendants knowingly and recklessly made any material misrepresentations to Ensource, that Ensource reasonably or justifiably relied on any misrepresentations, or that Ensource was damaged actually and proximately by any alleged misrepresentations. To the contrary, the details about the solicited investment were set forth in writing, and the invested funds were used exactly as disclosed. Ensource—comprised of sophisticated and experienced investors who at all times were represented by counsel—engaged in lengthy and comprehensive due diligence before it decided to invest. It negotiated the Hopewell and Title Rover company agreements it signed and it represented in writing that it was not relying on any representations made by Willis or Hopewell management. Further, it represented that it had received all of the information it deemed necessary to make its investment decision and appreciated the substantial risks of investing in a speculative oil and gas exploration startup business.

The conversion claim fails because Ensource willingly gave its money to Hopewell, and the money was used as it was intended and disclosed. None of the Willis Defendants took or received any money from Ensource (it all went to Hopewell—a nominal defendant that Ensource has not sued or otherwise). The only money received by any of the Willis Defendants was from Hopewell, as payment for services provided. Such services; the Willis Defendants' affiliation with Willis; and the costs for such services, were disclosed in writing to Ensource before it knowingly chose to invest. Finally, the Unfair Competition Law ("UCL") claim fails because such statute is inapplicable as a

matter of law to transactions involving the purchase of securities.

Ensource knew that Hopewell was an untested, speculative, short term, risky investment. Risky investments sometimes pay off. More often, they result in large losses. That's the gamble; that's what Ensource understood; and that's what happened here. The Willis Defendants are simply not liable for Ensource's decision to make a risky investment.

## SUMMARY OF FACTS

On March 29, 2016, Hopewell-Pilot Project, LLC[1] was organized to identify title defects in areas rich with oil wells. Once identified, the goal was to acquire title via the purchase or lease of oil, gas and mineral interests. *See* Ex. D (Third Amended and Restated Company Agreement of Hopewell-Pilot Project, LLC., §2.4). Hopewell further aimed to demonstrate a "Proof of Concept" that new proprietary software technology could be "refine[d], use[d], and appli[ed]" to sort and analyze land and mineral title records, thus speeding up and automating the title review process. *See* Ex. A (Private Placement Memorandum ("PPM"), Executive Summary); *see also* Ex. AK (Title Rover "being developed and refined").

In order to have a chance of success, Hopewell needed to raise money. It was initially capitalized by its founders and managers Willis and Thomas Tatham ("Tatham"), and their respective entities (Willis and his affiliates invested approximately $130,000). *See* Ex. D, Schedule A. The founders were given 1,000,000 founders shares in Hopewell. *See* Ex. C, p.28. Hopewell then solicited investments from experienced, "accredited investors" through an initial private placement of up to 1,000,000 Additional Equity Shares for $2,000,000.[2] *See* Ex. A, Term Sheet. Investors

---

[1]    A "pilot project" is an "activity planned as a test or trial." pilot project. (n.d.) *WordNet 3.0, Farlex clipart collection*. (2003-2008). Retrieved October 24 2019 from https://www.thefreedictionary.com/pilot+project (last visited October 28, 2019).

[2]    The private placement ultimately raised $920,000 from 8 distinct investors. *See* Ex. D, Schedule A (Member Information).

1  would receive shares in Hopewell and an option, via a share exchange warrant, to
2  exchange such warrant for shares of Title Rover, LLC. ("Title Rover"), a company
3  formed to hold and develop the proprietary technology to be used by Hopewell to
4  streamline automated title searches.[3] *See* Ex. AD; *see also* Ex. V (Title Rover Business
5  Plan (provided to Ensource))(Title Rover formed "for the purpose of refining and
6  modifying proprietary information technology").

7        Investment proceeds were to be "used to fund all operating overhead of the
8  Company through December 31, 2016, and for the acquisition of Mineral Interests,
9  primarily new Oil and Gas leases. . ." Ex. A, §AI. In connection with the private
10 placement, potential investors, including Ensource, were provided, among other things:
11 (1) the PPM (Ex. A);[4] (2) a Subscription Booklet (Ex. B); and (3) an Amended and
12 Restated Company Agreement of Hopewell-Pilot Project, LLC. (Ex. C)(collectively,
13 "Solicitation Documents"). *See* Ex. G & Ex.  W. The Solicitation Documents made it
14 clear that investment proceeds would be used first for operating expenses
15 ("Approximately $125,000 to $175,000 per month") and the "balance of the Proceeds
16 [would] be used for the purchase of Oil, Gas, and Mineral Interests. . ." Ex. C (Exhibit
17 A: "Application of Proceeds of Capital Contributions for Initial Additional Equity
18 Shares"). Operating expenses were disclosed and itemized in the 2016 Cash Forecast,
19 which was attached as Exhibit B to the Company Agreement. *See* Ex. C (Exhibit B). It
20 was expressly disclosed that evaluation of oil and gas opportunities would "consist of
21 title review by both contract legal and land personnel in addition to the exclusive
22 utilization of proprietary computer software and specialized IT services." *Id.* It was
23 further disclosed that such evaluation would be performed by "Beyond Review (Willis
24 Group affiliate) [which] provides contract land/O,G&M title attorneys" and "Image

25
26 [3]    As of March 2018, both Hopewell and Title Rover are in Chapter 7 bankruptcy.
27 [4]    The PPM contains all of the extensive risk warnings one would expect for a
28 speculative oil and gas lease proposed investment in a private company with
   unmarketable securities. *See* Ex. A (PPM, §IV(A)-(G)).

Engine (Willis Group Affiliate) [which] provides copying and imaging services." Ex. E (Schedule of Consulting and Contractor Agreements"); *see also* Ex. C (Exhibit B) (Beyond Review and Image Engine listed in Cash Forecast).

Ensource is a company formed in August 2016 for the sole purpose of investing in Hopewell. *See* Ex. X. It has four members (Justin Pannu ("Pannu"), Chad Martin ("Martin"), Cliff Sharp, and the Kilimanjaro Group (Jerome Johns ("Johns")), each of whom consider themselves to be (and represented to Hopewell that they are) "accredited investors." *See* Ex. F (FRCP 30(b)(6) deposition of Pannu, 42:11-43:3); *see also* Ex. M, Annex 1, Part 2. The individual members of Ensource were solicited for an investment in Hopewell between June and August 2016. *See* Ex. G (June 7, 2016 email from Tatham preparing documents for meeting with Martin). Willis participated in introductory meetings with Martin and Pannu. He did not meet with any other Ensource member at any time. When Ensource members were being solicited, Hopewell had little to no money in the bank, and ongoing monthly operating expenses due and accruing. The 2016 Cash Forecast, provided to an Ensource member in June 2016, shows that Hopewell had a $0 cash balance as of June 2016, and ongoing obligations. *See* Ex C, §Exhibit B, & Ex. G (email attaching Cash Forecast).

On August 16, 2016, Pannu began a formal due diligence inquiry into both Hopewell and Title Rover by forwarding extensive due diligence lists created by Richard Nawracaj ("Nawracaj"), Ensource's attorney, to Tatham.[5] *See* Ex. H (August 16, 2016 email with due diligence lists); *see also* Ex. F, 184:2-185:14. In response, Hopewell created two online data rooms that were populated with requested and other information. Tatham oversaw the data rooms, including populating them and responding to questions about the documents and potential investment. Willis never logged into the data room and had no involvement with deciding what information was placed therein.

