# EXHIBIT B

**PANAKOS LAW, APC**
Aaron D. Sadock  (SBN 282131)
555 West Beech Street, Ste. 500
San Diego, California 92101
Telephone:  (619) 800-0529
Facsimile:   (866) 365-4856
Email: asadock@panakoslaw.com

Attorney for Plaintiff ENSOURCE INVESTMENTS LLC

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENSOURCE INVESTMENTS LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> THOMAS P. TATHAM, an individual; MARK A. WILLIS, an individual; PDP MANAGEMENT GROUP, LLC, a Texas limited liability company; TITLE ROVER, LLC, a Texas limited liability company; BEYOND REVIEW, LLC, a Texas limited liability company; IMAGE ENGINE, LLC, a Texas limited liability company; WILLIS GROUP, LLC, a Texas limited liability company; and DOES 1-50, <br><br> Defendants. | Case No.: 3:17-CV-00079-H-LL <br><br> **DECLARATION OF THOMAS P. TATHAM** <br><br> Magistrate Judge: Hon. Linda Lopez <br> District Judge: Hon. Marilyn L. Huff <br> Courtroom: 15A <br> Action filed:  January 13, 2017 |

I, Thomas P. Tatham, hereby declare:

1.      I am over eighteen years of age. I have personal knowledge of each fact stated in this declaration.

2.    I am a Defendant in the above-captioned matter. I also am the sole Manager of PDP Management, LLC, another Defendant in this matter. I was also a previous Manager with Mark Willis ("Willis") of Hopewell-Pilot Project, LLC ("Hopewell") and Title Rover, LLC ("Title Rover"). Mr. Willis and Title Rover have also been listed as Defendants in this matter.

3.    In my capacity of a Manager of Hopewell, I reported to Willis and performed duties customary to the role of a Chief Financial Officer and Chief Operating Officer from Hopewell's formation on March 29, 2016 thru my resignation effective April 13, 2017 (the "Relevant Period").

4.    During the Relevant Period, Willis was provided with periodic financial reports of Hopewell as a matter of regular course, including a periodic or monthly Running Trial Balance report in the form of a Microsoft Excel spreadsheet, periodic or monthly accounts payable lists with past due accounts noted, if appropriate, and periodic cash forecasts for relevant time periods (the "Financial Reports").

5.    In addition to the Financial Reports, Willis was informed of the financial affairs and financial status of Hopewell during the Relevant Period in discussions he had with me as well as e-mails and text messages.

6.    Commencing in mid to late May 2016 and continuing thru September 2016, Willis solicited prospective investors, including certain individuals that ultimately became members of Plaintiff, for the purpose of selling securities of Hopewell in exchange for cash investment (the "Solicitation Period").

7.    Throughout the entire Solicitation Period, Hopewell was undercapitalized and did not have the ability to generally pay its debts as they became due without funds or advances being provided by investors in Hopewell or cash advances from Willis or entities controlled by Willis.  Willis was fully aware

1    of such situation through the Financial Reports as well as my frequent oral and
2    written communication with him.

3        8.      In connection with such solicitation efforts, in July 2016 certain
4    members of Plaintiff were provided with the private placement memorandum
5    attached hereto and incorporated herein as Exhibit A (the "PPM").  Willis provided
6    input in connection with the drafting of the PPM, as well as reviewed and approved
7    the PPM prior to its circulation to any investors, including certain members of
8    Plaintiff.

9        9.      From approximately mid-July 2016 thru mid-September 2016, Willis
10   and I engaged in active negotiations with members of Plaintiff for their investment
11   in Hopewell (the "Active Solicitation Period").  The financial condition of
12   Hopewell, specifically its solvency, deteriorated significantly during the Active
13   Solicitation Period because Hopewell had been incurring full monthly operating
14   expenses without any meaningful cash receipts being provided from either sale of
15   Hopewell securities to investors or cash advances from Willis or entities controlled
16   by Willis.  During this period, Hopewell was not generally able to pay its debts as
17   they became due, including the August and September license fees for the Title
18   Rover Technology.

19       10.     During the Active Solicitation Period, Willis and I conducted
20   numerous telephone calls, meetings (both telephonically and personally) and
21   presentations with members of Plaintiff concerning their potential investment in
22   Hopewell.  In connection therewith, we placed a high significance on the Title
23   Rover technology (the "Title Rover Technology") as the key to the financial
24   success of Hopewell and Hopewell's investors including Plaintiff.  The
25   functionality of the Title Rover Technology was often exaggerated and knowingly
26   misrepresented by Willis as well beyond that which the Title Rover Technology
27   could actually, at that time, perform.

28

DECLARATION OF THOMAS P. TATHAM

3                                    3:17-CV-00079-H-LL

11.     Three of the written presentations of the Title Rover Technology that had been provided to potential investors and certain members of Plaintiff during the Active Solicitation Period are attached hereto and incorporated herein as Exhibit B (the "Title Rover Technology Presentation Decks").

12.     During the Active Solicitation Period, Willis and I had meetings with Brent Stanley, Chief Technology Officer of Title Rover, in which Mr. Stanley was directed by Willis to develop and prepare the Title Rover Technology Presentation Decks.  Upon my review of the initial drafts of the Title Rover Technology Presentation Decks and prior to its circulation to investors in late July 2016, I voiced concerns to Mr. Stanley that some of the representations therein concerning the Title Rover Technology seemed aggressive given my then current knowledge of Title Rover Technology's capabilities.  Mr. Stanley agreed with me and stated that he had discussed these same concerns with Willis because Mr. Stanley believed that we were "a bit over the tips of our skis" with respect to the representations concerning the Title Rover Technology contained in the Title Rover Technology Presentation Decks; however, Mr. Stanley stated to me that Willis "wanted the language left in" and was insistent on retaining the subject language in the Title Rover Technology Presentation Decks.  I subsequently told Willis that I thought the representations concerning the functionality of the Title Rover Technology, as contained in the drafts of the Title Rover Technology Presentation Decks, "were certainly a bit exaggerated at this stage, if not materially inaccurate and that he should consider modifying or conditioning the subject language to make it more accurate".  Willis nevertheless approved the Title Rover Technology Presentation Decks "as is" and without any revisions per my and Mr. Stanley's recommendations so that the representations concerning the Title Rover Technology could be more accurately stated.

13.     During the Active Solicitation Period, Willis did not, as far as I am aware, disclose Hopewell's deteriorating financial condition and insolvency to any members of Plaintiff.  During this time and as demonstrated in the Financial Reports provided to Willis, it became increasingly difficult for Hopewell to pay its then current obligations.

14.     One of the primary obligations Hopewell was not able to pay during the Active Solicitation Period was the monthly license fee for the Title Rover Technology, which was due the first of each month and had not been paid for the months of August 2016 and September 2016.  Because of this, Title Rover, in turn, was not able to pay some of its vendors that were critical to the development of the Title Rover Technology.

15.     By early September 2016, Willis expressed concerns to me that certain vendors of Title Rover, particularly Beyond Recognition, a vendor that Willis deemed critical to Title Rover for the continued development of the Title Rover Technology, were going to disengage from their development activities unless paid amounts that had been owed or promised to them by Willis.

16.     In early September 2016, however, Title Rover did not have the money to pay Beyond Recognition, so Willis suggested that Hopewell pay Beyond Recognition using some of the proceeds from the investment to be provided by Plaintiff to Hopewell.  Willis made this suggestion notwithstanding the fact that Beyond Recognition had not at that point performed its obligations under the initial scope of work with Title Rover on behalf of Hopewell.  Both Mr. Stanley and I were reluctant to advance further funds to Beyond Recognition until such time as Beyond Recognition had performed the initial scope of work set forth in the Development Plan by successfully completing Phase 1 which included primary indexing of Madison County digital records. In connection with such discussions with Willis and pursuant to his request, I drafted and sent him an e-mail on

DECLARATION OF THOMAS P. TATHAM

1   September 8, 2016 that outlined the trade payables of Hopewell and Title Rover

2   that were going to be paid with proceeds from the investment of Plaintiff into

3   Hopewell.  A true and correct copy of such September 8, 2016 e-mail is attached

4   hereto and incorporated herein as Exhibit C (the "September 8th E-Mail").

