# EXHIBIT C

```
 1              UNITED STATES DISTRICT COURT
 2             SOUTHERN DISTRICT OF CALIFORNIA
 3
 4   ENSOURCE INVESTMENTS LLC, a        )
     Delaware limited liability company, ) Case No.:
 5                                       ) 3:17-CV-00079-H-LL
                Plaintiff,              )
 6                                       )
     v.                                 )
 7                                       )
     THOMAS P. TATHAM, an individual;   )
 8   MARK A. WILLIS, an individual;     )
     PDP MANAGEMENT GROUP, LLC, a Texas )
 9   limited liability company; TITLE   )
     ROVER, LLC, a Texas limited        )
10   liability company; IMAGE ENGINE,   )
     LLC, a Texas limited liability     )
11   company; WILLIS GROUP, LLC, a Texas )
     limited liability company;         )
12   and DOES 1-50,                     )
                                         )
13              Defendants.             )
     _____)
14
15        VIDEOTAPED DEPOSITION OF MARK ALLEN WILLIS
16                 San Diego, California
17                 Thursday, June 27, 2019
18
19
20
21   Reported by:
     ANELA SHERADIN, CSR NO. 9128
22
23   JOB NO. 3405283
24
25   PAGES 1 - 176

                                         Page 1
```

```
 1                 UNITED STATES DISTRICT COURT
 2               SOUTHERN DISTRICT OF CALIFORNIA
 3
 4    ENSOURCE INVESTMENTS LLC, a          )
      Delaware limited liability company, ) Case No.:
 5                                         ) 3:17-CV-00079-H-LL
              Plaintiff,                   )
 6                                         )
      v.                                   )
 7                                         )
      THOMAS P. TATHAM, an individual;     )
 8    MARK A. WILLIS, an individual;       )
      PDP MANAGEMENT GROUP, LLC, a Texas   )
 9    limited liability company; TITLE     )
      ROVER, LLC, a Texas limited          )
10    liability company; IMAGE ENGINE,     )
      LLC, a Texas limited liability       )
11    company; WILLIS GROUP, LLC, a Texas  )
      limited liability company;           )
12    and DOES 1-50,                       )
                                           )
13            Defendants.                  )
      _____ )
14
15
16            Videotaped deposition of MARK ALLEN WILLIS,
17    taken on behalf of Plaintiff at 550 West C Street,
18    Suite 800, San Diego, California, beginning at
19    10:04 a.m. and ending at 2:32 p.m. on Thursday,
20    June 27, 2019 before ANELA SHERADIN, Certified
21    Shorthand Reporter No. 9128.
22
23
24
25
                                               Page  2
```

```
 1    APPEARANCES:

 2

 3    For Plaintiff:

 4        LAW OFFICES OF RICHARD E. NAWRACAJ
          BY:  RICHARD E. NAWRACAJ, ESQ.

 5        155 North Wacker Drive, Suite 4250
          Chicago, Illinois 60606

 6        312.803.4837
          rich.nawracaj@nawracaj-law.com

 7

 8    For Defendants Mark A. Willis; Beyond Review, LLC; Image
      Engine, LLC; and Willis Group, LLC:

 9

10        SULLIVAN HILL LEWIN REZ & ENGEL APLC
          BY:  SHANNON D. SWEENEY, ESQ.

11        600 B Street, 17th Floor
          San Diego, California 92101

12        619.233.4100
          sweeney@sullivanhill.com

13

14    Pro Se Defendant:

15        THOMAS P. TATHAM
          621 East Twenty-Second Street, Suite C

16        Houston, Texas 77008
          (Appearing telephonically.)

17

18    Also Present:

19        JUSTIN PANNU
          PHILIPP ORTMANN

20

21    The Videographer:

22        JON IMEL

23

24

25

                                              Page  3
```

```
 1                         INDEX
 2   WITNESS                              EXAMINATION
 3   MARK ALLEN WILLIS
 4
 5                  BY MR. NAWRACAJ                  6
 6
 7
 8
 9                       EXHIBITS
10   DEPOSITION                                    PAGE
11   Exhibit 1      Plaintiff Ensoure Investments    13
                    LLC's Notice of Taking Deposition
12                  of Defendant Mark Willis
13   Exhibit 2      Memorandum of Agreement; 2 pages  48
14   Exhibit 3      Private Placement Memorandum;     59
                    5 pages
15
     Exhibit 4      Email chain Subject: Re: Are the  79
16                  wires going out today?
                    TAT_01422 - TAT_01423
17
     Exhibit 5      Test messages collectively marked 90
18                  Pages 41 - 61
19   Exhibit 6      Data Mining for Mineral Resource 111
                    Investigations; July 25, 2016
20                  PLTF_000670 - PLTF_000710
21   Exhibit 7      Hopewell-Pilot Project, LLC      137
                    Transactions by Account As of
22                  May 4, 2017; 4 pages
23
24
25
                                              Page  4
```

```
 1                San Diego, California, Thursday, June 27, 2019

 2                          10:04 a.m.

 3                           ooOOoo

 4           THE VIDEOGRAPHER:  Good morning.  We are going

 5     on the record at 10:04 a.m.  Today's date is June 27,

 6     2019.  This is media number one in the video-recorded

 7     deposition of Mark Willis testifying in the matter of

 8     Ensure -- EnSource v. Tatham, et al.

 9           Today we are located at 550 West C Street,        10:04:43

10     Suite 800, San Diego, California.  My name is Jon Imel.

11     I am the videographer with the firm Kramm Reporting.

12           Will counsel please introduce yourselves for      10:04:55

13     the record.

14           MR. NAWRACAJ:  Good morning.  Rich Nawracaj on     10:04:59

15     behalf of the plaintiff EnSource Investments LLC.

16           MS. SWEENEY:  Shannon Sweeney appearing on         10:05:05

17     behalf of Mark Willis, the Willis Group, Image Engine,

18     and Beyond Review.

19           And with me is Philipp Ortmann, who is a           10:05:11

20     trainee, spending time with our firm this summer.

21           MR. NAWRACAJ:  And we also have Tom Tatham, a      10:05:21

22     defendant in this matter, participating telephonically.

23           THE VIDEOGRAPHER:  The reporter may swear in       10:05:28

24     the witness.

25                (Witness sworn.)                              10:05:30
```

                                                       Page 5

```
 1                    MARK ALLEN WILLIS,              10:05:42

 2    having been first administered an oath, was examined and   10:05:42

 3    testified as follows:                          10:05:42

 4                       EXAMINATION                  10:05:42

 5                                                    10:05:42

 6    BY MR. NAWRACAJ:                                10:05:42

 7         Q    Good morning.                         10:05:42

 8         A    Good morning.                         10:05:42

 9         Q    Thank you for your time and attending this   10:05:43

10    deposition.  I appreciate it.

11              Have you ever taken a deposition before?   10:05:48

12         A    Yes.                                  10:05:49

13         Q    Okay.  So you have been through the drill.  How   10:05:50

14    long ago was it that you took a deposition?

15         A    I don't recall the last deposition.  Six   10:05:59

16    months, a year.

17         Q    Okay.                                 10:06:02

18         A    A year ago.                           10:06:03

19         Q    Okay.  Thank you.  We will go through the   10:06:04

20    general guidelines just to make sure we are on board.

21              So I am going to be asking you a series of   10:06:08

22    questions and you are going to answer them under oath.

23              And when you answer them, if you could, state   10:06:13

24    yes or no.

25         A    Right.                                10:06:17
```

Page 6

```
 1        Q   It's difficult sometimes because we are used to    10:06:18

 2   hand gestures and nodding the head; but if you can do

 3   that, that would be great.

 4        A   Sure.                                               10:06:24

 5        Q   So we are obviously in an informal setting but     10:06:25

 6   you are under oath, so the answers that you give would

 7   be the same force and effect as if you were in the

 8   courtroom.  Do you understand that?

 9        A   Yes, sir.                                           10:06:35

10        Q   Okay.  Thank you.                                  10:06:36

11            So once when we are done with the deposition,      10:06:38

12   you will have the opportunity to review the transcript

13   and then you can make any changes that you deem

14   necessary with respect to any of the answers that you

15   have given and everyone else will have the chance to do

16   the same.  Do you understand that?

17        A   Yes, sir.                                           10:06:53

18        Q   Okay.  If I ask a question and you don't           10:06:54

19   understand it or you need me to repeat a question, I am

20   happy to do that.  If I don't have that request from

21   you, I will just assume that you understand the

22   question; is that fair?

23        A   Fair enough.                                        10:07:11

24        Q   With respect to your answers, you need to give     10:07:18

25   full, complete and accurate answers.  And is there
```

Page 7

```
 1    anything that would prevent you from providing that

 2    today; any unusual stress, physical ailments, anything

 3    of that nature?

 4         A   No.                                        10:07:29

 5         Q   Okay.  Thank you.                          10:07:30

 6             When I ask questions, what we need to do is  10:07:35

 7    make sure that you answer them on personal knowledge.

 8             So, for instance, you would want -- if I asked  10:07:42

 9    you about how warm is it outside.  That would be an

10    estimate.  You could probably make a personal assessment

11    as to that.

12             If I asked you how many children I had, that  10:07:53

13    would be a guess.  So we want you to make sure that you

14    have no guesses but you can estimate.

15             Do you understand that?                    10:08:01

16         A   Sure.                                       10:08:02

17         Q   Okay.  And your counsel may raise objections as  10:08:02

18    we go through this deposition, and they will be noted

19    for the record; but once when the objections are raised,

20    you are to answer the question.  Do you understand that?

21         A   Yes, sir.                                   10:08:16

22             MS. SWEENEY:  Unless you are instructed not to  10:08:17

23    answer on privileged grounds.

24             MR. NAWRACAJ:  That's correct.              10:08:21

25             THE WITNESS:  Yeah.                         10:08:23
```

Page 8

| | | |
|---|---|---|
| 1 | BY MR. NAWRACAJ: | 10:08:23 |
| 2 | Q   Okay.  With that in mind, I'd like to just | 10:08:23 |
| 3 | briefly go through your background, if you don't mind. | |
| 4 | A   Sure. | 10:08:29 |
| 5 | Q   Could you state your full name for the record. | 10:08:29 |
| 6 | A   Mark Allen Willis. | 10:08:32 |
| 7 | Q   And where do you live? | 10:08:34 |
| 8 | A   I live in Houston, Texas. | 10:08:34 |
| 9 | Q   Have you always been in Houston? | 10:08:37 |
| 10 | A   My adult life, since I got out of college. | 10:08:39 |
| 11 | Q   Okay.  And how old are you? | 10:08:40 |
| 12 | A   51. | 10:08:41 |
| 13 | Q   Okay. | 10:08:43 |
| 14 | A   Almost 51. | 10:08:43 |
| 15 | Q   Okay.  You mentioned that you attended college. | 10:08:45 |
| 16 | Where did you attend college? | |
| 17 | A   At TCU. | 10:08:50 |
| 18 | Q   TCU?  And what did you major in? | 10:08:52 |
| 19 | A   Marketing. | 10:08:54 |
| 20 | Q   Marketing?  When did you graduate TCU? | 10:08:55 |
| 21 | A   '91-'2. | 10:09:00 |
| 22 | Q   Okay.  Did you go on after that to any other | 10:09:02 |
| 23 | education, master's, et cetera? | |
| 24 | A   No.  School of hard knocks. | 10:09:07 |
| 25 | Q   After school, what did you do?  Did you find a | 10:09:10 |

Page 9

```
 1    job?

 2         A    I got a job.                              10:09:14

 3         Q    Okay.  When was that?                     10:09:15

 4         A    When I got out of school, I guess.  In '92, I    10:09:20

 5    briefly worked for a staffing firm for about six months;

 6    and then I went to work for a company, an airfreight

 7    company, called Eagle US Air Freight.

 8         Q    Okay.  And after the Eagle US Air Freight, do    10:09:34

 9    you remember what your next job was?

10         A    My next job was entrepreneurial.  I think I    10:09:38

11    started a computer scrap business --

12         Q    Okay.                                     10:09:45

13         A    -- after that.                            10:09:45

14         But I stayed with that company until they went    10:09:45

15    public.  I was senior vice president of sales.  I got

16    some stock, when I made a little bit of money, I went

17    out on my own.

18         Q    About what year was that, would you say?    10:09:52

19         A    '95, something like that.                 10:09:55

20         Q    Okay.  And then after that, you worked for    10:09:57

21    someone or did you start up another company?

22         A    After that, I -- I did not work for anybody.  I    10:10:03

23    worked for a gentleman named Jim Crane who now owns the

24    Astros, my father, and some other high net worth guys,

25    looking at transactions, looking at deals, helping them
```

Page 10

```
 1    do due diligence on deals and -- and making investments.

 2         Q    Okay.  Generally were you involved in the        10:10:19

 3    financial end of those deals or marketing or what was

 4    your general responsibilities, if you were to classify

 5    them?

 6         A    Oversight of over all -- all those functions of   10:10:28

 7    the deals; so I might have been working with financial

 8    advisors, marketing advisors, HR advisors, you know,

 9    accounting advisors, different -- different advisors,

10    but I managed them.

11         Q    Okay.  Are you currently employed?               10:10:43

12         A    I am still currently employed by the Willis       10:10:46

13    Group.

14         Q    Right.  Can you go back a couple of years and     10:10:48

15    give a description of how you became part of the Willis

16    Group?

17         A    I formed the Willis Group in 2006.  Ended up      10:10:56

18    purchasing a small company called Donovan & Watkins; and

19    from there, started six different staffing companies

20    underneath that, different niche staffing companies, all

21    champion entrepreneurs, recruiting folks that knew very

22    specific niches, whereby, Willis Group provided all of

23    the back-office accounting support, HR, all the things

24    that allowed entrepreneurs to go out and focus really on

25    revenue generation and talent acquisition.
```

Page 11

```
 1      Q   Okay.  Okay.                          10:11:31

 2          So currently is the Willis Group functioning or   10:11:34

 3   is it --

 4      A   No.                                   10:11:37

 5      Q   No?                                   10:11:38

 6      A   No.  We sold our last asset about a year ago.  10:11:38

 7      Q   Who did you sell it to?               10:11:45

 8      A   There's a private equity group out of New York,  10:11:47

 9   University Capital Partners or University Venturers

10   Capital Partners, something like that.  And I sold the

11   lion share of it.  I still hold a board seat and I still

12   have equity.

13      Q   Got it.  So they bought the asset --  10:12:04

14      A   They bought --                        10:12:10

15          THE REPORTER:  Hang on.  We need to speak one  10:12:10

16   at a time, please.

17   BY MR. NAWRACAJ:                             10:12:12

18      Q   So they purchased the assets of the Willis  10:12:12

19   Group and then you still have some participating by way

20   of board member advisory?

21      A   Equity.                               10:12:18

22      Q   Equity?  Got it.  Okay.  Thank you.   10:12:19

23          Okay.  I am going to give you what I am going  10:12:22

24   to mark as Plaintiff's Exhibit Number 1.  You probably

25   have seen this, your Notice of Deposition.
```

Page 12

```
 1              (Exhibit 1 was marked for identification      10:12:42

 2                by the court reporter and is attached hereto.)

 3    BY MR. NAWRACAJ:                                         10:12:42

 4       Q   If you flip through it, towards the end there    10:12:42

 5    is a series of pages requesting documents.  Have you

 6    produced those documents either before this deposition

 7    or do you have them with you?

 8       A   Yes, so we have -- we brought some documents     10:12:55

 9    here today.

10            MR. NAWRACAJ:  Okay.  Are those the documents,   10:12:58

11    Shannon?

12            THE WITNESS:  Yes.                               10:13:03

13            MS. SWEENEY:  They are.                          10:13:04

14            MR. NAWRACAJ:  Okay.  Thank you.                 10:13:10

15            MS. SWEENEY:  For the record, I am handing       10:13:11

16    counsel a stack of documents that are being produced

17    pursuant to the Mark Willis Deposition Subpoena.

18    BY MR. NAWRACAJ:                                         10:13:29

19       Q   Okay.  I'd like to turn our attention to         10:13:29

20    TitleRover, LLC.

21       A   Um-hum.                                           10:13:33

22       Q   When was TitleRover, LLC formed?                 10:13:34

23       A   2016.                                             10:13:40

24       Q   Do you know about what month?                    10:13:41

25       A   I don't recall.                                   10:13:43
```

Page 13

```
 1        Q    Was it the first half of the year, do you        10:13:46
 2   remember?  Second half?
 3        A    I don't recall.  First or second quarter.        10:13:49
 4        Q    Okay.  Whose idea was TitleRover to actually,     10:13:51
 5   you know, organize and to get that business going?
 6        A    Tom Tatham.                                        10:14:07
 7        Q    Tom Tatham?                                        10:14:09
 8        A    Um-hum.                                            10:14:10
 9        Q    How do you know Tom?                               10:14:10
10        A    Tom is -- I know him through -- he married        10:14:11
11   my -- my half sister.
12        Q    Okay.                                              10:14:15
13        A    Yeah.                                              10:14:16
14        Q    And so Tom came up with the idea of TitleRover?   10:14:16
15        A    Yeah, we -- we mutually came up -- it was my      10:14:19
16   idea utilizing the technology.
17             I think in evaluating the opportunity at          10:14:24
18   Hopewell, Tom recognized, you know, kind of the value of
19   the technology and we talked about that can be a
20   complete separate opportunity to pursue.
21             And so went just as -- I -- I guess it's a        10:14:36
22   mutual kind of idea, but I think he was -- he is the one
23   who kind of said, look, this is something that we
24   could -- that we could go out and build a business
25   around.
```

Page 14

Kramm Court Reporters, A Veritext Company
866-299-5127

```
 1        Q   So Tom approached you on the idea?          10:14:47

 2        A   He didn't approach me on it.  It was a mutual   10:14:50

 3    approach.  I think it came out of evaluating an

 4    opportunity at Hopewell that Greg -- that Greg Kane had

 5    brought us.

 6            And what my thoughts were on it is utilizing   10:14:58

 7    similar tools that I utilized or that I came -- that I

 8    had utilized, that I became familiar and my attorneys

 9    utilized when we serviced different e-discovery

10    accounts.

11            I thought applying that technology to title   10:15:11

12    work could help, you know, make the title review process

13    a lot more efficient.

14        Q   Okay.  Thank you.  You mentioned Greg Kane?   10:15:19

15        A   Um-hum.                                       10:15:24

16        Q   He brought this concept or idea to you?       10:15:25

17        A   Yes, of Hopewell.                             10:15:26

18        Q   Did you know Greg before he approached --     10:15:30

19        A   I did.                                        10:15:33

20        Q   -- you?                                       10:15:34

21            How did you know him?                         10:15:34

22        A   I knew him through his involvement with a     10:15:35

23    company called SKH, Sigmund, Kane & Hatch, who had been

24    in Houston for many years.

25            I had pitched them several deals before in the   10:15:41
```

Page 15

```
 1   past, and they actually came close to purchasing, you

 2   know, one of my deals; but we never actually consummated

 3   any transactions, but we built relationships through

 4   looking at mutual deals together.

 5        Q   So when TitleRover was hatched, so to speak, it    10:15:56

 6   was through an opportunity that Greg Kane brought to you

 7   and then you and Tom germinated it?  Would that be fair?

 8            MS. SWEENEY:  Objection; misstates prior          10:16:09

 9   testimony.

10            THE WITNESS:  Yeah, no, that's not exactly        10:16:12

11   correct.  He brought us Hopewell and we -- I decided to

12   kind of bring in Brent and others to utilize the tools

13   around it.

14            And in describing what some of those tools        10:16:25

15   could do, I think it got hatched out of -- out of -- out

16   of those discussions.

17   BY MR. NAWRACAJ:                                           10:16:33

18        Q   So when you say he brought you Hopewell, is       10:16:33

19   that Hopewell-Pilot Project, LLC?

20        A   Correct, he brought us the opportunity in -- in   10:16:39

21   Madison County.

22        Q   What --                                           10:16:46

23        A   That we called Hopewell.  I am sorry.             10:16:47

24        Q   Okay.  So when you call it Hopewell, that's       10:16:49

25   referring to Hopewell-Pilot Project, LLC?
```

Page 16

```
 1        A   That's correct.                          10:16:55

 2        Q   Who formed Hopewell-Pilot Project, LLC?  Do you   10:16:55

 3   know?

 4        A   Yeah, myself and Tom and Greg, I suppose.    10:16:59

 5        Q   Okay.  So I am just trying to clear it up in my   10:17:04

 6   mind, trying to understand if it's accurate that he

 7   brought you Hopewell-Pilot Project, LLC because it had

 8   to be organized as a legal entity.  Who organized it?

 9   Do you know?

10        A   Yeah, so let's -- let me be clear.  Greg    10:17:19

11   brought us the opportunity that was happening within

12   Madison County and then we formed a company called

13   Hopewell-Pilot, LLC that came from that idea; so that we

14   formed a legal entity around that and we utilized my

15   attorney, Pat Doherty to do that.  But who helped

16   organize that would have been myself, Tom, and Greg with

17   that input of the original kind of founders of the -- of

18   Hopewell, if you will, and us supporting the idea that

19   Greg bought -- brought us.

20        Q   Thank you.  That helps a lot.             10:17:50

21        A   Great.                                    10:17:51

22        Q   Was Greg Kane involved with Hopewell -- and I    10:17:54

23   will say Hopewell, meaning Hopewell-Pilot Project,

24   LLC --

25        A   Okay.                                      10:18:03
```

Page 17

```
 1       Q    -- very long or was he not involved after, say,   10:18:04
 2   the first part of 2016?
 3       A    I think he was -- he wasn't involved very long.   10:18:11
 4   I think it was probably the first 90 days or so of the
 5   project before -- that we terminated the relationship.
 6       Q    Can you describe or give some background as to   10:18:24
 7   why the relationship was terminated, what led up to
 8   that?
 9       A    Sure.  I think that Greg was -- was having some   10:18:32
10   issues and having some paranoia around some of the
11   staff, some paranoia potentially around Tom, and feeling
12   like that he couldn't -- he wasn't driving the bus as
13   far as what the legal theories were and how the staff
14   should be allocating their time.
15       Q    Eventually was there a lawsuit involving Greg   10:18:56
16   Kane and Hopewell?
17       A    There was.                                       10:18:59
18       Q    What was that all about?                         10:19:00
19       A    I can't recall other than the fact, I think,    10:19:03
20   getting some interest back, perhaps, that he had.
21   That's the best I can recall at the moment.
22       Q    Okay.  That's fair.  Thank you.                  10:19:13
23            So at the inception you had yourself,            10:19:14
24   Mr. Tatham, and Mr. Kane --                               10:19:20
25       A    Um-hum.                                          10:19:21
```

Page 18

```
 1        Q    -- as part of Hopewell.                    10:19:22

 2             Anybody else?                              10:19:24

 3        A    I mean there might have been, I think, entities   10:19:29

 4   involved; for example, Willis Group might have been

 5   involved.

 6             We helped -- you know, the Willis Group is a   10:19:34

 7   partnership owned by my father and I, and we gave, you

 8   know, a home and IT support and services to Hopewell.

 9             And, also, I think, Willis Group might have   10:19:46

10   made some additional investments in Hopewell, along with

11   Mike Willis personally made some initial investments in

12   Hopewell; so I think that was kind of the original

13   founding group, if you will.

14        Q    Mike Willis is your dad?                    10:19:57

15        A    Correct.                                    10:20:00

16        Q    Okay.  Thank you.                           10:20:01

17             I am going to shift back a little bit to    10:20:02

18   TitleRover, although those questions and answers for

19   Hopewell were helpful.

20             Going back to TitleRover -- and you may have   10:20:09

21   answered it, and I am sorry if you did -- about when was

22   that organized?

23        A    The first or second quarter of 2016.        10:20:14

24        Q    So about the same time or close to the same   10:20:18

25   time as --
```

Page 19

```
 1        A    Um-hum.                                    10:20:21

 2        Q    -- Hopewell?                               10:20:22

 3        A    Correct.                                   10:20:23

 4        Q    Who in -- who organized -- and I apologize 10:20:23

 5   again if I asked that question -- who organized or

 6   incorporated TitleRover?

 7        A    That would have been my attorney, Pat Doherty. 10:20:34

 8        Q    Okay.  Upon your request?                  10:20:37

 9        A    Upon Tom and I's request and, yeah.        10:20:40

10        Q    Okay.  Who were the original members of    10:20:43

11   TitleRover, LLC, the owners, if you will?

12        A    My entity, one of my entities that was set up, 10:20:57

13   a special-purpose entity specifically for this

14   investment, and Willis Group.

15        Q    How about the managers of the limited liability 10:21:08

16   company, who are they?

17        A    To the best of my knowledge, they were Tom 10:21:13

18   Tatham and myself.

19        Q    Where were the operations of TitleRover based 10:21:22

20   out of?

21        A    They were based out of 1400 Post Oak Boulevard. 10:21:26

22   I had carved out an area that was kind of boxed in, an

23   area that held about seven people, that both entities

24   operated out of.

25        Q    Hopewell and TitleRover?                   10:21:43
```

Page 20

```
 1        A   Correct.                                    10:21:44

 2        Q   Got it.  Was Tom Tatham -- did he have an   10:21:45

 3   office there?

 4        A   He did.                                     10:21:51

 5        Q   So when you and Tom founded, if you will,   10:21:52

 6   TitleRover, what was the concept that you were trying to

 7   develop or the business, if you will?

 8        A   Sure.  It was to utilize, you know, various 10:22:05

 9   tools to help you organize data and review title a lot

10   more efficiently, to make that process a lot more

11   efficient of reviewing title.

12        Q   Did you have a business plan or any sort of 10:22:20

13   formal mapping of the company in what you planned on

14   doing?

15        A   At the time we formed it, we didn't.  I think 10:22:30

16   Tom and Brent might -- the guy that was doing the

17   technology for us, did work on some plans and marketing

18   materials, but he was more of the technical piece of the

19   deal.

20        Q   Okay.  Who were the other -- and so was Brent 10:22:45

21   an employee or an independent contractor?

22        A   No, he was an independent contractor.  He had 10:22:53

23   been a former employee of mine.  Brent worked for me

24   probably for, you know, half a dozen years or four or

25   five years or something like that.
```

Page 21

```
 1        Q    So you knew him from previous dealings?        10:23:04

 2        A    Sure.                                          10:23:06

 3        Q    Did TitleRover have any employees at all?      10:23:06

 4        A    No.                                            10:23:08

 5        Q    Was there any plan as far as the capitalization 10:23:16

 6   of TitleRover?  In other words, you form a company, the

 7   company likely will have expenses.

 8        A    Um-hum.                                        10:23:27

 9        Q    Was there any plan put in place as far as what 10:23:28

10   the capital needs would be for TitleRover?

11        A    I think we were working on that or developing  10:23:34

12   it.  In the interim, it was -- we were putting together

13   various components of different softwares out there and

14   putting a user interface on it; and we were trying to

15   determine, you know, if that was a real viable plan or

16   not.

17            At the moment, it had one -- one -- one client 10:23:51

18   and that was Hopewell.  So, you know, to the extent all

19   that really went well, our goal was to go out and

20   capitalize the company, but our primary focus was on

21   Hopewell-Pilot.

22        Q    How did you decide -- you mentioned that       10:24:07

23   your -- TitleRover is basically picking different

24   technology pieces out to form a solution.  How did you

25   or who determined what pieces to pick out, what portions
```

Page 22

```
 1    of technology to try to use --

 2        A   Sure.                                    10:24:26

 3        Q   -- in order to develop the solution?     10:24:26

 4        A   Sure.  Brent was -- Brent was the -- was the   10:24:28

 5    primary leader in that decision.  Another gentleman by

 6    the name of Joe Haynes, who had done a lot of title work

 7    before and had a great resume of doing exactly what we

 8    were doing in other applications, and then I had another

 9    gentleman through BeyondRecognition, a guy named John

10    Martin.

11            But, primarily, Brent who is an expert in      10:24:54

12    this -- this type of technology would understand the

13    business issue and then he would work with John

14    explaining on what we needed and they figured out what

15    technical solutions or what tools we needed to utilize

16    to help get there.

17        Q   And did Brent report to you or did he report to   10:25:09

18    Tom or someone else?

19        A   Yeah, Brent reported to Tom within -- within   10:25:13

20    the organization.

21        Q   Okay.  Did you have any formal meetings with   10:25:17

22    respect to TitleRover, in particular, you and Tom, or

23    was it more of an informal setting where you'd be

24    working on projects and collaborate and communicate, you

25    know, more or less constantly?
```

Page 23

```
 1        A    We had -- we had regular organized meetings,        10:25:38

 2    talking about the progress of the software and -- and

 3    the use of the software and the information that we are

 4    able to garnish.

 5             We'd also, you know, look at the user interface     10:25:50

 6    and we had talked to the landmen who were actually

 7    utilizing the technology, and they would give us

 8    feedback.

 9             And then what Brent would do is take that           10:25:59

10    feedback and put it -- you know, take the business

11    solution and then communicate it to the technical team,

12    Joe at that particular time, on what we needed to --

13    to -- to develop to help us be more efficient in that

14    particular area.

15        Q    Okay.  You mentioned Joe Haynes?                    10:26:14

16        A    Correct.                                            10:26:17

17        Q    Who was he with?                                    10:26:17

18        A    He was with the technical team.  I can't think     10:26:19

19    of the name of his company, off the top of my head, but

20    he was working with Brent and another young lady that

21    were out of Boston.

22        Q    If I mentioned the name Substantia LogiX, would    10:26:30

23    that ring a bell?

24        A    Yes.  Thank you so much.                           10:26:34

25        Q    Thank you.                                         10:26:36
```

Page 24

```
 1              So what were your responsibilities -- I guess     10:26:38

 2       maybe just start, what was your title at TitleRover?

 3           A    I was just a manager.                           10:26:45

 4           Q    Manager?                                        10:26:46

 5           A    I considered myself the non-operating manager   10:26:47

 6       but, certainly, I was involved at a very high level and

 7       I participated in meetings.

 8              As far as running the day-to-day business, that   10:26:54

 9       was Tom; but as far as oversight and getting updates

10       and -- and that type of thing, I was involved in -- in

11       the majority of the organized meetings that we had if I

12       was available.

13           Q    At the time were you doing other -- other       10:27:09

14       businesses or other dealings or was your focus full

15       time --

16           A    Sure.                                           10:27:14

17           Q    -- on TitleRover?                               10:27:15

18              MS. SWEENEY:  Objection; vague.  At what time?    10:27:16

19              MR. NAWRACAJ:  Oh.  During 2016.                  10:27:18

20              THE WITNESS:  I was still president and CEO of    10:27:21

21       Willis Group.

22       BY MR. NAWRACAJ:                                         10:27:24

23           Q    Okay.                                           10:27:24

24           A    Which was still a 100 plus million dollar       10:27:26

25       company with over 150 employees.
```

```
 1        Q   So with respect to the officers of TitleRover,    10:27:34

 2    were any appointed -- I am just trying to understand, at

 3    the end of the day, who's making the judgment call or

 4    the decision on material issues with respect to

 5    TitleRover.

 6            MS. SWEENEY:  Objection; assumes facts.           10:27:50

 7            THE WITNESS:  Could you restate the question?     10:27:53

 8    BY MR. NAWRACAJ:                                          10:27:55

 9        Q   Sure.  We will break it down.  Were there any     10:27:55

10    officers named by the board of managers for the limited

11    liability company?

12        A   I believe we gave some titles to some -- some     10:28:05

13    individuals.  But were there official managers elected

14    as officers at that particular time?  I don't recall.

15        Q   Do you remember what your title was?             10:28:21

16        A   I don't believe I had a title.  I don't believe  10:28:25

17    I had an operating title in the business.  I don't --

18    don't recall.

19        Q   How about Mr. Tatham, did he have a title?       10:28:32

20        A   Within TitleRover?                               10:28:36

21        Q   Yes.                                             10:28:37

22        A   I do not recall what he did.  If he did, it      10:28:40

23    would have been the CEO; but, again, the primary focus

24    was Hopewell, and TitleRover was -- was to the extent

25    that it was going to come -- that it was going to be a
```

Page 26

```
 1    very useful tool and we could help prove it out during

 2    this pilot program, then it was going to be more

 3    focusing on who's the right team to kind of take that

 4    company forward.

 5         Q   Did TitleRover have a bank account?          10:29:03

 6         A   I believe it did.                            10:29:10

 7         Q   Do you remember who was authorized, authorized 10:29:12

 8    signatories on the bank account?

 9         A   I believe Tom and I.                         10:29:19

10         Q   Okay.  Do you remember filling out any       10:29:20

11    information or material or forms at the bank where they

12    ask what your title is?

13         A   I don't recall.                              10:29:27

14         Q   Okay.                                        10:29:28

15         A   I don't recall.                              10:29:28

16         Q   With respect to TitleRover, did you participate 10:29:35

17    in the financial planning of that company?

18         A   As I -- could you define financial planning? 10:29:45

19         Q   Sure.  You are a successful businessman.  So 10:29:49

20    you start a company off and a lot of times you might do

21    things such as run pro forma financial statements,

22    understand what the capital needs of the company might

23    be, determine where the sources of that capital would

24    come from, that sort of thing.

25         A   Yeah.                                        10:30:09
```

Page 27

```
 1        Q    Did you participate in that?              10:30:10

 2        A    I -- I don't recall -- if we had meetings like   10:30:10

 3   that, I am sure I would have participated; but, again, I

 4   don't recall us getting to that stage of having a -- an

 5   operating budget because we had no employees.

 6             The strategy was still getting defined, you      10:30:21

 7   know, the -- how much capital was really needed was

 8   still getting defined.

 9             We were more focused in on Hopewell; and to the  10:30:27

10   extent that the -- the contract between Hopewell and

11   TitleRover, something was developed that was meaningful

12   out of that contract, then we gave the ownership of

13   Hopewell the opportunity to participate; so there wasn't

14   a clear path yet for -- for TitleRover.

15             We were also looking at various technologies     10:30:49

16   and relationships of those technologies that they had

17   with the Willis Group; for example, with

18   BeyondRecognition, whether that was going to be a useful

19   tool or not.

20             And to the extent it was, we had a -- the        10:31:01

21   Willis Group had a right to use license that was -- that

22   was very expensive.

23             So we were looking at all these different tools  10:31:07

24   to see how they might be combined within TitleRover, but

25   I don't think that we had a -- a budget or a -- a
```

                                                        Page 28

```
 1    refined business plan yet to go out and raise capital.

 2        Q   How was the company funded when it had to      10:31:27

 3    pay -- it, being TitleRover, when it had to pay, say,

 4    its vendors, the software developers, et cetera?  Was it

 5    on an as-need basis and, if so, who would be the

 6    funders?

 7        A   Sure.  It -- it didn't have any employees and  10:31:41

 8    it didn't have any vendors.  It had -- it had one

 9    vendor, rather, and that was Substantia LogiX; so

10    Substantia LogiX would -- would bill, you know,

11    TitleRover and TitleRover would -- would invoice

12    Hopewell.

13        Q   Did TitleRover have any other activities        10:32:01

14    besides what you described in this deposition?

15        A   That's kind of vague, your question.  I         10:32:12

16    guess --

17        Q   I am just trying to understand whether or not   10:32:15

18    there was any other focus of the company, any other

19    activities, any other business of -- of TitleRover or if

20    it was what you just described.

21        A   It's what I have -- what I have been            10:32:25

22    describing.

23        Q   With respect to the product development of      10:32:31

24    TitleRover -- and if you don't mind, I will use the

25    phrase TR technology or TitleRover technology.  I think
```

Page 29

```
 1    that's been used throughout this litigation -- who

 2    participated in determining what that's comprised of?

 3        A    What the TitleRover technology is comprised of?    10:32:50

 4        Q    Right, the solution ultimately that the company    10:32:54

 5    was going to build.

 6        A    We were building a user interface with    10:32:57

 7    different technologies behind it, and how those got

 8    built and what was actually used would have been Brent's

 9    category.

10         The way -- I am not a technologist, so all I am    10:33:11

11    typically interested in is does it make your job more

12    efficient.  So -- and, you know, does the magic box make

13    your job more efficient.

14         And so as far as what went into the box or how    10:33:21

15    it worked, I am not a technologist nor have I ever been,

16    but I have been involved in a lot of technology

17    companies.

18         So my test is does it make the attorney's job    10:33:30

19    more efficient in reviewing title, and I am -- as we are

20    building it and I am discussing it with them, that's the

21    true barometer.  That's where the rubber meets the road.

22        Q    Okay.  Thank you.    10:33:43

23         So you mentioned, I believe, that Tom was    10:33:49

24    involved with the day-to-day operations of TitleRover?

25    Managing the business, I guess is --
```

                                                            Page 30

```
 1        A    Tom was -- Tom was involved in the day-to-day      10:33:58

 2   operations of Hopewell-Pilot LLC.  As part of that, yes,

 3   we all, you know, participated in meetings in the

 4   development of the software for TitleRover as well.

 5   Through the interactions of refining what we were

 6   building for Hopewell, we'd also have applications that

 7   we could utilize for a lot of other counties and --

 8   across Texas and the U.S.

 9        Q    I guess my question is, to be direct, did you     10:34:24

10   and Mr. Tatham keep each other up to date with respect

11   to at least material issues involving TitleRover?

12        A    I believe so.                                     10:34:39

13             MS. SWEENEY:  I am going to make a belated        10:34:45

14   objection as that calls for speculation partially.

15   BY MR. NAWRACAJ:                                            10:34:56

16        Q    I am going to turn back to Hopewell.  And you     10:35:00

17   may have described this already, but I just want to make

18   sure that we have got it.

19             Who would you describe as the core team of        10:35:10

20   individuals at Hopewell, the top management, if you

21   will, the individuals that are running the business?

22        A    Sure.  Well, Tom ran the day-to-day business of   10:35:24

23   the company, and the other folks who participated along

24   with that would be myself at a high level.

25             The day-to-day that worked with Tom would have    10:35:36
```

Page 31

```
 1    been Brent, another gentleman named Hank Gamble, and we

 2    had a gentleman named Steve Ervi and two other young

 3    ladies that were -- that Beyond Review, a staffing

 4    company that I also have been a part of, placed two

 5    contract attorneys there and they were kind of part of

 6    the team as well; so they were there at the beginning

 7    when we started, all the way to the end.

 8         They are the ones that utilized the software on    10:36:05

 9    a day-to-day basis because they are the ones actually

10    searching for the title on the ground level.

11         And then we had a gentleman named Hank Gamble       10:36:13

12    which is a very experienced landman and familiar with

13    that area who also participated in the strategy and so

14    forth of the -- of the business.

15         But, again, none of them were employees of the     10:36:22

16    business, but they're all -- we all had meetings from

17    time to time on strategy.

18      Q    And the same question, I just want to make sure  10:36:35

19    it applies to Hopewell as well, is it fair to say that

20    you and Tom kept each other up to date and up to speed

21    with respect to material issues and decisions, that sort

22    of thing?

23      A    I believe that --                                10:36:48

24         MS. SWEENEY:  Objection.  It calls for             10:36:49

25    speculation.
```

Page 32

```
 1           THE WITNESS:  Yeah, I -- I believe -- I believe    10:36:50

 2    we kept each other up to speed most of the time, but

 3    there might have been some times where we weren't 100

 4    percent on the same page.

 5    BY MR. NAWRACAJ:                                           10:37:00

 6        Q    But you shared the same office.  You'd           10:37:00

 7    communicate --

 8        A    Well, we were on the same floor, but we didn't   10:37:02

 9    share the same office.

10        Q    Okay.  Was it physically separated?             10:37:06

11        A    Yes.                                             10:37:08

12        Q    Okay.  How often would you communicate with     10:37:08

13    Tom, would you say?  Once a week?  Daily?

14        A    Different times at, you know, different -- you   10:37:16

15    know, sometimes it was daily.  Sometimes it might have

16    been weekly.

17        Q    Okay.                                            10:37:22

18        A    Sometimes it might have been multiple times in  10:37:24

19    a day.

20        Q    Now, with respect to the TitleRover technology,  10:37:29

21    I'd like to drill down a little bit as to what that is.

22    Can you describe the components of the TitleRover

23    technology?

24        A    No, I can't.                                     10:37:43

25           MS. SWEENEY:  Objection; vague.                    10:37:44
```

Page 33

```
 1    BY MR. NAWRACAJ:                                     10:37:47

 2        Q   Did Title -- did the TitleRover technology have   10:37:50

 3    what's commonly referred to as OCR or

 4    optical-character-recognition functionality?

 5        A   I am not certain.  I -- I believe it had -- it   10:38:02

 6    had those capabilities, but I am not certain.

 7        Q   What did BeyondRecognition provide to        10:38:14

 8    TitleRover?

 9        A   BeyondRecognition provided -- they had a     10:38:24

10    technology that was an indexing technology and that was

11    one of the tools that we looked at utilizing and

12    organizing documents; so it basically sorted documents,

13    organized documents, key word phrase.  You know, it had

14    a technology that could -- that could sort and organize

15    documents very, very quickly.

16        Q   Do you know if the BeyondRecognition technology  10:38:51

17    was OCR based or optical-character-recognition based?

18        A   I -- I can't recall.  I am not -- that's more  10:39:01

19    of a technical phrase, but -- you know, so I rely on my

20    technical guys to categorize what it can and can't do.

21        Q   You mentioned John Martin.  Was John Martin the  10:39:11

22    CEO of BeyondRecognition?

23        A   Of BeyondRecognition, yes, he was.           10:39:19

24        Q   Have you worked with John before --          10:39:20

25        A   I have.                                       10:39:22
```

Page 34

| | | | |
|---|---|---|---|
| 1 | Q | -- Hopewell and/or TitleRover? | 10:39:24 |
| 2 | A | Before that? | 10:39:26 |
| 3 | Q | Yeah. | 10:39:27 |
| 4 | A | Yes, sir. | 10:39:27 |
| 5 | Q | Can you describe how you worked with him? | 10:39:28 |

6    A   Sure.  We worked with him as a vendor at one   10:39:30

7   particular point on a project that we had with BHP and

8   several others.

9      And then, ultimately, we were convinced that   10:39:39

10  there -- his technology was game-changing in the

11  e-discovery space; and then ultimately partnered with

12  John, made an investment in his company, licensing

13  his -- his company.

14      We changed our -- our name from Donovan &   10:39:54

15  Watkins Legal Solutions to Beyond Review; and so that

16  was going to -- before, we didn't really offer -- we

17  offered attorney review, and this gave us the ability to

18  offer a full suite of potential e-discovery services, so

19  we attempted to go into that -- that field.

20    Q   You said it was game-changing technology or you   10:40:13

21  thought it was?

22    A   Well, what I was told it was game-changing   10:40:16

23  technology from my team.

24    Q   Do you remember about how much you invested or,   10:40:21

25  you know, directly or indirectly, either personally or

Page 35

```
 1    through your companies?

 2        A    My company invested, you know, north of a        10:40:27

 3    million dollars, probably, in John's technology.

 4        Q    Did John ever describe the technology to you or   10:40:35

 5    did you have an understanding otherwise what the

 6    technology was that you were investing all this money

 7    in?

 8        A    He -- he did in layman's terms, but not in        10:40:44

 9    technical terms.  But, yeah, we sat down and we talked

10    about how it could -- how it could organize documents,

11    cluster documents, you know, very, very quickly.

12        Q    When you say organize and cluster, can you        10:40:56

13    describe it a little bit?  What's the difference between

14    organizing and cluster?

15        A    It could take unorganized documents and put       10:41:02

16    them -- put them together in an organized format, so

17    that's my understanding is what it could do, whether

18    that's by individual, whether that's by topic, whether

19    it was by --

20        Q    Did you have any understanding as to how it       10:41:20

21    worked functionally or just that high level?

22        A    High level.                                       10:41:26

23        Q    Okay.  Did the TitleRover technology use          10:41:27

24    technology that was developed by John Martin and

25    BeyondRecognition?
```

```
 1        A   Did TitleRover utilize?                    10:41:37

 2        Q   Yeah.  Was the Title -- was the TitleRover  10:41:39

 3   technology comprised, in whole or in part, with the

 4   BeyondRecognition technology that you just described?

 5        A   It was not combined.  They were -- it was   10:41:53

 6   separate.  It had -- BeyondRecognition had its own

 7   technology.  It was its own tool and their -- and -- and

 8   TitleRover had other tools that it was utilizing, also,

 9   where they were working in conjunction.  They were

10   collaborating -- Brent and John were collaborating on a

11   regular basis.

12        Q   What other tools did TitleRover utilize?    10:42:13

13        A   I don't recall the different names of the tools  10:42:17

14   that -- that we had in the back.

15        Q   Can you describe them?                      10:42:22

16        A   I'd be -- I'd be guessing.  I -- you know.  10:42:23

17        Q   You mentioned that you worked with John Martin  10:42:29

18   on a prior project.  I think you called it BHP?

19        A   Um-hum.  Yes, sir.                          10:42:36

20        Q   When was that?                              10:42:38

21        A   I don't recall the exact year.  It would have  10:42:42

22   been, estimate, a couple of years prior to TitleRover,

23   so 2005, maybe.

24        Q   Okay.  What was --                          10:42:53

25        A   Rather 2015.  I missed it by a decade.      10:42:55
```

Page 37

```
 1        Q   Do you remember what your interaction or, I      10:43:01

 2   should say, what sort of project you were working on?

 3   Can you describe that a little bit?

 4        A   Well, we worked on several of them.  We worked   10:43:12

 5   on a -- a digitization land project with BHP, whereby we

 6   were hired to come in and help digitize their dataset,

 7   and we did that with John Martin.

 8            And then we also had an e-discovery case,        10:43:28

 9   whereby we were helping organize documents for a case

10   for Chevron and that lasted six months or so as well.

11        Q   Okay.                                            10:43:41

12            MS. SWEENEY:  I am going to object to the        10:43:43

13   answer as being vague.  And I think we might want to

14   clear up the record because we are using a lot of we's

15   and I am not sure it's clear what that means --

16            THE WITNESS:  Fair enough.                       10:43:54

17            MS. SWEENEY:  -- in this context.                10:43:54

18            THE WITNESS:  Fair enough.  We had a lot of      10:43:56

19   different entities.  And thanks for the clarification.

20            Donovan & Watkins Legal Services had a project   10:43:59

21   with BHP, whereby John was strictly a vendor for us.

22            Then ultimately we invested and made it into a   10:44:08

23   transaction with John, whereby we pursued an

24   opportunity.  We, now BeyondRecog- -- Beyond Review, the

25   name change, pursued that with a company called Chevron.
```

Page 38

```
 1   BY MR. NAWRACAJ:                                    10:44:24

 2       Q   How did that work out?                      10:44:24

 3       A   The -- neither of the projects were -- were 10:44:27

 4   great.  I can't recall the exact issue that we had with

 5   Chevron.

 6           The problem we had with BHP, there's a lot of  10:44:38

 7   transitions at that particular time.  BHP had a huge

 8   downturn and they laid off about 35 percent of their

 9   staff in the middle of our project; and so we had like

10   five different project managers and there's the

11   communication breakdown and the scope of the project

12   became very challenging.

13           And Chevron -- I can't recall the issue --   10:44:53

14   they're ultimately okay, but it took -- it took a lot

15   longer than what we initially communicated to them.  I

16   can't remember the issue we had with -- with it, but

17   we -- we did have an issue.

18       Q   Okay.  So the Chevron -- you worked with John 10:45:13

19   Martin on the Chevron matter and this matter called BHP.

20       A   Um-hum.                                      10:45:20

21       Q   Were there any other matters that you worked 10:45:21

22   with him on with or BeyondRecognition?

23           MS. SWEENEY:  Objection; vague as to you.    10:45:25

24           MR. NAWRACAJ:  Okay.  Let me rephrase.       10:45:29

25       Q   Did you personally work on any other projects 10:45:34
```

                                                        Page 39

```
 1    other than BHP and Chevron with John Martin or

 2    BeyondRecognition?

 3         A    Yeah, I -- I personally never worked with John.    10:45:46

 4    I only worked with him as -- in my capacity as a manager

 5    for my different entities, so John and I's relationship

 6    was strictly professional.

 7              And so as a manager, depending on what project    10:45:57

 8    we were working on, depends on what -- what capacity I

 9    was communicating with John in.

10         Q    Was there any -- excuse me.                        10:46:07

11              Was there any litigation between you and -- or,    10:46:08

12    I should say, you personally or one of your entities

13    that you own or control and John Martin and/or

14    BeyondRecognition?

15         A    Yes, there was -- we ultimately litigated with    10:46:23

16    John -- we, as in BeyondRecognition; and, again, I can't

17    recall, where he had described some of his technology

18    had a certain capability, and what we needed it for for

19    e-discovery.

20              And, again, it was very unique to the legal       10:46:44

21    business at the time, and it -- it didn't have that

22    capability and for -- I just can't recall what exactly

23    it was; it was four or five years ago.

24              But, yes, we had -- we, as in                     10:46:53

25    BeyondRecognition, my management team had an issue with
```

Page 40

```
 1    ultimately John and -- and his capabilities that related

 2    to the e-discovery market.

 3              MS. SWEENEY:  I am sorry, did you say          10:47:05

 4    BeyondRecognition as in --

 5              THE WITNESS:  Beyond Review.  We had -- Beyond 10:47:10

 6    Review had a problem with BeyondRecognition software.

 7              MS. SWEENEY:  Okay.  I think we're confusing   10:47:14

 8    the two throughout that answer.

 9              MR. NAWRACAJ:  It's easy to do.                10:47:18

10              THE WITNESS:  That Beyond --                   10:47:20

11    BY MR. NAWRACAJ:                                         10:47:21

12        Q   There's a lot of similarities in the names.     10:47:21

13        A   Yeah.                                            10:47:23

14        Q   With respect to BeyondRecognition, were you     10:47:29

15    aware that its technology was being used as part of the

16    TitleRover technology?

17              MS. SWEENEY:  Objection.  It assumes facts.    10:47:43

18              MR. NAWRACAJ:  Okay.  Let me rephrase.         10:47:46

19        Q   Do you know or did you know that -- or whether  10:47:50

20    or not the TitleRover technology used, in whole or in

21    part, any of the Beyond Review technology?

22        A   I still didn't understand that question.        10:48:03

23        Q   Okay.  It's okay.  I will break it down.        10:48:05

24              We have what's called the TitleRover technology 10:48:10

25    which is the solution that -- that limited liability
```

Page 41

```
1    company is trying to develop, and I think you said that

2    it was comprised of different tools.

3        A    Um-hum.                                        10:48:26

4        Q    Did you know, when the TitleRover technology   10:48:28

5    was being developed, that any of -- whether any of its

6    tools was -- were from BeyondRecognition?

7        A    BeyondRecognition was only -- the tool was only  10:48:42

8    being utilized by John Martin himself, and that was

9    part of the -- part of the issue, is that -- you know,

10   we didn't -- you know, John was somewhat of a bottleneck

11   to get stuff done because he was the only one that

12   really knew how to work his -- his software.

13       Q    Okay.                                          10:49:03

14       A    So when you say, was it intertwined with the   10:49:04

15   TitleRover software, it was still -- it was still a

16   stand-alone software, as in BeyondRecognition; that we

17   were looking at how it can work together in concert with

18   the other pieces that were built or are being built.

19       Q    So the TitleRover technology did not           10:49:27

20   incorporate any of the BeyondRecognition technology but,

21   rather, had BeyondRecognition as a vendor or an

22   outsource arm that allowed the solution to develop?  I

23   am just trying to understand it a little bit.

24       A    TitleRover technology was a work in progress;  10:49:48

25   it was being built.  So, yes, we were looking at all
```

                                                          Page 42

```
 1    sorts of tools and how it could fit and how it could fit

 2    into a solution, whether that was -- whether it was all

 3    under one click of a button or whether you had to click

 4    several buttons to utilize several different tools to

 5    get to the same end game.

 6             So, yes, it was being analyzed, along with --      10:50:06

 7    with other tools.  We thought that it was going to be

 8    potentially a very significant game changer for us; but,

 9    you know, ultimately, you know, that had to -- that

10    still had to be proven.

11        Q    Was the TitleRover technology ever completed?      10:50:23

12        A    No.                                                10:50:27

13        Q    What happened?                                     10:50:28

14        A    Well, we got a lawsuit that was filed on us.       10:50:30

15    Unfortunately, we -- you know, when we got a lawsuit

16    filed on us by EnSource, it stopped our ability to raise

17    any capital at both Hopewell and TitleRover.

18        Q    Okay.  But with respect to TitleRover, earlier     10:50:47

19    you said that you weren't raising capital, you didn't

20    have any plans to do it.  Was it being funded as it

21    operated?

22             MS. SWEENEY:  Objection; misstates testimony.      10:50:59

23             THE WITNESS:  No, I said that we were -- that      10:51:00

24    we invested in Hopewell and Hopewell was -- was funding

25    through -- through its -- its contract.  It was
```

Page 43

```
 1    funding two individuals who were modifying the software

 2    along the way.

 3           When Hopewell could no longer pay its            10:51:15

 4    obligations because of -- TitleRover at that particular

 5    point could not raise any capital either.  It had a

 6    cloud of dust over it all of a sudden.

 7    BY MR. NAWRACAJ:                                         10:51:27

 8        Q   I think you mentioned earlier that TitleRover,   10:51:31

 9    LLC was organized in -- and I am hoping to get it right,

10    if my memory is correct, Q2 of 2016, or something like

11    that.  I forgot what the exact testimony was.

12        A   I believe I said in Q1.                          10:51:47

13        Q   Q1?                                              10:51:48

14        A   Q1 Or Q2.                                        10:51:48

15        Q   Where I am going to, is I am trying to           10:51:49

16    understand the evolution or the development of the

17    software of the TitleRover technology from, basically,

18    the inception of TitleRover in Q1 to the end of the

19    project or the end of the development of the technology.

20           So, I guess, just to start with that latter      10:52:11

21    bookend, when was, if you were to guess or to estimate,

22    the last material development effort for the TitleRover

23    technology?

24           MS. SWEENEY:  I am going to object as vague and   10:52:27

25    it misstates prior testimony in the preamble to that
```

Page 44

```
 1    question.

 2           THE WITNESS:  Yeah, could you -- could you ask    10:52:32

 3    it again?

 4    BY MR. NAWRACAJ:                                         10:52:34

 5       Q    Okay.  We will just go chronologically, then.   10:52:34

 6       A    Sure.                                            10:52:37

 7       Q    So in or about Q1 of 2016, TitleRover, LLC is   10:52:38

 8    formed?

 9       A    For either the first or second quarter of -- if 10:52:47

10    you have a document to show me, we can -- we can pin it

11    down directly.

12       Q    Can you generally give me a time line of how    10:52:53

13    the technology was developed?  In other words, you know,

14    by June or some significant event, we had certain

15    functionality developed or by July we had tests done, we

16    had --

17       A    I couldn't -- I couldn't speculate that, as I   10:53:06

18    sit here today, of how that time line worked out two

19    years ago or three years ago.  I'd be -- I'd be

20    completely guessing.

21       Q    Do you remember whether or not there was any    10:53:16

22    successful testing of the TitleRover software?

23       A    I do recall that.                               10:53:24

24       Q    And what was that?                              10:53:25

25       A    A long -- it was -- I can't remember any        10:53:28
```

Page 45

```
 1    specific dates.  I can remember that we had regular

 2    update meetings with the staff and the people that were

 3    utilizing the TitleRover, as well as we were -- we were

 4    getting very specific information pulled, whether that

 5    was by key word, by individual, by phrases.

 6              So we would get information pulled, so we would    10:53:50

 7    have stacks for our land people to go back and look at

 8    that were very specific; and then we also had an

 9    interface that actually allowed the landman to go in and

10    actually pull documents, mark documents, and review

11    documents on a very real-time basis.

12              So, yes, we saw progress in all of those things    10:54:07

13    along the way based on the feedback that I was getting.

14         Q   Do you remember generally what, if anything,        10:54:14

15    the TitleRover technology consisted of in Q1 of 2016

16    when TitleRover first commenced?

17              MS. SWEENEY:  Objection.  It misstates prior        10:54:32

18    testimony.

19              THE WITNESS:  Could you rephrase the question      10:54:36

20    again?

21    BY MR. NAWRACAJ:                                              10:54:38

22         Q   Sure.  In or around Q1 to Q2 of 2016, do you        10:54:39

23    recall what the TitleRover technology consisted of

24    and/or its functionality or operation?

25         A   No, I don't recall the specifics of -- of, you      10:55:00
```

Page 46

```
 1    know, any of that.

 2        Q   Was it functional?                       10:55:06

 3        A   It was -- what do you mean by functional? 10:55:08

 4        Q   Did it operate as -- as designed?        10:55:11

 5        A   We were utilizing tools as designed.  I  10:55:16

 6    don't -- I don't recall when the user interface

 7    actually -- you know, finally went up and we started

 8    operating out of the user interface.

 9            But we were -- yes, we were still pulling  10:55:27

10    information, and we'd sit in a room and discuss legal

11    issues or problems around very specific title

12    information or language use in the title information or

13    companies that continually had issues.

14            So we could -- we could pull title and well  10:55:43

15    information very quickly utilizing different tools,

16    where all those tools wrapped into, you know, an easy --

17    when I say easy, a user interface where you click a

18    button and magic happens.  All of that was getting

19    developed.  It was a work in progress.

20        Q   Okay.                                    10:56:02

21        A   But the early stages of developing what tools  10:56:03

22    were useful and what weren't useful, all that was the

23    work that was in progress.

24            MR. NAWRACAJ:  Okay.  I generally like to take  10:56:09

25    breaks every 45 minutes and we are right about there.
```

Page 47

```
 1    Do you want to take a little break?

 2           MS. SWEENEY:  Sure.  That sounds fine.        10:56:21

 3           MR. NAWRACAJ:  We can take a break so it      10:56:22

 4    doesn't wear everybody down.

 5           THE VIDEOGRAPHER:  Okay.  We are going off the 10:56:26

 6    record.  The time is 10:56.

 7           (Recess.)                                     10:56:29

 8           THE VIDEOGRAPHER:  We are going back on the   11:03:07

 9    record.  This is the beginning of media number two.  The

10    time is 11:03.

11    BY MR. NAWRACAJ:                                     11:03:12

12       Q   Going back to the TitleRover technology, was  11:03:23

13    the TitleRover technology ever licensed to any entity?

14       A   It had an agreement; whether we called that a 11:03:36

15    licensing agreement, as I sit here today, I can't recall

16    with -- with Hopewell.  Other than that, that was --

17    that was it.

18       Q   I am handing you what we will mark as         11:03:51

19    Plaintiff's Exhibit Number 2.

20           MR. NAWRACAJ:  I may have been short on the   11:04:07

21    copies.  I apologize.

22           (Exhibit 2 was marked for identification      11:04:26

23             by the court reporter and is attached hereto.)

24    BY MR. NAWRACAJ:                                     11:04:26

25       Q   Do you recognize this document?              11:04:26
```

Page 48

```
 1        A    I believe I do.                              11:04:31

 2             MS. SWEENEY:  I am sorry, what did you say?  11:04:32

 3             THE WITNESS:  I believe I do.                11:04:34

 4             MS. SWEENEY:  Okay.                          11:04:35

 5   BY MR. NAWRACAJ:                                       11:04:36

 6        Q    This document is between which parties?      11:04:38

 7        A    This is between Hopewell and TitleRover, LLC. 11:04:43

 8   Hopewell-Pilot Project, LLC and TitleRover, LLC.

 9        Q    What does this Memorandum of Agreement --    11:04:56

10   excuse me.  Strike that.

11             Does this agreement -- is this the agreement 11:05:06

12   that you were thinking of when you say there was a

13   memorandum between Hopewell and TitleRover with respect

14   to the TitleRover technology?

15             MS. SWEENEY:  Objection.  It misstates prior 11:05:18

16   testimony.

17             THE WITNESS:  I believe this is the agreement 11:05:22

18   that you asked me that was either a license agreement or

19   an agreement that gave Hopewell the right to use the

20   TitleRover tool.

21   BY MR. NAWRACAJ:                                       11:05:32

22        Q    Okay.  So the date of this agreement is April 11:05:33

23   4th, 2016, and it appears to be signed by you on behalf

24   of TitleRover and Thomas Tatham on behalf of

25   Hopewell-Pilot Project.  Was there anybody else involved
```

Page 49

```
 1    with respect to the negotiations of this agreement?

 2            MS. SWEENEY:  Objection; assumes facts.         11:05:56

 3            THE WITNESS:  I -- I don't recall.             11:05:57

 4            MS. SWEENEY:  It lacks foundation.             11:05:59

 5    BY MR. NAWRACAJ:                                        11:06:13

 6        Q   If you look at paragraph -- the preamble of the 11:06:16

 7    Memorandum of Agreement, it says that -- on the line

 8    right before the end -- the "(TR Technology) being

 9    developed and refined by TR" -- which was defined as

10    TitleRover -- "within an agreed area of mutual

11    interest," what was the TR technology at this time that

12    the Memorandum of Agreement was signed?

13        A   At this particular time, it was nothing more    11:06:53

14    probably than internal knowledge and the use of tools

15    that were going to be utilized to -- to make title more

16    efficient.

17        Q   I am looking at the date of April 4th, and I    11:07:10

18    believe you stated that in Q1 of 2016 TitleRover was

19    organized.

20        A   No.                                             11:07:22

21        Q   Q2?                                             11:07:23

22        A   I said sometime in Q1 or Q2 --                  11:07:24

23        Q   Okay.                                           11:07:26

24        A   -- of 2016.                                     11:07:27

25        Q   So you and Tom negotiated this agreement for    11:07:29
```

Page 50

1    the respective entities?

2          MS. SWEENEY:   Objection.  It lacks foundation.    11:07:35

3          THE WITNESS:   We put an agreement that would be    11:07:38

4    clear between the two parties, between the two entities.

5    BY MR. NAWRACAJ:                                          11:07:45

6      Q   Do you remember how you arrived at the license     11:07:46

7    fee of $17,500 per month which is stated in paragraph 3?

8      A   I don't recall specifically on how that number     11:07:59

9    was derived.  I have a pretty good assumption.

10     Q   Could you describe what that assumption is?         11:08:10

11     A   Sure.  I believe it matched what we negotiated      11:08:12

12   with Substantia LogiX to work and develop the -- the

13   software -- to work on developing the software.

14     Q   So, basically, what Hopewell was paying            11:08:31

15   TitleRover under the Memorandum of Agreement, what -- is

16   the sum that TitleRover was paying Substantia LogiX?

17     A   I believe that's correct, to the best of my        11:08:46

18   knowledge.

19     Q   At the time of this license agreement -- and       11:08:50

20   you may have answered this before.  I apologize if you

21   did -- was the TR technology operational?

22     A   No, the company wasn't formed.                     11:09:05

23     Q   Which company?                                     11:09:10

24     A   TitleRover.  I mean this is right around the       11:09:11

25   same time TitleRover was -- was formed.

                                                    Page 51

1    Q   Okay.  So right around when TitleRover is          11:09:18

2    formed, it executes an agreement with Hopewell that's

3    run by Tom --

4    A   Um-hum.                                            11:09:29

5    Q   -- by which, approximately, a quarter million      11:09:31

6    dollars would be paid over a year on technology that is

7    in a company that just formed.

8    A   Where do you see it's a contract for a year?  I     11:09:45

9    just don't recall.

10   Q   It will be $70,500 a month, so times 12,            11:09:49

11   roughly.  Analyzed, you are at a level of 200, 225,000 a

12   year for licensing technology, but there's no technology

13   or what is the technology if TitleRover was just formed?

14   A   Would you like me to read the agreement?            11:10:09

15   Q   Sure.                                               11:10:11

16   A   Because I don't -- I don't recall if this is --     11:10:11

17   are you stating that this is a one-year contract that it

18   was performance based for a quarter million dollars?

19   Q   No, I am not.  I am saying that paragraph 3         11:10:18

20   states a license fee of $17,500 per month.

21   A   Um-hum.                                             11:10:26

22   Q   And what I am trying to understand is on April      11:10:27

23   4th, 2016, right about when TitleRover was first

24   formed --

25   A   Um-hum.                                             11:10:35

Page 52

```
 1        Q    -- what possibly could justify a license fee of    11:10:35

 2   $17,000 -- $17,500 per month for technology which, my

 3   understanding is, isn't even developed?

 4        A    Well, it's --                                      11:10:48

 5             MS. SWEENEY:  Objection.  It lacks foundation.     11:10:49

 6             THE WITNESS:  If you'd like to, maybe I will        11:10:52

 7   reclarify because --

 8   BY MR. NAWRACAJ:                                             11:10:54

 9        Q    Sure.  Take your time.                             11:10:55

10        A    -- I don't think we are being clear on -- on       11:10:58

11   all of the aspects of the agreement.

12             Okay.  I got it.                                   11:11:03

13        Q    Usually, or in my experience, I should say,        11:12:23

14   when technology is licensed from licensor to licensee,

15   there's something that exists and something that is of

16   value that that technology can do and, in exchange,

17   there's a license fee paid.

18             So what I am trying to figure out here is on       11:12:41

19   April 4th, 2016, what value, what operational technology

20   existed in TitleRover that would warrant a license fee

21   of $17,500 per month, if you can recall?

22             MS. SWEENEY:  I am going to object to the          11:13:06

23   preamble as an incomplete hypothetical and it lacks

24   foundation.

25             THE WITNESS:  Do you want me to answer?            11:13:13
```

Page 53

```
 1    BY MR. NAWRACAJ:                                    11:13:14

 2        Q   Sure.                                       11:13:14

 3            MS. SWEENEY:  Yes.                           11:13:16

 4            THE WITNESS:  Okay.  I don't see where it says    11:13:17

 5    license fee on here, but there was a memorandum of an

 6    agreement; but perhaps, maybe, I am over- -- overstating

 7    it; but it was for services, so they were -- they were

 8    providing services for us; handling data, uploading

 9    data, providing portals, providing access to the data.

10            So they were providing work; and this actually    11:13:30

11    matched the costs, so there was no margin built into

12    this, this was actually the cost.  It was a flow-through

13    to Substantia LogiX, so there is no benefit, no

14    financial benefit or gain from TitleRover in this

15    particular agreement other than the services that were

16    provided.

17            So, you know, there was -- there was no markup,    11:13:49

18    there was no anything else.  It was a complete

19    pass-through and flow-through for services provided; and

20    in my experience, people don't work for free.

21            So they clearly were working for us, they          11:13:59

22    clearly managed data, they clearly managed indices, they

23    followed some of the terms that's outlined in this

24    agreement without me going through every paragraph.

25            So, yes, therefore it was entitled to get paid     11:14:12
```

Page 54

```
 1    and this is the agreement which we agreed to pay them

 2    by.

 3         Q   Can you look at paragraph 3 of the Memorandum    11:14:18

 4    of Agreement --

 5         A   Um-hum.                                          11:14:22

 6         Q   -- and read it?                                  11:14:23

 7         A   Hopewell shall pay TR the sum of 17,500 per      11:14:25

 8    month as a basic license fee covering exclusive use of

 9    TR Technology in the AMI which shall cover Madison,

10    Houston, Walker counties all located in Texas.

11         Q   So is it fair to say that there was a license    11:14:36

12    fee paid?

13         A   Sure.                                            11:14:41

14         MS. SWEENEY:  Objection.  The document speaks        11:14:42

15    for itself.

16    BY MR. NAWRACAJ:                                          11:14:48

17         Q   Did you and Tom discuss what the use of the TR   11:14:48

18    technology would be in the AMI which, I think, is an

19    acronym for area of mutual interest?

20         A   It was going to be exclusive use in that area.   11:15:03

21         Q   What would the TR technology do on April 4th     11:15:08

22    to -- for the licensee which, in this case, is Hopewell?

23         A   It was being developed, as the document states   11:15:16

24    in the first preamble of the deal.  So as I sit today, I

25    can't recall the functionality.  It had tools that it
```

Page 55

```
 1   was utilizing to help organize and sort data.

 2          How it was comprised or how it was put          11:15:31

 3   together, that was all being developed as we moved

 4   forward.

 5      Q   How was it being developed?                     11:15:39

 6      A   It was through discussions with the business    11:15:41

 7   folks and landmen, educated landmen and land folks and

 8   attorneys, that we outsourced attorneys, based on the --

 9   the criteria that we were either searching for or

10   solutions that we were looking to accomplish in refining

11   the ability for our attorneys to -- to utilize the

12   interface.

13          So with that feedback, then the technical       11:16:04

14   folks, Brent and Joe, would build a solution to help

15   accommodate those particular searches or to make the

16   folks that are utilizing the -- the tool more user

17   friendly; so those were the two areas of focus.

18      Q   I appreciate that.  So would it be fair to say  11:16:24

19   that when the Memorandum of Agreement was signed that

20   the TR technology was a work in process?

21      A   It's fair to say that it was being developed.    11:16:39

22      Q   And when you say being developed, was it at the  11:16:44

23   initial stages of development or was it providing tweaks

24   to already developed software?

25          MS. SWEENEY:  Objection.  The document speaks    11:17:00
```

Page 56

```
 1    for itself.
 2            THE WITNESS:  Different softwares that were        11:17:03
 3    being utilized were more developed than other different
 4    tools that were being utilized at the time were more
 5    developed than others and some were being developed like
 6    the user interface.
 7            So some tools that were -- specifically that       11:17:14
 8    Brent and them utilized had been tested and worked and
 9    were off the shelf and had been utilized in other fields
10    like the legal business.
11            So some of it was being developed and some of      11:17:25
12    it was already developed, and how we utilized them and
13    how we put them together and -- to the user interface
14    is -- is what we were working on.
15    BY MR. NAWRACAJ:                                           11:17:36
16        Q   You mentioned that some of the tools were off      11:17:39
17    the shelf?
18        A   Sure.                                              11:17:43
19        Q   What do you mean by that?                          11:17:44
20        A   Meaning that they were -- that they could be       11:17:45
21    bought.
22        Q   So --                                              11:17:48
23        A   Either bought or licensed.                         11:17:49
24        Q   So a third party would own that technology that    11:17:52
25    effectively you would buy through a license?
```

                                                      Page 57

```
 1        A   I believe that's correct.                    11:17:57

 2        Q   And some of those tools comprised the TR      11:18:00

 3   technology?

 4        A   I believe that's correct.                    11:18:06

 5        Q   Okay.  Are you and Mr. Tatham on speaking terms  11:18:17

 6   now?

 7        A   No.                                          11:18:20

 8        Q   Were you on speaking terms on April 4th, 2016?  11:18:23

 9        A   Yes, we were.                                11:18:28

10        Q   You were business partners?                  11:18:30

11        A   Correct.                                     11:18:31

12        Q   You both were involved with TitleRover, LLC; is  11:18:34

13   that correct?

14        A   That's correct.                              11:18:39

15        Q   And the same with Hopewell-Pilot Project?    11:18:40

16        A   Yes, sir.                                    11:18:44

17        Q   Was there any research, whether it's market  11:18:48

18   research or independent parties consulted, with respect

19   to the fairness of the license fee of $17,500,

20   understanding that it's between two companies that have

21   co-owners on each side of the signature block?

22            MS. SWEENEY:  Objection.  It calls for       11:19:13

23   speculation.

24            THE WITNESS:  I don't believe we had a fairness  11:19:16

25   opinion on it on a contract that we were funding.
```

Page 58

```
 1   BY MR. NAWRACAJ:                                11:19:21

 2       Q   Okay.  I am done with that document.  Thank   11:19:21

 3   you.

 4       A   Okay, thank you.                        11:19:36

 5       Q   I am handing what I am going to mark as  11:19:36

 6   Plaintiff's Exhibit Number 3.  I apologize again for

 7   being short.

 8           (Exhibit 3 was marked for identification  11:20:08

 9            by the court reporter and is attached hereto.)

10   BY MR. NAWRACAJ:                                11:20:08

11       Q   Do you remember who the investors were in  11:20:08

12   Hopewell-Pilot Project, LLC?

13       A   Some of them.                           11:21:10

14       Q   Could you name them?                    11:21:14

15       A   I can give it a shot.                   11:21:17

16           A gentleman named Michael Foran or entities  11:21:21

17   controlled by him, EnSource; and there were -- another

18   gentleman named Trent put some money in.  There's

19   another gentleman -- oh, my mind slips at the moment.

20       Q   That's okay if you can't remember.      11:21:51

21       A   I can go through them.                  11:21:53

22       Q   You mentioned EnSource as an investor in  11:21:54

23   Hopewell.

24       A   Um-hum.                                 11:22:00

25       Q   How did you first learn about EnSource -- or I  11:22:00
```

Page 59

```
 1    should be more specific.  EnSource was formed to make

 2    the investment; right?  So there were individuals behind

 3    EnSource.  How did you get connected to any of those

 4    individuals?  Did you know any of them?

 5         A    I knew one of them specifically.          11:22:18

 6         Q    Who was that?                             11:22:19

 7         A    Chad Martin.                              11:22:21

 8         Q    How did you know Chad?                    11:22:22

 9         A    Chad was a former neighbor, former friend that  11:22:23

10    I have known for years.

11         Q    Former friend?  Is he a current friend now?  11:22:30

12         A    Well, the relationship's been a little strained  11:22:33

13    but, you know, I still have -- you know, a really -- I

14    don't harbor any negative feelings.  Just frustration.

15         Q    Prior to this investment whereby EnSource    11:22:48

16    invested in Hopewell, did you do any other deals that

17    involved Chad?

18         A    No.                                      11:22:58

19         Q    Do you recall how much EnSource invested in  11:23:03

20    Hopewell?

21         A    Not to the penny.                        11:23:10

22         Q    If I said it was $430,000, would that sound  11:23:12

23    about right?

24         A    Yeah, I wouldn't say 4 --                11:23:16

25              MS. SWEENEY:  Objection.  It lacks --    11:23:18
```

Page 60

```
 1              THE WITNESS:  I would have said 480 but --      11:23:19

 2              MS. SWEENEY:  It lacks foundation.             11:23:21

 3    BY MR. NAWRACAJ:                                          11:23:23

 4        Q   Do you remember when the investment -- well,     11:23:24

 5    let's back up a little bit.  Do you remember the

 6    structure of that $430,000 investment that EnSource made

 7    into Hopewell?

 8              MS. SWEENEY:  Objection; vague.                11:23:39

 9    BY MR. NAWRACAJ:                                          11:23:43

10        Q   Was the $430,000 investment funded at one time?  11:23:43

11        A   No.                                               11:23:48

12        Q   Two times?                                        11:23:49

13        A   No.  It was funded over multiple times.          11:23:51

14        Q   Okay.                                             11:23:56

15        A   More than two.                                    11:23:56

16        Q   Okay.  Prior to the investment being made, did   11:23:57

17    you meet with any of the EnSource representatives other

18    than the legal counsel?  You mentioned Chad.  Anybody

19    else?

20        A   I didn't meet with their legal counsel.          11:24:11

21        Q   All right.                                        11:24:14

22        A   So you said other than their legal counsel.  I   11:24:14

23    didn't meet with their legal counsel.  I met with Chad

24    and then I met with Justin.

25        Q   Justin Pannu?                                     11:24:22
```

Page 61

```
 1        A    Pannu.                                        11:24:23

 2        Q    Do you remember when you met with him?        11:24:24

 3        A    I met him the summer of 2016.  My -- I sent my  11:24:27

 4   niece down here for a -- she was a little heavy and I

 5   sent her to a camp here for a couple of weeks to build

 6   her -- herself up and learning how to eat healthy and

 7   live healthy.  So I came down here to visit her for a

 8   visitation for the camp and I met Justin during that

 9   visitation.

10        Q    Do you remember about what month that was in    11:24:55

11   2016?  Was it summer, you say?

12        A    It was the summer.  I want to say it was June,  11:25:00

13   but it could have been early July.

14        Q    Do you remember if it was before or after the   11:25:04

15   first traunch of the investment was made?

16        A    I believe it was -- it was after.              11:25:10

17        Q    You met Justin --                              11:25:11

18        A    As far as the first traunch of EnSource        11:25:13

19   investment?

20        Q    Yes, I am sorry.                               11:25:17

21        A    Of course not.                                 11:25:19

22        Q    So it was before?                              11:25:19

23        A    I met Justin and then they formed EnSource     11:25:20

24   after I met Justin.

25        Q    When you met with Justin, did you talk about   11:25:28
```

Page 62

```
 1   Hopewell?

 2       A    When I met with Justin, I -- we discussed        11:25:35

 3   Hopewell.

 4       Q    Do you remember what you discussed about         11:25:39

 5   Hopewell to Justin?

 6       A    At a very high level, yes.                       11:25:46

 7       Q    And what was that?                               11:25:47

 8       A    I believe I brought a map with me, so I just     11:25:49

 9   kind of showed him the area that we were focusing on and

10   I gave him a very high-level pitch of the play.

11       Q    And what would that pitch be?                    11:25:57

12       A    That pitch is is that we are out acquiring the   11:26:00

13   leases in a -- you know, in an oil field, whereby most

14   of the public felt like it was all leased up, and we

15   felt like because of the dramatic downturn in -- in the

16   pricing of oil and gas, that there are a lot of

17   potential holes left out in this area.

18            And, also, in this particular area, title was    11:26:21

19   fairly complicated because it was very, very fragmented,

20   so it lent itself for a lot of complicated title; and

21   so, therefore, we -- we were out looking at utilizing

22   technology, picking up leases where we believe were in a

23   very prolific area, where companies were representing

24   that they had a -- that they had a unit completely

25   locked up, 640 or 705 acres, whereby you can go in there
```

Page 63

1    and there were potential holes and interest to be picked

2    up within those particular units, whether they were

3    complicated title, whether they overlooked it, whether

4    they had title mistakes, but those were the different

5    potential scenarios that you might be able to find in

6    looking for leases in what was thought to be a secure

7    oil field.

8         Q    Okay.  Did you talk about how you were able to        11:27:10

9    find those leases and opportunities with Justin?

10        A    How we were able -- I don't --                        11:27:21

11        Q    You know, locate them.  I think in your               11:27:23

12   testimony a second ago you mentioned use of technology.

13        A    I don't recall mentioning any use of technology       11:27:29

14   when I was talking to -- to Justin.  I was talking

15   purely of Hopewell and the opportunity that Hopewell

16   was -- was brought.  That was it.

17        Q    So when you spoke with Justin, you mentioned a        11:27:43

18   business opportunity, whereby you can capitalize, for

19   lack of a better phrase, on holes in the title or leases

20   or whatnot, and there was no discussion on the

21   technology that allowed you to find these opportunities

22   that no one else could find?

23        A    No, the technology was more of a tool to be           11:28:04

24   used and nothing really to do with the success of

25   potential Hopewell.

                                                      Page 64

```
 1              We brought in a lot of data and information by      11:28:13

 2    Greg Kane early on, about the field, how prolific it

 3    was, about the infrastructure that was going in there.

 4    And that was not -- our success was not determined on a

 5    tool.

 6              The tool would make the process a lot more         11:28:25

 7    efficient, but it was not any primary focus of

 8    Hopewell-Pilot, LLC at that particular time.

 9         Q    You mentioned information that Greg Kane           11:28:35

10    brought to you.

11         A    Um-hum.                                            11:28:40

12         Q    Was any of that verified or substantiated in      11:28:40

13    any way when you would come up and say here are some

14    opportunities that I believe existed?  Did anybody

15    verify them?  Check them out?

16         A    Sure.                                              11:28:50

17         Q    Who was that?                                      11:28:51

18         A    Sure.                                              11:28:52

19              Early on, Tom took field trips out to the         11:28:53

20    locations, saw the infrastructure going in.  Greg had a

21    lot of pictures, a lot of data, a lot of information.

22              Tom did some research with other folks in the     11:29:05

23    industry, so a lot of due diligence was done, you know,

24    prior.

25         Q    You mentioned that when you met with Justin,      11:29:13
```

Page 65

1    you talked about, I believe, oil and gas lease

2    opportunities?

3        A    What I talked to him about was picking up         11:29:20

4    acreage in a -- in a field where most of the public

5    thought the leases were completely leased up, and we

6    believed there was a lot of open acreage within that --

7    within that field; so whereby if a company has already

8    drilled a well and has an AMI and you can go out and

9    pick up a lease in that particular area, you might be

10   able to get into that area for the cost of land, where

11   most oil and gas companies had to pay land costs and

12   they had to drill at that particular -- the strategy out

13   there was to drill as cheap a well as possible to a

14   known gas end which was very -- it was nonproductive,

15   meaning it didn't justify the cost of leasing the 640

16   acres or drilling the well.

17            But what it did allow you to do is hold the      11:30:01

18   wells.  If you produced gas or oil at the minimum

19   productions allowed, you can hold the well for future

20   technology.

21            What companies tried to do is do a land grab,    11:30:12

22   lock up as much land as they can by drilling a well,

23   forming as big a unit as they could possibly, legally,

24   and then later coming back and using technology -- or

25   more sophisticated companies, like Enron Oil & Gas, to

                                                    Page 66

```
 1    go in and drill vertical -- or I mean horizontal wells

 2    and do multi-stage fracking and whereby those -- those

 3    prospects would become very, very lucrative.

 4           So the play was to be able to get into a play,      11:30:39

 5    whereby those companies had to do seismic, had to build

 6    infrastructure, had to, you know, spend a lot more costs

 7    than just the acquisition of the leases so --

 8       Q   Okay.  And this was summer of 2016, I think you     11:30:53

 9    mentioned, in the summertime?

10       A   Correct.                                            11:31:00

11       Q   At that point in time, what sort of experience      11:31:02

12    did you have from your either educational background or

13    prior jobs on oil/gas lease plays?

14       A   Sure.                                               11:31:13

15           MS. SWEENEY:  Objection.                            11:31:13

16    BY MR. NAWRACAJ:                                           11:31:14

17       Q   Experience with respect to this line of            11:31:14

18    business.  I think you mentioned earlier on that you

19    developed companies; staffing, legal staffing, things of

20    that nature.

21       A   Yeah.                                               11:31:22

22       Q   When you met Justin, what sort of experience       11:31:22

23    did you have with respect to the acquisition of oil and

24    gas leases and, for lack of a better word, capitalizing

25    on them -- on yours with respect to those?
```

```
 1        A    Sure.  I have been in the industry probably      11:31:35

 2    for, you know, since 2007, somewhere in there.  I was --

 3    I had -- I was the chairman of an oil and gas company

 4    called Core Energy that did traditional exploration, so

 5    whereby we went out -- and, actually, at that particular

 6    time, we were embracing new technology like 3D seismic

 7    which was coming on the market.

 8             We were utilizing technology to go out and read   11:32:03

 9    the squiggly lines on a piece of paper and the pretty

10    pictures, whereby in the past you had to utilize

11    geologists and geophysicists to interpret those squiggly

12    lines.

13             So I was -- we were out early on that             11:32:16

14    particular stage.  I helped to raise money for that

15    company, I invested money in that company, my family

16    invested money in that company, so that gave me the base

17    of that -- of experience.

18             Later I found out that those were all pretty      11:32:27

19    pictures to me, and I started evaluating companies from

20    a land aspect of it.

21             So prior to that, I have probably made dozens     11:32:35

22    of acquisitions, whereby when companies would go out and

23    permit a well, prior to shale, I would send the land --

24    I would send an army of title folks to go in and review

25    title and look for open acreage, very similar strategy
```

Page 68

```
 1   of what we embodied here.

 2          And I was very successful at doing that for      11:32:55

 3   several years, and I -- in 2000 -- 2000 -- I am sorry,

 4   '90 -- I am sorry, I have got my -- 1997, it was in my

 5   oil -- I have got another decade off, '97.

 6          2007 is when I decided to put my focus and       11:33:14

 7   really go build the Willis Group and start a staffing

 8   fund; but prior to that, I was -- I spent a year of my

 9   life, a year and a half of my life focusing nothing on

10   but land plays, going out and acquiring minerals,

11   royalty interests or lease interests, you know, tracking

12   other companies with public data when they permitted a

13   well.

14      Q    Okay.  Did you meet Justin over dinner or was   11:33:42

15   it lunch or how did you guys discuss this material?

16          MS. SWEENEY:  Objection; compound.               11:33:54

17          THE WITNESS:  Can you break the question down    11:33:57

18   for me?

19   BY MR. NAWRACAJ:                                        11:33:58

20      Q    When you met with Justin, where did you meet?   11:33:58

21   Did you have dinner?  Did you have lunch?  At the end of

22   that meeting, was there an interest?

23          MS. SWEENEY:  Objection; compound.               11:34:07

24          THE WITNESS:  Yeah, we had -- we had several     11:34:08

25   meetings -- not meetings.  I'd say we -- we got together
```

Page 69

```
 1    a couple of times socially.

 2         We met at a beach bar in La Jolla, I believe,    11:34:15

 3    for lunch the first time I met him; and he brought a

 4    friend with him and we kind of spoke kind of high level.

 5         I think I handed him the map that I brought       11:34:27

 6    with me at that particular time.  It was a map with --

 7    with pretty colors on it.

 8         And later -- so we met for an hour or so there.   11:34:34

 9    Later that evening, we met at a -- kind of a spot that

10    he recommended.  It was more like a little bit loud

11    music, outdoors, more social.  We talked no business.

12         And then the third time I saw him on this         11:34:50

13    particular trip, my oldest daughter came down from

14    California, and we had a night out here in the Gaslamp

15    area where we went out and we socialized again at a loud

16    music spot and it was, again, purely social.

17    Q    Okay.  When your visit here was done with         11:35:06

18    Justin, did that lead to any further discussions on an

19    investment in Hopewell?

20    A    It ultimately led to an investment in Hopewell    11:35:22

21    in the formation of EnSource, but I did a lot of my

22    following up at that particular time through -- through

23    Chad Martin.

24    Q    Okay.  So your primary interface was with         11:35:33

25    Chad --
```

Page 70

```
 1        A    Correct.                                      11:35:37

 2        Q    -- as far as the EnSource group, I will call  11:35:38

 3   them, is concerned?

 4        A    Correct.                                      11:35:43

 5            MS. SWEENEY:  I am going to make a belated      11:35:45

 6   objection to -- as vague as to the word "you," if you

 7   are asking about him specifically or Hopewell generally.

 8            MR. NAWRACAJ:  Okay.                            11:36:03

 9            THE WITNESS:  Could I clear that up?            11:36:04

10   BY MR. NAWRACAJ:                                         11:36:07

11        Q    Well, I am thinking it has to be you to have a 11:36:07

12   lunch.  It couldn't be Hopewell.

13            MR. NAWRACAJ:  So I understand the              11:36:12

14   objection but --

15            MS. SWEENEY:  You were asking about follow-up,  11:36:14

16   the follow-up communications.

17            THE WITNESS:  You were asking about follow-up,  11:36:16

18   so I just want to make it clear, when I was talking

19   about -- when I am talking about meeting with Justin or

20   meeting with Chad, when I say I, it is in my capacity as

21   manager in Hopewell and/or TitleRover, so I just want to

22   make sure we are not mixing it up.

23   BY MR. NAWRACAJ:                                         11:36:32

24        Q    Understood.  You are not holding yourself out  11:36:32

25   personally.
```

                                                    Page 71

| | | |
|---|---|---|
| 1 | A  Right. | 11:36:35 |
| 2 | Q  It was a representative manager. | 11:36:35 |
| 3 | A  That's right. | 11:36:36 |
| 4 | Q  That's what I assumed. | 11:36:36 |
| 5 | THE REPORTER:  Okay.  I need one at a time, | 11:36:40 |
| 6 | please. | |
| 7 | BY MR. NAWRACAJ: | 11:36:47 |
| 8 | Q  I handed you Plaintiff's Exhibit Number 3.  Did | 11:36:47 |
| 9 | you have a chance to look at it or do you need some | |
| 10 | time? | |
| 11 | A  I browsed through it. | 11:36:53 |
| 12 | Q  Okay.  I'd like to talk about it, if you don't | 11:36:55 |
| 13 | mind.  This is a Private Placement Memorandum for | |
| 14 | Hopewell-Pilot Project.  Do you remember who drafted | |
| 15 | this document? | |
| 16 | A  No. | 11:37:14 |
| 17 | Q  Did you have anything to do with drafting this | 11:37:14 |
| 18 | document? | |
| 19 | A  No, I did not. | 11:37:18 |
| 20 | Q  Do you know if this document was sent to any or | 11:37:23 |
| 21 | all of the representatives -- or I should say -- members | |
| 22 | of EnSource in connection with the investment? | |
| 23 | MS. SWEENEY:  Counsel, are you referring to | 11:37:33 |
| 24 | this particular version of this document? | |
| 25 | MR. NAWRACAJ:  Yes. | 11:37:36 |

Page 72

```
 1              THE WITNESS:  I don't --                      11:37:38

 2              MS. SWEENEY:  Is there -- is there a Bates    11:37:38

 3    number or some way to determine how this was produced so

 4    we know --

 5              MR. NAWRACAJ:  This was in the data room that 11:37:47

 6    they produced in connection with the investment.

 7              MS. SWEENEY:  Okay.                           11:37:53

 8              THE WITNESS:  Okay.  I am sorry, can you ask  11:37:56

 9    the question again?

10    BY MR. NAWRACAJ:                                        11:37:59

11        Q   Yeah.  I just wanted to understand your        11:37:59

12    involvement, if any, with respect to the drafting of

13    this document.

14        A   No, I am assuming it was drafted by a legal    11:38:03

15    professional, but I did not participate in the drafting

16    of it.

17        Q   Do you know if it was given to any of the      11:38:17

18    members of EnSource, say, for instance, Chad Martin or

19    Justin?

20        A   Yes.                                            11:38:26

21        Q   Do you know who gave that to them?             11:38:27

22        A   Tom did or Hopewell did or the company did.    11:38:29

23        Q   Did you know that it was being distributed to  11:38:38

24    Justin by Tom on behalf of, say, Hopewell?

25        A   Yes.                                            11:38:45
```

Page 73

1          Q   Prior to its distribution, were you able to          11:38:48

2     review it?  Did you know that it was going to be sent?

3     Did Tom say take a look and make sure you are okay with

4     this?

5              MS. SWEENEY:  Objection; compound.          11:38:58

6              THE WITNESS:  As I sit here today, I don't          11:38:59

7     recall that conversation, but it's -- it's a likely

8     assumption that I did review it.

9     BY MR. NAWRACAJ:          11:39:07

10         Q   Right, because I think when we talked earlier          11:39:07

11     with respect to both Hopewell and TitleRover, you and

12     Tom kept each other up to speed on developments; so this

13     would be something material, I am assuming?

14             MS. SWEENEY:  Objection.  It misstates prior          11:39:20

15     testimony.

16             THE WITNESS:  Yeah, to the best of my          11:39:21

17     knowledge, Tom and I kept each other up to speed.  I

18     wouldn't be surprised if we had a miss here and there,

19     but we weren't -- we weren't acting as one.  We were two

20     separate individuals, two separate managers.

21     BY MR. NAWRACAJ:          11:39:36

22         Q   But in this instance, you knew that the Private          11:39:37

23     Placement Memorandum was being sent to representatives

24     of EnSource or what would be EnSource?

25         A   In this instance, it's -- it's okay to assume          11:39:46

Page 74

```
 1    that I approved the document that was being sent to

 2    EnSource.  I had no -- I had no drafting or -- or

 3    wordsmithing of the agreement.

 4         Q   Understood.  Okay.  Can you turn to the second    11:40:04

 5    page of this document?

 6             And I guess before we do that, do you recall      11:40:19

 7    approximately what time frame Tom on behalf of Hopewell

 8    would have sent this to Justin?

 9         A   Not without looking at something.  I'd be         11:40:31

10    purely speculating.

11         Q   So it would be after the meeting that you had     11:40:36

12    with Justin when you visited San Diego?

13         A   I am pretty certain that's probably safe to       11:40:40

14    say.

15         Q   Okay.  So if you look and turn to page 2, where   11:40:44

16    it says, "Executive Summary."

17         A   Um-hum.                                           11:40:50

18         Q   Can you read the first paragraph?                 11:40:55

19         A   The introductory paragraph?                       11:40:58

20         Q   Yes, right underneath the Executive Summary       11:41:00

21    title.

22             MS. SWEENEY:  Out loud?                           11:41:04

23             MR. NAWRACAJ:  Sure.                              11:41:04

24             THE WITNESS:  "The more contemporary 'tight       11:41:05

25    sands' and 'shale' plays are more commercially rewarding
```

Page 75

```
 1    as the industry continues to refine and apply new

 2    horizontal completion of frac techniques to the" --

 3    BY MR. NAWRACAJ:                                    11:41:17

 4        Q   I am sorry to interrupt, Mark.  I meant the  11:41:17

 5    paragraph right below Executive Summary, so starting --

 6        A   Oh, okay.  "Hopewell-Pilot Project, LLC" --   11:41:24

 7    defined as Hopewell or the company -- "was formed in

 8    March 2016 for the purpose of demonstrating 'Proof of

 9    Concept' involving the refinement, use, and application

10    of a new proprietary software technology which can

11    geographically sort and analyze land and mineral title

12    records and related digital data for the purposes of

13    acquiring Oil, Gas & Mineral interests in the most

14    contemporary 'tight sands' and 'shale' plays."

15        Q   So in line 3, there's a phrase a new          11:41:50

16    proprietary software technology.  Is that referring to

17    the TitleRover technology?

18        A   I'd be- -- I believe it's referring to the    11:42:06

19    technology being utilized, but TitleRover being one of

20    them.

21        Q   Okay.  Earlier we talked about the tools --   11:42:13

22    some of the tools that the TitleRover technology

23    consisted of, and I think you mentioned that some of

24    them are out of the box or provided by third parties?

25        A   I think I -- yeah, I said they're commercial, 11:42:27
```

Page 76

```
 1    off-the-shelf technology, stuff that you could actually

 2    buy and you can purchase and then some things you could

 3    not.

 4        Q    So would those things be new and proprietary?    11:42:38

 5        A    Well, BeyondRecognition would be new and        11:42:41

 6    proprietary.  Any -- any things that we did to -- to be

 7    able to -- I think we had some sorting things that we --

 8    some sorting capabilities that other software did not

 9    have; but, again, that would be a technical question for

10    Brent or Joe.  But, yes, it's my understanding that we

11    had those things.

12        Q    Along that line, we have the phrase "which can    11:43:07

13    geographically sort and analyze land and mineral title

14    records."  At the time this prospectus -- or I should

15    say PPM was remitted to Justin, is that a true

16    statement, that this new proprietary software can -- not

17    that it's being developed to -- but can geographically

18    sort and analyze land and mineral title records?

19            MS. SWEENEY:  Objection.  It lacks foundation.     11:43:40

20            THE WITNESS:  I -- I believed that to be true      11:43:44

21    and correct at that particular time.

22    BY MR. NAWRACAJ:                                           11:43:47

23        Q    What sort of tests did you run in order to        11:43:47

24    verify that statement prior to this PPM being sent to

25    Justin?
```

Page 77

```
 1        A   As I sit here today, I can't recall what tests     11:43:53

 2   were done.  There were -- there was work being done and

 3   there was evidence of the results of that particular

 4   work, but I don't -- as I sit here today, I can't recall

 5   any particular test that was done.

 6            We were bouncing, you know, what John Martin        11:44:06

 7   could pull together, what -- what Brent and Joe could

 8   pull together, and -- but I don't recall any specific

 9   tests.

10        Q   Was the BeyondRecognition technology important     11:44:43

11   to the overall functionality to the TitleRover

12   technology?

13        A   Could you say that again or ask that again?        11:44:53

14        Q   Sure.  Was the technology and/or services that     11:44:55

15   John Martin through BeyondRecognition providing to

16   TitleRover essential for successful operation of the

17   TitleRover technology?

18        A   No.                                                11:45:14

19        Q   Can you elaborate on that?  Was there other        11:45:16

20   technology that you could use instead?

21        A   There's -- there's -- the TitleRover technology    11:45:21

22   was, again, is nothing -- as all software in my view is

23   it is nothing more than making your job more efficient.

24            I mean -- so there are certain areas that          11:45:31

25   John's technology could be -- it could be a lot more
```

Page 78

```
 1    impactful in making the job more efficient than other

 2    potential companies; but if it didn't work, there are

 3    still a lot of other aspects of the TitleRover

 4    technology that could still make the job of searching

 5    land and title records a lot more efficient.

 6           That was just one of the tools in the tool shed    11:45:55

 7    or one of the capabilities that would have been nice to

 8    have; but just if one of them isn't working, that

 9    doesn't mean that all of them -- that the software

10    wasn't still efficient and it still can't go forward.

11           It can still go forward.  It would just be nice    11:46:11

12    if you are always continuing to expand in making the

13    software more and more efficient so you can alleviate

14    less hours worked or less human hours being worked on

15    it.

16       Q   When this technology performs or you otherwise    11:46:24

17    use technology in order to do these land plays, is it

18    important to have indexing of the records?

19       A   Yes, you have to index the records to be able     11:46:49

20    to pull them up.

21           (Exhibit 4 was marked for identification          11:46:54

22             by the court reporter and is attached hereto.)

23    BY MR. NAWRACAJ:                                          11:46:54

24       Q   Okay.  I am handing you Plaintiff's Exhibit        11:46:55

25    Number 4 --
```

Page 79

| | | | |
|---|---|---|---|
| 1 | A | Are we done with this or keep it? | 11:47:00 |
| 2 | Q | You can keep it.  We will revisit it. | 11:47:02 |
| 3 | A | Okay. | 11:47:10 |

4      Q    So this is an email from Tom Tatham to Brent    11:47:17
5   Stanley, you're carbon copied on it, dated October 18,
6   2016.
7          And Tom seems to express a concern where he    11:47:31
8   says, quote, "It is amazing to me that we are just now
9   clustering leases/deeds/units and conveyances!  How are
10  we ever going to have a suitable index without?"
11         So my question is if indexing is important in    11:47:46
12  order for this technology to work, and this email dated
13  October 18, 2016 is expressing what appears to be a lack
14  of that ability, how in the world could there be
15  software of TitleRover technology when this PPM is
16  remitted that functions?
17         MS. SWEENEY:  Objection.  The document speaks    11:48:09
18  for itself, argumentative, compound, it lacks
19  foundation.
20         THE WITNESS:  Sure.                             11:48:17
21  BY MR. NAWRACAJ:                                       11:48:19
22      Q   I will go back to the PPM in that Private      11:48:19
23  Placement Memorandum, if you don't mind.
24      A   Um-hum.                                        11:48:26
25      Q   Can you reconcile or explain how in that first 11:48:27

Page 80

```
 1    paragraph, under Executive Summary, the statement can be
 2    made which says, "new proprietary software technology
 3    which can geographically sort and analyze land and
 4    mineral title records" and Mr. Tatham's October 18th
 5    email that indicates a problem with indexing?
 6        A   I don't --                                    11:49:01
 7            MS. SWEENEY:  Objection.  It lacks foundation.  11:49:01
 8            THE WITNESS:  You are going to have to ask     11:49:03
 9    Mr. Tatham what he meant by the correlation between    11:49:05
10    those two things because I am not certain.
11    BY MR. NAWRACAJ:                                       11:49:10
12        Q   You may have answered this already.  So when  11:49:15
13    this PPM was sent to Mr. Pannu, I think you said there
14    was some testing done on the TR technology or --
15        A   I believe I said I don't recall any testing   11:49:26
16    done on the TR technology.
17        Q   What sort of testing would there be if there  11:49:31
18    were any testing?
19        A   I am not a technologist.  I wouldn't want to  11:49:33
20    assume what kind of testing would need to be done.
21            I'd resolve to my technology team, what they  11:49:39
22    felt like needed to happen to have it independently
23    validated, to the extent it needed to be.
24        Q   If there was a problem with the technology,   11:49:46
25    would your technology team tell you?
```

Page 81

```
 1        A    I would hope so.                              11:49:53

 2        Q    Okay.  Going further down on page 2 of the    11:49:55

 3   Private Placement Memorandum, it's the paragraph that

 4   starts with "Hopewell has identified."  It's right

 5   underneath item number 5.

 6             At the very end of that paragraph we have a    11:50:10

 7   sentence that says, "Hopewell has retained certain

 8   Financial Advisors to assist in obtaining up to

 9   $25,000,000 prospective financing for the Company's

10   possible execution of the top lease strategy."

11             Can you describe what that entailed here?  Who  11:50:26

12   were these financial advisors and how far along you were

13   in obtaining up to $25 million of additional financing?

14             MS. SWEENEY:  Objection; compound.             11:50:38

15   BY MR. NAWRACAJ:                                         11:50:40

16        Q    Okay.  We'll start with who were the financial  11:50:40

17   advisors?

18        A    We had -- we had hired one particular company,  11:50:44

19   and I can't remember the name of the company, as I sit

20   here today.  The gentleman's name is -- that kind of led

21   that effort would have been Jeff Firestone, was one of

22   the individuals.

23             And then Tom had a son that worked for a       11:51:01

24   family -- family office out of New York.  We had

25   conversations with them at a very high level that said
```

                                                    Page 82

```
 1    that they would potentially have some interest in either

 2    investing through their fund which had a very

 3    significant fund, I think, slated for energy, but those

 4    were the only two sources that I can recall.

 5          Whether -- the firm out of New York was not        11:51:24

 6    ever retained, to the best of my knowledge, and we

 7    actually did retain a firm in Houston.

 8       Q   Do you remember if any -- anything transpired     11:51:37

 9    other than general discussions on possibly obtaining

10    this financing?  Was there a term sheet or was there

11    anything like that?

12       A   I think -- I think we had a term sheet.  I        11:51:48

13    think we engaged them.  I don't think we were -- they

14    weren't very helpful in our initial round as we thought

15    that they might be, and we didn't have enough data

16    information for the 25-year, hence the pilot project.

17    It was -- I think the results of the pilot project would

18    lead to the -- to our ability to go out and raise the

19    next traunch of capital.

20       Q   Did you put presentations on or otherwise pitch   11:52:18

21    these financial advisors?

22       A   They got information, I believe, on a -- on a     11:52:23

23    high level, yeah.

24       Q   By phone or in person?                            11:52:25

25       A   I don't recall.                                   11:52:27
```

Page 83

1       Q    And that was the extent of pursuing this $25        11:52:30

2   million in prospective financing?

3       A    Those were the two folks that expressed             11:52:37

4   interest, and Tom might have had other discussions with

5   other people as well.  Those are the ones that I know

6   of.  And -- yeah.

7       Q    Go ahead.                                            11:52:54

8       A    No, that was it.                                     11:52:54

9       Q    The paragraph right below it states, "Hopewell      11:53:01

10  is seeking qualified debt and equity investors to

11  provide up to $2,000,000 in new funds from the placement

12  of up to 1,000,000 Additional Equity Shares for the

13  purpose of acquiring new lease and mineral interest

14  acquisitions in the four initial target areas and for

15  working capital to continue the Company's operations and

16  evaluation of lease acquisition opportunities."

17          How did you arrive at the number of $2 million       11:53:28

18  as that needed to do these things?

19          MS. SWEENEY:  Objection.  Are you referring to       11:53:39

20  Hopewell when you say "you"?

21          MR. NAWRACAJ:  Yeah.  It says, Hopewell is            11:53:41

22  seeking qualified debt to provide up to $2 million in

23  new funds.

24          THE WITNESS:  Sure.                                   11:53:47

25  BY MR. NAWRACAJ:                                              11:53:48

                                                        Page 84

1      Q   So the question is how did -- how did that $2      11:53:48

2   million number be arrived at?

3      A   Sure.  We worked through a budget of what      11:53:54

4   operating expenses that we felt like that would operate

5   to get us a reasonable test of our ability to go out and

6   acquire leases, execute leases.

7         So not only our first ability to identify open      11:54:07

8   leases and then being able to go out and execute and

9   actually purchase a lease and then ultimately, you know,

10   look for a potential exit for that potential lease.

11   There are several potential exists.

12      Q   So you were doing budgets and pro formas?      11:54:23

13      A   We did.      11:54:27

14      Q   I thought when we talked about this earlier      11:54:27

15   that those weren't the activities that you guys

16   conducted when you were conducting business in Hopewell.

17   You were just kind of doing that on the fly.

18      A   You are mixing apples and oranges again, so you      11:54:37

19   are talking about two separate companies, TitleRover and

20   Hopewell.

21         Hopewell was an operating entity that went out      11:54:42

22   and raised capital for it that did have a budget, it did

23   have a pro forma.  It had all of the information you

24   typically -- that you have seen and it's gone to your

25   client.

```
 1            TitleRover was not.  TitleRover was a tool that    11:54:52

 2     was being developed.  To the extent that that tool was

 3     going to have some value and that we could get some

 4     traction on the results that it was -- that it was

 5     getting, then we would go out and put together a plan to

 6     raise capital and fund TitleRover; but that was not the

 7     objective of this document or the exercise of funding

 8     Hopewell.

 9        Q    Was there any discussion as far as of the funds    11:55:18

10     raised, how much would be used for the purposes of

11     acquiring new lease and mineral interests and that which

12     would be used for working capital?

13        A    Yes, sir, there was.                               11:55:31

14        Q    Can you describe that?                             11:55:33

15        A    Well, it was an estimated budget of, you know,     11:55:35

16     approximately a million dollars to fund the operating

17     expenses of Hopewell which we determined during that

18     pilot program we should be able to go out and execute

19     and purchase about a million dollars' worth of -- of

20     leases; so it was a million dollars of operating

21     expenses and a million dollars set aside to actually

22     acquire leases.

23        Q    Hopewell didn't have any employees at the time;    11:56:02

24     right?

25        A    Correct.                                           11:56:04
```

Page 86

```
 1      Q    And I think it was Joe Haynes, AIT, Substantia    11:56:07

 2   LogiX, they were vendors of TitleRover?

 3      A    Correct.                                          11:56:16

 4      Q    So when you say the operating expenses of         11:56:18

 5   Hopewell, generally what would those be?

 6      A    Those would be land expenses, legal expenses,     11:56:26

 7   consulting expenses by Tom or his entities.  It would be

 8   legal expenses of outside third-party law firms.  It

 9   would be land expenses, and it would be, you know, other

10   legal expenses or operating expenses related to the

11   service being provided by Beyond Review.

12      Q    When you hear the phrase working capital, what    11:56:55

13   do you generally think that to mean?

14      A    Working capital is typically what covers, you     11:57:02

15   know, the expenses of the business itself, so the SG&A

16   potentially.

17      Q    When you say the expenses, expenses --            11:57:15

18      A    It could be rent; it could be -- it could be      11:57:17

19   fees; it could be legal expenses; it could be employee

20   expenses, if you have employees; it could be contract

21   expenses as you have a contract.

22      Q    So, basically, expenses that are being incurred   11:57:29

23   while the business is being operated?

24      A    Correct.                                          11:57:35

25      Q    Okay.  11:58.  Do you want to take a break?       11:57:36
```

Page 87

```
 1        A    I could power through, if you want.        11:57:42

 2             MS. SWEENEY:   I am fine.                   11:57:48

 3   BY MR. NAWRACAJ:                                      11:58:03

 4        Q    If you could, turn to page 4.              11:58:04

 5        A    Are you done with Exhibit 4?                11:58:19

 6        Q    Yeah, for now.                              11:58:23

 7        A    Okay.   Where it says "Technology" at the top?   11:58:29

 8        Q    Yes.                                        11:58:31

 9        A    Because I don't see them numbered.   Okay.  11:58:31

10        Q    So the paragraph starts off with "The Founders   11:58:38

11   have arranged and provided a cost based contract to

12   Hopewell for the exclusive use of new proprietary

13   software technology owned by Title Rover, LLC."

14             So I am trying to understand what this new   11:58:53

15   proprietary software technology that's owned by

16   TitleRover, LLC is.   Can you describe that?

17             MS. SWEENEY:   Objection; asked and answered.   11:59:04

18             THE WITNESS:   I mean I am not -- I am not a   11:59:06

19   technologist.   It was the user interface and all the

20   tools that were behind that user interface that allowed

21   us to make the review of title a lot more efficient and

22   then to sort and pull documents together a lot more

23   efficiently.

24   BY MR. NAWRACAJ:                                      11:59:26

25        Q    Who developed the user interface?          11:59:26
```

Page 88

1     A    Joe Haynes with the -- with the feedback from        11:59:28

2  Brent, so Brent would analyze the business issues and

3  then he would communicate it and manage that to the

4  technologist in a way that he understood to be those

5  business needs.

6     Q    Was Joe Haynes -- did he contract directly with      11:59:45

7  TitleRover for this development?

8     A    Substantia LogiX, was my understanding, Joe          11:59:54

9  Haynes, Brent, and one other young lady.  That's who we

10 contracted with.

11    Q    Did you have a written agreement between             12:00:08

12 Substantia LogiX and TitleRover for this development?

13    A    I believe we did.                                    12:00:15

14    Q    Okay.  So, to recap, this Private Placement          12:00:30

15 Memorandum would have been reviewed by you prior to it

16 being sent to Justin?

17         MS. SWEENEY:  Objection; asked and answered.         12:00:52

18         MR. NAWRACAJ:  I will just rephrase it.              12:00:54

19    Q    If there was something wrong with this               12:00:55

20 document, would you say, hey, Tom or whatever, this

21 isn't right?

22    A    No question -- when you say you, again --            12:01:02

23    Q    I am sorry.                                          12:01:04

24    A    -- I want to make sure, you are talking              12:01:05

25 about --

Kramm Court Reporters, A Veritext Company
866-299-5127

```
 1        Q   Individually.                           12:01:07

 2        A   -- my capacity as a manager, yes, did I review   12:01:07

 3   this?  Yes.  And there is no question in my mind if I

 4   felt anything was not true or incorrect, I would have

 5   highlighted it and asked it to be changed.

 6        Q   Okay.  I am handing you Plaintiff's Exhibit   12:01:17

 7   Number 5.

 8            (Exhibit 5 was marked for identification   12:02:06

 9             by the court reporter and is attached hereto.)

10   BY MR. NAWRACAJ:                                  12:02:06

11        Q   You can take a moment to review that.    12:02:06

12        A   Do you want me to review the entire document?   12:02:10

13        Q   Well, you can just -- we will be talking about   12:02:14

14   specific ones, but just generally flip through it and

15   see if you recognize generally what it is.

16        A   It appears to be text messaging, some of them   12:02:38

17   individually between Chad Martin and myself and some

18   including others.

19        Q   Okay.                                    12:02:46

20            MS. SWEENEY:  And for the record, it does not   12:02:47

21   appear to be an entire length of the email or the text

22   chain, as evidenced by the numbers, which -- it begins

23   on page 41 of 146 and this particular exhibit ends on

24   page 61 of 146.

25            MR. NAWRACAJ:  That's correct.  The document   12:03:09
```

Page 90

```
 1    that we had been provided started on page 41.  And

 2    because there was no use for any of the text after page

 3    61, I didn't print it out, so it was quite long.

 4        Q   Going to page 1 of this exhibit, the very top      12:03:25

 5    left appears to be a text.  Is that your phone number,

 6    (713) 248-1555?

 7        A   That is.                                            12:03:40

 8        Q   Okay.                                               12:03:41

 9        A   Can we have that redacted so it's not a public     12:03:42

10    record?

11        Q   So --                                              12:03:47

12            MS. SWEENEY:  We --                                 12:03:48

13            MR. NAWRACAJ:  Go ahead.                            12:03:49

14            MS. SWEENEY:  Yeah.                                 12:03:49

15            MR. NAWRACAJ:  We can do that.                      12:03:50

16            MS. SWEENEY:  We can, yes, and we should do it,     12:03:51

17    also, for Mr. Martin's phone number as well.  I believe,

18    for the record, this was produced by your clients.

19    BY MR. NAWRACAJ:                                            12:04:05

20        Q   So it appears to be a text from you to Chad         12:04:05

21    Martin.  In the top left it says, Off to Miami.  No

22    problem at all if not interested or not in a position.

23    Truly, money isn't the issue.

24            What did -- what did you mean money isn't the       12:04:17

25    issue when you -- when you wrote that sentence in that
```

Page 91

```
 1   text?

 2        A    I wrote that like two years ago, so I can't        12:04:25

 3   tell you my -- you know, texting is kind of off the

 4   cuff, so I don't know what particularly I was referring

 5   to or what conversation I was referring to at that

 6   particular time.  I don't know if it's referencing even

 7   TitleRover or this deal.  We did look at other deals

 8   together as well.

 9        Q    Okay.  Maybe if you want to take some time to      12:04:48

10   review the rest of the text messages so it can refresh

11   your recollection as to which deal this involves.

12        A    I don't -- are you saying that these are only      12:04:55

13   text messages that only refer to deals or there are

14   personal text messages in here as well?

15        Q    No, I didn't pull your personal text messages.     12:05:03

16   This -- the only text messages that we going to go view

17   deal with communications concerning the investment in

18   Hopewell.

19            Now, there might be some back and forth that,        12:05:12

20   obviously, is irrelevant, but I can point you to the

21   ones that I am going to be focusing on.  There's about

22   10.

23        A    Not all of this -- I can see all of the front      12:05:22

24   page doesn't have anything to do with Hopewell or

25   anything else.  This is just two guys talking.  So,
```

Page 92

```
1    again, I don't -- I don't -- let's go through it.  I

2    mean I am happy to answer your questions.

3        Q   Okay.  So upper left, we have the text, "Off to    12:05:34

4    Miami.  No prob at all if not interested or not in a

5    position.  Truly, money isn't the issue.  Just want to

6    think this deal has and will have enormous upside in a

7    short period of time.  Would like some of my closest

8    friends to enjoy the ride.  Either way, let's connect

9    soon.  Mark."  My question is --

10         MS. SWEENEY:  And I am going to object.  The       12:05:56

11    document speaks for itself, to the extent there are

12    inconsistencies in the way you just read it versus the

13    document itself.

14         MR. NAWRACAJ:  Okay.                               12:06:02

15        Q   Do you remember what deal you are referring to   12:06:05

16    in this text which appears to be somewhere in or about

17    May of 2016?

18        A   I don't recall what that was.  I'd be           12:06:13

19    speculating.

20        Q   Okay.  Were you doing any other deals with Chad  12:06:17

21    at this time period other than possibly Hopewell?

22        A   I don't recall the time period -- yeah, we were  12:06:23

23    looking at -- we discussed a lot of different deals,

24    whether those were deals that he had or that I was

25    looking at, but I don't recall specifically what this
```

Page 93

1      was about, whether this was Hopewell or not.  It's

2      possible that it was and it's possible that it wasn't.

3      I just don't recall.

4          Q   I thought when we talked earlier when I asked      12:06:41

5      you if you did any other deals with Chad, I thought you

6      said no.

7          A   I did say no.                                      12:06:48

8          Q   Okay.  So what other deal would this be           12:06:49

9      referring to?

10         A   Well, we looked at a lot of other different        12:06:52

11     deals together.  So whether that was some of the deals

12     he was using on the housing side, whether those were

13     deals that I was -- I was involved in, we looked at a

14     lot of different deals.  We didn't do any other deals.

15     This is the only deal we did together.

16         Q   Okay.  Would there be any other deal that you      12:07:03

17     can think of other than Hopewell that these -- that that

18     particular text would be concerning?

19         A   As I sit here today, no.                           12:07:15

20         Q   And this is -- appears to be early May.           12:07:19

21         A   Um-hum.                                            12:07:24

22         Q   And I think that's when you testified Hopewell     12:07:25

23     was first formed is somewhere around there; Q1/Q2 2016?

24         A   I said the first or second quarter of 2016.        12:07:35

25         Q   Okay.  And this is within the first or second      12:07:38

Page 94

1    quarter, May?

2         A    It says May 2016, I would consider that to be        12:07:43

3    the second quarter of 2016.

4         Q    Okay.  If you go to the text at the bottom left       12:07:48

5    of what is titled at the bottom right page 41/146.

6         A    Um-hum.                                               12:08:01

7         Q    It starts off with the word "Cool."                  12:08:05

8         A    Yup.                                                  12:08:08

9         Q    And I will try to read this accurately.  "I          12:08:10

10   want to visit with you on this deal.  Truly don't need

11   the capital as I already have a" -- I think is couple --

12   "family funds wanting to take it all.  However, want to

13   give close friends a look."

14        A    Correct.                                              12:08:32

15        Q    "Truly the biggest deal I have ever had an           12:08:33

16   opportunity to take down."  Do you remember what this

17   text was about, what deal we are talking about here?

18        A    Yeah, I do believe this text was talking about        12:08:44

19   Hopewell.

20        Q    And earlier when we talked about your                12:08:52

21   experience, you have done a lot of big deals --

22        A    Um-hum.                                               12:08:57

23        Q    -- in your -- in your time before Hopewell.  So       12:08:57

24   when you state, "Truly the biggest deal I have ever had

25   an opportunity to take down," did you see enormous

Page 95

```
 1   incredible opportunity with this?

 2        A   I did.  Absolutely.                       12:09:13

 3        Q   And when you say, "Truly don't need the capital   12:09:18

 4   as I already have a couple of family funds wanting to

 5   take it all, what family funds are you referring to?

 6        A   Sure.  There was a gentleman that we hired,    12:09:28

 7   Jeff Firestone, who represented a family office that we

 8   were in connection with that he said potentially had an

 9   interest in taking it all down.

10        Tom's son represented a family office out of        12:09:46

11   New York.  They had an interest in potentially taking it

12   all down.

13        And I know that SMH was never considering           12:09:56

14   taking it all down, but they were interested in the $1

15   million kind of range.

16        We had Greg Kane's, you know, potential partner     12:10:03

17   interested in a half million dollars.  Whether that was

18   in this time period or not, I don't -- I don't recall

19   it.  I'd have to look at the dates.  But we had a lot

20   of -- we had -- we had tons of interested parties

21   interested.

22        Q   And out of all of those interested parties, how   12:10:21

23   many invested roughly?

24        A   I would have to count how many investors we      12:10:25

25   have right now.  Off the top of my head, more than five,
```

Page 96

```
 1    less than 12.

 2        Q    Can we turn to -- I think it's the third page,      12:10:31

 3    physical page of the exhibit.  It's entitled page 43 at

 4    the bottom right.

 5        A    Um-hum.                                              12:10:44

 6        Q    The text -- the top gray text on the left           12:10:49

 7    starts with "Ok."

 8             "Ok.  Just keep me posted.  I am way over           12:10:57

 9    committed on my deal but truly want to tell you about

10    it."  What do you mean when you state you are way over

11    committed on my deal?

12        A    We had a lot of people saying that they were        12:11:11

13    going to invest somewhere between X and Y.  And when you

14    added all that up, it over exceeded the amount that we

15    were trying to raise.

16        Q    When you say commitment, was it something in        12:11:25

17    writing that they committed to, these other investors?

18        A    No, no one commits in writing until it's time       12:11:31

19    to sign.  They express interest and say, I am interested

20    in this range.  So you add that up and that's -- that's

21    where I came up with the -- with the number that I am

22    referring to.

23        Q    So it was a verbal commitment by these third        12:11:45

24    parties, nothing that was enforceable?

25        A    Verbal.  That's correct.                            12:11:49
```

Page 97

```
 1       Q    Okay.  When you say over committed, that        12:11:53

 2   assumes that there is a level of dollars that you are

 3   looking to raise and over committed means that you have

 4   more than that potentially.

 5       A    I had -- what I mean by that is I have more      12:12:04

 6   interested parties to -- that have given me an amount

 7   that they are willing to invest, a range that exceeded

 8   the amount of capital that we were looking to raise.

 9       Q    And when you approached these other parties,    12:12:17

10   one question I have is, how did you value Hopewell?

11   When you went to them and asked them for money,

12   typically an investor would say, okay, I am interested

13   if I give you X dollars.

14       A    Um-hum.                                          12:12:35

15       Q    What's my interest, the pre-money valuation,    12:12:36

16   how did you do that with Hopewell at this time in May of

17   2016, a month after it was formed?

18            MS. SWEENEY:  Objection; vague.  Can you         12:12:48

19   clarify whether you are asking about you meaning

20   Hopewell or you meaning Mr. Willis?

21            MR. NAWRACAJ:  Meaning Mr. Willis.               12:12:56

22       Q    If you approached these potential third parties  12:12:58

23   for money, usually they'll ask what's the valuation of

24   the company.

25       A    Okay.  Yeah, and they approached Hopewell, me   12:13:09
```

Page 98

1    as a manager in my capacity of Hopewell, and they asked

2    me that valuation; and at that particular time, we

3    substantiated the valuation that we were asking for.

4        Q    Which was?                                    12:13:20

5        A    As I sit here today, I can't recall the exact  12:13:22

6    valuation, but whatever we had in -- in this deal.

7        Q    So when you made this statement and you are   12:13:49

8    talking about over commitment, third parties potentially

9    being interested in investing, and this is in May.

10       A    Um-hum.                                        12:13:58

11       Q    It looks like right before May 25th, based on  12:13:59

12   the text.  Did Hopewell have any assets?

13       A    Did Hopewell -- sure.                          12:14:07

14       Q    Which assets were those?                       12:14:12

15       A    At that particular time, we had -- we had the  12:14:14

16   assets of, one, knowing about the potential opportunity

17   in itself and as it existed, all the work that Greg Kane

18   had gone in to identifying the opportunity; maps,

19   potential issues were already discovered by Greg,

20   potential already that needed to be vetted out by the

21   legal community.

22            I'd have to look at when we entered into our   12:14:39

23   deal with Mark Bush who gave us, you know, potentially

24   seven figures' worth of data and information, maps, and

25   well control and logs and everything for wells in that

                                                     Page 99

```
 1    particular area.

 2          So, yeah, we -- we believed that we had -- we      12:14:52

 3    had quite a bit of value.

 4       Q    Okay.  If you can turn to page 6 of that         12:15:13

 5    exhibit.

 6       A    Is that 46 or --                                 12:15:22

 7       Q    Yeah, 46.                                        12:15:22

 8          At the very bottom, there is a gray text that      12:15:30

 9    appears to be from your phone.  "Chad, I am emailing you

10    a confidentiality agreement.  It's for a land oil and

11    gas play that I want to share with you.  I am currently

12    over subscribed so there is no pressure other than if

13    interested you will need to get with me ASAP so I can

14    explain.

15          "I truly think it is a once in a lifetime          12:15:58

16    opportunity with upside that is also unbelievable.

17          "I am using rediscovery technology on title,       12:16:06

18    regulatory and compliance issues with oil and gas.

19          "I am raising between 1-2m from friends and        12:16:15

20    family and have several already interested in putting a

21    25m acquisition fund in place.

22          "I have been holding out for you for the last      12:16:26

23    couple of weeks but" I -- excuse me -- "but have a

24    partner who also has friends that one in."  I think that

25    may be want in.  I don't know.
```

Page 100

```
 1        A    Probably.                                    12:16:43

 2        Q    "Accordingly, I can't hold it much longer."  So   12:16:44

 3   I'd like to go through this.   The date of this text is

 4   June 1st --

 5        A    Um-hum.                                       12:16:55

 6        Q    -- according to this document.               12:16:56

 7             What enforceable funding commitments did you  12:17:02

 8   have from third parties as of June 1st, 2016?

 9             MS. SWEENEY:   Objection.  It calls for a legal  12:17:16

10   conclusion.

11             THE WITNESS:   I don't know where I said -- used  12:17:20

12   that language anywhere in what you are referring to.

13   But as I sit here today, I don't know what hard

14   commitments we had and which ones we didn't by June 1st.

15   BY MR. NAWRACAJ:

16        Q    Okay.  I am looking at the third paragraph of  12:17:32

17   that text bubble.  "I am raising 1-2m from friends and

18   family" --

19        A    Um-hum.                                       12:17:40

20        Q    -- et cetera, and I am just trying to figure  12:17:40

21   out how accurate that statement is.

22        A    Sure.                                         12:17:46

23        Q    It's one thing, obviously, if you talk casually  12:17:47

24   with potential investors.  It's also a different thing

25   that -- you know, if those investors commit in writing
```

Page 101

```
 1    to invest.  Do you know where you stood in that time --
 2    you know, in that range with respect to this 1 to 2
 3    million?
 4        A    I have -- I have never been involved where        12:18:06
 5    someone puts something in writing, saying they are
 6    intending to invest, unless they are acquiring or
 7    anything else.
 8            But are you asking did we have interested          12:18:15
 9    parties for this at that particular time frame?
10        Q    Yeah, but I'd like to jump to -- you said you     12:18:22
11    never had been involved where you -- anybody commits in
12    writing to invest?
13        A    Not where there's not a mutual commitment back.   12:18:30
14    I mean if -- like I can say I will invest up to a
15    million dollars and that's just an open slate for you to
16    go out and shop that all you want and, you know, we will
17    invest if we want.
18            If someone -- if you come to terms of an           12:18:42
19    investment of a million dollars and they are committed,
20    we'll take their money unless we have someone else under
21    better terms, clearly, unless there was something in
22    their offering that didn't match what we were asking
23    for.
24        Q    Right.  You might execute something called a      12:18:53
25    subscription agreement?
```

Page 102

```
 1        A    Sure.                                      12:18:57

 2        Q    Okay.  Was any of these potential investors for   12:18:57

 3   1 to 2 million from friends and family, at that point,

 4   were they executing subscription agreements?

 5        A    I don't believe at June that's the case.  As I    12:19:07

 6   sit here, I -- I don't recall, but I don't believe that

 7   to be the case.

 8        Q    Did any of those friends and family that          12:19:13

 9   represented the 1 to 2 million actually invest in

10   Hopewell?

11        A    I believe they did.                               12:19:21

12        Q    How much did they invest?                         12:19:23

13        A    I'd have to go back and -- and calculate.         12:19:25

14   Ultimately, I know we had early conversations with the

15   Sanders Harris Group who put a million dollars in.

16             There was another gentleman or two other         12:19:34

17   gentlemen.  Trent was early on.  There was another --

18   Gilbert was early on.  And there were a bunch of others

19   that committed, that ultimately when it came to writing

20   a check, did not go forward.

21             And I can't -- there's a list of those           12:19:52

22   somewhere or at least there was a list -- a written

23   list, if not a formal list, at one particular time.

24        Q    Of those that did not go forward or those --      12:20:00

25        A    No, just a list of potential guys that were       12:20:02
```

                                                        Page 103

```
 1   interested and what range.
 2       Q   Okay.                                        12:20:06
 3       A   Yeah.                                        12:20:06
 4       Q   Do you remember what the total was of those  12:20:07
 5   interested investors?
 6       A   It was -- it was well over the amount that   12:20:11
 7   we -- that we were looking to raise.
 8       Q   Okay.  Well over the 2 million that you were 12:20:15
 9   looking to raise?
10       A   Correct.                                     12:20:18
11       Q   Okay.                                        12:20:18
12       A   Yeah, I think Greg Kane had someone that wanted 12:20:19
13   to put in a half million to a million dollars in and
14   that was still on the table at this particular time.
15       Q   What would you estimate, not guess, of all   12:20:29
16   those investors that were lining up to put money into
17   the company, who actually did percentage-wise?  Half of
18   them?
19       A   Oh, no.                                      12:20:41
20       Q   A quarter?                                   12:20:42
21       A   I'd be speculating.  I don't recall their    12:20:44
22   percentages.  Some of them either we didn't follow up on
23   or that we had -- felt like we had the commitments and
24   then some of them that was puffery that said they were
25   interested in investing until it came to writing a
```

Page 104

```
 1    check.

 2         Q    I would imagine that --                  12:21:03

 3         A    Some of them that's pretty normal.       12:21:05

 4         Q    Right.  And I would imagine the larger the   12:21:07

 5    check they either wrote or committed to write, the more

 6    they would stick in one's memory?

 7         A    Not necessarily.  Whether someone put $50,000   12:21:14

 8    in or 3 or $400,000 in, it doesn't stick in memory to me

 9    or committed to put a million dollars in, it doesn't

10    particularly stick to memory any more than the other.

11         Q    On this $25,000,000 acquisition fund --   12:21:28

12         A    Um-hum.                                   12:21:34

13         Q    -- what does it mean, "several already    12:21:36

14    interested in putting a 25m acquisition fund."  Who is

15    the several that you are referring to?

16         A    I can't remember everybody.  I do remember a   12:21:45

17    couple of them.  The family office I know that Firestone

18    had, he -- he represented that they had the ability to,

19    you know, write the larger play because some -- you

20    know, part of the problem when you are hitting venture

21    capital or -- deals could be too small and they are

22    easier to get done at a much larger level.

23              Tom also had some conversations with the -- I   12:22:06

24    believe a couple of funds, but one particularly that

25    stands out in my mind is the one that his son worked for
```

Page 105

```
 1    at that particular time; it was a family office.

 2          And they -- I forgot -- they had some funds      12:22:15

 3    available and a fund that was about ready to be wound up

 4    that was around $25 million that they said that they had

 5    a strong indication of interest of potentially

 6    investing.

 7        Q   Did they write an email to that effect, a       12:22:30

 8    strong indication, a strong interest?

 9        A   I don't recall.                                 12:22:35

10        Q   Whatever happened to --                         12:22:36

11        A   I trusted -- I trusted Tom when he -- when he   12:22:36

12    told me.

13        Q   Whatever happened to those, I guess the funds?  12:22:39

14        A   I -- I don't think that we got to the stage     12:22:41

15    through the pilot program to -- to be able to

16    demonstrate the ability to go out and get the -- the

17    larger funds.  That was the whole purpose of the pilot

18    program.

19        Q   The $25 million acquisition fund is not for --  12:23:00

20    I am confused when you say you have to get the pilot

21    program in first.

22        A   Well, the pilot program, I believe, we could go 12:23:08

23    out and execute on a larger scale.  The whole reason why

24    we did a Hopewell pilot program is to prove up what we

25    thought was in our -- our business thesis.
```

Page 106

1      Q    And you are trying to prove it up with          12:23:20

2    technology that's being developed at the time; right?

3      A    No, the technology was nothing more than a       12:23:25

4    tool.  The play was the play by itself.  The technology

5    had nothing to do with the play.

6      Q    Was the technology fully functional when you      12:23:33

7    wrote this text?

8      A    The technology had nothing -- this has to do     12:23:37

9    with Hopewell.  It has nothing to do with TitleRovers.

10   I don't know the relevance of those two questions.

11     Q    Well, the relevance is -- I forgot what we        12:23:45

12   marked these exhibits.

13     A    It says e-discovery technology.  It doesn't say   12:23:48

14   we are using TitleRover technology or proprietary

15   technology.  It doesn't say -- I mean it doesn't say any

16   of that stuff.  It says I am using e-discovery

17   technology.  That's what we are utilizing.

18     Q    So are you saying that the TitleRover             12:24:01

19   technology is irrelevant to the Hopewell activities?

20     A    I am saying that the TitleRover technology just   12:24:10

21   made the Hopewell activities more efficient.  This has

22   nothing to do with the success or failure of Title- --

23   of Hopewell.

24     Q    What was the pivotal point for the success or     12:24:21

25   failure of Hopewell?

                                                      Page 107

```
 1        A    Our ability to identify and execute on open        12:24:26

 2   leases in areas that were controlled in AMI by a

 3   particular oil and gas company, whereby we are now in

 4   the area of mutual interest to participate in the -- in

 5   the future development of that particular AMI -- or of

 6   that particular unit.

 7        Q    So if the TitleRover technology is not relevant    12:24:46

 8   to Hopewell's success, why would you be spending $17,500

 9   a month on a license fee --

10        A    Um-hum.                                            12:24:58

11        Q    -- when Hopewell -- and I can get the bank         12:24:58

12   statements at any given time --

13        A    Sure.                                              12:25:03

14        Q    -- had 10 or $15,000 in the bank?                 12:25:03

15        A    Yeah.                                              12:25:06

16        MS. SWEENEY:  Objection.  It misstates prior           12:25:06

17   testimony, it lacks foundation.

18        THE WITNESS:  Do you want me to clear that up           12:25:09

19   for you?

20   BY MR. NAWRACAJ:                                             12:25:15

21        Q    Sure.                                              12:25:15

22        A    Title- -- Title- -- because it was making         12:25:15

23   TitleRover's job a lot more efficient.  So the tools --

24   and if you talk to the land people that utilized the

25   tools, they'll tell you that it made their job more
```

Page 108

```
 1    efficient.
 2            So the spending of the 17,000 we believe had a    12:25:25
 3    great ROI based on the services that we were getting
 4    from -- from TitleRover as well as the potential upside
 5    potentially of -- of developing the software.
 6        Q   If we can turn to page 7 of that exhibit,         12:25:42
 7    there's a text.  It is the second one from the top
 8    that's gray, starting with "Yep, I know."
 9        A   Okay.                                             12:26:16
10        Q   "Yep, I know.  That's why I want you in.  Y'all   12:26:19
11    both sit with me.  Truly only want you in bc I am soo
12    confidently.  Or I would just take the other money.
13    Truly if not a good time I totally understand.  This is
14    probably a 8 month to 18 month play.  Enormous leverage
15    with little downside."
16        A   Um-hum.                                           12:26:42
17        Q   So that last statement, "Enormous leverage with  12:26:43
18    little downside," what basis did you have to make that
19    statement?
20        A   Well, when you are able to buy in to an energy    12:26:56
21    company's play that spent significantly more money than
22    you did on a development play and you had a handful of
23    companies out there that controlled this play, to the
24    extent you can -- you can identify opportunities within
25    each of those plays, you are putting up a lot less cash
```

Page 109

```
 1    than they did to actually go out and hold the play

 2    itself.

 3          So to the extent they want to develop it, they      12:27:25

 4    have to deal with you.  Either they have to give you

 5    some type of carried interest or you get -- you know,

 6    you have the right to participate.

 7          But you are in their play a lot less than they      12:27:34

 8    got into it, so it gives you tremendous leverage over

 9    those companies that want to go out and explore those,

10    for them to come back in and work a deal with you,

11    either for your right to participate in the wells or

12    your right to have them buy you out at a rate that's

13    acceptable with maybe some override or some carried

14    interest, but it gives you a lot of leverage over those

15    companies that want to go out and potentially develop

16    those when prices come back up.

17       Q   And those places were identified through the      12:28:02

18    information from Greg Kane and/or Mark Bush?

19       A   No, those opportunities were identified either     12:28:08

20    by Greg Kane or by opportunities that we might have

21    identified through our process of analyzing data and

22    looking at leases.

23       Q   Did you do any of those plays at the time this     12:28:17

24    text was written?

25       A   I am sorry?                                        12:28:21
```

Page 110

```
 1        Q    Did Hopewell execute on any of these, quote,      12:28:22

 2    unquote, plays?

 3        A    No.  At that particular time, we had not          12:28:27

 4    purchased any of those plays.  We were -- I think we

 5    were starting to catalog potential opportunities that

 6    had significant upside that were still subject to more

 7    legal examination.

 8        Q    Okay.  I think we need to take a quick break       12:28:42

 9    for the media.

10        A    Okay.                                              12:28:46

11             THE VIDEOGRAPHER:  We are going off the record.    12:28:47

12    The time is 12:28.

13             (Lunch recess.)                                    12:28:51

14             THE VIDEOGRAPHER:  We are going back on the        13:04:25

15    record.  This is the beginning of media number three.

16    The time is 1:04.

17             (Exhibit 6 was marked for identification           13:04:30

18               by the court reporter and is attached hereto.)

19    BY MR. NAWRACAJ:                                            13:04:30

20        Q    I am handing you Plaintiff's Exhibit Number 6.     13:04:32

21    And maybe just briefly flip through it.  I will just go

22    through certain pages.

23             MS. SWEENEY:  Counsel, am I correct that this      13:05:12

24    exhibit contains three separate documents?  Is that your

25    understanding?
```

                                                    Page 111

```
 1              MR. NAWRACAJ:  Yes.                    13:05:18

 2              MS. SWEENEY:  Okay.                    13:05:19

 3              THE WITNESS:  Okay.                    13:07:17

 4     BY MR. NAWRACAJ:                                13:07:18

 5         Q   All set?                                13:07:18

 6         A   Sure.                                   13:07:19

 7         Q   Okay.  So the first page is entitled "Data   13:07:19

 8     Mining for Mineral Resource Investigations," dated July

 9     25, 2016, with the TitleRover, LLC insignia on the

10     bottom right; and it goes for 11 pages to what's been

11     Bates stamped as plaintiff's number 680 on the bottom

12     right.

13              This appears to be a document that was    13:07:50

14     generated by TitleRover, LLC in connection with pitching

15     the technology, if you will.  Do you recognize it?

16         A   Yeah, I believe I have seen this before.   13:08:06

17     Um-hum.

18         Q   Okay.  As we discussed earlier, on items that   13:08:10

19     were material such as pitch decks, would it be something

20     that would be forwarded to you for review and approval?

21              MS. SWEENEY:  Objection.  It lacks foundation,   13:08:23

22     it assumes facts.

23              THE WITNESS:  Typically, all these things would   13:08:27

24     be forwarded to me for my input or approval.

25     BY MR. NAWRACAJ:                                13:08:34
```

                                           Page 112

1     Q    Okay.  Do you remember reviewing this document?    13:08:34

2     A    As I sit here today, I don't recall the exact    13:08:39

3     time I reviewed it.  I remember seeing it, but I

4     don't -- no instance sticks out in my mind.

5     Q    Okay.  But in the normal course of events for    13:08:49

6     TitleRover, assuming normal course of events, it would

7     have been something forwarded to you or at least cc'd to

8     you before going out?

9     A    I believe that's correct.    13:09:01

10     Q    Okay.  On page 2, if you can flip to page 2,    13:09:02

11     there's a title "Who We Are."

12          "TitleRover LLC is a Willis Group US affiliate    13:09:09

13     headquartered in Houston, Texas."  What does it mean by

14     Willis Group US affiliate?

15     A    I didn't think much of it.  It means Willis    13:09:21

16     Group owns 50 percent of the business.

17     Q    Okay.    13:09:26

18     A    Yeah.    13:09:27

19     Q    Right below it, the paragraph "TitleRover has    13:09:27

20     developed the proprietary technology workflow and

21     interface to power the data processing function which is

22     the key to automating and expediting much of the work

23     associated with traditional prospect area opportunity

24     analysis."  On July 25th, 2016, was the TitleRover

25     technology developed?

Page 113

```
 1        A    There had been technology that had been          13:09:58

 2   developed by that time, yes.

 3        Q    Was it proprietary?                               13:10:03

 4        A    Sure.                                             13:10:06

 5        Q    All of it?                                        13:10:06

 6        A    What do you mean by proprietary?  Our workflow,   13:10:08

 7   our interface, all of that was proprietary.

 8        Q    Yeah, generally proprietary means that you own    13:10:14

 9   it.  It's not a third-party --

10        A    Right.                                            13:10:18

11        Q    -- tool?                                          13:10:18

12        A    That's right.                                     13:10:19

13        Q    Was any of this involving BeyondRecognition?      13:10:19

14             MS. SWEENEY:  Objection; vague.                   13:10:25

15   BY MR. NAWRACAJ:                                            13:10:26

16        Q    Any of this technology, the technology that's     13:10:26

17   referred on line 2 in paragraph 2.  Proprietary

18   technology, did that incorporate at all --

19        A    I'd -- I'd be speculating if -- if they were      13:10:37

20   trying to include that or not.  My assumption is that it

21   was -- you know, it read appropriately at the time I

22   read it and it still does.  It's -- I don't know what he

23   was trying to include.  I -- I didn't author the

24   document.

25        Q    Do you have any idea who might have authored      13:10:52
```

Page 114

```
 1    it?

 2         A   I believe it was between Tom and Brent that put      13:10:55

 3    this together.

 4         Q   On July 25th, 2016, when this presentation is        13:11:05

 5    dated, was the TitleRover proprietary technology

 6    automated?

 7         A   I'd have to look at dates of when certain            13:11:20

 8    things were -- but my assumption, as I sit here today,

 9    that it was automated.  That there were portions of it

10    that were automated; that we did have a user interface

11    because we are -- we are mentioning it here in the -- in

12    the document.

13         Q   When the statement is made that "data               13:11:41

14    processing function which is the key to automating and

15    expediting much of the work associated with traditional

16    prospect area opportunity analysis," what does it mean

17    that it's the key?

18         A   I have --                                           13:11:58

19             MS. SWEENEY:  Objection.  It calls for              13:11:59

20    speculation.

21             THE WITNESS:  Again, I wouldn't -- I'd have --       13:12:00

22    I'd have to have you refer to Brent and Tom as it

23    related to that statement.

24    BY MR. NAWRACAJ:                                             13:12:09

25         Q   So you don't know whether or not data               13:12:09
```

Page 115

```
 1    processing functionality is key to the TitleRover

 2    technology?

 3        A    Oh, I believe that data processing was key to    13:12:17

 4    it.  That's what we did, is we took large chunks of

 5    title work and data and -- and made it more efficient to

 6    read through it and go through it.

 7        Q    How did you do that?  How did you make it more   13:12:30

 8    efficient -- or as it says in line 3 -- process?

 9        A    That there's a lot of different ways, taking     13:12:37

10    out specific documents, clustering documents for very

11    specific -- whether that's by -- by company, by

12    language, by phrase, by mile markers.  There's a lot of

13    different ways to -- to organize the documents,

14    depending on what you are looking for.

15        Q    So when you organize documents, how is it done,   13:12:58

16    is it done by looking at the content of the documents

17    and then organizing them by content?  In other words, do

18    you -- you have old deeds, documents that you might find

19    in the county recorder's office.  Somehow you have to

20    now digitize them; right?

21        A    They have to be put into digital format if you    13:13:27

22    want to search -- do anything with them --

23        Q    Right.                                            13:13:31

24        A    -- on a database.                                 13:13:32

25             MS. SWEENEY:  For the purpose of these            13:13:33
```

Page 116

```
 1    questions, when you refer to "you," are you talking

 2    about TitleRover?

 3           MR. NAWRACAJ:  Yeah, it would be TitleRover.  I     13:13:37

 4    will make it clear.

 5           MS. SWEENEY:  Okay.                                  13:13:40

 6           MR. NAWRACAJ:  TitleRover would have to             13:13:41

 7    digitize.

 8       Q    So did TitleRover digitize it or was there a       13:13:43

 9    third party digitizing these hard copies?

10       A    Well, to the extent that we could get our hands    13:13:49

11    on databases that had some digital component to it,

12    because certain time periods allowed digitization and it

13    didn't.  Certain time periods we had to go back to, you

14    know, a handwritten title.

15           So it just depends on whether it was in a           13:14:04

16    typewritten form that you could organize it or whether

17    you had to utilize other technologies, handwriting kind

18    of technologies to help you organize or identify and --

19       Q    Okay.  So once when it's digitized, meaning the    13:14:19

20    documents, how do you bring it to a form where you can

21    process the data?

22       A    Once we digitized the data, how did we process     13:14:34

23    it?

24       Q    Right.  So from a layman's perspective, I look     13:14:38

25    at digitizing kind of like scanning.
```

Page 117

```
 1        A    Um-hum.                                    13:14:45

 2        Q    So I go to the county recorder's office, I can   13:14:45

 3    scan a bunch of documents.  To me, that's what

 4    digitizing is.

 5        A    Okay.  That's fair.                        13:14:51

 6        Q    So, then, those documents -- like this one;   13:14:52

 7    right?

 8        A    Um-hum.                                    13:14:57

 9        Q    It's electronic but it has content in it.   13:14:57

10        A    Sure.                                      13:15:00

11        Q    So somehow you have to extract that content, I   13:15:00

12    believe, in order to be able to use that content to

13    figure out relationships between documents.

14        A    Is that a -- is that a --                  13:15:15

15        Q    I mean --                                  13:15:17

16        A    -- question or --                          13:15:17

17        Q    -- do you agree with that?                 13:15:18

18        A    I agree that's probably one of the things that   13:15:19

19    you have to do.  I don't know if you have to extract the

20    content.  I think you can leave the content where it is

21    and pull like and similar documents that have that same

22    content.

23             For example, it could have a certain        13:15:30

24    phraseology; you know, more or less than, for example.

25    More or less than could have some ambiguity as it
```

Page 118

```
 1    relates potentially to title.
 2            If I wanted to pull all the title work in a      13:15:44
 3    particular area that has more or less than, I could do
 4    that.  I could also do that by company; I could do that
 5    by landman; I could do that by a lot of different
 6    things.  I could do that maybe by mile marker.
 7            So there's a lot of different ways I can pull    13:15:59
 8    like and similar documents that may or may not be
 9    content-necessarily related, depending on what we are
10    looking for.
11        Q   I guess the question I have is, is optical       13:16:09
12    character recognition key in order to take the digitized
13    image and convert it into data that can be searched,
14    processed, or assimilated with other data?
15        A   I don't -- I don't know if optical or not is     13:16:31
16    the right word.  That has -- optics has a very
17    visualization connotation to me but, certainly, there's
18    technologies out there that we are familiar with that --
19    as a matter of fact, Brent -- Brent developed one that
20    was more optical, and that could be a marking on a
21    particular page.  We could pull a squiggly line that was
22    in that spot on every document that was out there.  It
23    had nothing to do with the content, but it could be just
24    a marking.
25        Q   The ability, though, to take that image, if you  13:17:01
```

Page 119

```
1    will, on a scanned digitized --

2         A    That would be one of the ways to do it.      13:17:09

3         Q    Right?                                         13:17:11

4         A    One.  Um-hum.                                  13:17:11

5         Q    So what tool did TitleRover use to do that?   13:17:12

6         A    I don't know.  I am -- I am not a technologist.  13:17:18

7    I just know that it was communicated to my -- my

8    technology team of what the end result was ultimately at

9    that particular time.

10        Depending on the -- the problem we were trying      13:17:29

11   to solve from a landman, it matched up.  Did it work?

12   Ah, yes.  It was a lot easier to pull them together a

13   lot quicker, that information a lot quicker.

14        Q    Do you remember TitleRover experiencing any    13:17:40

15   problems with taking digitized images and converting

16   them into searchable data?

17        A    We encountered all sorts of problems.  That    13:17:59

18   was -- what we were trying to do is to identify those

19   problems that landmen or legal folks had and tried to

20   narrow it, so we had eyeballs looking at -- at fewer

21   problems.

22        Q    Okay.  So when this presentation was developed  13:18:16

23   or, I should say, when it's dated July 25th, 2016, what

24   sort of support did -- did TitleRover have in the form

25   of testing, whether it's its own testing or actual
```

Page 120

```
 1    records that it pulled from county facilities to claim

 2    that it was automated, that -- to make the claims in

 3    paragraph 2?  Do you know any sort of testing that was

 4    done before that?

 5            MS. SWEENEY:  Objection; vague, it lacks          13:18:59

 6    foundation, and the document speaks for itself.

 7    BY MR. NAWRACAJ:                                          13:19:04

 8       Q    Okay.  Let's just go back, then.  What sort of   13:19:04

 9    testing was done on the TitleRover technology to make

10    sure that it's actually performing in connection with

11    this presentation?

12       A    Well --                                          13:19:12

13            MS. SWEENEY:  Objection.  It's asked and         13:19:13

14    answered.

15            THE WITNESS:  I think we -- we could visually    13:19:14

16    look at information and then the -- they'd pull

17    information for us and we'd go back and verify is that

18    information correct, is the chain of title correct.

19            And we go back and if we see if we are chaining  13:19:26

20    title, for an example, did it chain everything

21    correctly.  We go back and have an educated landman or a

22    title expert go by and, yup, everything matches up.  It

23    pulled everything you wanted to.  It chained it

24    properly.

25    BY MR. NAWRACAJ:                                         13:19:39
```

                                            Page 121

```
 1        Q    Was that done?                              13:19:39

 2        A    Yes.                                        13:19:40

 3        Q    And who did that?                           13:19:41

 4        A    The people we had working for us.  I mean -- so  13:19:44

 5   we had -- you know, we had land folks interacting with

 6   Brent and Brent interacting with technology; so they

 7   interacted.  Did this work?  Did that not work?  Yes, it

 8   pulled everything.  That was the dialogue that went back

 9   and forth on a -- on a daily regular basis.

10        Q    Okay.  So I understand the checking by people  13:20:03

11   on whether or not the output of the technology was

12   correct.  What I am trying to understand is how the

13   technology worked, the TitleRover technology is what I

14   am referring to.

15             So, again, sorry if it's basic or -- I am   13:20:21

16   trying to understand here.  You have scanned documents

17   or text feeds from county recorder's offices, I believe.

18        A    Okay.                                       13:20:40

19        Q    Then what happens?  How does TitleRover     13:20:42

20   technology take that -- and, in particular, the scanned

21   images -- to figure out if there's any, say, breaks in

22   the chain of title?

23        A    Well, because now we have got a complete -- we  13:20:58

24   have all the data and information that a landman might

25   have to normally typically go to the courthouse and pull
```

Page 122

1     themselves.

2           Now they don't have to go to the courthouse and     13:21:09

3     drive 60 miles away and get a per day per diem charge

4     and pay for food and lodging and inefficient time.

5     Instead, they can do that right from their desk, so

6     that's a huge advantage in digitizing title records.

7           So once you do that, you've captured all the --     13:21:28

8     you know, not only all the stuff that's already

9     digitized, the stuff that wasn't digitized but it was in

10    typeable format; and then you go all the way back to

11    potentially handwritten documents.

12          Those get extrapolated and put into a database,     13:21:42

13    so then now everything is searchable electronically.

14    Now you can move them and organize them and search them

15    and do everything you can that gives you the advantages

16    of having things loaded electronically in a database.

17    Q   How would that -- how would that information be     13:21:58

18    put in a database, would it be human intervention or

19    would that be automated through the software?

20    A   It could -- it could be a lot of different     13:22:06

21    ways.  If we got an electronic version from a county

22    courthouse record, we could take that version and upload

23    it and, you know, it's from what date to what.

24          So if it was -- if it gets uploaded every June,     13:22:16

25    we know it was accurate; and if we are sitting in July,

                                                        Page 123

```
 1    let's say July 31st and the last time the records we got

 2    were updated in June, then guess what, we are missing 30

 3    days.

 4          If we are going to make a business decision          13:22:29

 5    about title, we only have 30 days' worth of title to go

 6    up and review.  We are comfortable from the time that we

 7    did it back until the courthouse either gives us a new

 8    digitized copy or we manually entered it.

 9      Q   Okay.  So if the courthouse -- or excuse me --       13:22:43

10    if the county recorder's office gave you a digitized

11    image, could someone click a button or other interface

12    using the TitleRover technology so that that digitized

13    image is now -- the data is extracted and it's able to

14    magically perform an analysis and tell you whether or

15    not there's a break in the title?

16      A   Well, I think you are oversimplifying it.  But       13:23:14

17    it's -- again, it gives you all of the information that

18    you would have at the courthouse.

19          The difference is is you now get to sit at your      13:23:23

20    desk and look at it, so you are saving yourself days and

21    information of going in.

22          It's not uncommon, when you go to the                13:23:31

23    courthouse, somebody has checked out a book.  Guess

24    what?  If there's a -- it's not uncommon for oil and gas

25    companies to hide that book, to, you know, have that
```

Page 124

1    book checked out every single day for the next month.

2    Okay?  So that's not letting the competition come in and

3    review that title.

4          So, yes, you are saving a lot of time of          13:23:48

5    expense, per diem, travel, landman time, and everything

6    else by digitizing it and being able to review it right

7    there at your desk.  That alone is a huge win.

8          Putting tools around it, call it icing on the     13:24:02

9    cake, are going to make you that much more efficient to

10   be able to go through and review those documents quicker

11   than anybody else.

12   Q    So I understand what you just said as far as       13:24:12

13   being able to review on the portal the digitized

14   records.  Was that the extent of the TitleRover

15   technology, to basically pull digitized images from the

16   courtroom -- or excuse me -- the county court --

17   recorder's office or was there something more with the

18   TitleRover technology beyond that?

19   A    Well, again, there's -- there's no magic into      13:24:45

20   putting records into any type of database you want and

21   digitizing it.

22         It's then, you know, the technology of being      13:24:53

23   able to house that.  Anyone can go out and do that.

24   It's also being able to search and utilize the

25   functionality, you know, to outline, I guess, some of

                                                   Page 125

1    these capabilities that we are able to do.  That was

2    the -- that's not just going out and scanning the

3    documents.  Anyone could do that with a little bit of

4    money.

5        Q    Right.  Well, that's where I am going.  I          13:25:14

6    understand that and then the scanned documents can be

7    viewed with the TitleRover technology, so I am just

8    trying to understand what beyond that --

9        A    You can organize; you can sort; you can key        13:25:33

10   word sort; you can search it by the visualization

11   technology that you are looking for; you can use phrase

12   technology to search it.  A lot of things you can do

13   with it once you have it digitized.

14           I can put it in a phrase and it will pull up        13:25:45

15   the only 20 leases that had that phrase in it.

16       Q    And what tool do you need to do that?              13:25:50

17       A    I don't know.                                      13:25:52

18       Q    You don't know?                                    13:25:52

19       A    I don't -- I have already stated I am not a        13:25:53

20   technologist.  I rely on my technology team to tell me

21   what it's doing and I get the feedback.

22           My check and balance is listening to the people    13:26:01

23   that are utilizing the technology inside my office that

24   don't have a dog in the fight that say, yeah, wow.

25   That's really cool.  It made my job -- like typically

Page 126

```
 1   that would take hours, it took me 10 minutes.  That kind

 2   of testimony.  I believed it was credible.

 3       Q   If I were to say that optical character          13:26:21

 4   recognition is key to taking and searching the data

 5   that's digitized, would you agree with that?

 6       A   I wouldn't have an opinion on it.                13:26:34

 7       Q   But you ran a company that developed this        13:26:36

 8   technology and you don't know what you need in that

 9   technology?

10       A   No, I invested in a company that had this        13:26:42

11   technology that was being developed.  So, yeah, I -- I

12   was an investor in technology that's being developed by

13   what I believed to be very competent technology guys

14   that had a very deep record, being Joe Haynes and Brent

15   and John Martin.  To an extent, I had three experts in

16   dealing with large databases and searching and -- and

17   pulling out records.

18       Q   Okay.  If we go to page 3 of that presentation,  13:27:10

19   Bates stamped plaintiff's 671 -- I am sorry, 672.

20           So this is a document bearing TitleRover's       13:27:39

21   name.  And in paragraph 2 of this page it says, "It has

22   developed its own proprietary technology and licensed

23   sole rights to additional technology which delivers a

24   10X improvement to traditional methods of supporting

25   data investigations and specialized analysis."
```

Page 127

```
 1              What is the additional technology that        13:28:01

 2      apparently TitleRover had sole rights to use?

 3           A   You'd have to ask Tom and Brent the list of    13:28:17

 4      those technologies.  I wouldn't have a list of any --

 5      any of the technologies that we were utilizing.

 6           Q   Could -- could it be the BeyondRecognition     13:28:27

 7      technology?

 8           A   It could be.                                   13:28:29

 9           Q   Can you think of any other technology that it  13:28:32

10      would be?

11           A   There were a bunch of others that we used.    13:28:35

12      Again, I don't recall the names.  This isn't my area of

13      expertise, but I am sure Brent and Joe can accurately

14      tell you what other technologies they used.  They'll

15      substantiate what was written.

16           Q   Okay.  In line 4 of that paragraph it states,  13:28:51

17      "which delivers a 10X improvement to traditional methods

18      of supporting data investigations and specialized

19      analysis."  How was that determined, 10X?

20           A   You are going to have to ask Tom and Brent who 13:29:05

21      wrote that.  I believed it to be true.

22           Q   But you read this.                             13:29:10

23           A   I read it.                                     13:29:11

24           Q   Before it went out.                            13:29:12

25           A   Sure.                                          13:29:13
```

Kramm Court Reporters, A Veritext Company
866-299-5127

```
 1        Q   And that didn't strike you like maybe we should    13:29:13

 2   double check and figure out if that's an accurate

 3   statement?

 4        A   I believed -- I trusted the team that put this      13:29:20

 5   together, that I know them to be true and honest people.

 6   I am not a technologist.  I am not going to start

 7   learning technology.

 8            I went into the HR business, but I -- and also      13:29:35

 9   I went into technology, but I ran a $120 million IT

10   staffing company.

11        Q   If you were looking at this document as a           13:29:43

12   recipient --

13        A   Um-hum.                                             13:29:49

14        Q   -- would that statement be material to you?         13:29:49

15            MS. SWEENEY:  Objection; incomplete                 13:29:55

16   hypothetical.

17            THE WITNESS:  It might be.  If I -- if I was         13:29:58

18   interested in learning more about it, I would circle it,

19   highlight, and I'd ask my technical team to help me come

20   up and substantiate that number.

21   BY MR. NAWRACAJ:                                             13:30:11

22        Q   Okay.  So this document was, though, passed by      13:30:12

23   you before it went out.

24            MS. SWEENEY:  Objection; asked and answered.        13:30:19

25            THE WITNESS:  I believe so.                         13:30:21
```

                                                      Page 129

```
 1    BY MR. NAWRACAJ:                                    13:30:21

 2        Q    Okay.  Can we go to page 5.               13:30:21

 3        A    Um-hum.  675?                             13:30:23

 4        Q    674, actually.                            13:30:26

 5        A    Okay.                                     13:30:28

 6        Q    Entitled "Key TitleRover Features."  The first   13:30:29

 7    row says, "Custom Indexing using BeyondRecognition."

 8        A    Um-hum.                                   13:30:39

 9        Q    What does that mean, custom indexing used in   13:30:42

10    BeyondRecognition?

11             MS. SWEENEY:  Objection.  The document speaks   13:30:48

12    for itself.

13             THE WITNESS:  I think that's what it says.  It   13:30:51

14    customizes indexing.

15    BY MR. NAWRACAJ:                                    13:30:54

16        Q    Was that functionality actually working at the   13:30:55

17    time this presentation was dated?

18        A    I believe it to be.                       13:30:59

19        Q    But you did not know whether or not       13:31:03

20    BeyondRecognition was even being used right -- you know,

21    two minutes ago when we were talking.

22        A    I didn't ever say that.  You can go back and   13:31:11

23    read my testimony, if you'd like.  But --

24        Q    We can.                                   13:31:14

25        A    -- it's not the second or third or fourth or   13:31:15
```

```
 1    fifth time you've added words in my mouth that aren't

 2    going to be reflected on the record.

 3         Q   Can you just answer the question, please.        13:31:19

 4         A   I am.  Just --                                   13:31:21

 5         Q   So was custom indexing using BeyondRecognition   13:31:22

 6    a feature that worked on the date of this presentation

 7    for the TitleRover technology?

 8         A   I believe that it was.                           13:31:33

 9         Q   Was custom filtering, the next row?             13:31:34

10         A   I believe so.                                    13:31:38

11         Q   Custom grouping?                                 13:31:39

12         A   That's what it says.  I believe everything in    13:31:42

13    this document to be true and accurate.

14         Q   Did anybody at any time raise any issues with    13:31:46

15    respect to BeyondRecognition's ability to deliver on

16    their commitment to TitleRover with respect to services?

17             MS. SWEENEY:  Objection; vague as to time.       13:32:02

18             THE WITNESS:  Could you rephrase the question?   13:32:06

19    BY MR. NAWRACAJ:                                          13:32:07

20         Q   There was an SOW between TitleRover, right, and  13:32:07

21    BeyondRecognition?

22         A   I believe so.                                    13:32:12

23         Q   And BeyondRecognition was supposed to do         13:32:13

24    certain things as stated in that statement of work?

25         A   I believe so.                                    13:32:21
```

Page 131

```
 1        Q    Do you know whether or not --            13:32:21

 2        A    You'd have to ask --                     13:32:24

 3        Q    -- BeyondRecognition actually was able to do   13:32:25

 4   that?

 5        A    I have to recall if they were able to hit every   13:32:28

 6   function or not.  I don't recall.  That would be a --

 7   that would be a question you might want to ask the guy

 8   that ran the day-to-day business, the day-to-day

 9   interfacing.  That was not me.

10        Q    Who was that?                            13:32:42

11        A    Tom Tatham.                              13:32:42

12        Q    Tom.  And you guys, though, talked regularly?   13:32:45

13        A    What's regularly?  He didn't come run into my   13:32:48

14   office for every conversation that he had.

15        Q    Okay.                                    13:32:51

16        A    He didn't come into my office every time he   13:32:51

17   wrote a sentence or a paragraph, either.

18        Q    I think it's the fourth row, "Integrated   13:32:53

19   Production, Permitting, Appraisal District, Probate";

20   that's a key feature listed.  At the time of this

21   presentation, was that a feature that worked on the

22   TitleRover technology?

23             MS. SWEENEY:  Objection; asked and answered.   13:33:15

24             THE WITNESS:  I will state it again.  To the   13:33:17

25   best of my knowledge, after reading everything on -- or
```

Page 132

1    we can go through each one, if you want, one by one;

2    but, yes, I believed everything that Brent and Tom put

3    together on this piece of paper were true and accurate

4    or they wouldn't have put it down.

5    BY MR. NAWRACAJ:                                    13:33:34

6        Q    So when you would have read this document,  13:33:34

7    presumably this page, you would assume that everything

8    is accurate; you would not ask Mr. Tatham or Mr. Stanley

9    about the validity of these statements?

10       A    I believed everything they told me were valid.  13:34:01

11   Both of them are very astute, intelligent business guys

12   that I believed to be -- were acting in good faith and

13   honest.

14       Q    Understood.  But you had a problem with     13:34:14

15   BeyondRecognition years before in that blowup with BHP;

16   right?  And you had a lawsuit?

17       A    Blowup with BHP or --                       13:34:26

18       Q    Well, I think the project went awry, and I  13:34:27

19   believe there was a lawsuit because there was

20   nonperformance by BeyondRecognition.  So --

21       A    A lawsuit between who?                       13:34:37

22       Q    I believe it was the Willis Group.           13:34:38

23       A    And who?                                     13:34:40

24       Q    BeyondRecognition.                           13:34:40

25       A    Yeah, but that was because of its abilities to  13:34:41

```
 1    be able to go and -- specifically into some legal review

 2    platforms.  It had nothing to do with some of the

 3    capabilities that we are talking about here.

 4        Q   Do you remember John Martin delivering on        13:34:53

 5    projects successfully and consistently?

 6        A   John -- that -- do I remember any projects that  13:35:03

 7    John Martin -- I did not work with John Martin on a

 8    day-to-day business.

 9            John worked with my legal division, one of       13:35:15

10    seven entities that I -- the Willis Group was the

11    significant shareholder in, so I did not manage John on

12    a day-to-day basis.

13            John, we utilized in a lot of different           13:35:24

14    projects, large and small.  Ultimately, Chevron, he

15    delivered on.  It was just a long way to get there.  It

16    took longer than was anticipated and Chevron needed it

17    in speed and so there were some issues there.

18    That's what I -- what I recall.

19        Q   Okay.  If we can go to page 9 which is            13:35:40

20    plaintiff's 678.  The title at the top says,

21    "Differentiators."

22        A   Um-hum.                                           13:35:57

23        Q   The third paragraph, starting with               13:35:59

24    "Technology," it says, "We" -- I am assuming that means

25    TitleRover --
```

Page 134

```
 1        A    Um-hum.                                      13:36:08

 2        Q    -- "leverage the latest tools using artificial   13:36:08

 3   intelligence and analytics."  What sort of artificial

 4   intelligence was used in the technology?

 5        A    You'd have to ask Brent and Joe, perhaps Tom,   13:36:19

 6   but that's probably a team -- for our technical team.

 7        Q    You weren't involved in any of the product   13:36:29

 8   development for TitleRover?

 9        A    Not me personally, no, I was not.             13:36:33

10        Q    As a manager of TitleRover?                   13:36:35

11        A    I -- I was not in -- not in any of the        13:36:37

12   technical aspects.  I wouldn't -- I wouldn't know.  I

13   wouldn't know what code or what tool to utilize or

14   whether that's the best one or the only one or it's the

15   only one of its kind in the world.

16             I would have to rely on the guys that say,     13:36:49

17   look, this is the best I have ever seen.  This is --

18   it's the only one that can do this.  That's what I

19   relied on.

20        Q    Okay.                                         13:37:02

21        A    I relied on -- everything that was written on   13:37:05

22   this page and in this book, I relied on.

23        Q    Did you read it?                              13:37:13

24        A    Um-hum.                                       13:37:14

25        Q    The entire thing?                             13:37:15
```

Page 135

```
 1        A    I believed it to be true.              13:37:16

 2        Q    So you would have read this whole document?   13:37:18

 3             MS. SWEENEY:  Objection; asked and answered.   13:37:20

 4             THE WITNESS:  I thought I have answered it, but   13:37:23

 5    yes.

 6    BY MR. NAWRACAJ:                                  13:37:25

 7        Q    I am going to go to the next presentation in   13:37:32

 8    that packet.  It's the twelfth page, entitled "Data

 9    Mining for Mineral Resource Investigations."

10        A    It's numbered 06 --                     13:37:44

11        Q    Yeah, I can give you that number in a second.   13:37:46

12             MS. SWEENEY:  681?                       13:37:49

13             MR. NAWRACAJ:  Yeah.  I am actually going to   13:37:50

14    flip to 683.

15             THE WITNESS:  All right.  Okay.          13:37:53

16    BY MR. NAWRACAJ:                                  13:38:00

17        Q    Right.  And if you could turn -- there you   13:38:05

18    go -- the page with the graph on it.

19        A    Um-hum.                                  13:38:10

20        Q    Right below "What We Do," the second paragraph,   13:38:12

21    "It" -- and I believe that refers to TitleRover -- "has

22    developed its own proprietary technology and licensed

23    sole rights to additional technology which delivers a

24    10X improvement to traditional methods of supporting

25    data investigations and specialized analysis."
```

Page 136

```
 1              Essentially, the same statement, though, that      13:38:32
 2    was made in the other presentation.  Same sort of
 3    question.  You reviewed this document in the normal
 4    course of business?
 5        A   Yes, I did.                                          13:38:44
 6        Q   Did you raise any objection or ask any               13:38:45
 7    questions on any of those statements?
 8        A   I don't recall.                                      13:38:50
 9        Q   Okay.  I am done with that exhibit.                  13:38:53
10            I need a moment here.  My computer is                13:39:38
11    hiccuping.
12            (Exhibit 7 was marked for identification             13:39:46
13             by the court reporter and is attached hereto.)
14    BY MR. NAWRACAJ:                                             13:39:46
15        Q   I am handing you Plaintiff's Exhibit Number 7.       13:39:46
16            This is a ledger of Hopewell showing the             13:40:34
17    inflows and outflows of money.
18        A   Okay.                                                13:40:46
19        Q   Do you know when the first traunch of the           13:40:51
20    EnSource investment was received by Hopewell when
21    looking at that document?
22        A   I am sure it's on here.                              13:41:02
23        Q   If I pointed to September 13th, 2016, does that     13:41:04
24    look like the first traunch of the $430,000 investment?
25        A   September?                                           13:41:14
```

Page 137

```
 1        Q    Yeah, 13th.                                 13:41:15

 2        A    I'd have to go back and -- do you want me to 13:41:20

 3   review the rest of the check registry or are you just

 4   stating that to be a fact?

 5        Q    Yeah, I am asking you when the first traunch of 13:41:27

 6   money from Hopewell -- or excuse me -- from EnSource was

 7   received from Hopewell.

 8             MS. SWEENEY:   Objection.   The document speaks 13:41:34

 9   for itself.

10   BY MR. NAWRACAJ:                                      13:41:36

11        Q    Okay.   Well, then, I will state it.         13:41:36

12             On September 13th, 2016, as evidenced on the 13:41:37

13   document which speaks for itself, $205,000 was received

14   by Hopewell from EnSource; is that correct?

15        A    That's correct.   Okay.   I can't mark on that, 13:41:47

16   can I?

17             That's correct.                              13:41:52

18        Q    Immediately preceding that $205,000 wire      13:41:53

19   transfer --

20        A    Um-hum.                                       13:41:58

21        Q    -- what was the balance, as evidenced by that 13:41:59

22   document?

23        A    What was the balance?   On an accrual basis?  13:42:05

24        Q    As shown by the ledger.                       13:42:12

25        A    Right, but it says accrual at the top right   13:42:14
```

Page 138

```
 1    corner.

 2        Q    Okay.  We can go through the bank statements,      13:42:18

 3    if you'd like.  So, yeah, on an accrual basis.  We will

 4    do an accrual basis.  That's fine.

 5        A    With an accrual basis, it says it was negative     13:42:26

 6    on an accrual basis.

 7        Q    So referring back to the document, $205,000 was    13:42:29

 8    received on September 13th, 2016.

 9        A    Okay.                                              13:42:41

10        Q    So since it's an accrual basis, right,            13:42:42

11    September 13th, 2016 there's the payment to TitleRover

12    for $35,000.

13        A    Okay.                                              13:42:54

14        Q    Do you see that?                                   13:42:55

15        A    I do.                                              13:42:56

16        Q    So that payment of $35,000 was for amounts that   13:42:57

17    had accrued prior to the $205,000; right?

18             MS. SWEENEY:  To the extent you know.             13:43:15

19             THE WITNESS:  You know, I -- I didn't handle      13:43:18

20    the checkbook, so I am --

21    BY MR. NAWRACAJ:                                           13:43:22

22        Q    I guess where I am going with this is that        13:43:23

23    payable existed prior to the $205,000 wire transfer, did

24    it not?

25        A    It appears that it must have, yeah.  Yeah.        13:43:35
```

```
 1   There were -- there were still monies outstanding and

 2   due, correct.

 3       Q   And I won't go through excruciating detail,      13:43:45

 4   because there's a lot of them, but does the same

 5   analysis and your conclusion about having that payable

 6   existing at that time apply to the next entry which

 7   says, TitleRover for $7,500?

 8           MS. SWEENEY:  Objection; incomplete            13:44:08

 9   hypothetical.

10           THE WITNESS:  I don't -- I don't know what      13:44:11

11   invoice it was for.  I -- I don't know.

12   BY MR. NAWRACAJ:                                        13:44:14

13       Q   So the same date -- right?  You just said this  13:44:14

14   $35,000 must have been a preexisting payable because it

15   was paid on September 13th.

16       A   Okay.                                           13:44:25

17       Q   And I am just asking, if you go through all of  13:44:26

18   the transactions, from that one through to the bottom of

19   the page and you go to the top of the page and you keep

20   on going, the fourth one down -- the third one down,

21   Steve Ervi, is that the same scenario, these payables

22   existed prior to the receipt of the $205,000?

23           MS. SWEENEY:  Objection.  It calls for          13:44:51

24   speculation.

25           THE WITNESS:  I would -- I would assume that    13:44:54
```

Page 140

```
 1    was the case, yes.

 2    BY MR. NAWRACAJ:                                      13:44:56

 3         Q    Okay.  So earlier we talked about working   13:44:56

 4    capital.  We went back and forth, and I asked the

 5    question, is working capital for expenses that are being

 6    accrued -- or excuse me -- being incurred while the

 7    business is being operated, and you said yes.

 8         A    Okay.                                        13:45:20

 9         Q    And personally I would agree with that      13:45:21

10    definition of working capital.

11         A    Okay.                                        13:45:24

12         Q    Is it fair to say that the $205,000 was not 13:45:25

13    used for expenses that were being incurred but yet,

14    instead, being used for expenses that had been incurred?

15              MS. SWEENEY:  Objection; argumentative.      13:45:37

16              THE WITNESS:  I believe those to be the same, 13:45:39

17    but those are all expenses of the business.

18    BY MR. NAWRACAJ:                                       13:45:43

19         Q    Okay.  So I guess --                         13:45:44

20         A    So, I mean, typically that's not uncommon,   13:45:45

21    depending on what the payment terms are.  It's most --

22    just like individuals, businesses have stuff that hasn't

23    been paid yet.  It could be 60-day payment terms; 90-day

24    payment terms; two-week payment terms; it could be

25    payment due upon receipt, but that's kind of one on one.
```

```
 1        Q    There was a payment made on September 13th to      13:46:06

 2   PDP Management for $68,250.00 --

 3        A    Um-hum.                                            13:46:16

 4        Q    -- which, roughly speaking, is about 30 percent    13:46:17

 5   of the first traunch.  Do you remember that payment

 6   being made?

 7        A    Well, I don't remember the day it was made.  I     13:46:28

 8   remember looking at this document and seeing that it was

 9   paid at different times, sure.

10        Q    Who made the payments?                             13:46:35

11        A    Tom did.                                           13:46:36

12        Q    Did Tom ever ask you --                            13:46:37

13        A    No.                                                13:46:40

14        Q    -- should I make this payment, that payment or     13:46:40

15   the other?

16        A    No, he kind of informed me.                        13:46:42

17        Q    After the fact?                                    13:46:45

18        A    The majority of the time.  I am not saying that    13:46:47

19   there wasn't ever a time he said, hey, here is some

20   stuff that's outstanding or here is an outstanding.  But

21   we never did sit down and say we are paying this, not

22   paying this, we are paying that.

23             We didn't -- he ran the day-to-day operations      13:46:58

24   of the business, and what needed to be paid and what was

25   critical of being paid, and what was outstanding and --
```

Page 142

1    and how we were tracking to the budget that we

2    originally laid out.

3        Q    So on September 13th we have a payment of          13:47:10

4    35,000 to TitleRover.  That same date we have another

5    payment of 7500, so that's 42,500.

6            On September 14th, there's a $25,090 payment,      13:47:23

7    so now we are at $67,090 to TitleRover in two days, and

8    within one day of the $205,000 receipt.

9            Is it fair to say that that had to be payables     13:47:43

10   that existed since this license agreement only called

11   for $17,500 per month?

12           MS. SWEENEY:  Objection.  It calls for            13:47:52

13   speculation.

14           THE WITNESS:  I guess I don't understand your      13:47:55

15   question.  You are saying that -- was that -- did that

16   mark up the entirety of the amount that was owed?

17   BY MR. NAWRACAJ:                                           13:48:02

18       Q    No.  What I am saying is TitleRover was paid      13:48:02

19   $67,000, approximately --

20       A    Okay.                                            13:48:09

21       Q    -- in two days, on the 13th and 14th of           13:48:10

22   September.

23           My question is does that $67,000 represent debt   13:48:15

24   or payables that existed prior to or on receipt of the

25   $205,000?

```
 1          MS. SWEENEY:  Objection.  It calls for        13:48:31

 2    speculation, it calls for an expert opinion.

 3          THE WITNESS:  I'd have to -- I'd have to look   13:48:36

 4    at the invoices and everything.  I don't recall what was

 5    due and not due or the day of any of the funding, what

 6    the ARs were -- or rather what the AP was.  We didn't

 7    have any AR.

 8          MS. SWEENEY:  And he has testified that he      13:48:48

 9    didn't handle the accounts.

10          THE WITNESS:  I don't know.  I don't know.  But 13:48:51

11    I -- I believe -- if that's what the math is -- I was

12    just trying to check your math because I only see

13    TitleRover twice.  35 and 7, that's forty-two, five.

14    BY MR. NAWRACAJ:                                      13:49:01

15       Q   The second line from the bottom, there's one   13:49:01

16    for 25,000.

17       A   The second line from the bottom.              13:49:05

18       Q   Right above the --                            13:49:08

19       A   Yeah, it just wasn't marked over here.  Okay.  13:49:10

20    Yeah.  All right.

21       Q   So did Tom give you financial statements?  Did 13:49:13

22    you have any financial statements that you are supposed

23    to -- like a balance sheet showing cash balance?

24       A   We --                                         13:49:23

25          MS. SWEENEY:  Compound.                         13:49:23
```

Page 144

```
 1              THE WITNESS:  We -- we had -- we sat down and      13:49:24

 2      went over cash.  Yes, he produced an income statement

 3      and balance sheet.

 4      BY MR. NAWRACAJ:                                           13:49:35

 5         Q   Were you aware that the $205,000 that had been      13:49:36

 6      received on the 13th of September was consumed by the

 7      16th of September and that on an accrual basis, there

 8      was a negative balance?

 9         A   I will say I don't -- no, I don't recall the        13:50:05

10      exact -- lining up the exact numbers what was due and

11      wasn't due or what the exact balance was at that

12      particular time.  It was two years ago.

13              I do recall that -- was this, I think, in the      13:50:15

14      form of a loan?  If I can go back, the first -- so the

15      whole reason why we asked for a bridge loan is because

16      we hadn't paid technology.  I communicated that to the

17      team.  We aren't paying bills.

18              We started negotiating with Chad and, et al,       13:50:31

19      back in the summer.  We were anticipating we thought we

20      were getting close to closing or funding, I think.  At

21      various different times, it got stretched out.

22              Yes, the team knew that I needed to pay            13:50:44

23      technology.  They hadn't been paid.  If I don't pay

24      them, I am going to lose them.  I communicated that to

25      them.
```

Page 145

```
1              Yes, Tom and others had not been paid because      13:50:51

2     this had been stretched out.  I was not pursuing other

3     people because I was being told by Chad that his group

4     was going to take the rest of it.  Okay?  And they could

5     never -- and then it was, well, we are going to take

6     somewhere between three and five, we'll probably take

7     going all five.  That's how these guys work.

8              So I was being told that all along.  And so we     13:51:11

9     were continuing to be patient and, yes, we were

10    stretching, meaning that some of these things were

11    getting paid and some of them weren't.

12             Willis Group, for example, I was paying -- I        13:51:15

13    was still paying the staffing folks, so the staffing

14    consultants were still getting paid by Willis Group.

15             Image Engine was still providing services as        13:51:27

16    copy, coding, and scanning.  They had outstanding

17    invoices.  They weren't still getting paid.

18             Willis Group was providing office services and      13:51:32

19    they were -- they were not getting paid.  I was still

20    providing a service, I was still not getting paid.

21             So there are a lot of things that were not          13:51:38

22    getting paid; but, yes, absolutely this was communicated

23    to the team, that this money is critical.  By

24    definition, that's why they put in a bridge loan;

25    because if they didn't, our team would no longer exist;
```

Page 146

```
 1    and so they absolutely knew that we had money in arrears

 2    that was owed.

 3          How much?  I have no idea.  But no question, I      13:51:54

 4    got involved with a sense of urgency.  Guys, we need to

 5    get this over the line.  What can we do in the interim?

 6    We came up with a bridge loan to solve this problem.

 7       Q   So, essentially, on or before the $205,000        13:52:07

 8    coming in to the account, you had payables that had not

 9    been paid for a while -- or I should say TitleRover,

10    excuse me.

11       A   TitleRover had some payables that had not been     13:52:26

12    paid for a while.

13       Q   Or excuse me.  It's actually Hopewell.             13:52:29

14       A   I mean Hopewell, rather, had some payables that    13:52:31

15    had not been paid for a while which Substantia LogiX was

16    one of those or TitleRover was one of those.

17       Q   And because of that, I believe you just           13:52:37

18    mentioned that there was a real issue --

19       A   Sense of urgency.                                 13:52:46

20       Q   -- of losing your team or the developers?         13:52:47

21       A   There's a sense of urgency, if people didn't      13:52:50

22    get paid, they needed to get paid.  So if not, they were

23    going to go find a project that they would get paid on.

24       Q   Don't you think that's something that an          13:52:59

25    investor should know before --
```

Page 147

```
 1        A    They knew.                              13:53:03

 2        Q    -- paying $205,000?                     13:53:03

 3        A    They knew.                              13:53:05

 4        Q    Who knew?                               13:53:05

 5        A    The whole team, Justin -- that's why we 13:53:06

 6   negotiated the bridge loan.  The transaction wasn't

 7   done.  I personally guaranteed a $205,000 bridge loan.

 8        I was personally paying them back $205,000.  13:53:16

 9   They knew we were -- we were -- they were putting money

10   in to cover the bridge loan so we could pay people,

11   absolutely.

12        Q    Is there any emails to that fact?       13:53:25

13        A    Just conversations.  Conversations.     13:53:27

14        Q    And do you remember when those conversations 13:53:28

15   occurred as far as --

16        A    Right around --                         13:53:32

17        THE REPORTER:  I am sorry.  We have got to   13:53:34

18   wait.

19   BY MR. NAWRACAJ:                                  13:53:37

20        Q    Who did you have the conversations with? 13:53:37

21        A    As I sit here today, Justin and Chad are the 13:53:39

22   only guys I really communicated with.

23        Q    And what was generally the message to them that 13:53:46

24   you communicated?

25        A    Generally, the message to them is that this is 13:53:52
```

Page 148

```
 1    dragging out; and that if we don't get these guys paid,

 2    we are going to lose the team, because we have a lot of

 3    stuff that we have to get paid to get this -- to stretch

 4    the funding, can we get some funding.

 5         However we arrived at the $205,000, that's what      13:54:05

 6    was arrived at; but the purpose of the bridge loan was

 7    to pay back expenses.  That's specifically what we

 8    talked about.

 9         I think I even referred to them that we are          13:54:16

10    going to -- I was most concerned with our technology

11    team, Brent and Substantia LogiX, because if they leave

12    and they get engaged on another project, they are not

13    coming back for a while so the technology gets stuck in

14    the mud.

15    Q   Why at that time or what was the basis for -- I       13:54:36

16    think you mentioned that TitleRover was being funded, in

17    part, by the Willis Group.

18    A   No.                                                   13:54:46

19    Q   No?  Who was funding it before the funds came         13:54:46

20    from Hopewell to --

21    A   It was a host of folks.  I personally funded          13:54:52

22    it, I being my family partnership Jabco Partners funded,

23    Willis Group funded, Mike Willis funded, Gilbert funded,

24    Trent funded.

25         And then as far as vendors that they were            13:55:02
```

Page 149

```
 1    leaning on -- for example, Willis Group was funding the

 2    payroll through the legal attorneys and Willis Group

 3    was, you know, funding all the office services and

 4    rents, and Willis Group and -- and Image Engine was

 5    funding all of the copy, coding, and scanning services

 6    associated with digitizing the records of the

 7    courthouse.

 8        Q    So with all of those issues in TitleRover that    13:55:34

 9    you just mentioned --

10        A    Those weren't issues in TitleRover.  I didn't     13:55:40

11    mention that.

12        Q    What were the issues in?                          13:55:42

13        A    Those were issues in Hopewell.                    13:55:44

14        Q    Okay.  Would you then -- so it would be fair to   13:55:46

15    say that Hopewell was undercapitalized, since it

16    couldn't pay its bills since it became due?

17        A    No.                                               13:55:53

18        Q    No?                                               13:55:54

19        A    Hopewell -- we were raising capital at the same   13:55:54

20    time that we were running the business which is not

21    uncommon.

22        Q    Was Hopewell ever able to pay its bills as they   13:55:58

23    became due on a regular basis?

24        A    Hopewell was -- was shut down abruptly because    13:56:05

25    a $100,000 commitment wasn't -- was not funded by
```

Page 150

| | |
|---|---|
| 1 | EnSource, and because a lawsuit -- I believe a frivolous |
| 2 | lawsuit -- clouded the title and prohibited our ability |
| 3 | to go out and raise any more capital. |
| 4 | Q   I will reask the question, because I don't          13:56:29 |
| 5 | believe the answer was given. |
| 6 | A   Okay.                                               13:56:33 |
| 7 | Q   But you mentioned the final $100,000 that was       13:56:33 |
| 8 | not funded by EnSource. |
| 9 | A   Um-hum.                                             13:56:42 |
| 10 | Q   On that issue, did you have a conversation with     13:56:44 |
| 11 | Justin Pannu, or it may have been Cliff, about not |
| 12 | demanding that $100,000 to be funded? |
| 13 | A   I remember a conversation.                          13:56:59 |
| 14 | Q   Okay.                                               13:57:00 |
| 15 | A   Yeah.                                               13:57:01 |
| 16 | Q   Did you get a letter confirming that               13:57:01 |
| 17 | conversation in or around December of 2016? |
| 18 | A   I recall getting a letter, yes.                     13:57:07 |
| 19 | Q   Did you ever object to it and say that's not        13:57:09 |
| 20 | true? |
| 21 | A   I believe so.                                       13:57:12 |
| 22 | Q   Please fund 100,000?                                13:57:13 |
| 23 | A   I believe so.                                       13:57:15 |
| 24 | Q   You did?                                            13:57:16 |
| 25 | A   I believe so.                                       13:57:17 |

Page 151

```
 1        Q   Did you do it in writing?                13:57:17

 2        A   I don't recall.                          13:57:19

 3        Q   Who did you voice that to?               13:57:20

 4        A   Chad, Justin.                            13:57:21

 5        Q   Did you text them?  You do a lot of texting.  13:57:22

 6        A   I don't recall.                          13:57:26

 7            MS. SWEENEY:  Objection; argumentative.  13:57:27

 8            THE WITNESS:  It might have been a phone call.  13:57:28

 9   We had a lot of conversations, too, at that particular

10   moment.

11   BY MR. NAWRACAJ:                                  13:57:32

12        Q   So in December when you met with them in  13:57:32

13   your --

14        A   Did we have -- could I say -- did they say that  13:57:34

15   in writing?  Did that text to me in writing that --

16        Q   No, I am just trying to figure out.  So in  13:57:39

17   December, you say you don't have to fund the extra

18   100,000.

19        A   I didn't say that.                       13:57:45

20            MS. SWEENEY:  Objection --               13:57:50

21   BY MR. NAWRACAJ:                                  13:57:50

22        Q   You did not?                             13:57:50

23            MS. SWEENEY:  -- it lacks foundation.    13:57:50

24            THE WITNESS:  No.                         13:57:50

25            THE REPORTER:  Excuse me.  I need one at a  13:57:50
```

Page 152

```
  1    time, please.

  2              THE WITNESS:   Okay.                        13:57:52

  3    BY MR. NAWRACAJ:                                      13:57:53

  4        Q   So your testimony today is that you never told  13:57:53

  5    any of the EnSource representatives -- and we are under

  6    oath.

  7        A   Yes.                                          13:57:59

  8        Q   -- that they need not -- or EnSource need not  13:58:00

  9    make the final $100,000 payment of the original $530,000

 10    subscription amount.  Is that your testimony?

 11        A   Absolutely that's my testimony.              13:58:13

 12        Q   Under oath?                                   13:58:15

 13        A   Under oath.                                   13:58:16

 14        Q   Okay.                                         13:58:17

 15        A   Yeah.  I am happy to clarify it.             13:58:18

 16        Q   Please do.                                    13:58:25

 17        A   Yeah, we had a conversation where they asked.  13:58:27

 18        Q   I am sorry, we meaning?                       13:58:29

 19        A   Me, Chad, and Justin had a conversation, where  13:58:32

 20    they said they would not like to fund that deal.

 21              I said, you know what, that's not my call.  I  13:58:38

 22    said, I will go back and I will talk to Tom.  That --

 23    that was the conversation.

 24              There was a conversation about it.  There was  13:58:46

 25    never a commitment about it.  I don't go off and make
```

Page 153

```
 1    commitments without involving other members of the team,

 2    and Tom I considered a critical member of the team

 3    running the day-to-day operations.

 4         Q    Do you remember getting a letter from me, my        13:59:14

 5    law firm, dated December 16, 2016 --

 6         A    Um-hum.                                              13:59:23

 7         Q    -- which -- and I am sorry, I didn't print this     13:59:24

 8    one out, but I will read it for the record.

 9              Mr. Willis, this letter will confirm your offer     13:59:33

10    to representatives of EnSource Investments LLC --

11    parenthesis, quote, EnSource, end quote, parenthesis --

12    in your meeting with them yesterday that if in their

13    sole and exclusive discretion they do not feel

14    comfortable for whatever reason or no reason to fund the

15    final $100,000 due under the subscription agreement,

16    EnSource will be absolved from all obligations to do so.

17              Next paragraph.  By way of this letter,            14:00:06

18    EnSource accepts such offer and considers its

19    subscription agreement to be amended accordingly.

20              Do you remember that letter?                        14:00:15

21         A    I do.                                               14:00:16

22         Q    Did you ever respond or any of your counsel or      14:00:19

23    other representatives respond to this letter?

24         A    I don't recall.                                     14:00:25

25         Q    It's your testimony, though, that you,              14:00:28
```

Page 154

```
 1    nevertheless, demanded $100,000 to be still invested

 2    after this letter?

 3              MS. SWEENEY:  Objection; misstates prior        14:00:35

 4    testimony.

 5              THE WITNESS:  It is my testimony that the       14:00:38

 6    company, that Tom demanded the funds were there.  It's

 7    my testimony that I brought the proposal -- I discussed

 8    the proposal that the EnSource guys said that they did

 9    not want to fund the last $100,000.

10              What I told the guys is, look, Chad is a friend  14:00:52

11    of mine.  At the end of the day, I said, you know, I

12    understand what your -- what your concern or position

13    is.  Let me go back and talk to Tom.  That was my

14    position.

15              The next thing you know I get an agreement,     14:01:03

16    saying that I had some type of formal agreement that I

17    didn't talk to Tom about nor did I agree to.  It was a

18    discussion.

19    BY MR. NAWRACAJ:                                          14:01:15

20        Q    Going back to this $100,000 issue, do you        14:01:20

21    remember making an offer to any of the EnSource

22    representatives to the effect that if EnSource does not

23    want to fund the last $100,000, it's okay for it not to

24    do so?

25              MS. SWEENEY:  Objection; asked and answered.    14:01:42
```

Page 155

```
 1              THE WITNESS:  I don't -- I don't recall that at    14:01:44
 2    all.  With that -- absence of settlement discussions,
 3    after threat of litigation, I don't know what context
 4    that you are referring to that in.
 5            But as I sit here today, if you have a document    14:01:52
 6    to show me to refresh my memory, it would be helpful.
 7    BY MR. NAWRACAJ:                                            14:01:57
 8        Q   Okay.  I can probably have it printed out.         14:01:58
 9        A   Okay.                                              14:02:00
10        Q   And I am just wondering because, apparently,       14:02:01
11    you needed -- or Hopewell needed the $100,000 at this
12    juncture because it had to pay vendors and because of
13    the $100,000, I believe you said it pretty much
14    unraveled.
15        A   Well, that was one of the reasons why it           14:02:16
16    unraveled.  I checked that box.  Yes, I did.
17        Q   Okay.  So what other reserves did Hopewell have    14:02:21
18    in the form of cash, marketable securities, agreements
19    whereby they can draw on a line of credit --
20        A   Um-hum.                                            14:02:39
21        Q   -- so that if the $100,000 were received,          14:02:40
22    Hopewell could still continue operations into 2017?
23        A   I don't understand the question.                   14:02:51
24        Q   Well, it's easy.  If you got the 100,000 -- if     14:02:52
25    Hopewell received the $100,000 --
```

Page 156

```
 1        A    Um-hum.                                   14:03:00

 2        Q    -- what precautions were in place so that by,   14:03:00

 3   say, the end of January --

 4        A    Um-hum.                                   14:03:05

 5        Q    -- 2017 it's not out of money?           14:03:06

 6        A    Well, it had a line of credit in place to   14:03:11

 7   acquire leases, and we still had the ability to go out

 8   and raise capital.  That's what companies do.

 9            So to the extent that we hit our one-year   14:03:21

10   budget number, we had lease acquisition, you know,

11   opportunities lined up and the work was done, and now we

12   needed to go out and execute on some of the leases that

13   we had identified.

14        Q    The line of credit you reference, that was just   14:03:33

15   for procuring leases; correct?

16        A    Correct.  Correct.                        14:03:39

17        Q    Okay.  So that line of credit couldn't have   14:03:40

18   been used to pay operating expenses?

19        A    It was not supposed to be used to pay operating   14:03:43

20   expenses, correct.

21        Q    You mentioned that what companies do is raise   14:03:47

22   capital when it needs cash?

23        A    When you are in a start-up and you need -- if   14:03:52

24   we needed to have more capital, we'd go out and try to

25   raise more capital and justify that, whether that would
```

Page 157

```
 1    have been debt, equity, or otherwise, deferrals.

 2        Q    Did the thought cross your mind prior to         14:04:06

 3    December, after the cash was running low, to do that, to

 4    try to raise money?

 5        A    What -- absolutely it potentially needed to      14:04:19

 6    raise money.  But it was my view if we had that

 7    additional capital, that we -- we had enough time to

 8    execute on some of the other leases that we already

 9    identified.

10            We spent a lot of time on a very significant      14:04:35

11    lease, over 400 acres on -- or, you know, 500 acres, a

12    significant portion that would have spent the $1 million

13    that we had lined up; it would have taken 60 percent of

14    it or so, if not more.

15            And, unfortunately, that took a right turn.  We   14:04:52

16    had other prospects lined up that we could have started

17    negotiating those leases.

18            The lion share of the work had been done.  They   14:05:00

19    have already been identified.  They needed to be

20    negotiated and we needed to execute on them.

21            So, yes, it's my testimony if we had more         14:05:06

22    capital, that bought us more time to potentially close

23    more leases.  That was -- that was really it.

24            But we all knew that we had a budget and, at      14:05:18

25    the end of that budget, one year, the pilot program,
```

Page 158

```
 1    once the million dollars is up, we needed to analyze

 2    where we were at, determine whether we wanted to go out

 3    and raise more capital because that would evaluate the

 4    pilot program.

 5         Q   When was that done when you evaluated where the    14:05:33

 6    company -- where Hopewell was at and whether or not it's

 7    going to run out of money or efforts are to be made to

 8    raise more money, when -- when was that discussion?

 9         A   It was -- it was budgeted to run out of money.    14:05:51

10    That was budgeted.  It's all of our information.  It was

11    a holding company.

12         Q   Well, then, I am confused, because I believe      14:05:59

13    you testified that had the $100,000 been paid by

14    EnSource -- or I should rephrase it -- that the

15    nonpayment of that $100,000 spelled a demise of

16    Hopewell.

17         A   No, I said --                                     14:06:15

18             MS. SWEENEY:  Objection.  It misstates prior      14:06:16

19    testimony.

20             THE WITNESS:  Here we go again.  I have said      14:06:18

21    two major events prevented us from going out and raising

22    capital and putting more capital into the business.

23             The first event that happened was the $100,000.   14:06:26

24    Shortly after that, immediately after that was a threat

25    of litigation.  Then the actual coming of the
```

Page 159

```
 1    litigation.

 2          When someone threatens you to have litigation,     14:06:37

 3    you have a disclosure obligation, so therefore, going

 4    out and trying to raise capital and, saying, oh, by the

 5    way, we have been accused of all these horrible things

 6    and these guys are asking for an investor to come in and

 7    fill their hole -- not put money into the company, but

 8    fill their hole.

 9    BY MR. NAWRACAJ:                                          14:06:56

10          Q   Why didn't you put any of your -- and I am      14:06:56

11    saying personally your funds, your money into Hopewell

12    at this juncture?

13          A   I did.  I didn't have any more funds to commit  14:07:04

14    at that juncture.  I had a budget to put into the

15    company and I well exceeded what that budget was.

16          Q   Okay.  But capital wasn't an issue, right, as   14:07:10

17    you mentioned in one of your texts?

18          A   Are you mixing again apples and oranges?  Is    14:07:18

19    that what we are doing?

20          Q   No.                                             14:07:21

21          A   It sounds like it.  Could you break that down   14:07:21

22    for me --

23          Q   Yeah.                                           14:07:26

24          A   -- in what context I said that?                14:07:26

25          Q   I can.                                          14:07:29
```

Page 160

```
 1        A    Thank you.                               14:07:30

 2        Q    There's a text in late May to Chad saying,   14:07:31

 3   seriously, don't need the capital.

 4        A    That's May.                              14:07:37

 5        Q    Right.  And so --                        14:07:38

 6        A    May and December.                        14:07:40

 7        Q    So you ran out of money in seven months?   14:07:40

 8        A    No, we -- we had our budgeted amount.    14:07:42

 9        Q    No, I mean personally the capital evaporated in   14:07:45

10   seven months?

11        A    I didn't say my issue wasn't capital.  The   14:07:50

12   company's issue wasn't capital.  You are taking it out

13   of context again.  Let's please keep things in context.

14   It would be helpful.

15        Q    I am just asking when Hopewell needed     14:07:57

16   additional funds why you personally did not put more

17   money into the company?

18        A    Well, if you are asking did -- why didn't I   14:08:04

19   raise any capital for the business if I was going to

20   fund 100 percent of the capital.

21        Q    It's a simple question.  I am just asking you   14:08:12

22   why didn't you.  Did you think it was a bad business

23   choice?

24        A    I didn't have any more capital to put it into   14:08:16

25   it at the time.  Not --
```

Page 161

```
 1              THE REPORTER:  Hang on.  I didn't get the      14:08:25
 2    objection nor the answer.
 3              MS. SWEENEY:  The objection, it's asked and    14:08:25
 4    answered and argumentative.
 5              THE REPORTER:  And the answer?                 14:08:35
 6              MR. NAWRACAJ:  There was not answer.           14:08:35
 7         Q    I asked specifically why did he not put his own 14:08:35
 8    money in to Hopewell when it needed the cash.
 9         A    Asked and answered.  I am happy to answer it   14:08:42
10    again.  Would you like me to?
11         Q    Yeah.                                         14:08:45
12         A    Sure.  In May, when I spoke that capital isn't 14:08:46
13    an issue -- actually, we had over interested,
14    oversubscribed interest.
15              When I went out to raise capital for Hopewell, 14:08:53
16    I would have taken it all if I was in a position to fund
17    it all, but I wasn't.
18              So when I say capital was an issue, it wasn't  14:08:59
19    an issue for the interest that we had at that particular
20    time based on the budget we thought that it would take
21    to launch the project.
22              When it came to the end of the year, one, I    14:09:09
23    wouldn't put more money into a business that's clouded
24    by a lawsuit and threat of litigation.  That wouldn't
25    make any sense.  That would have to be cleared up.
```

Page 162

```
 1            That would be a business decision that, guess      14:09:18
 2    what, my partnership Jabco, it would be -- I have a
 3    fiduciary to them, too.  I am not going to put money
 4    into something where it's got a frivolous lawsuit
 5    overhanging it until all those issues get resolved,
 6    neither will any other sophisticated investor.
 7            (Mr. Pannu entered the proceedings.)            14:09:32
 8    BY MR. NAWRACAJ:                                        14:09:32
 9       Q   Okay.  So the $205,000 comes in via wire on     14:09:32
10    September 13th and by September 16th, according to this
11    ledger that's on accrual, more or less all of it's used
12    up.
13            I believe you testified that you advised       14:09:52
14    members of EnSource that the $205,000 is going to be
15    used for previously-incurred payables that needed to be
16    paid.
17       A   Well, you are paraphrasing it a little bit      14:10:10
18    differently, but I am happy to clarify that.
19       Q   Go ahead.                                       14:10:14
20       A   Yeah.  I said that I explained to EnSource that 14:10:15
21    we -- that we had not paid our technical team and
22    other -- and other expenses.
23            If we didn't get money in immediately, all this 14:10:21
24    was going to be for naught because we are going to lose
25    more -- most concerning was our technical team.  If they
```

Page 163

```
 1    left and got hired on to other opportunities and other

 2    jobs, it would be a while off until we got them back.

 3            So that was -- that was my major concern.  I      14:10:34

 4    voiced that to Chad and Justin, who just walked in, and

 5    so we came up with the bridge loan.

 6            That's the whole purpose of the bridge loan is    14:10:46

 7    because we needed the cash immediately and I personally

 8    guaranteed that bridge loan.  So, yes, things were not

 9    getting paid.

10        Q   When you advised Chad and Justin of this, did     14:10:56

11    you also say that two days after the first traunch

12    was -- would be received, that the company would

13    essentially not have any ability to pay its bills

14    because they had no cash?

15        A   I don't recall any conversations specifically     14:11:14

16    how quickly money would come in or out.  They -- they --

17    they had all the information they had requested.

18    They -- I told them the true scenario of what was going

19    on.  We had bills we had to pay.

20            To the extent that they had any other questions   14:11:29

21    to ask around that, I am sure they would have -- they

22    got that information; by definition, they funded.

23        Q   So, to paraphrase, you did not tell them --       14:11:36

24        A   I don't recall.                                   14:11:44

25        Q   -- that -- let me -- let me finish the            14:11:45
```

Page 164

```
 1    question.

 2             MR. NAWRACAJ:  You can object, if you want.     14:11:47

 3       Q    In connection with telling them, meaning        14:11:49

 4    telling Justin and Chad, that there needs to be a bridge

 5    loan because vendors have to be paid because they

 6    haven't been paid and they may leave if they are not

 7    paid, you did not say, you omitted the fact that once

 8    when they are paid, there's no money in Hopewell two

 9    days after the $205,000 was received.

10             MS. SWEENEY:  Objection.  That's argumentative,  14:12:20

11    it's vague and incomprehensible.

12    BY MR. NAWRACAJ:                                         14:12:27

13       Q    Well, just -- so did you tell them what the      14:12:27

14    balance would be after you paid these?

15       A    I didn't know what it was.                       14:12:31

16       Q    You didn't?  You interacted with Tom regularly;  14:12:32

17    right?

18             MS. SWEENEY:  Objection; asked and answered.    14:12:37

19             MR. NAWRACAJ:  Okay.                            14:12:39

20       Q    Well, you did.  Did Tom tell you?                14:12:39

21       A    Tom and I didn't visit on a day-to-day basis.    14:12:43

22    Tom and I didn't sit down and -- he didn't ask me what

23    was going to be paid, when it was going to be paid.

24             I didn't know if Tom wanted to stretch himself  14:12:49

25    out for another couple months or if he wanted to stretch
```

Page 165

```
 1    other vendors out for a couple of months or if he wanted

 2    to flush all of the -- we didn't -- we didn't talk about

 3    that, no.  We didn't get into that kind of detail.   I

 4    believe Tom was a responsible operator, Okay?  So I

 5    didn't get into what exactly is going to get paid or

 6    not.

 7         Q   Okay.  So --                                14:13:08

 8         A   Or whether he was going to pay Willis Group or  14:13:09

 9    whether I was going to get paid my fees or anything

10    else.  I didn't get into any of that.

11         Q   So looking at the bank ledger, it states that  14:13:15

12    on September 16th -- the last transaction on September

13    16th was for an $8,000 payment that, at least on an

14    accrual basis, left a negative balance of $2,028.68.

15         A   Where are you at?                           14:13:40

16         Q   It's the sixth line down.                   14:13:41

17         A   Okay.  Yeah.  The $8,000 TitleRover payment?  14:13:46

18         Q   Right.                                      14:13:52

19         A   So it's a split.                            14:13:52

20         Q   And then --                                 14:13:53

21         MS. SWEENEY:  So the accrual balance is not     14:13:54

22    2,000.  The document speaks for is itself.

23         MR. NAWRACAJ:  Yeah.  So, for the record, the   14:14:00

24    balance shows negative $2,028.68.

25         MS. SWEENEY:  Not on that line, it doesn't.     14:14:04
```

                                                    Page 166

```
 1              MR. NAWRACAJ:  Line 2.  I am looking at the      14:14:09

 2     sixth line.

 3              THE WITNESS:  A negative balance of 1,896.72.    14:14:22

 4              MS. SWEENEY:  The sixth line is not to           14:14:24

 5     TitleRover.

 6              MR. NAWRACAJ:  Oh, I am sorry, it's the bank     14:14:30

 7     fees.  My mistake.

 8         Q    So the fifth line, the $8,000 payment to        14:14:34

 9     TitleRover, left on an accrual basis a negative balance

10     of $1,896.72.

11              MS. SWEENEY:  The document speaks for itself.    14:14:45

12              THE WITNESS:  That's what it says.               14:14:48

13     BY MR. NAWRACAJ:                                          14:14:49

14         Q    Okay.  So the next traunch comes in on,          14:14:49

15     according to this ledger, October 28, 2016.

16         A    Okay.                                            14:15:00

17              MS. SWEENEY:  Objection.  That's -- the          14:15:00

18     document speaks for itself and that's not what it says.

19              MR. NAWRACAJ:  There's a line item that says on  14:15:07

20     October 28th there is a payment into Hopewell by

21     EnSource investments of $205,000.

22              MS. SWEENEY:  Yes, but that's not the next       14:15:22

23     payment.

24              MR. NAWRACAJ:  I didn't say it was.  I said      14:15:27

25     there was an in-flow of $205,000.
```

Page 167

```
 1              THE WITNESS:  You said the next payment before     14:15:31

 2    that.

 3    BY MR. NAWRACAJ:                                             14:15:40

 4        Q    There was, then, a payment to Beyond Review on      14:15:41

 5    October 28th, 2016 for $26,275.50.  Is Beyond Review one

 6    of the companies that was owned by the Willis Group?

 7        A    Yes, it is.                                         14:15:57

 8        Q    Okay.  Do you remember what that amount would       14:15:57

 9    have been for?

10        A    It would have been for services that Willis         14:16:00

11    Group had paid the contract attorneys that were working

12    for EnSource.

13        Q    So it would have been a payable on the ledger       14:16:10

14    of Hopewell?

15        A    Correct.                                            14:16:16

16        Q    Okay.  So when these payments were made, did        14:16:16

17    Tom ever flag to you or mention that there is cash flow

18    issues with Hopewell?

19              MS. SWEENEY:  Objection; vague as to time.         14:16:46

20    BY MR. NAWRACAJ:                                             14:16:49

21        Q    Okay.  From the period of the first traunch         14:16:49

22    which is September 13th through the second, $205,000

23    payment which was on October 28th, did Tom Tatham ever

24    indicate to you that there is a cash flow issue with

25    Hopewell?
```

                                                       Page 168

```
 1        A    I don't know what you mean by cash flow issues.    14:17:08

 2   We had a budget that we were anticipating and we had a

 3   schedule of expected funds and we had an -- anticipating

 4   a closing of a transaction that met our budget.

 5           So from my perspective, it was -- it was on    14:17:21

 6   time and we were getting to the funding of what was --

 7   had been committed and we had been discussing since the

 8   middle of the summer.

 9        Q    And just to confirm, during this period of time    14:17:44

10   there were no capital-raising activities that had been

11   occurring by yourself or Tom?

12        A    Correct.    14:17:54

13        Q    Okay.    14:17:58

14           MS. SWEENEY:  Is this a good time for a break?    14:17:59

15           MR. NAWRACAJ:  Sure.    14:18:01

16           THE VIDEOGRAPHER:  We are going off the record.    14:18:04

17   The time is 2:18.

18           (Recess.)    14:18:08

19           (Mr. Pannu exited the proceedings.)    14:26:16

20           THE VIDEOGRAPHER:  We are going back on the    14:26:40

21   record.  This is the beginning of media number four.

22   The time is 2:26.

23   BY MR. NAWRACAJ:    14:26:46

24        Q    I am going to turn to the events on and after    14:26:51

25   December 2016, in particular in the beginning of 2017.
```

Page 169

```
 1    When was the decision made to discontinue the operations

 2    of Hopewell, approximately?

 3         A    I -- I would have to look at some of the          14:27:16

 4    shareholder meetings and -- just to get that exact date.

 5    I don't recall.  Somewhere in this time frame.

 6         Q    So as to a limited liability company, Hopewell    14:27:26

 7    had managers?

 8         A    It did.                                           14:27:32

 9         Q    And you were a manager?                           14:27:33

10         A    I was a manager.                                  14:27:34

11         Q    And then Tom Tatham?                              14:27:35

12         A    Tom Tatham was a manager.                         14:27:37

13         Q    Did you hold a board of managers meeting to       14:27:39

14    discuss items such as discontinuance of operations

15    and/or the filing of bankruptcy protection for the

16    company?

17         A    Sure.  We actually had a shareholder meeting, I   14:27:50

18    think for the, you know, discontinuance of the -- you

19    know, kind of the state of affairs where the company was

20    at that particular time, so I think all of the

21    shareholders were invited and participated in that

22    meeting.

23         Q    When was that?                                    14:28:07

24         A    I don't recall.  It was somewhere in this time    14:28:08

25    frame.  Somewhere between December and, you know,
```

Page 170

1    February.

2        Q   Did you and Mr. Tatham after that -- and I        14:28:16

3    think it would be a member meeting, because it's a

4    limited liability company.

5        A   Um-hum.                                           14:28:25

6        Q   Did you and Mr. Tatham hold a board meeting or    14:28:25

7    an informal meeting as far as filing bankruptcy on

8    behalf of Hopewell?

9        A   We had several meetings as it related to that.    14:28:34

10       Q   What was the context of those meetings; in        14:28:37

11   other words, were you a proponent for filing the

12   bankruptcy?

13       A   I was.                                            14:28:44

14           MS. SWEENEY:  I am going to --                    14:28:45

15           THE WITNESS:  Sorry.                              14:28:46

16           MS. SWEENEY:  -- object in general to the         14:28:47

17   extent that the conversations included attorneys.

18           THE WITNESS:  Okay.                               14:28:50

19           MS. SWEENEY:  And if they did, I am instructing   14:28:51

20   you not to disclose confidential attorney-client

21   privileged communications.

22           THE WITNESS:  Okay.                               14:28:57

23   BY MR. NAWRACAJ:                                          14:28:59

24       Q   Yeah, I don't think that my question would        14:28:59

25   disclose it, but you were in favor?

                                             Page 171

```
 1        A    I was.                                      14:29:04

 2        Q    Without disclosing privileged information, why    14:29:06

 3   was that?

 4        A    A couple of reasons.  One, at that particular    14:29:12

 5   time, there was a lawsuit filed in federal court by

 6   EnSource and here in the State of California, so that

 7   was one of the reasons.

 8             The second reason was to protect what I thought   14:29:28

 9   was the company's -- you know, one of the company's

10   primary assets, and that was the lease that was acquired

11   by SMH.

12             So there were two things.  One, I wanted the --   14:29:40

13   the hearing, because it was a start-up, to hopefully

14   hear all the facts and be a lot quicker, what I was

15   told.  And I guess I can't -- I essentially consulted

16   with counsel, but the purpose was to -- to have a quick

17   hearing as quickly as possible as opposed to having this

18   drug out a year or two and have all the assets of

19   TitleRover and Hopewell go stale and potentially go to

20   zero or to have it heard expeditiously potentially in a

21   bankruptcy court; so that was one objective.

22             The second objective was the stayability for     14:30:15

23   SMH to foreclose on the lease that it had lent to so

24   that we could have a period of time to hopefully protect

25   that asset as well.
```

Page 172

```
 1        Q    Do you recall how much, if any, SMH was owed       14:30:29

 2    under the line of credit?

 3        A    Approximately $100,000.                            14:30:37

 4        Q    Who was behind -- or who owned SMH?                14:30:42

 5        A    The principals that the acronym stands for.        14:30:46

 6    Sanders, Morris & Harris, I believe.  I think that's

 7    right.

 8        Q    Any of those individuals related to you or Tom     14:30:57

 9    Tatham, to your knowledge?

10        A    No.                                                14:31:03

11        Q    No?  Did SMH eventually get the lease?             14:31:04

12        A    I believe they did.                                14:31:08

13        Q    Okay.  When you were talking with Tom Tatham on    14:31:10

14    bankruptcy possibilities for Hopewell, how did Tom

15    react?

16        A    He was not in favor of it.                         14:31:24

17        Q    Did he express why?                                14:31:25

18        A    He just didn't feel like it was a -- it was a      14:31:28

19    worthwhile strategy, and I don't believe he was

20    interested in staying the bankruptcy and delaying SMH

21    and their ability to grab their collateral.

22             I think he was more in favor of preserving his     14:31:46

23    relationship with SMH and giving them the collateral and

24    letting them move on their merry way.

25        Q    That's all I have.                                 14:31:59
```

Page 173

```
 1       A    Okay.                                        14:32:03

 2            MR. NAWRACAJ:  Over to you.                  14:32:04

 3            MS. SWEENEY:  I am not going to ask any right 14:32:05

 4   now.

 5            Tom?  Tom, are you here?                     14:32:07

 6            THE WITNESS:  Did he fall asleep?            14:32:18

 7            MS. SWEENEY:  Your depo, so your decision.   14:32:26

 8            MR. NAWRACAJ:  Well -- Tom.                  14:32:28

 9            MR. TATHAM:  Sorry, I just stepped out for a 14:32:35

10   second.  I don't have any -- any questions today.  I

11   will reserve whatever I have to the time of trial.

12            MR. NAWRACAJ:  Okay, great.  I think we are  14:32:45

13   set.

14            THE VIDEOGRAPHER:  Okay to go off the record? 14:32:49

15            MR. NAWRACAJ:  Yeah.                         14:32:52

16            THE VIDEOGRAPHER:  Okay.  We are going off the 14:32:53

17   record.  The time is 2:32.

18            (TIME NOTED: 2:32 p.m.)

19

20

21

22

23

24

25
```

Page 174

1

2

3              I, MARK ALLEN WILLIS, do hereby declare

4    under penalty of perjury that I have read the foregoing

5    transcript; that I have made such corrections as noted

6    herein, in ink, initialed by me, or attached hereto;

7    that my testimony as contained herein, as corrected, is

8    true and correct.

9              EXECUTED this_____day of_____,

10   2019, at_____, _____.

                    (City)                    (State)

11

12

13

14              _____

                MARK ALLEN WILLIS

15

16

17

18

19

20

21

22

23

24

25

                                            Page 175

```
 1              I, the undersigned, a Certified Shorthand
 2     Reporter of the State of California, do hereby certify:
 3              That the foregoing proceedings were taken
 4     before me at the time and place herein set forth; that
 5     any witnesses in the foregoing proceedings, prior to
 6     testifying, were duly sworn; that a record of the
 7     proceedings was made by me using machine shorthand
 8     which was thereafter transcribed under my direction;
 9     that the foregoing transcript is a true record of the
10     testimony given.
11              Further, that if the foregoing pertains to
12     the original transcript of a deposition in a Federal
13     Case, before completion of the proceedings, review of
14     the transcript [ X ] was [  ] was not requested.
15              I further certify I am neither financially
16     interested in the action nor a relative or employee
17     of any attorney or party to this action.
18              IN WITNESS WHEREOF, I have this date
19     subscribed my name.
20     Dated:  07/08/2019
21
22
23
24
                ANELA SHERADIN
25              CSR NO. 9128
```

                                                    Page 176

[& - 4]

| & | | | |
|---|---|---|---|
| **&**  3:10 11:18 15:23 35:14 38:20 66:25 76:13 173:6 | **111**  4:19 | 114:17 121:3 | **225,000**  52:11 |
| | **11:03**  48:10 | 127:21 167:1 | **248-1555**  91:6 |
| | **11:58**  87:25 | **2,000**  166:22 | **25**  4:19 82:13 |
| | **12**  52:10 97:1 | **2,000,000**  84:11 | 83:16 84:1 106:4 |

**&**

**&**  3:10 11:18
  15:23 35:14 38:20
  66:25 76:13 173:6

**0**

**000670**  4:20
**000710**  4:20
**00079**  1:5 2:5
**01422**  4:16
**01423**  4:16
**06**  136:10
**07/08/2019**  176:20

**1**

**1**  1:25 4:11 12:24
  13:1 91:4 96:14
  102:2 103:3,9
  158:12
**1,000,000**  84:12
**1,896.72.**  167:3,10
**1-2m**  100:19
  101:17
**1-50**  1:12 2:12
**10**  92:22 108:14
  127:1
**100**  25:24 33:3
  161:20
**100,000**  150:25
  151:7,12,22
  152:18 153:9
  154:15 155:1,9,20
  155:23 156:11,13
  156:21,24,25
  159:13,15,23
  173:3
**10:04**  2:19 5:2,5
**10:56**  48:6
**10x**  127:24 128:17
  128:19 136:24
**11**  112:10

**111**  4:19
**11:03**  48:10
**11:58**  87:25
**12**  52:10 97:1
**120**  129:9
**12:28**  111:12
**13**  4:11
**137**  4:21
**13th**  137:23 138:1
  138:12 139:8,11
  140:15 142:1
  143:3,21 145:6
  163:10 168:22
**1400**  20:21
**146**  90:23,24
**14th**  143:6,21
**15,000**  108:14
**150**  25:25
**155**  3:5
**16**  154:5
**16th**  145:7 163:10
  166:12,13
**17,000**  53:2 109:2
**17,500**  51:7 52:20
  53:2,21 55:7
  58:19 108:8
  143:11
**176**  1:25
**17th**  3:11
**18**  80:5,13 109:14
**18th**  81:4
**1997**  69:4
**1:04**  111:16
**1st**  101:4,8,14

**2**

**2**  4:13,13 9:21
  48:19,22 75:15
  82:2 84:17,22
  85:1 102:2 103:3
  103:9 104:8
  113:10,10 114:17

114:17 121:3
127:21 167:1
**2,000**  166:22
**2,000,000**  84:11
**2,028.68.**  166:14
  166:24
**20**  126:15
**200**  52:11
**2000**  69:3,3
**2005**  37:23
**2006**  11:17
**2007**  68:2 69:6
**2015**  37:25
**2016**  4:19 13:23
  18:2 19:23 25:19
  44:10 45:7 46:15
  46:22 49:23 50:18
  50:24 52:23 53:19
  58:8 62:3,11 67:8
  76:8 80:6,13
  93:17 94:23,24
  95:2,3 98:17
  101:8 112:9
  113:24 115:4
  120:23 137:23
  138:12 139:8,11
  151:17 154:5
  167:15 168:5
  169:25
**2017**  4:22 156:22
  157:5 169:25
**2019**  1:17 2:20 5:1
  5:6 175:10
**205,000**  138:13,18
  139:7,17,23
  140:22 141:12
  143:8,25 145:5
  147:7 148:2,7,8
  149:5 163:9,14
  165:9 167:21,25
  168:22

**225,000**  52:11
**248-1555**  91:6
**25**  4:19 82:13
  83:16 84:1 106:4
  106:19 112:9
**25,000**  144:16
**25,000,000**  82:9
  105:11
**25,090**  143:6
**25m**  100:21
  105:14
**25th**  99:11 113:24
  115:4 120:23
**26,275.50.**  168:5
**27**  1:17 2:20 5:1,5
**28**  167:15
**28th**  167:20 168:5
  168:23
**2:18**  169:17
**2:26**  169:22
**2:32**  2:19 174:17
  174:18

**3**

**3**  4:14 51:7 52:19
  55:3 59:6,8 72:8
  76:15 105:8 116:8
  127:18
**30**  124:2,5 142:4
**312.803.4837**  3:6
**31st**  124:1
**3405283**  1:23
**35**  39:8 144:13
**35,000**  139:12,16
  140:14 143:4
**3:17**  1:5 2:5
**3d**  68:6

**4**

**4**  4:15,22,22 60:24
  79:21,25 88:4,5
  128:16

Page 1

**[400 - additional]**

400   158:11
400,000   105:8
41   4:18 90:23 91:1
41/146   95:5
42,500   143:5
4250   3:5
43   97:3
430,000   60:22 61:6
  61:10 137:24
45   47:25
46   100:6,7
48   4:13
480   61:1
4th   49:23 50:17
  52:23 53:19 55:21
  58:8

**5**

5   4:14,17 82:5
  90:7,8 130:2
50   113:16
50,000   105:7
500   158:11
51   9:12,14
530,000   153:9
550   2:17 5:9
59   4:14

**6**

6   4:5,19 100:4
  111:17,20
60   123:3 141:23
  158:13
600   3:11
60606   3:5
61   4:18 90:24 91:3
619.233.4100   3:12
621   3:15
640   63:25 66:15
67,000   143:19,23
67,090   143:7

671   127:19
672   127:19
674   130:4
675   130:3
678   134:20
68,250.00   142:2
680   112:11
681   136:12
683   136:14

**7**

7   4:21 109:6
  137:12,15 144:13
7,500   140:7
70,500   52:10
7014   176:24
705   63:25
713   91:6
7500   143:5
77008   3:16
79   4:15

**8**

8   109:14
8,000   166:13,17
  167:8
800   2:18 5:10

**9**

9   134:19
90   4:17 18:4 69:4
  141:23
91   9:21
9128   1:21 2:21
  176:25
92   10:4
92101   3:11
95   10:19
97   69:5

**a**

a.m.   2:19 5:2,5

abilities   133:25
ability   35:17 43:16
  56:11 80:14 83:18
  85:5,7 105:18
  106:16 108:1
  119:25 131:15
  151:2 157:7
  164:13 173:21
able   24:4 64:5,8
  64:10 66:10 67:4
  74:1 77:7 79:19
  85:8 86:18 106:15
  109:20 118:12
  124:13 125:6,10
  125:13,23,24
  126:1 132:3,5
  134:1 150:22
abruptly   150:24
absence   156:2
absolutely   96:2
  146:22 147:1
  148:11 153:11
  158:5
absolved   154:16
acceptable   110:13
accepts   154:18
access   54:9
accommodate
  56:15
accomplish   56:10
account   4:21 27:5
  27:8 147:8
accounting   11:9
  11:23
accounts   15:10
  144:9
accrual   138:23,25
  139:3,4,5,6,10
  145:7 163:11
  166:14,21 167:9

accrued   139:17
  141:6
accurate   7:25 17:6
  101:21 123:25
  129:2 131:13
  133:3,8
accurately   95:9
  128:13
accused   160:5
acquire   85:6 86:22
  157:7
acquired   172:10
acquiring   63:12
  69:10 76:13 84:13
  86:11 102:6
acquisition   11:25
  67:7,23 84:16
  100:21 105:11,14
  106:19 157:10
acquisitions   68:22
  84:14
acreage   66:4,6
  68:25
acres   63:25 66:16
  158:11,11
acronym   55:19
  173:5
acting   74:19
  133:12
action   176:16,17
activities   29:13,19
  85:15 107:19,21
  169:10
actual   120:25
  159:25
add   97:20
added   97:14 131:1
additional   19:10
  82:13 84:12
  127:23 128:1
  136:23 158:7

[additional - aside]

161:16
administered  6:2
adult  9:10
advantage  123:6
advantages  123:15
advised  163:13
  164:10
advisors  11:8,8,8
  11:9,9 82:8,12,17
  83:21
advisory  12:20
affairs  170:19
affiliate  113:12,14
ago  6:14,18 12:6
  40:23 45:19,19
  64:12 92:2 130:21
  145:12
agree  118:17,18
  127:5 141:9
  155:17
agreed  50:10 55:1
agreement  4:13
  48:14,15 49:9,11
  49:11,17,18,19,22
  50:1,7,12,25 51:3
  51:15,19 52:2,14
  53:11 54:6,15,24
  55:1,4 56:19 75:3
  89:11 100:10
  102:25 143:10
  154:15,19 155:15
  155:16
agreements  103:4
  156:18
ah  120:12
ahead  84:7 91:13
  163:19
ailments  8:2
air  10:7,8
airfreight  10:6

ait  87:1
al  5:8 145:18
allen  1:15 2:16 4:3
  6:1 9:6 175:3,14
alleviate  79:13
allocating  18:14
allow  66:17
allowed  11:24
  42:22 46:9 64:21
  66:19 88:20
  117:12
amazing  80:8
ambiguity  118:25
amended  154:19
ami  55:9,18 66:8
  108:2,5
amount  97:14
  98:6,8 104:6
  143:16 153:10
  161:8 168:8
amounts  139:16
analysis  113:24
  115:16 124:14
  127:25 128:19
  136:25 140:5
analytics  135:3
analyze  76:11
  77:13,18 81:3
  89:2 159:1
analyzed  43:6
  52:11
analyzing  110:21
anela  1:21 2:20
  176:24
answer  6:22,23
  8:7,20,23 38:13
  41:8 53:25 93:2
  131:3 151:5 162:2
  162:5,6,9
answered  19:21
  51:20 81:12 88:17

89:17 121:14
  129:24 132:23
  136:3,4 155:25
  162:4,9 165:18
answers  7:6,14,24
  7:25 19:18
anticipated  134:16
anticipating
  145:19 169:2,3
anybody  10:22
  19:2 49:25 61:18
  65:14 102:11
  125:11 131:14
ap  144:6
aplc  3:10
apologize  20:4
  48:21 51:20 59:6
apparently  128:2
  156:10
appear  90:21
appearances  3:1
appearing  3:16
  5:16
appears  49:23
  80:13 90:16 91:5
  91:20 93:16 94:20
  100:9 112:13
  139:25
apples  85:18
  160:18
application  76:9
applications  23:8
  31:6
applies  32:19
apply  76:1 140:6
applying  15:11
appointed  26:2
appraisal  132:19
appreciate  6:10
  56:18

approach  15:2,3
approached  15:1
  15:18 98:9,22,25
appropriately
  114:21
approval  112:20
  112:24
approved  75:1
approximately
  52:5 75:7 86:16
  143:19 170:2
  173:3
april  49:22 50:17
  52:22 53:19 55:21
  58:8
ar  144:7
area  20:22,23
  24:14 32:13 50:10
  55:19,20 63:9,17
  63:18,23 66:9,10
  70:15 100:1 108:4
  113:23 115:16
  119:3 128:12
areas  56:17 78:24
  84:14 108:2
argumentative
  80:18 141:15
  152:7 162:4
  165:10
arm  42:22
army  68:24
arranged  88:11
arrears  147:1
arrive  84:17
arrived  51:6 85:2
  149:5,6
ars  144:6
artificial  135:2,3
asap  100:13
aside  86:21

[asked - believed]

asked   8:8,12 20:5
  49:18 88:17 89:17
  90:5 94:4 98:11
  99:1 121:13
  129:24 132:23
  136:3 141:4
  145:15 153:17
  155:25 162:3,7,9
  165:18
asking   6:21 71:7
  71:15,17 98:19
  99:3 102:8,22
  138:5 140:17
  160:6 161:15,18
  161:21
asleep   174:6
aspect   68:20
aspects   53:11 79:3
  135:12
assessment   8:10
asset   12:6,13
  172:25
assets   12:18 99:12
  99:14,16 172:10
  172:18
assimilated   119:14
assist   82:8
associated   113:23
  115:15 150:6
assume   7:21 74:25
  81:20 133:7
  140:25
assumed   72:4
assumes   26:6
  41:17 50:2 98:2
  112:22
assuming   73:14
  74:13 113:6
  134:24
assumption   51:9
  51:10 74:8 114:20

115:8
astros   10:24
astute   133:11
attached   13:2
  48:23 59:9 79:22
  90:9 111:18
  137:13 175:6
attempted   35:19
attend   9:16
attended   9:15
attending   6:9
attention   13:19
attorney   17:15
  20:7 35:17 171:20
  176:17
attorney's   30:18
attorneys   15:8
  32:5 56:8,8,11
  150:2 168:11
  171:17
author   114:23
authored   114:25
authorized   27:7,7
automated   115:6
  115:9,10 121:2
  123:19
automating
  113:22 115:14
available   25:12
  106:3
aware   41:15 145:5
awry   133:18

**b**

b   3:11
back   11:14,23
  18:20 19:17,20
  31:16 37:14 46:7
  48:8,12 61:5
  66:24 80:22 92:19
  102:13 103:13
  110:10,16 111:14

117:13 121:8,17
  121:19,21 122:8
  123:10 124:7
  130:22 138:2
  139:7 141:4
  145:14,19 148:8
  149:7,13 153:22
  155:13,20 164:2
  169:20
background   9:3
  18:6 67:12
bad   161:22
balance   126:22
  138:21,23 144:23
  144:23 145:3,8,11
  165:14 166:14,21
  166:24 167:3,9
bank   27:5,8,11
  108:11,14 139:2
  166:11 167:6
bankruptcy
  170:15 171:7,12
  172:21 173:14,20
bar   70:2
barometer   30:21
base   68:16
based   20:19,21
  34:17,17 46:13
  52:18 56:8 88:11
  99:11 109:3
  162:20
basic   55:8 122:15
basically   22:23
  34:12 44:17 51:14
  87:22 125:15
basis   29:5 32:9
  37:11 46:11
  109:18 122:9
  134:12 138:23
  139:3,4,5,6,10
  145:7 149:15

150:23 165:21
  166:14 167:9
bates   73:2 112:11
  127:19
bc   109:11
beach   70:2
bearing   127:20
beginning   2:18
  32:6 48:9 111:15
  169:21,25
begins   90:22
behalf   2:17 5:15
  5:17 49:23,24
  73:24 75:7 171:8
belated   31:13 71:5
believe   26:12,16
  26:16 27:6,9
  30:23 31:12 32:23
  33:1,1 34:5 44:12
  49:1,3,17 50:18
  51:11,17 58:1,4,24
  62:16 63:8,22
  65:14 66:1 70:2
  76:18 81:15 83:22
  89:13 91:17 95:18
  103:5,6,11 105:24
  106:22 109:2
  112:16 113:9
  115:2 116:3
  118:12 122:17
  129:25 130:18
  131:8,10,12,22,25
  133:19,22 136:21
  141:16 144:11
  147:17 151:1,5,21
  151:23,25 156:13
  159:12 163:13
  166:4 173:6,12,19
believed   66:6
  77:20 100:2 127:2
  127:13 128:21

[believed - calls]

129:4 133:2,10,12
136:1
**bell** 24:23
**benefit** 54:13,14
**best** 18:21 20:17
51:17 74:16 83:6
132:25 135:14,17
**better** 64:19 67:24
102:21
**beyond** 3:8 5:18
32:3 35:15 38:24
41:5,5,10,21 87:11
125:18 126:8
168:4,5
**beyondrecog**
38:24
**beyondrecogniti...**
23:9 28:18 34:7,9
34:16,22,23 36:25
37:4,6 39:22 40:2
40:14,16,25 41:4,6
41:14 42:6,7,16,20
42:21 77:5 78:10
78:15 114:13
128:6 130:7,10,20
131:5,21,23 132:3
133:15,20,24
**beyondrecogniti...**
131:15
**bhp** 35:7 37:18
38:5,21 39:6,7,19
40:1 133:15,17
**big** 66:23 95:21
**biggest** 95:15,24
**bill** 29:10
**bills** 145:17
150:16,22 164:13
164:19
**bit** 10:16 19:17
33:21 36:13 38:3
42:23 61:5 70:10

100:3 126:3
163:17
**block** 58:21
**blowup** 133:15,17
**board** 6:20 12:11
12:20 26:10
170:13 171:6
**book** 124:23,25
125:1 135:22
**bookend** 44:21
**boston** 24:21
**bottleneck** 42:10
**bottom** 95:4,5
97:4 100:8 112:10
112:11 140:18
144:15,17
**bought** 12:13,14
17:19 57:21,23
158:22
**boulevard** 20:21
**bouncing** 78:6
**box** 30:12,14
76:24 156:16
**boxed** 20:22
**break** 26:9 41:23
48:1,3 69:17
87:25 111:8
124:15 160:21
169:14
**breakdown** 39:11
**breaks** 47:25
122:21
**brent** 16:12 21:16
21:20,23 23:4,4,11
23:17,19 24:9,20
32:1 37:10 56:14
57:8 77:10 78:7
80:4 89:2,2,9
115:2,22 119:19
119:19 122:6,6
127:14 128:3,13

128:20 133:2
135:5 149:11
**brent's** 30:8
**bridge** 145:15
146:24 147:6
148:6,7,10 149:6
164:5,6,8 165:4
**briefly** 9:3 10:5
111:21
**bring** 16:12
117:20
**brought** 13:8 15:5
15:16 16:6,11,18
16:20 17:7,11,19
63:8 64:16 65:1
65:10 70:3,5
155:7
**browsed** 72:11
**bubble** 101:17
**budget** 28:5,25
85:3,22 86:15
143:1 157:10
158:24,25 160:14
160:15 162:20
169:2,4
**budgeted** 159:9,10
161:8
**budgets** 85:12
**build** 14:24 30:5
56:14 62:5 67:5
69:7
**building** 30:6,20
31:6
**built** 16:3 30:8
42:18,18,25 54:11
**bunch** 103:18
118:3 128:11
**bus** 18:12
**bush** 99:23 110:18
**business** 10:11
14:5,24 21:7,12

23:13 24:10 25:8
26:17 29:1,19
30:25 31:21,22
32:14,16 40:21
56:6 57:10 58:10
64:18 67:18 70:11
85:16 87:15,23
89:2,5 106:25
113:16 124:4
129:8 132:8
133:11 134:8
137:4 141:7,17
142:24 150:20
159:22 161:19,22
162:23 163:1
**businesses** 25:14
141:22
**businessman**
27:19
**button** 43:3 47:18
124:11
**buttons** 43:4
**buy** 57:25 77:2
109:20 110:12

**c**

**c** 2:17 3:15 5:9
**cake** 125:9
**calculate** 103:13
**california** 1:2,16
2:2,18 3:11 5:1,10
70:14 172:6 176:2
**call** 16:24 26:3
71:2 125:8 152:8
153:21
**called** 10:7 11:18
15:23 16:23 17:12
37:18 38:25 39:19
41:24 48:14 68:4
102:24 143:10
**calls** 31:14 32:24
58:22 101:9

[calls - comfortable]

115:19 140:23
143:12 144:1,2
camp  62:5,8
capabilities  34:6
41:1 77:8 79:7
126:1 134:3
capability  40:18
40:22
capacity  40:4,8
71:20 90:2 99:1
capital  12:9,10
22:10 27:22,23
28:7 29:1 43:17
43:19 44:5 83:19
84:15 85:22 86:6
86:12 87:12,14
95:11 96:3 98:8
105:21 141:4,5,10
150:19 151:3
157:8,22,24,25
158:7,22 159:3,22
159:22 160:4,16
161:3,9,11,12,19
161:20,24 162:12
162:15,18 169:10
capitalization  22:5
capitalize  22:20
64:18
capitalizing  67:24
captured  123:7
carbon  80:5
carried  110:5,13
carved  20:22
case  1:4 2:4 38:8,9
55:22 103:5,7
141:1 176:13
cash  109:25
144:23 145:2
156:18 157:22
158:3 162:8 164:7
164:14 168:17,24

169:1
casually  101:23
catalog  111:5
categorize  34:20
category  30:9
cc'd  113:7
ceo  25:20 26:23
34:22
certain  34:5,6
40:18 45:14 75:13
78:24 81:10 82:7
111:22 115:7
117:12,13 118:23
131:24
certainly  25:6
119:17
certified  2:20
176:1
certify  176:2,15
cetera  9:23 29:4
101:20
chad  60:7,8,9,17
61:18,23 70:23,25
71:20 73:18 90:17
91:20 93:20 94:5
100:9 145:18
146:3 148:21
152:4 153:19
155:10 161:2
164:4,10 165:4
chain  4:15 90:22
121:18,20 122:22
chained  121:23
chaining  121:19
chairman  68:3
challenging  39:12
champion  11:21
chance  7:15 72:9
change  38:25
changed  35:14
90:5

changer  43:8
changes  7:13
changing  35:10,20
35:22
character  34:4,17
119:12 127:3
charge  123:3
cheap  66:13
check  65:15
103:20 105:1,5
126:22 129:2
138:3 144:12
checkbook  139:20
checked  124:23
125:1 156:16
checking  122:10
chevron  38:10,25
39:5,13,18,19 40:1
134:14,16
chicago  3:5
children  8:12
choice  161:23
chronologically
45:5
chunks  116:4
circle  129:18
city  175:10
claim  121:1
claims  121:2
clarification  38:19
clarify  98:19
153:15 163:18
classify  11:4
clear  17:5,10
28:14 38:14,15
51:4 53:10 71:9
71:18 108:18
117:4
cleared  162:25
clearly  54:21,22
54:22 102:21

click  43:3,3 47:17
124:11
client  22:17 85:25
171:20
clients  91:18
cliff  151:11
close  16:1 19:24
95:13 145:20
158:22
closest  93:7
closing  145:20
169:4
cloud  44:6
clouded  151:2
162:23
cluster  36:11,12
36:14
clustering  80:9
116:10
code  135:13
coding  146:16
150:5
collaborate  23:24
collaborating
37:10,10
collateral  173:21
173:23
collectively  4:17
college  9:10,15,16
colors  70:7
combined  28:24
37:5
come  26:25 27:24
38:6 65:13 102:18
110:10,16 125:2
129:19 132:13,16
160:6 164:16
comes  163:9
167:14
comfortable  124:6
154:14

[coming - continuing]

coming  66:24 68:7
  147:8 149:13
  159:25
commenced  46:16
commercial  76:25
commercially
  75:25
commit  101:25
  160:13
commitment
  97:16,23 99:8
  102:13 131:16
  150:25 153:25
commitments
  101:7,14 104:23
  154:1
commits  97:18
  102:11
committed  97:9
  97:11,17 98:1,3
  102:19 103:19
  105:5,9 169:7
commonly  34:3
communicate
  23:24 24:11 33:7
  33:12 89:3
communicated
  39:15 120:7
  145:16,24 146:22
  148:22,24
communicating
  40:9
communication
  39:11
communications
  71:16 92:17
  171:21
community  99:21
companies  11:19
  11:20 30:17 36:1
  47:13 58:20 63:23

66:11,21,25 67:5
  67:19 68:19,22
  69:12 79:2 85:19
  109:23 110:9,15
  124:25 157:8,21
  168:6
company  1:4,9,10
  1:11,11 2:4,9,10
  2:11,11 10:6,7,14
  10:21 11:18 15:23
  17:12 20:16 21:13
  22:6,7,20 24:19
  25:25 26:11 27:4
  27:17,20,22 29:2
  29:18 30:4 31:23
  32:4 35:12,13
  36:2 38:25 42:1
  51:22,23 52:7
  66:7 68:3,15,15,16
  73:22 76:7 82:18
  82:19 98:24
  104:17 108:3
  116:11 119:4
  127:7,10 129:10
  155:6 159:6,11
  160:7,15 161:17
  164:12 170:6,16
  170:19 171:4
company's  82:9
  84:15 109:21
  161:12 172:9,9
competent  127:13
competition  125:2
complete  7:25
  14:20 54:18
  122:23
completed  43:11
completely  45:20
  63:24 66:5
completion  76:2
  176:13

compliance
  100:18
complicated  63:19
  63:20 64:3
component  117:11
components  22:13
  33:22
compound  69:16
  69:23 74:5 80:18
  82:14 144:25
comprised  30:2,3
  37:3 42:2 56:2
  58:2
computer  10:11
  137:10
concept  15:16
  21:6 76:9
concern  80:7
  155:12 164:3
concerned  71:3
  149:10
concerning  92:17
  94:18 163:25
concert  42:17
conclusion  101:10
  140:5
conducted  85:16
conducting  85:16
confidential
  171:20
confidentiality
  100:10
confidently
  109:12
confirm  154:9
  169:9
confirming  151:16
confused  106:20
  159:12
confusing  41:7

conjunction  37:9
connect  93:8
connected  60:3
connection  72:22
  73:6 96:8 112:14
  121:10 165:3
connotation
  119:17
consider  95:2
considered  25:5
  154:2
considering  96:13
considers  154:18
consisted  46:15,23
  76:23
consistently  134:5
constantly  23:25
consultants
  146:14
consulted  58:18
  172:15
consulting  87:7
consumed  145:6
consummated
  16:2
contained  175:7
contains  111:24
contemporary
  75:24 76:14
content  116:16,17
  118:9,11,12,20,20
  118:22 119:9,23
context  38:17
  156:3 160:24
  161:13,13 171:10
continually  47:13
continue  84:15
  156:22
continues  76:1
continuing  79:12
  146:9

[contract - dealing]

contract 28:10,12
32:5 43:25 52:8
52:17 58:25 87:20
87:21 88:11 89:6
168:11
contracted 89:10
contractor 21:21
21:22
control 40:13
99:25
controlled 59:17
108:2 109:23
conversation 74:7
92:5 132:14
151:10,13,17
153:17,19,23,24
conversations
82:25 103:14
105:23 148:13,13
148:14,20 152:9
164:15 171:17
convert 119:13
converting 120:15
conveyances 80:9
convinced 35:9
cool 95:7 126:25
copied 80:5
copies 48:21 117:9
copy 124:8 146:16
150:5
core 31:19 68:4
corner 139:1
correct 8:24 16:11
16:20 17:1 19:15
20:3 21:1 24:16
44:10 51:17 58:1
58:4,11,13,14
67:10 71:1,4
77:21 86:25 87:3
87:24 90:25 95:14
97:25 104:10

111:23 113:9
121:18,18 122:12
138:14,15,17
140:2 157:15,16
157:16,20 168:15
169:12 175:8
corrected 175:7
corrections 175:5
correctly 121:21
correlation 81:9
cost 54:12 66:10
66:15 88:11
costs 54:11 66:11
67:6
counsel 5:12 8:17
13:16 61:18,20,22
61:23 72:23
111:23 154:22
172:16
count 96:24
counties 31:7
55:10
county 16:21
17:12 116:19
118:2 121:1
122:17 123:21
124:10 125:16
couple 11:14
37:22 62:5 70:1
95:11 96:4 100:23
105:17,24 165:25
166:1 172:4
course 62:12
113:5,6 137:4
court 1:1 2:1 13:2
48:23 59:9 79:22
90:9 111:18
125:16 137:13
172:5,21
courthouse 122:25
123:2,22 124:7,9

124:18,23 150:7
courtroom 7:8
125:16
cover 55:9 148:10
covering 55:8
covers 87:14
crane 10:23
credible 127:2
credit 156:19
157:6,14,17 173:2
criteria 56:9
critical 142:25
146:23 154:2
cross 158:2
csr 1:21 176:25
cuff 92:4
current 60:11
currently 11:11,12
12:2 100:11
custom 130:7,9
131:5,9,11
customizes 130:14
cv 1:5 2:5

**d**

d 3:10
dad 19:14
daily 33:13,15
122:9
data 4:19 21:9
54:8,9,9,22 56:1
65:1,21 69:12
73:5 76:12 83:15
99:24 110:21
112:7 113:21
115:13,25 116:3,5
117:21,22 119:13
119:14 120:16
122:24 124:13
127:4,25 128:18
136:8,25

database 116:24
123:12,16,18
125:20
databases 117:11
127:16
dataset 38:6
date 5:5 31:10
32:20 49:22 50:17
101:3 123:23
131:6 140:13
143:4 170:4
176:18
dated 80:5,12
112:8 115:5
120:23 130:17
154:5 176:20
dates 46:1 96:19
115:7
daughter 70:13
day 25:8,8 26:3
30:24,24 31:1,1,22
31:22,25,25 32:9,9
33:19 123:3 125:1
132:8,8,8,8 134:8
134:8,12,12
141:23,23 142:7
142:23,23 143:8
144:5 154:3,3
155:11 165:21,21
175:9
days 18:4 124:3,5
124:20 143:7,21
164:11 165:9
deal 21:19 55:24
92:7,11,17 93:6,15
94:8,15,16 95:10
95:15,17,24 97:9
97:11 99:6,23
110:4,10 153:20
dealing 127:16

[dealings - discovery]

dealings  22:1
25:14
deals  10:25 11:1,3
11:7 15:25 16:2,4
60:16 92:7,13
93:20,23,24 94:5
94:11,11,13,14,14
95:21 105:21
debt  84:10,22
143:23 158:1
decade  37:25 69:5
december  151:17
152:12,17 154:5
158:3 161:6
169:25 170:25
decide  22:22
decided  16:11
69:6
decision  23:5 26:4
124:4 163:1 170:1
174:7
decisions  32:21
decks  112:19
declare  175:3
deeds  80:9 116:18
deem  7:13
deep  127:14
defendant  3:14
4:12 5:22
defendants  1:13
2:13 3:8
deferrals  158:1
define  27:18
defined  28:6,8
50:9 76:7
definition  141:10
146:24 164:22
delaware  1:4 2:4
delaying  173:20
deliver  131:15

delivered  134:15
delivering  134:4
delivers  127:23
128:17 136:23
demanded  155:1,6
demanding  151:12
demise  159:15
demonstrate
106:16
demonstrating
76:8
depending  40:7
116:14 119:9
120:10 141:21
depends  40:8
117:15
depo  174:7
deposition  1:15
2:16 4:10,11 5:7
6:10,11,14,15 7:11
8:18 12:25 13:6
13:17 29:14
176:12
derived  51:9
describe  18:6
31:19 33:22 35:5
36:4,13 37:15
38:3 51:10 82:11
86:14 88:16
described  29:14
29:20 31:17 37:4
40:17
describing  16:14
29:22
description  11:15
designed  47:4,5
desk  123:5 124:20
125:7
detail  140:3 166:3
determine  22:15
27:23 73:3 159:2

determined  22:25
65:4 86:17 128:19
determining  30:2
develop  21:7 23:3
24:13 42:1,22
51:12 110:3,15
developed  28:11
36:24 42:5 45:13
45:15 47:19 50:9
53:3 55:23 56:3,5
56:21,22,24 57:3,5
57:5,11,12 67:19
77:17 86:2 88:25
107:2 113:20,25
114:2 119:19
120:22 127:7,11
127:12,22 136:22
developers  29:4
147:20
developing  22:11
47:21 51:13 109:5
development
29:23 31:4 44:16
44:19,22 56:23
89:7,12 108:5
109:22 135:8
developments
74:12
dialogue  122:8
diego  1:16 2:18
3:11 5:1,10 75:12
diem  123:3 125:5
difference  36:13
124:19
different  11:9,9,19
11:20 15:9 22:13
22:23 28:23 30:7
33:14,14 37:13
38:19 39:10 40:5
42:2 43:4 47:15
57:2,3 64:4 93:23

94:10,14 101:24
116:9,13 119:5,7
123:20 134:13
142:9 145:21
differentiators
134:21
differently  163:18
difficult  7:1
digital  76:12
116:21 117:11
digitization  38:5
117:12
digitize  38:6
116:20 117:7,8
digitized  117:19
117:22 119:12
120:1,15 123:9,9
124:8,10,12
125:13,15 126:13
127:5
digitizing  117:9,25
118:4 123:6 125:6
125:21 150:6
diligence  11:1
65:23
dinner  69:14,21
direct  31:9
direction  176:8
directly  35:25
45:11 89:6
disclose  171:20,25
disclosing  172:2
disclosure  160:3
discontinuance
170:14,18
discontinue  170:1
discovered  99:19
discovery  15:9
35:11,18 38:8
40:19 41:2 107:13
107:16

[discretion - engaged]

discretion  154:13
discuss  47:10
    55:17 69:15
    170:14
discussed  63:2,4
    93:23 112:18
    155:7
discussing  30:20
    169:7
discussion  64:20
    86:9 155:18 159:8
discussions  16:16
    56:6 70:18 83:9
    84:4 156:2
distributed  73:23
distribution  74:1
district  1:1,2 2:1,2
    132:19
division  134:9
document  45:10
    48:25 49:6 55:14
    55:23 56:25 59:2
    72:15,18,20,24
    73:13 75:1,5
    80:17 86:7 89:20
    90:12,25 93:11,13
    101:6 112:13
    113:1 114:24
    115:12 119:22
    121:6 127:20
    129:11,22 130:11
    131:13 133:6
    136:2 137:3,21
    138:8,13,22 139:7
    142:8 156:5
    166:22 167:11,18
documents  13:5,6
    13:8,10,16 34:12
    34:12,13,15 36:10
    36:11,15 38:9
    46:10,10,11 88:22

111:24 116:10,10
    116:13,15,16,18
    117:20 118:3,6,13
    118:21 119:8
    122:16 123:11
    125:10 126:3,6
dog  126:24
doherty  17:15
    20:7
doing  21:14,16
    23:7,8 25:13 69:2
    85:12,17 93:20
    126:21 160:19
dollar  25:24
dollars  36:3 52:6
    52:18 86:16,19,20
    86:21 96:17 98:2
    98:13 102:15,19
    103:15 104:13
    105:9 159:1
donovan  11:18
    35:14 38:20
double  129:2
downside  109:15
    109:18
downturn  39:8
    63:15
dozen  21:24
dozens  68:21
drafted  72:14
    73:14
drafting  72:17
    73:12,15 75:2
dragging  149:1
dramatic  63:15
draw  156:19
drill  6:13 33:21
    66:12,13 67:1
drilled  66:8
drilling  66:16,22

drive  3:5 123:3
driving  18:12
drug  172:18
due  11:1 65:23
    140:2 141:25
    144:5,5 145:10,11
    150:16,23 154:15
duly  176:6
dust  44:6

e

e  3:4,4 15:9 35:11
    35:18 38:8 40:19
    41:2 107:13,16
eagle  10:7,8
earlier  43:18 44:8
    67:18 74:10 76:21
    85:14 94:4 95:20
    112:18 141:3
early  47:21 62:13
    65:2,19 68:13
    94:20 103:14,17
    103:18
easier  105:22
    120:12
east  3:15
easy  41:9 47:16,17
    156:24
eat  62:6
educated  56:7
    121:21
education  9:23
educational  67:12
effect  7:7 106:7
    155:22
effectively  57:25
efficient  15:13
    21:11 24:13 30:12
    30:13,19 50:16
    65:7 78:23 79:1,5
    79:10,13 88:21
    107:21 108:23

109:1 116:5,8
    125:9
efficiently  21:10
    88:23
effort  44:22 82:21
efforts  159:7
either  13:6 35:25
    44:5 45:9 49:18
    56:9 57:23 67:12
    83:1 93:8 104:22
    105:5 110:4,11,19
    124:7 132:17
elaborate  78:19
elected  26:13
electronic  118:9
    123:21
electronically
    123:13,16
email  4:15 80:4,12
    81:5 90:21 106:7
emailing  100:9
emails  148:12
embodied  69:1
embracing  68:6
employed  11:11
    11:12
employee  21:21,23
    87:19 176:16
employees  22:3
    25:25 28:5 29:7
    32:15 86:23 87:20
encountered
    120:17
ended  11:17
ends  90:23
energy  68:4 83:3
    109:20
enforceable  97:24
    101:7
engaged  83:13
    149:12

[engel - explained]

engel   3:10
engine   1:10 2:10
 3:8 5:17 146:15
 150:4
enjoy   93:8
enormous   93:6
 95:25 109:14,17
enron   66:25
ensource   1:4 2:4
 4:11 5:8,15 43:16
 59:17,22,25 60:1,3
 60:15,19 61:6,17
 62:18,23 70:21
 71:2 72:22 73:18
 74:24,24 75:2
 137:20 138:6,14
 151:1,8 153:5,8
 154:10,11,16,18
 155:8,21,22
 159:14 163:14,20
 167:21 168:12
 172:6
ensure   5:8
entailed   82:11
entered   99:22
 124:8 163:7
entire   90:12,21
 135:25
entirety   143:16
entities   19:3 20:12
 20:23 38:19 40:5
 40:12 51:1,4
 59:16 87:7 134:10
entitled   54:25 97:3
 112:7 130:6 136:8
entity   17:8,14
 20:12,13 48:13
 85:21
entrepreneurial
 10:10

entrepreneurs
 11:21,24
entry   140:6
equity   12:8,12,21
 12:22 84:10,12
 158:1
ervi   32:2 140:21
esq   3:4,10
essential   78:16
essentially   137:1
 147:7 164:13
 172:15
estimate   8:10,14
 37:22 44:21
 104:15
estimated   86:15
et   5:8 9:23 29:4
 101:20 145:18
evaluate   159:3
evaluated   159:5
evaluating   14:17
 15:3 68:19
evaluation   84:16
evaporated   161:9
evening   70:9
event   45:14
 159:23
events   113:5,6
 159:21 169:24
eventually   18:15
 173:11
everybody   48:4
 105:16
evidence   78:3
evidenced   90:22
 138:12,21
evolution   44:16
exact   37:21 39:4
 44:11 99:5 113:2
 145:10,10,11
 170:4

exactly   16:10 23:7
 40:22 166:5
examination   4:2
 6:4 111:7
examined   6:2
example   19:4
 28:17 118:23,24
 121:20 146:12
 150:1
exceeded   97:14
 98:7 160:15
exchange   53:16
exclusive   55:8,20
 88:12 154:13
excruciating
 140:3
excuse   40:10
 49:10 100:23
 124:9 125:16
 138:6 141:6
 147:10,13 152:25
execute   85:6,8
 86:18 102:24
 106:23 108:1
 111:1 157:12
 158:8,20
executed   175:9
executes   52:2
executing   103:4
execution   82:10
executive   75:16,20
 76:5 81:1
exercise   86:7
exhibit   4:11,13,14
 4:15,17,19,21
 12:24 13:1 48:19
 48:22 59:6,8 72:8
 79:21,24 88:5
 90:6,8,23 91:4
 97:3 100:5 109:6
 111:17,20,24

137:9,12,15
exhibits   4:9
 107:12
exist   146:25
existed   53:20
 65:14 99:17
 139:23 140:22
 143:10,24
existing   140:6
exists   53:15 85:11
exit   85:10
exited   169:19
expand   79:12
expected   169:3
expediting   113:22
 115:15
expeditiously
 172:20
expense   125:5
expenses   22:7 85:4
 86:17,21 87:4,6,6
 87:7,8,9,10,10,15
 87:17,17,19,20,21
 87:22 141:5,13,14
 141:17 149:7
 157:18,20 163:22
expensive   28:22
experience   53:13
 54:20 67:11,17,22
 68:17 95:21
experienced   32:12
experiencing
 120:14
expert   23:11
 121:22 144:2
expertise   128:13
experts   127:15
explain   80:25
 100:14
explained   163:20

Page 11

[explaining - following]

explaining 23:14
exploration 68:4
explore 110:9
express 80:7 97:19
  173:17
expressed 84:3
expressing 80:13
extent 22:18 26:24
  28:10,20 81:23
  84:1 86:2 93:11
  109:24 110:3
  117:10 125:14
  127:15 139:18
  157:9 164:20
  171:17
extra 152:17
extract 118:11,19
extracted 124:13
extrapolated
  123:12
eyeballs 120:20

**f**

facilities 121:1
fact 18:19 119:19
  138:4 142:17
  148:12 165:7
facts 26:6 41:17
  50:2 112:22
  172:14
failure 107:22,25
fair 7:22,23 16:7
  18:22 32:19 38:16
  38:18 55:11 56:18
  56:21 118:5
  141:12 143:9
  150:14
fairly 63:19
fairness 58:19,24
faith 133:12
fall 174:6

familiar 15:8
  32:12 119:18
family 68:15 82:24
  82:24 95:12 96:4
  96:5,7,10 100:20
  101:18 103:3,8
  105:17 106:1
  149:22
far 18:13 22:5,9
  25:8,9 30:14
  62:18 71:2 82:12
  86:9 125:12
  148:15 149:25
  171:7
father 10:24 19:7
favor 171:25
  173:16,22
feature 131:6
  132:20,21
features 130:6
february 171:1
federal 172:5
  176:12
fee 51:7 52:20 53:1
  53:17,20 54:5
  55:8,12 58:19
  108:9
feedback 24:8,10
  46:13 56:13 89:1
  126:21
feeds 122:17
feel 154:13 173:18
feeling 18:11
feelings 60:14
fees 87:19 166:9
  167:7
felt 63:14,15 81:22
  85:4 90:4 104:23
fewer 120:20
fiduciary 163:3

field 35:19 63:13
  64:7 65:2,19 66:4
  66:7
fields 57:9
fifth 131:1 167:8
fight 126:24
figure 53:18
  101:20 118:13
  122:21 129:2
  152:16
figured 23:14
figures 99:24
filed 43:14,16
  172:5
filing 170:15 171:7
  171:11
fill 160:7,8
filling 27:10
filtering 131:9
final 151:7 153:9
  154:15
finally 47:7
financial 11:3,7
  27:17,18,21 54:14
  82:8,12,16 83:21
  144:21,22
financially 176:15
financing 82:9,13
  83:10 84:2
find 9:25 64:5,9,21
  64:22 116:18
  147:23
fine 48:2 88:2
  139:4
finish 164:25
firestone 82:21
  96:7 105:17
firm 5:11,20 10:5
  83:5,7 154:5
firms 87:8

first 6:2 14:1,3
  18:2,4 19:23 45:9
  46:16 52:23 55:24
  59:25 62:15,18
  70:3 75:18 80:25
  85:7 94:23,24,25
  106:21 112:7
  130:6 137:19,24
  138:5 142:5
  145:14 159:23
  164:11 168:21
fit 43:1,1
five 21:25 39:10
  40:23 96:25
  144:13 146:6,7
flag 168:17
flip 13:4 90:14
  111:21 113:10
  136:14
floor 3:11 33:8
flow 54:12,19
  167:25 168:17,24
  169:1
flush 166:2
fly 85:17
focus 11:24 22:20
  25:14 26:23 29:18
  56:17 65:7 69:6
focused 28:9
focusing 27:3 63:9
  69:9 92:21
folks 11:21 31:23
  56:7,11,14,16 65:22
  68:24 84:3 120:19
  122:5 146:13
  149:21
follow 71:15,16,17
  104:22
followed 54:23
following 70:22

[follows - given]

follows  6:3
food  123:4
foran  59:16
force  7:7
foreclose  172:23
foregoing  175:4
    176:3,5,9,11
forgot  44:11 106:2
    107:11
form  22:6,24
    117:16,20 120:24
    145:14 156:18
forma  27:21 85:23
formal  21:13
    23:21 103:23
    155:16
formas  85:12
format  36:16
    116:21 123:10
formation  70:21
formed  11:17
    13:22 17:2,12,14
    21:15 45:8 51:22
    51:25 52:2,7,13,24
    60:1 62:23 76:7
    94:23 98:17
former  21:23 60:9
    60:9,11
forming  66:23
forms  27:11
forth  32:14 92:19
    122:9 141:4 176:4
forty  144:13
forward  27:4 56:4
    79:10,11 103:20
    103:24
forwarded  112:20
    112:24 113:7
found  68:18
foundation  50:4
    51:2 53:5,24 61:2

77:19 80:19 81:7
    108:17 112:21
    121:6 152:23
founded  21:5
founders  17:17
    88:10
founding  19:13
four  21:24 40:23
    84:14 169:21
fourth  130:25
    132:18 140:20
frac  76:2
fracking  67:2
fragmented  63:19
frame  75:7 102:9
    170:5,25
free  54:20
freight  10:7,8
friend  60:9,11,11
    70:4 155:10
friendly  56:17
friends  93:8 95:13
    100:19,24 101:17
    103:3,8
frivolous  151:1
    163:4
front  92:23
frustration  60:14
full  7:25 9:5 25:14
    35:18
fully  107:6
function  113:21
    115:14 132:6
functional  47:2,3
    107:6
functionality  34:4
    45:15 46:24 55:25
    78:11 116:1
    125:25 130:16
functionally  36:21

functioning  12:2
functions  11:6
    80:16
fund  69:8 83:2,3
    86:6,16 100:21
    105:11,14 106:3
    106:19 151:22
    152:17 153:20
    154:14 155:9,23
    161:20 162:16
funded  29:2 43:20
    61:10,13 149:16
    149:21,22,23,23
    149:23,24 150:25
    151:8,12 164:22
funders  29:6
funding  43:24
    44:1 58:25 86:7
    101:7 144:5
    145:20 149:4,4,19
    150:1,3,5 169:6
funds  84:11,23
    86:9 95:12 96:4,5
    105:24 106:2,13
    106:17 149:19
    155:6 160:11,13
    161:16 169:3
further  70:18 82:2
    176:11,15
future  66:19 108:5

g

gain  54:14
gamble  32:1,11
game  35:10,20,22
    43:5,8
garnish  24:4
gas  63:16 66:1,11
    66:14,18,25 67:13
    67:24 68:3 76:13
    100:11,18 108:3
    124:24

gaslamp  70:14
general  6:20 11:4
    83:9 171:16
generally  11:2
    45:12 46:14 47:24
    71:7 87:5,13
    90:14,15 114:8
    148:23,25
generated  112:14
generation  11:25
gentleman  10:23
    23:5,9 32:1,2,11
    59:16,18,19 96:6
    103:16
gentleman's  82:20
gentlemen  103:17
geographically
    76:11 77:13,17
    81:3
geologists  68:11
geophysicists
    68:11
germinated  16:7
gestures  7:2
getting  18:20 25:9
    28:4,6,8 46:4,13
    47:18 86:5 109:3
    145:20 146:11,14
    146:17,19,20,22
    151:18 154:4
    164:9 169:6
gilbert  103:18
    149:23
give  7:6,24 11:15
    12:23 18:6 24:7
    45:12 59:15 95:13
    98:13 110:4
    136:11 144:21
given  7:15 73:17
    98:6 108:12 151:5
    176:10

Page 13

[gives - haynes]

**gives**  110:8,14
123:15 124:7,17
**giving**  173:23
**go**  6:19 8:18 9:3
9:22 11:14,24
14:24 22:19 29:1
35:19 45:5 46:7,9
59:21 63:25 66:8
67:1 68:8,22,24
69:7 79:10,11
80:22 83:18 84:7
85:5,8 86:5,18
91:13 92:16 93:1
95:4 101:3 102:16
103:13,20,24
106:16,22 110:1,9
110:15 111:21
116:6 117:13
118:2 121:8,17,19
121:21,22 122:25
123:2,10 124:5,22
125:10,23 127:18
130:2,22 133:1
134:1,19 136:7,18
138:2 139:2 140:3
140:17,19 145:14
147:23 151:3
153:22,25 155:13
157:7,12,24 159:2
159:20 163:19
172:19,19 174:14
**goal**  22:19
**goes**  112:10
**going**  4:16 5:4
6:21,22 12:23,23
14:5 19:17,20
26:25,25 27:2
28:18 30:5 31:13
31:16 35:16 38:12
43:7 44:15,24
48:5,8,12 50:15

53:22 54:24 55:20
59:5 65:3,20
69:10 71:5 74:2
80:10 81:8 82:2
86:3 91:4 92:16
92:21 93:10 97:13
111:11,14 113:8
124:4,21 125:9
126:2,5 128:20
129:6 131:2 136:7
136:13 139:22
140:20 145:24
146:4,5,7 147:23
149:2,10 155:20
159:7,21 160:3
161:19 163:3,14
163:24,24 164:18
165:23,23 166:5,8
166:9 169:16,20
169:24 171:14
174:3,16
**good**  5:4,14 6:7,8
51:9 109:13
133:12 169:14
**grab**  66:21 173:21
**graduate**  9:20
**graph**  136:18
**gray**  97:6 100:8
109:8
**great**  7:3 17:21
23:7 39:4 109:3
174:12
**greg**  15:4,4,14,18
16:6 17:4,10,16,19
17:22 18:9,15
65:2,9,20 96:16
99:17,19 104:12
110:18,20
**ground**  32:10
**grounds**  8:23

**group**  1:8,11 2:8
2:11 3:8 5:17
11:13,16,17,22
12:2,8,19 19:4,6,9
19:13 20:14 25:21
28:17,21 69:7
71:2 103:15
113:12,14,16
133:22 134:10
146:3,12,14,18
149:17,23 150:1,2
150:4 166:8 168:6
168:11
**grouping**  131:11
**guaranteed**  148:7
164:8
**guess**  8:13 10:4
14:21 25:1 29:16
30:25 31:9 44:20
44:21 75:6 104:15
106:13 119:11
124:2,23 125:25
139:22 141:19
143:14 163:1
172:15
**guesses**  8:14
**guessing**  37:16
45:20
**guidelines**  6:20
**guy**  21:16 23:9
132:7
**guys**  10:24 34:20
69:15 85:15 92:25
103:25 127:13
132:12 133:11
135:16 146:7
147:4 148:22
149:1 155:8,10
160:6

**h**

**h**  1:5 2:5
**half**  14:1,2,11
21:24 69:9 96:17
104:13,17
**hand**  7:2
**handed**  70:5 72:8
**handful**  109:22
**handing**  13:15
48:18 59:5 79:24
90:6 111:20
137:15
**handle**  139:19
144:9
**handling**  54:8
**hands**  117:10
**handwriting**
117:17
**handwritten**
117:14 123:11
**hang**  12:15 162:1
**hank**  32:1,11
**happen**  81:22
**happened**  43:13
106:10,13 159:23
**happening**  17:11
**happens**  47:18
122:19
**happy**  7:20 93:2
153:15 162:9
163:18
**harbor**  60:14
**hard**  9:24 101:13
117:9
**harris**  103:15
173:6
**hatch**  15:23
**hatched**  16:5,15
**haynes**  23:6 24:15
87:1 89:1,6,9
127:14

head 7:2 24:19 96:25
headquartered 113:13
healthy 62:6,7
hear 87:12 172:14
heard 172:20
hearing 172:13,17
heavy 62:4
held 20:23
help 15:12 21:9 23:16 24:13 27:1 38:6 56:1,14 117:18 129:19
helped 17:15 19:6 68:14
helpful 19:19 83:14 156:6 161:14
helping 10:25 38:9
helps 17:20
hereto 13:2 48:23 59:9 79:22 90:9 111:18 137:13 175:6
hey 89:20 142:19
hiccuping 137:11
hide 124:25
high 10:24 25:6 31:24 36:21,22 63:6,10 70:4 82:25 83:23
highlight 129:19
highlighted 90:5
hill 3:10
hired 38:6 82:18 96:6 164:1
hit 132:5 157:9
hitting 105:20
hold 12:11 66:17 66:19 101:2 110:1

170:13 171:6
holding 71:24 100:22 159:11
hole 160:7,8
holes 63:17 64:1 64:19
home 19:8
honest 129:5 133:13
hope 82:1
hopefully 172:13 172:24
hopewell 4:21 14:18 15:4,17 16:11,18,19,23,24 16:25 17:2,7,13,18 17:22,23,23 18:16 19:1,8,10,12,19 20:2,25 22:18,21 26:24 28:9,10,13 29:12 31:2,6,16,20 32:19 35:1 43:17 43:24,24 44:3 48:16 49:7,8,13,19 49:25 51:14 52:2 55:7,22 58:15 59:12,23 60:16,20 61:7 63:1,3,5 64:15,15,25 65:8 70:19,20 71:7,12 71:21 72:14 73:22 73:24 74:11 75:7 76:6,7 82:4,7 84:9 84:20,21 85:16,20 85:21 86:8,17,23 87:5 88:12 92:18 92:24 93:21 94:1 94:17,22 95:19,23 98:10,16,20,25 99:1,12,13 103:10 106:24 107:9,19

107:21,23,25
108:11 111:1
137:16,20 138:6,7
138:14 147:13,14
149:20 150:13,15
150:19,22,24
156:11,17,22,25
159:6,16 160:11
161:15 162:8,15
165:8 167:20
168:14,18,25
170:2,6 171:8
172:19 173:14
hopewell's 108:8
hoping 44:9
horizontal 67:1 76:2
horrible 160:5
host 149:21
hour 70:8
hours 79:14,14 127:1
house 125:23
housing 94:12
houston 3:16 9:8,9 15:24 55:10 83:7 113:13
hr 11:8,23 129:8
huge 39:7 123:6 125:7
hum 13:21 14:8 15:15 18:25 20:1 22:8 37:19 39:20 42:3 52:4,21,25 55:5 59:24 65:11 75:17 80:24 94:21 95:6,22 97:5 98:14 99:10 101:5 101:19 105:12 108:10 109:16 112:17 118:1,8

120:4 129:13
130:3,8 134:22
135:1,24 136:19
138:20 142:3
151:9 154:6
156:20 157:1,4
171:5
human 79:14 123:18
hypothetical 53:23 129:16 140:9

**i**

icing 125:8
idea 14:4,14,16,22 15:1,16 17:13,18 114:25 147:3
identification 13:1 48:22 59:8 79:21 90:8 111:17 137:12
identified 82:4 110:17,19,21 157:13 158:9,19
identify 85:7 108:1 109:24 117:18 120:18
identifying 99:18
illinois 3:5
image 1:10 2:10 3:8 5:17 119:13 119:25 124:11,13 146:15 150:4
images 120:15 122:21 125:15
imagine 105:2,4
imel 3:22 5:10
immediately 138:18 159:24 163:23 164:7

[impactful - investors]

impactful  79:1
important  78:10
  79:18 80:11
improvement
  127:24 128:17
  136:24
inception  18:23
  44:18
include  114:20,23
included  171:17
including  90:18
income  145:2
incomplete  53:23
  129:15 140:8
incomprehensible
  165:11
inconsistencies
  93:12
incorporate  42:20
  114:18
incorporated  20:6
incorrect  90:4
incredible  96:1
incurred  87:22
  141:6,13,14
  163:15
independent  21:21
  21:22 58:18
independently
  81:22
index  4:1 79:19
  80:10
indexing  34:10
  79:18 80:11 81:5
  130:7,9,14 131:5
indicate  168:24
indicates  81:5
indication  106:5,8
indices  54:22
indirectly  35:25

individual  1:7,8
  2:7,8 36:18 46:5
individually  90:1
  90:17
individuals  26:13
  31:20,21 44:1
  60:2,4 74:20
  82:22 141:22
  173:8
industry  65:23
  68:1 76:1
inefficient  123:4
inflows  137:17
informal  7:5 23:23
  171:7
information  24:3
  27:11 46:4,6
  47:10,12,12,15
  65:1,9,21 83:16,22
  85:23 99:24
  110:18 120:13
  121:16,17,18
  122:24 123:17
  124:17,21 159:10
  164:17,22 172:2
informed  142:16
infrastructure
  65:3,20 67:6
initial  19:11 56:23
  83:14 84:14
initialed  175:6
initially  39:15
ink  175:6
input  17:17
  112:24
inside  126:23
insignia  112:9
instance  8:8 73:18
  74:22,25 113:4
instructed  8:22

instructing  171:19
integrated  132:18
intelligence  135:3
  135:4
intelligent  133:11
intending  102:6
interacted  122:7
  165:16
interacting  122:5
  122:6
interaction  38:1
interactions  31:5
interest  18:20
  50:11 55:19 64:1
  69:22 83:1 84:4
  84:13 96:9,11
  97:19 98:15 106:5
  106:8 108:4 110:5
  110:14 162:14,19
interested  30:11
  91:22 93:4 96:14
  96:17,20,21,22
  97:19 98:6,12
  99:9 100:13,20
  102:8 104:1,5,25
  105:14 129:18
  162:13 173:20
  176:16
interests  69:11,11
  76:13 86:11
interface  22:14
  24:5 30:6 46:9
  47:6,8,17 56:12
  57:6,13 70:24
  88:19,20,25
  113:21 114:7
  115:10 124:11
interfacing  132:9
interim  22:12
  147:5

internal  50:14
interpret  68:11
interrupt  76:4
intertwined  42:14
intervention
  123:18
introduce  5:12
introductory
  75:19
invest  97:13 98:7
  102:1,6,12,14,17
  103:9,12
invested  35:24
  36:2 38:22 43:24
  60:16,19 68:15,16
  96:23 127:10
  155:1
investigations
  4:19 112:8 127:25
  128:18 136:9,25
investing  36:6
  83:2 99:9 104:25
  106:6
investment  20:14
  35:12 60:2,15
  61:4,6,10,16 62:15
  62:19 70:19,20
  72:22 73:6 92:17
  102:19 137:20,24
investments  1:4
  2:4 4:11 5:15 11:1
  19:10,11 154:10
  167:21
investor  59:22
  98:12 127:12
  147:25 160:6
  163:6
investors  59:11
  84:10 96:24 97:17
  101:24,25 103:2
  104:5,16

Page 16

[invited - know]

**invited** 170:21
**invoice** 29:11
140:11
**invoices** 144:4
146:17
**involved** 11:2
17:22 18:1,3 19:4
19:5 25:6,10
30:16,24 31:1
49:25 58:12 60:17
94:13 102:4,11
135:7 147:4
**involvement** 15:22
73:12
**involves** 92:11
**involving** 18:15
31:11 76:9 114:13
154:1
**irrelevant** 92:20
107:19
**issue** 23:13 39:4
39:13,16,17 40:25
42:9 91:23,25
93:5 147:18
151:10 155:20
160:16 161:11,12
162:13,18,19
168:24
**issues** 18:10 26:4
31:11 32:21 47:11
47:13 89:2 99:19
100:18 131:14
134:17 150:8,10
150:12,13 163:5
168:18 169:1
**item** 82:5 167:19
**items** 112:18
170:14

**j**

**jabco** 149:22
163:2
**january** 157:3
**jeff** 82:21 96:7
**jim** 10:23
**job** 1:23 10:1,2,9
10:10 30:11,13,18
78:23 79:1,4
108:23,25 126:25
**jobs** 67:13 164:2
**joe** 23:6 24:12,15
56:14 77:10 78:7
87:1 89:1,6,8
127:14 128:13
135:5
**john** 23:9,13 34:21
34:21,24 35:12
36:4,24 37:10,17
38:7,21,23 39:18
40:1,3,5,9,13,16
41:1 42:8,10 78:6
78:15 127:15
134:4,6,7,7,9,11
134:13
**john's** 36:3 78:25
**jolla** 70:2
**jon** 3:22 5:10
**judgment** 26:3
**july** 4:19 45:15
62:13 112:8
113:24 115:4
120:23 123:25
124:1
**jump** 102:10
**juncture** 156:12
160:12,14
**june** 1:17 2:20 5:1
5:5 45:14 62:12
101:4,8,14 103:5
123:24 124:2

**justify** 53:1 66:15
157:25
**justin** 3:19 61:24
61:25 62:8,17,23
62:24,25 63:2,5
64:9,14,17 65:25
67:22 69:14,20
70:18 71:19 73:19
73:24 75:8,12
77:15,25 89:16
148:5,21 151:11
152:4 153:19
164:4,10 165:4

**k**

**kane** 15:4,14,23
16:6 17:22 18:16
18:24 65:2,9
99:17 104:12
110:18,20
**kane's** 96:16
**keep** 31:10 80:1,2
97:8 140:19
161:13
**kept** 32:20 33:2
74:12,17
**key** 34:13 46:5
113:22 115:14,17
116:1,3 119:12
126:9 127:4 130:6
132:20
**kind** 14:18,22,23
16:12 17:17 19:12
20:22 27:3 29:15
32:5 63:9 70:4,4,9
81:20 82:20 85:17
92:3 96:15 117:17
117:25 127:1
135:15 141:25
142:16 166:3
170:19

**knew** 11:21 15:22
22:1 42:12 60:5
74:22 145:22
147:1 148:1,3,4,9
158:24
**knocks** 9:24
**know** 11:8 13:24
14:5,9,10,18 15:12
15:18,21 16:2
17:3,9 19:6,8 21:8
21:24 22:15,18
23:25 24:5,10
28:7 29:10 30:12
31:3 33:14,15
34:13,16,19 35:25
36:2,11 37:16
41:19,19 42:4,9,10
43:9,9,15 45:13
47:1,7,16 54:17
60:4,8,13,13 63:13
64:11 65:23 67:6
68:2 69:11 72:20
73:4,17,21,23 74:2
78:6 84:5 85:9
86:15 87:9,15
92:3,4,6 96:13,16
99:23 100:25
101:11,13,25
102:1,2,16 103:14
105:17,19,20
107:10 109:8,10
110:5 114:21,22
115:25 117:14
118:19,24 119:15
120:6,7 121:3
122:5 123:8,23,25
124:25 125:22,25
126:17,18 127:8
129:5 130:19,20
132:1 135:12,13
137:19 139:18,19

[know - list]

140:10,11 144:10
144:10 147:25
150:3 153:21
155:11,15 156:3
157:10 158:11
165:15,24 169:1
170:18,19,25
172:9
**knowing** 99:16
**knowledge** 8:7
20:17 50:14 51:18
74:17 83:6 132:25
173:9
**known** 60:10
66:14
**kramm** 5:11

**l**

**la** 70:2
**lack** 64:19 67:24
80:13
**lacks** 50:4 51:2
53:5,23 60:25
61:2 77:19 80:18
81:7 108:17
112:21 121:5
152:23
**ladies** 32:3
**lady** 24:20 89:9
**laid** 39:8 143:2
**land** 38:5 46:7
56:7 66:10,11,21
66:22 68:20,23
69:10 76:11 77:13
77:18 79:5,17
81:3 87:6,9
100:10 108:24
122:5
**landman** 32:12
46:9 119:5 120:11
121:21 122:24
125:5

**landmen** 24:6 56:7
56:7 120:19
**language** 47:12
101:12 116:12
**large** 116:4 127:16
134:14
**larger** 105:4,19,22
106:17,23
**lasted** 38:10
**late** 161:2
**latest** 135:2
**launch** 162:21
**law** 3:4 87:8 154:5
**law.com** 3:6
**lawsuit** 18:15
43:14,15 133:16
133:19,21 151:1,2
162:24 163:4
172:5
**layman's** 36:8
117:24
**lead** 70:18 83:18
**leader** 23:5
**leaning** 150:1
**learn** 59:25
**learning** 62:6
129:7,18
**lease** 66:1,9 67:13
69:11 82:10 84:13
84:16 85:9,10
86:11 157:10
158:11 172:10,23
173:11
**leased** 63:14 66:5
**leases** 63:13,22
64:6,9,19 66:5
67:7,24 80:9 85:6
85:6,8 86:20,22
108:2 110:22
126:15 157:7,12
157:15 158:8,17

158:23
**leasing** 66:15
**leave** 118:20
149:11 165:6
**led** 18:7 70:20
82:20
**ledger** 137:16
138:24 163:11
166:11 167:15
168:13
**left** 63:17 91:5,21
93:3 95:4 97:6
164:1 166:14
167:9
**legal** 17:8,14 18:13
35:15 38:20 40:20
47:10 57:10 61:18
61:20,22,23 67:19
73:14 87:6,8,10,19
99:21 101:9 111:7
120:19 134:1,9
150:2
**legally** 66:23
**length** 90:21
**lent** 63:20 172:23
**letter** 151:16,18
154:4,9,17,20,23
155:2
**letting** 125:2
173:24
**level** 25:6 31:24
32:10 36:21,22
52:11 63:6,10
70:4 82:25 83:23
98:2 105:22
**leverage** 109:14
109:17 110:8,14
135:2
**lewin** 3:10
**liability** 1:4,9,10
1:10,11 2:4,9,10

2:10,11 20:15
26:11 41:25 170:6
171:4
**license** 28:21
49:18 51:6,19
52:20 53:1,17,20
54:5 55:8,11
57:25 58:19 108:9
143:10
**licensed** 48:13
53:14 57:23
127:22 136:22
**licensee** 53:14
55:22
**licensing** 35:12
48:15 52:12
**licensor** 53:14
**life** 9:10 69:9,9
**lifetime** 100:15
**limited** 1:4,9,9,10
1:11 2:4,9,9,10,11
20:15 26:10 41:25
170:6 171:4
**line** 45:12,18 50:7
67:17 76:15 77:12
114:17 116:8
119:21 128:16
144:15,17 147:5
156:19 157:6,14
157:17 166:16,25
167:1,2,4,8,19
173:2
**lined** 157:11
158:13,16
**lines** 68:9,12
**lining** 104:16
145:10
**lion** 12:11 158:18
**list** 103:21,22,23
103:23,25 128:3,4

[listed - martin]

listed   132:20
listening   126:22
litigated   40:15
litigation   30:1
   40:11 156:3
   159:25 160:1,2
   162:24
little   10:16 19:17
   33:21 36:13 38:3
   42:23 48:1 60:12
   61:5 62:4 70:10
   109:15,18 126:3
   163:17
live   9:7,8 62:7
llc   1:4,8,9,10,11
   2:4,8,9,10,11 3:8,8
   3:8 4:21 5:15
   13:20,22 16:19,25
   17:2,7,13,24 20:11
   31:2 44:9 45:7
   49:7,8,8 58:12
   59:12 65:8 76:6
   88:13,16 112:9,14
   113:12 154:10
llc's   4:11
loaded   123:16
loan   145:14,15
   146:24 147:6
   148:6,7,10 149:6
   164:5,6,8 165:5
locate   64:11
located   5:9 55:10
locations   65:20
lock   66:22
locked   63:25
lodging   123:4
logix   24:22 29:9
   29:10 51:12,16
   54:13 87:2 89:8
   89:12 147:15
   149:11

logs   99:25
long   6:14 18:1,3
   45:25 91:3 134:15
longer   39:15 44:3
   101:2 134:16
   146:25
look   14:23 24:5
   46:7 50:6 55:3
   68:25 72:9 74:3
   75:15 85:10 92:7
   95:13 96:19 99:22
   115:7 117:24
   121:16 124:20
   135:17 137:24
   144:3 155:10
   170:3
looked   34:11
   94:10,13
looking   10:25,25
   16:4 28:15,23
   42:17,25 50:17
   56:10 63:21 64:6
   75:9 93:23,25
   98:3,8 101:16
   104:7,9 110:22
   116:14,16 119:10
   120:20 126:11
   129:11 137:21
   142:8 166:11
   167:1
looks   99:11
lose   145:24 149:2
   163:24
losing   147:20
lot   15:13 17:20
   21:9,10 23:6
   27:20 30:16 31:7
   38:14,18 39:6,14
   41:12 63:16,20
   65:1,6,21,21,21,23
   66:6 67:6 70:21

78:25 79:3,5
   88:21,22 93:23
   94:10,14 95:21
   96:19 97:12
   108:23 109:25
   110:7,14 116:9,12
   119:5,7 120:12,13
   120:13 123:20
   125:4 126:12
   134:13 140:4
   146:21 149:2
   152:5,9 158:10
   172:14
loud   70:10,15
   75:22
low   158:3
lucrative   67:3
lunch   69:15,21
   70:3 71:12 111:13

m

machine   176:7
madison   16:21
   17:12 55:9
magic   30:12 47:18
   125:19
magically   124:14
major   9:18 159:21
   164:3
majority   25:11
   142:18
making   11:1 26:3
   78:23 79:1,12
   108:22 155:21
manage   89:3
   134:11
managed   11:10
   54:22,22
management   1:8
   2:8 31:20 40:25
   142:2

manager   25:3,4,5
   40:4,7 71:21 72:2
   90:2 99:1 135:10
   170:9,10,12
managers   20:15
   26:10,13 39:10
   74:20 170:7,13
managing   30:25
manually   124:8
map   63:8 70:5,6
mapping   21:13
maps   99:18,24
march   76:8
margin   54:11
mark   1:8,15 2:8
   2:16 3:8 4:3,12
   5:7,17 6:1 9:6
   12:24 13:17 46:10
   48:18 59:5 76:4
   93:9 99:23 110:18
   138:15 143:16
   175:3,14
marked   4:17 13:1
   48:22 59:8 79:21
   90:8 107:12
   111:17 137:12
   144:19
marker   119:6
markers   116:12
market   41:2 58:17
   68:7
marketable
   156:18
marketing   9:19,20
   11:3,8 21:17
marking   119:20
   119:24
markup   54:17
married   14:10
martin   23:10
   34:21,21 36:24

[martin - months]

37:17 38:7 39:19
40:1,13 42:8 60:7
70:23 73:18 78:6
78:15 90:17 91:21
127:15 134:4,7,7
**martin's** 91:17
**master's** 9:23
**match** 102:22
**matched** 51:11
54:11 120:11
**matches** 121:22
**material** 26:4
27:11 31:11 32:21
44:22 69:15 74:13
112:19 129:14
**materials** 21:18
**math** 144:11,12
**matter** 5:7,22
39:19,19 119:19
**matters** 39:21
**mean** 19:3 47:3
51:24 57:19 67:1
78:24 79:9 87:13
88:18 91:24 93:2
97:10 98:5 102:14
105:13 107:15
113:13 114:6
115:16 118:15
122:4 130:9
141:20 147:14
161:9 169:1
**meaning** 17:23
57:20 66:15 98:19
98:20,21 117:19
146:10 153:18
165:3
**meaningful** 28:11
**means** 38:15 98:3
113:15 114:8
134:24

**meant** 76:4 81:9
**media** 5:6 48:9
111:9,15 169:21
**meet** 61:17,20,23
69:14,20
**meeting** 69:22
71:19,20 75:11
154:12 170:13,17
170:22 171:3,6,7
**meetings** 23:21
24:1 25:7,11 28:2
31:3 32:16 46:2
69:25,25 170:4
171:9,10
**meets** 30:21
**member** 12:20
154:2 171:3
**members** 20:10
72:21 73:18 154:1
163:14
**memorandum**
4:13,14 49:9,13
50:7,12 51:15
54:5 55:3 56:19
72:13 74:23 80:23
82:3 89:15
**memory** 44:10
105:6,8,10 156:6
**mention** 150:11
168:17
**mentioned** 9:15
15:14 22:22 24:15
24:22 30:23 34:21
37:17 44:8 57:16
59:22 61:18 64:12
64:17 65:9,25
67:9,18 76:23
147:18 149:16
150:9 151:7
157:21 160:17

**mentioning** 64:13
115:11
**merry** 173:24
**message** 148:23,25
**messages** 4:17
92:10,13,14,15,16
**messaging** 90:16
**met** 61:23,24 62:2
62:3,8,17,23,24,25
63:2 65:25 67:22
69:20 70:2,3,8,9
152:12 169:4
**methods** 127:24
128:17 136:24
**miami** 91:21 93:4
**michael** 59:16
**middle** 39:9 169:8
**mike** 19:11,14
149:23
**mile** 116:12 119:6
**miles** 123:3
**million** 25:24 36:3
52:5,18 82:13
84:2,17,22 85:2
86:16,19,20,21
96:15,17 102:3,15
102:19 103:3,9,15
104:8,13,13 105:9
106:4,19 129:9
158:12 159:1
**mind** 9:2,3 17:6
29:24 59:19 72:13
80:23 90:3 105:25
113:4 158:2
**mine** 21:23 155:11
**mineral** 4:19
76:11,13 77:13,18
81:4 84:13 86:11
112:8 136:9
**minerals** 69:10

**minimum** 66:18
**mining** 4:19 112:8
136:9
**minutes** 47:25
127:1 130:21
**missed** 37:25
**missing** 124:2
**misstates** 16:8
43:22 44:25 46:17
49:15 74:14
108:16 155:3
159:18
**mistake** 167:7
**mistakes** 64:4
**mixing** 71:22
85:18 160:18
**modifying** 44:1
**moment** 18:21
22:17 59:19 90:11
137:10 152:10
**money** 10:16 36:6
59:18 68:14,15,16
91:23,24 93:5
98:11,15,23
102:20 104:16
109:12,21 126:4
137:17 138:6
146:23 147:1
148:9 157:5 158:4
158:6 159:7,8,9
160:7,11 161:7,17
162:8,23 163:3,23
164:16 165:8
**monies** 140:1
**month** 13:24 51:7
52:10,20 53:2,21
55:8 62:10 98:17
108:9 109:14,14
125:1 143:11
**months** 6:16 10:5
38:10 161:7,10

Page 20

Kramm Court Reporters, A Veritext Company
866-299-5127

**[months - object]**

165:25 166:1
**morning**  5:4,14
6:7,8
**morris**  173:6
**mouth**  131:1
**move**  123:14
173:24
**moved**  56:3
**mud**  149:14
**multi**  67:2
**multiple**  33:18
61:13
**music**  70:11,16
**mutual**  14:22 15:2
16:4 50:10 55:19
102:13 108:4
**mutually**  14:15

**n**

**name**  5:10 9:5
23:6 24:19,22
35:14 38:25 59:14
82:19,20 127:21
176:19
**named**  10:23 23:9
26:10 32:1,2,11
59:16,18
**names**  37:13 41:12
128:12
**narrow**  120:20
**nature**  8:3 67:20
**naught**  163:24
**nawracaj**  3:4,4,6
4:5 5:14,14,21 6:6
8:24 9:1 12:17
13:3,10,14,18
16:17 25:19,22
26:8 31:15 33:5
34:1 39:1,24 41:9
41:11,18 44:7
45:4 46:21 47:24
48:3,11,20,24 49:5

49:21 50:5 51:5
53:8 54:1 55:16
57:15 59:1,10
61:3,9 67:16
69:19 71:8,10,13
71:23 72:7,25
73:5,10 74:9,21
75:23 76:3 77:22
79:23 80:21 81:11
82:15 84:21,25
88:3,24 89:18
90:10,25 91:13,15
91:19 93:14 98:21
101:15 108:20
111:19 112:1,4,25
114:15 115:24
117:3,6 121:7,25
129:21 130:1,15
131:19 133:5
136:6,13,16
137:14 138:10
139:21 140:12
141:2,18 143:17
144:14 145:4
148:19 152:11,21
153:3 155:19
156:7 160:9 162:6
163:8 165:2,12,19
166:23 167:1,6,13
167:19,24 168:3
168:20 169:15,23
171:23 174:2,8,12
174:15
**necessarily**  105:7
119:9
**necessary**  7:14
**need**  7:19,24 8:6
12:15 29:5 72:5,9
81:20 95:10 96:3
100:13 111:8
126:16 127:8

137:10 147:4
152:25 153:8,8
157:23 161:3
**needed**  23:14,15
24:12 28:7 40:18
81:22,23 84:18
99:20 134:16
142:24 145:22
147:22 156:11,11
157:12,24 158:5
158:19,20 159:1
161:15 162:8
163:15 164:7
**needs**  22:10 27:22
89:5 157:22 165:4
**negative**  60:14
139:5 145:8
166:14,24 167:3,9
**negotiated**  50:25
51:11 148:6
158:20
**negotiating**  145:18
158:17
**negotiations**  50:1
**neighbor**  60:9
**neither**  39:3 163:6
176:15
**net**  10:24
**never**  16:2 40:3
96:13 102:4,11
142:21 146:5
153:4,25
**nevertheless**  155:1
**new**  12:8 68:6
76:1,10,15 77:4,5
77:16 81:2 82:24
83:5 84:11,13,23
86:11 88:12,14
96:11 124:7
**nice**  79:7,11

**niche**  11:20
**niches**  11:22
**niece**  62:4
**night**  70:14
**nodding**  7:2
**non**  25:5
**nonpayment**
159:15
**nonperformance**
133:20
**nonproductive**
66:14
**normal**  105:3
113:5,6 137:3
**normally**  122:25
**north**  3:5 36:2
**noted**  8:18 174:18
175:5
**notice**  4:11 12:25
**number**  5:6 12:24
48:9,19 51:8 59:6
72:8 73:3 79:25
82:5 84:17 85:2
90:7 91:5,17
97:21 111:15,20
112:11 129:20
136:11 137:15
157:10 169:21
**numbered**  88:9
136:10
**numbers**  90:22
145:10

**o**

**oak**  20:21
**oath**  6:2,22 7:6
153:6,12,13
**object**  38:12 44:24
53:22 93:10
151:19 165:2
171:16

[objection - opportunity]

**objection** 16:8
25:18 26:6 31:14
32:24 33:25 39:23
41:17 43:22 46:17
49:15 50:2 51:2
53:5 55:14 56:25
58:22 60:25 61:8
67:15 69:16,23
71:6,14 74:5,14
77:19 80:17 81:7
82:14 84:19 88:17
89:17 98:18 101:9
108:16 112:21
114:14 115:19
121:5,13 129:15
129:24 130:11
131:17 132:23
136:3 137:6 138:8
140:8,23 141:15
143:12 144:1
152:7,20 155:3,25
159:18 162:2,3
165:10,18 167:17
168:19
**objections** 8:17,19
**objective** 86:7
172:21,22
**obligation** 160:3
**obligations** 44:4
154:16
**obtaining** 82:8,13
83:9
**obviously** 7:5
92:20 101:23
**occurred** 148:15
**occurring** 169:11
**ocr** 34:3,17
**october** 80:5,13
81:4 167:15,20
168:5,23

**offer** 35:16,18
154:9,18 155:21
**offered** 35:17
**offering** 102:22
**office** 11:23 21:3
33:6,9 82:24 96:7
96:10 105:17
106:1 116:19
118:2 124:10
125:17 126:23
132:14,16 146:18
150:3
**officers** 26:1,10,14
**offices** 3:4 122:17
**official** 26:13
**oh** 25:19 59:19
76:6 104:19 116:3
160:4 167:6
**oil** 63:13,16 64:7
66:1,11,18,25
67:13,23 68:3
69:5 76:13 100:10
100:18 108:3
124:24
**ok** 97:7,8
**okay** 6:13,17,19
7:10,18 8:5,17 9:2
9:11,13,15,22 10:3
10:8,12,20 11:2,11
12:1,1,22,23 13:10
13:14,19 14:4,12
15:14 16:24 17:5
17:25 18:22 19:16
20:8,10 21:20
23:21 24:15 25:23
27:10,14 30:22
33:10,12,17 36:23
37:24 38:11 39:14
39:18,24 41:7,18
41:23,23 42:13
43:18 45:5 47:20

47:24 48:5 49:4
49:22 50:23 52:1
53:12 54:4 58:5
59:2,4,20 61:14,16
64:8 67:8 69:14
70:17,24 71:8
72:5,12 73:7,8
74:3,25 75:4,15
76:6,21 79:24
80:3 82:2,16
87:25 88:7,9
89:14 90:6,19
91:8 92:9 93:3,14
93:20 94:8,16,25
95:4 98:1,12,25
100:4 101:16
103:2 104:2,8,11
109:9 111:8,10
112:2,3,7,18 113:1
113:5,10,17 117:5
117:19 118:5
120:22 121:8
122:10,18 124:9
125:2 127:18
128:16 129:22
130:2,5 132:15
134:19 135:20
136:15 137:9,18
138:11,15 139:2,9
139:13 140:16
141:3,8,11,19
143:20 144:19
146:4 150:14
151:6,14 153:2,14
155:23 156:8,9,17
157:17 160:16
163:9 165:19
166:4,7,17 167:14
167:16 168:8,16
168:21 169:13
171:18,22 173:13

174:1,12,14,16
**old** 9:11 116:18
**oldest** 70:13
**omitted** 165:7
**once** 7:11 8:19
33:13 100:15
117:19,22 123:7
126:13 159:1
165:7
**one's** 105:6
**ones** 32:8,9 84:5
90:14 92:21
101:14
**oooooo** 5:3
**open** 66:6 68:25
85:7 102:15 108:1
**operate** 47:4 85:4
**operated** 20:24
43:21 87:23 141:7
**operating** 25:5
26:17 28:5 47:8
85:4,21 86:16,20
87:4,10 157:18,19
**operation** 46:24
78:16
**operational** 51:21
53:19
**operations** 20:19
30:24 31:2 84:15
142:23 154:3
156:22 170:1,14
**operator** 166:4
**opinion** 58:25
127:6 144:2
**opportunities** 64:9
64:21 65:14 66:2
84:16 109:24
110:19,20 111:5
157:11 164:1
**opportunity** 7:12
14:17,20 15:4

[opportunity - partners]

16:6,20 17:11 28:13 38:24 64:15 64:18 95:16,25 96:1 99:16,18 100:16 113:23 115:16
**opposed** 172:17
**optical** 34:4,17 119:11,15,20 127:3
**optics** 119:16
**oranges** 85:18 160:18
**order** 23:3 77:23 79:17 80:12 118:12 119:12
**organization** 23:20
**organize** 14:5 17:16 21:9 34:14 36:10,12 38:9 56:1 116:13,15 117:16,18 123:14 126:9
**organized** 17:8,8 19:22 20:4,5 24:1 25:11 34:13 36:16 44:9 50:19
**organizing** 34:12 36:14 116:17
**original** 17:17 19:12 20:10 153:9 176:12
**originally** 143:2
**ortmann** 3:19 5:19
**outdoors** 70:11
**outflows** 137:17
**outline** 125:25
**outlined** 54:23
**output** 122:11

**outside** 8:9 87:8
**outsource** 42:22
**outsourced** 56:8
**outstanding** 140:1 142:20,20,25 146:16
**overall** 78:11
**overhanging** 163:5
**overlooked** 64:3
**override** 110:13
**oversight** 11:6 25:9
**oversimplifying** 124:16
**overstating** 54:6
**oversubscribed** 162:14
**owed** 143:16 147:2 173:1
**owned** 19:7 88:13 88:15 168:6 173:4
**owners** 20:11 58:21
**ownership** 28:12
**owns** 10:23 113:16

**p**

**p** 1:7 2:7 3:15
**p.m.** 2:19 174:18
**packet** 136:8
**page** 4:10 33:4 75:5,15 82:2 88:4 90:23,24 91:1,2,4 92:24 95:5 97:2,3 97:3 100:4 109:6 112:7 113:10,10 119:21 127:18,21 130:2 133:7 134:19 135:22 136:8,18 140:19 140:19

**pages** 1:25 4:13,14 4:18,22 13:5 111:22 112:10
**paid** 52:6 53:17 54:25 55:12 140:15 141:23 142:9,24,25 143:18 145:16,23 146:1,11,14,17,19 146:20,22 147:9 147:12,15,22,22 147:23 149:1,3 159:13 163:16,21 164:9 165:5,6,7,8 165:14,23,23 166:5,9 168:11
**pannu** 3:19 61:25 62:1 81:13 151:11 163:7 169:19
**paper** 68:9 133:3
**paragraph** 50:6 51:7 52:19 54:24 55:3 75:18,19 76:5 81:1 82:3,6 84:9 88:10 101:16 113:19 114:17 121:3 127:21 128:16 132:17 134:23 136:20 154:17
**paranoia** 18:10,11
**paraphrase** 164:23
**paraphrasing** 163:17
**parenthesis** 154:11,11
**part** 11:15 18:2 19:1 31:2 32:4,5 37:3 41:15,21 42:9,9 105:20

149:17
**partially** 31:14
**participate** 27:16 28:1,13 73:15 108:4 110:6,11
**participated** 25:7 28:3 30:2 31:3,23 32:13 170:21
**participating** 5:22 12:19
**particular** 23:22 24:12,14 26:14 35:7 39:7 44:4 50:13 54:15 56:15 63:18 64:2 65:8 66:9,12 68:5,14 70:6,13,22 72:24 77:21 78:3,5 82:18 90:23 92:6 94:18 99:2,15 100:1 102:9 103:23 104:14 106:1 108:3,5,6 111:3 119:3,21 120:9 122:20 145:12 152:9 162:19 169:25 170:20 172:4
**particularly** 92:4 105:10,24
**parties** 49:6 51:4 58:18 76:24 96:20 96:22 97:24 98:6 98:9,22 99:8 101:8 102:9
**partner** 96:16 100:24
**partnered** 35:11
**partners** 12:9,10 58:10 149:22

[partnership - position]

**partnership** 19:7 149:22 163:2
**party** 57:24 87:8 114:9 117:9 176:17
**pass** 54:19
**passed** 129:22
**pat** 17:15 20:7
**path** 28:14
**patient** 146:9
**pay** 29:3,3 44:3 55:1,7 66:11 123:4 145:22,23 148:10 149:7 150:16,22 156:12 157:18,19 164:13 164:19 166:8
**payable** 139:23 140:5,14 168:13
**payables** 140:21 143:9,24 147:8,11 147:14 163:15
**paying** 51:14,16 142:21,22,22 145:17 146:12,13 148:2,8
**payment** 139:11 139:16 141:21,23 141:24,24,25 142:1,5,14,14 143:3,5,6 153:9 166:13,17 167:8 167:20,23 168:1,4 168:23
**payments** 142:10 168:16
**payroll** 150:2
**pdp** 1:8 2:8 142:2
**penalty** 175:4
**penny** 60:21

**people** 20:23 46:2 46:7 54:20 84:5 97:12 108:24 122:4,10 126:22 129:5 146:3 147:21 148:10
**percent** 33:4 39:8 113:16 142:4 158:13 161:20
**percentage** 104:17
**percentages** 104:22
**perform** 124:14
**performance** 52:18
**performing** 121:10
**performs** 79:16
**period** 93:7,21,22 96:18 168:21 169:9 172:24
**periods** 117:12,13
**perjury** 175:4
**permit** 68:23
**permitted** 69:12
**permitting** 132:19
**person** 83:24
**personal** 8:7,10 92:14,15
**personally** 19:11 35:25 39:25 40:3 40:12 71:25 135:9 141:9 148:7,8 149:21 160:11 161:9,16 164:7
**perspective** 117:24 169:5
**pertains** 176:11
**philipp** 3:19 5:19
**phone** 83:24 91:5 91:17 100:9 152:8

**phrase** 29:25 34:13,19 64:19 76:15 77:12 87:12 116:12 126:11,14 126:15
**phraseology** 118:24
**phrases** 46:5
**physical** 8:2 97:3
**physically** 33:10
**pick** 22:25 66:9
**picked** 64:1
**picking** 22:23 63:22 66:3
**pictures** 65:21 68:10,19
**piece** 21:18 68:9 133:3
**pieces** 22:24,25 42:18
**pilot** 4:21 16:19,25 17:2,7,13,23 22:21 27:2 31:2 49:8,25 58:15 59:12 65:8 72:14 76:6 83:16 83:17 86:18 106:15,17,20,22 106:24 158:25 159:4
**pin** 45:10
**pitch** 63:10,11,12 83:20 112:19
**pitched** 15:25
**pitching** 112:14
**pivotal** 107:24
**place** 22:9 100:21 157:2,6 176:4
**placed** 32:4
**placement** 4:14 72:13 74:23 80:23 82:3 84:11 89:14

**places** 110:17
**plaintiff** 1:5 2:5,17 3:3 4:11 5:15
**plaintiff's** 12:24 48:19 59:6 72:8 79:24 90:6 111:20 112:11 127:19 134:20 137:15
**plan** 21:12 22:5,9 22:15 29:1 86:5
**planned** 21:13
**planning** 27:17,18
**plans** 21:17 43:20
**platforms** 134:2
**play** 63:10 67:4,4 100:11 105:19 107:4,4,5 109:14 109:21,22,23 110:1,7
**plays** 67:13 69:10 75:25 76:14 79:17 109:25 110:23 111:2,4
**please** 5:12 12:16 72:6 131:3 151:22 153:1,16 161:13
**pltf** 4:20,20
**plus** 25:24
**point** 35:7 44:5 67:11 92:20 103:3 107:24
**pointed** 137:23
**portal** 125:13
**portals** 54:9
**portion** 158:12
**portions** 22:25 115:9
**position** 91:22 93:5 155:12,14 162:16

[possibilities - provided]

**possibilities**
173:14
**possible** 66:13
82:10 94:2,2
172:17
**possibly** 53:1
66:23 83:9 93:21
**post** 20:21
**posted** 97:8
**potential** 35:18
63:17 64:1,5,25
79:2 85:10,10,11
96:16 98:22 99:16
99:19,20 101:24
103:2,25 109:4
111:5
**potentially** 18:11
43:8 83:1 87:16
96:8,11 98:4 99:8
99:23 106:5 109:5
110:15 119:1
123:11 158:5,22
172:19,20
**power** 88:1 113:21
**ppm** 77:15,24
80:15,22 81:13
**pre** 98:15
**preamble** 44:25
50:6 53:23 55:24
**precautions** 157:2
**preceding** 138:18
**preexisting** 140:14
**present** 3:18
**presentation**
115:4 120:22
121:11 127:18
130:17 131:6
132:21 136:7
137:2
**presentations**
83:20

**preserving** 173:22
**president** 10:15
25:20
**pressure** 100:12
**presumably** 133:7
**pretty** 51:9 68:9
68:18 70:7 75:13
105:3 156:13
**prevent** 8:1
**prevented** 159:21
**previous** 22:1
**previously** 163:15
**prices** 110:16
**pricing** 63:16
**primarily** 23:11
**primary** 22:20
23:5 26:23 65:7
70:24 172:10
**principals** 173:5
**print** 91:3 154:7
**printed** 156:8
**prior** 16:8 37:18
37:22 44:25 46:17
49:15 60:15 61:16
65:24 67:13 68:21
68:23 69:8 74:1
74:14 77:24 89:15
108:16 139:17,23
140:22 143:24
155:3 158:2
159:18 176:5
**private** 4:14 12:8
72:13 74:22 80:22
82:3 89:14
**privileged** 8:23
171:21 172:2
**pro** 3:14 27:21
85:12,23
**prob** 93:4
**probably** 8:10
12:24 18:4 21:24

36:3 50:14 68:1
68:21 75:13 101:1
109:14 118:18
135:6 146:6 156:8
**probate** 132:19
**problem** 39:6 41:6
81:5,24 91:22
105:20 120:10
133:14 147:6
**problems** 47:11
120:15,17,19,21
**proceedings** 163:7
169:19 176:3,5,7
176:13
**process** 15:12
21:10 56:20 65:6
110:21 116:8
117:21,22
**processed** 119:14
**processing** 113:21
115:14 116:1,3
**procuring** 157:15
**produced** 13:6,16
66:18 73:3,6
91:18 145:2
**product** 29:23
135:7
**production** 132:19
**productions** 66:19
**professional** 40:6
73:15
**program** 27:2
86:18 106:15,18
106:21,22,24
158:25 159:4
**progress** 24:2
42:24 46:12 47:19
47:23
**prohibited** 151:2
**project** 4:21 16:19
16:25 17:2,7,23

18:5 35:7 37:18
38:2,5,20 39:9,10
39:11 40:7 44:19
49:8,25 58:15
59:12 72:14 76:6
83:16,17 133:18
147:23 149:12
162:21
**projects** 23:24
39:3,25 134:5,6,14
**prolific** 63:23 65:2
**proof** 76:8
**properly** 121:24
**proponent** 171:11
**proposal** 155:7,8
**proprietary** 76:10
76:16 77:4,6,16
81:2 88:12,15
107:14 113:20
114:3,6,7,8,17
115:5 127:22
136:22
**prospect** 113:23
115:16
**prospective** 82:9
84:2
**prospects** 67:3
158:16
**prospectus** 77:14
**protect** 172:8,24
**protection** 170:15
**prove** 27:1 106:24
107:1
**proven** 43:10
**provide** 34:7
84:11,22
**provided** 11:22
34:9 54:16,19
76:24 87:11 88:11
91:1

Page 25

[providing - recap]

**providing** 8:1 54:8 54:9,9,10 56:23 78:15 146:15,18 146:20
**public** 10:15 63:14 66:4 69:12 91:9
**puffery** 104:24
**pull** 46:10 47:14 78:7,8 79:20 88:22 92:15 118:21 119:2,7,21 120:12 121:16 122:25 125:15 126:14
**pulled** 46:4,6 121:1,23 122:8
**pulling** 47:9 127:17
**purchase** 77:2 85:9 86:19
**purchased** 12:18 111:4
**purchasing** 11:18 16:1
**purely** 64:15 70:16 75:10
**purpose** 20:13 76:8 84:13 106:17 116:25 149:6 164:6 172:16
**purposes** 76:12 86:10
**pursuant** 13:17
**pursue** 14:20
**pursued** 38:23,25
**pursuing** 84:1 146:2
**put** 22:9 24:10 36:15,16 51:3 56:2 57:13 59:18 69:6 83:20 86:5

103:15 104:13,16 105:7,9 115:2 116:21 123:12,18 126:14 129:4 133:2,4 146:24 160:7,10,14 161:16,24 162:7 162:23 163:3
**puts** 102:5
**putting** 22:12,14 100:20 105:14 109:25 125:8,20 148:9 159:22

**q**

**q1** 44:12,13,14,18 45:7 46:15,22 50:18,22 94:23
**q2** 44:10,14 46:22 50:21,22 94:23
**qualified** 84:10,22
**quarter** 14:3 19:23 45:9 52:5 52:18 94:24 95:1 95:3 104:20
**question** 7:18,19 7:22 8:20 20:5 26:7 29:15 31:9 32:18 41:22 45:1 46:19 69:17 73:9 77:9 80:11 85:1 89:22 90:3 93:9 98:10 118:16 119:11 131:3,18 132:7 137:3 141:5 143:15,23 147:3 151:4 156:23 161:21 165:1 171:24
**questions** 6:22 8:6 19:18 93:2 107:10 117:1 137:7

164:20 174:10
**quick** 111:8 172:16
**quicker** 120:13,13 125:10 172:14
**quickly** 34:15 36:11 47:15 164:16 172:17
**quite** 91:3 100:3
**quote** 80:8 111:1 154:11,11

**r**

**raise** 8:17 29:1 43:16 44:5 68:14 83:18 86:6 97:15 98:3,8 104:7,9 131:14 137:6 151:3 157:8,21,25 158:4,6 159:3,8 160:4 161:19 162:15
**raised** 8:19 85:22 86:10
**raising** 43:19 100:19 101:17 150:19 159:21 169:10
**ran** 31:22 127:7 129:9 132:8 142:23 161:7
**range** 96:15 97:20 98:7 102:2 104:1
**rate** 110:12
**react** 173:15
**read** 52:14 55:6 68:8 75:18 93:12 95:9 114:21,22 116:6 128:22,23 130:23 133:6 135:23 136:2 154:8 175:4

**reading** 132:25
**ready** 106:3
**real** 22:15 46:11 147:18
**really** 11:24 22:19 28:7 35:16 42:12 60:13 64:24 69:7 126:25 148:22 158:23
**reask** 151:4
**reason** 106:23 145:15 154:14,14 172:8
**reasonable** 85:5
**reasons** 156:15 172:4,7
**recall** 6:15 13:25 14:3 18:19,21 26:14,18,22 27:13 27:15 28:2,4 34:18 37:13,21 39:4,13 40:17,22 45:23 46:23,25 47:6 48:15 50:3 51:8 52:9,16 53:21 55:25 60:19 64:13 74:7 75:6 78:1,4,8 81:15 83:4,25 93:18,22 93:25 94:3 96:18 99:5 103:6 104:21 106:9 113:2 128:12 132:5,6 134:18 137:8 144:4 145:9,13 151:18 152:2,6 154:24 156:1 164:15,24 170:5 170:24 173:1
**recap** 89:14

[receipt - rest]

receipt 140:22 141:25 143:8,24
received 137:20 138:7,13 139:8 145:6 156:21,25 164:12 165:9
recess 48:7 111:13 169:18
recipient 129:12
reclarify 53:7
recognition 34:4 34:17 119:12 127:4
recognize 48:25 90:15 112:15
recognized 14:18
recollection 92:11
recommended 70:10
reconcile 80:25
record 5:5,13 8:19 9:5 13:15 38:14 48:6,9 90:20 91:10,18 111:11 111:15 123:22 127:14 131:2 154:8 166:23 169:16,21 174:14 174:17 176:6,9
recorded 5:6
recorder's 116:19 118:2 122:17 124:10 125:17
records 76:12 77:14,18 79:5,18 79:19 81:4 121:1 123:6 124:1 125:14,20 127:17 150:6
recruiting 11:21

redacted 91:9
rediscovery 100:17
refer 92:13 115:22 117:1
reference 157:14
referencing 92:6
referred 34:3 114:17 149:9
referring 16:25 72:23 76:16,18 84:19 92:4,5 93:15 94:9 96:5 97:22 101:12 105:15 122:14 139:7 156:4
refers 136:21
refine 76:1
refined 29:1 50:9
refinement 76:9
refining 31:5 56:10
reflected 131:2
refresh 92:10 156:6
registry 138:3
regular 24:1 37:11 46:1 122:9 150:23
regularly 132:12 132:13 165:16
regulatory 100:18
related 41:1 76:12 87:10 115:23 119:9 171:9 173:8
relates 119:1
relationship 18:5 18:7 40:5 173:23
relationship's 60:12
relationships 16:3 28:16 118:13

relative 176:16
relevance 107:10 107:11
relevant 108:7
relied 135:19,21 135:22
rely 34:19 126:20 135:16
remember 10:9 14:2 26:15 27:7 27:10 35:24 38:1 39:16 45:21,25 46:1,14 51:6 59:11,20 61:4,5 62:2,10,14 63:4 72:14 82:19 83:8 93:15 95:16 104:4 105:16,16 113:1,3 120:14 134:4,6 142:5,7,8 148:14 151:13 154:4,20 155:21 168:8
remitted 77:15 80:16
rent 87:18
rents 150:4
repeat 7:19
rephrase 39:24 41:18 46:19 89:18 131:18 159:14
report 23:17,17
reported 1:21 23:19
reporter 2:21 5:23 12:15 13:2 48:23 59:9 72:5 79:22 90:9 111:18 137:13 148:17 152:25 162:1,5 176:2

reporting 5:11
represent 143:23
representative 72:2
representatives 61:17 72:21 74:23 153:5 154:10,23 155:22
represented 96:7 96:10 103:9 105:18
representing 63:23
request 7:20 20:8 20:9
requested 164:17 176:14
requesting 13:5
research 58:17,18 65:22
reserve 174:11
reserves 156:17
resolve 81:21
resolved 163:5
resource 4:19 112:8 136:9
respect 7:14,24 23:22 26:1,4 27:16 29:23 31:10 32:21 33:20 41:14 43:18 49:13 50:1 58:18 67:17,23,25 73:12 74:11 102:2 131:15,16
respective 51:1
respond 154:22,23
responsibilities 11:4 25:1
responsible 166:4
rest 92:10 138:3 146:4

[restate - sentence]

**restate** 26:7
**result** 120:8
**results** 78:3 83:17
 86:4
**resume** 23:7
**retain** 83:7
**retained** 82:7 83:6
**revenue** 11:25
**review** 3:8 5:18
 7:12 15:12 21:9
 32:3 35:15,17
 38:24 41:5,6,21
 46:10 68:24 74:2
 74:8 87:11 88:21
 90:2,11,12 92:10
 112:20 124:6
 125:3,6,10,13
 134:1 138:3 168:4
 168:5 176:13
**reviewed** 89:15
 113:3 137:3
**reviewing** 21:11
 30:19 113:1
**revisit** 80:2
**rewarding** 75:25
**rez** 3:10
**rich** 5:14
**rich.nawracaj** 3:6
**richard** 3:4,4
**ride** 93:8
**right** 6:25 11:14
 27:3 28:21 30:4
 44:9 47:25 49:19
 50:8 51:24 52:1
 52:23 60:2,23
 61:21 72:1,3
 74:10 75:20 76:5
 82:4 84:9 86:24
 89:21 95:5 96:25
 97:4 99:11 102:24
 105:4 107:2 110:6

110:11,12 112:10
 112:12 113:19
 114:10,12 116:20
 116:23 117:24
 118:7 119:16
 120:3 123:5 125:6
 126:5 130:20
 131:20 133:16
 136:15,17,20
 138:25,25 139:10
 139:17 140:13
 144:18,20 148:16
 158:15 160:16
 161:5 165:17
 166:18 173:7
 174:3
**rights** 127:23
 128:2 136:23
**ring** 24:23
**road** 30:21
**roi** 109:3
**room** 47:10 73:5
**roughly** 52:11
 96:23 142:4
**round** 83:14
**rover** 1:9 2:9
 88:13
**row** 130:7 131:9
 132:18
**royalty** 69:11
**rubber** 30:21
**run** 27:21 52:3
 77:23 132:13
 159:7,9
**running** 25:8
 31:21 150:20
 154:3 158:3

**s**

**safe** 75:13
**sales** 10:15

**san** 1:16 2:18 3:11
 5:1,10 75:12
**sanders** 103:15
 173:6
**sands** 75:25 76:14
**sat** 36:9 145:1
**saving** 124:20
 125:4
**saw** 46:12 65:20
 70:12
**saying** 52:19 92:12
 97:12 102:5
 107:18,20 142:18
 143:15,18 155:16
 160:4,11 161:2
**says** 50:7 54:4
 75:16 80:8 81:2
 82:7 84:21 88:7
 91:21 95:2 107:13
 107:16 116:8
 127:21 130:7,13
 131:12 134:20,24
 138:25 139:5
 140:7 167:12,18
 167:19
**scale** 106:23
**scan** 118:3
**scanned** 120:1
 122:16,20 126:6
**scanning** 117:25
 126:2 146:16
 150:5
**scenario** 140:21
 164:18
**scenarios** 64:5
**schedule** 169:3
**school** 9:24,25
 10:4
**scope** 39:11
**scrap** 10:11

**se** 3:14
**search** 116:22
 123:14 125:24
 126:10,12
**searchable** 120:16
 123:13
**searched** 119:13
**searches** 56:15
**searching** 32:10
 56:9 79:4 127:4
 127:16
**seat** 12:11
**second** 3:15 14:2,3
 19:23 45:9 64:12
 75:4 94:24,25
 95:3 109:7 130:25
 136:11,20 144:15
 144:17 168:22
 172:8,22 174:10
**secure** 64:6
**securities** 156:18
**see** 28:24 52:8
 54:4 88:9 90:15
 92:23 95:25
 121:19 139:14
 144:12
**seeing** 113:3 142:8
**seeking** 84:10,22
**seen** 12:25 85:24
 112:16 135:17
**seismic** 67:5 68:6
**sell** 12:7
**send** 68:23,24
**senior** 10:15
**sense** 147:4,19,21
 162:25
**sent** 62:3,5 72:20
 74:2,23 75:1,8
 77:24 81:13 89:16
**sentence** 82:7
 91:25 132:17

[separate - sound]

separate 14:20
  37:6 74:20,20
  85:19 111:24
separated 33:10
september 137:23
  137:25 138:12
  139:8,11 140:15
  142:1 143:3,6,22
  145:6,7 163:10,10
  166:12,12 168:22
series 6:21 13:5
seriously 161:3
service 87:11
  146:20
serviced 15:9
services 19:8
  35:18 38:20 54:7
  54:8,15,19 78:14
  109:3 131:16
  146:15,18 150:3,5
  168:10
set 20:12 86:21
  112:5 174:13
  176:4
setting 7:5 23:23
settlement 156:2
seven 20:23 99:24
  134:10 161:7,10
sg&a 87:15
shale 68:23 75:25
  76:14
shannon 3:10 5:16
  13:11
share 12:11 33:9
  100:11 158:18
shared 33:6
shareholder
  134:11 170:4,17
shareholders
  170:21

shares 84:12
shed 79:6
sheet 83:10,12
  144:23 145:3
shelf 57:9,17 77:1
sheradin 1:21 2:20
  176:24
shift 19:17
shop 102:16
short 48:20 59:7
  93:7
shorthand 2:21
  176:1,7
shortly 159:24
shot 59:15
show 45:10 156:6
showed 63:9
showing 137:16
  144:23
shown 138:24
shows 166:24
shut 150:24
side 58:21 94:12
sigmund 15:23
sign 97:19
signatories 27:8
signature 58:21
  176:24
signed 49:23 50:12
  56:19
significant 43:8
  45:14 83:3 111:6
  134:11 158:10,12
significantly
  109:21
similar 15:7 68:25
  118:21 119:8
similarities 41:12
simple 161:21
single 125:1

sir 7:9,17 8:21
  35:4 37:19 58:16
  86:13
sister 14:11
sit 45:18 47:10
  48:15 55:24 74:6
  78:1,4 82:19
  94:19 99:5 101:13
  103:6 109:11
  113:2 115:8
  124:19 142:21
  148:21 156:5
  165:22
sitting 123:25
six 6:15 10:5 11:19
  38:10
sixth 166:16 167:2
  167:4
skh 15:23
slate 102:15
slated 83:3
slips 59:19
small 11:18
  105:21 134:14
smh 96:13 172:11
  172:23 173:1,4,11
  173:20,23
social 70:11,16
socialized 70:15
socially 70:1
software 24:2,3
  29:4 31:4 32:8
  41:6 42:12,15,16
  44:1,17 45:22
  51:13,13 56:24
  76:10,16 77:8,16
  78:22 79:9,13
  80:15 81:2 88:13
  88:15 109:5
  123:19

softwares 22:13
  57:2
sold 12:6,10
sole 127:23 128:2
  136:23 154:13
solution 22:24
  23:3 24:11 30:4
  41:25 42:22 43:2
  56:14
solutions 23:15
  35:15 56:10
solve 120:11 147:6
somebody 124:23
somewhat 42:10
son 82:23 96:10
  105:25
soo 109:11
soon 93:9
sophisticated
  66:25 163:6
sorry 16:23 19:21
  41:3 49:2 62:20
  69:3,4 73:8 76:4
  89:23 110:25
  122:15 127:19
  148:17 153:18
  154:7 167:6
  171:15 174:9
sort 21:12 27:24
  32:21 34:14 38:2
  56:1 67:11,22
  76:11 77:13,18,23
  81:3,17 88:22
  120:24 121:3,8
  126:9,10 135:3
  137:2
sorted 34:12
sorting 77:7,8
sorts 43:1 120:17
sound 60:22

[sounds - sullivan]

sounds  48:2 160:21
sources  27:23 83:4
southern  1:2 2:2
sow  131:20
space  35:11
speak  12:15 16:5
speaking  58:5,8 142:4
speaks  55:14 56:25 80:17 93:11 121:6 130:11 138:8,13 166:22 167:11,18
special  20:13
specialized  127:25 128:18 136:25
specific  11:22 46:1 46:4,8 47:11 60:1 78:8 90:14 116:10 116:11
specifically  20:13 51:8 57:7 60:5 71:7 93:25 134:1 149:7 162:7 164:15
specifics  46:25
speculate  45:17
speculating  75:10 93:19 104:21 114:19
speculation  31:14 32:25 58:23 115:20 140:24 143:13 144:2
speed  32:20 33:2 74:12,17 134:17
spelled  159:15
spend  67:6
spending  5:20 108:8 109:2

spent  69:8 109:21 158:10,12
split  166:19
spoke  64:17 70:4 162:12
spot  70:9,16 119:22
squiggly  68:9,11 119:21
stack  13:16
stacks  46:7
staff  18:11,13 39:9 46:2
staffing  10:5 11:19 11:20 32:3 67:19 67:19 69:7 129:10 146:13,13
stage  28:4 67:2 68:14 106:14
stages  47:21 56:23
stale  172:19
stamped  112:11 127:19
stand  42:16
stands  105:25 173:5
stanley  80:5 133:8
start  10:21 25:2 27:20 44:20 69:7 82:16 129:6 157:23 172:13
started  10:11 11:19 32:7 47:7 68:19 91:1 145:18 158:16
starting  76:5 109:8 111:5 134:23
starts  82:4 88:10 95:7 97:7

state  6:23 9:5 95:24 97:10 132:24 138:11 170:19 172:6 175:10 176:2
stated  50:18 51:7 126:19 131:24
statement  77:16 77:24 81:1 99:7 101:21 109:17,19 115:13,23 129:3 129:14 131:24 137:1 145:2
statements  27:21 108:12 133:9 137:7 139:2 144:21,22
states  1:1 2:1 52:20 55:23 84:9 128:16 166:11
stating  52:17 138:4
stayability  172:22
stayed  10:14
staying  173:20
stepped  174:9
steve  32:2 140:21
stick  105:6,8,10
sticks  113:4
stock  10:16
stood  102:1
stopped  43:16
strained  60:12
strategy  28:6 32:13,17 66:12 68:25 82:10 173:19
street  2:17 3:11,15 5:9
stress  8:2

stretch  149:3 165:24,25
stretched  145:21 146:2
stretching  146:10
strictly  38:21 40:6
strike  49:10 129:1
strong  106:5,8,8
structure  61:6
stuck  149:13
stuff  42:11 77:1 107:16 123:8,9 141:22 142:20 149:3
subject  4:15 111:6
subpoena  13:17
subscribed  100:12 176:19
subscription  102:25 103:4 153:10 154:15,19
substantia  24:22 29:9,10 51:12,16 54:13 87:1 89:8 89:12 147:15 149:11
substantiate  128:15 129:20
substantiated  65:12 99:3
success  64:24 65:4 107:22,24 108:8
successful  27:19 45:22 69:2 78:16
successfully  134:5
sudden  44:6
suitable  80:10
suite  2:18 3:5,15 5:10 35:18
sullivan  3:10

[sullivanhill.com - technology]

**sullivanhill.com**
3:12
**sum**  51:16 55:7
**summary**  75:16
75:20 76:5 81:1
**summer**  5:20 62:3
62:11,12 67:8
145:19 169:8
**summertime**  67:9
**support**  11:23
19:8 120:24
**supporting**  17:18
127:24 128:18
136:24
**suppose**  17:4
**supposed**  131:23
144:22 157:19
**sure**  6:20 7:4 8:7
8:13,16 9:4 18:9
21:8 22:2 23:2,4
25:16 26:9 27:19
28:3 29:7 31:18
31:22 32:18 35:6
38:15 45:6 46:22
48:2 51:11 52:15
53:9 54:2 55:13
57:18 65:16,18
67:14 68:1 71:22
74:3 75:23 78:14
80:20 84:24 85:3
89:24 96:6 99:13
101:22 103:1
108:13,21 112:6
114:4 118:10
121:10 128:13,25
137:22 142:9
162:12 164:21
169:15 170:17
**surprised**  74:18
**swear**  5:23

**sweeney**  3:10,12
5:16,16 8:22
13:13,15 16:8
25:18 26:6 31:13
32:24 33:25 38:12
38:17 39:23 41:3
41:7,17 43:22
44:24 46:17 48:2
49:2,4,15 50:2,4
51:2 53:5,22 54:3
55:14 56:25 58:22
60:25 61:2,8
67:15 69:16,23
71:5,15 72:23
73:2,7 74:5,14
75:22 77:19 80:17
81:7 82:14 84:19
88:2,17 89:17
90:20 91:12,14,16
93:10 98:18 101:9
108:16 111:23
112:2,21 114:14
115:19 116:25
117:5 121:5,13
129:15,24 130:11
131:17 132:23
136:3,12 138:8
139:18 140:8,23
141:15 143:12
144:1,8,25 152:7
152:20,23 155:3
155:25 159:18
162:3 165:10,18
166:21,25 167:4
167:11,17,22
168:19 169:14
171:14,16,19
174:3,7
**sworn**  5:25 176:6

**t**
**table**  104:14
**take**  24:9,10 27:3
36:15 47:24 48:1
48:3 53:9 74:3
87:25 90:11 92:9
95:12,16,25 96:5
102:20 109:12
111:8 119:12,25
122:20 123:22
127:1 146:4,5,6
162:20
**taken**  2:17 6:11
158:13 162:16
176:3
**talent**  11:25
**talk**  62:25 64:8
72:12 101:23
108:24 153:22
155:13,17 166:2
**talked**  14:19 24:6
36:9 66:1,3 70:11
74:10 76:21 85:14
94:4 95:20 132:12
141:3 149:8
**talking**  24:2 64:14
64:14 71:18,19
85:19 89:24 90:13
92:25 95:17,18
99:8 117:1 130:21
134:3 173:13
**target**  84:14
**tat**  4:16,16
**tatham**  1:7 2:7
3:15 5:8,21 14:6,7
18:24 20:18 21:2
26:19 31:10 49:24
58:5 80:4 81:9
132:11 133:8
168:23 170:11,12
171:2,6 173:9,13

174:9
**tatham's**  81:4
**tcu**  9:17,18,20
**team**  24:11,18
27:3 31:19 32:6
35:23 40:25 81:21
81:25 120:8
126:20 129:4,19
135:6,6 145:17,22
146:23,25 147:20
148:5 149:2,11
154:1,2 163:21,25
**technical**  21:18
23:15 24:11,18
34:19,20 36:9
56:13 77:9 129:19
135:6,12 163:21
163:25
**techniques**  76:2
**technologies**  28:15
28:16 30:7 117:17
117:18 119:18
128:4,5,14
**technologist**  30:10
30:15 81:19 88:19
89:4 120:6 126:20
129:6
**technology**  14:16
14:19 15:11 21:17
22:24 23:1,12
24:7 29:25,25
30:3,16 33:20,23
34:2,10,10,14,16
35:10,20,23 36:3,4
36:6,23,24 37:3,4
37:7 40:17 41:15
41:16,20,21,24
42:4,19,20,24
43:11 44:17,19,23
45:13 46:15,23
48:12,13 49:14

[technology - time]

50:8,11 51:21
52:6,12,12,13 53:2
53:14,16,19 55:9
55:18,21 56:20
57:24 58:3 63:22
64:12,13,21,23
66:20,24 68:6,8
76:10,16,17,19,22
77:1 78:10,12,14
78:17,20,21,25
79:4,16,17 80:12
80:15 81:2,14,16
81:21,24,25 88:7
88:13,15 100:17
107:2,3,4,6,8,13
107:14,15,17,19
107:20 108:7
112:15 113:20,25
114:1,16,16,18
115:5 116:2 120:8
121:9 122:6,11,13
122:13,20 124:12
125:15,18,22
126:7,11,12,20,23
127:8,9,11,12,13
127:22,23 128:1,7
128:9 129:7,9
131:7 132:22
134:24 135:4
136:22,23 145:16
145:23 149:10,13
**telephonically**
3:16 5:22
**tell** 81:25 92:3
97:9 108:25
124:14 126:20
128:14 164:23
165:13,20
**telling** 165:3,4
**term** 83:10,12

**terminated** 18:5,7
**terms** 36:8,9 54:23
58:5,8 102:18,21
141:21,23,24,24
**test** 4:17 30:18
78:5 85:5
**tested** 57:8
**testified** 6:3 94:22
144:8 159:13
163:13
**testifying** 5:7
176:6
**testimony** 16:9
43:22 44:11,25
46:18 49:16 64:12
74:15 108:17
127:2 130:23
153:4,10,11
154:25 155:4,5,7
158:21 159:19
175:7 176:10
**testing** 45:22
81:14,15,17,18,20
120:25,25 121:3,9
**tests** 45:15 77:23
78:1,9
**texas** 1:8,9,10,11
2:8,9,10,11 3:16
9:8 31:8 55:10
113:13
**text** 90:16,21 91:2
91:5,20 92:1,10,13
92:14,15,16 93:3
93:16 94:18 95:4
95:17,18 97:6,6
99:12 100:8 101:3
101:17 107:7
109:7 110:24
122:17 152:5,15
161:2

**texting** 92:3 152:5
**texts** 160:17
**thank** 6:9,19 7:10
8:5 12:22 13:14
15:14 17:20 18:22
19:16 24:24,25
30:22 59:2,4
161:1
**thanks** 38:19
**theories** 18:13
**thesis** 106:25
**thing** 25:10 27:24
32:22 101:23,24
135:25 155:15
**things** 11:23 27:21
46:12 67:19 77:2
77:4,6,7,11 81:10
84:18 112:23
115:8 118:18
119:6 123:16
126:12 131:24
146:10,21 160:5
161:13 164:8
172:12
**think** 10:10 14:17
14:22 15:3 16:15
18:3,4,9,19 19:3,9
19:12 21:15 22:11
24:18 28:25 29:25
37:18 38:13 41:7
42:1 44:8 53:10
55:18 64:11 67:8
67:18 70:5 74:10
76:23,25 77:7
81:13 83:3,12,12
83:13,13,17 87:1
87:13 93:6 94:17
94:22 95:11 97:2
100:15,24 104:12
106:14 111:4,8
113:15 118:20

121:15 124:16
128:9 130:13
132:18 133:18
145:13,20 147:24
149:9,16 161:22
170:18,20 171:3
171:24 173:6,22
174:12
**thinking** 49:12
71:11
**third** 57:24 70:12
76:24 87:8 97:2
97:23 98:22 99:8
101:8,16 114:9
117:9 130:25
134:23 140:20
**thomas** 1:7 2:7
3:15 49:24
**thought** 15:11
35:21 43:7 64:6
66:5 83:14 85:14
94:4,5 106:25
136:4 145:19
158:2 162:20
172:8
**thoughts** 15:6
**threat** 156:3
159:24 162:24
**threatens** 160:2
**three** 45:19 111:15
111:24 127:15
146:6
**thursday** 1:17
2:19 5:1
**tight** 75:24 76:14
**time** 5:20 6:9
12:16 18:14 19:24
19:25 21:15 24:12
25:13,15,18 26:14
32:17,17 33:2
39:7 40:21 45:12

Page 32

[time - top]

45:18 46:11 48:6
48:10 50:11,13
51:19,25 53:9
57:4 61:10 65:8
67:11 68:6 70:3,6
70:12,22 72:5,10
75:7 77:14,21
86:23 92:6,9 93:7
93:21,22 95:23
96:18 97:18 98:16
99:2,15 102:1,9
103:23 104:14
106:1 107:2
108:12 109:13
110:23 111:3,12
111:16 113:3
114:2,21 117:12
117:13 120:9
123:4 124:1,6
125:4,5 130:17
131:1,14,17
132:16,20 140:6
142:18,19 145:12
149:15 150:20
153:1 158:7,10,22
161:25 162:20
168:19 169:6,9,14
169:17,22 170:5
170:20,24 172:5
172:24 174:11,17
174:18 176:4
**times** 27:20 33:3
33:14,18 52:10
61:12,13 70:1
142:9 145:21
**title** 1:9 2:9 15:11
15:12 21:9,11
23:6 25:2 26:15
26:16,17,19 27:12
30:19 32:10 34:2
37:2 47:11,12,14

50:15 63:18,20
64:3,4,19 68:24,25
75:21 76:11 77:13
77:18 79:5 81:4
88:13,21 100:17
107:22 108:22,22
113:11 116:5
117:14 119:1,2
121:18,20,22
122:22 123:6
124:5,5,15 125:3
134:20 151:2
**titled** 95:5
**titlerover** 13:20,22
14:4,14 16:5
19:18,20 20:6,11
20:19,25 21:6
22:3,6,10,23 23:22
25:2,17 26:1,5,20
26:24 27:5,16
28:11,14,24 29:3
29:11,11,13,19,24
29:25 30:3,24
31:4,11 33:20,22
34:2,8 35:1 36:23
37:1,2,8,12,22
41:16,20,24 42:4
42:15,19,24 43:11
43:17,18 44:4,8,17
44:18,22 45:7,22
46:3,15,16,23
48:12,13 49:7,8,13
49:14,20,24 50:10
50:18 51:15,16,24
51:25 52:1,13,23
53:20 54:14 58:12
71:21 74:11 76:17
76:19,22 78:11,16
78:17,21 79:3
80:15 85:19 86:1
86:1,6 87:2 88:16

89:7,12 92:7
107:14,18,20
108:7 109:4 112:9
112:14 113:6,12
113:19,24 115:5
116:1 117:2,3,6,8
120:5,14,24 121:9
122:13,19 124:12
125:14,18 126:7
128:2 130:6 131:7
131:16,20 132:22
134:25 135:8,10
136:21 139:11
140:7 143:4,7,18
144:13 147:9,11
147:16 149:16
150:8,10 166:17
167:5,9 172:19
**titlerover's** 108:23
127:20
**titlerovers** 107:9
**titles** 26:12
**today** 4:16 5:9 8:2
13:9 45:18 48:15
55:24 74:6 78:1,4
82:20 94:19 99:5
101:13 113:2
115:8 148:21
153:4 156:5
174:10
**today's** 5:5
**told** 35:22 106:12
133:10 146:3,8
153:4 155:10
164:18 172:15
**tom** 5:21 14:6,7,9
14:10,14,18 15:1
16:7 17:4,16
18:11 20:9,17
21:2,5,16 23:18,19
23:22 25:9 27:9

30:23 31:1,1,22,25
32:20 33:13 50:25
52:3 55:17 65:19
65:22 73:22,24
74:3,12,17 75:7
80:4,7 82:23 84:4
87:7 89:20 105:23
106:11 115:2,22
128:3,20 132:11
132:12 133:2
135:5 142:11,12
144:21 146:1
153:22 154:2
155:6,13,17
165:16,20,21,22
165:24 166:4
168:17,23 169:11
170:11,12 173:8
173:13,14 174:5,5
174:8
**tom's** 96:10
**tons** 96:20
**tool** 27:1 28:19
37:7 42:7 49:20
56:16 64:23 65:5
65:6 79:6 86:1,2
107:4 114:11
120:5 126:16
135:13
**tools** 15:7 16:12,14
21:9 23:15 28:23
34:11 37:8,12,13
42:2,6 43:1,4,7
47:5,15,16,21
50:14 55:25 57:4
57:7,16 58:2
76:21,22 79:6
88:20 108:23,25
125:8 135:2
**top** 24:19 31:20
82:10 88:7 91:4

**[top - unraveled]**

91:21 96:25 97:6
109:7 134:20
138:25 140:19
**topic**  36:18
**total**  104:4
**totally**  109:13
**tr**  29:25 50:8,9,11
51:21 55:7,9,17,21
56:20 58:2 81:14
81:16
**tracking**  69:11
143:1
**traction**  86:4
**traditional**  68:4
113:23 115:15
127:24 128:17
136:24
**trainee**  5:20
**transaction**  38:23
148:6 166:12
169:4
**transactions**  4:21
10:25 16:3 140:18
**transcribed**  176:8
**transcript**  7:12
175:5 176:9,12,14
**transfer**  138:19
139:23
**transitions**  39:7
**transpired**  83:8
**traunch**  62:15,18
83:19 137:19,24
138:5 142:5
164:11 167:14
168:21
**travel**  125:5
**tremendous**  110:8
**trent**  59:18 103:17
149:24
**trial**  174:11

**tried**  66:21 120:19
**trip**  70:13
**trips**  65:19
**true**  30:21 77:15
77:20 90:4 128:21
129:5 131:13
133:3 136:1
151:20 164:18
175:8 176:9
**truly**  91:23 93:5
95:10,15,24 96:3
97:9 100:15
109:11,13
**trusted**  106:11,11
129:4
**try**  23:1 95:9
157:24 158:4
**trying**  17:5,6 21:6
22:14 26:2 29:17
42:1,23 44:15
52:22 53:18 88:14
97:15 101:20
107:1 114:20,23
120:10,18 122:12
122:16 126:8
144:12 152:16
160:4
**turn**  13:19 31:16
75:4,15 88:4 97:2
100:4 109:6
136:17 158:15
169:24
**tweaks**  56:23
**twelfth**  136:8
**twenty**  3:15
**twice**  144:13
**two**  32:2,4 41:8
44:1 45:18 48:9
51:4,4 56:17
58:20 61:12,15
74:19,20 81:10

83:4 84:3 85:19
92:2,25 103:16
107:10 130:21
141:24 143:7,21
144:13 145:12
159:21 164:11
165:8 172:12,18
**type**  23:12 25:10
110:5 125:20
155:16
**typeable**  123:10
**typewritten**
117:16
**typically**  30:11
85:24 87:14 98:12
112:23 122:25
126:25 141:20

**u**

**u.s.**  31:8
**ultimately**  30:4
35:9,11 38:22
39:14 40:15 41:1
43:9 70:20 85:9
103:14,19 120:8
134:14
**um**  13:21 14:8
15:15 18:25 20:1
22:8 37:19 39:20
42:3 52:4,21,25
55:5 59:24 65:11
75:17 80:24 94:21
95:6,22 97:5
98:14 99:10 101:5
101:19 105:12
108:10 109:16
112:17 118:1,8
120:4 129:13
130:3,8 134:22
135:1,24 136:19
138:20 142:3
151:9 154:6

156:20 157:1,4
171:5
**unbelievable**
100:16
**uncommon**  124:22
124:24 141:20
150:21
**undercapitalized**
150:15
**underneath**  11:20
75:20 82:5
**undersigned**  176:1
**understand**  7:8,16
7:19,21 8:15,20
17:6 23:12 26:2
27:22 29:17 41:22
42:23 44:16 52:22
71:13 73:11 88:14
109:13 122:10,12
122:16 125:12
126:6,8 143:14
155:12 156:23
**understanding**
36:5,17,20 53:3
58:20 77:10 89:8
111:25
**understood**  71:24
75:4 89:4 133:14
**unfortunately**
43:15 158:15
**unique**  40:20
**unit**  63:24 66:23
108:6
**united**  1:1 2:1
**units**  64:2 80:9
**university**  12:9,9
**unorganized**
36:15
**unquote**  111:2
**unraveled**  156:14
156:16

[unusual - willis]

unusual  8:2
update  46:2
updated  124:2
updates  25:9
upload  123:22
uploaded  123:24
uploading  54:8
upper  93:3
upside  93:6
  100:16 109:4
  111:6
urgency  147:4,19
  147:21
use  23:1 24:3
  28:21 29:24 36:23
  47:12 49:19 50:14
  55:8,17,20 64:12
  64:13 76:9 78:20
  79:17 88:12 91:2
  118:12 120:5
  126:11 128:2
useful  27:1 28:18
  47:22,22
user  22:14 24:5
  30:6 47:6,8,17
  56:16 57:6,13
  88:19,20,25
  115:10
usually  53:13
  98:23
utilize  16:12 21:8
  23:15 31:7 37:1
  37:12 43:4 56:11
  68:10 117:17
  125:24 135:13
utilized  15:7,8,9
  17:14 32:8 42:8
  50:15 57:3,4,8,9
  57:12 76:19
  108:24 134:13

utilizing  14:16
  15:6 24:7 34:11
  37:8 46:3 47:5,15
  56:1,16 63:21
  68:8 107:17
  126:23 128:5

v

v  1:6 2:6 5:8
vague  25:18 29:15
  33:25 38:13 39:23
  44:24 61:8 71:6
  98:18 114:14
  121:5 131:17
  165:11 168:19
valid  133:10
validated  81:23
validity  133:9
valuation  98:15,23
  99:2,3,6
value  14:18 53:16
  53:19 86:3 98:10
  100:3
various  21:8 22:13
  28:15 145:21
vendor  29:9 35:6
  38:21 42:21
vendors  29:4,8
  87:2 149:25
  156:12 165:5
  166:1
venture  105:20
venturers  12:9
verbal  97:23,25
verified  65:12
verify  65:15 77:24
  121:17
version  72:24
  123:21,22
versus  93:12
vertical  67:1

vetted  99:20
viable  22:15
vice  10:15
video  5:6
videographer  3:21
  5:4,11,23 48:5,8
  111:11,14 169:16
  169:20 174:14,16
videotaped  1:15
  2:16
view  78:22 92:16
  158:6
viewed  126:7
visit  62:7 70:17
  95:10 165:21
visitation  62:8,9
visited  75:12
visualization
  119:17 126:10
visually  121:15
voice  152:3
voiced  164:4

w

wacker  3:5
wait  148:18
walked  164:4
walker  55:10
want  8:8,13 31:17
  32:18 38:13 48:1
  53:25 62:12 71:18
  71:21 81:19 87:25
  88:1 89:24 90:12
  92:9 93:5 95:10
  95:12 97:9 100:11
  100:25 102:16,17
  108:18 109:10,11
  110:3,9,15 116:22
  125:20 132:7
  133:1 138:2 155:9
  155:23 165:2

wanted  73:11
  104:12 119:2
  121:23 159:2
  165:24,25 166:1
  172:12
wanting  95:12
  96:4
warm  8:9
warrant  53:20
watkins  11:18
  35:15 38:20
way  12:19 30:10
  32:7 44:2 46:13
  65:13 73:3 89:4
  93:8,12 97:8,10
  123:10 134:15
  154:17 160:5
  173:24
ways  116:9,13
  119:7 120:2
  123:21
we's  38:14
wear  48:4
week  33:13 141:24
weekly  33:16
weeks  62:5 100:23
wells  66:18 67:1
  99:25 110:11
went  10:6,14,16
  14:21 22:19 30:14
  47:7 68:5 70:15
  85:21 98:11 122:8
  128:24 129:8,9,23
  133:18 141:4
  145:2 162:15
west  2:17 5:9
whatnot  64:20
whereof  176:18
willing  98:7
willis  1:8,11,15 2:8
  2:11,16 3:8,8 4:3

[willis - zero]

4:12 5:7,17,17 6:1
9:6 11:12,15,17,22
12:2,18 13:17
19:4,6,9,11,14
20:14 25:21 28:17
28:21 69:7 98:20
98:21 113:12,14
113:15 133:22
134:10 146:12,14
146:18 149:17,23
149:23 150:1,2,4
154:9 166:8 168:6
168:10 175:3,14
**win** 125:7
**wire** 138:18
139:23 163:9
**wires** 4:16
**wise** 104:17
**witness** 4:2 5:24
5:25 8:25 13:12
16:10 25:20 26:7
33:1 38:16,18
41:5,10 43:23
45:2 46:19 49:3
49:17 50:3 51:3
53:6,25 54:4 57:2
58:24 61:1 69:17
69:24 71:9,17
73:1,8 74:6,16
75:24 77:20 80:20
81:8 84:24 88:18
101:11 108:18
112:3,23 115:21
121:15 129:17,25
130:13 131:18
132:24 136:4,15
139:19 140:10,25
141:16 143:14
144:3,10 145:1
152:8,24 153:2
155:5 156:1

159:20 167:3,12
168:1 171:15,18
171:22 174:6
176:18
**witnesses** 176:5
**wondering** 156:10
**word** 34:13 46:5
67:24 71:6 95:7
119:16 126:10
**words** 22:6 45:13
116:17 131:1
171:11
**wordsmithing**
75:3
**work** 10:6,22
15:12 21:17 23:6
23:13 39:2,25
42:12,17,24 47:19
47:23 51:12,13
54:10,20 56:20
78:2,4 79:2 80:12
99:17 110:10
113:22 115:15
116:5 119:2
120:11 122:7,7
131:24 134:7
146:7 157:11
158:18
**worked** 10:5,20,23
21:23 30:15 31:25
34:24 35:5,6
36:21 37:17 38:4
38:4 39:18,21
40:3,4 45:18 57:8
79:14,14 82:23
85:3 105:25
122:13 131:6
132:21 134:9
**workflow** 113:20
114:6

**working** 11:7
22:11 23:24 24:20
37:9 38:2 40:8
54:21 57:14 79:8
84:15 86:12 87:12
87:14 122:4
130:16 141:3,5,10
168:11
**world** 80:14
135:15
**worth** 10:24 86:19
99:24 124:5
**worthwhile**
173:19
**wound** 106:3
**wow** 126:24
**wrapped** 47:16
**write** 105:5,19
106:7
**writing** 97:17,18
101:25 102:5,12
103:19 104:25
152:1,15,15
**written** 89:11
103:22 110:24
128:15 135:21
**wrong** 89:19
**wrote** 91:25 92:2
105:5 107:7
128:21 132:17

| x |
| --- |

**x** 97:13 98:13
176:14

| y |
| --- |

**y** 97:13
**y'all** 109:10
**yeah** 8:25 14:13
14:15 16:10 17:4
17:10 20:9 23:19
27:25 33:1 35:3

36:9 37:2 40:3
41:13 45:2 60:24
67:21 69:24 73:11
74:16 76:25 83:23
84:6,21 88:6
91:14 93:22 95:18
98:25 100:2,7
102:10 104:3,12
108:15 112:16
113:18 114:8
117:3 126:24
127:11 133:25
136:11,13 138:1,5
139:3,25,25
144:19,20 151:15
153:15,17 160:23
162:11 163:20
166:17,23 171:24
174:15
**year** 6:16,18 10:18
12:6 14:1 37:21
52:6,8,12,17 69:8
69:9 83:16 157:9
158:25 162:22
172:18
**years** 11:14 15:24
21:24,25 37:22
40:23 45:19,19
60:10 69:3 92:2
133:15 145:12
**yep** 109:8,10
**yesterday** 154:12
**york** 12:8 82:24
83:5 96:11
**young** 24:20 32:2
89:9
**yup** 95:8 121:22

| z |
| --- |

**zero** 172:20

Kramm Court Reporters, A Veritext Company
866-299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.