# EXHIBIT D

```
 1              UNITED STATES DISTRICT COURT
 2             SOUTHERN DISTRICT OF CALIFORNIA
 3
    ENSOURCE INVESTMENTS LLC, a   ) Case No.
 4  Delaware limited liability   ) 3:17-CV-00079-H-LL
    company,                      )
 5                                )
              Plaintiff,          )
 6                                )
        v.                        )
 7                                )
    THOMAS P. TATHAM, an          )
 8  individual; MARK A. WILLIS,   )
    an individual; PDP MANAGEMENT )
 9  GROUP, LLC, a Texas limited   )
    liability company; TITLE      )
10  ROVER, LLC, a Texas limited   )
    liability company; BEYOND     )
11  REVIEW, LLC, a Texas limited  )
    liability company; IMAGE      )
12  ENGINE, LLC, a Texas limited  )
    liability company; WILLIS     )
13  GROUP, LLC, a Texas limited   )
    liability company; and        )
14  DOES 1 -50,                   )
                                  )
15            Defendants.         )
    ------------------------------)
16
17                    - - -
18             MONDAY, APRIL 29, 2019
19                    - - -
20
21       Deposition of JOSEPH HAYNES, taken at the offices
22  of Veritext Legal Solutions, 1250 I Street N.W.,
23  Washington, D.C., beginning at 10:29 a.m., before
24  Nancy J. Martin, a Registered Merit Reporter,
25  Certified Shorthand Reporter.
```

                                              Page 1

```
 1   A P P E A R A N C E S :

 2

 3           PANAKOS LAW, APC
             BY:  BONNIE McKNIGHT, ATTORNEY AT LAW
 4           555 West Beach Street
             Suite 500
 5           San Diego, California   92101
             (619) 800-0LAW
 6           BONNIE@PANAKOSLAW.COM
             Representing the Plaintiff
 7

 8
             SULLIVAN HILL LEWIN REZ & ENGEL, APLC
 9           BY:  SHANNON D. SWEENEY, ESQ.
             600 B Street
10           Suite 1700
             San Diego, California   92101
11           sweeney@sullivanhill.com
             Representing Mark A. Willis, Beyond Review,
12           LLC, Imagine Engine, LLC, and Willis Group,
             LLC
13

14
             THOMAS P. TATHAM
15           621 East 22nd Street
             Suite C
16           Houston, Texas   77008
             Representing Pro Se Defendant
17

18

19

20

21

22

23

24

25

                                                  Page  2
```

```
1                         I N D E X
                                                    PAGE
2
    TESTIMONY OF JOSEPH HAYNES
3
    BY MS. McKNIGHT                                  5
4
    BY MS. SWEENEY                                   85
5
    BY MR. TATHAM                                    94
6
    BY MS. McKNIGHT                                  98
7
8                         E X H I B I T S
9   NUMBER                  DESCRIPTION            PAGE
10  Exhibit 1               Plaintiff Ensource       11
                            Investments LLC's Notice of
11                          Taking Deposition of
                            Non-Party Witness Joseph V.
12                          Haynes Pursuant to
                            Fed.R.Civ.P.30; FED R.
13                          CIV.P.45, 44 pages
14  Exhibit 2               2 Terabyte Hard Drive     13
                            (Retained by Counsel)
15
    Exhibit 3               Net Payments to AIT LLC re:  22
16                          Title Rover/Hopewell,
                            1 page
17
    Exhibit 4               E-mail string, WIL_00004201  29
18                          - -4202, 2 pages
19  Exhibit 5               Data Mining for Mineral    45
                            Resource Investigations,
20                          July 25, 2016, PLTF_000670
                            - -710, 41 pages
21
    Exhibit 6               E-mail dated November 1,    51
22                          2016, TAT_01247 - -01248,
                            2 pages
23
    Exhibit 7               E-mail string, TAT_18818 -  68
24                          -18819, 2 pages
25

                                                  Page 3
```

Kramm Court Reporters, A Veritext Company
619-239-0080

```
 1                    E X H I B I T S
 2                      (CONTINUED)
 3    NUMBER                DESCRIPTION                 PAGE
 4    Exhibit 8             Flash Drive                  72
 5    Exhibit 9             Title Rover, LLC, Schedule   98
                            of Consultants, Contractors
 6                          and Outside Services
                            (excludes legal counsel and
 7                          investment bankers),
                            WIL_0000640, 1 page
 8
      Exhibit 10            The Fusion of Due Diligence  99
 9                          +e-, Discovery Expertise,
                            2 pages
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                             Page  4
```

```
1
2      WASHINGTON, D.C., MONDAY, APRIL 29, 2019; 10:29 A.M.
3                            -  -  -
4
5                       JOSEPH HAYNES,
6              having been first duly sworn,
7           was examined and testified as follows:
8
9                      EXAMINATION
10    BY MS. McKNIGHT:
11        Q.  Good morning, Mr. Haynes.
12        A.  Good morning.
13        Q.  Thank you for being here today.  I'm just
14    going to go over some basics.  First of all, have you
15    ever had your deposition taken before?
16        A.  Maybe 34 years ago.
17        Q.  So it's been a while?
18        A.  It's been a long time.
19        Q.  Okay.
20        A.  Before you were born.
21        Q.  Well, thank you for -- well, I'm here to sort
22    of ask you a bunch of questions, as you are probably
23    aware.
24            One of the first rules that I want you to
25    consider is to make sure that you always answer with a
```

Page 5

1    "yes" or a "no."  So no "uh-uhs" or "uh-huhs."  Do you

2    understand that?

3         A.  Yes.

4         Q.  Okay.  That makes it so that the record is

5    clear and the court reporter can take down what you

6    say without there being any ambiguity.

7              MR. JOHNS:  Jerry here.

8              MS. McKNIGHT:  Hi, Jerry.  We already started

9    the deposition.

10        Q.  So do you understand that?

11        A.  I do.

12        Q.  Thank you.

13             Okay.  So I'm going to ask you a series of

14   questions.  As I already mentioned, you're going to be

15   answering them under oath.  Do you understand the

16   significance of answering questions under oath?

17        A.  Yes.

18        Q.  You understand that even though we are in a

19   conference room in a relatively informal environment,

20   that it still has the same force and effect as if you

21   were in front of a judge.  Do you understand that?

22        A.  Yes.

23        Q.  Okay.  You're already doing a really good job

24   of this, but please try not to interrupt me, as well

25   as Ms. Sweeney is on the line, and so are a couple

```
 1    other people.  Ms. Sweeney, I believe, will be -- not
 2    "I believe."  I know she will be raising objections.
 3    That means that I would ask that you pause before you
 4    answer my questions.  Do you understand?
 5         A.  Yes.
 6         Q.  Okay.  Thank you.
 7              MS. SWEENEY:  Counsel?
 8              MS. McKNIGHT:  Yes.
 9              MS. SWEENEY:  Can you hear me?
10              MS. McKNIGHT:  Yes.
11              MS. SWEENEY:  Can we do introductions so that
12    we know who's participating in the deposition today?
13              MS. McKNIGHT:  Oh, yes.  Sure.  This is
14    Bonnie McKnight on behalf of plaintiff.
15              MS. SWEENEY:  Shannon Sweeney appearing on
16    behalf of Mark Willis, Image Engine, Beyond Review,
17    and the Willis Group.
18              MS. McKNIGHT:  Tom, can you announce
19    yourself.
20              MR. TATHAM:  Tom Tatham appearing.
21              MS. McKNIGHT:  And I have some -- one client
22    appearing by phone as well who will not be --
23              MS. SWEENEY:  Which client?
24              MS. McKNIGHT:  Jerry Johns is on the line.
25              MS. SWEENEY:  Okay.  Thank you.
```

```
 1              (A recess was taken from 10:31 a.m.

 2         to 10:35 a.m.)

 3         MS. McKNIGHT:  Okay.  So a notary just came

 4    in and notarized your signed copy of the protective

 5    order.  I just want to make that clear for the record,

 6    and we will get that scanned and circulated amongst

 7    the parties.

 8         Q.  And you read that protective order; correct?

 9         A.  Yes.

10         Q.  You agree to be bound by the terms of that

11    protective order?

12         A.  Yes.

13         Q.  Okay.  Again, as I mentioned before, please

14    pause before you answer my questions to allow time for

15    opposing counsel to raise their objections.  Okay?

16         A.  Okay.

17         Q.  Okay.  Make sure that you speak clearly.  You

18    can ask me to repeat a question if you don't

19    understand it.  I assume that you understand my

20    question if you don't ask me to clarify it or rephrase

21    it.  Do you understand that?

22         A.  Yes.

23         Q.  I want to make sure that you do not speculate

24    or guess.  I understand some of these events occurred

25    a few years ago, and so you may have to estimate which
```

Page 8

1    is okay.  Do you understand the difference between an

2    estimate and a guess -- or estimate -- yeah, and a

3    guess?

4         A.  I think so, yes.

5         Q.  So an estimate is something based on your

6    personal knowledge.  For example, the length of this

7    table.  Because you can see this table, you can

8    provide an estimate.  You may not know for certain,

9    but if I were to ask you to -- you know, how much does

10   my dog Milo weigh, you would have no idea because

11   you've never met Milo.  Do you understand the

12   difference?

13        A.  Yes.

14        Q.  Okay.  Okay.  Is there any other reason, such

15   as being under usual stress, a physical or mental

16   condition, or being under the influence of any

17   substances that would prevent or limit you from giving

18   truthful answers to my questions today?

19        A.  No.

20        Q.  Okay.  So let's talk a little bit about your

21   background.  What is your highest level of education?

22        A.  A master's.

23        Q.  Okay.  And what is your master's in?

24        A.  Mathematics.

25        Q.  And where did you get your master's?

1        A.  Texas Tech.

2        Q.  Where did you attend undergrad?

3        A.  Texas Tech.

4        Q.  Okay.  And when did you receive your

5    master's?

6        A.  '72.

7        Q.  Okay.  Do you have any other licenses or

8    credentials related to your master's?

9        A.  No.

10        Q.  Okay.  Where is your present place of

11   employment?

12        A.  AIT LLC, Leesburg, Virginia.

13        Q.  Okay.  Is that your company?

14        A.  Yes.

15        Q.  So you own that company?

16        A.  My wife and I own it.

17        Q.  Okay.  What's your wife's name?

18        A.  Zaure.

19        Q.  Can you spell that.

20        A.  Z-a-u-r-e.

21        Q.  Thank you.  How long have you owned AIT?

22        A.  We formed it in 2006, I'm pretty sure.

23        Q.  Okay.

24        A.  It's a Virginia Corporation.

25        Q.  Explain what AIT does.

Page 10

1        A.   We consult and develop software for public

2   records, mostly for government agencies.  We also do

3   some e-Discovery work for law firms relating to public

4   records.  We do -- we worked, for example, with the

5   attorney general of a certain state to do some

6   analysis that involved also public records, land

7   records.  You could say we specialize in land records

8   mostly, but anything to do with public records.

9        Q.   Okay.  Is AIT ever a subcontractor to other

10  companies?

11       A.   Oh, yes.

12            MS. McKNIGHT:  Okay.  Let's talk a little bit

13  about why we're here today.  I'm going to mark -- or

14  have the court reporter mark as Exhibit 1 the

15  subpoena.

16            (Deposition Exhibit 1 was marked for

17            identification.)

18            THE WITNESS:  This is the same one that I

19  have?

20  BY MS. McKNIGHT:

21       Q.   Yes.  It should be -- now that I'm looking at

22  it.  Let me just look through.

23       A.   It looks bigger.

24       Q.   Does it?

25       A.   Yep.

Page 11

```
 1            MS. McKNIGHT:  Well, can you just take a
 2    second to look through it.
 3            (The witness reviewed Exhibit 1.)
 4            THE WITNESS:  This is the actual lawsuit;
 5    right?
 6    BY MS. McKNIGHT:
 7        Q.  Yes.  It's attached to the subpoena.  So that
 8    might be the reason why it appears larger.
 9        A.  Okay.  There's some pages here in the front.
10    Yeah.  It's fine.
11        Q.  Okay.  If you could just turn to the
12    attachment of the subpoena.  It says, "Attachment A"
13    under Page 1.  And if you go to Page 3, actually,
14    you'll see "Requests for Production" --
15        A.  Uh-huh.
16        Q.  -- through Page 9.
17        A.  Yeah.
18        Q.  Do you -- did you look for any documents in
19    response to these requests?
20        A.  I looked on existing repositories.  So this
21    was, of course, two years.  Some things have been
22    discarded and so forth.  I did find, I think, all or
23    most of the data that we used in the system.  I did
24    have a copy of the database, and I pulled off all the
25    E-mails I could find that relate to these things.  I
```

```
 1   didn't have any hard copy documents per se that --
 2   everything was done by E-mail that I know of.
 3        Q.  Okay.
 4        A.  That I got.
 5        Q.  Did you bring a copy of that information with
 6   you today?
 7        A.  Sorry.  I couldn't give you one of the small
 8   ones.
 9        Q.  That's okay.
10        A.  Just mark that out (indicating).
11             MS. McKNIGHT:  Okay.
12             Let the record reflect Mr. Haynes has handed
13   me --
14             THE WITNESS:  It's 2 terabyte hard drive.
15             MS. McKNIGHT:  Okay.  And we're going to mark
16   this as Exhibit 2.
17             (Deposition Exhibit 2 was marked for
18             identification.)
19   BY MS. McKNIGHT:
20        Q.  Okay.  So you mentioned that some of the
21   information had been discarded.  Do you recall what
22   you're referring to?
23        A.  There was some -- there are a lot of tools
24   that I use in the course of my normal business.  This
25   is something that I do for agencies, for other law
```

Page 13

1    firms.  I take data in.  I try to make some sense of

2    it, format it, and then I most often provide a portal,

3    that is, a way for them to get in a website or

4    whatever to look at that data in a way that would be

5    meaningful to them.

6           So, for example, in the case of this one

7    database here, Madison County, there was no -- as far

8    as I know, there was no website available to access

9    public records, land records.  So we pulled their data

10   onto a server on my machine -- one of my machines, a

11   database, consolidated some other map data and so

12   forth -- this all occurred over a period of a year or

13   so -- and then provided a portal so that people could

14   remotely come in and look at that data.  That's what

15   we do with like the law firms, and that's the way we

16   work with the attorney general and so forth.

17          So just as a process of getting a website up

18   and things like that, when I finish with those, I

19   normally will just take them down and discard them

20   and, you know, move onto the next one.  Otherwise,

21   it's just stuff out there that you lose track of after

22   a while.  So, frankly, I'm surprised that we still had

23   the data.

24       Q.  Okay.  I'm going to probably make you go

25   through what you just explained to me ad nauseam,

```
 1    unfortunately, for you, just so that I can make sure I
 2    understand the scope of your work as it pertains to
 3    this case.  So just to back up a little bit about what
 4    it is that you did, "you" is AIT; correct?
 5         A.  Right.
 6         Q.  And AIT took data from Madison County and
 7    uploaded it all into your AIT system; is that correct?
 8         A.  Yeah.  And all of this came through Brent
 9    Stanley, who was our project lead --
10         Q.  Okay.
11         A.  -- in Houston.
12         Q.  Okay.  So what company did Brent Stanley work
13    for?
14         A.  Well, I understood he was the managing
15    director, at least when it started, for Substantia.
16         Q.  Okay.  And when "it started," are you
17    referring to -- what are you referring to?
18         A.  I'm referring to the Madison County
19    Hopewell -- I think Title Rover was formed sometime
20    after that --
21         Q.  Okay.
22         A.  -- but, you know, there was a continuum of --
23    Brent brought this business to Susan and I --
24         Q.  Okay.
25         A.  -- and asked us if we would be interested in
```

Page 15

1   participating.  As part of this, they sent -- we did a

2   pilot.  We were working -- it was always sort of a

3   pilot to see if there was anything feasible we could

4   really do.  So they would provide us with data.  Part

5   of the process is you're trying to build chains of

6   documents --

7        Q.  Okay.

8        A.  -- going back in time.

9            The problem is that there are 3,000 different

10  registration or recording offices in this country, and

11  they all do it differently, every single one of them.

12  So Madison County stands by itself, has its own

13  document types, its own way of classifying things.  It

14  may have been index things -- it indexes things

15  differently than anyone else.  In other words,

16  collecting data off the documents.

17       Q.  Okay.

18       A.  You don't know how far back they go.  You

19  don't know if they even have electronic images of the

20  documents, and if they do, what quality they are.

21           So there are all kinds of variables, and it

22  goes from recording history to recording history.

23  Everything is different.  So in that sense everything

24  is custom if you get into accounting or registration

25  district.

1          Q.   Okay.

2          A.   So what we were doing was trying to evaluate

3    what does Madison County have, how good is it, and

4    what kind of data can we extract from it.

5               So we started with the database that they

6    had.  I think their system provider was ACS.  It's a

7    company.

8          Q.   Okay.  And are you talking about the

9    Madison County --

10         A.   I'm talking about Madison County.  That's

11   really basically all we did was the Madison County.

12         Q.   Okay.

13         A.   We took what data they had.  I took it into a

14   database that -- the data we got was just text files

15   in various formats.  We imported it into a database so

16   we could run queries against it, and we expanded that

17   database to also accommodate things like in Texas

18   there are specific ways they handle surveys, and I

19   think that's through the Texas Railroad Commission.

20   And there was a mapping company that had some data

21   that they gave us that we incorporated into the

22   database, and then there were a lot of document

23   images.

24         Q.   Okay.

25         A.   That's copies of these (indicating).  That's

Page 17

1    mortgages, deeds, leases.  Anything relating to land

2    records.  So a lot of the data that Title Rover needed

3    was not in the data that came from the county because

4    the county didn't index it.

5        Q.  Okay.

6        A.  That's mostly references to other documents

7    moving backward in time.

8        Q.  Okay.

9        A.  So we also run a process of OCR, which we

10   took the raw images and ran them through the process

11   to see if we could find document references and add

12   those to the data.  And this was over a long process.

13   As you go back in time, the quality of the documents

14   gets worse and worse.  You get back into old

15   typewritten records, and finally you start hitting

16   script where they're actually recording these things

17   in handwriting.

18           So we went back as far as we could, trying to

19   extract the additional information that we needed in

20   order to tie documents together.

21       Q.  Okay.

22       A.  This was all a manual process.  And we even

23   provided them with another data entry portal that let

24   them look at what the OCR process extracted and

25   correct it because OCR is very vague technology.  Very

Page 18

1    inaccurate.

2         Q.  Okay.

3         A.  So you always have to look at it to evaluate

4    it and correct it because it makes errors.  So there

5    was a lot of manual process involved in that.

6              And so over a period of time we just built

7    this database where we could build chains, let them

8    build chains of title if you will, using a couple of

9    attorneys they had on staff, I think at Title Rover.

10        Q.  Okay.

11        A.  They would actually go back and go into our

12   portal, and they would build chains off the data.  And

13   then I would -- every month there would be a new

14   update from Madison County that I would have to then

15   import, go through all this process again to extract

16   the data and populate the database, put the images in

17   the right spot and, you know, so that the attorneys in

18   Houston can get to them.  And that was it.  That's

19   really it.

20        Q.  Okay.

21        A.  I'm not an oil and gas expert.  So a lot of

22   the things they were looking for were totally foreign

23   to me.

24        Q.  Okay.

25        A.  You know, I know land records, but they have

```
 1   some unique terminology in what they call the oil
 2   patch.  And so there were a lot of things that said,
 3   you know, "Look for this term."  I didn't know what
 4   that meant, but, you know, we would look for it
 5   through the OCR of the documents.  You know, it's very
 6   manual intensive.  There are E-mails on that.  There's
 7   several hundred.
 8        Q.  Okay.
 9        A.  Most of them are technical back and forth,
10   you know.  We can't find this document or that
11   reference is not there or whatever.
12        Q.  And which attorney from Title Rover were you
13   communicating with?  Do you recall their names?
14        A.  One was Jennifer.  I don't remember their
15   last names.  And the other I think was Laurie.
16        Q.  Okay.
17        A.  And that's -- but I don't remember their last
18   names.
19        Q.  Okay.  And just to go back to sort of the
20   beginning of what you were telling me about how the
21   project came, and by "the project," I mean the
22   Hopewell-Pilot project, does that term sound familiar
23   to you?
24        A.  Yes.
25        Q.  So when I call it, "the project," I mean the
```

Page 20

1    Hopewell-Pilot project.  Okay?

2         When the Hopewell-Pilot project came to you

3    from, I think you said Brent Stanley, did he say

4    how -- do you recall him telling, you know, how he

5    found out about this project or any other context

6    surrounding the project?

7         A.  I think we had been working in that office

8    with those people for a long time.  He's had some

9    association with the Willis companies for years.

10        Q.  Okay.

11        A.  That's my understanding.

12        Q.  Okay.  Did you know Brent Stanley prior to

13   him coming to you with the Hopewell-Pilot project?

14        A.  Yes.  He worked with us on that attorney

15   general project.

16        Q.  Okay.  And in what capacity did he work with

17   you on that?  Do you recall?

18        A.  Helping correlate data.  He produced a lot of

19   documentation for us.  Helped in the analysis.  We

20   were specifically looking for tax lien mining

21   companies, the people that were abusing the tax lien

22   process the attorney general was looking into.

23        Q.  Okay.  And was Brent working under the

24   capacity of Substantia LogiX?

25        A.  Yes.

Page 21

```
 1        Q.  Okay.  And to talk a little bit more about
 2   the data that you provided us, obviously, I can't go
 3   through it because it's on a very large drive that I
 4   know it contains a lot of information.  Do you have
 5   any information that you provided concerning payments
 6   that were made to you for your work?
 7        A.  Uh-huh.
 8            (Pause in proceedings.)
 9            MS. McKNIGHT:  We can go off the record.
10            (A recess was taken from 10:56 a.m.
11            to 10:57 a.m.)
12            MS. McKNIGHT:  Okay.  Let's go back on the
13   record.
14            THE WITNESS:  These are net payments to AIT
15   over that period of time.
16   BY MS. McKNIGHT:
17        Q.  And you said that your accountant pulled this
18   information for you?
19        A.  Yes.
20            MS. McKNIGHT:  Okay.  And these are -- it
21   says, "Net payments to AIT LLC re:  Title
22   Rover/Hopewell."  We'll mark this as Exhibit 3.
23            (Deposition Exhibit 3 was marked for
24            identification.)
25   BY MS. McKNIGHT:
```

1     Q.  And how did your accountant gather this

2  information?

3     A.  She went and looked on QuickBooks.

4     Q.  For AIT?

5     A.  Yeah.

6     Q.  Okay.  So it looks like, looking at this

7  document, the first payment listed is April 6, 2016.

8  Do you recall when you were first approached

9  concerning the Hopewell-Pilot project?

10     A.  I think the first -- and it will be reflected

11  on the E-mails there.  I think it's in March was the

12  first time I started -- we started having

13  conversation.  It may have been something in February,

14  but February, March, in that time frame.

15     Q.  Okay.  And do you recall your payment

16  arrangement with -- who was paying you?

