# EXHIBIT H

```
 1                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF CALIFORNIA
 2
    ENSOURCE INVESTMENTS LLC, )
 3  a Delaware limited        )
    liability company,        )
 4            Plaintiff,      )
                              )
 5  vs.                       ) CASE NO. 3:17-cv-00079-H-LL
                              )
 6  THOMAS P. TATHAM, an      )
    individual; MARK A.       )
 7  WILLIS, an individual; PDP)
    MANAGEMENT GROUP, LLC, a  )
 8  Texas limited liability   )
    company; HOPEWELL-PILOT   )
 9  PROJECT, LLC, a Texas     )
    limited liability company )
10  [nominal party]; TITLE    )
    ROVER, LLC, a Texas       )
11  limited liability company )
    [nominal party]; BEYOND   )
12  REVIEW, LLC, a Texas      )
    limited liability company;)
13  IMAGE ENGINE, LLC, a Texas)
    limited liability company;)
14  WILLIS GROUP, LLC, a Texas)
    limited liability company;)
15  and DOES 1-50,            )
             Defendants.      )
16
17
18                    ORAL DEPOSITION
19                    BRENT STANLEY
20                    June 5, 2019
21
22
23
24
25

                                        Page 1
```

1

2      ORAL DEPOSITION OF BRENT STANLEY, produced as a witness

3   at the instance of the Plaintiff and duly sworn, was taken in

4   the above-styled and numbered cause on the 5th day of June,

5   2019, from 10:14 a.m. to 5:27 p.m., before Stacey Whitley,

6   Certified Shorthand Reporter in and for the State of Texas,

7   reported by computerized stenotype machine at the offices of

8   Veritext Legal Solutions, 4295 San Felipe, Suite 125,

9   Houston, Texas, pursuant to the Federal Rules of Civil

10   Procedure and the provisions stated on the record or attached

11   hereto.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 2

```
 1                        APPEARANCES
 2
 3    FOR THE PLAINTIFF:
 4         Bonnie McKnight
           PANAKOS LAW, APC
 5         555 West Beech Street, Suite 500
           San Diego, California  92101
 6         Telephone: 619-800-0529 - Fax: 866-365-4856
           E-mail: Bonnie@PanakosLaw.com
 7
 8
 9    FOR THE DEFENDANTS, MARK WILLIS; WILLIS GROUP, LLC; BEYOND
      REVIEW, LLC; AND IMAGE ENGINE, LLC:
10
           Shannon D. Sweeney (Via videoconference)
11         SULLIVAN HILL
           600 B Street, 17th Floor
12         San Diego, California  92101
           Telephone: 619-595-3206 - Fax: 619-231-4372
13         E-mail: sweeney@sullivanhill.com
14
15    THOMAS P. TATHAM, PRO SE:
16         Thomas P. Tatham
           621 E. 22nd Street, Suite C
17         Houston, Texas  77008
           Telephone: 713-504-7199
18         E-mail: tpt@lngpartners.com
19
20    ALSO PRESENT:
21         Phillip Ortmann (Via videoconference)
22
23
24
25
                                                  Page  3
```

```
 1
 2                         INDEX
 3                                            PAGE
 4  BRENT STANLEY
 5  Examination by Ms. McKnight ......................6
    Examination by Ms. Sweeney .....................150
 6  Examination by Mr. Tatham ......................179
    Further Examination by Ms. McKnight ............192
 7  Further Examination by Ms. Sweeney .............197
    Further Examination by Ms. McKnight ............198
 8  Signature Page  ................................200
    Court Reporter's Certificate ...................202
 9
10                        EXHIBITS
11
12  EXHIBIT              DESCRIPTION              PAGE
13  EXHIBIT 1       Subpoena                       19
14  EXHIBIT 2       4-22-16 E-mail chain.  Bates   27
                    Nos. WIL_1803 to 1804
15
    EXHIBIT 3       Development plan.  Bates       40
16                  PLTF_547 to 548
17  EXHIBIT 4       July, 2016 E-mail chain.  Bates 46
                    TAT_717 to 720
18
    EXHIBIT 5       Data mining for mineral        49
19                  resource investigations, July
                    25, 2016.  Bates PLTF 670 to
20                  710
21  EXHIBIT 6       7-27-16 E-mail chain.  Bates   56
                    WIL_1809 to 1810
22
    EXHIBIT 7       Independent contractor         67
23                  agreement.  Bates PLTF 531 to
                    536
24
    EXHIBIT 8       August, 2016 E-mail chain.     70
25                  Bates WIL 4264 to 4267
```

Page 4

| | | | |
|---|---|---|---|
| 1 | EXHIBIT 9 | Statement of work for data services presented to Title Rover, LLC.  Bates PLTF 540 to 543 | 77 |
| 3 | EXHIBIT 10 | 8-23-16 E-mail from Brent Stanley to Mark Willis.  Bates TAT 2244 | 89 |
| 5 | EXHIBIT 11 | Title Rover schedule of consultants, contractors, and outside services.  Bates WIL 640 | 95 |
| 8 | EXHIBIT 12 | 12-22-16 E-mail from Tom Tatham to Brent Stanley with attachments.  Bates TAT 1429 to 1434 | 99 |
| 10 | EXHIBIT 13 | August, 2016 E-mail chain. Bates TAT 677 to 687 | 113 |
| 12 | EXHIBIT 14 | Bates PLTF 561 to 571 | 113 |
| 13 | EXHIBIT 15 | August, 2016 E-mail chain. Bates TAT 1650 to 1662 | 125 |
| 14 | EXHIBIT 16 | August 30, 2016 E-mail chain. Bates WIL 4201 to 4202 | 130 |
| 16 | EXHIBIT 17 | Bank of America bank statements | 133 |
| 17 | EXHIBIT 18 | 10-18-16 E-mail chain.  Bates TAT 1422 to 1423 | 136 |
| 18 | EXHIBIT 19 | October, 2016 E-mail chain. Bates TAT 2044 to 2046 | 139 |
| 20 | EXHIBIT 20 | Preliminary report on BR extraction data.  Bates TAT 1247 to 1248 | 141 |
| 22 | EXHIBIT 21 | March, 2017 E-mail chain. Bates TAT 1933 to 1944 | 142 |

23
24
25

Page 5

```
 1                         THE REPORTER:  Do y'all want the Federal

 2      read-on, or do you waive that?

 3                         MS. McKNIGHT:  I'm fine waiving it.  I don't

 4      think we normally do that.

 5                         THE REPORTER:  Is that okay, Ms. Sweeney, if

 6      we waive?

 7                         MS. SWEENEY:  That's fine.

 8                              BRENT STANLEY,

 9      having been first duly sworn, testified as follows:

10                              EXAMINATION

11         Q.    (BY MS. McKNIGHT)  Good morning, Mr. Stanley.

12         A.    Good morning.

13         Q.    My name is Bonnie McKnight.

14                         MS. McKNIGHT:  Let's first state appearances

15      for the record.  I'm Bonnie McKnight.  I represent Plaintiff

16      Ensource.

17                         MS. SWEENEY:  I'm Shannon Sweeney and I

18      represent Mark Willis, the Willis Group, Image Engine, and

19      Beyond Review.

20                         MS. McKNIGHT:  Mr. Tatham has informed me that

21      he's running a little behind schedule but he will be coming

22      in to sit in on this deposition as well.  So, just want to

23      make that note.

24         Q.    (BY MS. McKNIGHT)  I noticed here you don't have an

25      attorney with you today; is that correct?
```

Page 6

1      A.    Correct.

2      Q.    Okay.  So, you intend to proceed without an

3  attorney today?

4      A.    Yes.

5      Q.    Okay.  Have you ever been deposed before?

6      A.    No.

7      Q.    Okay.  So, I'm going to go over a few basics first.

8  I am going to ask you a series of questions and you're going

9  to be answering them under oath.  Do you understand that?

10      A.    I do.

11      Q.    Okay.  Even though we're in an informal setting in

12  a conference room, the answers that you give have the same

13  force and effect as if they were given in front of a judge in

14  a courtroom.  Do you understand that?

15      A.    Yes.

16      Q.    Okay.  So, once we're done with the deposition,

17  you're going to have an opportunity to review the transcript

18  and make any changes.  But I have the right to comment and

19  anyone else has the right to comment on those changes.  Do

20  you understand that?

21      A.    Yes.

22      Q.    Okay.  So, a couple things that you've already done

23  a great job at, wait until I finish the question, especially

24  before you answer, especially given that Ms. Sweeney is

25  appearing telephonically and by video.  There is a little bit

Page 7

```
 1    of a delay.  And so, we would ask that you pause before you

 2    answer so that any objections can be made and --

 3         A.    Okay.

 4         Q.    -- to keep the record clear.  Do you understand

 5    that?

 6         A.    Yes.

 7         Q.    Okay.  So, I will ask questions and ask that you

 8    only give the answer to the question that I'm asking and no

 9    more.  Do you understand that?

10         A.    Yes.

11         Q.    Okay.  So, make sure you speak clearly.  Don't say

12    "uh-huh" or "huh-uh" because they don't pick up on the

13    record.  Do you understand that?

14         A.    Yes.

15         Q.    Okay.  You can ask me to repeat a question but if

16    you don't ask me to repeat it, I'll understand that you -- or

17    I'll assume that you understand my question.  Okay?

18         A.    Yes.

19         Q.    You must give full, complete, and truthful answers.

20    No partial answers.  And is there any reason such as being

21    under unusual stress, physical, or mental condition or being

22    under the influence of any substances that would prevent or

23    limit you today from giving truthful answers to my questions?

24         A.    No.

25         Q.    Let's talk a little bit about your background.
```

Page 8

```
 1     What is your date of birth?
 2         A.    4-7-60.
 3         Q.    Okay.  And tell me about your education.
 4         A.    I have a BA in math and physics from Marietta
 5     College and a BS in mechanical engineering from Case Western
 6     Reserve University.
 7         Q.    Do you have any certificates of any kind?
 8         A.    No.
 9         Q.    And after you got your -- when did you get your BS?
10     What year was that?
11         A.    1983.
12         Q.    Okay.  And tell me about your professional life
13     after 1983.  What job did you have?
14         A.    Eastman Kodak from 1983 to 1991.  Then I moved to
15     Boston.  I worked for Boston Gas and then I worked for a
16     company called TriGen in Boston.  And then I worked for Iron
17     Mountain in Boston.  And then I moved to Texas.  And I worked
18     with and for Image Engine, Engineering Data Integrity
19     Services and then for the last -- since January of 2017, I've
20     been the CEO of Neural Vision Technologies.
21         Q.    Okay.  You said that's Neuro Engine Technology?
22         A.    Neural, N-E-U-R-A-L, Vision Technologies.
23         Q.    Okay.  And you said you're CEO there?
24         A.    That's correct.
25         Q.    Okay.  How long did you work at Image Engine?
```

1        A.    I would say -- and, again, this is the best of my

2    recollection --

3        Q.    Sure.

4        A.    -- from 2013 to 2015.

5        Q.    Okay.  And that brings up an important point.  So,

6    do you understand the difference between an estimate and a

7    guess?

8        A.    No.

9        Q.    Okay.  So, I think you did a good job of estimating

10   when you believe that you worked at Image Engine.

11       A.    Okay.

12       Q.    So, that's based on your personal knowledge.  So, I

13   don't -- I know that we're going to be talking about a number

14   of events that occurred several years ago.  So, you can use

15   your personal knowledge to answer those questions to the best

16   of your abilities.

17       A.    Okay.

18       Q.    However, if I ask you how much does my dog Milo

19   weigh, you wouldn't know the answer because you've never met

20   Milo before and that would be a guess.

21       A.    Right.  Right.

22       Q.    So, today I want to make sure that I get your --

23   any estimates and I don't want you to speculate or guess.

24       A.    Okay.  Understood.

25       Q.    Sounds good.  So, going back to your work at Image

1    Engine, you said it was about two years you worked there?

2        A.    That's correct.

3        Q.    And what was your role there?

4        A.    My role was chief operating officer.

5        Q.    And did you just apply to Image Engine for that

6    position when you changed from Iron Mountain to Image Engine

7    or did you --

8        A.    I left a company out in the mean -- in the middle

9    there.

10       Q.    Okay.

11       A.    There's a company Haystack.  Haystack was after

12   Iron Mountain before Image Engine.

13       Q.    Okay.  What did you do at Haystack?

14       A.    I was the COO also.  And so, I had been

15   introduced -- was actually working with Image Engine while I

16   was with Haystack and I decided that I wanted to leave

17   Haystack and join Image Engine, which is what I did.

18       Q.    Okay.  And who introduced you to Image Engine.  Who

19   was your contact?

20       A.    There was a gentleman named --

21            MS. SWEENEY:  Objection.  Assumes facts.

22       Q.    (BY MS. McKNIGHT)  Go ahead.  You can answer.

23       A.    There was a -- an attorney out of New York named

24   Richard Davis who I had been doing some consulting work for.

25   He had a contract with BP and he was working on the Deepwater

                                                        Page 11

1    Horizon incident.  And so, I was coming to Texas as a

2    consultant for him and he introduced me to the people at the

3    Willis Group and at Image Engine.

4        Q.    Okay.  So, can you explain what you did as COO of

5    Image Engine?

6        A.    Sure.  I was responsible for the operations.  And

7    so, there was a team of maybe 30 plus people, I would

8    estimate, that were responsible for getting work pushed

9    through the work flow in the organization.  I also led the

10   sales and business development effort as well.

11       Q.    Okay.  And what does Image Engine do?

12       A.    Image Engine's original purpose was to be a

13   standing service bureau to scan documents for companies.

14   Over time they developed an interest in adopting technologies

15   to help automate the process of indexing the documents.  And

16   because I had a background from Haystack and Iron Mountain in

17   those technologies, they found me a useful asset.

18       Q.    Okay.  In the automation of indexes?  That was your

19   background?

20       A.    Correct.

21       Q.    Okay.

22       A.    Yeah.  Document auto classification and automated

23   indexing.

24       Q.    Okay.  Why did you leave Image Engine?

25       A.    Well, I came up with a concept for a new business

```
 1    and I pitched that to Mike and Mark Willis.  They liked the

 2    idea and they stood the company up and put me in charge of it

 3    as CEO and we proceeded to generate business and do work.

 4         Q.    Okay.  And is that the company that you work at or

 5    that you're CEO of now?

 6         A.    No.  That was Engineering Data Integrity Services,

 7    EDIS.

 8         Q.    Okay.  Can you repeat that for my --

 9         A.    Engineering Data Integrity Services.

10         Q.    Okay.

11         A.    Or EDIS for short.

12         Q.    So, what does EDIS -- what did EDIS do?

13         A.    EDIS doesn't exist any longer.  But what they did

14    do is focus on what's called the asset integrity management

15    space.  So, if you were an operator of pipelines, chemical

16    plants, gas plants, and refineries, you have engineering

17    activities that are called mechanical integrity.  And in

18    order to do the engineering, you need a lot of data from

19    documents.  And those documents stipulate the material

20    specifications, the testing that's been done over time,

21    inspection histories and all that data is needed in order to

22    do engineering around how long a section of pipe or pressure

23    vessel is likely to be able to operate before it fails.  So,

24    I identified that market niche, which was unserved because

25    people were manhandling the data.  They had engineers filling
```

Page 13

1    out the spreadsheets.  So, using technologies to help
2    streamline the process of classifying the data and performing
3    extraction on the data was something that was very
4    interesting to the industry because it brought a level of
5    automation and efficiency that they hadn't seen before.
6        Q.    Okay.  And how long did EDIS exist time framewise?
7        A.    Well, I was there about a year, I would estimate.
8        Q.    Okay.  And why doesn't it exist anymore?  What
9    happened?
10       A.    So, I was asked to leave.  I was actually fired by
11   the Willis Group.  They continued to proceed with EDIS and
12   then some time during the year 2017 or '18 -- I would have to
13   look at my notes but they sold EDIS to another company here
14   in Houston.
15       Q.    Okay.  But you said it was your idea, EDIS?
16       A.    It was, yeah.
17       Q.    Why were you fired?
18       A.    I had suggested to the Willis Group that -- that
19   they shut down Image Engine because it was losing about a
20   hundred thousand dollars a month.  And the day that I read
21   over my closure plan to review with the CFO at the Willis
22   Group, I was asked to go to the conference room and they
23   proceeded to tell me that I was fired and they took my
24   laptop.  And I asked what's going on and I got no answers.
25       Q.    Okay.  So, who was the CFO?

1        A.      Dan Lensgraf.

2        Q.      What year was this approximately?

3        A.      So, this would have been -- this would have been

4    the end of 2015, I believe.  I estimate.

5        Q.      Do you know why they fired you?

6        A.      I had my suspicions.

7        Q.      Okay.  And what are your suspicions?

8                MS. SWEENEY:  Objection.  Calls for

9    speculation.

10       Q.      (BY MS. McKNIGHT)  Do you have a reasonable belief

11   as to why you were fired?

12       A.      I do.

13       Q.      And what is your reasonable belief based on your

14   personal knowledge?

15               MS. SWEENEY:  Objection.  Calls for -- calls

16   for speculation.

17       Q.      (BY MS. McKNIGHT)  You can answer if you know based

18   on your personal knowledge.

19       A.      Well, I think what it boiled down to was the CEO of

20   Image Engine, Steve Elston, and Mark had a very tight

21   relationship and I believe that Steve convinced Mark that

22   they needed to get rid of me in order to protect Steve.

23       Q.      Why would they need to protect Steve?

24       A.      Good question.

25       Q.      Is Steve still CEO?

                                                    Page 15

1      A.     No.   Image Engine is shut down and the assets were

2    sold.

3      Q.     Do you know when?

4      A.     I would have to look at my notes.

5      Q.     Okay.  Do you know why Image Engine was shut down?

6      A.     Because it was losing a lot of money.  Now, a point

7    of note here is that I maintained my relationship with Mark.

8      Q.     Okay.

9      A.     So, Mark actually asked me to help him wind down

10   Image Engine and I did help him with that as a consultant.

11   He also asked me to help him find a buyer for Image Engine

12   and EDIS and I assisted him with that as a consultant.

13     Q.     Okay.  Who bought EDIS?

14     A.     Zane Russell is the gentleman who is the CEO of a

15   company -- what is the name of the company?  They have two

16   companies.  They have a company called Benchly and the other

17   company is Innovative Litigation, I believe.

18     Q.     Okay.  What was the last name?  Russell you said?

19     A.     Zane Russell, correct.

20     Q.     Zane?

21     A.     Zane.

22     Q.     Okay.  I think you may have answered this before

23   but I just want to understand.  So, you came regarding -- you

24   brought up the issues of Image Engine and your pitch -- not

25   pitch but plan to close -- or what the plan would be to close

Page 16

1    Image Engine in around 2014 or do you recall?

2        A.    Probably closer to 2015.

3        Q.    Okay.  Do you know why it was losing money?

4        A.    Yes, I do.

5        Q.    Why?

6        A.    They had too little business and too many people.

7        Q.    Did you ever work for a company called Substantia

8    LogiX?

9        A.    Yes.

10       Q.    What was the time frame you worked at Substantia?

11       A.    I'm going to estimate that it was between 2015 and

12   2017.

13       Q.    What was your role at Substantia LogiX?

14       A.    I was a managing director.

15       Q.    And what does Substantia do?

16       A.    Well, Susan Willard and I formed Substantia because

17   we had some concepts that we thought would be useful to law

18   firms in the mortgage-backed security space to allow them to

19   understand the relationship between publicly recorded land

20   instruments and commercial data from people like Lewtan.  And

21   we had the observation that if you look at those two data

22   sets independently of each other, they each tell a story.

23   But if you mash those two data sets together, you get a

24   different story.  And we thought that would be of interest to

25   law firms who were plaintiff counsel for a lot of

1    mortgage-backed securities lawsuits.  And so, we proceeded to

2    try to pitch that to a lot of law firms and -- that we were

3    actively involved in mortgage-backed securities litigation.

4    But we didn't get any takers.

5        Q.    Okay.

6        A.    We tried that for a year and a half, two years and

7    we didn't go anywhere.

8        Q.    Okay.  Were you working anywhere else at the time

9    you were managing director of Substantia LogiX?

10       A.    Yes.  I was also working for Haystack part of the

11   time and probably the Willis Group part of the time.

12       Q.    So, you -- when you say you're working for Willis

13   Group, was that for --

14       A.    Image Engine or EDIS, yeah.

15       Q.    And was Image Engine sold as well or did it just

16   shut down?

17       A.    It was shut down and the assets were sold off.

18       Q.    Okay.

19       A.    We tried to sell it, but we couldn't find any

20   buyers.

21       Q.    Okay.  Why did you leave Substantia LogiX in 2017?

22       A.    I was frustrated with the lack of progress on any

23   of the business activities and wanted to focus on other

24   things.

25       Q.    Okay.  I'm going to go ahead and mark as Exhibit 1

Page 18

1    the subpoena.

2                    (Exhibit 1 marked)

3        Q.    (BY MS. McKNIGHT)   If you can just flip through

4    that.  This should have been the subpoena that you received.

5        A.    (Witness reviews document.)  Yeah.  I've read

6    through this.  It's the same document, right?

7        Q.    Yes.

8        A.    Yeah.

9        Q.    If you go to Page 3, there's a series of requests

10   for production.  Did you bring any documents with you today?

11       A.    I brought a hard drive.

12       Q.    Okay.  And what's on the hard drive?

13       A.    So, what's on the hard drive is everything that is

14   stipulated in these requests for production that I had

15   available to me.  I've had a number of E-mail addresses.

16       Q.    Okay.

17       A.    I had a Substantia LogiX E-mail address.  I no

18   longer have access to that E-mail.  I haven't had access for

19   a very long time.  I had a Title Rover E-mail.  I don't have

20   access to those E-mails.  I also had an Image Engine E-mail.

21   I had an EDIS E-mail.  I don't have access to any of those

22   E-mails.  So, I scoured my Gmail account and I also scoured

23   my Neural Vision account for any E-mails that were -- that

24   met the intent of these requests for productions and they're

25   on that hard drive as well as all documents that I had in my

                                                    Page 19

1    possession which are referenced by these requests for

2    production as well pertaining to Title Rover.

3         Q.    As for request numbers, I think, it's 1 to 5, did

4    you produce anything responsive to those requests?

5         A.    I do not have any source code.

6         Q.    Okay.

7         A.    I did provide documents that were requirements

8    documents.  So, a business requirements document is the

9    standard form of a document that's used during the product

10   management process.  So, I developed those business

11   requirements documents as well as various diagrams that

12   explained the intended vision --

13        Q.    Okay.

14        A.    -- of the technology that we were seeking to

15   produce.  But I do not have any software.  There are some

16   test documents in there that spoke to the efficacy of the

17   software and that's what I had.

18        Q.    Okay.  What do you mean by test documents that

19   spoke to the efficacy of the software?

20        A.    Test articles.  So, we -- I developed a test

21   protocol to sort of measure the efficiency of how well the

22   software would do a specific task.  And I did not -- I found

23   the document describing the test procedure.  I did not see --

24   although it might be on there because I didn't look at every

25   single document but we did collect results of that and those

Page 20

1    results were summarized in a document that is in there as

2    well.

3        Q.    Okay.  And --

4        A.    But I didn't see the raw data.

5        Q.    Okay.  So, we keep talking about the software.  Can

6    you tell me in your words what that software is specifically?

7        A.    Yes.  So, one of the things that I wanted to

8    clarify here is that -- and, you know, somewhere in this

9    document I see references to British Petroleum and IBM and

10   whatnot.

11       Q.    Sure.

12       A.    So, can I speak a little bit about --

13       Q.    How about we go through the complaint together,

14   then.  I think that's what you're referring to.

15       A.    Okay.

16       Q.    So, can you point me to where in the complaint that

17   you're --

18       A.    Yeah.  (Witness reviews document.)  So, on Page 15

19   of the amended complaint, Section 41.

20       Q.    Okay.  What about Section 41 --

21       A.    There's a reference here to the software being --

22   the technology was being used by IBM under a separate

23   exclusive license and there's also a reference to a

24   3-million-dollar investment and then there is a reference to

25   the software had or was already in use for a case involving

Page 21

1    BP dealing with E-discovery.

2        Q.    Okay.  Are those statements true, to your

3    knowledge?

4        A.    Well, there's three different software packages

5    here that we're talking about.

6        Q.    Okay.  Can you explain those three different

7    software packages?

8        A.    Sure.  So, there was the software that Joe Haynes

9    developed.  That's Software No. 1.  Software No. 2 was

10   software from a company called Beyond Recognition.  Software

11   No. 3 was software that the Willis Group had acquired certain

12   rights to from BHP called Courthouse WalkAbout.  And my

13   observation here is that this reference to IBM is a reference

14   to the Beyond Recognition software and that the reference to

15   BP is pointing to the Courthouse Walkabout software that was

16   acquired -- certain rights were acquired from BHP.

17       Q.    Okay.  So, as far as your understanding goes,

18   you're saying that the Beyond Recognition software was used

19   by IBM?

20       A.    Purportedly.

21       Q.    Purportedly by --

22       A.    By John Martin, the CEO of Beyond Recognition.

23       Q.    Why do you say -- why do you say purportedly?

24   Because you only heard it from John Martin?

25       A.    Yes.  That's correct.

1      Q.    Did you yourself tell potential investors that the

2   Beyond Recognition software was being used by IBM?

3      A.    No.

4      Q.    Did you ever hear Mr. Tom Tatham say that the

5   Beyond Recognition software was being used by IBM or was used

6   by IBM?

7      A.    No.

8      Q.    What about Mark Willis?

9      A.    Probably.

10     Q.    Okay.  In what capacity did you hear him say that,

11  if you can recall?

12     A.    Mark was very involved with Beyond Recognition.

13  Mark and the Willis Group had made a huge investment in

14  Beyond Recognition.  And so, John Martin as CEO of Beyond

15  Recognition actually had an office down the hall from Tom and

16  I for some period of time.  And so, the Willis Group was --

17  Mark was very interested in what John was doing and John

18  would talk about, well, I've got a contract with IBM.  I've

19  got a contract with ExxonMobil.  Most of that turned out not

20  to be true.  But Mark was very involved in financing Beyond

21  Recognition's entry into the marketplace.

22     Q.    When did you find out that it was not true that IBM

23  used this Beyond Recognition software?

24     A.    I don't know that there was a specific date and

25  time.  It was more like a -- a realization that -- that this

Page 23

1    is all smoke and mirrors.

2         Q.    When do you recall that realization occurred?

3         A.    I would say probably the last straw, probably the

4    first half of 2017.

5         Q.    What was the last straw?

6         A.    The last straw was I paid money to John Martin to

7    become a reseller for his software.  I had a very specific

8    use case in the virtual data room -- with the virtual data

9    room application.  And I paid John $75,000 to build a version

10   of a software that we could market to the virtual data room

11   space.  I also engaged him in a project with a chemical

12   company in Alvin, Texas.  The name I forget.  Ascend, I

13   believe, was the name of the company.  And he failed to

14   deliver on both projects.  And I, through the course of

15   speaking to other people in the industry, realized that he

16   wasn't delivering it to anybody, including IBM.  And so, that

17   was sort of the last straw.

18        Q.    Okay.  So, when you say you paid $75,000 for Beyond

19   Recognition to build a specific software, were you paying

20   that on behalf -- was that a personal investment?

21        A.    Uh-huh.

22        Q.    Okay.  And then you mentioned another project with

23   Ascend.  Did you also -- you also paid money for that as well

24   personally?

25        A.    It was covered under the same agreement.

Page 24

1    Q.    Okay.  So, how much money total -- it was $75,000?

2    A.    It was, yeah.

3    Q.    Did you ever get that money back?

4    A.    No.

5    Q.    When did you pay him $75,000?

6    A.    It was during the year 2017.  May strikes a chord.

7    I would have to confirm that by looking at my notes.

8    Q.    Okay.  So, let's talk about the other software with

9    BHP.  Did Willis Group have a license with BHP?

10    A.    So, the back story is Beyond Recognition engaged

11    with Image Engine to deliver a pilot project to BHP to index

12    their land records.  BHP prepaid over -- I think it was

13    $561,000 or something like that to Image Engine for Beyond

14    Recognition.  So, Image Engine was a reseller for Beyond

15    Recognition at that point for the Willis Group.  And over the

16    course of time, Beyond Recognition failed to deliver the

17    project to the specifications and BHP became very unhappy.

18    And then BHP and Mark and Steve Elston -- and I wasn't a part

19    of this but they negotiated a settlement.  And through the

20    course of that settlement somehow the Willis Group received

21    rights to use a land records software application that --

22    what I heard from people that I was communicating with at the

23    time and probably from BHP because I was also talking to BHP

24    on behalf of Image Engine on and off -- that they had

25    invested $3 million in the development of that software.

Page 25

```
 1              So, now the Willis Group at Image Engine had

 2    rights to that software for their own use.  They also had

 3    rights to license the software to others.  And the software

 4    also had three counties of Arkansas land records.  And BP was

 5    in a subscription relationship with Image Engine to access

 6    those Arkansas records for use by their land men.

 7       Q.   Okay.  So, when you said they invested

 8    $3 million --

 9       A.   BHP told us that they had invested -- they had

10    hired a company called -- I believe it was Tecnic to build

11    that software application.  And they said we've invested

12    $3 million in this software.  And essentially, you know, you

13    would dump land records into it and then you could, you know,

14    sort and filter the land records to look for grantees and

15    grantors and instrument types and so on and so forth.

16       Q.   Okay.  So, I might need you to walk me through some

17    of that because it's a lot of new information.  So, as far as

18    BHP, BHP used the Tecnics software.  Is that the software

19    that --

20       A.   They hired Tecnics to build a software for them.

21       Q.   Is there a name of that software?

22       A.   Courthouse WalkAbout was the name given to it.

23       Q.   Okay.  I'm going to mark Exhibit 2.  It's an E-mail

24    from Mark Willis dated April 22, 2016.  And the Bates numbers

25    are WIL 1803 to 1804.
```

Page 26

```
1                    (Exhibit 2 marked)

2        Q.    (BY MS. McKNIGHT)  If you could just look at this

3    E-mail.  I guess it's a chain of E-mails.

4        A.    (Witness reviews document.)  Yes.  I recall this.

5        Q.    Okay.  And can you explain to me who Steve Elston

6    is.  You referenced him earlier.

7        A.    Yes.  Steve Elston was the CEO of Image Engine.

8        Q.    And on Page 1804, the last page, it's Amit Prasad

9    and the E-mail is Amit.g@tecnics.com.  Is this the company

10   that you were referring to earlier?

11       A.    Yes.

12       Q.    Okay.  And then it also has Tom Callaghan.  Who is

13   Tom Callaghan?

14       A.    Tom Callaghan was an employee of -- or actually a

15   contractor for Image Engine in an IT capacity.

16       Q.    Okay.  And then it's an E-mail from Tom to Amit

17   discussing enhancing the WalkAbout system soon and we were

18   wondering if you were interested in some contract work.  And

19   then Amit responds, sure, let us know when you would like to

20   discuss.  So, then it looks like Steve Elston forwarded --

21   forwards that E-mail to Mark on April 22nd and then he asks

22   for time to set up a meeting regarding WalkAbout.  And then

23   it looks like Mark then forwards that to you regarding the

24   developer of the software that we got assigned from BHP.  Did

25   you ever have a meeting concerning this software?
```

Page 27

1     A.    We did.

2     Q.    Okay.  Do you recall when that was?

3     A.    I would assume that it is probably within a week or

4  two after the last date of the E-mail here.

5     Q.    Okay.

6     A.    So, late April, early May.

7     Q.    And what happened at that meeting?

8     A.    There was a demo done by Tom of the WalkAbout

9  software.  And the participants in the demo were myself,

10  Mark, Greg Kane.  Tom, you were probably there.  And there

11  may have been other people there as well.

12     Q.    After that demo, did -- did you ever receive that

13  software to use specifically?

14     A.    The purpose of the meeting was to let the subject

15  matter experts -- so, the Gregs and the Toms -- vet whether

16  or not the software had sufficient functionality to be able

17  to accomplish the objectives of Title Rover.

18     Q.    What were those objectives?

19     A.    Well, my observation there was that was somewhat of

20  a state of flux in terms of what the objectives were.

21     Q.    Okay.  And when --

22     A.    The general objective was to find a way to

23  modify -- to monetize defects in the oil and gas leases and

24  titles to minerals and so on.  That was the overarching

25  objective.  But there were numerous potential strategies that

Page 28

1    could potentially be leveraged to identify those

2    opportunities.

3        Q.    Okay.  And at this meeting, what was the -- what

4    were those strategies or opportunities that were discussed?

5        A.    Well, there was -- some of the ideas were -- and

6    this is all documented on the hard drive that I gave you.  I

7    have -- I was the primary person who kept track of what the

8    potential scenarios were.

9        Q.    Okay.

10       A.    So, that's all on the hard drive.  And, you know,

11   Greg Kane had a number of scenarios that he thought were

12   interesting.  Some of those had not -- most of those had not

13   been legally tested to my observation.  But there were a lot

14   of theories around finding, you know, wobbly boundary

15   descriptions that would potentially create a gap that would

16   potentially be a leasing opportunity.  There was the idea of

17   being able to do deed hops, so being able to track

18   instruments over the course of time in order to be able to

19   determine who actually owned what when.  There were -- I

20   mean, there was -- I don't know -- probably 25 or 30

21   potential scenarios that were talked about through the course

22   of time.  And -- so, it made the -- I thought that it made

23   the task quite difficult of trying to collapse all of the

24   collective discussion into an actionable plan.  What do you

25   really want the software to be able to do, right.  That

Page 29

```
 1    was -- that was a -- the most challenging part of my job,

 2    trying to sift through all the discussions and distill that

 3    down into a plan that we can actually move forward with

 4    something.

 5        Q.    Okay.  And so, I know we've kind of -- I'll come

 6    back to more on this E-mail and what we're talking about.

 7        A.    Sure.

 8        Q.    But to kind of take a broader view, you're talking

 9    about my job.  What was your job in this role with Title

10    Rover?

11        A.    Project manager.

12        Q.    How did you find out about Title Rover or come to

13    be project manager of Title Rover?

14        A.    Well, the beginning of the story is Susan and I

15    found Greg Kane on the internet through LinkedIn or someplace

16    and started communicating with Greg through E-mail.  And I

17    actually -- as I recall, estimate, that I spoke to Mark about

18    Greg.  And Greg said I think I know him.  And Greg came in

19    for a meeting and Greg proceeded to espouse his evil EOG

20    theories and Mark became interested.  Susan and I had, by

21    virtue of our work in mortgage-backed security space, we had

22    a lot of knowledge of land records and I had a lot of

23    knowledge of technology.

24        Q.    Okay.

25        A.    So, sort of the crystallization of the idea is
```

Page 30

1    that, wow, if Greg is anywhere close to being right and, you

2    know, we can harness the power of technology to help grind

3    through the data and find these scenarios that he's talking

4    about, that would be interesting maybe, right.  So, that was

5    the -- I can't remember when that all happened.

6        Q.    I was just going to ask.

7        A.    But it was some time -- so, Title Rover started --

8    so, January of '16, I think, right?  In that time frame or

9    first quarter of 2016.  So, this would have been probably the

10   latter half of 2015 that those discussions occurred.  And

11   then Tom came into the picture and it was decided to form a

12   company and so on and so forth.

13       Q.    Okay.  So, when -- you said that Greg discussed his

14   evil EOG theories.  What do you mean by that?

15       A.    So, Greg was a very interesting character.  And he

16   had a number of theories that were all pointing to EOG

17   planning a major E&P play in the counties north of Houston,

18   Madison County, adjacent counties, Walker County.  And his

19   evidence for that -- and I actually went up and rode around

20   with Greg for a day and he would show me trucks carrying

21   equipment and he would show me power lines being built

22   carrying high-voltage power and his theory was that EOG was

23   getting ready to punch a lot of holes in the ground and all

24   this infrastructure was being built in order to support all

25   of that exploration and production activity.  That was his

Page 31

1    theory.

2        Q.    Okay.  So, when -- you said that Mark was at this

3    meeting initially with you, Susan, and Greg, correct?

4        A.    Yeah.  Susan was on the phone because she lives in

5    Boston.  So, it would have been me there in person, Greg in

6    person, and Mark in person.

7        Q.    Okay.  Was that in Houston?

8        A.    Yeah.  It was at the Willis Group offices at 1400

9    Post Oak.

10       Q.    So, once -- you said that you and Susan found

11   out -- found Greg through LinkedIn?

12       A.    We found him on the internet someplace.  I can't

13   recall exactly how we found him.

14       Q.    Okay.

15       A.    But we found --

16       Q.    Why were you looking for -- how did you stumble

17   upon him?

18       A.    I don't remember.  I don't remember exactly.

19       Q.    Okay.

20       A.    We were doing some research.  Susan and I were

21   doing some research.  We were looking for, you know, ways to

22   do some work for somebody.  And Greg seemed to have an

23   interesting background.  And we connected with him and then

24   he was very excited to meet us and, you know, so on.

25       Q.    Okay.  And then you reached out to Mark when --

                                                    Page 32

1    after you talked to Greg?

2        A.    Yeah.

3        Q.    Okay.  And what was it that specifically made you

4    reach out to Mark?

5        A.    Well, I think I was sharing some background with

6    Greg on who I knew in the Houston market and I probably

7    mentioned Mark to Greg and Greg probably said, hey, I know

8    the Willises.  And that was probably how it transpired.  And

9    then I mentioned it to Mark and Mark said get him in here,

10   let's talk to him.

11       Q.    Okay.  And then is that where he was talking

12   about -- what was being specifically discussed at this

13   meeting that led to the launch of Title Rover is what I'm

14   getting at?

15       A.    Greg was talking about his evil EOG theories and

16   how he had all of these ideas for how these legal defects

17   could be found given the right technology and then monetized

18   as opportunities.

19       Q.    Okay.  So, how did BHP get linked into this

20   discussion, if at all?

21       A.    It didn't.

22       Q.    Okay.

23       A.    That was a total separate set of activities that

24   was occurring at Image Engine.

25       Q.    Okay.  So --

Page 33

 1        A.    So, that was -- Image Engine was a reseller for

 2    Beyond Recognition.  They had a project with BHP.  The

 3    project failed.  Settlement agreement.  Willis Group got

 4    access to the BHP software, the WalkAbout software.  And then

 5    after we formed or started to form -- I'm not sure if it was

 6    formally formed yet, I think it probably was -- then Steve

 7    Elston was saying, hey, don't hire Brent and Susan and Joe to

 8    build software.  Use ours.  We'll just show it to you.  And

 9    so, that's what this is about.

10        Q.    Okay.  And did they ever use the software for Title

11    Rover?

12        A.    No.

13        Q.    Why not?

14        A.    To my knowledge.  It had limited functionality.

15    So --

16        Q.    We're talking about the WalkAbout software?

17        A.    We are.

18        Q.    Okay.  Just want to make that clear.

19        A.    We're talking about the WalkAbout software.

20        Q.    And what made it limited?

21        A.    So, why don't I give you a little bit of a primer

22    on functionality, if that's okay.

23        Q.    I would love that.

24        A.    So, if you are -- if you go on the web and you go

25    to any county's land records in the United States for the

                                                    Page 34

1    most part and you can pay a fee or maybe it's free for a

2    limited use but, you know, you want to go in and look for an

3    instrument that's been recorded in a courthouse someplace.

4    So, the typical way that you do that is you maybe pay a fee,

5    maybe you don't, depending on the county.  But you go in and

6    you can search for -- are you familiar with the terms grantor

7    and grantee?

8         Q.    Yes.

9         A.    So, you can go in and search for a grantor, a

10   grantee.  Most of the time you can sort by date range and

11   most of the time you can also sort by instrument type.  So, a

12   deed versus a lease versus a will versus something else.

13   Okay.  And bring those documents back to be viewed and

14   printed, saved, whatever.  Okay.  That's standard

15   functionality for the land records management application.

16   And that was -- that was what WalkAbout had was pretty

17   standard functionality to allow a user to go in and do those

18   basic searches by grantor, grantee, instrument type, and

19   date.

20        Q.    Do you know why Willis Group paid $3 million for

21   software that had standard functionality?

22        A.    So, the Willis Group --

23             MS. SWEENEY:  Objection.  Misstates facts.

24        Q.    (BY MS. McKNIGHT)  You can answer.

25        A.    They didn't pay $3 million.  They got the software

                                                    Page 35

1    as a barter with BHP.

2        Q.    Okay.  As part of the settlement?

3        A.    Uh-huh.  BHP purportedly --

4        Q.    Is that a "yes"?

5        A.    -- paid $3 million to Tecnics, whatever the

6    company's name is, to build the software.  That's what they

7    told us.  But Image Engine, Willis Group, they didn't pay

8    $3 million for the software.  It was, again, received as part

9    of a settlement agreement, which is also on the hard drive.

10       Q.    Okay.  So, on Page 15 back on Exhibit 1.  I just

11   want to be clear in Paragraph 41, the piece that says that

12   Willis Group had invested $3 million into the Title Rover

13   Technology.

14       A.    Uh-huh.

15       Q.    Do you have any understanding that Willis Group

16   invested $3 million into any piece of the Title Rover

17   technology that we've mentioned today?

18       A.    Well, I know that they invested a few million

19   dollars in Beyond Recognition.

20       Q.    But as for the software that we've talked about

21   today, did they invest $3 million?

22       A.    So, there's a period of time when it was -- we

23   were -- I was asked to evaluate Beyond Recognition software

24   as it relates to supporting the Title Rover mission.  And

25   also on the hard drive are statements of work which I wrote

Page 36

1    which outlined what it is we would want Beyond Recognition to

2    do to create a value add, if you will, to the Title Rover

3    mission.  Now, the Willis Group had invested a lot of money

4    in Beyond Recognition.  So, we were interested in taking a

5    look at what they could potentially bring to the table in

6    order to make the effort a more productive effort, right.

7    That didn't go anyplace.  They failed -- Beyond Recognition

8    failed to deliver any useful work.

9        Q.    Do you know when Willis Group invested money into

10   Beyond Recognition?

11       A.    Between two thousand -- so, I estimate.  Between

12   2013 and 2016.  It went on for a while.

13       Q.    Okay.  But they -- and by "they," I mean Willis

14   Group -- just invested into the company Beyond Recognition?

15       A.    I'm not sure how they actually did the investment.

16   But I know that it was general knowledge in the Willis Group.

17   I mean, Mark told me specifically I've invested over a couple

18   million dollars in these guys, you know.  And he was very

19   anxious about wanting to see something for his money.

20       Q.    Okay.

21       A.    Which he never did.

22       Q.    When did Mark tell you that?

23       A.    Probably -- oh, man.  I don't know.  2015 or '16.

24               THE WITNESS:  Can I get some more coffee?

25               MS. McKNIGHT:  Yeah.  We can take a

Page 37

```
 1    five-minute break.

 2               MS. SWEENEY:  Bonnie, before we go off the

 3    record, I just want to state an objection or at least a

 4    caution that to the extent the documents produced in the hard

 5    drive by Mr. Stanley contain, I think he said, the settlement

 6    agreement between Willis Group or Image Engine and BHP, if

 7    that has a confidentiality provision, then we want to reserve

 8    our right to review that and maintain its confidentiality and

 9    its protections before reviewed by plaintiff.  So, I want

10    that on the record.

11               MS. McKNIGHT:  Okay.  We can confer on that

12    further maybe after -- or off the record.  We can go off the

13    record.

14               (Recess from 11:13 to 11:27)

15    Q.    (BY MS. McKNIGHT)  So, let's go back to Exhibit 1,

16    what we were talking about with the Paragraph 41.  A lot of

17    this is, you know, new information.  So, I want to make sure

18    I understand clearly what applies to which technology that

19    you mentioned earlier today.

20               So, the last piece of this Paragraph 41 is

21    regarding the software had or was already in use for a case

22    involving BP dealing with E-discovery.  Is that the BHP

23    WalkAbout?

24    A.    That's correct.  Yes.

25    Q.    Okay.  And do you know that it was used by BP?
```

Page 38

1      A.    Yes.

2      Q.    Okay.  How do you know that?

3      A.    Because I was asked to renew that contract by Mark

4  as part of assisting him in the figuring out of Image Engine

5  assets.

6      Q.    Ultimately Title Rover decided not to use the

7  WalkAbout technology, correct?

8      A.    Correct.

9      Q.    When did that -- when was that decision made not to

10  use the WalkAbout technology?

11     A.    I would say that it was probably some time soon

12  after the meeting that occurred as a result of this E-mail

13  thread in Exhibit 2.

14     Q.    Okay.  So, late April, early May, 2016?

15     A.    Yeah.

16     Q.    Okay.  So, did you ever hear anyone -- strike that.

17           Did you ever hear Mark Willis tell any

18  potential investors of Hopewell that the WalkAbout technology

19  was going to be used in Title Rover?

20     A.    No.

21     Q.    Did you ever hear Mark Willis represent that the

22  technology used by Title Rover was going to be -- or had been

23  used by BP?

24     A.    No.

25     Q.    What about Tom Tatham?  Did you ever --

                                              Page 39

1      A.    No.

2      Q.    -- hear him tell a potential investor that the

3   Title Rover technology had been used previously for a case

4   involving BP?

5      A.    No.

6      Q.    Okay.  And then did you ever hear Mark Willis --

7   actually strike that.  I think we covered that.

8              So, I'm going to mark Exhibit 3.  It's titled

9   development plan.  And the Bates numbers are PLTF 547 to 548.

10             (Exhibit 3 marked)

11     Q.    (BY MS. McKNIGHT)  Have you seen this document

12  before?  Or take a second to review it.

13     A.    Yeah, I have.  I think I wrote it.

14             MS. SWEENEY:  Sorry.  What's the Bates label

15  again?

16             MS. McKNIGHT:  547 to 548 PLTF.

17     A.    I'm pretty sure I wrote this.

18             MS. McKNIGHT:  It's actually -- I think it has

19  a title in it, Shannon.  It's BR development plan.

20             MS. SWEENEY:  Got it.  Thank you.

21     Q.    (BY MS. McKNIGHT)  So, you believe that you wrote

22  this document?

23     A.    Yeah.  Pretty sure I did.

24     Q.    You sounded sad when you said that.

25     A.    It was a sad experience.

Page 40

1      Q.    Oh, yeah.  What was so sad about it?

2      A.    That so --

3      Q.    Looks like it's cut off partially as well.

4      A.    -- much effort was being spent and money was being

5    spent on BR, Beyond Recognition, and it was -- there was no

6    success story on any of the projects that I was aware of.

7    And we had just come off this massive failure at BHP where --

8    I mean, it was a total, total disaster, right.  And here we

9    are, you know, looking at BR to help Title Rover.  So, we

10   were -- I was very -- I was cautious about what we were

11   expecting to get from this effort and I was right.  We got

12   nothing.

13     Q.    Okay.  And I just want the record to reflect it

14   looks like a page might be missing from the development plan

15   in the exhibit.

16     A.    This is likely also on the hard drive.

17     Q.    Okay.  That's great.  So --

18     A.    I think I saw this.

19     Q.    -- you said the BHP was a disaster?

20     A.    Uh-huh.

21     Q.    Because of how -- why?

22     A.    Because BR failed to deliver the work product that

23   BHP asked them to.  There was a written statement of work and

24   it took an enormous period of time to get the work done.

25   There was constant fighting and bickering between BHP and BR

Page 41

```
 1    and Image Engine about, you know, what the requirements were
 2    and can't do this, can't do that.  And then BHP just finally,
 3    you know, said time out, you know.  We're not going to keep
 4    doing this after about a year and a half of like trying to
 5    get this project done.  And so, BHP actually asked for their
 6    money back and then the settlement agreement was negotiated.
 7         Q.   So, that was prior to the Title Rover project?
 8         A.   Yeah.  Yeah.  That was all -- and I was sort of
 9    watching that thing develop from afar because John Martin
10    didn't like me and didn't want me involved in any of the
11    projects, although he and I warmed up over the course of
12    time.  But I was not involved in BHP directly in that project
13    with Image Engine.  I was asked to stay out of it because
14    that was a period of time when John didn't like me, wouldn't
15    go to a meeting if I was there.  But, you know, I certainly
16    had my ear to the ground and heard what was going on.  And,
17    in fact, when BHP asked Image Engine to give them their money
18    back, Mark sent me to go talk to BHP and offer to redo the
19    work using other technology.  And so, I made that pitch to
20    BHP and they thanked me for my time and showed me the door.
21         Q.   Is this the project with the Arkansas counties or
22    was that separate?
23         A.   So, WalkAbout had Arkansas data in it.  That was
24    the BHP software that Image Engine got as we developed the
25    settlement.  That was then licensed to BP.  Okay.
```

Page 42

1    Q.    Okay.

2    A.    So, now we're talking about -- right now we're

3    talking about the Beyond Recognition software that was being

4    used to execute a project where BHP put the Image Engine as a

5    reseller for Beyond Recognition software.  And I'm sorry this

6    is confusing but there's a whole sequence of events that are

7    related here.

8    Q.    That's fine.  And I apologize.  I don't want to be

9    super repetitive.  It's just --

10   A.    If we had a white board --

11   Q.    We could figure it out?

12   A.    Diagram this, yeah.

13   Q.    So, this development plan in Exhibit 3 is regarding

14   the Beyond Recognition software that Image Engine was

15   reselling or --

16   A.    This exhibit -- Exhibit 3?

17   Q.    Yeah.

18   A.    This Exhibit 3 is the statement of work, which I

19   wrote, to test the efficacy of Beyond Recognition software to

20   assist in the Title Rover effort.

21   Q.    Okay.  Did -- it says Phase I at the bottom

22   regarding primary indexing and user interface.

23   A.    Uh-huh.

24   Q.    Did that phase get accomplished?

25   A.    No.

Page 43

1      Q.    I guess, I want to try to understand why you say

2  BHP WalkAbout disaster -- there was a disaster with BHP and

3  now you go to this and this was also --

4      A.    With Beyond Recognition.

5      Q.    -- a letdown with Beyond Recognition.  Why do

6  you --

7      A.    The disaster was between BHP and Beyond

8  Recognition.  Why did we continue to engage with Beyond

9  Recognition?  Because a big investment had been made in

10  Beyond Recognition.

11      Q.    By the Willis Group?

12      A.    Yes.  So, there was a continued desire to leverage

13  that investment for something useful.  And so, this was -- I

14  wrote this.  I said, all right, let's give them a tight

15  scope.  Let's see what they can do.  And they failed to

16  deliver.  So, it was another college try, probably the near

17  last one.

18      Q.    Do you know what the time frame was to achieve

19  Phase I?

20      A.    I think that this says that there's 15 days to

21  complete a setup and it says on the second page the time

22  frame for completing Phase I should not exceed 30 days from

23  the date of execution by all parties.

24      Q.    So, if this is dated June 24, 2016 -- so, Phase I

25  should have been accomplished by the end of July?

Page  44

1      A.    That would make sense, yeah.

2      Q.    Okay.

3      A.    That's correct.

4      Q.    At the end of July, did you have concerns about

5    Beyond Recognition's ability to accomplish the plan for Title

6    Rover?

7      A.    Yes.

8      Q.    Did you raise those concerns with Mark Willis

9    and --

10     A.    Yes.

11     Q.    And what about Tom Tatham?

12     A.    I believe so.  Tom was part of the team --

13     Q.    Okay.

14     A.    -- talking about this.

15     Q.    What did they say to that?

16     A.    Well, I don't think anybody was particularly

17   surprised necessarily because of the track record of John

18   Martin.

19     Q.    Okay.  Do you know why Beyond Recognition failed?

20           MS. SWEENEY:  Objection.  Calls for

21   speculation, unless he knows.

22     A.    Well, there was -- there was a general reason,

23   which was that John has extreme attention deficit disorder

24   and he refused to let anyone else run his software but

25   himself.  And so, he was always juggling a thousand balls and

Page 45

```
 1    he dropped a lot of balls.  And there were also questions

 2    about what is this software really doing here to begin with

 3    and how good is it and can it really do what he says it can

 4    do.  So, for all of those reasons, there was trepidation.

 5        Q.    (BY MS. McKNIGHT)  Okay.  I'm going to mark

 6    Exhibit 4.  It's an E-mail from Tom Tatham to Brent

 7    Stanley -- or a series of E-mails, I should say, with the

 8    Bates numbers TAT_717 to 720.

 9              (Exhibit 4 marked)

10        Q.    (BY MS. McKNIGHT)  So, if you can just review.  It

11    looks like a chain of E-mails.  The last E-mail -- or the

12    earliest E-mail being July 9, 2016 to July 27, 2016.

13        A.    All right.  (Witness reviews document.)  Okay.

14        Q.    Do you remember receiving this chain of E-mails?

15        A.    Not specifically but obviously I did.

16        Q.    Okay.  And it's -- brentstanley@titlerover.com is

17    your E-mail or was?

18        A.    That's what this says, yeah.

19        Q.    So, it looks like --

20        A.    It's bstanley@titlerover.com.

21        Q.    The first E-mail on TAT 720 appears to be an E-mail

22    from Tom to Justin Pannu.  Do you know who Justin Pannu is?

23        A.    I don't recall if I met him or not.  I'm pretty

24    sure that I might have.  But I am sure that he was on one or

25    more conference calls that I was on.
```

Page 46

1      Q.     Okay.  And was your understanding of Justin Pannu

2    to be a potential investor in Hopewell?

3      A.     Correct.

4      Q.     And can you provide me with your understanding of

5    what the Hopewell-Pilot Project was as it relates to Title

6    Rover?

7      A.     It was a -- a focused effort to be able to prove

8    the efficacy of the ability to -- did I say that word

9    right -- efficacy.  I should stop saying it because I butcher

10   it.

11     Q.     That's okay.

12     A.     Proving the usefulness of the effort.  We were to

13   create monetization opportunities.

14     Q.     Okay.  And how did it interplay with Title Rover?

15     A.     What do you mean, how did it interplay?

16     Q.     Like it looks like you're involved as an operator

17   of -- or project manager of Title Rover and, yet, Justin

18   Pannu is trying to invest or was looking to invest in

19   Hopewell-Pilot Project.  Can you provide -- elaborate for me

20   what Title Rover's role was with Hopewell-Pilot Project?

21     A.     My understanding was that Title Rover was going to

22   sort of own the technology and data and subject matter

23   expertise and then subcontract that to the Hopewell project

24   for exercise of demonstration.

25     Q.     Okay.  And did Title Rover own technology

Page 47

1  specifically that was used for -- licensed to Hopewell?

2      A.   Well, I mean, they had three software packages,

3  right.  They have the BHP software in the mix, the Willis

4  Group asset.  They had the Beyond Recognition software and

5  then they had the software that Joe Haynes developed.  The

6  software that Joe Haynes developed was the primary software

7  that was the only software that I was aware of that was being

8  used, other than this failed effort with Beyond Recognition.

9  But we used the software that Joe built as the main software.

10     Q.   Okay.  So, going back to Exhibit 4.  Were you in

11 charge of putting on presentations for Title Rover concerning

12 the Title Rover capabilities and application?

13     A.   I was periodically asked to present, uh-huh.

14     Q.   And then on the top page of Exhibit 4, seven --

15 Bates stamp 717, it says that -- Tom says, "Hi Case.  We have

16 a web presentation on Title Rover."  Skipping down, "I will

17 have Brent Stanley, our CTO, send you instructions."

18               Were you CTO of Title Rover?

19     A.   No.

20     Q.   How many webinars did you put on for Title Rover?

21 Do you recall an estimate?

22     A.   I don't recall the exact number.  I don't recall it

23 being too many.  I would be -- I would say somewhere between

24 two and four is my recollection, estimate.

25     Q.   And what did you present in the webinars

1   specifically?

2      A.   The PowerPoint that's referenced in this E-mail

3   thread.

4      Q.   Okay.

5      A.   It references Title Rover, July 26, 2016.pptx.

6      Q.   Did you produce that document in your hard drive?

7      A.   Yes, I did.  I believe that I did.  I would have to

8   confirm that.  There's a bunch of PowerPoints on there.

9      Q.   Sure.

10     A.   It's likely one of them.

11     Q.   I'm going to mark as Exhibit 5 Bates stamped

12  document PLTF 670 to 7105.

13              (Exhibit 5 marked)

14     Q.   (BY MS. McKNIGHT)  If you can just take a look at

15  that packet.

16     A.   (Witness reviews document.)  Yeah.  I wrote all

17  this.

18     Q.   Was this part of the presentation that you gave on

19  the webinar?

20     A.   Likely.

21     Q.   So, on Page 671 it says management team.  It says

22  Brent Stanley, CTO.  So, did you -- you said you weren't CTO.

23     A.   No.

24     Q.   Then why were you being branded as CTO of Title

25  Rover?

                                                     Page 49

1      A.    I think Tom and Mark wanted me to assume that title

2    for the purposes of presentation.

3      Q.    Okay.  Why?  Do you know why?

4      A.    Girth.

5            THE REPORTER:  I'm sorry?

6      A.    Girth.

7      Q.    (BY MS. McKNIGHT)  That's a good word.

8            MS. SWEENEY:  I'm going to object to calling

9    for speculation.

10           MS. McKNIGHT:  Sure.

11     Q.    (BY MS. McKNIGHT)  So, it says on the same page

12   flex team powered by Willis Group Beyond Review.  Do you know

13   what that's referring to?

14     A.    Yes.

15     Q.    What is it referring to?

16     A.    So, Beyond Review is a company -- Willis Group

17   company whose purpose was to staff document review projects.

18   And the word beyond in the name Beyond Review implies an

19   intended use of Beyond Recognition technology to be part of

20   the solution for document review.

21     Q.    Okay.  Did you work directly with Beyond Review?

22     A.    I worked directly with two young ladies who were

23   supporting the project who I understand, understood were

24   formerly contracted through Beyond Review.

25     Q.    Okay.  Were those attorneys?

Page 50

1      A.     They were.  So, Lauren Messer and Jennifer

2   Burkhardt.

3      Q.     What was their role?

4      A.     They were skilled in the land man work and were

5   tasked with activities to examine legal defects and open

6   mineral interests.

7      Q.     Okay.  GIS analyst, what is meant by that?

8      A.     There was a plan to add spatial data.  Are you

9   familiar with what spatial data --

10     Q.     No.  Please explain.

11     A.     So, spatial data is data that allows you to

12   understand and visualize the topography.  So, spatial data is

13   data -- is a data set that you could -- you zoom in on a

14   county, zoom in on a parcel and look at the wells and look at

15   the production from the wells and so on and so forth.  There

16   was a -- there was a vision to add spatial data to the work

17   flow at some point in time.  And in doing that, you would

18   need GIS geographical information systems technology

19   expertise to work with this spatial data.  But that was a

20   futures thing, not a -- we didn't get to it.

21     Q.     Okay.  That would be one of the objectives that you

22   were talking about earlier?

23     A.     Yeah.  And I would point you to, also -- if you

24   don't mind my --

25     Q.     Sure.

Page 51

1        A.    There's a spider chart on Page 4 of the second

2    document.

3        Q.    Can you give me the Bates number at the bottom

4    right-hand corner?

5        A.    Yeah.   684.

6        Q.    Okay.

7        A.    So, in this -- I authored this as well.   So, this

8    was the vision for what we thought the technology could

9    ultimately accomplish.   And as you can see here, each bubble

10   is another data source.   You've got your spatial data.

11   You've got your tax data.   You've got your appraisal district

12   data.   You have your probate records.   You have your Texas

13   Railroad Commission database.   So, our vision was to work at

14   integrating as many of these, and hopefully all of these data

15   sources, into a single portal.   That was the vision.

16       Q.    Did that happen?

17       A.    No.

18       Q.    So, that page that you're referencing appears to be

19   part of the page that's titled on 681 as data mining for

20   mineral resource investigations, capabilities summary and

21   technical overview.

22       A.    Uh-huh.   Yes.

23       Q.    What was the purpose of preparing this document?

24       A.    It's a marketing document.

25       Q.    And you said you prepared this document?

1     A.     Yes.

2     Q.     Did anybody else prepare any marketing documents

3  for Title Rover?

4     A.     Not to my knowledge.

5     Q.     Do you know who this was provided to?  And, I

6  guess, "this" I'm referring to the -- I guess, the entire

7  packet.

8     A.     I'm assuming it was provided to the potential

9  investors.

10     Q.     Did you -- did you yourself send Exhibit 5 -- any

11  piece of Exhibit 5 to potential investors?

12     A.     I don't recall.  I would have to look at the E-mail

13  threads and verify if I did or not.

14     Q.     Okay.

15     A.     I was not in the habit of communicating with the

16  investors on a regular basis or at all.

17     Q.     Okay.  What did you -- so, your scope of

18  communicating with potential investors was on webinars?

19     A.     Webinars.  There was at least one in-office meeting

20  where I had a fairly brief meeting with a couple of gentlemen

21  who were potential investors.  I believe, Tom, you were at

22  that meeting.  It was in my office.  But that was the only --

23  that's the only meeting that I specifically recall.  I recall

24  there was another meeting that we had at the Willis Group

25  with a -- another set of folks who were interested in

Page 53

1    potentially marketing Title Rover to land departments and E&P

2    companies.  That was another meeting that I specifically

3    remember.  I remember going through this PowerPoint with some

4    of the investors on at least one webinar.  Could have been

5    more.  I can't recall.

6         Q.    And you say "this PowerPoint."  Do you mean the

7    670 -- the PowerPoint starting on Page 670?

8         A.    Yes.  And there were different versions of this

9    that I produced over time as I edited and tweaked.  And all

10   the versions that I have are on the hard drive.

11        Q.    Okay.

12        A.    They don't change too much.  I mean, it's, you

13   know, same story for the most part.

14        Q.    Okay.  So, Exhibit 5 or I should say the data

15   mining for mineral resource investigations on July -- it

16   looks like it's created on July 25, 2016, is that what that

17   date is for?

18        A.    That date would have been the date that I put on

19   the presentation at the time that I created the presentation,

20   not necessarily the exact date that it was delivered.

21        Q.    Okay.  And is it fair to say that the information

22   that's covered in Exhibit 5 would have been what was covered

23   in the webinar and the corresponding webinar that applied

24   with the dated document?

25        A.    Yeah.  Yeah, it would be.

                                                      Page 54

1    Q.    Would anything else have been covered in the
2   webinar?
3    A.    No.  I doubt it.  I mean, this is -- I mean,
4   normally -- I don't recall whether or not we had any
5   functioning software at that point.  We may have.  If we did,
6   then I probably would have done a demo of the software as
7   well, which would be my normal methodology for doing webinars
8   is you lead with a PowerPoint and then you do a demo of the
9   software.
10   Q.    Okay.  So, going back to Exhibit 4 on 717, you said
11  Justin, I'm -- I'm the CTO here at Title Rover and I will be
12  covering the attached PPT on the WebEx tomorrow along with
13  Tom and Mark.  Do you recall Tom and Mark being with you on
14  every webinar that you had?
15   A.    It would be normal course for them to be on every
16  webinar that I had.  I would never have done one without at
17  least one of them or both of them.
18   Q.    Okay.  And did they ever speak themselves or did
19  you present the entire webinar?
20   A.    It would be normal for both of them to speak,
21  especially at the beginning and at the end.
22   Q.    Okay.  What would they say, to your recollection?
23   A.    I really don't have a recollection of that.  So, I
24  mean, normally it would be setting the stage for me and then
25  doing a close at the end.

Page 55

1      Q.    And by close, do you mean like a recap or trying to

2    close the deal to get investors?

3      A.    They wouldn't do that over the phone.  That would

4    be done later.  But it would be a recap.

5      Q.    Okay.  Were the -- was the webinar recorded?

6      A.    I don't recall that it was.

7      Q.    I'm going to mark Exhibit 5 (sic).  The Bates

8    number is WIL_1809 to 1810.

9            THE REPORTER:  This will be No. 6.

10           MS. McKNIGHT:  Six.  Sorry.

11           (Exhibit 6 marked)

12     Q.    (BY MS. McKNIGHT)  Does that -- it says on here

13   recording but only looks like six seconds.  Do you know what

14   occurred here?  It's just a little confusing.

15     A.    Do not.

16     Q.    Does it refresh your recollection as to whether or

17   not these presentations were recorded?

18     A.    I don't recall that they were.  I do not know what

19   this means, that there's an indication of six seconds of

20   recording.

21     Q.    Okay.  But if you go to six -- sorry -- 1810, the

22   next page, is this the invite that would be sent out to

23   potential investors to join the webinar?  Does it look

24   similar to an invite that would have been sent out to

25   potential investors?

Page 56

1       A.      Yeah.  This is a standard WebEx invite.

2       Q.      And then you would send that out?

3       A.      Well, the person scheduling the meeting would send

4   it out.  I mean, it would typically be common for me to

5   create the WebEx and send it to Michelle Johnson or Tom or

6   Mark and they would forward it on to the investors.  That

7   would be common practice.

8       Q.      Okay.  Going back to Exhibit 5.  On Page 672, which

9   is the third page in -- sorry.

10      A.      Uh-huh.

11      Q.      The second paragraph says, "It has developed its

12  own proprietary technology and licensed sole rights to

13  additional technology which delivers a ten times improvement

14  to traditional methods of supporting data investigations and

15  specialized analysis."  What is that referring to?  Which

16  technology?

17      A.      That's pointing to Beyond Recognition.

18      Q.      And by that, are you talking about the piece where

19  it says "licensed sole rights to additional technology which

20  delivers a ten times improvement to traditional methods of

21  supporting data investigations and specialized analytics"?

22      A.      That's correct.

23      Q.      And then as far as it has developed its own

24  proprietary technology, what is that referring to?

25      A.      That's referring to the work that Joe Haynes did.

Page 57

1      Q.    Did you write this slide?

2      A.    I did.

3      Q.    Did anyone provide you with this information to put

4    into this slide?

5      A.    It would be normal course of process for me to

6    share drafts of everything that I was doing.  And to receive

7    feedback from Tom, Mark and make those edits as appropriate.

8      Q.    Okay.  Were there concerns about making

9    representations about Beyond Recognition's technology given

10   the problems that you testified earlier today?

11     A.    Can you repeat?

12     Q.    Were there concerns regarding presenting this --

13   making representations concerning the Beyond Recognition

14   software given the roadblocks that you testified to earlier

15   today?

16     A.    I think that there would have been concerns but

17   there was hope.

18     Q.    Okay.

19     A.    Perhaps misguided but there was hope.

20     Q.    Do you recall on any of your -- on the webinar

21   presentations mentioning the problems with the Beyond

22   Recognition issue?

23     A.    We wouldn't have aired our dirty laundry.

24     Q.    Okay.  So, on Page 674, can you turn there, please.

25   It says, "Custom indexing using Beyond Recognition."  So,

Page 58

1    there was a hope that that would be used?

2         A.    There was, yes.

3         Q.    But at the time this hadn't been developed?

4         A.    I don't recall the exact timing of when we did the

5    statement of work exercise.  Let's take a look at that as it

6    relates to this.  So, this is June and this is July.  So, it

7    looks like we probably would not have reached the conclusion

8    on this statement of work at the time of this date on the

9    PowerPoint.

10        Q.    Okay.  And when you say "conclusion," are you just

11   saying that it failed?

12        A.    Well, a confirmation of its capabilities of doing

13   what was articulated in the statement of work.

14        Q.    Okay.  It says custom filtering, custom grouping.

15   Is that also Beyond Recognition?

16        A.    No.

17        Q.    Would that be Joseph Haynes' software?

18        A.    Yes.

19        Q.    What about integrated production, permitting,

20   appraisal district, and probate?

21        A.    It was not done.

22        Q.    I'm sorry.  It was not ever done?

23        A.    Correct.  It was not done.

24        Q.    Okay.  Would that have been with Beyond

25   Recognition?

Page 59

1        A.     No.

2        Q.     Who would that have been with?

3        A.     That would have been done with resources that we

4     would have had to identify like the GIS analysts.  We need --

5     we would have needed to pull in some more resources to work

6     with Joe to do most of those things.

7        Q.     Okay.  So, that would have been a project that Joe

8     would have worked on?

9        A.     He would have worked on it, uh-huh, if we had

10    gotten to it.

11       Q.     Okay.  And you would say that Joe Haynes is the

12    best person to explain the soft -- the software that he

13    created, correct?

14       A.     Well, he can certainly explain it from an

15    architecture perspective.  I can explain it from a

16    functionality perspective.

17       Q.     Okay.  Can you explain that for me, then?

18       A.     Sure.  So, the functionality included an ability --

19    are you familiar with book and page references?

20       Q.     No.

21       A.     So, if you have a deed and in that deed you have a

22    property description.  And that property description, which

23    could be on Page 2 or 3 or whatever but there's a property

24    description that will reference other deeds.  And so, every

25    instrument, when it's recorded, is recorded with a book and

Page 60

1    page in the courthouse.  And so, that's standard

2    nomenclature.  It's Book 123, Page 456, whatever -- right.

3    So, that's called -- in the technology world, those are

4    called regular expressions.

5        Q.    Okay.

6        A.    So, there's a regular -- if this were a deed, then

7    this would have a book and page for this deed itself but then

8    on Page 2, there could be a property description which

9    referenced other deeds or other instruments of some sort.

10   Those references would also be book and page references.  So,

11   Book, you know, 789, page whatever, right.

12       Q.    Okay.

13       A.    So, what we did was to index those content-based

14   book and page references.

15       Q.    Okay.

16       A.    So that if I wanted to see all the instruments that

17   this instrument referred to by virtue of those book and page

18   references and the property description, that I could do that

19   without having to look each one of them up.

20       Q.    Okay.

21       A.    Because we index those relationships, we would also

22   bring to the user the presentation of the instruments -- the

23   other instruments that were referenced by this instrument.

24       Q.    Okay.

25       A.    So, you see that in -- on 675 you see an example of

Page 61

1   that.  So, you're starting with one of these documents -- I'm

2   not sure which one.  But let's say you're starting with a

3   document in the middle of the unit designation, whatever its

4   number is and you see all the other instruments underneath

5   it.  Those instruments are in that spider graph because that

6   unit designation instrument has references to the other book

7   and pages that you see below it.

8        Q.    Okay.  So, that's the functionality of what Joe

9   Haynes created?

10       A.    That was one piece.  So, that -- the indexing of

11  the instrument relationships was one piece.  And then let me

12  find another slide here.  And we determined that to be about

13  85 to 87 percent accurate, by the way, that indexing that I

14  just described.

15       Q.    Okay.

16       A.    Which was useful because it prevented somebody from

17  having to go look up all those instruments individually,

18  right.

19       Q.    Right.

20       A.    If you go to 689.  So, this is a grouping function.

21  And also 690.  These are screen shots of the grouping

22  functions that we built.  So, the reason this is useful is

23  because if you go to any courthouse, you know, the way that

24  they index the instruments -- if you take deeds as an

25  example, they could have 50 different variations of how they

Page 62

 1   indexed a deed as an instrument type.  It could be the word

 2   deed, the word deeds, mineral deeds, you know, this deed,

 3   that deed.  But they all fall into this general category of

 4   deeds.  So, we created this grouping function so that we

 5   could create these super sets of various categories of

 6   instruments that would further help a user collapse the view

 7   of the data without having to look up every single one.

 8       Q.    Okay.

 9       A.    We also created the grouping function to support

10   grantors and grantees, same issue, right.  John Smith, J.

11   Smith, so on and so forth.  Different variations of a

12   person's name, same person and you find various -- all those

13   variations in the index that we get from the courthouse.  So,

14   rather than -- same thing, rather than having to hold your

15   mouth right to look up every single variation of John Smith

16   every single time, we can create a group and find all the

17   variations of John Smith and give that one label as John

18   Smith.  So, we're using that as a search to find all the

19   instruments for John Smith.  We're going to get all those

20   variations as part of the results.

21       Q.    Okay.

22       A.    Then we also built --

23       Q.    And by "we," you're saying Joseph Haynes created?

24       A.    Yes.  That's correct.  The other piece of

25   functionality that we built -- I don't see a screen shot of

1    it here.  But we also gave users the capability of doing free

2    form search of the content of the instruments.  So, again,

3    using -- let's use this legal document as an example.  So,

4    you've got your basic index, which is your plaintiff, your

5    defendant, case number, so on and so forth.  So, in a

6    recorded instrument in a courthouse, you know, your basic

7    index is your grantee, your grantor.  In Texas it's called a

8    survey and abstract, which defines geography.  Okay.  And the

9    instrument type.  Okay.  That's your basic index.

10              Now, if you want to search a document for

11   specific language -- let's say, you know, you're looking for

12   specific language that referred to commencement of operations

13   and the attorneys say, well, you know -- so, depending on the

14   language around commencement of operations, that can either

15   trigger an event or not.  So, if you can search the content

16   of a lease -- an oil and gas lease for commencements --

17   commencement of operations which requires a rotating drill

18   bit as an example of commencement of operations, then that is

19   a trigger to look for the expiration of the initial lease

20   term of three years.  You potentially find expired leases

21   given those scenarios.  So, that's an example of, okay, so,

22   we want to search oil and gas leases where commencement of

23   operations language includes the phrase rotating drill bit.

24   So, we built a search engine that would allow you to go in

25   and search content.  We would OCR the documents and then

Page 64

1    there was a screen where a person could go in and type in

2    "rotating drill bit" and select oil and gas leases as the

3    document type category and bring back any instruments which

4    had the words "rotating drill bit" in the language.

5        Q.    Okay.  And when you brought up those different

6    capabilities, were those fully functional as of --

7        A.    What I just described were fully functional.

8        Q.    Okay.  Would you call the -- actually strike that.

9            So, let's talk a little bit more -- kind of

10   change our focus to your knowledge of the Hopewell-Pilot

11   Project.  Did you work with the Hopewell-Pilot Project at all

12   beyond your role of -- at Title Rover?

13       A.    Well -- so, the Hopewell-Pilot Project was focused

14   on Madison County.  And Madison County was the only data set

15   that we had to work with.

16       Q.    And by "we" meaning Title Rover?

17       A.    Uh-huh.

18       Q.    Okay.  Were you familiar with the operations at

19   Hopewell -- day-to-day operations?

20       A.    Well -- so, yes.  I sat next to Tom.  Lauren and

21   Jennifer sat across the aisle.

22       Q.    Where was the office located?

23       A.    1400 Post Oak.

24       Q.    So, both Title Rover and Hopewell shared an office

25   at that address?

Page 65

1        A.     Yes.

2        Q.     Okay.  Was anyone else physically present in the

3    office besides Lauren, the other woman, Tom, and you?

4        A.     There was a trainee named Hank Gamble that worked

5    with us for some time.  There was land man Steve Ervi that

6    worked with us for some time.  Early on in the project there

7    was Greg Kane and Greg had brought in a couple other land

8    men, which didn't seem to last very long.  And this was on

9    sort of the main floor of the Willis Group with Mike and Mark

10   further down the hall and so on.

11       Q.     So, you worked out of the Willis Group offices?

12       A.     That's right.

13       Q.     Okay.  Did you handle any of the -- any bills for

14   Hopewell-Pilot Project?  Was that --

15       A.     No.  I mean, I might have generated an invoice or

16   two for some graphics work.  I hired a graphics company for a

17   couple hundred bucks to come up with a Title Rover logo.  I

18   would have passed that invoice probably over to Tom.  And,

19   you know, we also got monthly updates of records from Madison

20   County courthouse.  But I think, Tom, you put that on your

21   credit card for the most part but I would typically go pick

22   up the CDs or whatever.  I wasn't involved in any financial

23   activities.

24       Q.     For Hopewell?

25       A.     No.

1     Q.    What about Title Rover?

2     A.    No.

3     Q.    Okay.

4     A.    No.  I -- also on that hard drive is my independent

5     contractor agreement.

6     Q.    We can go through that.  I actually have that as

7     well.  Let me just bring that out.  We'll mark as Exhibit 7

8     the independent contractor agreement.  The Bates numbers are

9     PLTF_531 to 536.

10                  (Exhibit 7 marked)

11    A.    Yeah.  I read this yesterday.

12    Q.    (BY MS. McKNIGHT)  And so, let's talk about your

13    compensation in Section III.

14    A.    Uh-huh.

15    Q.    So, it says you were -- you're contractor.  TR is

16    Title Rover.  It says, "TR agrees to pay contractor an hourly

17    rate of $150 an hour for services rendered and agrees to work

18    100 hours per calendar month."  So, you were getting paid

19    $15,000 a month; is that accurate?

20    A.     If that's what this says, yes.

21    Q.     Okay.  And then fees in the amount of 7500 shall be

22    paid every two weeks in advance.  Do you know what that's

23    referring to?  What does it mean by "fees"?  You mean like it

24    was paid bi-monthly?

25    A.     Well, if you multiply 100 times 150, divide by two.

Page 67

1      Q.    Okay.  I understand.  Sorry.

2      A.    That's okay.

3      Q.    And then it says that you'll be reimbursed for

4   reasonable expenses.  So, one of those expenses was the logo

5   work that you discussed for Title Rover?

6      A.    Yeah.  It was very minor, though.  Yeah.  Trivial.

7      Q.    Okay.  And then on Page 532 it says your

8   responsibilities are to provide TR reports and information as

9   from time to time related to contractor's performance or

10   other matters under this agreement.  Contractor will

11  reasonably cooperate with TR or TR's clients in the

12  measurement of client satisfaction and contractor

13  performance.  Excuse me.  Do you know who drafted this

14  agreement actually?

15     A.    I do not.  It wasn't me.

16     Q.    What were your services?

17     A.    Project management.

18     Q.    Okay.  And what is entailed by project manager?

19     A.    Well, that entails preparing business requirements

20  document and it entails translating that business

21  requirements document into a project plan for the technology

22  team to execute against.

23     Q.    Okay.  Were there ever times when you weren't

24  compensated on time?

25     A.    Yes, there were.

Page 68

1      Q.    Do you know how many times?

2      A.    I recall that it became somewhat tenuous in the

3   December time frame, 2016.

4      Q.    In your experience, is $15,000 a month a reasonable

5   rate for project managing?

6      A.    It is.

7      Q.    And at the time you entered into this independent

8   contractor agreement, were you still a director of Substantia

9   LogiX?

10     A.    I was, although I disassociated myself from

11  Substantia -- it's also on the hard drive -- probably first

12  quarter of 2017 --

13     Q.    Okay.  Were you --

14     A.    -- as I recall.

15     Q.    Were you getting compensated any other way besides

16  through this independent contractor agreement?

17     A.    Yeah.  I was taking a one-third of the Substantia

18  LogiX fee as well.

19     Q.    Did Susan Willard know about that?

20     A.    No.

21     Q.    Why didn't you tell her?

22     A.    That's a good question.

23     Q.    It's the first good one I've had today.  Just

24  kidding.  But why?  Why didn't you tell her?

25     A.    I don't have a good reason.

Page 69

1      Q.    Were you hiding -- did you want to hide your role

2    at Title Rover from her?

3      A.    Well, I guess, you know, I was there every day

4    doing what I do.  And her role is much more minor than mine.

5    So, I somehow justified it in my head.

6      Q.    What was her role?

7      A.    She was helping to chase down data relating to

8    other counties where those counties were potentially of

9    interest in the business.  And so, she prepared a spreadsheet

10   as a result of her discussions with people in the marketplace

11   on what it would cost and what it would entail to get copies

12   of different county's data.

13     Q.    Okay.  I'm going to mark Exhibit 8.  It's Bates

14   stamp numbers WIL 4264 to 4267.

15                (Exhibit 8 marked)

16     Q.    (BY MS. McKNIGHT)  Do you remember seeing this

17   E-mail chain?

18     A.    Probably.

19     Q.    Okay.  Do you recall the name Chad Martin?

20     A.    Yeah.

21     Q.    And what's your understanding of who Chad Martin

22   was or is?

23     A.    I believe he was a potential investor.

24     Q.    What about James P. Dibble?

25     A.    Not ringing a bell.

Page 70

1      Q.     Jeff Merola?

2      A.     No.

3      Q.     Jerry Johns?

4      A.     Not ringing a bell.

5      Q.     Cliff Sharp?

6      A.     Not ringing a bell.

7      Q.     Okay.  On Page 4264 it says in the bottom an E-mail

8    from Tom Tatham on August 23, 2016, Justin, see answers

9    below.  Later today, Brent Stanley will provide a more

10   detailed description of Title Rover's proprietary

11   intellectual property together with credentials of

12   collaborating consultants.  Please give me a call if you have

13   any questions."

14            Do you recall providing a more detailed

15   description of the proprietary intellectual property?

16     A.     This appears to indicate that I did.  I don't

17   recall that specifically.  So, I would have to refer to

18   E-mails to confirm that.

19     Q.     Okay.  And would you -- you mentioned earlier you

20   don't have access to some of those E-mails -- some of your

21   E-mails.  Do you recall if you have E-mails from Title Rover

22   that you provided on your drive?

23     A.     There are E-mails from my Gmail address and from my

24   Neural Vision address.  There are no E-mails from my Title

25   Rover E-mails address nor my Substantia LogiX E-mail address

Page 71

1   nor my Image Engine E-mail address nor my EDIS E-mail address

2   because I don't have access to those E-mails anymore.  I'm

3   not the owner of those domains.  I provided what I found.  I

4   followed the directions on the request for productions and I

5   filtered my Gmail and my Neural Vision E-mail for anything

6   that I found that was relevant as defined here and it's on

7   the hard drive.

8        Q.    Thank you.  On Page 4265, do you recall helping

9   with any of the answers to these questions?  It's kind of

10  hard to see but they're highlighted.  It's just we have a

11  black and white copy.  So, you can't really see the

12  highlights too well.  But there are responses in each

13  subsection.

14       A.    (Witness reviews document.)  I don't see the

15  highlights.  So, what is your question?

16       Q.    Did you help provide responses to these questions?

17       A.    Well, I mean, as a general practice, any time there

18  was a need to document anything around the technology, I was

19  usually asked to do that.

20       Q.    Okay.

21       A.    It doesn't mean that I did it a hundred percent of

22  the time.  But it would have been a normal part of my job as

23  project manager to prepare documents like this PowerPoint, to

24  prepare documents like this capability summary.  I also

25  prepared user guides to the software.

1        Q.    Okay.

2        A.    So, I did a lot of documentation.

3        Q.    Okay.  So, does -- I want to go back to one thing

4    because you say you're a project manager and, yet, the

5    marketing material and E-mails say that you're CTO of Title

6    Rover.  Why is -- why do you not call yourself a CTO of Title

7    Rover?

8        A.    So, chief technology officer is normally not

9    engaged through a contractor agreement, number one.  Number

10   two, the chief technology officer inherently has fiduciary

11   responsibilities and obligations to the company.  And I had

12   neither.  So -- nor did I have any ownership.  And so, I

13   recall being asked if I was okay being called the CTO for the

14   purposes of making the company look like it had a CTO because

15   that would make it look better.  But I was a contractor and I

16   had no other responsibilities that a CTO would have in the

17   organization.

18       Q.    What kind of fiduciary responsibilities does a CTO

19   have?

20       A.    I can Google it.

21       Q.    I'm asking you what your knowledge is.

22       A.    Any time you have a C level title, right, there is

23   an implication -- my layperson's understanding is there's an

24   implication of fiduciary responsibilities.

25       Q.    Okay.  Did you feel uncomfortable holding yourself

                                                    Page 73

1   out as CTO?

2       A.    I probably should have been.  In retrospect I

3   wouldn't have done it.

4       Q.    Why?

5       A.    Because it paints -- it's not honest.

6       Q.    Okay.  Did Mark Willis ask you to be -- act as --

7   portray yourself as CTO?

8       A.    Yes.

9       Q.    Did Tom Tatham ask you to act as -- or portray

10  yourself as CTO?

11      A.    Probably.

12      Q.    So, looking at 4265, Subsection B, it says, "If

13  Hopewell is not the owner of such item of necessary

14  intellectual property, state the party that does own such

15  item of necessary intellectual property and the rights to

16  such item of necessary intellectual property that is licensed

17  to Hopewell as well as provide copies of the documents

18  providing such rights."

19              And then I'm going to represent that this is

20  where the highlighted part starts.  It says, "Please note" --

21  I'm sorry.  Actually that's incorrect.  It's a follow up to

22  the question.  "If there are multiple levels of licensing,

23  i.e., the owner of an item of necessary intellectual property

24  licenses it to Title Rover, LLC and Title Rover, in turn,

25  licenses such items of necessary intellectual property to

Page 74

1    Hopewell, then documents evidencing each level of licensing

2    must be produced."

3              Now is the response.  "Title Rover has

4    developed the proprietary software code and portal operating

5    format representing the technology being licensed to Hopewell

6    in the AMI."  What is AMI?  Do you know?

7        A.    Area of mutual interest.

8        Q.    "Title Rover has direct ownership of the code

9    pursuant to its internal activities and agreements of

10   collaborating consultants which are available to review in

11   the contracts and agreements section of both Title Rover and

12   Hopewell data rooms."  Is that -- are those statements

13   accurate to you?

14       A.    I didn't write them.

15       Q.    I'm just asking you if you think that they're

16   accurate.

17       A.    I don't know if they're accurate or not.

18       Q.    What about the first sentence, "Title Rover has

19   developed the proprietary software code and portal operating

20   format representing the technology being licensed to Hopewell

21   in the AMI"?  Is that statement accurate?

22       A.    I don't know.  I don't know if it's accurate or

23   not.  I wasn't involved in any of the business documents that

24   were put in place which transferred rights from Party A to

25   Party B to Party C.  I was not part of that.

```
 1        Q.    So, do you mean --

 2        A.    I can't tell you who licensed what to whom.

 3        Q.    -- licensing?  You could not or you could?

 4        A.    I could not.

 5        Q.    Okay.

 6        A.    I wasn't part of that.

 7        Q.    Okay.  Do you know who is?

 8        A.    Well, Mark and Tom would have been responsible for

 9   setting out licensing arrangements that this relates to.  I

10   wasn't involved in any of that.

11        Q.    Did Title Rover have direct ownership of any code

12   at all?

13        A.    I would refer to the agreements that were in place

14   that spoke to that.

15        Q.    So, you don't know?

16        A.    I would refer to those agreements.

17        Q.    But without those agreements you wouldn't be able

18   to tell me?

19        A.    I don't know what the nature of the Beyond

20   relationship agreement was with Willis Group.  I know there

21   was a source code call-out and the agreement was Substantia.

22        Q.    I'm sorry.  There was a --

23        A.    A source code call-out in the agreement with

24   Substantia.

25        Q.    Okay.  We'll mark as Exhibit 9 the statement of
```

Page 76

```
 1    work for data services presented to Title Rover, LLC.
 2                    (Exhibit 9 marked)
 3                    MS. SWEENEY:  Can you please tell me what
 4    Exhibit 9 is again?
 5                    MS. McKNIGHT:  It's the statement of work --
 6    SLX statement of work.  It's Bates PLTF 540 to 543.  Do you
 7    see it?
 8                    MS. SWEENEY:  Got it.  Thank you.
 9        Q.    (BY MS. McKNIGHT)  Is this the document that you
10    were just referring to?
11        A.    This is the executed statement of work between
12    Substantia and Title Rover.
13        Q.    But you were talking about some agreement with
14    Substantia LogiX with code.  Is that a separate document or
15    is this the document that you were talking about?
16        A.    This is the document.
17        Q.    Did you write this document?
18        A.    I believe that I did.
19        Q.    Do you recall if there was any separate agreement
20    between Title Rover and Joseph Haynes' company?
21        A.    No.
22        Q.    Do you recall that Joseph Haynes was being
23    compensated via Substantia LogiX?
24        A.    Yes.
25        Q.    And in this document do you see anything about
```

Page 77

1    Substantia LogiX providing any sort of code that Title Rover

2    would be able to own?

3         A.    I do not see a reference to that.

4         Q.    Okay.  And this document is signed, it looks like,

5    on March 31, 2016.

6         A.    Correct.

7         Q.    And I'm trying to find your independent contractor

8    agreement date of signature.  Do you recall when that

9    document was signed?

10        A.    I recall it being in March or April.

11        Q.    Okay.  So, these documents were signed by you in or

12   around the same month period of time?

13        A.    I believe so.

14        Q.    Okay.  There is some red lines.  It says Mark

15   Willis and it crossed out and put Title Rover, LLC.  Is that

16   a red line that you made?

17        A.    I think that was Tom's red line.  And I think also

18   the question that is on 542 in brackets was Tom's question.

19   And -- yeah.

20        Q.    Did you show Susan Willard this document?

21        A.    Yes.

22        Q.    And she agreed that the statement of work was

23   acceptable?

24        A.    She did.

25        Q.    Okay.  It says at the top the anticipated project

Page 78

1    completion date is June 30, 2016.  Was that, in fact, the

2    project completion date for Substantia?

3         A.    It was contemplated that there would be a pilot

4    period and then at the conclusion of the pilot, which is

5    this -- which is what's referenced in this statement of work,

6    this three-month period, that it would be a go, no-go

7    decision around the extension of the project.

8         Q.    Okay.  Was there an extension of the project?

9         A.    No.

10        Q.    Did Substantia LogiX continue doing work after

11   June 30, 2016?

12        A.    Yes.

13        Q.    Do you know for how long?

14        A.    I believe that the last payment to Substantia was

15   made in December.

16        Q.    Okay.

17        A.    I believe.

18        Q.    Do you know why payments stopped to Substantia

19   LogiX in December of 2016?

20        A.    Because the Title Rover, Hopewell was out of gas.

21        Q.    So, Title Rover's only source of funding was

22   through Hopewell?

23        A.    I'm sorry?

24        Q.    So, Title Rover's only source of getting paid was

25   through Hopewell?

Page 79

1    A.    Again, I was not involved in the business side of

2    who was putting money in, per se.  I perceived the investors

3    put in money.  I don't know if they are the only ones that

4    put in money.  I wasn't involved in those business

5    activities.

6    Q.    Okay.  So, who was involved in the accounting or

7    the accounts payable for Title Rover?

8    A.    I would believe the managers, which would be Mark

9    and Tom.

10   Q.    Okay.  Did they explain to you, prior to the money

11   running out in December, 2016, that they were having

12   difficulties getting Title Rover paid?

13   A.    Yes.

14   Q.    And what was their explanation of those

15   difficulties?

16   A.    My recollection was that, you know, proceeding was

17   contingent on getting some money in the bank.  And that

18   failure to do so would result in a termination of activities.

19   Q.    Okay.  And the money in the bank would have been --

20   was it from investors or other sources?

21   A.    Well, my impression is that they were obviously --

22   we were pitching investors.  But I am also aware of a bank

23   note, I think, that Tom had secured to -- I don't know what

24   it was used for.  It was to buy leases.  But those are the

25   only two sources of outside investment.  And I don't know if,

Page 80

```
 1    you know, Mark or Mike or anybody else put their own money in
 2    or invested through Jabco or one of the other entities they
 3    had.  I don't know.
 4         Q.   So, tell me about --
 5              MS. SWEENEY:  I'm going -- I'm going to
 6    belatedly object to the question and the response as being
 7    calls for speculation and given based on speculation the
 8    witness has testified that he was not familiar with how the
 9    company was funded or the sources of the money that was
10    coming in.  And so, the response was speculative.
11         Q.   (BY MS. McKNIGHT)  Okay.  Well, let's talk about
12    Jabco Partners' role in Title Rover, if any.  What was Jabco
13    Partners -- what is it, to your understanding?
14         A.   My understanding is that Jabco is a company that
15    Mark set up through which he would make investments in
16    various business activities.
17         Q.   Okay.  Was Title Rover one of those?
18         A.   Don't know.
19         Q.   Do you know what Jabco Partners' role was in Title
20    Rover, if any?
21         A.   I do not know.
22         Q.   What about Mark Willis?  What was his role in Title
23    Rover, to your knowledge?
24         A.   Who?
25         Q.   Sorry.  Michael Willis.
```

Page 81

1     A.    Very little.  I don't -- I mean, I didn't perceive

2     that he really had a role.

3     Q.    Did you ever talk to Michael Willis about Title

4     Rover?

5     A.    Yeah.  I'm sure, you know, we would have hallway

6     conversations, scheduling.  But they would be very brief

7     and -- you know, probably 15 seconds or so.  How is it going,

8     right.  And that would be about it.

9             MS. McKNIGHT:  How about we take a break

10    because I think we've been going a while -- probably over an

11    hour.

12            (Recess from 12:47 to 1:20)

13    Q.    (BY MS. McKNIGHT)  So, let's keep looking at

14    Exhibit 8.  It's an E-mail chain.

15    A.    Okay.

16    Q.    So, if you go to Page 4266, it says, "Additional

17    technical description of Title Rover proprietary intellectual

18    property to be provided by Brent Stanley, chief technology

19    officer."  Do you recall ever providing information about

20    proprietary intellectual property to investors?

21    A.    I prepared a number of documents for Tom.  Those

22    are on the hard drive.

23    Q.    Okay.

24    A.    And so, it's likely that those written descriptions

25    were authored by me and provided to Tom and looks like

Page 82

1    they're referenced here.

2         Q.    But I'm talking about this technical -- do you know

3    what is meant by technical description of the Title Rover

4    proprietary intellectual property?  Do you know what that

5    refers to?

6         A.    Yeah.  I think that refers to Exhibit 5,

7    Document 2.

8         Q.    Can you point me to the page.

9         A.    Well, I think it's starting with 681.  I think

10   that's what it's referring to.  I may have written up status

11   reports -- well, I know I did write up status reports as

12   requested, which are also on the hard drive.  And so, that

13   was used for various purposes with the investors but I

14   wasn't -- I was providing input to others.

15        Q.    Sorry.  What was that last part?  You were not

16   providing input to others?

17        A.    I was providing input to others, yeah.

18        Q.    Okay.  Do you believe that the Title Rover software

19   is proprietary?

20        A.    I believe that they thought it was.

21        Q.    Who is "they"?

22        A.    The managers.

23        Q.    Tom and Mark?

24        A.    Yeah.

25        Q.    Do you think that the Title Rover technology is

1    proprietary?

2        A.    Yes and no.  I mean, there was software available

3    then from a company called Drilling Info.

4        Q.    Okay.

5        A.    Are you familiar with Drilling Info?

6        Q.    No.

7        A.    And so, you could license their software and they

8    purported -- and I did research on them.  They purported to

9    have the capabilities that we were seeking to develop.  So,

10   there was discussion around, you know, make versus buy.  Is

11   it going to be smarter to subscribe to Drilling Info's

12   software or do we want our own software that we can then

13   further customize to do the specific things that we wanted to

14   be able to do.  The Drilling Info software was expensive.

15   And so, decisions were made to proceed with the development

16   of the Title Rover software with Joe Haynes.

17       Q.    When was -- when did you have discussions about the

18   Drilling Info software?  Was that early on in the inception

19   of Title Rover?

20       A.    It would have been.

21       Q.    Who did you have discussions with?

22       A.    Tom, Mark, probably Greg Kane.

23       Q.    Okay.

24       A.    Probably Hank.

25       Q.    Do you recall -- sorry.  Anyone else?

Page 84

1    A.    Probably Steve Ervi as well.  I mean, to a lesser

2    degree.  Mainly with Mark and Tom.

3    Q.    And do you recall when the -- the time frame of

4    when those discussions were had?  Was that early 2016?

5    A.    That would make sense because those were in the

6    days we were also -- as I mentioned earlier, we were looking

7    at the WalkAbout -- the Courthouse WalkAbout software as

8    well.  So, I was a proponent of, you know, let's look at all

9    the commercially available software that's out there before

10   we go reinventing the wheel and see whether or not there's

11   stuff that already exists that would do what we need to do

12   rather than creating our own version of that.  And so, we

13   looked at -- we looked at Drilling Info.  We looked at

14   Courthouse WalkAbout.  I looked at various softwares that

15   were available already in the marketplace to do courthouse

16   records lookup from companies like Xerox, ACS, and others.

17   Q.    Okay.

18   A.    And sort of tried to develop a sense of, well,

19   okay, here's what the industry is doing.  Here's where there

20   are gaps between what we want to do and what they're doing.

21   Here's how much time and cost it will take us to get to where

22   we want to go and here's how much it would cost us to license

23   technology from others to be able to do that.

24   Q.    And you say license technology from others.  Are

25   you talking about from Drilling Info?

Page 85

1       A.      Uh-huh.

2       Q.      Okay.  Did -- are there written correspondence

3    concerning discussions about Drilling Info and whether or not

4    to use it?

5       A.      It's likely there are.  I mean, it was a topic

6    of -- we had Drilling Info in for a meeting at least once to

7    pick their brain and see how much it would cost.  So, it was

8    likely that there were E-mails about that.

9       Q.      Okay.  So, then you said "yes" and "no" as to

10   whether or not the Title Rover intellectual property is

11   proprietary.  Why do you think it is proprietary?

12      A.      I think if we had -- if we had developed everything

13   that is in this spider graph on Page 684 of Exhibit 5, I

14   think if we had done all that, then the answer would have

15   been definitely yes.  If we had been able to get Beyond

16   Recognition to do what John Martin said it could do, then

17   that would have been a definite yes.  Given the limited

18   progress that we made -- and, again, pointing back to this.

19   We never got to any of these --

20      Q.      On 684?

21      A.      -- with the bubbles.  Right.  We never got to any

22   of that.  And the things we got to in terms of providing that

23   grouping functionality, in terms of indexing the volume and

24   page references and in terms of providing the free form

25   content search capability, sort of standard stuff, right.

Page 86

1      Q.     Sorry.  What were those three categories again?

2      A.     So, the grouping, the volume and page indexing in

3   the content, and the free form search.  Those are the three

4   things we got done.  So, that's pretty standard stuff in the

5   industry.

6      Q.     Okay.

7      A.     I wouldn't call that -- in my world, I wouldn't

8   call that proprietary.  If we had gotten to these other

9   things and if we had gotten Beyond Recognition to work, then

10  I would say yes.

11     Q.     Okay.  And then we talked about --

12     A.     Now, having said that -- let me make one other

13  comment.  Having said that, the fact that we were able to

14  index the volume and page references prevented Lauren and

15  Jennifer from having to go look up each one of those

16  instruments.  So, I mean, some of the unit -- some of the

17  unit documents, as an example, might reference a hundred

18  leases.  So, rather than having to go into, you know, land

19  record system and look for each one individually, it might

20  take you, you know -- I don't know -- somewhere between two

21  and five minutes per instrument to look all of those up

22  manually.  To have them 85, 87 percent come back

23  automatically, you do the math.  I mean, that's how much time

24  it's saving you, right.  So, there was goodness associated

25  with being able to collapse the collection of those

Page 87

```
 1    instruments.  They liked that because they didn't have to run

 2    around and look up each one, right.

 3        Q.    But there was still some manual effort by Jennifer

 4    and what -- I forgot the other --

 5        A.    And Lauren.

 6        Q.    And Lauren.

 7        A.    Yes.

 8        Q.    Okay.  And earlier we talked about your role as

 9    project manager but I just want to be clear that you were

10    never the chief technology officer of Title Rover?

11        A.    Correct.

12        Q.    But the managers told you to lie and say that you

13    were chief technology officer?

14        A.    That's a very direct question.  Yes.

15        Q.    Okay.  Did they tell you to lie about anything

16    else?

17        A.    Not that I recall.

18        Q.    Okay.  Did they tell you to omit information that

19    you provide to investors?

20        A.    Well, the one thing that was obvious to me is that

21    when we start painting this picture to the investors, we're

22    pretty far over our skis.  And -- because we hadn't done

23    this.  We didn't get to it.  We got stuck on doing what we

24    did.  And so, I remember thinking to myself, we're pretty far

25    over our skis here in terms of painting the picture of what
```

Page 88

1    we are saying we're going to do.  It's going to take us a lot

2    of work.

3         Q.    When did you realize that first?

4         A.    I don't know.  I'm not sure.

5         Q.    Was it when Beyond Recognition wasn't meeting their

6    deadlines?

7         A.    It was definitely then, yeah.  Definitely then.

8    It's like, you know, we're sort of painting the picture here

9    that we're going to be able to do this stuff.  And, you know,

10   given the history of BR's performance, it was a little dicey.

11        Q.    Okay.  So, 10 is TAT 2244.

12              (Exhibit 10 marked)

13        Q.    (BY MS. McKNIGHT)  Do you remember writing this

14   E-mail?

15        A.    Let me read it first.

16        Q.    Yes.  Of course.  Sorry.

17        A.    (Witness reviews document.)  Uh-huh.

18        Q.    So, at the bottom it says, "Today is August 23rd,

19   so well past 30 days from start and we have not seen any

20   deliverables."

21              Is it fair to say that this was around the

22   time you realized we're over our heads with this?

23        A.    Yeah.  It would have been one of the times.

24        Q.    Was there a time before this?

25        A.    Probably.  I mean, you know, again, I'm going to

Page 89

1    point back to the spider chart here on Page 684.  We weren't

2    addressing these other things here -- these other data

3    sources and integrating these other data sources.  And over

4    the course of some weeks and months when I saw that we

5    weren't addressing these other pieces of projected solution,

6    I was, yeah, concerned.

7        Q.    Did you raise your concerns to Tom Tatham?

8        A.    I don't recall.  It's likely that I would have and

9    also raised them to Mark.  Hey, you know, we're not making a

10   lot of progress here.

11       Q.    Okay.  And what did Mark say in response, if you

12   can recall?

13       A.    Well, I think there was some disagreement between

14   Tom and Mark about how quickly to pursue some of this other

15   functionality.  I think Tom wanted to proceed in a very

16   linear fashion and make sure that, you know, the volume page

17   indexing worked before we moved on to the next thing.  It

18   took an awfully long time for us to get to the point of

19   concluding that that was working correctly.

20       Q.    Do you recall a time frame of when it -- you

21   realized the index was working properly?

22       A.    So, that would probably be in some of my E-mails

23   there.  It's probably third quarter of '16, maybe early

24   fourth quarter.  I know we focused on that very heavily for a

25   period of time and benchmarked -- I mean, did, you know,

Page 90

1    significant amount of manual review of the results and

2    benchmarked that, how many did we get right, how many did we

3    miss.  I tabulated all that, calculated all that to a

4    spreadsheet.  So, I was able to calculate percentage and

5    recall and so on and so forth but --

6        Q.    And you said -- what is your understanding of the

7    different roles that Tom Tatham had from Mark Willis?  Did

8    they have different roles as managers of -- I guess, we'll

9    start with Title Rover?

10       A.    Uh-huh.

11       Q.    What were their different roles?

12       A.    Well -- so, first of all, from my perspective, I

13   didn't really distinguish between Hopewell and Title Rover.

14   To me, it was the same.  So, I didn't really distinguish

15   between the two.  It was obvious to me that Tom was hands-on

16   day-to-day and Mark took more of a -- sort of a distant

17   involvement.

18       Q.    Okay.  But Mark was informed of all major updates?

19   I think you mentioned preparing updates.  Was he --

20       A.    Yeah, I did.

21            MS. SWEENEY:  Objection.  Calls for

22   speculation whether he was involved in all of anything.

23       Q.    (BY MS. McKNIGHT)  The updates that you provided

24   were given to Mark?

25       A.    Whenever I prepared an update, I would always

Page 91

1    include Mark on the E-mails.

2        Q.    Okay.  Would it just be an E-mail update like the

3    one on Exhibit 10 or was it in a more formal format?

4        A.    It would have been both.  There could have been

5    just E-mails regarding, you know, we made progress on this,

6    we're doing that or it might have been more formal documents

7    where I was asked to provide a status report.

8        Q.    Okay.  And then the status reports are on the drive

9    you've given us?

10       A.    Correct.

11       Q.    And you mentioned a disagreement between how to

12   proceed on -- for Title Rover.  And can you elaborate more on

13   what you mean by like this disagreement?

14       A.    Well, so, I would have -- because we're all closely

15   situated in the same office area.

16       Q.    Sure.

17       A.    So, I would have conversations with Mark and ask

18   what's going on, what are we doing.  And so, he would -- he

19   would often express displeasure with our rate of progress on

20   being able to, as he called it, create, you know, smaller

21   haystacks of opportunities.

22       Q.    Okay.

23       A.    So, it was obvious to me that there was

24   disagreement between Tom and Mark around the philosophy of

25   what we're going to pursue here.  Tom wanted to take a very

Page 92

1    linear approach, do one thing at a time, whereas Mark by

2    nature is more of a, you know, let's chase a whole bunch of

3    different scenarios at the same time.  So, I could tell there

4    was somewhat of a disagreement there philosophically around

5    how to proceed.

6         Q.    Okay.  And did Mark express to you his displeasure

7    with Tom -- with Tom's decision making at all?

8         A.    I would say to some degree, yeah.

9         Q.    Just saying that there were delays?

10        A.    Why are we taking so much time on this piece.

11        Q.    Did he blame Tom for that?

12        A.    Yes.

13        Q.    Did he blame anybody else for that?

14        A.    John Martin.

15        Q.    Okay.  What about Tom?  Did Tom ever say anything

16   to you about Mark Willis and any displeasure that Tom had

17   about what Mark was doing?

18        A.    Yeah.  So, Tom would complain about Mark.  Mark

19   would complain about Tom.  And Tom's complaint about Mark was

20   that, you know, Mark was all over the place, right.  And

21   Mark's complaint about Tom was that, you know, Tom is too

22   linear.

23        Q.    Okay.  Did Tom ever complain to you about why are

24   we still going about this Beyond Recognition project?

25        A.    I think Tom was rightfully skeptical about Beyond

                                                    Page 93

1    Recognition.

2        Q.    And you were skeptical from the beginning of the

3    Title Rover project using Beyond Recognition?

4        A.    Well, there was a history, which caused me to form

5    an opinion.

6        Q.    Just with the Beyond Recognition failure with BHP?

7        A.    It was a string of failures, yeah.

8        Q.    Have you mentioned all those failures today, or are

9    there any others?

10       A.    String of failures.  Well, there was the BHP one.

11   That was a pretty big one.  There was also an attempt to use

12   BR in the Beyond Review business, which didn't go well at

13   all.

14       Q.    When was that?

15       A.    That would have been probably in 2014 and '15.

16   There was a pretty solid history there of --

17       Q.    And how did it fail?  Just the technology didn't

18   work for Beyond Review or just never was developed?

19       A.    The problem was multi faceted.  The tip of the

20   speer was John Martin himself as an individual because he was

21   the only person that knew how to work the software.  It was

22   very difficult to get work done and he was very difficult to

23   work with.  He would tend to stomp his feet and make threats

24   if you didn't do exactly what he wanted.  So, he was very

25   difficult to work with.  And there was also the issue of

```
 1    trying to understand what his technology was doing and trying

 2    to get work product out of it.  He purportedly had this

 3    software that would be able to magically grind up all this

 4    data and create a hundred percent perfect results.  But as I

 5    watched what he was doing and learned how he was doing it, it

 6    was obvious to me that what he was claiming was not what he

 7    was actually doing.

 8         Q.    Did you ever get -- talking about in Title Rover,

 9    did you ever get access to the technology from John Martin to

10    try out Beyond Recognition?

11         A.    He would never let us get our hands on it.  He

12    always had to do it for us.

13         Q.    Did you tell Mark Willis that?  And Mark Willis

14    knew about that?

15         A.    Yes.

16         Q.    Why did Mark Willis hang on to Beyond Recognition,

17    then, if he was so difficult to work with?

18         A.    Because he had a lot invested.

19               MS. SWEENEY:  Objection.  Calls for

20    speculation.  He couldn't possibly know why Mark did

21    something.

22         Q.    (BY MS. McKNIGHT)  I'm going to mark Exhibit 11.

23               (Exhibit 11 marked)

24               MS. McKNIGHT:  So, this is -- sorry, Shannon.

25    This is the schedule of consultants for Title Rover WIL_640.
```

Page 95

1     Q.    (BY MS. McKNIGHT)   So, do you recall ever seeing

2     this document before?

3     A.    No.

4     Q.    So, you didn't make this?

5     A.    No.

6     Q.    Does this look like a list of -- full list of all

7     the consultants, contractors, and outside services used by

8     Title Rover with the exception of legal counsel and

9     investment banks?  Would you know that?

10    A.    Well, Hank Gamble was on board as a legal

11    consultant.  He's an attorney.

12    Q.    Do you know how much he was getting compensated?

13    A.    I don't.

14    Q.    Okay.

15    A.    Steve Ervi was also on board as a land man for a

16    good part of the project.

17    Q.    For how -- through what time frame?  Do you know?

18    A.    He came on board pretty early on.  And I'm not sure

19    how long he persisted but I recall that it was at least

20    through the end of the second quarter, if not the third

21    quarter of 2016.

22    Q.    Okay.  And then I see Beyond Recognition at the

23    top.  It provides specialized IT services as per contract,

24    25,000.  Was that $25,000 a month?  Do you know?

25    A.    I think that $25,000 was specific to this --

Page 96

```
 1        Q.     Exhibit 3?

 2        A.     Killing a lot of trees here, folks.

 3               MR. TATHAM:  A page is missing.

 4               MS. McKNIGHT:  Of which?

 5               MR. TATHAM:  Exhibit 3.

 6        A.     I recall that that 25 grand was specific to Phase I

 7    of Exhibit 3.

 8        Q.     (BY MS. McKNIGHT)  Yeah.  I think Exhibit 3 has a

 9    page -- I guess it would be on the third page of this.  Do

10    you know if it would be listed on the third page of

11    Exhibit 3?  Because it looks like we're missing -- there's

12    only two pages.

13               MR. TATHAM:  The third page has the payment

14    information, I believe.

15        A.     Okay.

16        Q.     (BY MS. McKNIGHT)  Do you know if it was $25,000 a

17    month or --

18        A.     I don't recall the payment terms.  I recall there

19    being a fixed price for Phase I is what I recall.

20        Q.     Okay.  Was it alarming to you that $25,000 a month

21    was -- or $25,000 was going to Beyond Recognition?

22        A.     Well, I mean, if he were able to do what Phase I

23    called for, then no.  I think that was a reasonable fee to

24    pay for that kind of proof of concept.

25        Q.     Okay.  And then it says BIS Consulting.  Do you
```

Page 97

1    know who they are?

2        A.    BIS Consulting was a group that provides spatial

3    data.  And we acquired some spatial data with the intent on

4    figuring how to integrate that spatial data.

5        Q.    So, you did -- you being Title Rover actually

6    received spatial data through BIS Consulting Services?

7        A.    It's on the hard drive.

8        Q.    Okay.  But that's a "yes"?

9        A.    Yes.

10       Q.    Okay.  And do you know what Upstream is at the

11   bottom?

12       A.    It looks like a periodical of some sort.

13       Q.    Okay.  Did you use Upstream?

14       A.    Did not.

15       Q.    Do you have any idea how much money Image Engine

16   was getting paid monthly for its services to Title Rover?

17       A.    Yes.

18       Q.    How much?

19       A.    I don't believe they were getting money monthly.

20   They were hired as a subcontractor to image a set of

21   historical records in the Madison County courthouse, which

22   were not part of the data set that we had previously acquired

23   from the courthouse.  So, these were -- these were deeds and

24   other instruments that would probably be from inception of

25   the Republic of Texas, which is state of Texas, 1837 until

Page 98

1    some period in the 1900s, probably around 1930 or 1940.  And

2    so, Image Engine was hired to send people and equipment into

3    the courthouse and to image those records.  And there was a

4    fee that was tendered by Image Engine.  I was involved in

5    that.  I'm trying to remember the details.  But I asked them

6    for a quote.  And I remember that when the actual numbers

7    came in for their work -- because that was part of my project

8    management responsibilities was to manage Image Engine's

9    scanning of those records.

10       Q.    Okay.

11       A.    So, they gave me a quote.  They sent people up to

12   Madison County to scan all of these very old records that are

13   in very old books, right.  It's a very tedious process.  When

14   the bill came in, I remember the bill being significantly

15   higher than what they gave us as a quote.

16       Q.    Okay.  Do you recall when the bill came?  Was it --

17   do you know months or anything like that?

18       A.    I don't remember.  I don't really remember.

19       Q.    Okay.

20       A.    But I remember the bill being probably twice what

21   they said it was going to be.

22       Q.    Okay.

23       A.    I remember Tom and I thinking what is going on.

24       Q.    Okay.  So, we'll mark this as Exhibit 12.

25             (Exhibit 12 marked)

Page 99

1             MS. McKNIGHT:   Shannon, this is Bates numbers

2    TAT_15 -- I'm sorry -- 1429 and then to 1434.  I think it

3    might be in two different document PDFs.

4         Q.   (BY MS. McKNIGHT)   Is this the discussion you were

5    talking about with Tom where you guys were talking about the

6    Image Engine invoices or was there a conversation previously?

7         A.   (Witness reviews document.)  I'm sorry.  What's

8    your question?

9         Q.   Is this the conversation that you were referring to

10   where you guys were talking about invoices that were higher

11   than what you would have thought you agreed to?

12        A.   Uh-huh.  Yes.

13        Q.   And do you recall whether this December 22nd E-mail

14   was the first time you had seen these invoices?

15        A.   Yes.  So, because Image Engine was being run by

16   Steve Elston and Steve did not communicate with me because he

17   was mad at me for trying to get him fired because he was

18   financially inept, he would tend to run this stuff directly

19   to Mark.  And so, you know, I probably didn't see the

20   invoices directly.  I saw them indirectly by virtue of having

21   them forwarded to me by others.  In this case, Tom.  And then

22   I would say, wow, okay, this is not what we agreed upon.  And

23   then what I recall at that point was Mark saying I'll take

24   care of it and he had conversations with Steve and they did

25   whatever they did.

Page 100

1      Q.    When -- to back up.  When Mark said he would take

2   care of it, was it in December of 2016 or was it earlier?

3      A.    I don't know.  Whatever the logical time frame is

4   here.  I would guess that it would be some time after the

5   date of this E-mail.  I'm guessing.

6      Q.    If you go to 1434, the first one is for -- the one

7   in this document that's the earliest date of May 31, 2016

8   says invoice total, twenty-four thousand eight eight or eight

9   six.

10      A.    I think this is a partial invoice, though.

11      Q.    Okay.  And then it says -- it looks like -- what do

12   you mean it's a partial invoice, I guess?

13      A.    I think their total bill was more than $25,000.

14      Q.    Did you recall seeing it after -- like in June,

15   2016?

16      A.    I don't recall.  Part of the problem was I was

17   bypassed.  Here I am trying to manage them as a vendor and

18   they're just bypassing me.

19      Q.    "Them" being Image Engine?

20      A.    Yeah.

21      Q.    Did you have concerns --

22      A.    I don't see the invoices until -- yeah.  Frankly, I

23   was pissed.

24      Q.    Throughout the entire relationship while you worked

25   at Title Rover?

                                                    Page 101

1    A.    Well, I was upset that, you know, here they are --

2    I mean, I'm responsible -- clearly responsible because I

3    wrote a statement of work.  They gave me a price.  Tom and I

4    reviewed it.  We gave them the go ahead to go start work.

5    Okay.  And they do all this work.  They spend a lot more

6    money than we agreed that they were going to spend on the

7    front end and then I don't even see the invoices.  And yeah,

8    I was not happy.

9    Q.    Do you know how much money, estimate, that he

10   spent?

11   A.    I don't recall.  I recall it being a lot more than

12   we originally gave them approval for.

13   Q.    Do you recall that number -- that original number?

14   A.    No.

15   Q.    Okay.  Do you know -- are you able to tell me

16   whether this -- there are invoices for after July 31, 2016?

17   That appears to be the latest invoice.

18   A.    Yeah.  I don't know.  I don't remember.  I couldn't

19   tell you if these are all the invoices or not.

20   Q.    Did you have discussions with Mark about whether to

21   use Image Engine at all as a vendor?

22   A.    Would what?

23   Q.    Did you ever have a conversation with Mark Willis

24   about using -- whether to drop Image Engine as a vendor?

25   A.    I think the work was already done by the point in

Page 102

1    time that I became aware of these invoices.  So, it was too

2    late.

3          Q.    Do you know when the work was done?

4          A.    Well, I can only surmise by looking at these

5    invoices that it was done no sooner than July 31st.  I don't

6    recall the exact details.  I may have the Image Engine

7    statement of work that I drafted on that hard drive.

8          Q.    That would say the time frame of which they were to

9    complete the work?

10         A.    And how much -- and what their -- what their --

11   we've agreed -- you've agreed to do this for X amount of

12   dollars.

13         Q.    Okay.  So, their work wasn't on a monthly rolling

14   basis?

15         A.    No.  It was per image.  It was per image.

16         Q.    So, once they were done with the images, they

17   were -- that was it for their work that they needed to do for

18   Title Rover?

19         A.    That's correct.  Yeah.

20         Q.    Okay.

21         A.    That's correct.

22         Q.    Do you know why these invoices were not paid?

23         A.    The difference between the invoice amount and the

24   agreed-upon amount per the statement of work would have been

25   the reason that they weren't paid.

1      Q.     Okay.  Do you have knowledge of Title Rover's

2   financial condition at the time that these invoices were

3   provided?

4      A.     Do not.

5      Q.     Would you know that?  Do you know who handled the

6   finances for Title Rover?

7      A.     I only assume that it was the managers and the CFO.

8      Q.     Okay.  Who was the CFO?

9      A.     Dan Lensgraf.

10      Q.     And the manager is Tom and Mark?

11      A.     Yeah.

12      Q.     But you yourself did not handle bills for Title

13   Rover?

14      A.     No.

15      Q.     And you didn't handle bills for Hopewell?

16      A.     No.  No.

17      Q.     Did you have any knowledge of accounts payable for

18   Title Rover?

19      A.     No.

20      Q.     Did you have any knowledge about --

21      A.     Only my own.

22      Q.     Yeah.  Do you recall when they started getting

23   behind on payments owed to you?  "They" being Title Rover?

24      A.     I recall that being in December that it was obvious

25   that things were getting dicey.

                                              Page 104

1      Q.      December, 2016?

2      A.      Uh-huh.

3      Q.      Okay.  Do you recall late payments before December,

4    2016?

5      A.      No.

6      Q.      And you may have answered this previously.  I just

7    can't recall.  What licenses -- do you have knowledge of what

8    licenses Title Rover had for technology?

9      A.      Licenses.  So, unclear to me whether or not the

10   Courthouse WalkAbout software was ever assigned in any

11   fashion to Title Rover.  Unclear to me if in any fashion the

12   Beyond Recognition license that the Willis Group had

13   purchased was assigned to Title Rover.

14     Q.      Those are the only licenses you think may -- that

15   you don't know if they exist for Title Rover?

16     A.      Correct.  I mean, we might have had a license to a

17   courthouse that was outside of Madison County where we needed

18   to get records.  I can't recall whether we did or not.  But

19   that would have been, you know, short money.

20     Q.      Okay.  Were people -- was anyone telling you that

21   Title Rover had licenses?

22     A.      I think that Mark and I had conversations about

23   leveraging the Beyond Recognition license for Title Rover

24   because he had paid for it and so he wanted to use it, right.

25   And that's why we drafted that statement of work.  Well, you

Page 105

1    own licensed software.  Let's give John Martin 25 grand and

2    give him a very specific statement of work and see if he can

3    use the license that Mark already owns to do some work for

4    Title Rover.  Now, in terms of specifically whether or not

5    that license was made part of Title Rover's IP or assets or

6    not, no idea.

7         Q.    Did anyone tell you --

8         A.    But it was clearly a desire to leverage the BR

9    license for Title Rover's benefit.

10        Q.    Okay.

11        A.    So, in order to do that, there would have to have

12   been some right by Title Rover to use the license.

13        Q.    But you don't know if that right exists?

14        A.    Do not know.

15        Q.    Did anyone tell you to inform potential investors

16   that Title Rover had a license to use the Beyond Recognition

17   software?

18        A.    Well, by virtue of the fact that I was asked to

19   mention BR in these documents, yes.

20        Q.    Did you ask questions about the licensing rights

21   for Title Rover?

22        A.    Did not.

23        Q.    Do you recall who gave you information concerning

24   the license -- the purported license to Title Rover?

25        A.    It would have been Mark.

Page 106

1      Q.     Okay.

2      A.     Yeah.

3      Q.     But you didn't ask for any --

4      A.     I didn't ask for any proof.

5      Q.     You just -- you believed -- you took Mark at his

6   word?

7      A.     Mark said he would use BR for Title Rover.  How?

8   Well, write a statement of work up.  What do you think we

9   should ask them to do, right.  So, we talked -- I remember

10  Tom and I talking about what should we write here.  And as a

11  result of that discussion, I wrote that statement of work and

12  I'd say, all right, let's let them try this, try Phase I.  If

13  you can get Phase I done and he can do it within the time

14  frame that we've -- that we've laid out, that's good, right.

15  If he does Phase I right, we'll ask him to do Phase II.

16  There was even discussion around if BR can do what they

17  purport to do, maybe we'll just use BR for this stuff.

18     Q.     When was that discussion?

19     A.     My brain has never hurt so badly.

20     Q.     I know.  We can take a break, too, if you --

21     A.     No.  That's fine.  So, what was the date of the

22  statement of work?  It was probably -- so, this is June 24th.

23  So, it would have been around that time frame.  And John

24  Martin was banging his chest saying, hey, you don't need Joe,

25  right.  You just need me.  And Tom and I are like really?

Page 107

1    Okay.  Mark is, you know, let's see what he can do.  See what

2    he can do.  Okay.  Statement of work.  Do Phase I, right.

3    Didn't go anywhere.

4         Q.    Okay.

5         A.    But there was discussion around, you know, maybe

6    we -- maybe we just use BR for this stuff but that was a long

7    shot.  That was a moon shot.

8         Q.    Were there any discussions between you and Mark

9    about why he continued to trust John Martin to do what he

10   said he would do?

11        A.    Yes.

12        Q.    Were there discussions between you and Mark about

13   John Martin?  You said he did not like you?

14        A.    He liked me more as time went on but there was a

15   long period of time that he did not like me.

16        Q.    Why didn't he like you?

17        A.    Because of my background in technology.  I was the

18   most likely person to say the emperor had no clothes.  And in

19   fact, I cautioned Mark before he ever invested a dime into

20   John Martin to do more due diligence on John Martin.

21        Q.    Do you know when that was?

22        A.    No.  It would have been prior to 2016.  It would

23   have been probably 2014 or '15.

24        Q.    Okay.  So, Mark invested into Beyond Recognition

25   between 2015 and early 2016?  Do you know?

1      A.    Or maybe even 2014.

2      Q.    Okay.

3      A.    Yeah.  That went on for a while.  And the BHP

4  project took a year and a half itself before it crashed.

5  So --

6      Q.    Why did you continue to do work on -- at Title

7  Rover despite your history with Mark not listening to you and

8  you losing your job at Image Engine?

9      A.    Excellent question.  My wife asked me the same

10  question several times.  I always -- I always liked Mark as a

11  guy, you know.  And I'm not one to burn bridges.  So, you

12  know, just like the whole EDIS situation, I knew what

13  happened there, right.  And I think Mark was misguided in his

14  efforts but it doesn't make him a horrible guy, you know.

15      Q.    When did you meet Mark?

16      A.    Probably 2012 or '13.

17      Q.    How did you guys meet?

18      A.    So, the story that I told you about how I was doing

19  some consulting work for Richard Davis on the Deepwater

20  Horizon incident and he -- Richard Davis knew Mark and knew

21  Steve Elston and Richard -- and I was with Haystack -- it was

22  while I was doing Haystack as well as working on a consulting

23  project with Richard.  And so, Richard was interested in

24  introducing Haystack into the Willis Group as a technology.

25  So, it was Richard's introduction.

Page 109

1      Q.     Was Haystack introduced as a technology?

2      A.     Uh-huh.

3      Q.     Okay.

4      A.     That's correct.

5      Q.     And then did you develop a friendship with Mark?

6      A.     I did, yeah.

7      Q.     Did you hang out at social events outside of work?

8      A.     No.  I mean, we grabbed lunch a few times.  We

9   never hung out after work, per se.

10     Q.     Okay.

11     A.     So, we weren't socially connected.

12     Q.     And as far as Mark's background in IT, you said you

13  were the one person who could say that the emperor is not

14  wearing any clothes.  Did Mark have, in your opinion, the

15  requisite background to be able to decipher the issues with

16  John Martin fully?

17     A.     Mark relied heavily on Rob Miller who was Mark's

18  general counsel at the time.

19     Q.     At Willis Group?

20     A.     Uh-huh.  And I remember sitting in Mark's office

21  with Rob some time around 2013ish when they were talking

22  about all of these great things they're going to do with

23  Beyond Recognition and they're going to do --

24              MS. SWEENEY:  I'm going to object to the

25  extent that the communication you're about to describe was

1    attorney-client privilege protected.  You're describing a

2    conversation that occurred between Mark Willis and his

3    attorney.

4         Q.    (BY MS. McKNIGHT)  Were you present --

5         A.    Uh-huh.

6         Q.    -- with them?  Were you working for Willis Group at

7    the time?

8         A.    I believe so.

9              MS. McKNIGHT:  Okay.  Shannon, I think as far

10   as he's not represented by Rob Miller, I think that it's not

11   privileged.

12             MS. SWEENEY:  If he's an employee and the

13   conversation is happening related to the business, then that

14   would be covered by the attorney-client privilege.

15        Q.    (BY MS. McKNIGHT)  Was it being -- was Willis Group

16   being discussed?  Was it your understanding that Rob Miller

17   was providing legal advice in that discussion?

18        A.    He wasn't providing legal advice.  He was providing

19   technology opinions.

20        Q.    Okay.

21        A.    It wasn't legal advice.

22             MS. SWEENEY:  I object -- I object to this

23   line of questioning.  I'm not sure this witness is -- has

24   established an expertise to discern whether or not legal

25   advice was being provided.

                                                      Page 111

```
 1                  MS. McKNIGHT:  Okay.  Well --

 2                  MS. SWEENEY:  I'm going to ask the witness not

 3      to provide content of the communications that took place with

 4      the attorney.

 5          Q.   (BY MS. McKNIGHT)  Okay.  I guess I'll just go back

 6      to our original line of inquiry, which is Mark relied on Rob

 7      Miller for IT information --

 8          A.    Yes.

 9          Q.    -- and expertise?

10          A.    Yes.

11          Q.    He also relied on you for expertise?

12          A.    Uh-huh.

13          Q.    Did Mark have any independent knowledge or

14      background to -- sufficient in the oil and gas industry to

15      hold himself out as an expert, in your opinion?

16          A.    No.

17          Q.    Have you ever seen Mark hold himself out as an

18      expert in the industry?

19          A.    The industry of?

20          Q.    Oil and gas.

21                  MS. SWEENEY:  I'm sorry for --

22                  MS. McKNIGHT:  Did you have an objection?

23                  MS. SWEENEY:  I was objecting on the grounds

24      that it was vague because I didn't know what issue you were

25      discussing but I think you just clarified.
```

Page 112

1              MS. McKNIGHT:  Yes.  Thank you.

2      A.    Yes.  Mark has some pretty deep background in the

3   oil and gas business.

4      Q.    (BY MS. McKNIGHT)  Have you ever seen him hold

5   himself out as an expert in the IT portion of the gas

6   industry and oil industry?

7      A.    No, not an expert.

8      Q.    You've never seen him portray himself as an expert

9   in IT?

10     A.    No.  No.

11     Q.    Okay.  We'll mark Exhibit 13.  It's Bates numbers

12  TAT 677 to 687.

13              (Exhibit 13 marked)

14     A.    This is a long E-mail thread.

15     Q.    (BY MS. McKNIGHT)  I know.  Take a second and read

16  through it.  It may take a minute.

17     A.    (Witness reviews document.)

18     Q.    And I guess while you're reviewing, I'm also going

19  to mark as Exhibit 14 Bates Plaintiff -- Bates numbers PLTF

20  561 to 571.

21              (Exhibit 14 marked)

22     A.    (Witness reviews document.)  Yeah.  The lawsuit, I

23  forgot about that one.

24     Q.    (BY MS. McKNIGHT)  What page are you referring to

25  on Exhibit 13?

                                              Page 113

1       A.      685.  Mark sued John Martin.

2       Q.      Why did he sue John Martin?

3       A.      Because he claimed to have contracts with all of

4    these companies and he claimed a lot of things that weren't

5    proven to be true.

6       Q.      Where on 685 are you thinking of the lawsuit?  Is

7    there a reference in here?

8       A.      Well, on 684 -- 685 -- so, 685 references a

9    settlement agreement dated July 24th, 2016 by and between

10   Willis Group and Beyond Recognition.

11      Q.      Okay.

12      A.      So, that settlement agreement was pursuant to a

13   lawsuit that was filed by Mark against John.

14      Q.      Mark individually or Willis Group?

15      A.      Willis Group.  I don't know.  I never saw it but

16   somebody --

17      Q.      You never saw the lawsuit?

18      A.      No.

19      Q.      Okay.  Did Mark ever tell you about the lawsuit?

20      A.      Uh-huh.

21      Q.      What did he say?

22      A.      That he had invested a lot of money and that John

23   Martin had completely misrepresented.

24      Q.      Was this the technology that we've been talking

25   about from the beginning?

Page 114

1        A.     Uh-huh.

2        Q.     Okay.  So, what did John -- do you recall what Mark

3    told you about what John had represented -- misrepresented?

4        A.      He represented that -- he misrepresented that he

5    had contracts with -- he told -- he told us collectively that

6    he had a master services agreement with ExxonMobil and that

7    he was doing these huge projects.  That he had master

8    services agreements with -- I don't know.  I mean, it was a

9    dozen or two dozen big oil and gas companies.

10       Q.     Was BP one of them?

11       A.      I can't remember.  I don't recall it being one of

12   them but it's not perfect knowledge.

13       Q.     Okay.  And so, you're saying that Beyond -- John

14   Martin had held Beyond Recognition of having all these master

15   services agreements with all these major oil companies when

16   the truth was Beyond Recognition did not?

17       A.      Apparently.

18       Q.     Okay.

19       A.      Yeah.

20       Q.     Was there any other misrepresentation that you can

21   recall that Mark told you about?

22       A.      There was misrepresentation about the ability of

23   the software to be operated by others.  So, John Martin

24   represented that the software could be installed and operated

25   by others and that turned out not to be the case.  It turned

Page 115

1     out that John was the only one who could operate the

2     software.

3          Q.     So, as of July 24, 2016, did you know that that was

4     the case, that only John could operate the Beyond Recognition

5     software?

6          A.     I would say that it was becoming increasingly

7     apparent, yes.

8          Q.     Did you ask -- did you raise that issue with Mark

9     and/or Tom about how is Title Rover even going to use this?

10         A.     We talked about BR so much ad nauseam, yeah.

11         Q.     Did it make you feel uncomfortable pitching to

12    potential investors that your -- Title Rover is able to use a

13    software that you don't even have access to?

14         A.     So, the attractiveness of what the software claimed

15    that it could do was very attractive.  And as a technologist

16    when I looked at what they were doing, even though John had

17    to stand in the middle of the software and, you know, turn

18    dials and pull levers, it was exciting what it -- I was

19    excited about what it could potentially do.  So, there was

20    this huge ground swell, not just with us but in the entire

21    marketplace of people wanting to believe because this was

22    going to be such a major advancement in the ability to create

23    structure out of unstructured data.  This was going to be

24    such a major advancement -- there was a fear that we

25    discussed about if we're not going to be part of this, we're

                                                      Page 116

```
 1   going to be left in the dust because this is going to be the
 2   de facto standard for how data gets processed.  And John was
 3   very good at playing that -- playing that game.
 4              So, it was -- it was -- it was a really
 5   interesting dynamic.  Because if he could pull it off -- and
 6   there were pieces of it that he would be able to do
 7   successfully and his main challenge was that he didn't trust
 8   anybody.  I tried to get him to teach me how to use the
 9   software.  He wouldn't do it.  Very paranoid.
10   Q.    But going back to my original question.  Did you
11   have cause for concern in late July that Title Rover wasn't
12   even able to access --
13   A.    Yes.
14   Q.    -- the software that it's claiming it has use of?
15   A.    Yes.  Yes.
16   Q.    And did you make that concern apparent to Mark and
17   Tom?
18   A.    Yes.
19   Q.    And what did they say?
20   A.    I recall their sharing my concern and wanting to
21   proceed very cautiously.
22   Q.    How -- were there any -- how did you proceed
23   cautiously, if at all?
24   A.    Well, cautiously by preparing a very tight
25   statement of work and saying, all right, we're going to hold
```

Page 117

1    your feet to the fire here on this very specific thing and if

2    you can't do this very specific thing, which by your

3    accounts, John Martin, should be a layup, okay.  So, we're

4    giving him -- making him take baby steps here and that's when

5    he didn't take the baby step.

6        Q.    Do you recall the statement of work being

7    terminated formally?

8        A.    No.  Because there was all of this other discussion

9    between Mark and John and, you know, someone -- and all these

10   other things that they were doing and then there was the

11   lawsuit and Mark filed suit against John.  So, I was not part

12   of -- but there was a lot of other spinning wheels of

13   discussion going on.

14       Q.    Politics?

15       A.    In terms of?

16       Q.    Mark's relationship with John and the investment

17   that Willis Group had.

18       A.    Sure.  Yeah.  Yeah.  Yeah.  A lot of money laid

19   out.

20       Q.    Do you recall in Exhibit 12 (sic) having read --

21   like seeing this E-mail chain?

22       A.    Exhibit 12 or 13?

23       Q.    Thirteen.  I even labeled it 12.  Exhibit 13.

24       A.    Yeah.  This -- yeah.

25       Q.    Do you remember seeing the responses on 684 to 685,

Page 118

1    687?

2         A.    I mean, I was on the E-mail thread.  So, I'm sure I

3    read it.

4         Q.    Okay.  Did you ever have -- do you know what the

5    data room that's being referenced is?

6         A.    I know there was a data room.

7         Q.    Did you help upload information into that data

8    room?

9         A.    I did not upload any information to the data room.

10        Q.    Did you ever look at the data room?

11        A.    I did not.

12        Q.    Did you ever read on 684, 1A it says, "Hopewell has

13   the exclusive right to use Title Rover's proprietary

14   software" and say to yourself, wait, what are we talking

15   about here?  Did you ever ask questions about Tom's answers

16   in the highlighted portion?

17        A.    I did not.

18        Q.    Do you recall any other lawsuits that occurred

19   between Willis Group and any other vendor that worked on

20   Title Rover?

21        A.    Not that I recall.

22        Q.    Okay.  For Exhibit 14, if you can look at that just

23   to connect the two.  Now that you see Exhibit 13, do you

24   recall the Intelometry Group at all, the name?

25        A.    I don't.  I surmise that some of the potential

Page 119

1    investors were with that firm and that domain -- E-mail

2    domain.

3        Q.    Do you have an estimate of how many potential

4    investors there were for Hopewell?

5        A.    My observation was that there was a handful of guys

6    who were day traders who were quasi buddies of Mark and

7    whatnot who were solicited to invest.  I don't know exactly

8    how many invested.  I mean, I've read the lawsuit.  So, I can

9    obviously see all that.  But I wasn't part of the inner

10   workings of any of that.

11       Q.    Of the soliciting investors?

12       A.    Yeah.

13       Q.    Except for the webinar that you put on?

14       A.    Yeah.  Except for a webinar and one meeting that I

15   specifically recall where I met a couple of the potential

16   investors in my office with Tom.  I -- but it was pretty

17   limited.

18       Q.    Do you recall if it was any of the investors that

19   were in the Intelometry Group?

20       A.    I don't specifically.  Again, I can connect the

21   dots and see that they're on the E-mail thread.  So, you can

22   surmise that they probably were part of the investor group or

23   potential investor group.

24       Q.    Did you ever have any phone calls with you only and

25   Justin Pannu?

Page 120

1      A.      Not that I recall.

2      Q.      What about you and Chad Martin only?

3      A.      Not that I recall.

4      Q.      Did you ever have phone calls with Justin Pannu

5   with others on the line?

6      A.      May have.

7      Q.      You just can't recall?

8      A.      I don't know.  It would have been in the context,

9   though, of delivering the pitch -- the Title Rover pitch, the

10  PowerPoint.

11     Q.      Would you say that Exhibit 5 encompasses the pitch?

12     A.      Yeah, I would.  Yes.

13     Q.      Okay.  Do you -- for Exhibit 14, if you go back to

14  the page -- there's a long E-mail thread but -- I'm trying to

15  find it.  Actually go to 564.  Do you recall writing --

16  helping Tom Tatham write any of these responses to Richard's

17  questions?

18     A.      (Witness reviews document.)  No.  I didn't write

19  any of this.

20     Q.      Do you remember him ever discussing with you how to

21  respond to these questions?

22     A.      We had conversations about what the technology was

23  being designed to do and not do.  So, I'm sure that Tom used

24  content from our conversations to write these responses.

25     Q.      Did Title Rover have any sort of file sharing

Page 121

1    system like DropBox or, you know, a shared server?

2        A.    Beyond the data room?

3        Q.    Yes.

4        A.    Not to my knowledge.

5        Q.    Do you remember having a discussion about this data

6    room, like setting it up?

7        A.    I was aware that one was being set up.

8        Q.    Do you know if Mark participated in the data room

9    setup?

10       A.    I do not know if he did or did not.

11       Q.    Okay.  Do you recall there ever being an investor

12   who was potentially putting $25 million into Hopewell?

13       A.    There were discussions around investors that I

14   heard bits and pieces of.  I couldn't tell you that I have a

15   good recollection of the amounts.  I know that they were

16   pursuing investments with multiple people but that doesn't

17   specifically ring a bell.

18       Q.    Okay.  Can you tell me how many lines of code

19   comprise the software that Joe Haynes created?

20       A.    I cannot.

21       Q.    Can you tell me how much of the code by rough

22   percentage is database code?

23       A.    I cannot.

24       Q.    Can you tell me how many total man-hours went into

25   the development of the title soft -- Title Rover software

                                                    Page 122

1    that Joe Haynes developed to date?

2        A.    Cannot.

3        Q.    I don't know if you're the right person for this.

4    I'm going to ask you.  Do you have the available functional

5    specifications that support the construction of the Title

6    Rover software?

7        A.    Do not.

8        Q.    Do you have the testing documentation or test

9    cases?

10       A.    Yes, for what was performed.

11       Q.    And that's on the hard drive?

12       A.    Yes.

13       Q.    Thank you.  Do you have any of the project

14   management documentation to support the development of the

15   software?

16       A.    Yes.

17       Q.    And that's on the hard drive?

18       A.    Yes.

19       Q.    And it's safe to say that everything on the hard

20   drive, with the exception of the E-mails that you cannot

21   access, is everything that you have in your possession for

22   Title Rover?

23       A.    That's correct.

24       Q.    And there's no source code on the hard drive?

25       A.    There is not.

1       Q.    Do you know what the functions -- the available

2   functions that were present in the software -- the software

3   Joe Haynes developed in 2017?

4       A.    Do --

5       Q.    Let me rephrase.  It was confusing.  What was

6   the -- did the software still exist in early 2017 or was it

7   still being developed?

8       A.    Well -- so, the functionality -- the three types of

9   functionality that I previously described were functioning.

10  When the project stopped in January, Joe stopped working on

11  it.

12      Q.    Okay.

13      A.    So, no further functionality was developed because

14  there was no project.

15      Q.    Do you know what happened to the software?

16      A.    I do not.

17      Q.    Did you ask Joe Haynes what happened to the

18  software at any time?

19      A.    He mentioned to me that he had decommissioned the

20  software and beyond that, I know nothing.

21      Q.    What is the usual standard of preserving something

22  like the portal that Title Rover used from Joe Haynes?

23      A.    That's a question for Joe, not for me.

24      Q.    Why was the project suspended in your -- to your

25  knowledge?

Page 124

1        A.    Lack of funding.

2        Q.    Do you know if the portal was ever reactivated?

3    And the portal being the software that Joe Haynes developed.

4        A.    Not to my knowledge.

5        Q.    Let's mark this as Exhibit 15.  It's TAT 1650 to

6    1662.

7                  (Exhibit 15 marked)

8        Q.    (BY MS. McKNIGHT)  Just go through these E-mails.

9        A.    (Witness reviews document.)

10                  MR. TATHAM:  Now I'm losing track.  Is this

11    15?

12                  MS. McKNIGHT:  Yes.

13        Q.    (BY MS. McKNIGHT)  It appears to be a continuation

14    of Exhibit 13's E-mail chain I just realized, just for the

15    record.

16        A.    (Witness reviews document.)  Some of this is

17    duplicative.

18        Q.    I just realized that.  Sorry.

19        A.    That's okay.

20        Q.    So, on 1650 it says at the top of the page an

21    E-mail from Tom Tatham to you about the reservation of

22    shares.  Is this regarding Title Rover?

23        A.    Yeah.  I remember reading this and being confused.

24        Q.    Did you invest into Title Rover?

25        A.    No.

                                        Page 125

1     Q.    Did Joe and Susan ever invest in the Title Rover?

2     A.    Not to my knowledge.

3     Q.    Do you recall the conclusion of this discussion

4 about a draft of a Title Rover document?  Do you know what

5 document he's talking about?

6     A.    Yeah.  And that draft is on my hard drive.

7     Q.    It looks like -- sorry.  On 1651 in the middle of

8 the page, Tom's E-mail, it says, "I have attached the draft

9 amended and restated company agreement."  Does that refresh

10 your recollection?

11     A.    What's your question?

12     Q.    Do you remember the conclusion of the discussion

13 concerning this amended and restated company agreement for

14 Title Rover?

15     A.    What I remember is no conclusion.  I know that

16 there was a -- a draft that's mentioned here, which I know

17 Joe and I reviewed it.  I'm not sure about Susan.  I know

18 that I made red lines to it, which are on the hard drive but

19 it was never executed.

20     Q.    Okay.  Do you have knowledge about where the money

21 was going -- what the money was going to be used for -- let

22 me rephrase.

23     Do you have any knowledge concerning the

24 investment from Intelometry Group and how that money was

25 going to be used?

Page 126

1      A.    The -- I knew that there was obviously our own burn

2   rate between Substantia LogiX and myself.  And I knew that

3   there was a goal of investing in leases or other legal defect

4   opportunities as the opportunities presented themselves.

5   Beyond that, I had very little knowledge -- no other

6   knowledge of who was charging what to whom.

7      Q.    And how their money was used?

8      A.    And how their money was being used.  The only

9   observation that I had was, again, in December when, you

10  know, it was obvious that unless the investors invested, we

11  weren't going to get paid.

12     Q.    Do you recall the investors specifically being the

13  folks from Intelometry or was it other people -- or the folks

14  from Ensource, I should say?

15     A.    Ensource, yeah.

16     Q.    So, you were -- your understanding was Title Rover

17  was waiting on that investment?

18     A.    That's right.  We weren't going to get paid for

19  December until that money came in --

20     Q.    Okay.

21     A.    -- that we had accrued.  We were being accrued.

22     Q.    Do you know if Tom Tatham ever personally lent

23  money to Title Rover?

24     A.    Not to my knowledge.

25     Q.    Do you know if Tom Tatham ever personally withdrew

Page 127

1   money to pay himself from Title Rover?

2       A.   I became aware of that at a shareholder's meeting

3   that was held.

4       Q.   When was that?

5       A.   Late December, early January.

6       Q.   And how did that come up?

7       A.   Tom made a presentation and during that

8   presentation, he went through the financials and said that,

9   you know, he paid us collectively and that he had paid

10  himself two fifty an hour times X number of hours that had

11  been accrued and there was no money left in the company.

12      Q.   Were you aware of Tom Tatham's terms of payment

13  before that shareholder meeting?

14      A.   Aware of what?  Repeat.

15      Q.   Were you aware of the terms of payment for Tom

16  Tatham --

17      A.   No.

18      Q.   -- before that?

19      A.   I was not.

20      Q.   Were you surprised to hear that he had also paid

21  himself at that meeting?

22      A.   I had no basis to be surprised or not surprised.  I

23  knew he was working on the project like I was.  So, you know,

24  our expenses are being accrued.  It didn't particularly

25  surprise me that he was accruing some expenses.  But it ended

Page 128

1     up being a lot of the $400,000.  That was obvious.  The

2     accrued expenses were a big chunk of that.

3          Q.    And the accrued expenses, to your knowledge, were

4     the amounts that were paid to Mr. Tatham, the amounts owed to

5     Substantia and Joe Haynes, and then the amounts owed to you?

6          A.    (Witness nods head.)

7          Q.    What about Beyond Recognition?  Were they still

8     getting paid?

9          A.    I don't know.  Don't know.  Don't know.

10         Q.    I'm going to attach as exhibit -- actually what

11    about Mark Willis?  Did Mark Willis ever personally loan

12    money into Title Rover?

13         A.    Not to my knowledge.

14         Q.    Did Willis Group ever loan money into Title Rover?

15         A.    Not to my knowledge.

16         Q.    To your knowledge, did Mark Willis ever personally

17    withdraw money from Title Rover?

18         A.    Not to my knowledge.

19         Q.    What about Willis Group?  Did they ever withdraw

20    money from Title Rover?

21         A.    Well -- so, Image Engine got paid.  So, if you

22    count that in that statement, yes, that's the only -- and

23    also the two ladies who were working, Lauren and Jennifer,

24    they were being billed through Beyond Review into Title

25    Rover, I believe.  So, I'm guessing that, you know -- I mean,

Page 129

1    that's a Willis Group business.  Image Engine is a Willis

2    Group business.  You know, theoretically they're all

3    for-profit businesses.  So, I doubt that they, you know,

4    submitted invoices as a cost, right.

5        Q.    Okay.  Did -- to your knowledge -- were there

6    credit cards for Title Rover specifically?

7        A.    Not to my knowledge.

8        Q.    What is your understanding of PDP Management's role

9    at Title Rover?

10        A.    I really don't have one.

11        Q.    Did you know that they were a vendor -- is it your

12    understanding that they were a vendor for Title Rover?

13        A.    I did not have that understanding.

14        Q.    What is your understanding of PDP Management?

15        A.    I understand from reading the complaint that that's

16    Tom's company.

17        Q.    But you don't have any other independent knowledge

18    of PDP Management?

19        A.    No.

20        Q.    Okay.  I'm going to mark this as Exhibit 16.

21        A.    This Beyond Recognition story just won't go away.

22        Q.    This is WIL_4201 to 4202.

23              (Exhibit 16 marked)

24        A.    (Witness reviews document.)  Okay.

25        Q.    (BY MS. McKNIGHT)  On 4202, the top appears to be a

                                                    Page 130

1    continuation of an E-mail -- or the body of an E-mail from

2    Tom Tatham dated August 18, 2016 to Mark Willis at

3    willisgroup.com.  CC, Mike Willis, T. Tatham twice.

4                Looking at the body of the E-mail, it says,

5    "Mark I met with Brent and Joe last night and we agreed

6    subject to your approval as follows:  Brent Stanley stays at

7    $15,000 per month for 100 hour monthly minimum.  SLX replaced

8    with AIT at 17,500 per month to cover both Joe Haynes and

9    Susan Willard."

10                Why was -- why did AIT replace SLX?  I assume

11   SLX is Substantia LogiX, correct?

12        A.    SLX is Substantia LogiX.

13        Q.    And AIT, is that Applied Intelligence Technologies?

14        A.    It is.

15        Q.    And that's Joe Haynes' company?

16        A.    Yeah.

17        Q.    Why did AIT replace SLX?

18        A.    Because I believe the thinking was to remove SLX as

19   the intermediary between Title Rover and AIT.

20        Q.    Okay.  So -- and that did happen where SLX was

21   removed as the intermediary?

22        A.    No.

23        Q.    It didn't?

24        A.    No.

25        Q.    SLX was not replaced with AIT?

1      A.    In what?

2      Q.    In compensation, I guess.

3      A.    No, not to my knowledge unless I'm forgetting

4   something but I don't recall that.

5      Q.    Well, in your E-mail it says, "Tom, Joe and I

6   discussed and are in agreement with your proposed terms

7   below."  So, what -- did anything change from your E-mail to

8   now that would make it such that SLX was still getting

9   compensated?

10      A.    Nothing happened as a result of this E-mail.  There

11   were no changes.  The reference memorandum here was never

12   executed.

13      Q.    Okay.

14      A.    And to my recollection, SLX continued to get paid

15   and SLX paid Joe.

16      Q.    Did SLX -- who handled the --

17      A.    Now, let me think about that for a second.  There

18   may -- there may or may not have been a point where AIT was

19   paid directly.  I don't recall if that change was made.  That

20   change might have been made because Joe wanted to get his

21   money directly as opposed to getting it from Susan.  I don't

22   recall that to be sure but what I do know to be sure is that

23   this reference memorandum was never executed.

24      Q.    Okay.  So, you don't know right now if the payment

25   terms changed as stated in 4202?

Page 132

```
 1        A.    I don't recall.

 2        Q.    I'm going to mark as Exhibit 17 -- they're not

 3   Bates numbered.

 4              MS. McKNIGHT:  Shannon, are you there?  I

 5   don't see you on the screen.

 6              MS. SWEENEY:  Sorry.  Yes, I'm here.

 7              MS. McKNIGHT:  I just want to make sure.

 8              THE WITNESS:  She's working.

 9              MS. McKNIGHT:  She's focused.  These are the

10   bank statements that were provided during the Willard

11   deposition.  They're also in the exhibits I E-mailed to you.

12   They're not Bates numbered.

13              (Exhibit 17 marked)

14        Q.    (BY MS. McKNIGHT)  Who at Substantia managed the

15   bank accounts?

16        A.    Susan.

17        Q.    Okay.

18        A.    It's near the end.  So, this shows money going out

19   to AIT in September, right?

20        Q.    Yeah.

21        A.    It shows a wire coming in to Substantia in

22   September.  So, I guess it didn't change, right?

23        Q.    So, Susan Willard, she testified that this was the

24   range of payments -- my understanding is this is the total

25   payments that were received by Substantia.  Now, the October
```

Page 133

1   statements aren't on here because -- my understanding from

2   Ms. Willard's testimony is Substantia was no longer receiving

3   payments.  So, does that -- looking at this refresh your

4   recollection as to why Substantia LogiX is not receiving

5   payments anymore?

6       A.   Well, if they received their last payment in

7   September but the project continued through December, then

8   did Title Rover pay AIT directly?

9       Q.   I'm asking you if you have knowledge of that.

10      A.   I'm guessing.

11      Q.   Okay.  I guess I'm confused because you said that

12  you were a managing director of AIT and AIT --

13      A.   No, not a managing director of AIT.

14      Q.   What was your title?

15      A.   I don't have a title with AIT.

16      Q.   I'm sorry.  SLX.

17      A.   Right.

18      Q.   So, you were managing -- you were a managing

19  director of SLX with Ms. Willard, correct?

20      A.   Right.

21      Q.   So, you two were partners?

22      A.   Yes.

23      Q.   Okay.  And so, my question is whether you have

24  knowledge of why payments stopped coming to Substantia LogiX?

25      A.   I don't.  And I never saw the books for Substantia.

```
 1    I trusted Susan to keep the books.  I never saw a single bank

 2    statement nor did I see a single balance sheet or anything

 3    financial.  And so, she handled all of that and I trusted

 4    her.

 5         Q.    Okay.  Do you recall why you had an E-mail for

 6    Title Rover specifically versus using your Substantia LogiX

 7    E-mail?

 8         A.    Yes.

 9         Q.    Why was that?

10         A.    Because it always looks better to the clients if

11    you have an E-mail with the company that you're doing -- that

12    you're working for.

13         Q.    Okay.  And did Susan Willard ever have a Title

14    Rover E-mail?

15         A.    I don't recall that she did.

16         Q.    Okay.  Do you recall Susan no longer being involved

17    in the Title Rover project after September, 2016?

18         A.    I know that her involvement sort of ended after she

19    completed her market assessment for data sources in other

20    counties.  I don't recall exactly when that was.  But I

21    recall that she had very little or no involvement after she

22    completed that task.

23         Q.    Did you ever talk to Susan Willard about the

24    conclusion of Title Rover?

25         A.    Yes.
```

1      Q.     Okay.  What did you say to her?

2      A.     Well, to the best of my recollection, we discussed

3   how bad it was that we couldn't continue, that it was an

4   interesting project, that we enjoyed working on it, and it

5   was unfortunate that it didn't continue.

6      Q.     Okay.  Mark this as Exhibit 18.

7             MR. TATHAM:  The statements were 16?

8             MS. McKNIGHT:  Seventeen.  And now we're on

9   Exhibit 18, which is TAT 1422 to 1423.

10            (Exhibit 18 marked)

11     A.     Okay.

12     Q.     (BY MS. McKNIGHT)  On 1423, from Tom to you on

13  October 17th that says, "Sorry.  I just got your message.  As

14  I mentioned, Hopewell has no funds until October 28th.  For

15  TR to make payments prior to 10-28 will require WG or

16  third-party advance and due to move I was not able to touch

17  base with Mark.  Will do so in the AM.  How did it go with

18  JM?  Do we have keys yet?"

19            So, does, I assume, TR, to your understanding,

20  stand for Title Rover?

21     A.     Yes.

22     Q.     So, is it fair to say that at this point in time

23  Title Rover was having financial problems?

24     A.     Fair to say.

25     Q.     Okay.  And do you recall -- and WG is Willis Group?

                                                    Page 136

1        A.     Uh-huh.

2        Q.     Do you recall WG ever advancing any money to Title

3    Rover?

4        A.     I may recall that.  I know that John was trying to

5    make sure that we collectively weren't being left in a lurch.

6    I don't remember the specifics --

7        Q.     Okay.

8        A.     -- in terms of amounts.  But I recall there being

9    discussion about Mike or Mark coming up with some money and

10   helping to bridge the gap.

11       Q.     Okay.  And then it says, "Do we have any keys yet?"

12   Do you know what he's referring to?

13       A.     Yes.  He's referring to access to John Martin's

14   software which had the data loaded that we were doing that

15   Phase I test for under that statement of work.

16       Q.     And that you never were able to actually --

17       A.     No.

18       Q.     -- run because he never gave you the instructions?

19       A.     Right.

20       Q.     Okay.  So, on 1422 at the top, Tom E-mails you on

21   October 18, "It is amazing to me that we are just now

22   clustering leases/deeds/units and conveyances.  How are we

23   ever going to have a suitable index without?  Please keep us

24   posted on today's results."

25                   I assume that's amazement as in

1    disappointment?

2         A.    Yeah.  Tongue and cheek.

3         Q.    Okay.  And do you know what today's results were?

4         A.    So, the process that John followed whenever he ran

5    a data set, he would cluster the data.  So, the way that

6    worked, if you were to establish an XY coordinate for every

7    character on every page -- so, you had positional knowledge

8    of every character on every page.  And if you had a rule

9    which said as long as 70 percent of the characters on any

10   given page map to 70 percent of the same character positions

11   on another page, we'll put those documents into the same

12   cluster.  Documents being in the same cluster means that they

13   are going to be the same document type.  So, that means that

14   you'll have a cluster of leases.  You'll have a cluster of

15   deed Type A, you'll have a cluster of something else, right.

16              So, the first step in the process is always to

17   cluster the data, which is separating it into those document

18   type buckets.  Step 2 is to go into each of those clusters

19   and say, okay, for this cluster, we want to extract this data

20   field, this data field, and this data field.  Okay.  Go to

21   the next cluster, we're going to extract this data field,

22   this data field, and this data field.  So, we were trying to

23   get him to complete the clustering, right, as the first step

24   in the process.  That's what it's referring to.

25        Q.    Okay.

Page 138

1      A.    Sorry for the long answer.

2      Q.    No.  It was fine.  Did that actually happen?

3      A.    I don't recall if he actually got the clusters

4   done.  He may or may not have but that really wasn't the

5   point because clustering wasn't the work product we were

6   looking for.

7      Q.    Okay.

8      A.    This was still going on in October.  Amazing.

9      Q.    Yeah.  I'll attach as Exhibit 19 TAT 02044 through

10   46.

11              (Exhibit 19 marked)

12              MS. SWEENEY:  Sorry.  Can you repeat that

13   again what Exhibit 19 is?

14              MS. McKNIGHT:  It's TAT 2044 to 2046.  It's an

15   E-mail chain.

16              MS. SWEENEY:  Thank you.

17      A.    (Witness reviews document.)

18      Q.    (BY MS. McKNIGHT)  So, let me know when you're

19   finished reading.

20      A.    (Witness reviews document.)  Okay.

21      Q.    On 2045, it's an E-mail from Mark Willis on

22   October 27, 2016.  Is it -- do you have any understanding as

23   to whether John Martin was holding off doing work pending

24   receipt of money from Hopewell in this time frame?

25      A.    That was John's standard operating procedure.

                                                    Page 139

1      Q.     Okay.  So, he would withhold work until money was

2    given to him?

3      A.     Yes.

4      Q.     But this is what you were referring to earlier

5    where you were trying to hold him to the original statement

6    of work or Mark was?

7      A.     Yeah, we were.  And jogging my memory a little bit.

8    He did some work on Pugh clauses, which were outside the

9    scope of work that we originally drafted for him because it

10   would be cool to be able to identify Pugh clauses in the

11   data.  He went ahead and did that, even though it wasn't part

12   of what we asked for.  And then he gave me access to some of

13   those results in a web portal or something and it was like,

14   okay, well, this isn't even in the statement of work.  And

15   you can see him commenting on that in the E-mail on 2045,

16   "classification is done, Pugh is done."  We didn't ask for

17   Pugh.  And he says all of this other stuff is done but he

18   never showed us the work product.

19     Q.     Okay.  So, you never saw the work that he claims he

20   completed here?

21     A.     Except for the Pugh clause identification --

22     Q.     Okay.

23     A.     -- which we didn't even ask for.

24     Q.     Did anybody -- do you know if anyone else received

25   the work product he claimed to have completed here?

Page 140

1       A.     I would have seen it.

2       Q.     And then there's 2044, Mark says, "Brent, can we

3    get a detailed response to our issues and agenda for the

4    WebEx?"  Do you know what this WebEx was supposed to be

5    about?

6       A.     So, this would have been a WebEx to force John to

7    communicate with us about the status of what we asked him to

8    do in Phase I of that statement of work.

9       Q.     Okay.  Which was he never completed anything?

10       A.     Right.

11       Q.     Okay.

12       A.     Right.

13       Q.     All right.  Exhibit 20 is TAT 1247 to 1248.

14              (Exhibit 20 marked)

15       A.     (Witness reviews document.)  Yep.

16       Q.     (BY MS. McKNIGHT)  Do you remember seeing this

17    preliminary report?

18       A.     Uh-huh.  Yes.

19       Q.     And this is a report that Joseph Haynes prepared?

20       A.     Yes.

21       Q.     Was this, to you, the final realization, just

22    another reinforcing -- strike that.

23              Was there any other follow-up concerning

24    Beyond Review -- sorry -- Beyond Recognition's deliverable

25    done after Mr. Haynes' report?

Page 141

1      A.    I don't recall that there was.  I think that the

2   ball -- the hot potato was dropped after this.

3      Q.    Okay.

4      A.    I think we gave up trying to work with him.

5      Q.    "We" being you, Tom, and Mark?  Title Rover?

6      A.    Collectively, yes.

7      Q.    Let's do Exhibit 21.

8            (Exhibit 21 marked)

9      A.    (Witness reviews document.)

10           MS. SWEENEY:  What is Exhibit 21, please?

11           MS. McKNIGHT:  I'm sorry.  I forgot.  TAT 1933

12   to 1934.

13     A.    Okay.

14     Q.    (BY MS. McKNIGHT)  Do you recall this E-mail

15   exchange with Tom Tatham?

16     A.    I do.

17     Q.    Okay.  There's this discussion -- or this E-mail

18   you sent on March 2, 2017 at 9:15 a.m., it says, "Tom, we had

19   a call back on December 2nd; your proposed agreement, which

20   was accepted by AIT, was for either Title Rover to land more

21   funding by Jan 31 and make Joe whole on the discounted Title

22   Rover payments to AIT for Dec and Jan, or else AIT is free of

23   any obligations or restrictions on the use of the software."

24   Do you remember that call?

25     A.    I do.

1    Q.    Okay.  And then Tom responded, "Brent, your message

2    regarding our early December call is not accurate."  Do you

3    recall any follow-up conversation concerning this proposed

4    agreement regarding AIT being free of any obligations or

5    restrictions to use the software?

6    A.    Well, I recall -- I recall Joe and I talking about

7    this E-mail and thinking that it looked like the whole

8    initiative was going to go south anyway.  So, just leave it

9    alone.

10    Q.    What do you mean by "leave it alone"?

11    A.    Did not respond -- keep responding to it.  They

12    were out of money.  So, it's going to die.

13    Q.    So, there was no follow-up on Tom's E-mail to you?

14    A.    I think there was a draft memorandum of

15    understanding still outstanding that Tom asked Joe and I to

16    approve and I don't think Joe ever responded to it.  I red

17    lined it.  I sent it back to Tom.  It had a bunch of

18    revisions that I wouldn't accept.  It's on the hard drive.

19    And I just --

20    Q.    Nothing ever came of it --

21    A.    Right.

22    Q.    -- from there?

23    A.    Correct.

24             MS. McKNIGHT:  Okay.  Let's take a five-minute

25    break.

                                              Page 143

```
 1              (Recess from 3:15 to 3:35)
 2      Q.    (BY MS. McKNIGHT)  I have a couple more questions
 3  for you and then I'll pass the baton.  Do you know how
 4  versioning of the software was managed or how source control
 5  was implemented?
 6      A.    Do not.
 7      Q.    Okay.  Did you ever recommend Title Rover establish
 8  a source code escrow agreement so it could be deposited and
 9  protected?
10      A.    No.
11      Q.    If you were the CTO, is that something you would
12  have done?
13      A.    Escrow agreements are merited in certain
14  situations.  I'm not sure.
15      Q.    Do you think an escrow agreement would have been
16  merited in this occasion?
17      A.    Escrow agreements are usually put in place where
18  there's a mill risk issue around the provider going out of
19  business.  That's the usual reason for escrow agreements to
20  be put in place.  I used to sell escrow agreements when I was
21  with Iron Mountain.
22      Q.    If something were to happen to Title Rover, though,
23  hypothetically, wouldn't there need to be something in place
24  to protect Hopewell's interests in whatever had been
25  developed?
```

Page 144

1          MS. SWEENEY:  Objection.  Calls for expert

2    legal conclusion.

3      Q.    (BY MS. McKNIGHT)  You can answer.

4      A.    Huh?

5      Q.    You can still answer.

6      A.    So, the answer is that if I were CTO of Hopewell --

7      Q.    Or Title Rover.

8      A.    -- or Title Rover, then I would have done a lot of

9    things differently.

10      Q.    Okay.  What would you have done differently?

11      A.    Well, I would have made a faster call on the whole

12    Beyond Recognition thing, number one.  Number two, I would

13    have been more aggressive in terms of pinning the business

14    team down on what the direction was because a lot of time was

15    spent in the first several months of the project through a

16    Ferris wheel effect of, you know, what are we going to focus

17    on.  And so, the technology team doesn't really know what

18    it's supposed to build to from a requirement standpoint

19    unless there is an agreement -- an agreement upon the

20    business requirements.

21      Q.    Okay.

22      A.    Someone who's truly a CTO would have been able to

23    weigh in much more heavily.

24      Q.    Than you were able to?

25      A.    Yes.

1      Q.    Did you have -- feel you had any power in the

2    decision-making process at Title Rover?

3      A.    No.  I didn't really have any power in the

4    decision-making process.  I did attempt to document what I

5    heard and attempt to get people to prioritize what they were

6    wanting to do.  But it was still very much a Ferris wheel

7    effect.

8      Q.    Okay.

9           MS. SWEENEY:  Sorry.  Could you repeat that

10    last -- it was still very much a what?

11           THE WITNESS:  A Ferris wheel effect.

12           MS. SWEENEY:  Gotcha.

13      Q.    (BY MS. McKNIGHT)  In 2018 were you ever contacted

14    by -- were you ever contacted concerning the bankruptcy's

15    trustee request to preserve software for Title Rover?

16      A.    I was contacted.  I don't remember exactly when,

17    but I was contacted.

18      Q.    Okay.  And do you recall what they contacted you

19    about?

20      A.    They contacted me regarding the issue of wanting to

21    lock down the source code.

22      Q.    Okay.  And what did you respond with?

23      A.    I responded that I did not have the source code and

24    that was not even sure if source code existed.  And that was

25    my response.

1      Q.    And did Tom Tatham ever personally use his own

2  funds to -- I guess, provide his own funds to float Hopewell?

3      A.    Not to my knowledge.

4      Q.    Okay.  Did Tom ever withdraw funds from Hopewell to

5  compensate himself, to your knowledge?

6      A.    Well, we talked earlier about Tom paying himself as

7  well as us out of the accrued expenses.

8      Q.    Via Hopewell to Title Rover?

9      A.    Right.

10      Q.    Okay.

11      A.    Beyond that, I have no knowledge of anything else

12  or recollection of anything else.

13      Q.    Do you know if Mark Willis ever invested into

14  Hopewell?

15      A.    I do not know that he did or did not.  My

16  recollection is that he might have made a bridge loan through

17  Jabco during some of the rough spots.  I remember there being

18  conversation about that between he and I.  I don't know if he

19  actually did or not.

20      Q.    Around what time frame was that?

21      A.    I think it would have been in the fourth quarter.

22  That's when we were having problems getting people paid.

23      Q.    Okay.  And I think I asked this earlier but is your

24  understanding of -- what was your understanding of Mark

25  Willis' involvement with Hopewell specifically as a manager?

Page 147

1    Was he -- was Tom still direct operations of Hopewell and

2    Mark Willis was sort of a major update kind of -- was he in

3    the higher role or just trying to understand Mark Willis --

4        A.    Tom was currently doing the day-to-day.  I know

5    that I gave Mark updates on at least a weekly basis.  I'd

6    just go down to his office and jab with him, you know.  What

7    transpired between he and Tom, I mean, we all sat in the same

8    office and everybody talks to everybody, right.  So, I assume

9    people are talking about what they're working on.  I don't

10   think Mark was far out of the loop in terms of knowing where

11   things were at because I gave him my own updates.

12       Q.    Okay.  When did Gregory Kane stop being involved in

13   the Title Rover and Hopewell-Pilot Project?

14       A.    Probably after the day that he came in over the

15   weekend and took a bunch of drawings and documents that he

16   wasn't authorized to take.

17       Q.    When was that?

18       A.    That was probably the late second quarter maybe.

19       Q.    And why wasn't he authorized to take them?

20       A.    He had been disassociated at that point.

21       Q.    With Hopewell-Pilot Project?

22       A.    With the whole effort.

23       Q.    Okay.  Was there -- did you join in the TRO against

24   Gregory Kane?

25       A.    I did, yeah.

Page 148

1      Q.    Do you recall when that happened, the TRO?

2      A.    Not specifically but it would seem to me that it

3   would have been in that same second quarter time frame.

4      Q.    Okay.  And what else did he -- did he do anything

5   else besides take things from the office that led to that

6   TRO?

7      A.    The purpose of the TRO was he was making some

8   threatening statements to the people that were named in the

9   TRO and that was the purpose for the TRO.

10      Q.    Was it -- did he make threatening statements

11   against you?

12      A.    He had made statements to myself and Susan and Joe

13   to the effect of either you're with me or you're against me

14   and I'm going to take these guys down.

15      Q.    Okay.

16      A.    So, that was cause for concern.

17      Q.    Okay.

18            MS. McKNIGHT:  All right.  If someone --

19   Shannon or Tom, if you want to ask some questions.

20            MS. SWEENEY:  Sure.  Tom, is that okay with

21   you if I go next?

22            MR. TATHAM:  Yeah, as long as -- I've got a

23   lot.  So, I want to get -- certainly I have a few favorites

24   that I would like to get out.  But I'll defer ladies first.

25            MS. SWEENEY:  Thank you.  I don't have that

Page 149

```
 1    many, I don't think.

 2                          EXAMINATION

 3         Q.    (BY MS. SWEENEY)  Mr. Stanley, when Ms. McKnight

 4    was questioning you, she asked you what you discussed with

 5    Susan Willard at the end when Title -- when it was clear

 6    Title Rover was done and your response was you discussed how

 7    bad it was, that it couldn't continue.  Can you tell me why

 8    you believed it was bad, it couldn't continue?

 9         A.    Yes, I can.  We thought it was an interesting

10    project.

11         Q.    Can you elaborate, please.

12         A.    Well, Susan and I had done a lot of work, as had

13    Joe in the line record space and we were intrigued by the

14    idea of being able to fuel an effort to find opportunities.

15    And so, initially when the project started out, it seemed

16    like it was very exciting.  There were a number of legal

17    theories that were potentially of interest and we felt it was

18    too bad that those couldn't be followed through on.

19         Q.    Am I correct that the reason why it couldn't be

20    followed through on is because the project ran out of money?

21         A.    Well, that's the condition that resulted, yes.

22    Obviously with no money, no project.

23         Q.    So, if there had been more money, do you believe

24    that Title Rover could have been successful?

25         A.    I think that Title Rover needed to have a better
```

Page 150

1    understanding of the types of opportunities that were of

2    interest.  So, when I referenced the Ferris wheel effect,

3    it's because, you know, on Monday we're chasing deeds with no

4    exhibits and on Tuesday we're chasing something else.  And

5    so, if there was a more clear path around what the business

6    strategy was, then I think we could have been more

7    productive.

8        Q.    And to your knowledge, who -- whose baby was it to

9    set the business strategy?

10       A.    The managers.

11       Q.    Do you think it would have solely fallen on Tom

12   Tatham and Mark Willis?

13       A.    As the managers, yes.

14       Q.    Was there ever a time during the course of the

15   project that the strategy seemed to distill and crystallize

16   and get more focused?

17       A.    No.

18       Q.    I'm asking because I believe you testified earlier

19   that there were -- Title Rover had three different types of

20   software within its bailiwick and at some point it was

21   apparent that the Beyond Recognition avenue was not working.

22   So, I am wondering if that meant that the Joe Haynes model

23   became more focused at that point?

24              MS. McKNIGHT:  Misstates prior testimony but

25   you can answer.

1           THE WITNESS:  I'm sorry?

2           MS. McKNIGHT:  I just put in my objection that

3     it misstated your prior testimony.

4           THE WITNESS:  In which way?

5           MS. McKNIGHT:  It's not -- it misstates the

6     prior testimony in that she's -- she stated that there's

7     three types of software that were in Title Rover's bailiwick

8     and, yet, you testified that you don't actually know if Title

9     Rover has licensing rights to that software.

10    A.    Yeah.  That's correct.  Yeah.  So, I don't know --

11          MS. McKNIGHT:  That's how it misstates prior

12    testimony.

13    A.    I agree with Bonnie on that point.

14    Q.    (BY MS. SWEENEY)  Let's go back, then, because I

15    might have misunderstood when you were testifying earlier.  I

16    had written down that you said that there were -- there was

17    the Joe Haynes software development that Title Rover was

18    working on; is that right?

19    A.    Uh-huh.

20    Q.    There was the Beyond Recognition software that

21    Title Rover was trying to use, correct?

22    A.    Yes.

23    Q.    And then the third was the BHP software that Title

24    Rover owned the -- or at least received in the settlement?

25    A.    No.  That's incorrect.  Title Rover --

                                                  Page 152

1      Q.      That's incorrect?

2      A.      That's incorrect, yes.

3      Q.      What about it is incorrect?

4      A.      Title Rover was not a party to the BHP settlement.

5      Q.      So, Willis Group was the one who had the BHP

6   software after the settlement?

7      A.      As a parent company, yes.  I think the settlement

8   was between Image Engine and BHP.  I'm not sure if Willis

9   Group had rights -- direct rights there or if it was Image

10  Engine.  You would have to read the settlement agreement,

11  which is on the hard drive.

12     Q.      Okay.  So, the BHP software is the WalkAbout that

13  we've -- that we talked about?

14     A.      Correct.

15     Q.      And am I accurate -- am I accurate that that was

16  listed by you as the third different software that Title

17  Rover had access to?

18     A.      So, you're twisting words here.  I never said that

19  Title Rover had access to it.  I said it was one of the

20  software packages that the Willis Group or its subsidiaries

21  had in their possession with some limited access -- limited

22  use rights to and that it was unclear to me whether or not

23  Title Rover/Hopewell had any rights to that software as

24  granted or not.  That's what I said earlier.

25     Q.      Okay.  So, then let's just clarify the record.  So,

Page 153

1    to your knowledge, did Title Rover use the BHP software at

2    all?

3         A.    To my knowledge, no.

4         Q.    And to -- based on your recollection, when was the

5    decision made to stop trying to make it work with Beyond

6    Recognition?

7         A.    Well, referring back to Exhibit 20, the E-mail

8    dated November 1, 2016 to which attached is Joe Haynes'

9    preliminary report on BR extraction, I would refer to that as

10   the time frame to which Beyond Recognition seems to be a

11   viable option.

12        Q.    So, at that point, was there any regrouping in

13   terms of, okay, well, we're solely relying on Joe Haynes and

14   the development of that software?

15        A.    At that point in time Joe's software was the only

16   software in play.

17        Q.    And do you believe that Tom and Mark understood

18   that as of November, 2016?

19        A.    Yes.

20        Q.    And do you believe that if Title Rover had more

21   money in that time frame -- November, December -- that the

22   Joe Haynes software could have been developed to perform as

23   was the aspirations of Title Rover?

24             MS. McKNIGHT:  Vague and ambiguous.  Calls for

25   speculation.  Incomplete hypothetical.  You can still answer.

                                                    Page 154

1           THE WITNESS:  So, am I supposed to answer or

2    no?

3           MS. McKNIGHT:  You can still answer.

4    A.    So, I'm going to refer you back to -- all the

5    stacks of paper here.  I'm going to refer you back to

6    Exhibit 5 and specifically to the diagram on Page 684, that

7    if we had had --

8    Q.    (BY MS. SWEENEY)  Okay.

9    A.    Are you there?

10   Q.    Yes, sir.  Go ahead.

11   A.    So, referring to this diagram on Page 684, if we

12   had been given a mandate to address the other functionality

13   that's articulated in this diagram and if there were solid

14   underlying legal theories that would support the types of

15   data inquisitions that would make doing this work relevant,

16   then, yes.

17   Q.    Is there some reason to think he would not have

18   been given that mandate if the money had been there?

19   A.    Well, I think it roots back to having a clear

20   picture from a business and legal perspective on what's going

21   to make commercial sense to spend money on to pursue the

22   development of software.  It roots back to that.  So, the

23   last thing that you want to do on an exercise like this is

24   have the tail wagging the dog.  You don't want to build

25   software for the sake of building software.  You want to do

Page 155

```
 1    it because you have a clear, pristine, massive clarity point

 2    of view around how the software will help you do business.

 3    If you have that and you can articulate a set of requirements

 4    for what you want the software to do to support your

 5    inquisitions of data to support those business outcomes,

 6    then, yes.  That isn't -- that's the premise of building

 7    software for any application, not just Title Rover.

 8        Q.    Okay.  Would you have gotten resistance to building

 9    that type of software had the money been there?

10              MS. McKNIGHT:  Calls for incomplete

11    hypothetical.

12        A.    Yeah.  I can't answer that.

13        Q.    (BY MS. SWEENEY)  Was it your perception -- at that

14    time in November when it was clear that Beyond Recognition

15    was not going to work out, was it your perception that Tom

16    and Mark as managers of Title Rover were still hoping that

17    Title Rover could be a successful enterprise?

18        A.    Why wouldn't they be?

19        Q.    I guess that's not really the question.  I'm trying

20    to figure out if your perception was that they were still

21    hopeful.

22        A.    Well, I guess, the answer is, of course, they were

23    hopeful because we wouldn't continue to be doing it if they

24    weren't.

25              MS. McKNIGHT:  I'm going to do a belated
```

Page 156

1    objection that it calls for speculation.

2        Q.   (BY MS. SWEENEY)  Were you still hopeful that Title

3    Rover could be successful as of November, 2016?

4        A.   I was -- I was disturbed by the lack of business

5    clarity.  So, that caused me to question what are we trying

6    to accomplish here.

7        Q.   If you were questioning, does that mean you didn't

8    have hope?

9        A.   No, it doesn't mean that.

10       Q.   So, I guess is the answer, yes, you still did have

11   hope as of November, 2016?

12       A.   By extension, yes.  That's correct.

13       Q.   Do you know if Mark and Tom were relying on you to

14   be the interface with John Martin?

15       A.   Do I know if they were relying on me to be the only

16   interface to John Martin?  Is that your question?

17       Q.   That you were the one tasked with overseeing his

18   involvement.

19       A.   No, I wouldn't say that.  I would say Mark's

20   involvement with John was deeper than mine because of his

21   prior investments with John and their lawsuit.  And so, I

22   played a very focused, limited role in trying to get John to

23   do something productive for Title Rover, which is evidenced

24   by the statement of work that I drafted and trying to draw --

25   bring his feet to the fire on the execution of Phase I of

Page 157

1    that, which we've already discussed did not meet

2    expectations.

3        Q.    So, I guess, the reason why I'm asking that is it

4    appears, to me, when you look at Exhibit 18, which is TAT

5    1422, it looks to me -- the top E-mail of that exchange from

6    Tom Tatham saying to you, gosh, it's amazing to me that we

7    are just now clustering leases, deeds, units and conveyances.

8    Am I incorrect in reading that to think that Tom was unaware

9    of the slowlessness of the project?

10       A.    Tom was aware.

11       Q.    Did you believe that the E-mail that he sent as we

12   just -- that I just read from was -- was not genuine

13   surprise?

14       A.    I think that Tom and I were collectively skeptical

15   of John Martin's intent and ability to deliver what we asked

16   for.

17       Q.    Did you have any evidence prior to October 18, 2016

18   that Mr. Tatham was frustrated with the progress of Beyond

19   Recognition and/or John Martin?

20       A.    Yes.

21       Q.    Do you remember him memorializing those

22   frustrations in writing?

23       A.    I don't recall but that doesn't mean that he did

24   not.  I know we talked about it.

25       Q.    Do you know if -- sorry.  Do you know if Mr. Tatham

Page 158

1    was aware prior to October 18, 2016 that we were just now

2    clustering leases, deeds, units and conveyances?

3         A.    I recall that Tom and I had very regular

4    communication about the progress of what was going on with

5    this task order for John Martin.

6              MR. TATHAM:  I've got an objection.  That

7    question, Shannon, was a little bit vague in terms of -- you

8    said "we" in terms of clustering.  I think that if you can

9    clarify that for us, it would be helpful.

10             MS. SWEENEY:  Sorry, Tom.  I was quoting

11   directly from the E-mail.  In the E-mail you say, "We are

12   just now clustering leases/deeds/units and conveyances."

13   That's a direct quote.  So, I'm assuming you were meaning

14   Title Rover but that could be an incorrect assumption.

15             MR. TATHAM:  I guess you'll get a chance to

16   ask me one of these days.

17        A.    I can make a comment there.  I think the "we" that

18   Tom is referring to is Beyond Recognition.

19             MR. TATHAM:  Sometimes sarcasm isn't

20   appreciated.

21             MS. McKNIGHT:  I think we all just want to

22   make sure we can interpret it correctly.

23             MR. TATHAM:  That's why I raised the question.

24             MS. SWEENEY:  And I appreciate that.  It helps

25   to have a clear record.

                                              Page 159

1       Q.     (BY MS. SWEENEY)  I guess, then, I should rephrase

2    the question and get a better question, better answer.  So,

3    do you have any reason to believe that Tom Tatham knew before

4    October 18, 2016 that Beyond Recognition was just then

5    clustering leases, deeds, units and conveyances?

6       A.     As I previously stated, Tom and I were in regular

7    communication about the status of BR and the work product and

8    the status of the work product.

9       Q.     So, you think he did know that?

10      A.     Again, we were in regular communication.  We

11   probably spoke almost every day about the status of work

12   activities, especially BR and what's going on and where are

13   we and what are we waiting on and when are we going to have

14   it.

15      Q.     So, did it surprise you, then, when you got this

16   E-mail on October 18, 2016 from Mr. Tatham saying --

17   expressing amazement that this was happening if your

18   assessment was that Mr. Tatham already knew?

19      A.     If you're trying to paint the picture that Tom

20   found out about this for the first time and made comments

21   about it for the first time on October 18, I think that's an

22   incorrect assumption.

23      Q.     I just want to be clear.  I'm not trying to paint a

24   picture of anything.  I'm trying to get information and

25   understand the timing of this.  This is my first time having

Page 160

1    the opportunity to chat with you about this particular

2    E-mail.  And so, I'm trying to understand why it was sent on

3    this date and what information people had prior to that date

4    to put it in context.

5        A.    Okay.  Is there a question in there somewhere?

6        Q.    Excuse me?

7        A.    Is there a question in there someplace for me to

8    answer?

9        Q.    No.  I was just moving on to a different question.

10       A.    Okay.

11       Q.    Unless you have something else you wanted to

12   clarify.

13       A.    No.

14       Q.    So, when we talked earlier about Exhibit 19, which

15   begins at TAT 2044, I would like to go to the E-mail that is

16   from Mark Willis that's found on Page 2045 at the very bottom

17   of that page.  I believe this is an E-mail from Mark Willis

18   to John Martin.

19              MS. McKNIGHT:  What exhibit are we using?

20              THE WITNESS:  Nineteen, Page 2.

21              MS. SWEENEY:  We're using right now 19.

22       Q.    (BY MS. SWEENEY)  Again, this is October 27, 2016

23   and it appears to be an E-mail from Mark where he's

24   expressing frustration to John about the inability to get

25   information about the progress of Beyond Recognition.  Is

                                                    Page 161

1  that how you also read it?

2      A.    Yes.

3      Q.    Were you speaking with Mark to the same level of

4  frequency as you were with Mr. Tatham related to Beyond

5  Recognition?

6      A.    Probably so.

7      Q.    Is it your sense that Mr. Willis was aware of the

8  challenges that Beyond Recognition was facing at that time?

9      A.    Yes.

10     Q.    Do you recall when you started expressing your

11 concerns to Mr. Willis and Mr. Tatham related to Beyond

12 Recognition?

13     A.    I don't know the exact date but I -- as I

14 described, my concerns about Beyond Recognition going back

15 several years prior to that.  Then those concerns were on the

16 table for a long time.

17           Let me make a point, though.  The idea of

18 using John Martin to create what's called a primary index for

19 a county's records -- sometimes when you acquire the county's

20 records, they provide no index to the records and you have to

21 derive your own index.  Many of the counties that we surveyed

22 could not sell the index to us or would not sell the index to

23 us or had an incomplete index for our needs or some

24 combination of the above.  So, the idea was to be able to use

25 Beyond Recognition to create not only the primary index of

Page 162

1    grantee, grantor, survey, abstract -- the primary seven

2    fields -- instrument type, instrument date, recording date

3    but to also be able to support a deeper index which allow us

4    to pull out things like acreage and all kinds of stuff.  And

5    to be able to do that -- the market price to index a record

6    is $2 an instrument.  So, if you're looking at every county

7    has 400,000 instruments, two bucks an instrument, that's

8    $800,000 to create just the primary index.

9           So, the interest in John Martin was, well, if

10   we can create a much more robust index than just the primary

11   index for a fraction of that money, then we've got a big leg

12   up on the market because we'll have intelligence that nobody

13   else has for our purposes.  That was the whole idea behind

14   using Beyond Recognition.  And it was our purpose in doing

15   this pilot Phase I was to give him the chance of showing us

16   how he could initially create the primary index of seven

17   index fields.  And if that went well and if we could create a

18   repeatable process, that we could scale that against multiple

19   counties of data.  That was the point of the exercise.

20   Q.    And so, when in November, 2016 it was clear that it

21   wasn't working, that was still related to Phase I, right?

22   A.    Correct.

23   Q.    You testified earlier that the software did have

24   some benefits to the two attorneys that were working.  Rather

25   than having to spend time going and picking out individual

Page 163

```
 1   leases, it was all compiled for them?

 2       A.    Which software are you referring to?

 3       Q.    Is that because --

 4             MR. TATHAM:  Objection.  Vague.

 5             MS. McKNIGHT:  Join.

 6             MS. SWEENEY:  I'm sorry.  What was your

 7   question?

 8             MS. McKNIGHT:  The objection was it's vague.

 9   Tom and I join as vague and ambiguous as to which software.

10             MR. TATHAM:  Which software are we talking

11   about now?

12             MS. SWEENEY:  That was going to be my

13   question.  I hadn't finished my sentence.

14       Q.    (BY MS. SWEENEY)  I was wondering which of the

15   softwares provided that benefit?

16             MS. McKNIGHT:  Same objection.

17       A.    Well, given that Beyond Recognition was not able to

18   do anything, that obviously is eliminated from the question.

19   Therefore -- and given the fact that we weren't using the

20   WalkAbout software at all, that leaves the only software

21   standing, which was Joe's software.

22       Q.    (BY MS. SWEENEY)  And at what point during the

23   process did Joe's software start being used by Title Rover?

24       A.    The volume -- the book and page indexing was -- and

25   this is all reflected in status reports on the hard drive --
```

Page 164

1    I believe was completed in the July to August time frame.

2        Q.    So, if it was completed in that time, when was --

3    when did it start being used?

4        A.    It would have been used right away by the land men

5    and women that were working on the project.

6        Q.    So, during the entirety of 2016, was that software

7    in use?

8        A.    Well, from the point of time that the functionality

9    was available -- which like I said was the July, August time

10   frame through the end of the year, at which point the project

11   concluded -- it would have been used by the land men and

12   women who were working on the project, which were primarily

13   Jennifer and Lauren.

14       Q.    Was there ever an expectation that Joe's software

15   and the Beyond Recognition software would interface together

16   or were they two different softwares being developed kind of

17   on a parallel track?

18       A.    There were a couple of different discussions.  One

19   discussion was about using Beyond Recognition to index the

20   county data -- a new county's data and to push that index

21   into Joe's software.  That was the more logical conversation.

22   There was a separate conversation which John Martin was

23   pushing, which was to use his software instead of Joe's

24   software.

25       Q.    And were those discussions that were being held

Page 165

1    with Mark and Tom as well?

2        A.    I recall those discussions certainly with Mark and

3    perhaps with Tom.   I don't recall that as clearly.

4        Q.    I believe you testified earlier that as to Tom and

5    Mark, Tom was more linear and Mark had a different approach

6    in that he was more kind of throw everything on the wall sort

7    of a guy.   When it comes to the use of the two different

8    software packages and that discussion, do you recall if Mark

9    was in favor of -- I guess I'll ask.   Which one was Mark more

10   in favor of?   Which approach?

11            MS. McKNIGHT:   Calls for speculation.

12       A.    I don't think that it was a matter of -- my opinion

13   is that it's not a matter of Mark being more in favor of one

14   versus the other but looking at, you know, which horse can

15   win the race.   And so, if BR can accelerate at least some

16   part of the process like I described around creating the

17   index, then that's a game changer.   And, you know, Mark

18   really liked what Joe had done and got great feedback from

19   Lauren and Jennifer around its ability to allow them to have

20   a faster, more complete view of relevant data.   That was

21   goodness.   Mark was looking to make progress.   And so, I

22   supported that, as did Tom.   You know, we're all trying to

23   push the ball down the court.

24       Q.    (BY MS. SWEENEY)   Is it your assessment that Mark

25   and Tom wanted this endeavor to work?

Page 166

1      A.    Yes.

2      Q.    Is it your assessment that Mark and Tom believed

3   that they could make it work?

4            MS. McKNIGHT:  Vague as to time.

5      A.    Repeat, please.

6      Q.    (BY MS. SWEENEY)  Is it your assessment that Mark

7   and Tom believed they could make the project work?

8            MS. McKNIGHT:  Calls for speculation.  Vague

9   as to time.

10     A.    I don't know why they would have done what they did

11  otherwise.

12           MS. McKNIGHT:  Also --

13     A.    If they believed otherwise.

14           MS. McKNIGHT:  A belated objection.  It's

15  vague and ambiguous as to "make it work."

16     Q.    (BY MS. SWEENEY)  Were you trying to make Title

17  Rover work?

18     A.    What do you mean by "work"?

19     Q.    Be effective.

20     A.    Of course.

21     Q.    Was there ever a time when you were employed by

22  Title Rover that you stopped trying to make it be successful?

23           MS. McKNIGHT:  What was the question?  I

24  couldn't hear her.

25           THE WITNESS:  Was there ever a time when I

Page 167

```
 1    stopped trying to make Title Rover be successful.

 2              MS. McKNIGHT:  Vague and ambiguous.

 3        A.    Why would I do that?  Yeah.  That makes no sense.

 4              MR. TATHAM:  Is it fair to ask how much time

 5    we have left?

 6              MS. McKNIGHT:  We can do that when -- when

 7    she's done, we can go off the record.

 8              MR. TATHAM:  Okay.

 9              THE WITNESS:  What are we doing?

10              MS. McKNIGHT:  Shannon, are you just reviewing

11    your questions?  Just want to make sure.  Hello.

12              THE WITNESS:  I think she lost her audio.

13              MS. McKNIGHT:  Let's just go off the record,

14    then.

15              (Recess from 4:21 to 4:24)

16              MS. SWEENEY:  Madam court reporter, can you

17    please read back the question because I honestly don't

18    remember it at this point.

19              (The record was read as requested.)

20        A.    I answered that question.

21        Q.    (BY MS. SWEENEY)  What was the response?  Sorry.  I

22    must have missed it.

23        A.    The response was no.

24        Q.    I think you testified that you prepared the

25    marketing material for Title Rover.
```

Page 168

1    A.    I testified that I prepared the PowerPoint document

2    that's Exhibit No. 5.  I testified that I prepared the

3    document -- the Word document that's behind the PowerPoint in

4    the same exhibit.

5    Q.    And that would be the data mining for mineral

6    resources investigation?

7    A.    That's the document in the exhibit, yes.

8    Q.    Okay.  As you drafted those and prepared them, was

9    there anything in them that you knew to be false?

10                MS. McKNIGHT:  Calls for speculation but go

11   ahead.

12   A.    No, not false.  I previously testified that I had

13   some concerns about how far we were getting over our skis

14   here.  We were talking about doing some things that hadn't

15   been done yet.

16   Q.    (BY MS. SWEENEY)  If you were -- if you were

17   concerned that you were getting ahead of yourself in such a

18   way, why add that to the marketing material that was going to

19   be shown to third parties?

20   A.    Because the managers wanted me to.

21   Q.    Do you have a recollection of conversations you had

22   with Mark and/or Tom where you said, hey, looks like we're

23   going a little bit too far afield and you were instructed to

24   do it anyway?

25   A.    I think that those conversations were probably more

Page 169

1    with Mark than with Tom is my recollection.

2         Q.    Can you remember any specific instance where that

3    instruction was given?

4         A.    I do not recall a specific conversation word for

5    word, no.

6         Q.    Can you recall any specific issue where that

7    instruction was given?

8         A.    What do you mean by "specific issue"?

9         Q.    Just content, we're overstepping here on this

10   issue.

11        A.    I remember drafting these documents and reviewing

12   them with Tom and Mark and having discussions about what we

13   should say, not say, and so on.  Ultimately they were the

14   approver of the content.

15        Q.    I don't think that answered the question.  I'm

16   wondering if there's a specific issue that you recall feeling

17   that you were getting ahead of yourself on and bringing it to

18   Mark and/or Tom's attention and being instructed to say it

19   anyway?

20        A.    Well, I think we've talked at length about the

21   whole Beyond Recognition situation.  So, that would have been

22   the most riskiest point to discuss is how far should we go

23   talking about Beyond Recognition.  How far should we bait

24   them into this?  Do we really know what they can do?  Should

25   we hope that they're going to do it?  Are we going to say

1   that?  Okay.  We're going to say that.  I'm going to put it

2   in the documents and hope he delivers.

3       Q.    So, looking at the Exhibit 5 that we have been

4   talking about, specifically the data mining for mineral

5   resource investigation, can you point to a section in that

6   document where that reflects the concern you were just

7   discussing about Beyond Recognition?

8       A.    Well, one simply needs to scan the document for

9   references to Beyond Recognition and those are the points

10  that you're talking about.  So, one of those, as an example,

11  would be -- let's see where we're talking about Beyond

12  Recognition here.  So, we're talking about Beyond Recognition

13  on -- at least on Page 15.

14              MS. McKNIGHT:  Can you read the Bates number

15  for that?

16      A.    Yeah.  So, that's 695.  That's pointing to Beyond

17  Recognition technology.  In fact, those are graphics from

18  them.  There's other references --

19      Q.    (BY MS. SWEENEY)  But it's not -- it's not

20  mentioned by name, though, correct?

21      A.    Well, I could do -- if I had these documents, I

22  could easily do a word search, right, rather than leafing

23  through these.  We could all do that to try to find the

24  reference points.

25      Q.    On the first page of the exhibit -- of this

                                                    Page 171

```
 1    document -- let me get back to that and give you a Bates
 2    label.  Bates label 682.
 3        A.    Okay.
 4        Q.    It discusses the technology team and it mentions
 5    Mr. Haynes and GIS analysts.  I don't see Beyond Recognition
 6    mentioned at all as part of the technology team.
 7        A.    If you go to 671, which is the second page of the
 8    PowerPoint, then under technology team you see John Martin
 9    listed.  And you see a reference to Beyond Recognition on
10    674.  I'm not sure why we're forcing this.  And so on and so
11    forth.
12        Q.    Is it possible, then that by the time --
13        A.    On 699 --
14              THE REPORTER:  I'm sorry.  Hold on.
15        A.    On 699 you've got a reference to John Martin as
16    well when it's talking about technology intellectual property
17    overview.  There are probably other references as well.
18    Those are the ones that I'm flipping through and seeing.
19        Q.    (BY MS. SWEENEY)  That is August 23.
20        A.    There's also a reference to BR starting on Page 707
21    and going through 708 going through 709 going through 710.
22        Q.    So, it looks, to me, like these documents were
23    created on different dates, August 19th, August 23rd.  And
24    I'm not sure they -- looks like they contain the same
25    information.  Do you have any memory for why that might be?
```

Page 172

1      A.    Only that there were different types of documents

2    needed for different purposes.  Obviously the PowerPoint was

3    meant to be a presentation that looks like it's 11 slides

4    long.  So, that's something you can cover in half an hour, 45

5    minutes.  The next document titled data mining for mineral

6    resource investigations was meant to be, generally speaking,

7    a follow-up document to the PowerPoint.  And then the third

8    document titled technology utilization and intellectual

9    property, looks like it was something perhaps that was

10   developed for the purposes of the data room.

11     Q.    That's helpful.  Thank you.  We had -- the original

12   question had been specific issues that you recalled where you

13   were worried you were getting a bit ahead of yourself and you

14   expressed concerns and were instructed by Mark and/or Tom to

15   include the information anyway and the example you gave was

16   Beyond Recognition.  Is there any other example -- is there

17   any other issue that you can recall?

18     A.    Let me refer you, again, to the diagram on 684 in

19   Exhibit 5.  And I previously spoke to the vision that this

20   diagram represents and my concern with this was that this was

21   a leading vision that we didn't have all -- didn't have the

22   functionality except for the things in the middle -- the

23   middle bubble.  All the other things we were talking about

24   what we could do.  My concern was that we were causing people

25   to believe that perhaps we could do these things but they

1   weren't built yet.  So, that's what I meant about being over

2   our skis.

3       Q.    And if you had concerns that might be confusing

4   potential readers of this information, why did you go along

5   with allowing your name to be associated with the documents?

6       A.    As a non manager contractor, I chose to do what my

7   employers asked me to do.

8       Q.    Were you ever -- did any potential investor ever

9   ask follow-up questions on the areas in which you had

10  concerns?

11      A.    No.  The investors, again, were day traders, my

12  observation, who had little background in any of this.  And

13  as such were not well positioned to know what questions to

14  ask.

15      Q.    Did you have any involvement with the investors

16  during their due diligence process?

17      A.    Not beyond what I previously described.

18      Q.    Why don't you tell me again so I can make sure I

19  know accurately.

20      A.    I'm going to refer you back to previous testimony.

21      Q.    You interacted with potential investors on

22  PowerPoint presentations, correct?

23      A.    Yes.  On probably a couple of occasions I -- at

24  least one occasion that there's an E-mail record of I was

25  active participant in a webinar.  There may have been --

Page 174

1      Q.      Did you ever have -- sorry.  Go ahead.

2      A.      As I previously stated, you know, there might have

3   been a small handful of other interactions to describe the

4   vision around what we're doing and so on.

5      Q.      Do you have an appreciation of where -- of the

6   difference between kind of an initial introduction to Title

7   Rover versus now we've moved into due diligence?

8      A.      I don't understand your question.

9      Q.      Do you have an understanding that those might be

10  two different phases preceding an investment in the company?

11     A.      I'm familiar with M&A due diligence, yes.

12     Q.      Do you have a specific recollection of discussing

13  anything related to Title Rover once the due diligence

14  process related to Hopewell had begun for the Ensource

15  plaintiff?

16     A.      I don't recall whether or not I had any

17  conversations with potential investors once the data room was

18  opened up to them.  I don't recall.

19     Q.      Going back to the issue of adding things to your

20  marketing materials that you felt were overstepping, did you

21  express any of your concerns to Mark and/or Tom in writing?

22     A.      I would rely on the E-mail record to say whether I

23  did or not.  I do not recall.

24     Q.      Do you recall if you have any writings from Mark

25  and/or Tom instructing you to proceed with contents that

Page 175

1      might be overstepping in your marketing materials?

2          A.    Same answer.

3          Q.    And when you say referring to E-mails, that would

4      be E-mails that would be in the database that you provided to

5      counsel today?

6          A.    As previously stated, I do not have access to my

7      Title Rover E-mail nor my Image Engine E-mail nor my EDIS

8      E-mail nor my Substantia LogiX E-mail.  Therefore, any

9      communications records using E-mails with those domains are

10     not in my possession.

11         Q.    In the documents you provided in the database to

12     counsel, did you see any E-mails of the type that I just

13     asked about?

14         A.    In the exhibits that I've received?

15         Q.    In the database that you provided to counsel today.

16         A.    I do not recall there being an E-mail which

17     addresses that issue.

18         Q.    Do you believe that you were -- you ever saw any

19     material that was provided to third parties not prepared by

20     you that had materials that may have overstepped?

21             MS. McKNIGHT:  Vague and ambiguous.

22         A.    Vague and ambiguous.

23         Q.    (BY MS. SWEENEY)  Did you understand the question?

24         A.    Well, I obviously didn't draft everything that was

25     given to the investors.  So, to the extent that people

1    drafted documents, which I was never privy to, that were

2    given to the investors, then I would not have access nor

3    knowledge of them.  I was not privy to --

4         Q.    That wasn't my question.

5         A.    I was not privy to the data room.  I do not know

6    what the investors saw.  I only know the documents that I

7    prepared, which are the ones we're taking about.

8         Q.    So, I'm asking specifically if there are documents

9    that you are specifically aware of that overstated facts that

10   you did not prepare?

11        A.    I would refer you to the exhibits today and the

12   explanations of the technology that was provided and the

13   communications with the investors as to whether or not they

14   were overstepped or not.  It's subject to the interpretation

15   of the reader to determine whether or not there was

16   overstepping.

17        Q.    And which exhibits are you referring to?

18              MS. McKNIGHT:  I'm going to ask you anyway

19   even if she didn't.

20        A.    Okay.  So, I think that we are -- so, Exhibit 14

21   would be one potential example.  So, I didn't write any of

22   this.

23        Q.    (BY MS. SWEENEY)  Anything else?

24        A.    That's the only one that I see.  Doesn't mean there

25   aren't others.  But that's the one that I see.

1      Q.     Was it your assessment that Mark Willis believed

2   the things that John Martin told him about the Beyond

3   Recognition software?

4               MS. McKNIGHT:  Vague as to time.  Calls for

5   speculation.

6      A.     I believe that Mark wanted to believe that John was

7   going to be able to produce something useful.

8      Q.     (BY MS. SWEENEY)  Are you aware of any plans by

9   Mark Willis or Tom Tatham to dupe investors?

10     A.     Repeat.

11     Q.     Are you aware of a plan by Mark and Tom to dupe

12  investors?

13     A.     No.

14               MS. McKNIGHT:  Vague and ambiguous as to

15  "dupe."

16     A.     What do you mean by "dupe"?  What do you mean by

17  "dupe"?

18     Q.     (BY MS. SWEENEY)  What is your understanding of the

19  word "dupe"?

20     A.     You're the one that used the word.  You tell me.

21     Q.     I'm asking if there was a plan that you're aware of

22  to defraud investors.

23               MS. McKNIGHT:  Calls for speculation.  Calls

24  for a legal conclusion.

25     A.     I don't think Tom and Mark were trying to defraud

Page 178

1    the investors.  No, I don't believe that.

2              MS. SWEENEY:  I'm going to pass the witness,

3    Tom.  Thank you very much.

4                        EXAMINATION

5        Q.    (BY MR. TATHAM)  I would like to back up a little

6    bit and I wasn't here in the beginning.  But my first

7    question is how many depositions have you given in your

8    lifetime?

9        A.    This would be the first.

10       Q.    That's fascinating.

11       A.    Why is that?

12       Q.    Because you do very well at this, I think.  I don't

13   know.  Speaking from a lot more experience than you have.

14   Anyway, my next question is -- I believe you stated earlier

15   that you were introduced to Mark by a Jack Davis?

16       A.    Richard Davis.

17       Q.    Richard Davis.  Sorry.  And this was during the

18   Deepwater Horizon litigation with British Petroleum, BP?

19       A.    Yep.

20       Q.    Which some of us refer to as the Macondo well

21   blowout.

22       A.    Right.

23       Q.    What -- were you involved for Willis Group in any

24   of the discovery -- the E-discovery management effort for BP?

25       A.    No.

                                                    Page 179

1    Q.    As a result of your relationship with Mark Willis

2    later at Image Engine, were you aware of what search-and-sort

3    technology was used for the BP E-discovery management effort?

4    A.    I was not.

5    Q.    Okay.  Let's -- we spent a fair amount of time on

6    John Martin and Beyond Recognition.  So, I think it's only

7    fair --

8    A.    You're going to beat that more?

9    Q.    Exhibit No. 3, if you'll take a look at the date at

10   the top.  That was the statement of work.  That initial date

11   is, I believe, June 24th.  Is that --

12   A.    That's what it says, yeah.

13   Q.    And immediately prior to this agreement, do you

14   recall a conversation with Mike Willis and myself in the hall

15   regarding John Martin and his historical success rate with

16   the Willis Group of companies?

17   A.    I think I might.

18   Q.    Words to the effect that fool me once, shame on

19   you.  Fool me twice, shame on me.  Do you remember that

20   statement?

21   A.    I remember cash is king and a few other

22   colloquialisms that stuck in my head, yes.

23   Q.    All right.  The point here -- the date here is

24   June 24th.  I think we've covered the fact that the Phase I

25   was due, I believe, in 15 days from full execution.

1        A.    This says 30 days --

2        Q.    Okay.

3        A.    -- right here.

4        Q.    Is that Phase II or Phase I?

5        A.    Phase I, 30 days.  I also recall, though, Tom, that

6    this might have been a slow launch.

7        Q.    I was going to point out and I want to ask you, do

8    you recall the settlement negotiations of the litigation

9    between Willis Group and Mark were going on subsequent to

10   that -- when that agreement was signed?  In other words,

11   the -- do you recall if the settlement had been concluded

12   with John Martin and Beyond Recognition at the point in time

13   when this was signed?

14       A.    I did not have much visibility into the details of

15   that nor the status of it.  I was aware that there was a

16   suit.  I was aware that Mark and John were dancing around

17   each other.  And I observed that it was an odd situation.

18       Q.    Yes.

19       A.    That if one is suing the other, why does John

20   Martin have an office down the hall from us and why are we

21   still trying to use the software?

22       Q.    Do you recall the date that John Martin got his

23   office down the hall from us?  Was it before or after the

24   June 24th date or the settlement date, which I believe was

25   July 23rd or the end of July, 24th?

                                                    Page 181

```
 1        A.    I don't recall.

 2        Q.    Okay.

 3        A.    He wasn't there much.

 4        Q.    From your experience with John Martin, has he ever

 5   finished a project on time, made a deliverable by the due

 6   date in the scope of work or the particular contract that

 7   you've been privy to?

 8        A.    Not to my knowledge.

 9        Q.    Okay.  So, it wouldn't be surprising if a

10   settlement were taking place after this agreement that was

11   signed that might have an impact on how hard John worked on

12   the particular project at hand?

13        A.    That's a very accurate statement.

14        Q.    Okay.  I think we've got another exhibit in here

15   that demonstrates that Phase I work was still outstanding in

16   late August, if I'm not mistaken.  And further, Exhibit 19, I

17   believe --

18        A.    So, 18, Tom -- Exhibit 18 is the E-mail thread

19   between you and I and Mark where it's sort of -- this is

20   October 18th --

21        Q.    Eighteen.  I'm sorry.

22        A.    -- where we're -- he's just getting to clustering.

23              MS. McKNIGHT:  I think you're referring to 10,

24   though -- Exhibit 10.

25        Q.    (BY MR. TATHAM)  Yes.  There was another exhibit,
```

Page 182

1    No. 10, which talked about -- this was dated August 23rd that

2    the first phase of work was still outstanding then and then

3    Exhibit 18, as you pointed out, where we're talking about how

4    amazing it is that he's just now clustering leases, deeds,

5    and units.

6        A.    Well, that's correct.  And what's notable here,

7    too -- or also is that, you know, John would never start work

8    before he got paid.

9        Q.    That's right.  My next question, do you recall -- I

10   think you were asked if you recall the amount that was due

11   for Phase I.

12       A.    I think it's referenced in here someplace as

13   $25,000.

14       Q.    That's right.  And to your recollection, was John

15   paid that money in advance?

16       A.    I believe that he was.

17       Q.    Right.  And if you look back on the exhibit on

18   page -- Exhibit 18 on the 1429 --

19       A.    I don't have a one four --

20       Q.    Pardon me.  That's the -- there's another one.  My

21   question is was the completion of the Phase I work held up by

22   John because of a request for the payment -- advanced payment

23   for Phase II work?  This is toward the end of October, 2016.

24       A.    Yeah.  I don't recall that.  I recall -- I mean,

25   you know, we -- looks like we drafted this statement of work

Page 183

1     the end of June.  It looks like John got paid the first week

2     in July.  And here we are sitting in the middle of October on

3     Exhibit 18 and he's completed Step 1 of several in the work

4     that was requested in Phase I.  So, obviously a long time

5     went by and he didn't deliver what we asked him to do and he

6     certainly missed the time frame by a very wide mark.  Because

7     now we're looking at the month of July, the month of August,

8     the month of September, and half of October and we're still

9     not done.  That's three and a half months.

10         Q.    This is the Exhibit 18, the first page that

11    references the October 28th funds coming in to Hopewell

12    and --

13         A.    Right.

14         Q.    -- obviously John had requested an advance payment

15    for Phase II, even though he hadn't completed Phase I.  Do

16    you recall the discussions with Mark Willis about making the

17    payment in advance for Phase II in advance of him providing

18    completion of the work required for Phase I?

19         A.    I don't.  What I do recall, though, was John always

20    needing money and always having his hand pretty deep in

21    Mark's pocket.

22         Q.    If you don't recall a discussion --

23         A.    I don't remember.  It wouldn't surprise me,

24    however, that John would request Phase II payment before he

25    finished Phase I.  That would be classic John.

1    Q.    Okay.  Leave that one.  I'll need my exhibits back

2    when you're finished with them.  I want to go back and

3    revisit the Image Engine discussion earlier today relative to

4    Exhibit 12.

5    A.    Okay.

6    Q.    To your knowledge, do you recall what tasks Image

7    Engine performed for Hopewell and/or Title Rover?

8    A.    They were tasked with imaging those ancient records

9    in the Madison County courthouse.

10   Q.    Obtaining digital records of the deed records of

11   Madison County was one of the tasks?

12   A.    Uh-huh.

13   Q.    Do you recall any other tasks related to straight

14   copying of the leases contained in each of the recorded units

15   in Madison County?

16   A.    Yes, actually I do.

17   Q.    Okay.

18   A.    Thanks for reminding me about that.  I recall that

19   they were tasked to do that and I recall there was a large

20   degree of consternation, particularly on your part, as well

21   as mine --

22   Q.    Right.

23   A.    -- regarding their charge to do that.

24   Q.    Do you recall any other task that Image Engine

25   might have performed for either Title Rover or Hopewell other

Page 185

1    than the copying of the leases and each of the filed and

2    recorded units or the obtaining digital copies of the Madison

3    County deed records?

4         A.    Those are the only two things I remember.

5         Q.    If I asked you to take a look at Exhibit 12 again,

6    and particularly the invoices attaching to that -- and I

7    believe they're in inverse order of date.

8         A.    Right.

9         Q.    Would it appear that the initial invoice dated

10   May 31 is for the copying of the unit files?

11        A.    At 60 cents a page, yes.

12        Q.    If we were to do copying at Kinko's, what kind of

13   price would we be likely to get for this kind of a volume

14   job?

15        A.    36,000 pages.  I'm going to guess you could get

16   that done for a few cents a page.

17        Q.    The other invoices, if you take a look at those and

18   see if you believe they would relate to the obtaining digital

19   images of the Madison County deed records.

20        A.    Yes.  These reference expenses for going to Madison

21   courthouse -- Madison County courthouse.  So, they look

22   relevant to that.  That's correct.

23        Q.    And I think that it was your testimony earlier that

24   the initial effort to obtain the digital images didn't pass

25   muster under the QC and had to be redone or substantially

 1    redone.  Did I recollect that correctly?

 2        A.    Yeah, there was.  So, I was reviewing the work

 3    product that was coming out of Image Engine and there -- I

 4    can't remember the percentage or the amount but there were --

 5    was some illegible images.  And the whole point was obviously

 6    to be able to read the images because it's what you needed to

 7    do, right.  So, if the images were illegible, then it had to

 8    be redone.  And they were under agreement in a statement of

 9    work that's someplace to produce legible images.

10        Q.    And they, in fact, went back and redid the job and

11    passed muster on that next inspection; is that correct?

12        A.    That's correct.  And the issue was that if you try

13    to scan a bound book, you can't get the edges far enough down

14    to the glass to get it to capture the image.  That's hard to

15    do, right.

16        Q.    So, you asked permission to take the book apart?

17        A.    That's right.

18        Q.    Which is what, in fact, happened?

19        A.    Correct.

20        Q.    Okay.  The initial page on this exhibit is an

21    E-mail message from me to you with copying Mark and Joe

22    Haynes for different reasons.  And I request that you give me

23    a call regarding settlement of the final invoices to get your

24    thoughts.  Do you recall us having a conversation --

25    telephone conversation later that day?

Kramm Court Reporters, A Veritext Company
866-299-5127

1      A.    Not specifically.

2      Q.    Okay.  If I told you that the attached invoices

3   totaling some fifty-six, $57,000, that I had asked you to

4   approve settlement for $24,000, would that refresh your

5   memory?

6              MS. McKNIGHT:  Asked and answered.

7      A.    I would have to look at the original statement of

8   work to -- for -- that I drafted for Image Engine, which I

9   think we both looked at and you probably approved and compare

10  it against these invoices.  What I do recall, as I testified

11  earlier, was that the invoices were for a much larger amount

12  than was originally stipulated on the statement of work.

13     Q.    (BY MR. TATHAM)  But you don't have any

14  recollection of your approving the 24,000-dollar settlement

15  of all these outstanding invoices?

16     A.    I don't.  I mean, it doesn't sound like it's

17  something that I would have objected to because we were

18  looking for a reasonable conclusion to the whole mess.

19     Q.    Okay.  We had a fair discussion about your role as

20  chief technology officer earlier.  And I believe -- let me

21  see if I can find my notes here.  I believe there was a

22  question -- first series of questions from Ms. McKnight to

23  you in which she asked if Mark Willis had asked you to pose

24  as CTO to which you responded "yes."  Is that a correct

25  summary of your earlier testimony?

                                              Page 188

1       A.      I believe so.

2       Q.      And then she also asked you -- Ms. McKnight -- if

3    Tom Tatham had asked you to pose as CTO to which you

4    responded "probably."  Is that a fair summary of your

5    testimony?

6       A.      Yes.  I think so.

7       Q.      Later after we had a break she came back --

8    Ms. McKnight came back and asked you did the managers,

9    plural, tell you to lie about your title as CTO to which you

10   responded "yes."  Is that a fair summary of your testimony?

11      A.      It is.  But managers, plural, in that latter

12   statement is in conflict with a prior statement because if I

13   said "probably" about you asking me to use a CTO title --

14      Q.      Let me solve it this way.  Did I ever ask you to

15   lie about your title at Title Rover?  "I" being Tom Tatham --

16   Thomas Tatham.

17      A.      I wouldn't characterize -- no.  I would say no.  I

18   think there was desire probably more on Mark's part to try to

19   create some puffery, so to speak, right.

20      Q.      Okay.

21      A.      We need a CTO.  Hey, you over here, right.

22      Q.      Okay.  But just for the record, did I ever ask you

23   to lie about anything --

24      A.      No.

25      Q.      -- related to Title --

1      A.      You didn't explicitly ask me to lie, no.

2      Q.      I want to ask you a couple questions about Exhibits

3    7 and 9.  Exhibit 9 was the statement of work for data

4    services presented to Title Rover and this is dated

5    March 8th, 2016 around it's signed by you and Mark.  And the

6    other agreement is the independent contractor agreement

7    between you and Title Rover, which is executed by Mark only.

8      A.      Right.

9      Q.      Do these represent the final executed agreements

10   relative to these tasks or were they superseded by subsequent

11   agreements?

12     A.      I believe that these were the agreements -- I don't

13   recall signing anything other than this.  And this is the

14   executed draft between Mark and I.  So, if there's something

15   that supersedes this, I don't have a copy of it.

16     Q.      From the statement of work, you pointed out that

17   there's some red line notes where Mark -- in the first

18   paragraph where Mark Willis is Xed out and Title Rover, LLC

19   is put in.  And then on one of the other pages it's got a

20   parenthetical about the cost that says, "This seems very

21   reasonable to me.  Which SLX personnel are covered by this

22   estimate?  Should they be identified in this agreement?"

23   These are sort of atypical for execution documents, right?

24     A.      They are.

25     Q.      Comments.

1      A.    Yeah.  These would normally be taken out prior to

2   an execution version.

3      Q.    And anyway, you don't recollect another version

4   that was signed that superseded this version?

5      A.    I don't have anything else in my possession.  I

6   recall --

7      Q.    Also, too, if you take a look at the last page,

8   it's -- there's a footnote saying that this was executed

9   prior to the formation of Title Rover.

10      A.    Yeah.  I see that.

11      Q.    Is it likely that there would have been another

12   agreement once Title Rover was formed that was executed?

13                  MS. McKNIGHT:  Leading.  Asked and answered.

14                  MR. TATHAM:  I'm sorry.

15                  MS. McKNIGHT:  Calls for speculation.

16      Q.    (BY MR. TATHAM)  I guess I've asked that question.

17   Do you recall any other agreements signed subsequent to this

18   agreement?

19                  MS. McKNIGHT:  Same objection.

20      A.    This is the only agreement that I have, which is

21   also the version that I have in my hard drive.

22      Q.    (BY MR. TATHAM)  Okay.  Did you ever make the

23   statement as CTO in any of the materials or reports that the

24   software developed by Joe Haynes was owned or the property of

25   Title Rover?

                                          Page 191

1        A.    I can't recall the exact wording that I've used to

2    describe what is essentially at least proprietary use of the

3    software by Title Rover at the time.  I don't recall the

4    exact words that I might or might not have used.

5                    MR. TATHAM:  Okay.  I don't have any other

6    questions.

7                      FURTHER EXAMINATION

8        Q.    (BY MS. McKNIGHT)  I have -- I'm sorry.  I have two

9    that I missed that you may have answered.  But did you

10   provide analysis and requirements gathering for Title Rover

11   software?

12       A.    Did I provide analysis --

13       Q.    Analysis and requirements.

14       A.    -- and requirements gathering, yes.

15       Q.    Okay.

16       A.    And that work product is on the hard drive.

17       Q.    Okay.  And you already went over in your testimony

18   earlier what the functions of the software were?

19       A.    I did.  And those are further explained in one of

20   the exhibits here which contains the technical overview.

21       Q.    Exhibit 5?

22       A.    Yeah.  Whichever one it is, yeah.

23       Q.    Okay.  But the analysis and requirements gathering,

24   was that solely for the Joe Haynes-created --

25       A.    I'm sorry?

1     Q.    That applies to the Joe Haynes-created software,

2     correct?

3     A.    Not exclusively, no.

4     Q.    Okay.

5     A.    No.  I mean, the requirements gathering -- so,

6     think about -- think about it this way.  So, you've got Tom,

7     Mark, Steve Ervi, Hank Gamble, Greg Kane, a couple of other

8     land men and a couple other attorneys maybe in the room,

9     right.  And everybody is talking over each other.  And so,

10    Greg Kane is off in the ozone.  Tom is trying to create

11    order.  And I'm sitting there listening to all of this trying

12    to figure out -- listening to everybody talk through some

13    series of days of weeks of meetings, what are we supposed to

14    be doing here?  What can we focus on?  What's the problem

15    we're trying to solve?  What are the problems, plural, we're

16    trying to solve that would lead to how can technology help do

17    this better, faster, and cheaper than alternatives.  Okay?

18    Q.    Okay.

19    A.    So, interpreting all of that business and legal

20    discussion and translating that into, okay, here's what we

21    can -- here's what I heard and here's what we can do from a

22    technology standpoint to solve those problems.  It isn't

23    specifically what Joe could do but it's what first -- the

24    first question to ask is what commercial, off-the-shelf

25    software in the marketplace that can do this today.

1      Q.     And what would that be?

2      A.     Drilling Info is an example of that.

3      Q.     Yes.

4      A.     But what are we trying to accomplish from a

5   business standpoint?  Maybe we need to build tools, maybe we

6   need to combine some tools together, maybe we need to

7   integrate some tools, right.  So, my job is to listen to the

8   business people describe what they want to do and then

9   translate that into a requirements document that reflects on

10  what they said and looks for what's the best way to solve the

11  problem from a technology standpoint if, in fact, it can be

12  solved.

13     Q.     Okay.

14     A.     And what's it going to cost and how long is it

15  going to take.

16     Q.     Okay.  But you said all of that gathering was

17  summarized in Exhibit 5?

18     A.     It's on the hard drive.

19     Q.     The hard drive.  Okay.

20     A.     Yeah.

21     Q.     Did you do any type of design or development on the

22  Title Rover --

23     A.     I don't write code.

24     Q.     Sorry?

25     A.     I don't write code.  Wish I did.

1      Q.     Were any release notes or specifications existed or

2    were used?  Did any --

3      A.     Documentation consisted of the user guide that I

4    wrote and used as a training guide.  There were no release

5    notes, per se.  If we added a new feature, then I update the

6    user guide and train the users on that new feature.

7      Q.     Okay.  So, the only specification document was the

8    user guide that you created?

9      A.     There were other -- there are other documents on

10   that hard drive which lay out in project plan detail the

11   exact features that were going to deliver in the next release

12   and the release after that.

13     Q.     Okay.

14     A.     So, that would typically be in a -- it's in a

15   project plan-type format, typically in a spreadsheet, which

16   is on the hard drive.

17     Q.     So, all of the specifications are on the hard drive

18   that were created?

19     A.     To the extent they were documented, yes.  So, they

20   were documented probably not as thoroughly as, you know, you

21   would document specifications in, you know, Oracle, right.

22   But, you know, Joe and I would have an easier, less -- a less

23   formal communication.

24     Q.     Okay.

25     A.     But it was all documented but it wasn't

Page 195

 1    necessarily, you know, to Microsoft standards.  But it was

 2    adequate to get the job done.

 3        Q.    Okay.  Do you know what -- and maybe you covered

 4    this but it's just some jargon.  I want to make sure that

 5    we've discussed this.  Do you want what software development

 6    methodology was used to construct the software?

 7        A.    Well -- so, your options would be Agile or Scrum

 8    for the most part or Waterfall.  Waterfall is a very linear

 9    process.  Agile and Scrum are very short-term, sprint-focused

10    activities.  So, this project would have lent itself more --

11    or did lend itself more to an Agile, Scrum style, which was

12    building modules at a time.

13        Q.    Okay.  You mentioned earlier that there was a

14    common phrase, cash is king.  What was the context of who

15    said that?

16        A.    Mike Willis is famous for saying that.

17        Q.    Mike Willis?

18        A.    Uh-huh.

19        Q.    Okay.  He's famous in the country for saying that?

20        A.    No.  It was something that he actually said in a

21    meeting once that I was in.  We would have these monthly

22    financial meetings.  And particularly when I was trying to

23    help Willis Group figure out Image Engine, which was losing a

24    lot of money and, you know, we would review the balance sheet

25    every month and they were hemorrhaging a hundred thirty grand

Page 196

1   a month or thereabouts.  And so, I -- he made the comment

2   about cash being king.  Stuck in my head.

3       Q.    Okay.  But that was not said in the Title Rover

4   context?

5       A.    No.  I was being a little cute.  Sorry.  Nothing to

6   do with Title Rover.

7              MS. McKNIGHT:  Okay.  I don't have any further

8   questions.

9              MS. SWEENEY:  I have just a couple more.  Just

10  a couple more.

11             FURTHER EXAMINATION

12      Q.    (BY MS. SWEENEY)  When Mr. Willis told you to call

13  yourself CTO, was that a directive that he made orally or was

14  that in writing?

15      A.    I don't recall.

16      Q.    Can you -- was there ever any other time where

17  Mr. Willis specifically asked you to lie?

18      A.    I would point back to my previous testimony where I

19  spoke about my concerns of being too far over our skis as it

20  relates to the technology that we were talking about being

21  used for the project.  I wouldn't necessarily call that a

22  lie, per se.  But I do think that we were pretty far over our

23  skis.

24      Q.    That was Mark and not Tom?

25      A.    Tom tended to make -- take a much more conservative

Page 197

1    view of the technology.  So, yes.

2              MS. SWEENEY:  No other questions.

3                   FURTHER EXAMINATION

4        Q.   (BY MS. McKNIGHT)  Would you say it's reasonable to

5    say that you -- meaning Title Rover -- was far over your skis

6    as of late August, 2016?

7        A.   Well, I think we had -- we had developed certain

8    dependencies for ourselves at that point.  One very large

9    dependency was waiting for John Martin to do or not whatever

10   he was going to do.  That was really a critical factor.  So,

11   yes.

12       Q.   Okay.  And is that what you're referring to when

13   you said John had his hands in Mark's pocket?

14       A.   Yeah.

15             MS. McKNIGHT:  No further questions.  Anything

16   else?  Let's work out a stipulation off the record.

17             (Discussion off the record, 5:23 to 5:26)

18             MS. McKNIGHT:  So, we're relieving the court

19   reporter of her duties.  Mr. Stanley will have two weeks to

20   review the electronic copy that the court reporter will send

21   to his personal E-mail and he will make any changes

22   understanding that we can comment on any changes he makes and

23   he will provide that back to the court reporter.

24   Additionally, any certified copy may be used in lieu of the

25   original.  So stipulated?

                                              Page 198

1                     MR. TATHAM:  Yes.

2                     MS. SWEENEY:  Yes, so stipulated.

3                     MS. McKNIGHT:  We can go off the record.

4                     (Proceedings concluded at 5:27 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                          Page 199

```
1                    CHANGES AND SIGNATURE

2   WITNESS NAME: _____ DATE OF DEPOSITION: _____

3   PAGE LINE  CHANGE                    REASON

4   _____

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____
```

Kramm Court Reporters, A Veritext Company
866-299-5127

```
 1        I, BRENT STANLEY, have read the foregoing deposition and

 2   hereby affix my signature that same is true and correct,

 3   except as noted above.

 4

 5                            _____

 6                            BRENT STANLEY

 7

 8   THE STATE OF _____)

 9   COUNTY OF _____)

10

11        Before me, _____, on this day

12   personally appeared BRENT STANLEY, known to me or proved to

13   me on the oath of _____ or through

14   _____ (description of identity card or other

15   document) to be the person whose name is subscribed to the

16   foregoing instrument and acknowledged to me that he/she

17   executed the same for the purpose and consideration therein

18   expressed.

19        Given under my hand and seal of office on this

20   _____ day of _____, _____.

21

22                            _____

23                            NOTARY PUBLIC IN AND FOR

24                            THE STATE OF _____

25   My Commission Expires: _____
```

Page 201

1    STATE OF TEXAS

2    COUNTY OF HARRIS

3

4                      REPORTER'S CERTIFICATE

5                 ORAL DEPOSITION OF BRENT STANLEY

6                         June 5, 2019

7

8         I, the undersigned Certified Shorthand Reporter in and

9    for the State of Texas, certify that the facts stated in the

10   foregoing pages are true and correct.

11        I further certify that I am neither attorney or counsel

12   for, related to, nor employed by any parties to the action in

13   which this testimony is taken and, further, that I am not a

14   relative or employee of any counsel employed by the parties

15   hereto or financially interested in the action.

16        SUBSCRIBED AND SWORN TO under my hand and seal of office

17   on this the 19th day of June, 2019.

18

19

20

21                 Stacey Whitley, CSR

                   Texas CSR 3999

22                 Expiration:   12/31/2019

                   VERITEXT LEGAL SOLUTIONS

23                 Firm Registration No. 571

                   300 Throckmorton Street

24                 Suite 1600

25                 Fort Worth, Texas   76102

                                              Page 202

[00079 - 24,000]

**0**

**00079**   1:5
**02044**   139:9

**1**

**1**   4:13 18:25 19:2
20:3 22:9 36:10
38:15 154:8 184:3
**1-50**   1:15
**10**   5:3 89:11,12
92:3 182:23,24
183:1
**10-18-16**   5:17
**10-28**   136:15
**100**   67:18,25 131:7
**10:14**   2:5
**11**   5:5 95:22,23
173:3
**113**   5:10,12
**11:13**   38:14
**11:27**   38:14
**12**   5:8 99:24,25
118:20,22,23
185:4 186:5
**12-22-16**   5:8
**12/31/2019**   202:22
**123**   61:2
**1247**   5:21 141:13
**1248**   5:21 141:13
**125**   2:8 5:13
**12:47**   82:12
**13**   5:10 109:16
113:11,13,25
118:22,23 119:23
**13's**   125:14
**130**   5:14
**133**   5:16
**136**   5:17
**139**   5:18
**14**   5:12 113:19,21
119:22 121:13

177:20
**1400**   32:8 65:23
**141**   5:20
**142**   5:22
**1422**   5:17 136:9
137:20 158:5
**1423**   5:17 136:9,12
**1429**   5:9 100:2
183:18
**1434**   5:9 100:2
101:6
**15**   5:13 21:18
36:10 44:20 82:7
94:15 100:2
108:23 125:5,7,11
171:13 180:25
**15,000**   67:19 69:4
131:7
**150**   4:5 67:17,25
**16**   5:14 31:8 37:23
90:23 130:20,23
136:7
**1600**   202:24
**1650**   5:13 125:5,20
**1651**   126:7
**1662**   5:13 125:6
**17**   5:16 133:2,13
**17,500**   131:8
**179**   4:6
**17th**   3:11 136:13
**18**   5:17 14:12
131:2 136:6,9,10
137:21 158:4,17
159:1 160:4,16,21
182:18,18 183:3
183:18 184:3,10
**1803**   4:14 26:25
**1804**   4:14 26:25
27:8
**1809**   4:21 56:8

**1810**   4:21 56:8,21
**1837**   98:25
**18930**   202:20
**18th**   182:20
**19**   4:13 5:18 139:9
139:11,13 161:14
161:21 182:16
**1900s**   99:1
**192**   4:6
**1930**   99:1
**1933**   5:22 142:11
**1934**   142:12
**1940**   99:1
**1944**   5:22
**197**   4:7
**198**   4:7
**1983**   9:11,13,14
**1991**   9:14
**19th**   172:23
202:17
**1:20**   82:12
**1a**   119:12

**2**

**2**   4:14 22:9 26:23
27:1 39:13 60:23
61:8 83:7 138:18
142:18 161:20
163:6
**20**   5:20 141:13,14
154:7
**200**   4:8
**2012**   109:16
**2013**   10:4 37:12
**2013ish**   110:21
**2014**   17:1 94:15
108:23 109:1
**2015**   10:4 15:4
17:2,11 31:10
37:23 108:25
**2016**   4:17,19,24
5:10,13,14,18

26:24 31:9 37:12
39:14 44:24 46:12
46:12 54:16 69:3
71:8 78:5 79:1,11
79:19 80:11 85:4
96:21 101:2,7,15
102:16 105:1,4
108:22,25 114:9
116:3 131:2
135:17 139:22
154:8,18 157:3,11
158:17 159:1
160:4,16 161:22
163:20 165:6
183:23 190:5
198:6
**2016.pptx.**   49:5
**2017**   5:22 9:19
14:12 17:12 18:21
24:4 25:6 69:12
124:3,6 142:18
**2018**   146:13
**2019**   1:20 2:5
202:6,17
**202**   4:8
**2044**   5:19 139:14
141:2 161:15
**2045**   139:21
140:15 161:16
**2046**   5:19 139:14
**21**   5:22 142:7,8,10
**22**   26:24
**2244**   5:4 89:11
**22nd**   3:16 27:21
100:13
**23**   71:8 172:19
**23rd**   89:18 172:23
181:25 183:1
**24**   44:24 116:3
**24,000**   188:4,14

Page 1

**[24th - 92101]**

**24th**   107:22 114:9
180:11,24 181:24
181:25
**25**   4:19 29:20
54:16 97:6 106:1
122:12
**25,000**   96:24,24,25
97:16,20,21
101:13 183:13
**26**   49:5
**27**   4:14 46:12
139:22 161:22
**28th**   136:14
184:11
**2nd**   142:19

**3**

**3**   4:15 19:9 21:24
22:11 25:25 26:8
26:12 35:20,25
36:5,8,12,16,21
40:8,10 43:13,16
43:18 60:23 97:1
97:5,7,8,11 180:9
**30**   5:14 12:7 29:20
44:22 79:1,11
89:19 181:1,5
**300**   202:23
**31**   78:5 101:7
102:16 142:21
186:10
**31st**   103:5
**36,000**   186:15
**3999**   202:21
**3:15**   144:1
**3:17**   1:5
**3:35**   144:1

**4**

**4**   4:17 46:6,9
48:10,14 52:1
55:10

**4-22-16**   4:14
**4-7-60**   9:2
**40**   4:15
**400,000**   129:1
163:7
**41**   21:19,20 36:11
38:16,20
**4201**   5:15 130:22
**4202**   5:15 130:22
130:25 132:25
**4264**   4:25 70:14
71:7
**4265**   72:8 74:12
**4266**   82:16
**4267**   4:25 70:14
**4295**   2:8
**45**   173:4
**456**   61:2
**46**   4:17 139:10
**49**   4:18
**4:21**   168:15
**4:24**   168:15

**5**

**5**   1:20 4:18 20:3
49:11,13 53:10,11
54:14,22 56:7
57:8 83:6 86:13
121:11 155:6
169:2 171:3
173:19 192:21
194:17 202:6
**50**   62:25
**500**   3:5
**531**   4:23 67:9
**532**   68:7
**536**   4:23 67:9
**540**   5:2 77:6
**542**   78:18
**543**   5:2 77:6
**547**   4:16 40:9,16

**548**   4:16 40:9,16
**555**   3:5
**56**   4:21
**561**   5:12 113:20
**561,000**   25:13
**564**   121:15
**57,000**   188:3
**571**   5:12 113:20
202:23
**5:23**   198:17
**5:26**   198:17
**5:27**   2:5 199:4
**5th**   2:4

**6**

**6**   4:5,21 56:9,11
**60**   186:11
**600**   3:11
**619-231-4372**   3:12
**619-595-3206**   3:12
**619-800-0529**   3:6
**621**   3:16
**640**   5:7 95:25
**67**   4:22
**670**   4:19 49:12
54:7,7
**671**   49:21 172:7
**672**   57:8
**674**   58:24 172:10
**675**   61:25
**677**   5:11 113:12
**681**   52:19 83:9
**682**   172:2
**684**   52:5 86:13,20
90:1 114:8 118:25
119:12 155:6,11
173:18
**685**   114:1,6,8,8
118:25
**687**   5:11 113:12
119:1

**689**   62:20
**690**   62:21
**695**   171:16
**699**   172:13,15

**7**

**7**   4:22 67:7,10
190:3
**7-27-16**   4:21
**70**   4:24 138:9,10
**707**   172:20
**708**   172:21
**709**   172:21
**710**   4:20 172:21
**7105**   49:12
**713-504-7199**   3:17
**717**   4:17 46:8
48:15 55:10
**720**   4:17 46:8,21
**75,000**   24:9,18
25:1,5
**7500**   67:21
**76102**   202:25
**77**   5:1
**77008**   3:17
**789**   61:11

**8**

**8**   4:24 70:13,15
82:14
**8-23-16**   5:3
**800,000**   163:8
**85**   62:13 87:22
**866-365-4856**   3:6
**87**   62:13 87:22
**89**   5:3
**8th**   190:5

**9**

**9**   5:1 46:12 76:25
77:2,4 190:3,3
**92101**   3:5,12

Page 2

[95 - amazement]

| | | | |
|---|---|---|---|
| **95** 5:5 | **accomplished** | **adding** 175:19 | 77:13,19 78:8 |
| **99** 5:8 | 43:24 44:25 | **additional** 57:13 | 114:9,12 115:6 |
| **9:15** 142:18 | **account** 19:22,23 | 57:19 82:16 | 126:9,13 132:6 |
| **a** | **accounting** 80:6 | **additionally** | 142:19 143:4 |
| **a.m.** 2:5 142:18 | **accounts** 80:7 | 198:24 | 144:8,15 145:19 |
| **abilities** 10:16 | 104:17 118:3 | **address** 19:17 | 145:19 153:10 |
| **ability** 45:5 47:8 | 133:15 | 65:25 71:23,24,25 | 180:13 181:10 |
| 60:18 115:22 | **accrued** 127:21,21 | 71:25 72:1,1 | 182:10 187:8 |
| 116:22 158:15 | 128:11,24 129:2,3 | 155:12 | 190:6,6,22 191:12 |
| 166:19 | 147:7 | **addresses** 19:15 | 191:18,20 |
| **able** 13:23 28:16 | **accruing** 128:25 | 176:17 | **agreements** 75:9 |
| 29:17,17,18,25 | **accurate** 62:13 | **addressing** 90:2,5 | 75:11 76:13,16,17 |
| 47:7 76:17 78:2 | 67:19 75:13,16,17 | **adequate** 196:2 | 115:8,15 144:13 |
| 84:14 85:23 86:15 | 75:21,22 143:2 | **adjacent** 31:18 | 144:17,19,20 |
| 87:13,25 89:9 | 153:15,15 182:13 | **adopting** 12:14 | 190:9,11,12 |
| 91:4 92:20 95:3 | **accurately** 174:19 | **advance** 67:22 | 191:17 |
| 97:22 102:15 | **achieve** 44:18 | 136:16 183:15 | **agrees** 67:16,17 |
| 110:15 116:12 | **acknowledged** | 184:14,17,17 | **ahead** 11:22 18:25 |
| 117:6,12 136:16 | 201:16 | **advanced** 183:22 | 102:4 140:11 |
| 137:16 140:10 | **acquire** 162:19 | **advancement** | 155:10 169:11,17 |
| 145:22,24 150:14 | **acquired** 22:11,16 | 116:22,24 | 170:17 173:13 |
| 162:24 163:3,5 | 22:16 98:3,22 | **advancing** 137:2 | 175:1 |
| 164:17 178:7 | **acreage** 163:4 | **advice** 111:17,18 | **aired** 58:23 |
| 187:6 | **acs** 85:16 | 111:21,25 | **aisle** 65:21 |
| **abstract** 64:8 | **act** 74:6,9 | **afar** 42:9 | **ait** 131:8,10,13,17 |
| 163:1 | **action** 202:12,15 | **affix** 201:2 | 131:19,25 132:18 |
| **accelerate** 166:15 | **actionable** 29:24 | **afield** 169:23 | 133:19 134:8,12 |
| **accept** 143:18 | **active** 174:25 | **agenda** 141:3 | 134:12,13,15 |
| **acceptable** 78:23 | **actively** 18:3 | **aggressive** 145:13 | 142:20,22,22 |
| **accepted** 142:20 | **activities** 13:17 | **agile** 196:7,9,11 | 143:4 |
| **access** 19:18,18,20 | 18:23 33:23 51:5 | **ago** 10:14 | **alarming** 97:20 |
| 19:21 26:5 34:4 | 66:23 75:9 80:5 | **agree** 152:13 | **allow** 17:18 35:17 |
| 71:20 72:2 95:9 | 80:18 81:16 | **agreed** 78:22 | 64:24 163:3 |
| 116:13 117:12 | 160:12 196:10 | 100:11,22 102:6 | 166:19 |
| 123:21 137:13 | **activity** 31:25 | 103:11,11,24 | **allowing** 174:5 |
| 140:12 153:17,19 | **actual** 99:6 | 131:5 | **allows** 51:11 |
| 153:21 176:6 | **ad** 116:10 | **agreement** 4:23 | **alternatives** |
| 177:2 | **add** 37:2 51:8,16 | 24:25 34:3 36:9 | 193:17 |
| **accomplish** 28:17 | 169:18 | 38:6 42:6 67:5,8 | **alvin** 24:12 |
| 45:5 52:9 157:6 | **added** 195:5 | 68:10,14 69:8,16 | **amazement** |
| 194:4 | | 73:9 76:20,21,23 | 137:25 160:17 |

[amazing - attaching]

amazing 137:21
139:8 158:6 183:4
ambiguous 154:24
164:9 167:15
168:2 176:21,22
178:14
amended 21:19
126:9,13
america 5:16
ami 75:6,6,21
amit 27:8,16,19
amit.g 27:9
amount 67:21
91:1 103:11,23,24
180:5 183:10
187:4 188:11
amounts 122:15
129:4,4,5 137:8
analysis 57:15
192:10,12,13,23
analyst 51:7
analysts 60:4
172:5
analytics 57:21
ancient 185:8
answer 7:24 8:2,8
10:15,19 11:22
15:17 35:24 86:14
139:1 145:3,5,6
151:25 154:25
155:1,3 156:12,22
157:10 160:2
161:8 176:2
answered 16:22
105:6 168:20
170:15 188:6
191:13 192:9
answering 7:9
answers 7:12 8:19
8:20,23 14:24
71:8 72:9 119:15

anticipated 78:25
anxious 37:19
anybody 24:16
45:16 53:2 81:1
93:13 117:8
140:24
anymore 14:8
72:2 134:5
anyplace 37:7
anyway 143:8
169:24 170:19
173:15 177:18
179:14 191:3
apart 187:16
apc 3:4
apologize 43:8
apparent 116:7
117:16 151:21
apparently 115:17
appear 186:9
appearances 3:1
6:14
appeared 201:12
appearing 7:25
appears 46:21
52:18 71:16
102:17 125:13
130:25 158:4
161:23
application 24:9
25:21 26:11 35:15
48:12 156:7
applied 54:23
131:13
applies 38:18
193:1
apply 11:5
appraisal 52:11
59:20
appreciate 159:24

appreciated
159:20
appreciation
175:5
approach 93:1
166:5,10
appropriate 58:7
approval 102:12
131:6
approve 143:16
188:4
approved 188:9
approver 170:14
approving 188:14
approximately
15:2
april 26:24 27:21
28:6 39:14 78:10
architecture 60:15
area 75:7 92:15
areas 174:9
arkansas 26:4,6
42:21,23
arrangements
76:9
articles 20:20
articulate 156:3
articulated 59:13
155:13
ascend 24:12,23
asked 14:10,22,24
16:9,11 36:23
39:3 41:23 42:5
42:13,17 48:13
72:19 73:13 92:7
99:5 106:18 109:9
140:12 141:7
143:15 147:23
150:4 158:15
174:7 176:13
183:10 184:5

186:5 187:16
188:3,6,23,23
189:2,3,8 191:13
191:16 197:17
asking 8:8 73:21
75:15 134:9
151:18 158:3
177:8 178:21
189:13
asks 27:21
aspirations 154:23
assessment 135:19
160:18 166:24
167:2,6 178:1
asset 12:17 13:14
48:4
assets 16:1 18:17
39:5 106:5
assigned 27:24
105:10,13
assist 43:20
assisted 16:12
assisting 39:4
associated 87:24
174:5
assume 8:17 28:3
50:1 104:7 131:10
136:19 137:25
148:8
assumes 11:21
assuming 53:8
159:13
assumption
159:14 160:22
attach 129:10
139:9
attached 2:10
55:12 126:8 154:8
188:2
attaching 186:6

[attachments - best]

attachments  5:9
attempt  94:11
  146:4,5
attention  45:23
  170:18
attorney  6:25 7:3
  11:23 96:11 111:1
  111:3,14 112:4
  202:11
attorneys  50:25
  64:13 163:24
  193:8
attractive  116:15
attractiveness
  116:14
atypical  190:23
audio  168:12
august  4:24 5:10
  5:13,14 71:8
  89:18 131:2 165:1
  165:9 172:19,23
  172:23 182:16
  183:1 184:7 198:6
authored  52:7
  82:25
authorized  148:16
  148:19
auto  12:22
automate  12:15
automated  12:22
automatically
  87:23
automation  12:18
  14:5
available  19:15
  75:10 84:2 85:9
  85:15 123:4 124:1
  165:9
avenue  151:21
aware  41:6 48:7
  80:22 103:1 122:7

128:2,12,14,15
158:10 159:1
162:7 177:9 178:8
178:11,21 180:2
181:15,16
awfully  90:18

**b**

b  3:11 74:12 75:25
ba  9:4
baby  118:4,5
  151:8
back  10:25 25:3
  25:10 30:6 35:13
  36:10 38:15 42:6
  42:18 48:10 55:10
  57:8 65:3 73:3
  86:18 87:22 90:1
  101:1 112:5
  117:10 121:13
  142:19 143:17
  152:14 154:7
  155:4,5,19,22
  162:14 168:17
  172:1 174:20
  175:19 179:5
  183:17 185:1,2
  187:10 189:7,8
  197:18 198:23
backed  17:18 18:1
  18:3 30:21
background  8:25
  12:16,19 32:23
  33:5 108:17
  110:12,15 112:14
  113:2 174:12
bad  136:3 150:7,8
  150:18
badly  107:19
bailiwick  151:20
  152:7

bait  170:23
balance  135:2
  196:24
ball  142:2 166:23
balls  45:25 46:1
banging  107:24
bank  5:16,16
  80:17,19,22
  133:10,15 135:1
bankruptcy's
  146:14
banks  96:9
barter  36:1
base  136:17
based  10:12 15:13
  15:17 61:13 81:7
  154:4
basic  35:18 64:4,6
  64:9
basics  7:7
basis  53:16 103:14
  128:22 148:5
bates  4:14,15,17
  4:19,21,23,25 5:2
  5:4,6,9,11,12,13
  5:15,17,19,20,22
  26:24 40:9,14
  46:8 48:15 49:11
  52:3 56:7 67:8
  70:13 77:6 100:1
  113:11,19,19
  133:3,12 171:14
  172:1,2
baton  144:3
beat  180:8
becoming  116:6
beech  3:5
beginning  30:14
  55:21 94:2 114:25
  179:6

begins  161:15
begun  175:14
behalf  24:20 25:24
belated  156:25
  167:14
belatedly  81:6
belief  15:10,13
believe  10:10 15:4
  15:21 16:17 24:13
  26:10 40:21 45:12
  49:7 53:21 70:23
  77:18 78:13 79:14
  79:17 80:8 83:18
  83:20 97:14 98:19
  111:8 116:21
  129:25 131:18
  150:23 151:18
  154:17,20 158:11
  160:3 161:17
  165:1 166:4
  173:25 176:18
  178:6,6 179:1,14
  180:11,25 181:24
  182:17 183:16
  186:7,18 188:20
  188:21 189:1
  190:12
believed  107:5
  150:8 167:2,7,13
  178:1
bell  70:25 71:4,6
  122:17
benchly  16:16
benchmarked
  90:25 91:2
benefit  106:9
  164:15
benefits  163:24
best  10:1,15 60:12
  136:2 194:10

[better - business]

**better** 73:15
135:10 150:25
160:2,2 193:17
**beyond** 1:11 3:9
6:19 22:10,14,18
22:22 23:2,5,12,14
23:14,20,23 24:18
25:10,13,14,16
34:2 36:19,23
37:1,4,7,10,14
41:5 43:3,5,14,19
44:4,5,7,8,10 45:5
45:19 48:4,8
50:12,16,18,18,19
50:21,24 57:17
58:9,13,21,25
59:15,24 65:12
76:19 86:15 87:9
89:5 93:24,25
94:3,6,12,18 95:10
95:16 96:22 97:21
105:12,23 106:16
108:24 110:23
114:10 115:13,14
115:16 116:4
122:2 124:20
127:5 129:7,24
130:21 141:24,24
145:12 147:11
151:21 152:20
154:5,10 156:14
158:18 159:18
160:4 161:25
162:4,8,11,14,25
163:14 164:17
165:15,19 170:21
170:23 171:7,9,11
171:12,16 172:5,9
173:16 174:17
178:2 180:6
181:12

**bhp** 22:12,16 25:9
25:9,11,12,17,18
25:23,23 26:9,18
26:18 27:24 33:19
34:2,4 36:1,3 38:6
38:22 41:7,19,23
41:25 42:2,5,12,17
42:18,20,24 43:4
44:2,2,7 48:3 94:6
94:10 109:3
152:23 153:4,5,8
153:12 154:1
**bi** 67:24
**bickering** 41:25
**big** 44:9 94:11
115:9 129:2
163:11
**bill** 99:14,14,16,20
101:13
**billed** 129:24
**bills** 66:13 104:12
104:15
**birth** 9:1
**bis** 97:25 98:2,6
**bit** 7:25 8:25 21:12
34:21 64:18,23
65:2,4,9 140:7
159:7 169:23
173:13 179:6
**bits** 122:14
**black** 72:11
**blame** 93:11,13
**blowout** 179:21
**board** 43:10 96:10
96:15,18
**body** 131:1,4
**boiled** 15:19
**bonnie** 3:4,6 6:13
6:15 38:2 152:13
**book** 60:19,25
61:2,7,10,11,14,17

62:6 164:24
187:13,16
**books** 99:13
134:25 135:1
**boston** 9:15,15,16
9:17 32:5
**bottom** 43:21 52:3
71:7 89:18 98:11
161:16
**bought** 16:13
**bound** 187:13
**boundary** 29:14
**bp** 11:25 22:1,15
26:4 38:22,25
39:23 40:4 42:25
115:10 179:18,24
180:3
**br** 5:20 40:19 41:5
41:9,22,25 94:12
106:8,19 107:7,16
107:17 108:6
116:10 154:9
160:7,12 166:15
172:20
**br's** 89:10
**brackets** 78:18
**brain** 86:7 107:19
**branded** 49:24
**break** 38:1 82:9
107:20 143:25
189:7
**brent** 1:19 2:2 4:4
5:3,8 6:8 34:7
46:6 48:17 49:22
71:9 82:18 131:5
131:6 141:2 143:1
201:1,6,12 202:5
**brentstanley**
46:16
**bridge** 137:10
147:16

**bridges** 109:11
**brief** 53:20 82:6
**bring** 19:10 35:13
37:5 61:22 65:3
67:7 157:25
**bringing** 170:17
**brings** 10:5
**british** 21:9
179:18
**broader** 30:8
**brought** 14:4
16:24 19:11 65:5
66:7
**bs** 9:5,9
**bstanley** 46:20
**bubble** 52:9
173:23
**bubbles** 86:21
**buckets** 138:18
**bucks** 66:17 163:7
**buddies** 120:6
**build** 24:9,19
26:10,20 34:8
36:6 145:18
155:24 194:5
**building** 155:25
156:6,8 196:12
**built** 31:21,24 48:9
62:22 63:22,25
64:24 174:1
**bunch** 49:8 93:2
143:17 148:15
**bureau** 12:13
**burkhardt** 51:2
**burn** 109:11 127:1
**business** 12:10,25
13:3 17:6 18:23
20:8,10 68:19,20
70:9 75:23 80:1,4
81:16 94:12
111:13 113:3

[business - clearly]

130:1,2 144:19
145:13,20 151:5,9
155:20 156:2,5
157:4 193:19
194:5,8
**businesses** 130:3
**butcher** 47:9
**buy** 80:24 84:10
**buyer** 16:11
**buyers** 18:20
**bypassed** 101:17
**bypassing** 101:18

**c**

**c** 3:16 73:22 75:25
**calculate** 91:4
**calculated** 91:3
**calendar** 67:18
**california** 1:1 3:5
3:12
**call** 65:8 71:12
73:6 76:21,23
87:7,8 142:19,24
143:2 145:11
187:23 197:12,21
**callaghan** 27:12
27:13,14
**called** 9:16 13:14
13:17 16:16 17:7
22:10,12 26:10
61:3,4 64:7 73:13
84:3 92:20 97:23
162:18
**calling** 50:8
**calls** 15:8,15,15
45:20 46:25 81:7
91:21 95:19
120:24 121:4
145:1 154:24
156:10 157:1
166:11 167:8
169:10 178:4,23

178:23 191:15
**capabilities** 48:12
52:20 59:12 65:6
84:9
**capability** 64:1
72:24 86:25
**capacity** 23:10
27:15
**capture** 187:14
**card** 66:21 201:14
**cards** 130:6
**care** 100:24 101:2
**carrying** 31:20,22
**case** 1:5 9:5 21:25
24:8 38:21 40:3
48:15 64:5 100:21
115:25 116:4
**cases** 123:9
**cash** 180:21
196:14 197:2
**categories** 63:5
87:1
**category** 63:3 65:3
**cause** 2:4 117:11
149:16
**caused** 94:4 157:5
**causing** 173:24
**caution** 38:4
**cautioned** 108:19
**cautious** 41:10
**cautiously** 117:21
117:23,24
**cc** 131:3
**cds** 66:22
**cents** 186:11,16
**ceo** 9:20,23 13:3,5
15:19,25 16:14
22:22 23:14 27:7
**certain** 22:11,16
144:13 198:7

**certainly** 42:15
60:14 149:23
166:2 184:6
**certificate** 4:8
202:4
**certificates** 9:7
**certified** 2:6
198:24 202:8
**certify** 202:9,11
**cfo** 14:21,25 104:7
104:8
**chad** 70:19,21
121:2
**chain** 4:14,17,21
4:24 5:10,13,14,17
5:18,22 27:3
46:11,14 70:17
82:14 118:21
125:14 139:15
**challenge** 117:7
**challenges** 162:8
**challenging** 30:1
**chance** 159:15
163:15
**change** 54:12
65:10 132:7,19,20
133:22 200:3
**changed** 11:6
132:25
**changer** 166:17
**changes** 7:18,19
132:11 198:21,22
200:1
**character** 31:15
138:7,8,10
**characterize**
189:17
**characters** 138:9
**charge** 13:2 48:11
185:23

**charging** 127:6
**chart** 52:1 90:1
**chase** 70:7 93:2
**chasing** 151:3,4
**chat** 161:1
**cheaper** 193:17
**cheek** 138:2
**chemical** 13:15
24:11
**chest** 107:24
**chief** 11:4 73:8,10
82:18 88:10,13
188:20
**chord** 25:6
**chose** 174:6
**chunk** 129:2
**civil** 2:9
**claimed** 114:3,4
116:14 140:25
**claiming** 95:6
117:14
**claims** 140:19
**clarified** 112:25
**clarify** 21:8
153:25 159:9
161:12
**clarity** 156:1
157:5
**classic** 184:25
**classification**
12:22 140:16
**classifying** 14:2
**clause** 140:21
**clauses** 140:8,10
**clear** 8:4 34:18
36:11 88:9 150:5
151:5 155:19
156:1,14 159:25
160:23 163:20
**clearly** 8:11 38:18
102:2 106:8 166:3

Page 7

[client - confirm]

client  68:12 111:1
  111:14
clients  68:11
  135:10
cliff  71:5
close  16:25,25
  31:1 55:25 56:1,2
closely  92:14
closer  17:2
closure  14:21
clothes  108:18
  110:14
cluster  138:5,12
  138:12,14,14,15
  138:17,19,21
clustering  137:22
  138:23 139:5
  158:7 159:2,8,12
  160:5 182:22
  183:4
clusters  138:18
  139:3
code  20:5 75:4,8
  75:19 76:11,21,23
  77:14 78:1 122:18
  122:21,22 123:24
  144:8 146:21,23
  146:24 194:23,25
coffee  37:24
collaborating
  71:12 75:10
collapse  29:23
  63:6 87:25
collect  20:25
collection  87:25
collective  29:24
collectively  115:5
  128:9 137:5 142:6
  158:14
college  9:5 44:16

colloquialisms
  180:22
combination
  162:24
combine  194:6
come  30:5,12 41:7
  66:17 87:22 128:6
comes  166:7
coming  6:21 12:1
  81:10 133:21
  134:24 137:9
  184:11 187:3
commencement
  64:12,14,17,18,22
commencements
  64:16
comment  7:18,19
  87:13 159:17
  197:1 198:22
commenting
  140:15
comments  160:20
  190:25
commercial  17:20
  155:21 193:24
commercially  85:9
commission  52:13
  201:25
common  57:4,7
  196:14
communicate
  100:16 141:7
communicating
  25:22 30:16 53:15
  53:18
communication
  110:25 159:4
  160:7,10 195:23
communications
  112:3 176:9
  177:13

companies  12:13
  16:16 54:2 85:16
  114:4 115:9,15
  180:16
company  1:3,8,9
  1:11,12,13,14 9:16
  11:8,11 13:2,4
  14:13 16:15,15,16
  16:17 17:7 22:10
  24:12,13 26:10
  27:9 31:12 37:14
  50:16,17 66:16
  73:11,14 77:20
  81:9,14 84:3
  126:9,13 128:11
  130:16 131:15
  135:11 153:7
  175:10
company's  36:6
compare  188:9
compensate  147:5
compensated
  68:24 69:15 77:23
  96:12 132:9
compensation
  67:13 132:2
compiled  164:1
complain  93:18,19
  93:23
complaint  21:13
  21:16,19 93:19,21
  130:15
complete  8:19
  44:21 103:9
  138:23 166:20
completed  135:19
  135:22 140:20,25
  141:9 165:1,2
  184:3,15
completely  114:23

completing  44:22
completion  79:1,2
  183:21 184:18
comprise  122:19
computerized  2:7
concept  12:25
  97:24
concepts  17:17
concern  117:11,16
  117:20 149:16
  171:6 173:20,24
concerned  90:6
  169:17
concerning  27:25
  48:11 58:13 86:3
  106:23 126:13,23
  141:23 143:3
  146:14
concerns  45:4,8
  58:8,12,16 90:7
  101:21 162:11,14
  162:15 169:13
  173:14 174:3,10
  175:21 197:19
concluded  165:11
  181:11 199:4
concluding  90:19
conclusion  59:7,10
  79:4 126:3,12,15
  135:24 145:2
  178:24 188:18
condition  8:21
  104:2 150:21
confer  38:11
conference  7:12
  14:22 46:25
confidentiality
  38:7,8
confirm  25:7 49:8
  71:18

**[confirmation - courthouse]**

confirmation
59:12
conflict  189:12
confused  125:23
134:11
confusing  43:6
56:14 124:5 174:3
connect  119:23
120:20
connected  32:23
110:11
conservative
197:25
consideration
201:17
consisted  195:3
constant  41:25
consternation
185:20
construct  196:6
construction
123:5
consultant  12:2
16:10,12 96:11
consultants  5:6
71:12 75:10 95:25
96:7
consulting  11:24
97:25 98:2,6
109:19,22
contact  11:19
contacted  146:13
146:14,16,17,18
146:20
contain  38:5
172:24
contained  185:14
contains  192:20
contemplated  79:3
content  61:13 64:2
64:15,25 86:25

87:3 112:3 121:24
170:9,14
contents  175:25
context  121:8
161:4 196:14
197:4
contingent  80:17
continuation
125:13 131:1
continue  44:8
79:10 109:6 136:3
136:5 150:7,8
156:23
continued  14:11
44:12 108:9
132:14 134:7
contract  11:25
23:18,19 27:18
39:3 96:23 182:6
contracted  50:24
contractor  4:22
27:15 67:5,8,15,16
68:10,12 69:8,16
73:9,15 78:7
174:6 190:6
contractor's  68:9
contractors  5:6
96:7
contracts  75:11
114:3 115:5
control  144:4
conversation
100:6,9 102:23
111:2,13 143:3
147:18 165:21,22
170:4 180:14
187:24,25
conversations
82:6 92:17 100:24
105:22 121:22,24
169:21,25 175:17

conveyances
137:22 158:7
159:2,12 160:5
convinced  15:21
coo  11:14 12:4
cool  140:10
cooperate  68:11
coordinate  138:6
copies  70:11 74:17
186:2
copy  72:11 190:15
198:20,24
copying  185:14
186:1,10,12
187:21
corner  52:4
correct  6:25 7:1
9:24 11:2 12:20
16:19 22:25 32:3
38:24 39:7,8 45:3
47:3 57:22 59:23
60:13 63:24 78:6
88:11 92:10
103:19,21 105:16
110:4 123:23
131:11 134:19
143:23 150:19
152:10,21 153:14
157:12 163:22
171:20 174:22
183:6 186:22
187:11,12,19
188:24 193:2
201:2 202:10
correctly  90:19
159:22 187:1
correspondence
86:2
corresponding
54:23

cost  70:11 85:21
85:22 86:7 130:4
190:20 194:14
counsel  17:25 96:8
110:18 176:5,12
176:15 202:11,14
count  129:22
counties  26:4
31:17,18 42:21
70:8,8 135:20
162:21 163:19
country  196:19
county  31:18,18
35:5 51:14 65:14
65:14 66:20 98:21
99:12 105:17
163:6 165:20
185:9,11,15 186:3
186:19,21 201:9
202:2
county's  34:25
70:12 162:19,19
165:20
couple  7:22 37:17
53:20 66:7,17
120:15 144:2
165:18 174:23
190:2 193:7,8
197:9,10
course  24:14
25:16,20 29:18,21
42:11 55:15 58:5
89:16 90:4 151:14
156:22 167:20
court  1:1 4:8
166:23 168:16
198:18,20,23
courthouse  22:12
22:15 26:22 35:3
61:1 62:23 63:13
64:6 66:20 85:7

Case 3:17-cv-00079-H-LL   Document 153-8   Filed 11/25/19   PageID.3248   Page 213 of 250

[courthouse - degree]

85:14,15 98:21,23
99:3 105:10,17
185:9 186:21,21
**courtroom** 7:14
**cover** 131:8 173:4
**covered** 24:25
40:7 54:22,22
55:1 111:14
180:24 190:21
196:3
**covering** 55:12
**crashed** 109:4
**create** 29:15 37:2
47:13 57:5 63:5
63:16 92:20 95:4
116:22 162:18,25
163:8,10,16,17
189:19 193:10
**created** 54:16,19
60:13 62:9 63:4,9
63:23 122:19
172:23 192:24
193:1 195:8,18
**creating** 85:12
166:16
**credentials** 71:11
**credit** 66:21 130:6
**critical** 198:10
**crossed** 78:15
**crystallization**
30:25
**crystallize** 151:15
**csr** 202:21,21
**cto** 48:17,18 49:22
49:22,24 55:11
73:5,6,13,14,16,18
74:1,7,10 144:11
145:6,22 188:24
189:3,9,13,21
191:23 197:13

**currently** 148:4
**custom** 58:25
59:14,14
**customize** 84:13
**cut** 41:3
**cute** 197:5
**cv** 1:5

**d**

**d** 3:10
**dan** 15:1 104:9
**dancing** 181:16
**data** 4:18 5:1,20
9:18 13:6,9,18,21
13:25 14:2,3
17:20,21,23 21:4
24:8,8,10 31:3
42:23 47:22 51:8
51:9,11,11,12,13
51:13,16,19 52:10
52:10,11,12,14,19
54:14 57:14,21
63:7 65:14 70:7
70:12 75:12 77:1
90:2,3 95:4 98:3,3
98:4,6,22 116:23
117:2 119:5,6,7,9
119:10 122:2,5,8
135:19 137:14
138:5,5,17,19,20
138:20,21,22,22
140:11 155:15
156:5 163:19
165:20,20 166:20
169:5 171:4 173:5
173:10 175:17
177:5 190:3
**database** 52:13
122:22 176:4,11
176:15
**date** 9:1 23:24
28:4 35:10,19

44:23 54:17,18,18
54:20 59:8 78:8
79:1,2 101:5,7
107:21 123:1
161:3,3 162:13
163:2,2 180:9,10
180:23 181:22,24
181:24 182:6
186:7 200:2
**dated** 26:24 44:24
54:24 114:9 131:2
154:8 183:1 186:9
190:4
**dates** 172:23
**davis** 11:24 109:19
109:20 179:15,16
179:17
**day** 2:4 14:20
31:20 65:19,19
70:3 91:16,16
120:6 148:4,4,14
160:11 174:11
187:25 201:11,20
202:17
**days** 44:20,22 85:6
89:19 159:16
180:25 181:1,5
193:13
**de** 117:2
**deadlines** 89:6
**deal** 56:2
**dealing** 22:1 38:22
**dec** 142:22
**december** 69:3
79:15,19 80:11
100:13 101:2
104:24 105:1,3
127:9,19 128:5
134:7 142:19
143:2 154:21

**decided** 11:16
31:11 39:6
**decipher** 110:15
**decision** 39:9 79:7
93:7 146:2,4
154:5
**decisions** 84:15
**decommissioned**
124:19
**deed** 29:17 35:12
60:21,21 61:6,7
63:1,2,2,3 138:15
185:10 186:3,19
**deeds** 60:24 61:9
62:24 63:2,2,4
98:23 137:22
151:3 158:7 159:2
159:12 160:5
183:4
**deep** 113:2 184:20
**deeper** 157:20
163:3
**deepwater** 11:25
109:19 179:18
**defect** 127:3
**defects** 28:23
33:16 51:5
**defendant** 64:5
**defendants** 1:15
3:9
**defer** 149:24
**deficit** 45:23
**defined** 72:6
**defines** 64:8
**definite** 86:17
**definitely** 86:15
89:7,7
**defraud** 178:22,25
**degree** 85:2 93:8
185:20

Page 10

Kramm Court Reporters, A Veritext Company
866-299-5127

[delaware - discussion]

delaware 1:3
delay 8:1
delays 93:9
deliver 24:14
25:11,16 37:8
41:22 44:16
158:15 184:5
195:11
deliverable 141:24
182:5
deliverables 89:20
delivered 54:20
delivering 24:16
121:9
delivers 57:13,20
171:2
demo 28:8,9,12
55:6,8
demonstrates
182:15
demonstration
47:24
departments 54:1
dependencies
198:8
dependency 198:9
depending 35:5
64:13
deposed 7:5
deposited 144:8
deposition 1:18
2:2 6:22 7:16
133:11 200:2
201:1 202:5
depositions 179:7
derive 162:21
describe 110:25
175:3 192:2 194:8
described 62:14
65:7 124:9 162:14
166:16 174:17

describing 20:23
111:1
description 4:12
60:22,22,24 61:8
61:18 71:10,15
82:17 83:3 201:14
descriptions 29:15
82:24
design 194:21
designation 62:3,6
designed 121:23
desire 44:12 106:8
189:18
despite 109:7
detail 195:10
detailed 71:10,14
141:3
details 99:5 103:6
181:14
determine 29:19
177:15
determined 62:12
develop 42:9 84:9
85:18 110:5
developed 12:14
20:10,20 22:9
42:24 48:5,6
57:11,23 59:3
75:4,19 86:12
94:18 123:1 124:3
124:7,13 125:3
144:25 154:22
165:16 173:10
191:24 198:7
developer 27:24
development 4:15
12:10 25:25 40:9
40:19 41:14 43:13
84:15 122:25
123:14 152:17
154:14 155:22

194:21 196:5
diagram 43:12
155:6,11,13
173:18,20
diagrams 20:11
dials 116:18
dibble 70:24
dicey 89:10 104:25
die 143:12
diego 3:5,12
difference 10:6
103:23 175:6
different 17:24
22:4,6 54:8 62:25
63:11 65:5 70:12
91:7,8,11 93:3
100:3 151:19
153:16 161:9
165:16,18 166:5,7
172:23 173:1,2
175:10 187:22
differently 145:9
145:10
difficult 29:23
94:22,22,25 95:17
difficulties 80:12
80:15
digital 185:10
186:2,18,24
diligence 108:20
174:16 175:7,11
175:13
dime 108:19
direct 75:8 76:11
88:14 148:1 153:9
159:13
direction 145:14
directions 72:4
directive 197:13
directly 42:12
50:21,22 100:18

100:20 132:19,21
134:8 159:11
director 17:14
18:9 69:8 134:12
134:13,19
dirty 58:23
disagreement
90:13 92:11,13,24
93:4
disappointment
138:1
disassociated
69:10 148:20
disaster 41:8,19
44:2,2,7
discern 111:24
discounted 142:21
discovery 22:1
38:22 179:24,24
180:3
discuss 27:20
170:22
discussed 29:4
31:13 33:12 68:5
111:16 116:25
132:6 136:2 150:4
150:6 158:1 196:5
discusses 172:4
discussing 27:17
112:25 121:20
171:7 175:12
discussion 29:24
33:20 84:10 100:4
107:11,16,18
108:5 111:17
118:8,13 122:5
126:3,12 137:9
142:17 165:19
166:8 184:22
185:3 188:19
193:20 198:17

[discussions - e]

**discussions**  30:2
31:10 70:10 84:17
84:21 85:4 86:3
102:20 108:8,12
122:13 165:18,25
166:2 170:12
184:16
**disorder**  45:23
**displeasure**  92:19
93:6,16
**distant**  91:16
**distill**  30:2 151:15
**distinguish**  91:13
91:14
**district**  1:1,1
52:11 59:20
**disturbed**  157:4
**divide**  67:25
**document**  12:22
19:5,6 20:8,9,23
20:25 21:1,9,18
27:4 40:11,22
46:13 49:6,12,16
50:17,20 52:2,23
52:24,25 54:24
62:3 64:3,10 65:3
68:20,21 72:14,18
77:9,14,15,16,17
77:25 78:4,9,20
83:7 89:17 96:2
100:3,7 101:7
113:17,22 121:18
125:9,16 126:4,5
130:24 138:13,17
139:17,20 141:15
142:9 146:4 169:1
169:3,3,7 171:6,8
172:1 173:5,7,8
194:9 195:7,21
201:15

**documentation**
73:2 123:8,14
195:3
**documented**  29:6
195:19,20,25
**documents**  12:13
12:15 13:19,19
19:10,25 20:7,8,11
20:16,18 35:13
38:4 53:2 62:1
64:25 72:23,24
74:17 75:1,23
78:11 82:21 87:17
92:6 106:19
138:11,12 148:15
170:11 171:2,21
172:22 173:1
174:5 176:11
177:1,6,8 190:23
195:9
**dog**  10:18 155:24
**doing**  11:24 23:17
32:20,21 42:4
46:2 51:17 55:7
55:25 58:6 59:12
64:1 70:4 79:10
85:19,20 88:23
92:6,18 93:17
95:1,5,5,7 109:18
109:22 115:7
116:16 118:10
135:11 137:14
139:23 148:4
155:15 156:23
163:14 168:9
169:14 175:4
193:14
**dollar**  21:24
188:14
**dollars**  14:20
36:19 37:18

103:12
**domain**  120:1,2
**domains**  72:3
176:9
**door**  42:20
**dots**  120:21
**doubt**  55:3 130:3
**dozen**  115:9,9
**draft**  126:4,6,8,16
143:14 176:24
190:14
**drafted**  68:13
103:7 105:25
140:9 157:24
169:8 177:1
183:25 188:8
**drafting**  170:11
**drafts**  58:6
**draw**  157:24
**drawings**  148:15
**drill**  64:17,23 65:2
65:4
**drilling**  84:3,5,11
84:14,18 85:13,25
86:3,6 194:2
**drive**  19:11,12,13
19:25 29:6,10
36:9,25 38:5
41:16 49:6 54:10
67:4 69:11 71:22
72:7 82:22 83:12
92:8 98:7 103:7
123:11,17,20,24
126:6,18 143:18
153:11 164:25
191:21 192:16
194:18,19 195:10
195:16,17
**drop**  102:24
**dropbox**  122:1

**dropped**  46:1
142:2
**due**  108:20 136:16
174:16 175:7,11
175:13 180:25
182:5 183:10
**duly**  2:3 6:9
**dump**  26:13
**dupe**  178:9,11,15
178:16,17,19
**duplicative**  125:17
**dust**  117:1
**duties**  198:19
**dynamic**  117:5

**e**

**e**  3:6,13,16,18 4:14
4:17,21,24 5:3,8
5:10,13,14,17,18
5:22 9:22 19:15
19:17,18,19,20,20
19:21,22,23 22:1
26:23 27:3,3,9,16
27:21 28:4 30:6
30:16 38:22 39:12
46:6,7,11,11,12,14
46:17,21,21 49:2
53:12 70:17 71:7
71:18,20,21,21,23
71:24,25,25 72:1,1
72:2,5 73:5 82:14
86:8 89:14 90:22
92:1,2,5 100:13
101:5 113:14
118:21 119:2
120:1,21 121:14
123:20 125:8,14
125:21 126:8
131:1,1,4 132:5,7
132:10 133:11
135:5,7,11,14
137:20 139:15,21

[e - exact]

140:15 142:14,17
143:7,13 154:7
158:5,11 159:11
159:11 160:16
161:2,15,17,23
174:24 175:22
176:3,4,7,7,8,8,9
176:12,16 179:24
180:3 182:18
187:21 198:21
**e&p** 31:17 54:1
**ear** 42:16
**earlier** 27:6,10
38:19 51:22 58:10
58:14 71:19 85:6
88:8 101:2 140:4
147:6,23 151:18
152:15 153:24
161:14 163:23
166:4 179:14
185:3 186:23
188:11,20,25
192:18 196:13
**earliest** 46:12
101:7
**early** 28:6 39:14
66:6 84:18 85:4
90:23 96:18
108:25 124:6
128:5 143:2
**easier** 195:22
**easily** 171:22
**eastman** 9:14
**edges** 187:13
**edis** 13:7,11,12,12
13:13 14:6,11,13
14:15 16:12,13
18:14 19:21 72:1
109:12 176:7
**edited** 54:9

**edits** 58:7
**education** 9:3
**effect** 7:13 145:16
146:7,11 149:13
151:2 180:18
**effective** 167:19
**efficacy** 20:16,19
43:19 47:8,9
**efficiency** 14:5
20:21
**effort** 12:10 37:6,6
41:4,11 43:20
47:7,12 48:8 88:3
148:22 150:14
179:24 180:3
186:24
**efforts** 109:14
**eight** 101:8,8,8
**eighteen** 182:21
**either** 64:14
142:20 149:13
185:25
**elaborate** 47:19
92:12 150:11
**electronic** 198:20
**eliminated** 164:18
**elston** 15:20 25:18
27:5,7,20 34:7
100:16 109:21
**emperor** 108:18
110:13
**employed** 167:21
202:12,14
**employee** 27:14
111:12 202:14
**employers** 174:7
**encompasses**
121:11
**endeavor** 166:25
**ended** 128:25
135:18

**engage** 44:8
**engaged** 24:11
25:10 73:9
**engine** 1:13 3:9
6:18 9:18,21,25
10:10 11:1,5,6,12
11:15,17,18 12:3,5
12:11,24 14:19
15:20 16:1,5,10,11
16:24 17:1 18:14
18:15 19:20 25:11
25:13,14,24 26:1,5
27:7,15 33:24
34:1 36:7 38:6
39:4 42:1,13,17,24
43:4,14 64:24
72:1 98:15 99:2,4
100:6,15 101:19
102:21,24 103:6
109:8 129:21
130:1 153:8,10
176:7 180:2 185:3
185:7,24 187:3
188:8 196:23
**engine's** 12:12
99:8
**engineering** 9:5,18
13:6,9,16,18,22
**engineers** 13:25
**enhancing** 27:17
**enjoyed** 136:4
**enormous** 41:24
**ensource** 1:2 6:16
127:14,15 175:14
**entail** 70:11
**entailed** 68:18
**entails** 68:19,20
**entered** 69:7
**enterprise** 156:17
**entire** 53:6 55:19
101:24 116:20

**entirety** 165:6
**entities** 81:2
**entry** 23:21
**eog** 30:19 31:14,16
31:22 33:15
**equipment** 31:21
99:2
**ervi** 66:5 85:1
96:15 193:7
**escrow** 144:8,13
144:15,17,19,20
**especially** 7:23,24
55:21 160:12
**espouse** 30:19
**essentially** 26:12
192:2
**establish** 138:6
144:7
**established** 111:24
**estimate** 10:6 12:8
14:7 15:4 17:11
30:17 37:11 48:21
48:24 102:9 120:3
190:22
**estimates** 10:23
**estimating** 10:9
**evaluate** 36:23
**event** 64:15
**events** 10:14 43:6
110:7
**everybody** 148:8,8
193:9,12
**evidence** 31:19
158:17
**evidenced** 157:23
**evidencing** 75:1
**evil** 30:19 31:14
33:15
**exact** 48:22 54:20
59:4 103:6 162:13
192:1,4 195:11

[exactly - fair]

**exactly** 32:13,18
94:24 120:7
135:20 146:16
**examination** 4:5,5
4:6,6,7,7 6:10
150:2 179:4 192:7
197:11 198:3
**examine** 51:5
**example** 61:25
62:25 64:3,18,21
87:17 171:10
173:15,16 177:21
194:2
**exceed** 44:22
**excellent** 109:9
**exception** 96:8
123:20
**exchange** 142:15
158:5
**excited** 32:24
116:19
**exciting** 116:18
150:16
**exclusive** 21:23
119:13
**exclusively** 193:3
**excuse** 68:13
161:6
**execute** 43:4 68:22
**executed** 77:11
126:19 132:12,23
190:7,9,14 191:8
191:12 201:17
**execution** 44:23
157:25 180:25
190:23 191:2
**exercise** 47:24
59:5 155:23
163:19
**exhibit** 4:12,13,14
4:15,17,18,21,22

4:24 5:1,3,5,8,10
5:12,13,14,16,17
5:18,20,22 18:25
19:2 26:23 27:1
36:10 38:15 39:13
40:8,10 41:15
43:13,16,16,18
46:6,9 48:10,14
49:11,13 53:10,11
54:14,22 55:10
56:7,11 57:8 67:7
67:10 70:13,15
76:25 77:2,4
82:14 83:6 86:13
89:12 92:3 95:22
95:23 97:1,5,7,8
97:11 99:24,25
113:11,13,19,21
113:25 118:20,22
118:23 119:22,23
121:11,13 125:5,7
125:14 129:10
130:20,23 133:2
133:13 136:6,9,10
139:9,11,13
141:13,14 142:7,8
142:10 154:7
155:6 158:4
161:14,19 169:2,4
169:7 171:3,25
173:19 177:20
180:9 182:14,16
182:18,24,25
183:3,17,18 184:3
184:10 185:4
186:5 187:20
190:3 192:21
194:17
**exhibits** 4:10
133:11 151:4
176:14 177:11,17

185:1 190:2
192:20
**exist** 13:13 14:6,8
105:15 124:6
**existed** 146:24
195:1
**exists** 85:11
106:13
**expectation**
165:14
**expectations**
158:2
**expecting** 41:11
**expenses** 68:4,4
128:24,25 129:2,3
147:7 186:20
**expensive** 84:14
**experience** 40:25
69:4 179:13 182:4
**expert** 112:15,18
113:5,7,8 145:1
**expertise** 47:23
51:19 111:24
112:9,11
**experts** 28:15
**expiration** 64:19
202:22
**expired** 64:20
**expires** 201:25
**explain** 12:4 22:6
27:5 51:10 60:12
60:14,15,17 80:10
**explained** 20:12
192:19
**explanation** 80:14
**explanations**
177:12
**explicitly** 190:1
**exploration** 31:25
**express** 92:19 93:6
175:21

**expressed** 173:14
201:18
**expressing** 160:17
161:24 162:10
**expressions** 61:4
**extension** 79:7,8
157:12
**extent** 38:4 110:25
176:25 195:19
**extract** 138:19,21
**extraction** 5:20
14:3 154:9
**extreme** 45:23
**exxonmobil** 23:19
115:6

**f**

**faceted** 94:19
**facing** 162:8
**fact** 42:17 79:1
87:13 106:18
108:19 164:10
171:17 180:24
187:10,18 194:11
**facto** 117:2
**factor** 198:10
**facts** 11:21 35:23
177:9 202:9
**fail** 94:17
**failed** 24:13 25:16
34:3 37:7,8 41:22
44:15 45:19 48:8
59:11
**fails** 13:23
**failure** 41:7 80:18
94:6
**failures** 94:7,8,10
**fair** 54:21 89:21
136:22,24 168:4
180:5,7 188:19
189:4,10

[fairly - found]

fairly  53:20
fall  63:3
fallen  151:11
false  169:9,12
familiar  35:6 51:9
  60:19 65:18 81:8
  84:5 175:11
famous  196:16,19
far  22:17 26:17
  57:23 88:22,24
  110:12 111:9
  148:10 169:13,23
  170:22,23 187:13
  197:19,22 198:5
fascinating  179:10
fashion  90:16
  105:11,11
faster  145:11
  166:20 193:17
favor  166:9,10,13
favorites  149:23
fax  3:6,12
fear  116:24
feature  195:5,6
features  195:11
federal  2:9 6:1
fee  35:1,4 69:18
  97:23 99:4
feedback  58:7
  166:18
feel  73:25 116:11
  146:1
feeling  170:16
fees  67:21,23
feet  94:23 118:1
  157:25
felipe  2:8
felt  150:17 175:20
ferris  145:16
  146:6,11 151:2

fiduciary  73:10,18
  73:24
field  138:20,20,20
  138:21,22,22
fields  163:2,17
fifty  128:10 188:3
fighting  41:25
figure  43:11
  156:20 193:12
  196:23
figuring  39:4 98:4
file  121:25
filed  114:13
  118:11 186:1
files  186:10
filling  13:25
filter  26:14
filtered  72:5
filtering  59:14
final  141:21
  187:23 190:9
finally  42:2
finances  104:6
financial  66:22
  104:2 135:3
  136:23 196:22
financially  100:18
  202:15
financials  128:8
financing  23:20
find  16:11 18:19
  23:22 28:22 30:12
  31:3 62:12 63:12
  63:16,18 64:20
  78:7 121:15
  150:14 171:23
  188:21
finding  29:14
fine  6:3,7 43:8
  107:21 139:2

finish  7:23
finished  139:19
  164:13 182:5
  184:25 185:2
fire  118:1 157:25
fired  14:10,17,23
  15:5,11 100:17
firm  120:1 202:23
firms  17:18,25
  18:2
first  6:9,14 7:7
  24:4 31:9 46:21
  69:11,23 75:18
  89:3,15 91:12
  100:14 101:6
  138:16,23 145:15
  149:24 160:20,21
  160:25 171:25
  179:6,9 183:2
  184:1,10 188:22
  190:17 193:23,24
five  38:1 87:21
  143:24
fixed  97:19
flex  50:12
flip  19:3
flipping  172:18
float  147:2
floor  3:11 66:9
flow  12:9 51:17
flux  28:20
focus  13:14 18:23
  65:10 145:16
  193:14
focused  47:7 65:13
  90:24 133:9
  151:16,23 157:22
  196:9
folks  53:25 97:2
  127:13,13

follow  74:21
  141:23 143:3,13
  173:7 174:9
followed  72:4
  138:4 150:18,20
follows  6:9 131:6
fool  180:18,19
footnote  191:8
force  7:13 141:6
forcing  172:10
foregoing  201:1
  201:16 202:10
forget  24:12
forgetting  132:3
forgot  88:4 113:23
  142:11
form  20:9 31:11
  34:5 64:2 86:24
  87:3 94:4
formal  92:3,6
  195:23
formally  34:6
  118:7
format  75:5,20
  92:3 195:15
formation  191:9
formed  17:16 34:5
  34:6 191:12
formerly  50:24
fort  202:25
forth  26:15 31:12
  51:15 63:11 64:5
  91:5 172:11
forward  30:3 57:6
forwarded  27:20
  100:21
forwards  27:21,23
found  12:17 20:22
  30:15 32:10,11,12
  32:13,15 33:17
  72:3,6 160:20

[found - going]

161:16
**four** 48:24 101:8
    183:19
**fourth** 90:24
    147:21
**fraction** 163:11
**frame** 17:10 31:8
    44:18,22 69:3
    85:3 90:20 96:17
    101:3 103:8
    107:14,23 139:24
    147:20 149:3
    154:10,21 165:1
    165:10 184:6
**framewise** 14:6
**frankly** 101:22
**free** 35:1 64:1
    86:24 87:3 142:22
    143:4
**frequency** 162:4
**friendship** 110:5
**front** 7:13 102:7
**frustrated** 18:22
    158:18
**frustration** 161:24
**frustrations**
    158:22
**fuel** 150:14
**full** 8:19 96:6
    180:25
**fully** 65:6,7 110:16
**function** 62:20
    63:4,9
**functional** 65:6,7
    123:4
**functionality**
    28:16 34:14,22
    35:15,17,21 60:16
    60:18 62:8 63:25
    86:23 90:15 124:8
    124:9,13 155:12

165:8 173:22
**functioning** 55:5
    124:9
**functions** 62:22
    124:1,2 192:18
**funded** 81:9
**funding** 79:21
    125:1 142:21
**funds** 136:14
    147:2,2,4 184:11
**further** 4:6,7,7
    38:12 63:6 66:10
    84:13 124:13
    182:16 192:7,19
    197:7,11 198:3,15
    202:11,13
**futures** 51:20

**g**

**gamble** 66:4 96:10
    193:7
**game** 117:3
    166:17
**gap** 29:15 137:10
**gaps** 85:20
**gas** 9:15 13:16
    28:23 64:16,22
    65:2 79:20 112:14
    112:20 113:3,5
    115:9
**gathering** 192:10
    192:14,23 193:5
    194:16
**general** 28:22
    37:16 45:22 63:3
    72:17 110:18
**generally** 173:6
**generate** 13:3
**generated** 66:15
**gentleman** 11:20
    16:14

**gentlemen** 53:20
**genuine** 158:12
**geographical**
    51:18
**geography** 64:8
**getting** 12:8 31:23
    33:14 67:18 69:15
    79:24 80:12,17
    96:12 98:16,19
    104:22,25 129:8
    132:8,21 147:22
    169:13,17 170:17
    173:13 182:22
**girth** 50:4,6
**gis** 51:7,18 60:4
    172:5
**give** 7:12 8:8,19
    34:21 42:17 44:14
    52:3 63:17 71:12
    106:1,2 163:15
    172:1 187:22
**given** 7:13,24
    26:22 33:17 58:9
    58:14 64:21 81:7
    86:17 89:10 91:24
    92:9 138:10 140:2
    155:12,18 164:17
    164:19 170:3,7
    176:25 177:2
    179:7 201:19
**giving** 8:23 118:4
**glass** 187:14
**gmail** 19:22 71:23
    72:5
**go** 7:7 11:22 14:22
    18:7,25 19:9
    21:13 34:24,24
    35:2,5,9,17 37:7
    38:2,12,15 42:15
    42:18 44:3 56:21
    62:17,20,23 64:24

65:1 66:21 67:6
73:3 79:6,6 82:16
85:10,22 87:15,18
94:12 101:6 102:4
102:4 108:3 112:5
121:13,15 125:8
130:21 136:17
138:18,20 143:8
148:6 149:21
152:14 155:10
161:15 168:7,13
169:10 170:22
172:7 174:4 175:1
185:2 199:3
**goal** 127:3
**goes** 22:17
**going** 7:7,8,8,17
10:13,25 14:24
17:11 18:25 26:23
31:6 39:19,22
40:8 42:3,16 46:5
47:21 48:10 49:11
50:8 54:3 55:10
56:7 57:8 63:19
70:13 74:19 81:5
81:5 82:7,10
84:11 89:1,1,9,25
92:18,25 93:24
95:22 97:21 99:21
99:23 102:6
110:22,23,24
112:2 113:18
116:9,22,23,25
117:1,1,10,25
118:13 123:4
126:21,21,25
127:11,18 129:10
130:20 133:2,18
137:23 138:13,21
139:8 143:8,12
144:18 145:16

[going - haystack]

149:14 155:4,5,20
156:15,25 159:4
160:12,13 162:14
163:25 164:12
169:18,23 170:25
170:25 171:1,1
172:21,21,21
174:20 175:19
177:18 178:7
179:2 180:8 181:7
181:9 186:15,20
194:14,15 195:11
198:10
**good**   6:11,12 10:9
10:25 15:24 46:3
50:7 69:22,23,25
96:16 107:14
117:3 122:15
**goodness**   87:24
166:21
**google**   73:20
**gosh**   158:6
**gotcha**   146:12
**gotten**   60:10 87:8
87:9 156:8
**grabbed**   110:8
**grand**   97:6 106:1
196:25
**granted**   153:24
**grantee**   35:7,10,18
64:7 163:1
**grantees**   26:14
63:10
**grantor**   35:6,9,18
64:7 163:1
**grantors**   26:15
63:10
**graph**   62:5 86:13
**graphics**   66:16,16
171:17

**great**   7:23 41:17
110:22 166:18
**greg**   28:10 29:11
30:15,16,18,18,18
30:19 31:1,13,15
31:20 32:3,5,11,22
33:1,6,7,7,15 66:7
66:7 84:22 193:7
193:10
**gregory**   148:12,24
**gregs**   28:15
**grind**   31:2 95:3
**ground**   31:23
42:16 116:20
**grounds**   112:23
**group**   1:7,14 3:9
6:18 12:3 14:11
14:18,22 18:11,13
22:11 23:13,16
25:9,15,20 26:1
32:8 34:3 35:20
35:22 36:7,12,15
37:3,9,14,16 38:6
44:11 48:4 50:12
50:16 53:24 63:16
66:9,11 76:20
98:2 105:12
109:24 110:19
111:6,15 114:10
114:14,15 118:17
119:19,24 120:19
120:22,23 126:24
129:14,19 130:1,2
136:25 153:5,9,20
179:23 180:16
181:9 196:23
**grouping**   59:14
62:20,21 63:4,9
86:23 87:2
**guess**   10:7,20,23
27:3 44:1 53:6,6

70:3 91:8 97:9
101:4,12 112:5
113:18 132:2
133:22 134:11
147:2 156:19,22
157:10 158:3
159:15 160:1
166:9 186:15
191:16
**guessing**   101:5
129:25 134:10
**guide**   195:3,4,6,8
**guides**   72:25
**guy**   109:11,14
166:7
**guys**   37:18 100:5
100:10 109:17
120:5 149:14

## h

**h**   1:5
**habit**   53:15
**half**   18:6 24:4
31:10 42:4 109:4
173:4 184:8,9
**hall**   23:15 66:10
180:14 181:20,23
**hallway**   82:5
**hand**   52:4 182:12
184:20 201:19
202:16
**handful**   120:5
175:3
**handle**   66:13
104:12,15
**handled**   104:5
132:16 135:3
**hands**   91:15 95:11
198:13
**hang**   95:16 110:7
**hank**   66:4 84:24
96:10 193:7

**happen**   52:16
131:20 139:2
144:22
**happened**   14:9
28:7 31:5 109:13
124:15,17 132:10
149:1 187:18
**happening**   111:13
160:17
**happy**   102:8
**hard**   19:11,12,13
19:25 29:6,10
36:9,25 38:4
41:16 49:6 54:10
67:4 69:11 72:7
72:10 82:22 83:12
98:7 103:7 123:11
123:17,19,24
126:6,18 143:18
153:11 164:25
182:11 187:14
191:21 192:16
194:18,19 195:10
195:16,17
**harness**   31:2
**harris**   202:2
**haynes**   22:8 48:5,6
57:25 59:17 60:11
62:9 63:23 77:20
77:22 84:16
122:19 123:1
124:3,17,22 125:3
129:5 131:8,15
141:19,25 151:22
152:17 154:8,13
154:22 172:5
187:22 191:24
192:24 193:1
**haystack**   11:11,11
11:13,16,17 12:16
18:10 109:21,22

[haystack - image]

109:24 110:1
**haystacks** 92:21
**head** 70:5 129:6
180:22 197:2
**heads** 89:22
**hear** 23:4,10 39:16
39:17,21 40:2,6
128:20 167:24
**heard** 22:24 25:22
42:16 122:14
146:5 193:21
**heavily** 90:24
110:17 145:23
**held** 115:14 128:3
165:25 183:21
**hello** 168:11
**help** 12:15 14:1
16:9,10,11 31:2
41:9 63:6 72:16
119:7 156:2
193:16 196:23
**helpful** 159:9
173:11
**helping** 70:7 72:8
121:16 137:10
**helps** 159:24
**hemorrhaging**
196:25
**hereto** 2:11 202:15
**hey** 33:7 34:7 90:9
107:24 169:22
189:21
**hi** 48:15
**hide** 70:1
**hiding** 70:1
**high** 31:22
**higher** 99:15
100:10 148:3
**highlighted** 72:10
74:20 119:16

**highlights** 72:12
72:15
**hill** 3:11
**hire** 34:7
**hired** 26:10,20
66:16 98:20 99:2
**historical** 98:21
180:15
**histories** 13:21
**history** 89:10 94:4
94:16 109:7
**hold** 63:14 112:15
112:17 113:4
117:25 140:5
172:14
**holding** 73:25
139:23
**holes** 31:23
**honest** 74:5
**honestly** 168:17
**hope** 58:17,19
59:1 157:8,11
170:25 171:2
**hopeful** 156:21,23
157:2
**hopefully** 52:14
**hopewell** 1:8
39:18 47:2,5,19,20
47:23 48:1 65:10
65:11,13,19,24
66:14,24 74:13,17
75:1,5,12,20 79:20
79:22,25 91:13
104:15 119:12
120:4 122:12
136:14 139:24
145:6 147:2,4,8,14
147:25 148:1,13
148:21 153:23
175:14 184:11
185:7,25

**hopewell's** 144:24
**hoping** 156:16
**hops** 29:17
**horizon** 12:1
109:20 179:18
**horrible** 109:14
**horse** 166:14
**hot** 142:2
**hour** 67:17 82:11
128:10 131:7
173:4
**hourly** 67:16
**hours** 67:18
122:24 128:10
**houston** 2:9 3:17
14:14 31:17 32:7
33:6
**huge** 23:13 115:7
116:20
**huh** 8:12,12 24:21
36:3,14 41:20
43:23 48:13 52:22
57:10 60:9 65:17
67:14 86:1 89:17
91:10 100:12
105:2 110:2,20
111:5 112:12
114:20 115:1
137:1 141:18
145:4 152:19
185:12 196:18
**hundred** 14:20
66:17 72:21 87:17
95:4 196:25
**hung** 110:9
**hurt** 107:19
**hypothetical**
154:25 156:11
**hypothetically**
144:23

**i**

**i.e.** 74:23
**ibm** 21:9,22 22:13
22:19 23:2,5,6,18
23:22 24:16
**idea** 13:2 14:15
29:16 30:25 98:15
106:6 150:14
162:17,24 163:13
**ideas** 29:5 33:16
**identification**
140:21
**identified** 13:24
190:22
**identify** 29:1 60:4
140:10
**identity** 201:14
**ii** 107:15 181:4
183:23 184:15,17
184:24
**iii** 67:13
**illegible** 187:5,7
**image** 1:13 3:9
6:18 9:18,25
10:10,25 11:5,6,12
11:15,17,18 12:3,5
12:11,12,24 14:19
15:20 16:1,5,10,11
16:24 17:1 18:14
18:15 19:20 25:11
25:13,14,24 26:1,5
27:7,15 33:24
34:1 36:7 38:6
39:4 42:1,13,17,24
43:4,14 72:1
98:15,20 99:2,3,4
99:8 100:6,15
101:19 102:21,24
103:6,15,15 109:8
129:21 130:1
153:8,9 176:7

Kramm Court Reporters, A Veritext Company
866-299-5127

[image - interface]

180:2 185:3,6,24
187:3,14 188:8
196:23
**images** 103:16
186:19,24 187:5,6
187:7,9
**imaging** 185:8
**immediately**
180:13
**impact** 182:11
**implemented**
144:5
**implication** 73:23
73:24
**implies** 50:18
**important** 10:5
**impression** 80:21
**improvement**
57:13,20
**inability** 161:24
**inception** 84:18
98:24
**incident** 12:1
109:20
**include** 92:1
173:15
**included** 60:18
**includes** 64:23
**including** 24:16
**incomplete** 154:25
156:10 162:23
**incorrect** 74:21
152:25 153:1,2,3
158:8 159:14
160:22
**increasingly** 116:6
**independent** 4:22
67:4,8 69:7,16
78:7 112:13
130:17 190:6

**independently**
17:22
**index** 4:2 25:11
61:13,21 62:24
63:13 64:4,7,9
87:14 90:21
137:23 162:18,20
162:21,22,22,23
162:25 163:3,5,8
163:10,11,16,17
165:19,20 166:17
**indexed** 63:1
**indexes** 12:18
**indexing** 12:15,23
43:22 58:25 62:10
62:13 86:23 87:2
90:17 164:24
**indicate** 71:16
**indication** 56:19
**indirectly** 100:20
**individual** 1:6,7
94:20 163:25
**individually** 62:17
87:19 114:14
**industry** 14:4
24:15 85:19 87:5
112:14,18,19
113:6,6
**inept** 100:18
**influence** 8:22
**info** 84:3,5,14,18
85:13,25 86:3,6
194:2
**info's** 84:11
**inform** 106:15
**informal** 7:11
**information** 26:17
38:17 51:18 54:21
58:3 68:8 82:19
88:18 97:14
106:23 112:7

119:7,9 160:24
161:3,25 172:25
173:15 174:4
**informed** 6:20
91:18
**infrastructure**
31:24
**inherently** 73:10
**initial** 64:19 175:6
180:10 186:9,24
187:20
**initially** 32:3
150:15 163:16
**initiative** 143:8
**inner** 120:9
**innovative** 16:17
**input** 83:14,16,17
**inquiry** 112:6
**inquisitions**
155:15 156:5
**inspection** 13:21
187:11
**installed** 115:24
**instance** 2:3 170:2
**instructed** 169:23
170:18 173:14
**instructing** 175:25
**instruction** 170:3
170:7
**instructions** 48:17
137:18
**instrument** 26:15
35:3,11,18 60:25
61:17,23 62:6,11
63:1 64:6,9 87:21
163:2,2,6,7 201:16
**instruments** 17:20
29:18 61:9,16,22
61:23 62:4,5,17,24
63:6,19 64:2 65:3
87:16 88:1 98:24

163:7
**integrate** 98:4
194:7
**integrated** 59:19
**integrating** 52:14
90:3
**integrity** 9:18 13:6
13:9,14,17
**intellectual** 71:11
71:15 74:14,15,16
74:23,25 82:17,20
83:4 86:10 172:16
173:8
**intelligence**
131:13 163:12
**intelometry**
119:24 120:19
126:24 127:13
**intend** 7:2
**intended** 20:12
50:19
**intent** 19:24 98:3
158:15
**interacted** 174:21
**interactions** 175:3
**interest** 12:14
17:24 70:9 75:7
150:17 151:2
163:9
**interested** 23:17
27:18 30:20 37:4
53:25 109:23
202:15
**interesting** 14:4
29:12 31:4,15
32:23 117:5 136:4
150:9
**interests** 51:6
144:24
**interface** 43:22
157:14,16 165:15

[intermediary - john]

**intermediary**
131:19,21
**internal** 75:9
**internet** 30:15
32:12
**interplay** 47:14,15
**interpret** 159:22
**interpretation**
177:14
**interpreting**
193:19
**intrigued** 150:13
**introduced** 11:15
11:18 12:2 110:1
179:15
**introducing**
109:24
**introduction**
109:25 175:6
**inverse** 186:7
**invest** 36:21 47:18
47:18 120:7
125:24 126:1
**invested** 25:25
26:7,9,11 36:12,16
36:18 37:3,9,14,17
81:2 95:18 108:19
108:24 114:22
120:8 127:10
147:13
**investigation**
169:6 171:5
**investigations**
4:19 52:20 54:15
57:14,21 173:6
**investing** 127:3
**investment** 21:24
23:13 24:20 37:15
44:9,13 80:25
96:9 118:16
126:24 127:17

175:10
**investments** 1:2
81:15 122:16
157:21
**investor** 40:2 47:2
70:23 120:22,23
122:11 174:8
**investors** 23:1
39:18 53:9,11,16
53:18,21 54:4
56:2,23,25 57:6
80:2,20,22 82:20
83:13 88:19,21
106:15 116:12
120:1,4,11,16,18
122:13 127:10,12
174:11,15,21
175:17 176:25
177:2,6,13 178:9
178:12,22 179:1
**invite** 56:22,24
57:1
**invoice** 66:15,18
101:8,10,12
102:17 103:23
186:9
**invoices** 100:6,10
100:14,20 101:22
102:7,16,19 103:1
103:5,22 104:2
130:4 186:6,17
187:23 188:2,10
188:11,15
**involved** 18:3
23:12,20 42:10,12
47:16 66:22 75:23
76:10 80:1,4,6
91:22 99:4 135:16
148:12 179:23
**involvement** 91:17
135:18,21 147:25

157:18,20 174:15
**involving** 21:25
38:22 40:4
**ip** 106:5
**iron** 9:16 11:6,12
12:16 144:21
**issue** 58:22 63:10
94:25 112:24
116:8 144:18
146:20 170:6,8,10
170:16 173:17
175:19 176:17
187:12
**issues** 16:24
110:15 141:3
173:12
**item** 74:13,15,16
74:23
**items** 74:25

**j**

**j** 63:10
**jab** 148:6
**jabco** 81:2,12,12
81:14,19 147:17
**jack** 179:15
**james** 70:24
**jan** 142:21,22
**january** 9:19 31:8
124:10 128:5
**jargon** 196:4
**jeff** 71:1
**jennifer** 51:1
65:21 87:15 88:3
129:23 165:13
166:19
**jerry** 71:3
**jm** 136:18
**job** 7:23 9:13 10:9
30:1,9,9 72:22
109:8 186:14
187:10 194:7

196:2
**joe** 22:8 34:7 48:5
48:6,9 57:25 60:6
60:7,11 62:8
84:16 107:24
122:19 123:1
124:3,10,17,22,23
125:3 126:1,17
129:5 131:5,8,15
132:5,15,20
142:21 143:6,15
143:16 149:12
150:13 151:22
152:17 154:8,13
154:22 166:18
187:21 191:24
192:24 193:1,23
195:22
**joe's** 154:15
164:21,23 165:14
165:21,23
**jogging** 140:7
**john** 22:22,24
23:14,17,17 24:6,9
42:9,14 45:17,23
63:10,15,17,17,19
86:16 93:14 94:20
95:9 106:1 107:23
108:9,13,20,20
110:16 114:1,2,13
114:22 115:2,3,13
115:23 116:1,4,16
117:2 118:3,9,11
118:16 137:4,13
138:4 139:23
141:6 157:14,16
157:20,21,22
158:15,19 159:5
161:18,24 162:18
163:9 165:22
172:8,15 178:2,6

Page 20

[john - language]

180:6,15 181:12
181:16,19,22
182:4,11 183:7,14
183:22 184:1,14
184:19,24,25
198:9,13
**john's** 139:25
**johns** 71:3
**johnson** 57:5
**join** 11:17 56:23
148:23 164:5,9
**joseph** 59:17
63:23 77:20,22
141:19
**judge** 7:13
**juggling** 45:25
**july** 4:17,19 44:25
45:4 46:12,12
49:5 54:15,16
59:6 102:16 103:5
114:9 116:3
117:11 165:1,9
181:25,25 184:2,7
**june** 1:20 2:4
44:24 59:6 79:1
79:11 101:14
107:22 180:11,24
181:24 184:1
202:6,17
**justified** 70:5
**justin** 46:22,22
47:1,17 55:11
71:8 120:25 121:4

**k**

**kane** 28:10 29:11
30:15 66:7 84:22
148:12,24 193:7
193:10
**keep** 8:4 21:5 42:3
82:13 135:1
137:23 143:11

**kept** 29:7
**keys** 136:18
137:11
**kidding** 69:24
**killing** 97:2
**kind** 9:7 30:5,8
65:9 72:9 73:18
97:24 148:2
165:16 166:6
175:6 186:12,13
**kinds** 163:4
**king** 180:21
196:14 197:2
**kinko's** 186:12
**knew** 33:6 94:21
95:14 109:12,20
109:20 127:1,2
128:23 160:3,18
169:9
**know** 10:13,19
15:5,17 16:3,5
17:3 21:8 23:24
26:12,13 27:19
29:10,14,20 30:5
30:18 31:2 32:21
32:24 33:7 35:2
35:20 36:18 37:9
37:16,18,23 38:17
38:25 39:2 41:9
42:1,3,3,15 44:18
45:19 46:22 50:3
50:12 53:5 54:13
56:13,18 61:11
62:23 63:2 64:6
64:11,13 66:19
67:22 68:13 69:1
69:19 70:3 75:6
75:17,22,22 76:7
76:15,19,20 79:13
79:18 80:3,16,23
80:25 81:1,3,18,19

81:21 82:5,7 83:2
83:4,11 84:10
85:8 87:18,20,20
89:4,8,9,25 90:9
90:16,24,25 92:5
92:20 93:2,20,21
95:20 96:9,12,17
96:24 97:10,16
98:1,10 99:17
100:19 101:3
102:1,9,15,18
103:3,22 104:5,5
105:15,19 106:13
106:14 107:20
108:1,5,21,25
109:11,12,14
112:24 113:15
114:15 115:8
116:3,17 118:9
119:4,6 120:7
121:8 122:1,8,10
122:15 123:3
124:1,15,20 125:2
126:4,15,16,17
127:10,22,25
128:9,23 129:9,9,9
129:25 130:2,3,11
132:22,24 135:18
137:4,12 138:3
139:18 140:24
141:4 144:3
145:16,17 147:13
147:15,18 148:4,6
151:3 152:8,10
157:13,15 158:24
158:25,25 160:9
162:13 166:14,17
166:22 167:10
170:24 174:13,19
175:2 177:5,6
179:13 183:7,25

195:20,21,22
196:1,3,24
**knowing** 148:10
**knowledge** 10:12
10:15 15:14,18
22:3 30:22,23
34:14 37:16 53:4
65:10 73:21 81:23
104:1,17,20 105:7
112:13 115:12
122:4 124:25
125:4 126:2,20,23
127:5,6,24 129:3
129:13,15,16,18
130:5,7,17 132:3
134:9,24 138:7
147:3,5,11 151:8
154:1,3 177:3
182:8 185:6
**known** 201:12
**knows** 45:21
**kodak** 9:14

**l**

**l** 9:22
**label** 40:14 63:17
172:2,2
**labeled** 118:23
**lack** 18:22 125:1
157:4
**ladies** 50:22
129:23 149:24
**laid** 107:14 118:18
**land** 17:19 25:12
25:21 26:4,6,13,14
30:22 34:25 35:15
51:4 54:1 66:5,7
87:18 96:15
142:20 165:4,11
193:8
**language** 64:11,12
64:14,23 65:4

[laptop - long]

laptop  14:24
large  185:19 198:8
larger  188:11
late  28:6 39:14
    103:2 105:3
    117:11 128:5
    148:18 182:16
    198:6
latest  102:17
launch  33:13
    181:6
laundry  58:23
lauren  51:1 65:20
    66:3 87:14 88:5,6
    129:23 165:13
    166:19
law  3:4 17:17,25
    18:2
lawsuit  113:22
    114:6,13,17,19
    118:11 120:8
    157:21
lawsuits  18:1
    119:18
lay  195:10
layperson's  73:23
layup  118:3
lead  55:8 193:16
leading  173:21
    191:13
leafing  171:22
learned  95:5
lease  35:12 64:16
    64:16,19
leases  28:23 64:20
    64:22 65:2 80:24
    87:18 127:3
    137:22 138:14
    158:7 159:2,12
    160:5 164:1 183:4
    185:14 186:1

leasing  29:16
leave  11:16 12:24
    14:10 18:21 143:8
    143:10 185:1
leaves  164:20
led  12:9 33:13
    149:5
left  11:8 117:1
    128:11 137:5
    168:5
leg  163:11
legal  2:8 33:16
    51:5 64:3 96:8,10
    111:17,18,21,24
    127:3 145:2
    150:16 155:14,20
    178:24 193:19
    202:22
legally  29:13
legible  187:9
lend  196:11
length  170:20
lensgraf  15:1
    104:9
lent  127:22 196:10
lesser  85:1
letdown  44:5
level  14:4 73:22
    75:1 162:3
levels  74:22
leverage  44:12
    106:8
leveraged  29:1
leveraging  105:23
levers  116:18
lewtan  17:20
liability  1:3,8,9,11
    1:12,13,14
license  21:23 25:9
    26:3 84:7 85:22
    85:24 105:12,16

105:23 106:3,5,9
106:12,16,24,24
licensed  42:25
    48:1 57:12,19
    74:16 75:5,20
    76:2 106:1
licenses  74:24,25
    105:7,8,9,14,21
licensing  74:22
    75:1 76:3,9
    106:20 152:9
lie  88:12,15 189:9
    189:15,23 190:1
    197:17,22
lieu  198:24
life  9:12
lifetime  179:8
liked  13:1 88:1
    108:14 109:10
    166:18
limit  8:23
limited  1:3,8,9,11
    1:12,13,14 34:14
    34:20 35:2 86:17
    120:17 153:21,21
    157:22
line  78:16,17
    111:23 112:6
    121:5 150:13
    190:17 200:3
linear  90:16 93:1
    93:22 166:5 196:8
lined  143:17
lines  31:21 78:14
    122:18 126:18
linked  33:19
linkedin  30:15
    32:11
list  96:6,6
listed  97:10
    153:16 172:9

listen  194:7
listening  109:7
    193:11,12
litigation  16:17
    18:3 179:18 181:8
little  6:21 7:25
    8:25 17:6 21:12
    34:21 56:14 65:9
    82:1 89:10 127:5
    135:21 140:7
    159:7 169:23
    174:12 179:5
    197:5
lives  32:4
llc  1:2,7,9,10,12,13
    1:14 3:9,9,9 5:2
    74:24 77:1 78:15
    190:18
lngpartners.com
    3:18
loaded  137:14
loan  129:11,14
    147:16
located  65:22
lock  146:21
logical  101:3
    165:21
logix  17:8,13 18:9
    18:21 19:17 69:9
    69:18 71:25 77:14
    77:23 78:1 79:10
    79:19 127:2
    131:11,12 134:4
    134:24 135:6
    176:8
logo  66:17 68:4
long  9:25 13:22
    14:6 19:19 66:8
    79:13 90:18 96:19
    108:6,15 113:14
    121:14 138:9

[long - mark]

139:1 149:22
162:16 173:4
184:4 194:14
**longer**   13:13 19:18
134:2 135:16
**look**   14:13 16:4
17:21 20:24 26:14
27:2 35:2 37:5
49:14 51:14,14
53:12 56:23 59:5
61:19 62:17 63:7
63:15 64:19 73:14
73:15 85:8 87:15
87:19,21 88:2
96:6 119:10,22
158:4 180:9
183:17 186:5,17
186:21 188:7
191:7
**looked**   85:13,13
85:13,14 116:16
143:7 188:9
**looking**   25:7 32:16
32:21 41:9 47:18
64:11 74:12 82:13
85:6 103:4 131:4
134:3 139:6 163:6
166:14,21 171:3
184:7 188:18
**looks**   27:20,23
41:3,14 46:11,19
47:16 54:16 56:13
59:7 78:4 82:25
97:11 98:12
101:11 126:7
135:10 158:5
169:22 172:22,24
173:3,9 183:25
184:1 194:10
**lookup**   85:16

**loop**   148:10
**losing**   14:19 16:6
17:3 109:8 125:10
196:23
**lost**   168:12
**lot**   13:18 16:6
17:25 18:2 26:17
29:13 30:22,22
31:23 37:3 38:16
46:1 73:2 89:1
90:10 95:18 97:2
102:5,11 114:4,22
118:12,18 129:1
145:8,14 149:23
150:12 179:13
196:24
**love**   34:23
**lunch**   110:8
**lurch**   137:5

**m**

**m&a**   175:11
**machine**   2:7
**macondo**   179:20
**mad**   100:17
**madam**   168:16
**madison**   31:18
65:14,14 66:19
98:21 99:12
105:17 185:9,11
185:15 186:2,19
186:20,21
**magically**   95:3
**mail**   3:6,13,18
4:14,17,21,24 5:3
5:8,10,13,14,17,18
5:22 19:15,17,18
19:19,20,21 26:23
27:3,9,16,21 28:4
30:6,16 39:12
46:6,11,12,17,21
46:21 49:2 53:12

70:17 71:7,25
72:1,1,5 82:14
89:14 92:2 100:13
101:5 113:14
118:21 119:2
120:1,21 121:14
125:14,21 126:8
131:1,1,4 132:5,7
132:10 135:5,7,11
135:14 139:15,21
140:15 142:14,17
143:7,13 154:7
158:5,11 159:11
159:11 160:16
161:2,15,17,23
174:24 175:22
176:7,7,8,8,16
182:18 187:21
198:21
**mailed**   133:11
**mails**   19:20,22,23
27:3 46:7,11,14
71:18,20,21,21,23
71:24,25 72:2
73:5 86:8 90:22
92:1,5 123:20
125:8 137:20
176:3,4,9,12
**main**   48:9 66:9
117:7
**maintain**   38:8
**maintained**   16:7
**major**   31:17 91:18
115:15 116:22,24
148:2
**making**   58:8,13
73:14 90:9 93:7
118:4 146:2,4
149:7 184:16
**man**   37:23 51:4
66:5 96:15 122:24

**manage**   99:8
101:17
**managed**   133:14
144:4
**management**   1:7
13:14 20:10 35:15
49:21 68:17 99:8
123:14 130:14,18
179:24 180:3
**management's**
130:8
**manager**   30:11,13
47:17 68:18 72:23
73:4 88:9 104:10
147:25 174:6
**managers**   80:8
83:22 88:12 91:8
104:7 151:10,13
156:16 169:20
189:8,11
**managing**   17:14
18:9 69:5 134:12
134:13,18,18
**mandate**   155:12
155:18
**manhandling**
13:25
**manual**   88:3 91:1
**manually**   87:22
**map**   138:10
**march**   5:22 78:5
78:10 142:18
190:5
**marietta**   9:4
**mark**   1:6 3:9 5:4
6:18 13:1 15:20
15:21 16:7,9
18:25 23:8,12,13
23:17,20 25:18
26:23,24 27:21,23
28:10 30:17,20

[mark - mean]

32:2,6,25 33:4,7,9
33:9 37:17,22
39:3,17,21 40:6,8
42:18 45:8 46:5
49:11 50:1 55:13
55:13 56:7 57:6
58:7 66:9 67:7
70:13 74:6 76:8
76:25 78:14 80:8
81:1,15,22 83:23
84:22 85:2 90:9
90:11,14 91:7,16
91:18,24 92:1,17
92:24 93:1,6,16,17
93:18,18,19,20
95:13,13,16,20,22
99:24 100:19,23
101:1 102:20,23
104:10 105:22
106:3,25 107:5,7
108:1,8,12,19,24
109:7,10,13,15,20
110:5,14,17 111:2
112:6,13,17 113:2
113:11,19 114:1
114:13,14,19
115:2,21 116:8
117:16 118:9,11
120:6 122:8 125:5
129:11,11,16
130:20 131:2,5
133:2 136:6,17
137:9 139:21
140:6 141:2 142:5
147:13,24 148:2,3
148:5,10 151:12
154:17 156:16
157:13 161:16,17
161:23 162:3
166:1,2,5,5,8,9,13
166:17,21,24

167:2,6 169:22
170:1,12,18
173:14 175:21,24
178:1,6,9,11,25
179:15 180:1
181:9,16 182:19
184:6,16 187:21
188:23 190:5,7,14
190:17,18 193:7
197:24
**mark's** 93:21
110:12,17,20
118:16 157:19
184:21 189:18
198:13
**marked** 19:2 27:1
40:10 46:9 49:13
56:11 67:10 70:15
77:2 89:12 95:23
99:25 113:13,21
125:7 130:23
133:13 136:10
139:11 141:14
142:8
**market** 13:24
24:10 33:6 135:19
163:5,12
**marketing** 52:24
53:2 54:1 73:5
168:25 169:18
175:20 176:1
**marketplace**
23:21 70:10 85:15
116:21 193:25
**martin** 22:22,24
23:14 24:6 42:9
45:18 70:19,21
86:16 93:14 94:20
95:9 106:1 107:24
108:9,13,20,20
110:16 114:1,2,23

115:14,23 118:3
121:2 139:23
157:14,16 158:19
159:5 161:18
162:18 163:9
165:22 172:8,15
178:2 180:6,15
181:12,20,22
182:4 198:9
**martin's** 137:13
158:15
**mash** 17:23
**massive** 41:7
156:1
**master** 115:6,7,14
**material** 13:19
73:5 168:25
169:18 176:19
**materials** 175:20
176:1,20 191:23
**math** 9:4 87:23
**matter** 28:15
47:22 166:12,13
**matters** 68:10
**mcknight** 3:4 4:5
4:6,7 6:3,11,13,14
6:15,20,24 11:22
15:10,17 19:3
27:2 35:24 37:25
38:11,15 40:11,16
40:18,21 46:5,10
49:14 50:7,10,11
56:10,12 67:12
70:16 77:5,9
81:11 82:9,13
89:13 91:23 95:22
95:24 96:1 97:4,8
97:16 100:1,4
111:4,9,15 112:1,5
112:22 113:1,4,15
113:24 125:8,12

125:13 130:25
133:4,7,9,14 136:8
136:12 139:14,18
141:16 142:11,14
143:24 144:2
145:3 146:13
149:18 150:3
151:24 152:2,5,11
154:24 155:3
156:10,25 159:21
161:19 164:5,8,16
166:11 167:4,8,12
167:14,23 168:2,6
168:10,13 169:10
171:14 176:21
177:18 178:4,14
178:23 182:23
188:6,22 189:2,8
191:13,15,19
192:8 197:7 198:4
198:15,18 199:3
**mean** 11:8 20:18
29:20 31:14 37:13
37:17 41:8 47:15
48:2 54:6,12 55:3
55:3,24 56:1 57:4
66:15 67:23,23
72:17,21 76:1
82:1 84:2 85:1
86:5 87:16,23
89:25 90:25 92:13
97:22 101:12
102:2 105:16
110:8 115:8 119:2
120:8 129:25
143:10 148:7
157:7,9 158:23
167:18 170:8
177:24 178:16,16
183:24 188:16
193:5

[meaning - multiple]

meaning 65:16
159:13 198:5
means 56:19
138:12,13
meant 51:7 83:3
151:22 173:3,6
174:1
measure 20:21
measurement
68:12
mechanical 9:5
13:17
meet 32:24 109:15
109:17 158:1
meeting 27:22,25
28:7,14 29:3
30:19 32:3 33:13
39:12 42:15 53:19
53:20,22,23,24
54:2 57:3 86:6
89:5 120:14 128:2
128:13,21 196:21
meetings 193:13
196:22
memorandum
132:11,23 143:14
memorializing
158:21
memory 140:7
172:25 188:5
men 26:6 66:8
165:4,11 193:8
mental 8:21
mention 106:19
mentioned 24:22
33:7,9 36:17
38:19 71:19 85:6
91:19 92:11 94:8
124:19 126:16
136:14 171:20
172:6 196:13

mentioning 58:21
mentions 172:4
merited 144:13,16
merola 71:1
mess 188:18
message 136:13
143:1 187:21
messer 51:1
met 10:19 19:24
46:23 120:15
131:5
methodology 55:7
196:6
methods 57:14,20
michael 81:25
82:3
michelle 57:5
microsoft 196:1
middle 11:8 62:3
116:17 126:7
173:22,23 184:2
mike 13:1 66:9
81:1 131:3 137:9
180:14 196:16,17
mill 144:18
miller 110:17
111:10,16 112:7
million 21:24
25:25 26:8,12
35:20,25 36:5,8,12
36:16,18,21 37:18
122:12
milo 10:18,20
mind 51:24
mine 70:4 157:20
185:21
mineral 4:18 51:6
52:20 54:15 63:2
169:5 171:4 173:5
minerals 28:24

minimum 131:7
mining 4:18 52:19
54:15 169:5 171:4
173:5
minor 68:6 70:4
minute 38:1
113:16 143:24
minutes 87:21
173:5
mirrors 24:1
misguided 58:19
109:13
misrepresentation
115:20,22
misrepresented
114:23 115:3,4
missed 168:22
184:6 192:9
missing 41:14 97:3
97:11
mission 36:24 37:3
misstated 152:3
misstates 35:23
151:24 152:5,11
mistaken 182:16
misunderstood
152:15
mix 48:3
model 151:22
modify 28:23
modules 196:12
monday 151:3
monetization
47:13
monetize 28:23
monetized 33:17
money 16:6 17:3
24:6,23 25:1,3
37:3,9,19 41:4
42:6,17 80:2,3,4
80:10,17,19 81:1,9

98:15,19 102:6,9
105:19 114:22
118:18 126:20,21
126:24 127:7,8,19
127:23 128:1,11
129:12,14,17,20
132:21 133:18
137:2,9 139:24
140:1 143:12
150:20,22,23
154:21 155:18,21
156:9 163:11
183:15 184:20
196:24
month 14:20
67:18,19 69:4
78:12 79:6 96:24
97:17,20 131:7,8
184:7,7,8 196:25
197:1
monthly 66:19
67:24 98:16,19
103:13 131:7
196:21
months 90:4 99:17
145:15 184:9
moon 108:7
morning 6:11,12
mortgage 17:18
18:1,3 30:21
mountain 9:17
11:6,12 12:16
144:21
mouth 63:15
move 30:3 136:16
moved 9:14,17
90:17 175:7
moving 161:9
multi 94:19
multiple 74:22
122:16 163:18

[multiply - officer]

**multiply** 67:25
**muster** 186:25
  187:11
**mutual** 75:7

**n**

**n** 9:22
**name** 6:13 16:15
  16:18 24:12,13
  26:21,22 36:6
  50:18 63:12 70:19
  119:24 171:20
  174:5 200:2
  201:15
**named** 11:20,23
  66:4 149:8
**nature** 76:19 93:2
**nauseam** 116:10
**near** 44:16 133:18
**necessarily** 45:17
  54:20 196:1
  197:21
**necessary** 74:13
  74:15,16,23,25
**need** 13:18 15:23
  26:16 51:18 60:4
  72:18 85:11
  107:24,25 144:23
  185:1 189:21
  194:5,6,6
**needed** 13:21
  15:22 60:5 103:17
  105:17 150:25
  173:2 187:6
**needing** 184:20
**needs** 162:23
  171:8
**negotiated** 25:19
  42:6
**negotiations** 181:8
**neither** 73:12
  202:11

**neural** 9:20,22
  19:23 71:24 72:5
**neuro** 9:21
**never** 10:19 37:21
  55:16 86:19,21
  88:10 94:18 95:11
  107:19 110:9
  113:8 114:15,17
  126:19 132:11,23
  134:25 135:1
  137:16,18 140:18
  140:19 141:9
  153:18 177:1
  183:7
**new** 11:23 12:25
  26:17 38:17
  165:20 195:5,6
**niche** 13:24
**night** 131:5
**nineteen** 161:20
**nods** 129:6
**nomenclature**
  61:2
**nominal** 1:10,11
**non** 174:6
**normal** 55:7,15,20
  58:5 72:22
**normally** 6:4 55:4
  55:24 73:8 191:1
**north** 31:17
**nos** 4:14
**notable** 183:6
**notary** 201:23
**note** 6:23 16:7
  74:20 80:23
**noted** 201:3
**notes** 14:13 16:4
  25:7 188:21
  190:17 195:1,5
**noticed** 6:24

**november** 154:8
  154:18,21 156:14
  157:3,11 163:20
**number** 10:13
  19:15 29:11 31:16
  48:22 52:3 56:8
  62:4 64:5 73:9,9
  82:21 102:13,13
  128:10 145:12,12
  150:16 171:14
**numbered** 2:4
  133:3,12
**numbers** 20:3
  26:24 40:9 46:8
  67:8 70:14 99:6
  100:1 113:11,19
**numerous** 28:25

**o**

**oak** 32:9 65:23
**oath** 7:9 201:13
**object** 50:8 81:6
  110:24 111:22,22
**objected** 188:17
**objecting** 112:23
**objection** 11:21
  15:8,15 35:23
  38:3 45:20 91:21
  95:19 112:22
  145:1 152:2 157:1
  159:6 164:4,8,16
  167:14 191:19
**objections** 8:2
**objective** 28:22,25
**objectives** 28:17
  28:18,20 51:21
**obligations** 73:11
  142:23 143:4
**observation** 17:21
  22:13 28:19 29:13
  120:5 127:9
  174:12

**observed** 181:17
**obtain** 186:24
**obtaining** 185:10
  186:2,18
**obvious** 88:20
  91:15 92:23 95:6
  104:24 127:10
  129:1
**obviously** 46:15
  80:21 120:9 127:1
  150:22 164:18
  173:2 176:24
  184:4,14 187:5
**occasion** 144:16
  174:24
**occasions** 174:23
**occurred** 10:14
  24:2 31:10 39:12
  56:14 111:2
  119:18
**occurring** 33:24
**ocr** 64:25
**october** 5:18
  133:25 136:13,14
  137:21 139:8,22
  158:17 159:1
  160:4,16,21
  161:22 182:20
  183:23 184:2,8,11
**odd** 181:17
**offer** 42:18
**office** 23:15 53:19
  53:22 65:22,24
  66:3 92:15 110:20
  120:16 148:6,8
  149:5 181:20,23
  201:19 202:16
**officer** 11:4 73:8
  73:10 82:19 88:10
  88:13 188:20

[offices - outside]

**offices**   2:7 32:8
66:11
**oh**   37:23 41:1
**oil**   28:23 64:16,22
65:2 112:14,20
113:3,6 115:9,15
**okay**   6:5 7:2,5,7
7:11,16,22 8:3,7
8:11,15,17 9:3,12
9:21,23,25 10:5,9
10:11,17,24 11:10
11:13,18 12:4,11
12:18,21,24 13:4,8
13:10 14:6,8,15,25
15:7 16:5,8,13,18
16:22 17:3 18:5,8
18:18,21,25 19:12
19:16 20:6,13,18
21:3,5,15,20 22:2
22:6,17 23:10
24:18,22 25:1,8
26:7,16,23 27:5,12
27:16 28:2,5,21
29:3,9 30:5,24
31:13 32:2,7,14,19
32:25 33:3,11,19
33:22,25 34:10,18
34:22 35:13,14
36:2,10 37:13,20
38:11,25 39:2,14
39:16 40:6 41:13
41:17 42:25 43:1
43:21 45:2,13,19
46:5,13,16 47:1,11
47:14,25 48:10
49:4 50:3,21,25
51:7,21 52:6
53:14,17 54:11,14
54:21 55:10,18,22
56:5,21 57:8 58:8
58:18,24 59:10,14

59:24 60:7,11,17
61:5,12,15,20,24
62:8,15 63:8,21
64:8,9,21 65:5,8
65:18 66:2,13
67:3,21 68:1,2,7
68:18,23 69:13
70:13,19 71:7,19
72:20 73:1,3,13,25
74:6 76:5,7,25
78:4,11,14,25 79:8
79:16 80:6,10,19
81:11,17 82:15,23
83:18 84:4,23
85:17,19 86:2,9
87:6,11 88:8,15,18
89:11 90:11 91:18
92:2,8,22 93:6,15
93:23 96:14,22
97:15,20,25 98:8
98:10,13 99:10,16
99:19,22,24
100:22 101:11
102:5,15 103:13
103:20 104:1,8
105:3,20 106:10
107:1 108:1,2,4,24
109:2 110:3,10
111:9,20 112:1,5
113:11 114:11,19
115:2,13,18 118:3
119:4,22 121:13
122:11,18 124:12
125:19 126:20
127:20 130:5,20
130:24 131:20
132:13,24 133:17
134:11,23 135:5
135:13,16 136:1,6
136:11,25 137:7
137:11,20 138:3

138:19,20,25
139:7,20 140:1,14
140:19,22 141:9
141:11 142:3,13
142:17 143:1,24
144:7 145:10,21
146:8,18,22 147:4
147:10,23 148:12
148:23 149:4,15
149:17,20 153:12
153:25 154:13
155:8 156:8 161:5
161:10 168:8
169:8 171:1 172:3
177:20 180:5
181:2 182:2,9,14
185:1,5,17 187:20
188:2,19 189:20
189:22 191:22
192:5,15,17,23
193:4,17,18,20
194:13,16,19
195:7,13,24 196:3
196:13,19 197:3,7
198:12
**old**   99:12,13
**omit**   88:18
**once**   7:16 32:10
86:6 103:16
175:13,17 180:18
191:12 196:21
**ones**   80:3 172:18
177:7
**open**   51:5
**opened**   175:18
**operate**   13:23
116:1,4
**operated**   115:23
115:24
**operating**   11:4
75:4,19 139:25

**operations**   12:6
64:12,14,17,18,23
65:18,19 148:1
**operator**   13:15
47:16
**opinion**   94:5
110:14 112:15
166:12
**opinions**   111:19
**opportunities**   29:2
29:4 33:18 47:13
92:21 127:4,4
150:14 151:1
**opportunity**   7:17
29:16 161:1
**opposed**   132:21
**option**   154:11
**options**   196:7
**oracle**   195:21
**oral**   1:18 2:2 202:5
**orally**   197:13
**order**   13:18,21
15:22 29:18 31:24
37:6 106:11 159:5
186:7 193:11
**organization**   12:9
73:17
**original**   12:12
102:13 112:6
117:10 140:5
173:11 188:7
198:25
**originally**   102:12
140:9 188:12
**ortmann**   3:21
**outcomes**   156:5
**outlined**   37:1
**outside**   5:6 80:25
96:7 105:17 110:7
140:8

Page 27

[outstanding - percent]

**outstanding**
143:15 182:15
183:2 188:15
**overarching**  28:24
**overseeing**  157:17
**overstated**  177:9
**overstepped**
176:20 177:14
**overstepping**
170:9 175:20
176:1 177:16
**overview**  52:21
172:17 192:20
**owed**  104:23 129:4
129:5
**owned**  29:19
152:24 191:24
**owner**  72:3 74:13
74:23
**ownership**  73:12
75:8 76:11
**owns**  106:3
**ozone**  193:10

**p**

**p**  1:6 3:15,16
70:24
**p.m.**  2:5 199:4
**packages**  22:4,7
48:2 153:20 166:8
**packet**  49:15 53:7
**page**  4:3,8,12 19:9
21:18 27:8,8
36:10 41:14 44:21
48:14 49:21 50:11
52:1,18,19 54:7
56:22 57:8,9
58:24 60:19,23
61:1,2,7,8,10,11
61:14,17 68:7
71:7 72:8 82:16
83:8 86:13,24

87:2,14 90:1,16
97:3,9,9,10,13
113:24 121:14
125:20 126:8
138:7,8,10,11
155:6,11 161:16
161:17,20 164:24
171:13,25 172:7
172:20 183:18
184:10 186:11,16
187:20 191:7
200:3
**pages**  62:7 97:12
186:15 190:19
202:10
**paid**  24:6,9,18,23
35:20 36:5 67:18
67:22,24 79:24
80:12 98:16
103:22,25 105:24
127:11,18 128:9,9
128:20 129:4,8,21
132:14,15,19
147:22 183:8,15
184:1
**paint**  160:19,23
**painting**  88:21,25
89:8
**paints**  74:5
**panakos**  3:4
**panakoslaw.com**
3:6
**pannu**  46:22,22
47:1,18 120:25
121:4
**paper**  155:5
**paragraph**  36:11
38:16,20 57:11
190:18
**parallel**  165:17

**paranoid**  117:9
**parcel**  51:14
**pardon**  183:20
**parent**  153:7
**parenthetical**
190:20
**part**  18:10,11
25:18 30:1 35:1
36:2,8 39:4 45:12
49:18 50:19 52:19
54:13 63:20 66:21
72:22 74:20 75:25
76:6 83:15 96:16
98:22 99:7 101:16
106:5 116:25
118:11 120:9,22
140:11 166:16
172:6 185:20
189:18 196:8
**partial**  8:20
101:10,12
**partially**  41:3
**participant**  174:25
**participants**  28:9
**participated**  122:8
**particular**  161:1
182:6,12
**particularly**  45:16
128:24 185:20
186:6 196:22
**parties**  44:23
169:19 176:19
202:12,14
**partners**  81:12,13
81:19 134:21
**party**  1:10,11
74:14 75:24,25,25
136:16 153:4
**pass**  144:3 179:2
186:24

**passed**  66:18
187:11
**path**  151:5
**pause**  8:1
**pay**  25:5 35:1,4,25
36:7 67:16 97:24
128:1 134:8
**payable**  80:7
104:17
**paying**  24:19
147:6
**payment**  79:14
97:13,18 128:12
128:15 132:24
134:6 183:22,22
184:14,17,24
**payments**  79:18
104:23 105:3
133:24,25 134:3,5
134:24 136:15
142:22
**pdfs**  100:3
**pdp**  1:7 130:8,14
130:18
**pending**  139:23
**people**  12:2,7
13:25 17:6,20
24:15 25:22 28:11
70:10 99:2,11
105:20 116:21
122:16 127:13
146:5 147:22
148:9 149:8 161:3
173:24 176:25
194:8
**perceive**  82:1
**perceived**  80:2
**percent**  62:13
72:21 87:22 95:4
138:9,10

[percentage - possession]

percentage 91:4
122:22 187:4
perception 156:13
156:15,20
perfect 95:4
115:12
perform 154:22
performance 68:9
68:13 89:10
performed 123:10
185:7,25
performing 14:2
period 23:16
36:22 41:24 42:14
78:12 79:4,6
90:25 99:1 108:15
periodical 98:12
periodically 48:13
permission 187:16
permitting 59:19
persisted 96:19
person 29:7 32:5,6
32:6 57:3 60:12
63:12 65:1 94:21
108:18 110:13
123:3 201:15
person's 63:12
personal 10:12,15
15:14,18 24:20
198:21
personally 24:24
127:22,25 129:11
129:16 147:1
201:12
personnel 190:21
perspective 60:15
60:16 91:12
155:20
pertaining 20:2
petroleum 21:9
179:18

phase 43:21,24
44:19,22,24 97:6
97:19,22 107:12
107:13,15,15
108:2 137:15
141:8 157:25
163:15,21 180:24
181:4,4,5 182:15
183:2,11,21,23
184:4,15,15,17,18
184:24,25
phases 175:10
phillip 3:21
philosophically
93:4
philosophy 92:24
phone 32:4 56:3
120:24 121:4
phrase 64:23
196:14
physical 8:21
physically 66:2
physics 9:4
pick 8:12 66:21
86:7
picking 163:25
picture 31:11
88:21,25 89:8
155:20 160:19,24
piece 36:11,16
38:20 53:11 57:18
62:10,11 63:24
93:10
pieces 90:5 117:6
122:14
pilot 1:8 25:11
47:5,19,20 65:10
65:11,13 66:14
79:3,4 148:13,21
163:15

pinning 145:13
pipe 13:22
pipelines 13:15
pissed 101:23
pitch 16:24,25
18:2 42:19 121:9
121:9,11
pitched 13:1
pitching 80:22
116:11
place 75:24 76:13
93:20 112:3
144:17,20,23
182:10
plaintiff 1:4 2:3
3:3 6:15 17:25
38:9 64:4 113:19
175:15
plan 4:15 14:21
16:25,25 29:24
30:3 40:9,19
41:14 43:13 45:5
51:8 68:21 178:11
178:21 195:10,15
planning 31:17
plans 178:8
plants 13:16,16
play 31:17 154:16
played 157:22
playing 117:3,3
please 51:10 58:24
71:12 74:20 77:3
137:23 142:10
150:11 167:5
168:17
pltf 4:16,19,23 5:2
5:12 40:9,16
49:12 67:9 77:6
113:19
plural 189:9,11
193:15

plus 12:7
pocket 184:21
198:13
point 10:5 16:6
21:16 25:15 51:17
51:23 55:5 83:8
90:1,18 100:23
102:25 132:18
136:22 139:5
148:20 151:20,23
152:13 154:12,15
156:1 162:17
163:19 164:22
165:8,10 168:18
170:22 171:5
180:23 181:7,12
187:5 197:18
198:8
pointed 183:3
190:16
pointing 22:15
31:16 57:17 86:18
171:16
points 171:9,24
politics 118:14
portal 52:15 75:4
75:19 124:22
125:2,3 140:13
portion 113:5
119:16
portray 74:7,9
113:8
pose 188:23 189:3
position 11:6
positional 138:7
positioned 174:13
positions 138:10
possession 20:1
123:21 153:21
176:10 191:5

[possible - productive]

possible  172:12
possibly  95:20
post  32:9 65:23
posted  137:24
potato  142:2
potential  23:1
  28:25 29:8,21
  39:18 40:2 47:2
  53:8,11,18,21
  56:23,25 70:23
  106:15 116:12
  119:25 120:3,15
  120:23 174:4,8,21
  175:17 177:21
potentially  29:1
  29:15,16 37:5
  54:1 64:20 70:8
  116:19 122:12
  150:17
power  31:2,21,22
  146:1,3
powered  50:12
powerpoint  49:2
  54:3,6,7 55:8 59:9
  72:23 121:10
  169:1,3 172:8
  173:2,7 174:22
powerpoints  49:8
ppt  55:12
practice  57:7
  72:17
prasad  27:8
preceding  175:10
preliminary  5:20
  141:17 154:9
premise  156:6
prepaid  25:12
prepare  53:2
  72:23,24 177:10
prepared  52:25
  70:9 72:25 82:21

91:25 141:19
  168:24 169:1,2,8
  176:19 177:7
preparing  52:23
  68:19 91:19
  117:24
present  3:20 48:13
  48:25 55:19 66:2
  111:4 124:2
presentation
  48:16 49:18 50:2
  54:19,19 61:22
  128:7,8 173:3
presentations
  48:11 56:17 58:21
  174:22
presented  5:1 77:1
  127:4 190:4
presenting  58:12
preserve  146:15
preserving  124:21
pressure  13:22
pretty  35:16 40:17
  40:23 46:23 87:4
  88:22,24 94:11,16
  96:18 113:2
  120:16 184:20
  197:22
prevent  8:22
prevented  62:16
  87:14
previous  174:20
  197:18
previously  40:3
  98:22 100:6 105:6
  124:9 160:6
  169:12 173:19
  174:17 175:2
  176:6
price  97:19 102:3
  163:5 186:13

primarily  165:12
primary  29:7
  43:22 48:6 162:18
  162:25 163:1,8,10
  163:16
primer  34:21
printed  35:14
prior  42:7 80:10
  108:22 136:15
  151:24 152:3,6,11
  157:21 158:17
  159:1 161:3
  162:15 180:13
  189:12 191:1,9
prioritize  146:5
pristine  156:1
privilege  111:1,14
privileged  111:11
privy  177:1,3,5
  182:7
pro  3:15
probably  17:2
  18:11 23:9 24:3,3
  25:23 28:3,10
  29:20 31:9 33:6,7
  33:8 34:6 37:23
  39:11 44:16 55:6
  59:7 66:18 69:11
  70:18 74:2,11
  82:7,10 84:22,24
  85:1 89:25 90:22
  90:23 94:15 98:24
  99:1,20 100:19
  107:22 108:23
  109:16 120:22
  148:14,18 160:11
  162:6 169:25
  172:17 174:23
  188:9 189:4,13,18
  195:20

probate  52:12
  59:20
problem  94:19
  101:16 193:14
  194:11
problems  58:10,21
  136:23 147:22
  193:15,22
procedure  2:10
  20:23 139:25
proceed  7:2 14:11
  84:15 90:15 92:12
  93:5 117:21,22
  175:25
proceeded  13:3
  14:23 18:1 30:19
proceeding  80:16
proceedings  199:4
process  12:15 14:2
  20:10 58:5 99:13
  138:4,16,24 146:2
  146:4 163:18
  164:23 166:16
  174:16 175:14
  196:9
processed  117:2
produce  20:4,15
  49:6 178:7 187:9
produced  2:2 38:4
  54:9 75:2
product  20:9
  41:22 95:2 139:5
  140:18,25 160:7,8
  187:3 192:16
production  19:10
  19:14 20:2 31:25
  51:15 59:19
productions  19:24
  72:4
productive  37:6
  151:7 157:23

[professional - quickly]

**professional**  9:12
**profit**  130:3
**progress**  18:22
  86:18 90:10 92:5
  92:19 158:18
  159:4 161:25
  166:21
**project**  1:9 24:11
  24:22 25:11,17
  30:11,13 34:2,3
  42:5,7,12,21 43:4
  47:5,17,19,20,23
  50:23 60:7 65:11
  65:11,13 66:6,14
  68:17,18,21 69:5
  72:23 73:4 78:25
  79:2,7,8 88:9
  93:24 94:3 96:16
  99:7 109:4,23
  123:13 124:10,14
  124:24 128:23
  134:7 135:17
  136:4 145:15
  148:13,21 150:10
  150:15,20,22
  151:15 158:9
  165:5,10,12 167:7
  182:5,12 195:10
  195:15 196:10
  197:21
**projected**  90:5
**projects**  24:14
  41:6 42:11 50:17
  115:7
**proof**  97:24 107:4
**properly**  90:21
**property**  60:22,22
  60:23 61:8,18
  71:11,15 74:14,15
  74:16,23,25 82:18
  82:20 83:4 86:10

172:16 173:9
191:24
**proponent**  85:8
**proposed**  132:6
  142:19 143:3
**proprietary**  57:12
  57:24 71:10,15
  75:4,19 82:17,20
  83:4,19 84:1
  86:11,11 87:8
  119:13 192:2
**protect**  15:22,23
  144:24
**protected**  111:1
  144:9
**protections**  38:9
**protocol**  20:21
**prove**  47:7
**proved**  201:12
**proven**  114:5
**provide**  20:7 47:4
  47:19 58:3 68:8
  71:9 72:16 74:17
  88:19 92:7 112:3
  147:2 162:20
  192:10,12 198:23
**provided**  53:5,8
  71:22 72:3 82:18
  82:25 91:23 104:3
  111:25 133:10
  164:15 176:4,11
  176:15,19 177:12
**provider**  144:18
**provides**  96:23
  98:2
**providing**  71:14
  74:18 78:1 82:19
  83:14,16,17 86:22
  86:24 111:17,18
  111:18 184:17

**proving**  47:12
**provision**  38:7
**provisions**  2:10
**public**  201:23
**publicly**  17:19
**puffery**  189:19
**pugh**  140:8,10,16
  140:17,21
**pull**  60:5 116:18
  117:5 163:4
**punch**  31:23
**purchased**  105:13
**purport**  107:17
**purported**  84:8,8
  106:24
**purportedly**  22:20
  22:21,23 36:3
  95:2
**purpose**  12:12
  28:14 50:17 52:23
  149:7,9 163:14
  201:17
**purposes**  50:2
  73:14 83:13
  163:13 173:2,10
**pursuant**  2:9 75:9
  114:12
**pursue**  90:14
  92:25 155:21
**pursuing**  122:16
**push**  165:20
  166:23
**pushed**  12:8
**pushing**  165:23
**put**  13:2 43:4
  48:20 54:18 58:3
  66:20 75:24 78:15
  80:3,4 81:1
  120:13 138:11
  144:17,20 152:2
  161:4 171:1

190:19
**putting**  48:11 80:2
  122:12

| q |
| --- |

**qc**  186:25
**quarter**  31:9
  69:12 90:23,24
  96:20,21 147:21
  148:18 149:3
**quasi**  120:6
**question**  7:23 8:8
  8:15,17 15:24
  69:22 72:15 74:22
  78:18,18 81:6
  88:14 100:8 109:9
  109:10 117:10
  124:23 126:11
  134:23 156:19
  157:5,16 159:7,23
  160:2,2 161:5,7,9
  164:7,13,18
  167:23 168:17,20
  170:15 173:12
  175:8 176:23
  177:4 179:7,14
  183:9,21 188:22
  191:16 193:24
**questioning**
  111:23 150:4
  157:7
**questions**  7:8 8:7
  8:23 10:15 46:1
  71:13 72:9,16
  106:20 119:15
  121:17,21 144:2
  149:19 168:11
  174:9,13 188:22
  190:2 192:6 197:8
  198:2,15
**quickly**  90:14

[quite - recollection]

| | | | |
|---|---|---|---|
| **quite**  29:23 | 125:14,18 | 115:2,11,21 | 24:19 25:10,14,15 |
| **quote**  99:6,11,15 | **really**  29:25 46:2,3 | 117:20 118:6,20 | 25:16 34:2 36:19 |
|   159:13 | 55:23 72:11 82:2 | 119:18,21,24 | 36:23 37:1,4,7,10 |
| **quoting**  159:10 | 91:13,14 99:18 | 120:15,18 121:1,3 | 37:14 41:5 43:3,5 |
| **r** | 107:25 117:4 | 121:7,15 122:11 | 43:14,19 44:4,5,8 |
|  | 130:10 139:4 | 126:3 127:12 | 44:9,10 45:19 |
| **r**  9:22 | 145:17 146:3 | 132:4,19,22 133:1 | 48:4,8 50:19 |
| **race**  166:15 | 156:19 166:18 | 135:5,15,16,20,21 | 57:17 58:13,22,25 |
| **railroad**  52:13 | 170:24 198:10 | 136:25 137:2,4,8 | 59:15,25 86:16 |
| **raise**  45:8 90:7 | **reason**  8:20 45:22 | 139:3 142:1,14 | 87:9 89:5 93:24 |
|   116:8 | 62:22 69:25 | 143:3,6,6 146:18 | 94:1,3,6 95:10,16 |
| **raised**  90:9 159:23 | 103:25 144:19 | 149:1 158:23 | 96:22 97:21 |
| **ran**  138:4 150:20 | 150:19 155:17 | 159:3 162:10 | 105:12,23 106:16 |
| **range**  35:10 | 158:3 160:3 200:3 | 166:2,3,8 170:4,6 | 108:24 110:23 |
|   133:24 | **reasonable**  15:10 | 170:16 173:17 | 114:10 115:14,16 |
| **rate**  67:17 69:5 | 15:13 68:4 69:4 | 175:16,18,23,24 | 116:4 129:7 |
|   92:19 127:2 | 97:23 188:18 | 176:16 180:14 | 130:21 145:12 |
|   180:15 | 190:21 198:4 | 181:5,8,11,22 | 151:21 152:20 |
| **raw**  21:4 | **reasonably**  68:11 | 182:1 183:9,10,24 | 154:6,10 156:14 |
| **reach**  33:4 | **reasons**  46:4 | 183:24 184:16,19 | 158:19 159:18 |
| **reached**  32:25 | 187:22 | 184:22 185:6,13 | 160:4 161:25 |
|   59:7 | **recall**  17:1 23:11 | 185:18,19,24 | 162:5,8,12,14,25 |
| **reactivated**  125:2 | 24:2 27:4 28:2 | 187:24 188:10 | 163:14 164:17 |
| **read**  6:2 14:20 | 30:17 32:13 46:23 | 190:13 191:6,17 | 165:15,19 170:21 |
|   19:5 67:11 89:15 | 48:21,22,22 53:12 | 192:1,3 197:15 | 170:23 171:7,9,12 |
|   113:15 118:20 | 53:23,23 54:5 | **recalled**  173:12 | 171:12,17 172:5,9 |
|   119:3,12 120:8 | 55:4,13 56:6,18 | **recap**  56:1,4 | 173:16 178:3 |
|   153:10 158:12 | 58:20 59:4 69:2 | **receipt**  139:24 | 180:6 181:12 |
|   162:1 168:17,19 | 69:14 70:19 71:14 | **receive**  28:12 58:6 | **recognition's** |
|   171:14 187:6 | 71:17,21 72:8 | **received**  19:4 | 23:21 45:5 58:9 |
|   201:1 | 73:13 77:19,22 | 25:20 36:8 98:6 | 141:24 |
| **reader**  177:15 | 78:8,10 82:19 | 133:25 134:6 | **recollect**  187:1 |
| **readers**  174:4 | 84:25 85:3 88:17 | 140:24 152:24 | 191:3 |
| **reading**  125:23 | 90:8,12,20 91:5 | 176:14 | **recollection**  10:2 |
|   130:15 139:19 | 96:1,19 97:6,18,18 | **receiving**  46:14 | 48:24 55:22,23 |
|   158:8 | 97:19 99:16 | 134:2,4 | 56:16 80:16 |
| **ready**  31:23 | 100:13,23 101:14 | **recess**  38:14 82:12 | 122:15 126:10 |
| **realization**  23:25 | 101:16 102:11,11 | 144:1 168:15 | 132:14 134:4 |
|   24:2 141:21 | 102:13 103:6 | **recognition**  22:10 | 136:2 147:12,16 |
| **realize**  89:3 | 104:22,24 105:3,7 | 22:14,18,22 23:2,5 | 154:4 169:21 |
| **realized**  24:15 | 105:18 106:23 | 23:12,14,15,23 | 170:1 175:12 |
|   89:22 90:21 | | | |

[recollection - reports]

183:14 188:14
**recommend** 144:7
**record** 2:10 6:15
  8:4,13 38:3,10,12
  38:13 41:13 45:17
  87:19 125:15
  150:13 153:25
  159:25 163:5
  168:7,13,19
  174:24 175:22
  189:22 198:16,17
  199:3
**recorded** 17:19
  35:3 56:5,17
  60:25,25 64:6
  185:14 186:2
**recording** 56:13
  56:20 163:2
**records** 25:12,21
  26:4,6,13,14 30:22
  34:25 35:15 52:12
  66:19 85:16 98:21
  99:3,9,12 105:18
  162:19,20,20
  176:9 185:8,10,10
  186:3,19
**red** 78:14,16,17
  126:18 143:16
  190:17
**redid** 187:10
**redo** 42:18
**redone** 186:25
  187:1,8
**refer** 71:17 76:13
  76:16 154:9 155:4
  155:5 173:18
  174:20 177:11
  179:20
**reference** 21:21,23
  21:24 22:13,13,14
  60:24 78:3 87:17

114:7 132:11,23
  171:24 172:9,15
  172:20 186:20
**referenced** 20:1
  27:6 49:2 61:9,23
  79:5 83:1 119:5
  151:2 183:12
**references** 21:9
  49:5 60:19 61:10
  61:10,14,18 62:6
  86:24 87:14 114:8
  171:9,18 172:17
  184:11
**referencing** 52:18
**referred** 61:17
  64:12
**referring** 21:14
  27:10 50:13,15
  53:6 57:15,24,25
  67:23 77:10 83:10
  100:9 113:24
  137:12,13 138:24
  140:4 154:7
  155:11 159:18
  164:2 176:3
  177:17 182:23
  198:12
**refers** 83:5,6
**refineries** 13:16
**reflect** 41:13
**reflected** 164:25
**reflects** 171:6
  194:9
**refresh** 56:16
  126:9 134:3 188:4
**refused** 45:24
**regarding** 16:23
  27:22,23 38:21
  43:13,22 58:12
  92:5 125:22 143:2
  143:4 146:20

180:15 185:23
  187:23
**registration**
  202:23
**regrouping** 154:12
**regular** 53:16 61:4
  61:6 159:3 160:6
  160:10
**reimbursed** 68:3
**reinforcing** 141:22
**reinventing** 85:10
**relate** 186:18
**related** 43:7 68:9
  111:13 162:4,11
  163:21 175:13,14
  185:13 189:25
  202:12
**relates** 36:24 47:5
  59:6 76:9 197:20
**relating** 70:7
**relationship** 15:21
  16:7 17:19 26:5
  76:20 101:24
  118:16 180:1
**relationships**
  61:21 62:11
**relative** 185:3
  190:10 202:14
**release** 195:1,4,11
  195:12
**relevant** 72:6
  155:15 166:20
  186:22
**relied** 110:17
  112:6,11
**relieving** 198:18
**rely** 175:22
**relying** 154:13
  157:13,15
**remember** 31:5
  32:18,18 46:14

54:3,3 70:16
  88:24 89:13 99:5
  99:6,14,18,18,20
  99:23 102:18
  107:9 110:20
  115:11 118:25
  121:20 122:5
  125:23 126:12,15
  137:6 141:16
  142:24 146:16
  147:17 158:21
  168:18 170:2,11
  180:19,21 184:23
  186:4 187:4
**reminding** 185:18
**remove** 131:18
**removed** 131:21
**rendered** 67:17
**renew** 39:3
**repeat** 8:15,16
  13:8 58:11 128:14
  139:12 146:9
  167:5 178:10
**repeatable** 163:18
**repetitive** 43:9
**rephrase** 124:5
  126:22 160:1
**replace** 131:10,17
**replaced** 131:7,25
**report** 5:20 92:7
  141:17,19,25
  154:9
**reported** 2:7
**reporter** 2:6 6:1,5
  50:5 56:9 168:16
  172:14 198:19,20
  198:23 202:8
**reporter's** 4:8
  202:4
**reports** 68:8 83:11
  83:11 92:8 164:25

Page 33

[reports - room]

191:23
**represent** 6:15,18
39:21 74:19 190:9
**representations**
58:9,13
**represented**
111:10 115:3,4,24
**representing** 75:5
75:20
**represents** 173:20
**republic** 98:25
**request** 20:3 72:4
146:15 183:22
184:24 187:22
**requested** 83:12
168:19 184:4,14
**requests** 19:9,14
19:24 20:1,4
**require** 136:15
**required** 184:18
**requirement**
145:18
**requirements** 20:7
20:8,11 42:1
68:19,21 145:20
156:3 192:10,13
192:14,23 193:5
194:9
**requires** 64:17
**requisite** 110:15
**research** 32:20,21
84:8
**reseller** 24:7 25:14
34:1 43:5
**reselling** 43:15
**reservation**
125:21
**reserve** 9:6 38:7
**resistance** 156:8
**resource** 4:19
52:20 54:15 171:5

173:6
**resources** 60:3,5
169:6
**respond** 121:21
143:11 146:22
**responded** 143:1
143:16 146:23
188:24 189:4,10
**responding** 143:11
**responds** 27:19
**response** 75:3 81:6
81:10 90:11 141:3
146:25 150:6
168:21,23
**responses** 72:12
72:16 118:25
121:16,24
**responsibilities**
68:8 73:11,16,18
73:24 99:8
**responsible** 12:6,8
76:8 102:2,2
**responsive** 20:4
**restated** 126:9,13
**restrictions**
142:23 143:5
**result** 39:12 70:10
80:18 107:11
132:10 180:1
**resulted** 150:21
**results** 20:25 21:1
63:20 91:1 95:4
137:24 138:3
140:13
**retrospect** 74:2
**review** 1:12 3:9
6:19 7:17 14:21
38:8 40:12 46:10
50:12,16,17,18,20
50:21,24 75:10
91:1 94:12,18

129:24 141:24
196:24 198:20
**reviewed** 38:9
102:4 126:17
**reviewing** 113:18
168:10 170:11
187:2
**reviews** 19:5 21:18
27:4 46:13 49:16
72:14 89:17 100:7
113:17,22 121:18
125:9,16 130:24
139:17,20 141:15
142:9
**revisions** 143:18
**revisit** 185:3
**richard** 11:24
109:19,20,21,23
109:23 179:16,17
**richard's** 109:25
121:16
**rid** 15:22
**right** 7:18,19
10:21,21 19:6
29:25 31:1,4,8
33:17 37:6 38:8
41:8,11 43:2
44:14 46:13 47:9
48:3 52:4 61:2,11
62:18,19 63:10,15
66:12 73:22 82:8
86:21,25 87:24
88:2 91:2 93:20
99:13 105:24
106:12,13 107:9
107:12,14,15,25
108:2 109:13
117:25 119:13
123:3 127:18
130:4 132:24
133:19,22 134:17

134:20 137:19
138:15,23 141:10
141:12,13 143:21
147:9 148:8
149:18 152:18
161:21 163:21
165:4 171:22
179:22 180:23
181:3 183:9,14,17
184:13 185:22
186:8 187:7,15,17
189:19,21 190:8
190:23 193:9
194:7 195:21
**rightfully** 93:25
**rights** 22:12,16
25:21 26:2,3
57:12,19 74:15,18
75:24 106:20
152:9 153:9,9,22
153:23
**ring** 122:17
**ringing** 70:25 71:4
71:6
**risk** 144:18
**riskiest** 170:22
**roadblocks** 58:14
**rob** 110:17,21
111:10,16 112:6
**robust** 163:10
**rode** 31:19
**role** 11:3,4 17:13
30:9 47:20 51:3
65:12 70:1,4,6
81:12,19,22 82:2
88:8 130:8 148:3
157:22 188:19
**roles** 91:7,8,11
**rolling** 103:13
**room** 7:12 14:22
24:8,9,10 119:5,6

Page 34

[room - see]

119:8,9,10 122:2,6
122:8 173:10
175:17 177:5
193:8
**rooms**  75:12
**roots**  155:19,22
**rotating**  64:17,23
65:2,4
**rough**  122:21
147:17
**rover**  1:10 5:2,5
19:19 20:2 28:17
30:10,12,13 31:7
33:13 34:11 36:12
36:16,24 37:2
39:6,19,22 40:3
41:9 42:7 43:20
45:6 47:6,14,17,21
47:25 48:11,12,16
48:18,20 49:5,25
53:3 54:1 55:11
65:12,16,24 66:17
67:1,16 68:5 70:2
71:21,25 73:6,7
74:24,24 75:3,8,11
75:18 76:11 77:1
77:12,20 78:1,15
79:20 80:7,12
81:12,17,20,23
82:4,17 83:3,18,25
84:16,19 86:10
88:10 91:9,13
92:12 94:3 95:8
95:25 96:8 98:5
98:16 101:25
103:18 104:6,13
104:18,23 105:8
105:11,13,15,21
105:23 106:4,12
106:16,21,24
107:7 109:7 116:9

116:12 117:11
119:20 121:9,25
122:25 123:6,22
124:22 125:22,24
126:1,4,14 127:16
127:23 128:1
129:12,14,17,20
129:25 130:6,9,12
131:19 134:8
135:6,14,17,24
136:20,23 137:3
142:5,20,22 144:7
144:22 145:7,8
146:2,15 147:8
148:13 150:6,24
150:25 151:19
152:9,17,21,24,25
153:4,17,19,23
154:1,20,23 156:7
156:16,17 157:3
157:23 159:14
164:23 167:17,22
168:1,25 175:7,13
176:7 185:7,25
189:15 190:4,7,18
191:9,12,25 192:3
192:10 194:22
197:3,6 198:5
**rover's**  47:20
71:10 79:21,24
104:1 106:5,9
119:13 152:7
**rule**  138:8
**rules**  2:9
**run**  45:24 88:1
100:15,18 137:18
**running**  6:21
80:11
**russell**  16:14,18,19

**s**

**sad**  40:24,25 41:1
**safe**  123:19
**sake**  155:25
**sales**  12:10
**san**  2:8 3:5,12
**sarcasm**  159:19
**sat**  65:20,21 148:7
**satisfaction**  68:12
**saved**  35:14
**saving**  87:24
**saw**  41:18 90:4
100:20 114:15,17
134:25 135:1
140:19 176:18
177:6
**saying**  22:18 34:7
47:9 59:11 63:23
89:1 93:9 100:23
107:24 115:13
117:25 158:6
160:16 191:8
196:16,19
**says**  36:11 43:21
44:20,21 46:3,18
48:15,15 49:21,21
50:11 56:12 57:11
57:19 58:25 59:14
67:15,16,20 68:3,7
71:7 74:12,20
78:14,25 82:16
89:18 97:25 101:8
101:11 119:12
125:20 126:8
131:4 132:5
136:13 137:11
140:17 141:2
142:18 180:12
181:1 190:20
**scale**  163:18

**scan**  12:13 99:12
171:8 187:13
**scanning**  99:9
**scenarios**  29:8,11
29:21 31:3 64:21
93:3
**schedule**  5:5 6:21
95:25
**scheduling**  57:3
82:6
**scope**  44:15 53:17
140:9 182:6
**scoured**  19:22,22
**screen**  62:21 63:25
65:1 133:5
**scrum**  196:7,9,11
**se**  3:15 80:2 110:9
195:5 197:22
**seal**  201:19 202:16
**search**  35:6,9
63:18 64:2,10,15
64:22,24,25 86:25
87:3 171:22 180:2
**searches**  35:18
**second**  40:12
44:21 52:1 57:11
96:20 113:15
132:17 148:18
149:3 172:7
**seconds**  56:13,19
82:7
**section**  13:22
21:19,20 67:13
75:11 171:5
**secured**  80:23
**securities**  18:1,3
**security**  17:18
30:21
**see**  20:23 21:4,9
37:19 44:15 52:9
61:16,25,25 62:4,7

[see - software]

63:25 71:8 72:10
72:11,14 77:7,25
78:3 85:10 86:7
96:22 100:19
101:22 102:7
106:2 108:1,1
119:23 120:9,21
133:5 135:2
140:15 171:11
172:5,8,9 176:12
177:24,25 186:18
188:21 191:10
**seeing**  70:16 96:1
101:14 118:21,25
141:16 172:18
**seeking**  20:14 84:9
**seen**  14:5 40:11
89:19 100:14
112:17 113:4,8
141:1
**select**  65:2
**sell**  18:19 144:20
162:22,22
**send**  48:17 53:10
57:2,3,5 99:2
198:20
**sense**  45:1 85:5,18
155:21 162:7
168:3
**sent**  42:18 56:22
56:24 99:11
142:18 143:17
158:11 161:2
**sentence**  75:18
164:13
**separate**  21:22
33:23 42:22 77:14
77:19 165:22
**separating**  138:17
**september**  133:19
133:22 134:7

135:17 184:8
**sequence**  43:6
**series**  7:8 19:9
46:7 188:22
193:13
**server**  122:1
**service**  12:13
**services**  5:1,6 9:19
13:6,9 67:17
68:16 77:1 96:7
96:23 98:6,16
115:6,8,15 190:4
**set**  27:22 33:23
51:13 53:25 65:14
81:15 98:20,22
122:7 138:5 151:9
156:3
**sets**  17:22,23 63:5
**setting**  7:11 55:24
76:9 122:6
**settlement**  25:19
25:20 34:3 36:2,9
38:5 42:6,25
114:9,12 152:24
153:4,6,7,10 181:8
181:11,24 182:10
187:23 188:4,14
**setup**  44:21 122:9
**seven**  48:14 163:1
163:16
**seventeen**  136:8
**shame**  180:18,19
**shannon**  3:10 6:17
40:19 95:24 100:1
111:9 133:4
149:19 159:7
168:10
**share**  58:6
**shared**  65:24
122:1

**shareholder**
128:13
**shareholder's**
128:2
**shares**  125:22
**sharing**  33:5
117:20 121:25
**sharp**  71:5
**sheet**  135:2 196:24
**shelf**  193:24
**short**  13:11 105:19
196:9
**shorthand**  2:6
202:8
**shot**  63:25 108:7,7
**shots**  62:21
**show**  31:20,21
34:8 78:20
**showed**  42:20
140:18
**showing**  163:15
**shown**  169:19
**shows**  133:18,21
**shut**  14:19 16:1,5
18:16,17
**sic**  56:7 118:20
**side**  80:1
**sift**  30:2
**signature**  4:8 78:8
200:1 201:2
202:20
**signed**  78:4,9,11
181:10,13 182:11
190:5 191:4,17
**significant**  91:1
**significantly**  99:14
**signing**  190:13
**similar**  56:24
**simply**  171:8
**single**  20:25 52:15
63:7,15,16 135:1,2

**sir**  155:10
**sit**  6:22
**sitting**  110:20
184:2 193:11
**situated**  92:15
**situation**  109:12
170:21 181:17
**situations**  144:14
**six**  56:10,13,19,21
101:9 188:3
**skeptical**  93:25
94:2 158:14
**skilled**  51:4
**skipping**  48:16
**skis**  88:22,25
169:13 174:2
197:19,23 198:5
**slide**  58:1,4 62:12
**slides**  173:3
**slow**  181:6
**slowlessness**  158:9
**slx**  77:6 131:7,10
131:11,12,17,18
131:20,25 132:8
132:14,15,16
134:16,19 190:21
**small**  175:3
**smaller**  92:20
**smarter**  84:11
**smith**  63:10,11,15
63:17,18,19
**smoke**  24:1
**social**  110:7
**socially**  110:11
**soft**  60:12 122:25
**software**  20:15,17
20:19,22 21:5,6,21
21:25 22:4,7,8,9,9
22:10,10,11,14,15
22:18 23:2,5,23
24:7,10,19 25:8,21

[software - spoke]

25:25 26:2,3,3,11
26:12,18,18,20,21
27:24,25 28:9,13
28:16 29:25 34:4
34:4,8,10,16,19
35:21,25 36:6,8,20
36:23 38:21 42:24
43:3,5,14,19 45:24
46:2 48:2,3,4,5,6,6
48:7,9,9 55:5,6,9
58:14 59:17 60:12
72:25 75:4,19
83:18 84:2,7,12,12
84:14,16,18 85:7,9
94:21 95:3 105:10
106:1,17 115:23
115:24 116:2,5,13
116:14,17 117:9
117:14 119:14
122:19,25 123:6
123:15 124:2,2,6
124:15,18,20
125:3 137:14
142:23 143:5
144:4 146:15
151:20 152:7,9,17
152:20,23 153:6
153:12,16,20,23
154:1,14,15,16,22
155:22,25,25
156:2,4,7,9 163:23
164:2,9,10,20,20
164:21,23 165:6
165:14,15,21,23
165:24 166:8
178:3 181:21
191:24 192:3,11
192:18 193:1,25
196:5,6
**softwares** 85:14
164:15 165:16

**sold** 14:13 16:2
18:15,17
**sole** 57:12,19
**solely** 151:11
154:13 192:24
**solicited** 120:7
**soliciting** 120:11
**solid** 94:16 155:13
**solution** 50:20
90:5
**solutions** 2:8
202:22
**solve** 189:14
193:15,16,22
194:10
**solved** 194:12
**somebody** 32:22
62:16 114:16
**someplace** 30:15
32:12 35:3 161:7
183:12 187:9
**somewhat** 28:19
69:2 93:4
**soon** 27:17 39:11
**sooner** 103:5
**sorry** 40:14 43:5
50:5 56:10,21
57:9 59:22 68:1
74:21 76:22 79:23
81:25 83:15 84:25
87:1 89:16 95:24
100:2,7 112:21
125:18 126:7
133:6 134:16
136:13 139:1,12
141:24 142:11
146:9 152:1
158:25 159:10
164:6 168:21
172:14 175:1
179:17 182:21

191:14 192:8,25
194:24 197:5
**sort** 20:21 24:17
26:14 30:25 35:10
35:11 42:8 47:22
61:9 66:9 78:1
85:18 86:25 89:8
91:16 98:12
121:25 135:18
148:2 166:6 180:2
182:19 190:23
**sound** 188:16
**sounded** 40:24
**sounds** 10:25
**source** 20:5 52:10
76:21,23 79:21,24
123:24 144:4,8
146:21,23,24
**sources** 52:15
80:20,25 81:9
90:3,3 135:19
**south** 143:8
**southern** 1:1
**space** 13:15 17:18
24:11 30:21
150:13
**spatial** 51:8,9,11
51:12,16,19 52:10
98:2,3,4,6
**speak** 8:11 21:12
55:18,20 189:19
**speaking** 24:15
162:3 173:6
179:13
**specialized** 57:15
57:21 96:23
**specific** 20:22
23:24 24:7,19
64:11,12 84:13
96:25 97:6 106:2
118:1,2 170:2,4,6

170:8,16 173:12
175:12
**specifically** 21:6
28:13 33:3,12
37:17 46:15 48:1
49:1 53:23 54:2
71:17 106:4
120:15,20 122:17
127:12 130:6
135:6 147:25
149:2 155:6 171:4
177:8,9 188:1
193:23 197:17
**specification**
195:7
**specifications**
13:20 25:17 123:5
195:1,17,21
**specifics** 137:6
**speculate** 10:23
**speculation** 15:9
15:16 45:21 50:9
81:7,7 91:22
95:20 154:25
157:1 166:11
167:8 169:10
178:5,23 191:15
**speculative** 81:10
**speer** 94:20
**spend** 102:5,6
155:21 163:25
**spent** 41:4,5
102:10 145:15
180:5
**spider** 52:1 62:5
86:13 90:1
**spinning** 118:12
**spoke** 20:16,19
30:17 76:14
160:11 173:19
197:19

[spots - successful]

**spots** 147:17
**spreadsheet** 70:9
  91:4 195:15
**spreadsheets** 14:1
**sprint** 196:9
**stacey** 2:5 202:21
**stacks** 155:5
**staff** 50:17
**stage** 55:24
**stamp** 48:15 70:14
**stamped** 49:11
**stand** 116:17
  136:20
**standard** 20:9
  35:14,17,21 57:1
  61:1 86:25 87:4
  117:2 124:21
  139:25
**standards** 196:1
**standing** 12:13
  164:21
**standpoint** 145:18
  193:22 194:5,11
**stanley** 1:19 2:2
  4:4 5:4,8 6:8,11
  38:5 46:7 48:17
  49:22 71:9 82:18
  131:6 150:3
  198:19 201:1,6,12
  202:5
**start** 88:21 89:19
  91:9 102:4 164:23
  165:3 183:7
**started** 30:16 31:7
  34:5 104:22
  150:15 162:10
**starting** 54:7 62:1
  62:2 83:9 172:20
**starts** 74:20
**state** 2:6 6:14
  28:20 38:3 74:14

98:25 201:8,24
  202:1,9
**stated** 2:10 132:25
  152:6 160:6 175:2
  176:6 179:14
  202:9
**statement** 5:1
  41:23 43:18 59:5
  59:8,13 75:21
  76:25 77:5,6,11
  78:22 79:5 102:3
  103:7,24 105:25
  106:2 107:8,11,22
  108:2 117:25
  118:6 129:22
  135:2 137:15
  140:5,14 141:8
  157:24 180:10,20
  182:13 183:25
  187:8 188:7,12
  189:12,12 190:3
  190:16 191:23
**statements** 5:16
  22:2 36:25 75:12
  133:10 134:1
  136:7 149:8,10,12
**states** 1:1 34:25
**status** 83:10,11
  92:7,8 141:7
  160:7,8,11 164:25
  181:15
**stay** 42:13
**stays** 131:6
**stenotype** 2:7
**step** 118:5 138:16
  138:18,23 184:3
**steps** 118:4
**steve** 15:20,21,22
  15:23,25 25:18
  27:5,7,20 34:6
  66:5 85:1 96:15

100:16,16,24
  109:21 193:7
**stipulate** 13:19
**stipulated** 19:14
  188:12 198:25
  199:2
**stipulation** 198:16
**stomp** 94:23
**stood** 13:2
**stop** 47:9 148:12
  154:5
**stopped** 79:18
  124:10,10 134:24
  167:22 168:1
**story** 17:22,24
  25:10 30:14 41:6
  54:13 109:18
  130:21
**straight** 185:13
**strategies** 28:25
  29:4
**strategy** 151:6,9
  151:15
**straw** 24:3,5,6,17
**streamline** 14:2
**street** 3:5,11,16
  202:23
**stress** 8:21
**strike** 39:16 40:7
  65:8 141:22
**strikes** 25:6
**string** 94:7,10
**structure** 116:23
**stuck** 88:23
  180:22 197:2
**stuff** 85:11 86:25
  87:4 89:9 100:18
  107:17 108:6
  140:17 163:4
**stumble** 32:16

**style** 196:11
**styled** 2:4
**subcontract** 47:23
**subcontractor**
  98:20
**subject** 28:14
  47:22 131:6
  177:14
**submitted** 130:4
**subpoena** 4:13
  19:1,4
**subscribe** 84:11
**subscribed** 201:15
  202:16
**subscription** 26:5
**subsection** 72:13
  74:12
**subsequent** 181:9
  190:10 191:17
**subsidiaries**
  153:20
**substances** 8:22
**substantia** 17:7,10
  17:13,15,16 18:9
  18:21 19:17 69:8
  69:11,17 71:25
  76:21,24 77:12,14
  77:23 78:1 79:2
  79:10,14,18 127:2
  129:5 131:11,12
  133:14,21,25
  134:2,4,24,25
  135:6 176:8
**substantially**
  186:25
**success** 41:6
  180:15
**successful** 150:24
  156:17 157:3
  167:22 168:1

Page 38

[successfully - tatham]

successfully   117:7
sue   114:2
sued   114:1
sufficient   28:16
    112:14
suggested   14:18
suing   181:19
suit   118:11 181:16
suitable   137:23
suite   2:8 3:5,16
    202:24
sullivan   3:11
sullivanhill.com
    3:13
summarized   21:1
    194:17
summary   52:20
    72:24 188:25
    189:4,10
super   43:9 63:5
superseded   190:10
    191:4
supersedes   190:15
support   31:24
    63:9 123:5,14
    155:14 156:4,5
    163:3
supported   166:22
supporting   36:24
    50:23 57:14,21
supposed   141:4
    145:18 155:1
    193:13
sure   8:11 10:3,22
    12:6 21:11 22:8
    27:19 30:7 34:5
    37:15 38:17 40:17
    40:23 46:24,24
    49:9 50:10 51:25
    60:18 62:2 82:5
    89:4 90:16 92:16

96:18 111:23
118:18 119:2
121:23 126:17
132:22,22 133:7
137:5 144:14
146:24 149:20
153:8 159:22
168:11 172:10,24
174:18 196:4
surmise   103:4
    119:25 120:22
surprise   128:25
    158:13 160:15
    184:23
surprised   45:17
    128:20,22,22
surprising   182:9
survey   64:8 163:1
surveyed   162:21
susan   17:16 30:14
    30:20 32:3,4,10,20
    34:7 69:19 78:20
    126:1,17 131:9
    132:21 133:16,23
    135:1,13,16,23
    149:12 150:5,12
suspended   124:24
suspicions   15:6,7
sweeney   3:10,13
    4:5,7 6:5,7,17,17
    7:24 11:21 15:8
    15:15 35:23 38:2
    40:14,20 45:20
    50:8 77:3,8 81:5
    91:21 95:19
    110:24 111:12,22
    112:2,21,23 133:6
    139:12,16 142:10
    145:1 146:9,12
    149:20,25 150:3
    152:14 155:8

156:13 157:2
159:10,24 160:1
161:21,22 164:6
164:12,14,22
166:24 167:6,16
168:16,21 169:16
171:19 172:19
176:23 177:23
178:8,18 179:2
197:9,12 198:2
199:2
swell   116:20
sworn   2:3 6:9
    202:16
system   27:17
    87:19 122:1
systems   51:18

t

t   131:3
table   37:5 162:16
tabulated   91:3
tail   155:24
take   30:8 37:25
    40:12 49:14 59:5
    62:24 82:9 85:21
    87:20 89:1 92:25
    100:23 101:1
    107:20 113:15,16
    118:4,5 143:24
    148:16,19 149:5
    149:14 180:9
    186:5,17 187:16
    191:7 194:15
    197:25
taken   2:3 191:1
    202:13
takers   18:4
talk   8:25 23:18
    25:8 33:10 42:18
    65:9 67:12 81:11
    82:3 135:23

193:12
talked   29:21 33:1
    36:20 87:11 88:8
    107:9 116:10
    147:6 153:13
    158:24 161:14
    170:20 183:1
talking   10:13 21:5
    22:5 25:23 30:6,8
    31:3 33:11,15
    34:16,19 38:16
    43:2,3 45:14
    51:22 57:18 77:13
    77:15 83:2 85:25
    95:8 100:5,5,10
    107:10 110:21
    114:24 119:14
    126:5 143:6 148:9
    164:10 169:14
    170:23 171:4,10
    171:11,12 172:16
    173:23 183:3
    193:9 197:20
talks   148:8
task   20:22 29:23
    135:22 159:5
    185:24
tasked   51:5
    157:17 185:8,19
tasks   185:6,11,13
    190:10
tat   4:17 5:4,9,11
    5:13,17,19,20,22
    46:8,21 89:11
    100:2 113:12
    125:5 136:9 139:9
    139:14 141:13
    142:11 158:4
    161:15
tatham   1:6 3:15
    3:16 4:6 5:8 6:20

[tatham - think]

23:4 39:25 45:11
46:6 71:8 74:9
90:7 91:7 97:3,5
97:13 121:16
125:10,21 127:22
127:25 128:16
129:4 131:2,3
136:7 142:15
147:1 149:22
151:12 158:6,18
158:25 159:6,15
159:19,23 160:3
160:16,18 162:4
162:11 164:4,10
168:4,8 178:9
179:5 182:25
188:13 189:3,15
189:16 191:14,16
191:22 192:5
199:1
**tatham's** 128:12
**tax** 52:11
**teach** 117:8
**team** 12:7 45:12
49:21 50:12 68:22
145:14,17 172:4,6
172:8
**technical** 52:21
82:17 83:2,3
192:20
**technologies** 9:20
9:22 12:14,17
14:1 131:13
**technologist**
116:15
**technology** 9:21
20:14 21:22 30:23
31:2 33:17 36:13
36:17 38:18 39:7
39:10,18,22 40:3
42:19 47:22,25

50:19 51:18 52:8
57:12,13,16,19,24
58:9 61:3 68:21
72:18 73:8,10
75:5,20 82:18
83:25 85:23,24
88:10,13 94:17
95:1,9 105:8
108:17 109:24
110:1 111:19
114:24 121:22
145:17 171:17
172:4,6,8,16 173:8
177:12 180:3
188:20 193:16,22
194:11 197:20
198:1
**tecnic** 26:10
**tecnics** 26:18,20
36:5
**tecnics.com.** 27:9
**tedious** 99:13
**telephone** 3:6,12
3:17 187:25
**telephonically**
7:25
**tell** 9:3,12 14:23
17:22 21:6 23:1
37:22 39:17 40:2
69:21,24 76:2,18
77:3 81:4 88:15
88:18 93:3 95:13
102:15,19 106:7
106:15 114:19
122:14,18,21,24
150:7 174:18
178:20 189:9
**telling** 105:20
**ten** 57:13,20
**tend** 94:23 100:18

**tended** 197:25
**tendered** 99:4
**tenuous** 69:2
**term** 64:20 196:9
**terminated** 118:7
**termination** 80:18
**terms** 28:20 35:6
86:22,23,24 88:25
97:18 106:4
118:15 128:12,15
132:6,25 137:8
145:13 148:10
154:13 159:7,8
**test** 20:16,18,20,20
20:23 43:19 123:8
137:15
**tested** 29:13
**testified** 6:9 58:10
58:14 81:8 133:23
151:18 152:8
163:23 166:4
168:24 169:1,2,12
188:10
**testifying** 152:15
**testimony** 134:2
151:24 152:3,6,12
174:20 186:23
188:25 189:5,10
192:17 197:18
202:13
**testing** 13:20
123:8
**texas** 1:8,9,10,12
1:13,14 2:6,9 3:17
9:17 12:1 24:12
52:12 64:7 98:25
98:25 202:1,9,21
202:25
**thank** 40:20 72:8
77:8 113:1 123:13
139:16 149:25

173:11 179:3
**thanked** 42:20
**thanks** 185:18
**theoretically**
130:2
**theories** 29:14
30:20 31:14,16
33:15 150:17
155:14
**theory** 31:22 32:1
**thereabouts** 197:1
**thing** 42:9 51:20
63:14 73:3 88:20
90:17 93:1 118:1
118:2 145:12
155:23
**things** 7:22 18:24
21:7 60:6 84:13
86:22 87:4,9 90:2
104:25 110:22
114:4 118:10
145:9 148:11
149:5 163:4
169:14 173:22,23
173:25 175:19
178:2 186:4
**think** 6:4 10:9
15:19 16:22 20:3
21:14 25:12 30:18
31:8 33:5 34:6
38:5 40:7,13,18
41:18 44:20 45:16
50:1 58:16 66:20
75:15 78:17,17
80:23 82:10 83:6
83:9,25 86:11,12
86:14 90:13,15
91:19 93:25 96:25
97:8,23 100:2
101:10,13 102:25
105:14,22 107:8

[think - titled]

109:13 111:9,10
112:25 132:17
142:1,4 143:14,16
144:15 147:21,23
148:10 150:1,25
151:6,11 153:7
155:17,19 158:8
158:14 159:8,17
159:21 160:9,21
166:12 168:12,24
169:25 170:15,20
177:20 178:25
179:12 180:6,17
180:24 182:14,23
183:10,12 186:23
188:9 189:6,18
193:6,6 197:22
198:7
**thinking**  88:24
99:23 114:6
131:18 143:7
**third**  57:9 69:17
90:23 96:20 97:9
97:10,13 136:16
152:23 153:16
169:19 173:7
176:19
**thirteen**  118:23
**thirty**  196:25
**thomas**  1:6 3:15
3:16 189:16
**thoroughly**  195:20
**thought**  17:17,24
29:11,22 52:8
83:20 100:11
150:9
**thoughts**  187:24
**thousand**  14:20
37:11 45:25 101:8
**thread**  39:13 49:3
113:14 119:2

120:21 121:14
182:18
**threads**  53:13
**threatening**  149:8
149:10
**threats**  94:23
**three**  22:4,6 26:4
48:2 64:20 79:6
87:1,3 124:8
151:19 152:7
184:9
**throckmorton**
202:23
**throw**  166:6
**tight**  15:20 44:14
117:24
**time**  12:14 13:20
14:6,12 17:10
18:8,11,11 19:19
23:16,25 25:16,23
27:22 29:18,22
31:7,8 35:10,11
36:22 39:11 41:24
42:3,12,14,20
44:18,21 51:17
54:9,19 59:3,8
63:16 66:5,6 68:9
68:9,24 69:3,7
72:17,22 73:22
78:12 85:3,21
87:23 89:22,24
90:18,20,25 93:1,3
93:10 96:17
100:14 101:3,4
103:1,8 104:2
107:13,23 108:14
108:15 110:18,21
111:7 124:18
136:22 139:24
145:14 147:20
149:3 151:14

154:10,15,21
156:14 160:20,21
160:25 162:8,16
163:25 165:1,2,8,9
167:4,9,21,25
168:4 172:12
178:4 180:5
181:12 182:5
184:4,6 192:3
196:12 197:16
**times**  57:13,20
67:25 68:23 69:1
89:23 109:10
110:8 128:10
**timing**  59:4
160:25
**tip**  94:19
**title**  1:10 5:1,5
19:19 20:2 28:17
30:9,12,13 31:7
33:13 34:10 36:12
36:16,24 37:2
39:6,19,22 40:3,19
41:9 42:7 43:20
45:5 47:5,14,17,20
47:21,25 48:11,12
48:16,18,20 49:5
49:24 50:1 53:3
54:1 55:11 65:12
65:16,24 66:17
67:1,16 68:5 70:2
71:10,21,24 73:5,6
73:22 74:24,24
75:3,8,11,18 76:11
77:1,12,20 78:1,15
79:20,21,24 80:7
80:12 81:12,17,19
81:22 82:3,17
83:3,18,25 84:16
84:19 86:10 88:10
91:9,13 92:12

94:3 95:8,25 96:8
98:5,16 101:25
103:18 104:1,6,12
104:18,23 105:8
105:11,13,15,21
105:23 106:4,5,9
106:12,16,21,24
107:7 109:6 116:9
116:12 117:11
119:13,20 121:9
121:25 122:25,25
123:5,22 124:22
125:22,24 126:1,4
126:14 127:16,23
128:1 129:12,14
129:17,20,24
130:6,9,12 131:19
134:8,14,15 135:6
135:13,17,24
136:20,23 137:2
142:5,20,21 144:7
144:22 145:7,8
146:2,15 147:8
148:13 150:5,6,24
150:25 151:19
152:7,8,17,21,23
152:25 153:4,16
153:19,23 154:1
154:20,23 156:7
156:16,17 157:2
157:23 159:14
164:23 167:16,22
168:1,25 175:6,13
176:7 185:7,25
189:9,13,15,15,25
190:4,7,18 191:9
191:12,25 192:3
192:10 194:22
197:3,6 198:5
**titled**  40:8 52:19
173:5,8

[titlerover.com - type]

titlerover.com
 46:16
titlerover.com.
 46:20
titles  28:24
today  6:25 7:3
 8:23 10:22 19:10
 36:17,21 38:19
 58:10,15 69:23
 71:9 89:18 94:8
 176:5,15 177:11
 185:3 193:25
today's  137:24
 138:3
told  26:9 36:7
 37:17 88:12
 109:18 115:3,5,5
 115:21 178:2
 188:2 197:12
tom  5:8 23:4,15
 27:12,13,14,16
 28:8,10 31:11
 39:25 45:11,12
 46:6,22 48:15
 50:1 53:21 55:13
 55:13 57:5 58:7
 65:20 66:3,18,20
 71:8 74:9 76:8
 80:9,23 82:21,25
 83:23 84:22 85:2
 90:7,14,15 91:7,15
 92:24,25 93:7,11
 93:15,15,16,18,19
 93:21,21,23,25
 99:23 100:5,21
 102:3 104:10
 107:10,25 116:9
 117:17 120:16
 121:16,23 125:21
 127:22,25 128:7
 128:12,15 131:2

132:5 136:12
137:20 142:5,15
142:18 143:1,15
143:17 147:1,4,6
148:1,4,7 149:19
149:20 151:11
154:17 156:15
157:13 158:6,8,10
158:14 159:3,10
159:18 160:3,6,19
164:9 166:1,3,4,5
166:22,25 167:2,7
169:22 170:1,12
173:14 175:21,25
178:9,11,25 179:3
181:5 182:18
189:3,15 193:6,10
197:24,25
tom's  78:17,18
 93:7,19 119:15
 126:8 130:16
 143:13 170:18
tomorrow  55:12
toms  28:15
tongue  138:2
tools  194:5,6,7
top  48:14 78:25
 96:23 125:20
 130:25 137:20
 158:5 180:10
topic  86:5
topography  51:12
total  25:1 33:23
 41:8,8 101:8,13
 122:24 133:24
totaling  188:3
touch  136:16
tpt  3:18
tr  67:15,16 68:8
 68:11 136:15,19

tr's  68:11
track  29:7,17
 45:17 125:10
 165:17
traders  120:6
 174:11
traditional  57:14
 57:20
train  195:6
trainee  66:4
training  195:4
transcript  7:17
transferred  75:24
translate  194:9
translating  68:20
 193:20
transpired  33:8
 148:7
trees  97:2
trepidation  46:4
tried  18:6,19
 85:18 117:8
trigen  9:16
trigger  64:15,19
trivial  68:6
tro  148:23 149:1,6
 149:7,9,9
trucks  31:20
true  22:2 23:20,22
 114:5 201:2
 202:10
truly  145:22
trust  108:9 117:7
trusted  135:1,3
trustee  146:15
truth  115:16
truthful  8:19,23
try  18:2 44:1,16
 95:10 107:12,12
 171:23 187:12
 189:18

trying  29:23 30:2
 42:4 47:18 56:1
 78:7 95:1,1 99:5
 100:17 101:17
 121:14 137:4
 138:22 140:5
 142:4 148:3
 152:21 154:5
 156:19 157:5,22
 157:24 160:19,23
 160:24 161:2
 166:22 167:16,22
 168:1 178:25
 181:21 193:10,11
 193:15,16 194:4
 196:22
tuesday  151:4
turn  58:24 74:24
 116:17
turned  23:19
 115:25,25
tweaked  54:9
twenty  101:8
twice  99:20 131:3
 180:19
twisting  153:18
two  11:1 16:15
 17:21,23 18:6
 28:4 37:11 48:24
 50:22 66:16 67:22
 67:25 73:10 80:25
 87:20 91:15 97:12
 100:3 115:9
 119:23 128:10
 129:23 134:21
 145:12 163:7,24
 165:16 166:7
 175:10 186:4
 192:8 198:19
type  35:11,18 63:1
 64:9 65:1,3

Page 42

[type - vs]

138:13,15,18
156:9 163:2
176:12 194:21
195:15
**types** 26:15 124:8
151:1,19 152:7
155:14 173:1
**typical** 35:4
**typically** 57:4
66:21 195:14,15

**u**

**u** 9:22
**uh** 8:12,12 24:21
36:3,14 41:20
43:23 48:13 52:22
57:10 60:9 65:17
67:14 86:1 89:17
91:10 100:12
105:2 110:2,20
111:5 112:12
114:20 115:1
137:1 141:18
152:19 185:12
196:18
**ultimately** 39:6
52:9 170:13
**unaware** 158:8
**unclear** 105:9,11
153:22
**uncomfortable**
73:25 116:11
**underlying** 155:14
**underneath** 62:4
**undersigned** 202:8
**understand** 7:9,14
7:20 8:4,9,13,16
8:17 10:6 16:23
17:19 38:18 44:1
50:23 51:12 68:1
95:1 130:15 148:3
160:25 161:2

175:8 176:23
**understanding**
22:17 36:15 47:1
47:4,21 70:21
73:23 81:13,14
91:6 111:16
127:16 130:8,12
130:13,14 133:24
134:1 136:19
139:22 143:15
147:24,24 151:1
175:9 178:18
198:22
**understood** 10:24
50:23 154:17
**unfortunate** 136:5
**unhappy** 25:17
**unit** 62:3,6 87:16
87:17 186:10
**united** 1:1 34:25
**units** 137:22 158:7
159:2,12 160:5
183:5 185:14
186:2
**university** 9:6
**unserved** 13:24
**unstructured**
116:23
**unusual** 8:21
**update** 91:25 92:2
148:2 195:5
**updates** 66:19
91:18,19,23 148:5
148:11
**upload** 119:7,9
**upset** 102:1
**upstream** 98:10
98:13
**use** 10:14 21:25
24:8 25:21 26:2,6
28:13 34:8,10

35:2 38:21 39:6
39:10 50:19 64:3
86:4 94:11 98:13
102:21 105:24
106:3,12,16 107:7
107:17 108:6
116:9,12 117:8,14
119:13 142:23
143:5 147:1
152:21 153:22
154:1 162:24
165:7,23 166:7
181:21 189:13
192:2
**useful** 12:17 17:17
37:8 44:13 62:16
62:22 178:7
**usefulness** 47:12
**user** 35:17 43:22
61:22 63:6 72:25
195:3,6,8
**users** 64:1 195:6
**usual** 124:21
144:19
**usually** 72:19
144:17
**utilization** 173:8

**v**

**vague** 112:24
154:24 159:7
164:4,8,9 167:4,8
167:15 168:2
176:21,22 178:4
178:14
**value** 37:2
**variation** 63:15
**variations** 62:25
63:11,13,17,20
**various** 20:11 63:5
63:12 81:16 83:13
85:14

**vendor** 101:17
102:21,24 119:19
130:11,12
**verify** 53:13
**veritext** 2:8
202:22
**version** 24:9 85:12
191:2,3,4,21
**versioning** 144:4
**versions** 54:8,10
**versus** 35:12,12,12
84:10 135:6
166:14 175:7
**vessel** 13:23
**vet** 28:15
**viable** 154:11
**video** 7:25
**videoconference**
3:10,21
**view** 30:8 63:6
156:2 166:20
198:1
**viewed** 35:13
**virtual** 24:8,8,10
**virtue** 30:21 61:17
100:20 106:18
**visibility** 181:14
**vision** 9:20,22
19:23 20:12 51:16
52:8,13,15 71:24
72:5 173:19,21
175:4
**visualize** 51:12
**voltage** 31:22
**volume** 86:23 87:2
87:14 90:16
164:24 186:13
**vs** 1:5

Page 43

[wagging - witness]

| w | | | |
|---|---|---|---|
| **wagging** 155:24 | **wanting** 37:19 | **wells** 51:14,15 | 44:11 45:8 48:3 |
| **wait** 7:23 119:14 | 116:21 117:20 | **went** 31:19 37:12 | 50:12,16 53:24 |
| **waiting** 127:17 | 146:6,20 | 108:14 109:3 | 66:9,11 74:6 |
| 160:13 198:9 | **warmed** 42:11 | 122:24 128:8 | 76:20 78:15 81:22 |
| **waive** 6:2,6 | **watched** 95:5 | 140:11 163:17 | 81:25 82:3 91:7 |
| **waiving** 6:3 | **watching** 42:9 | 184:5 187:10 | 93:16 95:13,13,16 |
| **walk** 26:16 | **waterfall** 196:8,8 | 192:17 | 102:23 105:12 |
| **walkabout** 22:12 | **way** 28:22 35:4 | **west** 3:5 | 109:24 110:19 |
| 22:15 26:22 27:17 | 62:13,23 69:15 | **western** 9:5 | 111:2,6,15 114:10 |
| 27:22 28:8 34:4 | 138:5 152:4 | **wg** 136:15,25 | 114:14,15 118:17 |
| 34:16,19 35:16 | 169:18 189:14 | 137:2 | 119:19 129:11,11 |
| 38:23 39:7,10,18 | 193:6 194:10 | **whatnot** 21:10 | 129:14,16,19 |
| 42:23 44:2 85:7,7 | **ways** 32:21 | 120:7 | 130:1,1 131:2,3 |
| 85:14 105:10 | **we've** 26:11 30:5 | **wheel** 85:10 | 136:25 139:21 |
| 153:12 164:20 | 36:17,20 82:10 | 145:16 146:6,11 | 147:13,25 148:2,3 |
| **walker** 31:18 | 103:11 107:14,14 | 151:2 | 151:12 153:5,8,20 |
| **wall** 166:6 | 114:24 153:13 | **wheels** 118:12 | 161:16,17 162:7 |
| **want** 6:1,22 10:22 | 158:1 163:11 | **whichever** 192:22 | 162:11 178:1,9 |
| 10:23 16:23 29:25 | 170:20 175:7 | **white** 43:10 72:11 | 179:23 180:1,14 |
| 34:18 35:2 36:11 | 180:24 182:14 | **whitley** 2:5 202:21 | 180:16 181:9 |
| 37:1 38:3,7,9,17 | 196:5 | **wide** 184:6 | 184:16 188:23 |
| 41:13 42:10 43:8 | **wearing** 110:14 | **wife** 109:9 | 190:18 196:16,17 |
| 44:1 64:10,22 | **web** 34:24 48:16 | **wil** 4:14,21,25 5:6 | 196:23 197:12,17 |
| 70:1 73:3 84:12 | 140:13 | 5:15 26:25 56:8 | **willises** 33:8 |
| 85:20,22 88:9 | **webex** 55:12 57:1 | 70:14 95:25 | **willisgroup.com.** |
| 133:7 138:19 | 57:5 141:4,4,6 | 130:22 | 131:3 |
| 149:19,23 155:23 | **webinar** 49:19 | **willard** 17:16 | **win** 166:15 |
| 155:24,25 156:4 | 54:4,23,23 55:2,14 | 69:19 78:20 131:9 | **wind** 16:9 |
| 159:21 160:23 | 55:16,19 56:5,23 | 133:10,23 134:19 | **wire** 133:21 |
| 168:11 181:7 | 58:20 120:13,14 | 135:13,23 150:5 | **wish** 194:25 |
| 185:2 190:2 194:8 | 174:25 | **willard's** 134:2 | **withdraw** 129:17 |
| 196:4,5 | **webinars** 48:20,25 | **willis** 1:7,14 3:9,9 | 129:19 147:4 |
| **wanted** 11:16 | 53:18,19 55:7 | 5:4 6:18,18 12:3 | **withdrew** 127:25 |
| 18:23 21:7 50:1 | **week** 28:3 184:1 | 13:1 14:11,18,21 | **withhold** 140:1 |
| 61:16 84:13 90:15 | **weekend** 148:15 | 18:11,12 22:11 | **witness** 2:2 19:5 |
| 92:25 94:24 | **weekly** 148:5 | 23:8,13,16 25:9,15 | 21:18 27:4 37:24 |
| 105:24 132:20 | **weeks** 67:22 90:4 | 25:20 26:1,24 | 46:13 49:16 72:14 |
| 161:11 166:25 | 193:13 198:19 | 32:8 34:3 35:20 | 81:8 89:17 100:7 |
| 169:20 178:6 | **weigh** 10:19 | 35:22 36:7,12,15 | 111:23 112:2 |
| | 145:23 | 37:3,9,13,16 38:6 | 113:17,22 121:18 |
| | | 39:17,21 40:6 | 125:9,16 129:6 |

[witness - zoom]

130:24 133:8
139:17,20 141:15
142:9 146:11
152:1,4 155:1
161:20 167:25
168:9,12 179:2
200:2
**wobbly** 29:14
**woman** 66:3
**women** 165:5,12
**wondering** 27:18
151:22 164:14
170:16
**word** 47:8 50:7,18
63:1,2 107:6
169:3 170:4,5
171:22 178:19,20
**wording** 192:1
**words** 21:6 65:4
153:18 180:18
181:10 192:4
**work** 5:1 9:25
10:25 11:24 12:8
12:9 13:3,4 17:7
27:18 30:21 32:22
36:25 37:8 41:22
41:23,24 42:19
43:18 50:21 51:4
51:16,19 52:13
57:25 59:5,8,13
60:5 65:11,15
66:16 67:17 68:5
77:1,5,6,11 78:22
79:5,10 87:9 89:2
94:18,21,22,23,25
95:2,17 99:7
102:3,4,5,25 103:3
103:7,9,13,17,24
105:25 106:2,3
107:8,11,22 108:2
109:6,19 110:7,9

117:25 118:6
137:15 139:5,23
140:1,6,8,9,14,18
140:19,25 141:8
142:4 150:12
154:5 155:15
156:15 157:24
160:7,8,11 166:25
167:3,7,15,17,18
180:10 182:6,15
183:2,7,21,23,25
184:3,18 187:2,9
188:8,12 190:3,16
192:16 198:16
**worked** 9:15,15,16
9:17 10:10 11:1
17:10 50:22 60:8
60:9 66:4,6,11
90:17 101:24
119:19 138:6
182:11
**working** 11:15,25
18:8,10,12 90:19
90:21 109:22
111:6 124:10
128:23 129:23
133:8 135:12
136:4 148:9
151:21 152:18
163:21,24 165:5
165:12
**workings** 120:10
**world** 61:3 87:7
**worried** 173:13
**worth** 202:25
**wow** 31:1 100:22
**write** 58:1 75:14
77:17 83:11 107:8
107:10 121:16,18
121:24 177:21
194:23,25

**writing** 89:13
121:15 158:22
175:21 197:14
**writings** 175:24
**written** 41:23
82:24 83:10 86:2
152:16
**wrote** 36:25 40:13
40:17,21 43:19
44:14 49:16 102:3
107:11 195:4

---
**x**
---

**x** 103:11 128:10
**xed** 190:18
**xerox** 85:16
**xy** 138:6

---
**y**
---

**y'all** 6:1
**yeah** 12:22 14:16
18:14 19:5,8
21:18 25:2 32:4,8
33:2 37:25 39:15
40:13,23 41:1
42:8,8 43:12,17
45:1 46:18 49:16
51:23 52:5 54:25
54:25 57:1 67:11
68:6,6 69:17
70:20 78:19 82:5
83:6,17,24 89:7,23
90:6 91:20 93:8
93:18 94:7 97:8
101:20,22 102:7
102:18 103:19
104:11,22 107:2
109:3 110:6
113:22 115:19
116:10 118:18,18
118:18,24,24
120:12,14 121:12

125:23 126:6
127:15 131:16
133:20 138:2
139:9 140:7
148:25 149:22
152:10,10 156:12
168:3 171:16
180:12 183:24
187:2 191:1,10
192:22,22 194:20
198:14
**year** 9:10 14:7,12
15:2 18:6 25:6
42:4 109:4 165:10
**years** 10:14 11:1
18:6 64:20 162:15
**yep** 141:15 179:19
**yesterday** 67:11
**york** 11:23
**young** 50:22

---
**z**
---

**zane** 16:14,19,20
16:21
**zoom** 51:13,14

Kramm Court Reporters, A Veritext Company
866-299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.