---

[5]     Nawracaj is one of Ensource's attorneys in this case. Because he prepared the due diligence demands, oversaw the due diligence process, negotiated the Hopewell and Title Rover company agreements, and advised Ensource in its decision to enter the Hopewell investment, he is also a percipient witness in this case and will be called to testify at trial.

During the due diligence process, Hopewell, by and through Tatham, engaged in lengthy and detailed conversations with Ensource members about the two companies, and answered all questions posed by members of Ensource. *See e.g.*, Ex. I & Ex. J (August 23, 2016 email exchange between Tatham and Pannu and conversation between Tatham and Nawracaj, respectively). Johns was a technical expert, and that member dealt directly with Title Rover's expert technicians to assess Title Rover ("there was a webinar and a number of calls"). *See* Ex. F, 79:15-80:14.[6] After almost a month of investigation, Ensource decided that it wanted to invest, but only on condition that it (through its attorney) could negotiate amendments to the Hopewell and Title Rover company agreements. *See* Ex. Y; *see also* Ex. F, 228:24-229:3 (confirming the "precondition to investment"). Such negotiations lasted several weeks. While the negotiations were underway, Hopewell pushed Ensource to make its investment. Hopewell, by and through Willis, disclosed that it had operational obligations that couldn't be paid until cash was infused in Hopewell. *See* Ex. Z. It needed money quickly. Because the company agreements were not yet satisfactorily amended, Ensource agreed to give Hopewell a $205,000 bridge loan, which would be personally guaranteed by Willis, and convertible to Hopewell shares upon execution of the amended company agreements. *See* Ex. K (September 12, 2016 email exchange between Nawracaj and Tatham).

On September 30, 2016, after six weeks of due diligence and negotiations, Ensource agreed to invest $530,000 in Hopewell. *See* AA. In so doing, it signed the Subscription Agreement (Ex. M); the negotiated Third Amended and Restated Company Agreement of Hopewell-Pilot Project, LLC (Ex. D); and the negotiated Second Amended and Restated Company Agreement of Title Rover, LLC (Ex. L). The bridge loan was converted to Hopewell shares, and Ensource wired an additional $20,000 to Hopewell's bank account.

---

[6]     Q: "Is it true that EnSource satisfied itself that the representations that had been made about the technology were truthful before making the investment in Hopewell?" A: "I believe it did, but the reason I say I believe so is because those representations were made to [Johns] and James."

*See* Ex. AB. Ensource did not request the Title Rover Share Exchange Warrant at this time.[7]

By signing the Subscription Agreement, Ensource represented to Hopewell and its Members that, among other things: (a) it was knowledgeable and "experienced in evaluating investments" and understood and could bear the "risks and potential conflicts of interests;" (b) the Managers would not be liable for Hopewell's use of the proceeds of the investment; (c) no representations or warranties were made by Hopewell's Managers; (d) it "had access to the designated representatives. . . its Managers and the opportunity to ask questions of, and receive answers satisfactory to it;" (e) it "obtained all additional information requested by [it] to verify the accuracy of all information furnished in connection with the" investment; (f) it had "not relied upon any representations or other information . . . other than that [set forth in the Solicitation Documents] and independent investigations made by it or [its] representatives;" (g) it was "aware and acknowledges that [] the Company has limited or no significant operating history;" and (h) its "representations and warranties could be used as a defense in any actions related to the Company." Ex. M (Executed Subscription Agreement), §§3(g)), 3(h), 5(c), 5(d), 5(k), 5(l), 8(c). By signing the Hopewell Company Agreement, Ensource agreed that Hopewell's Managers would not be liable to "any Member under any theory of law, including tort. . ., and that [the Managers] would be indemnified by Ensource to "to the fullest extent permitted by law" Ex. D, §§9.1., 13.10.

By October 28, 2019, Ensource had paid $430,000 of its subscribed amount (on that day, payment of $205,000 was made by wire transfer to the Hopewell bank account). *See* Ex. AB. Prior to this payment being made, Ensource was expressly told that the payment would be used by Hopewell for "budgeted commitments." *See* Ex. AC & Ex. AF.

---

[7]     The Title Rover Share Exchange Warrant entitled the holder of the original Exchange Warrant to exchange shares in Hopewell for shares in Title Rover until June 30, 2017, at which point the Exchange Warrant would be void. *See* Ex. N (Share Exchange Warrant, §§1, 3). Plaintiff did not request such Warrant until October 27, 2016. *See* Ex. O (October 27, 2016 email exchange between Nawracaj and Tatham).

On December 7, 2016, Hopewell sent a summary of progress to its members. *See* Ex. P (December 7, 2016 email from Tatham to Members). In it, Tatham expressed disappointment and disclosed that Hopewell needed "to complete a good portion or at least 50% of the pending transactions for our initial pilot project to be considered successful from an economic standpoint."[8] He further disclosed that while "the use of the Title Rover technology has significantly cut [Hopewell's] costs; progress has been slow." *Id.* Given that "the initial pilot project was set up and budgeted for 2016 operations only," Hopewell committed to discussing "the relative merits of continued Hopewell operations vs. a hold and sell exploitation of the existing portfolio of interests" at a January member meeting. *Id.*

The next day Pannu told Willis that he was "ok" with the report, and told his Ensource partner that he was "not so worried." Ex. R & Ex. S (December 8, 2016 emails to Willis and Cliff Sharp, respectively). Pannu confirmed at his deposition that no member of Ensource was worried about the news. *See* Ex. F, 287:1-16. In fact, the only person who was worried was attorney Nawracaj. *See id.* Ensource filed this lawsuit on January 13, 2017— a mere 2.5 months after it knowingly made its short-term investment in Hopewell.[9] Ensource did not make its final $100,000 investment as promised in the Subscription Agreement.

Despite its apparent belief that Hopewell was a bad investment, Ensource never exercised its Title Rover Share Exchange Warrant, which would have converted its equity stake in Hopewell to Title Rover. *See* Ex. O. Thus, Ensource never owned Title Rover stock and could not have been damaged by its lack of success, if any.

---

[8]   In response to questions from Ensource, Tatham revealed that Hopewell closed over 125 net acres and had pending offers for 657.54 more net acres. He stated that having 400 more net acres close would constitute an economic success, and that he hoped Hopewell would get there in "the next few weeks." Ex. Q (December 8, 2016 email from Tatham to Pannu).

[9]   Ensource alleges the following claims against all Willis Defendants: (1) securities fraud (10(b)-(5)); (2) conversion; (3) intentional misrepresentation; and (4) violation of the Unfair Competition Laws.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## POINTS OF LAW

### Securities Fraud and Intentional Misrepresentation Claims (asserted against all Willis Defendants)

Ensource alleges the Willis Defendants violated Section 10(b) of the Exchange Act and Securities Exchange Commission Rule 10b-5 promulgated thereunder. In a section 10(b) private action, a plaintiff must prove: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *See Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 341-342 (2005).

Ensource also alleges that the Willis Defendants are liable for intentional misrepresentation, which is a state-law fraud claim.[10] To prevail on such claim, Ensource must prove: (1) a material misrepresentation was made; (2) with knowledge of its falsity; (3) to induce reliance; (4) actual and justifiable reliance on the misrepresentation; and (5) damage caused by the reliance. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001). Because both species of fraud require similar showings of proof, they are analyzed collectively below.