5        17.    When the September 8th E-Mail was sent, the negotiations with the

6   members of Plaintiff for their investment in Hopewell were on-going.  The

7   members of Plaintiff wanted to negotiate and make certain changes to the

8   Operating Agreements of Hopewell and Title Rover.  As a result, the actual

9   investment by Plaintiff appeared, at that time, to require more time in order to

10  finalize.

11       18.    On the morning of September 12, 2016 Willis advised me that in

12  order to provide Plaintiff with more time to finalize the terms of its investment in

13  Hopewell he had reached agreement with Plaintiff for Plaintiff to provide a "bridge

14  loan" to Hopewell to be guaranteed by Willis and for me to prepare the promissory

15  note with term of 14 days, a conversion privilege into Hopewell Initial Additional

16  Equity Shares and to work out the details with Plaintiff's Counsel, Richard

17  Nawracaj. This resulted in a cash infusion into Hopewell of Two Hundred Five

18  Thousand Dollars ($205,000) on September 13, 2016 (the "First Tranche").

19       19.    The proceeds of the First Tranche were used to pay the amounts set

20  forth in my September 8th E-Mail and in addition Willis insisted on using $25,000

21  of the remaining amount of the First Tranche to make an additional advance to

22  Beyond Recognition.  As a result, the entire amount of the First Tranche was used

23  within three days following its receipt.  Further, notwithstanding receipt of the

24  First Tranche, its use and application, the financial problems of Hopewell

25  continued.

26       20.    After the First Tranche was received, the changes to the Operating

27  Agreement of Hopewell and Title Rover were negotiated and agreed upon by

28

1   Plaintiff.  As a result, Plaintiff executed a Subscription Agreement on or about

2   September 29, 20016 for an investment of Five Hundred Thirty Thousand Dollars

3   ($530,000) in Hopewell (the "Subscription Amount").  Further, the convertible

4   promissory note issued by Hopewell on September 13, 2016 and personal guaranty

5   of Willis were canceled since the First Tranche in the outstanding principal amount

6   of the bridge loan was converted and considered to be part of the Five Hundred

7   Thirty Thousand Dollar ($530,000) investment of Plaintiff in Hopewell.

8       21.    On September 30, 2016 and October 28, 2016, Plaintiff paid the

9   amounts of Twenty Thousand Dollars ($20,000) and Two Hundred Five Thousand

10  Dollars ($205,000) of the Subscription Amount.  Such amounts were used in a

11  similar fashion, and under similar circumstances, as the First Tranche to pay for

12  Hopewell operations and antecedent debts related thereto.

13      22.    Although my job duties involved the oversight, and monitoring of the

14  development of the Title Rover Technology from a financial and personnel

15  standpoint, the technical decisions concerning the Title Rover Technology were

16  ultimately made by Willis.  However, having been involved with both Hopewell

17  and Title Rover since their inception of operations, and as a member of senior

18  management who had been privy to internal discussions concerning the Title Rover

19  Technology and its development, I was appalled that significant time and resources

20  were being wasted in the continuing effort to support the use of Beyond

21  Recognition's technology as it never was able to viably operate as represented in

22  Title Rover Technology Presentation Decks.  Willis' preoccupation with support

23  and use of Beyond Recognition's technology was the primary reason, in my

24  opinion, that Title Rover failed to deliver the functionality described in the Title

25  Rover Technology Presentation Decks.

26      23.    One of the key goals for the development of Title Rover Technology

27  within the scope of the Hopewell-Pilot Project and to be in conformity with the

28

representations in the Title Rover Technology Presentation Decks was the production of a suitable index of the deed and title information gathered from the digitization of Madison County land records.  The production of a suitable index relied upon the successful sorting into discreet fields or categories such as Date, Grantor, Grantee, Volume, Page, Land Description/Location, Document Type and the clustering of key documents such as leases, deeds, units and conveyances.

24.    Up through October 2016, by focusing almost exclusively on the application of Beyond Recognition' technology Title Rover, was not able to produce a suitable index of the information gathered from the land records concerning the areas of interest stated in the PPM.

25.    On October 18, 2016, I sent an e-mail to Brent Stanley, copying Willis in facetious reference to Beyond Recognition's pathetically slow progress, which stated as follows: "It is amazing to me that we are just now clustering leases/deed/units and conveyances!  How were we ever going to have a suitable index without?  Please keep us posted on today's results!"  This work should have started in July 2016 when Beyond Recognition was paid initially.

26.    I reviewed Exhibit D hereto in its entirety, which has been represented to me as true and correct copies of excerpts of text messages sent by Willis.

27.    The following text message sent by Mark Willis to Chad Martin on May 11, 2016 was a complete and utter falsehood: "Truly don't need the capital as I already have a couple of family funds waiting to take it all."

28.    The following text message sent by Mark Willis to Chad Martin on May 18, 2016 was a complete and utter falsehood: "I am WAY overcommitted on my deal."

29.    The following text message sent by Mark Willis to Chad Martin on June 1, 2016 was a complete and utter falsehood: "I am currently oversubscribed."

30.   The following text message sent by Mark Willis to Chad Martin on June 1, 2016 was a complete exaggeration and puffery: "Raising 1-2 million from friends and family and have several already interested in putting a 25 million acquisition fund in place."

31.   The following text message sent by Mark Willis to Chad Martin on June 27, 2016 was a complete and utter falsehood: "My business partner got a full commitment."

32.   During the solicitation, Willis represented to Plaintiff that he had extensive experience in oil, gas and mineral interest acquisitions, but the reality is he did not have nearly as much experience in the industry as he proclaimed.

33.   Additionally, Willis continually exaggerated Title Rover's then current capabilities, Willis' investment in Title Rover and Hopewell's present stage of growth to various prospective Hopewell investors which put me in an uncomfortable position.

34.   It was Willis' idea to file to bankruptcy on behalf of Hopewell and Title Rover simply as a litigation tactic in an effort to delay the California case. I did not support the idea of filing the bankruptcy actions in Texas as they were not necessary or warranted given the relatively small amounts owed to outside creditors. It was a total waste of the Texas court's time in my opinion to oversee two unnecessary bankruptcy proceedings for over two years at this point. Willis, as Debtor in Possession, did not bother to honor his fiduciary duty to creditors to safeguard and protect the assets of each entity. Both cases were converted to Chapter 7 proceedings in March 2018 following Willis' submittal of his reorganization plan in which Willis again lied, exaggerated, and misrepresented several facts.

1  I declare under penalty of perjury under the laws of the State of California that the

2  information contained in this declaration is true and correct to the best of my

3  knowledge.

4

5  Executed this 19th day of August, 2019.

6

7                                          THOMAS P. TATHAM

8                                          By: *Thomas P. Tatt*

9                                          Thomas P. Tatham, In Pro Per

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF THOMAS P. TATHAM

**EXHIBIT A**

# PRIVATE PLACEMENT MEMORANDUM

## HOPEWELL-PILOT PROJECT, LLC

### PRIVATE PLACEMENT OF UP TO 1,000,000 INITIAL ADDITIONAL EQUITY SHARES

THE OFFERING OF SECURITIES DESCRIBED HEREIN HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION.   THIS OFFERING IS MADE PURSUANT TO REGULATION S OR REGULATION D UNDER SECTION 4(a)(2) OF SAID ACT, WHICH EXEMPTS FROM SUCH REGISTRATION CERTAIN TRANSACTIONS. FOR THIS REASON, THESE SECURITIES WILL BE SOLD ONLY TO INVESTORS WHO MEET CERTAIN MINIMUM SUITABILITY QUALIFICATIONS DESCRIBED HEREIN.

A PROSPECTIVE INVESTOR SHOULD BE PREPARED TO BEAR THE ECONOMIC RISK OF AN INVESTMENT IN THE COMPANY FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE SHARES OR MEMBER'S INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE LAWS OF ANY OTHER JURISDICTION, AND, THEREFORE, CANNOT BE SOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.   THERE IS NO OBLIGATION OF THE ISSUER TO REGISTER THE SHARES OR MEMBER'S INTERESTS UNDER THE SECURITIES ACT OR THE LAWS OF ANY OTHER JURISDICTION. TRANSFER OF THE SHARES OR MEMBER'S INTERESTS IS ALSO RESTRICTED BY THE TERMS OF THE AMENDED AND RESTATED COMPANY AGREEMENT RELATING THERETO.