17     A.  The first -- those first payments were coming

18  from Substantia.  I think -- I've got to get that for

19  you.  The first five payments, at least, came from

20  Substantia.  Everything was being paid through

21  Substantia.  In about September of that year, 2016,

22  Brent and Susan split, and Brent withdrew from

23  Substantia.

24     Q.  Do you know why?

25     A.  No.  Something between the two of them.  You

Page 23

Kramm Court Reporters, A Veritext Company
619-239-0080

```
 1   can ask her --
 2        Q.  Okay.
 3        A.  -- or Brent.
 4        Q.  Okay.  So you said, just to make it clear,
 5   that the first, you believe, five payments came
 6   through Substantia?
 7        A.  Yes.
 8        Q.  And that was because you were acting -- "you"
 9   being AIT -- acting as subcontractor for Substantia?
10        A.  Yes.  I had a general subcontracting
11   agreement with Substantia that dated back to our work
12   with the attorney general.  In other words, a blanket.
13   There wasn't a specific contract for this.  In fact,
14   as far as I know, I haven't signed anything, period,
15   with regard to anything to do with Title Rover,
16   Madison County, Hopewell, any of it.
17        Q.  Okay.
18        A.  All of that came through Substantia.  Brent
19   came to me and said, "Would you be interested in
20   working with us."
21             And I said, "Sure."  That's when payments
22   started through Substantia.  After the -- after Brent
23   and Substantia -- after Brent withdrew from
24   Substantia, the payments were coming from Title
25   Rover --
```

Page 24

1    Q.   Okay.

2    A.   -- directly.  But that was all coming --

3    you'll see it in the E-mails.  Brent was arranging all

4    of that.

5    Q.   Okay.  And how are the payments being made?

6    A.   Wire transfer.

7    Q.   Okay.  In looking at this document, it says,

8    "July 11, 2016, $5,835," and then the next line says

9    "September 14, 2016, $11,670."  Why is there a gap?

10   A.   That's the actual payment, the arrears.

11   That's not an accrual.  So there were some arrears

12   being caught up.

13   Q.   Okay.  So they missed a payment?

14   A.   They missed payments, yes.  They started

15   missing payments.  I don't know why, but it did

16   concern us.

17   Q.   Okay.  Did you ask them why?

18   A.   Yes, I asked Brent, and he said well, they're

19   having -- they're trying to raise money and whatever.

20   Q.   And did Brent tell you that -- or anyone at

21   Title Rover, I should say, tell you that you would get

22   paid for -- once something happened?

23   A.   Yeah.  It was always there was something

24   coming, and for a period of time there they did catch

25   up and it was okay.  Companies go in arrears

Page 25

1    occasionally, and companies can be late paying.  And

2    Brent kept us -- I've been working with Brent for a

3    while.  So he told me, "Hey, they'll make it good."

4            And I said, "Okay."  So we continued on.

5        Q.  Okay.  When you say they'll make it good, I

6    assume --

7        A.  Brent said that.

8        Q.  Brent.  Thank you.  Title Rover will make it

9    good?

10       A.  I was never totally clear who was doing what

11   there --

12       Q.  Okay.

13       A.  -- honestly.

14       Q.  Okay.  And then who did you communicate with?

15       A.  Brent.

16       Q.  Did you ever communicate with Mark Willis?

17       A.  Not regarding this.  I met Mark -- I think I

18   met Mark once, and I may have had a couple -- been on

19   a couple of phone calls, but I don't -- specifically,

20   what would you like to know?

21       Q.  I would like to know if you spoke with Mark

22   Willis concerning Title Rover.

23       A.  Yeah.  We've had a couple of conversations,

24   yes.

25       Q.  Okay.  I'm just trying to get at who were the

Page 26

```
 1   people you spoke with who worked under Title Rover?
 2       A.  I spoke almost 100 percent with Brent.  I
 3   have a handful of conversations with Mark Willis.  I
 4   had a couple of meetings.  I met Tom --
 5       Q.  Tom Tatham?
 6       A.  Yeah.
 7           -- in Houston a couple of times.  My mother
 8   was still alive in Dallas.  So when I was traveling to
 9   Dallas, we'd go to Houston.  It wasn't that much of a
10   hop for me to go down and just talk business.  So I
11   did go down and meet with them a couple of times in
12   Houston.
13       Q.  And this was concerning the Hopewell-Pilot
14   project?
15       A.  Yes.  Yeah.
16       Q.  Okay.  And so going back to the discussion on
17   the arrears and the payments owed to you, or AIT, I
18   guess it sounds like you were speaking with Brent on
19   the issue of the arrears?
20       A.  Yes.
21       Q.  And did Brent mention anything about an
22   investment coming in that would help pay arrears?
23       A.  He did talk about them raising money, and
24   yes, and he was talking to Tom and Mark and -- yes.
25   To be honest with you, though, I was not involved in
```

Page 27

1   any of that.  So it was just what Brent -- you know,

2   the reason I'm hesitating is because it's hearsay.

3   I'm just telling you, you know, Brent on the other end

4   of the phone said, "Hey, they're working on raising

5   money.  It's looking good" or you know, "You're going

6   to have to wait" or whatever.  It was just everything

7   I knew about it came from Brent.

8        Q.  Sure.  And I understand that, and if your

9   personal knowledge is related to what someone has told

10  you, it's okay to share that, and down the road other

11  people will raise objections concerning the things

12  that you've raised.  But I want your personal

13  knowledge and what you know.  I understand a lot of

14  the things you may not know, but I'm just trying to

15  figure out what it is you know and what you don't

16  know.

17       A.  Yeah, you really need to be talking to Brent.

18       Q.  Okay.  So just to confirm, was there any

19  formal agreement between you and Title Rover for the

20  scope of your services?

21       A.  Nothing I signed.

22       Q.  Do you know if there's one between Substantia

23  LogiX and Title Rover for the scope of your services?

24       A.  Not that I was direct party to.  I don't

25  know -- I assume there was some sort of contract, but

Page 28

```
 1   I don't know that.
 2        Q.  Okay.  And it looks like your work started in
 3   approximately April 2016?
 4        A.  That's correct.  We had sort of started to
 5   look at the data before that, and then at some point
 6   they decided to move ahead, and that's when they
 7   started -- the payments started.
 8             MS. McKNIGHT:  Okay.
 9             (Deposition Exhibit 4 was marked for
10             identification.)
11             MS. McKNIGHT:  I'm going to mark as Exhibit 4
12   the document Bates numbered WIL_00004201 through
13   -4202.
14             If you could just look at that E-mail or
15   series of E-mails.
16             (The witness reviewed Exhibit 4.)
17             THE WITNESS:  Uh-huh.
18   BY MS. McKNIGHT:
19        Q.  And if you look at Page -4202, it says,
20   "Mark, I met with Brent and Joe last night."
21        A.  Yes.
22        Q.  And then it has -- it says, "We agreed,
23   subject to your approval, as follows:  Comp," which
24   I --
25        A.  Uh-huh.
```

Page 29

1          Q.   -- think means --

2          A.   I tell you, that was a point of controversy.

3     What I was referring to when Brent and I were talking,

4     because I hadn't even looked at this, was that payment

5     schedule on the next page.

6          Q.   And you're talking about -4202?

7          A.   I'm talking -- well --

8          Q.   It's the bottom right.

9          A.   The top on that page, I was talking about,

10    you know, payment terms.

11         Q.   Okay.

12         A.   This is talking about an agreement, and that

13    agreement was never agreed to.

14         Q.   So this memorandum of agreement that Tom

15    Tatham is referencing in the August 30 --

16         A.   I remember looking -- I'm sorry.

17         Q.   Yeah.  So just to make sure that -- for the

18    court reporter, that you have to wait for me to finish

19    my question.

20              So on -4201 you can see an E-mail from Tom

21    Tatham dated August 30, 2016 at 10:02 to Brent

22    Stanley, and it looks like you as well.  Is that your

23    E-mail address, JBHAYNES --

24         A.   Yes.

25         Q.   It says, "I am behind in providing the

                                              Page 30

1    Memorandum of Agreement regarding your future services
2    to Title Rover as I had promised"  But it appears --
3    you're telling me that there was no memorandum of
4    agreement provided to you?
5          A.  No, there was, but it was never agreed to.
6    What I was agreeing -- what Brent was referring to in
7    his previous thing, we're in agreement for the
8    proposed terms.  We were talking about that
9    immediately preceding an E-mail where he's talking
10   about payment terms.  Brent Stanley, 15,000 per month,
11   et cetera.
12         Q.  Okay.
13         A.  The memorandum of agreement I immediately
14   objected to, and Brent will testify to that.  I
15   couldn't understand it.
16         Q.  Okay.
17         A.  I gave it to my attorney.  My attorney
18   couldn't understand it, and I said, you know, "This is
19   nonsense."  So we just said, "We'll continue to
20   provide services based on the terms that we mentioned
21   there."  And that was it.
22         Q.  So the terms you mentioned there, it says,
23   "SLX," which I presume stands for Substantia LogiX.
24   Is that your understanding --
25         A.  Yes.

Page 31

1      Q.   -- on -4202.  It looks like an E-mail from

2  Tom Tatham to Mark Willis.  And it says, "SLX -

3  Replaced with AIT at $17,500 per month."  So that was

4  the term that was agreed to for AIT at least?

5      A.   Yeah, and Brent Stanley and so forth.  Yeah.

6      Q.   And then you split that amount -- monthly

7  amount?

8      A.   Yeah.  There was an additional controversy on

9  that.  We did not realize that Brent Stanley was being

10  paid.  He apparently had been being paid by Willis or

11  someone, 15,000 a month.  We had no idea, Susan and I.

12      Q.   Okay.

13      A.   And so we had actually been splitting that

14  amount, $17,500 three ways.  We had been writing Brent

15  a check -- or wiring Brent money out of that.

16      Q.   Okay.

17      A.   So this E-mail, Brent had a problem when this

18  came out because all of a sudden Susan and I knew that

19  Brent was being paid from both sides.  So we had some

20  interesting discussions.

21      Q.   Okay.  And what did you find out about Brent

22  being paid an additional sum separate from the amount

23  you were receiving?

24      A.   From this E-mail.

25      Q.   Okay.  Did you find out what services were

1    for that he was getting paid extra money?

2        A.   No.

3        Q.   Is this around the time that Brent and -- do

4    you know if this is one of the reasons why Brent and

5    Susan parted ways?

6        A.   It possibly could have led up to --

7             MS. SWEENEY:   Objection.  Calls for

8    speculation.

9             THE WITNESS:   Okay.

10   BY MS. McKNIGHT:

11       Q.   Just so you know, if she objects, she's just

12   making a clear record.  You can still answer the

13   question as long as you have personal knowledge or

14   not.

15       A.   I'll just observe that these E-mails are

16   dated, you know, through the end of August, and they

17   split up in September, as I recall.

18       Q.   Okay.  Thank you.

19            So looking back at Exhibit 3, it shows

20   December 6, 2016 payment for $5,416.50.  That amount

21   went down from the initial payments which were $5,835

22   according to Exhibit 3.  Can you explain the reason

23   for that?

24       A.   They started reducing our payments because

25   they were -- as Brent put it, they were running short

                                          Page 33

1    of money.

2         Q.   Okay.  So it looks like -- "they" being Title

3    Rover?

4         A.   Yeah.  The agreement was that the amount of

5    shortage would be accrued, and then once Title Rover

6    had obtained financing, that they would make good on

7    the payments.

8         Q.   Okay.  So the payments on November 17, 2016

9    here says "$5,416.50."  This looks like it was the

10   first time where the payment was reduced because they

11   were waiting on additional financing.

12        A.   Right.  And then in December it reduced

13   again.

14        Q.   Okay.  And then it went -- it reduced even

15   further on December 19, 2016.  Do you know how they

16   calculated that for you?

17            MS. SWEENEY:  Objection.  Calls for

18   speculation.

19   BY MS. McKNIGHT:

20        Q.   If you know the answer, you can say.  If not,

21   you can say, "I don't know."

22        A.   I do not recall.  I'd have to go back and

23   look at E-mails.

24        Q.   Okay.  And the last payment on the sheet says

25   February 2, 2017.  Is that the last payment you ever

Page 34

1    received for your services?

2         A.   Yes.

3         Q.   Okay.   And let's talk about why your services

4    ended.

5         A.   As I recall, the bankruptcy notice came up

6    right after that.

7         Q.   Which bankruptcy are you referring to?

8         A.   Title Rover.

9         Q.   Okay.   Did they know -- did anyone notify you

10   of that bankruptcy?

11        A.   Brent told me it was imminent.   I mean I

12   didn't get an official notification until I got the

13   papers, and there was some -- I had some discussions

14   with Brent, and then internally when we would file as

15   an additional claimant in the bankruptcy because we

16   were low on funds, and I just decided to write it off

17   and let it go.

18        Q.   Do you know how much you were owed

19   approximately?

20        A.   It's a few thousand.   Not a huge amount.

21        Q.   Okay.   Less than 5,000?

22        A.   I would -- between 5- and 10-.

23        Q.   Okay.   Earlier you were saying that Title

24   Rover was waiting on financing.   Did you get any

25   specifics on what that financing was from Brent?

Page 35

1     A.   Maybe verbally.   I don't recall any

2  specifics.

3     Q.   Okay.   Now, I understand that you went

4  through -- or you explained previously the work that

5  you did for Title Rover, but I'm going to ask you a

6  series of questions about what you did technically on

7  Title Rover sort of to help really understand what it

8  is that AIT did.   Okay?

9        So the first question I have is did you

10  provide analysis and requirements gathering for any

11  Title Rover software?

12     A.   I'm not sure I understand what that means.   I

13  didn't do any formal documents.   I may have done some

14  analytical work showing maybe what we could do, all we

15  could do with the data, but nothing I would consider

16  formal requirements.

17     Q.   Okay.   Do you know who would be responsible

18  for those requirements?

19     A.   Brent would have probably put them together.

20     Q.   Okay.   So just to go back a little bit to

21  your payment arrangement.   On the Exhibit 4 E-mail it

22  says that "SLX - Replaced with AIT at $17,500 per

23  month."   Were you -- at that time were you still

24  getting paid by SLX, or you were starting to get paid

25  by Title Rover?

Page 36

1        A.   It was splitting to Title Rover at that time.

2        Q.   Okay.  And then do you know if SLX was

3   contracted with Title Rover or Hopewell?

4        A.   I don't know.

5        Q.   Okay.  Thank you.

6        A.   Everything I did came through Brent.  So, you

7   know, the arrangement -- even Susan at this point, she

8   had specific things she was doing, like doing research

9   for other states to find out what data was available

10   and that sort of thing.  So even Susan was working

11   under Brent's direction.

12        Q.   Okay.  Can you explain what Susan did?

13        A.   For this?

14        Q.   Yes.

15        A.   She did a lot of analytical work.  I didn't

16   see a lot of it because it went directly to Brent, but

17   I know she was on the phone with Ohio, West Virginia,

18   Pennsylvania, various counties there that I guess Tom,

19   and I guess Mark Willis were interested in looking

20   into shale, possible oil fracking opportunities there

21   in those states.

22        So as I mentioned, there are 3,000 recording

23   districts.  You know, every county is its own little

24   fiefdom.  So she was actually on the phone with

25   counties in those states, with the local officials,

Page 37

```
 1   and sometimes with the system vendors, whoever
 2   provided the data processing for those counties to
 3   find out what data they had available and how, if
 4   possible, it would be -- how it would be possible to
 5   get it.
 6        Q.  Okay.  Is that -- what do you mean by
 7   "analytics"?
 8        A.  Uh-huh.
 9        Q.  So she was evaluating the data to see if it
10   could actually be used?
11        A.  And see if it was even available.  See, like
12   if it's a county clerk, it's entirely under the
13   control of the clerk whether he or she even lets it
14   out.
15        Q.  Okay.
16        A.  So Madison County, they seemed to be very
17   open.  They just produce CDs with the data and images
18   on it, but a lot of counties are not that way.
19   They're very closed with their data.
20        Q.  Okay.  Did you do any type of designer
21   development on the -- for Title Rover for any
22   software?
23        A.  To the extent of building the portal, yes.
24        Q.  Okay.
25        A.  But I just used existing tools that I use in
```

Page 38

1  the normal course of what I do, and I built a portal
2  to try to present the data in a way they could use it
3  at Title Rover.
4        Q.   Okay.   So there was nothing unusual about
5  this project for you?
6        A.   Absolutely not.
7        Q.   So just to clarify, the specific designing
8  and development was only with the web portal that you
9  worked on?
10        A.   Yeah.
11        Q.   Okay.
12        A.   There weren't any formal documents.   A lot of
13  it we were just feeling our way through to see what
14  was there, but I mean we didn't go through a big
15  design documentation thing at all.   It was just
16  pulling the different tools together, trying to
17  present a -- they would, for example, "they" I mean
18  those attorneys on Title Rover would call and say,
19  "Hey, Joe, it would be really great if we could get
20  these documents in a PDF format."
21           So we went in and changed the software so
22  they could import the images off our portal in PDF
23  format.  So things like that.  So it was like it was a
24  give-and-take.  There wasn't a formal requirements
25  document or anything like that.

Page 39

1        Q.   Okay.

2        A.   Now, Brent may have done some stuff, but, you

3    know...

4        Q.   But the scope of what you worked on was

5    solely with the web portal?

6        A.   Yes.

7        Q.   Okay.

8        A.   And the data import, that sort of thing.

9        Q.   The data import into the web portal?

10       A.   Yes.

11       Q.   Okay.

12       A.   The guts of the software never left our

13   office.

14       Q.   I'm sorry?

15       A.   The guts of the software, the core of what we

16   were doing and the database and all that has always

17   resided on our systems.

18       Q.   Okay.  And what you provided to me would

19   constitute what you --

20       A.   That was the data and so forth that we built

21   that off of.  The actual database that they would

22   query against is on that drive.

23       Q.   But the software is not on the drive?

24       A.   It's just a web piece.  It's an executable.

25   There's nothing -- I don't know what I would give you.

Page  40

1      Q.   Okay.

2      A.   There's nothing I could give you that you

3    could fire up and run.

4      Q.   Okay.   So the portal that we've been talking

5    about, that AIT's intellectual property?

6      A.   If it's anyone's.   I don't even consider it

7    proprietary, necessarily, to AIT.   It's just a

8    general -- I mean I used third-party tools.   I used

9    standard Microsoft products.   I have some licenses for

10   software components that I use, and I produce a

11   portal.   And that's what I did.

12     Q.   That's what you've done in the past before

13   this project?

14     A.   Absolutely.

15     Q.   Okay.   Do you know who owns the licenses

16   related to the software that you worked on?

17     A.   AIT.   Any third party -- like I have licenses

18   with Microsoft.   I have licenses with SAP.   I have

19   licenses with probably a half a dozen different

20   companies for different things, and they're all used

21   in putting this together.

22     Q.   Okay.   So --

23     A.   When I say, "I," I mean AIT.

24     Q.   Yes.   I think we'll make it clear for the

25   record that when you say, "I" you mean AIT.

```
 1              Okay.  Looking at Exhibit 3, it says the
 2   total is $74,176 that was paid to you.
 3        A.  Through AIT.
 4        Q.  Through AIT.
 5        A.  Well, to AIT.
 6        Q.  Okay.  Do you know the total amount of money
 7   that was spent -- or paid to AIT and Substantia for
 8   the work that was completed for the Title Rover?
 9        A.  I couldn't tell you what -- I don't have
10   Substantia's records.
11        Q.  Okay.
12        A.  So I mean I could tell you what came into
13   AIT.
14        Q.  Okay.
15        A.  The numbers there are net.  Part of that
16   money just went right out to either Susan or to Brent.
17        Q.  Okay.  I understand.  So going back to the
18   licenses, can you provide a list of the third-party
19   licenses you've used and owned?
20        A.  I guess.  I don't have it with me.
21        Q.  But any of the -- I don't want to say --
22   what's the right -- is it software that you were
23   using?  Is that the right term for it?
24        A.  Development tools to do -- we work in
25   Microsoft environment.
```

Page 42

1        Q.   Okay.

2        A.   You have to have licenses in order to use

3    Microsoft's development environment.   The database is

4    Microsoft SQL server.   You have to have a license to

5    use Microsoft SQL server.   We use a component library

6    from a company called DevExpress that's a Czech

7    Republic company.   It's several thousand dollars.

8        Q.   And this is all related to what you would use

9    for Title Rover?

10       A.   Yeah.   This example I gave you of they

11   wanted -- the attorneys for Title Rover wanted PDFs

12   exported.   There's a license from a company called

13   ABCpdf that's like $1,000 that, you know, I used my

14   license to provide that export service from our

15   portal.   So, you know, I can give you a list, but they

16   range from a few thousand to a few hundred --

17       Q.   Okay.

18       A.   -- per year.

19       Q.   Okay.   Did you use any third-party reporting

20   tools?

21       A.   Crystal SAP.   Crystal reports from SAP.

22       Q.   Okay.   And that's a license you also had?

23       A.   Yes.

24       Q.   I appreciate you breaking this down for me

25   because I don't have the tech background to really

                                          Page 43

1    know, you know, all the intricacies.  So I appreciate

2    it, and I'm going to keep asking you a bunch of

3    questions that you may have already answered, but I'm

4    just trying to cover all my bases.

5           Did you create any marketing defining or

6    outlining the software and its capabilities for Title

7    Rover?

8        A.  No, not marketing.

9        Q.  Okay.  Do you know who did?

10       A.  Brent.

11       Q.  Okay.

12       A.  Probably working with Tom.  Probably Brent

13   would work with Tom and, I guess, Mark.

14       Q.  Tom Tatham and Mark Willis?

15       A.  Uh-huh.  They all work in the same office.

16       Q.  Okay.  That's the same office in Texas?

17       A.  In Houston.

18       Q.  Okay.  Do you know why you would be listed as

19   a marketing and technology role for Title Rover?

20       A.  Me?

21       Q.  Yes.

22           MS. McKNIGHT:  I guess we can mark as

23   Exhibit 5 documents with the Bates No. PLTF_00670

24   through -710.

25           (Deposition Exhibit 5 was marked for

Page 44

```
 1              identification.)

 2   BY MS. McKNIGHT:

 3      Q.  So have you ever seen pages -- let's start

 4   with -670 through -680.  Let's start with that section

 5   first.

 6      A.  Uh-huh.

 7      Q.  And it's titled "Data Mining for Mineral

 8   Resource Investigations."

 9      A.  Uh-huh.

10      Q.  If you go to Page -671.

11      A.  Uh-huh.

12      Q.  Have you ever seen this document before?

13      A.  I know I don't have a copy of it.  Whether I

14   have seen it, I do not recall.  I'll be honest with

15   you, I really don't recall.

16      Q.  That's okay.  So if you look under

17   "Technology Team" it says, "Joe Haynes" --

18      A.  Uh-huh.

19      Q.  -- "Data Architect, Developer."  Do you know

20   if you picked that title or someone else did?

21      A.  I didn't pick it.

22      Q.  Okay.

23      A.  And I always refer to myself as "Joseph."

24      Q.  Okay.

25      A.  So if you see my name as "Joe Haynes,"
```

Page 45

```
 1    somebody else put it in there.
 2         Q.   I have some friends who have similar issues.
 3              So do you know who drafted this document?
 4         A.   I bet Brent did.  Brent's a good marketing
 5    guy.
 6         Q.   Okay.  So if you go to the page, at the
 7    bottom right it says -672, the second paragraph says,
 8    "It has developed its own proprietary technology and
 9    licensed sole rights to additional technology which
10    delivers a" 10 times -- or "10X improvement to
11    traditional methods of supporting data investigations
12    and specialized analysis."  Do you know what that's
13    referring to?
14         A.   (Nods head.)
15         Q.   Is that a "no"?
16         A.   That's a no.  I'm sorry.  I'm perplexed.
17         Q.   Why are you perplexed?
18         A.   Anything I say here is conjecture, and it has
19    to do with that second name in that list.
20              MS. SWEENEY:  I object to testimony that it's
21    based on conjecture.
22    BY MS. McKNIGHT:
23         Q.   Right.  I don't want you to make -- I don't
24    want you to speculate.
25         A.   What I'm surprised is that my name is listed
```

Page 46

1    together with John Martin's.

2        Q.  Okay.  So let's talk about John Martin.  Who

3    is John Martin?

4        A.  I was introduced to John Martin as the owner,

5    proprietor, whatever, of a company called Beyond

6    Recognition.

7        Q.  Okay.

8        A.  And he purported to have some sort of a super

9    OCR project -- program of some sort that he claimed

10   could extract -- remember I told you about the OCR

11   process we went through to try to extract data from

12   these documents?