### A.    There Is No Allegation or Evidence That Image Engine, Beyond Review or the Willis Group Made Any Representation

Ensource cannot prevail on its fraud claims (10b-5 securities fraud claim or intentional misrepresentation) against Image Engine, Beyond Review or the Willis Group because Ensource does not allege—and there is no evidence to prove—that Image Engine, Beyond Review or the Willis Group ever made representations to Ensource, let alone misrepresentations. Indeed, there is no allegation or evidence to support a theory that Image Engine, Beyond Review or the Willis Group were involved

---

[10]    This Court has already determined that Texas law applies to state law claims. *See* March 9, 2017 Order on Motion to Dismiss, p. 10-11 (ROA #15)("The Court will apply Texas law"). The parties agreed that Texas Law would govern this dispute. *See* Ex. D, §13.7; *see also* Ex. M, §14.

in any way with the solicitation of investors for Hopewell.

Beyond Review is an entity that provided contract, land, and oil, gas and mineral contract title attorneys to Hopewell. *See* Ex. E. Image Engine was an entity that provided copying and imaging services to Hopewell. *See id.* Both service providers performed work for Hopewell, issued invoices for such work, and were partially paid for such work.[11] *See* Ex. AM. The Willis Group was an entity that provided office space to, invested in, and lent money to, Hopewell. *See* Willis Decl., ¶12. The money paid to these defendants was routine, customary and supported by admissible evidence. *See* Ex. AM. Prior to its investment, Ensource knew that such defendants were performing work for, and would be paid for such work, by Hopewell, as it was disclosed and discussed multiple times. *See* Ex. C (Exhibit B), Ex. E, & Ex. I, p. PLTF_000570.

There are multiple other problems with the other elements of the fraud claims, but an inability to prove that a misrepresentation was made dooms such claims as to Image Engine, Beyond Review and the Willis Group as a threshold matter.

### B.   Willis Has No Personal Liability For Fraud

At all times and on all issues relevant to the case, Willis was acting as one of the disclosed Managers of Hopewell. Any and all representations made by him to Ensource were made on behalf of Hopewell, not Willis personally.[12] Willis cannot be liable under Rule 10b-5 for statements made by others (i.e. Hopewell or Tatham). *See Jackson v. Fischer*, 2015 U.S. Dist. LEXIS 32128, at *13 (N.D. Cal. Mar. 13, 2015) ("liability under Rule 10b-5 is limited to parties who actually 'make' misstatements of fact."); *see also Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 143 (2011) (to be liable, the defendant "must have 'made' the material misstatements"

---

[11]   Such providers were not paid in full for the work performed for Hopewell. *Compare* Ex. AM with FAC, ¶¶14-15.

[12]   If there is liability for any representation made by Willis in connection with the solicitation of an investment in Hopewell, it is Hopewell's liability—not Willis'. *See* Ex. D, §9.2)(Willis has an express right to indemnity by Hopewell).

1    and "[o]ne who prepares or publishes a statement on behalf of another is not its

2    maker."). Further, it is well-established that "Rule 10b-5's private right of action does

3    not include suits against aiders and abettors." *Id.* (citing *Central Bank of Denver N.A.*

4    *v. First Interstate Bank of Denver N.A.*, 511 U.S. 164, 180 (1994)).  Finally, 10b(5)

5    liability does not attach to Willis merely because he was a manager of Hopewell. The

6    United States Supreme Court has made it clear that such control theory of liability is

7    governed by a different statute (Section 20(a) of the Exchange Act), and to adopt such

8    theory "would read into Rule 10b-5 a theory of liability similar to—but broader in

9    application than—what Congress has already created expressly elsewhere." *Janus*,

10   564 U.S. at 146 (internal citations omitted).[13]

11          Ensoure's fraud claims against Willis fail because it cannot prove that Willis

12   knowingly and intentionally made misrepresentations to Ensoure. Further, it cannot

13   establish reasonable reliance on anything Willis allegedly represented, or that it was

14   damaged as a result of representations allegedly made by Willis. Finally, there is no

15   evidence—and Ensoure does not even allege—that Willis received anything

16   personally from it or Hopewell. Rather, the evidence demonstrates that Willis only

17   contributed to and invested in Hopewell. He did not take any money out. He did not

18   receive a salary. He lost his capital contribution and did not receive any return on his

19   investment.

20          **1.    There Is No Evidence Willis Made Material**
            **Misrepresentations**

21

22          Ensoure claims that misrepresentations or omissions were made regarding: (1)

23   Hopewell's pre-solicitation financial condition and investment prospects; (2)

24   Hopewell's use of the investment proceeds; (3) Hopewell's business progress and

25

26   [13]     It is too late for Ensoure to amend its complaint to add a claim for control
     person liability. The complaint was already amended once, and the time to do so
27   expired in 2018. Further, to make a prima facie case for control person liability, a
     plaintiff must prove that there is a primary violation of federal securities laws. *See*
28   *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000). As demonstrated herein,
     Ensoure cannot prove such violation.

likelihood of success; and (4) Title Rover's robustness. *See* First Amended Complaint ("FAC"), pp. 9-15. While Ensoure generally claims that representations were made on these topics by Tatham and Willis, it has never identified actionable misrepresentations made specifically and personally by Willis.[14]

Even if Willis could be liable for information provided by Hopewell to Ensoure members, the Hopewell documents demonstrate that no misrepresentations, let alone *material* misrepresentations, were made at all. First, Ensoure claims that it was told Hopewell had potential investors lined up (thus buttressing Ensoure's confidence), but it did not know, and was not told, that Hopewell was in "dire financial condition." FAC, pp.9-10. Hyperbole aside, this is not true. Hopewell was trying to raise capital, hence the private placement. Hopewell disclosed that it had $0 cash. *See* Ex. C (Exhibit B: 2016 Cash Forecast). Hopewell disclosed that investment funds would be spent first on monthly operating expenses, and that its monthly operating expenses were between $125,000 to $175,000 per month. *See id*, (Exhibit A: "Application of Proceeds of Capital Contributions for Initial Additional Equity Shares"). Given these disclosures, any sophisticated accredited investor would know not only that Hopewell could not endure without an infusion of cash, but that such infusion needed to be used for Hopewell's operating expenses, including for those scheduled in the 2016 Forecast and the evaluations by Beyond Review and Image Engine. Further, Ensoure conducted extensive due diligence, and acknowledged that it had every opportunity to ask questions related to anything it desired, including Hopewell's financial condition. *See* Ex. M, §5(d)("The investor has had access to such information concerning the Company as the investor deems necessary to make an informed decision concerning the acquisition of the interest."); *see also* Ex. F, 268:22-

---

[14]      Ensoure does allege that Willis made a misrepresentation when he told Ensoure that Hopewell was "oversubscribed" but he wanted to give his friends a chance to invest but this is not actionable. *See* Ex. F, 65:7-66:17; *see also Jackson*, 2015 U.S. Dist. LEXIS 32128, at *25 (statements that fundraising prospects were "moving along well" and were "sufficient" deemed "to be little more than statements of corporate optimism regarding [defendant's] prospects for obtaining financing for its future operations, or "mere puffery.").