## TABLE OF CONTENTS

I.      Executive Summary

II.     Term Sheet

III.    Technology

IV.     Risk Factors

V.      Previously Distributed Offering Materials

VI.     Subscription Booklet

VII.    Amended and Restated Company Agreement



I.     EXECUTIVE SUMMARY

The Hopewell – Pilot Project, LLC ("Hopewell" or the "Company") was formed in March 2016 for the purpose of demonstrating "Proof of Concept" involving the refinement, use, and application of a new proprietary software technology which can geographically sort and analyze land and mineral title records and related digital data for the purpose of acquiring Oil, Gas & Mineral interests in the most contemporary "tight sands" and "shale" plays.

The business concept behind the formation and funding of Hopewell depends upon five basic premises! They are:

1. The more contemporary "tight sands" and "shale" plays are more commercially rewarding as the industry continues to refine and apply new horizontal completion and frac techniques to the areas best suited for the application of such technology.
2. The best contemporary "tight sands" and "shale" plays were initiated 2010-2013 in a very competitive environment and the initial leasing effort was undertaken on a "trend basis" which provided less than 100% title review by contract land personnel.  Legal title opinions were generally only undertaken on "drill site" tracts.
3. Operators tried to hold the maximum amount of leased acreage by forming large pooled units for the drilling and completion of lower cost vertical wells.  Many of such pooled units were formed without contemporary survey of leased acreage included.  In the past two years since mid 2014, as the cash flow to most Operators declined due to falling oil and gas prices, many pooled units were hastily formed and contain numerous irregularities.
4. Most of the new initial leases taken in the contemporary "tight sands" and "shale" plays, unless "held by production", will expire in the 2016 -2017 time frame.  Many of the existing pooled units contain unleased acreage or have leased tracts that would have expired if not for a "pooled unit" designation.
5. The most lucrative opportunities for Hopewell will occur in contemporary "tight sands" and "shale" plays located in geographical areas where significant land title problems exist .

Hopewell has identified four initial target areas in Madison County, Texas which it believes will optimize investment returns as well as provide "Proof of Concept".  The areas selected have multiple proven hydrocarbon pay zones which have demonstrated significant commercial production in recently completed horizontal wells.  Initial evaluation of the prospective areas indicate that there are unleased tracts in many of the existing Pooled or Declared Units.  Based upon recent field discussions, Hopewell believes that it can acquire new leases in the four areas for initial bonus and lease acquisitions costs of $1,000 per acre or less and by providing traditional lease royalty burdens to the related mineral owners.  In addition to open acreage, many of the existing Pooled or Declared Units and underlying leases appear to have possible deficiencies.  Hopewell plans to continue detailed legal evaluation of these identified Units and underlying leases.  If warranted, upon conclusion of Hopewell's legal evaluation, Hopewell will seek to arrange additional financing for Company to pursue an aggressive "top lease" strategy for the purchase of new leases in the affected areas.  Hopewell has retained certain Financial Advisors to assist in obtaining up to $25,000,000 of prospective financing for the Company's possible execution of the top lease strategy.

Hopewell is seeking qualified debt and equity investors to provide up to $2,000,000 in new funds from the placement of up to 1,000,000 Initial Additional Equity Shares for the purpose of acquiring new lease and mineral interest acquisitions in the four initial target areas and for working capital to continue the Company's operations and evaluation of lease acquisition opportunities.

New leases acquired by the Company will be held for resale to Operators seeking to organize multi well horizontal drilling & completion programs or to provide the Company with working interest particpation in such development.  The Company's leasing activities will also likely provide opportunity to purchase term royalty and mineral interests on commercially favorable terms.

II.   TERM SHEET

THE INITIAL PRIVATE PLACEMENT:  Hopewell-Pilot Project LLC ("Hopewell" or the "Company") is seeking to privately arrange the placement of 1,000,000 shares ("Initial Additional Equity Shares) of the Company for $2,000,000, the proceeds of which are to be used to fund all operating overhead of the Company through December 31, 2016, and for the acquisition of Mineral Interests, primarily new Oil and Gas leases, in an agreed Area of Mutual Interest ("AMI") covering Madison County, TX and the Buda Rose play ("Buda Rose" play).

Threshold Placement Amounts - Initial Additional Equity Shares:

Minimum Subscription Amount:  $250,000 – 125,000 shares
Maximum Subscription Amount:  $2,000,000 – 1,000,000 shares

Pricing of Initial Additional Equity Shares:

The price per share for all Initial Additional Equity Shares subscribed prior to closing shall be $2.00 per share.

Priority Rights to Distributions:

Initial Additional Equity Shares shall have a priority right to cash distributions.  The Amended and Restated Company Agreement provides that the holders of Initial Additional Equity Shares shall receive all cash distributions made by the Company until such time as they have received $2.00 per share in distributions. Once the holders of the Initial Additional Equity Shares have received $2.00 per share in cash distributions, then all additional cash distributions made by the Company shall be paid uniformly on a per share basis.

Financial Advisors:

The Company has retained Meridian Circle Advisors and may retain other financial advisors (collectively "Financial Advisors") to assist the Company in obtaining additional capital if needed for the acquisition of additional Oil, Gas & Mineral interests within the AMI. Additional capital may involve the issuance of debt, convertible debt, preferred equity or the formation of a Limited Partnership involving the Company.

Shares Authorized and Outstanding:

The Company has 5,000,000 authorized shares of which 1,000,000 have been issued to Founders and are currently outstanding.

Other Terms and Conditions:

As provided in the Subscription Agreement and the Amended and Restated Company Agreement.

## III.   TECHNOLOGY

The Founders have arranged and provided a cost based contract to Hopewell for the exclusive use of new proprietary software technology owned by Title Rover, LLC, an affiltiate of the Founders.  Hopewell will pay only for the direct costs of digital data purchase, direct operations and traning of Hopewell personnel related to use of Title Rover's proprietary software in an agreed AMI covering Madison County, TX.  Direct costs are currently running $17,500 per month in addition to the purchase or acquisition of digital data.  Either party may terminate the contract beginning January 1, 2017 by providing 30 days prior written notice to the other.  The Company believes that the use of Title Rover technology in the evaluation of OG&M title will result in significant savings in both time and costs.

## IV.   RISK FACTORS

A.   Although the Company has identified open or unleased acreage in many existing Pooled or Declared Units there is no certainty that leases of such acreage can be timely obtained or that leases can be obtained at the Company's estimated cost.

B.   Even if the Company is successful in obtaining new leases within existing Pooled or Declared Units there is no assurance that Operators of such Units will include the leases acquired by the Company in the Pooled or Declared Units without a legal action requiring "forced pooling" brought on behalf of the Company and the Lessor of the new leases.

C.   Even if the Company is successful in obtaining new leases within existing Pooled or Declared Units and the Company succeeds to include the new leases in the Pooled or Declared Units, the leasehold interests owned by the Company may not be sufficient to assure that new horizontal wells are drilled and completed and that such activity will be timely undertaken by the Operator.

D.   If the Company is not able to acquire a significant leased acreage position in the identified prospect areas, they Company may not be able to sell or consolidate its lease position with other operators undertaking development of the Buda Rose play.

E.   If oil and gas prices decline significantly, current Operators in the Buda Rose play may defer all horizontal development drilling until such time as prices recover.  If this proves to be the case then the Company may not realize any value for the leases it acquires for a prolonged period of time.

F.   Investment in oil, gas and mineral leases is a speculative undertaking with a high degree of risk.  Investors that cannot afford substantial risk and the entire loss of their invested capital should not undertake the proposed investment.

G.   There is no ready market for the shares of the Company. A prospective investor should be prepared to bear the economic risk of an investment in the Company for an indefinite period of time because the shares or Member's interests have not been registered under the Securities Act or the laws of any other jurisdiction, and, therefore, cannot be sold unless they are subsequently registered of an exemption from registration is available.  There is no obligation of the Company to register the shares or Member's interests under the Securities Act or the Laws of any other jurisdiction.