13       Q.  Yes.

14       A.  What I use is a commercial product called

15   Tessaract that Google uses.  So if you do a Google

16   search, it's the same thing.  It's a free software.

17   You can go out and download it on the Internet, and

18   that's what I use.  And he had some other process that

19   apparently the Willis Group had been investing in.  I

20   don't know all the details, but that may be what

21   they're referring to here.

22       Q.  And when you say, "What they're referring

23   to," are you talking --

24       A.  I'm talking about --

25       Q.  -- about Page -672?

Page 47

1        A.   Yeah, the proprietary -- that one paragraph

2   where they talked about the 10 times improvement and

3   proprietary technology.

4        Q.   Okay.   But in your opinion, based on the work

5   you did, does that tool in its current state have a 10

6   times impact on manual process reduction?

7        A.   I have no idea.

8        Q.   Okay.

9        A.   I mean it makes it easier.

10       Q.   But you didn't come up with this --

11       A.   I did not.

12            MS. McKNIGHT:   Okay.   Can we take a -- a

13   five-minute break really quickly.   I'm just going to

14   use the restroom.

15            THE WITNESS:   Me too.

16            MS. McKNIGHT:   Okay.

17            (A recess was taken from 11:37 a.m.

18            to 11:52 a.m.)

19   BY MS. McKNIGHT:

20       Q.   Okay.   So we were talking a little bit about

21   Exhibit number -- what number is that?

22       A.   5.

23       Q.   5.   We're just going to ask you some

24   questions about it.   On Page -671, on the bottom

25   right -- it's Page 2 of the document, it says,

1   "Management Team," and then it says, "Brent Stanley,

2   CTO."  Did you understand Mr. Stanley to be CTO of

3   Title Rover?

4        A.  Not specifically, no.  It doesn't surprise me

5   or concern me.  I just don't recall him being referred

6   to with that title.

7        Q.  And your understanding is "CTO" means chief

8   technology officer?

9        A.  Yes.

10       Q.  And then technology team, we were already

11   talking about that section.  You spoke of John Martin

12   being affiliated with Beyond Recognition.  Did you

13   ever work with John Martin?

14       A.  I tried to.

15       Q.  Okay.  Can you explain how you tried to work

16   with him?

17       A.  He, as I mentioned earlier, had a product

18   that he purported would do -- the best way I can

19   describe is the magic work with OCR, extracting data

20   from images.  Document images.  I sat through a

21   presentation of his, which -- in Houston, one of my

22   visits, and honestly wasn't impressed, but everyone

23   else seemed to want to work with -- you know, go down

24   that path.

25            So they gave him some sample documents out of

Page 49

1    the Madison collection, as I recall, and he was

2    supposed to produce extracted data.  And this went on,

3    as I recall, for months.  He kept promising and didn't

4    deliver.  Promise, didn't deliver.  Promise, didn't

5    deliver.  And during that time I also just -- I was

6    running some of the documents using that Google

7    product I told you about that's free.  OCR product,

8    just see what results were.

9          And we finally got some results from John

10   Martin, and the -- his results were actually worse

11   than what we got off the free Google product.

12         Q.  Okay.

13         A.  So I think that sort of -- you know, I talked

14   to Brent about that.  I said, "Look, you know, I don't

15   think you're getting much out of this," going down

16   that path.  I had understood from Brent that John

17   Martin was being paid a lot of money for this, and I

18   said, "As far as I can see, you can run the free

19   product and get the same or better result."

20         Q.  Okay.

21         A.  So then that sort of is where -- again, this

22   all came from Brent.  It was a very complex

23   relationship between John Martin and Mark Willis.

24   Apparently, even during this time that we were

25   supposed to be evaluating the technology, Mark had

1    sued John Martin even though they were working in the

2    same office.

3            So there was a lawsuit going on that Mark

4    Willis had sued either John Martin or Beyond

5    Recognition or both or whatever.  So they were

6    actually in the middle of a lawsuit while they were

7    working together, which I found very strange.  But

8    anyway...

9        Q.  Okay.  And what time period did the

10   evaluation of Beyond Recognition begin?

11       A.  That would have been during the summer of

12   2016.

13           MR. McKNIGHT:  Okay.  So I think we're on

14   Exhibit No. 6 now.

15           (Deposition Exhibit 6 was marked for

16           identification.)

17           MS. McKNIGHT:  So Let's mark, it Bates

18   No. TAT_01247 to -48 as Exhibit 6.

19       Q.  Okay.  Take a look at the two pages.  It's an

20   E-mail from Brent Stanley to Tom Tatham dated

21   November 1, 2016.

22       A.  Uh-huh.

23       Q.  Do you recognize the document on -1248?

24       A.  Yes.

25       Q.  What is this document?

1      A.   That was what I sent to Brent on the E-mail.

2   It's in the collection there.   It's the way I

3   evaluated what John Martin had finally come up with.

4      Q.   Okay.   And that was -- explain a little bit

5   about what this report says.

6      A.   Okay.   They had OCRed around 37,000 total

7   documents, and I observed that that comported well

8   with the 37,000 documents I had from the Madison

9   repository.   We're talking about Madison images,

10  Madison County.

11     Q.   Okay.

12     A.   And they provided an Excel file of only

13  roughly 1,500 -- remember, I told you we were trying

14  to extract references to older documents.

15     Q.   Yes.

16     A.   Okay.   So we could see the chain back to the

17  title ownership at the time.   And they had extracted

18  about 1,500, and I pointed out that I could pull out

19  of the database almost 40,000 references.   So there

20  was a big discrepancy there.

21          MS. SWEENEY:   Bonnie can you tell me the name

22  of this document again?   I know it's Exhibit 6, but

23  I'm not seeing it in the E-mail you sent me.

24          MS. McKNIGHT:   It's TAT_01247 through -1248.

25  Let me make sure it's in the file, but it should be.

Page 52

```
 1              MS. SWEENEY:  It's not there, no.
 2              MS. McKNIGHT:  It's in the folder.  Do you
 3    see that folder?  There's a sub folder.
 4              MS. SWEENEY:  Got it.  Sorry.  Yes, I got it.
 5    BY MS. McKNIGHT:
 6         Q.  Okay.  And then as far as like -- it says,
 7    "Preliminary Conclusions," and then it says, "(AIT as
 8    OCRd Madison document images dated from approximately
 9    January 1, 1922 to June 15, 2016 using a widely
10    available Tessaract OCR engine (similar to the engine
11    used by Google).  The results from the AIT process was
12    used for comparison)."
13              So this is exactly what you've just told me,
14    that this Beyond Recognition capability didn't add up
15    to what Beyond Recognition purported it to be.  Is
16    that your understanding?
17         A.  That was my evaluation.
18         Q.  Okay.  And do you recall when that
19    presentation on the Beyond Recognition software
20    occurred approximately?
21         A.  Toward the end of the summer.  We tried to
22    work with them, as I recall, all during the summer of
23    2016.  Finally, at the end of September, I think, they
24    gave us -- it took them months to do that, even though
25    they kept saying, "Oh, we'll have it in 5 days, 10
```

Page 53

1    days," dah, dah, dah.  It kept getting pushed out.

2    Finally, toward the end of September they actually

3    presented some results, and that's the analysis.

4         Q.  And, yeah, this is the analysis of the result

5    that -- from September?

6         A.  Right.

7         Q.  Okay.  And was that the end of the evaluation

8    for Beyond Recognition, as far as you know?

9         A.  That's the last contact I had with them.

10        Q.  Do you know if, after November 2016, that

11   Title Rover continued to work with Beyond Recognition?

12        A.  I have no idea.

13        Q.  Okay.  And then earlier you mentioned a

14   lawsuit between Mark Willis and John Martin.  Do you

15   know what that lawsuit was concerning?

16        A.  No.  You'll have to ask Brent.

17        Q.  So Brent was the one who told you about the

18   lawsuit?

19        A.  Yes.

20        Q.  Okay.  So going back to Exhibit 5 on -671,

21   the page we were just on, the second page.

22        A.  Yes.

23        Q.  It says, "GIS Analysts."  Do you know who GIS

24   analysts were?

25        A.  If you go back in those E-mails, I think

Page 54

1   there was a guy who worked for another company, and

2   Mark Willis brought him in to do mapping.  That's what

3   we're talking about is mapping work at GIS.

4        Q.   Okay.

5        A.   Mark Willis brought him in, and I met him one

6   time.  He had a Hispanic name.  I do not recall it.

7        Q.   Okay.

8        A.   And that's the only GIS -- when you say,

9   "GIS," I think mapping.

10       Q.   Okay.  So do you know if this is like a

11  formal name of a company --

12       A.   No.

13       Q.   -- or is it just a generalization?

14       A.   Just general.  I suspect it's just general.

15       Q.   Okay.  And then it says, "Legal, Records

16  SME."  Do you know what SME" stands for?

17       A.   Subject matter expert.

18       Q.   Okay.  And then "Staff Attorneys"?

19       A.   Those would be probably those two ladies I

20  told you about.  Jennifer and Laurie, I guess.

21       Q.   And then it says, "Flex Team powered by

22  Willis Group BeyondReview."  Do you know anything

23  about a flex team?

24       A.   I have no idea what that even refers to.

25       Q.   And then "Data Acquisition."  It says, "Susan

1    Willard, Project Lead."  Do you think -- this is the

2    Susan Willard we were talking about was with

3    Substantia LogiX; right?

4         A.  Yes.

5         Q.  And do you understand what is meant by

6    "project lead"?

7         A.  For data acquisition, yeah.  She was out

8    there trying to acquire data.

9         Q.  Okay.

10        A.  The key is the data.  The presentation stuff

11   is secondary.  If you can't get the data, I don't care

12   what tools you have.  They're not going to help you.

13        Q.  Okay.

14        A.  We happen to have a good, cooperative, and

15   relatively clean set of data from Madison, but that is

16   rare.

17        Q.  Okay.  So it says, "Flex Team powered by

18   Willis Group"?

19        A.  Not a clue.

20        Q.  Let's go to Page -674.

21        A.  Uh-huh.

22        Q.  It says, "Integrated Production, Permitting,

23   Appraisal District," and "Probate" under the "Feature"

24   column?

25        A.  Yes.

                                          Page 56

1        Q.  Do you see that?  Do you know what that was

2    regarding?

3        A.  I suspect that was --

4            MS. SWEENEY:  Objection.  I object to

5    testimony relating to suspicions.

6            THE WITNESS:  Well, I know what he's

7    referring to.

8    BY MS. McKNIGHT:

9        Q.  Okay.  What is he referring to?

10       A.  When you're trying to build chains of title,

11   you are not only dealing with the land records.  You

12   have probate, wills, trusts.  You have tax issues.

13   Are there tax liens on the property, that sort of

14   thing.  There may be a different zoning authority,

15   zoning for various tracts of land.  The ability to

16   integrate those I would think would be very valuable.

17   I don't know of anyone who's been able to do that --

18       Q.  Okay.

19       A.  -- but that's what, I'm pretty sure, he's

20   talking about.

21       Q.  And he -- you keep saying, "he" --

22       A.  I think Brent did this.

23       Q.  Why do you think Brent did this?

24       A.  It looks like his work to me.

25       Q.  How do you know it looks like his work?

Page 57

1          A.   I've been working with him for four years.

2          Q.   Four years --

3          A.   Yeah, at least.

4          Q.   -- at the time that you did Title Rover

5    project work?

6          A.   Four or five years total.  We started -- I'm

7    trying to remember when the AG project was.  I think

8    the AG project was 2014.

9          Q.   Okay.

10         A.   So since then.

11         Q.   Okay.  And did the integrated production,

12   permitting, appraisal district, probate features exist

13   in the product that you worked on?

14         A.   No, ma'am.

15         Q.   Okay.  And then it says, "Automated Title

16   Chaining."  Did that exist in your database?

17         A.   Some of that we did do, yes.  And then that

18   was the importance of these document references I was

19   telling you about.  We do that all the time.  That's

20   fundamental in land records in the United States is to

21   build -- be able to build a chain of land records so

22   you can trace ownership and validate ownership.  So

23   that's fundamental to my business, if you will.

24         Q.   Okay.

25         A.   But that's normally done by a title examiner

1    or someone who goes in and actually looks at the

2    records.  We have developed ways to help that, make it

3    a little easier, because we can automate some of that.

4    You know, if you've got a reference in the database

5    back to a previous document, we can let the computer

6    chain backwards.

7         Q.  So that's how you automate it?

8         A.  Yeah.

9         Q.  You tell the computer to build a chain?

10        A.  Yes.  Yes.  That's something that our

11   portal --

12             MS. McKNIGHT:  He's referencing the -675.

13             THE WITNESS:  -675.  That diagram came off of

14   our portal.

15   BY MS. McKNIGHT:

16        Q.  The Title Rover portal?

17        A.  Well, the one that I did.

18        Q.  Okay.

19        A.  All right.  And this -- let me explain that

20   graph.

21        Q.  Okay.

22        A.  That graph shows you a chain of titles for

23   the types of documents that they are -- they were

24   interested in that is relating mostly to oil leases.

25        Q.  Okay.

Page 59

1          A.   This particular graph I use all the time.
2    This is not my product.   This is Microsoft.   It's a
3    licensed product from Microsoft called the automatic
4    graph layout, AGL.   I use this, for example, in
5    Massachusetts for tracking subdivisions of parcels.
6          Q.   Uh-huh.
7          A.   You have one big parcel and the seacoast, and
8    they want to divide it up and make lots of little
9    parcels to sell houses on, they divide that parcel up
10   into sub parcels, and those parcels get subdivided
11   again, and some parcels get merged down the road to
12   people who decide they want to build a big house.   The
13   tracking of subdivisions, I actually use exactly the
14   same graph for that.
15         Q.   Okay.
16         A.   And that predates Title Rover by years.
17         Q.   Okay.
18         A.   So it's just one of those tools.   It's a
19   licensed product, and you feed in -- the squares on
20   that are called "nodes."
21         Q.   Nodes like n-o-d-e-s?
22         A.   Yes, node, n-o-d-e-s.
23              The arrows are called -- in graph theory are
24   called "edges," and we feed in the basic node
25   information.   We fill in the edge information, and it

1    draws a nice graph and lays it out for you.

2        Q.  Okay.

3        A.  It makes a nice picture, but there's nothing

4    particularly proprietary about it.

5        Q.  Okay.  Do you know if this is a graph, on

6    -675, that you provided to Title Rover?

7        A.  They probably produced it off the portal.

8        Q.  Okay.  Then the Title Rover -- this might be

9    very simplistic and you may have already covered it.

10   Did the Title Rover software that you worked on, did

11   it have a database?

12       A.  Yes.  This.  You've got it right there.

13   (Indicating)

14       Q.  And you're referencing Exhibit 2?

15       A.  2, yes.

16       Q.  Okay.  And did you make that database, AIT?

17       A.  Absolutely.

18       Q.  Okay.

19       A.  But it's almost the same database I use over

20   and over again.  I use the same basic structures.

21       Q.  Okay.

22       A.  Because you have -- you have documents.  You

23   have people that are on those documents.  We call them

24   "grantors" and "grantees."  You have legal

25   descriptions.  That's addresses or other descriptions.

Page 61

1    You know, definitions.  And you have references to

2    previous documents.

3         Q.  Okay.

4         A.  We call them "marginal references."  And

5    that's your basic structure for any land record

6    database.

7         Q.  Okay.  So did you create a database schema

8    for Title Rover?

9         A.  A database --

10        Q.  Schema.

11        A.  Normally what I do is I build a database, and

12   then I produce pictures off of it.  So there may have

13   been some pictures that came off the database in terms

14   of the layout, the way it's structured, but I don't

15   recall doing anything specific.  I mean I did design a

16   database, but I know what needs to go in it.

17        Q.  But you know what needs to go into it?

18   That's what you said?

19        A.  Yeah.

20        Q.  So anything that is in the database is yours

21   that you created?

22        A.  Yeah.  I'm sorry if that wasn't clear.

23        Q.  Oh, no.  You're fine.  Do you know if that

24   was relational?

25        A.  Yes, it was relational.

1      Q.   Okay.

2      A.   That's Microsoft SQL server.   S-Q-L server.

3  That's probably the most popular server that's out

4  there right now.

5      Q.   Okay.  So if you go to Page -677 of

6  Exhibit 5, it says in the middle -- have you seen this

7  chart before?

8      A.   I don't recall ever seeing this chart.

9      Q.   Okay.

10     A.   This whole document, I doubt that I -- if it

11  had been given to me for review, first thing I would

12  have done is take out Joe Haynes and put in Joseph.  I

13  really would have.  I don't like myself being referred

14  to as Joe on a formal document.

15     Q.   Okay.

16     A.   And so that's the reason I think I probably

17  didn't see this.

18     Q.   Okay.  Is there anything else about the

19  document you've seen so far that you know would have

20  caught your attention if you had seen it previously?

21          MS. SWEENEY:  Objection.  Vague.

22          MS. McKNIGHT:  I can re-ask.

23     Q.   Besides "Joe," is there any other -- strike

24  that.  We'll just focus on Page -677 for now, and then

25  I can always ask that question later.

Page 63

1                It says, "'Big Data Processing.'"  Do you
2       understand what that means?
3           A.  No.
4           Q.  Okay.
5           A.  In fact, I can't even read it.
6           Q.  Okay.  It's the middle part of the chart.  It
7       says in quotes, "'Big Data Processing.'"
8           A.  Yeah, I know.  I'm trying to read the --
9           Q.  The thing underneath it.  It appears to say,
10      "Custom Indexing," "Data Cleanup" and "Chaining."
11          A.  I mean there's nothing, you know,
12      objectionable or anything.  To me it looks like a
13      marketing document.
14          Q.  Okay.
15          A.  I don't know what to say about it.
16          Q.  Okay.
17          A.  It's too general to make a real comment on.
18          Q.  Sure.  And then on -678 it says, "Big Data"
19      again.  "We are skilled in acquiring and harvesting
20      large volumes of data, including structured,
21      unstructured and spatial data."  Is there anything
22      unusual about that sentence?
23              MS. SWEENEY:  Objection.  Leading.
24              THE WITNESS:  I know what he means by all of
25      it.  You know, and whether -- I don't know who "we"

                                                Page 64

1    is, and I have no way of assessing the skills of

2    whoever "we" is.

3    BY MS. McKNIGHT:

4         Q.   Okay.  We can set Exhibit 5 aside for right

5    now.

6         A.   Can I just make a comment?  Some of the

7    screen shots on here came off the portal that I've

8    talked about.

9         Q.   Okay.  Well, let's just -- can you point out

10   which of those screen shots those are.

11        A.   The first one was that graph that we talked

12   about.

13        Q.   Can you reference it by the page?

14        A.   -675.

15        Q.   Okay.

16        A.   It's sort of nonsense, but that's the log-on

17   screen for the portal, -687.  Screen shot on -688,

18   -689, -690.  The two things on -691.  And some of

19   these are repetitive if you go further back, -701,

20   -702 -- these are repeating -- -703, -704, -705.

21   That's it.

22        Q.   Did you say -703 as well?

23        A.   Yes.

24        Q.   So -701 through -705?

25        A.   Uh-huh.  These actually repeat from the

Page 65

1    previous stuff.

2         Q.  Okay.  Were you aware that your portal

3    product was being used or showcased as part of the

4    Title Rover software presentation to investors?

5         A.  Was I aware?

6         Q.  Yes.

7              MS. SWEENEY:  Objection.  Calls for facts not

8    in evidence.

9              THE WITNESS:  I may have been told that, and

10   I don't know that I would have objected to it.

11   BY MS. McKNIGHT:

12        Q.  Okay.

13        A.  It's a tool they were using to do whatever

14   they were doing.

15        Q.  For the Hopewell-Pilot project, you mean?

16        A.  Yeah.

17        Q.  Did anyone ever contact you in early 2018

18   about the retrieval of the data that you have for

19   Title Rover?

20        A.  I had one call from the bankruptcy guy and

21   his -- I'm trying to recall.  It's been so long ago.

22   I think he was mainly interested in whether or not I

23   was going to be a claimant, and his name is Toe, I

24   think.

25        Q.  Rodney Toe?

1    A.  Yeah.  He called me once, and we may have
2  been -- I may have said, "Look, I've got all this data
3  sitting there.  You're welcome to it if you want."
4  And I never heard back from him.
5    Q.  Okay.  So he -- I just want to make sure I
6  understand.  You believe Rodney Toe reached out to you
7  concerning the bankruptcy?
8    A.  Yes.
9    Q.  And he asked if you were going to be a
10  claimant, or a creditor?  Do you mean creditor?
11    A.  Creditor, yeah.  Creditor.
12    Q.  Okay.
13    A.  And I don't recall whether I said, "yes" or
14  "no" at that point.  I think that was still kind of up
15  in the air, whether or not we would, but I decided we
16  wouldn't.
17    Q.  Okay.
18    A.  But I never talked to him after that.  I
19  think we did discuss the data that was still sitting
20  out on the server, and I said, "It's still there, you
21  know, if you guys want it."  And I never heard back.
22    Q.  Okay.  Was that after you mentioned some of
23  the stuff had been removed from the -- from your
24  server; right?
25    A.  Yeah.  No.  It was on the workstation.  You

Page 67

1    know, the stuff I used for building screens and stuff.

2    Actually, I've got less room on the workstations that

3    I use for development than I do on the servers that we

4    use for storing data.  So some things got cleaned off.

5        Q.  Do you know what those things were?

6        A.  Just projects.  Some scripts maybe.  There

7    were a lot of things that I had to run like every

8    month for the data extraction.  There were little

9    programs that I had done that were specific to Madison

10   County, like to extract the survey information, trying

11   to pull that out of the data.

12           And so I would run these different scripts.

13   They're not structured.  They're just -- it's just a

14   procedure I went through to get the data loaded every

15   month.

16       Q.  Okay.  But that was the extent of what had

17   been removed?

18       A.  Yeah.  I don't recall.  It's been two years

19   ago.

20           MS. McKNIGHT:  Okay.  So I'm going to mark as

21   Exhibit 7 -- just trying to find the second copy.

22   It's an E-mail chain -- or forwarded E-mail, I should

23   say, dated November 20, 2017.

24           (Deposition Exhibit 7 was marked for

25           identification.)

Page 68

 1   BY MS. McKNIGHT:

 2        Q.  If you can just review Exhibit 7, which is

 3   Bates No. TAT_18818 through -18819.  Do you recognize

 4   or recall the E-mail on the first page from Tom Tatham

 5   to -- it says, "Joseph Haynes dated November 20, 2017

 6   at 11:49 a.m."  Do you recall that?

 7        A.  I don't, but it's probably on that drive.

 8        Q.  Okay.  And do you recall why in November 2017

 9   Tom Tatham reached out to you about the Title Rover

10   portal?

11        A.  Uh-huh.

12            MS. SWEENEY:  Objection.  Calls for

13   speculation.

14   BY MS. McKNIGHT:

15        Q.  Why?  Why do you recall?

16        A.  I recall we did talk, and I said, "Look, I

17   took the portal down.  I'd taken it down months before

18   when we --

19        Q.  When the project ended?

20        A.  Yeah.  When the project ended.  Bankruptcy.

21   I mean, you know, just take it down.  And I hadn't

22   kept all that stuff -- the data -- like I said,

23   sitting on the server, and I'm surprised that it's

24   still there, but it was.  But the -- all the other

25   stuff, the program, the web page, the web support, the

Page 69

1    middleware, all that stuff had been taken down.

2           And I told him, "Hey, I can re-create it if

3    you want," and he seemed to think that there was

4    some -- when I talked to him, he indicated it was

5    something to do with the bankruptcy, that he thought

6    there might be some value in recreating the portal as

7    part of the bankruptcy.  The bankruptcy had already

8    been filed here.