270:1 (admitting at deposition that when Ensource signed the Subscription Agreement it did not disagree with such representation).[15]

Second, Ensource claims that it was told that investment proceeds would be used on "go-forward" operational requirements and acquiring mineral interests. FAC, ¶28. This is also demonstrably not true. The PPM expressly says that the investment proceeds will be used "to fund <u>all</u> operating overhead. . . and for the acquisition of Mineral Interests." *See* Ex. A, Term Sheet (emphasis added). Ensource also claims, without evidence, that Willis "covertly planned to use the investment proceeds to line" his pockets. FAC, ¶29. Ensource was told that two of the Hopewell service providers were affiliates of Willis, as well as the cost to Hopewell to use them. Ex. E; *see also* Ex. C (Exhibit B)(Beyond Review and Image Engine listed in Cash Forecast); *and* Ex. I, p. PLTF_000570. Finally, there is no evidence whatsoever that Willis personally received any money, let alone "lined his pockets" with it.

Third, Ensource claims that it did not understand Hopewell's business progress or its likelihood of success. It claims that the PPM "implies" something that it now believes is not true. *See* FAC, ¶37. Ensource's misinterpretation of the PPM is not actionable fraud or misrepresentation. Ensource also claims that Tatham and Willis misrepresented the payoff potential with representations of "moon-shot" profits. *See* FAC, ¶39. Such puffery, of course, is inactionable. *See Pub. Emples. Ret. Sys. v. Qualcomm, Inc.*, No. 18-55005, 2019 U.S. App. LEXIS 21969, at *3 (9th Cir. July 23, 2019)("vague, optimistic statements. . . constitute nonactionable puffery"). It is also

---

[15]    It is undisputed that Ensource created the due diligence checklist that set forth the information it deemed important to discover about Hopewell. *See* Ex. H. It is also a fact that the extensive checklist does not ask a single question, or seek any information, related to Hopewell's finances. *See id.* Pannu confirmed at his deposition that he never asked for Hopewell bank statements. *See* Ex. F, 91:9-20. Ensource did ask for operating expenses, and those were made available. *See* Ex. C (Exhibit B)(cash forecast shows operating expenses at between $106,000-173,400 a month); *see also id.*, Ex. A (operating expenses were "[a]pproximately $125,000 to $175,000 per month"); *and* Ex. AG (monthly expenses close to $150,000 a month and budgeted for project at "approximately $900,000"). Ensource also asked for a pro forma, and that too was provided. *See* Ex. AH (8/31/16 email from Tatham attaching pro formas). Ensource has not identified a single piece of information it requested from Willis specifically that was not provided. Nor can it, given its representation in the Subscription Agreement and admission at deposition.

1   belied by the numerous and specific risk warnings included in the PPM and

2   Subscription Agreements.

3       Fourth, Ensure claims that the Title Rover technology was not as robust or

4   automated as represented.[16] In fact, Hopewell disclosed that Title Rover was being

5   developed. *See* Ex. A (Executive Summary)(the Pilot Project involves "the

6   **refinement**, use and application of" new technology)(emphasis added); *see also* Ex. T

7   (August 8 email from Tatham, with Pannu cc'd)("Hopewell was formed to **test and**

8   **refine** new IT software. . . . We wanted to **test** our new IT software in a down

9   cycle.")(emphasis added); Ex. V ("time, cost and efficiency gains… are being

10  **validated and benchmarked** through a . . . pilot program")(emphasis added); *and* Ex.

11  AJ, 22:9-16 ("we were putting together various components of different softwares out

12  there and putting a user interface on it; and we were trying to determine, you know, if

13  that was a real viable plan or not"). Hopewell did not represent that it was a perfected

14  product. Hopewell talked about it aspirationally. *See* Ex. A ("The company **believes**

15  that the use of Title Rover technology. . . will result in significant savings in both time

16  and cost.")(emphasis added). Most importantly, Ensure knew that the Title Rover

17  proprietary software was not yet developed when it decided to invest. *See* Ex. U

18  (August 29, 2016 email from Pannu to Tatham)("it appears that whatever these

19  individuals are developing is critically important to the success of the Madison

20  County and Buda Rose plays – but that such items are **not yet developed**.")(emphasis

21  added); *see also* Ex. F, 60:16-61:6 (the Title Rover "technology is something he just

22  needed to refine"), *and* 77:9-78:25 ("Willis represented that it—you know, it was the

23  technology that **just needed to be refined**."). Hopewell expressly and repeatedly

24  disclosed that Title Rover was a work in progress.

25      The representations at issue were simply not misrepresentations. And,

26  significantly, there is no evidence that Willis himself made any material

27  ───────────────

28  [16]     Though Ensure currently claims that representations allegedly made about Title
    Rover were material to its investment in Hopewell, the fact that it didn't take advantage
    of its right to attain an ownership interest in Title Rover belies such argument.

misrepresentation at all.[17] The failure of this element dooms both fraud claims.

### 2.   There Is No Evidence That Willis Had Knowledge of Falsity or Acted with Scienter

There is no evidence that Willis knowingly and intentionally made misrepresentations to induce Ensource's reliance. To be actionable, statements must be "known to be false or misleading at that time by the people who made them." *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001)(optimistic predictions about company's future not actionable). The mere "fact that the prediction proves to be wrong in hindsight does not render the statement untrue when made." *In re VeriFone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993). "Where an allegedly false or misleading statement is a prediction about future prospects, the plaintiff must allege with particularity facts showing that the initial prediction was clearly a falsehood at the time it was made." *Jackson*, 2015 U.S. Dist. LEXIS 32128, at *27.

There is no evidence to suggest that Willis knew Hopewell or Title Rover would not meet expectations or be profitable, or that interested investors would not invest as stated. At the time Ensource was solicited to invest, to the contrary, Willis was excited about Hopewell's potential and wanted it to be successful.[18] In fact, all of

---

[17]   Ensource may point to the representation made by Hopewell (allegedly at the behest of Willis) that Brent Stanley was Chief Technology Officer of Title Rover when, in fact, he was really an independent contractor. But "[i]t is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). A misrepresentation is only actionable if it was material. *See id.* There is no evidence that Stanley's job title was at all material to Ensource's investment.

[18]   The mere fact that Hopewell was cash-poor at its inception and needed money each month does not suggest, let alone prove, that its lack of success was certain. The mere fact that, from the vantage of hindsight, a corporation turns out to have been underfinanced is:

a condition not uncommon among new small businesses, including small corporations privately financed. It is common knowledge that many such corporations have been highly successful, that others have prospered but without legendary success, and that still others have failed in part, at least, because of inadequate capital. Such is the story of our American enterprise system.

*Harris v. Curtis*, 8 Cal. App. 3d 837, 843 (1970).

his conduct is consistent with his belief that the business plan was viable and worth his time, money and effort. As Manager, he solicited investors, engaged contractors, service providers and employees, hired technical experts, provided entrepreneurial vision, and invested and loaned money as needed. *See* Ex. AI (offering two-year equity positions to key technical employees). His optimism and excitement was based on knowledge of the market and industry, guidance from experts (upon which he relied), and some positive results throughout 2016. That, at the end of the year, Hopewell was not successful or profitable enough, or Title Rover fast or robust enough, was not a known or expected outcome. When talking to prospective investors, Willis could not have known or anticipated how it eventually worked out, and it is black letter law that "fraud by hindsight" is inactionable. *See In Re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999). Moreover, it's common knowledge that investing in an oil and gas pilot project is risky. That's why the Solicitation Documents contained substantial risk warnings.