V.   PREVIOUSLY DISTRIBUTED OFFERING MATERIALS

    A.  Hopewell Executive Summary Teaser

    B.  Hopewell Project Highlights

    C.  Prospect Area Maps

VI.   SUBSCRIPTION BOOKLET - ATTACHED

VII.   AMENDED AND RESTATED COMPANY AGREEMENT - ATTACHED

**EXHIBIT B**

# Data Mining for Mineral Resource Investigations

**July 25, 2016**



PLTF_000670



# Who We Are

TitleRover LLC is a Willis Group US affiliate headquartered in Houston, Texas.

TitleRover has developed the proprietary technology, workflow and interface to power the data processing function which is the key to automating and expediting much of the work associated with traditional prospect area opportunity analysis.

TitleRover encourages and supports joint venture arrangements with oil and gas investors and operating entities who wish to participate and collaborate in specific mineral opportunities.

**Management Team**
- Mark Willis, Managing Partner
- Tom Tatham, Managing Partner
- Brent Stanley, CTO

**Technology Team**
- Joe Haynes, Data Architect, Developer
- John Martin, Visual Similarity Software IP
- GIS Analysts

**Legal, Records SME**
- Staff Attorneys
- Flex Team powered by Willis Group BeyondReview

**Data Acquisition**
- Susan Willard, Project Lead
- Flex Team powered by Willis Group Image Engine



2

PLTF_000671

# What We Do

TitleRover leverages its technology prowess to reduce the cost of and shorten the timeframe to build a high quality database of land records and spatial data.

It has developed its own proprietary technology and licensed sole rights to additional technology which delivers a 10X improvement to traditional methods of supporting data investigations and specialized analysis.





PLTF_000672

## Why It Matters

The traditional work effort to determine mineral ownership and related opportunities includes a laborious effort to perform the multiple, linear tasks inherent in the workflow.



Which means that as a result of significant time and cost efficiencies, more investment dollars can be used to monetize opportunities. This also means that more opportunities can be pursued for a given budget.



PLTF_000673

# Key TitleRover Features

| Feature | Description | Benefit |
|---|---|---|
| Custom Indexing using BeyondRecognition | Use of visual similarity and glyph-based image recognition to classify and attribute records | Non-linear relationship between work and cost; no reliance on text; ability to generate high quality deep index |
| Custom Filtering | Ability to dynamically slice data a number of ways | Reduces time spent performing analysis |
| Custom Grouping | Create prospect area, surname or other types of custom groups to create smaller haystacks | Reduces time spent performing analysis |
| Integrated Production, Permitting, Appraisal District, Probate | Single view of multiple data sources | Reduces time spent performing analysis |
| Automated Title Chaining | System-driven tree graph of related deeds and other instruments | Reduces time spent performing analysis |



TitleRover
LLC
5

PLTF_000674

# Significant Applications

- Identify unleased oil, gas, & mineral interests
- Identify leases held by production or unitization
- Identify lease composition of pooled units
- Identify leases with depth limitations and or unique commercial terms
- Identify expiration dates for existing leases not held by production
- Identify leases or pooled Unit Designations with prospective legal or compliance deficiencies





PLTF_000675

# Historical Title Effort Characteristics

- Lease volumes during recent period compared to history
- Gold rush
- Inherent inaccuracies in court records
- Data silos needing to be examined
- Manual efforts with high error rates
- Horizontal drilling inherently is more complex leasing because of the multiple tracts required to be leased
- Systemic issues in a prospect area

All of this leads to poor examination of titles and leasing errors



PLTF_000676





PLTF_000677

# Differentiators

We integrate four key skill sets to deliver our work:

**Subject Matter Experts (SME):** Experienced attorneys in the field of lease and title analysis, as well as local attorneys for the projects of interest.

**Technology:** We leverage the latest tools using artificial intelligence and analytics.

**Big Data:** We are skilled in acquiring and harvesting large volumes of data, including structured, unstructured and spatial data.

**Agility:** We are nimble and quick to conceive and build variants of applications needed to support the nuances of different projects.





PLTF_000678

# Project Framework

## Data Architecture

- Develop Data Models/Fact Patterns
- Software and Infrastructure Requirements

## Data Acquisition Plan

- Source Investigation
- Cost Benefit Analysis

## Data Processing

- Project Plan
- Staged Deliverables

## User Interface Design

- Analytics Objectives
- Results Presentation/Visualization





10

PLTF_000679

# Getting Started

Identify commercial opportunities

Prepare resource plan and budget

Prepare/execute project plan

Build out database and UI

Perform analytics and deliver results





11

PLTF_000680

# Data Mining for Mineral Resource Investigations

*Capabilities Summary and Technical Overview*

August 19, 2016

1



PLTF_000681

## Who We are

TitleRover LLC is a Willis Group US affiliate headquartered in Houston, Texas.

TitleRover has developed the proprietary technology, workflow and interface to power the data processing function which is the key to automating and expediting much of the work associated with traditional prospect area opportunity analysis.

TitleRover encourages and supports joint venture arrangements with oil and gas investors and operating entities who wish to participate and collaborate in specific mineral opportunities. The TitleRover organization is structured as follows:



**Management Team**

- Mark Willis, Managing Partner
- Tom Tatham, Managing Partner
- Brent Stanley, CTO

**Technology Team**

- Joe Haynes, Data Architect, Developer
- GIS Analysts

**Legal, Records SME**

- Staff Attorneys
- Flex Team powered by Willis Group BeyondReview

**Data Acquisition**

- Susan Willard, Project Lead
- Flex Team powered by Willis Group Image Engine

## The Resultant Mineral Leasing Mess

Looking back at the events over the last several years, we see a confluence of conditions that have led us to conclude there are opportunities to exploit.

- Gold rush conditions created a scramble to lease prospect areas
- Inherent inaccuracies in court record indexes

2



- Inexperienced landmen performing lease and title analysis

- Multiple data silos needing to be examined

- Manual efforts with high error rates

- Horizontal drilling inherently is more complex leasing because often multiple tracts need to be leased

These factors resulted in poor or limited examination of titles, leasing errors and systemic issues in a prospect area. The following graph illustrates the dramatic increase in oil production from the top prospect areas; the volume of mineral leasing activity is in direct proportion.



## What We Do

TitleRover leverages its technology prowess to reduce the cost of and shorten the timeframe to build a high quality database of land records and spatial data.

It has developed its own proprietary technology and licensed sole rights to additional technology which delivers a 10X improvement to traditional methods of supporting data investigations and specialized analysis.

Historically, the investigation of mineral opportunities was a laborious effort which required people to visit the county courthouse to review records and decipher ownership and title. There are multiple data sources to check and correlate in order to answer these ownership and other questions.

3



PLTF_000683

The following diagram depicts to common sources of documents and data and the high level wiring diagram of how the various records and databases are related.



Obviously, performing these tasks manually is a huge effort and requires not only experienced personnel to do it properly, but also takes months to execute. Some of these records have been digitized and partially indexed; commonly the Land Records have been digitized back to a certain point in time and indexed with basic information including grantor/grantee, lessor/lessee, abstract/survey, recording date instrument type, and sometimes acreage.

When one examines the quality of the index provided by a county courthouse, you see an enormous variety of ways the indexing has been performed; for example, there are thousands of unique instrument types present in the courthouse index, but in reality there are only a few hundred. Even those can be collapsed in a dozen or so buckets (conveyances, O&G leases, etc.). Even something as simple as surnames and surveys are spelled wildly diverse; the survey name Moffitt, in one example, is present 10 different ways.

In addition, the county index is incomplete. For example, often there are multiple surveys referenced in an instrument but only one is in the index, or its simply listed as "Various".

Given these conditions and our goal of being able to answer data-driven questions which point to potential opportunities, its mandatory to have high quality, deep and complete index information across these multiple silos in order to execute the queries and find the opportunities faster and at less cost than traditional methods.