9           Q.  Okay.

10          A.  And I said, "Well" -- you know, I think I

11   sent him a quote for rebuilding it and reconstructing

12   all that stuff.  That's it.

13          Q.  Okay.  Do you recall what that quote was?

14   How much?  Estimate?

15          A.  Around $40,000.

16          Q.  $40,000?

17          A.  Yes.

18          Q.  Okay.  Would you be able to estimate the

19   current value of the Title Rover software based on

20   your knowledge of how it performed for the

21   Hopewell-Pilot project?

22          A.  I have no idea.

23          Q.  Okay.

24          A.  Anywhere between zero and -- I don't know.

25          Q.  That's okay.  I only want you to answer what

Page 70

```
 1    you know or have an estimate for.  I don't want you to
 2    speculate or guess.
 3         A.  Okay.  One thing, this was specific to this
 4    project.  It was specific to that county.
 5         Q.  Okay.
 6         A.  Just pulling data from that county.  This was
 7    not a product.  Okay?  It was a way of presenting data
 8    from a specific county so that the people at Title
 9    Rover could look at it.  Remember, Madison didn't even
10    have a website.  They didn't even have a way to get
11    into that.  So we gave -- in effect, we gave Madison
12    County a website --
13         Q.  Okay.
14         A.  -- that a lot of counties already had.  Now,
15    it may not have been as sophisticated -- you know, the
16    other general things that are available now may not
17    have been as sophisticated as this, but, you know,
18    that's all this was was a way of presenting Madison
19    County data so that they could get to it remotely,
20    data and document images.
21         Q.  Okay.  How much time did it take you to build
22    the portal in like man hours?
23         A.  Because it's not all like I sat down and did
24    it in one day.  It was spread out over a year almost.
25         Q.  Okay.
```

Page 71

1        A.   Every month it was something, you know,

2    tweaking here, doing something there.

3        Q.   Okay.  But the initial portal, how much do

4    you think that took you?

5        A.   Probably three or four weeks.

6        Q.   Okay.

7        A.   That's just a guess.

8        Q.   How much -- do you know how much it cost to

9    build a portal?

10       A.   How much it cost?

11       Q.   Yeah.  If you can answer that.  I don't know

12   if that's an easy answer.

13       A.   I normally bill -- if I'm doing work for a

14   law firm, like if your firm came to hire me to build a

15   portal and do eDiscovery, electronic discovery, I'd

16   normally bill it about right at 300- an hour.

17           MS. McKNIGHT:  Okay.  I'm going to mark as

18   Exhibit 8, Shannon and Tom -- I'm going to mark as

19   Exhibit 8 what the trustee has been provided to us

20   through Knox.  I have a flash drive that I'm going to

21   attach to the transcript.

22           Can we go off the record really fast?

23           (Deposition Exhibit 8 was marked for

24           identification.)

25           (A recess was taken from 12:30 p.m.

Page 72

1          to 12:32 p.m.)

2          MS. McKNIGHT:  All right.  We're back on the

3    record.

4          Q.  Mr. Haynes, you had said that you wanted to

5    correct a date?

6          A.  You had asked me if somebody had contacted me

7    in early 2018.

8          Q.  From the trustee?

9          A.  Yeah.  And it was early 2017 that he -- it

10   was like in March or April.  It was right after the

11   bankruptcy was filed.  Sometime, I think in the spring

12   of 2017.

13         Q.  Okay.  You don't recall anyone contacting you

14   from the trustee in 2018?

15         A.  I do not.

16         Q.  Okay.  Thank you for clarifying.

17         A.  Yeah.

18         Q.  All right.  So we're going to talk about

19   Exhibit 8 now.  So I have Exhibit 8 on our Dell pulled

20   up, and it's the chains 3D folder within Exhibit 8.

21   If you could just take a look at that chains 3D folder

22   and see if you recognize any of these files and what

23   they might be.

24         A.  Yeah.  Okay.  Chains is -- remember, I keep

25   talking about chains of title?

                                              Page 73

1       Q.   Yes.

2       A.   You'll see the name "chains" appear in a lot

3   of my work because that's a lot of what I do is

4   doing -- is trying to build chains of title.  Even the

5   work we did for the attorney general, we were trying

6   to find chains of title before and after tax liens.

7   So there was a program there called Chains.  It's a

8   general thing that I use for software that I do to

9   help people build chains of title.

10      Q.   Okay.

11      A.   All right.  So that chains is just, you know,

12  that's -- this is an executable program.

13      Q.   What is an executable?  This whole thing

14  within the chains 3D folder?

15      A.   Yes.

16      Q.   Okay.

17      A.   It starts with that.

18      Q.   With what?

19      A.   The chains application.

20      Q.   Okay.

21      A.   It won't run because this is designed to be

22  tied to something.

23      Q.   Okay.

24      A.   The only thing that's in this program are

25  presentation logic and reporting logic.  Like see the

Page 74

1    crystal decisions?  That's crystal reports.   That's

2    SAP.  That's the licensed product I told you about

3    that produces reports.

4         Q.  Okay.

5         A.  All right.

6         Q.  Do you know what these sub folders are that

7    they --

8         A.  That's something Microsoft puts in there

9    automatically.  It's for language support.

10        Q.  Okay.  Can you reference which ones that

11   Microsoft just puts in automatically so they are

12   clear?

13        A.  All four of them.

14        Q.  So DE, ES --

15        A.  ES, JA -- I think that's -- DE is -- I think

16   that's German, English, Japanese, and Russian.  Don't

17   ask me.  That's part of the build process.

18        Q.  But that's not related to what you worked on?

19        A.  Nothing I ever look at or anything.  It comes

20   automatically from Microsoft.

21        Q.  Okay.

22        A.  Devexpress, that's that company I told you

23   about from the Czech Republic that does components.

24   Those are various components that are used in the

25   program.  These are some other like sub projects.

1          Q.   Programs?

2          A.   Subprojects, yeah.

3          Q.   What do you mean?  Do you mean like a sub

4     program or --

5          A.   Yeah.  Like these are reports (indicating).

6          Q.   Can you say what that is?  It says, grid flat

7     doc?

8          A.   These are all reports.

9          Q.   The grid doc report --

10         A.   Yes, grid flat --

11         Q.   -- and anything that says, "grid" is a

12    report?

13         A.   Yeah.  Generally it will end with either

14    report or rep.

15         Q.   Okay.  And what are they reports of?  The

16    same chain titling?

17         A.   Yeah.

18         Q.   Okay.

19         A.   These --

20         Q.   The Microsoft --

21         A.   Remember, I told you about the drawing of

22    the -- you know, that thing with the network.

23         Q.   Exhibit 5, -675?

24         A.   Yeah.  Microsoft MSGL, that's what those are.

25         Q.   MSAGL --

1        A.    MSAGL.

2        Q.    -- creates the thing on -675.

3        A.    Yeah.

4        Q.    Okay.

5        A.    That's a Microsoft licensed product, as I

6    mentioned.

7        Q.    Okay.

8        A.    Shockware, that's just stuff.

9        Q.    What is STDOLE?

10        A.    Stands for stand object link and embedding.

11    Do you really want a description of that?  It's

12    Microsoft.

13        Q.    Okay.

14        A.    That Win OCR --

15        Q.    WINSOFT.OCR.DLL?

16        A.    That's that Google OCR product I told you

17    about.

18        Q.    Okay.  And where it says, "user controls" --

19        A.    Those, I'm not sure.  It's something

20    that's -- a DLL is a component that is usually

21    embedded in another component.

22        Q.    Okay.

23        A.    So it could be that one.  I can't tell you.

24    It's been too long.  It could be like the thing that

25    paints these things in the little screen on -690.

Page 77

1      Q.   On Exhibit 5?

2      A.   Yeah.   It's just conjecture on my part.

3      Q.   Okay.

4      A.   Now, the only thing -- that is something that

5   AIT would have done.

6           MS. SWEENEY:   For the record, I'm going to

7   object to testimony that's based on conjecture.

8   BY MS. McKNIGHT:

9      Q.   Yes, we -- again, just don't -- only talk to

10  me what you really know or can estimate.

11     A.   Well, I know that user control is something I

12  did.

13     Q.   For the Title Rover project?

14     A.   Well, yeah.

15     Q.   For any of your projects.

16     A.   Yeah.   Chain is a program that I do.   The

17  rest of them are support, things that do reports or

18  draw graphs or whatever.

19     Q.   Okay.

20     A.   Now, this only does -- this is a web portal

21  (indicating).

22     Q.   So what is a web portal?   What we're looking

23  at, this exhibit?

24     A.   Yes.   All of the guts, if you will, the

25  queries, the databases and everything are sitting back

                                        Page 78

```
 1    in Virginia running on our servers.  All this does is
 2    draw the screens.
 3         Q.  So all the other stuff is -- like the guts
 4    are on your servers --
 5         A.  It would have been sitting out there.
 6         Q.  Is it still there?
 7         A.  Just the database that I gave you.
 8         Q.  So everything else that exists is still
 9    there?
10         A.  Web server space is kind of critical to me.
11    I don't have much of it.
12         Q.  Okay.
13         A.  So I usually will clean that off pretty
14    quickly.  But all this does is paint these screens --
15         Q.  So just to be clear for the record, we're
16    talking about the --
17         A.  Chains.
18         Q.  -- chains file that you're looking at on
19    Exhibit 8 is the web portal that creates what the
20    screens are on Exhibit 5 --
21         A.  Yes.
22         Q.  -- for -688?
23         A.  Yes.
24         Q.  And you call it "the guts."  Is that like the
25    code?
```

Page 79

1          A.   Yeah, the queries and the database.   In other

2     words, there's no data out there and there's no -- in

3     order to draw a screen like that.

4          Q.   We're talking about Exhibit 5 on -691?

5          A.   That code to draw that, it has to be sitting

6     on your computer here.

7          Q.   Okay.

8          A.   Because they can actually edit that graphic

9     and move these around and change the labels, and you

10    can't do that on a web page.   So we give them a local

11    program that lets them --

12         Q.   So this is a local program on Exhibit 8?

13         A.   This runs only on what we call "the client."

14         Q.   "The client"?   Okay.

15         A.   This is client code.

16         Q.   So when I double chick on the chains

17    application, it has a user name and a password.

18         A.   Uh-huh.

19         Q.   Do you know what the user name and password

20    is now?

21         A.   What this will do is try to take you to a web

22    portal that --

23         Q.   That would have been on your server, but it's

24    not there anymore?

25         A.   Right.   This is just collecting --

                                                   Page 80

1       Q.   Okay.

2       A.   This is just allowing access.  In other

3  words, it's asking for a user ID and password.  The

4  user ID and password on the screen just gets passed to

5  the server back here in Virginia, and they can

6  continue.

7       Q.   Okay.  So this -- even if we had a user name

8  and password, it wouldn't run?

9       A.   Yeah.

10      Q.   That's a "yes"?

11      A.   It would not run.

12      Q.   Okay.  Thank you for avoiding the double

13  negative.

14           Okay.  Is that a normal standard for you

15  to -- for your projects to kind of open up space on

16  your server and discard the previous data?

17      A.   Yes.

18      Q.   Okay.  Is that like a normal, standard

19  practice in like data management?

20      A.   Yeah.  I wouldn't -- I normally don't delete

21  data without -- unless I offer it back to the client.

22  I don't consider the data to be mine in any event.  So

23  I would formally say, "Do you want the data?  If you

24  do, I'll put it on a hard drive and send it to you."

25      Q.   Do you offer that?

Kramm Court Reporters, A Veritext Company
619-239-0080

1       A.   Oh, yeah.

2       Q.   To whom?

3       A.   The trustee.

4       Q.   Rodney Toe?

5       A.   Yeah.   I'm pretty sure Tom.

6       Q.   Tom Tatham?

7       A.   Yeah.

8       Q.   And did anyone take you up on it?

9       A.   No one.

10      Q.   "No"?

11           And do you recall when you offered it to Tom

12  Tatham, "it" being the code?

13      A.   No.   "It" being the data.

14      Q.   The data.   Okay.

15      A.   Probably like 2017.   I've never considered

16  data mine.

17      Q.   Okay.

18      A.   So I would -- if anyone asked for it, I'll

19  always give it back.

20      Q.   Okay.   But before you deleted it, you did --

21      A.   I didn't delete it.

22      Q.   You didn't delete it?

23      A.   No.   You got it right there (indicating).

24      Q.   Oh.   Okay.   You kept talking about the guts,

25  and I guess I'm confused about what the guts are

Page 82

1    versus what the data that you've given me is.

2        A.  Yeah, the guts is the way of getting to the

3    data.  In other words, you want to do a search for all

4    documents recorded for Bonnie McKnight.

5        Q.  Yeah.

6        A.  The query that goes out to the database and

7    then gets that and assembles all those documents is

8    what I'm talking about as the guts.

9        Q.  Okay.  And is that your query that you use?

10       A.  No.  I give the data away, but my core

11   project -- when I build a portal, I don't give away

12   the code to the portal.  I give people access to data

13   through the portal using my techniques.

14       Q.  Okay.  That you keep for yourself?

15       A.  Yeah.

16       Q.  Okay.

17       A.  Honestly, I don't even consider them

18   proprietary.  They're not important.

19       Q.  Yeah, you --

20       A.  I redo them any time I need -- I'll have a

21   client tomorrow, and I'll re-create.

22       Q.  Okay.

23       A.  But it will be -- it will have some specifics

24   to their particular project.

25       Q.  Okay.  And I'm trying to recall which exhibit

Page 83

1    it was where Tom Tatham asked you to redo the portal.

2        A.   It's this (indicating).

3        Q.   Exhibit --

4        A.   7.

5        Q.   -- 7.

6             Did you offer him the data before he asked

7    you to redo the portal on Exhibit 7?  Do you recall?

8        A.   I probably volunteered it.

9        Q.   Okay.

10       A.   I typically would.  I'm not going to keep it.

11   In fact, all the data was even uploaded to what we

12   call an "FTP site."  You know what FTP is?  File

13   transfer protocol.

14       Q.   Okay.

15       A.   And that site was still active.  I told

16   Brent, "If you guys want to collect it, you can

17   collect it and you can download it."

18       Q.   All the data that you have pulled from the

19   Title Rover project?

20       A.   Yeah.  And like I said, it was their choice.

21            MS. McKNIGHT:  Okay.  I think I'm good for

22   right now, Shannon, if you have questions.

23   ///

24   ///

25   ///

Page 84

```
 1                    EXAMINATION
 2   BY MS. SWEENEY:
 3        Q.   Okay.  I have a couple of questions, and I
 4   just want to apologize from the beginning if I am
 5   duplicative of what you've already testified.  I'm
 6   having a hard time hearing a lot of the testimony.  So
 7   hopefully we can get through this without too much
 8   duplication.
 9             I believe that you testified that you were
10   not impressed with the data that was collected by
11   Beyond Recognition in 2016.  Did I get that right?
12        A.   Well, no.  With the processing results of
13   what they had done.  Did I answer your question?
14        Q.   You cut out.  You said you thought the
15   processing results were not --
16        A.   Yeah, as I said earlier, and it's covering
17   one of those E-mails, and there's even an example in
18   this collection of E-mails I've given you.  I sent a
19   comparison between what the Google OCR -- let me refer
20   to it as "the Google OCR" would do compared with the
21   Beyond Recognition OCR to just show that it was --
22   that Google actually did a better job.
23        Q.   And the Google is Tessaract program?
24        A.   Yes.
25             REPORTER MARTIN:  Is the what program?
```

Page 85

1            THE WITNESS:  Tessaract, T-e-s-s-a-r-a-c-t.

2    BY MS. SWEENEY:

3        Q.  And did you personally run the Tessaract

4    program to compare the output versus Beyond

5    Recognition?

6        A.  Yes, I did.

7        Q.  And did you provide the results of the

8    Tessaract search with anyone at Title Rover?

9        A.  Brent Stanley.

10       Q.  And how many times did you perform that

11   search --

12       A.  What search?

13       Q.  -- for that analysis?

14       A.  Oh, I don't recall.  I did kind of a bulk

15   analysis comparing the extraction totals that's

16   covered in that E-mail, and then I compared -- I

17   picked out two or three documents that -- you know,

18   the same document done with the Google, with the

19   Tessaract program and the document done by Beyond

20   Recognition and compared those.

21       Q.  And each time you did that, did you provide

22   the results of that analysis to Title Rover?

23       A.  No.  I just gave them one example in that

24   summer E-mail.  That's all they asked for.

25       Q.  And by "they," you mean Brent Stanley?

Page 86

1          A.  Yes, I sent it to Brent.

2          Q.  Okay.  You testified earlier that you met

3     with Mark Willis once; is that right?

4          A.  Yes.  I think so.  Maybe twice.  I do

5     remember once.

6          Q.  Where was that meeting that you remember?

7          A.  In Houston.

8          Q.  Was it in Mark's office?

9          A.  We went to Denver.  It was me, Tom Tatham,

10    and Brent Stanley.

11         Q.  And what was that meeting about?  What

12    happened at that meeting?

13         A.  We were talking about the program and the

14    project.  It wasn't anything specific.

15         Q.  Had you already been retained at that point?

16         A.  Retained in what sense?

17         Q.  Were you already working with Title Rover?

18         A.  If you mean in the sense were they paying us,

19    it was either just before or early in the process.

20         Q.  So can you describe the substance of that

21    meeting?  Was it -- and let me just be a little more

22    specific.  Was it a planning meeting?  Was it a -- the

23    "Hire me" meeting?

24              MS. McKNIGHT:  What was that Shannon?  What

25    was the last part?

Page 87

1    BY MS. SWEENEY:

2        Q.   Was it a meeting designed to have them hire

3    you?

4        A.   No.   I think it was a get acquainted meeting.

5        Q.   After you had already come on board?

6        A.   Yeah.   But, remember, Brent brought me on

7    board.   Brent had the relationship with Mark Willis

8    from way back, as I understand it.

9        Q.   Do you remember how long the meeting lasted?

10       A.   The meeting?   Maybe until 10:00 at night.   We

11   were sitting in a restaurant, and it wasn't all

12   business.

13       Q.   Okay.   I see.   Do you remember anything

14   specifically that Mark Willis said during that

15   meeting?

16       A.   He talked about his girlfriend.   I don't

17   recall anything specific, no.

18       Q.   You also testified that you had a couple of

19   phone conversations with Mark Willis.   Do you remember

20   how many?

21       A.   Two.

22       Q.   Can you tell me about the first one?

23       A.   That was when we discovered that Brent was

24   being paid by both us and -- by, you know, Substantia,

25   if you will, and by Mark Willis, and Mark didn't

Page 88

```
 1    realize -- you know, I got the impression on the phone
 2    that Mark didn't realize that we didn't know that he
 3    was being paid by both sides.
 4         Q.   And you said he was being paid by Mark
 5    Willis.  Do you know for a fact that the payment was
 6    coming from Mark Willis --
 7         A.   No.  I know that --
 8         Q.   -- personally?
 9         A.   No.  But if you look on the E-mail, you see
10    the schedule of payments.  15,000 a month was coming
11    from somewhere.
12         Q.   Could that have been coming from Title Rover?
13         A.   I guess it could.  I don't know.
14         Q.   Or --
15         A.   You'd have to ask Brent or Mark or somebody.
16         Q.   Who made that call that you're remembering?
17    Was it you or was it Mark?
18         A.   I think Brent initiated it, and I think it
19    came from Mark.  I've never called Mark.  I have never
20    called Mark.
21         Q.   Okay.  Who was on that call?
22         A.   The first one I -- the only person I spoke to
23    was Mark.  I got the impression Brent was in the room,
24    but I don't know that.
25         Q.   And you thought Brent was in the room with
```

Page 89

1   Mark during the call?

2        A.   I had that impression.

3        Q.   And what was the substance of that call?

4        A.   He was trying to explain to me that Brent was

5   doing some other work for him, and I said, well, you

6   know there was still a conflict of interest there that

7   really concerned me because he had just negotiated a

8   reduction of my and Susan's payments, and he kept

9   his -- managed to keep his the same, and Mark was

10  not -- Mark was surprised we didn't know that Brent

11  was being paid by him separately.  And he didn't know

12  that -- I think he didn't know that Brent was getting

13  paid by us.

14       Q.   Was the entire substance of that phone call

15  related to Brent Stanley's pay?

16       A.   I think it was.

17       Q.   What was the outcome of that call related to

18  his pay?

19       A.   There was no specific outcome that I can

20  recall.  I just let Mark know that I was unhappy.

21       Q.   You mentioned that you had a second phone

22  call with Mark Willis.  Tell me about that call.

23       A.   Yes.  He called -- I don't even remember when

24  it was.  It's been in the last several months.  Maybe

25  last year, and he called and said -- and basically

Page 90

```
 1    wanted the software -- you know, the programs, and I
 2    said, "Hey, you know, I don't keep that stuff laying
 3    around, not for two years."  And I think at that time
 4    I told him he could have the data, and in fact, I
 5    mentioned that Brent had access -- still probably had
 6    access to that FTP site if he wanted to take it back.
 7    And as I recall, he hung up on me.
 8         Q.  He hung up on you.  Was it your perception
 9    that he was angry?
10         A.  I don't know.  I don't know if you've ever
11    talked to Mark, but he's -- well, it's hard to tell.
12         Q.  Okay.  And his seeking the information, how
13    was that different than Mr. Tatham seeking the
14    information in 2017, or was it?
15         A.  At that point, ma'am -- and this, again,
16    comes from Brent.  I think Tom Tatham is Mark Willis'
17    brother-in-law, and because of all of this there was a
18    big family controversy, and I don't know that Tom and
19    Mark were talking.
20         Q.  But it was your perception that both Mark
21    Willis and Tom Tatham were requesting the same
22    information?
23         A.  I think they were, but I don't think they
24    were talking.
25         Q.  But you don't have any personal knowledge
```

Page 91

1    about that?

2         A.   I don't have any personal knowledge.  Only

3    what I've heard from Brent.

4         Q.   Okay.  I think you testified earlier that you

5    were not on the management team of Title Rover;

6    correct?

7         A.   I was not on -- I'm sorry.

8         Q.   That you were not on the management team for

9    Title Rover.

10        A.   No, I was not.

11        Q.   Would you characterize your involvement as a

12   vendor, a service provider?

13        A.   Service provider?  Yep.

14        Q.   And I think you also said that you weren't

15   participating at all in any marketing for Title Rover;

16   right?

17        A.   I was not.

18        Q.   And is it safe to say that you were not

19   involved in any strategic planning for Title Rover?

20        A.   I would say that's pretty safe.  I mean I may

21   have come up with some technical ideas, and I had an

22   idea about maybe tying some of these automated mapping

23   programs into this to make it easier to identify

24   parcels, but we never went anywhere with that.