To establish scienter, Ensoure must demonstrate that Willis himself acted with a mental state embracing an "intent to deceive, manipulate, or defraud."[19] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976). Scienter requires reckless conduct

> defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990)(adopting the standard set forth in *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1044-45 (7th Cir.)).

Here, there is no evidence of any false statement made by Willis, let alone one made recklessly. Rather, the alleged misrepresentations attributed to Willis from his

---

[19]     Scienter must be established as to Willis personally. *Or. Pub. Emples. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014)("Where, as here, the Plaintiffs seek to hold individuals and a company liable on a securities fraud theory, we require that the Plaintiffs allege [and prove] scienter with respect to each of the individual defendants.").

initial solicitation discussions—*e.g.*, Hopewell was a hot investment, other investors were committed, Willis had invested his own money, and that invested funds would be used for tech commitments—are either provably true or are no more than statements reflecting "routine corporate objectives such as the desire to obtain new financing and develop new products, which are insufficient to support or create a strong inference of scienter." *Jackson*, 2015 U.S. Dist. LEXIS 32128, at *52. Because there is no evidence that Willis acted with scienter, the securities fraud claim fails as a matter of law.

### 3.  <u>Ensource Did Not Reasonably or Justifiably Rely on any Alleged Misrepresentation or Omission by Willis</u>

Ensource must prove that it justifiably relied on the alleged misrepresentations and that it would not have made the decision to invest but for such misrepresentations. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011)("The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction--*e.g.*, purchasing common stock--based on that specific misrepresentation."). Ensource cannot meet this burden.

Even if Willis personally had made misrepresentations, there is no evidence that any misrepresentation caused Ensource to invest in Hopewell. To the contrary, Ensource researched Hopewell for months after discussing the investment opportunity with Willis. During those months, Ensource received information from Hopewell and Title Rover and in the deal rooms established for Ensource's due diligence efforts and had direct access to Title Rover's technical contractors. *See* Ex. F, 161:7-162:19 ("it is fair that somebody would have thoroughly reviewed [the Subscription Documents] . . . on behalf of Ensource prior to our investment"). And, before and conditional to its investment, Ensource insisted that the Hopewell and Title Rover company agreements be negotiated and revised, which they both ultimately were to Ensource's satisfaction (i.e. had such condition not been met, there would have been no investment

notwithstanding anything allegedly represented by Willis). *See* Ex. Y. Ensource's decision to invest was made after much time, thought and deliberation, it was informed by significant information, and was guided by counsel. *See* Ex. F, 236:15-17 ("I believe as a group we weren't going to invest—I don't know if we felt rushed or not—until we were comfortable"). In fact, Pannu specifically testified that Ensource DID NOT decide to invest after talking to Willis. *See* Ex. F, 62:20-63:3 (Q: "did you decide to invest in Hopewell after that first meeting?" A: "No").[20]

Further, when it signed the Subscription Agreement, Ensource expressly and decisively represented that it **did not rely** on anything Willis represented. *See* Ex. M, §5(k)(It was "not relying upon any other information, representation or warranty by the Company, the Managers of the Company or any designated representatives of the Company" and it had "not relied upon any representations or other information (whether oral or written) other than that [set forth in the Subscription Agreement], the Memorandum, the Company Agreement, the other agreements and independent investigations made by it or [its] representatives."). Pannu confirmed this at his deposition. *See* Ex. F, 278:15-279:13. Such disclaimers of reliance are binding and enforceable. *See Bank of the West v. Valley Nat'l Bank of Arizona*, 41 F.3d 471, 478 (9th Cir. 1994); *see also Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 332 (Tex. 2011)("when sophisticated parties represented by counsel disclaim reliance on representations about a specific matter in dispute, such a disclaimer may be binding, conclusively negating the element of reliance in a suit for fraudulent inducement."); *and Kelter v. Forrest*, 2009 U.S. Dist. LEXIS 136364, at *11 (C.D. Cal. Feb. 23, 2009)(plaintiff bound by representations made in a Subscription Agreement).

In addition, Ensource—comprised of sophisticated investors and by and through its counsel—engaged in a lengthy and comprehensive due diligence process

---

[20]    As the designated person most qualified, Pannu agreed at his deposition that his responses, unless qualified, would be made on behalf of Ensource. *See* Ex. F, 22:11-24:13.

to evaluate Hopewell, Title Rover, and the proposed investment. It represented in the Subscription Agreement that it had access to <u>all of the information</u> it deemed necessary in order to make its investment decision. *See* Ex. M (Subscription Agreement, §5(d)). Pannu testified such representation was true when made. *See* Ex. F, 268:22-270:1. Such a representation is binding, and refutes reliance. *See Paracor Fin., Inc. v. GE Capital Corp.*, 96 F.3d 1151, 1159 (9th Cir. 1996)(investors could not demonstrate reasonable reliance where the document they signed said they had been given access to all the information they requested).

Ensoure further represented that it had all the access to Company management it wanted, and that it received all of the answers and information it requested. *See* Ex. M, §5(d). Pannu testified this was also a true statement at the time the Agreement was entered. *See* Ex. F, 270:2-25. Thus, even if material oral misrepresentations were made (and there is no evidence of any), Ensoure's own due diligence and stated exclusive reliance on the PPM, company agreements and Solicitation Agreement precludes justifiable reliance on them. *See J.F. Lehman & Co. v. Treinen*, 2000 U.S. Dist. LEXIS 10329, at \*23 (C.D. Cal. June 9, 2000)("it is a well settled rule that where a party relies on his independent investigation after acquiring all the knowledge he desires without hindrance, he will not be heard to say that he relied on the representation of the other party.");[21] *see also Sanguinetti v. Viewlogic Sys.*, 1996 U.S. Dist. LEXIS 1219, at \*53 (N.D. Cal. Jan. 23, 1996) ("When contracts clearly state the

---

[21]    Notwithstanding this, Pannu testified over and over again that he had a "deep level of trust" in Willis before he ever talked to or met him, such that he just "went on his word" about the investment. *See* Ex. F, 62:3-25. Such reliance on alleged oral representations by someone he had never met, if true, is objectively UNreasonable—especially when Pannu is an experienced investor and the written documents and information gleaned in due diligence contradicted such alleged representations and contained detailed risk warnings. *See Kelter*, 2009 U.S. Dist. LEXIS 136364, at \*10 ("Reliance is not justified when it is 'manifestly unreasonable' in light of the plaintiff's 'own intelligence and information'"); *see also Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1030 (9th Cir. 1992)(an "investor who closes his eyes to a known risk" cannot claim reliance) *and Carr v. CIGNA Sec.*, 95 F.3d 544, 547 (7th Cir. 1996)("If a literate, competent adult is given a document that in readable and comprehensible prose says X (X might be, "this is a risky investment"), and the person who hands it to him tells him, orally, not-X ("this is a safe investment"), our literate, competent adult cannot maintain an action for fraud against the issuer of the document.").

1    nature of the parties' intentions, reliance upon outside representations is

2    unjustifiable"). When, as here, a PPM contains detailed risk warnings about an

3    investment, reliance on contrary representations is unreasonable. *See Kenney v.*

4    *Deloitte, Haskins & Sells*, 1992 U.S. Dist. LEXIS 14600, at *8 (N.D. Cal. Sep. 1,

5    1992)(in such "fact situations, courts in this and other circuits often absolve. . .

6    professionals from section 10(b) liability as a matter of law").