4



## Why It Matters

The traditional work effort to determine mineral ownership and related opportunities includes a laborious effort to perform the multiple, linear tasks inherent in the workflow. The following diagrams show a typical workflow for uncovering unleased mineral interests.

Historical efforts rely on the manual processes described earlier and take several months to execute, even if the user is able to use a web-based subscription to the available land records (which are usually a subset of the total records and suffer from inaccurate and incomplete indexes, as described earlier).



## Current Methods: Months of Effort



## TitleRover Methods: Weeks of Effort

Using TitleRover capabilities, this means that as a result of significant time and cost efficiencies, more investment dollars can be used to monetize opportunities. This also means that more opportunities can be pursued for a given budget.

## Key TitleRover Features

TitleRover's key features are summarized in the following table. Compared to the available data services in the market, TitleRover offers not only more data sources (which can therefore be leveraged to answer more complex questions) but also deeper indexes and higher quality indexes. The marketplace is currently comprised of the following categories of participants:

- Full service title and run sheet capabilities: One market participant (DrillingInfo) offers deeper data in limited markets. Indexing is purely manual and therefore expensive. TitleRover offers wider and deeper data and technology driven indexing.

5



- Land record services companies: There are many companies who purchase available digitized and indexed sets of land records from courthouses (typically with a narrow geographic focus) and offer subscription services to access those records from the web.
- Data services companies: There are several companies and government entities who sell spatial data which can be used in conjunction with other data. An example would be P2 who sells spatial data sets containing some useful geographical and boundary data.

The following table summarizes certain key features which differentiate TitleRover in the market.

| Feature | Description | Benefit |
|---------|-------------|---------|
| Custom Indexing | Use of visual similarity and glyph-based image recognition to classify and attribute records | Non-linear relationship between work and cost; no reliance on text; ability to generate high quality deep index |
| Custom Filtering | Ability to dynamically slice data a number of ways | Reduces time spent performing analysis |
| Custom Grouping | Create prospect area, surname or other types of custom groups to create smaller haystacks | Reduces time spent performing analysis |
| Integrated Production, Permitting, Appraisal District, Probate | Single view of multiple data sources | Reduces time spent performing analysis |
| Automated Title Chaining | System-driven tree graph of related deeds and other instruments | Reduces time spent performing analysis |

## Data Acquisition

Acquiring the necessary data to answer the questions leading to opportunity identification across a variety of scenarios is in itself a large set of tasks requiring specific expertise. The nature of the market is that each county in each state has performed more or less digitization of their records and all follow different protocols in how they index their records. The work to acquire data includes such tasks as:

- Developing relationships with the county governments of interest, and the vendor ecosystem which supports their records including hosting their records and assisting in the digitization process.
- Preparing budgets and project plans for acquiring the data of interest.
- Deploying and managing teams in the field to perform imaging where counties have not digitized back to sovereignty.

As an example, the following table represents our investigation into certain counties in Ohio; note there is a significant amount of imaging and indexing to perform and TitleRover's approach supports first mover advantage based on collection and processing skills and technology.

6



| County | ST | Records Digitized | By County, Or Commercial | Beg Digital Records Date | End Digital Records Date | Indexing | Back-to Sovereignty Date | Unscanned Doc Count |
|--------|-----|--------|-------------|-------------|-------------|----------|------------|------------|
| Columbiana | OH | Y | Cotts System | July 2001 | To present | 1966 to present | Late 1700's | N/A |
| | | | | | | | | |
| Carroll | OH | Y | CSSI | All from 1831 | Present | All from 1831 | 1831 | N/A |
| Harrison | OH | Y | ACS/Xerox | 1994 | Present | 1994 online & pre-1994 on | 1813 | On A/V - 387,397 |
| Guernsey | OH | Y | ACS/Xerox | 1988 | Present | 1986 to present | 1820's | On A/V - 339,118 |
| Noble | OH | Y | ACS/Xerox | 1992 | Present | 1992 online & pre-1992 on | 1832 | In process by ACS |
| Monroe | OH | Y | ACS/Xerox | 1993 | Present | 1993 online & pre-1993 on | 1800's | In process by ACS |
| Washington | OH | Y | ACS/Xerox | 1985 | Present | 1985 online & pre-1985 on | 1788 | On A/V - 70,516 |
| Jefferson | OH | Y | In-house | 1992 | Present | 1992 to present | 1796 | N/A |
| Belmont | OH | Y | ACS/Xerox | 1991 | Present | 1991 online & pre-1991 on | 1840s | In process by ACS |
| Tuscarawas | OH | Y | ACS/Xerox | 1991 | Present | 1991 online & pre-1991 on | 1800 | On A/V - 1,086,094 |
| Muskingum | OH | Y | In-house | All from 1803 | Present | All from 1803 | 1803 | N/A |
| Coshocton | OH | Y | ACS/Xerox | 1980 | Present | 1980 to present | Early 1800's | N/A |

## TitleRover Portal Overview

The following are a set of screenshots which show the current version of the TitleRover portal. We also have a development plan which adds additional features in subsequent releases to enrich the functionality.

The screenshot below is the login page, which uses two factor authentication.



7



PLTF_000687

The main search page allows a user to select the prospect area of interest and then a rich menu of facets, depending on the query objectives. Compared to the other user interfaces available in the market, TitleRover offers more flexibility and customization.



One of our unique features is our ability to create custom groups, described as follows.

- Surnames:  Often it is interesting to examine the activity of a family over the course of decades, where there are many surnames associated with the ancestral tree.  This feature allows a user to custom-create a list of surnames gleaned from sampling the data, and then use this as a facet of search on the main search screen.
- Instrument Types:  Since any given county uses multiple and redundant labels to describe the same instrument type, aggregating these into a group makes the search tasks much easier.  For instance, all types of deeds have been aggregated into a single group called conveyances.
- Surveys/Abstracts:  Since this is the primary geographical division in Texas, prospect areas are defined by which surveys and abstracts they cover.  Filtering records and data by prospect area using this feature is very useful.

8



PLTF_000688

Here is a screen shot of the grouping function for deed types. Note the long list of deed types as provided by the county.



9



Here is a screen shot of the grouping function for family ancestry. Note the multiple spelling variations as found in the records and county index.



One of the primary objectives is to examine the chain of title, including surface, mineral and royalty. Automating the collection of documents in the chain saves tremendous amounts of time. In order to create these relationships, we have used our technology to extract the contextual references to instruments within the documents themselves. Unit Declarations, for example, can contain many tract and lease references (sometimes hundreds). Automating deed hopping allows a user to see quickly what has happened and where the gaps may exist.

The following is an example of a tree graph which is automatically generated by our system.

10





From the tree graph, a user can see the same data in a grid format, which forms the basis for what is called a "Runsheet". Our attorneys add comments and artifacts to this grid, which can be used as the basis for a title opinion where required.

The following screenshot is the grid equivalent of the tree graph above, and can be exported as a xls or pdf.



## Pugh Clause Detection

Auto-detecting Pugh clauses in leases is interesting in certain scenarios. Our technology creates perfected, fully searchable text files and we then use K-nearest neighbor thematic clustering to isolate the documents containing those clauses, even where the wording is slightly different.

For example, we start with examples of a typical clause like this:

> "If at the end of the primary term, a part but not all of the land covered by this lease, on a surface acreage basis, is not included within a unit or units in accordance with the other provisions hereof, this lease shall terminate as to such part, or parts, of the land lying outside such unit or units, unless this lease is perpetuated as to such land outside such unit or units by operations conducted thereon or by the production of oil, gas or

11



other minerals, or by such operations and such production in accordance with the provisions hereof."

Using our tools, we find thematically matching candidate clauses across the entire data set within seconds and create a database marker where those candidate matches exist. This marker is then a faceted search term in the user interface.

## Data Mining Framework

The TitleRover approach is comprised of three primary categories:

1. Data Sources: Historically, legal and other investigations were constrained by the human cost associated with gathering and reviewing the data. Our approach turns this paradigm in its head, because access to high quality data is no longer the restriction. The new restriction is prioritizing the types of opportunity of interest, which is a much better problem to have.
2. Big Data Processing: Since we are able to grind document-based data like never before, we can do it with scale and speed and with cost efficiency. Triangulating records-based data with spatial and structured is accomplished by our team of experts.
3. Analytics: With a rich and deep database and with powerful and flexible search tools, our issues experts can detect the systemic issues and locate the specific owners, parcels and operators affected by those conditions.