25        Q.   And if you had an idea like that, would

Page 92

```
 1   you -- who would you have shared it with?
 2        A.   Brent.   And he may have shared it on with
 3   Mark and Tom.
 4        Q.   But you don't know for sure?
 5        A.   No.
 6        Q.   Did you have any communication with any
 7   potential investor of Title Rover or Hopewell?
 8        A.   I did not.
 9        Q.   I'm sorry.   Is that "no"?
10        A.   That's a no.
11        Q.   Okay.   So other than these two phone
12   conversations and the one in-person meeting you talked
13   to, can you recall any other communication that you
14   had with Mr. Willis?
15        A.   Not directly, and I don't think I either sent
16   him an E-mail nor received an E-mail from him.   I may
17   have been on the chain, you know.   A carbon copy on an
18   E-mail, but that's it.
19             MS. SWEENEY:   Okay.   That's all the questions
20   I had.   Thank you very much.
21             MS. McKNIGHT:   And I just have two more
22   follow-up questions after reviewing my notes.
23             MR. TATHAM:   Excuse me, Bonnie?
24             MS. McKNIGHT:   Yes, Tom.   Did you have
25   questions?
```

Page 93

```
 1                 MR. TATHAM:  When you get finished.
 2                 MS. McKNIGHT:  Go ahead.  You can go.  I'll
 3    go after you.
 4
 5                      EXAMINATION
 6    BY MR. TATHAM:
 7        Q.  Okay.  The Bates stamp -4202.  I think it's
 8    plaintiff's -4202.  I think it was an exhibit.  I want
 9    to say 2 or 3 identified for the record.
10                 MS. SWEENEY:  I think it's Exhibit 4 maybe.
11                 MR. TATHAM:  It's an E-mail, August of 2016.
12    An E-mail chain.
13                 MS. McKNIGHT:  It's not plaintiff.  It's
14    WIL_4201?  Is that what you're referring to?
15                 MR. TATHAM:  Yes.
16                 MS. McKNIGHT:  For Exhibit 4.  Okay.
17    BY MR. TATHAM:
18        Q.  Mr. Haynes, if you would refer to that
19    document, please.
20        A.  I have it.
21        Q.  And I'm going to try and pull it up here as
22    well.
23             Do you see the E-mail from myself, Tom to
24    Mark, dated August 18, 2016?
25        A.  Yes.
```

Page 94

```
 1          Q.  And do you -- can you take a look at the
 2     terms that are set in that E-mail?
 3          A.  Yeah.
 4          Q.  My question is do you agree that you and
 5     Brent Stanley agreed to those terms?
 6          A.  Yeah.  That's fine.  Yeah.
 7          Q.  And do you recall a dinner and a meeting the
 8     next day in which all the terms were discussed and
 9     negotiated?
10          A.  I don't recall that there were negotiations.
11     I think that -- didn't this come out first?
12          Q.  Well, my question is that there was a dinner
13     meeting and a follow-up meeting the next day in
14     Houston --
15               REPORTER MARTIN:  I can't hear him.
16               MS. McKNIGHT:  You're cutting out, Tom.
17     You're going to have to repeat the question.
18     BY MR. TATHAM:
19          Q.  Okay.  My question again is --
20               MS. McKNIGHT:  You have a really bad
21     connection, Tom.  Can you go to a different spot
22     because your voice is warped.
23               MR. TATHAM:  I can't --
24               MS. McKNIGHT:  Are you there?  Tom?
25               All right.  Well, he's having issues.
```

Page 95

1          MR. TATHAM:  (Inaudible response.)

2          MS. McKNIGHT:  What?  I'm sorry.  We cannot

3    hear you at all.  It was fine in the beginning.  I

4    don't know what changed.

5          MR. TATHAM:  Well, if you can't hear me, then

6    I guess I'll pass the deponent over to Bonnie.

7          MS. SWEENEY:  We can hear you now.

8          MS. McKNIGHT:  Yeah, we can hear you now.  I

9    don't know what happened before.

10         MR. TATHAM:  Okay.  I'm trying to be very

11    still with my cell phone.

12       Q.  Let's try this again.

13         Do you recall a dinner meeting and a

14    follow-up meeting the next day in which the go-forward

15    compensation and equity participation were discussed

16    and negotiated for yourself, Susan Willard, and Brent

17    Stanley?

18       A.  I remember us talking about it, but it was

19    supposed to be reduced to a written agreement, and

20    that written agreement was total nonsense.

21       Q.  Okay.  But you do agree to -- do remember

22    agreeing to the terms set forward in the E-mail

23    correspondence, the chain of August 18, 2016?

24       A.  Well, if that had been kept, that would have

25    been fine, but when you guys reduced it to writing, it

                                        Page 96

1    was total nonsense.

2         Q.  And when you say it was "reduced to writing,"

3    the agreements that were submitted to you and Brent

4    somewhat after this data recall, do you -- have you

5    furnished copy of those agreements?

6         A.  Have I furnished?

7         Q.  Yes.  Weren't you required to produce the

8    documents --

9         A.  They're in the E-mail chain because it was

10   attached to this E-mail.  It's on the hard drive.

11        Q.  Going back to Exhibit No. 4, the E-mail from

12   Brent Stanley to myself with yourself, Mark Willis,

13   and Pat Doherty copied on August 30, is that a true

14   statement by Brent Stanley in that E-mail?

15        A.  Not referring to that written agreement, no.

16        Q.  If this message predated those written

17   agreements that were furnished to you, would it then

18   be a true statement?

19        A.  The terms and conditions in the 18th sounded

20   okay to me.

21        Q.  One last question.  In terms of your

22   discussions with Brent Stanley and Title Rover

23   beginning in March of 2016 through, let's say, January

24   of 2017, do you believe that Mr. Stanley kept you

25   apprised of all the financial terms and conditions of

Page 97

1    the agreement that he and SLX made with Title Rover?

2            MS. McKNIGHT:  Objection.  Vague and

3    ambiguous as to "agreements."

4            THE WITNESS:  My answer is no, I couldn't say

5    that for sure.

6            MR. TATHAM:  Okay.  I don't have any further

7    questions.

8

9                    FURTHER EXAMINATION

10           MS. McKNIGHT:  Okay.  I'm just going to mark

11   a couple of exhibits.  I'm going to mark as Exhibit 9,

12   it's Bates numbered WIL- -- W-I-L -- _64 0.

13           If you could just look at that.

14           (Deposition Exhibit 9 was marked for

15           identification.)

16   BY MS. McKNIGHT:

17       Q.  Have you seen this document before?

18       A.  No.

19       Q.  Okay.  If you see under -- it says,

20   Substantia "LogiX, LLC/AIT."

21       A.  Uh-huh.

22       Q.  Was that the initial payment that was

23   provided to Substantia LogiX and AIT collectively?  Do

24   you recall?

25       A.  Yes.  And one thing I need to point out is

                                            Page 98

```
 1    one third of that was going to Brent Stanley --
 2         Q.  Right.  But ultimately --
 3         A.  -- but it shows here -- okay.  It says,
 4    "(includes Joe Haynes & Susan Willard)," but it was
 5    divided three ways.
 6         Q.  Okay.  But then the payment terms changed
 7    later on?
 8         A.  Yes, they were reduced.
 9              MS. McKNIGHT:  And then I'm going to mark as
10    Exhibit 10 -- so sorry.
11              (Deposition Exhibit 10 was marked for
12              identification.)
13    BY MS. McKNIGHT:
14         Q.  Exhibit 10 is a Substantia LogiX website
15    page, and it's a two-page printout which includes --
16    it looks like -- can you review it?
17         A.  Uh-huh.
18         Q.  Have you seen this before?
19         A.  Uh-uh.
20         Q.  "No"?
21              Does this look like it's your bio?
22         A.  It's not my picture at the top.
23         Q.  Oh, yeah.  Okay.  If you could just review
24    the portion for you and whether it's an accurate
25    summary of your work.
```

Page 99

```
 1              (The witness reviewed Exhibit 10.)
 2              THE WITNESS:  Yes.  It's not even up to date.
 3    BY MS. McKNIGHT:
 4         Q.  But it was at one point an accurate summary
 5    of the work that you completed in your --
 6         A.  Yeah.
 7         Q.  Okay.
 8         A.  Yeah.  Again, I would never have let "Joe
 9    Haynes" get past.
10         Q.  Oh, right.
11              Okay.  And then my last question is going
12    back to Exhibit 8, the software we were looking at --
13         A.  Uh-huh.
14         Q.  -- on the laptop.  This is a question that,
15    as far as the data that you saw on the laptop, did it
16    look like a complete version of the data that you
17    worked on?
18         A.  Well, it's the executable.  It's a facade.
19    It's taking the place of a web page --
20         Q.  Okay.
21         A.  -- but it runs on the client computer so that
22    you can do more on your client computer.  It's hard to
23    draw a graph on a web page and let them edit the
24    graph.
25         Q.  Okay.
```

Page 100

1      A.   So we give them a component that runs on the

2   computer they're working on.   But it's still

3   connecting over the Internet on the same web page.

4      Q.   But if it was fully functioning with the

5   server, then it would be able to run like a

6   complete --

7      A.   Yeah.   It would be able to do the screens,

8   and, you know, yeah.

9      Q.   Just to make the record clear, it would be if

10   the server still possessed the queries --

11      A.   Uh-huh.

12      Q.   -- it would be able to run -- like the client

13   version would run?

14      A.   Uh-huh.

15      Q.   "Yes"?

16      A.   Yes.

17           MS. McKNIGHT:   That's my final question, I

18   think, unless do you guys have any other follow-ups?

19           MS. SWEENEY:   No, thank you.

20           MR. TATHAM:   No, thank you.

21           MS. McKNIGHT:   All right.   Let's go off the

22   record really fast so we can work out the stipulation.

23           (A recess was taken from 1:18 p.m.

24           to 1:21 p.m.)

25           MS. McKNIGHT:   So the court reporter is

Page 101

1    relieved of her duties to keep an original copy of the

2    deposition transcript.  Upon completion of the

3    transcript by the court reporter, which is

4    approximately 10 days, Mr. Haynes will be notified to

5    review that copy, which he can review electronically,

6    and he'll have two weeks to make any changes.

7            Mr. Haynes, please know that any changes that

8    you do make can be commented on by counsel or parties.

9            And that upon Mr. Haynes' review, the

10   original shall be sent to Panakos Law at

11   555 West Beach Street where Panakos will keep the

12   original copy.

13           Other than that, copies of the transcript

14   that aren't original can also be used in lieu of the

15   original copy.

16           Shannon, am I missing anything?

17           MS. SWEENEY:  So stipulated.

18           MS. McKNIGHT:  Tom, do you stipulate?

19           MR. TATHAM:  Yes.

20           MS. McKNIGHT:  Thank you.  All right.

21           (Witness excused.)

22           (Deposition concluded at 1:22 P.M.)

23

24

25

                                          Page 102

```
 1              C E R T I F I C A T E

 2       I do hereby certify that the aforesaid testimony

 3   was taken before me, pursuant to notice, at the time

 4   and place indicated; that said deponent was by me duly

 5   sworn to tell the truth, the whole truth, and nothing

 6   but the truth; that the testimony of said deponent was

 7   correctly recorded in machine shorthand by me and

 8   thereafter transcribed under my supervision with

 9   computer-aided transcription; that the deposition is a

10   true and correct record of the testimony given by the

11   witness; and that I am neither of counsel nor kin to

12   any party in said action, nor interested in the

13   outcome thereof.

14

15

16              Nancy J. Martin, RMR, CSR

17   Dated:  April 29, 2019

18

19

20   (The foregoing certification of this transcript does

21   not apply to any reproduction of the same by any

22   means, unless under the direct control and/or

23   supervision of the certifying shorthand reporter.)

24

25
```

Kramm Court Reporters, A Veritext Company
619-239-0080

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3          Please read your deposition over carefully

 4    and make any necessary corrections. You should state

 5    the reason in the appropriate space on the errata

 6    sheet for any corrections that are made.

 7             After doing so, please sign the errata sheet

 8    and date it.  You are signing same subject to the

 9    changes you have noted on the errata sheet, which will

10    be attached to your deposition.  It is imperative that

11    you return the original errata sheet to the deposing

12    attorney within thirty (30) days of receipt of the

13    deposition transcript by you.  If you fail to do so,

14    the deposition transcript may be deemed to be accurate

15    and may be used in court.

16

17

18

19

20

21

22

23

24

25
```

                                              Page 104

1              - - - - - - - -

2            E R R A T A

3              - - - - - - - -

4    PAGE    LINE      CHANGE

5    _____   _____   _____

6    _____   _____   _____

7    _____   _____   _____

8    _____   _____   _____

9    _____   _____   _____

10   _____   _____   _____

11   _____   _____   _____

12   _____   _____   _____

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20   _____   _____   _____

21   _____   _____   _____

22   _____   _____   _____

23   _____   _____   _____

24   _____   _____   _____

25   _____   _____   _____

Page 105

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, JOSEPH HAYNES, do hereby certify that I

 4     have read the foregoing pages, _____ to _____,

 5     and that the same is a correct transcription of the

 6     answers given by me to the questions therein

 7     propounded, except for the corrections or changes in

 8     form or substance, if any, noted in the attached

 9     Errata Sheet.

10

11     _____

12     DATE                    SIGNATURE

13

14

15

16     Subscribed and sworn to before me this _____ day

17     of _____, 20__.

18

19

20     My commission expires:  _____.

21

22     _____

23     Notary Public

24

25


                                         Page 106
```

[& - 710]

| & | | | |
|---|---|---|---|
| **&**   2:8 99:4 | **12:30**   72:25 | **2019**   1:18 5:2 | **5,416.50.**   33:20 |
| **0** | **12:32**   73:1 | 103:17 | 34:9 |
| **0**   98:12 | **13**   3:14 | **22**   3:15 | **5,835**   25:8 33:21 |
| **00004201**   3:17 | **14**   25:9 | **22nd**   2:15 | **50**   1:14 |
| 29:12 | **15**   53:9 | **25**   3:20 | **500**   2:4 |
| **0000640**   4:7 | **15,000**   31:10 32:11 | **29**   1:18 3:17 5:2 | **51**   3:21 |
| **000670**   3:20 | 89:10 | 103:17 | **555**   2:4 102:11 |
| **00079**   1:4 | **17**   34:8 | **3** | **6** |
| **00670**   44:23 | **17,500**   32:3,14 | **3**   3:15 12:13 22:22 | **6**   3:21 23:7 33:20 |
| **01247**   3:22 51:18 | 36:22 | 22:23 33:19,22 | 51:14,15,18 52:22 |
| 52:24 | **1700**   2:10 | 42:1 94:9 | **600**   2:9 |
| **01248**   3:22 | **18**   94:24 96:23 | **3,000**   16:9 37:22 | **619**   2:5 |
| **1** | **18818**   3:23 69:3 | **30**   30:15,21 97:13 | **621**   2:15 |
| **1**   1:14 3:10,16,21 | **18819**   3:24 69:3 | 104:12 | **64**   98:12 |
| 4:7 11:14,16 12:3 | **18th**   97:19 | **300**   72:16 | **670**   45:4 |
| 12:13 51:21 53:9 | **19**   34:15 | **34**   5:16 | **671**   45:10 48:24 |
| **1,000**   43:13 | **1922**   53:9 | **37,000**   52:6,8 | 54:20 |
| **1,500**   52:13,18 | **1:18**   101:23 | **3:17**   1:4 | **672**   46:7 47:25 |
| **10**   4:8 35:22 46:10 | **1:21**   101:24 | **3d**   73:20,21 74:14 | **674**   56:20 |
| 48:2,5 53:25 | **1:22**   102:22 | **4** | **675**   59:12,13 61:6 |
| 99:10,11,14 100:1 | **2** | **4**   3:17 29:9,11,16 | 65:14 76:23 77:2 |
| 102:4 | **2**   3:14,14,18,22,24 | 36:21 94:10,16 | **677**   63:5,24 |
| **100**   27:2 | 4:9 13:14,16,17 | 97:11 | **678**   64:18 |
| **10:00**   88:10 | 34:25 48:25 61:14 | **40,000**   52:19 70:15 | **68**   3:23 |
| **10:02**   30:21 | 61:15 94:9 | 70:16 | **680**   45:4 |
| **10:29**   1:23 5:2 | **20**   68:23 69:5 | **41**   3:20 | **687**   65:17 |
| **10:31**   8:1 | 106:17 | **4201**   30:20 94:14 | **688**   65:17 79:22 |
| **10:35**   8:2 | **2006**   10:22 | **4202**   3:18 29:13,19 | **689**   65:18 |
| **10:56**   22:10 | **2014**   58:8 | 30:6 32:1 94:7,8 | **690**   65:18 77:25 |
| **10:57**   22:11 | **2016**   3:20,22 23:7 | **44**   3:13 | **691**   65:18 80:4 |
| **10x**   46:10 | 23:21 25:8,9 29:3 | **45**   3:19 | **7** |
| **11**   3:10 25:8 | 30:21 33:20 34:8 | **48**   51:18 | **7**   3:23 68:21,24 |
| **11,670**   25:9 | 34:15 51:12,21 | **5** | 69:2 84:4,5,7 |
| **11:37**   48:17 | 53:9,23 54:10 | **5**   3:3,19 35:22 | **701**   65:19,24 |
| **11:49**   69:6 | 85:11 94:11,24 | 44:23,25 48:22,23 | **702**   65:20 |
| **11:52**   48:18 | 96:23 97:23 | 53:25 54:20 63:6 | **703**   65:20,22 |
| **1248**   51:23 52:24 | **2017**   34:25 68:23 | 65:4 76:23 78:1 | **704**   65:20 |
| **1250**   1:22 | 69:5,8 73:9,12 | 79:20 80:4 | **705**   65:20,24 |
| | 82:15 91:14 97:24 | **5,000**   35:21 | **710**   3:20 44:24 |
| | **2018**   66:17 73:7,14 | | |

**[72 - asked]**

**72**   4:4 10:6
**74,176**   42:2
**77008**   2:16

**8**

**8**   4:4 72:18,19,23
73:19,19,20 79:19
80:12 100:12
**800-0law**   2:5
**85**   3:4

**9**

**9**   4:5 12:16 98:11
98:14
**92101**   2:5,10
**94**   3:5
**975**   103:15
**98**   3:6 4:5
**99**   4:8

**a**

**a.m.**   1:23 5:2 8:1,2
22:10,11 48:17,18
69:6
**abcpdf**   43:13
**ability**   57:15
**able**   57:17 58:21
70:18 101:5,7,12
**absolutely**   39:6
41:14 61:17
**abusing**   21:21
**access**   14:8 81:2
83:12 91:5,6
**accommodate**
17:17
**accountant**   22:17
23:1
**accounting**   16:24
**accrual**   25:11
**accrued**   34:5
**accurate**   99:24
100:4 104:14

**acknowledgment**
106:1
**acquainted**   88:4
**acquire**   56:8
**acquiring**   64:19
**acquisition**   55:25
56:7
**acs**   17:6
**acting**   24:8,9
**action**   103:12
**active**   84:15
**actual**   12:4 25:10
40:21
**ad**   14:25
**add**   18:11 53:14
**additional**   18:19
32:8,22 34:11
35:15 46:9
**address**   30:23
**addresses**   61:25
**affiliated**   49:12
**aforesaid**   103:2
**ag**   58:7,8
**agencies**   11:2
13:25
**agl**   60:4
**ago**   5:16 8:25
66:21 68:19
**agree**   8:10 95:4
96:21
**agreed**   29:22
30:13 31:5 32:4
95:5
**agreeing**   31:6
96:22
**agreement**   24:11
28:19 30:12,13,14
31:1,4,7,13 34:4
96:19,20 97:15
98:1

**agreements**   97:3,5
97:17 98:3
**ahead**   29:6 94:2
**aided**   103:9
**air**   67:15
**ait**   3:15 10:12,21
10:25 11:9 15:4,6
15:7 22:14,21
23:4 24:9 27:17
32:3,4 36:8,22
41:7,17,23,25 42:3
42:4,5,7,13 53:7
53:11 61:16 78:5
98:20,23
**ait's**   41:5
**alive**   27:8
**allow**   8:14
**allowing**   81:2
**ambiguity**   6:6
**ambiguous**   98:3
**amount**   32:6,7,14
32:22 33:20 34:4
35:20 42:6
**analysis**   11:6
21:19 36:10 46:12
54:3,4 86:13,15,22
**analysts**   54:23,24
**analytical**   36:14
37:15
**analytics**   38:7
**angry**   91:9
**announce**   7:18
**answer**   5:25 7:4
8:14 33:12 34:20
70:25 72:11,12
85:13 98:4
**answered**   44:3
**answering**   6:15,16
**answers**   9:18
106:6

**anymore**   80:24
**anyone's**   41:6
**anyway**   51:8
**apc**   2:3
**aplc**   2:8
**apologize**   85:4
**apparently**   32:10
47:19 50:24
**appear**   74:2
**appearing**   7:15,20
7:22
**appears**   12:8 31:2
64:9
**application**   74:19
80:17
**apply**   103:21
**appraisal**   56:23
58:12
**appreciate**   43:24
44:1
**apprised**   97:25
**approached**   23:8
**appropriate**   104:5
**approval**   29:23
**approximately**
29:3 35:19 53:8
53:20 102:4
**april**   1:18 5:2 23:7
29:3 73:10 103:17
**architect**   45:19
**arrangement**
23:16 36:21 37:7
**arranging**   25:3
**arrears**   25:10,11
25:25 27:17,19,22
**arrows**   60:23
**aside**   65:4
**asked**   15:25 25:18
67:9 73:6 82:18
84:1,6 86:24

[asking - called]

**asking** 44:2 81:3
**assembles** 83:7
**assessing** 65:1
**association** 21:9
**assume** 8:19 26:6
  28:25
**attach** 72:21
**attached** 12:7
  97:10 104:10
  106:8
**attachment** 12:12
  12:12
**attend** 10:2
**attention** 63:20
**attorney** 2:3 11:5
  14:16 20:12 21:14
  21:22 24:12 31:17
  31:17 74:5 104:12
**attorneys** 19:9,17
  39:18 43:11 55:18
**august** 30:15,21
  33:16 94:11,24
  96:23 97:13
**authority** 57:14
**automate** 59:3,7
**automated** 58:15
  92:22
**automatic** 60:3
**automatically**
  75:9,11,20
**available** 14:8
  37:9 38:3,11
  53:10 71:16
**avoiding** 81:12
**aware** 5:23 66:2,5

**b**

**b** 2:9 3:8 4:1
**back** 15:3 16:8,18
  18:13,14,18 19:11
  20:9,19 22:12
  24:11 27:16 33:19

**34**:22 36:20 42:17
  52:16 54:20,25
  59:5 65:19 67:4
  67:21 73:2 78:25
  81:5,21 82:19
  88:8 91:6 97:11
  100:12
**background** 9:21
  43:25
**backward** 18:7
**backwards** 59:6
**bad** 95:20
**bankers** 4:7
**bankruptcy** 35:5,7
  35:10,15 66:20
  67:7 69:20 70:5,7
  70:7 73:11
**based** 9:5 31:20
  46:21 48:4 70:19
  78:7
**bases** 44:4
**basic** 60:24 61:20
  62:5
**basically** 17:11
  90:25
**basics** 5:14
**bates** 29:12 44:23
  51:17 69:3 94:7
  98:12
**beach** 2:4 102:11
**beginning** 1:23
  20:20 85:4 96:3
  97:23
**behalf** 7:14,16
**believe** 7:1,2 24:5
  67:6 85:9 97:24
**best** 49:18
**bet** 46:4
**better** 50:19 85:22
**beyond** 1:10 2:11
  7:16 47:5 49:12

**51**:4,10 53:14,15
  53:19 54:8,11
  85:11,21 86:4,19
**beyondreview**
  55:22
**big** 39:14 52:20
  60:7,12 64:1,7,18
  91:18
**bigger** 11:23
**bill** 72:13,16
**bio** 99:21
**bit** 9:20 11:12 15:3
  22:1 36:20 48:20
  52:4
**blanket** 24:12
**board** 88:5,7
**bonnie** 2:3,6 7:14
  52:21 83:4 93:23
  96:6
**born** 5:20
**bottom** 30:8 46:7
  48:24
**bound** 8:10
**break** 48:13
**breaking** 43:24
**brent** 15:8,12,23
  21:3,12,23 23:22
  23:22 24:3,18,22
  24:23 25:3,18,20
  26:2,2,7,8,15 27:2
  27:18,21 28:1,3,7
  28:17 29:20 30:3
  30:21 31:6,10,14
  32:5,9,14,15,17,19
  32:21 33:3,4,25
  35:11,14,25 36:19
  37:6,16 40:2
  42:16 44:10,12
  46:4 49:1 50:14
  50:16,22 51:20
  52:1 54:16,17