7        If the case primarily alleges omissions (something not readily clear here), a

8    plaintiff is entitled to a rebuttable presumption of reliance when "there is an omission of a

9    material fact by one with a duty to disclose." *Stoneridge Inv. Partners, LLC v. Sci.-*

10   *Atlanta, Inc.*, 552 U.S. 148, 159 (2008); *see also Binder v. Gillespie*, 184 F.3d 1059, 1064

11   (9th Cir. 1999)(the "presumption should not be applied to cases that allege both

12   misstatements and omissions unless the case can be characterized as one that primarily

13   alleges omissions."). A duty to disclose, however, does not arise merely from the

14   possession of material information. "Rather, disclosure is required 'only when necessary

15   to make . . . statements made, in the light of the circumstances under which they were

16   made, not misleading.'" *In re Yahoo! Inc. Sec. Litig.*, 611 F. App'x 387, 389 (9th Cir.

17   2015)(citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011)).

18       Ensoure claims that Willis failed to disclose "Hopewell's insolvency" and its

19   "pathetically low" cash balance. *See* FAC, ¶¶3, 25. Ensoure is demonstrably,

20   provably wrong. Such information was specifically disclosed in the 2016 Cash

21   Forecast. *See* Ex. C (Exhibit B). Even if such information was undisclosed, however,

22   Willis had no duty to reveal the exact financial condition of Hopewell because he

23   never made a statement about Hopewell's financial health that was rendered

24   materially misleading by the alleged omission. *See Friedman v. Salomon Bros.*, 1994

25   U.S. App. LEXIS 35918, at *6 (9th Cir. Dec. 7, 1994). Moreover, given the

26   information Ensoure had been provided, it would have been manifestly *unreasonable*

27   for Ensoure to believe that Hopewell was in a good financial position. It was a pilot

28   program—a startup, which was seeking significant investment for a short term risky

project which would cover its significant overhead costs. Moreover, over several months, Hopewell repeatedly pressed Ensource to commit and fund the investment, and it repeatedly informed Ensource that the anticipated funds had already been budgeted.  *See* Exs. Z ("Can we agree… to fund tomorrow…my fear is we… disappoint tech commitments by delaying them"), Ex. AC ("we currently have commitments that we have budgeted for"), Ex. AF ("please try to coordinate this for timely payment"), and Ex. AL ("let's please close and fund this morning... Would be helpful if you could fund enough for the initial payment…)." Such information, provided to Ensource from the very beginning, revealed Hopewell's financial position, and Willis never said otherwise. Because Ensource cannot prove justifiable reliance, both fraud claims fail.

### 4.    Ensource Cannot Establish Loss Causation

Loss causation is an essential element of a securities fraud claim. *See Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1115 (9th Cir. 2013). Loss causation—a causal connection between the claimed misrepresentation and the alleged damages—is different than transaction causation (i.e. reliance). Ensource claims, but cannot prove, that it would not have purchased the Hopewell securities had alleged misrepresentations not been made. Such contention relates solely to the reliance element of a securities fraud claim. Ensource has not suggested, let alone attempted to prove, that any alleged misrepresentation caused economic loss separate and apart from its decision to invest.

To establish loss causation when, as here, privately-traded securities are at issue, Ensource must show that the value of the securities decreased because of the alleged misrepresentations (as opposed to other market reasons). *See id.* at 1123 ("evidence that certain misrepresented risks are responsible for a loss must reasonably distinguish the impact of those risks from other economic factors"). Ensource cannot make such showing. There is no evidence that the Hopewell shares diminished in value as a result of any misrepresentation made by Willis. Likewise there is no

evidence that the Title Rover shares diminished in value as a result of any misrepresentation made by Willis. Even if there was evidence of diminished value, it would be irrelevant as Ensource did not own Title Rover shares. In fact, Ensource made the specific and conscious choice *not* to exercise its option to own shares in Title Rover, notwithstanding that it had possession of a fully-executed share warrant and was able to do so through June 2017. *See* Ex. O; *see also* Ex. F, 281:20-282:14 (Pannu testified that Ensource did not exercise its right because its trust was broken with *Hopewell* "and therefore while Willis continued to say that this was a good opportunity, it didn't matter to us"). Thus, Ensource could not have been damaged by any misrepresentation related to Title Rover, if any.   As "[f]ederal securities law requires proof of both transaction and loss causation[,]" Ensource's inability to prove loss causation is another reason why summary judgment is warranted. *See Nuveen*, 730 F.3d at 1116 (affirming summary judgment for defendant when plaintiff's only theory was that it would not have purchased the security but for the alleged misrepresentation)(citing *Dura Pharm.*, 544 U.S. at 342).

### Conversion Claim (asserted against all Willis Defendants)

Ensource claims that Defendants converted $399,000 of their $430,000 investment. *See* FAC, ¶10. Of that, it claims that $150,590 was converted by nominal defendant Title Rover, and $159,250 by PDP Management, an entity solely owned by Tatham. *See id*. ¶¶12-13. It alleges that the Willis Defendants collectively "took" $89,548. *See id*. ¶¶14-16. Even if Ensource is correct on the amount received, it cannot prevail on its conversion claim.[22]

---

[22]   At best, Ensource's entitlement to damages is limited to the value of the property at the time of the conversion. *See Tyrone Pac. Int'l, Inc. v. MV Eurychili*, 658 F.2d 664, 666 (9th Cir. 1981). Ensource alleges that Beyond Review took $50,548 from Hopewell. *See* FAC, ¶14. It alleges that Image Engine took $24,000 from Hopewell. *See id*., ¶15. And, it claims the Willis Group took $15,000 from Hopewell. *See id*., ¶16. There is no allegation or evidence that Willis himself took or received anything from Ensource or Hopewell. Thus, the most that Ensource could recover from the Willis Defendants on the conversion claim, collectively, is $89,548.

First, "[c]onversion involves a taking of property without the owner's consent; hence there can be no conversion where the owner has expressly or impliedly assented to the taking or disposition." *Hull v. Freedman*, 383 S.W.2d 236, 238 (Tex. Civ. App. 1964); *see also Robinson v. Nat'l Autotech, Inc.*, 117 S.W.3d 37, 39-40 (Tex. App. 2003). Here, Ensource willingly gave its money to Hopewell for Initial Equity Shares pursuant to an initial private placement. The investment proceeds were to be "used to fund all operating overhead of the Company through December 31, 2016, and for the acquisition of Mineral Interests…."[23] Ex. A (PPM, Term Sheet). Operating overhead was disclosed to be "approximately $125,000 to $175,000 per month" and it was made clear such expenses would be paid before Mineral Interests. Ex. C (Exhibit A). While Ensource now apparently complains that its investment was used to fund operating overhead, that was the stated use, and Ensource agreed to it when it made the decision to invest. Because Ensource gave its money to Hopewell willingly, there is no conversion.

Second, there is no evidence that the Willis Defendants received anything from Ensource. To the contrary, the evidence establishes that the invested money was given by Ensource to *Hopewell*. It was wired by Ensource directly into *Hopewell's* bank account. *See* Ex. AE. The Willis Defendants cannot be liable for "taking" or "possessing" property they never took or possessed. The only party that could even potentially be liable for conversion is Hopewell, as that is the only entity that transacted with Ensource.