The following diagram summarizes the high level approach to data processing.



12



## Logical Architecture

The TitleRover logical architecture is represented in the following diagram.



A partial list of the software and programming used:

- Tesseract (Custom)
- QGIS
- C++
- Python
- Solr/Lucene
- Café
- BeyondRecognition
- Windows Communication Foundation (WCF)

## Unstructured Data Processing Technology

Unstructured (document-based) data is one of the biggest challenges faced by industry, since it historically has been the most expensive data to mine. TitleRover uses very advanced technology to automate data mining for this data type; the benefit of which is ability to dramatically lower the cost and improve the speed of the effort. Doing this not only accelerates the time to find the opportunity, but also allows more of the project money to be spent on things like mineral or lease acquisition instead of data processing. The following diagram shows the traditional linear relationship of cost to work, compared to very non-linear relationship benefit of using our technology.

13





The high level workflow associated with the document classification and attribution process is illustrated in the following diagram. Note that a small team of content experts is used to process very large volumes of data.



The primary task of any document-based data processing effort is document classification, which is assigning a document or instrument type to each document. Manual efforts to perform this task are highly error prone, costly and inconsistent. The following diagram illustrates a collection of different types of records as commonly found in their disorganized state.

14





Using visual similarity techniques, this document collection can be easily sorted into buckets containing a single document type with zero errors.  This process does not require documents to be OCR'd thus does not rely on text for its analysis, instead using graphical analysis and making decisions the same way a person would look at a document and make a decision.

The output of the process are pure folders of each document type as illustrated in the following diagram. This process is self-describing and thus requires no training.



15



PLTF_000695

Once document type classification is complete, data attribution is performed by zonally identifying the data which is desired from within the content. Since we know the precise location of each character on the page, we use that information to enhance the extraction of the target data. The following diagram illustrates the extraction process.



## Differentiators

TitleRover integrates four key skill sets to deliver our work:

1. **Subject Matter Experts (SME):** Experienced attorneys in the field of lease and title analysis, as well as local attorneys for the projects of interest. Our technology team has deep land records and mineral investigation expertise as well.

2. **Technology:** We leverage the latest tools using visual similarity, artificial intelligence and analytics.

3. **Big Data:** We are skilled in acquiring and harvesting large volumes of data, including structured, unstructured and spatial data.

4. **Agility:** We are nimble and quick to conceive and build variants of applications needed to support the nuances of different projects.



16



## Project Framework

TitleRover's approach to project management follows a disciplined approach and leverages the seasoned experts on the team to develop and manage complex projects on time and on budget.



**Data Architecture**
- Develop Data Models/Fact Patterns
- Software and Infrastructure Requirements

**Data Acquisition Plan**
- Source Investigation
- Cost Benefit Analysis

**Data Processing**
- Project Plan
- Staged Deliverables

**User Interface Design**
- Analytics Objectives
- Results Presentation/Visualization

17



# Technology Utilization and Intellectual Property

Version 1.0

August 23, 2016

1



PLTF_000698

## Technology and Intellectual Property Overview

TitleRover has commissioned a team of experts to build a web portal where users can explore the data using tools and features which are unique in the industry. The team responsible for building the portal and populating with high quality deep data include the following individuals:

- Brent Stanley, now the CTO for TitleRover, has 15 years of experience working with document-based data. Brent has founded several technology companies and has a background in machine learning, artificial intelligence, neural networking, and natural language processing. Brent's experience includes working on several large land records projects as well as oil and gas industry experience, where he has led a data mining initiative for operators of pipelines and refineries.
- Joe Haynes, the senior developer/programmer for TitleRover, has 30+ years of experience in land records software development. Joe has worked on projects for the World Bank which included setting up a land records system for the former USSR, and recently was awarded a contract by the Commonwealth of Massachusetts as a sole source provider of land records management software for the entire Commonwealth.
- John Martin, the founder of BeyondRecognition LLC ("BR"), whose software performs visual classification and delivers consistent, enterprise-scale classification of all of an organization's documents both electronic and paper, and serves as a knowledge base of decisions made for each cluster regarding retention, document type designations, and attributes extracted.

Brent and Joe have worked together for the last 5 years on a variety of projects in the land records and mortgage backed security space. Together, they are responsible for the defining the feature set used by the portal and developing, testing and deploying the portal. John and Brent have worked together for the last 3 years on deployments of BeyondRecognition software in the energy space.

The TitleRover technology effort has two main thrusts:

1. To build a portal where attorneys and other users can perform faceted searches using more data and on a variety of topics more efficiently than any other means;
2. To build a deep index from records more quickly and cost effectively than is available in the industry.

What we have done over the last few months for TitleRover is to create v1.0 of the portal, which is described in some detail herein. This new customized portal accomplishes the primary tasks which include:

- Creating an automated chain of title from the data;
- Creating a run sheet from the chain as an automated output;
- Supporting custom groups of instrument types, family genealogy, and geographies to enhance the searching of the data for specific interests.

In addition, TitleRover has commissioned BR to execute a statement of work demonstrating its ability to derive a high quality, deep index from a collection of land records from scratch, obviating the need for a manually intensive effort as is used by the rest of the industry. The basic workflow for execution is:

- Team agreement on the investigation objective;

2



- Development of the necessary "fact patterns" which answer the questions begged by the investigation objective, leading to the development of unique TitleRover data models;
- Collection of the data from available industry sources;
- Data mining performed by BR, generating a load file for ingestion into the portal;
- Portal readiness for its users, with feature enhancement according to our road map.

Possessing both a unique search portal and data mining engine to feed it, TitleRover is well positioned to execute desired specialized mineral resource investigations.

## Disconnected Data Expertise

TitleRover has the skill sets to identify, collect and aggregate the disparate data needed to perform its opportunity investigations. Historically, the investigation of mineral opportunities was a laborious effort which required people to visit the county courthouse to review records and decipher ownership and title. There are multiple data sources to check and correlate in order to answer these ownership and other questions.

The following diagram depicts to common sources of documents and data and the high level wiring diagram of how the various records and databases are related. TitleRover collects this data in bulk and using its data mining engine, correlates the data to itself and presents through the portal.



Obviously, performing these tasks manually is a huge effort and requires not only experienced personnel to do it properly, but also takes months to execute. Some of these records have been digitized and partially indexed; commonly the Land Records have been digitized back to a certain point in time and indexed with basic information including grantor/grantee, lessor/lessee, abstract/survey, recording date instrument type, and sometimes acreage.

3



When one examines the quality of the index provided by a county courthouse, you see an enormous variety of ways the indexing has been performed; for example, there are thousands of unique instrument types present in the courthouse index, but in reality there are only a few hundred. Even those can be collapsed in a dozen or so buckets (conveyances, O&G leases, etc.). Even something as simple as surnames and surveys are spelled wildly diverse; the survey name Moffitt, in one example, is present 10 different ways.

In addition, the county index is incomplete. For example, often there are multiple surveys referenced in an instrument but only one is in the index, or its simply listed as "Various".

Given these conditions and our goal of being able to answer data-driven questions which point to potential opportunities, its mandatory to have high quality, deep and complete index information across these multiple silos in order to execute the queries and find the opportunities faster and at less cost than traditional methods.

## TitleRover Portal Overview

The TitleRover portal has been custom developed to support the types of specialized investigations described by our industry experts. In performing its design, we studied the best available systems currently available in the industry in order to benchmark the state of the art, with a goal of far surpassing those features.

The following are a set of screenshots which show the current version of the TitleRover portal. We also have a development plan which adds additional features in subsequent releases to enrich the functionality.

The screenshot below is the login page.



4



PLTF_000701

The main search page allows a user to select the prospect area of interest and then a rich menu of facets, depending on the query objectives.  Compared to the other user interfaces available in the market, TitleRover offers more flexibility and customization for the user, combined with richer and deeper data.