**57**:22,23 84:16
  86:9,25 87:1,10
  88:6,7,23 89:15,18
  89:23,25 90:4,10
  90:12,15 91:5,16
  92:3 93:2 95:5
  96:16 97:3,12,14
  97:22 99:1
**brent's** 37:11 46:4
**bring** 13:5
**brother** 91:17
**brought** 15:23
  55:2,5 88:6
**build** 16:5 19:7,8
  19:12 57:10 58:21
  58:21 59:9 60:12
  62:11 71:21 72:9
  72:14 74:4,9
  75:17 83:11
**building** 38:23
  68:1
**built** 19:6 39:1
  40:20
**bulk** 86:14
**bunch** 5:22 44:2
**business** 13:24
  15:23 27:10 58:23
  88:12

**c**

**c** 2:1,15 86:1 103:1
  103:1
**calculated** 34:16
**california** 1:2 2:5
  2:10
**call** 20:1,25 39:18
  61:23 62:4 66:20
  79:24 80:13 84:12
  89:16,21 90:1,3,14
  90:17,22,22
**called** 43:6,12 47:5
  47:14 60:3,20,23

Kramm Court Reporters, A Veritext Company
619-239-0080

[called - contacted]

60:24 67:1 74:7
89:19,20 90:23,25
**calls** 26:19 33:7
34:17 66:7 69:12
**capabilities** 44:6
**capability** 53:14
**capacity** 21:16,24
**carbon** 93:17
**care** 56:11
**carefully** 104:3
**case** 1:3 14:6 15:3
**catch** 25:24
**caught** 25:12
63:20
**cds** 38:17
**cell** 96:11
**certain** 9:8 11:5
**certification**
103:20
**certified** 1:25
**certify** 103:2
106:3
**certifying** 103:23
**cetera** 31:11
**chain** 52:16 58:21
59:6,9,22 68:22
76:16 78:16 93:17
94:12 96:23 97:9
**chaining** 58:16
64:10
**chains** 16:5 19:7,8
19:12 57:10 73:20
73:21,24,25 74:2,4
74:6,7,9,11,14,19
79:17,18 80:16
**change** 80:9 105:4
**changed** 39:21
96:4 99:6
**changes** 102:6,7
104:9 106:7

**characterize** 92:11
**chart** 63:7,8 64:6
**check** 32:15
**chick** 80:16
**chief** 49:7
**choice** 84:20
**circulated** 8:6
**civ.p.45** 3:13
**claimant** 35:15
66:23 67:10
**claimed** 47:9
**clarify** 8:20 39:7
**clarifying** 73:16
**classifying** 16:13
**clean** 56:15 79:13
**cleaned** 68:4
**cleanup** 64:10
**clear** 6:5 8:5 24:4
26:10 33:12 41:24
62:22 75:12 79:15
101:9
**clearly** 8:17
**clerk** 38:12,13
**client** 7:21,23
80:13,14,15 81:21
83:21 100:21,22
101:12
**closed** 38:19
**clue** 56:19
**code** 79:25 80:5,15
82:12 83:12
**collect** 84:16,17
**collected** 85:10
**collecting** 16:16
80:25
**collection** 50:1
52:2 85:18
**collectively** 98:23
**column** 56:24
**come** 14:14 48:10
52:3 88:5 92:21

95:11
**comes** 75:19 91:16
**coming** 21:13
23:17 24:24 25:2
25:24 27:22 89:6
89:10,12
**comment** 64:17
65:6
**commented** 102:8
**commercial** 47:14
**commission** 17:19
106:20
**communicate**
26:14,16
**communicating**
20:13
**communication**
93:6,13
**comp** 29:23
**companies** 11:10
21:9,21 25:25
26:1 41:20
**company** 1:4,9,10
1:11,12,13 10:13
10:15 15:12 17:7
17:20 43:6,7,12
47:5 55:1,11
75:22
**compare** 86:4
**compared** 85:20
86:16,20
**comparing** 86:15
**comparison** 53:12
85:19
**compensation**
96:15
**complete** 100:16
101:6
**completed** 42:8
100:5

**completion** 102:2
**complex** 50:22
**component** 43:5
77:20,21 101:1
**components** 41:10
75:23,24
**comported** 52:7
**computer** 59:5,9
80:6 100:21,22
101:2 103:9
**concern** 25:16
49:5
**concerned** 90:7
**concerning** 22:5
23:9 26:22 27:13
28:11 54:15 67:7
**concluded** 102:22
**conclusions** 53:7
**condition** 9:16
**conditions** 97:19
97:25
**conference** 6:19
**confirm** 28:18
**conflict** 90:6
**confused** 82:25
**conjecture** 46:18
46:21 78:2,7
**connecting** 101:3
**connection** 95:21
**consider** 5:25
36:15 41:6 81:22
83:17
**considered** 82:15
**consolidated**
14:11
**constitute** 40:19
**consult** 11:1
**consultants** 4:5
**contact** 54:9 66:17
**contacted** 73:6

[contacting - deposition]

**contacting**  73:13
**contains**  22:4
**context**  21:5
**continue**  31:19
  81:6
**continued**  4:2 26:4
  54:11
**continuum**  15:22
**contract**  24:13
  28:25
**contracted**  37:3
**contractors**  4:5
**control**  38:13
  78:11 103:22
**controls**  77:18
**controversy**  30:2
  32:8 91:18
**conversation**
  23:13
**conversations**
  26:23 27:3 88:19
  93:12
**cooperative**  56:14
**copied**  97:13
**copies**  17:25
  102:13
**copy**  8:4 12:24
  13:1,5 45:13
  68:21 93:17 97:5
  102:1,5,12,15
**core**  40:15 83:10
**corporation**  10:24
**correct**  8:8 15:4,7
  18:25 19:4 29:4
  73:5 92:6 103:10
  106:5
**corrections**  104:4
  104:6 106:7
**correctly**  103:7
**correlate**  21:18

**correspondence**
  96:23
**cost**  72:8,10
**counsel**  3:14 4:6
  7:7 8:15 102:8
  103:11
**counties**  37:18,25
  38:2,18 71:14
**country**  16:10
**county**  14:7 15:6
  15:18 16:12 17:3
  17:9,10,11 18:3,4
  19:14 24:16 37:23
  38:12,16 52:10
  68:10 71:4,6,8,12
  71:19
**couple**  6:25 19:8
  26:18,19,23 27:4,7
  27:11 85:3 88:18
  98:11
**course**  12:21
  13:24 39:1
**court**  1:1 6:5
  11:14 30:18
  101:25 102:3
  104:15
**cover**  44:4
**covered**  61:9
  86:16
**covering**  85:16
**create**  44:5 62:7
  70:2 83:21
**created**  62:21
**creates**  77:2 79:19
**credentials**  10:8
**creditor**  67:10,10
  67:11,11
**critical**  79:10
**crystal**  43:21,21
  75:1,1

**csr**  103:16
**cto**  49:2,2,7
**current**  48:5 70:19
**custom**  16:24
  64:10
**cut**  85:14
**cutting**  95:16
**cv**  1:4
**czech**  43:6 75:23

**d**

**d**  2:9 3:1 60:21,22
**d.c.**  1:23 5:2
**dah**  54:1,1,1
**dallas**  27:8,9
**data**  3:19 12:23
  14:1,4,9,11,14,23
  15:6 16:4,16 17:4
  17:13,14,20 18:2,3
  18:12,23 19:12,16
  21:18 22:2 29:5
  36:15 37:9 38:2,3
  38:9,17,19 39:2
  40:8,9,20 45:7,19
  46:11 47:11 49:19
  50:2 55:25 56:7,8
  56:10,11,15 64:1,7
  64:10,18,20,21
  66:18 67:2,19
  68:4,8,11,14 69:22
  71:6,7,19,20 80:2
  81:16,19,21,22,23
  82:13,14,16 83:1,3
  83:10,12 84:6,11
  84:18 85:10 91:4
  97:4 100:15,16
**database**  12:24
  14:7,11 17:5,14,15
  17:17,22 19:7,16
  40:16,21 43:3
  52:19 58:16 59:4
  61:11,16,19 62:6,7

62:9,11,13,16,20
  79:7 80:1 83:6
**databases**  78:25
**date**  73:5 100:2
  104:8 106:12
**dated**  3:21 24:11
  30:21 33:16 51:20
  53:8 68:23 69:5
  94:24 103:17
**day**  71:24 95:8,13
  96:14 106:16
**days**  53:25 54:1
  102:4 104:12
**de**  75:14,15
**dealing**  57:11
**december**  33:20
  34:12,15
**decide**  60:12
**decided**  29:6
  35:16 67:15
**decisions**  75:1
**deeds**  18:1
**deemed**  104:14
**defendant**  2:16
**defendants**  1:15
**defining**  44:5
**definitions**  62:1
**delaware**  1:4
**delete**  81:20 82:21
  82:22
**deleted**  82:20
**deliver**  50:4,4,5
**delivers**  46:10
**dell**  73:19
**denver**  87:9
**deponent**  96:6
  103:4,6 106:1
**deposing**  104:11
**deposition**  1:21
  3:11 5:15 6:9 7:12
  11:16 13:17 22:23

Page 5

[deposition - ensource]

29:9 44:25 51:15
68:24 72:23 98:14
99:11 102:2,22
103:9 104:3,10,13
104:14
**describe**   49:19
87:20
**description**   3:9
4:3 77:11
**descriptions**   61:25
61:25
**design**   39:15 62:15
**designed**   74:21
88:2
**designer**   38:20
**designing**   39:7
**details**   47:20
**develop**   11:1
**developed**   46:8
59:2
**developer**   45:19
**development**
38:21 39:8 42:24
43:3 68:3
**devexpress**   43:6
75:22
**diagram**   59:13
**diego**   2:5,10
**difference**   9:1,12
**different**   16:9,23
39:16 41:19,20
57:14 68:12 91:13
95:21
**differently**   16:11
16:15
**diligence**   4:8
**dinner**   95:7,12
96:13
**direct**   28:24
103:22

**direction**   37:11
**directly**   25:2
37:16 93:15
**director**   15:15
**discard**   14:19
81:16
**discarded**   12:22
13:21
**discovered**   88:23
**discovery**   4:9 11:3
72:15
**discrepancy**   52:20
**discuss**   67:19
**discussed**   95:8
96:15
**discussion**   27:16
**discussions**   32:20
35:13 97:22
**district**   1:1,2
16:25 56:23 58:12
**districts**   37:23
**divide**   60:8,9
**divided**   99:5
**dll**   77:20
**doc**   76:7,9
**document**   16:13
17:22 18:11 20:10
23:7 25:7 29:12
39:25 45:12 46:3
48:25 49:20 51:23
51:25 52:22 53:8
58:18 59:5 63:10
63:14,19 64:13
71:20 86:18,19
94:19 98:17
**documentation**
21:19 39:15
**documents**   12:18
13:1 16:6,16,20
18:6,13,20 20:5
36:13 39:12,20

44:23 47:12 49:25
50:6 52:7,8,14
59:23 61:22,23
62:2 83:4,7 86:17
97:8
**dog**   9:10
**doherty**   97:13
**doing**   6:23 17:2
26:10 37:8,8
40:16 62:15 66:14
72:2,13 74:4 90:5
104:7
**dollars**   43:7
**double**   80:16
81:12
**doubt**   63:10
**download**   47:17
84:17
**dozen**   41:19
**drafted**   46:3
**draw**   78:18 79:2
80:3,5 100:23
**drawing**   76:21
**draws**   61:1
**drive**   3:14 4:4
13:14 22:3 40:22
40:23 69:7 72:20
81:24 97:10
**due**   4:8
**duly**   5:6 103:4
**duplication**   85:8
**duplicative**   85:5
**duties**   102:1

**e**

**e**   2:1,1 3:1,8,17,21
3:23 4:1,9 10:20
11:3 12:25 13:2
20:6 23:11 25:3
29:14,15 30:20,23
31:9 32:1,17,24
33:15 34:23 36:21

51:20 52:1,23
54:25 60:21,22
68:22,22 69:4
85:17,18 86:1,16
86:24 89:9 93:16
93:16,18 94:11,12
94:23 95:2 96:22
97:9,10,11,14
103:1,1 105:2
**earlier**   35:23
49:17 54:13 85:16
87:2 92:4
**early**   66:17 73:7,9
87:19
**easier**   48:9 59:3
92:23
**east**   2:15
**easy**   72:12
**edge**   60:25
**edges**   60:24
**ediscovery**   72:15
**edit**   80:8 100:23
**education**   9:21
**effect**   6:20 71:11
**either**   42:16 51:4
76:13 87:19 93:15
**electronic**   16:19
72:15
**electronically**
102:5
**embedded**   77:21
**embedding**   77:10
**employment**   10:11
**ended**   35:4 69:19
69:20
**engel**   2:8
**engine**   1:12 2:12
7:16 53:10,10
**english**   75:16
**ensource**   1:3 3:10

[entire - formats]

**entire** 90:14
**entirely** 38:12
**entry** 18:23
**environment** 6:19
  42:25 43:3
**equity** 96:15
**errata** 104:5,7,9
  104:11 106:9
**errors** 19:4
**es** 75:14,15
**esq** 2:9
**estimate** 8:25 9:2
  9:2,5,8 70:14,18
  71:1 78:10
**et** 31:11
**evaluate** 17:2 19:3
**evaluated** 52:3
**evaluating** 38:9
  50:25
**evaluation** 51:10
  53:17 54:7
**event** 81:22
**events** 8:24
**evidence** 66:8
**exactly** 53:13
  60:13
**examination** 5:9
  85:1 94:5 98:9
**examined** 5:7
**examiner** 58:25
**example** 9:6 11:4
  14:6 39:17 43:10
  60:4 85:17 86:23
**excel** 52:12
**excludes** 4:6
**excuse** 93:23
**excused** 102:21
**executable** 40:24
  74:12,13 100:18
**exhibit** 3:10,14,15
  3:17,19,21,23 4:4

4:5,8 11:14,16
  12:3 13:16,17
  22:22,23 29:9,11
  29:16 33:19,22
  36:21 42:1 44:23
  44:25 48:21 51:14
  51:15,18 52:22
  54:20 61:14 63:6
  65:4 68:21,24
  69:2 72:18,19,23
  73:19,19,20 76:23
  78:1,23 79:19,20
  80:4,12 83:25
  84:3,7 94:8,10,16
  97:11 98:11,14
  99:10,11,14 100:1
  100:12
**exhibits** 98:11
**exist** 58:12,16
**existing** 12:20
  38:25
**exists** 79:8
**expanded** 17:16
**expert** 19:21 55:17
**expertise** 4:9
**expires** 106:20
**explain** 10:25
  33:22 37:12 49:15
  52:4 59:19 90:4
**explained** 14:25
  36:4
**export** 43:14
**exported** 43:12
**extent** 38:23 68:16
**extra** 33:1
**extract** 17:4 18:19
  19:15 47:10,11
  52:14 68:10
**extracted** 18:24
  50:2 52:17

**extracting** 49:19
**extraction** 68:8
  86:15

**f**

**f** 103:1
**facade** 100:18
**fact** 24:13 64:5
  84:11 89:5 91:4
**facts** 66:7
**fail** 104:13
**familiar** 20:22
**family** 91:18
**far** 14:7 16:18
  18:18 24:14 50:18
  53:6 54:8 63:19
  100:15
**fast** 72:22 101:22
**feasible** 16:3
**feature** 56:23
**features** 58:12
**february** 23:13,14
  34:25
**fed** 3:12
**fed.r.civ.p.30** 3:12
**feed** 60:19,24
**feeling** 39:13
**fiefdom** 37:24
**figure** 28:15
**file** 35:14 52:12,25
  79:18 84:12
**filed** 70:8 73:11
**files** 17:14 73:22
**fill** 60:25
**final** 101:17
**finally** 18:15 50:9
  52:3 53:23 54:2
**financial** 97:25
**financing** 34:6,11
  35:24,25
**find** 12:22,25
  18:11 20:10 32:21

32:25 37:9 38:3
  68:21 74:6
**fine** 12:10 62:23
  95:6 96:3,25
**finish** 14:18 30:18
**finished** 94:1
**fire** 41:3
**firm** 72:14,14
**firms** 11:3 14:1,15
**first** 5:6,14,24
  23:7,8,10,12,17,17
  23:19 24:5 34:10
  36:9 45:5 63:11
  65:11 69:4 88:22
  89:22 95:11
**five** 23:19 24:5
  48:13 58:6
**flash** 4:4 72:20
**flat** 76:6,10
**flex** 55:21,23
  56:17
**focus** 63:24
**folder** 53:2,3,3
  73:20,21 74:14
**folders** 75:6
**follow** 93:22 95:13
  96:14 101:18
**follows** 5:7 29:23
**force** 6:20
**foregoing** 103:20
  106:4
**foreign** 19:22
**form** 106:8
**formal** 28:19
  36:13,16 39:12,24
  55:11 63:14
**formally** 81:23
**format** 14:2 39:20
  39:23
**formats** 17:15

Kramm Court Reporters, A Veritext Company
619-239-0080

[formed - honest]

**formed** 10:22
15:19
**forth** 12:22 14:12
14:16 20:9 32:5
40:20
**forward** 96:14,22
**forwarded** 68:22
**found** 21:5 51:7
**four** 58:1,2,6 72:5
75:13
**fracking** 37:20
**frame** 23:14
**frankly** 14:22
**free** 47:16 50:7,11
50:18
**friends** 46:2
**front** 6:21 12:9
**ftp** 84:12,12 91:6
**fully** 101:4
**functioning** 101:4
**fundamental**
58:20,23
**funds** 35:16
**furnished** 97:5,6
97:17
**further** 34:15
65:19 98:6,9
**fusion** 4:8
**future** 31:1

**g**

**gap** 25:9
**gas** 19:21
**gather** 23:1
**gathering** 36:10
**general** 11:5 14:16
21:15,22 24:10,12
41:8 55:14,14
64:17 71:16 74:5
74:8
**generalization**
55:13

**generally** 76:13
**german** 75:16
**getting** 14:17 33:1
36:24 50:15 54:1
83:2 90:12
**girlfriend** 88:16
**gis** 54:23,23 55:3,8
55:9
**give** 13:7 39:24
40:25 41:2 43:15
80:10 82:19 83:10
83:11,12 101:1
**given** 63:11 83:1
85:18 103:10
106:6
**giving** 9:17
**go** 5:14 12:13
14:24 16:18 18:13
19:11,11,15 20:19
22:2,9,12 25:25
27:9,10,11 34:22
35:17 36:20 39:14
45:10 46:6 47:17
49:23 54:25 56:20
62:16,17 63:5
65:19 72:22 94:2
94:2,3 95:21
96:14 101:21
**goes** 16:22 59:1
83:6
**going** 5:14 6:13,14
11:13 13:15 14:24
16:8 27:16 28:5
29:11 36:5 42:17
44:2 48:13,23
50:15 51:3 54:20
56:12 66:23 67:9
68:20 72:17,18,20
73:18 78:6 84:10
94:21 95:17 97:11
98:10,11 99:1,9

100:11
**good** 5:11,12 6:23
17:3 26:3,5,9 28:5
34:6 46:4 56:14
84:21
**google** 47:15,15
50:6,11 53:11
77:16 85:19,20,22
85:23 86:18
**government** 11:2
**grantees** 61:24
**grantors** 61:24
**graph** 59:20,22
60:1,4,14,23 61:1
61:5 65:11 100:23
100:24
**graphic** 80:8
**graphs** 78:18
**great** 39:19
**grid** 76:6,9,10,11
**group** 1:9,13 2:12
7:17 47:19 55:22
56:18
**guess** 8:24 9:2,3
27:18 37:18,19
42:20 44:13,22
55:20 71:2 72:7
82:25 89:13 96:6
**guts** 40:12,15
78:24 79:3,24
82:24,25 83:2,8
**guy** 46:5 55:1
66:20
**guys** 67:21 84:16
96:25 101:18

**h**

**h** 1:4 3:8 4:1
**half** 41:19
**handed** 13:12
**handful** 27:3

**handle** 17:18
**handwriting**
18:17
**happen** 56:14
**happened** 25:22
87:12 96:9
**hard** 3:14 13:1,14
81:24 85:6 91:11
97:10 100:22
**harvesting** 64:19
**haynes** 1:21 3:2,12
5:5,11 13:12
45:17,25 63:12
69:5 73:4 94:18
99:4 100:9 102:4
102:7,9 106:3
**he'll** 102:6
**head** 46:14
**hear** 7:9 95:15
96:3,5,7,8
**heard** 67:4,21 92:3
**hearing** 85:6
**hearsay** 28:2
**help** 27:22 36:7
56:12 59:2 74:9
**helped** 21:19
**helping** 21:18
**hesitating** 28:2
**hey** 26:3 28:4
39:19 70:2 91:2
**hi** 6:8
**highest** 9:21
**hill** 2:8
**hire** 72:14 87:23
88:2
**hispanic** 55:6
**history** 16:22,22
**hitting** 18:15
**honest** 27:25
45:14

Page 8

[honestly - kin]

honestly   26:13
  49:22 83:17
hop   27:10
hopefully   85:7
hopewell   3:16
  15:19 20:22 21:1
  21:2,13 22:22
  23:9 24:16 27:13
  37:3 66:15 70:21
  93:7
hour   72:16
hours   71:22
house   60:12
houses   60:9
houston   2:16
  15:11 19:18 27:7
  27:9,12 44:17
  49:21 87:7 95:14
huge   35:20
huh   12:15 22:7
  29:17,25 38:8
  44:15 45:6,9,11,18
  51:22 56:21 60:6
  65:25 69:11 80:18
  98:21 99:17
  100:13 101:11,14
huhs   6:1
hundred   20:7
  43:16
hung   91:7,8

**i**

idea   9:10 32:11
  48:7 54:12 55:24
  70:22 92:22,25
ideas   92:21
identification
  11:17 13:18 22:24
  29:10 45:1 51:16
  68:25 72:24 98:15
  99:12

identified   94:9
identify   92:23
image   1:11 7:16
images   16:19
  17:23 18:10 19:16
  38:17 39:22 49:20
  49:20 52:9 53:8
  71:20
imagine   2:12
immediately   31:9
  31:13
imminent   35:11
impact   48:6
imperative   104:10
import   19:15
  39:22 40:8,9
importance   58:18
important   83:18
imported   17:15
impressed   49:22
  85:10
impression   89:1
  89:23 90:2
improvement
  46:10 48:2
inaccurate   19:1
inaudible   96:1
includes   99:4,15
including   64:20
incorporated
  17:21
index   16:14 18:4
indexes   16:14
indexing   64:10
indicated   70:4
  103:4
indicating   13:10
  17:25 61:13 76:5
  78:21 82:23 84:2
individual   1:8,8

influence   9:16
informal   6:19
information   13:5
  13:21 18:19 22:4
  22:5,18 23:2
  60:25,25 68:10
  91:12,14,22
initial   33:21 72:3
  98:22
initiated   89:18
instructions   104:1
integrate   57:16
integrated   56:22
  58:11
intellectual   41:5
intensive   20:6
interest   90:6
interested   15:25
  24:19 37:19 59:24
  66:22 103:12
interesting   32:20
internally   35:14
internet   47:17
  101:3
interrupt   6:24
intricacies   44:1
introduced   47:4
introductions   7:11
investigations
  3:19 45:8 46:11
investing   47:19
investment   4:7
  27:22
investments   1:3
  3:10
investor   93:7
investors   66:4
involved   11:6 19:5
  27:25 92:19
involvement   92:11

issue   27:19
issues   46:2 57:12
  95:25

**j**

j   1:24 103:16
ja   75:15
january   53:9
  97:23
japanese   75:16
jbhaynes   30:23
jennifer   20:14
  55:20
jerry   6:7,8 7:24
job   6:23 85:22
joe   29:20 39:19
  45:17,25 63:12,14
  63:23 99:4 100:8
john   47:1,2,3,4
  49:11,13 50:9,16
  50:23 51:1,4 52:3
  54:14
johns   6:7 7:24
joseph   1:21 3:2,11
  5:5 45:23 63:12
  69:5 106:3
judge   6:21
july   3:20 25:8
june   53:9