Finally, money cannot generally be the subject of conversion. *See Houston Nat. Bank v. Biber*, 613 S.W.2d 771, 774 (Tex. Civ. App. 1981). There is an exception,

---

[23]     Of the $430,000 invested, the first $205,000 was paid by Ensource in connection with the bridge loan, which was personally guaranteed by Willis. The agreement was that such amount would be loaned by Ensource to Hopewell so that Hopewell could meet its operational expenses. If certain contingencies were met within two weeks, the personal guarantee would be void and the loan would be converted to equity in Hopewell. If the contingencies were not met, the money would be returned to Ensource. *See* Ex. K. After two weeks, Ensource agreed that the contingencies were met, and the loan was converted to equity. *See* Ex. AA.

however, when "identification of the money is possible and there is a breach of an obligation to deliver the specific money in question or to otherwise treat specific money." *Sw. Indus. Inv. Co. v. Berkeley House Inv'rs*, 685 S.W.2d 615, 617 (Tex App. 1985). Preliminarily, money is fungible and identification of Ensource's invested money is not possible. Further, documentary evidence establishes that the invested money was treated the way intended and disclosed. As set forth above, the money was intended to be used for "all operating overhead." Ex. A, Term Sheet. There is no stated requirement that it only be used for "go forward" operating expenses. "All" means "all." Further, the allegation that Ensource did not know that Hopewell's operating expenses included payment obligations to service providers affiliated with Willis is false. Such information was expressly disclosed prior to the investment. *See* Ex. E. As the invested money was used exactly as disclosed, the exception does not apply and there can be no conversion for the alleged taking of money. The conversion claim fails.

**<u>Unfair Competition Law (CA Business and Professions Code §17200) Claim</u>**
**<u>(asserted against all Willis Defendants)</u>**

It is well-established that the UCL "does not apply to securities transactions." *Bowen v. Ziasun Technologies, Inc.*, 116 Cal. App. 4th 777, 788 (2004); *see also Kronk v. Landwin Group*, LLC, 517 Fed. Appx. 611, 613 (9th Cir. 2013)(plaintiff lacked standing to assert an UCL claim because his alleged injury related to the purchase of a security); *Siegal v. Gamble*, 2016 U.S. Dist. LEXIS 36346, *22 (N.D. Cal. 2016); *Schaffer Family Investors, LLC v. Sonnier*, 120 F. Supp. 3d 1028, 1049 (C.D. Cal. 2015); *San Francisco Residence Club, Inc. v. Amado*, 773 F. Supp. 2d 822, 833-34 (N.D. Cal. 2011); *Holland v. TD Ameritrade, Inc.*, 2011 U.S. Dist. LEXIS 395,*17-*18 (E.D. Cal. 2011); *and Feitelberg v. Credit Suisse First Boston, LLC.*, 134 Cal. App. 4th 997, 1009 (2005)("some conduct is beyond the reach of the UCL. For example, . . . section 17200 does not apply to securities transactions"). In fact, <u>"[n]o court</u>. . . has allowed Section 17200 claims to proceed" when, as here, the claims alleged are all predicated on a securities transaction. *Betz v. Trainer Wortham & Co.*,

829 F. Supp. 2d 860, 866 (N.D. Cal. 2011)(emphasis added). According to Ensoure, the "litigation arises from a scheme to defraud the Plaintiff in connection with the purchase and sale of securities." FAC, ¶1. Because the case is predicated on a securities transaction, the UCL claim fails as a matter of law.

## FIRST AFFIRMATIVE DEFENSE

For all the reasons set forth, the law cited, and based on all of the evidence cited above, Ensoure's claims are barred because they fail to state facts sufficient to constitute claims for relief or causes of action against the Answering Defendants.

## SECOND AFFIRMATIVE DEFENSE

For all the reasons set forth, the law cited, and based on all of the evidence cited above, Ensoure's damages, if any, were the proximate result of its own conduct and decisions, and Ensoure engaged in such conduct and made decisions knowing full well the risks involved, so as to have assumed any such risks and the likely consequences of such risks. Ensoure received substantial written information about Hopewell, was able to ask any questions of management and technical experts it deemed necessary, was able to ask for any documents it deemed necessary, determined the scope and depth of its due diligence inquiry, and was able to negotiate and revise the Hopewell and Title Rover company agreements, before its decision to invest. Ensoure represented in writing that it understood the investment and its risks, had access to all the information and information sources it needed, and that it was not relying on anything represented by management. Further, Ensoure decided not to invest $100,000 of what it promised it would invest, thus preventing Hopewell from meeting its operational budget and thus contributing to its lack of success.

## THIRD AFFIRMATIVE DEFENSE

Ensoure's claims are barred because Answering Defendants assert, without admitting that it engaged in any of the acts or conduct attributed to it by the First Amended Complaint, that any of the alleged acts or conduct which the Answering Defendants may have engaged in were reasonable, justified, in good faith, privileged

and/or for legitimate, non-discriminatory business reasons. At all relevant times the Willis Defendants acted appropriately and lawfully. As set forth above, Beyond Review and Image Engine performed work for Hopewell, as they were contracted to do. They billed for such work, and expected to be paid for such work. The Willis Group provided IT support, office space and phone services to Hopewell and Title Rover. It was not paid for such support services. Willis acted as a high-level manager of Hopewell and Title Rover, and exercised appropriate and reasonable oversight. He hired and relied upon experts to assist with Title Rover's development, and he relied upon Tatham to perform day-to-day oversight of operations. Representations made by Willis were made in his capacity as Manager of Hopewell, and were made in good faith with reasonable bases of fact.

## FOURTH AFFIRMATIVE DEFENSE

Ensource's claims are barred because Answering Defendants at all times acted in good faith and had no knowledge or were not reckless in not knowing that any alleged statements or omissions made were false or misleading when made.

## FIFTH AFFIRMATIVE DEFENSE

Ensource's claims are barred because any allegedly untrue statement of fact, omissions of fact, misleading statements, or other actions allegedly made by the Answering Defendants were not material to the investment.

## SIXTH AFFIRMATIVE DEFENSE

Ensource's claims are barred because, as an admitted Accredited Investor and/or as a result of its extensive due diligence, Ensource knew or, in the exercise of reasonable care, should have known of any alleged misrepresentations and/or omissions, and was thus negligent with respect to the purchase of its Securities. This negligence was the cause in fact and proximate cause of the alleged damages asserted in the First Amended Complaint.

## SEVENTH AFFIRMATIVE DEFENSE

Ensource's claims are barred because no conduct attributable to Answering Defendants was the cause in fact or proximate cause of the alleged damages Ensource seeks to recover in this action. There is no evidence to establish that any alleged conduct by the Willis Defendants caused Ensource's injuries, if any. The investment was risky and speculative and required a lot of things to go right in order to be successful (i.e. the oil and gas market had to remain depressed, title defects had to be found, land owners had to accept lease purchase offers at a reasonable price, sufficient funds had to be raised, etc.).

## EIGHTH AFFIRMATIVE DEFENSE

For all the reasons set forth, the law cited, and based on all of the evidence cited above, Ensource's claims are barred because Ensource did not reasonably rely on any of the statements or omissions alleged in the First Amended Complaint in deciding to purchase its Securities.

## NINTH AFFIRMATIVE DEFENSE

For all the reasons set forth, the law cited, and based on all of the evidence cited above, Ensource's claims are barred because Ensource failed to plead fraud or its predicate acts with sufficient particularity under the Private Securities Litigation Reform Act and Rule 9 of the Federal Rules of Civil Procedure.