One of the features which users appreciate is the ability to dynamically create new data views by simply clicking and dragging the desired view structure in the user interface.  The screenshot below shows an example of sorting the data by survey, date and instrument type.



5



PLTF_000702

Another of our unique features is our ability to create custom groups, described as follows.

- Surnames: Often it is interesting to examine the activity of a family over the course of decades, where there are many surnames associated with the ancestral tree. This feature allows a user to custom-create a list of surnames gleaned from sampling the data, and then use this as a facet of search on the main search screen.
- Instrument Types: Since any given county uses multiple and redundant labels to describe the same instrument type, aggregating these into a group makes the search tasks much easier. For instance, all types of deeds have been aggregated into a single group called conveyances.
- Surveys/Abstracts: Since this is the primary geographical division in Texas, prospect areas are defined by which surveys and abstracts they cover. Filtering records and data by prospect area using this feature is very useful.

Here is a screen shot of the grouping function for deed types. Note the long list of deed types as provided by the county.



6



Here is a screen shot of the grouping function for family ancestry.  Note the multiple spelling variations as found in the records and county index.



One of the primary objectives is to examine the chain of title, including surface, mineral and royalty. Automating the collection of documents in the chain saves tremendous amounts of time.  In order to create these relationships, we have used our technology to extract the contextual references to instruments within the documents themselves.  Unit Declarations, for example, can contain many tract and lease references (sometimes hundreds).  Automating deed hopping allows a user to see quickly what has happened and where the gaps may exist.

The following is an example of a tree graph which is automatically generated by our system.

7





From the tree graph, a user can see the same data in a grid format, which forms the basis for what is called a "Runsheet". Our attorneys add comments and artifacts to this grid, which can be used as the basis for a title opinion where required.

The following screenshot is the grid equivalent of the tree graph above, and can be exported as a xls or pdf.



8



## Portal Logical Architecture

The TitleRover portal was built by Joe Haynes in collaboration with the team and resides on servers in a secure data center.  All software code in use for the portal is owned by TitleRover. The logical architecture of the portal is represented in the following diagram.



In development of the portal, Joe uses a variety of software and programming tools, a partial list of which is as follows:

- Tesseract (Custom)
- QGIS
- C++
- Python
- Solr/Lucene
- Café
- Windows Communication Foundation (WCF)
- REGEX and Fuzzy REGEX
- Named Entity Recognition
- Natural Language Processing

## Data Mining Functions Performed by BeyondRecognition

BeyondRecognition LLC is a software company headquartered in Houston which has developed a unique method for executing data mining on records. Unstructured (document-based) data is one of the biggest challenges faced by industry, since it historically has been the most expensive data to mine.  TitleRover has licensed technology from BR to automate data mining for this data type; the benefit of which is ability to dramatically lower the cost and improve the speed of the effort.  Doing this not only accelerates the time to find the opportunity, but also allows more of the project money to be spent on things like mineral or lease acquisition instead of data processing.

BR's technology is not currently used by any other players in the TitleRover market, and TitleRover has both a license for use of the technology and an exclusivity option.

9



BR has three primary processing functions:

1. Document classification, using a machine vision-based visual similarity process. The output of this process is a set of clusters containing only one type of document. This step is fast and highly accurate and forms the basis for the following functions.
2. Data attribution, which is the zonal capture of specific data fields and extraction to a database; here, normalization and rule application are executed.
3. Content enablement, which is the creation of a perfected text file at accuracies of 99+%.

Each of these steps are further described in sections which follow.

## Machine Vision-Based Content Analysis

What makes BR unique is that it is the only processing engine which does not require OCR'd text in order to perform its function, and instead used a type of graphical analysis in what's generally referred to as "machine vision". Machine vision includes the technologies used for facial recognition and other complex image analysis tasks. BR has developed proprietary source code and the application to leverage visual similarity for its purpose.

## Document Classification/Self-Organizing Maps

The primary task of any document-based data processing effort is document classification, which is assigning a document or instrument type to each document. Manual and OCR'd text-based efforts to perform this task are highly error prone, costly and inconsistent because of the following factors:

- The OCR'd text is corrupt and therefore incomplete, as a general function of image quality, age and genre;
- The text generated from OCR is one long string with no positional information;
- Text-based algorithms are looking for things like word frequency and end up putting dissimilar documents together because they contain some of the same words;
- As a result, accuracy results from text analytics are in the range of 70-80% and require 100% QC in order to find and correct errors.

BR looks at documents the way a human would; for example, if you placed a random collection of documents on a wall and stepped back, and asked someone near the wall to group the documents at your direction based on their visual appearance, you would emulate BR's process. This method of letting data describe itself, with no training, is referred to in industry as a self-organizing map.

The following diagram illustrates a collection of different types of records as commonly found in their disorganized state.



PLTF_000707



Using visual similarity techniques, this document collection can be easily sorted into buckets containing a single document type with zero errors. This process does not require documents to be OCR'd and thus does not rely on text for its analysis, instead using graphical analysis and making decisions the same way a person would look at a document and make a decision.

The output of the process are pure folders of each document type as illustrated in the following diagram. This process is self-describing and thus requires no training.



Once these clusters are formed and a subject expert labels the clusters, this intelligence persists across all future documents that are ingested by the system, greatly reducing the effort. In the land record space, this is very important as there are a fixed number of instrument types across the industry and once we have processed a few county's records, the net-new types will be minimal.

11



## Data Attribution

Data attribution is the process of extracting target data elements from any given type of record, and always follows the classification process. Data attribution is performed by zonally identifying the data which is desired from within the content. Since BR knows the precise location of each character on the page, it uses that information to enhance the extraction of the target data. The following diagram illustrates the extraction process.



BR's uniqueness for data attribution includes a process for cascading any error correction to all positional locations for all documents in any given document type cluster, allowing a worker to speed through large data collections very quickly. Similar to the benefit of persistence of knowledge in classification, attribution will persist across any new document collections which are ingested into BR, further improving the efficiency of the process. The more that BR sees, the more valuable it becomes in time and cost savings. These capabilities are unique in the industry.

## Content Enablement

Content enablement is a term used to describe the creation of a "perfected" text file for each document in the collection. Creating a perfected text file is not economically viable using current industry methods because it's too expensive. Using BR, creating a perfected text file is viable with minimal resources and again, the results are cascaded across future document collections with the same persistence as classification and attribution.

Content enablement allows for accurate and precise search results and us useful in a variety of scenarios. An example would be locating Pugh clauses in leases, where variations of the clause can be spotted and

12



exposed to the user. BR uses K-nearest neighbor thematic clustering to isolate the documents containing those clauses, even where the wording is slightly different.

For example, we start with examples of a typical clause like this:

> "If at the end of the primary term, a part but not all of the land covered by this lease, on a surface acreage basis, is not included within a unit or units in accordance with the other provisions hereof, this lease shall terminate as to such part, or parts, of the land lying outside such unit or units, unless this lease is perpetuated as to such land outside such unit or units by operations conducted thereon or by the production of oil, gas or other minerals, or by such operations and such production in accordance with the provisions hereof."

Using BR, we find thematically matching candidate clauses across the entire data set within seconds and create a database marker where those candidate matches exist. This marker is then a faceted search term in the user interface.

BR also supports positional search, which is also unique in the industry. For example, if we wanted to find a lease number on the same row of data as a specific survey/abstract, that is a supported query. That is impossible to perform in any other search engine.

13



**EXHIBIT C**

**From:**     Tom Tatham <tpt@lngpartners.com>
**Sent:**     Thursday, September 08, 2016 2:15 PM
**To:**       Mark Willis
**Subject:**  Let's discuss when you have a chance!

**Importance:**     High

PAST DUE ACCOUNTS - Title Rover
  SLX - Aug & Sept prepayment $35,000
  Brent Stanley - Aug 16-31 & Sep 1-15 prepayment $15,000
  BR - balance of 2nd installment - $10,000
PAST DUE ACCOUNTS - Hopewell
  PDP Management - July and August Includes TR - $68,500
  Steve Ervi/SDE - Aug 16 - Aug 31 - $4,837
  Beyond Review - $54,109 of which $24,273 is past 60 days
  Doherty & Doherty - $2,357
  Houston Bookkeeping - $250
  Patterson - $15,210
  Daniel Ellwood - $2,893
  Image Engine - $24,825 (under review)

WE NEED $180,000 to get current!!!