**k**

keep   44:2 57:21
  73:24 83:14 84:10
  90:9 91:2 102:1
  102:11
kept   26:2 50:3
  53:25 54:1 69:22
  82:24 90:8 96:24
  97:24
key   56:10
kin   103:11

Page 9

[kind - madison]

**kind**   17:4 67:14
  79:10 81:15 86:14
**kinds**   16:21
**knew**   28:7 32:18
**know**   7:2,12 9:8,9
  13:2 14:8,20
  15:22 16:18,19
  19:17,25,25 20:3,3
  20:4,5,10 21:4,12
  22:4 23:24 24:14
  25:15 26:20,21
  28:1,3,5,13,14,15
  28:16,22,25 29:1
  30:10 31:18 33:4
  33:11,16 34:15,20
  34:21 35:9,18
  36:17 37:2,4,7,17
  37:23 40:3,25
  41:15 42:6 43:13
  43:15 44:1,1,9,18
  45:13,19 46:3,12
  47:20 49:23 50:13
  50:14 52:22 54:8
  54:10,15,23 55:10
  55:16,22 57:1,6,17
  57:25 59:4 61:5
  62:1,16,17,23
  63:19 64:8,11,15
  64:24,25,25 66:10
  67:21 68:1,5
  69:21 70:10,24
  71:1,15,17 72:1,8
  72:11 74:11 75:6
  76:22 78:10,11
  80:19 84:12 86:17
  88:24 89:1,2,5,7
  89:13,24 90:6,10
  90:11,12,20 91:1,2
  91:10,10,18 93:4
  93:17 96:4,9
  101:8 102:7

**knowledge**   9:6
  28:9,13 33:13
  70:20 91:25 92:2
**knox**   72:20

**l**

**l**   63:2 98:12
**labels**   80:9
**ladies**   55:19
**land**   11:6,7 14:9
  18:1 19:25 57:11
  57:15 58:20,21
  62:5
**language**   75:9
**laptop**   100:14,15
**large**   22:3 64:20
**larger**   12:8
**lasted**   88:9
**late**   26:1
**laurie**   20:15 55:20
**law**   2:3,3 11:3
  13:25 14:15 72:14
  91:17 102:10
**lawsuit**   12:4 51:3
  51:6 54:14,15,18
**laying**   91:2
**layout**   60:4 62:14
**lays**   61:1
**lead**   15:9 56:1,6
**leading**   64:23
**leases**   18:1 59:24
**led**   33:6
**leesburg**   10:12
**left**   40:12
**legal**   1:22 4:6
  55:15 61:24
**length**   9:6
**level**   9:21
**lewin**   2:8
**liability**   1:4,9,10
  1:11,12,13

**library**   43:5
**license**   43:4,12,14
  43:22
**licensed**   46:9 60:3
  60:19 75:2 77:5
**licenses**   10:7 41:9
  41:15,17,18,19
  42:18,19 43:2
**lien**   21:20,21
**liens**   57:13 74:6
**lieu**   102:14
**limit**   9:17
**limited**   1:4,9,10,11
  1:12,13
**line**   6:25 7:24 25:8
  105:4
**link**   77:10
**list**   42:18 43:15
  46:19
**listed**   23:7 44:18
  46:25
**little**   9:20 11:12
  15:3 22:1 36:20
  37:23 48:20 52:4
  59:3 60:8 68:8
  77:25 87:21
**llc**   1:3,9,10,11,12
  1:13 2:12,12,12
  3:15 4:5 10:12
  22:21 98:20
**llc's**   3:10
**loaded**   68:14
**local**   37:25 80:10
  80:12
**log**   65:16
**logic**   74:25,25
**logix**   21:24 28:23
  31:23 56:3 98:20
  98:23 99:14
**long**   5:18 10:21
  18:12 21:8 33:13

**66:21 77:24 88:9
look**   11:22 12:2,18
  14:4,14 18:24
  19:3 20:3,4 29:5
  29:14,19 34:23
  45:16 50:14 51:19
  67:2 69:16 71:9
  73:21 75:19 89:9
  95:1 98:13 99:21
  100:16
**looked**   12:20 23:3
  30:4
**looking**   11:21
  19:22 21:20,22
  23:6 25:7 28:5
  30:16 33:19 37:19
  42:1 78:22 79:18
  100:12
**looks**   11:23 23:6
  29:2 30:22 32:1
  34:2,9 57:24,25
  59:1 64:12 99:16
**lose**   14:21
**lot**   13:23 17:22
  18:2 19:5,21 20:2
  21:18 22:4 28:13
  37:15,16 38:18
  39:12 50:17 68:7
  71:14 74:2,3 85:6
**lots**   60:8
**low**   35:16

**m**

**ma'am**   58:14
  91:15
**machine**   14:10
  103:7
**machines**   14:10
**madison**   14:7 15:6
  15:18 16:12 17:3
  17:9,10,11 19:14
  24:16 38:16 50:1

[madison - moving]

52:8,9,10 53:8
56:15 68:9 71:9
71:11,18
**magic**  49:19
**mail**  3:17,21,23
13:2 29:14 30:20
30:23 31:9 32:1
32:17,24 36:21
51:20 52:1,23
68:22,22 69:4
86:16,24 89:9
93:16,16,18 94:11
94:12,23 95:2
96:22 97:9,10,11
97:14
**mails**  12:25 20:6
23:11 25:3 29:15
33:15 34:23 54:25
85:17,18
**making**  33:12
**man**  71:22
**managed**  90:9
**management**  1:8
49:1 81:19 92:5,8
**managing**  15:14
**manual**  18:22 19:5
20:6 48:6
**map**  14:11
**mapping**  17:20
55:2,3,9 92:22
**march**  23:11,14
73:10 97:23
**marginal**  62:4
**mark**  1:8 2:11
7:16 11:13,14
13:10,15 22:22
26:16,17,18,21
27:3,24 29:11,20
32:2 37:19 44:13
44:14,22 50:23,25
51:3,17 54:14

55:2,5 68:20
72:17,18 87:3
88:7,14,19,25,25
89:2,4,6,15,17,19
89:19,20,23 90:1,9
90:10,20,22 91:11
91:16,19,20 93:3
94:24 97:12 98:10
98:11 99:9
**mark's**  87:8
**marked**  11:16
13:17 22:23 29:9
44:25 51:15 68:24
72:23 98:14 99:11
**marketing**  44:5,8
44:19 46:4 64:13
92:15
**martin**  1:24 47:2,3
47:4 49:11,13
50:10,17,23 51:1,4
52:3 54:14 85:25
95:15 103:16
**martin's**  47:1
**massachusetts**
60:5
**master's**  9:22,23
9:25 10:5,8
**mathematics**  9:24
**matter**  55:17
**mcknight**  2:3 3:3
3:6 5:10 6:8 7:8
7:10,13,14,18,21
7:24 8:3 11:12,20
12:1,6 13:11,15,19
22:9,12,16,20,25
29:8,11,18 33:10
34:19 44:22 45:2
46:22 48:12,16,19
51:13,17 52:24
53:2,5 57:8 59:12
59:15 63:22 65:3

66:11 68:20 69:1
69:14 72:17 73:2
78:8 83:4 84:21
87:24 93:21,24
94:2,13,16 95:16
95:20,24 96:2,8
98:2,10,16 99:9,13
100:3 101:17,21
101:25 102:18,20
**mean**  20:21,25
35:11 38:6 39:14
39:17 41:8,23,25
42:12 48:9 62:15
64:11 66:15 67:10
69:21 76:3,3
86:25 87:18 92:20
**meaningful**  14:5
**means**  7:3 30:1
36:12 49:7 64:2
64:24 103:22
**meant**  20:4 56:5
**meet**  27:11
**meeting**  87:6,11
87:12,21,22,23
88:2,4,9,10,15
93:12 95:7,13,13
96:13,14
**meetings**  27:4
**memorandum**
30:14 31:1,3,13
**mental**  9:15
**mention**  27:21
**mentioned**  6:14
8:13 13:20 31:20
31:22 37:22 49:17
54:13 67:22 77:6
90:21 91:5
**merged**  60:11
**merit**  1:24
**message**  97:16

**met**  9:11 26:17,18
27:4 29:20 55:5
87:2
**methods**  46:11
**microsoft**  41:9,18
42:25 43:4,5 60:2
60:3 63:2 75:8,11
75:20 76:20,24
77:5,12
**microsoft's**  43:3
**middle**  51:6 63:6
64:6
**middleware**  70:1
**milo**  9:10,11
**mine**  81:22 82:16
**mineral**  3:19 45:7
**mining**  3:19 21:20
45:7
**minute**  48:13
**missed**  25:13,14
**missing**  25:15
102:16
**monday**  1:18 5:2
**money**  25:19
27:23 28:5 32:15
33:1 34:1 42:6,16
50:17
**month**  19:13
31:10 32:3,11
36:23 68:8,15
72:1 89:10
**monthly**  32:6
**months**  50:3 53:24
69:17 90:24
**morning**  5:11,12
**mortgages**  18:1
**mother**  27:7
**move**  14:20 29:6
80:9
**moving**  18:7

**[msagl - okay]**

**msagl** 76:25 77:1
**msgl** 76:24

**n**

**n** 2:1 3:1 60:21,22
**n.w.** 1:22
**name** 10:17 45:25
46:19,25 52:21
55:6,11 66:23
74:2 80:17,19
81:7
**names** 20:13,15,18
**nancy** 1:24 103:16
**nauseam** 14:25
**necessarily** 41:7
**necessary** 104:4
**need** 28:17 83:20
98:25
**needed** 18:2,19
**needs** 62:16,17
**negative** 81:13
**negotiated** 90:7
95:9 96:16
**negotiations** 95:10
**neither** 103:11
**net** 3:15 22:14,21
42:15
**network** 76:22
**never** 9:11 26:10
30:13 31:5 40:12
67:4,18,21 82:15
89:19,19 92:24
100:8
**new** 19:13
**nice** 61:1,3
**night** 29:20 88:10
**node** 60:22,24
**nodes** 60:20,21
**nods** 46:14
**non** 3:11
**nonsense** 31:19
65:16 96:20 97:1

**normal** 13:24 39:1
81:14,18
**normally** 14:19
58:25 62:11 72:13
72:16 81:20
**notarized** 8:4
**notary** 8:3 106:23
**noted** 104:9 106:8
**notes** 93:22
**notice** 3:10 35:5
103:3
**notification** 35:12
**notified** 102:4
**notify** 35:9
**november** 3:21
34:8 51:21 54:10
68:23 69:5,8
**number** 3:9 4:3
48:21,21
**numbered** 29:12
98:12
**numbers** 42:15

**o**

**o** 60:21,22
**oath** 6:15,16
**object** 46:20 57:4
77:10 78:7
**objected** 31:14
66:10
**objection** 33:7
34:17 57:4 63:21
64:23 66:7 69:12
98:2
**objectionable**
64:12
**objections** 7:2
8:15 28:11
**objects** 33:11
**observe** 33:15
**observed** 52:7

**obtained** 34:6
**obviously** 22:2
**occasionally** 26:1
**occurred** 8:24
14:12 53:20
**ocr** 18:9,24,25
20:5 47:9,10
49:19 50:7 53:10
77:14,16 85:19,20
85:21
**ocrd** 53:8
**ocred** 52:6
**offer** 81:21,25
84:6
**offered** 82:11
**office** 21:7 40:13
44:15,16 51:2
87:8
**officer** 49:8
**offices** 1:21 16:10
**official** 35:12
**officials** 37:25
**oh** 7:13 11:11
53:25 62:23 82:1
82:24 86:14 99:23
100:10
**ohio** 37:17
**oil** 19:21 20:1
37:20 59:24
**okay** 5:19 6:4,13
6:23 7:6,25 8:3,13
8:15,16,17 9:1,14
9:14,20,23 10:4,7
10:10,13,17,23
11:9,12 12:9,11
13:3,9,11,15,20
14:24 15:10,12,16
15:21,24 16:7,17
17:1,8,12,24 18:5
18:8,21 19:2,10,20
19:24 20:8,16,19

21:1,10,12,16,23
22:1,12,20 23:6,15
24:2,4,17 25:1,5,7
25:13,17,25 26:4,5
26:12,14,25 27:16
28:10,18 29:2,8
30:11 31:12,16
32:12,16,21,25
33:9,18 34:2,8,14
34:24 35:3,9,21,23
36:3,8,17,20 37:2
37:5,12 38:6,15,20
38:24 39:4,11
40:1,7,11,18 41:1
41:4,15,22 42:1,6
42:11,14,17 43:1
43:17,19,22 44:9
44:11,16,18 45:16
45:22,24 46:6
47:2,7 48:4,8,12
48:16,20 49:15
50:12,20 51:9,13
51:19 52:4,6,11,16
53:6,18 54:7,13,20
55:4,7,10,15,18
56:9,13,17 57:9,18
58:9,11,15,24
59:18,21,25 60:15
60:17 61:2,5,8,16
61:18,21 62:3,7
63:1,5,9,15,18
64:4,6,14,16 65:4
65:9,15 66:2,12
67:5,12,17,22
68:16,20 69:8
70:9,13,18,23,25
71:3,5,7,13,21,25
72:3,6,17 73:13,16
73:24 74:10,16,20
74:23 75:4,10,21
76:15,18 77:4,7,13

Kramm Court Reporters, A Veritext Company
619-239-0080

[okay - plaintiff's]

**p**

77:18,22 78:3,19
79:12 80:7,14
81:1,7,12,14,18
82:14,17,20,24
83:9,14,16,22,25
84:9,14,21 85:3
87:2 88:13 89:21
91:12 92:4 93:11
93:19 94:7,16
95:19 96:10,21
97:20 98:6,10,19
99:3,6,23 100:7,11
100:20,25
**old** 18:14
**older** 52:14
**once** 25:22 26:18
34:5 67:1 87:3,5
**ones** 13:8 75:10
**open** 38:17 81:15
**opinion** 48:4
**opportunities**
37:20
**opposing** 8:15
**order** 8:5,8,11
18:20 43:2 80:3
**original** 102:1,10
102:12,14,15
104:11
**outcome** 90:17,19
103:13
**outlining** 44:6
**output** 86:4
**outside** 4:6
**owed** 27:17 35:18
**owned** 10:21
42:19
**owner** 47:4
**ownership** 52:17
58:22,22
**owns** 41:15

**p** 1:7 2:1,1,14
**p.m.** 72:25 73:1
101:23,24 102:22
**page** 3:1,9,16 4:3,7
12:13,13,16 29:19
30:5,9 45:10 46:6
47:25 48:24,25
54:21,21 56:20
63:5,24 65:13
69:4,25 80:10
99:15,15 100:19
100:23 101:3
105:4
**pages** 3:13,18,20
3:22,24 4:9 12:9
45:3 51:19 106:4
**paid** 23:20 25:22
32:10,10,19,22
33:1 36:24,24
42:2,7 50:17
88:24 89:3,4
90:11,13
**paint** 79:14
**paints** 77:25
**panakos** 2:3
102:10,11
**panakoslaw.com**
2:6
**papers** 35:13
**paragraph** 46:7
48:1
**parcel** 60:7,9
**parcels** 60:5,9,10
60:10,11 92:24
**part** 16:1,4 42:15
64:6 66:3 70:7
75:17 78:2 87:25
**parted** 33:5
**participating** 7:12
16:1 92:15

**participation**
96:15
**particular** 60:1
83:24
**particularly** 61:4
**parties** 8:7 102:8
**party** 3:11 28:24
41:8,17 42:18
43:19 103:12
**pass** 96:6
**passed** 81:4
**password** 80:17
80:19 81:3,4,8
**pat** 97:13
**patch** 20:2
**path** 49:24 50:16
**pause** 7:3 8:14
22:8
**pay** 27:22 90:15
90:18
**paying** 23:16 26:1
87:18
**payment** 23:7,15
25:10,13 30:4,10
31:10 33:20 34:10
34:24,25 36:21
89:5 98:22 99:6
**payments** 3:15
22:5,14,21 23:17
23:19 24:5,21,24
25:5,14,15 27:17
29:7 33:21,24
34:7,8 89:10 90:8
**pdf** 39:20,22
**pdfs** 43:11
**pdp** 1:8
**pennsylvania**
37:18
**people** 7:1 14:13
21:8,21 27:1
28:11 60:12 61:23

71:8 74:9 83:12
**percent** 27:2
**perception** 91:8
91:20
**perform** 86:10
**performed** 70:20
**period** 14:12 19:6
22:15 24:14 25:24
51:9
**permitting** 56:22
58:12
**perplexed** 46:16
46:17
**person** 89:22
93:12
**personal** 9:6 28:9
28:12 33:13 91:25
92:2
**personally** 86:3
89:8
**pertains** 15:2
**phone** 7:22 26:19
28:4 37:17,24
88:19 89:1 90:14
90:21 93:11 96:11
**physical** 9:15
**pick** 45:21
**picked** 45:20
86:17
**picture** 61:3 99:22
**pictures** 62:12,13
**piece** 40:24
**pilot** 16:2,3 20:22
21:1,2,13 23:9
27:13 66:15 70:21
**place** 10:10 100:19
103:4
**plaintiff** 1:5 2:6
3:10 7:14 94:13
**plaintiff's** 94:8

[planning - questions]

planning 87:22 92:19
please 6:24 8:13 94:19 102:7 104:3 104:7
pltf 3:20 44:23
point 29:5 30:2 37:7 65:9 67:14 87:15 91:15 98:25 100:4
pointed 52:18
popular 63:3
populate 19:16
portal 14:2,13 18:23 19:12 38:23 39:1,8,22 40:5,9 41:4,11 43:15 59:11,14,16 61:7 65:7,17 66:2 69:10,17 70:6 71:22 72:3,9,15 78:20,22 79:19 80:22 83:11,12,13 84:1,7
portion 99:24
possessed 101:10
possible 37:20 38:4,4
possibly 33:6
potential 93:7
powered 55:21 56:17
practice 81:19
preceding 31:9
predated 97:16
predates 60:16
preliminary 53:7
present 10:10 39:2 39:17
presentation 49:21 53:19 56:10

66:4 74:25
presented 54:3
presenting 71:7,18
presume 31:23
pretty 10:22 57:19 79:13 82:5 92:20
prevent 9:17
previous 31:7 59:5 62:2 66:1 81:16
previously 36:4 63:20
printout 99:15
prior 21:12
pro 2:16
probably 5:22 14:24 36:19 41:19 44:12,12 55:19 61:7 63:3,16 69:7 72:5 82:15 84:8 91:5
probate 56:23 57:12 58:12
problem 16:9 32:17
procedure 68:14
proceedings 22:8
process 14:17 16:5 18:9,10,12,22,24 19:5,15 21:22 47:11,18 48:6 53:11 75:17 87:19
processing 38:2 64:1,7 85:12,15
produce 38:17 41:10 50:2 62:12 97:7
produced 21:18 61:7
produces 75:3
product 47:14 49:17 50:7,7,11,19

58:13 60:2,3,19 66:3 71:7 75:2 77:5,16
production 12:14 56:22 58:11
products 41:9
program 47:9 69:25 74:7,12,24 75:25 76:4 78:16 80:11,12 85:23,25 86:4,19 87:13
programs 68:9 76:1 91:1 92:23
project 15:9 20:21 20:21,22,25 21:1,2 21:5,6,13,15 23:9 27:14 39:5 41:13 47:9 56:1,6 58:5,7 58:8 66:15 69:19 69:20 70:21 71:4 78:13 83:11,24 84:19 87:14
projects 68:6 75:25 78:15 81:15
promise 50:4,4
promised 31:2
promising 50:3
property 41:5 57:13
proposed 31:8
propounded 106:7
proprietary 41:7 46:8 48:1,3 61:4 83:18
proprietor 47:5
protective 8:4,8,11
protocol 84:13
provide 9:8 14:2 16:4 31:20 36:10 42:18 43:14 86:7 86:21

provided 14:13 18:23 22:2,5 31:4 38:2 40:18 52:12 61:6 72:19 98:23
provider 17:6 92:12,13
providing 30:25
public 11:1,3,6,8 14:9 106:23
pull 52:18 68:11 94:21
pulled 12:24 14:9 22:17 73:19 84:18
pulling 39:16 71:6
purported 47:8 49:18 53:15
pursuant 3:12 103:3
pushed 54:1
put 19:16 33:25 36:19 46:1 63:12 81:24
puts 75:8,11
putting 41:21

**q**

quality 16:20 18:13
queries 17:16 78:25 80:1 101:10
query 40:22 83:6 83:9
question 8:18,20 30:19 33:13 36:9 63:25 85:13 95:4 95:12,17,19 97:21 100:11,14 101:17
questions 5:22 6:14,16 7:4 8:14 9:18 36:6 44:3 48:24 84:22 85:3 93:19,22,25 98:7

[questions - repositories]

106:6
**quickbooks**  23:3
**quickly**  48:13
  79:14
**quote**  70:11,13
**quotes**  64:7

**r**

**r**  2:1 3:12 10:20
  86:1 103:1 105:2
  105:2
**railroad**  17:19
**raise**  8:15 25:19
  28:11
**raised**  28:12
**raising**  7:2 27:23
  28:4
**ran**  18:10
**range**  43:16
**rare**  56:16
**raw**  18:10
**reached**  67:6 69:9
**read**  8:8 64:5,8
  104:3 106:4
**real**  64:17
**realize**  32:9 89:1,2
**really**  6:23 16:4
  17:11 19:19 28:17
  36:7 39:19 43:25
  45:15 48:13 63:13
  72:22 77:11 78:10
  90:7 95:20 101:22
**reason**  9:14 12:8
  28:2 33:22 63:16
  104:5
**reasons**  33:4
**rebuilding**  70:11
**recall**  13:21 20:13
  21:4,17 23:8,15
  33:17 34:22 35:5
  36:1 45:14,15
  49:5 50:1,3 53:18

53:22 55:6 62:15
63:8 66:21 67:13
68:18 69:4,6,8,15
69:16 70:13 73:13
82:11 83:25 84:7
86:14 88:17 90:20
91:7 93:13 95:7
95:10 96:13 97:4
98:24
**receipt**  104:12
**receive**  10:4
**received**  35:1
  93:16
**receiving**  32:23
**recess**  8:1 22:10
  48:17 72:25
  101:23
**recognition**  47:6
  49:12 51:5,10
  53:14,15,19 54:8
  54:11 85:11,21
  86:5,20
**recognize**  51:23
  69:3 73:22
**reconstructing**
  70:11
**record**  6:4 8:5
  13:12 22:9,13
  33:12 41:25 62:5
  72:22 73:3 78:6
  79:15 94:9 101:9
  101:22 103:10
**recorded**  83:4
  103:7
**recording**  16:10
  16:22,22 18:16
  37:22
**records**  11:2,4,6,7
  11:7,8 14:9,9 18:2
  18:15 19:25 42:10
  55:15 57:11 58:20

58:21 59:2
**recreating**  70:6
**redo**  83:20 84:1,7
**reduced**  34:10,12
  34:14 96:19,25
  97:2 99:8
**reducing**  33:24
**reduction**  48:6
  90:8
**refer**  45:23 85:19
  94:18
**reference**  20:11
  59:4 65:13 75:10
**references**  18:6,11
  52:14,19 58:18
  62:1,4
**referencing**  30:15
  59:12 61:14
**referred**  49:5
  63:13
**referring**  13:22
  15:17,17,18 30:3
  31:6 35:7 46:13
  47:21,22 57:7,9
  94:14 97:15
**refers**  55:24
**reflect**  13:12
**reflected**  23:10
**regard**  24:15
**regarding**  26:17
  31:1 57:2
**registered**  1:24
**registration**  16:10
  16:24
**relate**  12:25
**related**  10:8 28:9
  41:16 43:8 75:18
  90:15,17
**relating**  11:3 18:1
  57:5 59:24