## TENTH AFFIRMATIVE DEFENSE

Ensource's claims are barred because factors other than the allegedly untrue statements of material fact, omissions of material fact, misleading statements or other alleged actions by Answering Defendants caused some or all of Ensource's alleged damages. Ensource decided not to invest $100,000 of what it promised it would invest, thus preventing Hopewell from meeting its operational budget and thus contributing to its lack of success. Ensource threatened to sue, and then did sue, thus preventing Hoepwell and/or Title Rover from raising additional funds to continue operations. Further, the investment was risky and speculative and required a lot of

things to go right in order to be successful (i.e. the oil and gas market had to remain depressed, title defects had to be found, land owners had to accept lease purchase offers at a reasonable price, sufficient funds had to be raised, etc.).

### ELEVENTH AFFIRMATIVE DEFENSE

Ensource's claims are barred because Ensource failed to mitigate its damages, if any. Had Ensource invested the $100,000 it promised it would invest (and not sued within months of its investment), Hopewell might have met its operational budget, and might have been able to raise additional funds, which would have allowed Hopewell to pursue additional lease purchases. As set forth above, Hopewell believed that it could meet its lease purchase goals, and have Hopewell be deemed an "economic success" with more time and money. Had Hopewell been successful, Ensource's investment would have been productive.

### TWELFTH AFFIRMATIVE DEFENSE

Based on the law cited above, Ensource's UCL claim is inapplicable to claims related to the sale of securities.

### THIRTEENTH AFFIRMATIVE DEFENSE

For all the reasons set forth, the law cited, and based on all of the evidence cited above, Ensource's claims are barred because Answering Defendants lacked the scienter required for liability.

### FOURTEENTH AFFIRMATIVE DEFENSE

Ensource's claims are barred by own unclean hands, fraud, and wrongful conduct. Ensource decided not to invest $100,000 of what it promised it would invest, thus preventing Hopewell from meeting its operational budget and thus contributing to its lack of success. Ensource threatened to sue, and then did sue, thus preventing Hoepwell and/or Title Rover from raising additional funds to continue operations.

### FIFTEENTH AFFIRMATIVE DEFENSE

Ensource's claims are barred by estoppel and/or waiver. Ensource made significant representations and warranties in its Subscription Agreement and Company

Agreements, and Willis relied on such representations to his detriment, including Ensource's promise to indemnify Willis and pay his attorneys fees. *See* Ex. M. p.3-6 & Ex. D, §§9.1, 9.2 & 13.10 (Ensource "shall" indemnify each other Member [e.g., Willis] "and hold [him] harmless from and against all losses, costs, liabilities, damages and expenses (including, without limitation, costs of suit and attorney's fees) [he] may incur on account. . . of any business activities conducted by that Member. . ..").

## SIXTEENTH AFFIRMATIVE DEFENSE

For all the reasons set forth, the law cited, and based on all of the evidence cited above, Ensource's claims are barred because Answering Defendants were not involved in the alleged conversion.

## SEVENTEENTH AFFIRMATIVE DEFENSE

For all the reasons set forth, the law cited, and based on all of the evidence cited above, Ensource's claims are inactionable because any misrepresentations made by the Answering Defendants were mere puffery.

## EIGHTEENTH AFFIRMATIVE DEFENSE

For all the reasons set forth, the law cited, and based on all of the evidence cited above, Ensource's claims are barred by its own breach of contract (i.e. its failure to provide $100,000 of its $530,000 investment).

## NINETEENTH AFFIRMATIVE DEFENSE

For all the reasons set forth, the law cited, and based on all of the evidence cited above, Answering Defendants' alleged conduct was not unlawful, unfair or fraudulent, and was not likely to mislead.

## TWENTIETH AFFIRMATIVE DEFENSE

Answering Defendants' statements, if any, were forward looking statements accompanied by cautionary language, and thus protected by a safe harbor.

## TWENTY FIRST AFFIRMATIVE DEFENSE

Answering Defendants presently have insufficient knowledge or information upon which to form a belief as to whether, as yet unknown, affirmative defenses exist,

so it reserves the right to assert additional affirmative defenses in the event evidence adduced at trial indicates it would be appropriate.

## ABANDONED ISSUES

The Willis Defendants are unaware of any abandoned issues at this time.

## EXHIBITS

See attached list of exhibits, which the Willis Defendants expect to present at trial. It is anticipated that not all of these exhibits will be offered, and such determination will be made after the Court rules on the parties' respective motions for summary judgment on or about December 9, 2019.

## PROSPECTIVE WITNESSES

Below are the witnesses the Willis Defendants expect to present at trial. It is anticipated that some of these witnesses will only be called if the need arises, and such determination will be made after the Court rules on the parties' respective motions for summary judgment on or about December 9, 2019.

| Witness Name | Address |
|---|---|
| Jennifer Burkhardt | Address TBD |
| Mark Bush | 5868 Westheimer, Apt 458 Houston, TX 77057 |
| James Dibble | Address TBD |
| Pat Doherty, Doherty & Doherty | 1717 Saint James Place Houston, TX 77056 |
| Harry "Hank" Gamble IV, CPL | 7670 Woodway, Suite 360 Houston, TX 11063 |
| Michelle Hansen | Ms. Hansen may be contacted through the Willis Group's counsel |
| Joseph Haynes (by deposition or live) | 43807 Lees Mill Square Leesburg, VA 20176-3826 |

| | |
|---|---|
| Jerry Johns | 1570 Grasshopper Rd.<br>Huntingdon Valley, PA 19006 |
| Michelle Johnson | Ms. Johnson may be contacted through the Willis Group's counsel |
| Gil Lopez | 16522 Champions Cove Circle<br>Spring, TX 77379 |
| Chad Martin | 2 Greenway Plaza, Suite 720<br>Houston, TX 77046 |
| John Martin, Beyond Recognition | Level IV Data Center<br>Houston, TX 77067 |
| Jeff Merola | 15600 John F. Kennedy Blvd., Suite 680<br>Houston, TX 77032 |
| Lauren Messer | Address TBD |
| Rob Miller | Address TBD |
| Richard Nawracaj | 155 N. Wacker Dr. Suite 4250<br>Chicago, IL 60606 |
| Justin Pannu (by deposition or live) | Work: Calpine Energy<br>401 West A Street, Suite 500<br>San Diego, CA 92101<br>Home:700 W. E. Street, Suite 3804<br>San Diego CA 92101 |
| Cliff Sharp | 216 Centerview Dr., Suite 160<br>Brentwood, TN 37027 |
| Brent Stanley (by deposition or live) | Substantia Logix, LLC<br>56 Whitman Street<br>Stow, MA 01775 |
| Thomas Trent Stout | 231 Bryn Mawr Cir. |

| | Houston, TX 77024 |
|---|---|
| Thomas Tatham | 1327 Rutland Street |
| | Houston, TX 77008 |
| Susan Willard-Killen (by deposition or live) | Substantia Logix, LLC |
| | 56 Whitman Street |
| | Stow, MA 01775 |
| Mark Willis | Mr. Willis may be contacted through counsel |

Respectfully submitted,

DATED:  November 6, 2019        SULLIVAN HILL REZ & ENGEL

By: */s/ Shannon D. Sweeney*
Attorney for Defendants MARK A WILLIS;
BEYOND REVIEW, LLC; IMAGE ENGINE,
LLC; and WILLIS GROUP, LLC