1

**EXHIBIT D**

Mark Willis Willis Group   (+1 (713) 248-1555)

Off to Miami . No prob at all if not interested or not in a position . Truly, money isn 't the issue . Just want think this deal has and will have enormous upside in a short period of time . Would like some of my closest friends enjoy the ride .
Either way , let's connect soon . Mark

Friday, May 06  2016

Chad Martin  (partner) Scott Kelly (+1 (281) 770-6020)

Been locked up in Vegas Hospital like prison/psych ward all week since Sunday w no cell etc .... Gavin called police worried about me and it 's like I was in jail , just got released and about to head on plane back to houston

Mark Willis Willis Group   (+1 (713) 248-1555)

Ugh! Hope your ok .

Chad Martin  (partner) Scott Kelly (+1 (281) 770-6020)

Crazy fucking week . Some fucked up people in there and to be treated like criminal and not have done anything wrong is frustrating as hell .... just ready to get back to Houston

Have some good stories

Mark Willis Willis Group   (+1 (713) 248-1555)

Let's catch up early next week

Chad Martin  (partner) Scott Kelly (+1 (281) 770-6020)

Cool

Wednesday, May 11  2016

Mark Willis Willis Group   (+1 (713) 248-1555)

You around tonight ?

Chad Martin  (partner) Scott Kelly (+1 (281) 770-6020)

No, out at the house . A trader of mine is staying at apartment so I keep coming home for now straight after work unless have other plans

Mark Willis Willis Group   (+1 (713) 248-1555)

Cool. I want to visit with you on this deal. Truly don't need the capital as I already have a cpl family funds wanting to take it all . However, want to give close friends a look .

Truly the biggest deal I have ever had an opportunity to take down :



Δ π EXHIBIT 5

Deponent WILLIS
Date 1-23-19 Rptr AS
WWW.DEPOBOOKPRODUCTS.COM

Chad Martin (partner) Scott Kelly (+1 (281) 770-6020)

I am going to be in town tomorrow w dr and some things after work but maybe could meet up around 6:15 or 6:30 after that's done. Or earlier Friday afternoon if that worked better

Mark Willis Willis Group (+1 (713) 248-1555)

Ok. Just keep me posted . I am WAY over committed on my deal but truly want to tell you about it . Seriously don't need the capital . Just figure you might be interests bc I know you wanted to diversify .

Chad Martin (partner) Scott Kelly (+1 (281) 770-6020)

Ok cool , they

Wednesday   May 25, 2016

Chad Martin (partner) Scott Kelly (+1 (281) 770-6020)

Headed to town , let me know if your around for any beers tonight

Mark Willis Willis Group (+1 (713) 248-1555)

Cool. Will try you after dinner

Where r u going ?

?

Chad Martin (partner) Scott Kelly (+1 (281) 770-6020)

Not sure . Just got to town at owl for now w Duval just cuz I 'm shorts and sweatshirt and didn 't have place to change. Just let me know when your done w dinner

Mark Willis Willis Group (+1 (713) 248-1555)

Will do

Chad Martin (partner) Scott Kelly (+1 (281) 770-6020)

Going to bed . Let me know if your around later this week or weekend

Mark Willis Willis Group (+1 (713) 248-1555)

Cool. Sorry dinner went longer and had a small issue with Jake . Let's try tomorrow or over the weekend .

Thursday  May 26, 2016

Chad Martin (partner) Scott Kelly (+1 (281) 770-6020)

I didn't realize Gavin was coming by today so we are going to hang here

Mark Willis Willis Group   (+1 (713) 248-1555)

Ok. We can try tomorrow if you want

Monday, May 30, 2016

Chad Martin (partner) Scott Kelly (+1 (281) 770-6020)

My car flooded and going to do some stuff w Gavin today. This week sound good but I need to figure out when I am getting my car back

Mark Willis Willis Group   (+1 (713) 248-1555)

That sucks . Enjoy your time Gavin

Chad Martin (partner) Scott Kelly (+1 (281) 770-6020)

Thanks

Wednesday, June 01, 2016

Mark Willis Willis Group   (+1 (713) 248-1555)

Chad, send me you and Tracies email when you get a moment .

Chad Martin (partner) Scott Kelly (+1 (281) 770-6020)

Hers is crmtam @hotmail.com, I never check mine unless someone res me they sent something haha

Mark Willis Willis Group   (+1 (713) 248-1555)

Chad, I am emailing you a confidentiality agreement . It's for a Land oil and gas play that I want to share with you . I am currently over subscribed so there is no pressure other than if interested you will need to get with me ASAP so I can explain  .

I truly think It is a once in a lifetime opportunity with upside that is also unbelievable.

I am using ediscovery technology on title , regulatory and compliance issues with oil and gas .

I am raising between  1-2m from friends and family and have several already interested in putting a  25m acquisition fund in place .

I have been holding out for you for the last couple of weeks but have a partner who also has friends that one in . Accordingly , I can't hold it much longer.

Mark Willis Willis Group   (+1 (713) 248-1555)

On way

Sunday, June 26, 2016

Mark Willis Willis Group   (+1 (713) 248-1555)

All ok?

Chad Martin (partner) Scott Kelly (+1 (281) 770-6020)

Yeah. Just came back and took sleeping pills and was knocked out... long week

Think we are going out by pool in few hours to chill again if your bored

Mark Willis Willis Group   (+1 (713) 248-1555)

Cool. Good to come by?

Chad Martin (partner) Scott Kelly (+1 (281) 770-6020)

Yeah jumping in shower now , will you plz bring my credit card

Mark Willis Willis Group   (+1 (713) 248-1555)

Here. Just pulled in guest garage

Chad Martin (partner) Scott Kelly (+1 (281) 770-6020)

Ok coming down

Mark Willis Willis Group   (+1 (713) 248-1555)

Your place? On way?

Chad Martin (partner) Scott Kelly (+1 (281) 770-6020)

Kats 1219 I will come get u when in garage

Mark Willis Willis Group   (+1 (713) 248-1555)

Here

Chad Martin (partner) Scott Kelly (+1 (281) 770-6020)

Walking down

Monday, June 27, 2016

Mark Willis Willis Group   (+1 (713) 248-1555)

Chad,
Good morning. Didn't want to talk business yesterday but need to understand if you want to invest in this initial round. My business Partner got a full commitment so if not in a position then i understand . We can discuss a cpl other ways to participate  . If in a position I think you should put in 50-200k. If can afford, certainly more . I

have a Very high level of confidence
this will Kill it .
I can hold you for whatever as a quick
payment schedule if needed . So if you
commit to fund  75-100k immediately
and the rest to quick turn around I can
make it work bc of our long
relationship . Meaning , I can tell Tom
your good for it .

No pressure , but need to know today
your thoughts so I can hold off some
others .

Great times this weekend .  Love ya
brotha! Make it a great week . !!

Chad Martin  (partner ) Scott Kelly (+1 (281 ) 770 -6020 )

Ok , cool let me call bank and see if all
my shit got worked out

Call me when you leave work and have
a few about oil  & gas deal

Mark Willis Willis Group   (+1 (713 ) 248 -1555 )

Will do . You going to Kirby !

Chad Martin  (partner ) Scott Kelly (+1 (281 ) 770 -6020 )

Here already haha

What 's your plans for the evening ? May
go back to the apartment  . My buddy
just left and it 's loud as shit in here and
trying to find some houses to buy
Think your getting away later and I can
come back up or we can call  ?

Mark Willis Willis Group   (+1 (713 ) 248 -1555 )

I am leaving my office now . Need to
swing by my house so we can just
touch base in a bit of you want

Chad Martin  (partner ) Scott Kelly (+1 (281 ) 770 -6020 )

Ok I will head to apartment then call
me when you settle in

Tuesday , June 28 , 2016

Mark Willis Willis Group   (+1 (713 ) 248 -1555 )

Hey! I know you were looking into your
bank situation . Give me a call when
you get a second today  .

You alive? 😊😊