**relational**  62:24
  62:25
**relationship**  50:23
  88:7
**relatively**  6:19
  56:15
**relieved**  102:1
**remember**  20:14
  20:17 30:16 47:10
  52:13 58:7 71:9
  73:24 76:21 87:5
  87:6 88:6,9,13,19
  90:23 96:18,21
**remembering**
  89:16
**remotely**  14:14
  71:19
**removed**  67:23
  68:17
**rep**  76:14
**repeat**  8:18 65:25
  95:17
**repeating**  65:20
**repetitive**  65:19
**rephrase**  8:20
**replaced**  32:3
  36:22
**report**  52:5 76:9
  76:12,14
**reporter**  1:24,25
  6:5 11:14 30:18
  85:25 95:15
  101:25 102:3
  103:23
**reporting**  43:19
  74:25
**reports**  43:21 75:1
  75:3 76:5,8,15
  78:17
**repositories**  12:20

[repository - server]

repository  52:9
representing  2:6
  2:11,16
reproduction
  103:21
republic  43:7
  75:23
requesting  91:21
requests  12:14,19
required  97:7
requirements
  36:10,16,18 39:24
research  37:8
resided  40:17
resource  3:19 45:8
response  12:19
  96:1
responsible  36:17
rest  78:17
restaurant  88:11
restroom  48:14
result  50:19 54:4
results  50:8,9,10
  53:11 54:3 85:12
  85:15 86:7,22
retained  3:14
  87:15,16
retrieval  66:18
return  104:11
review  1:11 2:11
  7:16 63:11 69:2
  99:16,23 102:5,5,9
reviewed  12:3
  29:16 100:1
reviewing  93:22
rez  2:8
right  12:5 15:5
  19:17 30:8 34:12
  35:6 42:16,22,23
  46:7,23 48:25
  54:6 56:3 59:19

61:12 63:4 65:4
  67:24 72:16 73:2
  73:10,18 74:11
  75:5 80:25 82:23
  84:22 85:11 87:3
  92:16 95:25 99:2
  100:10 101:21
  102:20
rights  46:9
rmr  103:16
road  28:10 60:11
rodney  66:25 67:6
  82:4
role  44:19
room  6:19 68:2
  89:23,25
roughly  52:13
rover  1:10 3:16
  4:5 15:19 18:2
  19:9 20:12 22:22
  24:15,25 25:21
  26:8,22 27:1
  28:19,23 31:2
  34:3,5 35:8,24
  36:5,7,11,25 37:1
  37:3 38:21 39:3
  39:18 42:8 43:9
  43:11 44:7,19
  49:3 54:11 58:4
  59:16 60:16 61:6
  61:8,10 62:8 66:4
  66:19 69:9 70:19
  71:9 78:13 84:19
  86:8,22 87:17
  89:12 92:5,9,15,19
  93:7 97:22 98:1
rules  5:24
run  17:16 18:9
  41:3 50:18 68:7
  68:12 74:21 81:8
  81:11 86:3 101:5

101:12,13
running  33:25
  50:6 79:1
runs  80:13 100:21
  101:1
russian  75:16

**s**

s  2:1 3:8 4:1 60:21
  60:22 63:2 86:1,1
safe  92:18,20
sample  49:25
san  2:5,10
sap  41:18 43:21,21
  75:2
sat  49:20 71:23
saw  100:15
saying  35:23 53:25
  57:21
says  12:12 22:21
  25:7,8 29:19,22
  30:25 31:22 32:2
  34:9,24 36:22
  42:1 45:17 46:7,7
  48:25 49:1 52:5
  53:6,7 54:23
  55:15,21,25 56:17
  56:22 58:15 63:6
  64:1,7,18 69:5
  76:6,11 77:18
  98:19 99:3
scanned  8:6
schedule  4:5 30:5
  89:10
schema  62:7,10
scope  15:2 28:20
  28:23 40:4
screen  65:7,10,17
  65:17 77:25 80:3
  81:4
screens  68:1 79:2
  79:14,20 101:7

script  18:16
scripts  68:6,12
se  2:16 13:1
seacoast  60:7
search  47:16 83:3
  86:8,11,12
second  12:2 46:7
  46:19 54:21 68:21
  90:21
secondary  56:11
section  45:4 49:11
see  9:7 12:14 16:3
  18:11 25:3 30:20
  37:16 38:9,11,11
  39:13 45:25 50:8
  50:18 52:16 53:3
  57:1 63:17 73:22
  74:2,25 88:13
  89:9 94:23 98:19
seeing  52:23 63:8
seeking  91:12,13
seen  45:3,12,14
  63:6,19,20 98:17
  99:18
sell  60:9
send  81:24
sense  14:1 16:23
  87:16,18
sent  16:1 52:1,23
  70:11 85:18 87:1
  93:15 102:10
sentence  64:22
separate  32:22
separately  90:11
september  23:21
  25:9 33:17 53:23
  54:2,5
series  6:13 29:15
  36:6
server  14:10 43:4
  43:5 63:2,2,3

[server - structures]

67:20,24 69:23
79:10 80:23 81:5
81:16 101:5,10
**servers** 68:3 79:1
79:4
**service** 43:14
92:12,13
**services** 4:6 28:20
28:23 31:1,20
32:25 35:1,3
**set** 56:15 65:4 95:2
96:22
**shale** 37:20
**shannon** 2:9 7:15
72:18 84:22 87:24
102:16
**share** 28:10
**shared** 93:1,2
**sheet** 34:24 104:6
104:7,9,11 106:9
**shockware** 77:8
**short** 33:25
**shortage** 34:5
**shorthand** 1:25
103:7,23
**shot** 65:17
**shots** 65:7,10
**show** 85:21
**showcased** 66:3
**showing** 36:14
**shows** 33:19 59:22
99:3
**sides** 32:19 89:3
**sign** 104:7
**signature** 103:15
106:12
**signed** 8:4 24:14
28:21
**significance** 6:16
**signing** 104:8

**similar** 46:2 53:10
**simplistic** 61:9
**single** 16:11
**site** 84:12,15 91:6
**sitting** 67:3,19
69:23 78:25 79:5
80:5 88:11
**skilled** 64:19
**skills** 65:1
**slx** 31:23 32:2
36:22,24 37:2
98:1
**small** 13:7
**sme** 55:16,16
**software** 11:1
36:11 38:22 39:21
40:12,15,23 41:10
41:16 42:22 44:6
47:16 53:19 61:10
66:4 70:19 74:8
91:1 100:12
**sole** 46:9
**solely** 40:5
**solutions** 1:22
**somebody** 46:1
73:6 89:15
**somewhat** 97:4
**sophisticated**
71:15,17
**sorry** 13:7 30:16
40:14 46:16 53:4
62:22 92:7 93:9
96:2 99:10
**sort** 5:21 16:2
20:19 28:25 29:4
36:7 37:10 40:8
47:8,9 50:13,21
57:13 65:16
**sound** 20:22
**sounded** 97:19

**sounds** 27:18
**southern** 1:2
**space** 79:10 81:15
104:5
**spatial** 64:21
**speak** 8:17
**speaking** 27:18
**specialize** 11:7
**specialized** 46:12
**specific** 17:18
24:13 37:8 39:7
62:15 68:9 71:3,4
71:8 87:14,22
88:17 90:19
**specifically** 21:20
26:19 49:4 88:14
**specifics** 35:25
36:2 83:23
**speculate** 8:23
46:24 71:2
**speculation** 33:8
34:18 69:13
**spell** 10:19
**spent** 42:7
**split** 23:22 32:6
33:17
**splitting** 32:13
37:1
**spoke** 26:21 27:1,2
49:11 89:22
**spot** 19:17 95:21
**spread** 71:24
**spring** 73:11
**sql** 43:4,5 63:2
**squares** 60:19
**staff** 19:9 55:18
**stamp** 94:7
**stand** 77:10
**standard** 41:9
81:14,18

**stands** 16:12 31:23
55:16 77:10
**stanley** 15:9,12
21:3,12 30:22
31:10 32:5,9 49:1
49:2 51:20 86:9
86:25 87:10 95:5
96:17 97:12,14,22
97:24 99:1
**stanley's** 90:15
**start** 18:15 45:3,4
**started** 6:8 15:15
15:16 17:5 23:12
23:12 24:22 25:14
29:2,4,7,7 33:24
58:6
**starting** 36:24
**starts** 74:17
**state** 11:5 48:5
104:4
**statement** 97:14
97:18
**states** 1:1 37:9,21
37:25 58:20
**stdole** 77:9
**stipulate** 102:18
**stipulated** 102:17
**stipulation** 101:22
**storing** 68:4
**strange** 51:7
**strategic** 92:19
**street** 1:22 2:4,9
2:15 102:11
**stress** 9:15
**strike** 63:23
**string** 3:17,23
**structure** 62:5
**structured** 62:14
64:20 68:13
**structures** 61:20

[stuff - testified]

**stuff**  14:21 40:2 56:10 66:1 67:23 68:1,1 69:22,25 70:1,12 77:8 79:3 91:2
**sub**  53:3 60:10 75:6,25 76:3
**subcontracting**  24:10
**subcontractor**  11:9 24:9
**subdivided**  60:10
**subdivisions**  60:5 60:13
**subject**  29:23 55:17 104:8
**submitted**  97:3
**subpoena**  11:15 12:7,12
**subprojects**  76:2
**subscribed**  106:16
**substance**  87:20 90:3,14 106:8
**substances**  9:17
**substantia**  15:15 21:24 23:18,20,21 23:23 24:6,9,11,18 24:22,23,24 28:22 31:23 42:7 56:3 88:24 98:20,23 99:14
**substantia's**  42:10
**sudden**  32:18
**sued**  51:1,4
**suite**  2:4,10,15
**sullivan**  2:8
**sullivanhill.com**  2:11
**sum**  32:22
**summary**  99:25 100:4

**summer**  51:11 53:21,22 86:24
**super**  47:8
**supervision**  103:8 103:23
**support**  69:25 75:9 78:17
**supporting**  46:11
**supposed**  50:2,25 96:19
**sure**  5:25 7:13 8:17,23 10:22 15:1 24:21 28:8 30:17 36:12 52:25 57:19 64:18 67:5 77:19 82:5 93:4 98:5
**surprise**  49:4
**surprised**  14:22 46:25 69:23 90:10
**surrounding**  21:6
**survey**  68:10
**surveys**  17:18
**susan**  15:23 23:22 32:11,18 33:5 37:7,10,12 42:16 55:25 56:2 96:16 99:4
**susan's**  90:8
**suspect**  55:14 57:3
**suspicions**  57:5
**sweeney**  2:9,11 3:4 6:25 7:1,7,9 7:11,15,15,23,25 33:7 34:17 46:20 52:21 53:1,4 57:4 63:21 64:23 66:7 69:12 78:6 85:2 86:2 88:1 93:19 94:10 96:7 101:19 102:17

**sworn**  5:6 103:5 106:16
**system**  12:23 15:7 17:6 38:1
**systems**  40:17

**t**

**t**  3:8 4:1 86:1,1 103:1,1 105:2
**table**  9:7,7
**take**  6:5 12:1 14:1 14:19 39:24 48:12 51:19 63:12 69:21 71:21 73:21 80:21 82:8 91:6 95:1
**taken**  1:21 5:15 8:1 22:10 48:17 69:17 70:1 72:25 101:23 103:3
**talk**  9:20 11:12 22:1 27:10,23 35:3 47:2 69:16 73:18 78:9
**talked**  48:2 50:13 65:8,11 67:18 70:4 88:16 91:11 93:12
**talking**  17:8,10 27:24 28:17 30:3 30:6,7,9,12 31:8,9 41:4 47:23,24 48:20 49:11 52:9 55:3 56:2 57:20 73:25 79:16 80:4 82:24 83:8 87:13 91:19,24 96:18
**tat**  3:22,23 51:18 52:24 69:3
**tatham**  1:7 2:14 3:5 7:20,20 27:5 30:15,21 32:2 44:14 51:20 69:4

69:9 82:6,12 84:1 87:9 91:13,16,21 93:23 94:1,6,11,15 94:17 95:18,23 96:1,5,10 98:6 101:20 102:19
**tax**  21:20,21 57:12 57:13 74:6
**team**  45:17 49:1 49:10 55:21,23 56:17 92:5,8
**tech**  10:1,3 43:25
**technical**  20:9 92:21
**technically**  36:6
**techniques**  83:13
**technology**  18:25 44:19 45:17 46:8 46:9 48:3 49:8,10 50:25
**tell**  25:20,21 30:2 42:9,12 52:21 59:9 77:23 88:22 90:22 91:11 103:5
**telling**  20:20 21:4 28:3 31:3 58:19
**terabyte**  3:14 13:14
**term**  20:3,22 32:4 42:23
**terminology**  20:1
**terms**  8:10 30:10 31:8,10,20,22 62:13 95:2,5,8 96:22 97:19,21,25 99:6
**tessaract**  47:15 53:10 85:23 86:1 86:3,8,19
**testified**  5:7 85:5,9 87:2 88:18 92:4

[testify - two]

testify  31:14
testimony  3:2
    46:20 57:5 78:7
    85:6 103:2,6,10
texas  1:9,10,11,12
    1:13 2:16 10:1,3
    17:17,19 44:16
text  17:14
thank  5:13,21 6:12
    7:6,25 10:21 26:8
    33:18 37:5 73:16
    81:12 93:20
    101:19,20 102:20
theory  60:23
thereof  103:13
thing  31:7 37:10
    39:15 40:8 47:16
    57:14 63:11 64:9
    71:3 74:8,13,24
    76:22 77:2,24
    78:4 98:25
things  12:21,25
    14:18 16:13,14,14
    17:17 18:16 19:22
    20:2 28:11,14
    37:8 39:23 41:20
    65:18 68:4,5,7
    71:16 77:25 78:17
think  9:4 12:22
    15:19 17:6,19
    19:9 20:15 21:3,7
    23:10,11,18 26:17
    30:1 41:24 50:13
    50:15 51:13 53:23
    54:25 55:9 56:1
    57:16,22,23 58:7
    63:16 66:22,24
    67:14,19 70:3,10
    72:4 73:11 75:15
    75:15 84:21 87:4
    88:4 89:18,18

90:12,16 91:3,16
    91:23,23 92:4,14
    93:15 94:7,8,10
    95:11 101:18
third  41:8,17
    42:18 43:19 99:1
thirty  104:12
thomas  1:7 2:14
thought  70:5
    85:14 89:25
thousand  35:20
    43:7,16
three  32:14 72:5
    86:17 99:5
tie  18:20
tied  74:22
time  5:18 8:14
    16:8 18:7,13 19:6
    21:8 22:15 23:12
    23:14 25:24 33:3
    34:10 36:23 37:1
    50:5,24 51:9
    52:17 55:6 58:4
    58:19 60:1 71:21
    83:20 85:6 86:21
    91:3 103:3
times  27:7,11
    46:10 48:2,6
    86:10
title  1:9 3:16 4:5
    15:19 18:2 19:8,9
    20:12 22:21 24:15
    24:24 25:21 26:8
    26:22 27:1 28:19
    28:23 31:2 34:2,5
    35:8,23 36:5,7,11
    36:25 37:1,3
    38:21 39:3,18
    42:8 43:9,11 44:6
    44:19 45:20 49:3
    49:6 52:17 54:11

57:10 58:4,15,25
    59:16 60:16 61:6
    61:8,10 62:8 66:4
    66:19 69:9 70:19
    71:8 73:25 74:4,6
    74:9 78:13 84:19
    86:8,22 87:17
    89:12 92:5,9,15,19
    93:7 97:22 98:1
titled  45:7
titles  59:22
titling  76:16
today  5:13 7:12
    9:18 11:13 13:6
toe  66:23,25 67:6
    82:4
told  26:3 28:9
    35:11 47:10 50:7
    52:13 53:13 54:17
    55:20 66:9 70:2
    75:2,22 76:21
    77:16 84:15 91:4
tom  7:18,20 27:4,5
    27:24 30:14,20
    32:2 37:18 44:12
    44:13,14 51:20
    69:4,9 72:18 82:5
    82:6,11 84:1 87:9
    91:16,18,21 93:3
    93:24 94:23 95:16
    95:21,24 102:18
tomorrow  83:21
tool  48:5 66:13
tools  13:23 38:25
    39:16 41:8 42:24
    43:20 56:12 60:18
top  30:9 99:22
total  42:2,6 52:6
    58:6 96:20 97:1
totally  19:22 26:10

totals  86:15
trace  58:22
track  14:21
tracking  60:5,13
tracts  57:15
traditional  46:11
transcribed  103:8
transcript  72:21
    102:2,3,13 103:20
    104:13,14
transcription
    103:9 106:5
transfer  25:6
    84:13
traveling  27:8
tried  49:14,15
    53:21
true  97:13,18
    103:10
trustee  72:19 73:8
    73:14 82:3
trusts  57:12
truth  103:5,5,6
truthful  9:18
try  6:24 14:1 39:2
    47:11 80:21 94:21
    96:12
trying  16:5 17:2
    18:18 25:19 26:25
    28:14 39:16 44:4
    52:13 56:8 57:10
    58:7 64:8 66:21
    68:10,21 74:4,5
    83:25 90:4 96:10
turn  12:11
tweaking  72:2
twice  87:4
two  12:21 23:25
    51:19 55:19 65:18
    68:18 86:17 88:21
    91:3 93:11,21

Page 19

[two - work]

99:15 102:6
**tying** 92:22
**type** 38:20
**types** 16:13 59:23
**typewritten** 18:15
**typically** 84:10

**u**

**u** 10:20
**uh** 6:1,1 12:15
22:7 29:17,25
38:8 44:15 45:6,9
45:11,18 51:22
56:21 60:6 65:25
69:11 80:18 98:21
99:17,19,19
100:13 101:11,14
**uhs** 6:1
**ultimately** 99:2
**undergrad** 10:2
**underneath** 64:9
**understand** 6:2,10
6:15,18,21 7:4
8:19,19,21,24 9:1
9:11 15:2 28:8,13
31:15,18 36:3,7,12
42:17 49:2 56:5
64:2 67:6 88:8
**understanding**
21:11 31:24 49:7
53:16
**understood** 15:14
50:16
**unfortunately**
15:1
**unhappy** 90:20
**unique** 20:1
**united** 1:1 58:20
**unstructured**
64:21
**unusual** 39:4
64:22

**update** 19:14
**uploaded** 15:7
84:11
**ups** 101:18
**use** 13:24 38:25
39:2 41:10 43:2,5
43:5,8,19 47:14,18
48:14 60:1,4,13
61:19,20 68:3,4
74:8 83:9
**user** 77:18 78:11
80:17,19 81:3,4,7
**uses** 47:15
**usual** 9:15
**usually** 77:20
79:13

**v**

**v** 1:6 3:11
**vague** 18:25 63:21
98:2
**validate** 58:22
**valuable** 57:16
**value** 70:6,19
**variables** 16:21
**various** 17:15
37:18 57:15 75:24
**vendor** 92:12
**vendors** 38:1
**verbally** 36:1
**veritext** 1:22
**version** 100:16
101:13
**versus** 83:1 86:4
**virginia** 10:12,24
37:17 79:1 81:5
**visits** 49:22
**voice** 95:22
**volumes** 64:20
**volunteered** 84:8

**w**

**w** 98:12
**wait** 28:6 30:18
**waiting** 34:11
35:24
**want** 5:24 8:5,23
28:12 42:21 46:23
46:24 49:23 60:8
60:12 67:3,5,21
70:3,25 71:1
77:11 81:23 83:3
84:16 85:4 94:8
**wanted** 43:11,11
73:4 91:1,6
**warped** 95:22
**washington** 1:23
5:2
**way** 14:3,4,15
16:13 38:18 39:2
39:13 49:18 52:2
62:14 65:1 71:7
71:10,18 83:2
88:8
**ways** 17:18 32:14
33:5 59:2 99:5
**we've** 26:23 41:4
**web** 39:8 40:5,9,24
69:25,25 78:20,22
79:10,19 80:10,21
100:19,23 101:3
**website** 14:3,8,17
71:10,12 99:14
**weeks** 72:5 102:6
**weigh** 9:10
**welcome** 67:3
**went** 18:18 23:3
33:21 34:14 36:3
37:16 39:21 42:16
47:11 50:2 68:14
87:9 92:24

**west** 2:4 37:17
102:11
**widely** 53:9
**wife** 10:16
**wife's** 10:17
**wil** 3:17 4:7 29:12
94:14 98:12
**willard** 56:1,2
96:16 99:4
**willis** 1:8,12 2:11
2:12 7:16,17 21:9
26:16,22 27:3
32:2,10 37:19
44:14 47:19 50:23
51:4 54:14 55:2,5
55:22 56:18 87:3
88:7,14,19,25 89:5
89:6 90:22 91:16
91:21 93:14 97:12
**wills** 57:12
**win** 77:14
**winsoft.ocr.dll**
77:15
**wire** 25:6
**wiring** 32:15
**withdrew** 23:22
24:23
**witness** 3:11 11:18
12:3,4 13:14
22:14 29:16,17
33:9 48:15 57:6
59:13 64:24 66:9
86:1 98:4 100:1,2
102:21 103:11
104:1
**words** 16:15 24:12
80:2 81:3 83:3
**work** 11:3 14:16
15:2,12 21:16
22:6 24:11 29:2
36:4,14 37:15

Page 20

[work - zoning]

| | |
|---|---|
| 42:8,24 44:13,15 | 76:13,17,24 77:3 |
| 48:4 49:13,15,19 | 78:2,14,16 80:1 |
| 49:23 53:22 54:11 | 81:9,20 82:1,5,7 |
| 55:3 57:24,25 | 83:2,5,15,19 84:20 |
| 58:5 72:13 74:3,5 | 85:16 88:6 95:3,6 |
| 90:5 99:25 100:5 | 95:6 96:8 99:23 |
| 101:22 | 100:6,8 101:7,8 |
| **worked** 11:4 21:14 | **year** 14:12 23:21 |
| 27:1 39:9 40:4 | 43:18 71:24 90:25 |
| 41:16 55:1 58:13 | **years** 5:16 8:25 |
| 61:10 75:18 | 12:21 21:9 58:1,2 |
| 100:17 | 58:6 60:16 68:18 |
| **working** 16:2 21:7 | 91:3 |
| 21:23 24:20 26:2 | **yep** 11:25 92:13 |
| 28:4 37:10 44:12 | |
| 51:1,7 58:1 87:17 | **z** |
| 101:2 | **z** 10:20 |
| **workstation** 67:25 | **zaure** 10:18 |
| **workstations** 68:2 | **zero** 70:24 |
| **worse** 18:14,14 | **zoning** 57:14,15 |
| 50:10 | |
| **write** 35:16 | |
| **writing** 32:14 | |
| 96:25 97:2 | |
| **written** 96:19,20 | |
| 97:15,16 | |

| **x** |
|---|
| **x** 3:1,8 4:1 |

| **y** |
|---|
| **yeah** 9:2 12:10,17 |
| 15:8 23:5 25:23 |
| 26:23 27:6,15 |
| 28:17 30:17 32:5 |
| 32:5,8 34:4 39:10 |
| 43:10 48:1 54:4 |
| 56:7 58:3 59:8 |
| 62:19,22 64:8 |
| 66:16 67:1,11,25 |
| 68:18 69:20 72:11 |
| 73:9,17,24 76:2,5 |

Page 21

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.