# EXHIBIT I

Justin Pannu  10/29/2018

```
 1              UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF CALIFORNIA

 3

 4  ENSOURCE INVESTMENTS, LLC, a        )
    Delaware limited liability company,  )
 5                                       )
                Plaintiff,               )
 6                                       )
         v.                              )
 7                                       )Case No.:
                                         )17CV0079 H JMA
 8  THOMAS P. TATHAM, an individual;     )
    MARK A. WILLIS, an individual; PDP   )
 9  MANAGEMENT GROUP, LLC, a Texas       )
    limited liability company; TITLE     )
10  ROVER, LLC, a Texas limited liability)
    company; BEYOND REVIEW, LLC, a Texas )
11  limited company; IMAGE ENGINE, LLC, a)
    WILLIS GROUP, LLC, a Texas limited   )
12  liability company; and DOES 1-50,    )
                                         )
13                Defendants.            )
    _____)

14

15        VIDEOTAPED DEPOSITION OF JUSTIN PANNU

16                SAN DIEGO, CALIFORNIA

17                 OCTOBER 29, 2018

18

19  REPORTED BY BRIDGET L. MASTROBATTISTA, CSR NO. 7715,
            REGISTERED PROFESSIONAL REPORTER
20           REGISTERED MERIT REPORTER
             CERTIFIED REALTIME REPORTER
21

22

23

24

25
```

Justin Pannu  10/29/2018

```
 1            UNITED STATES DISTRICT COURT

 2           SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   ENSOURCE INVESTMENTS, LLC, a        )
     Delaware limited liability company, )
 5                                        )
                  Plaintiff,             )
 6                                        )
         v.                              )Case No.:
 7                                        )17CV0079 H JMA
     THOMAS P. TATHAM, an individual;    )
 8   MARK A. WILLIS, an individual; PDP  )
     MANAGEMENT GROUP, LLC, a Texas      )
 9   limited liability company; TITLE    )
     ROVER, LLC, a Texas limited liability)
10   company; BEYOND REVIEW, LLC, a Texas )
     limited company; IMAGE ENGINE, LLC, a)
11   WILLIS GROUP, LLC, a Texas limited   )
     liability company; and DOES 1-50,   )
12                                        )
                  Defendants.            )
13   _____)

14

15                      -oOo-

16        VIDEOTAPED DEPOSITION OF JUSTIN PANNU,

17   taken by the attorney for the Defendant Mark A.

18   Willis; Beyond Review, LLC; Image Engine, LLc; and

19   Willis Group, LLC, commencing at the hour of 9:30

20   a.m. on Monday, October 29, 2018, at 530 B Street,

21   Suite 350, San Diego, California, before Bridget L.

22   Mastrobattista, Certified Shorthand Reporter No.

23   7715, RPR, RMR, CRR, in and for the State of

24   California.

25
```

Justin Pannu  10/29/2018

```
 1   APPEARANCES:

 2     For the Plaintiff:

 3     PANAKOS LAW APC
       BY:   AARON DAVID SADOCK, ESQ.
 4           BONNIE E. MCKNIGHT, ESQ.
       555 West Beech Street, Suite 500
 5     San Diego, California  92101
       t.619.800.0529
 6     f.866.365.4856

 7    For the Defendants Mark A. Willis; Beyond Review, LLC;
      Image Engine, LLC; and Willis Group, LLC:
 8
       SULLIVAN HILL REZ & ENGEL
 9     BY:   SHANNON D. SWEENEY, ESQ.
       600 B Street, Suite 1700
10     San Diego, California  92101
       t.619.233.4100
11     f.619.231.4372

12   VIA ZOOM:

13     Defendant Pro se:

14     THOMAS P. TATHAM
       1326 Rutland Street
15     Houston, Texas  77008
       email:  tpt@Ingpartners.com

16

17    Mark Willis, via ZOOM

18

19    Videography Services Provided By:

20     PETERSON REPORTING, VIDEO & LITIGATION SERVICES
       BY:   ABEL SIBREL
21     530 B Street, Suite 350
       San Diego, California  92101
22     619.260.1069

23

24

25
```

Justin Pannu  10/29/2018

```
 1                    I N D E X

 2
     WITNESS:    JUSTIN PANNU
 3

 4   EXAMINATION                               PAGE

 5   BY MS. SWEENEY                              9

 6                  E X H I B I T S

 7   EXHIBITS:                                MARKED

 8   1         Amended Notice of Videotaped      20
               Deposition of Person Most
 9             Knowledgeable

10   2         Email exchange with attachments;  115
               Bates-stamped WIL_00000798 to 863
11
     3         Email exchange; Bates-stamped     122
12             WIL_00001501

13   4         Email dated July 9, 2016, with    124
               attachments; Bates-stamped
14             PLTF_000711 to 722

15   5         Email exchange with attached      139
               Executive Summary; Bates-stamped
16             PLTF_000723 to 724

17   6         Email exchange with attached      143
               Confidentiality and Non-Competition
18             Agreement; Bates-stamped PLTF_000726
               to 730
19
     7         Email dated August 2, 2016, with  152
20             attached Subscription Booklet for
               Initial Additional Equity Shares;
21             Bates-stamped PLTF_000763 to 826

22   8         Email exchange; Bates-stamped     177
               WIL_00000884 to 886
23
     9         Email dated August 15, 2016 with  179
24             revision to NDA; Bates-stamped
               PLTF_000862 to 864
25   ///
```

Justin Pannu  10/29/2018

```
 1                  E X H I B I T S (Continued)

 2    EXHIBITS:                                      MARKED

 3    10        Confidentiality and Non-Competition  180
                Agreement; Bates-stamped PLTF_002396
 4              to 2398

 5    11        Email exchange with attached         183
                Preliminary Legal Due Diligence
 6              Checklist; Bates-stamped
                WIL_00001009 to 1029
 7
      12        Email exchange; Bates-stamped        191
 8              WIL_00000865 to 869

 9    13        Email dated August 19, 2016;         199
                Bates-stamped PLTF_001002
10
      14        Email exchange with attachment;      202
11              Bates-stamped WIL_00000982 to 1003

12    15        Email exchange; Bates-stamped        204
                WIL_00000979 to 981
13
      16        Hopewell-Pilot Project, LLC Schedule 208
14              of Consulting and Contractor
                Agreements; Bates-stamped
15              PLTF_000136

16    17        Title Rover, LLC Memo to File, Terms 212
                to be provided in an Amended and
17              Restated Company Agreement";
                Bates-stamped PLTF_000659 to 660
18
      18        Email exchange; Bates-stamped        215
19              PLTF_001058 to 1061

20    19        Email exchange; Bates-stamped        217
                PLTF_001068 to 1075
21
      20        Word document; Bates-stamped         218
22              PLTF_000561 to 565

23    21        Email exchange; Bates-stamped        220
                PLTF_001100 to 1112
24
      22        Email exchange; Bates-stamped        224
25              WIL_00000881 to 883
```

Justin Pannu  10/29/2018

```
 1                  E X H I B I T S (Continued)

 2    EXHIBITS:                                      MARKED

 3    23         Email exchange; Bates-stamped        228
                 PLTF_001130 to 1132
 4
      24         Email exchange; Bates-stamped        231
 5               PLTF_001146 to 1147

 6    25         Email dated August 31, 2016, with    232
                 attached Pro Forma Valuations;
 7               Bates-stamped WIL_00000873 to 877

 8    26         Email exchange with attached Amended 234
                 and Restated Company Agreement of
 9               Title Rover, LLC; Bates-stamped
                 WIL_00001443 to 1473
10
      27         Email dated September 2, 2016, with  236
11               attached Hopewell-Pilot Project, LLC
                 Initial Additional Equity Shares
12               Subscription Agreement;
                 Bates-stamped WIL_00000963 to 978
13
      28         Email dated September 6, 2016;       240
14               Bates-stamped PLTF_001253

15    29         Email exchange; Bates-stamped        245
                 WIL_00001401 to 1402
16
      30         Email exchange; Bates-stamped        246
17               PLTF_001451 to 1454

18    31         Email dated September 9, 2016;       251
                 Bates-stamped PLTF_001559
19
      32         Email exchange; Bates-stamped        254
20               WIL_00001394 to 1400

21    33         Email exchange; Bates-stamped        256
                 PLTF_001705 to 1706
22
      34         Email exchange with attached         260
23               Hopewell-Pilot Project, LLC Initial
                 Additional Equity Shares
24               Subscription Agreement;
                 Bates-stamped WIL_00000933 to 952
25    ///
```

Justin Pannu  10/29/2018

```
 1                    E X H I B I T S (Continued)

 2    EXHIBITS:                                      MARKED

 3     35        Email exchange; Bates-stamped        282
                 PLTF_001975 to 1977
 4
       36        Email exchange; Bates-stamped        284
 5               PLTF_001970 to 1971

 6         QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

 7                     PAGE      LINE

 8                       36       21

 9                       51       21

10                      102        2

11                      112       22

12                      219       24

13                      287        6

14                      298       11

15                      299        5

16

17

18

19

20

21

22

23

24

25
```

Justin Pannu  10/29/2018

```
 1                  SAN DIEGO, CALIFORNIA
 2              MONDAY, OCTOBER 29, 2018
 3                      9:30 A.M.
 4              THE VIDEOGRAPHER:  Good morning.  The time
 5    on the record is 9:30 a.m.  Today's date is
 6    October 29th, 2018.
 7              My name is Abel Sibrel with
 8    Peterson Reporting, Video & Litigation Services.
 9              The court reporter today is
10    Bridget Mastrobattista of Peterson Reporting located
11    at 530 B Street, Suite 350, San Diego, California
12    92101.
13              This begins the videotaped deposition of
14    Justin Pannu testifying in the matter of
15    EnSource Investments versus Thomas Tatham,
16    Case No. 17CV0079 H JMA, taken at Peterson
17    Reporting.
18              Will counsel please identify yourselves
19    and state whom you represent.
20              MR. SADOCK:  Aaron Sadock on behalf of the
21    plaintiff.
22              MS. MCKNIGHT:  Bonnie McKnight on behalf
23    of plaintiff.
24              MS. SWEENEY:  I'm Shannon Sweeney
25    appearing on behalf of Mark Willis, Image Engine,
```

Justin Pannu  10/29/2018

1    Beyond Review and the Willis Group.

2            And on the video conference is Mark Willis

3    who noticed this deposition.

4            THE VIDEOGRAPHER:  Thank you.

5            The court reporter may now swear in the

6    witness.

7            MS. SWEENEY:  Sorry.  We should also say

8    that Tom Tatham, who is representing himself in this

9    litigation, is also appearing by video conference.

10

11                    JUSTIN PANNU,

12   having been first duly sworn, testified as follows:

13

14                    EXAMINATION

15   BY MS. SWEENEY:

16       Q   **Good morning.**

17       A   Good morning.

18       Q   **Can you please state your name for the**

19   **record, please.**

20       A   Justin Singh, S-I-N-G-H, Pannu, P-A-N-N-U.

21       Q   **And have you ever given a deposition**

22   **before?**

23       A   Yes.

24       Q   **How many times?**

25       A   Twice.

Justin Pannu  10/29/2018

1      Q     When was the last time?

2      A     If I remember correctly, 2016.

3      Q     And the time before that?

4      A     I believe it was in -- between 1999 and

5   2002.  It was quite a while ago.  That may not even

6   be correct.

7      Q     In those cases where you gave depositions

8   were you parties -- a party to those cases?

9      A     Yes.

10     Q     How many lawsuits have you been a party

11  to?

12     A     I think four.

13     Q     Have you ever been a defendant in a

14  lawsuit?

15     A     Yes.

16     Q     How many of the four?

17     A     One.

18     Q     And the other three you were a plaintiff?

19     A     Yes.

20     Q     Can you give me the names of the four

21  lawsuits that you were involved in, please?

22     A     The first one was in Canada.  That was --

23  I believe it is N-G-U-Y-E-N versus a number of

24  defendants, including myself.

25     Q     What type of case was that?

Justin Pannu  10/29/2018

```
 1        A     That was -- I believe it was something to

 2   do with a tender being copied or misappropriated.

 3        Q     The allegation was the --

 4        A     The allegation was that a tender for a

 5   transportation service was misappropriated or copied

 6   from a competing tender.

 7        Q     Like a tender offer?

 8        A     A tender to provide service to the airport

 9   for an airport shuttle service.

10        Q     And was that one of the cases where you

11   were deposed?

12        A     Yes.

13        Q     So that was back in the 1999 to 2002 time

14   frame?

15        A     Yes.

16        Q     How did that case resolve?

17        A     It settled.  And I believe the terms are

18   confidential.

19        Q     And what was the next lawsuit that you

20   were involved in?

21        A     About 16 years later, 2016, it was myself

22   versus Coin-Op.

23        Q     Coin-Op?

24        A     Coin-Op.

25        Q     And what did that case involve?
```

Justin Pannu  10/29/2018

```
 1       A    That case involved fraudulent concealment.

 2  Allegation of fraudulent concealment.

 3       Q    In connection with what?

 4       A    In connection with opening a first right

 5  of refusal.  I didn't know that they had opened a --

 6  or they were going to open a -- another Coin-Op when

 7  I was buying out -- when -- after -- as my interest

 8  was being bought out.

 9       Q    This was a case that involved your

10  purchase of an interest in a business?

11       A    Yes.  My purchase in an interest in a

12  business.

13       Q    And your allegation was that the defendant

14  in that case failed to disclose information in

15  connection with your purchase of that interest?

16       A    In the sale of my interest back to them.

17       Q    And how did that case resolve?

18       A    It settled.

19       Q    When did it settle?

20       A    I don't remember.  Do you remember?  I

21  don't remember.  I think it was -- I think it was

22  2016.

23       Q    Several years ago?

24       A    Yeah, several years ago.  2016.

25       Q    And what was the next lawsuit that you
```

Justin Pannu  10/29/2018

```
 1   were involved with?

 2        A    AD Nightclub.

 3        Q    I'm sorry?

 4        A    AD.

 5        Q    80, eight zero?

 6        A    AD, A as in apple, D as in delta

 7   nightclub.

 8        Q    Were you the only plaintiff in that?

 9        A    No.

10        Q    Who else was a plaintiff?

11        A    Well, the civil -- let me correct that.

12   The civil suit, I believe I was the only plaintiff

13   in the civil, California suit, and the -- there were

14   a number of other investors that sued as well, but

15   not part of my suit.

16        Q    And what was the gist of your allegations

17   in that case?

18        A    That he had -- for the civil suit,

19   there's -- it's transferred or it's now in federal

20   court, bankruptcy, as a fraud case with a number of

21   other investors.

22        Q    And the allegations?

23        A    The allegation is that he -- in the

24   federal court is that he solicited investment having

25   said that he had -- into an operating company that
```

Justin Pannu  10/29/2018

1    was operating the nightclub, but we later found out

2    that that operating company was not operating the

3    nightclub.

4              And he -- unbeknownst to the investors he

5    had taken a management fee of 5 percent off the

6    revenue.  And there were a couple other claims I

7    can't remember, but...

8         **Q    So this is a case where you invested into**

9    **a business?**

10        A    Into a business, yes.

11        **Q    Was that via a private placement**

12   **memorandum?**

13        A    That was introduced to me by a friend

14   Chris Martin.

15        **Q    And was the investment via a private**

16   **placement memorandum?**

17        A    It was via a private placement memorandum,

18   I believe.

19        **Q    And did you conduct due diligence in**

20   **connection with that investment prior to making the**

21   **investment?**

22        A    I had asked a few questions but not

23   extensive because of our personal relationship with

24   Chris Martin.

25        **Q    And was Chris Martin one of the**

Justin Pannu  10/29/2018

1    **defendants?**

2        A    No.  He was the manager that I knew.

3        **Q    Did you file a lawsuit against**

4    **Chris Martin in connection with what you claim to be**

5    **I guess --**

6        A    It was Bayless Cobb that I filed the suit

7    against.  Chris Martin didn't represent things to

8    me.  He just introduced me to Bayless.

9        **Q    But if I understand correctly, the reason**

10   **why you entered into the investment without doing a**

11   **lot of due diligence is because of your connection**

12   **with Chris Martin, correct?**

13           MR. SADOCK:  Objection.  Misstates

14   testimony.

15           THE WITNESS:  The -- Chris Martin

16   introduced me to the investment.  And I did do some

17   due diligence.  There wasn't an extensive due

18   diligence performed, but, yes, there was do you have

19   any loans?  What accounting system are you using?

20   Things like that.

21   BY MS. SWEENEY:

22       **Q    And your allegations in that lawsuit is**

23   **that the defendant misled you into making that**

24   **investment; is that right?**

25       A    Yeah, the California suit where I was the

Justin Pannu  10/29/2018

1    lone plaintiff, I believe, if I remember correctly,

2    he had misrepresented that he did not -- that he

3    did -- sorry.  He represented that he did not have

4    any loans, and we found out later through a lawsuit

5    from other investors that he did actually, in fact,

6    have loans from those investors.

7         Q    When was that case filed?

8         A    The civil?  In California, I don't

9    remember.  The one in federal court with the other

10   investors was -- I believe it was this year.

11        Q    And the one in California, was that within

12   several years of this year in the 2016 to 2018 time

13   frame?

14        A    The 20- -- which?  Sorry.  Could you

15   clarify.

16        Q    The case that you filed in California.

17        A    The case I filed in California was -- I

18   don't remember when that was filed, but it was

19   between 2016 and 2018.

20        Q    Okay.  And how did that case resolve?

21        A    He filed bankruptcy.  So it moved to

22   federal court with a bunch of other plaintiffs.

23        Q    Is it still pending in federal court?

24        A    It's still pending in the bankruptcy

25   proceeding.

Justin Pannu  10/29/2018

 1      Q    And you've several times mentioned it

 2  being a civil case, which is leading me to wonder if

 3  there is also a criminal case connected with that.

 4  Is that the case?

 5          MR. SADOCK:  Objection.  Calls for a legal

 6  conclusion.

 7          THE WITNESS:  I don't know.

 8  BY MS. SWEENEY:

 9      Q    I just am trying to clarify.  You're

10  talking about a civil case on the one hand and then

11  you're also talking then about the bankruptcy.

12      A    Oh, when I say civil --

13      Q    Excuse me.

14      A    Sorry.  My bad.

15      Q    Let me finish asking the question.

16      A    Yeah.

17      Q    And then you're also talking about a

18  bankruptcy case.

19          Are those the two cases you're familiar

20  with in connection with those facts?

21      A    I don't quite understand your question,

22  but I can try to answer.

23      Q    Thank you.

24      A    Okay.  So the -- the case in California

25  civil court and the case in the bankruptcy court are

Justin Pannu  10/29/2018

1    the same person, are the same defendant.  He filed

2    for bankruptcy; therefore, the case in California

3    was stayed.  And there were a number of other

4    plaintiffs that joined who he had misrepresented the

5    same things too in the federal case.

6        **Q     And are those the only two cases that**

7    **you're aware of related to the same incident?**

8        A     There's -- well, there's another case, I

9    believe, that was filed in the California courts

10   from other investors that are not involved in the

11   federal case.

12       **Q     Okay.  And then you mentioned being**

13   **involved in one other lawsuit.**

14       A     This one.

15       **Q     And this one.  Okay.**

16       A     Yeah.

17       **Q     All right.  So you're doing a pretty good**

18   **job of answering the questions after I ask them.**

19   **Throughout the day let's just make a attempt to**

20   **allow me to finish my question.  I will allow you to**

21   **finish your answer, and then we can make sure we**

22   **have a good record.**

23           **You understand that you're under oath**

24   **today?**

25       A     I do.

Justin Pannu  10/29/2018

1      Q     And that you are committed to providing

2  your best, most accurate, most truthful testimony.

3            Do you understand that?

4      A     Yes.

5      Q     And you understand that this is

6  Mark Willis who has noticed this deposition.  This

7  is my only opportunity on his behalf to ask you

8  questions.

9            Do you understand that?

10     A     I understand.

11     Q     So I'm anticipating that you will answer

12  truthfully and that you will provide as

13  comprehensive answers as you can give today.

14            Can you commit to do that?

15     A     Yes.

16     Q     If I ask a question that you don't

17  understand, please ask me to or tell me you don't

18  understand it.  I will try and rephrase it or try

19  and make sure that you understand it.  But if you do

20  answer the question, I'm going to assume that you

21  have understood it.

22            Does that make sense?

23     A     Yes.

24     Q     Okay.  At any point today if you feel like

25  you are not capable of giving the most comprehensive

Justin Pannu 10/29/2018

1    and honest testimony that you're capable of, if you

2    could let me know I would appreciate it.

3         A    I will.

4         Q    Okay.  And at the end of this deposition

5    process, after the deposition -- after the court

6    reporter has time to take everything down, she will

7    provide a transcript that you will have an

8    opportunity to review.

9              And you are allowed to make changes to

10   that, to make corrections, but if you make

11   substantive changes, I at trial in this matter am

12   allowed to comment about those, and I'm allowed to

13   draw inferences about the changes to your testimony.

14             Do you understand that?

15        A    I do.

16        Q    Okay.  You are here today because we

17   noticed the deposition of the person most

18   knowledgeable of EnSource Investments.  You were

19   designated as that person.

20             Do you understand that?

21        A    I understand that I'm designated as that.

22        Q    Okay.  I'm going to -- I'm going to hand

23   you what we'll mark as Exhibit 1 to this deposition.

24             (Exhibit 1 was marked.)

25   ///

Justin Pannu  10/29/2018

```
 1              THE WITNESS:  I just want to add to that
 2    answer that there are a number of other members that
 3    were involved in the due diligence.
 4              So for a complete record, you're going to
 5    need to ask -- there are representations that were
 6    made to them as well, and you'll need to ask them if
 7    I don't know certain things.
 8    BY MS. SWEENEY:
 9        Q    And we'll go through that because I want
10    to talk about specific things that were said.  But
11    for the purpose of today, if you will look at this
12    document.  Have you seen it before?
13        A    Yes.
14        Q    So for the record, this is the Amended
15    Notice of Videotaped Deposition of the Person Most
16    Knowledgeable for EnSource Investments.
17              If you turn to page 3, please.  There's a
18    section entitled "Matters for examination."  Do you
19    see that?  And then there are 18 different topics
20    that have been listed.
21        A    I see that.
22        Q    You have been designated and brought here
23    today to provide testimony on behalf of
24    EnSource Investments on those 18 topics as being the
25    person most knowledgeable.
```

Justin Pannu  10/29/2018

```
1              Do you understand that?
2       A    I am generally knowledgeable about these
3  18 topics, but if we're getting into the minutia,
4  there are other members where Willis made
5  representations or to whom Willis made
6  representations to, and for a complete record,
7  you'll need to ask the other members about the
8  details of these topics as well, but generally, yes,
9  there -- I'm knowledgeable of -- on a high level of
10 these topics.
11      Q    So as a general rule going forward for
12 today, let's -- let's say that if we get to a topic
13 and you believe there is somebody within the
14 EnSource organization that has more knowledge than
15 you, that you will tell me.
16      A    Yes.
17      Q    Can you do that?
18      A    I can do that.
19      Q    And if you don't tell me, I'm going to
20 assume that you gave is the answer on behalf of
21 EnSource.  Okay?
22           MR. SADOCK:  Justin, do you understand the
23 condition?
24           THE WITNESS:  I think I do.  Okay.
25           MR. SADOCK:  If you're not sure, ask her
```

Justin Pannu  10/29/2018

```
 1   to rephrase it.
 2              THE WITNESS:  Could you just repeat it one
 3   more time.
 4   BY MS. SWEENEY:
 5       Q    Sure.  Because you've been designated as
 6   the spokesperson for EnSource today --
 7       A    Right.
 8       Q    -- and the person who has the most
 9   knowledge --
10       A    Got you.
11       Q    -- for this entity, if you don't tell me
12   that somebody else has more knowledge than you and
13   you give me an answer, I'm going to assume that that
14   answer is the best answer on behalf of EnSource.
15   Okay?
16       A    I'll -- okay.  I will try to do that.
17       Q    Well, I need -- I actually need you to
18   commit to that, because that's the whole point of
19   today is that you are the spokesperson of EnSource,
20   and so if you don't tell me otherwise, I'm going to
21   assume that the answer that you're giving is on
22   behalf of EnSource.
23       A    I will try to let you know about the
24   answers.  I will -- I'll -- you know, there are a
25   number of other investors involved in this and there
```

Justin Pannu  10/29/2018

```
 1    is -- in the due diligence aspects of it.  So when

 2    you ask me a question, I will think carefully as to

 3    whether I know that answer.

 4         Q    I appreciate that.  And I want you to

 5    think carefully and I want you to be sure about the

 6    answers that you are giving, but going forward, if

 7    you do not tell me that somebody else has more

 8    information, I am entitled, because of the type of

 9    deposition that this is, to assume and rely on the

10    fact that that information is being given on behalf

11    of EnSource.

12         A    Okay.  You can do that.

13         Q    Okay.  Thank you.

14              Before we get into the substance, can you

15    tell me a little bit about you.  I would like to

16    know about your education background.

17         A    I have a Bachelor's in business from the

18    University of Victoria in British Columbia, Canada.

19    Bachelor's in commerce.  Sorry.  That's the

20    Bachelor's in commerce.  And then an MBA from

21    Queen's University in Kingston, Ontario, Canada.

22         Q    And that's the highest level of education

23    you've --

24         A    Yes.

25         Q    -- attained?
```

Justin Pannu  10/29/2018

1                    **Do you have any certificates?**

2          A     At one point I had a Canadian securities

3    course certificate.

4          **Q     Has that lapsed?**

5          A     I believe so.

6          **Q     Do you have any licenses other than a**

7    **driver's license?**

8          A     No.

9          **Q     Tell me briefly about your work history**

10   **post-college.**

11         A     My first employment was with Powerex, a

12   power trading firm out of Vancouver, Canada.

13         **Q     Was that trading on public securities**

14   **markets?**

15         A     No.  It was a -- I wasn't trading at

16   Powerex.  I was scheduling.  It was straight out of

17   college.  And it -- so that -- I guess your question

18   is moot at that point because I wasn't trading.

19         **Q     When you say "scheduling," what does that**

20   **mean?**

21         A     It means that we have traders that trade

22   the power, and what I would do is physically

23   transport that power for them.

24         **Q     And what year did you graduate from**

25   **college?**

Justin Pannu  10/29/2018

1      A    2000.

2      **Q    So how long did you work at Powerex?**

3      A    About a year and eight months.

4      **Q    And then what?**

5      A    And then I moved to Santa Clara to work

6    for a firm called APX.  It was a scheduling service

7    provider to entities that trade power or schedule

8    power.

9      **Q    What did you do there?**

10      A    I was in operations for about six --

11    maybe -- I don't remember how long I was there, but

12    it was a few months.

13      **Q    You only stayed at that job for a few**

14    **months?**

15      A    Before I moved to Solutions.

16      **Q    The company is called Solutions?**

17      A    It was Sempra Energy Solutions at the

18    time.  I'm still with the company.  And that was in

19    2003.  And it was Sempra Energy Solutions, and it

20    became Noble Americas Energy Solutions in 2000 -- I

21    think it was '10.  I'm not sure.  And then we're now

22    Calpine Energy Solutions.  Calpine headquartered out

23    of Houston had purchased Solutions from Noble.

24      **Q    Do you work out of Houston?**

25      A    I work out of San Diego.

Justin Pannu  10/29/2018

```
 1        Q     Do you work out of your home or do they
 2   have an office here?
 3        A     The -- because the original company for
 4   the retail energy portion of this -- for the retail
 5   energy was first formed by Sempra, it continued to
 6   be head- -- the retail energy and gas headquarters
 7   stayed in San Diego.
 8        Q     So the entire time you worked for
 9   Sempra Energy or its various names?
10        A     Various names.  I call it Solutions from
11   2003 to now.
12        Q     So were you in San Diego that whole time?
13        A     Yes.
14        Q     Okay.  What were your jobs at -- beginning
15   at Solutions in 2003?
16        A     I was in operations and scheduling.  The
17   same.  And then I was Director of Operations until
18   last -- I moved out from manager to director I'm not
19   sure what time frame, but I was Director of
20   Operations until July, I believe.  Now I'm Director
21   of Portfolio Management and Operations.
22        Q     Is that a senior-level job?
23        A     I report to the vice president, so I don't
24   know if it's midlevel or senior level.
25        Q     Do you have reports?
```

Justin Pannu  10/29/2018

```
 1       A    I have one report.

 2       Q    Does your job involve investing?

 3       A    No.

 4       Q    Does it involve trading?

 5       A    Yes.

 6       Q    How so?

 7       A    My main function is to trade power that

 8  our sales folks sell to our fortune -- or just

 9  commercial industrial-type customers.  And we have a

10  sales force that does that.  I manage the portfolio

11  by hedging.  I don't trade, but I hedge the power.

12  And -- and the -- then I manage the physical power,

13  and I only trade the financial gas as a dirty hedge

14  to power and not physical gas.

15       Q    And is that on a public market?

16       A    That's on ICE or through the broker

17  markets, which is how I met Chad Martin.

18       Q    What's your experience in oil and gas?

19       A    Other than financial trading gas for the

20  purpose of hedging power positions, none.

21       Q    How much do you need to know substantively

22  about the oil and gas market about wells, about

23  digging, in order to do your job?

24       A    I think I need -- I don't need to know

25  that much about it other than, say, gas moves the
```

Justin Pannu  10/29/2018

1    power markets.  So I would need to know how much

2    storage, what storage.

3          I don't know much about transport or the

4    physical capabilities of gas, but I do know that the

5    power, the generators used -- the generators in

6    California are the marginal unit, the gas fire

7    generators.

8          So to the extent I have to know certain

9    things about heat rates and how power plants use gas

10    in terms of wells and productions and fracking and

11    how -- you know, I have general knowledge of that,

12    but how they go through leasing and how they produce

13    and build the physical capability.

14          I actually haven't transported gas or I

15    don't have -- I don't think I have the knowledge

16    that, say, a physical gas trader would or an actual

17    gas trader would.

18    **Q   Do you have any other employment that we**

19    **haven't covered yet?**

20    A   Other than working for my parents at the

21    airport shuttle service, that was -- that was it.

22    **Q   And when did you do that?**

23    A   That was from '96 when I was going to

24    college.

25          Oh, and BC Investment Management

Justin Pannu  10/29/2018

1  Corporation, I was in equities there.  That was an

2  internship in college.

3      **Q     When did you get your MBA?**

4      A    I think it was 2007.

5      **Q     And that is something that you did while**

6  **you were employed at Solutions?**

7      A    I did.  I was flying to Kingston to -- for

8  that MBA program which was over a weekend.  Well,

9  Kingston and Vancouver.

10     **Q     The course was over a weekend?**

11     A    Yeah, the courses were over weekends.  It

12  was for M -- for those who could -- for those people

13  who were working and already had a Bachelor's in

14  business degree, and it was an MBA that was taught

15  out of Vancouver most of the time and Kingston some

16  of the time.

17         And I would fly over the weekend.  It

18  would be taught on the weekends or -- and a Monday,

19  and I would fly back.  They gave me the flexibility

20  at work to be able to do that.

21     **Q     Was that a two-year program?**

22     A    That was a -- I don't remember how long it

23  was.  It was -- it wasn't more than two years.  I

24  think it was -- might have been just one year,

25  because if you had a Bachelor's degree already, it

Justin Pannu  10/29/2018

1    might have been a year.

2         **Q     And did you go every weekend during that**

3    **year --**

4         A     I did.

5         **Q     -- to Canada?**

6         A     I did go to Canada during that weekend.

7    Well, every second weekend would be the course.  So

8    every second weekend.

9         **Q     So I noticed when you were going through**

10   **the lawsuits that you've been involved in that you**

11   **have some experience with investing in other outside**

12   **endeavors.**

13            **Are you involved in any investments right**

14   **now?**

15        A     I am.

16        **Q     What are those?**

17        A     With Chad Martin in real estate in -- in

18   Houston.

19        **Q     How long have you been involved in that?**

20        A     I believe 2016.

21        **Q     You made the investment in 2016?**

22        A     It's an ongoing investment.  So the first

23   investment was 2016, you know, in the number of

24   different companies or entities that held real

25   estate for rehabs or development.

Justin Pannu  10/29/2018

1      Q     And do you have an entity that was created
2    in order to make that investment?
3      A     There was a few entities that were
4    created, yes.
5      Q     What are the names of those entities?
6      A     One of them -- the first was
7    CMSK Ventures.
8      Q     CMSK?
9      A     CMSK Ventures.  The other one is -- and
10    that held the two rehabs.
11          The other one is -- I don't remember the
12    address, but it's a numbered address, Woodthorpe,
13    LLC.
14      Q     Are those --
15      A     And then --
16      Q     Excuse me.
17      A     There is one called JPCM Ventures, LLC.
18          And there are a number of companies on the
19    shelf that we have created that we haven't actually
20    used yet.  So I don't remember what they were, but
21    if you want them I can get them.
22      Q     The CMSK Ventures, is that an LLC as well?
23      A     Yes.
24      Q     And is Chad Martin the other -- the only
25    other member in those three entities?

Justin Pannu  10/29/2018

1       A     No.  It is Cliff Sharp in CMSK.  And

2  Scott Kelly in CMSK.  And it is myself and

3  Chad Martin in Woodthorpe and JPCM.  I believe JPCM

4  now owns Woodthorpe.  And Queenswood.  There's

5  6102 Queenswood, LLC.  That's Chad and I also.

6       **Q     Are all of those Houston-based LLCs?**

7       A     They are.

8       **Q     And are they all involved in real estate?**

9       A     They are all involved in real estate, yes.

10      **Q     Is that purchasing different types of real**

11 **estate as investments?**

12      A     That is -- we -- that is either purchasing

13 them for rehabs or purchasing for the purpose of

14 developing new -- a spec home.

15      **Q     So is the business model that you purchase**

16 **rehab and then sell or is it to purchase rehab and**

17 **rent?**

18      A     At first it was to purchase rehab and

19 sell.  Now it is to purchase lots or homes with --

20 or lots with homes that can be torn down and then

21 redeveloped by a builder that we have.

22      **Q     And are all of the properties being**

23 **purchased in Houston?**

24      A     Yes.

25      **Q     How much money do you have invested in the**

Justin Pannu  10/29/2018

1   **entities we just discussed in Houston?**

2            MR. SADOCK:  Objection.  Relevancy.

3   BY MS. SWEENEY:

4        Q    **You can answer.**

5        A    I can answer?  I don't want to answer

6   incorrectly, so I have to -- can I take a break and

7   figure that out or --

8        Q    **I don't need an exact amount, if you can**

9   **just give me an estimate.**

10       A    It is how much have I invested?

11       Q    **Yes.**

12       A    Including what I've gotten back or --

13       Q    **How much did you initially contribute.**

14   **Let's start there.**

15       A    My equity in the companies?  Is that what

16   you're talking about.  The equity --

17       Q    **That's fine.**

18       A    -- the equity in the companies is a total

19   right now outstanding of 320,000.  And I think that

20   we have 320- and -- sorry.  I just really have to do

21   the math on this.  And I think there's 390,000 in

22   notes.

23       Q    **Are you involved in any other investment**

24   **groups at the moment?**

25       A    So just give me -- you know, for that

Justin Pannu  10/29/2018

1    answer you'll have to -- I may have to supplement it

2    because I don't remember exactly the figures, but I

3    think it's around there.

4        **Q    No, the money amount you just told me**

5    **about?**

6        A    The money amount.

7        **Q    Okay.  Are you involved in other**

8    **investments at the moment?**

9        A    I have an investment in Canada in real

10   estate.  It's a house that I own by myself.  And

11   then that's it.

12       **Q    Do you own a property here in San Diego?**

13       A    Oh, I do.  That's my personal residence.

14       **Q    Just one residence in San Diego?**

15       A    (Witness nods head.)  Yes.

16       **Q    Do you own any property anywhere else?**

17       A    I have -- well, actually I don't anymore.

18   I had one in India that I inherited.  But it's now

19   in my mom's name.

20       **Q    So any other investments that you're**

21   **involved in right now?**

22       A    Other than the public stock market, some

23   index funds that I'm involved in, no.

24       **Q    Have you ever invested in tech companies?**

25       A    Oh, yes, there was another investment.  It

Justin Pannu  10/29/2018

```
 1    was Fantasy Hub.  And that was with Chad Martin and

 2    Jerry Johns, who is also involved in this

 3    investment.  And there's a few other members that I

 4    don't remember who they were.

 5         Q    And is that an ongoing investment?

 6         A    No.  That investment ended a few years

 7    ago.

 8         Q    How did it end?

 9         A    It -- if I remember correctly, there were

10    some change in laws that occurred for daily fantasy

11    sports.  That's what that was.  And we did -- we --

12    you know, the agreement was amended and we didn't

13    put the rest of our money in because we were spooked

14    by those change in laws.

15         Q    Did you end up in a lawsuit related to

16    that investment?

17         A    No.

18         Q    Have you been involved in any lawsuits

19    related to the investments we discussed in Houston?

20         A    No.

21         Q    Are you anticipating any lawsuits in

22    those?

23         A    I don't know.

24              MR. SADOCK:  Objection.  Calls for a legal

25    conclusion, relevancy and privileged communications.
```

Justin Pannu  10/29/2018

```
 1              Don't answer that.
 2    BY MS. SWEENEY:
 3         Q    Are you following your lawyer's advice?
 4         A    Yes.
 5         Q    Are you happy with the investments that
 6    you have going in Houston right now that you
 7    discussed?
 8         A    The -- I believe they've made money, and
 9    from that aspect of things, yes.  They're -- they're
10    fine investments.  So far we've made money on the
11    few investments that we've had or the -- for the few
12    rehabs so -- and I think we will make money on the
13    two other projects we will have.
14         Q    Is Chad Martin the one managing those
15    investments?
16         A    He is the CEO, yes.
17         Q    Is somebody else involved with managing
18    those investments?
19         A    Our builder Brian, but he's not a partner.
20         Q    Are you happy with Brian?
21         A    Yes.
22         Q    Are you happy with the work that Chad's
23    doing on your behalf?
24         A    From an operational perspective, yes.
25         Q    How about in other perspective?
```

Justin Pannu  10/29/2018

```
 1            MR. SADOCK:  Objection.  Vague and
 2   ambiguous as to time and "happiness."
 3            THE WITNESS:  There are some
 4   disagreements.  There are some issues with, you
 5   know, Chad -- there might be some issues, I don't
 6   know, with financial obligations that Chad might owe
 7   to JPCM.
 8   BY MS. SWEENEY:
 9       Q    And do those relate to debt that he may
10   have?
11       A    Yes.  With JPCM.
12       Q    And is that debt that you were previously
13   unaware of?
14       A    I was aware of that debt.  I wrote the
15   note.
16       Q    Does he owe you money?
17       A    He owes me money, yes.
18       Q    How much is he in arrears?
19            MR. SADOCK:  Objection.  Calls for a legal
20   conclusion.
21            THE WITNESS:  In arrears to JPCM, he is
22   approximately 80- to 85,000 or so.  In arrears to
23   me, he is -- the note says it's 390,000 personally.
24   BY MS. SWEENEY:
25       Q    How much in arrears is he on the 390,000?
```

Justin Pannu  10/29/2018

1        A      The note is due and payable as of

2   September 30th.

3        Q      **Are you worried that that debt won't get**

4   **resolved?**

5        A      Yes.

6        Q      **I want to learn about EnSource.  Why --**

7   **what is EnSource?**

8        A      EnSource is a company that was formed for

9   the purpose of investing in Hopewell.

10       Q      **Who are its members?**

11       A      Its members are the Kilimanjaro group,

12   myself, Cliff Sharp and Chad Martin.

13       Q      **Was anyone else ever a member?**

14       A      No.

15       Q      **Kilimanjaro is affiliated with**

16   **Jerry Johns; is that correct?**

17       A      Jerry Johns, yes.

18       Q      **What's the affiliation there?**

19       A      He's a member of Kilimanjaro.

20       Q      **Is he the managing member?**

21       A      As far as I know.  I don't know exactly.

22       Q      **What does Kilimanjaro do?**

23       A      I --

24              MR. SADOCK:  Objection.  Calls for

25   speculation.

Justin Pannu  10/29/2018

1            THE WITNESS:  I don't know.  I don't know.
2    They're just a group.  They're a member of EnSource.
3    BY MS. SWEENEY:
4        Q    **Did you do any sort of due diligence on**
5    **the members of EnSource before they became members?**
6        A    Other than that they're my friends and
7    that I've known them for quite some time, no.
8        Q    **Jerry Johns is your friend?**
9        A    Yes.
10       Q    **How long have you known him?**
11       A    Over, I think, quite a number of years.
12   No, I couldn't tell you.  I think maybe ten?  I
13   don't know.
14       Q    **Did you ever ask him what Kilimanjaro did?**
15       A    I don't remember what -- I don't remember
16   what he did.  I don't know -- I do have some vague
17   memory that he might have told me they formed
18   Kilimanjaro for the purpose of investing in
19   EnSource.  Or they had that on the shelf.
20       Q    **So you're using the word "they."  Does**
21   **that mean that Kilimanjaro has more than one member?**
22       A    Yes.
23       Q    **Who are the other members of Kilimanjaro?**
24       A    James Dibble.  Jeff Merola.  And there's
25   another member.  I don't know who it is.  And there

Justin Pannu  10/29/2018

```
 1    might be other members.  I don't know who they are.
 2       Q    Do you know James Dibble?
 3       A    I do know James Dibble.
 4       Q    Is he a friend?
 5       A    No.  He's -- I know him because of Jerry.
 6       Q    And is Jeff Merola a friend?
 7       A    No, I know him because of Jerry.
 8       Q    How long have you known James Dibble?
 9       A    I've met him probably two or three times.
10       Q    And Jeff Merola?
11       A    Once.
12       Q    How long have you known Cliff Sharp?
13       A    I believe since July of 2016.
14       Q    Was that in connection with this
15    investment that you met him?
16       A    I believe so, as far as I remember, yeah.
17       Q    And how long have you known Chad Martin?
18       A    Since I believe 2007.  It's approximate.
19       Q    Other than the investments that we've
20    discussed with Chad Martin, have you done any sort
21    of investing with any of the other people that you
22    just mentioned any of the other members of EnSource?
23       A    I have with Chad -- with Jerry.  With
24    Jerry's group.  I have -- we've done Fantasy Hub.
25       Q    And by Jerry's group, do you mean
```

Justin Pannu  10/29/2018

1   **Kilimanjaro?**

2        A    I don't know if it was Kilimanjaro at that

3   time.  I don't think it was.

4        **Q    And when you say Jerry's group, do you**

5   **mean the group that includes James Dibble and**

6   **Jeff Merola?**

7        A    Yeah.  And maybe other people that I don't

8   know about.

9        **Q    They were involved in the Fantasy Hub?**

10       A    Yes.

11       **Q    Okay.  When you formed EnSource, was there**

12  **any sort of requirement for someone to become a**

13  **member?**

14            MR. SADOCK:  Objection.  Vague as to time.

15  Ambiguous as to "requirement."

16            THE WITNESS:  Other than we were friends,

17  I don't remember being any requirement.

18  BY MS. SWEENEY:

19       **Q    There wasn't a requirement that somebody**

20  **had a certain amount of net worth or a certain**

21  **amount of money to invest?**

22       A    Oh, yes, I'd asked -- because the Hopewell

23  subscription agreement had asked for a net worth, I

24  had asked if everybody was accredited.  And I got a

25  yes from everybody.

Justin Pannu  10/29/2018

1       Q     Did you ask it just like that, "Are you
2  accredited?"
3       A     Yes.  "Are you accredited?"  That's it.
4       Q     What do you understand accredited to mean?
5             MR. SADOCK:  Objection.  Calls for a legal
6  conclusion.
7             THE WITNESS:  I believe it was over -- I
8  believe it was a SEC definition at the time, and I
9  don't remember what that was, but I just asked if
10  they were accredited.
11  BY MS. SWEENEY:
12       Q     Do you have a appreciation as to what it
13  means?  Does it require a certain net worth?  Does
14  it require --
15       A     Yeah, I didn't ask exactly what -- it just
16  said -- everyone seemed to know what that meant.
17  And they just said yes.  So I -- for me, I don't
18  remember the amounts, but I think it was 200- or
19  250- for the last two years, and a million dollars
20  net of your residence or something like that.
21       Q     Were you an accredited investor?
22       A     I'm an accredited investor.
23       Q     You are now?
24       A     I am now as well.
25       Q     You were in 2016?

Justin Pannu  10/29/2018

```
 1        A    I was -- I was as well in 2016.

 2        Q    And that was based on what?

 3        A    Based on my income in the last two years.

 4             MR. SADOCK:  Just objection -- standing

 5   objection to legal conclusion for the last four

 6   questions.

 7             MS. SWEENEY:  What's the objection?

 8             MR. SADOCK:  Calls for a legal conclusion.

 9   BY MR. SADOCK:

10        Q    Are you married?

11        A    No.

12        Q    Have you been married?

13        A    No.

14             MR. SADOCK:  Justin, if you could slow

15   down your answers, I could object.

16             THE WITNESS:  Okay.  Sorry.

17   BY MS. SWEENEY:

18        Q    Did the members of EnSource have regular

19   meetings?

20             MR. SADOCK:  Objection.  Vague as to time.

21             THE WITNESS:  Not regular meetings.

22   BY MS. SWEENEY:

23        Q    Is EnSource still a going concern as an

24   organization?

25        A    Yes.
```

Justin Pannu  10/29/2018

1      Q     Approximately how many meetings per year

2  does EnSource hold?

3      A     They're ad hoc, so I wouldn't be able to

4  say.

5      Q     You don't have regular annual meetings?

6      A     It's a formation of friends.  So it's

7  pretty informal.

8      Q     When you do have meetings, do you have

9  minutes of those meetings?

10     A     No.

11     Q     Do you do anything to formalize or

12  memorialize the meetings or discussions that you

13  have?

14     A     No.

15          MR. SADOCK:  Objection.  Calls for a legal

16  conclusion as -- slow down.

17          THE WITNESS:  I don't believe so, other

18  than a bank account.

19          MR. SADOCK:  Objection.  Calls for a legal

20  conclusion as it pertains to questions on legal

21  formation.

22  BY MS. SWEENEY:

23     Q     Do you -- does EnSource invest -- have any

24  other investments going on right now?

25     A     No.

Justin Pannu  10/29/2018

```
 1      Q     Has EnSource made any other investments
 2  other than the one at issue in this lawsuit?
 3      A     No.
 4      Q     For what reason is EnSource still a valid
 5  entity?
 6            MR. SADOCK:  Objection.  Calls for a legal
 7  conclusion.  Speculation.
 8            THE WITNESS:  Why?  I guess for the
 9  purpose of this case.
10  BY MS. SWEENEY:
11      Q     Did you ever have meetings in person?
12      A     Could you be more specific, like EnSource
13  meetings?
14      Q     Correct.
15      A     In person?
16      Q     Yes.
17      A     With?
18      Q     With the members of EnSource.
19            MR. SADOCK:  Vague as to time.
20  BY MS. SWEENEY:
21      Q     Did you ever?
22      A     I don't believe we have because we live --
23  all of us live all over the country.
24      Q     Do you ever have meetings via Skype or
25  video conference?
```

Justin Pannu  10/29/2018

```
1        A    No.

2        Q    So is it fair then to say that whenever

3   you do have a meeting, it's over the telephone?

4        A    Yes.

5        Q    And is that something that you do via a

6   conference call?

7        A    I think there was -- I think that we dial

8   each other in just off our iPhones, or when we were

9   during the due diligence period, we may have used

10  Free Count Conference Call.  But I'm not sure.

11       Q    How many times in the approximate two

12  years since EnSource was formed was there a

13  telephone communication that included all the

14  members of EnSource?

15       A    When was the first time?

16       Q    How many times.

17       A    I don't know.  I don't remember.

18       Q    More than ten?

19       A    That included all the members?

20       Q    Correct.

21       A    Every single member?  I don't think there

22  has been that many.

23       Q    Less than five?

24       A    Maybe.

25       Q    So when a decision needs to be made, is
```

Justin Pannu  10/29/2018

1   **there a formal vote that is taken?**

2       A    I think for a portion of the time after

3   the due diligence period, the members just relied on

4   what I was doing.

5       **Q    What you were doing?**

6       A    Yeah.

7       **Q    So you would make a recommendation to the**

8   **group?**

9       A    I don't even know if it went that far,

10  but...

11      **Q    So is it fair to say that if you took an**

12  **action, that the general practice was that the rest**

13  **of the members would back up whatever action you**

14  **took?**

15          MR. SADOCK:  Objection.  Misstates

16  testimony.  Vague as to time.  Ambiguous as to

17  voting.

18          THE WITNESS:  Yeah, I don't remember like

19  all these details, but there would be some -- during

20  the due diligence period or are you talking about

21  afterwards?

22  BY MS. SWEENEY:

23      **Q    I'm talking about in general.**

24      A    In general.  During the due diligence

25  period, we'd have conference calls with our -- to

Justin Pannu  10/29/2018

```
 1   make a decision with our attorney onboard.  So...
 2              MR. SADOCK:  Don't answer anything that
 3   involves decision-making with your attorney.
 4              THE WITNESS:  Okay.
 5   BY MS. SWEENEY:
 6       Q    I don't want to hear about the
 7   communications with your attorney.
 8       A    All right.
 9       Q    But do you, as the manager, have a comfort
10   or an understanding that if you make a decision on
11   behalf of EnSource, that you -- that you were
12   allowed to make that decision without soliciting the
13   vote of the rest of the members?
14              MR. SADOCK:  Objection.  Compound.  Calls
15   for a legal conclusion.
16              THE WITNESS:  I think I would inform them
17   by a telephone call what I -- one at a time what I
18   was doing.  So it wouldn't be really a meeting of
19   the members.
20   BY MS. SWEENEY:
21       Q    Did you ever get a EnSource domain
22   registry for your emails?
23       A    No.
24       Q    So we're going to go through some of the
25   emails here today, and I notice that there are --
```

Justin Pannu  10/29/2018

```
 1    that a lot of them are gmails or personal email
 2    accounts.
 3              Is that the way it still is?
 4        A    Yes, for -- yeah.
 5        Q    Who is your lawyer for EnSource?
 6        A    Aaron Sadock, Bonnie, and Rich Nawracaj --
 7    or I don't know how to pronounce his last name.
 8    But --
 9        Q    Are there any other lawyers that EnSource
10    has used?
11              MR. SADOCK:  Objection as to -- are you
12    referring to this case?
13              MS. SWEENEY:  I'm just asking if there
14    were other lawyers that have been used.
15              MR. SADOCK:  By EnSource?
16    BY MR. SADOCK:
17        Q    By EnSource.
18        A    Including Houston?
19        Q    Yes.
20        A    So Alan Gerber.  Justin Stoller.  And then
21    there are a couple of, I believe, attorneys that
22    Gerber had used, but I don't remember their names.
23        Q    Mr. Nawracaj, is he somebody that you knew
24    prior to becoming involved with EnSource?
25        A    Yes.
```

Justin Pannu  10/29/2018

1      Q      How?

2      A      Through Jerry.

3      Q      Had you retained Mr. Nawracaj for anything

4   prior to becoming involved in EnSource?

5      A      Yes.

6      Q      And when you retained him, was it in his

7   role as an attorney or as a business adviser?

8      A      Attorney.

9      Q      When you retained him for EnSource

10  purposes, did you retain him as an attorney or as a

11  business adviser?

12     A      Attorney.

13     Q      And was that to give you advice related to

14  the investment that you were contemplating making?

15            MR. SADOCK:  Don't answer anything that

16  pertains to what your discussions pertained to or

17  what they were about with your attorney.

18            THE WITNESS:  After the objection, I lost

19  my train of thought on your question.

20  BY MS. SWEENEY:

21     Q      Okay.  Let me ask it another way.

22            Did Mr. Nawracaj provide business advice

23  to you in addition to legal advice?

24            MR. SADOCK:  Objection.  That calls for a

25  legal conclusion.  I am asking him not to answer

Justin Pannu  10/29/2018

```
 1    about any discussions that you had with your
 2    attorney.  Don't answer that, Justin.
 3            MS. SWEENEY:  We may get into this a
 4    little bit more substantively, because it -- I don't
 5    fully understand the relationship of Mr. Nawracaj.
 6    My sense is that he provided business advice in some
 7    respects, and we'll get to it specifically.
 8            MR. SADOCK:  Yeah.
 9            MS. SWEENEY:  Because we may need to delve
10    into some of the nonlegal advice that he was giving.
11    I don't want to talk about the legal advice.
12            MR. SADOCK:  When we get there, I'm happy
13    to mingle on it.  But right now his answer is it's
14    his attorney.
15    BY MS. SWEENEY:
16        Q    You understand that EnSource is suing
17    Mark Willis and Tom Tatham and a various host of
18    other entities, correct?
19        A    Correct.
20        Q    In your words, what is the -- what is the
21    reason why you're suing Mark Willis personally?
22            MR. SADOCK:  Objection.  Calls for a legal
23    conclusion.
24            THE WITNESS:  There are a number of
25    representations made to EnSource members.  So some I
```

1    may not be aware of representations that were either

2    made to Chad Martin or Jerry by Willis.

3           And therefore for a complete record,

4    you're going to need -- on behalf of EnSource,

5    you'll need to ask them, you know, what

6    representations were made to them.

7           But personally, the representations that

8    Mark made to me was that, one, when he first visited

9    me, he made the representation that he need -- he

10   made a presentation on -- or he talked to me about

11   Hopewell and Title Rover, and general -- and then

12   the business, I guess, concept.

13          And he indicated that Chad Martin was a

14   friend of his.  Chad Martin also told me about

15   Willis.  And he endorsed Mark Willis as a

16   trustworthy person, and so, a personal relationship

17   between -- you know, that there was a deep personal

18   relationship between Chad and Mark.

19          During that meeting in San Diego, he

20   represented to me that -- so first I asked him about

21   this business prospect and what it was.  And the

22   first questions I usually ask is what is, you know,

23   the valuation and how are you going to use the

24   funds.

25          And Willis represented that he had a

Justin Pannu  10/29/2018

```
 1    number of tech commitments to fund, and that's why

 2    he was raising capital.  And he continued that theme

 3    throughout by email or text throughout the course of

 4    the due diligence.

 5              And when we came to realize that wasn't

 6    the case in -- sometime in a few months after that

 7    and when that wasn't the case, we lost trust in

 8    Mark Willis and as to how he portrayed the funds

 9    were going to be used to meet tech commitments by

10    email and text.

11    BY MS. SWEENEY:

12        Q    Okay.  I'm going to stop you there.

13        A    All right.

14        Q    So you told me that when you met with him,

15    he gave you some information and now you're talking

16    about --

17        A    You asked.

18        Q    -- communications via email and text.

19              So I want to -- I want to be really

20    specific with these -- with this question and with

21    this answer.  I'd like you to tell me the exact

22    representations that you contend that Mark Willis

23    made to you.

24        A    To me personally, I don't know what he

25    made to other members, and so on behalf of EnSource,
```

Justin Pannu  10/29/2018

1    I'm not speaking on behalf of EnSource but myself.

2        **Q      Okay.**

3        A      There were representations he made to me

4    were that during the meeting at Tower 23 when he

5    visited me in San Diego is that he -- the basis of

6    his valuation was that he invested $3 million for

7    his companies into the Title Rover technology.

8             And that was for the basis of his

9    valuation, that he was oversubscribed, but he wanted

10   to give Chad and his buddies an opportunity, because

11   they had a deep relationship.

12            He also represented that there was some

13   25 million-dollar VC that might be waiting in the

14   wings for an investment.

15            He represented to me that BP -- he used

16   the core technology with -- in a case with BP for

17   purposes of e-discovery.

18            He represented to me that the

19   investments -- no, the fund, the use of funds was

20   generally for his tech commitments.

21            He also represented to me personally that

22   there was the profit potential of the lease place,

23   that there were significant profit potential in

24   these lease place.

25            He also represented to me and so did Chad

Justin Pannu  10/29/2018

```
 1    represented to me as well, that Willis had a

 2    significant amount of experience.  He was an

 3    entrepreneur.  He was very successful.  Significant

 4    amount of experience in oil and gas.

 5              He also represented to me -- that's all I

 6    remember.

 7         Q    Okay.  Let me go through them just to make

 8    sure that I got them all.

 9              All right.  You claim that he represented

10    that he had $3 million invested into Title Rover.

11         A    He invested $3 million into the

12    Title Rover technology.

13         Q    Okay.  He represented that he was over --

14    that Hopewell was oversubscribed, but he wanted to

15    give Chad and his friends an opportunity to invest.

16         A    Yes.

17         Q    You claim he represented that he had a

18    five-million-dollar venture capital investor that

19    might be waiting in the wings?

20              MR. SADOCK:  Objection.  Misstates the

21    testimony.

22              THE WITNESS:  I believe he said that there

23    would be a -- there's a 25 million-dollar --

24    BY MS. SWEENEY:

25         Q    Oh, 25.
```

Justin Pannu  10/29/2018

1      A    -- potential or investment that he did

2   procure.  I don't -- actually I don't remember that

3   statement, but it was a 25 million-dollar investment

4   potentially based on some acquisition fund that he

5   was going to put together.

6      **Q    Okay.  You claim he represented that he**

7   **had used the core technology with BP for discovery?**

8      A    Yeah, that's --

9           MR. SADOCK:  Could -- do you want to just

10  read back his testimony on these?

11          MS. SWEENEY:  I do not.

12          MR. SADOCK:  Okay.  So make sure you

13  listen and correct if you hear something different.

14          THE WITNESS:  Say your --

15  BY MS. SWEENEY:

16     **Q    You claim he represented that he had used**

17  **core technology with BP for discovery.**

18     A    He used the technology in a BP case for

19  the purposes of e-discovery.

20     **Q    You claim he represented that the funds**

21  **would be used for tech commitments?**

22     A    Yes.

23     **Q    You claim he represented that the profit**

24  **potential was significant?**

25     A    Yes.

Justin Pannu  10/29/2018

```
 1        Q     And you claim he represented that he had a

 2   lot of experience in oil and gas.

 3        A     And he was -- he was an entrepreneur and

 4   he was a very successful one.

 5        Q     An entrepreneur.

 6              Is there anything else that you can

 7   remember he represented to you personally?

 8        A     There are a number of other

 9   representations made to other members which I'm

10   probably not aware of.  So you will have to ask

11   them.  But, no, I don't remember anything else

12   personally.

13              There was -- oh, that there was a number

14   of opportunities that Title Rover had found, that

15   technology had already found, and that was, you

16   know, the -- for Hopewell.

17        Q     Can you think of anything else that he

18   represented to you personally?

19        A     That's as far as I remember.

20        Q     Okay.  Let's take the first one.  That

21   there was --

22        A     Can we take a break?

23        Q     I'm sorry?

24        A     Can I take a break?

25              MS. SWEENEY:  Sure.  Let's take a
```

Justin Pannu  10/29/2018

1    five-minute break.

2              THE WITNESS:   Thank you.

3              THE VIDEOGRAPHER:   Off the record.   The

4    time is 10:40 a.m.

5              (A recess was taken.)

6              MS. SWEENEY:   Back on the record.   The

7    time is 10:48 a.m.

8    BY MS. SWEENEY:

9        Q    Okay.  So I'd like to go through the

10   various representations that you -- that we just

11   went through that you claim that Mark Willis made to

12   you personally.  One at a time.

13            So the first one was you claim that

14   Mark Willis represented that $3 million was invested

15   into Title Rover technology.  When did he tell you

16   that?

17       A    That was at the Beach House in San Diego.

18   And I asked him -- the normal questions that I ask

19   is what are you going to use the funds for and why

20   do you need the investment and what is your

21   valuation and what's the basis for it.  And that's

22   the first time he told me that.  Tatham also said

23   that in an email.

24       Q    So I just want to focus the question and

25   the answers on Mark Willis right now.

Justin Pannu  10/29/2018

```
 1        A     Okay.

 2        Q     So your testimony is that Mark Willis told

 3   you that in person during a meeting in San Diego,

 4   correct?

 5        A     Yes.   When I asked what the basis of his

 6   valuation was.

 7        Q     And was there ever another time when

 8   Mark Willis personally told you that there was

 9   $3 million invested into Title Rover technology?

10        A     I don't remember Willis telling me that,

11   but Tatham told me that, that the Willis Group

12   entities had invested, in an email, I believe.

13        Q     Okay.  And again, I am trying to limit the

14   questions and the answers into what Mark Willis told

15   you.

16              Was there ever an email or a written

17   communication, text, email, where Mark Willis told

18   you that $3 million was invested into Title Rover

19   technology?

20        A     There was not.  I don't believe.

21        Q     So it was just that one time during that

22   first meeting?

23        A     Yes.

24        Q     Okay.  And was that statement something

25   that you relied upon when you ultimately made an
```

Justin Pannu  10/29/2018

 1   **investment into Hopewell?**

 2        A    The reason why I relied upon that

 3   statement is because he said it was cutting-edge

 4   technology.  And it was -- it was a manual effort to

 5   find these leases and that technology is something

 6   that he just needed to refine.  So, yes, the

 7   investment in the technology was relied upon.

 8        **Q    Did you rely on that specific number, the**

 9   **$3 million that he told you supposedly or was it**

10   **just that some amount of money had been invested?**

11        A    If he had told me 100,000 --

12             MR. SADOCK:  Objection.  Calls for

13   speculation.  Incomplete hypothetical.

14             THE WITNESS:  I just trusted Willis that

15   he told me that he'd spent $3 million on that.

16   BY MS. SWEENEY:

17        **Q    Did you ever ask any other questions, you**

18   **meaning EnSource right now, related to the**

19   **three-million-dollar investment into Title Rover**

20   **technology?**

21        A    I don't remember.

22             MR. SADOCK:  Objection.  Calls for

23   speculation as it pertains to every other member.

24   BY MS. SWEENEY:

25        **Q    Did you ever ask to see any proof that**

Justin Pannu  10/29/2018

1    **$3 million had been invested into Title Rover**

2    **technology?**

3         A    Given Chad's endorsement -- well, while I

4    did not ask for any proof but given Chad's

5    endorsement of Mark Willis and their deep

6    relationship and the trust that developed between

7    Mark Willis and I, I just went on his word.

8         Q    **At your first meeting in San Diego when**

9    **you first met Mark, that was the first time you met**

10   **him, right?**

11        A    Yes.

12        Q    **Did you have a deep level of trust with**

13   **him at that first meeting?**

14        A    Yes.  Because Chad endorsed their deep

15   relationship and before Chad really trusted and

16   endorsed Mark and said he'd known him for a long

17   time, that their families knew each other, that they

18   were neighbors, close -- close neighbors.  So, yes,

19   I -- what was your question?

20        Q    **You developed a deep trust in Mark Willis?**

21        A    So, yes, I developed one probably before I

22   had met him.

23        Q    **Had you decided to invest in Hopewell**

24   **before you met Mark Willis?**

25        A    No.  I just trusted him.

Justin Pannu  10/29/2018

1      Q     Did you decide to invest in Hopewell after
2   that first meeting?
3      A     No, I just decided I trusted him.
4      Q     Did you ever ask for any financial
5   documents that might have provided information
6   related to investments into the Title Rover
7   technology?
8            MR. SADOCK:  Objection.  Vague as to you,
9   as it pertains to Justin or EnSource.
10           THE WITNESS:  I don't know if I personally
11  did, but you'd have to ask the other members of
12  EnSource.
13  BY MS. SWEENEY:
14     Q     Okay.  Let me ask it because I want a
15  clearer record.
16           Did you personally ever ask for financial
17  documents that would have provided information
18  related to investments that had been made into
19  Title Rover technology, you personally?
20     A     I don't believe I did, but I just took
21  Mark on his word based on the relationship that him
22  and Chad had and the trust that we had with him.
23     Q     Do you have a specific understanding that
24  anybody at EnSource asked for financial documents
25  that would have shown investments into Title Rover

Justin Pannu  10/29/2018

1    technology?

2           MR. SADOCK:  Objection.  Calls for

3    speculation.

4           THE WITNESS:  I don't know.

5    BY MS. SWEENEY:

6       Q    Did you ever come to the conclusion, you

7    personally, that the representation that $3 million

8    had been invested into Title Rover technology was

9    incorrect?

10      A    I didn't even think about it.

11      Q    As you sit here today, do you believe that

12   that is an incorrect representation?

13      A    I don't know personally.

14      Q    As the representative of EnSource, do you

15   believe that the representation that $3 million had

16   been invested into Title Rover technology was false?

17          MR. SADOCK:  Objection.  Calls for a legal

18   conclusion.  And do not answer anything as it

19   pertains to attorney-client discussions or work

20   product.

21          THE WITNESS:  I guess I can't answer.

22   BY MS. SWEENEY:

23      Q    Do you as the representative of EnSource,

24   separate and apart from any communications you've

25   had with your lawyer, believe that the

Justin Pannu  10/29/2018

```
 1   representation that $3 million had been invested

 2   into Title Rover technology was false?

 3       A    I don't know what other representations

 4   that were made to other members, so I can't really

 5   speak on behalf of EnSource, but personally, I don't

 6   know.

 7       Q    So moving on to the next representation

 8   that you claim Mr. Willis made to you.  You claim he

 9   said that Hopewell was oversubscribed, but he wanted

10   to give Chad and his friends an opportunity to

11   invest.

12       A    Yes.

13       Q    When did Mr. Willis make that

14   representation to you?

15       A    He made that representation in San Diego.

16       Q    In person?

17       A    In person, at the beach or at Tower 23.

18       Q    Did he ever make that representation to

19   you personally in any other way at any other time?

20       A    I believe either Tatham or Willis -- and I

21   don't remember which -- stated that there was

22   another investor that they were looking at, that

23   wanted to take our subscription agreement if we

24   didn't invest in time.

25       Q    When Mr. Willis made the representation
```

Justin Pannu  10/29/2018

1    that Hopewell was oversubscribed, what did you

2    understand that to mean?

3         A    That there was a lot of demand for -- that

4    they had a lot of demand for people who wanted to

5    invest into Hopewell.

6         Q    Did you take it to mean that there was a

7    commitment by other people to invest?

8         A    I don't know what I thought at the time.

9         Q    Did you ask him what he meant by

10   "oversubscribed"?

11        A    I don't remember.

12        Q    Do you know he specifically used that

13   word, "oversubscribed"?

14        A    Yes.

15        Q    Did you do anything to try and

16   substantiate that representation?

17        A    Other than take his word on it, no.

18        Q    During the course of your due diligence,

19   did you have the opportunity to get information

20   related to other investors in Hopewell?

21             MR. SADOCK:  Objection.  Vague as to "you"

22   whether you're talking about Justin or EnSource.

23             THE WITNESS:  Say it again?

24   BY MS. SWEENEY:

25        Q    Let's do it two ways.

Justin Pannu  10/29/2018

```
 1              Did you, personally, have the opportunity
 2    to get information about other investors in
 3    Hopewell?
 4         A    When you mean "opportunity," what do you
 5    mean by that?
 6         Q    Did you ever see any information related
 7    to the investors in Hopewell?
 8         A    I did -- I do remember seeing a Hopewell
 9    subscription agreement with some other investors --
10    or not a -- sorry, an operating agreement of some
11    sort.  It was an agreement of some sort with some
12    names in it.  I looked over it briefly.  Other than
13    that, I don't remember anything else.
14         Q    Did you personally ever ask anybody who
15    the other investors in Hopewell were?
16              MR. SADOCK:  Objection.  Vague as to time.
17              THE WITNESS:  I don't remember asking, but
18    I think Chad told me that he might have known
19    somebody.
20    BY MS. SWEENEY:
21         Q    Do you, meaning EnSource, know if there
22    was an opportunity to get information as to the
23    other investors in Hopewell?
24         A    Because Chad had a deeper relationship
25    with Willis, I wouldn't be able to answer that on
```

Justin Pannu  10/29/2018

```
 1   behalf of EnSource.
 2        Q     So I should ask that question of Chad?
 3             MR. SADOCK:  Objection.  Misstates
 4   testimony.
 5             THE WITNESS:  I just answered it.
 6   BY MS. SWEENEY:
 7        Q     Is Chad the person that you believe would
 8   have information related to whether EnSource had the
 9   opportunity to get information about Hopewell's
10   other investors?
11             MR. SADOCK:  Objection.  Calls for
12   speculation.
13             THE WITNESS:  I just think he mentioned
14   that he knew somebody that had invested as well in
15   Hopewell.  That's all I know.
16   BY MS. SWEENEY:
17        Q     And I'm trying to determine as part of the
18   due diligence process --
19        A     Right.
20        Q     -- before deciding to make an investment
21   in Hopewell whether EnSource had the opportunity to
22   learn the identity of the other investors in
23   Hopewell?
24        A     I don't know.  Because there were other
25   representations made to other members that I'm not
```

Justin Pannu  10/29/2018

1    aware of.

2        Q    I'm not talking about representations

3    right now.  I'm talking about during the due

4    diligence process whether EnSource had the

5    opportunity to learn information about the other

6    investors in Hopewell?

7        A    EnSource was a team effort; therefore, I

8    don't know.  Did I personally ask for information on

9    the other investors?  No.

10       Q    And as the person most knowledgeable about

11   EnSource, I'm trying to determine who would have the

12   most information about the due diligence process and

13   the information that was available to EnSource

14   related to the identity of the other investors.  If

15   that's not you, I'm wondering who that person is.

16            MR. SADOCK:  Objection.  Asked and

17   answered.

18            THE WITNESS:  Asked and answered?

19   BY MS. SWEENEY:

20       Q    You can still answer.

21       A    Maybe Chad.

22       Q    Did you -- when Mr. Willis represented

23   that Hopewell was oversubscribed but wanted to give

24   an opportunity to Chad and his friends, what was

25   your feeling at the time about that representation,

Justin Pannu  10/29/2018

1   **you personally?**

2        A     The feeling at the time was neutral.

3        **Q     You didn't feel pressure?**

4        A     Oh, I guess, I see what you're saying.

5   Yeah, I mean it made me want to, like, be more

6   involved in the investment.

7        **Q     Did you personally ever come to form a**

8   **conclusion that the statement that Hopewell was**

9   **oversubscribed was false?**

10            MR. SADOCK:  Objection.  Asked and

11   answered.

12            THE WITNESS:  I trusted Willis at the time

13   and Chad's deep endorsement and their deep

14   friendship, so I had no reason to believe that it

15   was false.

16   BY MS. SWEENEY:

17        **Q     Did you ever come to believe it was false,**

18   **you personally?**

19            MR. SADOCK:  Objection.  Asked and

20   answered.

21            THE WITNESS:  I think it's -- these are

22   things that I haven't thought about, you know, other

23   than how I feel in general about my -- how he used

24   the funds.

25            MR. SADOCK:  Just for the record, I would

Justin Pannu  10/29/2018

1    like my objections for the previous times that it

2    was asked to stand.

3    BY MS. SWEENEY:

4        Q    So I'm trying to be precise, because I

5    want to go through each of these representations.

6             So specifically as it relates to this

7    supposed representation that there was -- Hopewell

8    was oversubscribed, I'm trying to determine whether

9    you personally ever came to form the conclusion that

10   that was not a true statement?

11            MR. SADOCK:  Objection.  Asked and

12   answered.

13            THE WITNESS:  I think that with the amount

14   that they had raised, it obviously wasn't

15   oversubscribed.

16   BY MS. SWEENEY:

17       Q    Do you know how much Hopewell was trying

18   to raise at that time?

19            MR. SADOCK:  Objection.  Calls for

20   speculation.

21            THE WITNESS:  I don't remember.

22   BY MS. SWEENEY:

23       Q    Do you remember how many founder shares

24   had already been subscribed?

25       A    I don't remember.

Justin Pannu  10/29/2018

```
 1        Q     Do you remember the amount of money that
 2   Hopewell was trying to raise?
 3        A     Up to $2 million.
 4        Q     So when you were told that Hopewell was
 5   oversubscribed, was it your -- did you believe,
 6   therefore, that there were $2 million --
 7        A     Yes.
 8        Q     -- that had been invested at that time?
 9        A     Yes, at that time.
10              Well, when you said "oversubscribed," you
11   just said I said -- what I believed was he was
12   oversubscribed, basically, he would have met the
13   $2 million with that oversubscription.
14        Q     And did you ask during what period of time
15   that that $2 million would be met?
16        A     No.
17        Q     Did you ever have an understanding during
18   what period of time that $2 million was being
19   sought?
20        A     I think I might have at the time, but I
21   don't remember now.
22        Q     Did you have an idea as of that date when
23   you were meeting Mr. Willis in person how much money
24   you personally were interested or could be
25   interested in investing?
```

Justin Pannu  10/29/2018

```
 1      A     No, I didn't.  It was changing.
 2      Q     As of the date of the meeting with
 3  Mr. Willis, had you already talked to the other
 4  members of EnSource about the potential investment?
 5      A     You know, I don't remember, but it was in
 6  around that period of time.
 7      Q     During that discussion in person, was it
 8  just you and Mark that were there?
 9      A     Just Mark and I.
10      Q     Did you tell him what sort of money you or
11  your group might be interested in investing?
12      A     I don't know if it was at that time at
13  that Beach House, because we hadn't had a lot of due
14  diligence done yet.  So I don't think that we talked
15  about that.
16      Q     Did you get the sense during that meeting
17  that there was any sort of -- that Mark was in some
18  sort of a hurry to have EnSource or you invest?
19            MR. SADOCK:  Objection.  Calls for
20  speculation.
21            THE WITNESS:  Well, I felt that -- I know
22  he told me that he was visiting -- came down to
23  visit his niece.  I also felt that he came down to
24  visit me.  So I don't know.  But I think, you know,
25  I found it as a nice kind gesture for him to come
```

Justin Pannu  10/29/2018

1    down and see me.

2             So I don't know if I translated that into

3    anything else other than him wanting to personally

4    meet me.

5    BY MS. SWEENEY:

6        **Q    Did you get the sense during that meeting**

7    **that Mr. Willis wanted you to invest?**

8        A    I got the sense that he did want me to

9    invest during that meeting, yes.

10       **Q    Even though he was supposedly**

11   **oversubscribed?**

12       A    Yes.  Because he told me again it was --

13   that he wanted to give Chad and his buddies an

14   opportunity -- of people that he knew that he could

15   trust, you know, and that's why he wanted to give us

16   an opportunity.

17       **Q    Moving on to the next supposed**

18   **representation made by Mark Willis.  You said that**

19   **he represented that there was a 25 million-dollar**

20   **venture capital investor that might be waiting in**

21   **the wings.**

22            **When did he make that representation?**

23       A    He made that at the Beach House.  That one

24   I don't particularly remember too well, but it was

25   just off the top of my head, so -- but he did say

Justin Pannu  10/29/2018

1   that there was a 25 million-dollar VC acquisition

2   fund that was waiting in the wings.

3       **Q    So you remember the amount, that it was**

4   **25 million?**

5       A    I remember it was 25 million, I believe.

6       **Q    And did -- did Mr. Willis make that**

7   **representation at any other time to you personally?**

8       A    I don't remember if he did or not.

9       **Q    Do you know if Mr. Willis made the**

10  **representation to anyone at EnSource at any other**

11  **time?**

12          MR. SADOCK:  Objection.  Calls for

13  speculation.

14          THE WITNESS:  You'll have to ask the other

15  members.

16  BY MS. SWEENEY:

17      **Q    Do you know?**

18      A    Based on what I've been told, I believe

19  so.  I'm not sure though, because I don't remember.

20  May have been told to Chad.

21      **Q    To Chad.**

22          **And what -- what was --**

23      A    Well, may have been told to Jerry as well.

24  I do remember something.

25      **Q    What was your opinion about that**

Justin Pannu  10/29/2018

 1    representation?

 2         A    I felt that it was a -- that if VC was

 3    looking to invest, it would -- it is, you know, an

 4    opportunity that I should get on -- get in on.

 5         Q    At any time did you personally get -- ask

 6    for information that would have proved the truth of

 7    that statement?

 8         A    Try that question again.  Sorry.

 9         Q    Sure.  Did you ever, you personally at any

10    time, ask for proof that there was a

11    25 million-dollar venture capital acquisition fund

12    that was waiting in the wings to invest?

13         A    I did not.  I took Mark Willis on his word

14    on that.

15         Q    Did you rely on that representation when

16    you decided to invest in Hopewell?

17         A    I believe so, yes.

18         Q    Did you ever come to form the conclusion

19    that that was an incorrect representation that Mark

20    made?

21              MR. SADOCK:  Objection.  Calls for a legal

22    conclusion.  Don't answer anything as pertains to

23    attorney work product.

24              THE WITNESS:  Personally?

25    ///

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:
 2       Q    Did you personally form the conclusion at
 3   any point that that was not a true statement?
 4       A    Well, I haven't seen anything.  So I don't
 5   think there is.
 6       Q    Did you ask for anything?
 7       A    I didn't ask.  I just took Mark on his
 8   word for it.
 9       Q    The next statement that Mark represented
10   that he had used the core technology with BP in a
11   case dealing with e-discovery.
12       A    Yes.
13       Q    When did that representation get made?
14       A    That was made to myself at the -- at the
15   Beach House.  And then I believe it was made to
16   Jerry.  And it may have been made to Chad.  I'm not
17   sure.
18       Q    Do you have a specific memory or knowledge
19   that it was made to Jerry or Chad?
20       A    I remember Jerry talking about it that
21   that technology -- that Willis represented to them
22   that that technology was used in an e-discovery
23   case.
24       Q    And what --
25       A    Or BP case regarding e-discovery.
```

Justin Pannu  10/29/2018

```
 1      Q    Did Mr. Willis make that representation to
 2  you personally at any other time?
 3      A    He may have, yes.  I do remember sometime
 4  during the due diligence he could have.  He did say
 5  something like that.
 6      Q    Was that in writing?
 7      A    I don't remember.
 8      Q    And what was it about that representation
 9  that -- what did you think about that
10  representation?
11      A    I thought it was --
12           MR. SADOCK:  Objection.  Vague as to time.
13           THE WITNESS:  What did I think?
14  BY MS. SWEENEY:
15      Q    Uh-huh.
16      A    I -- personally I thought -- and I don't
17  know what other members thought -- that that was --
18  you know, Willis represented that it -- you know, it
19  was the technology that just needed to be refined
20  for the use of finding problem areas for any of the
21  chain of title issues.  So it -- you know, it was
22  something that was very convincing to us.
23      Q    It's something that you relied on in
24  making the investment?
25      A    Definitely we relied on that one.
```

Justin Pannu  10/29/2018

1      **Q     You personally?**

2      A    I -- me personally.

3      **Q     And EnSource as well?**

4            MR. SADOCK:  Objection.  Calls for

5      speculation.

6            THE WITNESS:  I don't know about the other

7      members, but me personally for sure.

8      BY MS. SWEENEY:

9      **Q     And as a representative of EnSource today,**

10     **is that something that EnSource relied upon?**

11           MR. SADOCK:  Objection.  Calls for

12     speculation.

13           THE WITNESS:  I think so.

14     BY MS. SWEENEY:

15     **Q     Did you ever ask, you personally ask for**

16     **any proof that the technology had been used for**

17     **e-discovery purposes?**

18     A    Me personally, no.  That wasn't my area of

19     expertise and that's why we brought Jerry in.

20     **Q     That is Jerry's area of expertise?**

21     A    Jerry.  And James Dibble.

22     **Q     Do you know if Jerry ever asked for any**

23     **proof that the technology had been used for**

24     **e-discovery?**

25     A    There was a webinar and there were a

Justin Pannu  10/29/2018

```
1    number of phone calls between -- I don't know who it

2    was, between either the CTO or Willis or Tatham.

3    And there were a numbers of questions asked.

4               And I'm not a technology person;

5    therefore, you know, that when they got into the

6    technology discussions, I was -- I guess I could say

7    I was in and out of that discussion even though I

8    was on the webinar.

9         Q    Do you know if Jerry ever satisfied

10   himself that the representation that the technology

11   had been used in e-discovery was true?

12              MR. SADOCK:  Objection.  Calls for

13   speculation.

14              THE WITNESS:  I don't know for that

15   specific purpose or if it was that specific -- for

16   that specific event.  I wouldn't know.

17   BY MS. SWEENEY:

18        Q    Is it true that the technology of

19   Title Rover was important to EnSource when deciding

20   to make the investment in Hopewell?

21        A    Yes.

22        Q    Is it true that EnSource did whatever due

23   diligence needed to be done to satisfy itself that

24   the representations being made about the technology

25   were accurate?
```

Justin Pannu  10/29/2018

```
 1              MR. SADOCK:  Objection.  Calls for
 2    speculation.  Vague as to satisfaction and due
 3    diligence.
 4              THE WITNESS:  I -- I -- so, I don't know
 5    if -- ask that question again, just -- sorry.
 6    BY MS. SWEENEY:
 7        Q    Is it true that EnSource satisfied itself
 8    that the representations that had been made about
 9    the technology were truthful before making the
10    investment in Hopewell?
11        A    I believe so it did, but the reason I say
12    I believe so is because those representations were
13    made to Jerry and James.  I might have been there,
14    but I didn't understand.
15        Q    Okay.  So as to the representation we were
16    just discussing that was made to you, was there --
17    did there ever come a time where you formed the
18    conclusion that the core technology had not been
19    used for e-discovery?
20        A    I don't think that the technology other
21    than that it was in that -- in that specific
22    purpose, other than that it was used for BP in the
23    e-discovery.  And that's -- and that that technology
24    was specifically applied to look at title issues
25    within the AMIs, and that's -- that's all I --
```

Justin Pannu  10/29/2018

1    that's all I concluded.

2            And that's why that -- you know, and that

3    representation that was made to me, I personally

4    relied on the fact that this manual effort that was

5    required to -- to look at titling would then be

6    absolved by this proprietary technology that didn't

7    exist.  So that's personally why I invested.

8        Q    Okay.  I didn't quite understand that, so

9    I'm going to just probe a little bit because -- I'm

10   sorry.

11       A    Okay.

12       Q    Did you ever conclude that the technology

13   was not used for e-discovery, you personally?

14       A    I didn't -- I didn't even think about it.

15       Q    You thought about it when he made the

16   representation, correct?

17       A    When he made the representation, I took

18   him on his word that it was used for e-discovery

19   purposes.

20       Q    And you have no reason to believe that was

21   not a true statement?

22            MR. SADOCK:  Objection.  Misstates

23   testimony.

24            THE WITNESS:  I personally do not.

25   ///

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:

 2       Q     Moving on to the next one.  You said Mark

 3   represented that the funds would be used for tech

 4   commitments.

 5             When was that representation made?

 6       A     That was made consistently throughout

 7   the -- because that was one of the areas that I was

 8   involved in is, you know, the use of the funds.

 9             And he had mentioned that one at the Beach

10   House, once by text as we needed -- you know, as we

11   were still negotiating certain aspects of, I believe

12   it was the operating agreement, and then by email.

13             And he said those tech commitments, you

14   know, those are the things that he -- that is what

15   he needed the funds for.

16             And it was for -- to us that was, you

17   know, he was waiting on us, there was no prior debt

18   and he needed to use that for going-forward

19   operating expenses.  And that was the type of

20   investment that they were waiting on.

21       Q     You just said Mark -- Mark specifically

22   told you there was no debt?

23       A     No, we concluded that there was -- that

24   the -- so if he said that he was using it -- their

25   tech commitments were waiting on us to fund, we just
```

Justin Pannu  10/29/2018

```
 1   assumed that there would be no debt.
 2           But they didn't disclose that there was a
 3   payable to a number of -- you know, there was no
 4   disclosure that there was a payable to Tatham, to
 5   Willis -- or, sorry, to Tatham for management fees.
 6       Q    So taking a step back, you claim that
 7   Mr. Willis made that representation to you both at
 8   the Beach House via text and via email?
 9       A    Via -- I need to fund my tech commitments
10   is basically what he said.
11       Q    Okay.  Did Mr. Willis during that -- let's
12   talk about the Beach House specifically --
13       A    Right.
14       Q    -- first?
15           During that conversation, did Mr. Willis
16   say that the funds would be used exclusively for
17   tech commitments?
18       A    He said -- he did -- no, he said it would
19   be used for tech commitments.
20       Q    But he didn't say exclusively?
21           MR. SADOCK:  Objection.  Asked and
22   answered.
23           THE WITNESS:  I took that as exclusively.
24   BY MS. SWEENEY:
25       Q    That was your assumption?
```

Justin Pannu  10/29/2018

```
 1        A    That was my assumption or bulk of it.
 2        Q    When he communicated to you in text about
 3   the funds being used for tech commitments, did he --
 4   did he say exclusively tech commitments?
 5        A    I need to fund my tech commitments.
 6   Because he emphasized it so much, it felt to me
 7   that's all he was going to use it -- well, the bulk
 8   of it was going to be used for that.
 9        Q    How specifically did he emphasize it?
10        A    Well, this is -- basically he emphasized
11   it by, you know, text -- by texting me that specific
12   thing out of all of the due diligence, you know,
13   there was that -- he emailed me and texted me about
14   that specific thing.
15             So that -- for me that felt like that's
16   what he was going to use it for.  So because that --
17   that is how I mean by emphasized, just the modes of
18   different communication.
19        Q    Okay.  Did he -- did he bold it?
20        A    No, he just said it two different modes of
21   communication.
22        Q    Okay.  But it wasn't in bolded text or
23   italicized?
24        A    No, it was just a consistent theme.
25        Q    And when he said "tech commitments," what
```

Justin Pannu  10/29/2018

1   **did you interpret that as meaning?**

2      A    To refine the use of his and maintain the

3   use of the Title Rover technology.

4      **Q    Did you ever ask him to make sure that you**

5   **guys were on the same page with respect to what,**

6   **quote, tech commitments, end quote, meant?**

7      A    I don't believe so.

8      **Q    During any of the communications related**

9   **to the tech commitments, did you ask if the funds**

10  **would go towards any other purposes?**

11          MR. SADOCK:  Vague as to emails, time, and

12  you.

13          THE WITNESS:  I, personally, on Jeff

14  Merola's request, asked for how the funds were used

15  to date and how they were going to be used forward.

16  BY MS. SWEENEY:

17     **Q    You asked Mark how the funds --**

18     A    Tatham.  Tom.

19     **Q    You personally asked Mr. Tatham how the**

20  **funds had been used to date?**

21     A    No.  I had asked him for operating

22  expenses to date and how the funds were going to be

23  used going forward on a pro forma.

24     **Q    The operating expenses?**

25     A    Operating expenses to date and pro forma

Justin Pannu  10/29/2018

```
 1   going forward.
 2        Q     You asked that to Mr. Tatham?
 3        A     Yes.
 4        Q     In writing?
 5        A     Yes.
 6        Q     And did you receive operating expenses to
 7   date?
 8        A     I didn't --
 9              MR. MR. SADOCK:  Vague as to time.
10              THE WITNESS:  I don't believe we did.
11   BY MS. SWEENEY:
12        Q     Did you receive a pro forma?
13        A     We received the basic valuation pro forma,
14   but nothing that would -- when I had personally
15   asked for it, nothing that was given to us in terms
16   of a spreadsheet that would show how the
17   expenditures would be made, which is how I look at
18   things.
19        Q     Does that mean you were not satisfied with
20   the information that you personally had been given?
21              MR. SADOCK:  Objection as pertains to
22   "you."
23              THE WITNESS:  Willis -- personally for me.
24   Personally, Willis had said it was a start-up
25   company.  This is at the Beach House.
```

Justin Pannu  10/29/2018

1          And Tom Tatham said the same thing, that

2     the pro forma isn't realistic at this point, because

3     it's a -- in -- because it's a start-up.

4          And he -- so we took him at their word

5     that there was no pro forma projections realistic at

6     that point because we obviously trusted Mark on how

7     they would use the funds.  And Tatham.

8     BY MS. SWEENEY:

9     **Q     So to the extent you did not receive the**

10    **information that you requested, is it fair to say**

11    **that you didn't pursue that because --**

12    A     Their answer made sense, that they were a

13    start-up and professional projections weren't

14    realistic at that point.

15         And then we took Mark on his word, because

16    we felt what we had asked for in a way that was fair

17    and reasonable, without trying to strain the

18    relationship that developed and -- between us and

19    then Chad's and Mark's relationship.

20         So I didn't know that Willis and Tatham

21    were going to steal my money.

22    **Q     How did Mark steal your money,**

23    **Mark Willis?**

24         MR. SADOCK:  Objection.  Calls for a legal

25    conclusion.

Justin Pannu  10/29/2018

1             THE WITNESS:  Well, if you look on the --

2    there were a number of after -- after we invested --

3    three or four days after we invested the first

4    tranche, and then, you know, a few days after we

5    invested the second tranche, the funds went to

6    Tatham or Willis entities.

7    BY MS. SWEENEY:

8        Q    And you consider that stealing?

9             MR. SADOCK:  Objection.  Calls for a legal

10   conclusion.

11            THE WITNESS:  Well, I considered that --

12   that's not -- that doesn't seem a normal way of

13   operating a business to me.

14   BY MS. SWEENEY:

15       Q    Did you -- at the time when Mr. Willis

16   made the representation that the funds would be used

17   for tech commitments, did you ask for any bank

18   records or financial documents that would

19   demonstrate how funds were being spent at that time?

20            MR. SADOCK:  Objection.  Vague as to

21   "you."  Asked and answered.

22            THE WITNESS:  At which time?

23   BY MS. SWEENEY:

24       Q    At the time that the representation was

25   made at the Beach House.

Justin Pannu  10/29/2018

```
1        A    Did I ask him at that point?  No.
2        Q    At any time, did you personally ask Mark
3   for bank statements or financial records of Hopewell
4   that would show how money that had been invested was
5   being used by Hopewell?
6        A    We'd asked -- he had tasked Tatham to deal
7   with our due diligence queries, as I understand it.
8   And we asked Tatham and we felt he was acting on
9   behalf of Mark Willis.
10       Q    Why did you think that?
11       A    Because he was the one -- I believe he was
12  the one that if we ever had an issue in due
13  diligence, we would go up to him to --
14       Q    Him being Tatham?
15       A    Willis.  When we were talking about
16  anti-dilution or if we were -- and there was some
17  discussion that needed -- more discussion that
18  needed to be to have Mark Willis involved in that
19  discussion, you know, the -- we would be discussing
20  those issues with him.
21            So the general feeling was that Mark was
22  calling the shots and Tatham was, you know, also
23  participating.
24       Q    That wasn't anything that was ever told to
25  you officially, correct?
```

```
1        A    No, but the circumstances and the events

2   that occurred throughout the due diligence process

3   on having to move to a higher level when we're

4   negotiating just -- it felt like that Mark was the

5   person who was in -- Mark was -- Willis was the one

6   that was involved throughout the process and that he

7   was in charge.  That's just the general feeling that

8   I had.

9        Q    So going back to -- circling back to where

10  I was.  At any point prior to making the investment,

11  did you personally ask for the bank statements of

12  Hopewell?

13            MR. SADOCK:  Objection.  Asked and

14  answered.

15            THE WITNESS:  During the due diligence

16  process?

17  BY MS. SWEENEY:

18       Q    Any time prior to your investment.

19       A    Any time prior to my investment.  I don't

20  believe we did.

21       Q    At any time prior to your investment, did

22  you personally ask for accounts receivable of

23  Hopewell?

24       A    From either Tatham or Willis?

25       Q    Correct.
```

Justin Pannu  10/29/2018

```
 1       A    We asked for operating expenses to date,
 2   which would have given us the aging receivables
 3   knowledge if they had provided one by -- through
 4   Tatham and how the investments were going to be or
 5   what the capital expenditures were going to look
 6   like going forward.
 7       Q    At any time prior to making the investment
 8   in Hopewell, did EnSource ask for bank statements of
 9   Hopewell?
10       A    I don't believe so.  Prior to?
11       Q    Prior to.
12       A    Prior to.
13       Q    And to your knowledge, is it a fair
14   statement that the only financial documents that
15   EnSource requested prior to making the investment
16   was the operating expenses to date?
17            MR. SADOCK:  Objection.  Calls for
18   speculation.
19            THE WITNESS:  The operating expenses to
20   date and the capital -- and a pro forma and a
21   capital expend- -- or what they would -- how they
22   would expend the funds going forward specifically.
23   BY MS. SWEENEY:
24       Q    Did you ever receive the capital
25   going-forward expenses?
```

Justin Pannu  10/29/2018

```
 1              MR. SADOCK:  Objection.  Vague as to
 2   "you."
 3   BY MS. SWEENEY:
 4       Q     You meaning EnSource.
 5       A     I -- did EnSource receive?  I personally
 6   didn't receive it.
 7       Q     Do you know if EnSource received it prior
 8   to making the investment?
 9       A     I don't know.
10       Q     The pro forma, do you know if EnSource
11   received a pro forma prior to making its investment?
12              MR. SADOCK:  Objection.
13              THE WITNESS:  There was a basic pro forma
14   done that I received personally that were for
15   Title Rover and that was sometime in late
16   August 2016.
17   BY MS. SWEENEY:
18       Q     Prior to making the investment, did
19   EnSource ever receive operating expenses to date --
20              MR. SADOCK:  Objection.
21   BY MS. SWEENEY:
22       Q     -- of Hopewell?
23              MR. SADOCK:  Excuse me.  Objection.  Asked
24   and answered.
25              THE WITNESS:  I requested that personally.
```

1    I did not receive it personally.  I don't know about

2    EnSource.

3         MS. SWEENEY:  Okay.  I'm going to stop for

4    a moment because we need to change the videotape.

5    So let's go off the record.

6         THE VIDEOGRAPHER:  This ends Media

7    No. 1 in the deposition of Justin Pannu.  The time

8    off the record is 11:36 a.m.

9         (A recess was taken.)

10        THE VIDEOGRAPHER:  This begins Media

11   No. 2 in the deposition of Justin Pannu.  The time

12   on the record is 11:45 a.m.

13   BY MS. SWEENEY:

14        **Q    Okay.  So we were going through the**

15   **various representations that you claim Mark Willis**

16   **made to you personally.**

17        A    Right.

18        **Q    And the next one on the list was that he**

19   **had a lot of experience in oil and gas, and he was**

20   **an entrepreneur.**

21        **When did he make that representation to**

22   **you?**

23        A    That was in San Diego.

24        **Q    Was there ever another time that he made**

25   **that representation?**

Justin Pannu  10/29/2018

```
 1       A     There was, I believe, when he -- well, I
 2   can't speak on behalf of the other members, but
 3   there was probably a time that he did to other
 4   members because they're aware of it.
 5       Q     Do you believe that that was not a true
 6   representation, you personally?
 7       A     I believe that -- do I believe it's not a
 8   true representation?
 9       Q     Yes.
10             MR. SADOCK:  Objection.  Vague as to time.
11             THE WITNESS:  That he's an entrepreneur.
12   I believe that he is an entrepreneur.
13   BY MS. SWEENEY:
14       Q     Do you believe that he has a lot of
15   experience in the oil and gas industry?
16       A     I don't know.
17       Q     Did you personally ever do anything to
18   look into his background to satisfy yourself that
19   this was a true statement?
20       A     I did not.
21       Q     Do you know if anyone at EnSource ever did
22   any due diligence as to Mark Willis's background?
23             MR. SADOCK:  Objection.  Calls for
24   speculation.
25             THE WITNESS:  You would have to ask them.
```

Justin Pannu  10/29/2018

1    BY MS. SWEENEY:

2         Q    You're not familiar with it?

3         A    I'm not.

4         Q    Is the representation that Mark Willis had

5    a lot of experience in oil and gas and was an

6    entrepreneur, is that something that EnSource relied

7    upon in making the investment in Hopewell?

8         A    It's something that I personally relied

9    upon.  And I don't know about EnSource.

10        Q    Why is it something you relied on?

11        A    If he's -- if he's -- he says he had the

12   experience and relationships to execute these plays

13   and that's something that I relied upon, you need

14   somebody to execute, so...

15        Q    But again, to -- as you are sitting here

16   today, you do not know whether or not that was a

17   misrepresentation?

18        A    I do not know.

19        Q    The last representation that Mr. Willis

20   made to you was that there were a number of

21   opportunities that the Title Rover technology had

22   already found?

23             MR. SADOCK:  Objection.  Misstates

24   testimony.

25   ///

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:

 2        Q    Is that accurate?

 3             MR. SADOCK:  Objection.  Misstates

 4   testimony as to "last representation."

 5             THE WITNESS:  There was a representation

 6   made that Title Rover had identified a number of

 7   opportunities for Hopewell already.

 8   BY MS. SWEENEY:

 9        Q    Where was that representation made?

10        A    That was made a number of times during --

11   in San Diego, during the due diligence process.

12   That's as far as I remember.

13        Q    Was it made -- other than San Diego, was

14   it anything that was said in other in-person

15   communications?

16        A    I believe there was a data room that was

17   filled with the opportunities that were found by

18   Title Rover.

19        Q    So that's not what I was asking.  I was

20   asking if that representation was made in person at

21   any other time.

22        A    I wouldn't remember.  But I do remember

23   the representation.

24        Q    Made by Mark?

25        A    Made by Mark.
```

Justin Pannu  10/29/2018

1      **Q     In writing?**

2      A     I don't know in writing, but he made that

3  representation to me and -- and I don't know about

4  other members, but he may have.

5      **Q     So I just want to be precise.  You said**

6  **that it was a representation that Mr. Willis made to**

7  **you a number of times, correct?**

8      A     Correct.

9      **Q     And the first time was in San Diego?**

10     A     First time was in San Diego, yes.

11     **Q     When were the other times?**

12     A     Throughout the due diligence process, I

13  believe.  I don't remember that -- when he would

14  have made those exactly.

15     **Q     Do you remember whether those**

16  **representations were made in writing or whether they**

17  **were on the phone?**

18     A     I don't remember.

19          MR. SADOCK:  Objection.  Asked and

20  answered.

21  BY MS. SWEENEY:

22     **Q     Do you know approximately how many times**

23  **other than the first time Mr. Willis made this**

24  **representation?**

25     A     I remember at the airport, but I also

Justin Pannu  10/29/2018

1    remember him and Tatham making those

2    representations.

3         Q    You said earlier that the data room which

4    was where the due diligence information was loaded;

5    is that correct?

6         A    Yes.

7         Q    So that the data room was populated with

8    information showing the other opportunities that had

9    been found; is that accurate?

10        A    That's what I thought I saw.

11        Q    Okay.  Did you personally ever request

12   information that would back up this representation

13   that the technology had found other opportunities?

14        A    There was a webinar that was conducted

15   with a number of us on the call, and it appeared

16   that the technology was locating these and

17   identifying these opportunities based on the

18   webinar.

19        Q    Did EnSource ask for additional

20   information about those opportunities in connection

21   with the due diligence process?

22             MR. SADOCK:  Objection.  Calls for

23   speculation.

24             THE WITNESS:  I personally did not.  I

25   don't know if other EnSource -- other members of

Justin Pannu  10/29/2018

1    EnSource did or not.

2    BY MS. SWEENEY:

3        Q    Do you believe that it's a true statement

4    that the technology had located opportunities?

5            MR. SADOCK:  Objection.  Calls for

6    speculation and a legal conclusion.

7            THE WITNESS:  Not on specific information

8    that I know, but I -- I believe other members might

9    be aware of something like that.  Or maybe our

10   attorney.

11   BY MS. SWEENEY:

12       Q    That it is a true statement?

13       A    Yeah, that it is a true statement.

14       Q    Sitting here today, do you believe that it

15   is an untrue statement?

16       A    Sorry?  That is -- that it is -- sorry.  I

17   thought you were talking about it is an untrue

18   statement.  So could you repeat the question.

19       Q    Yeah.  Let's -- let's start over.

20       A    Yeah.

21       Q    As you sit here today --

22       A    Okay.

23       Q    -- do you believe that it is not true that

24   Title Rover had located other opportunities?

25       A    Do I personally believe or EnSource -- I

Justin Pannu  10/29/2018

```
 1   personally --

 2            MR. SADOCK:  Objection.  Vague as to

 3   "locate" and vague as to "opportunities."

 4            THE WITNESS:  I don't think I understand

 5   the question.

 6   BY MS. SWEENEY:

 7       Q    Do you personally, as you sit here today,

 8   believe it is an untrue statement that Title Rover

 9   had located other opportunities?

10            MR. SADOCK:  Objection.  Calls for expert

11   opinion.

12            THE WITNESS:  I believe it is an --

13   personally an untrue statement.

14   BY MS. SWEENEY:

15       Q    Untrue statement.

16       A    Or a true statement that he had not --

17   that those opportunities were not found using

18   Title Rover.

19       Q    Why do you believe that?

20            MR. SADOCK:  Objection.  Don't answer

21   anything regarding discussion with your attorneys or

22   attorney work product.

23            THE WITNESS:  So I won't be able to answer

24   at that point.

25   ///
```

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:
 2       Q    So your opinion as to that being an untrue
 3   statement is based solely on information gleaned
 4   from your attorney?
 5            MR. SADOCK:  Do not answer.
 6            THE WITNESS:  I can't answer.
 7   BY MS. SWEENEY:
 8       Q    And you won't be answering any question
 9   related to your understanding as to the truth of
10   that statement; is that accurate?
11       A    That is accurate.
12            MR. SADOCK:  I did not instruct that --
13   you can ask other questions if you would like on
14   that area.
15            MS. SWEENEY:  Are you instructing him not
16   to answer?
17            MR. SADOCK:  I'm instructing him not to
18   answer the question that you asked.
19   BY MS. SWEENEY:
20       Q    Let me get about it in a different way
21   because I think we may be talking around each other.
22            You testified a little bit ago that you
23   saw in the data room documents that showed that
24   Title Rover had located opportunities; is that --
25       A    I had personally seen that.
```

Justin Pannu  10/29/2018

1      Q     Okay.  Do you personally believe that that

2  information you saw in the data room was false?

3           MR. SADOCK:  Objection.  Calls for a legal

4  conclusion.  And don't answer anything that is based

5  off of discussions with your attorney or attorney

6  work product.

7           THE WITNESS:  I can't answer that

8  question.

9  BY MS. SWEENEY:

10     Q     I'm asking your personal opinion which is

11  not based on anything a lawyer told you.

12     A     Then, yes, I believe that it is false

13  that --

14     Q     The information that you were shown in the

15  data room was false?

16     A     Was false.

17     Q     Do you believe that the information that

18  you were shown in the data room --

19     A     Well, was false in the sense that

20  Title Rover produced those results.

21     Q     Do you believe that it was manufactured

22  information?

23           MR. SADOCK:  Objection.  Vague as to

24  information, time.

25           THE WITNESS:  Other than that, I wouldn't

Justin Pannu  10/29/2018

 1    know.

 2              MR. SADOCK:  Calls for opinion.

 3    BY MS. SWEENEY:

 4         Q    **Do you believe that the information that**

 5    **you saw about opportunities discovered by**

 6    **Title Rover was manufactured?**

 7              MR. SADOCK:  Objection.

 8    BY MS. SWEENEY:

 9         Q    **Do you personally believe --**

10              MR. SADOCK:  Sorry.  I didn't mean to cut

11    you off.

12              THE WITNESS:  The information itself?

13              MR. SADOCK:  Objection.  Calls for

14    speculation.  Legal conclusion.

15              THE WITNESS:  You would have to ask other

16    members.

17    BY MS. SWEENEY:

18         Q    **I'm asking your personal belief.**

19         A    I hadn't thought of it, so I don't know.

20         Q    **As you sit here today, is it your personal**

21    **belief that Title Rover has found no opportunities?**

22         A    Yes, it's my personal belief.

23         Q    **That it has been completely ineffective?**

24              MR. SADOCK:  Objection.  Misstates

25    testimony.

Justin Pannu  10/29/2018

1           THE WITNESS:  That it's found no

2    opportunities.

3    BY MS. SWEENEY:

4        Q    **Other than communications with your**

5    **lawyer, what is that opinion based on?**

6        A    That's it.

7        Q    **Okay.  Have we now gone through all of the**

8    **representations that Mark Willis made to you**

9    **personally?**

10       A    To me personally, yes.  I'm not aware of

11   any other representations he made to other members

12   and you'll have to ask them to get a complete

13   record.

14       Q    **Okay.**

15           MS. SWEENEY:  Then you know what, guys?

16   Let's stop right here.  This is a good stopping

17   place.  So I will move into another area when we

18   start back up.  Watch your mic.

19           THE VIDEOGRAPHER:  Off the record.  The

20   time is 11:57 a.m.

21           (A lunch recess was taken at 11:57 a.m.

22           until 12:49 p.m.)

23           THE VIDEOGRAPHER:  Back on the record.

24   The time is 12:49 p.m.

25   ///

Justin Pannu  10/29/2018

```
 1    BY MS. SWEENEY:

 2        Q     All right.  So you realize that you are

 3    still under oath?

 4        A     I do.

 5        Q     The meeting that we've been talking about

 6    in San Diego, did you just meet with Mr. Willis on

 7    one occasion during that -- his visit to San Diego?

 8        A     I met him, I believe, twice that day and

 9    once the next day, to the best of my knowledge.

10        Q     And where was the first meeting on the

11    first day?

12        A     I believe it was at Tower 23.

13        Q     Was that a meeting with a meal, a lunch

14    meeting, a dinner meeting?

15        A     I don't remember.

16        Q     Were there drinks involved?

17        A     There might have been, yes.

18        Q     Do you recall whether you had anything to

19    drink during that meeting?

20        A     I don't recall.

21        Q     And then you said you met again later that

22    night?

23        A     We met that night later, yes.

24        Q     Where was that?

25        A     At Backyard, I believe.
```

Justin Pannu  10/29/2018

1      Q     Is that the name of a bar?

2      A     Yes.

3      Q     Where is that?

4      A     In P.B.

5      Q     And was that a business meeting?

6      A     No.

7      Q     Did you discuss any issues related to

8   Hopewell at that --

9      A     It's too loud.

10      Q     Okay.  Were you drinking during that

11   meeting?

12      A     That meeting I was drinking, I remember,

13   yes.

14      Q     A lot?

15      A     No.  I don't drink a lot.

16      Q     Okay.  And you understood when you were

17   having these meetings with Mark that he was there as

18   a member of Hopewell, correct?

19            MR. SADOCK:  Objection.  Calls for a legal

20   conclusion.

21            THE WITNESS:  He said that he was there to

22   visit his niece, but I also believe he was also

23   there to visit me.

24   BY MS. SWEENEY:

25      Q     And he was there to visit you in his

Justin Pannu  10/29/2018

1    **capacity as a manager of Hopewell?**

2              MR. SADOCK:  Objection.  Calls for

3    speculation.

4              THE WITNESS:  You will have to ask him.

5              MR. SADOCK:  Legal conclusion -- just

6    wait.  Let me get my objections on the record.

7    BY MS. SWEENEY:

8         **Q    You understood at that time that Hopewell**

9    **was an entity that had been duly formed prior to**

10   **that date?**

11        A    I don't remember what I understood at that

12   time with Hopewell, but I believe there were some

13   things that were sent to me prior to his visit.

14        **Q    And did you know at that time that**

15   **Mr. Willis was a manager of Hopewell?**

16             MR. SADOCK:  Objection.  Calls for

17   speculation, a legal conclusion.

18             THE WITNESS:  It's not something that I

19   thought about.

20   BY MS. SWEENEY:

21        **Q    Did you ever come to form a understanding**

22   **as to Mr. Willis's affiliation with Hopewell?**

23             MR. SADOCK:  Objection.  Calls for a legal

24   conclusion.

25             THE WITNESS:  I don't remember.

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:
 2        Q    Did you ever form a conclusion that
 3   Mark Willis was involved with Hopewell in any
 4   capacity?
 5        A    Yes.
 6        Q    What was the capacity?
 7        A    As Chad's friend looking for investment
 8   into Hopewell.
 9        Q    Did you --
10        A    As far as I remember.
11        Q    Do you know if Mark Willis was an investor
12   in Hopewell personally?
13             MR. SADOCK:  Objection.  Vague as to time.
14   Conclusion.
15             THE WITNESS:  I don't know.  I don't
16   remember at that specific time.
17   BY MS. SWEENEY:
18        Q    The visit that we were just talking about,
19   you said you met the next night, where was that?
20        A    That was at -- he had an invitation that
21   he sent me to PARQ Nightclub.
22        Q    And that's the nightclub downtown?
23        A    Yes.
24        Q    Would you call that a business meeting?
25        A    No.
```

Justin Pannu  10/29/2018

```
 1      Q    Was that purely social?

 2      A    Yes.

 3      Q    Did that involve drinking as well?

 4      A    Yes.

 5      Q    Were there any other opportunities that

 6  you had to socialize with Mr. Willis from that date

 7  to the present?

 8      A    I said hello to him in the bankruptcy

 9  hearing.

10      Q    That was in Texas?

11      A    In Texas.

12      Q    Did you socialize after the hearing?

13      A    No.

14      Q    Have you ever met with Mr. Willis in

15  person, other than at the bankruptcy hearing and at

16  these three times in San Diego?

17      A    I don't remember any other time than those

18  times.

19      Q    Would you consider yourself a

20  sophisticated investor?

21          MR. SADOCK:  Objection.  Calls for a legal

22  conclusion.

23          THE WITNESS:  I would consider myself an

24  accredited investor, probably not sophisticated

25  enough for this investment.
```

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:

 2        Q    Why do you say that?

 3        A    I would -- because at first when I

 4   received the PPM, I probably needed an attorney to

 5   look over it.

 6        Q    Did you ever have an attorney look over

 7   it?

 8        A    Well, I'm allowed to --

 9             MR. SADOCK:  You're allowed to answer.

10             THE WITNESS:  Yes.

11   BY MS. SWEENEY:

12        Q    And was that Rich Nawracaj?

13        A    Yes.

14        Q    Were there any other attorneys that looked

15   over it on your behalf?

16             MR. SADOCK:  Vague as to "you."

17             THE WITNESS:  On EnSource?

18   BY MS. SWEENEY:

19        Q    Correct.

20        A    You know, I don't know.

21        Q    Were there any other attorneys who looked

22   over the private placement memorandum on your behalf

23   personally?

24        A    Not actively.  Not actively.

25        Q    Explain what you mean by that.
```

Justin Pannu  10/29/2018

1       A    There was forwards to another attorney.

2       **Q    Did you forward it to another attorney?**

3       A    Yes.

4       **Q    Did you forward it to that attorney for**

5  **the purpose of receiving legal advice?**

6       A    Yes.

7       **Q    What is that attorney's name?**

8       A    Aaron.

9       **Q    Excuse me?**

10      A    Aaron Sadock.

11      **Q    Oh.  Did you forward it to Mr. Sadock**

12  **prior to making your investment in Hopewell?**

13      A    I believe I might have.  I don't know.  I

14  don't remember.

15      **Q    And did you receive advice from Mr. Sadock**

16  **related to the private placement memorandum?  I**

17  **don't want to know the contents of it.**

18          MR. SADOCK:  Objection.  Don't answer

19  anything as pertains to any responses by email or

20  communications with me or the firm.

21  BY MS. SWEENEY:

22      **Q    Did you receive legal advice?**

23      A    I don't remember.

24          MR. SADOCK:  Objection.  Calls for a legal

25  conclusion and I'm going to instruct you not to

Justin Pannu  10/29/2018

1   answer.

2   BY MS. SWEENEY:

3        **Q    Was there anyone else in Mr. Sadock's**

4   **office that you communicated with with respect to**

5   **the private placement memorandum?**

6        A    I don't believe so.

7        **Q    Were there any other attorneys that you**

8   **passed along the private placement memorandum to?**

9        A    I don't believe so, no.

10       **Q    How much money did you invest in Hopewell,**

11  **you personally?**

12       A    Into EnSource or into Hopewell?

13       **Q    Into Hopewell.**

14       A    Directly or --

15       **Q    I'm not trying to be complicated.**

16       A    Okay.

17       **Q    I can take it a step back if that is**

18  **easier.**

19       A    Okay.

20       **Q    How much money did you put into EnSource?**

21       A    Over, I believe, 200,000.

22       **Q    Was the entire $200,000 that you put into**

23  **EnSource invested into Hopewell?**

24            MR. SADOCK:  Objection.  Calls for a legal

25  conclusion.  Speculation.

Justin Pannu  10/29/2018

```
 1              THE WITNESS:  There was over 200,000.
 2   There was, I believe, 200,000 that was invested into
 3   Hopewell and the other was for operating costs.
 4   BY MS. SWEENEY:
 5        Q     The operating costs of EnSource?
 6        A     (Witness nods head.)
 7        Q     Yes?  Is that a "yes"?
 8        A     Yes.
 9        Q     To the best of your knowledge, how much of
10   the money you invested into EnSource was spent on
11   EnSource operating costs?
12              MR. SADOCK:  Objection.  Calls for
13   speculation.  Vague as to time.
14              THE WITNESS:  To date?
15   BY MS. SWEENEY:
16        Q     Sure.
17        A     I think around 74,000.
18        Q     So is that 74,000 in addition to the
19   $200,000 that was contributed -- ultimately invested
20   in Hopewell?
21        A     Yes.
22        Q     Was that $74,000 that went to over --
23   operating expenses of EnSource contributed by you
24   after the Hopewell investment?
25        A     Not all of it.
```

Justin Pannu  10/29/2018

```
1        Q    And was -- was the $200,000 that you put

2   into EnSource, was that cash?

3        A    That was cash.

4        Q    That wasn't any sort of --

5        A    200,000 -- it was over 200,000.

6        Q    It wasn't a carry?

7        A    Sorry?

8        Q    It wasn't a carry?

9        A    What's a carry?

10       Q    I guess, no.

11            It wasn't a loan?

12       A    No.

13       Q    I'm going to go through some documents

14   with you and we'll mark this as Exhibit 2.

15       A    Okay.

16            (Exhibit 2 was marked.)

17   BY MS. SWEENEY:

18       Q    I've put in front of you what we're

19   calling Exhibit 2, which is a series of emails.  The

20   top one is dated June 7, 2016.  It's an email from

21   Tom Tatham to Michelle Johnson, cc'ing Mark Willis.

22            You are not listed as a recipient of these

23   emails, but I'm wondering if you've seen this email

24   before?

25       A    Not prior to last week, if I have, but
```

Justin Pannu  10/29/2018

1   definitely not prior to last week.

2       Q    Okay.  So this email is a -- refers to a

3   meeting taking place on June 7, 2016, between, it

4   looks like, Mark, Tom and Chad Martin.

5            Were you aware that this meeting was

6   happening before it happened?

7            MR. SADOCK:  Vague as to time.

8            THE WITNESS:  No, I wasn't aware.

9   BY MS. SWEENEY:

10      Q    Did you -- at what point did you become

11  aware that the meeting on June 7th happened?

12      A    Last week.

13      Q    And that was during your preparation for

14  this deposition?

15      A    It was when you produced it, I believe.

16  If -- if this was part of the original document.  I

17  remember seeing some June documents, I don't

18  remember if this was exactly the email.  I believe

19  it was.  It just was -- this was part of the --

20      Q    Attached to this email there are four

21  documents that it looks like were printed and

22  provided to Mr. Martin prior to the June 7 meeting.

23  One is a confidentiality agreement.  One is a

24  private placement memorandum.  One is a subscription

25  booklet, and one is an amended restated company

Justin Pannu  10/29/2018

1    agreement.

2              Do you see that as attachments on this

3    email?

4         A    I see them.

5         Q    Did Mr. Martin provide copies of these

6    documents to you?

7              MR. SADOCK:  Vague as to time.

8              THE WITNESS:  I don't believe so, no.

9    BY MS. SWEENEY:

10        Q    How did you learn about the potential

11   Hopewell investment?

12        A    Through Chad.

13        Q    Do you recall when that was?

14        A    I don't recall.

15        Q    Do you recall whether it was sometime

16   after June 7th, 2016?

17             MR. SADOCK:  Objection.  Asked and

18   answered.

19             THE WITNESS:  The first time I remember

20   anything to do with Hopewell or Mark Willis is

21   July 2016.

22   BY MS. SWEENEY:

23        Q    How did Mr. Martin communicate information

24   about the Hopewell opportunity to you?

25             MR. SADOCK:  Vague as to time.

Justin Pannu  10/29/2018

```
 1                  THE WITNESS:  I don't remember how he did

 2      that.

 3      BY MS. SWEENEY:

 4          Q     Is Mr. Martin somebody that you see on a

 5      regular basis in person?

 6          A     No.

 7          Q     Is it more probable, then, that the

 8      communication was either by email or phone?

 9                  MR. SADOCK:  Objection.  Calls for

10      speculation.  Incomplete hypothetical.

11                  THE WITNESS:  Probably not email.

12      BY MS. SWEENEY:

13          Q     If you can, tell me the substance of the

14      communication the first time you became aware of

15      Hopewell opportunity.

16          A     The first record I have of anything as far

17      as I remember is July 2016, Chad Martin.  You know,

18      I -- I don't know when exactly he told me about it

19      but -- so the substance was there's an opportunity.

20      I have a friend, Mark Willis, he -- it was somebody

21      who was going to be an investor in the Fantasy Hub,

22      and that's -- that's all I remember.

23          Q     Who was going to be an investor in the

24      Fantasy Hub?

25          A     Willis.
```

Justin Pannu  10/29/2018

1       **Q    And was he?**

2       A    I didn't know.  He -- I didn't know him

3   prior to July 2016.

4       **Q    You don't know whether he ever became an**

5   **investor in the Fantasy Hub?**

6       A    I don't know for sure for certain, no.

7       **Q    Did the Fantasy Hub investment involve**

8   **litigation?**

9       A    No.

10          MR. SADOCK:  Objection.  Asked and

11   answered.  Relevance.

12          THE WITNESS:  I don't believe so, no.

13   BY MS. SWEENEY:

14      **Q    Was litigation ever threatened?**

15          MR. SADOCK:  Objection.  Asked and

16   answered.  Calls for speculation.

17          THE WITNESS:  I don't remember.

18          MR. SADOCK:  Vague as to time.

19   BY MS. SWEENEY:

20      **Q    How did that investment end?**

21          MR. SADOCK:  Objection.  Asked and

22   answered.

23          THE WITNESS:  As far as I remember, it

24   ended up with us not putting in the rest of the

25   money into that -- into the investment.

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:
 2       Q    Did you receive any of the money that you
 3   put in back?
 4       A    Yes.
 5       Q    Is that because there was threatened
 6   litigation?
 7            MR. SADOCK:  Objection.  Asked and
 8   answered.
 9            THE WITNESS:  I don't remember if there
10   was threatened litigation or not.  I don't remember
11   that.
12   BY MS. SWEENEY:
13       Q    Is it a true statement that you were
14   unhappy with the investment prior to receiving some
15   money back?
16            MR. SADOCK:  Objection.  Vague as to time.
17            THE WITNESS:  The laws were changed.  And
18   we feel we didn't want to invest any more of our own
19   money into the -- into the investment.
20   BY MS. SWEENEY:
21       Q    So circling back to my question, was there
22   unhappiness on your part with respect to the
23   investment prior to getting your money back?
24            MR. SADOCK:  Objection.  Asked and
25   answered.
```

Justin Pannu  10/29/2018

```
 1              THE WITNESS:  It was unhappiness with the
 2     change in laws for me personally.
 3     BY MS. SWEENEY:
 4         Q     How much money did you get back?
 5         A     I don't remember.  I'm just -- under
 6     100,000.
 7         Q     What percentage of your investment was
 8     that?
 9         A     I have no idea.
10         Q     Did you get --
11         A     I forgot.
12         Q     Did you get 50 percent back?
13         A     Oh, I see what you're saying.  I think it
14     was -- I believe it was less than 50 percent.  Or
15     was it more?  I don't remember.
16         Q     So going back to this document, Exhibit B
17     in front of you.  At any point prior to your meeting
18     with Mr. Willis in San Diego did Mr. Martin pass
19     along documents or material related to the Hopewell
20     opportunity to you?
21              MR. SADOCK:  Objection.  Vague as to
22     "you."
23              THE WITNESS:  I don't believe so, no.
24     BY MS. SWEENEY:
25         Q     To you --
```

Justin Pannu  10/29/2018

```
1       A    Not to me specifically.

2       Q    To anybody at EnSource?

3            MR. SADOCK:  Objection.  Calls for

4  speculation.

5            THE WITNESS:  You would have to ask them.

6  BY MS. SWEENEY:

7       Q    And just so I'm clear, EnSource was not

8  formed at the time you met with Mr. Willis in

9  San Diego, correct?

10      A    It was not.

11      Q    What date was it formed?

12      A    I don't remember.

13      Q    Do you have an idea as to the approximate

14 time?

15      A    Sometime in August.

16      Q    2016?

17      A    2016.

18      Q    And the meeting with Mr. Willis, do you

19 remember the exact date of that?

20      A    It was early August, I believe.  I think.

21      Q    All right.  I'm handing you another

22 document.  We'll mark it as Exhibit 3.

23           (Exhibit 3 was marked.)

24 BY MS. SWEENEY:

25      Q    It's an email from Mr. Martin to
```

Justin Pannu  10/29/2018

1    **Mr. Willis dated June 23rd, 2016.**

2            **Have you ever seen this document before?**

3        A    Not before last week.

4        Q    **So this email purports to be an email to**

5    **Mark that is naming and providing email addresses**

6    **to -- of various individuals who might be interested**

7    **in making the Hopewell investment.**

8            **Is that a fair assessment of the email?**

9            MR. SADOCK:  Objection.  Document speaks

10   for itself.

11           THE WITNESS:  It speaks for itself.

12   BY MS. SWEENEY:

13       Q    **Did I characterize it correctly?**

14           MR. SADOCK:  Objection.  Calls for

15   speculation.

16           THE WITNESS:  I can't really comment on

17   something that I hadn't seen prior to last week.

18   BY MS. SWEENEY:

19       Q    **Why don't you take a look at it then and**

20   **read it?**

21       A    Okay.

22       Q    **Does this appear to be an email from**

23   **Mr. Martin suggesting friends that night be**

24   **interested in the Hopewell opportunity?**

25       A    Yes.

Justin Pannu  10/29/2018

```
1        Q    Your -- what looks to be your email is
2   down below, justinpannu1503@gmail.com.
3             Is that your email address?
4        A    That's my email address.
5        Q    So this email was sent on June 23rd, 2016.
6   Did you authorize Mr. Martin to provide your name
7   and email to Mr. Willis prior to this date?
8             MR. SADOCK:  Objection.
9             THE WITNESS:  I don't think --
10            MR. SADOCK:  Just objection.  Calls for a
11  legal conclusion.
12  BY MS. SWEENEY:
13       Q    You can answer.
14       A    I -- I don't know.
15       Q    Do you have any memory that Mr. Martin may
16  have told you about the Hopewell investment prior to
17  June 23rd, the date of this email, Exhibit 3?
18       A    I don't have any memory of that.
19       Q    Were you cc'd or bcc'd on this email, to
20  your knowledge?
21       A    I was not.
22       Q    I'm handing you another document that
23  we'll mark as Exhibit 4.
24            (Exhibit 4 was marked.)
25  ///
```

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:
 2        Q    This is an email to you from Mr. Tatham
 3   dated July 9th, 2016.  Mr. Tatham is sending you the
 4   non-compete agreement related to the Hopewell
 5   opportunity.
 6             Do you remember receiving this email?
 7        A    I think so, yeah.
 8        Q    To the best of your knowledge, was there
 9   any prior written communication between you and
10   Tom Tatham or Mark Willis prior to this email?
11             MR. SADOCK:  Objection.  Vague as to
12   "you."
13   BY MS. SWEENEY:
14        Q    To you personally?
15        A    Personally me?  I don't think so.
16        Q    Had you had any communication with
17   Mr. Willis prior to this email?
18        A    I don't remember, but I know that I did
19   not know Willis in July -- prior to July 2016.
20        Q    Had you had a conversation with Mr. Tatham
21   prior to this email on July 9th, 2016?
22        A    I don't remember, but I know that I did
23   not know Tatham prior to July 2016.
24        Q    When is the first time you met Mr. Tatham?
25        A    In San Diego.
```

Justin Pannu  10/29/2018

1      Q     Was he at the meeting that we've been

2  talking about with Mark?

3      A     No.

4      Q     When did you meet with Mr. Tatham?

5      A     Around the time -- they both came within a

6  week or two or a few weeks with each other.  I don't

7  remember who came first.

8      Q     Who else was there during your meeting

9  with Mr. Tatham?

10     A     His wife.

11     Q     Where was it?

12     A     Cucina Enoteca, I remember that.  It's a

13  restaurant in Del Mar.

14     Q     Did you have a meal?

15     A     Yes.

16     Q     What meal?

17     A     I don't remember what meal.

18     Q     Was there drinking during that meeting?

19     A     I believe so.  Not heavy at all.

20     Q     What do you recall about that meeting?

21     A     We talked about Tom's experience in the

22  oil and gas.  He gave me an overview of -- of

23  Hopewell.  He gave me an overview of the Title Rover

24  technology, and he gave me -- what else did he say?

25            Essentially the same types of things

Justin Pannu  10/29/2018

1    that -- we didn't talk about the investment itself

2    per se of how our funds would be used.  That wasn't

3    something that we discussed.

4          He gave me the profit potential.  I

5    represented the profit potential of these lease

6    plays and gave us some overview of the technology,

7    the same thing as Mark, basically, that the -- he --

8    it was proprietary technology.

9          It could be -- it could find these chain

10   of title defects extremely quickly.  It produced a

11   bunch of results.  And it wasn't as extensive as

12   Mark's meeting, but those were some of the

13   representations that were made.

14   **Q    Do you believe that that meeting with**

15   **Mr. Tatham happened after you received this email on**

16   **July 9, 2016?**

17   A    Yes, it was after, I believe.

18   **Q    Can you estimate how far after in time**

19   **that meeting occurred?**

20   A    I'll have to look it up.  I don't remember

21   off the top of my head.

22   **Q    Do you keep a calendar?**

23   A    Sorry?

24   **Q    Do you keep a calendar?**

25   A    No, I don't keep a calendar, but I believe

Justin Pannu  10/29/2018

1    there were certain texts that I produced to my

2    attorneys.

3         Q    And you communicated with Mr. Tatham about

4    the meeting via text?

5         A    Via text.

6         Q    How frequently did you communicate via

7    text with either Tom Tatham or Mark Willis?

8         A    I produced all the texts, so you will have

9    to -- you know, I don't know if you have it yet, but

10   they were produced.

11        MS. SWEENEY:  Yeah, Counsel, I haven't

12   received any text messages.

13        MR. SADOCK:  We're still going through

14   them.  We should be able to produce them.

15        MS. SWEENEY:  Okay.  Then I will reserve

16   my right to reopen this deposition to talk about the

17   texts when I get them.  I haven't received them yet.

18   BY MS. SWEENEY:

19        Q    So going back to this email of July 9,

20   2016, there are two documents attached.  One is a

21   confidentiality agreement, and the other appears to

22   be a term sheet and some additional material that

23   were attached to the email.

24             Do you see that?

25        A    I do.

Justin Pannu  10/29/2018

1     Q     Did you review the documents that were

2     attached to this email at the time that you received

3     this?

4     A     I do remember reviewing it and it looking

5     like Chinese to me.

6     Q     I'm sorry?

7     A     I remember reviewing it for the first time

8     and it looking like something that was a little bit

9     more complex than I had ever read before.

10    Q     Are you saying that as to the

11    confidentiality agreement or as to the term sheet?

12    A     As to the term sheet.  But the

13    confidentiality agreement I understood it.

14    Q     Okay.  So let's turn to the term sheet

15    now --

16    A     Okay.

17    Q     -- of this exhibit?

18    A     What were we talking about before the

19    confidentiality.  No, I understood that.  Sorry, I

20    was on the term sheet page.

21    Q     That's fine.

22    A     Yeah.

23    Q     So Exhibit 4, turning to the term sheet

24    which begins Plaintiff 000715, you do have a memory

25    of looking at this at the time you received it?

Justin Pannu  10/29/2018

1       A    I do, yeah.

2       Q    And it's dated July 2016, correct?

3       A    Right.

4       Q    So you could see that the offering amount

5    was a million shares of Hopewell?

6       A    Yes.

7       Q    And you saw the offering price was $2 per

8    share?

9       A    I saw that.

10       Q    And prior to this time, you hadn't had, to

11    the best of your knowledge, any communications with

12    either Tatham or Willis related to this opportunity,

13    correct?

14            MR. SADOCK:  Objection as to time.

15    Specifically when he reviewed this document or when

16    you had these conversations?

17            THE WITNESS:  No, I hadn't, but I knew

18    that by looking at this I would need an attorney.

19    BY MS. SWEENEY:

20       Q    Did you -- you can see in the -- in the

21    header that's entitled "Existing capital structure,"

22    that there are a million shares of founders shares

23    outstanding.

24            Do you see that?

25            MR. SADOCK:  Objection.  Vague as to "you"

Justin Pannu  10/29/2018

1    and vague as to time.

2             THE WITNESS:  I don't remember.

3             MS. SWEENEY:  I remember seeing this sheet

4    and the $2 per share offering price and the million

5    units.

6    BY MS. SWEENEY:

7        Q    **You can see in the same sentence or the**

8    **paragraph that I was just referencing reference to**

9    **an Exhibit B.**

10           **Do you see that?**

11       A    Yes.  So where is Exhibit B?

12       Q    **If you turn the page to the end of the**

13   **offering, there's an Exhibit B?  Exhibit B, which is**

14   **on Plaintiff 000722.**

15       A    Oh, that.  Okay.

16       Q    **Do you remember seeing this at the time**

17   **that you received this email and looked at these**

18   **documents?**

19       A    I don't remember the specific Exhibit B,

20   no.

21       Q    **Exhibit B explains the currently**

22   **outstanding shares as of July 1, 2016, correct?**

23       A    Correct.

24       Q    **Did you know who these different entities**

25   **were?**

Justin Pannu  10/29/2018

 1        A    I didn't look -- I didn't see this sheet

 2   at that time.  I --

 3             MR. SADOCK:  Objection.  Lacks foundation.

 4             THE WITNESS:  I just looked at the first

 5   page.

 6   BY MS. SWEENEY:

 7        Q    **Just the term sheet?**

 8        A    Yes, just the term sheet.

 9        Q    **Did there ever come a time when you looked**

10   **at Exhibit B?**

11             MR. SADOCK:  Objection.  Asked and

12   answered.

13             THE WITNESS:  When I was going through

14   documents this last week.

15   BY MS. SWEENEY:

16        Q    **Prior to that you did not look at**

17   **Exhibit B?**

18        A    I did not look at this.  I probably

19   received it, but I didn't look at it, no.

20        Q    **Does that mean that you personally did not**

21   **have an understanding as to who the owners of the**

22   **outstanding shares were at the time that you made**

23   **the investment in Hopewell?**

24        A    Not at the time I made the investment, but

25   at the time I saw this, I forwarded.  I knew I

Justin Pannu  10/29/2018

1    wasn't -- I couldn't do this on my own.

2         Q    Okay.  So my question is prior to you

3    making the investment --

4         A    Right.

5         Q    -- in Hopewell, did you ever look at this

6    Exhibit B?

7              MR. SADOCK:  Objection.  Asked and

8    answered.

9              THE WITNESS:  I don't believe so.

10   BY MS. SWEENEY:

11        Q    Did you ever -- strike that.

12             Prior to making the investment in

13   Hopewell, did you ever gain an appreciation as to

14   who owned the founders shares of Hopewell?

15             MR. SADOCK:  Objection.  Vague as to

16   "appreciation."

17   BY MS. SWEENEY:

18        Q    You personally.

19             MR. SADOCK:  Vague as to "appreciation."

20   Calls for speculation.

21             THE WITNESS:  I do remember these names,

22   not in this format, and some shares being issued.

23   BY MS. SWEENEY:

24        Q    So I guess my question was a little bit

25   more precise than that.

Justin Pannu  10/29/2018

1             Did you understand that these names, these

2    entities with these names, owned founders shares in

3    Hopewell prior to you making the investment?

4        A    I didn't understand that specifically.  I

5    did probably see it, but as I said, I didn't pay a

6    whole lot of attention to that.

7             So you're asking me questions that I

8    didn't pay a whole -- you know, I didn't pay a whole

9    lot of attention to and that would -- that was

10   something that I would have leaned on my attorney.

11       Q    Going back to the term sheet page which is

12   on the 000715, do you see the header that says "Use

13   of Proceeds"?

14       A    Yes.

15       Q    Did you read that at the time you received

16   this email in July of 2016?

17       A    I don't remember.

18       Q    Do you want to review it now --

19       A    Sure.

20       Q    -- and see if it reminds you?

21       A    It doesn't remind me of anything.

22       Q    It does not?

23       A    No.

24       Q    Do you see that in the header in the

25   section with the heading "Use of Proceeds," it says

Justin Pannu  10/29/2018

```
 1    that the shares that are going to be subscribed will

 2    be used, number one, for the purchase of oil, gas

 3    and mineral leases?

 4         A    That's what it says.

 5         Q    No. 2, "Funding of Hopewell general and

 6    administrative overhead, including maintenance of

 7    the service contract with Title Rover"?

 8         A    That's what it.

 9         Q    And No. 3, "Procurement of suitable legal

10    opinions and memorandums regarding validity of

11    existing Designated Pooled Units and underlying

12    pooled leases within the AMI."

13         A    Yes.

14         Q    Do you see those three --

15         A    I see them.

16         Q    -- listed?

17              Did you understand in the July 2016 time

18    frame that the shares that were being purchased

19    would be used for those three categories of things?

20         A    No, I just --

21              MR. SADOCK:  Vague as to time.  Lacks

22    foundation.

23              THE WITNESS:  No, I didn't rely on this.

24    I relied on what Willis told me how the funds were

25    going to be spent.  And I did not see that prior.  I
```

Justin Pannu  10/29/2018

1    did not read that prior.

2    BY MS. SWEENEY:

3        Q    So No. 2 on this page for "Use of

4    Proceeds" says that the funds -- the shares will be

5    used to fund Hopewell general and administrative

6    overhead.

7            Did you ask -- you personally ask any

8    questions about what the overhead was of Hopewell?

9            MR. SADOCK:  Objection.  Vague as to time.

10   Asked and answered.

11           THE WITNESS:  I asked what the -- I

12   asked -- yeah, I asked and answered, right.

13   BY MS. SWEENEY:

14       Q    Yeah.  You can answer.

15       A    I asked what the operating expenses were

16   to date and what the expenditures were going

17   forward.  And I believe that was to Tom Tatham.

18       Q    And what information did you receive about

19   what the operating expenses were on a going-forward

20   basis?

21           MR. SADOCK:  Objection.  Asked and

22   answered.

23           THE WITNESS:  I received a -- an email

24   with a description and something saying that the

25   pro forma -- more detailed pro forma isn't -- you

1    know, more detailed pro forma didn't make sense at

2    the time or something to that effect.

3    BY MS. SWEENEY:

4        Q    I'm asking more specifically about your

5    understanding of what the overhead expenses were on

6    a going-forward basis.

7        A    My understanding was that the

8    investment --

9            MR. SADOCK:  Objection.  Vague as to time

10   and vague as to "you."

11           THE WITNESS:  Personally, my understanding

12   of expenses were what Mark was telling me they were

13   going to be either by text or email for tech

14   commitments.  That was my understanding the whole

15   time.

16   BY MS. SWEENEY:

17       Q    So your understanding of, quote, overhead

18   expenses, meant tech commitments?

19           MR. SADOCK:  Objection.  Misstates

20   testimony.  Asked and answered.

21           THE WITNESS:  I remember something about

22   licensing fees and something like that, but never a

23   mention -- I've never heard that there was going to

24   be a specified amount going towards per month in

25   some sort of detailed pro forma towards management

Justin Pannu  10/29/2018

```
 1   fees, I guess you could say.
 2   BY MS. SWEENEY:
 3        Q    I'm actually asking about overhead, not
 4   management fees.  I'm asking whether -- or what you
 5   did to ascertain what, quote, overhead expenses, end
 6   quote, meant?
 7             MR. SADOCK:  Objection.  Vague as to time.
 8   Asked and answered.  And vague as to "you."
 9             THE WITNESS:  I didn't ask what overhead
10   meant.  And I believe that was used as a
11   description, but I just trusted Willis' word on the
12   fact that the proceeds were going to be used for
13   tech commitments.
14   BY MS. SWEENEY:
15        Q    What did -- what did EnSource do to
16   determine what overhead expenses were prior to
17   making the investment in Hopewell?
18             MR. SADOCK:  Objection.  Asked and
19   answered.  Vague as to time.
20             THE WITNESS:  There was a question by
21   Jeff Merola.  He asked me to ask for that
22   information, and I believe I asked it on behalf of
23   EnSource.  So...
24   BY MS. SWEENEY:
25        Q    In what medium did you ask that?
```

Justin Pannu  10/29/2018

```
 1        A    By email for the operating expenses to
 2   date and what the expenditures might be going
 3   forward.
 4        Q    Who did you ask that of?
 5        A    Mr. Tatham.
 6        Q    But that was not in reference to this
 7   No. 2 in the use of proceeds in the term sheet?
 8        A    No.  I didn't know that existed at that
 9   point in time.
10        Q    There's also a draft subscription
11   agreement attached to this email on the next page.
12             Did you look at that at the time you
13   received this email on July of 2016?
14             MR. SADOCK:  Objection.  Lacks foundation.
15             THE WITNESS:  I probably did not.
16   BY MS. SWEENEY:
17        Q    I'm handing you another document that
18   we'll mark as Exhibit 5.
19             (Exhibit 5 was marked.)
20   BY MS. SWEENEY:
21        Q    This is an email from Tom Tatham to you
22   dated July 12th, 2016.
23        A    Uh-huh.
24        Q    And it looks like you're responding to
25   Tom's request to see if you've been able to sign the
```

Justin Pannu  10/29/2018

 1   NDA.

 2            Does that seem like an accurate summary?

 3       A    Yes.

 4            MR. SADOCK:  Objection.  Document speaks

 5   for itself.

 6   BY MS. SWEENEY:

 7       Q    And in the top email, the July 12th email,

 8   Mr. Tatham is attaching an executive summary.

 9            Do you see that?

10       A    I do.

11       Q    And it's attached to this exhibit on the

12   next page.

13            Did you read this executive summary when

14   you received this email?

15            MR. SADOCK:  Objection.  Vague as to time

16   and vague as to "you."

17            THE WITNESS:  I remember reading this

18   summary, yes, personally.

19   BY MS. SWEENEY:

20       Q    Going down to the fourth out of five

21   paragraphs of this executive summary, the one that

22   begins "Hopewell is seeking qualified debt and

23   equity investors."

24            Do you see where I'm looking?

25       A    Yep.

Justin Pannu  10/29/2018

1      Q    The second sentence there reads and I'll
2  just quote it:  "Proceeds from the private placement
3  will be used to acquire new leases and mineral
4  interest in the four initial targeted areas, for
5  working capital to continue the Company's
6  operations, and for the legal evaluation of
7  additional lease and mineral interest acquisition
8  opportunities within the Area of Mutual Interest."
9      A    Yes.
10      Q    Do you remember reading this at the time
11  that you reviewed the executive summary?
12      A    I believe so.
13      Q    What was your understanding of what,
14  quote, working capital, end quote, was?
15           MR. SADOCK:  Objection.  Vague as to time.
16  Calls for a legal conclusion.  Speculation.
17           THE WITNESS:  What I understood it as is
18  based on what Mark had said to me is they're tech
19  commitments to continue the company operations.
20  BY MS. SWEENEY:
21      Q    So you believed that you had a
22  conversation with Mark prior to July 12th, 2016?
23      A    Oh --
24           MR. SADOCK:  Objection.  Misstates
25  testimony.

Justin Pannu  10/29/2018

```
 1              THE WITNESS:  No, I don't -- if you're
 2    talking about at the time, no.  But I'm talking --
 3    I'm talking about right now.
 4    BY MS. SWEENEY:
 5         Q    You're talking about when you received
 6    this --
 7         A    When I received this.
 8         Q    -- email of --
 9              MR. SADOCK:  Slow down.  Slow down.
10    BY MS. SWEENEY:
11         Q    -- of July 20th -- I'm sorry, July 12th,
12    2016 --
13         A    Okay.
14         Q    -- did you have an understanding, you
15    personally have an understanding of what working
16    capital would be required to continue the company's
17    operations?
18         A    Yeah.  That -- at July 12th I probably did
19    not read that right at that time.
20         Q    Did you read it prior to having a meeting
21    with either Mark Willis or Tom Tatham?
22         A    I don't believe so.
23         Q    I'm handing you another email that we'll
24    call Exhibit 6.
25         A    Uh-huh.
```

Justin Pannu  10/29/2018

```
 1              (Exhibit 6 was marked.)

 2   BY MS. SWEENEY:

 3        Q     This is more emails.  The top one is dated

 4   July 22nd, 2016, and it is an email from you to

 5   Tom Tatham.

 6        A     Uh-huh.

 7        Q     Do you see that?

 8        A     I do.

 9        Q     And in this email you appear to be

10   attaching a signed NDA.

11        A     Yes.

12        Q     And the signed NDA is attached to this

13   agreement, is it not?

14        A     Yes.

15        Q     Why was it important to have the NDA?

16              MR. SADOCK:  Objection.  Vague as to when

17   and speculation as to important to whom.  Calls for

18   a legal conclusion.

19              THE WITNESS:  I don't know.  You'd have to

20   ask Tom.  He sent it to me, I believe.

21   BY MS. SWEENEY:

22        Q     What was your understanding of its

23   importance?

24        A     To retain whatever confidentiality --

25   whatever information that they gave me as
```

Justin Pannu  10/29/2018

```
 1   confidential.
 2        Q    The email that's directly below is dated
 3   July 18th, 2018, from Tom Tatham.
 4        A    Uh-huh.
 5        Q    And it talks about a webinar on
 6   Title Rover technology.
 7             Do you see that?
 8        A    Where is it?  I'm sorry?
 9        Q    The email dated July 18th from Tom Tatham
10   to you, it's on the front page.  It says, "Please
11   let me know if you have any questions on the
12   Hopewell offering or are available this week for a
13   webinar on the Title Rover technology."
14        A    Yes, I see that.  I see that.
15        Q    And then when you sent your NDA back, in
16   the email directly above it says you look forward to
17   the webinar.
18             Do you see that?
19        A    Yes.  I was on the webinar.
20        Q    You were on the webinar?
21        A    Yes.
22        Q    Approximately how long did that last?
23        A    I don't remember.
24        Q    More than an hour?
25        A    I don't remember.
```

Justin Pannu  10/29/2018

1      Q     Less than an hour?

2      A     I don't remember.

3      Q     Who participated in the webinar?

4            MR. SADOCK:  Objection.  Calls for

5      speculation.

6            THE WITNESS:  I believe it was myself,

7      Jerry and maybe James Dibble.

8      BY MS. SWEENEY:

9      Q     What was it related to?

10     A     The technology.

11     Q     The Title Rover technology?

12     A     The Title Rover technology.

13     Q     What do you remember learning about

14     Title Rover during that webinar?

15     A     As I mentioned, that I didn't have much

16     say in that.  I think the questions were fired off

17     by Jerry and/or James.  I remember that the

18     technology was presented like it was working.

19     Q     In your words what was the technology

20     designed to do?

21     A     The technology was used to analyze, as far

22     as I understand it, title issues and finding chain

23     of title issues in terms of, you know, property

24     transfers or issues related to lineage or genealogy,

25     as far as I remember, and misspelled names and

Justin Pannu  10/29/2018

1   linking that together.

2           As far as I remember there was a

3   bright-line test on how the -- those leases had to

4   work and these pool designations of the oil fields,

5   and that if this technology could find those --

6   those issues with the -- with the title.

7           And that could be exploited by, you know,

8   looking at leases that were not done properly or

9   that were expiring within these units and selling

10  them back to -- you know, selling it back to the

11  operator, as far as I understand it.

12      **Q    Did you form an opinion about the**

13  **technology after the webinar, you personally?**

14      A    I believe I might have talked to Jerry

15  about that.  And after that, I formed his opinion.

16      **Q    What was his opinion?**

17      A    That the questions that were answered,

18  they answered the questions, and it appeared that it

19  looks like it was working, as far as I remember.

20      **Q    Was it your impression that Mr. --**

21  **Mr. Johns thought that the information learned in**

22  **the webinar was -- was good?**

23          MR. SADOCK:  Calls for speculation.

24          Counsel, continue your line of

25  questioning, but I just would like to ask for a

Justin Pannu  10/29/2018

```
 1    break when you get done with this line.

 2              THE WITNESS:  You'd have -- was -- so say

 3    it again?

 4    BY MS. SWEENEY:

 5         Q    Was it your impression that Mr. Johns had

 6    a favorable impression of the technology after the

 7    webinar?

 8         A    I believe so, yes.

 9         Q    To the extent we are interested in

10    learning about EnSource's thought process related to

11    the technology of Title Rover, would he be somebody

12    more knowledgeable than you?

13         A    I had a general overall understanding of

14    what the technology could do and the general overall

15    understanding of each of the topics since I was the

16    point person, but specifics, you would have to ask

17    on -- at what the technology could do from I would

18    say like a -- how the architecture was built or

19    things like that, those would be more Jerry's

20    territory.

21         Q    What about assessing the Title Rover

22    technology?

23         A    And assessing the Title Rover technology.

24    I -- in terms of the specifics.

25         Q    That would be Jerry Johns?
```

Justin Pannu  10/29/2018

1      A    Specifics, yes.  Generally I have an

2  understanding of what the technology is supposed to

3  be doing, but I'm no -- by no means Jerry Johns or

4  James Dibble.

5      **Q    Who -- did anybody ask any questions**

6  **during that webinar?**

7      A    I believe Jerry and James -- and/or James

8  did if James was on it.

9      **Q    Did you ask any questions?**

10     A    No, I don't believe so.  I don't remember

11 asking any questions.

12     **Q    Do you remember any specific questions**

13 **that Mr. Johns asked during that webinar?**

14     A    Yes, there was -- there was a question

15 that was asked and I didn't get -- I didn't

16 understand the question.  All I heard was IBM.  So

17 that -- that's something specific that the

18 technology was using was being used by IBM or

19 something to that effect.

20     **Q    Who gave the presentation during the**

21 **webinar?**

22     A    I don't remember.

23     **Q    Was Mr. Willis participating in the**

24 **webinar?**

25     A    I don't remember.

Justin Pannu  10/29/2018

```
 1              MR. SADOCK:  Objection.  Calls for
 2   speculation.
 3   BY MS. SWEENEY:
 4       Q    Was Mr. Tatham participating?
 5       A    I don't remember.
 6       Q    Do you know if Mr. Stanley was involved?
 7       A    I've seen the name but I -- he may have
 8   been presenting in an email.  But I don't remember
 9   if it was actually on the webinar.
10       Q    Was there a time at all during the webinar
11   where anyone from EnSource wanted to ask a question
12   and was denied the opportunity to do so?
13       A    I don't remember.
14              MR. SADOCK:  Objection.  Incomplete
15   hypothetical.  Lacks foundation.
16              THE WITNESS:  I don't -- I don't -- I
17   didn't ask any questions personally.  I don't
18   remember.  You'd have to ask Jerry or James.
19   BY MS. SWEENEY:
20       Q    You don't have a memory of someone saying
21   "I have a question" and a rep -- let me finish the
22   question -- and a representative from Hopewell or
23   Title Rover saying, nope, no more questions?
24              MR. SADOCK:  Objection.  Asked and
25   answered.
```

Justin Pannu  10/29/2018

```
 1              THE WITNESS:  I was in and out of that
 2   conference call, just working on other things,
 3   because when it got a little bit complex, but I
 4   was -- in terms of I was hearing everything, but --
 5   so, no, I wouldn't remember.  You'd have to ask
 6   them.
 7   BY MS. SWEENEY:
 8        Q    What did you do to prepare for your
 9   deposition today?
10        A    I met with my attorneys.
11        Q    When?
12        A    Last week.
13        Q    For how long?
14              MR. SADOCK:  Sorry, Counsel.  Do you want
15   to continue.  I just have a call I have to make in
16   about two minutes.
17              MS. SWEENEY:  Okay.  Let me finish this
18   line of questioning.
19              THE WITNESS:  We were going through
20   documents on -- I don't remember how long, probably
21   like -- it was a lot of documents to review.  Couple
22   hours, few hours.  I don't remember.
23   BY MS. SWEENEY:
24        Q    Did you only meet once?
25        A    Met twice.
```

Justin Pannu  10/29/2018

1      Q     Both times last week?

2      A     Both times last week.

3      Q     What days?

4      A     Sunday and Friday.

5      Q     Sunday this weekend?

6      A     Sunday --

7      Q     Yesterday?

8      A     -- Sunday of last weekend.

9      Q     Last weekend preceding.

10           Did you do anything to refresh your

11     recollection in preparation for this deposition?

12     A     I reviewed some emails and I reviewed

13     documents, data room, some of the data room stuff.

14     And I reviewed text messages.

15     Q     Do you remember any specific documents

16     that you reviewed?

17     A     I briefly reviewed because there's so many

18     of all these documents, so you'd have to point them

19     out.  And I can tell you whether I --

20     Q     I'm just asking what you recall, just

21     sitting here right now, anything specific?

22     A     No.  There's just too many for me to just

23     sitting here -- all of these emails I reviewed, text

24     messages, data room things like the opportunities

25     that were presented, the Title Rover presentation.

Justin Pannu  10/29/2018

1    The --

2        **Q      The webinar we're just talking about or a**

3    **different presentation?**

4        A     It might have been the webinar, but I'm

5    not sure if it is the webinar, but I think it was.

6             MS. SWEENEY:  All right.  Do you want to

7    take a break?

8             MR. SADOCK:  Yeah, five minutes.

9             MS. SWEENEY:  How long?

10            MR. SADOCK:  Five minutes.

11            MS. SWEENEY:  Okay.  Five minutes.

12            THE VIDEOGRAPHER:  Off the record.  The

13   time is 1:44 p.m.

14            (A recess was taken.)

15            THE VIDEOGRAPHER:  Back on the record.

16   The time is 1:53 p.m.

17   BY MS. SWEENEY:

18       **Q     All right.  I'm going to hand you another**

19   **document that we will mark as Exhibit 7.**

20            **(Exhibit 7 was marked.)**

21   BY MS. SWEENEY:

22       **Q     This is an email dated August 2nd, 2016.**

23   **It's from Mr. Tatham to Chad Martin, you Justin**

24   **Pannu, Jerome Johns and James Dibble.  Mark Willis**

25   **and Michelle Johnson are cc'd.**

Justin Pannu  10/29/2018

1              And the email says, "Gents:  Chad Martin

2     advised that you are all considering forming a

3     special-purpose entity in the form of a limited

4     liability company for the purposes of investing in

5     the purchase of Hopewell Shares."

6              Do you see that?

7        A    I do.

8        Q    And attached to the email are a bunch of

9     attachments.  It appears to be the Hopewell

10    subscription agreement, the private placement

11    memorandum, the company agreement, and the agreement

12    related to Title Rover.

13             Do you see that?

14       A    I do.

15       Q    Do you recall receiving this email?

16       A    I do remember this email.

17       Q    And this was sent to you prior to meeting

18    with either Mark or Tom in person?

19       A    I wouldn't be able to tell you that,

20    but -- probably, maybe.

21       Q    Do you have any way that you can refresh

22    your recollection and try and remember?

23             MR. SADOCK:  I will ask you not to guess.

24             THE WITNESS:  I don't remember.

25    ///

Justin Pannu  10/29/2018

1   BY MS. SWEENEY:

2        Q    **Is it a fair -- is the sentence that I**

3   **read a fair account of EnSource's thinking as of**

4   **August 2nd, 2016?**

5             MR. SADOCK:  Objection.  Document calls

6   for itself -- speaks for itself.

7             THE WITNESS:  I think so, yes.

8   BY MS. SWEENEY:

9        Q    **So as of August 2nd, 2016, you and the**

10  **others to whom this email was addressed were**

11  **considering creating a company for the purposes of**

12  **investing, right?**

13       A    I believe so, yes.

14       Q    **Does that mean that the decision had been**

15  **made as of August 2nd, 2016, that you were going**

16  **to -- you being EnSource -- purchase the Hopewell**

17  **shares?**

18            MR. SADOCK:  Objection.  Calls for a legal

19  conclusion.  Calls for speculation.  Incomplete

20  hypothetical.

21            THE WITNESS:  I have to listen to him at

22  the same time, so you are going to have to go again.

23  BY MS. SWEENEY:

24       Q    **All right.  So then is it a true statement**

25  **that as of August 2nd, 2016, EnSource or what became**

Justin Pannu  10/29/2018

1   **EnSource had already decided to invest in Hopewell?**

2              MR. SADOCK:  Objection.

3              THE WITNESS:  I --

4              MR. SADOCK:  Let me say the objection.

5   Calls for a legal conclusion and incomplete

6   hypothetical.  Speculation.

7              You can answer.

8              THE WITNESS:  I don't -- you'd have to

9   talk to the other members.  I can't speak

10  specifically for them, but I just don't remember if

11  at that time we had decided to invest or not on that

12  specific --

13  BY MS. SWEENEY:

14      Q    **Had you decided to vest?**

15      A    -- on that specific date.

16      Q    **Had you decided to invest by August 2nd,**

17  **2016?**

18      A    I don't know.  I couldn't tell you that.

19      Q    **And you're the representative with the**

20  **person most knowledgeable of EnSource, correct?**

21      A    Correct.  Generally on these most specific

22  topics, but the details you would have to ask

23  different people for different things.

24      Q    **Who would be the person most knowledgeable**

25  **about when EnSource decided to make its investment**

Justin Pannu  10/29/2018

1    **in Hopewell?**

2         A     I don't think there's any specific person.

3    I just don't have a memory.

4              MR. SADOCK:  Objection.  Calls for a legal

5    conclusion.  The witness here today has been

6    designated as the person most knowledgeable.

7    BY MS. SWEENEY:

8         **Q     As the person most knowledgeable, when did**

9    **EnSource or the people that comprise EnSource decide**

10   **to make the investment in Hopewell?**

11        A     I couldn't remember specifically.

12        **Q     Would there have been any reason to set up**

13   **a limited liability company if not for the purpose**

14   **of investing in Hopewell?**

15             MR. SADOCK:  Objection.  Vague as to time.

16   Calls for a legal conclusion.  And incomplete

17   hypothetical.

18             THE WITNESS:  It's possible that we could

19   have thought about an entity as we all -- but we

20   weren't for certain that we would invest.

21   BY MS. SWEENEY:

22        **Q     So when this email says that you were**

23   **considering forming a special-purpose entity for the**

24   **purpose of investing and the purchase of Hopewell,**

25   **that is not an accurate statement?**

Justin Pannu  10/29/2018

```
1              MR. SADOCK:  Objection.  Calls for
2    speculation.  Email speaks for itself.
3              THE WITNESS:  Yeah, the email speaks for
4    itself, but I think on behalf of EnSource, if we
5    were going to invest, we would be creating a
6    special-purpose entity is what I -- I don't know
7    what Chad -- how Chad advised Tom Tatham.  So it
8    says there Chad talked to Tom.
9    BY MS. SWEENEY:
10        Q    Is it possible that Chad Martin might be
11   the person most knowledgeable on the issue of when
12   the people comprising EnSource decided to invest in
13   Hopewell?
14        A    No.
15             MR. SADOCK:  Objection.  Calls for a legal
16   conclusion.  Speculation.  Asked and answered.
17             THE WITNESS:  He would not be.
18   BY MS. SWEENEY:
19        Q    He would not be the person?
20        A    No, he would not be.  Probably be the last
21   person.
22        Q    Why do you say that?
23        A    He wasn't as involved in the technology
24   due diligence, the funds, how the funds were going
25   to be used.  All those sorts of things he relied
```

Justin Pannu  10/29/2018

1    upon myself and Jerry and Jeff Merola and

2    James Dibble.

3        Q    Who was most involved in the due diligence

4    of Hopewell?

5             MR. SADOCK:  Objection.  Vague as to time.

6    Vague as to the term "due diligence."

7             THE WITNESS:  I believe I was.  I think I

8    was the most involved.  I was comprising of

9    the -- you know, I was the one that was retrieving

10   all the questions and sending them off and

11   coordinating the effort.

12   BY MS. SWEENEY:

13       Q    Were you --

14       A    Generally, yeah.  For specifics you would

15   probably have on different topics and different

16   areas and details.  There are a number of other

17   members involved.

18       Q    Was there -- were you the only person that

19   was the designated scribe in terms of correspondence

20   about due diligence questions with Hopewell?

21       A    I don't think there was an appointment,

22   but I just became that person.

23       Q    So is it fair to say that if other members

24   of EnSource had questions, they would send them to

25   you, and you would forward them to Hopewell?

Justin Pannu  10/29/2018

```
 1       A    Most of the time.
 2       Q    Can you remember any specific examples of
 3  times where that was not the case?
 4       A    I think that when I was out of town, Jerry
 5  took over on some of the due -- the anti-dilution
 6  issues and the noncash consideration and things like
 7  that.
 8            Other than that I think I was mostly the
 9  person that was the scribe, so to say, or the point.
10       Q    I notice in this email chain the email
11  address for Jerry Johns says
12  jerryjohns@intelometry.com.
13            Is Intelometry somehow related to
14  Kilimanjaro?
15       A    You'd have to ask Jerry.
16       Q    You don't know?
17       A    I don't know.
18       Q    So on August 2nd, 2016, when you received
19  this email, which is Exhibit 7, did you review the
20  attached documents, you personally?
21       A    August 2nd, 2016?
22       Q    Correct.
23       A    I probably hadn't yet reviewed them at
24  that time, no.
25       Q    Do you recall when you reviewed these
```

Justin Pannu  10/29/2018

1    **documents?**

2        A    Well, to me these were unexecuted versions

3    of it, anything that would require an attorney to

4    look at.  So I wouldn't review things like this

5    until I had an attorney review it.  That's just

6    my -- that is just how I personally do things.

7        **Q    And are you speaking on behalf of EnSource**

8    **with that response as well?**

9        A    We had an attorney review this stuff.  I

10   don't know if any of the other members would have

11   reviewed it by themselves, but you'd have to ask

12   them.

13       **Q    Did there ever come a time when you**

14   **reviewed these documents?**

15           MR. SADOCK:  Vague as to "you."

16           THE WITNESS:  When I briefly reviewed

17   these --

18           MR. SADOCK:  Vague as to "you" and "these

19   documents."

20           THE WITNESS:  Yeah, these --

21           MS. SWEENEY:  You guys were talking over

22   each other.  Let's try and not do that.  It's hard

23   for the court reporter.

24           Do you want to finish your objection?

25           MR. SADOCK:  Just vague as to "you" and

Justin Pannu  10/29/2018

1     vague as to "these documents."

2              THE WITNESS:  I personally, and not on

3     behalf of EnSource, would have reviewed things that

4     I was signing on behalf of EnSource, but briefly

5     because I trusted my attorney.

6     BY MS. SWEENEY:

7          **Q     You understood that you were being**

8     **solicited to make an investment of Hopewell,**

9     **correct?**

10         A     Right.

11         **Q     So is it fair to say that EnSource was**

12    **interested in learning what that investment was all**

13    **about?**

14         A     Yes.

15         **Q     And that would be important to discover**

16    **prior to actually making the investment, correct?**

17         A     Correct.

18         **Q     And so is it fair to say that somebody at**

19    **EnSource reviewed these documents prior to them**

20    **being signed in order to make a decision to make the**

21    **investment?**

22             MR. SADOCK:  Vague.  Calls for

23    speculation.  Incomplete hypothetical.

24             THE WITNESS:  I personally relied on what

25    Willis and Tatham were telling me in emails or by

Justin Pannu  10/29/2018

1    text or by verbal communication.

2         Yes, but it is fair that somebody would

3    have thoroughly reviewed these documents to say that

4    on behalf of EnSource prior to our investment.

5    BY MS. SWEENEY:

6         Q    So your -- you personally, your sole

7    calculus in entering into the subscription agreement

8    and making an investment in Hopewell was relying on

9    the words of Mark Willis and Tom Tatham; is that

10   accurate?

11        MR. SADOCK:  Objection.  Misstates

12   testimony.

13        THE WITNESS:  Not solely on, but mostly

14   on.  And there were -- there was certain things that

15   I had read such as the -- what the capital -- what

16   the PPM stated in the sense that the working capital

17   was going to be used to continue.  I remember that.

18   I don't know when I specifically read that, but that

19   was at some point before it was signed.

20   BY MS. SWEENEY:

21        Q    So looking at Exhibit 7, if you scroll

22   through it, please, it's the thicker one in front of

23   you.  I believe it's the one that you've already

24   turned over.

25        A    Okay.

Justin Pannu  10/29/2018

1        Q     And if you scroll through to Plaintiff

2   000783.  783 at the bottom.

3        A     Okay.

4        Q     That's the private placement memorandum.

5        A     Yes.

6        Q     Is this a document that you read

7   personally?

8              MR. SADOCK:  Objection.  Lacks foundation.

9   Vague as to time.

10             THE WITNESS:  I read that at some point,

11  yes.

12  BY MS. SWEENEY:

13       Q     And this is the document that explains

14  what the investment is all about, right?

15       A     Right.

16       Q     And you have some familiarity with private

17  placement memorandums, correct?

18             MR. SADOCK:  Objection.  Misstates prior

19  testimony.

20             THE WITNESS:  I do, but nothing -- no PPM

21  this complex.  And at that point in time I would

22  have relied on how that was explained to me.

23  BY MS. SWEENEY:

24       Q     Did you understand that the private

25  placement memorandum was the document that described

Justin Pannu  10/29/2018

```
 1   what the investment was?

 2       A    Yes.

 3       Q    And it was -- it was the document that you

 4   would be able to rely upon in making decisions about

 5   whether or not to make an investment in the company?

 6       A    I understood that.

 7            MR. SADOCK:  Objection -- slow down.

 8   Objection.  Calls for a legal conclusion.  Vague as

 9   to time.  Calls for expert testimony.

10   BY MS. SWEENEY:

11       Q    I'm sorry?

12       A    I'm sorry.  Ask the question again.

13       Q    Your testimony was you understood that?

14       A    Understood what?

15       Q    That this was the document that was

16   setting forth the investment that was being offered

17   to you.

18       A    Okay.  So it wasn't just this private

19   placement memorandum that I relied upon.  It was

20   also Marks's word and Tatham's words and verbal

21   communications that I relied upon as well, not

22   specifically just this document.

23       Q    But you understood that this was the

24   document that formally set out what was being

25   offered and what the investment was all about,
```

Justin Pannu  10/29/2018

1    **right?**

2              MR. SADOCK:  Objection.  Misstates

3    testimony.  Asked and answered.

4              THE WITNESS:  I have the same answer as my

5    last.

6    BY MS. SWEENEY:

7         **Q    And on behalf of EnSource as the person**

8    **most knowledgeable, you had an understanding that**

9    **the private placement memorandum set forth the terms**

10   **of the opportunity being presented, right?**

11             MR. SADOCK:  Objection.  Asked and

12   answered.  Calls for a legal conclusion.

13             THE WITNESS:  You'd have to ask the other

14   members on how they felt about it.  But on behalf of

15   EnSource, it was this private placement along with

16   what Mark Willis and Tom Tatham represented to us.

17   BY MS. SWEENEY:

18        **Q    And you hadn't yet had a meeting with**

19   **Mark Willis or Tom Tatham when you received this,**

20   **right?**

21        A    Yeah, but I also hadn't read it.

22             MR. SADOCK:  Objection.  Vague as to time.

23   BY MS. SWEENEY:

24        **Q    So turning to page 784 of Exhibit 7, which**

25   **is the executive summary of the private placement**

Justin Pannu  10/29/2018

1    **memorandum.**

2        A    Okay.

3        Q    **784.**

4        A    Okay.

5        Q    **And the last -- or second-to-last full**

6    **paragraph at the bottom of the executive summary**

7    **sets forth that Hopewell is seeking investors to**

8    **provide up to $2 million in funds --**

9        A    Right.

10       Q    **-- from the placement of over -- of up to**

11   **one million dollars additional equity shares.**

12            **Do you see that?**

13       A    I do.

14       Q    **So you understood that the goal of the**

15   **private placement memorandum was to generate**

16   **$2 million of funds, correct?**

17            MR. SADOCK:  Objection.  Calls for a legal

18   conclusion and leaves out the rest of the paragraph.

19            THE WITNESS:  Yes, I believe on --

20   personally or on behalf of EnSource.  Which one are

21   you talking about?

22   BY MS. SWEENEY:

23       Q    **On behalf of EnSource.**

24       A    I see that, yes.  So on behalf of

25   EnSource, I see that's what it says.

Justin Pannu  10/29/2018

1       Q     And if you continue on in that

2   paragraph --

3       A     Okay.

4       Q     -- it says that the purpose of acquiring

5   up to $2 million in funds is for acquiring new lease

6   and mineral interest acquisitions and for working

7   capital to continue the company's operations and

8   evaluations of lease acquisition opportunities.

9             Do you see that in that paragraph?

10      A     I do.

11      Q     Did you at the time, August 2nd, 2016,

12  have an understanding, you on behalf of EnSource, of

13  what working capital was necessary to continue the

14  company's operations?

15      A     As --

16            MR. SADOCK:  Objection.  Asked and

17  answered as it pertains to working capital.  Calls

18  for a legal conclusion.

19            THE WITNESS:  I don't think I read this as

20  of August 2nd.  So we're getting confused on time.

21  I believe it was after I had met Tatham and Willis

22  that I had looked through some of this

23  documentation.

24  BY MS. SWEENEY:

25      Q     Okay.  And this was the second time you

Justin Pannu  10/29/2018

1   **had seen the executive summary or that the executive**

2   **summary had been sent to you?**

3       A    I -- yeah.

4           MR. SADOCK:  Objection.  Misstates

5   testimony.

6           THE WITNESS:  I agree it was sent to me

7   before I met Tatham and Willis.

8   BY MS. SWEENEY:

9       Q    **I'm asking if this was the second time it**

10  **was sent to you.**

11      A    I don't remember.

12      Q    **If you look back at Exhibit 5.**

13      A    Okay.  All right.

14      Q    **This is an email to you where it says "I'm**

15  **attaching an executive summary"?**

16      A    Right.

17      Q    **And that was the first time that you were**

18  **sent the executive summary, right?**

19      A    That was I believe so...

20      Q    **Okay.  So now in Exhibit 7, this is the**

21  **second time you are receiving it?**

22      A    I believe so, yes.

23      Q    **Continuing on in this document, still in**

24  **the private placement memorandum, page 786, there's**

25  **a large section entitled "Risk Factors."**

Justin Pannu  10/29/2018

1          Do you see that?

2      A    I do.

3      Q    In August, early August 2016, did you read

4  this section about risk factors of this investment?

5          MR. SADOCK:  Objection.  Asked and

6  answered.

7          THE WITNESS:  Probably not.

8  BY MS. SWEENEY:

9      Q    At any point did you read about the risk

10  factors involved in this investment?

11     A    Possibly afterwards.  After I met Tom and

12  Mark.

13     Q    You understood that it was not a sure

14  thing that the Title Rover technology was going to

15  find additional leaseholds?

16     A    I didn't understand -- that was

17  something -- when I was reviewing -- when I started

18  to review these documents, I had to give my attorney

19  it to look over.

20     Q    Just -- I'm not asking about specific

21  language.  Did you, on behalf of EnSource, know that

22  nobody was guaranteeing that Title Rover would do

23  what it said it did, right?

24         MR. SADOCK:  Vague as to do as what

25  Title Rover said it would do.

Justin Pannu  10/29/2018

```
 1                THE WITNESS:  Could you be more specific,
 2     like what exactly?
 3     BY MS. SWEENEY:
 4          Q     Did you know whether there was a guar- --
 5     did you feel there was a guarantee that Title Rover
 6     was going to find defects in title such that new
 7     leases could be acquired?
 8          A     I knew that they -- what they represented
 9     to me was that they had found defects in title.
10          Q     Did you know -- did you feel it was a
11     guarantee they would find more?
12                MR. SADOCK:  Objection.  Asked and
13     answered.
14                THE WITNESS:  That's something that on
15     behalf of EnSource I wouldn't be able to -- I
16     wouldn't be able to answer that.  I had my attorneys
17     look this over.
18     BY MS. SWEENEY:
19          Q     It's a yes-or-no question.  Did you feel
20     that you were being given a guarantee --
21          A     I don't --
22                MR. SADOCK:  Let her finish the question.
23     BY MS. SWEENEY:
24          Q     Did you feel like you were being given a
25     guarantee that Title Rover would find defects,
```

Justin Pannu  10/29/2018

1    **additional defects?**

2             MR. SADOCK:  Vague as to time.  Lacks

3    foundation.

4             THE WITNESS:  Something you're going to

5    have to ask, again, my attorney about.

6    BY MS. SWEENEY:

7         **Q    I'm asking about your knowledge on behalf**

8    **of EnSource.  As the person most knowledgeable, did**

9    **EnSource believe that there was a guarantee that**

10   **Title Rover would find other defects?**

11        A    I don't know.

12        **Q    As the person most knowledgeable on behalf**

13   **of EnSource, did you believe that there was a**

14   **guarantee that Hopewell would be able to**

15   **successfully negotiate leases on a going-forward**

16   **basis?**

17        A    There was a feeling that there was, but I

18   don't know if there was a guarantee on behalf of

19   EnSource.

20        **Q    On behalf of EnSource, did you have any**

21   **sense that this was a risky venture?**

22        A    With my discussions with Mark Willis, he

23   believed that he -- this was something that could be

24   monetized in a -- and the potential payoffs were

25   very large, and he made it sound like it was an

Justin Pannu  10/29/2018

1    opportunity of a lifetime and that his friends

2    shouldn't forgo it.  So that was the understanding

3    that EnSource had.

4         Q    Does that mean EnSource believed there was

5    no risk involved?

6         A    That's -- no.  There's -- there's -- I

7    believe there is risk involved in this on behalf of

8    EnSource, but it was a reduced -- the way Mark

9    described it, it was a very reduced probability.

10        Q    There was a reduced probability that it

11   would be unsuccessful?

12        A    Right.

13        Q    Were you given a guarantee, you on behalf

14   of EnSource, a guarantee about a certain rate of

15   return on your investment?

16             MR. SADOCK:  Objection.  Calls for a legal

17   conclusion.  Vague as to time.

18             THE WITNESS:  There was -- I don't

19   remember them giving a guarantee other than a

20   pro forma of what the values of the lease could

21   bring.

22   BY MS. SWEENEY:

23        Q    Did you on behalf of EnSource believe that

24   the pro forma was a guarantee?

25             MR. SADOCK:  Asked and answered.  Calls

Justin Pannu  10/29/2018

1    for a legal conclusion.

2            THE WITNESS:  Based on Mark Willis'

3    representations, we believed there was reduced

4    risk -- a reduced probability on the risk of it not

5    occurring based on his relationships and Tatham's

6    relationships.

7    BY MS. SWEENEY:

8        Q    So that's not my question.

9            My question was:  Do you, on behalf of

10   EnSource, believe that it was a guarantee that you

11   would have a certain rate of return?

12       A    Reduced risk I don't believe means

13   guarantee.

14       Q    So you did not see it was a guarantee?

15       A    It was a reduced risk.

16       Q    So going back to this document with the --

17   with the header entitled "Risk Factors," when you

18   look down at subpart F, as in Frank, it says,

19   "Investment in oil, gas and mineral leases is a

20   speculative undertaking with a high degree of risk.

21   Investors that cannot afford substantial risk and

22   the entire loss of their invested capital should not

23   undertake the proposed investment."

24           Do you see that?

25       A    I see that.

Justin Pannu  10/29/2018

```
 1       Q      Did you read that at any time prior to
 2   making the investment?
 3              MR. SADOCK:  Objection.  Asked and
 4   answered.
 5              THE WITNESS:  I don't remember reading it,
 6   no.
 7   BY MS. SWEENEY:
 8       Q      Do you understand that this sentence in --
 9   or two sentences in Section F to be true?
10              MR. SADOCK:  Objection.  Calls for
11   speculation.  Legal conclusion.
12              THE WITNESS:  Based on what Mark Willis
13   told me personally, he believed that he could
14   execute on the opportunities that were identified by
15   Title Rover.
16   BY MS. SWEENEY:
17       Q      So you thought you could disregard the
18   risks that were delineated in the PPM based on --
19       A      No.
20       Q      -- based on communications that you had
21   with Mr. Willis or Mr. Tatham?
22              MR. SADOCK:  Objection.  Misstates
23   testimony.  Vague as to time.  Calls for speculation
24   and incomplete hypothetical.
25              THE WITNESS:  No.  It is something that I
```

Justin Pannu  10/29/2018

```
 1    would have had my attorney review.

 2    BY MS. SWEENEY:

 3         Q     Did you?

 4         A     I believe so.

 5         Q     Turning to page 818 of this document,

 6    Exhibit 7, please, says Exhibit A.  And the title is

 7    "Application of Proceeds of Capital Contributions

 8    for Initial Additional Equity Shares."

 9              And I will just read it for the record.

10    "Approximately $125,000 to $175,000 per month to be

11    spent as per Exhibit B covering estimated current

12    operating requirements through the end of calendar

13    2016."

14              It goes on to say, "The balance of the

15    Proceeds will be used for the purchase of Oil, Gas

16    and Mineral Interests."

17              Do you see that?

18         A     I do.

19         Q     At what point did you read that page of

20    the private placement memorandum?

21              MR. SADOCK:  Objection.  Lacks foundation.

22    Asked and answered.

23              THE WITNESS:  I remember having my

24    attorney review this information.

25    ///
```

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:

 2        Q    Do you remember reading it, you

 3   personally?

 4        A    I don't remember.

 5             MR. SADOCK:  Vague as to time.

 6             THE WITNESS:  I don't remember.

 7   BY MS. SWEENEY:

 8        Q    Does it ring any bells that approximately

 9   between 125- and $175,000 per month would be spent

10   on operating expenses?

11        A    It rung a bell when Tatham said that to me

12   in an email.

13        Q    And you understood, then, that the balance

14   of the proceeds after the monthly operating expenses

15   would be used for the purchase of oil, gas and

16   mineral interests?

17             MR. SADOCK:  Objection.  Lacks foundation.

18   Calls for speculation.  And legal conclusion.

19             THE WITNESS:  I don't remember reading

20   this specific thing other than an email from Tom.

21   BY MS. SWEENEY:

22        Q    Okay.  But you have no reason to doubt

23   that these documents were included in the

24   August 2nd, 2016, email that we've been looking at?

25        A    No reason to doubt that, no.
```

Justin Pannu  10/29/2018

1      Q    I'm handing you another document that we

2  will call Exhibit 8.

3           (Exhibit 8 was marked.)

4  BY MS. SWEENEY:

5      Q    And it is another email dated August 8,

6  2016, and it's an email from Tom Tatham to somebody

7  named Robert Humphrey, but you are cc'd --

8      A    Yes.

9      Q    -- on that email.

10          Do you see that?

11     A    I do.

12     Q    And the email is providing some

13 information to Mr. Humphrey, but it's also attaching

14 several documents.

15          Do you see that?

16     A    I do.

17     Q    And the documents being attached on

18 August 8th, 2016, are the, No. 1, Executive Summary;

19 No. 2, the Hopewell Project Units Map; No. 3, the

20 Hopewell Pilot Project Term Sheet; No. 4,

21 Title Rover Business and Exploitation Plan; and

22 No. 5, Title Rover Exploitation Plan.

23          Do you see that?

24     A    I do.

25     Q    And so you received these -- do you have

Justin Pannu  10/29/2018

1    any reason to believe you did not also receive these

2    attachments when you were cc'd on this email dated

3    August 8th, 2016?

4        A    I believe I received these.

5        Q    Did you review the documents that were

6    attached to the August 8th, 2016, email when you

7    received them?

8        A    No.

9        Q    If I told you that the meeting that you

10   had with Mr. Willis was on August 8th, 2016, does

11   that sound consistent with your memory?

12       A    I don't know.

13            MR. SADOCK:  Objection.  Asked and

14   answered.

15   BY MS. SWEENEY:

16       Q    Would you have any way to determine the

17   exact date of that meeting?

18            MR. SADOCK:  Objection.  Asked and

19   answered.

20            THE WITNESS:  I produced records.

21   BY MS. SWEENEY:

22       Q    What sort of records did you produce that

23   would show the date of that meeting?

24       A    Text messages.

25       Q    And the text messages would also show the

Justin Pannu  10/29/2018

```
 1   date of the meeting with Mr. Tatham?

 2        A    Yeah.  You could infer from the text

 3   messages.

 4        Q    In either the meeting with Mr. Tatham or

 5   the meeting with Mr. Willis in person, did you

 6   receive documents from them during those meetings?

 7             MR. SADOCK:  Objection.  Compound.  Vague

 8   as to time.

 9             THE WITNESS:  I don't remember receiving

10   any documents.

11   BY MS. SWEENEY:

12        Q    At either meeting?

13        A    At either meeting.

14        Q    I am handing you a document that we will

15   mark as Exhibit 9.

16             (Exhibit 9 was marked.)

17   BY MS. SWEENEY:

18        Q    This is another email from you to

19   Mr. Willis.

20        A    Right.

21        Q    And it's attaching a revision to the NDA?

22        A    Yes.

23        Q    You say in this email, it is required

24   prior to updating our attorney today at 5:00 p.m.

25             Do you see that?
```

Justin Pannu  10/29/2018

```
1        A    Yes.

2        Q    And the reason for the revision was to

3   include -- to allow legal counsel to review the

4   documents you had received; is that right?

5        A    Yes.

6             MR. SADOCK:  Justin, slow down so I can

7   insert my objections.

8             Vague as to time.

9   BY MS. SWEENEY:

10       Q    So prior to August 15th, 2016, the date of

11  this email, may I assume that EnSource had not

12  provided any material to its attorneys?

13            MR. SADOCK:  Objection.  Calls for

14  speculation.

15            THE WITNESS:  I believe so.

16  BY MS. SWEENEY:

17       Q    Because you wanted to make sure that the

18  attorney was authorized to receive the information

19  via the NDA, right?

20       A    Yes.

21       Q    Okay.  Exhibit 10 is going to be the

22  revised NDA.

23            (Exhibit 10 was marked.)

24  BY MS. SWEENEY:

25       Q    Is that your signature on the third page
```

Justin Pannu  10/29/2018

1    of Exhibit 10?

2        A    It is.

3        Q    And if you just can take a look at it and

4    confirm that this is the revised NDA that reflects

5    the changes made to enable you to let your attorney

6    review the documents?

7        A    Okay.  I believe it does.

8        Q    Was this the only revision made to the

9    NDA, your NDA?

10            MR. SADOCK:  Objection.  Lacks foundation.

11   Calls for speculation.  Calls for a legal

12   conclusion.

13            THE WITNESS:  I believe so, yes.

14   BY MS. SWEENEY:

15       Q    So this would be the final binding NDA

16   agreement between you and Hopewell?

17            MR. SADOCK:  Objection.  Calls for a legal

18   conclusion and speculation.

19   BY MS. SWEENEY:

20       Q    You may answer.

21            MR. SADOCK:  You can answer.

22            THE WITNESS:  I believe so, yes.

23   BY MS. SWEENEY:

24       Q    And is there any reason to believe that

25   these same changes were not made -- sorry.  Strike

Justin Pannu  10/29/2018

1    that.

2           Is there any reason to doubt that the

3    changes made to your NDA were also made to the NDAs

4    of the other members of EnSource?

5           MR. SADOCK:  Objection.  Calls for expert

6    testimony and speculation and attorney-client

7    privilege.

8           THE WITNESS:  I don't know.  You'd have to

9    ask them.  I don't remember.

10   BY MS. SWEENEY:

11      Q    Well, going back to Exhibit 9, your email

12   specifically says, "Jerry, Chad, Jeff Merola, James

13   Dibble, Intex, Chad and a couple of other Chad's

14   investor friends will need to make the same

15   revisions today as well."

16           Do you see that?

17           MR. SADOCK:  Objection.  Calls for

18   speculation.  Privileged communications.

19           THE WITNESS:  I see that.

20           MS. SWEENEY:  How is that privileged

21   asking if he sees something in a document that I'm

22   reading?

23           MR. SADOCK:  Well, if you're asking about

24   what documents either these individuals had reviewed

25   with their attorney in some way.

Justin Pannu  10/29/2018

1               MS. SWEENEY:  I didn't.  I asked do you

2    see that it says that?

3               MR. SADOCK:  Okay.  If you're asking what

4    the email says, you can answer that.

5               THE WITNESS:  Yes.

6    BY MS. SWEENEY:

7        **Q    Do you have any reason to believe that the**

8    **same revisions were not made in the other potential**

9    **investors?**

10              MR. SADOCK:  Objection.  Calls for

11   speculation.

12              THE WITNESS:  I don't remember.  I really

13   don't.

14   BY MS. SWEENEY:

15       **Q    Do you have any reason to believe that**

16   **that would not have happened?**

17              MR. SADOCK:  Objection.  Calls for

18   speculation.

19              THE WITNESS:  I don't know.

20   BY MS. SWEENEY:

21       **Q    As the person most knowledgeable of**

22   **Hopewell, your testimony is you don't remember?**

23       A    I don't remember.

24              (Exhibit 11 was marked.)

25   ///

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:
 2        Q    Okay.  I just handed you what we'll mark
 3   as Exhibit 11, which is an email at the top from you
 4   to Mr. Tatham dated August 17, 2016.  The subject
 5   line is "Due diligence List - Dropbox or Online Data
 6   Room."
 7             Do you see that?
 8        A    I do.
 9        Q    And then there are two documents listed.
10   One is called a due diligence request list for
11   Title Rover, and the other is called a due diligence
12   request list for Hopewell-Pilot.
13             Do you see that?
14        A    I do.
15        Q    I think if you turn the page to the email
16   that originated the email chain, it's dated
17   August 16, 2016.  Again, it's a email from you.
18             It says, I hope this note -- or "Hope this
19   note finds you well.  Attached are due diligence
20   lists for both Hopewell-Pilot Project, LLC and
21   Title Rover, LLC."
22             Do you see that?
23        A    I do.
24        Q    So if you just flip the page through the
25   various due diligence checklists, are those the
```

Justin Pannu  10/29/2018

```
 1   checklists that you provided to Tom Tatham?

 2       A    Yes.  I believe so, yes.

 3       Q    And this is the information that EnSource

 4   wanted to learn about Hopewell prior to making the

 5   investment in Hopewell, correct?

 6       A    Correct.

 7       Q    Who created the due diligence list?

 8       A    I don't believe it was any of the EnSource

 9   members.

10       Q    It was your lawyer?

11            THE WITNESS:  Is that attorney-client

12   privilege?

13            MR. SADOCK:  No.

14            THE WITNESS:  Yes.

15   BY MS. SWEENEY:

16       Q    Had you ever used this due diligence

17   checklist before?

18            MR. SADOCK:  Objection.  Vague as to

19   "you," and vague as to time.

20            THE WITNESS:  I don't remember if I had.

21   BY MS. SWEENEY:

22       Q    In connection with other investments that

23   you personally are involved in, did you use a due

24   diligence list similar to this?

25       A    It's possible.
```

Justin Pannu  10/29/2018

```
 1       Q    When you received this document from your
 2   attorney, did you make any revisions to it or
 3   additions?
 4       A    No.
 5            MR. SADOCK:  Objection.  Vague as to time.
 6   Lacks foundation.
 7   BY MS. SWEENEY:
 8       Q    Prior to sending it to Hopewell, did you,
 9   on behalf of EnSource, make any changes, revisions,
10   additions to the due diligence checklist?
11       A    I don't believe so, no.
12       Q    At any time after this due diligence
13   checklist was sent to Hopewell, did you, on behalf
14   of EnSource, make any additions, changes to it?
15       A    After it was sent back to us?
16       Q    After you sent it, was it -- let me -- let
17   me ask it a different way.
18            Was this due diligence checklist something
19   that was being augmented or added to during the
20   course of the due diligence process or was the list
21   a finite list that as things were provided they were
22   just checked off?
23            MR. SADOCK:  Objection.  Vague as to time.
24   Vague as to "you" and compound.
25            THE WITNESS:  There were other questions
```

Justin Pannu  10/29/2018

```
 1    that we had asked other than this due diligence

 2    checklist.

 3    BY MS. SWEENEY:

 4        Q      So were those questions asked in either

 5    written or oral form or were they added to this

 6    checklist as additional line items?

 7        A      Oh, they were not added to this checklist.

 8        Q      Okay.  And just to be clear, the

 9    checklist, there is one here for Title Rover and

10    there's one for Hopewell --

11        A      Okay.

12        Q      -- right?

13        A      Right.

14        Q      How familiar are you on behalf of -- as

15    the person most knowledgeable of EnSource with this

16    due diligence checklist?

17        A      I've skimmed over it, so I probably know

18    it better than all of the other members of EnSource,

19    but I did only skim over it briefly.

20        Q      And I notice that there is no -- there's

21    no section in here requesting financial information

22    of either EnSource -- of either, excuse me, Hopewell

23    or Title Rover.

24               Did you notice that?

25               MR. SADOCK:  Objection.  Lacks foundation.
```

Justin Pannu  10/29/2018

1    Vague as to time.

2              THE WITNESS:  That was -- I didn't notice

3    that, but I asked that in another email.

4    BY MS. SWEENEY:

5         Q    **You asked that of your attorney or you**

6    **asked that of somebody else?**

7         A    Tatham.  I asked Tatham for operating

8    expenses to date and what capital expenditures he

9    was going to -- how -- what other capital

10   expenditures going forward and as well as

11   pro formas.

12        Q    **Okay.  Was there any concern to you as the**

13   **person most knowledgeable at EnSource that the due**

14   **diligence checklist did not seek any financial**

15   **information of Hopewell or Title Rover?**

16             MR. SADOCK:  Objection.  Calls for a legal

17   conclusion and misstates the document.

18             THE WITNESS:  I asked on behalf of

19   Jeff Merola, and you would have to ask him that.

20   BY MS. SWEENEY:

21        Q    **I'm asking if there was any concern on**

22   **your part?**

23        A    I didn't have a concern.

24        Q    **And Jeff Merola is the one that wanted you**

25   **to ask Mr. Tatham about the operating expenses?**

Justin Pannu  10/29/2018

1      A    Yes.

2      Q    Was he also the one that wanted you to ask

3   about the pro forma?

4      A    Yes.

5      Q    Did any of the other members of EnSource

6   ask you to ask about financial information prior to

7   making the financial investment in Hopewell?

8      A    I don't recall.  I don't believe so.

9      Q    In your email of August 16, which is on

10  the second page of Exhibit 11, your third paragraph

11  starts -- says, "The due diligence lists are fairly

12  comprehensive."

13          Do you still believe that to be true?

14          MR. SADOCK:  Objection.  Calls for a legal

15  conclusion.

16          THE WITNESS:  Where do I say that?

17  BY MS. SWEENEY:

18      Q    The second page of your -- of this exhibit

19  in the third paragraph.

20      A    Okay.  I see that.

21      Q    Do you still believe that to be true?

22          MR. SADOCK:  Objection.  Lacks foundation.

23          THE WITNESS:  It's fairly comprehensive.

24  BY MS. SWEENEY:

25      Q    So yes?

```
 1        A    Fairly comprehensive, yes.

 2        Q    Do you see in the next paragraph you said,

 3   "It was a pleasure to meet both you and Mark in

 4   San Diego"?

 5        A    Yes.

 6        Q    So can we assume that the meeting happened

 7   prior to August 16, 2016?

 8        A    Yes.

 9        Q    On the first page of Exhibit 11 in the

10   center of the page --

11        A    Do you mind if we take a break?

12        Q    Let's finish the question on the table.

13        A    Sure.  Which?

14        Q    In the second section of the first page

15   there's a email from Tom Tatham to you August 16,

16   4:16, he's responding to the due diligence that

17   you've asked for and he's saying that he thought the

18   best thing to do was to set up a Dropbox site or an

19   online data site.

20             Do you see that?

21        A    I do.

22        Q    So ultimately that's what happened,

23   correct?  Online data rooms were set up?

24        A    Yes.

25        Q    And that was underway within a few hours
```

Justin Pannu  10/29/2018

```
 1    of you asking for the due diligence, correct?
 2         A    You'd have to ask Tom that, but it appears
 3    so.
 4              MS. SWEENEY:  Okay.  Now would be a good
 5    time to take a short break.
 6              THE WITNESS:  Thank you.
 7              MS. SWEENEY:  How much time would you
 8    like?
 9              THE WITNESS:  Just a few minutes.
10              THE VIDEOGRAPHER:  This ends Media
11    No. 2 in the deposition of Justin Pannu.
12              The time off the record is 2:42 p.m.
13              (A recess was taken.)
14              THE VIDEOGRAPHER:  This begins Media
15    No. 3 in the deposition of Justin Pannu.
16              The time on the record is 2:54 p.m.
17              (Exhibit 12 was marked.)
18    BY MS. SWEENEY:
19         Q    All right.  Moving on to Exhibit 12, which
20    is another email chain.  The top email of this email
21    chain -- it's a five-page document, but the top
22    email is dated August 18, 2016, and it's an email
23    from you to Tom Tatham with some cc people.
24              But I'd like to start the discussion with
25    the second page of this exhibit which is an email
```

Justin Pannu  10/29/2018

```
 1    from you to Tom Tatham dated August 17, 2016.
 2              The subject line is "Talking points," and
 3    this appears to be an email from you to Tom related
 4    to talking -- talking points, to use your word,
 5    which appear to be questions related to the Hopewell
 6    investment.
 7              Do you have a memory of this email?
 8         A    I do.
 9         Q    And tell me what these questions were
10    about.
11              Well, that's a bad question.
12              Why did you send this email?
13         A    Which one?
14         Q    This email that we just talked about.
15         A    The whole chain?
16         Q    On August 17, the one that says "Talking
17    points."
18         A    Okay.  I'll have to read it.
19              It's a long email.  I sent the email
20    because we had these questions.
21         Q    Was this as you described before where you
22    were the person who was passing along questions on
23    behalf of the group of people that comprised
24    EnSource?
25         A    This is one of the emails, yes.
```

Justin Pannu  10/29/2018

1       Q     And am I correct that the portion of the

2  email that is highlighted in yellow are the

3  responses provided by Mr. Tatham?

4       A     Yes, I believe so.

5       Q     So when we look at your email and the

6  first question which is called the amount of units

7  issued for capital raise and valuation, you are

8  asking about the monthly cost of running Hopewell;

9  is that right?

10      A     That wasn't my -- on behalf of EnSource,

11  yes.

12      Q     Yes.

13            And Mr. Tatham's response which is in

14  yellow tells you that the -- the -- that the 17,500

15  a month only represents Hopewell's direct cost for

16  maintaining Title Rover.

17            And it goes on in the next page to say,

18  "The actual cost of maintaining Hopewell's current

19  level of operations is closer to $150,000 a month."

20            Do you see that?

21            MR. SADOCK:  Objection.  Misstates the

22  document.  The email.

23            THE WITNESS:  I see this, yes.

24  BY MS. SWEENEY:

25      Q     And that paragraph goes on to say:  The

Justin Pannu  10/29/2018

```
 1    placement of 1,000,000 Initial Additional Equity

 2    Shares at $2 per share was allocated to cover:

 3    No. 1, operating overhead through December 31st,

 4    2016 hyphen approximately $900,000; and 2,

 5    acquisition of leases, approximately a million

 6    dollars; and 3, legal expense necessary to validate

 7    top lease play, approximately 100,000.

 8             Do you see that?

 9        A    I see that.

10        Q    And when you received this email you

11    understood that?

12        A    I understood that.

13        Q    On page 1 of Exhibit 12 at the very bottom

14    of the page, you responded to Tom's email.  This is

15    dated August 18, 2016, still, and your email begins,

16    "We are still working on additional questions, and

17    will get those to you as quickly as we can."

18             And then it goes on later on to say, "It

19    would be helpful to understand capital expenditures

20    and operating expenses to date and into the future

21    to provide a benchmark."

22             Is this the email that you've been

23    referring to where you asked Tom Tatham for

24    operating expenses?

25        A    Yes.
```

Justin Pannu  10/29/2018

```
 1        Q     It goes on -- your email goes on to say,

 2   "Since this project may ultimately result in equity

 3   in Title Rover, would you be able to provide any

 4   pro forma for Title Rover?"

 5              That's the second part of the email we've

 6   been talking about?

 7        A     Yes.

 8        Q     Can you think of any other email offhand

 9   or any other writing in general where you

10   specifically asked Mr. Tatham for operating expenses

11   and a pro forma?

12              MR. SADOCK:  Objection.  Vague as to

13   "you."

14              THE WITNESS:  I don't remember any, no.

15   BY MS. SWEENEY:

16        Q     Okay.  So on the first page of Exhibit 12

17   now at the top of the page is Mr. Tatham's response

18   to that request.

19              Do you see that?

20        A     I see that.

21        Q     It starts off by saying, "Hopewell is an

22   exploitation/asset play! Proceeds from the private

23   placement will most likely be fully expended by the

24   end of 2016."

25              Did you see that?
```

Justin Pannu  10/29/2018

```
 1        A    I see that, yes.
 2        Q    And the next paragraph talks about
 3   purchases of leases and it says, quote, "Assuming
 4   the private placement is fully subscribed, if we are
 5   able to buy 1,000 acres of oil, gas and mineral
 6   leases," and it goes on to say how much money they
 7   anticipate Hopewell will raise."
 8             Do you understand that?
 9        A    I see that, yes.
10        Q    And you understood by this point that
11   fully subscribed meant a million shares, right?
12             MR. SADOCK:  Objection.  Calls for a legal
13   conclusion.
14             THE WITNESS:  Okay.  Ask the question
15   again.  Sorry.
16   BY MS. SWEENEY:
17        Q    You understood that fully subscribed meant
18   a million shares sold, right?
19             MR. SADOCK:  Objection.  Vague as to time.
20   Calls for a legal conclusion.
21             THE WITNESS:  I see that now.  I don't
22   remember at the time what I thought, yes, so...
23   BY MS. SWEENEY:
24        Q    Do you know, as you are sitting here
25   today, a million shares would cost the purchaser
```

Justin Pannu  10/29/2018

```
 1     $2 million, right?

 2         A     Right.

 3         Q     So the personal --

 4         A     Sitting here today?

 5         Q     Sitting here today.  You did not at the

 6     time?

 7         A     I didn't look directly at that piece of

 8     it, no.

 9         Q     Had you looked at the --

10         A     Personally, but other members may have.

11         Q     Had you looked at the private placement

12     memorandum by this point?

13         A     Yes.

14               MR. SADOCK:  Objection.

15               THE WITNESS:  I --

16               MR. SADOCK:  Asked and answered.

17               THE WITNESS:  Probably.  By this point, I

18     probably would have looked at it.  I don't know for

19     certain though.

20     BY MS. SWEENEY:

21         Q     When you look at your questions, they are

22     asking questions specific to the private placement

23     memorandum, are they not?

24               MR. SADOCK:  Objection.  Lacks foundation.

25               THE WITNESS:  Those aren't -- that wasn't
```

Justin Pannu  10/29/2018

1    my specific question personally.

2    BY MS. SWEENEY:

3         Q    **Okay.  But you, as the person most**

4    **knowledgeable of EnSource, knew as of the time these**

5    **the emails are going back and forth that the private**

6    **placement memorandum was seeking to sell one million**

7    **shares at a price of $2 million?**

8         A    Yes.

9              MR. SADOCK:  Objection.  Lacks foundation.

10   Calls for speculation.

11             THE WITNESS:  I believe so.

12   BY MS. SWEENEY:

13        Q    **And therefore that the pro forma or the**

14   **estimate of the value of that investment was based**

15   **on that being fully subscribed as said in the**

16   **section entitled "Purchase of leases."**

17             MR. SADOCK:  Objection.  Calls for a legal

18   conclusion.  Vague as to time.  Lacks foundation.

19             THE WITNESS:  Will you answer the question

20   again?  Sorry.  Ask the question again.  I'm sorry.

21   BY MS. SWEENEY:

22        Q    **Sure.  In the email from you -- I mean**

23   **from Tom Tatham to you where he's providing**

24   **information and what the potential upside of the**

25   **investment might be --**

Justin Pannu  10/29/2018

```
 1        A    Right.
 2        Q    -- you can see that it starts with the
 3   paragraph saying "assuming the private placement is
 4   fully subscribed," right?
 5        A    I see that.
 6        Q    So the numbers that follow on that
 7   paragraph are numbers that are relevant only if the
 8   private placement is fully subscribed.
 9             Do you understand that?
10             MR. SADOCK:  Objection.  Calls for a legal
11   conclusion.  Incomplete hypothetical and calls for
12   speculation.
13             THE WITNESS:  I don't know if I personally
14   understand that, but, yes, I believe EnSource
15   understood that.
16   BY MS. SWEENEY:
17        Q    Here's another document that we'll call
18   Exhibit 13.
19             (Exhibit 13 was marked.)
20   BY MS. SWEENEY:
21        Q    This is an email from Mr. Tatham to you
22   dated August 19, 2016.
23             Are you familiar with this document?
24        A    I'm sure I received it.
25        Q    And this document is informing you that
```

Justin Pannu  10/29/2018

```
 1    Hopewell and Title Rover had put -- had set up two
 2    data rooms to facilitate the due diligence, correct?
 3         A    That's what it says.
 4              MR. SADOCK:  Objection.  Misstates the
 5    email.
 6    BY MS. SWEENEY:
 7         Q    And going back to our prior exhibit, you
 8    first requested on behalf of EnSource due diligence
 9    information on August 16, correct?
10         A    Which exhibit?
11         Q    Exhibit 11.
12              MR. SADOCK:  Objection.  Misstates prior
13    testimony.
14              MS. SWEENEY:  Second page.
15              THE WITNESS:  Yes, that was the due
16    diligence -- we sent them due diligence requests,
17    these lists understanding that Tom had said it was a
18    start-up.
19    BY MS. SWEENEY:
20         Q    On the 16th?
21         A    On the 16th.
22         Q    And on the 17th, as we just went through
23    with Exhibit 12, you sent questions based on the
24    private placement memorandum.
25              MR. SADOCK:  Objection.  Misstates
```

Justin Pannu  10/29/2018

```
 1   testimony.
 2            THE WITNESS:  I don't remember if it was
 3   because of the items in the Dropbox or not.
 4   BY MS. SWEENEY:
 5       Q    That's not the question.
 6       A    All right.
 7       Q    The question was you sent the email on
 8   August 17 asking questions, which is Exhibit 12.
 9       A    Where is 12?  This is it?  This is 12?  It
10   doesn't say.
11       Q    I believe that's Exhibit 12.  Just look at
12   the address.
13       A    Right.  So what's your question now?  I
14   was turning the page.
15       Q    It's the next page.
16       A    Okay.
17       Q    Your email is dated the 12th -- I'm sorry,
18   the 18th.
19       A    Okay.
20       Q    Sorry.  Strike all of that.
21            Your email is dated the 17th.
22            MR. SADOCK:  In the bottom where it says
23   866 I think she's referring to.
24            THE WITNESS:  My email dated the 17th.
25   Okay.  What's your question now?
```

Justin Pannu  10/29/2018

```
1   BY MS. SWEENEY:

2       Q    All right.  And you received a response to

3   that on the 18th?

4       A    Yes.

5       Q    And then the data room was set up on the

6   19th, correct?

7            MR. SADOCK:  Objection.  Calls for

8   speculation.

9            THE WITNESS:  I guess so.

10  BY MS. SWEENEY:

11      Q    Was it your impression that Mr. Tatham was

12  working hard to get you information as fast as he

13  could?

14           MR. SADOCK:  Objection.  Vague as to time.

15  BY MS. SWEENEY:

16      Q    Was it your impression?

17      A    It looks like it, yes.

18      Q    I'll mark this next one as Exhibit 14.

19           (Exhibit 14 was marked.)

20  BY MS. SWEENEY:

21      Q    The top email of this chain -- excuse

22  me -- is dated August 20th, 2016.  It's an email

23  from you to Mr. Tatham -- strike that.  It's an

24  email from Mr. Tatham to you.

25      A    Yeah, I was going to say.
```

Justin Pannu  10/29/2018

```
1        Q    Did you receive this email?
2        A    Yes, I believe so.
3        Q    And it appears from the prior email chain
4   below that you had already accessed the data room by
5   the 20th of August, 2016; is that accurate?
6        A    As EnSource?
7        Q    Sure.  Let's start with EnSource.
8             MR. SADOCK:  Objection.  Calls for
9   speculation.
10            THE WITNESS:  Yes, it appears that way.
11  BY MS. SWEENEY:
12       Q    And on the 19th, you confirm that your
13  attorney had access to that room, correct?
14       A    That's what it says in the email.
15       Q    And then on the top email from Mr. Tatham
16  to you, your attorney, and Jeff, Mr. Tatham
17  specifically asks you to call or email him if
18  there's anything additional you need.
19            Do you see that?
20       A    I do see that.
21       Q    Did you have any communications with
22  Mr. Willis related to setting up the deal rooms?
23            MR. SADOCK:  Objection.  Asked and
24  answered.  Vague as to "you."  Vague as to time.
25            THE WITNESS:  Personally I don't remember
```

1   and I don't know on behalf of EnSource.

2   BY MS. SWEENEY:

3       Q     **Is there somebody else who would have more**

4   **knowledge about that than you?**

5       A     Probably not.

6             MR. SADOCK:  Objection.  Calls for

7   speculation.

8   BY MS. SWEENEY:

9       Q     **I've handed you another document.  I'm**

10  **calling it Exhibit 15.**

11            **(Exhibit 15 was marked.)**

12  BY MS. SWEENEY:

13      Q     **It is additional emails.  The one that I**

14  **want to talk about is in the middle of page 1 of**

15  **Exhibit 15.  It is from you to Tom Tatham, and it is**

16  **dated August 22nd, 2016.**

17            **You start off by saying, "Thank you for**

18  **taking the time to populate the respective Data**

19  **Rooms over the weekend.  We appreciate the time you**

20  **have taken to respond to our due diligence efforts."**

21  **And then you have additional questions that you were**

22  **forwarding.**

23            **Were these questions that were on behalf**

24  **of your EnSource team?**

25      A     On behalf of the EnSource team, yes.

```
 1      Q    I want to draw your attention to your

 2   fourth question which is on page 2 of Exhibit 15.

 3   It says, "Please describe all of the services

 4   provided to Hopewell by Beyond Review."

 5           Do you see that?

 6      A    I do.

 7      Q    As you sit here today, what is your

 8   understanding of who Beyond Review is?

 9      A    So my understanding of Beyond Review -- I

10   may have the -- I don't know which if it's the

11   Beyond Review or Beyond Recognition was contracted

12   for -- I don't necessarily know who Beyond Review

13   is.  I probably know who Beyond Recognition is.

14      Q    Let's take a step back.

15           The portions of this email in yellow are

16   Tom Tatham's response again to your questions?

17      A    Yes.

18      Q    So looking at No. 4, your question was,

19   "Describe the services provided to Hopewell by

20   Beyond Review."  And then Mr. Tatham provided a

21   lengthy answer.

22           Do you see that?

23      A    I do.

24           MR. SADOCK:  Objection.  Misstates the

25   document.
```

1    BY MS. SWEENEY:

2        Q    This -- Mr. Tatham's response indicates

3    that Beyond Review has two contract employees who

4    are doing document review, preparation of legal

5    files, and oil, gas, and mineral ownership title

6    review.

7             Do you see where it says that?  It's the

8    page before, the bottom of the page.

9        A    I do see that.

10       Q    Goes on to say, "All referenced work tasks

11   undertaken to date have been for the benefit of

12   Hopewell and the services have been billed to

13   Hopewell by agreement at $45 an hour for actual time

14   worked and have averaged approximately 2,000 per

15   week per contract employees since April 2016."

16            Do you see that?

17       A    I see that.

18       Q    And then there's an additional explanation

19   of who the contract attorneys are and what the type

20   of work that they're doing.

21            Did EnSource have any further questions

22   related to Beyond Review after receiving that

23   explanation of their monthly services they were

24   providing to Hopewell?

25       A    I don't believe so, no.

Justin Pannu  10/29/2018

1        Q      So No. 5, "Please describe all of the

2   services provided to Hopewell by Image Engine."

3              Do you see that?

4        A      I do.

5        Q      And Mr. Tatham's response says,

6   "Image Engine has performed bulk copying services

7   and digital imaging of Madison County Deed Records

8   for Hopewell and/or Title Rover.  All services

9   provided to Hopewell by Image Engine have been

10  provided under mutually agreed terms or approved

11  purchase orders."

12             After receiving that explanation of who

13  Image Engine was, did you have any further questions

14  about the services that Image Engine was providing

15  to Hopewell?

16             MR. SADOCK:  Objection.  Misstates the

17  email.

18             THE WITNESS:  I don't remember having any

19  more after that.

20  BY MS. SWEENEY:

21        Q      I'm going to hand you a document that

22  we're going to mark as Exhibit 16.  The Bates number

23  on it is Plaintiff 000136.  The title is

24  "Hopewell-Pilot Project, LLC Schedule of Consulting

25  and Contractor Agreements."

Justin Pannu  10/29/2018

```
 1       A     I see it.
 2             (Exhibit 16 was marked.)
 3   BY MS. SWEENEY:
 4       Q     This is a document that was in the deal
 5   room.  Do you remember seeing it at the time that
 6   you first looked or at any time that you looked in
 7   the deal room?
 8       A     I do not remember seeing this document in
 9   the deal room.  I did see it last week when I was
10   going through this documents.
11       Q     This schedule of consulting and contractor
12   agreements lists Beyond Review and it informs that
13   Beyond Review provides contract land, oil and gas
14   title attorneys and the price per hour.
15             It also lists Image Engine and discloses
16   that it provides copying and imaging services as per
17   approved purchase orders.
18             You don't have a specific recollection
19   that this document, Exhibit 16, was the reason why
20   you asked the questions that you asked in the prior
21   exhibit we were talking about?
22             MR. SADOCK:  Objection.  Misstates prior
23   testimony.  Vague as to "you."  And the document
24   speaks for itself.
25             THE WITNESS:  I personally did not --
```

Justin Pannu  10/29/2018

1   personally did not review this document.  However,

2   and other members of EnSource may have and/or the

3   other team members, and you may have to ask one of

4   them.

5   BY MS. SWEENEY:

6       Q    As you sit here today, is it your -- can

7   you say that you reviewed on behalf of EnSource all

8   of the material that was in the data rooms or the

9   deal rooms?

10           MR. SADOCK:  Objection.  Vague as to time.

11  Vague as to "review."

12           THE WITNESS:  I personally reviewed

13  some -- or some data as such as the opportunities

14  and maps.  Other people reviewed probably -- or may

15  have reviewed technology, but you're going to have

16  to ask them.  Other people may have reviewed these

17  other agreements and you will have to ask them.

18  BY MS. SWEENEY:

19      Q    I'm interested in finding out whether

20  EnSource reviewed all of the material in the deal

21  rooms.

22           MR. SADOCK:  Objection.  Calls for

23  speculation.  Vague as to time.  Vague as to

24  materials and review.

25           THE WITNESS:  Generally I was responsible

Justin Pannu  10/29/2018

1   with Tom for coordinating the due diligence effort

2   and asking him to set up the data room.

3          However, specifically, other members would

4   have looked through certain material, other than

5   myself and then have had -- or team members or the

6   part of the due diligence team members would have

7   looked at different parts of it is my understanding.

8   BY MS. SWEENEY:

9      Q    **Do you have confidence that every single**

10   **document in the deal room was reviewed by somebody**

11   **from EnSource?**

12     A    I don't know.

13     Q    **Who would have more knowledge about that**

14   **question than you?**

15          MR. SADOCK:  Objection.  Calls for

16   speculation.

17          THE WITNESS:  I don't think anyone would

18   have more knowledge than anybody else.

19   BY MS. SWEENEY:

20     Q    **As the person in charge of due diligence**

21   **for EnSource, would you feel like it was important**

22   **for EnSource to review the material that had been**

23   **provided to it in order to -- for it to make the**

24   **most knowing and intelligent decision about an**

25   **investment?**

Justin Pannu  10/29/2018

```
 1        A     Yes.

 2        Q     Did you have any conversations about

 3   Beyond Review or Image Engine with Mr. Tatham?

 4              MR. SADOCK:  Objection.  Vague as to

 5   "you."  Vague as to time.

 6              THE WITNESS:  I don't remember.

 7   BY MS. SWEENEY:

 8        Q     Did anyone at EnSource have any

 9   conversations with Mr. Tatham related to

10   Beyond Review or Image Engine?

11              MR. SADOCK:  It calls for speculation.

12              THE WITNESS:  I don't remember.

13   BY MS. SWEENEY:

14        Q     Did you personally have any conversations

15   with Mark Willis at any time related to

16   Beyond Review or Image Engine?

17        A     Personally?

18        Q     Yes.

19        A     I don't think so.

20        Q     Did anyone at EnSource have any

21   communications with Mr. Willis specifically related

22   to Image Engine or Beyond Review?

23              MR. SADOCK:  Objection.  Calls for

24   speculation.

25              THE WITNESS:  You will have to ask --
```

Justin Pannu  10/29/2018

 1              MR. SADOCK:  Objection.  Calls for

 2      speculation.

 3              THE WITNESS:  You'd have to ask one of the

 4      other members if they did.

 5      BY MS. SWEENEY:

 6         Q    But as the person most knowledgeable of

 7      the company, you don't have any independent

 8      knowledge of any such communication; is that true?

 9              MR. SADOCK:  Objection.  Misstates

10      testimony.

11              THE WITNESS:  I don't think they have had

12      any.

13              (Exhibit 17 was marked.)

14      BY MS. SWEENEY:

15         Q    Okay.  I'm handing what we're going to

16      mark as Exhibit 17.  This is a two-page document

17      also from the deal room.  The Bates label is

18      Plaintiff 000659 and 660.

19              The first document is called "Title Rover,

20      LLC Memo to File, Terms to be provided in an Amended

21      and Restated Company Agreement."

22              And the second page is called

23      "Title Rover, LLC Schedule of Corporate Information

24      As of August 20th, 2014."

25              Turning to that page, the second page of

Justin Pannu  10/29/2018

1    Exhibit 17, there's a highlighted or a header

2    entitled "Subsidiaries and Affiliates."

3            Do you see that?

4        A    I see that.

5        Q    The document says, "TR," for Title Rover,

6    "has no subsidiaries as of the date hereof.  TR uses

7    Willis Group companies, Beyond Review, and

8    Image Engine to provide certain services to TR

9    and/or Hopewell.  Hopewell, Beyond Review and

10   Image Engine are directly or indirectly owned in

11   part by Mark A. Willis."

12           Do you see that?

13       A    I see that.

14       Q    Prior to seeing this document in the deal

15   room, did you have an understanding that Mark Willis

16   was affiliated with Beyond Review and Image Engine?

17           MR. SADOCK:  Objection.  Calls for a legal

18   conclusion.  Speculation.

19           THE WITNESS:  There in -- did I personally

20   or did EnSource?

21   BY MS. SWEENEY:

22       Q    Did EnSource.

23           MR. SADOCK:  Calls for speculation.

24           THE WITNESS:  I don't know.

25   ///

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:
 2       Q    As the person most knowledgeable of
 3   EnSource, did it have any understanding prior to
 4   this time that Beyond Review and Image Engine were
 5   affiliated with Mark Willis?
 6            MR. SADOCK:  Objection.  Calls for a legal
 7   conclusion.
 8            THE WITNESS:  I think so.
 9   BY MS. SWEENEY:
10       Q    Did it matter to EnSource?
11            MR. SADOCK:  Objection.  Vague as to time.
12   Vague as to "matter."
13            THE WITNESS:  I don't believe so.  I don't
14   believe -- I don't remember any discussions among
15   the members about this, but I believe that we were
16   aware of that.
17   BY MS. SWEENEY:
18       Q    And you had the opportunity to ask
19   questions related to that if you had any --
20            MR. SADOCK:  Objection.
21   BY MS. SWEENEY:
22       Q    -- you being EnSource?
23       A    Yes.
24            MR. SADOCK:  Vague as to time.
25   ///
```

Justin Pannu  10/29/2018

1    BY MS. SWEENEY:

2        Q    I just handed you a document that we're

3    going to mark as Exhibit 18.

4             (Exhibit 18 was marked.)

5    BY MS. SWEENEY:

6        Q    This is another email chain.  The top one

7    is dated August 24th, 2016, and it's from Tom Tatham

8    to you with some other people in the cc.

9             This email is a follow-on from the last

10   communication where Mr. Tatham provided information

11   about Image Engine and Beyond Review.

12            Mr. Tatham in this email says, "Please let

13   me know where you stand by the end of the day and if

14   you need further clarification."

15            Do you see that?

16       A    I see that.

17       Q    Was there a reason why he was asking to

18   know where EnSource stood at the end of the day, if

19   you know?

20            MR. SADOCK:  Objection.  Calls for

21   speculation.

22            THE WITNESS:  I don't remember at the

23   time, but I guess I could assume now.

24   BY MS. SWEENEY:

25       Q    What would you assume now?

```
 1              MR. SADOCK:  Objection.  Calls for

 2    speculation.

 3              THE WITNESS:  Where we stand at the end of

 4    the day for our investment into Hopewell.

 5    BY MS. SWEENEY:

 6       Q    Did you, on behalf of EnSource, have an

 7    understanding that Hopewell was interested in

 8    getting an investment sooner rather than later as of

 9    August 24, 2016?

10              MR. SADOCK:  Objection.  Calls for

11    speculation.

12              THE WITNESS:  Could you restate the

13    question, please.

14    BY MS. SWEENEY:

15       Q    Sure.  Did EnSource have a belief that

16    Hopewell wanted to get the investment as soon as

17    possible as of August 24, 2016?

18       A    I believe so, yes.

19       Q    What was that understanding based on?

20       A    I don't remember.  I do remember that they

21    said they had another investor.  I do remember some

22    conversation about that, lined up, that wanted to

23    subscribe.

24       Q    And how would that have been relevant?

25       A    That's -- that's the reason for the hurry,
```

Justin Pannu  10/29/2018

```
 1    I guess.
 2        Q    Because you were competing with that
 3    potential investor?
 4        A    I believe so.
 5        Q    The second part of the email says, "Let me
 6    know if you need any further clarification."
 7             Do you recall ever reaching out to
 8    Mr. Tatham to get further clarification on any
 9    issue?
10        A    I don't remember.
11        Q    Did you ever reach out to Mr. Willis to
12    get further clarification on any issue?
13        A    I don't remember.
14        Q    And when you say you don't remember,
15    that's on behalf of EnSource?
16        A    On behalf of EnSource, yeah.  There may be
17    other members that do remember.
18        Q    The next document will be marked
19    Exhibit 19.
20             (Exhibit 19 was marked.)
21             THE WITNESS:  Mine is not marked.
22             MS. SWEENEY:  Yeah, they're not marked
23    yet.
24             MR. SADOCK:  Don't worry.
25    ///
```

Justin Pannu  10/29/2018

1    BY MS. SWEENEY:

2         Q    **Turning to the second page of this**

3    **exhibit, which is Plaintiff 001069, about**

4    **three-quarters of the way down is an email from you**

5    **to Tom dated August 24, 2016.**

6              **Says, "Hi, Tom.  We attached Word document**

7    **with follow-on question in the balloons."**

8              **Do you see that?**

9         A    I need to read the email to get context.

10             Okay.  So ask your question?

11        Q    **The question was do you see where you say,**

12   **"We attached Word document with follow-on questions**

13   **in the balloons"?**

14        A    I see that.

15        Q    **Okay.  Now I'm going to hand you a**

16   **document that I'm going to mark as Exhibit 20 that**

17   **we can look at both of them side by side.**

18             **(Exhibit 20 was marked.)**

19   BY MS. SWEENEY:

20        Q    **Is this the Word document with follow-on**

21   **questions that you were referring to in the email of**

22   **Exhibit 19?**

23        A    Yes.

24        Q    **And again appears that there is a**

25   **highlighted portion of the Word document.**

Justin Pannu  10/29/2018

1            Are those the responses from Mr. Tatham?

2            MR. SADOCK:  Objection.  Calls for

3     speculation.

4            THE WITNESS:  It looks like it, yes.

5     BY MS. SWEENEY:

6        Q    It also looks like some of them might be

7     questions from Mr. Nawracaj.  Is he R1 and Richard

8     on page 2?

9        A    Yes.

10       Q    Was there any other Richard that would be

11    asking questions if it wasn't Mr. Nawracaj?

12       A    No.

13           MR. SADOCK:  Objection.  Calls for

14    speculation.

15    BY MS. SWEENEY:

16       Q    So in this -- was Mr. Nawracaj working in

17    the capacity of a providing business advice in this

18    exercise?

19           MR. SADOCK:  Objection.  Calls for a legal

20    conclusion.  Asked and answered.

21           THE WITNESS:  I and EnSource have always

22    thought of him as our attorney.

23    BY MS. SWEENEY:

24       Q    Did Mr. Nawracaj ever identify himself as

25    your attorney in the beginning of the due diligence

1    **process, if you know?**

2               MR. SADOCK:  Objection.  Do not talk about

3    any communications you had with your attorney.

4    Instruct you not to answer.

5    BY MS. SWEENEY:

6        **Q    The question is do you know if he ever**

7    **identified himself to Hopewell as being your**

8    **attorney?**

9        A    I don't remember.

10       **Q    Here's Exhibit 21 which is a multipage**

11   **document, again multi-email chain.**

12              **(Exhibit 21 was marked.)**

13   BY MS. SWEENEY:

14       **Q    The one on the top is dated August 26 from**

15   **Mr. Tatham to Jerome Johns and you are cc'd.**

16              **This email is follow-on from the questions**

17   **that -- the questions and answers that you and**

18   **Mr. Tatham were exchanging relating to the due**

19   **diligence.  It refers to a phone call on**

20   **August 25th, 2016, that EnSource was having with**

21   **Mr. Tatham.**

22              **Do you recall that call?**

23       MR. SADOCK:  Objection.  Lacks foundation.

24   BY MS. SWEENEY:

25       **Q    If I can orient you, you can turn to the**

Justin Pannu  10/29/2018

```
 1    page that is identified Plaintiff 001104?

 2        A     Okay.

 3        Q     Your email to Jerry Johns says, "Jerry, do

 4    you mind taking the lead on having the dilution

 5    call?  Just update me"?

 6        A     Right.

 7        Q     Does that refresh your memory as to what

 8    the call was about?

 9        A     It was about the dilution.

10        Q     Did you attend that call?

11        A     I don't remember.

12        Q     What was the issue related to dilution?

13              MR. SADOCK:  Objection.  Calls for

14    speculation.  Lacks foundation.

15              THE WITNESS:  I believe it was related to

16    issuance of shares to insiders for noncash -- and

17    issuance of shares for noncash consideration and

18    with the understanding that we had -- I do remember

19    there were a number of related companies that we

20    were concerned about and entities and persons.  So

21    we didn't want some sort of manipulation to occur

22    should the profit potential be realized.

23    BY MS. SWEENEY:

24        Q     Do you remember who the related companies

25    were that you were concerned about?
```

Justin Pannu  10/29/2018

1        A    I think we talked in general about all of

2    them.  When we said "related companies," we felt

3    that all the companies that we had seen, I guess.  I

4    don't remember specifically each one.

5        Q    **Are you referring to companies that**

6    **already were invested with founders shares?**

7             MR. SADOCK:  Objection.  Calls for

8    speculation.  Legal conclusion.

9             THE WITNESS:  I don't recall which

10   companies specifically.

11   BY MS. SWEENEY:

12       Q    **Do you recall whether your concerns**

13   **related to anti-dilution were resolved?**

14       A    I believe they were.

15       Q    **How were they resolved?**

16            MR. SADOCK:  Objection.  Calls for a legal

17   conclusion.

18            THE WITNESS:  I don't remember

19   specifically.

20   BY MS. SWEENEY:

21       Q    **Did you, EnSource, see the anti-dilution**

22   **issue as one that would preclude the investment in**

23   **Hopewell?**

24       A    I believe so, yes.

25       Q    **So going back to the first page of**

Justin Pannu  10/29/2018

1      **Exhibit 21, once that issue was resolved, was**

2      **there -- did you communicate to Mr. Tatham that you**

3      **were prepared -- you, EnSource, were prepared to**

4      **move forward with an investment?**

5                  MR. SADOCK:  Objection.  Misstates

6      testimony.

7                  THE WITNESS:  On which date?

8      BY MS. SWEENEY:

9          Q     **On any date after that issue was resolved.**

10                 MR. SADOCK:  Objection.  Misstates prior

11     testimony.  Vague as to "resolve."  Calls for a

12     legal conclusion.

13                 THE WITNESS:  Okay.  Answer the

14     question -- or reask the question again.  Sorry.

15     It's been a long day.

16     BY MS. SWEENEY:

17         Q     **After -- after the issue related to the**

18     **anti-dilution was resolved, did you communicate on**

19     **behalf of EnSource to Hopewell that EnSource was**

20     **prepared to move forward with the investment?**

21         A     I don't remember.

22         Q     **As of August 26, which is the top date on**

23     **this email, did you have a sense that EnSource was**

24     **still -- I mean, sorry -- that Hopewell was still**

25     **hoping that EnSource would invest as soon as**

Justin Pannu  10/29/2018

```
 1   possible?

 2              MR. SADOCK:  Objection.  Calls for

 3   speculation.

 4              THE WITNESS:  Yes, it appears that way.

 5   BY MS. SWEENEY:

 6      Q    All right.  I just handed you what is

 7   going to be Exhibit 22.

 8              (Exhibit 22 was marked.)

 9   BY MS. SWEENEY:

10      Q    It's another email chain.  The top date is

11   August 27, 2016, and it's an email from you to

12   Tom -- I'm sorry, from Tom to you.

13              I want to refer you to page 2 of this

14   Exhibit 22 which is also an email, but this one is

15   from you to Tom.

16              It says, "For Jerry's and Rich's benefit I

17   will summarize our discussion.  Thank you for taking

18   my call today to address our two high level concerns

19   regarding the Memo and Title Rover Operating/Company

20   Agreement."

21              Do you remember having that call with

22   Mr. Tatham?

23              MR. SADOCK:  Objection.  Lacks foundation.

24              THE WITNESS:  I don't remember this call

25   specifically.
```

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:
 2       Q    Do you remember any call with anybody at
 3   Hopewell related to revisions of the company
 4   agreement at Title Rover or Hopewell?
 5       A    I do remember a call related to some
 6   high-level concerns that were brought up, yes.
 7       Q    What were those concerns?
 8            MR. SADOCK:  Objection.  Lacks foundation.
 9            THE WITNESS:  I don't remember what the --
10   but they were very high-level concerns.  I don't
11   remember what they were.
12   BY MS. SWEENEY:
13       Q    Was Mr. Willis involved in the phone call
14   related to the high-level concerns about the company
15   agreement?
16       A    I don't believe so.
17       Q    That was with Mr. Tatham?
18            MR. SADOCK:  Objection.  Lacks foundation.
19            THE WITNESS:  I think so.
20            MR. SADOCK:  Calls for speculation.
21   BY MS. SWEENEY:
22       Q    Was --
23       A    For this call?  For the one that you're
24   referring to?
25       Q    For any call related to high-level
```

Justin Pannu  10/29/2018

1   concerns about the company agreement?

2       A    He may have been on another call.

3       Q    By "he" who are you referring to?

4       A    Willis.

5       Q    Are you remembering a specific call that

6   Willis might have been on?

7       A    Not specifically.  I remember him being on

8   a call regarding this anti-dilution or some

9   revisions to the operating agreement, one of the

10  two.

11      Q    Was that a call that had multiple

12  participants or was it just with you?

13      A    I don't remember.

14      Q    Was Mr. Tatham on the phone during that

15  call?

16      A    I don't remember.

17      Q    Do you recall what, if anything,

18  Mr. Willis specifically said during that call?

19          MR. SADOCK:  Objection.  Asked and

20  answered.

21          THE WITNESS:  I don't remember.

22  BY MS. SWEENEY:

23      Q    The high-level concerns that EnSource had

24  related to the company agreement of Title Rover,

25  were those concerns sufficient enough that they

Justin Pannu  10/29/2018

1    would preclude the investment in Hopewell?

2              MR. SADOCK:  Objection.  Calls for a legal

3    conclusion.  Incomplete hypothetical.

4              THE WITNESS:  I believe so.

5    BY MS. SWEENEY:

6        Q    Turning to the first page of Exhibit 22,

7    which is an August 27th email from you to Tom that

8    starts, "Thanks, Tom.  EnSource Investments, LLC,

9    was formed for the purpose of a potential investment

10   in Hopewell."

11             Do you see that?

12       A    Yes.

13       Q    And you go on to list the various members

14   of EnSource and the way -- the potential investments

15   that each person may be making.

16             Do you see that?

17       A    I do.

18       Q    As of the date of August 27th, was

19   everything in this email true?

20             MR. SADOCK:  Objection.  Calls for

21   speculation.  Misstates the email in its entirety.

22   Calls for a legal conclusion.

23             THE WITNESS:  When I wrote it, it is what

24   I believed to be true at the time.

25   ///

Justin Pannu  10/29/2018

```
 1    BY MS. SWEENEY:

 2        Q     And Mr. Tatham's response to you, which is

 3    just directly above on this email chain, it says,

 4    "Okay.  Please send me the executed subscription

 5    agreements that were effective on Friday, August 26,

 6    2016."

 7              So Mr. Tatham appears to think that there

 8    were subscription agreements that had been entered

 9    the day previous.

10              Were there subscription agreements that

11    had been entered on August 26, 2016?

12              MR. SADOCK:  Objection.  Lacks foundation.

13    Vague as to time.  Calls for speculation.

14              THE WITNESS:  I don't remember.

15    BY MS. SWEENEY:

16        Q     I'm marking this next one Exhibit 23.

17              (Exhibit 23 was marked.)

18    BY MS. SWEENEY:

19        Q     The email is dated August 30th, 2016.

20    It's from Mr. Tatham to you, but it's in response to

21    a lengthy email that you sent to Tom related to

22    revisions of the amended and restated operating

23    agreement of Title Rover.

24              Do you remember that at some point there

25    was a precondition to investment to have the
```

Justin Pannu  10/29/2018

```
 1   Title Rover and Hopewell operating agreements

 2   amended?

 3       A    I do remember that.  Generally.

 4            MR. SADOCK:  Objection.

 5   BY MS. SWEENEY:

 6       Q    Do you see --

 7            MR. SADOCK:  Sorry.  Just objection.

 8   Compound.  Calls for a legal conclusion.

 9   BY MS. SWEENEY:

10       Q    Do you see in the email at the top of the

11   page from Mr. Tatham, it says, "Please have Rich

12   give me a call in the morning as we need to resolve

13   whether your group or the individuals involved have

14   made subscriptions."

15            So as of August 30th, 2016, had anybody

16   communicated to Mr. Tatham that subscriptions had

17   already been entered by your group?

18            MR. SADOCK:  Objection.  Misstates the

19   email.  Calls for speculation.

20            THE WITNESS:  I don't remember.  This was

21   two years ago.

22   BY MS. SWEENEY:

23       Q    Do you recall an instance where EnSource

24   executed subscriptions but held them back from

25   delivery to Hopewell pending resolution of
```

Justin Pannu  10/29/2018

1   **amendments to the operating agreement?**

2          MR. SADOCK:  Objection.  Lacks foundation.

3   Compound.  Calls for speculation.

4          THE WITNESS:  I do remember an issue with

5   subscription agreements generally.

6   BY MS. SWEENEY:

7          Q    **What is the issue you remember?**

8          A    There were certain subscription

9   agreements.  I don't know if they were executed or

10  not, but I believe there was an issue with us

11  holding them -- with us holding them back or -- or

12  the fact that we felt that they were rejected in

13  some way.  That's as far as I remember anything

14  about that.

15         Q    **As of -- as of the date of these**

16  **discussions when you were talking about amending the**

17  **operating agreements of Title Rover and of Hopewell,**

18  **were there any other issues that you recall at that**

19  **time that were preventing EnSource from moving ahead**

20  **with the investment in Hopewell?**

21         MR. SADOCK:  Objection.  Asked and

22  answered.

23         THE WITNESS:  I don't remember any other

24  issues.

25  ///

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:
 2        Q    This next one will be Exhibit 24.
 3             (Exhibit 24 was marked.)
 4   BY MS. SWEENEY:
 5        Q    It's an email dated August 31st, and it's
 6   from you to Mr. Johns.
 7             You say in the second sentence of the
 8   email, "I didn't ask for a financial model but have
 9   a good idea of the value the lease play can bring
10   now.  They really don't want to do a pro forma
11   anyway."
12             Are you referring to Hopewell when you say
13   they really didn't want to?
14        A    I'm referring to Hopewell and maybe
15   Title Rover.
16        Q    Why did you think they didn't want to do a
17   pro forma?
18        A    A more detailed pro forma is what I was
19   referring to in Tom's email that we had previously
20   referred to.  That's what I was referring to.
21        Q    Did it concern you that in your perception
22   they didn't want to do a pro forma?
23             MR. SADOCK:  Objection.
24   BY MS. SWEENEY:
25        Q    Did it concern you, meaning EnSource?
```

Justin Pannu  10/29/2018

```
 1                MR. SADOCK:  Objection.  Asked and

 2    answered.

 3                THE WITNESS:  The representation that Mark

 4    made in terms of the investment and how they would

 5    be used was enough for EnSource at that point in

 6    time.

 7    BY MS. SWEENEY:

 8        Q    So the answer is, no, it did not concern

 9    you?

10                MR. SADOCK:  Objection.  Misstates

11    testimony.  Asked and answered.

12                THE WITNESS:  So because of that it did

13    not.  I don't believe it did concern us, as far as I

14    remember.

15    BY MS. SWEENEY:

16        Q    This next one is going to be Exhibit 25.

17             (Exhibit 25 was marked.)

18    BY MS. SWEENEY:

19        Q    It is a five-page document beginning with

20    an email dated August 31st, 2016, from Mr. Tatham to

21    Mr. Johns, and it's attaching pro forma valuations

22    as of September 1st, 2016.

23             Do you see that?

24        A    I do.

25        Q    So based on the previous exhibit where you
```

Justin Pannu  10/29/2018

1    didn't think that Hopewell wanted to do a pro forma,

2    they ended up doing one, right?

3        A    Well, I know what I was talking about.  I

4    believe so, yes, they ended up doing one.

5        Q    Do you see in the email from Mr. Tatham

6    that there are several assumptions listed upon which

7    the pro forma is based?

8             MR. SADOCK:  Objection.  Misstates the

9    email.

10            THE WITNESS:  I see that.

11   BY MS. SWEENEY:

12       Q    So you understood that the pro forma was

13   based on certain business assumptions that would

14   need to come true in order for the pro forma to

15   be -- in order for the valuations to be what the pro

16   forma said they would be?

17            MR. SADOCK:  Objection.  Misstates the

18   document.  Lacks foundation.  Compound.  Calls for a

19   legal conclusion.

20            THE WITNESS:  Could you point to a

21   specific assumptions.

22   BY MS. SWEENEY:

23       Q    Sure.  The third sentence begins, quote,

24   "Please note that the only subjective business

25   assumptions are that Hopewell is able to lease 1,000

Justin Pannu  10/29/2018

```
1    net leasehold acres in Target Areas 1-4 prior to
2    December 31st, 2016, and that once the acreage is
3    pooled into existing Production Units (on or about
4    June 30, 2017), that the value of such leases (at
5    the low end of our sales comp range) is 5,000 per
6    net leasehold acre or $5,000, million for the 1,000
7    net acres."
8             Those were the business assumptions upon
9    which the pro forma was based.
10        A    Right.  I see that.
11        Q    Okay.  And you read that at the time that
12   you received that on August 31st, 2016?
13            MR. SADOCK:  Objection.  Vague as to
14   "you."
15            THE WITNESS:  Personally or EnSource?
16   BY MS. SWEENEY:
17        Q    EnSource.
18        A    I would believe so, yes.
19        Q    I'm now going to hand you a document that
20   we're marking as Exhibit 26.
21            (Exhibit 26 was marked.)
22   BY MS. SWEENEY:
23        Q    Which is a --
24        A    Do you mind if we take a break in a few
25   minutes?
```

Justin Pannu  10/29/2018

```
 1        Q     Sure.

 2              It's a email with a document -- with a

 3   amended and restated company agreement of

 4   Title Rover attached to it.  The email is dated

 5   September 2nd, 2016, from Tom Tatham to Mr. Nawracaj

 6   on the front page.

 7        A     I see that.

 8              Do you mind if I take a break now.  Just I

 9   have to use the restroom.

10              MS. SWEENEY:  Okay.  All right.  We'll go

11   off the record.

12              THE VIDEOGRAPHER:  Off the record the time

13   is 4:03 p.m.

14              (A recess was taken.)

15              THE VIDEOGRAPHER:  Back on the record.

16   The time is 4:09 p.m.

17   BY MS. SWEENEY:

18        Q     Turning to page 2 of Exhibit 26, which is

19   right in front of you, there's an email in the

20   middle of that page, page 2, from Mr. Tatham to you.

21              It starts with, "Justin, as I have not

22   heard from you or Rich" and at the bottom of the

23   paragraph it says, "If you/EnSource are to

24   participate in the initial Hopewell private

25   placement, we will need to receive funds by wire
```

Justin Pannu  10/29/2018

1    transfer no later than 3:00 p.m. CST tomorrow,

2    Friday, September 2nd."

3              Did you have any understanding as to why

4    there was a time sensitivity for the investment?

5              MR. SADOCK:  Objection.  Calls for

6    speculation.

7              THE WITNESS:  I don't remember any at the

8    time.

9    BY MS. SWEENEY:

10       Q    Did you -- as of September 1st, 2016, did

11   you, EnSource, have a feeling like you were being

12   rushed into making this investment?

13             MR. SADOCK:  Objection.  Calls for

14   speculation.

15             THE WITNESS:  I believe as a group we

16   weren't going to invest -- I don't know if we felt

17   rushed or not -- until we were comfortable.

18   BY MS. SWEENEY:

19       Q    What were you still waiting for as of that

20   time to feel comfortable?

21       A    I was just telling you our general

22   feeling, but at the time I don't remember.

23       Q    I'm handing you a document that I'm going

24   to mark as Exhibit 27.

25             (Exhibit 27 was marked.)

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:
 2       Q     It is a multipage document.  The first
 3   page is an email dated September 2nd, 2016, from you
 4   to Tom Tatham.
 5             It starts off by saying, "We have attached
 6   a partially executed Subscription Agreement."  And
 7   then the document which is attached is this
 8   Exhibit 27 is the subscription agreement.
 9             Your email goes on to say, "The language
10   concerning the investment's contingency on the
11   Amended Company Agreement of Title Rover is found in
12   the last paragraph of Section 4."
13             Do you see that?
14       A     Okay.  Do I see what?
15       Q     What I just read.
16       A     Yes.
17       Q     Does that refresh your recollection as to
18   what outstanding issue was still there at the time
19   that you were making this initial assessment?
20             MR. SADOCK:  Objection.  Lacks foundation.
21   Vague as to issues and time.
22             THE WITNESS:  I don't remember.  I believe
23   I relied on my attorney's assessment and was just
24   passing the message.
25   ///
```

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:
 2       Q    Did you understand -- as you say in your
 3   email, did you understand that there was a
 4   contingency placed on the subscription agreement?
 5       A    Yes, I understand that.
 6       Q    Did you understand that the contingency
 7   related to needing to amend the Title Rover
 8   operating agreement.
 9            Do you recall that?
10            MR. SADOCK:  Objection.  Lacks foundation.
11   Misstates the email.
12            THE WITNESS:  I don't have a specific
13   memory, but what is stated here is probably true.
14   BY MS. SWEENEY:
15       Q    And to say it in another way unrelated to
16   the exhibit, EnSource wanted to condition its
17   investment on the revision of the Title Rover
18   company agreement; is that accurate?
19            MR. SADOCK:  Objection.  Incomplete
20   hypothetical.  Lacks foundation.  Calls for
21   speculation.  Calls for a legal conclusion.
22            THE WITNESS:  I guess what you're doing is
23   you're restating the email here, and I -- like I
24   said, I don't have a specific memory of that, but
25   what is probably said here is true in this
```

Justin Pannu  10/29/2018

1    paragraph.

2    BY MS. SWEENEY:

3         Q    Okay.  So let's become a little bit more

4    precise and turn to Bates label 00000966 of this

5    exhibit --

6         A    Okay.

7         Q    -- in paragraph 4 where it says

8    "Conditions to Closing."

9              Do you see that?

10        A    I do see that.

11        Q    Do you see the second paragraph of

12   Subsection B as in boy?

13        A    Yes.

14        Q    The paragraph says, "The Investor's

15   obligations hereunder are subject to the fulfillment

16   at the time of, or prior to, the Closing Date of the

17   following condition:  An Amended and Restated

18   Company Agreement of Title Rover, LLC, reasonably

19   acceptable to Investor."

20        A    I see that.

21        Q    And EnSource in this case was the

22   investor?

23        A    Yes.

24        Q    Does that help you remember that that was

25   the condition upon which EnSource was willing to

Justin Pannu  10/29/2018

1    **make its investment in Hopewell?**

2         A    Relied on the assessment of my attorney on

3    this one.  That's why I don't have a specific memory

4    and I was probably just...

5         **Q    Can we rely on this document that you**

6    **attached?**

7         A    Yes.

8              MR. SADOCK:  Objection.  Asked and

9    answered.  Calls for a legal conclusion.

10             You got to slow down.

11             THE WITNESS:  Okay.  Sorry.

12   BY MS. SWEENEY:

13        **Q    Mark this as Exhibit 28, please.**

14             **(Exhibit 28 was marked.)**

15   BY MS. SWEENEY:

16        **Q    This is a one-page document dated**

17   **September 26, 2016.  The subject is "Conference call**

18   **financing from SMW Group."  It's an email from you.**

19             **What is SMW Group?**

20        A    I believe it was the -- as far as I

21   remember, a lease acquisition line of credit that

22   was set up by Tatham or Willis.

23        **Q    And you say, "EnSource is just beginning**

24   **to understand the impact of this potential**

25   **financing.  Have some concerns and potential**

Justin Pannu  10/29/2018

1    solutions."

2         Do you remember what it was that you were

3    concerned that EnSource was concerned about as of

4    September 6, 2016?

5         A    That there was debt.

6         Q    Did you participate in the conference call

7    that you set up for September 6?

8         A    I probably did.  I don't have a specific

9    memory.

10        Q    Do you know if Tom Tatham participated in

11   that conference call?

12             MR. SADOCK:  Objection.  Lacks foundation.

13   Calls for speculation.

14             THE WITNESS:  I don't remember.

15   BY MS. SWEENEY:

16        Q    Do you know if Mark Willis participated?

17        A    I don't remember.

18        Q    Do you remember discussing the financing

19   from SMW Group in a conference call?

20        A    I remember discussing the issue with

21   either Willis or Tatham.

22        Q    Do you remember doing that during a

23   conference call?

24        A    I don't remember.

25        Q    And you don't remember whether it was

Justin Pannu  10/29/2018

1   **Mr. Willis or Mr. Tatham?**

2        A     No.  I remember the discussions we've had

3   generally about it.  We had a discussion about it

4   generally.

5        **Q     And what was the gist of the conversation**

6   **during -- what was the gist of the conversation**

7   **related to SMW Group?**

8             MR. SADOCK:  Objection.  Lacks foundation.

9   Vague as to time.

10            THE WITNESS:  Just the fact it was debt

11  that could be secured by the leases.

12  BY MS. SWEENEY:

13       **Q     You, meaning EnSource, was able to confirm**

14  **that it was debt?**

15            MR. SADOCK:  Objection.  Misstates

16  testimony.  Vague as to time.  Lacks foundation.

17            THE WITNESS:  That this was possibly debt

18  that was related to this potential investment that

19  we had.

20  BY MS. SWEENEY:

21       **Q     And during the conversation did you ask is**

22  **this debt?**

23            MR. SADOCK:  Objection.  Lacks foundation.

24  Vague as to time.

25            THE WITNESS:  I don't remember what we

Justin Pannu  10/29/2018

```
 1  asked specifically, but I remember asking why it was

 2  there.

 3  BY MS. SWEENEY:

 4      Q     What was the answer?

 5      A     The answer was -- I remember talking to

 6  Willis, and the answer was something to the effect

 7  of -- and I don't know if it was on this conference

 8  call, that this financing shouldn't be worried about

 9  because the lease -- the potential it could bring in

10  terms of when -- once it's aggregated would pay off

11  the debt and -- and make a return on investment for

12  the investors.

13      Q     That was something that Mr. Willis told

14  you?

15      A     Yes.

16      Q     On a phone call?

17      A     Yes.

18      Q     And did you -- was that on a phone call

19  just with you?

20      A     I don't remember.

21      Q     Did you, on behalf of EnSource, ask

22  Mr. Willis when he said that to give you information

23  to back up what he had told you about it would pay

24  off any debt?

25      A     Sorry.  I didn't understand your question.
```

Justin Pannu  10/29/2018

1      Q    Did you ask Mr. Willis, you on behalf of

2  **EnSource, ask Mr. Willis to provide you any**

3  **information about what it was that he said to you as**

4  **you articulated it three minutes ago?**

5           MR. SADOCK:  Objection.  Vague as to time.

6           THE WITNESS:  I did not.  I trusted

7  Mr. Willis on his word.

8  BY MS. SWEENEY:

9      Q    **So it was a debt, right?**

10          MR. SADOCK:  Objection.  Misstates

11 testimony.  Calls for a legal conclusion.

12          THE WITNESS:  As far as I understand it,

13 it was -- he told me it was debt convertible to

14 equity.

15 BY MS. SWEENEY:

16     Q    **And after your conversation you felt**

17 **better about SMW Group.**

18          **Is that a true statement?**

19          MR. SADOCK:  Objection.  Vague as to "felt

20 better" and vague as to "you."

21          THE WITNESS:  I personally felt better.

22 Other members of EnSource you'd have to ask them,

23 but I believe they did.

24 BY MS. SWEENEY:

25     Q    **Well, as the representative person most**

Justin Pannu  10/29/2018

1    **knowledgeable of EnSource, did EnSource feel better?**

2        A    I believe so.

3        **Q    I'm handing you what we're marking as**

4    **Exhibit 29.**

5            **(Exhibit 29 was marked.)**

6    BY MS. SWEENEY:

7        **Q    It's a two-page email dated September 6,**

8    **2016.  It's from Mr. Nawracaj to Tom Tatham.  It's**

9    **about the partially executed subscription agreement,**

10   **and Mr. Nawracaj's email says, "To be clear, it is**

11   **hereby withdrawn."**

12           **Can you tell me why EnSource wanted the**

13   **initial subscription agreement withdrawn?**

14       A    I remember it being an issue, but I don't

15   remember the exact specifics of why we wanted it

16   withdrawn.

17       **Q    That was something that you on behalf of**

18   **EnSource wanted?**

19           MR. SADOCK:  I'm sorry, Counsel.  Which

20   email are we talking about right now?

21           MS. SWEENEY:  The very top one.

22           MR. SADOCK:  Thank you.

23           Objection.  Calls for a legal conclusion.

24   Speculation.

25           THE WITNESS:  That was something that my

Justin Pannu  10/29/2018

```
 1   attorney would probably have more specifics on.

 2   BY MS. SWEENEY:

 3        Q    EnSource was the client, correct?

 4        A    Yes.

 5        Q    So was it EnSource's desire that the

 6   partially executed subscription agreement be

 7   withdrawn?

 8        A    Yes.

 9        Q    And you don't recall why?

10        A    I -- I don't recall why.

11        Q    This will be Exhibit 30.

12             (Exhibit 30 was marked.)

13             THE WITNESS:  Which one?

14   BY MS. SWEENEY:

15        Q    That's a multipage email exchange, but I

16   just want to talk about the top email which is from

17   Mark Willis to you.

18             Based on my review of this, it appears

19   that there was some resolution on the amendments to

20   the company agreement; is that accurate?

21             MR. SADOCK:  Objection.  Misstates the

22   email.  Calls for speculation and a legal

23   conclusion.

24             THE WITNESS:  Okay.  Ask the question.

25   ///
```

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:
 2        Q    Based on your review of the email chain,
 3   is it accurate that the parties had negotiated the
 4   Title Rover operating agreement and it was close to
 5   finality?
 6             MR. SADOCK:  Objection.  Misstates the
 7   email.  Calls for a legal conclusion.  Speculation.
 8             THE WITNESS:  We relied on the assessment
 9   of legal counsel of our attorney on the specific
10   issue, so you would probably have to ask him.
11   BY MS. SWEENEY:
12        Q    Is it true, then, that you are not the
13   person most knowledgeable to talk about the
14   revisions to the company agreements and the
15   negotiations leading up to the subscription
16   agreement?
17             MR. SADOCK:  Objection.  Misstates
18   testimony.  Calls for a legal conclusion.  And the
19   witness has been designated as the person most
20   knowledgeable.
21             THE WITNESS:  I'm the person most
22   knowledgeable about coordinating the effort and
23   understand that there was an amendment required.
24             However, the specifics of what those were
25   and the reliance on our counsels would probably be
```

Justin Pannu  10/29/2018

1    the one to talk to about this.

2    BY MS. SWEENEY:

3       **Q       So to be clear, notwithstanding that**

4    **you've been designated as the person most**

5    **knowledgeable in this instance on issues related to**

6    **the negotiations leading up to this subscription**

7    **agreement, it would be Mr. Nawracaj who is the**

8    **person most knowledgeable?**

9            MR. SADOCK:  Objection.  Misstates the

10   witness' testimony.  Asked and answered.  I'd ask if

11   you want to keep asking this question, read back his

12   former response.

13           MS. SWEENEY:  I'm not going to keep asking

14   the question.  I'm just going to say on the record,

15   it seems that there are multiple areas throughout

16   the day where I have asked questions to you as the

17   person who has designated as the person most

18   knowledgeable, and you defer to somebody else and

19   say I have to ask them.

20           So I'm trying to ascertain throughout the

21   day what the areas are that you lack the expertise

22   and where someone else should have been designated

23   as the person most knowledgeable.

24           MR. SADOCK:  Counsel, is that a question

25   or a statement for the --

Justin Pannu  10/29/2018

1          MS. SWEENEY:  No, it's a statement and

2   it's something we may take up at a later date

3   because -- so I'm entitled to on -- under the Code

4   to get the testimony of the person most

5   knowledgeable on the topics that have been

6   designated, and if you are not that person, that's

7   fine, but I'm entitled to get the testimony of the

8   person most knowledgeable.

9          And so if you are not the person who has

10   the most knowledge about these negotiations, that's

11   fine.  I will get the information from someone else.

12          I would just ask that your counsel provide

13   the names of -- and the categories of the people who

14   will provide the most knowledgeable testimony so

15   that we can proceed on those topics.

16          MR. SADOCK:  Fair enough.

17          And just to put a statement on the record,

18   we have designated Mr. Pannu as the person most

19   knowledgeable.  His testimony today makes it clear

20   that there may be other individuals who he cannot

21   speak for.  It does not mean he's not the person

22   most knowledgeable.

23          We're more than happy to provide a list on

24   areas of people who you may also want to speak with.

25   That does not mean that Mr. Pannu is not the person

1    most knowledgeable on the topics requested for

2    today.

3            MS. MCKNIGHT:  And if I can add in

4    something really fast.  It might make sense towards

5    the end to go through the list of items.  I know

6    that you have emphasized certain areas, but it's

7    still unclear as to which matters you feel besides

8    the most recent one requires us to, you know,

9    further discuss a person most knowledgeable for --

10           MS. SWEENEY:  I'm happy to do that.

11           MS. MCKNIGHT:  -- so we can alleviate

12   that.

13           MS. SWEENEY:  I am happy to do that and

14   we'll do that off the record.  I don't want to use

15   my time for that, but yes.  Thank you.

16   BY MS. SWEENEY:

17       Q    So back to Exhibit 30.  Mr. Willis says:

18   Can we request that Rich be available to finalize

19   all documents this evening and be prepared to sign

20   and fund tomorrow.

21           Did EnSource have the sense that there was

22   a rush to get the funds by Hopewell?

23       A    I believe there might have been a sense by

24   EnSource, but it didn't matter.

25       Q    Why is that?

Justin Pannu  10/29/2018

```
 1        A    So we could properly negotiate and execute

 2   the agreements.

 3        Q    I've put in front of you Exhibit 31, which

 4   is a one-page document. It's a email from you to

 5   Mark Willis dated September 9th, 2016.

 6             (Exhibit 31 was marked.)

 7   BY MS. SWEENEY:

 8        Q    And it is -- your first line says, "Below

 9   is the summary of our discussion.  Please let me

10   know if you agree to the following and we will make

11   the following changes."

12             So it sounds to me as if you and

13   Mr. Willis had a phone conversation?

14        A    Yes, I believe so.

15        Q    Do you specifically remember a phone

16   conversation that would have taken place on

17   September 8th, 2016?

18        A    I remember a conversations taking place.

19   I don't remember specific dates or specific

20   conversations.  I remember subject of those

21   conversations and sort of as an aggregate in my

22   head.

23        Q    So the last issue at the bottom of this

24   email discusses a bridge loan.

25             Do you remember a conversation where a
```

Justin Pannu  10/29/2018

1    bridge loan was discussed for the first time with

2    Mr. Willis?

3                MR. SADOCK:  Objection.  Misstates the

4    document.

5                THE WITNESS:  I don't remember.

6    BY MS. SWEENEY:

7        Q    Do you remember discussing a bridge loan

8    with Mr. Willis?

9        A    I -- other than this email?

10       Q    On the phone.

11       A    I don't remember.

12       Q    So the section under the bridge loan says,

13   "We have discussed the changes to Hopewell occurring

14   after the subscription agreement and I believe the

15   group is comfortable with providing a bridge loan

16   (personally secured by one of the Managers) for 14

17   days."

18               Why -- why was the bridge loan necessary?

19       A    I believe the amended operating agreements

20   weren't yet agreed to or the changes that needed to

21   be made to it, and if there was a sense that they

22   required the funds, that we would then provide a

23   loan if they needed the money right away.  I do

24   remember this.  This jogged my memory.

25       Q    Did anyone at Hopewell tell you why they

Justin Pannu  10/29/2018

1    needed the money right away?

2        A    Tech commitments as far as I remember.

3        Q    When you started talking about a bridge

4    loan, did you, on behalf of EnSource, ask

5    Mark Willis to provide documentation that would

6    support the need for a loan and a fast cash

7    infusion?

8        A    The general theme was that he needed the

9    loan or the money for tech commitments.  And that's

10   as far as I remember.  So we didn't need to ask

11   because we thought we knew based on Mark's emails

12   and text message.

13       Q    Did you know -- based on your

14   understanding of what the tech commitments were, did

15   you have an idea of whether there was an amount in

16   arrears as of that time?

17            MR. SADOCK:  Objection.  Calls for

18   speculation.  Asked and answered.

19            THE WITNESS:  We didn't believe that, and

20   if there was, it should have been disclosed.

21   BY MS. SWEENEY:

22       Q    Did you ask for any documentation that

23   would support the need for a fast cash infusion to

24   pay commitments?

25            MR. SADOCK:  Objection.  Asked and

Justin Pannu  10/29/2018

 1   answered.

 2            THE WITNESS:  Well, this is -- we took

 3   Willis's word on it.  We trusted him and we made

 4   the -- based on the Chad's endorsement of Willis, we

 5   didn't ask for more than what we thought was fair

 6   and reasonable given the personal relationships

 7   involved.

 8   BY MS. SWEENEY:

 9        Q    All right.  I believe this is going to be

10   Exhibit 32.

11            (Exhibit 32 was marked.)

12   BY MS. SWEENEY:

13        Q    This is an email dated September 12, 2016,

14   from Tom Tatham to Mr. Nawracaj there's a series of

15   emails.

16            The email immediately below is from

17   Mr. Nawracaj to Mr. Tatham.  And it describes where

18   the deal was as of September 12.

19            According to Mr. Nawracaj, the plan was

20   that a convertible promissory note would be issued

21   for $205,000, which would be convertible to 102,500

22   units of Hopewell with a maturity date of

23   September 26, 2016 and that Mark Willis would

24   personally guarantee it.

25            And then No. 2, then, between

Justin Pannu  10/29/2018

1   September 12, and September 26, the company

2   agreements of Hopewell and Title Rover would be

3   amended.

4          And No. 3, it talks about the amount of

5   money that EnSource was looking to invest, and as of

6   this date it was $610,000 in total.

7          Does that seem to be an accurate

8   recitation of the deal that was reached by your

9   attorney?

10          MR. SADOCK:  Objection.  Misstates the

11   email and the testimony speaks for itself.  Calls

12   for speculation.

13          THE WITNESS:  The email says what it says,

14   so I agree the email says what it says.

15   BY MS. SWEENEY:

16      Q    And you were cc'd on that email, correct?

17      A    Yes.

18      Q    And you were the representative of

19   EnSource and the client of Mr. Nawracaj at that

20   time, correct?

21      A    And EnSource was the client of

22   Mr. Nawracaj.

23      Q    And so as the client of Mr. Nawracaj, did

24   you object or take issue with anything that was

25   articulated by him in this email?

Justin Pannu  10/29/2018

```
 1                MR. SADOCK:  Objection as to time.

 2                THE WITNESS:  I don't remember.

 3    BY MS. SWEENEY:

 4         Q    Up above then Mr. Tatham says Mark wanted

 5    him to prepare a promissory note with Hopewell and

 6    Mark as joint makers.

 7                Do you know if that ever happened?

 8                MR. SADOCK:  Objection.  Misstates the

 9    email.  Calls for speculation.  The email speaks for

10    itself.

11                THE WITNESS:  I don't remember.

12    BY MS. SWEENEY:

13         Q    So the next day there's this email, which

14    we'll call Exhibit 33.

15                (Exhibit 33 was marked.)

16    BY MS. SWEENEY:

17         Q    And about an inch down there's an email

18    from Mark to you where it says, "Just signed.

19    Please try and wire the funds ASAP."

20                Do you see that?

21         A    I do see that.

22         Q    The documents that were just signed, is

23    that referring to the guarantee and promissory note?

24                MR. SADOCK:  Objection.  Calls for

25    speculation.  Lacks foundation.
```

Justin Pannu  10/29/2018

```
 1                THE WITNESS:  Was there an attachment to
 2   this email?
 3   BY MS. SWEENEY:
 4        Q     Not that I can see.
 5        A     It probably is, but I don't recall.
 6        Q     Do you see the email from you up above the
 7   first line at the EnSource account as being open
 8   now?
 9        A     Yes.
10        Q     Is that referring to EnSource's bank
11   account?
12        A     Yes.
13        Q     At some point EnSource decided to increase
14   the amount that was going to be subscribed to from
15   610- to 630,000.
16              Do you recall that?
17              MR. SADOCK:  Objection.  Lacks foundation.
18              THE WITNESS:  There were a lot of changes.
19   I don't recall any specific change.
20   BY MS. SWEENEY:
21        Q     Would it surprise you that the person that
22   was interested in adding an additional $20,000 was
23   Mr. Johns?
24        A     No.
25        Q     Do you have a recollection as to why he
```

Justin Pannu  10/29/2018

 1    **would have been interested in investing more than he**

 2    **initially was planning?**

 3                   MR. SADOCK:  Objection.  Calls for

 4    speculation.

 5                   THE WITNESS:  I don't remember any

 6    specific.

 7    BY MS. SWEENEY:

 8       **Q    Do you remember having any conversations**

 9    **with Mr. Johns about the amount of his investment in**

10    **Hopewell?**

11       A    I don't remember anything specific.

12       **Q    Did the amount you were planning to invest**

13    **ever change?**

14       A    I believe so.

15       **Q    How so?**

16                   MR. SADOCK:  Objection.  Lacks foundation.

17    Vague as to time.  Vague as to "investment."

18                   You can answer.

19                   THE WITNESS:  It did change.  I believe it

20    was 100,000 at first, and then the final amount was

21    200,000.  I -- as far as I remember.

22    BY MS. SWEENEY:

23       **Q    And do you recall the reason why your**

24    **personal investment increased from 100- to $200,000?**

25       A    Yes.  There was a -- I entered into a

Justin Pannu  10/29/2018

1   settlement with Coin-Op at that time.

2       Q    So you had more money to invest?

3       A    (Witness nods head.)

4       Q    At some point Chad Martin decided to

5   decrease the amount of money he was going to invest

6   by $100,000.

7            Do you recall why that happened?

8            MR. SADOCK:  Objection.  Lacks foundation.

9   Calls for speculation.

10           THE WITNESS:  Sorry.

11  BY MS. SWEENEY:

12      Q    Do you recall why Chad Martin decided to

13  decrease the amount he was going to invest by

14  $100,000?

15      A    You will have to ask him.

16      Q    Do you, as the person most knowledgeable

17  of EnSource, know why that decision was made?

18           MR. SADOCK:  Objection.  Asked and

19  answered.  Lacks foundation.  Calls for speculation.

20           THE WITNESS:  I'm not sure, but I believe

21  he might have been going through a divorce.

22  BY MS. SWEENEY:

23      Q    And that affected his liquidity or how was

24  that relevant to the investment?

25           MR. SADOCK:  Objection.  Relevant.  Calls

Justin Pannu  10/29/2018

```
 1   for speculation.
 2           THE WITNESS:  You know, you are going to
 3   have to ask him.
 4   BY MS. SWEENEY:
 5       Q    Because you don't know?
 6       A    I don't remember.
 7       Q    Do you remember the final amount that
 8   EnSource ultimately invested in Hopewell?
 9       A    The cash that we transferred to Hopewell I
10   believe was $430,000 in total, as far as I recall.
11       Q    Was that the total amount subscribed to?
12       A    No.
13       Q    What was the total amount subscribed to?
14       A    I believe it was 530,000.
15       Q    This next document is going to be
16   Exhibit -- it's 35?
17           MR. SADOCK:  Thirty-five.
18           THE COURT REPORTER:  Thirty-four.
19           (Exhibit 34 was marked.)
20   BY MS. SWEENEY:
21       Q    And for the record this is a two-page
22   email, and connected to the two-page email is a
23   subscription agreement and Schedule A is a further
24   attachment to the email.
25           It's dated September 30th, 2016.  It's
```

Justin Pannu  10/29/2018

```
 1   from Mr. Tatham to you, and it says, "Attached is

 2   the fully executed Subscription Agreement for your

 3   files."

 4           Do you see that?

 5       A   I do see that.

 6       Q   Okay.  And if you turn to page

 7   WIL_00000944, it's the signature page.

 8           Is that your signature on there?

 9       A   It is.

10       Q   So I guess the page prior to that -- two

11   pages prior to that 00000942 is also a signature

12   page.

13           Is that your signature as well?

14       A   It is.

15       Q   And in both of those instances you were

16   signing on behalf of EnSource, correct?

17       A   I was.

18       Q   Okay.  So this is the final subscription

19   agreement for the amount of $530,000, right?

20       A   Do you know what page that is?

21       Q   The amount of the subscription is listed,

22   just for your reference to speed it up, on page

23   WIL_00000942 below your signature.

24       A   Correct.  530-.

25       Q   Did you read the subscription agreement
```

Justin Pannu  10/29/2018

1    before you signed it on behalf of EnSource?

2           MR. SADOCK:  Objection.  Vague as to "you"

3    And time.

4           THE WITNESS:  I briefly read the

5    subscription agreement but relied on the assessment

6    of my attorney to understand it.

7    BY MS. SWEENEY:

8       Q    Back on the page we were just discussing,

9    your signature page --

10      A    Uh-huh.

11      Q    -- do you see at the top of that page it

12   says, "The undersigned investor hereby represents

13   that the undersigned investor has carefully read and

14   is familiar with this agreement and the company

15   agreement.  The information contained herein is

16   complete and accurate and may be relied upon."

17          Do you see that?

18      A    I do.

19      Q    Did you understand at the time that you

20   were attesting that you were -- had understood and

21   read this document before you signed it?

22      A    I had --

23          MR. SADOCK:  Objection.  Calls for a legal

24   conclusion.  Asked and answered.

25   ///

Justin Pannu  10/29/2018

```
 1    BY MS. SWEENEY:
 2         Q    You can answer.
 3         A    I understood -- is this privileged?  I
 4    don't know, but...
 5         Q    Your understanding is not privileged.
 6         A    My understanding.
 7              Okay.  So I understood the agreement at
 8    the time.
 9         Q    And you understood that you were attesting
10    that you had read it, that you were familiar with
11    it, and that Hopewell was entitled to rely upon that
12    fact?
13              MR. SADOCK:  Objection.  Calls for a legal
14    conclusion.
15              THE WITNESS:  I understood it and I relied
16    on the assessment of my attorney to understand it
17    and read it for EnSource.
18    BY MS. SWEENEY:
19         Q    And you understood that Hopewell was
20    entitled to rely on you reading it?
21              MR. SADOCK:  Objection.  Calls for a legal
22    conclusion.  Speculation as to "reliance."
23              THE WITNESS:  I did -- I understand that
24    it says what it says there, yes.
25    ///
```

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:

 2       Q    And did you understand that -- that you,

 3   as the investor, that EnSource was also making

 4   representations by signing the subscription

 5   agreement?

 6            MR. SADOCK:  Objection.  Calls for a legal

 7   conclusion.

 8            THE WITNESS:  I relied on the assessment

 9   of my attorney to understand the representations

10   that were being made on behalf of EnSource.

11   BY MS. SWEENEY:

12       Q    But did you understand that EnSource was

13   making representations in this document?

14       A    Yes.

15       Q    Turning to the second page of the

16   subscription agreement which is found at 00000937.

17   Do you see Subsection G?

18       A    I do.

19       Q    In Subsection G says, "The Investor is

20   aware of and understands each of the risks and

21   potential conflicts of interest inherent of an

22   investment in the Company as is set forth in the

23   Memorandum."

24            That would be the PPM, correct?

25       A    I believe so.
```

Justin Pannu  10/29/2018

```
 1        Q    Did you read that sentence before you
 2   signed the subscription agreement?
 3             MR. SADOCK:  Objection.  Asked and
 4   answered.
 5             THE WITNESS:  Did EnSource read that?  We
 6   relied on the assessment of our attorney, so I would
 7   say that EnSource read it so long as our attorney
 8   read it.
 9   BY MS. SWEENEY:
10        Q    And was it a true statement that the
11   investor, which was EnSource, was aware of and
12   understood the risks and potential conflicts of
13   interest?
14             MR. SADOCK:  Objection.  Calls for a legal
15   conclusion.  Vague as to time.
16             THE WITNESS:  I believe so, yes.
17             MS. SWEENEY:  Let's go off the record.
18   We've got to change the tape.
19             THE VIDEOGRAPHER:  This ends Media
20   No. 3 in the deposition of Justin Pannu.
21             The time off the record is 4:57 p.m.
22             (A recess was taken.)
23             THE VIDEOGRAPHER:  This begins Media No.
24   4 in the deposition of Justin Pannu.
25             The time on the record is 5:11 p.m.
```

Justin Pannu  10/29/2018

```
1    BY MS. SWEENEY:
2        Q    We're in the middle of discussing
3    Exhibit 34 which is the subscription agreement.  And
4    if you will please turn to the page that's Bates
5    labeled 00000937.  And there is a section at the
6    bottom of that page numbered paragraph 5 "Investor
7    representations."
8             Do you see that?
9        A    What page is this, 000937?
10       Q    937.
11       A    I do see it.
12       Q    At the very bottom is a 5?
13       A    Okay.
14       Q    Those are representations that EnSource,
15   the investor, was making.
16            Turning to the next page, Subsection C in
17   the "Investor representation" section, EnSource is
18   attesting to the fact that the investor is an
19   accredited investor.
20            And we discussed that a little bit
21   earlier, but it's -- as the person most
22   knowledgeable of EnSource, is it your understanding
23   that all members of EnSource are accredited
24   investors?
25            MR. SADOCK:  Objection.  Calls for a legal
```

Justin Pannu  10/29/2018

1    conclusion and speculation.

2              THE WITNESS:  I asked the members of

3    EnSource if they were accredited investors as the

4    person most knowledgeable and the person that was

5    responsible for asking about this particular topic,

6    and they all said to me, yes, they were, and I have

7    no reason not to believe them.

8    BY MS. SWEENEY:

9        Q    You, personally, is your net worth in

10   excess of a million dollars?

11             MR. SADOCK:  Objection.  Relevancy.

12   Privacy.

13             THE WITNESS:  Yes.

14   BY MS. SWEENEY:

15       Q    Moving down to Subsection D of the

16   "Investor representations," I want to go through

17   this paragraph in some detail.

18             The first part of it says, quote, "No

19   representations or warranties have been made to the

20   Investor by the Company, the Company's Managers, or

21   any agent thereof, other than those -- other than as

22   set forth in the Company Agreement, and this

23   Agreement."

24             Do you see that?

25       A    I see that.

Justin Pannu  10/29/2018

1       Q      And you understood that at the time that
2    you signed this document?
3              MR. SADOCK:  Objection.  Calls for a legal
4    conclusion.
5    BY MS. SWEENEY:
6       Q      Sir, I'm only asking about the first
7    sentence of Subsection D.
8       A      I read that and that's what it says.
9       Q      Do you understand what that says?
10      A      That no representations or warranties have
11   been made to the investor by the company, the
12   company's manager or agent thereof other than as set
13   forth in the company agreement in this agreement.
14      Q      Do you understand that?
15      A      I believe so.
16             It doesn't say anything about omissions.
17      Q      You understand that it says that the only
18   thing that the company is warrantying is that which
19   is in the company agreement and in this agreement?
20      A      Represent warranties but nothing about
21   omissions.
22      Q      The next sentence goes on to say, "The
23   Investor has had access to such information
24   concerning the Company, as the Investor deems
25   necessary to enable the Investor to make an informed

Justin Pannu 10/29/2018

1 decision concerning the acquisition of the

2 Interest."

3          Is there anything about that sentence that

4 you disagree with?

5          MR. SADOCK:  Objection.  Calls for a legal

6 conclusion.

7          THE WITNESS:  That's what that sentence

8 says.

9 BY MS. SWEENEY:

10     Q    And as of the time that you signed the

11 subscription agreement, did you disagree with that

12 sentence?

13          MR. SADOCK:  Objection.  Calls for a legal

14 conclusion.

15          THE WITNESS:  We had a -- there were a

16 number of representations that Willis made to us

17 such as the -- the fact that we trusted Willis on

18 the information that -- and Tatham on the

19 information that they had provided to us.

20 BY MS. SWEENEY:

21     Q    So --

22     A    So having --

23     Q    I'm asking a yes-or-no question.  As of

24 the date that you signed the subscription agreement,

25 did you disagree with that sentence?

Justin Pannu  10/29/2018

```
 1        A     As of that date, no, I don't believe so.

 2        Q     The next sentence says, "The Investor has

 3   had access to the designated representatives of the

 4   Company, its Managers, and the opportunity to ask

 5   questions of, and receive answers satisfactory to

 6   the Investor from, the Managers and/or such

 7   designated representatives concerning the offering

 8   of Interests in the Company generally."

 9             As of the time you signed the subscription

10   agreement, did you disagree with that sentence?

11        A     We believed at the time that the

12   representations that were made to us, based on a

13   personal relationship with Willis and Chad, we were

14   satisfied without having to strain that personal

15   relationship without asking any further -- for

16   further information.

17        Q     Okay.  I'm going to ask -- I'm asking just

18   a simple yes-or-no question.  As of the date that

19   you signed this subscription agreement, did you

20   disagree with anything in that last sentence that we

21   just discussed?

22             MR. SADOCK:  Objection.  Calls for a legal

23   conclusion.  Asked and answered.

24             THE WITNESS:  I'm unaware of any concerns

25   that we had at that point in time.
```

Justin Pannu  10/29/2018

1  BY MS. SWEENEY:

2      **Q    And the last sentence in this paragraph**

3  **says, "The Investor has obtained all additional**

4  **information requested by the Investor to verify the**

5  **accuracy of all information furnished in connection**

6  **with the offering of Interests in the Company."**

7          **As a yes-or-no question, as of the date**

8  **that you signed the subscription agreement, did you**

9  **disagree with anything in that last sentence of**

10  **paragraph D?**

11          MR. SADOCK:  Objection.  Calls for a legal

12  conclusion.

13          THE WITNESS:  At the time -- at the time

14  we believed we had either asked for the information

15  or -- or we did receive it or did not, but we were

16  satisfied with the response if their information was

17  not available.

18  BY MS. SWEENEY:

19      **Q    Subsection E, about halfway in the first**

20  **sentence at the very last line of that page it says,**

21  **"The Investor acknowledges that it has received and**

22  **carefully read the Confidential Private Placement**

23  **Memorandum of the Company, the Company Agreement,**

24  **and this Agreement."**

25          **At the time you signed the subscription**

Justin Pannu  10/29/2018

```
 1    agreement, was that a true statement?

 2         A    Which one is this?  Sorry.

 3         Q    The one I just read --

 4         A    Yeah, I was --

 5         Q    -- starting on the last line says, "The

 6    Investor acknowledges" --

 7         A    Which page?

 8         Q    Page 3, yeah.  "The Investor acknowledges

 9    that it received and carefully read" --

10         A    Okay.

11         Q    -- "the Confidential Private Placement of

12    the Company, the Company Agreement and this

13    Agreement."

14         A    I agree that's what it says.

15         Q    I'm asking you if that's a true statement

16    as of the date that you signed the subscription

17    agreement.

18              MR. SADOCK:  Objection.  Calls for a legal

19    conclusion and speculation.

20              THE WITNESS:  We relied on our legal

21    counsel to read that for us, so I would say yes.

22    BY MS. SWEENEY:

23         Q    Did you personally read the confidential

24    private placement memorandum, the company agreement

25    and this agreement prior to signing it?
```

Justin Pannu  10/29/2018

1          MR. SADOCK:  Objection.  Asked and

2   answered.

3          THE WITNESS:  I relied on my counsel to

4   read the three items and to fully understand it.  I

5   may have briefly glanced at it and there were things

6   that I didn't personally understand.

7   BY MS. SWEENEY:

8      Q     Okay.  So the testimony is, no, you did

9   not carefully read all three things personally?

10         MR. SADOCK:  Objection.  Misstates

11  testimony.  Asked and answered.

12         THE WITNESS:  I believe EnSource read it

13  carefully given that they had counsel.

14  BY MS. SWEENEY:

15     Q     I'm asking about you.

16     A     Personally?

17     Q     Personally, if you carefully read the

18  private placement memorandum, the company agreement,

19  and this agreement prior to signing it.

20         MR. SADOCK:  Objection.  Asked and

21  answered.

22         THE WITNESS:  I don't remember.

23  BY MS. SWEENEY:

24     Q     Still in that paragraph, the middle of

25  that paragraph it says, "No separate counsel has

Justin Pannu  10/29/2018

1    been retained to act on behalf of the Investors."

2              Was that a true statement at the time you

3    signed the subscription agreement?

4              MR. SADOCK:  Objection.  Calls for a legal

5    conclusion.  Lacks foundation.

6              THE WITNESS:  I'm not clear what that

7    means "to act on behalf," so I don't know.

8    BY MS. SWEENEY:

9         Q    Did you believe -- did you on behalf of

10   EnSource believe that you had retained an attorney

11   to act on your behalf in connection with this

12   investment?

13        A    Yes, but I believe --

14             MR. SADOCK:  Objection.  Asked and

15   answered.  Calls for a legal conclusion.

16   BY MS. SWEENEY:

17        Q    I'm sorry.  Your counsel was talking at

18   the same time.  What was your -- what did you say?

19        A    I don't -- I don't understand what act on

20   means, but...

21        Q    What about act on is confusing?

22        A    As just act on, just what does that

23   specifically mean?  I don't understand.

24        Q    Did EnSource have an attorney acting on

25   its behalf?

1      A     Yes.

2      Q     So then is it a fact that that sentence is

3  untrue?

4      A     I don't know.

5      Q     Moving down to Subparagraph K at the

6  bottom of that page, it says, "The Investor is

7  knowledgeable and experienced in evaluating

8  investments and experienced in financial and

9  business matters and is capable of evaluating the

10  merits and risks of investing in this -- in the

11  Interests."

12          Was that a true statement at the time you

13  signed this subscription agreement?

14      A     I believe so, yes.

15      Q     Do you personally believe that you were

16  knowledgeable and experienced in evaluating

17  investments and capable of evaluating this

18  particular investment?

19      A     I'm knowledged and experienced in

20  evaluating investments in financial and business

21  matters.

22      Q     Did you personally believe that this

23  particular investment was beyond your expertise to

24  evaluate?

25              MR. SADOCK:  Objection.  Asked and

Justin Pannu  10/29/2018

1    answered.

2              THE WITNESS:  I believe it -- I believe I

3    have the knowledge and experience in evaluating

4    investments and experienced in financial and

5    business matters and evaluating the merits and risks

6    of investing.

7    BY MS. SWEENEY:

8        Q    And in connection with this particular

9    investment, do you personally believe that you have

10   the experience to evaluate the particular interests

11   investment?

12       A    Personally not by myself, if we're talking

13   about technology and evaluating lease and title

14   issues.

15       Q    The next sentence says, "The Investor has

16   evaluated the risks of investing in the Interests,

17   and has determined that the Interests are a suitable

18   investment for the Investor.  In evaluating the

19   suitability of an investment in the Interests, the

20   Investor has not relied on any representations or

21   other information (whether oral or written) other

22   than as set forth herein in the Memorandum, the

23   Company Agreement, the other agreements, and

24   independent investigations made by the Investor or

25   representatives of the Investor."

Justin Pannu  10/29/2018

1          **Was any part of that two sentences untrue**
2    **at the time you signed the subscription agreement?**
3          MR. SADOCK:  Objection.  Calls for a legal
4    conclusion.
5          THE WITNESS:  So we relied on
6    representations as not relied on --
7    BY MS. SWEENEY:
8          Q    **Was that an answer or were you --**
9          A    I was just reading.
10         Q    **Okay.**
11         A    I'm trying to understand the paragraph.
12              This particular thing I couldn't speak on
13    behalf of EnSource.  There might be other members
14    that have relied upon or other attorneys that have
15    looked at this particular language, but as the
16    person most knowledgeable, I believe we may have
17    not -- I'm not sure.
18         Q    **You're not sure if that's a true**
19    **statement?**
20         A    I'm not sure.
21         Q    **Why is that?**
22              MR. SADOCK:  Calls for a legal conclusion.
23              THE WITNESS:  I'm just -- yeah, it calls
24    for a legal conclusion.  I'm not sure.  I --
25    ///

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:

 2        Q     You understand that this is in a section

 3   that's entitled "Investor representation" that you

 4   are, by signing the agreement, representing that you

 5   had not relied on any representations oral or

 6   written other than those inside here.  That's what

 7   you were representing when you signed the agreement.

 8              MR. SADOCK:  Calls for a legal conclusion.

 9              THE WITNESS:  I agree that's what I

10   signed.

11   BY MS. SWEENEY:

12        Q     The next paragraph --

13        A     It doesn't make any mention about

14   omissions though.

15        Q     The next sentence of that paragraph says,

16   "With respect to its investment in the Company, the

17   Investor is not relying on any other information,

18   representation or warranty by the Company, the

19   Managers of the Company, or any designated

20   representatives of the Company."

21              Do you see that that's also what you were

22   attesting to when you signed the subscription

23   agreement?

24              MR. SADOCK:  Objection.  Calls for a legal

25   conclusion.
```

Justin Pannu  10/29/2018

```
1    BY MS. SWEENEY:

2        Q    Sir, I'm only asking you about the last

3    sentence of paragraph K and I'm running out of time,

4    so...

5        A    On "K"?  Okay.

6        Q    "K."

7        A    I was reading it -- okay.  So what --

8        Q    "With respect to its investment in the

9    Company, the Investor is not relying upon any other

10   information, representation or warranty by the

11   Company, the Managers of the Company, or any

12   designated representatives of the Company."

13       A    I agree that's why I signed, but it

14   doesn't make any mention about omissions.

15       Q    Down in paragraph 7 it talks about signing

16   as the agent of an entity.

17            Did you understand at the time that you

18   were signing on behalf of EnSource that you were the

19   designated representative of EnSource for this

20   investment?

21            MR. SADOCK:  Objection.  Calls for a legal

22   conclusion.

23   BY MS. SWEENEY:

24       Q    I'm asking you a question that doesn't

25   involve reading.
```

```
1        A     Oh, reading.  Sorry.  Go ahead.

2        Q     Were you the designated representative of

3   EnSource?

4              MR. SADOCK:  Objection.  Calls for a legal

5   conclusion.

6              THE WITNESS:  I don't know if I was

7   designated specifically, but it naturally came to

8   be.

9   BY MS. SWEENEY:

10       Q     Your signature had the ability to bind

11  EnSource?

12       A     Yes.  Yes, it did.

13       Q     Section 8(b), which is on page 6 on the

14  next page, it starts by saying, "The Investor

15  acknowledges that the Investor understands the

16  meaning and legal consequences of the

17  representations and warranties made by the Investor

18  herein.  Such representations and warranties are a

19  complete and accurate -- shall be complete and

20  accurate as of the Closing Date and may be relied

21  upon by the Company's Managers and the Company."

22             Did you understand that in making the

23  representations we've just talked about, that

24  Hopewell was relying on those representations made

25  by EnSource?
```

Justin Pannu  10/29/2018

1            MR. SADOCK:  Objection.  Calls for a legal

2     conclusion.  Vague as to "representations" and calls

3     for speculation.

4            THE WITNESS:  Okay.  So your question was

5     again?

6     BY MS. SWEENEY:

7         Q    **Did you understand that Hopewell was**

8     **relying on the representations that EnSource was**

9     **making in this subscription agreement?**

10           MR. SADOCK:  Objection.  Vague as to

11    "representations."  Calls for speculation and a

12    legal conclusion.

13           THE WITNESS:  I had my attorney look at

14    this specific agreement and I -- we sought his

15    assessment on that.  So if that is the

16    representation that we made based on our attorney's

17    assessment and opinion, then that's the

18    representation that we did make.

19    BY MS. SWEENEY:

20        Q    **You understood that EnSource had the**

21    **option to convert the Hopewell shares to an interest**

22    **in Title Rover at some point, correct?**

23           MR. SADOCK:  Objection.  Lacks foundation.

24    Vague as to time.

25           THE WITNESS:  I understood at some point

Justin Pannu  10/29/2018

```
 1    we had the right to convert for a period of time.
 2    BY MS. SWEENEY:
 3        Q     And that right was set forth in an
 4    exchange warrant?
 5        A     Yes.
 6        Q     Did EnSource ever exercise that right?
 7        A     No.
 8        Q     Why?
 9        A     Because while EnSource was -- when
10    EnSource -- EnSource's trust was broken with
11    Hopewell, Willis and Tatham after we had seen what
12    happened to the funds.  And therefore while Willis
13    continued to say that this was still a good
14    opportunity, it didn't matter to us.
15        Q     Because you weren't interested in having
16    an investment in Title Rover at that point?
17        A     Because the trust was broken.
18        Q     Did you -- strike that.
19              I'm giving you a document I'm going to
20    label Exhibit 35.
21              (Exhibit 35 was marked.)
22    BY MS. SWEENEY:
23        Q     It's an email chain again, this one dated
24    December 8th, 2016.
25              If you follow it to the third page of the
```

Justin Pannu  10/29/2018

```
 1    email exchange, you can see that what precipitated

 2    this email was the progress-to-date email from

 3    Mr. Tatham of December 7th.

 4              Do you have a recollection of receiving

 5    that email?

 6        A    I do.

 7        Q    And it looks like you sent an email to

 8    Mr. Tatham that day asking a couple of questions, as

 9    you say, "off the cuff without conferring with the

10    group."

11              Do you see those questions and then

12    Mr. Tatham's answers immediately above Mr. Tatham's

13    email?

14        A    I do.

15        Q    And then immediately above Mr. Tatham's

16    answers, your response also on December 8th to

17    Mr. Tatham says, "Thanks, Tom.  This helps."

18              Do you see that?

19        A    Yes.

20        Q    And above that, Mr. Willis emailed you and

21    said, "Give me a call" -- or he says, "Call me any

22    time via cell if you need to discuss anything."

23              Do you see that?

24        A    I do see that.

25        Q    And then right above that your response to
```

Justin Pannu  10/29/2018

1    Mr. Willis says, "Thanks, Mark!  Tom clarified some

2    things in the last email.  I'm okay.  Was just

3    trying to understand the math."

4         A    Okay.

5         Q    Do you recall being okay with the

6    information that you received in the December 7th

7    email as you represented to Mr. Willis?

8              MR. SADOCK:  Objection.  Lacks foundation.

9    Misstates testimony.

10             THE WITNESS:  That was an "I'm okay."  Not

11   "I'm great."

12   BY MS. SWEENEY:

13        Q    And when you say "I'm okay," was that you

14   personally or was that you as the representative of

15   EnSource?

16        A    Personally as this whole email chain is

17   personally because I hadn't conferred with the

18   group.

19        Q    Let's label this Exhibit 36.  And it's

20   another email dated December 8th, 2016.  This one

21   from -- the top one at least from Cliff Sharp to

22   you.

23             (Exhibit 36 was marked.)

24   BY MS. SWEENEY:

25        Q    And this appears to be a communication

Justin Pannu  10/29/2018

1    discussing the December 7th email again.

2            A couple of email chains down Cliff Sharp

3    says to you, "Was there a new attachment?  I didn't

4    see it."

5            And your response says, "Yes, the

6    attachment is there.  Seems like he's taking low-end

7    estimates (which is what Tom does).  His personality

8    is the type to under-promise and over-deliver.  I'm

9    not so worried."

10           Does this email reflect the way you

11   personally were feeling on December 8th about the

12   condition of Hopewell?

13           MR. SADOCK:  Objection.  Lacks foundation.

14   Misstates the email chain.

15           THE WITNESS:  Right, I say that.  It says

16   "I'm not so worried."

17           Okay.  So what was your question?

18   BY MS. SWEENEY:

19       Q    Is that the way you were feeling on

20   December 8th, not so worried?

21           MR. SADOCK:  Lacks foundation.  Vague as

22   to what -- what the email is referring to as

23   worried.

24           THE WITNESS:  Yeah, I couldn't tell you

25   what I was not so worried about.  I don't remember.

Justin Pannu  10/29/2018

```
1    BY MS. SWEENEY:
2         Q    Does your statement that you're not so
3    worried reflect the way -- was that a statement on
4    behalf of EnSource or was that a statement on behalf
5    of you personally?
6         A    Personally.
7         Q    By the time you made this communication,
8    had you spoken with other people at EnSource about
9    the November 7th email?
10        A    I don't believe so.  I'm not sure.
11        Q    At what point did you personally become
12   worried about the information received on
13   December 7th, 2016?
14        A    I don't know when I became worried about
15   it.
16        Q    Were other members of EnSource more
17   worried than you?
18        A    Not specifically other members of
19   EnSource.
20        Q    Not specifically?
21        A    Not other members of EnSource.
22        Q    Does that mean the other members of
23   EnSource were not worried?
24        A    I don't believe they had a chance to read
25   or chime in prior to this email.
```

Justin Pannu  10/29/2018

1      Q    And to the best of your recollection and

2  on behalf, speaking as the person most knowledgeable

3  of EnSource, who was the member who first expressed

4  that they were worried about the investment?

5      A    It wasn't a member.

6      Q    Who was it?

7           MR. SADOCK:  Do not discuss any

8  communications with your attorney.

9  BY MS. SWEENEY:

10     Q    Are you able to answer that question

11  without divulging your discussion with your

12  attorney?

13     A    No.

14     Q    Are you going to follow your counsel's

15  advice and not answer the question?

16     A    Yes.

17     Q    In your complaint against Mr. Willis and

18  the other defendants, you allege that Mr. Willis

19  took acts to conceal the insolvency of Hopewell.

20          What acts did Mr. Willis take to conceal

21  the insolvency of Hopewell?

22          MR. SADOCK:  Objection.  Don't answer

23  anything as it pertains to discussions with your

24  attorney or attorney work product.

25          THE WITNESS:  My attorney wrote that.

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:
 2       Q    Are you specifically aware of any acts
 3   that Mr. Willis took to conceal the insolvency of
 4   Hopewell?
 5       A    Mr. Willis himself?
 6       Q    Yes.
 7       A    He represented that it was a start-up
 8   company.
 9       Q    Was that an act to conceal the insolvency
10   of the company?
11       A    And I -- he didn't disclose the aging
12   payables.
13       Q    I'm sorry, the what?
14       A    The aging payables.
15       Q    What were the aging payables at the time
16   EnSource made its investment in Hopewell?
17            MR. SADOCK:  Objection.  Calls for
18   speculation.
19            THE WITNESS:  I don't know.
20   BY MS. SWEENEY:
21       Q    What other acts did Mr. Willis take to
22   conceal the insolvency?
23       A    There may be other people that know
24   more -- not more, but have some other detail
25   representations were made to other members or --
```

Justin Pannu  10/29/2018

1      Q     I'm talking about acts?

2      A     Or acts.  There --

3            MR. SADOCK:  Objection.  Calls for

4   speculation.

5            THE WITNESS:  I may not be aware of

6   everything, so...

7   BY MS. SWEENEY:

8      Q     But you're not aware of any?

9            MR. SADOCK:  Objection.  Misstates

10   testimony.  Asked and answered.

11            THE WITNESS:  I -- asked and answered.  I

12   refer back to what I said about your question.

13   BY MS. SWEENEY:

14      Q     Okay.  I'm going to need you to repeat it

15   because I heard you talk about a representation he

16   made and I'm asking about an act.  An act he took --

17      A     To not disclose --

18      Q     -- to conceal?

19      A     -- the aging payables.

20      Q     Okay.  What exact amount of money do you

21   believe that Mark Willis personally took from

22   Hopewell?

23            MR. SADOCK:  Objection.  Do not answer

24   anything as it pertains to discussions with your

25   attorney or attorney work product.

Justin Pannu  10/29/2018

```
 1              THE WITNESS:  I can't answer your question

 2   then.

 3   BY MS. SWEENEY:

 4        Q    You personally are unaware of the exact

 5   amount that you allege Mark Willis took?

 6              MR. SADOCK:  Objection.  Misstates

 7   testimony.  Asked and answered.

 8              THE WITNESS:  I was aware.  I don't

 9   remember as I sit here, but if I tell you how I was

10   aware, I can't tell you because it's attorney

11   work-client privilege.

12   BY MS. SWEENEY:

13        Q    On behalf -- as the person most

14   knowledgeable of EnSource, can you tell me the exact

15   amount that you EnSource alleges Mark Willis took

16   improperly?

17        A    I believe it's in the complaint.

18        Q    It's actually not in the complaint.

19        A    This isn't --

20        Q    I'm asking about Mark Willis personally.

21        A    Oh.  Okay.

22              MR. SADOCK:  Objection.  Asked and

23   answered.  Don't answer anything that pertains to

24   the discussions with your attorneys or attorney work

25   product.
```

Justin Pannu  10/29/2018

1           THE WITNESS:  Well, what he took

2   personally, I don't --

3   BY MS. SWEENEY:

4       Q    **Do you have an understanding?**

5       A    I don't believe so.

6           MR. SADOCK:  Objection -- sorry.  Belated

7   objection.  Misstates the complaint.

8   BY MS. SWEENEY:

9       Q    **Does EnSource contend that Mark Willis**

10  **intend to -- intended to use the proceeds to -- for**

11  **his own personal benefit?**

12          MR. SADOCK:  Objection.  Calls for a legal

13  conclusion.

14          THE WITNESS:  Say that again?

15  BY MS. SWEENEY:

16      Q    **Do you, does EnSource, contend that**

17  **Mark Willis intended to use the proceeds for his own**

18  **benefit prior to making the solicitation?**

19          MR. SADOCK:  Objection.  Calls for a legal

20  conclusion.

21          THE WITNESS:  Do we contend that in the

22  complaint?

23  BY MS. SWEENEY:

24      Q    **Is that what EnSource believes?**

25      A    That is the -- what my attorney wrote.

Justin Pannu  10/29/2018

1        Q    Is that what EnSource believes?

2             MR. SADOCK:  Objection.  Do not talk about

3    anything that were discussions with your attorneys.

4    And this question calls for a legal conclusion.

5             You can answer as best you can.

6             THE WITNESS:  I will answer as best I can

7    without divulging attorney-client privilege.

8    BY MS. SWEENEY:

9        Q    So tell me all of the reasons why you

10   believe Mark Willis intended to induce EnSource to

11   make the investment so that he could line his own

12   pockets.

13            MR. SADOCK:  Objection.  Asked and

14   answered.

15            THE WITNESS:  I can't answer that question

16   without going into attorney-client privilege --

17   privilege issues.

18   BY MS. SWEENEY:

19       Q    You don't have an independent

20   understanding of the facts?

21            MR. SADOCK:  Objection.  Asked and

22   answered.  Misstates testimony.

23            THE WITNESS:  I have an understanding that

24   Mark Willis represented to us that he would use the

25   money for tech commitments.  And it appeared as it

Justin Pannu  10/29/2018

1    was used to pay aging payables.

2    BY MS. SWEENEY:

3        **Q      And do you equate the payment of aging**

4    **payables with lining his own pockets?**

5            MR. SADOCK:  Objection.  Asked and

6    answered.  Misstates testimony.  Calls for a legal

7    conclusion.

8            THE WITNESS:  Based on the -- how quickly

9    the funds disappeared from the account, that was the

10   assumption.

11   BY MS. SWEENEY:

12       **Q      And that's the assumption that EnSource**

13   **made?**

14       A      Personally for me.

15       **Q      That was your personal assumption.  What**

16   **was EnSource's assumption?**

17       A      That's attorney-client privilege

18   communications.

19       **Q      Are you the person most knowledgeable as**

20   **to EnSource's -- as to EnSource?**

21           MR. SADOCK:  Objection.  Asked and

22   answered.

23           THE WITNESS:  Generally speaking, I am the

24   person most knowledgeable on most topics generally.

25   Specifically -- the specifics that you are asking,

Justin Pannu  10/29/2018

1    other members -- you'd have to ask other members or

2    other people.

3    BY MS. SWEENEY:

4        Q    Who would those people be?

5             MR. SADOCK:  Objection.  Calls for

6    speculation.

7             THE WITNESS:  That I believe it would be

8    our attorney.

9             MS. SWEENEY:  Okay.  I'd like to go off

10   the record for a few minutes.

11            THE VIDEOGRAPHER:  Off the record.  The

12   time is 5:57 p.m.

13            (A recess was taken.)

14            THE VIDEOGRAPHER:  Back on the record.

15   The time is 6:06 p.m.

16            MR. SADOCK:  Just quickly for the record,

17   I want to take this opportunity that I reminded

18   Mr. Tatham -- I know he doesn't have counsel -- over

19   an hour ago, that we have about 18 minutes left and

20   we don't expect to be called back if he waives his

21   opportunity to ask any questions he may have.

22            MS. SWEENEY:  And I will just state for

23   the record that this is a deposition that was

24   noticed by Mark Willis specifically, and so,

25   Mr. Tatham may have rights to resume this deposition

Justin Pannu 10/29/2018

```
 1    either in Mr. Tatham's individual capacity or as a

 2    person most knowledgeable on issues that he may

 3    designate at some later date.  And I will just say

 4    that for the record.

 5    BY MS. SWEENEY:

 6        Q    So I want to talk a little bit more about

 7    the due diligence process that you oversaw on behalf

 8    of EnSource.

 9             Did EnSource do any due diligence above

10    and beyond the deal room or the due diligence

11    questions, the checklist that we saw, or the

12    questions back and forth with Mr. Tatham?

13             MR. SADOCK:  Objection.  Compound.  Vague

14    as to time.

15             THE WITNESS:  I don't remember.

16    BY MS. SWEENEY:

17        Q    Did EnSource do any independent research

18    about the Title Rover technology separate and apart

19    from something that Hopewell told them?

20        A    I don't believe so.

21        Q    Did EnSource go to Texas to inspect the

22    books and records of Hopewell at any point?

23        A    I know there was discussion about that.  I

24    don't know if it actually occurred.

25        Q    Did EnSource ever test the Title Rover
```

Justin Pannu  10/29/2018

1    technology?

2              MR. SADOCK:  Vague as to time.  Vague as

3    to "test."

4              THE WITNESS:  Well, I generally know about

5    the technology and what it's supposed to do.  Any

6    specifics about who might have went to test, other

7    members would know more specifics around the details

8    related to their area of expertise.

9    BY MS. SWEENEY:

10        Q    You specifically have no knowledge of

11   any -- any testing that was done of the Title Rover

12   technology?

13        A    I don't specifically have any knowledge.

14        Q    Who would have that knowledge?

15             MR. SADOCK:  Objection.  Calls for

16   speculation.

17             THE WITNESS:  Either Jerry or

18   James Dibble, but I don't know if they did that.

19   BY MS. SWEENEY:

20        Q    Did EnSource do any independent research

21   related to any title work?

22             MR. SADOCK:  Objection.  Vague as to time.

23   Vague as to "test title work."

24             THE WITNESS:  I don't believe we did any

25   research, independent research on title work.

Justin Pannu  10/29/2018

```
 1   BY MS. SWEENEY:
 2       Q    Did EnSource do any -- ask for any due
 3   diligence related to Beyond Review?
 4       A    I remember seeing an email about
 5   Beyond Review.  I don't know if we asked that or Tom
 6   answered a question regarding that.  I think we went
 7   through that.
 8       Q    We went through an email.
 9       A    Right.
10       Q    Right.
11            Was there any other research done about
12   Beyond Review other than that email that we've
13   already discussed?
14       A    I don't remember any.
15       Q    Did EnSource do any independent research
16   related to Image Engine other than what we discussed
17   in that prior email?
18       A    I don't remember any.
19       Q    Prior to the lawsuit being filed, did
20   EnSource look at the invoices from either
21   Image Engine or Beyond Review to Hopewell?
22       A    I personally didn't.
23            MR. SADOCK:  Objection.  Vague as to
24   "invoices."
25            THE WITNESS:  I personally, not on behalf
```

Justin Pannu  10/29/2018

```
 1    of EnSource, did not look at any invoices.
 2    BY MS. SWEENEY:
 3        Q    Did EnSource look at any -- any billing by
 4    Beyond Review to Hopewell?
 5             MR. SADOCK:  Objection.  Vague as to time.
 6    Vague as to "billing."
 7             THE WITNESS:  I personally did not, but
 8    there may be other members that might have.  If they
 9    had, I don't know.
10    BY MS. SWEENEY:
11        Q    Has EnSource ever done an analysis of the
12    amount billed to Hopewell by Beyond Review and
13    compared to the amount Hopewell paid to
14    Beyond Review?
15             MR. SADOCK:  Objection.  I instruct you
16    not to answer about any assessments done by your
17    attorneys or any attorney work product.
18    BY MS. SWEENEY:
19        Q    Has EnSource itself done that work?
20        A    The members itself.  I don't know.  I
21    haven't done personally any of that.
22        Q    Did EnSource do any comparison between the
23    invoices sent to Hopewell from Image Engine and the
24    amounts Hopewell paid Image Engine?
25             MR. SADOCK:  Objection.  Vague as to time.
```

Justin Pannu  10/29/2018

```
 1                 THE WITNESS:  Say it again.
 2    BY MS. SWEENEY:
 3        Q    Has EnSource --
 4        A    Or clarify the time.
 5        Q    Has EnSource itself, at any time, done an
 6    analysis that compared the invoices from
 7    Image Engine to Hopewell with the payments made by
 8    Hopewell to Image Engine?
 9                 MR. SADOCK:  Once again, objection.  Do
10    not answer anything as it pertains to what the
11    attorneys for EnSource may have done or their work
12    product.
13                 THE WITNESS:  I can't speak to what our
14    attorney might have done or not done.
15    BY MS. SWEENEY:
16        Q    The question was did EnSource itself ever
17    do that analysis?
18                 MR. SADOCK:  Objection.  Asked and
19    answered.
20                 THE WITNESS:  I can't speak to what my
21    attorney might have done.
22    BY MS. SWEENEY:
23        Q    So did EnSource itself, separate and apart
24    from its attorney, ever do that analysis?  That's a
25    yes-or-no question.
```

Justin Pannu  10/29/2018

```
 1              MR. SADOCK:  Objection.  Asked and
 2    answered.
 3              Are you clear on the distinction she's
 4    giving you?
 5              THE WITNESS:  No.  Just -- well, what
 6    distinction are you giving me?
 7    BY MS. SWEENEY:
 8         Q    Did EnSource itself, separate and apart
 9    from any communication with an attorney or any work
10    product of an attorney, did EnSource itself ever
11    look at the invoices generated by Image Engine and
12    the payments made by Hopewell to Image Engine and
13    compare them?
14         A    I personally have not.  You may have to
15    ask the other members if they did.
16         Q    And as the person most knowledgeable of
17    EnSource, did the company do that analysis?
18              MR. SADOCK:  Objection.  Once again.
19    BY MS. SWEENEY:
20         Q    If you know.
21              MR. SADOCK:  Do not answer anything that
22    involved your attorneys.
23              THE WITNESS:  I don't know.
24    BY MS. SWEENEY:
25         Q    Prior to making the investment in
```

Justin Pannu  10/29/2018

```
 1   Hopewell, did EnSource ever look at any invoices

 2   generated or -- generated by Image Engine?

 3            MR. SADOCK:  Objection.  Lacks foundation.

 4            THE WITNESS:  Prior to?

 5   BY MS. SWEENEY:

 6       Q    Yes.

 7       A    The lawsuit?

 8       Q    Prior to the investment.

 9       A    I don't believe so.

10       Q    Prior to its investment, did EnSource ever

11   look at any invoices generated by Beyond Review?

12            MR. SADOCK:  Objection.  Lacks foundation.

13            THE WITNESS:  I don't believe so.

14   BY MS. SWEENEY:

15       Q    Prior to its investment, did EnSource ever

16   look at documentation supporting investments made by

17   the Willis Group in Hopewell?

18            MR. SADOCK:  Objection.  Asked and

19   answered.  Lacks foundation.

20            THE WITNESS:  We were aware of investments

21   made by Willis.

22   BY MS. SWEENEY:

23       Q    Was EnSource aware of any loans made by

24   the Willis Group to Hopewell?

25            MR. SADOCK:  Objection.  Vague as to time.
```

Justin Pannu  10/29/2018

1   Lacks foundation.

2          THE WITNESS:  I don't remember

3   specifically.

4   BY MS. SWEENEY:

5      **Q      Was EnSource aware of any loans made by**

6   **anybody to Hopewell prior to EnSource making its**

7   **investment?**

8      A    I don't -- say that again?

9      **Q      Was EnSource aware, prior to making its**

10  **investments in Hopewell, of any loans made to**

11  **Hopewell?**

12         MR. SADOCK:  Objection.  Lacks foundation.

13  Asked and answered.

14         THE WITNESS:  I personally was not aware

15  of it.  I don't know about EnSource.

16  BY MS. SWEENEY:

17     **Q      Who would know that?**

18         MR. SADOCK:  Objection.  Calls for

19  speculation.

20         THE WITNESS:  You'd have to talk to other

21  members or our attorney.

22         MS. SWEENEY:  Okay.  I have no further

23  questions?

24         MR. SADOCK:  Thank you.

25         MS. SWEENEY:  All right.

Justin Pannu  10/29/2018

```
 1              MR. SADOCK:  Code stipulation?

 2              MS. SWEENEY:  Yeah, let's -- can we go off

 3   the record, please.

 4              THE VIDEOGRAPHER:  Off the record.  The

 5   time is 6:18 p.m.

 6              (A pause in the proceedings.)

 7              THE VIDEOGRAPHER:  Back on the record.

 8   The time is 6:19 p.m.

 9              MS. SWEENEY:  During the short break,

10   we discussed the procedure going forward and we've

11   agreed that the court reporter will finish

12   transcribing the record and will send the original

13   to your counsel within approximately ten days.

14              Thereafter you will have 30 days within

15   which to review the transcript, make any changes,

16   and return it.

17              And during that period of time, all

18   parties will be able to use a certified copy of the

19   transcript for any purpose in this litigation.

20              MR. SADOCK:  So stipulated.

21              MS. SWEENEY:  So stipulated.

22              Thank you very much.

23              THE VIDEOGRAPHER:  This ends the

24   videotaped deposition of Justin Pannu.  Today's date

25   is October 29, 2018.  The time is 6:20 p.m.
```

Justin Pannu  10/29/2018

1               Off the record.

2               (Whereupon, the deposition concluded at

3               6:20 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    I, JUSTIN PANNU                , declare under

2    penalty of perjury under the laws of the State of

3    California that the foregoing is true and correct;

4    that I have read my deposition and have made the

5    necessary corrections, additions or changes to my

6    answers I deem necessary.

7

8    Executed on this_____day of_____,

9    2018.

10

11                  _____

12                            JUSTIN PANNU

13

14

15

16

17

18

19

20

21

22

23

24

25

Justin Pannu  10/29/2018

```
 1   State of California      )

 2                            )     ss

 3   County of San Diego      )

 4

 5          I, BRIDGET L. MASTROBATTISTA, CSR No. 7715,

 6   RPR, RMR, CRR, duly licensed and qualified in and

 7   for the State of California, do hereby certify that

 8   there came before me on the 29th day of October,

 9   2018, at 530 B Street, Suite 350, San Diego,

10   California, the following named person, to-wit

11   JUSTIN PANNU, who was duly sworn to testify the

12   truth, the whole truth, and nothing but the truth of

13   knowledge touching and concerning the matters in

14   controversy in this case; and that he was thereupon

15   examined under oath and his examination reduced to

16   typewriting under my supervision; that the

17   deposition is a true record of the testimony given

18   by the witness.

19          I further certify that pursuant to FRCP

20   Rule 30(e)(1) that the signature of the deponent:

21          (x) Was requested by the deponent or a

22   party before the completion of the deposition;

23          ( ) Was not requested by the deponent of a

24   party before the completion of the deposition.

25          I further certify that I am neither
```

Justin Pannu  10/29/2018

```
 1   attorney or counsel for, nor related to or employed

 2   by any of the parties to the action in which this

 3   deposition is taken, and further that I am not a

 4   relative, employee of any attorney or counsel

 5   employed by the parties hereto, or financially

 6   interested in the action.

 7              CERTIFIED TO BY ME on this 12th day of

 8   November, 2018.

 9

10                        _____

11                        BRIDGET L. MASTROBATTISTA
                          CSR No. 7715, RPR, RMR, CRR
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Justin Pannu  10/29/2018

## WORD INDEX

**< $ >**
**$100,000** 259:6, 14
**$125,000** 175:10
**$150,000** 193:19
**$175,000** 175:10 176:9
**$2** 72:3, 6, 13, 15, 18 130:7 131:4 166:8, 16 167:5 194:2 197:1 198:7
**$20,000** 257:22
**$200,000** 113:22 114:19 115:1 258:24
**$205,000** 254:21
**$3** 55:6 56:10, 11 59:14 60:9, 18 61:9, 15 62:1 64:7, 15 65:1
**$430,000** 260:10
**$45** 206:13
**$5,000** 234:6
**$530,000** 261:19
**$610,000** 255:6
**$74,000** 114:22
**$900,000** 194:4

**< 0 >**
**00000798** 4:10
**00000865** 5:8
**00000873** 6:7
**00000881** 5:25
**00000884** 4:22
**00000933** 6:24
**00000937** 264:16 266:5
**00000942** 261:11, 23
**00000944** 261:7
**00000963** 6:12
**00000966** 239:4
**00000979** 5:12
**00000982** 5:11
**00001009** 5:6
**00001394** 6:20
**00001401** 6:15
**00001443** 6:9
**00001501** 4:12
**000136** 5:15 207:23
**000561** 5:22

**000659** 5:17 212:18
**000711** 4:14
**000715** 129:24 134:12
**000722** 131:14
**000723** 4:16
**000726** 4:18
**000763** 4:21
**000783** 163:2
**000862** 4:24
**000937** 266:9
**001002** 5:9
**001058** 5:19
**001068** 5:20
**001069** 218:3
**001100** 5:23
**001104** 221:1
**001130** 6:3
**001146** 6:5
**001253** 6:14
**001451** 6:17
**001559** 6:18
**001705** 6:21
**001970** 7:5
**001975** 7:3
**002396** 5:3

**< 1 >**
**1** 4:8 20:23, 24 94:7 131:22 177:18 194:3, 13 204:14 306:20
**1,000** 196:5 233:25 234:6
**1,000,000** 194:1
**1:44** 152:13
**1:53** 152:16
**10** 5:3 26:21 180:21, 23 181:1
**10:40** 59:4
**10:48** 59:7
**100** 258:24
**100,000** 61:11 121:6 194:7 258:20
**1003** 5:11
**102** 7:10
**102,500** 254:21
**1029** 5:6
**1061** 5:19
**1075** 5:20
**11** 5:5 7:14 183:24 184:3

**189:**10 190:9 200:11
**11:36** 94:8
**11:45** 94:12
**11:57** 105:20, 21
**1112** 5:23
**112** 7:11
**1132** 6:3
**1147** 6:5
**115** 4:10
**12** 5:6 191:17, 19 194:13 195:16 200:23 201:8, 9, 9, 11 254:13, 18 255:1
**12:49** 105:22, 24
**122** 4:10
**124** 4:13
**125** 176:9
**12th** 139:22 140:7 141:22 142:11, 18 201:17 307:7
**13** 5:9 199:18, 19
**1326** 3:14
**139** 4:15
**14** 5:9 202:18, 19 252:16
**1-4** 234:1
**1400** 6:20
**1402** 6:15
**143** 4:17
**1454** 6:17
**1473** 6:9
**15** 4:22 5:12 204:10, 11, 15 205:2
**1-50** 1:12 2:11
**152** 4:18
**15th** 180:10
**16** 5:12 11:21 184:17 189:9 190:7, 15 200:9 207:22 208:2, 19
**16th** 200:20, 21
**17** 5:16 184:4 192:1, 16 201:8 212:13, 16 213:1
**17,500** 193:14
**1700** 3:9
**1706** 6:21
**177** 4:22
**179** 4:22

**17CV0079** 1:7 2:7 8:16
**17th** 200:22 201:21, 24
**18** 5:17 21:19, 24 22:3 191:22 194:15 215:3, 4 294:19
**180** 5:3
**183** 5:5
**18th** 144:3, 9 201:18 202:3
**19** 5:9, 20 199:22 217:19, 20 218:22
**191** 5:6
**1971** 7:5
**1977** 7:3
**199** 5:9
**1999** 10:4 11:13
**19th** 202:6 203:12
**1st** 232:22 236:10

**< 2 >**
**2** 4:10, 18 6:9 7:10 94:11 115:14, 16, 19 135:5 136:3 139:7 177:19 191:11 194:4 205:2 219:8 224:13 235:18, 20 254:25
**2,000** 206:14
**2:42** 191:12
**2:54** 191:16
**20** 4:8 5:20 16:14 218:16, 18
**200** 43:18
**200,000** 113:21 114:1, 2 115:5, 5 258:21
**2000** 26:1, 20
**2002** 10:5 11:13
**2003** 26:19 27:11, 15
**2007** 30:4 41:18
**2014** 212:24
**2016** 4:13, 18, 22 5:9 6:6, 9, 12, 18 10:2 11:21 12:22, 24 16:12, 19 31:20, 21, 23

**41:**13 43:25 44:1 93:16
**115:**20 116:3
**117:**16, 21
**118:**17 119:3
**122:**16, 17 123:1
**124:**5 125:3, 19, 21, 23 127:16
**128:**20 130:2
**131:**22 134:16
**135:**17 139:13, 22 141:22
**142:**12 143:4
**152:**22 154:4, 9, 15, 25 155:17
**159:**18, 21
**167:**11 169:3
**175:**13 176:24
**177:**6, 18 178:3, 6, 10 180:10
**184:**4, 17 190:7
**191:**22 192:1
**194:**4, 15 195:24
**199:**22 202:22
**203:**5 204:16
**206:**15 215:7
**216:**9, 17 218:5
**220:**20 224:11
**228:**6, 11, 19
**229:**15 232:20, 22 234:2, 12
**235:**5 236:10
**237:**3 240:17
**241:**4 245:8
**251:**5, 17 254:13, 23 260:25
**282:**24 284:20
**286:**13
**2017** 234:4
**2018** 1:17 2:20 8:2, 6 16:12, 19 144:3 303:25 305:9 306:9 307:8
**202** 5:9
**204** 5:12
**208** 5:12
**20th** 142:11 202:22 203:5 212:24
**21** 5:23 7:8, 9 220:10, 12 223:1
**212** 5:16
**215** 5:17

Justin Pannu  10/29/2018

**217** 5:20
**218** 5:20
**219** 7:12
**22** 5:23 7:11
224:7, 8, 14
227:6
**220** 5:23
**224** 5:23
**228** 6:3
**22nd** 143:4
204:16
**23** 6:3 55:4
65:17 106:12
228:16, 17
**231** 6:3
**232** 6:6
**234** 6:8
**236** 6:9
**2398** 5:4
**23rd** 123:1
124:5, 17
**24** 6:3 7:12
216:9, 17 218:5
231:2, 3
**240** 6:12
**245** 6:15
**246** 6:15
**24th** 215:7
**25** 6:6 55:13
56:23, 25 57:3
74:19 75:1, 4, 5
76:11 232:16, 17
**250** 43:19
**251** 6:18
**254** 6:18
**256** 6:21
**25th** 220:20
**26** 6:8 220:14
223:22 228:5, 11
234:20, 21
235:18 240:17
254:23 255:1
**260** 6:21
**27** 6:9 224:11
236:24, 25 237:8
**27th** 227:7, 18
**28** 6:12 240:13,
14
**282** 7:3
**284** 7:3
**287** 7:13
**29** 1:17 2:20
6:15 8:2 245:4,
5 303:25

**298** 7:14
**299** 7:15
**29th** 8:6 306:8
**2nd** 152:22
154:4, 9, 15, 25
155:16 159:18,
21 167:11, 20
176:24 235:5
236:2 237:3

< 3 >
**3** 4:10 21:17
122:22, 23
124:17 135:9
177:19 191:15
194:6 255:4
265:20 272:8
**3:00** 236:1
**30** 6:15 234:4
246:11, 12
250:17 303:14
306:20
**30th** 39:2
228:19 229:15
260:25
**31** 6:6, 18 251:3,
6
**31st** 194:3
231:5 232:20
234:2, 12
**32** 6:18 254:10,
11
**320** 34:20
**320,000** 34:19
**33** 6:21 256:14,
15
**34** 6:21 260:19
266:3
**35** 7:3 260:16
282:20, 21
**350** 2:21 3:21
8:11 306:9
**36** 7:3, 8 284:19,
23
**390,000** 34:21
38:23, 25

< 4 >
**4** 4:13 124:23,
24 129:23
177:20 205:18
237:12 239:7
265:24
**4:03** 235:13

**4:09** 235:16
**4:16** 190:16
**4:57** 265:21

< 5 >
**5** 4:15 7:15
14:5 139:18, 19
168:12 177:22
207:1 266:6, 12
**5,000** 234:5
**5:00** 179:24
**5:11** 265:25
**5:57** 294:12
**50** 121:12, 14
**500** 3:4
**51** 7:9
**530** 2:20 3:21
8:11 306:9
**530-** 261:24
**530,000** 260:14
**555** 3:4
**565** 5:22

< 6 >
**6** 4:17 6:12
7:13 142:24
143:1 241:4, 7
245:7 280:13
**6:06** 294:15
**6:18** 303:5
**6:19** 303:8
**6:20** 303:25
304:3
**600** 3:9
**610** 257:15
**6102** 33:5
**619.260.1069**
3:22
**630,000** 257:15
**660** 5:17 212:18

< 7 >
**7** 4:18 115:20
116:3, 22 152:19,
20 159:19
162:21 165:24
168:20 175:6
279:15
**722** 4:14
**724** 4:16
**730** 4:18
**74,000** 114:17, 18
**77008** 3:15
**7715** 1:19 2:23

306:5 307:11
**783** 163:2
**784** 165:24
166:3
**786** 168:24
**7th** 116:11
117:16 283:3
284:6 285:1
286:9, 13

< 8 >
**8** 4:22 177:2, 3,
5 280:13
**80** 13:5 38:22
**818** 175:5
**826** 4:21
**85,000** 38:22
**863** 4:10
**864** 4:24
**866** 201:23
**869** 5:8
**877** 6:7
**883** 5:25
**886** 4:22
**8th** 177:18
178:3, 6, 10
251:17 282:24
283:16 284:20
285:11, 20

< 9 >
**9** 4:5, 13, 22
6:18 127:16
128:19 179:15,
16 182:11
**9:30** 2:19 8:3, 5
**92101** 3:5, 10, 21
8:12
**937** 266:10
**952** 6:24
**96** 29:23
**978** 6:12
**981** 5:12
**9th** 125:3, 21
251:5

< A >
**a.m** 2:20 8:3, 5
59:4, 7 94:8, 12
105:20, 21
**AARON** 3:3
8:20 50:6 112:8,
10
**ABEL** 3:20 8:7
**ability** 280:10

**able** 30:20 45:3
67:25 101:23
128:14 139:25
153:19 164:4
170:15, 16
171:14 195:3
196:5 233:25
242:13 287:10
303:18
**About** 11:21
17:10, 11, 17
20:12, 13 21:10
22:2, 7 23:23
24:5, 15, 16 25:9
26:3, 10 28:22,
22, 22, 25 29:3, 9
34:16 35:5
37:25 39:6 42:8
48:20, 23 49:6
51:17 52:1, 11
53:10, 14, 20
54:16 64:10
66:22 67:2 68:9
69:2, 3, 5, 10, 12,
25 70:22, 23
73:4, 15 75:25
77:20 78:8, 9
79:6 80:24 81:8
82:14, 15 84:12
85:2, 13 90:15
94:1 96:9 98:3
99:20 100:17
102:20 104:5
106:5 108:19
109:18 117:10,
24 118:18
124:16 126:2, 20,
21 127:1 128:3,
16 129:18 136:8,
18 137:4, 21
138:3 142:2, 3, 5
144:5 145:13
146:12, 15
147:10, 21
150:16 152:2
155:25 156:19
158:20 161:13
163:14 164:4, 25
165:14 166:21
169:4, 9, 20
171:5, 7 172:14
182:23 185:4
188:25 189:3, 6
192:10, 14 193:8
195:6 196:2

204:*4, 14*  207:*14*
208:*21*  210:*13,
24*  211:*2*  214:*15*
215:*11*  216:*22*
218:*3*  220:*2*
221:*8, 9, 20, 25*
222:*1*  225:*14*
226:*1*  230:*14, 16*
233:*3*  234:*3*
241:*3*  242:*3, 3*
243:*8, 23*  244:*3,
17*  245:*9, 20*
246:*16*  247:*13,
22*  248:*1*  249:*10*
253:*3*  255:*4*
256:*17*  258:*9*
267:*5*  268:*6, 16,
20*  269:*3*  271:*19*
273:*15*  274:*21*
276:*13*  278:*13*
279:*2, 14, 15*
280:*23*  285:*11,
25*  286:*8, 12, 14*
287:*4*  289:*1, 12,
15, 16*  290:*20*
292:*2*  294:*19*
295:*6, 18, 23*
296:*4, 6*  297:*4,
11*  298:*16*
302:*15*
**above**  144:*16*
228:*3*  256:*4*
257:*6*  283:*12, 15,
20, 25*  295:*9*
**absolved**  82:*6*
**acceptable**
239:*19*
**access**  203:*13*
268:*23*  270:*3*
**accessed**  203:*4*
**According**
254:*19*
**account**  45:*18*
154:*3*  257:*7, 11*
293:*9*
**accounting**  15:*19*
**accounts**  50:*2*
91:*22*
**accredited**  42:*24*
43:*2, 3, 4, 10, 21,
22*  110:*24*
266:*19, 23*  267:*3*
**accuracy**  271:*5*
**accurate**  19:*2*
80:*25*  97:*2*  99:*9*

102:*10, 11*  140:*2*
156:*25*  162:*10*
203:*5*  238:*18*
246:*20*  247:*3*
255:*7*  262:*16*
280:*19, 20*
**acknowledges**
271:*21*  272:*6, 8*
280:*15*
**acquire**  141:*3*
**acquired**  170:*7*
**acquiring**  167:*4,
5*
**acquisition**  57:*4*
75:*1*  76:*11*
141:*7*  167:*8*
194:*5*  240:*21*
269:*1*
**acquisitions**
167:*6*
**acre**  234:*6*
**acreage**  234:*2*
**acres**  196:*5*
234:*1, 7*
**act**  274:*1, 7, 11,
19, 21, 22*  288:*9*
289:*16, 16*
**acting**  90:*8*
274:*24*
**action**  48:*12, 13*
307:*2, 6*
**actively**  111:*24,
24*
**acts**  287:*19, 20*
288:*2, 21*  289:*1,
2*
**actual**  29:*16*
193:*18*  206:*13*
**actually**  16:*5*
23:*17*  29:*14*
32:*19*  35:*17*
57:*2*  138:*3*
149:*9*  161:*16*
290:*18*  295:*24*
**AD**  13:*2, 4, 6*
45:*3*
**add**  21:*1*  250:*3*
**added**  186:*19*
187:*5, 7*
**adding**  257:*22*
**addition**  51:*23*
114:*18*
**Additional**  4:*20*
6:*11, 23*  99:*19*
128:*22*  141:*7*

166:*11*  169:*15*
171:*1*  175:*8*
187:*6*  194:*1, 16*
203:*18*  204:*13,
21*  206:*18*
257:*22*  271:*3*
**additions**  186:*3,
10, 14*  305:*5*
**address**  32:*12,
12*  124:*3, 4*
159:*11*  201:*12*
224:*18*
**addressed**  154:*10*
**addresses**  123:*5*
**administrative**
135:*6*  136:*5*
**advice**  37:*3*
51:*13, 22, 23*
52:*6, 10, 11*
112:*5, 15, 22*
219:*17*  287:*15*
**advised**  153:*2*
157:*7*
**adviser**  51:*7, 11*
**affected**  259:*23*
**affiliated**  39:*15*
213:*16*  214:*5*
**Affiliates**  213:*2*
**affiliation**  39:*18*
108:*22*
**afford**  173:*21*
**after**  12:*7*  18:*18*
20:*5, 5*  48:*2*
51:*18*  54:*6*  63:*1*
89:*2, 2, 3, 4*
110:*12*  114:*24*
117:*16*  127:*15,
17, 18*  146:*13, 15*
147:*6*  167:*21*
169:*11*  176:*14*
186:*12, 15, 16*
206:*22*  207:*12,
19*  223:*9, 17, 17*
244:*16*  252:*14*
282:*11*
**afterwards**
48:*21*  169:*11*
**again**  60:*13*
66:*23*  74:*12*
76:*8*  81:*5*  96:*15*
106:*21*  147:*3*
154:*22*  164:*12*
171:*5*  184:*17*
196:*15*  198:*20,
20*  205:*16*

218:*24*  220:*11*
223:*14*  281:*5*
282:*23*  285:*1*
291:*14*  299:*1, 9*
300:*18*  302:*8*
**against**  15:*3, 7*
287:*17*
**agent**  267:*21*
268:*12*  279:*16*
**aggregate**  251:*21*
**aggregated**
243:*10*
**aging**  92:*2*
288:*11, 14, 15*
289:*19*  293:*1, 3*
**ago**  10:*5*  12:*23,
24*  36:*7*  102:*22*
229:*21*  244:*4*
294:*19*
**agree**  168:*6*
251:*10*  255:*14*
272:*14*  278:*9*
279:*13*
**agreed**  207:*10*
252:*20*  303:*11*
**Agreement**  4:*18*
5:*3, 17*  6:*8, 12,
24*  36:*12*  42:*23*
65:*23*  67:*9, 10,
11*  83:*12*  116:*23*
117:*1*  125:*4*
128:*21*  129:*11,
13*  139:*11*
143:*13*  153:*10,
11, 11*  162:*7*
181:*16*  206:*13*
212:*21*  224:*20*
225:*4, 15*  226:*1,
9, 24*  228:*23*
230:*1*  235:*3*
237:*6, 8, 11*
238:*4, 8, 18*
239:*18*  245:*9, 13*
246:*6, 20*  247:*4,
16*  248:*7*  252:*14*
260:*23*  261:*2, 19,
25*  262:*5, 14, 15*
263:*7*  264:*5, 16*
265:*2*  266:*3*
267:*22, 23*
268:*13, 13, 19, 19*
269:*11, 24*
270:*10, 19*  271:*8,
23, 24*  272:*1, 12,
13, 17, 24, 25*

273:*18, 19*  274:*3*
275:*13*  276:*23*
277:*2*  278:*4, 7,
23*  281:*9, 14*
**Agreements**  5:*14*
207:*25*  208:*12*
209:*17*  228:*5, 8,
10*  229:*1*  230:*5,
9, 17*  247:*14*
251:*2*  252:*19*
255:*2*  276:*23*
**ahead**  230:*19*
280:*1*
**airport**  11:*8, 9*
29:*21*  98:*25*
**Alan**  50:*20*
**All**  18:*17*  33:*6,
8, 9, 22*  46:*23, 23*
47:*13, 19*  48:*19*
49:*8*  54:*13*  56:*5,
8, 9*  68:*15*  81:*25*
82:*1*  85:*7, 12*
105:*7*  106:*2*
114:*25*  118:*22*
122:*21*  126:*19*
128:*8*  148:*16*
149:*10*  151:*18,
23*  152:*6, 18*
153:*2*  154:*24*
156:*19*  157:*25*
158:*10*  161:*12*
163:*14*  164:*25*
168:*13*  187:*18*
191:*19*  201:*6, 20*
202:*2*  205:*3*
206:*10*  207:*1, 8*
209:*7, 20*  222:*1,
3*  224:*6*  235:*10*
250:*19*  254:*9*
266:*23*  267:*6*
271:*3, 5*  273:*9*
292:*9*  302:*25*
303:*17*
**allegation**  11:*3,
4*  12:*2, 13*  13:*23*
**allegations**  13:*16,
22*  15:*22*
**allege**  287:*18*
290:*5*
**alleges**  290:*15*
**alleviate**  250:*11*
**allocated**  194:*2*
**allow**  18:*20, 20*
180:*3*

**allowed** 20:9, *12,
12* 49:*12* 111:*8,
9*
**along** 113:*8*
121:*19* 165:*15*
192:22
**already** 30:*13,
25* 58:*15* 71:24
73:3 96:22 97:7
155:*1* 162:*23*
203:*4* 222:6
229:*17* 297:*13*
**also** 9:*7, 9* 17:*3,
11, 17* 33:5 36:2
53:*14* 55:*12, 21,
25* 56:5 59:22
73:*23* 90:22
98:*25* 107:22, *22*
139:*10* 164:*20*
165:*21* 177:*13*
178:*1, 25* 182:*3*
189:*2* 208:*15*
212:*17* 219:6
224:*14* 249:24
261:*11* 264:*3*
278:*21* 283:*16*
**ambiguous** 38:2
42:*15* 48:*16*
**amend** 238:7
**Amended** 4:*8*
5:*16* 6:*8* 21:*14*
36:*12* 116:25
212:20 228:22
229:*2* 235:*3*
237:*11* 239:*17*
252:*19* 255:*3*
**amending** 230:*16*
**amendment**
247:*23*
**amendments**
230:*1* 246:*19*
**Americas** 26:*20*
**AMI** 135:*12*
**AMIs** 81:25
**amount** 34:*8*
35:*4, 6* 42:*20, 21*
56:2, *4* 61:*10*
71:*13* 72:*1* 75:*3*
130:*4* 137:24
193:6 253:*15*
255:*4* 257:*14*
258:*9, 12, 20*
259:*5, 13* 260:*7,
11, 13* 261:*19, 21*

289:20 290:*5, 15*
298:*12, 13*
**amounts** 43:*18*
298:24
**analysis** 298:*11*
299:6, *17, 24*
300:*17*
**analyze** 145:*21*
**annual** 45:5
**ANSWER** 7:6
17:22 18:*21*
19:*11, 20* 21:2
22:20 23:*13, 14,
14, 21* 24:3 34:*4,
5, 5* 35:*1* 37:*1*
49:*2* 51:*15, 25*
52:2, *13* 54:*21*
64:*18, 21* 67:25
69:*20* 76:22
88:*12* 101:*20, 23*
102:5, *6, 16, 18*
103:*4, 7* 111:9
112:*18* 113:*1*
124:*13* 136:*14*
155:7 165:*4*
170:*16* 181:*20,
21* 183:*4* 198:*19*
205:*21* 220:*4*
223:*13* 232:*8*
243:*4, 5, 6*
258:*18* 263:*2*
277:*8* 287:*10, 15,
22* 289:*23* 290:*1,
1, 23* 292:*5, 6, 15*
298:*16* 299:*10*
300:*21*
**answered** 68:5
69:*17, 18* 70:*11,
20* 71:*12* 84:22
89:*21* 91:*14*
93:24 98:20
117:*18* 119:*11,
16, 22* 120:*8, 25*
132:*12* 133:*8*
136:*10, 12, 22*
137:*20* 138:*8, 19*
146:*17, 18*
149:*25* 157:*16*
165:*3, 12* 167:*17*
169:6 170:*13*
172:*25* 174:*4*
175:*22* 178:*14,
19* 197:*16*
203:*24* 219:*20*
226:*20* 230:22

232:2, *11* 240:9
248:*10* 253:*18*
254:*1* 259:*19*
262:24 265:*4*
270:*23* 273:2, *11,
21* 274:*15* 276:*1*
289:*10, 11* 290:*7,
23* 292:*14, 22*
293:*6, 22* 297:6
299:*19* 300:2
301:*19* 302:*13*
**answering** 18:*18*
102:*8*
**answers** 19:*13*
23:24 24:6
44:*15* 59:25
60:*14* 220:*17*
270:5 283:*12, 16*
305:6
**anticipate** 196:7
**anticipating**
19:*11* 36:*21*
**anti-dilution**
90:*16* 159:5
222:*13, 21*
223:*18* 226:8
**anybody** 63:24
67:*14* 122:2
148:5 210:*18*
225:2 229:*15*
302:6
**anymore** 35:*17*
**anyway** 231:*11*
**apart** 64:24
295:*18* 299:*23*
300:8
**APC** 3:*3*
**appear** 123:22
143:9 192:5
**APPEARANCES**
3:*1*
**appeared** 99:*15*
146:*18* 292:*25*
**appearing** 8:25
9:9
**appears** 128:*21*
153:9 191:2
192:*3* 203:*3, 10*
218:24 224:*4*
228:7 246:*18*
284:25
**apple** 13:6
**Application**
175:7
**applied** 81:24

**appointment**
158:*21*
**appreciate** 20:2
24:*4* 204:*19*
**appreciation**
43:*12* 133:*13, 16,
19*
**approved** 207:*10*
208:*17*
**approximate**
41:*18* 47:*11*
122:*13*
**approximately**
38:22 45:*1*
98:22 144:22
175:*10* 176:*8*
194:*4, 5, 7*
206:*14* 303:*13*
**April** 206:*15*
**APX** 26:6
**architecture**
147:*18*
**area** 79:*18, 20*
102:*14* 105:*17*
141:*8* 296:*8*
**areas** 78:*20*
83:7 141:*4*
158:*16* 234:*1*
248:*15, 21*
249:24 250:6
**arrears** 38:*18,
21, 22, 25* 253:*16*
**articulated**
244:*4* 255:*25*
**ASAP** 256:*19*
**ascertain** 138:5
248:*20*
**asked** 14:22
42:22, *23, 24*
43:9 53:*20*
54:*17* 59:*18*
60:5 63:*24*
69:*16, 18* 70:*10,
19* 71:2, *11*
79:22 80:*3*
84:*21* 86:*14, 17,
19, 21* 87:2, *15*
88:*16* 89:*21*
90:6, *8* 91:*13*
92:*1* 93:23
98:*19* 102:*18*
117:*17* 119:*10,
15, 21* 120:7, *24*
132:*11* 133:7
136:*10, 11, 12, 12,*

*15, 21* 137:20
138:*8, 18, 21, 22*
148:*13, 15*
149:*24* 157:*16*
165:*3, 11* 167:*16*
169:5 170:*12*
172:*25* 174:*3*
175:22 178:*13,
18* 183:*1* 187:*1,
4* 188:*3, 5, 6, 7,
18* 190:*17*
194:*23* 195:*10*
197:*16* 203:*23*
208:*20, 20*
219:*20* 226:*19*
230:*21* 232:*1, 11*
240:8 243:*1*
248:*10, 16*
253:*18, 25*
259:*18* 262:24
265:*3* 267:2
270:*23* 271:*14*
273:*1, 11, 20*
274:*14* 275:25
289:*10, 11* 290:*7,
22* 292:*13, 21*
293:5, *21* 297:5
299:*18* 300:*1*
301:*18* 302:*13*
**asking** 17:*15*
50:*13* 51:25
67:*17* 97:*19, 20*
103:*10* 104:*18*
134:7 137:*4*
138:*3, 4* 148:*11*
151:*20* 168:9
169:*20* 171:7
182:*21, 23* 183:*3*
188:*21* 191:*1*
193:8 197:22
201:*8* 210:2
215:*17* 219:*11*
243:*1* 248:*11, 13*
267:5 268:6
269:*23* 270:*15,
17* 272:*15*
273:*15* 279:2, *24*
283:8 289:*16*
290:*20* 293:25
**asks** 203:*17*
**aspect** 37:9
**aspects** 24:*1*
83:*11*
**assessing** 147:*21,
23*

Justin Pannu   10/29/2018

**assessment**
123:8   237:19, 23
240:2   247:8
262:5   263:16
264:8   265:6
281:15, 17
**assessments**
298:16
**asset**   195:22
**assume**   19:20
22:20   23:13, 21
24:9   180:11
190:6   215:23, 25
**assumed**   84:1
**Assuming**   196:3
199:3
**assumption**
84:25   85:1
293:10, 12, 15, 16
**assumptions**
233:6, 13, 21, 25
234:8
**attached**   4:15,
17, 20   5:5   6:6, 8,
11, 21   116:20
128:20, 23   129:2
139:11   140:11
143:12   153:8
159:20   177:17
178:6   184:19
218:6, 12   235:4
237:5, 7   240:6
261:1
**attaching**   140:8
143:10   168:15
177:13   179:21
232:21
**attachment**   5:9
257:1   260:24
285:3, 6
**attachments**
4:10, 13   117:2
153:9   178:2
**attained**   24:25
**attempt**   18:19
**attend**   221:10
**attention**   134:6,
9   205:1
**attesting**   262:20
263:9   266:18
278:22
**attorney**   2:17
49:1, 3, 7   51:7, 8,
10, 12, 17   52:2,
14   76:23   100:10

101:22   102:4
103:5, 5   111:4, 6
112:1, 2, 4
130:18   134:10
160:3, 5, 9   161:5
169:18   171:5
175:1, 24   179:24
180:18   181:5
182:25   186:2
188:5   203:13, 16
219:22, 25   220:3,
8   240:2   246:1
247:9   255:9
262:6   263:16
264:9   265:6, 7
274:10, 24
281:13   287:8, 12,
24, 24, 25   289:25,
25   290:10, 24
291:25   294:8
298:17   299:14,
21, 24   300:9, 10
302:21   307:1, 4
**attorney-client**
64:19   182:6
185:11   292:7, 16
293:17
**attorneys**   50:21
101:21   111:14,
21   113:7   128:2
150:10   170:16
180:12   206:19
208:14   277:14
290:24   292:3
298:17   299:11
300:22
**attorney's**   112:7
237:23   281:16
**augmented**
186:19
**August**   4:18, 22
5:9   6:6   93:16
122:15, 20
152:22   154:4, 9,
15, 25   155:16
159:18, 21
167:11, 20   169:3,
3   176:24   177:5,
18   178:3, 6, 10
180:10   184:4, 17
189:9   190:7, 15
191:22   192:1, 16
194:15   199:22
200:9   201:8
202:22   203:5

204:16   212:24
215:7   216:9, 17
218:5   220:14, 20
223:22   224:11
227:7, 18   228:5,
11, 19   229:15
231:5   232:20
234:12
**authorize**   124:6
**authorized**
180:18
**available**   69:13
144:12   250:18
271:17
**averaged**   206:14
**aware**   18:7
38:14   53:1
58:10   69:1   95:4
100:9   105:10
116:5, 8, 11
118:14   214:16
264:20   265:11
288:2   289:5, 8
290:8, 10   301:20,
23   302:5, 9, 14

**< B >**
**Bachelor's**   24:17,
19, 20   30:13, 25
**back**   11:13
12:16   30:19
34:12   48:13
57:10   59:6   84:6
91:9, 9   99:12
105:18, 23
113:17   120:3, 15,
21, 23   121:4, 12,
16   128:19
134:11   144:15
146:10, 10
152:15   168:12
173:16   182:11
186:15   198:5
200:7   205:14
222:25   229:24
230:11   235:15
243:23   248:11
250:17   262:8
289:12   294:14,
20   295:12   303:7
**background**
24:16   95:18, 22
**Backyard**   106:25
**bad**   17:14
192:11

**balance**   175:14
176:13
**balloons**   218:7,
13
**bank**   45:18
89:17   90:3
91:11   92:8
257:10
**bankruptcy**
13:20   16:21, 24
17:11, 18, 25
18:2   110:8, 15
**bar**   107:1
**based**   44:2, 3
57:4   63:21
75:18   99:17
102:3   103:4, 11
105:5   141:18
173:2, 5   174:12,
18, 20   198:14
200:23   216:19
232:25   233:7, 13
234:9   246:18
247:2   253:11, 13
254:4   270:12
281:16   293:8
**basic**   87:13
93:13
**basically**   72:12
84:10   85:10
127:7
**basis**   55:5, 8
59:21   60:5
118:5   136:20
137:6   171:16
**Bates**   207:22
212:17   239:4
266:4
**Bates-stamped**
4:10, 10, 13, 15,
18, 21, 22, 24   5:3,
6, 6, 9, 11, 12, 14,
17, 17, 20, 20, 23,
23   6:3, 3, 7, 9, 12,
14, 15, 15, 18, 18,
21, 24   7:3, 3
**Bayless**   15:6, 8
**BC**   29:25
**bcc'd**   124:19
**Beach**   59:17
65:17   73:13
74:23   77:15
83:9   84:8, 12
87:25   89:25

**becoming**   50:24
51:4
**Beech**   3:4
**beginning**   27:14
219:25   232:19
240:23
**begins**   8:13
94:10   129:24
140:22   191:14
194:15   233:23
265:23
**behalf**   8:20, 22,
25   19:7   21:23
22:20   23:14, 22
24:10   37:23
49:11   53:4
54:25   55:1   65:5
68:1   90:9   95:2
111:15, 22
138:22   157:4
160:7   161:3, 4
162:4   165:7, 14
166:20, 23, 24
167:12   169:21
170:15   171:7, 12,
18, 20   172:7, 13,
23   173:9   186:9,
13   187:14
188:18   192:23
193:10   200:8
204:1, 23, 25
209:7   216:6
217:15, 16
223:19   243:21
244:1   245:17
253:4   261:16
262:1   264:10
274:1, 9, 11, 25
277:13   279:18
286:4, 4   287:2
290:13   295:7
297:25
**behalf,**   274:7
**Belated**   291:6
**belief**   104:18, 21,
22   216:15
**believe**   10:4, 23
11:1, 17   13:12
14:18   16:1, 10
18:9   22:13   25:5
27:20   31:20
33:3   37:8   41:13,
16, 18   43:7, 8
45:17   46:22
50:21   56:22

60:*12, 20*  63:20
64:*11, 15, 25*
65:20  68:7
70:*14, 17*  72:5
75:5, *18*  76:*17*
77:15  81:*11, 12*
82:20  83:*11*
86:7  87:*10*
90:*11*  91:20
92:*10*  95:*1, 5, 7,
7, 12, 14*  97:16
98:*13*  100:*3, 8,
14, 23, 25*  101:*8,
12, 19*  103:*1, 12,
17, 21*  104:*4, 9*
106:*8, 12, 25*
107:22  108:*12*
112:*13*  113:6, *9,
21*  114:2  116:*15,
18*  117:8  119:*12*
121:*14, 23*
122:20  126:*19*
127:*14, 17, 25*
133:9  136:*17*
138:*10, 22*
141:*12*  142:22
143:20  145:6
146:*14*  147:8
148:7, *10*  154:*13*
158:7  162:*23*
166:*19*  167:*21*
168:*19, 22*  171:9,
*13*  172:7, *23*
173:*10, 12*  175:4
178:*1, 4*  180:*15*
181:7, *13, 22, 24*
183:7, *15*  185:2,
*8*  186:*11*  189:*8,
13, 21*  193:*4*
198:*11*  199:*14*
201:*11*  203:2
206:25  214:*13,
14, 15*  216:*18*
217:*4*  221:*15*
222:*14, 24*
225:16  227:*4*
230:*10*  232:*13*
233:*4*  234:*18*
236:*15*  237:22
240:20  244:*23*
245:2  250:*23*
251:*14*  252:*14,
19*  253:*19*  254:9
258:*14, 19*
259:20  260:*10,*

14  264:25
265:*16*  267:7
268:*15*  270:*1*
273:*12*  274:9, *10,
13*  275:*14, 15, 22*
276:2, 2, *9*
277:16  286:*10,
24*  289:*21*
290:*17*  291:5
292:*10*  294:7
295:20  296:24
301:9, *13*
**believed**  72:*11*
141:*21*  171:23
172:*4*  173:*3*
174:*13*  227:*24*
270:*11*  271:*14*
**believes**  291:*24*
292:*1*
**bell**  176:*11*
**bells**  176:8
**benchmark**
194:*21*
**benefit**  206:*11*
224:*16*  291:*11,
18*
**best**  19:2  23:*14*
106:9  114:9
125:8  130:*11*
190:*18*  287:*1*
292:5, *6*
**better**  187:*18*
244:*17, 20, 21*
245:*1*
**BEYOND**  1:*10*
2:*10, 18*  3:7  9:*1*
205:4, 8, 9, 11, 11,
12, 13, 20  206:*3,
22*  208:*12, 13*
211:3, *10, 16, 22*
213:7, 9, *16*
214:*4*  215:*11*
275:23  295:*10*
297:*3, 5, 12, 21*
298:*4, 12, 14*
301:*11*
**billed**  206:*12*
298:*12*
**billing**  298:*3, 6*
**bind**  280:*10*
**binding**  181:*15*
**bit**  24:*15*  52:*4*
82:9  102:22
129:8  133:*24*

150:*3*  239:*3*
266:*20*  295:6
**bold**  85:*19*
**bolded**  85:22
**BONNIE**  3:*4*
8:22  50:6
**Booklet**  4:*20*
116:*25*
**books**  295:22
**bottom**  163:2
166:6  194:*13*
201:22  206:8
235:22  251:*23*
266:6, *12*  275:6
**bought**  12:8
**boy**  239:*12*
**BP**  55:*15, 16*
57:7, *17, 18*
77:*10, 25*  81:22
**break**  34:6
58:22, *24*  59:*1*
147:*1*  152:7
190:*11*  191:5
234:*24*  235:8
303:9
**Brian**  37:*19, 20*
**bridge**  251:*24*
252:*1, 7, 12, 15,
18*  253:3
**BRIDGET**  1:*19*
2:*21*  8:*10*  306:5
307:*11*
**briefly**  25:9
67:*12*  151:*17*
160:*16*  161:*4*
187:*19*  262:*4*
273:5
**bright-line**  146:*3*
**bring**  172:*21*
231:9  243:9
**British**  24:*18*
**broken**  282:*10,
17*
**broker**  28:*16*
**brought**  21:22
79:*19*  225:6
**buddies**  55:*10*
74:*13*
**build**  29:*13*
**builder**  33:*21*
37:*19*
**built**  147:*18*
**bulk**  85:*1, 7*
207:6

**bunch**  16:22
127:*11*  153:8
**business**  12:*10,
12*  14:9, *10*
24:*17*  30:*14*
33:*15*  51:7, *11,
22*  52:6  53:*12,
21*  89:*13*  107:5
109:24  177:*21*
219:*17*  233:*13,
24*  234:8  275:9,
20  276:5
**buy**  196:5
**buying**  12:7

< C >
**calculus**  162:7
**calendar**  127:22,
24, 25  175:*12*
**CALIFORNIA**
1:2, *16*  2:2, *21,
24*  3:5, *10, 21*
8:*1, 11*  13:*13*
15:25  16:*8, 11,
16, 17*  17:24
18:2, 9  29:6
305:*3*  306:*1, 7,
10*
**call**  27:*10*  47:*6,
10*  49:*17*  99:*15*
109:24  142:*24*
150:2, *15*  177:2
199:*17*  203:*17*
220:*19, 22*  221:*5,
8, 10*  224:*18, 21,
24*  225:2, 5, 13,
23, 25*  226:2, 5, 8,
11, 15, 18*  229:*12*
240:*17*  241:6, *11,
19, 23*  243:8, *16,
18*  256:*14*
283:*21, 21*
**called**  26:6, *16*
32:*17*  184:*10, 11*
193:6  212:*19, 22*
294:20
**calling**  90:22
115:*19*  204:*10*
**Calls**  17:5
36:24  38:*19*
39:*24*  43:5  44:8
45:*15, 19*  46:6
48:25  49:*14*
51:24  52:22
61:*12, 22*  64:2,

17  68:*11*  71:*19*
73:*19*  75:*12*
76:21  79:*4, 11*
80:*1, 12*  81:*1*
88:24  89:9
92:*17*  95:*23*
99:22  100:5
101:*10*  103:*3*
104:2, *13*  107:*19*
108:2, *16, 23*
110:*21*  112:24
113:*24*  114:*12*
118:9  119:*16*
122:3  123:*14*
124:*10*  133:20
141:*16*  143:*17*
145:*4*  146:23
149:*1*  154:5, *18,
19*  155:5  156:*4,
16*  157:*1, 15*
161:22  164:8, 9
165:*12*  166:*17*
167:*17*  172:*16,
25*  174:*10, 23*
176:*18*  180:*13*
181:*11, 11, 17*
182:5, *17*  183:*10,
17*  188:16
189:*14*  196:*12,
20*  198:*10, 17*
199:*10, 11*  202:7
203:8  204:6
209:22  210:*15*
211:*11, 23*  212:*1*
213:*17, 23*  214:6
215:20  216:*1, 10*
219:2, *13, 19*
221:*13*  222:7, *16*
223:*11*  224:2
225:20  227:2, *20,
22*  228:*13*  229:*8,
19*  230:*3*  233:*18*
236:5, *13*  238:*20,
21*  240:9  241:*13*
244:*11*  245:23
246:22  247:7, *18*
253:*17*  255:*11*
256:9, *24*  258:*3*
259:9, *19, 25*
262:*23*  263:*13,
21*  264:6  265:*14*
266:25  268:*3*
269:5, *13*  270:22
271:*11*  272:*18*
274:4, *15*  277:*3,*

Justin Pannu  10/29/2018

*22, 23* 278:8, *24*
279:*21* 280:*4*
281:*1, 2, 11*
288:*17* 289:*3*
291:*12, 19* 292:*4*
293:6 294:5
296:*15* 302:*18*
**Calpine** 26:22, *22*
**Canada** 10:22
*24:18, 21* 25:*12*
31:5, *6* 35:9
**Canadian** 25:2
**capabilities** 29:*4*
**capability** 29:*13*
**capable** 19:25
20:*1* 275:9, *17*
**capacity** 108:*1*
109:*4, 6* 219:*17*
295:*1*
**capital** 54:2
56:*18* 74:20
76:*11* 92:5, *20,*
*21, 24* 130:*21*
141:5, *14* 142:*16*
162:*15, 16* 167:*7,*
*13, 17* 173:22
175:*7* 188:8, *9*
193:*7* 194:*19*
**carefully** 24:2, *5*
262:*13* 271:22
272:*9* 273:9, *13,*
*17*
**carry** 115:6, *8, 9*
**Case** 1:*7* 2:*6*
8:*16* 10:25
11:*16, 25* 12:*1, 9,*
*14, 17* 13:*17, 20*
14:*8* 16:*7, 16, 17,*
*20* 17:2, *3, 4, 10,*
*18, 24, 25* 18:2, *5,*
*8, 11* 46:*9* 50:*12*
54:6, *7* 55:*16*
57:*18* 77:*11, 23,*
*25* 159:*3* 239:*21*
306:*14*
**cases** 10:7, *8*
11:*10* 17:*19*
18:6
**cash** 115:2, *3*
253:6, *23* 260:*9*
**categories**
135:*19* 249:*13*
**cc** 191:*23* 215:8
**cc'd** 124:*19*
152:25 177:7

178:2 220:*15*
255:*16*
**cc'ing** 115:*21*
**cell** 283:22
**center** 190:*10*
**CEO** 37:*16*
**certain** 21:7
29:*8* 42:*20, 20*
43:*13* 83:*11*
119:6 128:*1*
156:20 162:*14*
172:*14* 173:*11*
197:*19* 210:*4*
213:*8* 230:*8*
233:*13* 250:6
**certificate** 25:*3*
**certificates** 25:*1*
**CERTIFIED**
1:20  2:22
303:*18* 307:7
**certify** 306:7, *19,*
*25*
**Chad** 28:*17*
31:*17* 32:24
33:*3, 5* 36:*1*
37:*14* 38:5, *6*
39:*12* 41:*17, 20,*
*23* 53:2, *13, 14,*
*18* 55:*10, 25*
56:*15* 62:*14, 15*
63:22 65:*10*
67:*18, 24* 68:2, *7*
69:*21, 24* 74:*13*
75:20, *21* 77:*16,*
*19* 116:*4* 117:*12*
118:*17* 152:23
153:*1* 157:7, *7, 8,*
*10* 182:*12, 13*
259:*4, 12* 270:*13*
**Chad's** 37:22
62:*3, 4* 70:*13*
88:*19* 109:7
182:*13* 254:*4*
**chain** 78:*21*
127:9 145:22
159:*10* 184:*16*
191:20, *21*
192:*15* 202:*21*
203:*3* 215:6
220:*11* 224:*10*
228:*3* 247:2
282:*23* 284:*16*
285:*14*
**chains** 285:2
**chance** 286:*24*

**change** 36:*10, 14*
94:*4* 121:2
257:*19* 258:*13,*
*19* 265:*18*
**changed** 120:*17*
**changes** 20:9, *11,*
*13* 181:5, *25*
182:*3* 186:9, *14*
251:*11* 252:*13,*
*20* 257:*18*
303:*15* 305:5
**changing** 73:*1*
**characterize**
123:*13*
**charge** 91:7
210:*20*
**checked** 186:22
**Checklist** 5:6
185:*17* 186:*10,*
*13, 18* 187:2, *6, 7,*
*9, 16* 188:*14*
295:*11*
**checklists** 184:25
185:*1*
**chime** 286:25
**Chinese** 129:*5*
**Chris** 14:*14, 24,*
*25* 15:4, *7, 12, 15*
**circling** 91:9
120:*21*
**circumstances**
91:*1*
**civil** 13:*11, 12,*
*13, 18* 16:8 17:2,
*10, 12, 25*
**claim** 15:4 56:9,
*17* 57:6, *16, 20,*
*23* 58:*1* 59:*11,*
*13* 65:8, *8* 84:6
94:*15*
**claims** 14:6
**Clara** 26:5
**clarification**
215:*14* 217:6, *8,*
*12*
**clarified** 284:*1*
**clarify** 16:*15*
17:9 299:*4*
**clear** 122:7
187:8 245:*10*
248:*3* 249:*19*
274:6 300:*3*
**clearer** 63:*15*
**client** 246:*3*
255:*19, 21, 23*

**Cliff** 33:*1* 39:*12*
41:*12* 284:*21*
285:2
**close** 62:*18, 18*
247:*4*
**closer** 193:*19*
**Closing** 239:8,
*16* 280:20
**CMSK** 32:7, 8, *9,*
*22* 33:*1, 2*
**Cobb** 15:6
**Code** 249:*3*
303:*1*
**Coin-Op** 11:22,
*23, 24* 12:6
259:*1*
**college** 25:*17, 25*
29:*24* 30:2
**Columbia** 24:*18*
**come** 64:6 70:7,
*17* 73:25 76:*18*
81:*17* 108:*21*
132:9 160:*13*
233:*14*
**comfort** 49:9
**comfortable**
236:*17, 20*
252:*15*
**commencing**
2:*19*
**comment** 20:*12*
123:*16*
**commerce** 24:*19,*
*20*
**commercial** 28:9
**commit** 19:*14*
23:*18*
**commitment**
66:7
**commitments**
54:*1, 9* 55:20
57:*21* 83:4, *13,*
*25* 84:9, *17, 19*
85:*3, 4, 5* 86:6, *9*
89:*17* 137:*14, 18*
138:*13* 141:*19*
253:2, 9, *14, 24*
292:*25*
**commitments,**
85:25
**committed** 19:*1*
**communicate**
117:*23* 128:6
223:2, *18*

**communicated**
85:2 113:*4*
128:*3* 229:*16*
**communication**
47:*13* 60:*17*
85:*18, 21* 118:8,
*14* 125:9, *16*
162:*1* 212:8
215:*10* 284:25
286:7 300:9
**communications**
36:25 49:7
54:*18* 64:*24*
86:8 97:*15*
105:*4* 112:20
130:*11* 164:*21*
174:20 182:*18*
203:21 211:*21*
220:*3* 287:8
293:*18*
**comp** 234:5
**companies** 31:*24*
32:*18* 34:*15, 18*
35:*24* 55:7
213:7 221:*19, 24*
222:*3, 5, 10*
**companies,** 222:2
**company** 1:*4, 9,*
*10, 11, 12* 2:4, *9,*
*10, 10, 11* 5:*17*
6:8 13:25 14:2
26:*16, 18* 27:*3*
39:8 87:25
116:25 141:*19*
153:*4, 11* 154:*11*
156:*13* 164:5
212:7, *21* 224:*19*
225:*3, 14* 226:*1,*
*24* 235:*3* 237:*11*
238:*18* 239:*18*
246:20 247:*14*
255:*1* 262:*14*
264:22 267:*20,*
*22* 268:*11, 13, 18,*
*19, 24* 270:*4, 8*
271:6, *23, 23*
272:*12, 12, 24*
273:*18* 276:*23*
278:*16, 18, 19, 20*
279:9, *11, 11, 12*
280:*21* 288:8, *10*
300:*17*
**Company's**
141:5 142:*16*

Justin Pannu  10/29/2018

167:7, *14*  267:20
268:*12*  280:*21*
**compare**  300:*13*
**compared**
298:*13*  299:6
**comparison**
298:22
**competing**  11:6
217:2
**complaint**
287:*17*  290:*17,
18*  291:7, *22*
**complete**  21:*4*
22:6  53:*3*
105:*12*  262:*16*
280:*19, 19*
**completely**
104:*23*
**completion**
306:22, *24*
**complex**  129:*9*
150:*3*  163:*21*
**complicated**
113:*15*
**Compound**
49:*14*  179:7
186:*24*  229:8
230:*3*  233:*18*
295:*13*
**comprehensive**
19:*13, 25*  189:*12,
23*  190:*1*
**comprise**  156:*9*
**comprised**
192:*23*
**comprising**
157:*12*  158:*8*
**conceal**  287:*19,
20*  288:*3, 9, 22*
289:*18*
**concealment**
12:*1, 2*
**concept**  53:*12*
**concern**  44:*23*
188:*12, 21, 23*
231:*21, 25*  232:8,
*13*
**concerned**
221:*20, 25*  241:*3,
3*
**concerning**
237:*10*  268:24
269:*1*  270:7
306:*13*

**concerns**  222:*12*
224:*18*  225:6, 7,
10, 14*  226:*1, 23,
25*  240:25
270:*24*
**conclude**  82:*12*
**concluded**  82:*1*
83:*23*  304:2
**conclusion**  17:6
36:*25*  38:*20*
43:6  44:5, 8*
45:*16, 20*  46:7
49:*15*  51:*25*
52:*23*  64:6, *18*
70:8  71:9  76:*18,
22*  77:2  81:*18*
88:*25*  89:*10*
100:6  103:*4*
104:*14*  107:*20*
108:5, *17, 24*
109:2, *14*  110:22
112:*25*  113:*25*
124:*11*  141:*16*
143:*18*  154:*19*
155:*5*  156:*5, 16*
157:*16*  164:*8*
165:*12*  166:*18*
167:*18*  172:*17*
173:*1*  174:*11*
176:*18*  181:*12,
18*  188:*17*
189:*15*  196:*13,
20*  198:*18*
199:*11*  213:*18*
214:7  219:*20*
222:8, *17*  223:*12*
227:*3, 22*  229:8
233:*19*  238:*21*
240:9  244:*11*
245:*23*  246:*23*
247:7, *18*  262:*24*
263:*14, 22*  264:7
265:*15*  267:*1*
268:*4*  269:6, *14*
270:*23*  271:*12*
272:*19*  274:5, *15*
277:*4, 22, 24*
278:8, *25*  279:22
280:*5*  281:2, *12*
291:*13, 20*  292:*4*
293:*7*
**condition**  22:*23*
238:*16*  239:*17,
25*  285:*12*

**Conditions**  239:*8*
**conduct**  14:*19*
**conducted**  99:*14*
**conference**  9:2, *9*
46:25  47:6, *10*
48:*25*  150:2
240:*17*  241:6, *11,
19, 23*  243:7
**conferred**  284:*17*
**conferring**  283:9
**confidence**  210:9
**confidential**
11:*18*  144:*1*
271:*22*  272:*11,
23*
**Confidentiality**
4:*17*  5:*3*  116:*23*
128:*21*  129:*11,
13, 19*  143:*24*
**confirm**  181:*4*
203:*12*  242:*13*
**conflicts**  264:*21*
265:*12*
**confused**  167:*20*
**confusing**  274:*21*
**connected**  17:*3*
260:22
**connection**  12:*3,
4, 15*  14:*20*  15:*4,
11*  17:*20*  41:*14*
99:20  185:22
271:*5*  274:*11*
276:*8*
**consequences**
280:*16*
**consider**  89:*8*
110:*19, 23*
**consideration**
159:*6*  221:*17*
**considered**  89:*11*
**considering**
153:*2*  154:*11*
156:*23*
**consistent**  85:*24*
178:*11*
**consistently**  83:*6*
**Consulting**  5:*14*
207:*24*  208:*11*
**contained**  262:*15*
**contemplating**
51:*14*
**contend**  54:*22*
291:*9, 16, 21*
**contents**  112:*17*
**context**  218:*9*

**contingency**
237:*10*  238:*4, 6*
**continue**  141:*5,
19*  142:*16*
146:24  150:*15*
162:*17*  167:*1, 7,
13*
**Continued**  5:*1*
6:*1*  7:*1*  27:5
54:2  282:*13*
**Continuing**
168:*23*
**contract**  135:7
206:*3, 15, 19*
208:*13*
**contracted**
205:*11*
**Contractor**  5:*14*
207:25  208:*11*
**contribute**  34:*13*
**contributed**
114:*19, 23*
**Contributions**
175:7
**controversy**
306:*14*
**conversation**
84:*15*  125:*20*
141:22  216:22
242:*5, 6, 21*
244:*16*  251:*13,
16, 25*
**conversations**
130:*16*  211:2, *9,
14*  251:*18, 20, 21*
258:*8*
**convert**  281:*21*
282:*1*
**convertible**
244:*13*  254:*20,
21*
**convincing**  78:*22*
**coordinating**
158:*11*  210:*1*
247:22
**copied**  11:2, *5*
**copies**  117:*5*
**copy**  303:*18*
**copying**  207:6
208:*16*
**core**  55:*16*  57:7,
*17*  77:*10*  81:*18*
**Corporate**
212:*23*
**Corporation**  30:*1*

**correct**  10:6
13:*11*  15:*12*
39:*16*  46:*14*
47:*20*  52:*18, 19*
57:*13*  60:*4*
82:*16*  90:*25*
91:*25*  98:7, *8*
99:*5*  107:*18*
111:*19*  122:*9*
130:2, *13*  131:*22,
23*  155:*20, 21*
159:*22*  161:9, *16,
17*  163:*17*
166:*16*  185:*5, 6*
190:*23*  191:*1*
193:*1*  200:2, *9*
202:6  203:*13*
246:*3*  255:*16, 20*
261:*16, 24*
264:*24*  281:22
305:*3*
**corrections**
20:*10*  305:*5*
**correctly**  10:*2*
15:*9*  16:*1*  36:*9*
123:*13*
**correspondence**
158:*19*
**cost**  193:8, *15,
18*  196:*25*
**costs**  114:*3, 5, 11*
**counsel**  8:*18*
128:*11*  146:*24*
150:*14*  180:*3*
245:*19*  247:*9*
248:*24*  249:*12*
272:*21*  273:*3, 13,
25*  274:*17*
294:*18*  303:*13*
307:*1, 4*
**counsels**  247:*25*
**counsel's**  287:*14*
**Count**  47:*10*
**country**  46:*23*
**County**  207:7
306:*3*
**couple**  14:*6*
50:*21*  150:*21*
182:*13*  283:*8*
285:2
**course**  25:*3*
30:*10*  31:7  54:*3*
66:*18*  186:*20*
**courses**  30:*11*

Justin Pannu  10/29/2018

**COURT**  1:*1*
2:*1*  8:*9*  9:*5*
13:*20, 24*  16:*9,*
*22, 23*  17:*25, 25*
20:*5*  160:*23*
260:*18*  303:*11*
**courts**  18:*9*
**cover**  194:*2*
**covered**  29:*19*
**covering**  175:*11*
**created**  32:*1, 4,*
*19*  185:*7*
**creating**  154:*11*
157:*5*
**credit**  240:*21*
**criminal**  17:*3*
**CRR**  2:*23*
306:*6*  307:*11*
**CSR**  1:*19*  306:*5*
307:*11*
**CST**  236:*1*
**CTO**  80:*2*
**Cucina**  126:*12*
**cuff**  283:*9*
**current**  175:*11*
193:*18*
**currently**  131:*21*
**customers**  28:*9*
**cut**  104:*10*
**cutting-edge**  61:*3*

< D >
**daily**  36:*10*
**data**  97:*16*  99:*3,*
*7*  102:*23*  103:*2,*
*15, 18*  151:*13, 13,*
*24*  184:*5*  190:*19,*
*23*  200:*2*  202:*5*
203:*4*  204:*18*
209:*8, 13*  210:*2*
**date**  8:*5*  72:*22*
73:*2*  86:*15, 20,*
*22, 25*  87:*7*  92:*1,*
*16, 20*  93:*19*
108:*10*  110:*6*
114:*14*  122:*11,*
*19*  124:*7, 17*
136:*16*  139:*2*
155:*15*  178:*17,*
*23*  179:*1*  180:*10*
188:*8*  194:*20*
206:*11*  213:*6*
223:*7, 9, 22*
224:*10*  227:*18*
230:*15*  239:*16*

249:*2*  254:*22*
255:*6*  269:*24*
270:*1, 18*  271:*7*
272:*16*  280:*20*
295:*3*  303:*24*
**dated**  4:*13, 18,*
*22*  5:*9*  6:*6, 9, 12,*
*18*  115:*20*  123:*1*
125:*3*  130:*2*
139:*22*  143:*3*
144:*2, 9*  152:*22*
177:*5*  178:*2*
184:*4, 16*  191:*22*
192:*1*  194:*15*
199:*22*  201:*17,*
*21, 24*  202:*22*
204:*16*  215:*7*
218:*5*  220:*14*
228:*19*  231:*5*
232:*20*  235:*4*
237:*3*  240:*16*
245:*7*  251:*5*
254:*13*  260:*25*
282:*23*  284:*20*
**dates**  251:*19*
**DAVID**  3:*3*
**day**  18:*19*  106:*8,*
*9, 11*  215:*13, 18*
216:*4*  223:*15*
228:*9*  248:*16, 21*
256:*13*  283:*8*
305:*8*  306:*8*
307:*7*
**days**  89:*3, 4*
151:*3*  252:*17*
303:*13, 14*
**deal**  90:*6*
203:*22*  208:*4, 7,*
*9*  209:*9, 20*
210:*10*  212:*17*
213:*14*  254:*18*
255:*8*  295:*10*
**dealing**  77:*11*
**debt**  38:*9, 12, 14*
39:*3*  83:*17, 22*
84:*1*  140:*22*
241:*5*  242:*10, 14,*
*17, 22*  243:*11, 24*
244:*9, 13*
**December**  194:*3*
234:*2*  282:*24*
283:*3, 16*  284:*6,*
*20*  285:*1, 11, 20*
286:*13*

**decide**  63:*1*
156:*9*
**decided**  62:*23*
63:*3*  76:*16*
155:*1, 11, 14, 16,*
*25*  157:*12*
257:*13*  259:*4, 12*
**deciding**  68:*20*
80:*19*
**decision**  47:*25*
49:*1, 10, 12*
154:*14*  161:*20*
210:*24*  259:*17*
269:*1*
**decision-making**
49:*3*
**decisions**  164:*4*
**declare**  305:*1*
**decrease**  259:*5,*
*13*
**Deed**  207:*7*
**deem**  305:*6*
**deems**  268:*24*
**deep**  53:*17*
55:*11*  62:*5, 12,*
*14, 20*  70:*13, 13*
**deeper**  67:*24*
**defects**  127:*10*
170:*6, 9, 25*
171:*1, 10*
**Defendant**  2:*17*
3:*13*  10:*13*
12:*13*  15:*23*
18:*1*
**Defendants**  1:*13*
2:*12*  3:*7*  10:*24*
15:*1*  287:*18*
**defer**  248:*18*
**Definitely**  78:*25*
116:*1*
**definition**  43:*8*
**degree**  30:*14, 25*
173:*20*
**Del**  126:*13*
**Delaware**  1:*4*
2:*4*
**delineated**
174:*18*
**delivery**  229:*25*
**delta**  13:*6*
**delve**  52:*9*
**demand**  66:*3, 4*
**demonstrate**
89:*19*
**denied**  149:*12*

**deponent**  306:*20,*
*21, 23*
**deposed**  11:*11*
**DEPOSITION**
1:*15*  2:*16*  4:*8*
8:*13*  9:*3, 21*
19:*6*  20:*4, 5, 17,*
*23*  21:*15*  24:*9*
94:*7, 11*  116:*14*
128:*16*  150:*9*
151:*11*  191:*11,*
*15*  265:*20, 24*
294:*23, 25*
303:*24*  304:*2*
305:*4*  306:*17, 22,*
*24*  307:*3*
**depositions**  10:*7*
**describe**  205:*3,*
*19*  207:*1*
**described**  163:*25*
172:*9*  192:*21*
**describes**  254:*17*
**description**
136:*24*  138:*11*
**designate**  295:*3*
**designated**  20:*19,*
*21*  21:*22*  23:*5*
135:*11*  156:*6*
158:*19*  247:*19*
248:*4, 17, 22*
249:*6, 18*  270:*3,*
*7*  278:*19*  279:*12,*
*19*  280:*2, 7*
**designations**
146:*4*
**designed**  145:*20*
**desire**  246:*5*
**detail**  267:*17*
288:*24*
**detailed**  136:*25*
137:*1, 25*  231:*18*
**details**  22:*8*
48:*19*  155:*22*
158:*16*  296:*7*
**determine**  68:*17*
69:*11*  71:*8*
138:*16*  178:*16*
**determined**
276:*17*
**developed**  62:*6,*
*20, 21*  88:*18*
**developing**  33:*14*
**development**
31:*25*
**dial**  47:*7*

**Dibble**  40:*24*
41:*2, 3, 8*  42:*5*
79:*21*  145:*7*
148:*4*  152:*24*
158:*2*  182:*13*
296:*18*
**DIEGO**  1:*16*
2:*21*  3:*5, 10, 21*
8:*1, 11*  26:*25*
27:*7, 12*  35:*12,*
*14*  53:*19*  55:*5*
59:*17*  60:*3*  62:*8*
65:*15*  94:*23*
97:*11, 13*  98:*9,*
*10*  106:*6, 7*
110:*16*  121:*18*
122:*9*  125:*25*
190:*4*  306:*3, 9*
**different**  21:*19*
31:*24*  33:*10*
57:*13*  85:*18, 20*
102:*20*  131:*24*
152:*3*  155:*23, 23*
158:*15, 15*
186:*17*  210:*7*
**digging**  28:*23*
**digital**  207:*7*
**Diligence**  5:*5*
14:*19*  15:*11, 17,*
*18*  21:*3*  24:*1*
40:*4*  47:*9*  48:*3,*
*20, 24*  54:*4*
66:*18*  68:*18*
69:*4, 12*  73:*14*
78:*4*  80:*23*  81:*3*
85:*12*  90:*7, 13*
91:*2, 15*  95:*22*
97:*11*  98:*12*
99:*4, 21*  157:*24*
158:*3, 6, 20*
184:*5, 10, 11, 19,*
*25*  185:*7, 16, 24*
186:*10, 12, 18, 20*
187:*1, 16*  188:*14*
189:*11*  190:*16*
191:*1*  200:*2, 8,*
*16, 16*  204:*20*
210:*1, 6, 20*
219:*25*  220:*19*
295:*7, 9, 10*
297:*3*
**dilution**  221:*4, 9,*
*12*
**dinner**  106:*14*
**direct**  193:*15*

Justin Pannu  10/29/2018

**Directly**  113:*14*
144:*2, 16*  197:*7*
213:*10*  228:*3*
**Director**  27:*17,*
*18, 19, 20*
**dirty**  28:*13*
**disagree**  269:*4,*
*11, 25*  270:*10, 20*
271:*9*
**disagreements**
38:*4*
**disappeared**
293:*9*
**disclose**  12:*14*
84:*2*  288:*11*
289:*17*
**disclosed**  253:*20*
**discloses**  208:*15*
**disclosure**  84:*4*
**discover**  161:*15*
**discovered**  104:*5*
**discovery**  57:*7,*
*17*
**discuss**  107:*7*
250:*9*  283:*22*
287:*7*
**discussed**  34:*1*
36:*19*  37:*7*
41:*20*  127:*3*
252:*1, 13*  266:*20*
270:*21*  297:*13,*
*16*  303:*10*
**discusses**  251:*24*
**discussing**  81:*16*
90:*19*  241:*18, 20*
252:*7*  262:*8*
266:*2*  285:*1*
**discussion**  73:*7*
80:*7*  90:*17, 17,*
*19*  101:*21*
191:*24*  224:*17*
242:*3*  251:*9*
287:*11*  295:*23*
**discussions**
45:*12*  51:*16*
52:*1*  64:*19*  80:*6*
103:*5*  171:*22*
214:*14*  230:*16*
242:*2*  287:*23*
289:*24*  290:*24*
292:*3*
**disregard**  174:*17*
**distinction**  300:*3,*
*6*

**DISTRICT**  1:*1,*
*2*  2:*1, 2*
**divorce**  259:*21*
**divulging**  287:*11*
292:*7*
**document**  5:*20*
21:*12*  116:*16*
121:*16*  122:*22*
123:*2, 9*  124:*22*
130:*15*  139:*17*
140:*4*  152:*19*
154:*5*  163:*6, 13,*
*25*  164:*3, 15, 22,*
*24*  168:*23*
173:*16*  175:*5*
177:*1*  179:*14*
182:*21*  186:*1*
188:*17*  191:*21*
193:*22*  199:*17,*
*23, 25*  204:*9*
205:*25*  206:*4*
207:*21*  208:*4, 8,*
*19, 23*  209:*1*
210:*10*  212:*16,*
*19*  213:*5, 14*
215:*2*  217:*18*
218:*6, 12, 16, 20,*
*25*  220:*11*
232:*19*  233:*18*
234:*19*  235:*2*
236:*23*  237:*2, 7*
240:*5, 16*  251:*4*
252:*4*  260:*15*
262:*21*  264:*13*
268:*2*  282:*19*
**documentation**
167:*23*  253:*5, 22*
301:*16*
**documents**  63:*5,*
*17, 24*  89:*18*
92:*14*  102:*23*
115:*13*  116:*17,*
*21*  117:*6*  121:*19*
128:*20*  129:*1*
131:*18*  132:*14*
150:*20, 21*
151:*13, 15, 18*
159:*20*  160:*1, 14,*
*19*  161:*1, 19*
162:*3*  169:*18*
176:*23*  177:*14,*
*17*  178:*5*  179:*6,*
*10*  180:*4*  181:*6*
182:*24*  184:*9*

208:*10*  250:*19*
256:*22*
**doing**  15:*10*
18:*17*  37:*23*
48:*4, 5*  49:*18*
148:*3*  206:*4, 20*
233:*2, 4*  238:*22*
241:*22*
**dollars**  43:*19*
166:*11*  194:*6*
267:*10*
**domain**  49:*21*
**doubt**  176:*22, 25*
182:*2*
**downtown**
109:*22*
**draft**  139:*10*
**draw**  20:*13*
205:*1*
**drink**  106:*19*
107:*15*
**drinking**  107:*10,*
*12*  110:*3*  126:*18*
**drinks**  106:*16*
**driver's**  25:*7*
**Dropbox**  184:*5*
190:*18*  201:*3*
**Due**  5:*5*  14:*19*
15:*11, 17, 17*
21:*3*  24:*1*  39:*1*
40:*4*  47:*9*  48:*3,*
*20, 24*  54:*4*
66:*18*  68:*18*
69:*3, 12*  73:*13*
78:*4*  80:*22*  81:*2*
85:*12*  90:*7, 12*
91:*2, 15*  95:*22*
97:*11*  98:*12*
99:*4, 21*  157:*24*
158:*3, 6, 20*
159:*5*  184:*5, 10,*
*11, 19, 25*  185:*7,*
*16, 23*  186:*10, 12,*
*18, 20*  187:*1, 16*
188:*13*  189:*11*
190:*16*  191:*1*
200:*2, 8, 15, 16*
204:*20*  210:*1, 6,*
*20*  219:*25*
220:*18*  295:*7, 9,*
*10*  297:*2*
**duly**  9:*12*  108:*9*
306:*6, 11*

< E >

**earlier**  99:*3*
266:*21*
**early**  122:*20*
169:*3*
**easier**  113:*18*
**e-discovery**
55:*17*  57:*19*
77:*11, 22, 25*
79:*17, 24*  80:*11*
81:*19, 23*  82:*13,*
*18*
**education**  24:*16,*
*22*
**effect**  137:*2*
148:*19*  243:*6*
**effective**  228:*5*
**effort**  61:*4*  69:*7*
82:*4*  158:*11*
210:*1*  247:*22*
**efforts**  204:*20*
**eight**  13:*5*  26:*3*
**either**  33:*12*
53:*1*  65:*20*  80:*2*
91:*24*  118:*8*
128:*7*  130:*12*
137:*13*  142:*21*
153:*18*  179:*4, 12,*
*13*  182:*24*  187:*4,*
*22, 22*  241:*21*
271:*14*  295:*1*
296:*17*  297:*20*
**email**  3:*15*  4:*10,*
*10, 13, 15, 17, 18,*
*22, 22*  5:*5, 6, 9, 9,*
*12, 17, 20, 23, 23*
*6:3, 3, 6, 8, 9, 12,*
*15, 15, 18, 18, 21,*
*21*  7:*3, 3*  50:*1*
54:*3, 10, 18*
59:*23*  60:*12, 16,*
*17*  83:*12*  84:*8*
112:*19*  115:*20,*
*23*  116:*2, 18, 20*
117:*3*  118:*8, 11*
122:*25*  123:*4, 4,*
*5, 8, 22*  124:*1, 3,*
*4, 5, 7, 17, 19*
125:*2, 6, 10, 17,*
*21*  127:*15*
128:*19, 23*  129:*2*
131:*17*  134:*16*
136:*23*  137:*13*
139:*1, 11, 13, 21*
140:*7, 7, 14*
142:*8, 23*  143:*4,*

*9*  144:*2, 9, 16*
149:*8*  152:*22*
153:*1, 8, 15, 16*
154:*10*  156:*22*
157:*2, 3*  159:*10,*
*10, 19*  168:*14*
176:*12, 20, 24*
177:*5, 6, 9, 12*
178:*2, 6*  179:*18,*
*23*  180:*11*
182:*11*  183:*4*
184:*3, 15, 16, 17*
188:*3*  189:*9*
190:*15*  191:*20,*
*20, 20, 22, 22, 25*
192:*3, 7, 12, 14,*
*19, 19*  193:*2, 5,*
*22*  194:*10, 14, 15,*
*22*  195:*1, 5, 8*
198:*22*  199:*2*
200:*5*  201:*7, 17,*
*21, 24*  202:*21, 22,*
*24*  203:*1, 3, 14,*
*15, 17*  205:*15*
207:*17*  215:*6, 9,*
*12*  217:*5*  218:*4,*
*9, 21*  220:*16*
221:*3*  223:*23*
224:*10, 11, 14*
227:*7, 19, 21*
228:*3, 19, 21*
229:*10, 19*  231:*5,*
*8, 19*  232:*20*
233:*5, 9*  235:*2, 4,*
*19*  237:*3, 9*
238:*3, 11, 23*
240:*18*  245:*7, 10,*
*20*  246:*15, 16, 22*
247:*2, 7*  251:*4,*
*24*  252:*9*  254:*13,*
*16*  255:*11, 13, 14,*
*16, 25*  256:*9, 9,*
*13, 17*  257:*2, 6*
260:*22, 22, 24*
282:*23*  283:*1, 2,*
*2, 5, 7, 13*  284:*2,*
*7, 16, 20*  285:*1, 2,*
*2, 10, 14, 22*  286:*9,*
*25*  297:*4, 8, 12,*
*17*
**emailed**  85:*13*
283:*20*
**emails**  49:*22, 25*
86:*11*  115:*19, 23*
143:*3*  151:*12, 23*

Justin Pannu  10/29/2018

161:*25*  192:*25*
198:*5*  204:*13*
253:*11*  254:*15*
**emphasize** 85:*9*
**emphasized** 85:*6,*
*10, 17*  250:*6*
**employed** 30:*6*
307:*1, 5*
**employee** 307:*4*
**employees** 206:*3,*
*15*
**employment**
25:*11*  29:*18*
**enable** 181:*5*
268:*25*
**endeavors** 31:*12*
**ended** 36:*6*
119:*24*  233:*2, 4*
**endorsed** 53:*15*
62:*14, 16*
**endorsement**
62:*3, 5*  70:*13*
254:*4*
**ends** 94:*6*
191:*10*  265:*19*
303:*23*
**Energy** 26:*17, 19,*
*20, 22*  27:*4, 5, 6,*
*9*
**ENGEL** 3:*7*
**ENGINE** 1:*11*
*2:10, 18*  3:*7*
*8:25*  207:*2, 6, 9,*
*13, 14*  208:*15*
*211:3, 10, 16, 22*
*213:8, 10, 16*
*214:4*  215:*11*
*297:16, 21*
*298:23, 24*  299:*7,*
*8*  300:*11, 12*
*301:2*
**Enoteca** 126:*12*
**ENSOURCE** 1:*4*
*2:4*  8:*15*  20:*18*
*21:16, 24*  22:*14,*
*21*  23:*6, 14, 19,*
*22*  24:*11*  39:*6, 7,*
*8*  40:*2, 5, 19*
*41:22*  42:*11*
*44:18, 23*  45:*2,*
*23*  46:*1, 4, 12, 18*
*47:12, 14*  49:*11,*
*21*  50:*5, 9, 15, 17,*
*24*  51:*4, 9*  52:*16,*
*25*  53:*4*  54:*25*

55:*1*  61:*18*  63:*9,*
*12, 24*  64:*14, 23*
65:*5*  66:*22*
67:*21*  68:*1, 8, 21*
69:*4, 7, 11, 13*
73:*4, 18*  75:*10*
79:*3, 9, 10*  80:*19,*
*22*  81:*7*  92:*8, 15*
93:*4, 5, 7, 10, 19*
94:*2*  95:*21*  96:*6,*
*9*  99:*19, 25*
100:*1, 25*  111:*17*
113:*12, 20, 23*
114:*5, 10, 11, 23*
115:*2*  122:*2, 7*
138:*15, 23*
149:*11*  154:*16,*
*25*  155:*1, 20, 25*
156:*9, 9*  157:*4,*
*12*  158:*24*  160:*7*
161:*3, 4, 11, 19*
162:*4*  165:*7, 15*
166:*20, 23, 25*
167:*12*  169:*21*
170:*15*  171:*8, 9,*
*13, 19, 20*  172:*3,*
*4, 8, 14, 23*
173:*10*  180:*11*
182:*4*  185:*3, 8*
186:*9, 14*  187:*15,*
*18, 22*  188:*13*
189:*5*  192:*24*
193:*10*  198:*4*
199:*14*  200:*8*
203:*6, 7*  204:*1,*
*14, 25*  206:*21*
209:*2, 7, 20*
210:*11, 21, 22*
211:*8, 20*  213:*20,*
*22*  214:*3, 10, 22*
215:*18*  216:*6, 15*
217:*15, 16*
219:*21*  220:*20*
222:*21*  223:*3, 19,*
*19, 23, 25*  226:*23*
227:*8, 14*  229:*23*
230:*19*  231:*25*
232:*5*  234:*15, 17*
235:*23*  236:*11*
238:*16*  239:*21,*
*25*  240:*23*  241:*3*
242:*13*  243:*21*
244:*2, 22*  245:*1,*
*1, 12, 18*  246:*3*
250:*21, 24*  253:*4*

255:*5, 19, 21*
257:*7, 13*  259:*17*
260:*8*  261:*16*
262:*1*  263:*17*
264:*3, 10, 12*
265:*5, 7, 11*
266:*14, 17, 22, 23*
267:*3*  273:*12*
274:*10, 24*
277:*13*  279:*18,*
*19*  280:*3, 11, 25*
281:*8, 20*  282:*6,*
*9, 10*  284:*15*
286:*4, 8, 16, 19,*
*21, 23*  287:*3*
288:*16*  290:*14,*
*15*  291:*9, 16, 24*
292:*1, 10*  293:*12,*
*20*  295:*8, 9, 17,*
*21, 25*  296:*20*
297:*2, 15, 20*
298:*1, 3, 11, 19,*
*22*  299:*3, 5, 11,*
*16, 23*  300:*8, 10,*
*17*  301:*1, 10, 15,*
*23*  302:*5, 6, 9, 15*
**EnSource's**
147:*10*  154:*3*
246:*5*  257:*10*
282:*10*  293:*16,*
*20*
**entered** 15:*10*
228:*8, 11*  229:*17*
258:*25*
**entering** 162:*7*
**entire** 27:*8*
113:*22*  173:*22*
**entirety** 227:*21*
**entities** 26:*7*
31:*24*  32:*3, 5, 25*
34:*1*  52:*18*
60:*12*  89:*6*
131:*24*  134:*2*
221:*20*
**entitled** 21:*18*
24:*8*  130:*21*
168:*25*  173:*17*
198:*16*  213:*2*
249:*3, 7*  263:*11,*
*20*  278:*3*
**entity** 23:*11*
32:*1*  46:*5*  108:*9*
153:*3*  156:*19, 23*
157:*6*  279:*16*

**entrepreneur**
56:*3*  58:*3, 5*
94:*20*  95:*11, 12*
96:*6*
**equate** 293:*3*
**equities** 30:*1*
**Equity** 4:*20*
*6:11, 23*  34:*15,*
*16, 18*  140:*23*
166:*11*  175:*8*
194:*1*  195:*2*
244:*14*
**ESQ** 3:*3, 4, 9*
**Essentially**
126:*25*
**estate** 31:*17, 25*
33:*8, 9, 11*  35:*10*
**estimate** 34:*9*
127:*18*  198:*14*
**estimated** 175:*11*
**estimates** 285:*7*
**evaluate** 275:*24*
276:*10*
**evaluated** 276:*16*
**evaluating** 275:*7,*
*9, 16, 17, 20*
276:*3, 5, 13, 18*
**evaluation** 141:*6*
**evaluations** 167:*8*
**evening** 250:*19*
**event** 80:*16*
**events** 91:*1*
**everybody** 42:*24,*
*25*
**exact** 34:*8*
54:*21*  122:*19*
178:*17*  245:*15*
289:*20*  290:*4, 14*
**exactly** 35:*2*
39:*21*  43:*15*
98:*14*  116:*18*
118:*18*  170:*2*
**EXAMINATION**
4:*4*  9:*14*  21:*18*
306:*15*
**examined** 306:*15*
**examples** 159:*2*
**excess** 267:*10*
**exchange** 4:*10,*
*10, 15, 17, 22*  5:*5,*
*6, 9, 12, 17, 20, 23,*
*23*  6:*3, 3, 8, 15,*
*15, 18, 21, 21*  7:*3,*
*3*  246:*15*  282:*4*
283:*1*

**exchanging**
220:*18*
**exclusively** 84:*16,*
*20, 23*  85:*4*
**Excuse** 17:*13*
32:*16*  93:*23*
112:*9*  187:*22*
202:*21*
**execute** 96:*12,*
*14*  174:*14*  251:*1*
**executed** 228:*4*
229:*24*  230:*9*
237:*6*  245:*9*
246:*6*  261:*2*
305:*8*
**Executive** 4:*15*
140:*8, 13, 21*
141:*11*  165:*25*
166:*6*  168:*1, 1,*
*15, 18*  177:*18*
**exercise** 219:*18*
282:*6*
**Exhibit** 20:*23,*
*24*  115:*14, 16, 19*
121:*16*  122:*22,*
*23*  124:*17, 23, 24*
129:*17, 23*  131:*9,*
*11, 13, 13, 19, 21*
132:*10, 17*  133:*6*
139:*18, 19*
140:*11*  142:*24*
143:*1*  152:*19, 20*
159:*19*  162:*21*
165:*24*  168:*12,*
*20*  175:*6, 6, 11*
177:*2, 3*  179:*15,*
*16*  180:*21, 23*
181:*1*  182:*11*
183:*24*  184:*3*
189:*10, 18*  190:*9*
191:*17, 19, 25*
194:*13*  195:*16*
199:*18, 19*  200:*7,*
*10, 11, 23*  201:*8,*
*11*  202:*18, 19*
204:*10, 11, 15*
205:*2*  207:*22*
208:*2, 19, 21*
212:*13, 16*  213:*1*
215:*3, 4*  217:*19,*
*20*  218:*3, 16, 18,*
*22*  220:*10, 12*
223:*1*  224:*7, 8,*
*14*  227:*6*  228:*16,*
*17*  231:*2, 3*

Justin Pannu  10/29/2018

232:*16, 17, 25*
234:20, *21*
235:*18* 236:*24,*
*25* 237:*8* 238:*16*
239:*5* 240:*13, 14*
245:*4, 5* 246:*11,*
*12* 250:*17* 251:*3,*
*6* 254:*10, 11*
256:*14, 15*
260:*16, 19* 266:*3*
282:*20, 21*
284:*19, 23*
**EXHIBITS** 4:*7*
5:*2* 6:*2* 7:*2*
**exist** 82:*7*
**existed** 139:*8*
**Existing** 130:*21*
135:*11* 234:*3*
**expect** 294:*20*
**expend** 92:*21, 22*
**expended** 195:*23*
**expenditures**
87:*17* 92:*5*
136:*16* 139:*2*
188:*8, 10* 194:*19*
**expense** 194:*6*
**expenses** 83:*19*
86:*22, 24, 25*
87:*6* 92:*1, 16, 19,*
*25* 93:*19* 114:*23*
136:*15, 19* 137:*5,*
*12, 18* 138:*5, 16*
139:*1* 176:*10, 14*
188:*8, 25* 194:*20,*
*24* 195:*10*
**experience** 28:*18*
31:*11* 56:*2, 4*
58:*2* 94:*19*
95:*15* 96:*5, 12*
126:*21* 276:*3, 10*
**experienced**
275:*7, 8, 16, 19*
276:*4*
**expert** 101:*10*
164:*9* 182:*5*
**expertise** 79:*19,*
*20* 248:*21*
275:*23* 296:*8*
**expiring** 146:*9*
**Explain** 111:*25*
**explained** 163:*22*
**explains** 131:*21*
163:*13*

**explanation**
206:*18, 23*
207:*12*
**Exploitation**
177:*21, 22*
195:*22*
**exploited** 146:*7*
**expressed** 287:*3*
**extensive** 14:*23*
15:*17* 127:*11*
**extent** 29:*8*
88:*9* 147:*9*
**extremely** 127:*10*

**< F >**
**f.619.231.4372**
3:*11*
**f.866.365.4856**
3:*6*
**facilitate** 200:*2*
**fact** 16:*5* 24:*10*
82:*4* 138:*12*
230:*12* 242:*10*
263:*12* 266:*18*
269:*17* 275:*2*
**Factors** 168:*25*
169:*4, 10*
**Factors,** 173:*17*
292:*20*
**failed** 12:*14*
**fair** 47:*2* 48:*11*
88:*10, 16* 92:*13*
123:*8* 154:*2, 3*
158:*23* 161:*11,*
*18* 162:*2* 249:*16*
254:*5*
**fairly** 189:*11, 23*
190:*1*
**false** 64:*16* 65:*2*
70:*9, 15, 17*
103:*2, 12, 15, 16,*
*19*
**familiar** 17:*19*
96:*2* 187:*14*
199:*23* 262:*14*
263:*10*
**familiarity**
163:*16*
**families** 62:*17*
**Fantasy** 36:*1, 10*
41:*24* 42:*9*
118:*21, 24* 119:*5,*
*7*

**far** 37:*10* 39:*21*
41:*16* 48:*9*
58:*19* 97:*12*
109:*10* 118:*16*
119:*23* 127:*18*
145:*21, 25* 146:*2,*
*11, 19* 230:*13*
232:*13* 240:*20*
244:*12* 253:*2, 10*
258:*21* 260:*10*
**fast** 202:*12*
250:*4* 253:*6, 23*
**favorable** 147:*6*
**federal** 13:*19, 24*
16:*9, 22, 23* 18:*5,*
*11*
**fee** 14:*5*
**feel** 19:*24* 70:*3,*
*23* 120:*18* 170:*5,*
*10, 19, 24* 210:*21*
236:*20* 245:*1*
250:*7*
**feeling** 69:*25*
70:*2* 90:*21* 91:*7*
171:*17* 236:*11,*
*22* 285:*11, 19*
**fees** 84:*5*
137:*22* 138:*1, 4*
**felt** 73:*21, 23*
76:*2* 85:*6, 15*
88:*16* 90:*8* 91:*4*
165:*14* 222:*2*
230:*12* 236:*16*
244:*16, 19, 21*
**fields** 146:*4*
**figure** 34:*7*
**figures** 35:*2*
**File** 5:*16* 15:*3*
212:*20*
**filed** 15:*6* 16:*7,*
*16, 17, 18, 21*
18:*1, 9* 297:*19*
**files** 206:*5* 261:*3*
**filled** 97:*17*
**final** 181:*15*
258:*20* 260:*7*
261:*18*
**finality** 247:*5*
**finalize** 250:*18*
**financial** 28:*13,*
*19* 38:*6* 63:*4, 16,*
*24* 89:*18* 90:*3*
92:*14* 187:*21*
188:*14* 189:*6, 7*

231:*8* 275:*8, 20*
276:*4*
**financially** 307:*5*
**financing** 240:*18,*
*25* 241:*18* 243:*8*
**find** 61:*5* 127:*9*
146:*5* 169:*15*
170:*6, 11, 25*
171:*10*
**finding** 78:*20*
145:*22* 209:*19*
**finds** 184:*19*
**fine** 34:*17*
37:*10* 129:*21*
249:*7, 11*
**finish** 17:*15*
18:*20, 21* 149:*21*
150:*17* 160:*24*
170:*22* 190:*12*
303:*11*
**finite** 186:*21*
**fire** 29:*6*
**fired** 145:*16*
**firm** 25:*12* 26:*6*
112:*20*
**first** 9:*12* 10:*22*
12:*4* 25:*11* 27:*5*
31:*22* 32:*6*
33:*18* 47:*15*
53:*8, 20, 22*
58:*20* 59:*13, 22*
60:*22* 62:*8, 9, 9,*
*13* 63:*2* 84:*14*
89:*3* 98:*9, 10, 23*
106:*10, 11* 111:*3*
117:*19* 118:*14,*
*16* 125:*24* 126:*7*
129:*7* 132:*4*
168:*17* 190:*9, 14*
193:*6* 195:*16*
200:*8* 208:*6*
212:*19* 222:*25*
227:*6* 237:*2*
251:*8* 252:*1*
257:*7* 258:*20*
267:*18* 268:*6*
271:*19* 287:*3*
**five** 47:*23*
140:*20* 152:*8, 10,*
*11*

**five-million-dollar**
56:*18*
**five-minute** 59:*1*

**five-page** 191:*21*
232:*19*
**flexibility** 30:*19*
**flip** 184:*24*
**fly** 30:*17, 19*
**flying** 30:*7*
**focus** 59:*24*
**folks** 28:*8*
**follow** 199:*6*
282:*25* 287:*14*
**following** 37:*3*
239:*17* 251:*10,*
*11* 306:*10*
**follow-on** 215:*9*
218:*7, 12, 20*
220:*16*
**follows** 9:*12*
**force** 28:*10*
**foregoing** 305:*3*
**forgo** 172:*2*
**forgot** 121:*11*
**form** 70:*7* 71:*9*
76:*18* 77:*2*
108:*21* 109:*2*
146:*12* 153:*3*
187:*5*
**Forma** 6:*6*
86:*23, 25* 87:*12,*
*13* 88:*2, 5* 92:*20*
93:*10, 11, 13*
136:*25, 25* 137:*1,*
*25* 172:*20, 24*
189:*3* 195:*4, 11*
198:*13* 231:*10,*
*17, 18, 22* 232:*21*
233:*1, 7, 12, 14,*
*16* 234:*9*
**formal** 48:*1*
**formalize** 45:*11*
**formally** 164:*24*
**formas** 188:*11*
**format** 133:*22*
**formation** 45:*6,*
*21*
**formed** 27:*5*
39:*8* 40:*17*
42:*11* 47:*12*
81:*17* 108:*9*
122:*8, 11* 146:*15*
227:*9*
**former** 248:*12*
**forming** 153:*2*
156:*23*
**forth** 164:*16*
165:*9* 166:*7*

Justin Pannu  10/29/2018

198:5  264:22
267:22  268:13
276:22  282:3
295:12
**fortune**  28:8
**forward**  22:11
24:6  86:15, 23
87:1  92:6, 22
112:2, 4, 11
136:17  139:3
144:16  158:25
188:10  223:4, 20
303:10
**forwarded**
132:25
**forwarding**
204:22
**forwards**  112:1
**found**  14:1  16:4
58:14, 15  73:25
96:22  97:17
99:9, 13  101:17
104:21  105:1
170:9  237:11
264:16
**foundation**
132:3  135:22
139:14  149:15
163:8  171:3
175:21  176:17
181:10  186:6
187:25  189:22
197:24  198:9, 18
220:23  221:14
224:23  225:8, 18
228:12  230:2
233:18  237:20
238:10, 20
241:12  242:8, 16,
23  256:25
257:17  258:16
259:8, 19  274:5
281:23  284:8
285:13, 21  301:3,
12, 19  302:1, 12
**founder**  71:23
**founders**  130:22
133:14  134:2
222:6
**four**  10:12, 16,
20  44:5  89:3
116:20  141:4
**fourth**  140:20
205:2
**fracking**  29:10

**frame**  11:14
16:13  27:19
135:18
**Frank**  173:18
**fraud**  13:20
**fraudulent**  12:1,
2
**FRCP**  306:19
**Free**  47:10
**frequently**  128:6
**Friday**  151:4
228:5  236:2
**friend**  14:13
40:8  41:4, 6
53:14  109:7
118:20
**friends**  40:6
42:16  45:6
56:15  65:10
69:24  123:23
172:1  182:14
**friendship**  70:14
**front**  115:18
121:17  144:10
162:22  235:6, 19
251:3
**fulfillment**
239:15
**full**  166:5
**fully**  52:5
195:23  196:4, 11,
17  198:15  199:4,
8  261:2  273:4
**function**  28:7
**fund**  54:1  55:19
57:4  75:2  76:11
83:25  84:9  85:5
136:5  250:20
**Funding**  135:5
**funds**  35:23
53:24  54:8
55:19  57:20
59:19  70:24
83:3, 8, 15  84:16
85:3  86:9, 14, 17,
20, 22  88:7  89:5,
16, 19  92:22
127:2  135:24
136:4  157:24, 24
166:8, 16  167:5
235:25  250:22
252:22  256:19
282:12  293:9
**furnished**  271:5

**further**  206:21
207:13  215:14
217:6, 8, 12
250:9  260:23
270:15, 16
302:22  306:19,
25  307:3
**future**  194:20

**< G >**
**gain**  133:13
**gas**  27:6  28:13,
14, 18, 19, 22, 25
29:4, 6, 9, 14, 16,
17  56:4  58:2
94:19  95:15
96:5  126:22
135:2  173:19
175:15  176:15
196:5  206:5
208:13
**genealogy**  145:24
**general**  22:11
29:11  48:12, 23,
24  53:11  70:23
90:21  91:7
135:5  136:5
147:13, 14  195:9
222:1  236:21
253:8
**generally**  22:2, 8
55:20  148:1
155:21  158:14
209:25  229:3
230:5  242:3, 4
270:8  293:23, 24
296:4
**generate**  166:15
**generated**
300:11  301:2, 2,
11
**generators**  29:5,
5, 7
**Gents**  153:1
**Gerber**  50:20, 22
**gesture**  73:25
**getting**  22:3
120:23  167:20
216:8
**gist**  13:16  242:5,
6
**give**  10:20
19:13  23:13
34:9, 25  51:13
55:10  56:15

65:10  69:23
74:13, 15  169:18
229:12  243:22
283:21
**given**  9:21
24:10  62:3, 4
87:15, 20  92:2
170:20, 24
172:13  254:6
273:13  306:17
**giving**  19:25
23:21  24:6
52:10  172:19
282:19  300:4, 6
**glanced**  273:5
**gleaned**  102:3
**gmails**  50:1
**go**  21:9  29:12
31:2, 6  49:24
56:7  59:9  71:5
86:10  90:13
94:5  115:13
154:22  227:13
235:10  250:5
265:17  267:16
280:1  294:9
295:21  303:2
**goal**  166:14
**goes**  175:14
193:17, 25
194:18  195:1, 1
196:6  206:10
237:9  268:22
**going**  12:6
19:20  20:22, 22
21:4  22:11, 19
23:13, 20  24:6
29:23  31:9  37:6
44:23  45:24
49:24  53:4, 23
54:9, 12  57:5
59:19  82:9  85:7,
8, 16  86:15, 22,
23  87:1  88:21
91:9  92:4, 5, 6,
22  94:3, 14
112:25  115:13
118:21, 23
121:16  128:13,
19  132:13
134:11  135:1, 25
136:16  137:13,
23, 24  138:12
139:2  140:20
150:19  152:18

154:15, 22  157:5,
24  162:17
169:14  170:6
171:4  173:16
180:21  182:11
188:9, 10  198:5
200:7  202:25
207:21, 22
208:10  209:15
212:15  215:3
218:15, 16
222:25  224:7
232:16  234:19
236:16, 23
248:13, 14  254:9
257:14  259:5, 13,
21  260:2, 15
270:17  282:19
287:14  289:14
292:16  303:10
**going-forward**
83:18  92:25
136:19  137:6
171:15
**Good**  8:4  9:16,
17  18:17, 22
105:16  146:22
191:4  231:9
282:13
**gotten**  34:12
**graduate**  25:24
**great**  284:11
**GROUP**  1:9, 11
2:8, 11, 19  3:7
9:1  39:11  40:2
41:24, 25  42:4, 5
48:8  60:11
73:11  192:23
213:7  229:13, 17
236:15  240:18,
19  241:19  242:7
244:17  252:15
283:10  284:18
301:17, 24
**groups**  34:24
**guar**  170:4
**guarantee**  170:5,
11, 20, 25  171:9,
14, 18  172:13, 14,
19, 24  173:10, 13,
14  254:24
256:23
**guaranteeing**
169:22

**guess**  15:5
25:17  46:8
53:12  64:21
70:4  80:6
115:10  133:24
138:1  153:23
202:9  215:23
217:1  222:3
238:22  261:10
**guys**  86:5
105:15  160:21

**< H >**
**halfway**  271:19
**hand**  17:10
20:22  152:18
207:21  218:15
234:19
**handed**  184:2
204:9  215:2
224:6
**handing**  122:21
124:22  139:17
142:23  177:1
179:14  212:15
236:23  245:3
**happened**  116:6,
11  127:15
183:16  190:6, 22
256:7  259:7
282:12
**happening**  116:6
**happiness**  38:2
**happy**  37:5, 20,
22  52:12  249:23
250:10, 13
**hard**  160:22
202:12
**head**  27:6  35:15
74:25  114:6
127:21  251:22
259:3
**header**  130:21
134:12, 24
173:17  213:1
**heading**  134:25
**headquartered**
26:22
**headquarters**
27:6
**hear**  49:6  57:13
**heard**  137:23
148:16  235:22
289:15

**hearing**  110:9,
12, 15  150:4
**heat**  29:9
**heavy**  126:19
**he'd**  61:15  62:16
**hedge**  28:11, 13
**hedging**  28:11,
20
**held**  31:24
32:10  229:24
**hello**  110:8
**help**  239:24
**helpful**  194:19
**helps**  283:17
**hereof**  213:6
**hereto**  307:5
**hereunder**
239:15
**Hi**  218:6
**high**  22:9
173:20  224:18
**higher**  91:3
**highest**  24:22
**high-level**  225:6,
10, 14, 25  226:23
**highlighted**
193:2  213:1
218:25
**HILL**  3:7
**history**  25:9
**hoc**  45:3
**hold**  45:2
**holding**  230:11,
11
**home**  27:1  33:14
**homes**  33:19, 20
**honest**  20:1
**Hope**  184:18, 18
**Hopewell**  39:9
42:22  53:11
56:14  58:16
61:1  62:23  63:1
65:9  66:1, 5, 20
67:3, 7, 8, 15, 23
68:15, 21, 23
69:6, 23  70:8
71:7, 17  72:2, 4
76:16  80:20
81:10  90:3, 5
91:12, 23  92:8, 9
93:22  96:7  97:7
107:8, 18  108:1,
8, 12, 15, 22
109:3, 8, 12
112:12  113:10,

12, 13, 23  114:3,
20, 24  117:11, 20,
24  118:15
121:19  123:7, 24
124:16  125:4
126:23  130:5
132:23  133:5, 13,
14  134:3  135:5
136:5, 8  138:17
140:22  144:12
149:22  153:5, 9
154:16  155:1
156:1, 10, 14, 24
157:13  158:4, 20,
25  161:8  162:8
166:7  171:14
177:19, 20
181:16  183:22
185:4, 5  186:8,
13  187:10, 22
188:15  189:7
192:5  193:8
195:21  196:7
200:1  205:4, 19
206:12, 13, 24
207:2, 8, 9, 15
213:9, 9  216:4, 7,
16  220:7  222:23
223:19, 24  225:3,
4  227:1, 10
229:1, 25  230:17,
20  231:12, 14
233:1, 25  235:24
240:1  250:22
252:13, 25
254:22  255:2
256:5  258:10
260:8, 9  263:11,
19  280:24  281:7,
21  282:11
285:12  287:19,
21  288:4, 16
289:22  295:19,
22  297:21  298:4,
12, 13, 23, 24
299:7, 8  300:12
301:1, 17, 24
302:6, 10, 11
**Hopewell-Pilot**
5:12  6:11, 23
184:12, 20
207:24
**Hopewell's**  68:9
193:15, 18

**hoping**  223:25
**host**  52:17
**hour**  2:19
144:24  145:1
206:13  208:14
294:19
**hours**  150:22, 22
190:25
**house**  35:10
59:17  73:13
74:23  77:15
83:10  84:8, 12
87:25  89:25
**Houston**  3:15
26:23, 24  31:18
33:23  34:1
36:19  37:6
50:18
**Houston-based**
33:6
**Hub**  36:1  41:24
42:9  118:21, 24
119:5, 7
**Humphrey**
177:7, 13
**hurry**  73:18
216:25
**hyphen**  194:4
**hypothetical**
61:13  118:10
149:15  154:20
155:6  156:17
161:23  174:24
199:11  227:3
238:20

**< I >**
**IBM**  148:16, 18
**ICE**  28:16
**idea**  72:22
121:9  122:13
231:9  253:15
**identified**  97:6
174:14  220:7
221:1
**identify**  8:18
219:24
**identifying**  99:7
**identity**  68:22
69:14
**IMAGE**  1:11
2:10, 18  3:7
8:25  207:2, 6, 9,
13, 14  208:15
211:3, 10, 16, 22

213:8, 10, 16
214:4  215:11
297:16, 21
298:23, 24  299:7,
8  300:11, 12
301:2
**imaging**  207:7
208:16
**immediately**
254:16  283:12,
15
**impact**  240:24
**importance**
143:23
**important**  80:19
143:15, 17
161:15  210:21
**impression**
146:20  147:5, 6
202:11, 16
**improperly**
290:16
**inch**  256:17
**incident**  18:7
**include**  180:3
**included**  47:13,
19  176:23
**includes**  42:5
**including**  10:24
34:12  50:18
135:6
**income**  44:3
**Incomplete**
61:13  118:10
149:14  154:19
155:5  156:16
161:23  174:24
199:11  227:3
238:19
**incorrect**  64:9,
12  76:19
**incorrectly**  34:6
**increase**  257:13
**increased**  258:24
**independent**
212:7  276:24
292:19  295:17
296:20, 25
297:15
**index**  35:23
**India**  35:18
**indicated**  53:13
**indicates**  206:2
**indirectly**  213:10

**individual** 1:8, 8
2:7, 8 295:1
**individuals**
123:6 182:24
229:13 249:20
**induce** 292:10
**industrial-type**
28:9
**industry** 95:15
**ineffective**
104:23
**infer** 179:2
**inferences** 20:13
**inform** 49:16
**informal** 45:7
**information**
12:14 24:8, 10
54:15 63:5, 17
66:19 67:2, 6, 22
68:8, 9 69:5, 8,
12, 13 76:6
87:20 88:10
99:4, 8, 12, 20
100:7 102:3
103:2, 14, 17, 22,
24 104:4, 12
117:23 136:18
138:22 143:25
146:21 175:24
177:13 180:18
185:3 187:21
188:15 189:6
198:24 200:9
202:12 212:23
215:10 243:22
244:3 249:11
262:15 268:23
269:18, 19
270:16 271:4, 5,
14, 16 276:21
278:17 279:10
284:6 286:12
**informed** 268:25
**informing** 199:25
**informs** 208:12
**infusion** 253:7,
23
**inherent** 264:21
**inherited** 35:18
**Initial** 4:20
6:11, 23 141:4
175:8 194:1
235:24 237:19
245:13

**initially** 34:13
258:2
**in-person** 97:14
**insert** 180:7
**inside** 278:6
**insiders** 221:16
**insolvency**
287:19, 21 288:3,
9, 22
**inspect** 295:21
**instance** 229:23
248:5
**instances** 261:15
**instruct** 102:12
112:25 220:4
298:15
**INSTRUCTED**
7:6
**instructing**
102:15, 17
**intelligent** 210:24
**Intelometry**
159:13
**intend** 291:10
**intended** 291:10,
17 292:10
**interest** 12:7, 10,
11, 15, 16 141:4,
7, 8 167:6
264:21 265:13
269:2 281:21
**interested** 72:24,
25 73:11 123:6,
24 147:9 161:12
209:19 216:7
257:22 258:1
282:15 307:6
**Interests** 175:16
176:16 270:8
271:6 275:11
276:10, 16, 17, 19
**internship** 30:2
**interpret** 86:1
**Intex** 182:13
**introduced**
14:13 15:8, 16
**invest** 42:21
45:23 56:15
62:23 63:1
65:11, 24 66:5, 7
73:18 74:7, 9
76:3, 12, 16
113:10 120:18
155:1, 11, 16
156:20 157:5, 12

223:25 236:16
255:5 258:12
259:2, 5, 13
**invested** 14:8
33:25 34:10
35:24 55:6
56:10, 11 59:14
60:9, 12, 18
61:10 62:1 64:8,
16 65:1 68:14
72:8 82:7 89:2,
3, 5 90:4 113:23
114:2, 10, 19
173:22 222:6
260:8
**investigations**
276:24
**investing** 28:2
31:11 39:9
40:18 41:21
72:25 73:11
153:4 154:12
156:14, 24 258:1
275:10 276:6, 16
**investment**
13:24 14:15, 20,
21 15:10, 16, 24
29:25 31:21, 22,
23 32:2 34:23
35:9, 25 36:3, 5,
6, 16 41:15
51:14 55:14
57:1, 3 59:20
61:1, 7, 19 68:20
70:6 73:4 78:24
80:20 81:10
83:20 91:10, 18,
19, 21 92:7, 15
93:8, 11, 18 96:7
109:7 110:25
112:12 114:24
117:11 119:7, 20,
25 120:14, 19, 23
121:7 123:7
124:16 127:1
132:23, 24 133:3,
12 134:3 137:8
138:17 155:25
156:10 161:8, 12,
16, 21 162:4, 8
163:14 164:1, 5,
16, 25 169:4, 10
172:15 173:19,
23 174:2 185:5
189:7 192:6

198:14, 25
210:25 216:4, 8,
16 222:22 223:4,
20 227:1, 9
228:25 230:20
232:4 236:4, 12
238:17 240:1
242:18 243:11
258:9, 17, 24
259:24 264:22
274:12 275:18,
23 276:9, 11, 18,
19 278:16 279:8,
20 282:16 287:4
288:16 292:11
300:25 301:8, 10,
15 302:7
**INVESTMENTS**
1:4 2:4 8:15
20:18 21:16, 24
31:13 33:11
35:8, 20 36:19
37:5, 10, 11, 15,
18 41:19 45:24
46:1 55:19 63:6,
18, 25 92:4
185:22 227:8, 14
275:8, 17, 20
276:4 301:16, 20
302:10
**investment's**
237:10
**investor** 43:21,
22 56:18 65:22
74:20 109:11
110:20, 24
118:21, 23 119:5
182:14 216:21
217:3 239:19, 22
262:12, 13 264:3,
19 265:11 266:6,
15, 17, 18, 19
267:16, 20
268:11, 23, 24, 25
270:2, 6 271:3, 4,
21 272:6, 8
275:6 276:15, 18,
20, 24, 25 278:3,
17 279:9 280:14,
15, 17
**investors** 13:14,
21 14:4 16:5, 6,
10 18:10 23:25
66:20 67:2, 7, 9,
15, 23 68:10, 22

69:6, 9, 14
140:23 166:7
173:21 183:9
243:12 266:24
267:3 274:1
**Investor's** 239:14
**invitation** 109:20
**invoices** 297:20,
24 298:1, 23
299:6 300:11
301:1, 11
**involve** 11:25
28:2, 4 110:3
119:7 279:25
**involved** 10:21
11:20 12:1, 9
13:1 18:10, 13
21:3 23:25
31:10, 13, 19
33:8, 9 34:23
35:7, 21, 23 36:2,
18 37:17 42:9
50:24 51:4 70:6
83:8 90:18 91:6
106:16 109:3
149:6 157:23
158:3, 8, 17
169:10 172:5, 7
185:23 225:13
229:13 254:7
300:22
**involves** 49:3
**iPhones** 47:8
**issuance** 221:16,
17
**issue** 46:2 90:12
157:11 217:9, 12
221:12 222:22
223:1, 9, 17
230:4, 7, 10
237:18 241:20
245:14 247:10
251:23 255:24
**issued** 133:22
193:7 254:20
**issues** 38:4, 5
78:21 81:24
90:20 107:7
145:22, 23, 24
146:6 159:6
230:18, 24
237:21 248:5
276:14 292:17
295:2
**italicized** 85:23

Justin Pannu  10/29/2018

**items** 187:6
201:*3* 250:*5*
273:*4*
**its** 27:9 39:*10,*
*11* 93:*11* 143:22
155:25 180:*12*
227:21 238:16
240:*1* 270:*4*
274:25 278:*16*
279:8 288:*16*
299:*24* 301:*10,*
*15* 302:6, *9*

**< J >**
**James** 40:*24*
41:2, *3*, 8 42:5
79:21 81:*13*
145:7, *17* 148:*4,*
*7, 7, 8* 149:*18*
152:24 158:2
182:12 296:*18*
**Jeff** 40:*24* 41:6,
*10* 42:6 86:*13*
138:*21* 158:*1*
182:12 188:*19,*
*24* 203:*16*
**Jerome** 152:*24*
220:*15*
**Jerry** 36:2
39:*16, 17* 40:*8*
41:5, 7, *23* 51:2
53:2 75:*23*
77:*16, 19, 20*
79:*19, 21, 22*
80:*9* 81:*13*
145:7, *17* 146:*14*
147:25 148:*3, 7*
149:*18* 158:*1*
159:*4, 11, 15*
182:12 221:*3, 3*
296:*17*
**jerryjohns@intelo**
**metry.com**
159:*12*
**Jerry's** 41:*24, 25*
42:*4* 79:*20*
147:*19* 224:*16*
**JMA** 1:7 2:7
8:*16*
**job** 18:*18* 26:*13*
27:22 28:2, *23*
**jobs** 27:*14*
**jogged** 252:*24*
**Johns** 36:2
39:*16, 17* 40:*8*

146:*21* 147:*5, 25*
148:*3, 13* 152:*24*
159:*11* 220:*15*
221:*3* 231:6
232:*21* 257:*23*
258:*9*
**Johnson** 115:*21*
152:*25*
**joined** 18:*4*
**joint** 256:*6*
**JPCM** 32:*17*
33:*3, 3* 38:7, *11,*
*21*
**July** 4:*13* 27:20
41:*13* 117:*21*
118:*17* 119:*3*
125:*3, 19, 19, 21,*
*23* 127:*16*
128:*19* 130:2
131:22 134:*16*
135:*17* 139:*13,*
*22* 140:7 141:22
142:*11, 11, 18*
143:*4* 144:*3, 9*
**June** 115:*20*
116:*3, 11, 17, 22*
117:*16* 123:*1*
124:*5, 17* 234:*4*
**JUSTIN** 1:*15*
2:*16* 4:*1* 8:*14*
9:*11, 20* 22:22
44:*14* 50:*20*
52:*2* 63:*9* 66:22
94:7, *11* 152:*23*
180:*6* 191:*11, 15*
235:*21* 265:*20,*
*24* 303:*24* 305:*1,*
*12* 306:*11*
**justinpannu1503**
**@gmail.com**
124:*2*

**< K >**
**keep** 127:*22, 24,*
*25* 248:*11, 13*
**Kelly** 33:2
**Kilimanjaro**
39:*11, 15, 19, 22*
40:*14, 18, 21, 23*
42:*1, 2* 159:*14*
**kind** 73:*25*
**Kingston** 24:*21*
30:7, *9, 15*
**knew** 15:2
50:*23* 62:*17*

68:*14* 74:*14*
130:*17* 132:25
170:*8* 198:*4*
253:*11*
**know** 12:5 17:7
20:2 21:7 23:*23,*
*24* 24:*3, 16*
27:24 28:*21, 24*
29:*1, 3, 4, 8, 11*
31:*23* 34:25
36:*12, 23* 38:5, *6*
39:*21, 21* 40:*1, 1,*
*13, 16, 25* 41:*1, 2,*
*3, 5, 7* 42:2, *8*
43:*16* 47:*17*
48:*9* 50:7 53:5,
*17, 22* 54:*24*
58:*16* 63:*10*
64:*4, 13* 65:*3, 6*
66:*8, 12* 67:*21*
68:*15, 24* 69:*8*
70:22 71:*17*
73:5, *12, 21, 24,*
*24* 74:2, *15* 75:*9,*
*17* 76:*3* 78:*17,*
*18, 18, 21* 79:*6,*
*22* 80:*1, 5, 9, 14,*
*16* 81:*4* 82:2
83:8, *10, 14, 17*
84:*3* 85:*11, 12*
88:20 89:*4*
90:*19, 22* 93:7, *9,*
*10* 94:*1* 95:*16,*
*21* 96:*9, 16, 18*
98:*2, 3, 22* 99:25
100:*8* 104:*1, 19*
105:*15* 108:*14*
109:*11, 15*
111:*20, 20*
112:*13, 17*
118:*17, 18* 119:*2,*
*2, 4, 6* 124:*14*
125:*18, 19, 22, 23*
128:*9, 9* 131:*24*
134:*8* 137:*1*
139:*8* 143:*19*
144:*11* 145:*23*
146:*7, 10* 149:*6*
155:*18* 157:*6*
158:*9* 159:*16, 17*
160:*10* 162:*18*
169:*21* 170:*4, 10*
171:*11, 18*
178:*12* 182:*8*
183:*19* 187:*17*

196:24 197:*18*
199:*13* 204:*1*
205:*10, 12, 13*
210:*12* 213:24
215:*13, 18, 19*
217:*6* 220:*1, 6*
230:*9* 233:*3*
236:*16* 241:*10,*
*16* 243:7 250:*5,*
*8* 251:*10* 253:*13*
256:7 259:*17*
260:*2, 5* 261:*20*
263:*4* 274:*7*
275:*4* 280:*6*
286:*14* 288:*19,*
*23* 294:*18*
295:*23, 24* 296:*4,*
*7, 18* 297:*5*
298:*9, 20* 300:*20,*
*23* 302:*15, 17*
**knowing** 210:*24*
**knowledge** 22:*14*
23:*9, 12* 29:*11,*
*15* 77:*18* 92:*3,*
*13* 106:*9* 114:*9*
124:*20* 125:*8*
130:*11* 171:*7*
204:*4* 210:*13, 18*
212:*8* 249:*10*
276:*3* 296:*10, 13,*
*14* 306:*13*
**Knowledgeable**
4:*9* 20:*18* 21:*16,*
*25* 22:2, *9* 69:*10*
147:*12* 155:*20,*
*24* 156:*6, 8*
157:*11* 165:*8*
171:*8, 12* 183:*21*
187:*15* 188:*13*
198:*4* 212:*6*
214:*2* 245:*1*
247:*13, 20, 22*
248:*5, 8, 18, 23*
249:*5, 8, 14, 19,*
*22* 250:*1, 9*
259:*16* 266:*22*
267:*4* 275:*7, 16*
277:*16* 287:*2*
290:*14* 293:*19,*
*24* 295:*2* 300:*16*
**knowledged**
275:*19*
**known** 40:*7, 10*
41:*8, 12, 17*

62:*16* 67:*18*

**< L >**
**label** 212:*17*
239:*4* 282:20
284:*19*
**labeled** 266:*5*
**lack** 248:*21*
**Lacks** 132:*3*
135:*21* 139:*14*
149:*15* 163:*8*
171:*2* 175:*21*
176:*17* 181:*10*
186:*6* 187:*25*
189:*22* 197:*24*
198:*9, 18* 220:*23*
221:*14* 224:*23*
225:8, *18* 228:*12*
230:*2* 233:*18*
237:*20* 238:*10,*
*20* 241:*12* 242:*8,*
*16, 23* 256:*25*
257:*17* 258:*16*
259:*8, 19* 274:*5*
281:*23* 284:*8*
285:*13, 21* 301:*3,*
*12, 19* 302:*1, 12*
**land** 208:*13*
**language** 169:*21*
237:*9* 277:*15*
**lapsed** 25:*4*
**large** 168:*25*
171:*25*
**late** 93:*15*
**LAW** 3:*3*
**laws** 36:*10, 14*
120:*17* 121:2
305:*2*
**lawsuit** 10:*14*
11:*19* 12:25
15:*3, 22* 16:*4*
18:*13* 36:*15*
46:2 297:*19*
301:*7*
**lawsuits** 10:*10,*
*21* 31:*10* 36:*18,*
*21*
**lawyer** 50:*5*
64:25 103:*11*
105:*5* 185:*10*
**lawyers** 50:*9, 14*
**lawyer's** 37:*3*
**lead** 221:*4*
**leading** 17:2

Justin Pannu  10/29/2018

247:15  248:6
**leaned**  134:10
**learn**  39:6
68:22  69:5
117:10  185:4
**learned**  146:21
**learning**  145:13
147:10  161:12
**lease**  55:22, 24
127:5  141:7
167:5, 8  172:20
194:7  231:9
233:25  240:21
243:9  276:13
**leasehold**  234:1,
6
**leaseholds**  169:15
**leases**  61:5
135:3, 12  141:3
146:3, 8  170:7
171:15  173:19
194:5  196:3
198:16  234:4
242:11
**leases,**  196:6
**leasing**  29:12
**leaves**  166:18
**left**  294:19
**Legal**  5:5  17:5
36:24  38:19
43:5  44:5, 8
45:15, 19, 20
46:6  49:15
51:23, 25  52:11,
22  64:17  76:21
88:24  89:9
100:6  103:3
104:14  107:19
108:5, 17, 23
110:21  112:5, 22,
24  113:24
124:11  135:9
141:6, 16  143:18
154:18  155:5
156:4, 16  157:15
164:8  165:12
166:17  167:18
172:16  173:1
174:11  176:18
180:3  181:11, 17
188:16  189:14
194:6  196:12, 20
198:17  199:10
206:4  213:17
214:6  219:19

222:8, 16  223:12
227:2, 22  229:8
233:19  238:21
240:9  244:11
245:23  246:22
247:7, 9, 18
262:23  263:13,
21  264:6  265:14
266:25  268:3
269:5, 13  270:22
271:11  272:18,
20  274:4, 15
277:3, 22, 24
278:8, 24  279:21
280:4, 16  281:1,
12  291:12, 19
292:4  293:6
**lengthy**  205:21
228:21
**level**  22:9  24:22
27:24  62:12
91:3  193:19
224:18
**liability**  1:4, 9,
10, 12  2:4, 9, 9,
11  153:4  156:13
**license**  25:7
**licensed**  306:6
**licenses**  25:6
**licensing**  137:22
**lifetime**  172:1
**limit**  60:13
**limited**  1:4, 9, 10,
11, 11  2:4, 9, 9,
10, 11  153:3
156:13
**LINE**  7:7
146:24  147:1
150:18  184:5
187:6  192:2
240:21  251:8
257:7  271:20
272:5  292:11
**lineage**  145:24
**lined**  216:22
**lining**  293:4
**linking**  146:1
**liquidity**  259:23
**list**  94:18  184:5,
10, 12  185:7, 24
186:20, 21
227:13  249:23
250:5
**listed**  21:20
115:22  135:16

184:9  233:6
261:21
**listen**  57:13
154:21
**lists**  184:20
189:11  200:17
208:12, 15
**LITIGATION**
3:20  8:8  9:9
119:8, 14  120:6,
10  303:19
**little**  24:15  52:4
82:9  102:22
129:8  133:24
150:3  239:3
266:20  295:6
**live**  46:22, 23
**LLC**  1:4, 9, 10,
10, 11, 11  2:4, 8,
9, 10, 10, 11, 18,
18, 19  3:7, 7, 7
5:12, 16  6:9, 11,
23  32:13, 17, 22
33:5  184:20, 21
207:24  212:20,
23  227:8  239:18
**LLCs**  33:6
**loaded**  99:4
**loan**  115:11
251:24  252:1, 7,
12, 15, 18, 23
253:4, 6, 9
**loans**  15:19
16:4, 6  301:23
302:5, 10
**locate**  101:3
**located**  8:10
100:4, 24  101:9
102:24
**locating**  99:16
**lone**  16:1
**long**  26:2, 11
30:22  31:19
40:10  41:8, 12,
17  62:16  144:22
150:13, 20  152:9
192:19  223:15
265:7
**look**  21:11
81:24  82:5
87:17  89:1  92:5
95:18  111:5, 6
123:19  127:20
132:1, 16, 18, 19
133:5  139:12

144:16  160:4
168:12  169:19
170:17  173:18
181:3  193:5
197:7, 21  201:11
218:17  281:13
297:20  298:1, 3
300:11  301:1, 11,
16
**looked**  67:12
111:14, 21
131:17  132:4, 9
167:22  197:9, 11,
18  208:6, 6
210:4, 7  277:15
**looking**  65:22
76:3  109:7
129:4, 8, 25
130:18  140:24
146:8  162:21
176:24  205:18
255:5
**looks**  116:4, 21
124:1  139:24
146:19  202:17
219:4, 6  283:7
**loss**  173:22
**lost**  51:18  54:7
**lot**  15:11  50:1
58:2  66:3, 4
73:13  94:19
95:14  96:5
107:14, 15  134:6,
9  150:21  257:18
**lots**  33:19, 20
**loud**  107:9
**low**  234:5
**low-end**  285:6
**lunch**  105:21
106:13

< M >
**Madison**  207:7
**main**  28:7
**maintain**  86:2
**maintaining**
193:16, 18
**maintenance**
135:6
**makers**  256:6
**making**  14:20
15:23  51:14
78:24  81:9
91:10  92:7, 15
93:8, 11, 18  96:7

99:1  112:12
123:7  133:3, 12
134:3  138:17
161:16  162:8
164:4  174:2
185:4  189:7
227:15  236:12
231:19  264:3, 13
266:15  280:22
281:9  291:18
300:25  302:6, 9
**manage**  28:10, 12
**MANAGEMENT**
1:9  2:8  14:5
27:21  29:25
84:5  137:25
138:4
**manager**  15:2
27:18  49:9
108:1, 15  268:12
**Managers**
252:16  267:20
270:4, 6  278:19
279:11  280:21
**managing**  37:14,
17  39:20
**manipulation**
221:21
**manual**  61:4
82:4
**manufactured**
103:21  104:6
**Map**  177:19
**maps**  209:14
**Mar**  126:13
**marginal**  29:6
**MARK**  1:8  2:8,
17  3:7, 17  8:25
9:2  19:6  20:23
52:17, 21  53:8,
15, 18  54:8, 22
59:11, 14, 25
60:2, 8, 14, 17
62:5, 7, 9, 16, 20,
24  63:21  73:8, 9,
17  74:18  76:13,
19  77:7, 9  83:2,
21, 21  86:17
88:6, 15, 22, 23
90:2, 9, 18, 21
91:4, 5  94:15
95:22  96:4
97:24, 25  105:8
107:17  109:3, 11
115:14, 21  116:4

Justin Pannu  10/29/2018

117:20  118:20
122:22  123:5
124:23  125:10
126:2  127:7
128:7  137:12
139:18  141:18,
22  142:21
152:19, 24
153:18  162:9
165:16, 19
169:12  171:22
172:8  173:2
174:12  179:15
184:2  190:3
202:18  207:22
211:15  212:16
213:11, 15  214:5
215:3  218:16
232:3  236:24
240:13  241:16
246:17  251:5
253:5  254:23
256:4, 6, 18
284:1  289:21
290:5, 15, 20
291:9, 17  292:10,
24  294:24
**MARKED**  4:7
5:2  6:2  7:2
20:24  115:16
122:23  124:24
139:19  143:1
152:20  177:3
179:16  180:23
183:24  191:17
199:19  202:19
204:11  208:2
212:13  215:4
217:18, 20, 21, 22
218:18  220:12
224:8  228:17
231:3  232:17
234:21  236:25
240:14  245:5
246:12  251:6
254:11  256:15
260:19  282:21
284:23
**market**  28:15, 22
35:22
**markets**  25:14
28:17  29:1
**marking**  228:16
234:20  245:3

**Mark's**  88:19
127:12  253:11
**Marks's**  164:20
**married**  44:10,
12
**Martin**  14:14, 24,
25  15:4, 7, 12, 15
28:17  31:17
32:24  33:3  36:1
37:14  39:12
41:17, 20  53:2,
13, 14  116:4, 22
117:5, 23  118:4,
17  121:18
122:25  123:23
124:6, 15  152:23
153:1  157:10
259:4, 12
**MASTROBATTI**
**STA**  1:19  2:22
8:10  306:5
307:11
**material**  121:19
128:22  180:12
209:8, 20  210:4,
22
**materials**  209:24
**math**  34:21
284:3
**matter**  8:14
20:11  214:10, 12
250:24  282:14
**Matters**  21:18
250:7  275:9, 21
276:5  306:13
**maturity**  254:22
**MBA**  24:20
30:3, 8, 14
**MCKNIGHT**
3:4  8:22, 22
250:3, 11
**meal**  106:13
126:14, 16, 17
**mean**  25:20
40:21  41:25
42:5  43:4  66:2,
6  67:4, 5  70:5
85:17  87:19
104:10  111:25
132:20  154:14
172:4  198:22
223:24  249:21,
25  274:23
286:22

**meaning**  61:18
67:21  86:1  93:4
231:25  242:13
280:16
**means**  25:21
43:13  148:3
173:12  274:7, 20
**meant**  43:16
66:9  86:6
137:18  138:6, 10
196:11, 17
**Media**  94:6, 10
191:10, 14
265:19, 23
**medium**  138:25
**meet**  54:9  74:4
106:6  126:4
150:24  190:3
**meeting**  47:3
49:18  53:19
55:4  60:3, 22
62:8, 13  63:2
72:23  73:2, 16
74:6, 9  106:5, 10,
13, 14, 14, 19
107:5, 11, 12
109:24  116:3, 5,
11, 22  121:17
122:18  126:1, 8,
18, 20  127:12, 14,
19  128:4  142:20
153:17  165:18
178:9, 17, 23
179:1, 4, 5, 12, 13
190:6
**meetings**  44:19,
21  45:1, 5, 8, 9,
12  46:11, 13, 24
107:17  179:6
**member**  32:25
39:13, 19, 20
40:2, 21, 25
42:13  47:21
61:23  107:18
287:3, 5
**members**  21:2
22:4, 7  36:3
39:10, 11  40:5, 5,
23  41:1, 22
44:18  46:18
47:14, 19  48:3,
13  49:13, 19
52:25  54:25
58:9  63:11  65:4
68:25  73:4

75:15  78:17
79:7  95:2, 4
98:4  99:25
100:8  104:16
105:11  155:9
158:17, 23
160:10  165:14
182:4  185:9
187:18  189:5
197:10  209:2, 3
210:3, 5, 6  212:4
214:15  217:17
227:13  244:22
266:23  267:2
277:13  286:16,
18, 21, 22  288:25
294:1, 1  296:7
298:8, 20  300:15
302:21
**Memo**  5:16
212:20  224:19
**memorandum**
14:12, 16, 17
111:22  112:16
113:5, 8  116:24
153:11  163:4, 25
164:19  165:9
166:1, 15  168:24
175:20  197:12,
23  198:6  200:24
264:23  271:23
272:24  273:18
276:22
**memorandums**
135:10  163:17
**memorialize**
45:12
**memory**  40:17
77:18  124:15, 18
129:24  149:20
156:3  178:11
192:7  221:7
238:13, 24  240:3
241:9  252:24
**mention**  137:23
278:13  279:14
**mentioned**  17:1
18:12  41:22
68:13  83:9
145:15
**MERIT**  1:20
**merits**  275:10
276:5
**Merola**  40:24
41:6, 10  42:6

138:21  158:1
182:12  188:19,
24
**Merola's**  86:14
**message**  237:24
253:12
**messages**  128:12
151:14, 24
178:24, 25  179:3
**met**  28:17  41:9,
15  54:14  62:9, 9,
22, 24  72:12, 15
106:8, 21, 23
109:19  110:14
122:8  125:24
150:10, 25
167:21  168:7
169:11
**mic**  105:18
**Michelle**  115:21
152:25
**middle**  204:14
235:20  266:2
273:24
**midlevel**  27:24
**million**  43:19
55:6  56:10, 11
59:14  60:9, 18
61:9, 15  62:1
64:7, 15  65:1
72:3, 6, 13, 15, 18
75:4, 5  130:5, 22
131:4  166:8, 11,
16  167:5  194:5
196:11, 18, 25
197:1  198:6, 7
234:6  267:10
**million-dollar**
55:13  56:23
57:3  74:19  75:1
76:11
**mind**  190:11
221:4  234:24
235:8
**Mine**  217:21
**mineral**  135:3
141:3, 7  167:6
173:19  175:16
176:16  196:5
206:5
**mingle**  52:13
**minutes**  45:9
150:16  152:8, 10,
11  191:9  234:25

244:4  294:10, 19
**minutia**  22:3
**misappropriated**
11:2, 5
**misled**  15:23

**misrepresentation**
96:17
**misrepresented**
16:2  18:4
**misspelled**
145:25
**Misstates**  15:13
48:15  56:20
68:3  82:22
96:23  97:3
104:24  137:19
141:24  162:11
163:18  165:2
168:4  174:22
188:17  193:21
200:4, 12, 25
205:24  207:16
208:22  212:9
223:5, 10  227:21
229:18  232:10
233:8, 17  238:11
242:15  244:10
246:21  247:6, 17
248:9  252:3
255:10  256:8
273:10  284:9
285:14  289:9
290:6  291:7
292:22  293:6
**model**  33:15
231:8
**modes**  85:17, 20
**moment**  34:24
35:8  94:4
**mom's**  35:19
**Monday**  2:20
8:2  30:18
**monetized**
171:24
**money**  33:25
35:4, 6  36:13
37:8, 10, 12
38:16, 17  42:21
61:10  72:1, 23
73:10  88:21, 22
90:4  113:10, 20
114:10  119:25
120:2, 15, 19, 23
121:4  196:6

252:23  253:1, 9
255:5  259:2, 5
289:20  292:25
**month**  137:24
175:10  176:9
193:15, 19
**monthly**  176:14
193:8  206:23
**months**  26:3, 12,
14  54:6
**moot**  25:18
**morning**  8:4
9:16, 17  229:12
**move**  91:3
105:17  223:4, 20
**moved**  16:21
26:5, 15  27:18
**moves**  28:25
**moving**  65:7
74:17  83:2
191:19  230:19
267:15  275:5
**multi-email**
220:11
**multipage**
220:10  237:2
246:15
**multiple**  226:11
248:15
**Mutual**  141:8
**mutually**  207:10

< N >
**name**  8:7  9:18
35:19  50:7
107:1  112:7
124:6  149:7
**named**  177:7
306:10
**names**  10:20
27:9, 10  32:5
50:22  67:12
133:21  134:1, 2
145:25  249:13
**naming**  123:5
**naturally**  280:7
**Nawracaj**  50:6,
23  51:3, 22  52:5
111:12  219:7, 11,
16, 24  235:5
245:8  248:7
254:14, 17, 19
255:19, 22, 23
**Nawracaj's**
245:10

**NDA**  4:24
140:1  143:10, 12,
15  144:15
179:21  180:19,
22  181:4, 9, 9, 15
182:3
**NDAs**  182:3
**necessarily**
205:12
**necessary**  167:13
194:6  252:18
268:25  305:5, 6
**need**  21:5, 6
22:7  23:17, 17
28:21, 24, 24
29:1  34:8  52:9
53:4, 5, 9  59:20
84:9  85:5  94:4
96:13  130:18
182:14  203:18
215:14  217:6
218:9  229:12
233:14  235:25
253:6, 10, 23
283:22  289:14
**needed**  61:6
78:19  80:23
83:10, 15, 18
90:17, 18  111:4
252:20, 23  253:1,
8
**needing**  238:7
**needs**  47:25
**negotiate**  171:15
251:1
**negotiated**  247:3
**negotiating**
83:11  91:4
**negotiations**
247:15  248:6
249:10
**neighbors**  62:18,
18
**neither**  306:25
**net**  42:20, 23
43:13, 20  234:1,
6, 7  267:9
**neutral**  70:2
**never**  137:22, 23
**new**  33:14
141:3  167:5
170:6  285:3
**N-G-U-Y-E-N**
10:23
**nice**  73:25

**niece**  73:23
107:22
**night**  106:22, 23
109:19  123:23
**Nightclub**  13:2,
7  14:1, 3  109:21,
22
**Noble**  26:20, 23
**nods**  35:15
114:6  259:3
**noncash**  159:6
221:16, 17
**non-compete**
125:4
**Non-Competition**
4:17  5:3
**nonlegal**  52:10
**nope**  149:23
**normal**  59:18
89:12
**note**  38:15, 23
39:1  184:18, 19
233:24  254:20
256:5, 23
**notes**  34:22
**Notice**  4:8
21:15  49:25
159:10  187:20,
24  188:2
**noticed**  9:3
19:6  20:17  31:9
294:24
**notwithstanding**
248:3
**November**  286:9
307:8
**number**  10:23
13:14, 20  18:3
21:2  23:25
31:23  32:18
40:11  52:24
54:1  58:8, 13
61:8  80:1  84:3
89:2  96:20  97:6,
10  98:7  99:15
135:2  158:16
207:22  221:19
269:16
**numbered**  32:12
266:6
**numbers**  80:3
199:6, 7

< O >
**o0o**  2:15

**oath**  18:23
106:3  306:15
**object**  44:15
255:24
**Objection**  15:13
17:5  34:2  36:24
38:1, 19  39:24
42:14  43:5  44:4,
5, 7, 20  45:15, 19
46:6  48:15
49:14  50:11
51:18, 24  52:22
56:20  61:12, 22
63:8  64:2, 17
66:21  67:16
68:3, 11  69:16
70:10, 19  71:11,
19  73:19  75:12
76:21  78:12
79:4, 11  80:12
81:1  82:22
84:21  87:21
88:24  89:9, 20
91:13  92:17
93:1, 12, 20, 23
95:10, 23  96:23
97:3  98:19
99:22  100:5
101:2, 10, 20
103:3, 23  104:7,
13, 24  107:19
108:2, 16, 23
109:13  110:21
112:18, 24
113:24  114:12
117:17  118:9
119:10, 15, 24
120:7, 16, 24
121:21  122:3
123:9, 14  124:8,
10  125:11
130:14, 25  132:3,
11  133:7, 15
136:9, 21  137:9,
19  138:7, 18
139:14  140:4, 15
141:15, 24
143:16  145:4
149:1, 14, 24
154:5, 18  155:2,
4  156:4, 15
157:1, 15  158:5
160:24  162:11
163:8, 18  164:7,
8  165:2, 11, 22

166:17  167:16
168:4  169:5
170:12  172:16
174:3, 10, 22
175:21  176:17
178:13, 18  179:7
180:13  181:10,
17  182:5, 17
183:10, 17
185:18  186:5, 23
187:25  188:16
189:14, 22
193:21  195:12
196:12, 19
197:14, 24  198:9,
17  199:10  200:4,
12, 25  202:7, 14
203:8, 23  204:6
205:24  207:14
208:22  209:10,
22  210:15  211:4,
23  212:1, 9
213:17  214:6, 11,
20  215:20  216:1,
10  219:2, 13, 19
220:2, 23  221:13
222:7, 16  223:5,
10  224:2, 23
225:8, 18  226:19
227:2, 20  228:12
229:4, 7, 18
230:2, 21  231:23
232:1, 10  233:8,
17  234:13  236:5,
13  237:20
238:10, 19  240:8
241:12  242:8, 15,
23  244:5, 10, 19
245:23  246:21
247:6, 17  248:9
252:3  253:17, 25
255:10  256:1, 8,
24  257:17  258:3,
16  259:8, 18, 25
262:2, 23  263:13,
21  264:6  265:3,
14  266:25
267:11  268:3
269:5, 13  270:22
271:11  272:18
273:1, 10, 20
274:4, 14  275:25
277:3  278:24
279:21  280:4
281:1, 10, 23

284:8  285:13
287:22  288:17
289:3, 9, 23
290:6, 22  291:6,
7, 12, 19  292:2,
13, 21  293:5, 21
294:5  295:13
296:15, 22
297:23  298:5, 15,
25  299:9, 18
300:1, 18  301:3,
12, 18, 25  302:12,
18
**objections**  71:1
108:6  180:7
**obligations**  38:6
239:15
**obtained**  271:3
**obviously**  71:14
88:6
**occasion**  106:7
**occur**  221:21
**occurred**  36:10
91:2  127:19
295:24
**occurring**  173:5
252:13
**OCTOBER**  1:17
2:20  8:2, 6
303:25  306:8
**offer**  11:7
**offered**  164:16,
25
**offering**  130:4, 7
131:4, 13  144:12
270:7  271:6
**offhand**  195:8
**office**  27:2  113:4
**officially**  90:25
**Oh**  17:12  29:25
35:13, 25  42:22
56:25  58:13
70:4  112:11
121:13  131:15
141:23  187:7
280:1  290:21
**oil**  28:18, 22
56:4  58:2  94:19
95:15  96:5
126:22  135:2
146:4  173:19
175:15  176:15
196:5  206:5
208:13

**Okay**  16:20
17:24  18:12, 15
19:24  20:4, 16,
22  22:21, 24
23:15, 16  24:12,
13  27:14  35:7
42:11  44:16
49:4  51:21
54:12  55:2  56:7,
13  57:6, 12
58:20  59:9  60:1,
13, 24  63:14
81:15  82:8, 11
84:11  85:19, 22
94:3, 14  99:11
100:22  103:1
105:7, 14  107:10,
16  113:16, 19
115:15  116:2
123:21  128:15
129:14, 16
131:15  133:2
142:13  150:17
152:11  162:25
163:3  164:18
166:2, 4  167:3,
25  168:13, 20
176:22  180:21
181:7  183:3
184:2  187:8, 11
188:12  189:20
191:4  192:18
195:16  196:14
198:3  201:16, 19,
25  212:15
218:10, 15  221:2
223:13  228:4
234:11  235:10
237:14  239:3, 6
240:11  246:24
261:6, 18  263:7
266:13  270:17
272:10  273:8
277:10  279:5, 7
281:4  284:2, 4, 5,
10  285:17
289:14, 20
290:21  294:9
302:22
**okay,**  284:13
**omissions**  268:16,
21  278:14
279:14
**onboard**  49:1

**Once**  41:11
83:10  106:9
150:24  223:1
234:2  243:10
299:9  300:18
**one-page**  240:16
251:4
**ongoing**  31:22
36:5
**Online**  184:5
190:19, 23
**Ontario**  24:21
**open**  12:6  257:7
**opened**  12:5
**opening**  12:4
**operating**  12:25
14:1, 2, 2  67:10
83:12, 19  86:21,
24, 25  87:6
89:13  92:1, 16,
19  93:19  114:3,
5, 11, 23  136:15,
19  139:1  175:12
176:10, 14  188:7,
25  194:3, 20, 24
195:10  224:19
226:9  228:22
229:1  230:1, 17
238:8  247:4
252:19
**operational**
37:24
**operations**  26:10
27:16, 17, 20, 21
141:6, 19  142:17
167:7, 14  193:19
**operator**  146:11
**opinion**  75:25
101:11  102:2
103:10  104:2
105:5  146:12, 15,
16  281:17
**opinions**  135:10
**opportunities**
58:14  96:21
97:7, 17  99:8, 13,
17, 20  100:4, 24
101:3, 9, 17
102:24  104:5, 21
105:2  110:5
141:8  151:24
167:8  174:14
209:13
**opportunity**  19:7
20:8  55:10

56:15  65:10
66:19  67:1, 22
68:9, 21  69:5, 24
74:14, 16  76:4
117:24  118:15,
19  121:20
123:24  125:5
130:12  149:12
165:10  172:1
214:18  270:4
282:14  294:17,
21
**opportunity,**  67:4
**option**  281:21
**oral**  187:5
276:21  278:5
**order**  28:23
32:2  161:20
210:23  233:14,
15
**orders**  207:11
208:17
**organization**
22:14  44:24
**orient**  220:25
**original**  27:3
116:16  303:12
**originated**
184:16
**outside**  31:11
**outstanding**
34:19  130:23
131:22  132:22
237:18
**overall**  147:13,
14
**over-deliver**
285:8
**overhead**  135:6
136:6, 8  137:5,
17  138:3, 5, 9, 16
194:3
**oversaw**  295:7
**oversubscribed**
55:9  56:14  65:9
66:1, 10, 13
69:23  70:9  71:8,
15  72:5, 12
74:11
**oversubscribed,**
72:10
**oversubscription**
72:13
**overview**  126:22,

*23* 127:6
**owe** 38:6, *16*
**owes** 38:*17*
**owned** 133:*14*
134:2 213:*10*
**owners** 132:*21*
**ownership** 206:5
**owns** 33:4

**< P >**
**P.B** 107:*4*
**p.m** 105:22, *24*
152:*13, 16*
179:*24* 191:*12,*
*16* 235:*13, 16*
236:*1* 265:*21, 25*
294:*12, 15* 303:5,
*8, 25* 304:*3*
**PAGE** 4:4 7:7
21:*17* 86:5
129:20 131:*12*
132:5 134:*11*
136:*3* 139:*11*
140:*12* 144:*10*
165:*24* 168:*24*
175:5, *19* 180:25
184:*15, 24*
189:*10, 18* 190:9,
*10, 14* 191:25
193:*17* 194:*13,*
*14* 195:*16, 17*
200:*14* 201:*14,*
*15* 204:*14* 205:2
206:8, *8* 212:22,
*25, 25* 218:2
219:8 221:*1*
222:25 224:*13*
227:6 229:*11*
235:6, *18, 20, 20*
237:*3* 261:6, *7,*
*10, 12, 20, 22*
262:8, *9, 11*
264:*15* 266:*4, 6,*
*9, 16* 271:20
272:7, *8* 275:6
280:*13, 14*
282:25
**pages** 261:*11*
**paid** 298:*13, 24*
**PANAKOS** 3:*3*
**PANNU** 1:*15*
2:*16* 4:*1* 8:*14*
9:*11, 20* 94:7, *11*
152:*24* 191:*11,*
*15* 249:*18, 25*

265:*20, 24*
303:*24* 305:*1, 12*
306:*11*
**P-A-N-N-U** 9:*20*
**paragraph** 131:*8*
166:6, *18* 167:2,
*9* 189:*10, 19*
190:2 193:25
196:2 199:*3, 7*
235:*23* 237:*12*
239:*1, 7, 11, 14*
266:6 267:*17*
271:2, *10* 273:*24,*
*25* 277:*11*
278:*12, 15* 279:*3,*
*15*
**paragraphs**
140:*21*
**parents** 29:*20*
**PARQ** 109:*21*
**part** 13:*15*
68:*17* 116:*16, 19*
120:22 188:22
195:5 210:6
213:*11* 217:5
267:*18* 277:*1*
**partially** 237:*6*
245:9 246:6
**participants**
226:*12*
**participate**
235:*24* 241:6
**participated**
145:*3* 241:*10, 16*
**participating**
90:*23* 148:*23*
149:*4*
**particular** 267:5
275:*18, 23* 276:8,
*10* 277:*12, 15*
**particularly**
74:*24*
**parties** 10:8
247:*3* 303:*18*
307:2, *5*
**partner** 37:*19*
**parts** 210:7
**party** 10:8, *10*
306:22, *24*
**pass** 121:*18*
**passed** 113:8
**passing** 192:22
237:*24*
**pause** 303:6

**pay** 134:*5, 8, 8*
243:*10, 23*
253:*24* 293:*1*
**payable** 39:*1*
84:*3, 4*
**payables** 288:*12,*
*14, 15* 289:*19*
293:*1, 4*
**payment** 293:*3*
**payments** 299:7
300:*12*
**payoffs** 171:*24*
**PDP** 1:8 2:8
**penalty** 305:2
**pending** 16:*23,*
*24* 229:25
**people** 30:*12*
41:*21* 42:7 66:*4,*
*7* 74:*14* 155:*23*
156:9 157:*12*
191:*23* 192:*23*
209:*14, 16* 215:8
249:*13, 24* 286:8
288:*23* 294:*2, 4*
**percent** 14:5
121:*12, 14*
**percentage** 121:7
**perception**
231:*21*
**performed** 15:*18*
207:6
**period** 47:*9*
48:*3, 20, 25*
72:*14, 18* 73:6
282:*1* 303:*17*
**perjury** 305:2
**Person** 4:8 18:*1*
20:*17, 19* 21:*15,*
*25* 23:8 46:*11,*
*15* 53:*16* 60:*3*
65:*16, 17* 68:7
69:*10, 15* 72:*23*
73:7 80:*4* 91:5
97:20 110:*15*
118:5 147:*16*
153:*18* 155:*20,*
*24* 156:2, *6, 8*
157:*11, 19, 21*
158:*18, 22* 159:9
165:7 171:*8, 12*
179:5 183:*21*
187:*15* 188:*13*
192:22 198:*3*
210:*20* 212:6
214:2 227:*15*

244:25 247:*13,*
*19, 21* 248:*4, 8,*
*17, 17, 23* 249:*4,*
*6, 8, 9, 18, 21, 25*
250:9 257:*21*
259:*16* 266:*21*
267:*4, 4* 277:*16*
287:2 290:*13*
293:*19, 24* 295:2
300:*16* 306:*10*
**personal** 14:*23*
35:*13* 50:*1*
53:*16, 17* 103:*10*
104:*18, 20, 22*
197:*3* 254:6
258:*24* 270:*13,*
*14* 291:*11*
293:*15*
**personality** 285:7
**personally** 38:*23*
52:*21* 53:7
54:*24* 55:*21*
58:7, *12, 18*
59:*12* 60:8
63:*10, 16, 19*
64:7, *13* 65:5, *19*
67:*1, 14* 69:8
70:*1, 7, 18* 71:9
72:*24* 74:*3* 75:7
76:5, *9, 24* 77:2
78:2, *16* 79:*1, 2,*
*7, 15, 18* 82:*3, 7,*
*13, 24* 86:*13, 19*
87:*14, 20, 23, 24*
90:2 91:*11, 22*
93:5, *14, 25* 94:*1,*
*16* 95:6, *17* 96:8
99:*11, 24* 100:25
101:*1, 7, 13*
102:25 103:*1*
104:9 105:9, *10*
109:*12* 111:*23*
113:*11* 121:2
125:*14, 15*
132:20 133:*18*
136:7 137:*11*
140:*18* 142:*15*
146:*13* 149:*17*
159:*20* 160:6
161:2, *24* 162:6
163:7 166:*20*
174:*13* 176:3
185:*23* 197:*10*
198:*1* 199:*13*
203:25 208:25

209:*1, 12* 211:*14,*
*17* 213:*19*
234:*15* 244:*21*
252:*16* 254:*24*
267:9 272:*23*
273:6, *9, 16, 17*
275:*15, 22* 276:*9,*
*12* 284:*14, 16, 17*
285:*11* 286:5, *6,*
*11* 289:*21* 290:*4,*
*20* 291:2 293:*14*
297:22, *25* 298:*7,*
*21* 300:*14*
302:*14*
**persons** 221:*20*
**perspective**
37:*24, 25*
**pertained** 51:*16*
**pertains** 45:*20*
51:*16* 61:*23*
63:9 64:*19*
76:22 87:*21*
112:*19* 167:*17*
287:*23* 289:*24*
290:*23* 299:*10*
**PETERSON**
3:*20* 8:*8, 10, 16*
**phone** 80:*1*
98:*17* 118:8
220:*19* 225:*13*
226:*14* 243:*16,*
*18* 251:*13, 15*
252:*10*
**physical** 28:*12,*
*14* 29:*4, 13, 16*
**physically** 25:22
**piece** 197:7
**Pilot** 177:*20*
**place** 55:22, *24*
105:*17* 116:*3*
251:*16, 18*
**placed** 238:*4*
**placement** 14:*11,*
*16, 17* 111:22
112:*16* 113:5, *8*
116:24 141:2
153:*10* 163:*4, 17,*
*25* 164:*19* 165:9,
*15, 25* 166:*10, 15*
168:*24* 175:20
194:*1* 195:*23*
196:*4* 197:*11, 22*
198:6 199:*3, 8*
200:*24* 235:25

Justin Pannu  10/29/2018

271:22  272:11,
24  273:18
**Plaintiff**  1:5  2:5
3:2  8:21, 23
10:18  13:8, 10,
12  16:1  129:24
131:14  163:1
207:23  212:18
218:3  221:1
**plaintiffs**  16:22
18:4
**Plan**  177:21, 22
254:19
**planning**  258:2,
12
**plants**  29:9
**play**  194:7
195:22  231:9
**plays**  96:12
127:6
**please**  8:18
9:18, 19  10:21
19:17  21:17
144:10  162:22
175:6  205:3
207:1  215:12
216:13  228:4
229:11  233:24
240:13  251:9
256:19  266:4
303:3
**pleasure**  190:3
**PLTF**  4:14, 16,
18, 21, 24  5:3, 9,
15, 17, 19, 20, 22,
23  6:3, 5, 14, 17,
18, 21  7:3, 5
**pockets**  292:12
293:4
**point**  19:24
23:18  25:2, 18
77:3  88:2, 6, 14
90:1  91:10
101:24  116:10
121:17  139:9
147:16  151:18
159:9  162:19
163:10, 21  169:9
175:19  196:10
197:12, 17
228:24  232:5
233:20  257:13
259:4  270:25
281:22, 25

282:16  286:11
295:22
**points**  192:4, 17
**points,**  192:2
**pool**  146:4
**Pooled**  135:11,
12  234:3
**populate**  204:18
**populated**  99:7
**Portfolio**  27:21
28:10
**portion**  27:4
48:2  193:1
218:25
**portions**  205:15
**portrayed**  54:8
**positions**  28:20
**possible**  156:18
157:10  185:25
216:17  224:1
**Possibly**  169:11
242:17
**post-college**
25:10
**potential**  55:22,
23  57:1, 24  73:4
117:10  127:4, 5
171:24  183:8
198:24  217:3
221:22  227:9, 14
240:24, 25
242:18  243:9
264:21  265:12
**potentially**  57:4
**power**  25:12, 22,
23  26:7, 8  28:7,
11, 12, 14, 20
29:1, 5, 9
**Powerex**  25:11,
16  26:2
**PPM**  111:4
162:16  163:20
174:18  264:24
**practice**  48:12
**preceding**  151:9
**precipitated**
283:1
**precise**  71:4
98:5  133:25
239:4
**preclude**  222:22
227:1
**precondition**
228:25
**Preliminary**  5:5

**preparation**
116:13  151:11
206:4
**prepare**  150:8
256:5
**prepared**  223:3,
3, 20  250:19
**present**  110:7
**presentation**
53:10  148:20
151:25  152:3
**presented**
145:18  151:25
165:10
**presenting**  149:8
**president**  27:23
**pressure**  70:3
**pretty**  18:17
45:7
**preventing**
230:19
**previous**  71:1
228:9  232:25
**previously**  38:12
231:19
**price**  130:7
131:4  198:7
208:14
**printed**  116:21
**prior**  14:20
50:24  51:4
83:17  91:10, 18,
19, 21  92:7, 10,
11, 12, 15  93:7,
11, 18  108:9, 13
112:12  115:25
116:1, 22  119:3
120:14, 23
121:17  123:17
124:7, 16  125:9,
10, 17, 19, 21, 23
130:10  132:16
133:2, 12  134:3
135:25  136:1
138:16  141:22
142:20  153:17
161:16, 19  162:4
163:18  174:1
179:24  180:10
185:4  186:8
189:6  190:7
200:7, 12  203:3
208:20, 22
213:14  214:3
223:10  234:1

239:16  261:10,
11  272:25
273:19  286:25
291:18  297:17,
19  300:25  301:4,
8, 10, 15  302:6, 9
**Privacy**  267:12
**private**  14:11, 15,
17  111:22
112:16  113:5, 8
116:24  141:2
153:10  163:4, 16,
24  164:18  165:9,
15, 25  166:15
168:24  175:20
195:22  196:4
197:11, 22  198:5
199:3, 8  200:24
235:24  271:22
272:11, 24
273:18
**privilege**  182:7
185:12  290:11
292:7, 16, 17
293:17
**privileged**  36:25
182:18, 20  263:3,
5
**Pro**  3:13  6:6
86:23, 25  87:12,
13  88:2, 5  92:20
93:10, 11, 13
136:25, 25  137:1,
25  172:20, 24
188:11  189:3
195:4, 11  198:13
231:10, 17, 18, 22
232:21  233:1, 7,
12, 14, 15  234:9
**probability**
172:9, 10  173:4
**probable**  118:7
**probably**  41:9
58:10  62:21
95:3  110:24
111:4  118:11
132:18  134:5
139:15  142:18
150:20  153:20
157:20  158:15
159:23  169:7
187:17  197:17,
18  204:5  205:13
209:14  238:13,
25  240:4  241:8

246:1  247:10, 25
257:5
**probe**  82:9
**problem**  78:20
**procedure**
303:10
**proceed**  249:15
**proceeding**  16:25
**proceedings**
303:6
**Proceeds**  134:13
136:4  138:12
139:7  141:2
175:7, 15  176:14
195:22  291:10,
17
**Proceeds,**  134:25
**process**  20:5
68:18  69:4, 12
91:2, 6, 16  97:11
98:12  99:21
147:10  186:20
220:1  295:7
**procure**  57:2
**Procurement**
135:9
**produce**  29:12
128:14  178:22
**produced**  103:20
116:15  127:10
128:1, 8, 10
178:20
**product**  64:20
76:23  101:22
103:6  287:24
289:25  290:25
298:17  299:12
300:10
**Production**  234:3
**productions**
29:10

**PROFESSIONAL**
1:19  88:13
**profit**  55:22, 23
57:23  127:4, 5
221:22
**program**  30:8, 21
**progress-to-date**
283:2
**Project**  5:12
6:11, 23  177:19,
20  184:20  195:2
207:24

Justin Pannu  10/29/2018

**projections** 88:*5, 13*
**projects** 37:*13*
**promissory** 254:*20* 256:*5, 23*
**pronounce** 50:*7*
**proof** 61:*25* 62:*4* 76:*10* 79:*16, 23*
**properly** 146:*8* 251:*1*
**properties** 33:*22*
**property** 35:*12, 16* 145:*23*
**proposed** 173:*23*
**proprietary** 82:*6* 127:*8*
**prospect** 53:*21*
**proved** 76:*6*
**provide** 11:*8* 19:*12* 20:*7* 21:*23* 51:*22* 117:*5* 124:*6* 166:*8* 194:*21* 195:*3* 213:*8* 244:*2* 249:*12, 14, 23* 252:*22* 253:*5*
**Provided** 3:*19* 5:*16* 52:*6* 63:*5, 17* 92:*3* 116:*22* 180:*12* 185:*1* 186:*21* 193:*3* 205:*4, 19, 20* 207:*2, 9, 10* 210:*23* 212:*20* 215:*10* 269:*19*
**provider** 26:*7*
**provides** 208:*13, 16*
**providing** 19:*1* 123:*5* 177:*12* 198:*23* 206:*24* 207:*14* 219:*17* 252:*15*
**public** 25:*13* 28:*15* 35:*22*
**purchase** 12:*10, 11, 15* 33:*15, 16, 18, 19* 135:*2* 153:*5* 154:*16* 156:*24* 175:*15* 176:*15* 198:*16* 207:*11* 208:*17*
**purchased** 26:*23*

33:*23* 135:*18*
**purchaser** 196:*25*
**purchases** 196:*3*
**purchasing** 33:*10, 12, 13*
**purely** 110:*1*
**purports** 123:*4*
**purpose** 21:*11* 28:*20* 33:*13* 39:*9* 40:*18* 46:*9* 80:*15* 81:*22* 112:*5* 156:*13, 24* 167:*4* 227:*9* 303:*19*
**purposes** 51:*10* 55:*17* 57:*19* 79:*17* 82:*19* 86:*10* 153:*4* 154:*11*
**pursuant** 306:*19*
**pursue** 88:*11*
**put** 36:*13* 57:*5* 113:*20, 22* 115:*1, 18* 120:*3* 200:*1* 249:*17* 251:*3*
**putting** 119:*24*

< Q >
**qualified** 140:*22* 306:*6*
**Queen's** 24:*21*
**Queenswood** 33:*4, 5*
**queries** 90:*7*
**question** 17:*15, 21* 18:*20* 19:*16, 20* 24:*2* 25:*17* 51:*19* 54:*20* 59:*24* 62:*19* 68:*2* 76:*8* 81:*5* 100:*18* 101:*5* 102:*8, 18* 103:*8* 120:*21* 133:*2, 24* 138:*20* 148:*14, 16* 149:*11, 21, 22* 164:*12* 170:*19, 22* 173:*8, 9* 190:*12* 192:*11* 193:*6* 196:*14* 198:*1, 19, 20* 201:*5, 7, 13, 25* 205:*2, 18* 210:*14* 216:*13* 218:*7, 10, 11* 220:*6* 223:*14, 14* 243:*25*

246:*24* 248:*11, 14, 24* 269:*23* 270:*18* 271:*7* 279:*24* 281:*4* 285:*17* 287:*10, 15* 289:*12* 290:*1* 292:*4, 15* 297:*6* 299:*16, 25*
**questioning** 146:*25* 150:*18*
**QUESTIONS** 7:*6* 14:*22* 18:*18* 19:*8* 44:*6* 45:*20* 53:*22* 59:*18* 60:*14* 61:*17* 80:*3* 102:*13* 134:*7* 136:*8* 144:*11* 145:*16* 146:*17, 18* 148:*5, 9, 11, 12* 149:*17, 23* 158:*10, 20, 24* 186:*25* 187:*4* 192:*5, 9, 20, 22* 194:*16* 197:*21, 22* 200:*23* 201:*8* 204:*21, 23* 205:*16* 206:*21* 207:*13* 208:*20* 214:*19* 218:*12, 21* 219:*7, 11* 220:*16, 17* 248:*16* 270:*5* 283:*8, 11* 294:*21* 295:*11, 12* 302:*23*
**quickly** 127:*10* 194:*17* 293:*8* 294:*16*
**quite** 10:*5* 17:*21* 40:*7, 11* 82:*8*
**quote** 86:*6, 6* 137:*17* 138:*5, 6* 141:*2, 14, 14* 196:*3* 233:*23* 267:*18*

< R >
**R1** 219:*7*
**raise** 71:*18* 72:*2* 193:*7* 196:*7*
**raised** 71:*14*
**raising** 54:*2*
**range** 234:*5*

**rate** 172:*14* 173:*11*
**rates** 29:*9*
**reach** 217:*11*
**reached** 255:*8*
**reaching** 217:*7*
**read** 57:*10* 123:*20* 129:*9* 134:*15* 136:*1* 140:*13* 142:*19, 20* 154:*3* 162:*15, 18* 163:*6, 10* 165:*21* 167:*19* 169:*3, 9* 174:*1* 175:*9, 19* 192:*18* 218:*9* 234:*11* 237:*15* 248:*11* 261:*25* 262:*4, 13, 21* 263:*10, 17* 265:*1, 5, 7, 8* 268:*8* 271:*22* 272:*3, 9, 21, 23* 273:*4, 9, 12, 17* 286:*24* 305:*4*
**reading** 140:*17* 141:*10* 174:*5* 176:*2, 19* 182:*22* 263:*20* 277:*9* 279:*7, 25* 280:*1*
**reads** 141:*1*
**real** 31:*17, 24* 33:*8, 9, 10* 35:*9*
**realistic** 88:*2, 5, 14*
**realize** 54:*5* 106:*2*
**realized** 221:*22*
**really** 34:*20* 49:*18* 54:*19* 62:*15* 65:*4* 123:*16* 183:*12* 231:*10, 13* 250:*4*
**REALTIME** 1:*20*
**reask** 223:*14*
**reason** 15:*9* 46:*4* 52:*21* 61:*2* 70:*14* 81:*11* 82:*20* 156:*12* 176:*22, 25* 178:*1* 180:*2* 181:*24* 182:*2* 183:*7, 15* 208:*19* 215:*17* 216:*25* 258:*23* 267:*7*

**reasonable** 88:*17* 254:*6*
**reasonably** 239:*18*
**reasons** 292:*9*
**recall** 106:*18, 20* 117:*13, 14, 15* 126:*20* 151:*20* 153:*15* 159:*25* 189:*8* 217:*7* 220:*22* 222:*9, 12* 226:*17* 229:*23* 230:*18* 238:*9* 246:*9, 10* 257:*5, 16, 19* 258:*23* 259:*7, 12* 260:*10* 284:*5*
**receivable** 91:*22*
**receivables** 92:*2*
**receive** 87:*6, 12* 88:*9* 92:*24* 93:*5, 6, 19* 94:*1* 112:*15, 22* 120:*2* 136:*18* 178:*1* 179:*6* 180:*18* 203:*1* 235:*25* 270:*5* 271:*15*
**received** 87:*13* 93:*7, 11, 14* 111:*4* 127:*15* 128:*12, 17* 129:*2, 25* 131:*17* 132:*19* 134:*15* 136:*23* 139:*13* 140:*14* 142:*5, 7* 159:*18* 165:*19* 177:*25* 178:*4, 7* 180:*4* 186:*1* 194:*10* 199:*24* 202:*2* 234:*12* 271:*21* 272:*9* 284:*6* 286:*12*
**receiving** 112:*5* 120:*14* 125:*6* 153:*15* 168:*21* 179:*9* 206:*22* 207:*12* 283:*4*
**recess** 59:*5* 94:*9* 105:*21* 152:*14* 191:*13* 235:*14* 265:*22* 294:*13*
**recipient** 115:*22*
**recitation** 255:*8*
**Recognition** 205:*11, 13*

Justin Pannu  10/29/2018

recollection
151:*11*  153:22
208:*18*  237:*17*
257:*25*  283:*4*
287:*1*
**recommendation**
48:*7*
**record**  8:5  9:*19*
18:22  21:*4, 14*
22:6  53:*3*  59:*3,*
*6*  63:*15*  70:*25*
94:5, *8, 12*
105:*13, 19, 23*
108:6  118:*16*
152:*12, 15*  175:*9*
191:*12, 16*
235:*11, 12, 15*
248:*14*  249:*17*
250:*14*  260:*21*
265:*17, 21, 25*
294:*10, 11, 14, 16,*
*23*  295:*4*  303:*3,*
*4, 7, 12*  304:*1*
306:*17*
**records**  89:*18*
90:*3*  178:*20, 22*
207:*7*  295:22
**redeveloped**
33:*21*
**reduced**  172:*8, 9,*
*10*  173:*3, 4, 12,*
*15*  306:*15*
**refer**  224:*13*
289:*12*
**reference**  131:*8*
139:6  261:22
**referenced**
206:*10*
**referencing**
131:8
**referred**  231:*20*
**referring**  50:*12*
194:*23*  201:*23*
218:*21*  222:5
225:*24*  226:*3*
231:*12, 14, 19, 20*
256:*23*  257:*10*
285:22
**refers**  116:2
220:*19*
**refine**  61:6  86:2
**refined**  78:*19*
**reflect**  285:*10*
286:*3*
**reflects**  181:*4*

**refresh**  151:*10*
153:*21*  221:7
237:*17*
**refusal**  12:5
**regarding**  77:25
101:*21*  135:*10*
224:*19*  226:*8*
297:6
**REGISTERED**
1:*19, 20*
**registry**  49:22
**regular**  44:*18,*
*21*  45:5  118:5
**rehab**  33:*16, 16,*
*18*
**rehabs**  31:*25*
32:*10*  33:*13*
37:*12*
**rejected**  230:*12*
**relate**  38:9
**related**  18:7
36:*15, 19*  51:*13*
61:*18*  63:6, *18*
66:20  67:6  68:8
69:*14*  86:8
102:9  107:7
112:*16*  121:*19*
125:*4*  130:*12*
145:9, *24*  147:*10*
153:*12*  159:*13*
192:3, 5  203:22
206:22  211:9, *15,*
*21*  214:*19*
221:*12, 15, 19, 24*
222:2, *13*  223:*17*
225:3, *5, 14, 25*
226:*24*  228:*21*
238:7  242:7, *18*
248:5  296:8, *21*
297:3, *16*  307:*1*
**relates**  71:6
**relating**  220:*18*
**relationship**
14:*23*  52:5
53:*16, 18*  55:*11*
62:6, *15*  63:*21*
67:*24*  88:*18, 19*
270:*13, 15*
**relationships**
96:*12*  173:5, *6*
254:6
**relative**  307:*4*
**Relevance**  119:*11*
**Relevancy**  34:2
36:*25*  267:*11*

**relevant**  199:7
216:*24*  259:*24,*
*25*
**reliance**  247:*25*
263:22
**relied**  48:*3*
60:25  61:2, *7*
78:*23, 25*  79:*10*
82:*4*  96:*6, 8, 10,*
*13*  135:*24*
157:*25*  161:*24*
163:22  164:*19,*
*21*  237:*23*  240:2
247:8  262:5, *16*
263:*15*  264:8
265:6  272:*20*
273:*3*  276:*20*
277:5, *6, 14*
278:5  280:*20*
**rely**  24:9  61:8
76:*15*  135:*23*
164:*4*  240:5
263:*11, 20*
**relying**  162:8
278:*17*  279:9
280:*24*  281:8
**remember**  10:2
12:*20, 20, 21*
14:7  16:*1, 9, 18*
26:*11*  30:22
32:*11, 20*  35:2
36:*4, 9*  40:*15, 15*
41:*16*  42:*17*
43:9, *18*  47:*17*
48:*18*  50:22
56:6  57:2  58:7,
*11, 19*  60:*10*
61:*21*  65:*21*
66:*11*  67:8, *13,*
*17*  71:*21, 23, 25*
72:*1, 21*  73:5
74:*24*  75:*3, 5, 8,*
*19, 24*  77:*20*
78:*3, 7*  97:*12, 22,*
*22*  98:*13, 15, 18,*
*25*  99:*1*  106:*15*
107:*12*  108:*11,*
*25*  109:*10, 16*
110:*17*  112:*14,*
*23*  116:*17, 18*
117:*19*  118:*1, 17,*
*22*  119:*17, 23*
120:*9, 10*  121:5,
*15*  122:*12, 19*
125:6, *18, 22*

126:7, *12, 17*
127:*20*  129:*4, 7*
131:2, *3, 16, 19*
133:*21*  134:*17*
137:*21*  140:*17*
141:*10*  144:23,
*25*  145:2, *13, 17,*
*25*  146:2, *19*
148:*10, 12, 22, 25*
149:5, *8, 13, 18*
150:5, *20, 22*
151:*15*  153:*16,*
*22, 24*  155:*10*
156:*11*  159:2
162:*17*  168:*11*
172:*19*  174:5
175:*23*  176:2, *4,*
*6, 19*  179:9
182:9  183:*12, 22,*
*23*  185:*20*
195:*14*  196:22
201:2  203:*25*
207:*18*  208:5, *8*
211:6, *12*  214:*14*
215:22  216:*20,*
*20, 21*  217:*10, 13,*
*14, 17*  220:9
221:*11, 18, 24*
222:*4, 18*  223:21
224:*21, 24*  225:2,
*5, 9, 11*  226:7, *13,*
*16, 21*  228:*14, 24*
229:*3, 20*  230:*4,*
*7, 13, 23*  232:*14*
236:7, 22  237:22
239:*24*  240:*21*
241:2, *14, 17, 18,*
*20, 22, 24, 25*
242:2, *25*  243:*1,*
*5, 20*  245:*14, 15*
251:*15, 18, 19, 20,*
*25*  252:5, *7, 11,*
*24*  253:2, *10*
256:2, *11*  258:5,
*8, 11, 21*  260:6, *7*
273:22  285:*25*
290:9  295:*15*
297:*4, 14, 18*
302:2
**remembering**
226:5
**remind**  134:*21*
**reminded**  294:*17*
**reminds**  134:*20*

**rent**  33:*17*
**reopen**  128:*16*
**rep**  149:*21*
**repeat**  23:2
100:*18*  289:*14*
**rephrase**  19:*18*
23:*1*
**report**  27:*23*
28:*1*
**REPORTED**
1:*19*
**REPORTER**
1:*19, 20, 20*  2:22
8:9  9:5  20:6
160:*23*  260:*18*
303:*11*
**REPORTING**
3:*20*  8:8, *10, 17*
**reports**  27:25
**represent**  8:*19*
15:7  268:*20*
**representation**
53:9  64:7, *12, 15*
65:*1, 7, 14, 15, 18,*
*25*  66:*16*  69:25
71:7  74:*18, 22*
75:*7, 10*  76:*1, 15,*
*19*  77:13  78:*1, 8,*
*10*  80:*10*  81:*15*
82:*3, 16, 17*  83:5
84:7  89:*16, 24*
94:*21, 25*  95:6, *8*
96:*4, 19*  97:*4, 5,*
*9, 20, 23*  98:*3, 6,*
*24*  99:*12*  232:*3*
237:*8*  278:*3, 18*
279:*10*  281:*16,*
*18*  289:*15*
**representations**
21:5  22:5, *6*
52:25  53:*1, 6, 7*
54:22  55:*3*  58:9
59:*10*  65:*3*
68:*25*  69:2  71:5
80:*24*  81:8, *12*
94:*15*  98:*16*
99:2  105:*8, 11*
127:*13*  173:*3*
264:*4, 9, 13*
266:7, *14*  267:*19*
268:*10*  269:*16*
270:*12*  276:*20*
277:6  278:5
280:*17, 18, 23, 24*

Justin Pannu  10/29/2018

281:2, *8, 11*
288:*25*
**representations,**
267:*16*
**representative**
64:*14, 23*  79:*9*
149:*22*  155:*19*
244:*25*  255:*18*
279:*19*  280:*2*
284:*14*
**representatives**
270:*3, 7*  276:*25*
278:*20*  279:*12*
**represented**  16:*3*
53:*20, 25*  55:*12,*
*15, 18, 21, 25*
56:*1, 5, 9, 13, 17*
57:*6, 16, 20, 23*
58:*1, 7, 18*  59:*14*
69:*22*  74:*19*
77:*9, 21*  78:*18*
83:*3*  127:*5*
165:*16*  170:*8*
284:*7*  288:*7*
292:*24*
**representing**  9:*8*
278:*4, 7*
**represents**
193:*15*  262:*12*
**request**  86:*14*
99:*11*  139:*25*
184:*10, 12*
195:*18*  250:*18*
**requested**  88:*10*
92:*15*  93:*25*
200:*8*  250:*1*
271:*4*  306:*21, 23*
**requesting**
187:*21*
**requests**  200:*16*
**require**  43:*13,*
*14*  160:*3*
**required**  82:*5*
142:*16*  179:*23*
247:*23*  252:*22*
**requirement**
42:*12, 15, 17, 19*
**requirements**
175:*12*
**requires**  250:*8*
**research**  295:*17*
296:*20, 25, 25*
297:*11, 15*
**reserve**  128:*15*

**residence**  35:*13,*
*14*  43:*20*
**resolution**
229:*25*  246:*19*
**resolve**  11:*16*
12:*17*  16:*20*
223:*11*  229:*12*
**resolved**  39:*4*
222:*13, 15*  223:*1,*
*9, 18*
**respect**  86:*5*
113:*4*  120:*22*
278:*16*  279:*8*
**respective**  204:*18*
**respects**  52:*7*
**respond**  204:*20*
**responded**
194:*14*
**responding**
139:*24*  190:*16*
**response**  160:*8*
193:*13*  195:*17*
202:*2*  205:*16*
206:*2*  207:*5*
228:*2, 20*  248:*12*
271:*16*  283:*16,*
*25*  285:*5*
**responses**  112:*19*
193:*3*  219:*1*
**responsible**
209:*25*  267:*5*
**rest**  36:*13*
48:*12*  49:*13*
119:*24*  166:*18*
**restate**  216:*12*
**Restated**  5:*17*
6:*8*  116:*25*
212:*21*  228:*22*
235:*3*  239:*17*
**restating**  238:*23*
**restaurant**
126:*13*
**restroom**  235:*9*
**result**  195:*2*
**results**  103:*20*
127:*11*
**resume**  294:*25*
**retail**  27:*4, 4, 6*
**retain**  51:*10*
143:*24*
**retained**  51:*3, 6,*
*9*  274:*1, 10*
**retrieving**  158:*9*

**return**  172:*15*
173:*11*  243:*11*
303:*16*
**revenue**  14:*6*
**REVIEW**  1:*10*
2:*10, 18*  3:*7*  9:*1*
20:*8*  129:*1*
134:*18*  150:*21*
159:*19*  160:*4, 5,*
*9*  169:*18*  175:*1,*
*24*  178:*5*  180:*3*
181:*6*  205:*4, 8, 9,*
*11, 12, 20*  206:*3,*
*4, 6, 22*  208:*12,*
*13*  209:*1, 11, 24*
210:*22*  211:*3, 10,*
*16, 22*  213:*7, 9,*
*16*  214:*4*  215:*11*
246:*18*  247:*2*
297:*3, 5, 12, 21*
298:*4, 12, 14*
301:*11*  303:*15*
**reviewed**  130:*15*
141:*11*  151:*12,*
*12, 14, 16, 17, 23*
159:*23, 25*
160:*11, 14, 16*
161:*3, 19*  162:*3*
182:*24*  209:*7, 12,*
*14, 15, 16, 20*
210:*10*
**reviewing**  129:*4,*
*7*  169:*17*
**revised**  180:*22*
181:*4*
**revision**  4:*24*
179:*21*  180:*2*
181:*8*  238:*17*
**revisions**  182:*15*
183:*8*  186:*2, 9*
225:*3*  226:*9*
228:*22*  247:*14*
**REZ**  3:*7*
**Rich**  50:*6*
111:*12*  229:*11*
235:*22*  250:*18*
**Richard**  219:*7,*
*10*
**Rich's**  224:*16*
**right**  12:*4*
15:*24*  18:*17*
23:*7*  31:*13*
34:*19*  35:*21*
37:*6*  45:*24*  49:*8*
52:*13*  54:*13*

56:*9*  59:*25*
61:*18*  62:*10*
68:*19*  69:*3*
84:*13*  94:*17*
105:*16*  106:*2*
122:*21*  128:*16*
130:*3*  133:*4*
136:*12*  142:*3, 19*
151:*21*  152:*6, 18*
154:*12, 24*
161:*10*  163:*14,*
*15*  165:*1, 10, 20*
166:*9*  168:*13, 16,*
*18*  169:*23*
172:*12*  179:*20*
180:*4, 19*  187:*12,*
*13*  191:*19*  193:*9*
196:*11, 18*  197:*1,*
*2*  199:*1, 4*  201:*6,*
*13*  202:*2*  221:*6*
224:*6*  233:*2*
234:*10*  235:*10,*
*19*  244:*9*  245:*20*
252:*23*  253:*1*
254:*9*  261:*19*
282:*1, 3, 6*
283:*25*  285:*15*
297:*9, 10*  302:*25*
**rights**  294:*25*
**ring**  176:*8*
**Risk**  168:*25*
169:*4, 9*  172:*5, 7*
173:*4, 4, 12, 15,*
*17, 20, 21*
**risks**  174:*18*
264:*20*  265:*12*
275:*10*  276:*5, 16*
**risky**  171:*21*
**RMR**  2:*23*
306:*6*  307:*11*
**Robert**  177:*7*
**role**  51:*7*
**room**  97:*16*
99:*3, 7*  102:*23*
103:*2, 15, 18*
151:*13, 13, 24*
184:*6*  202:*5*
203:*4, 13*  208:*5,*
*7, 9*  210:*2, 10*
212:*17*  213:*15*
295:*10*
**rooms**  190:*23*
200:*2*  203:*22*
204:*19*  209:*8, 9,*
*21*

**ROVER**  1:*10*
2:*9*  5:*16*  6:*9*
53:*11*  55:*7*
56:*10, 12*  58:*14*
59:*15*  60:*9, 18*
61:*19*  62:*1*  63:*6,*
*19, 25*  64:*8, 16*
65:*2*  80:*19*  86:*3*
93:*15*  96:*21*
97:*6, 18*  100:*24*
101:*8, 18*  102:*24*
103:*20*  104:*6, 21*
126:*23*  135:*7*
144:*6, 13*  145:*11,*
*12, 14*  147:*11, 21,*
*23*  149:*23*
151:*25*  153:*12*
169:*14, 22, 25*
170:*5, 25*  171:*10*
174:*15*  177:*21,*
*22*  184:*11, 21*
187:*9, 23*  188:*15*
193:*16*  195:*3, 4*
200:*1*  207:*8*
212:*19, 23*  213:*5*
224:*19*  225:*4*
226:*24*  228:*23*
229:*1*  230:*17*
231:*15*  235:*4*
237:*11*  238:*7, 17*
239:*18*  247:*4*
255:*2*  281:*22*
282:*16*  295:*18,*
*25*  296:*11*
**RPR**  2:*23*  306:*6*
307:*11*
**rule**  22:*11*
306:*20*
**rung**  176:*11*
**running**  193:*8*
279:*3*
**rush**  250:*22*
**rushed**  236:*12,*
*17*
**Rutland**  3:*14*

< S >
**SADOCK**  3:*3*
8:*20, 20*  15:*13*
17:*5*  22:*22, 25*
34:*2*  36:*24*  38:*1,*
*19*  39:*24*  42:*14*
43:*5*  44:*4, 8, 9,*
*14, 20*  45:*15, 19*
46:*6, 19*  48:*15*

49:2, *14*  50:6, *11,*
*15, 16*  51:*15, 24*
52:8, *12, 22*
56:20  57:9, *12*
61:*12, 22*  63:8
64:2, *17*  66:21
67:16  68:*3, 11*
69:16  70:*10, 19,*
*25*  71:*11, 19*
73:19  75:12
76:21  78:12
79:4, *11*  80:12
81:*1*  82:22
84:*21*  86:*11*
87:9, *21*  88:24
89:9, *20*  91:*13*
92:17  93:*1, 12,*
*20, 23*  95:*10, 23*
96:23  97:*3*
98:*19*  99:22
100:5  101:2, *10,*
*20*  102:*5, 12, 17*
103:*3, 23*  104:2,
*7, 10, 13, 24*
107:*19*  108:2, *5,*
*16, 23*  109:*13*
110:*21*  111:9, *16*
112:*10, 11, 15, 18,*
*24*  113:24
114:*12*  116:7
117:7, *17, 25*
118:9  119:*10, 15,*
*18, 21*  120:7, *16,*
*24*  121:*21*  122:*3*
123:9, *14*  124:*8,*
*10*  125:*11*
128:*13*  130:*14,*
*25*  132:*3, 11*
133:7, *15, 19*
135:*21*  136:9, *21*
137:*9, 19*  138:*7,*
*18*  139:*14*  140:*4,*
*15*  141:*15, 24*
142:*9*  143:*16*
145:*4*  146:*23*
149:*1, 14, 24*
150:*14*  152:8, *10*
153:*23*  154:*5, 18*
155:*2, 4*  156:*4,*
*15*  157:*1, 15*
158:5  160:*15, 18,*
*25*  161:22
162:*11*  163:8, *18*
164:7  165:2, *11,*
*22*  166:*17*

167:16  168:*4*
169:*5, 24*  170:*12,*
*22*  171:2  172:*16,*
*25*  174:*3, 10, 22*
175:*21*  176:5, *17*
178:*13, 18*  179:7
180:6, *13*  181:*10,*
*17, 21*  182:5, *17,*
*23*  183:*3, 10, 17*
185:*13, 18*  186:5,
*23*  187:25
188:*16*  189:*14,*
*22*  193:*21*
195:*12*  196:*12,*
*19*  197:*14, 16, 24*
198:9, *17*  199:*10*
200:*4, 12, 25*
201:22  202:7, *14*
203:*8, 23*  204:6
205:24  207:16
208:22  209:*10,*
*22*  210:*15*  211:*4,*
*11, 23*  212:*1, 9*
213:*17, 23*  214:6,
*11, 20, 24*  215:20
216:*1, 10*  217:24
219:*2, 13, 19*
220:*2, 23*  221:*13*
222:7, *16*  223:5,
*10*  224:*2, 23*
225:8, *18, 20*
226:19  227:*2, 20*
228:*12*  229:*4, 7,*
*18*  230:*2, 21*
231:*23*  232:*1, 10*
233:8, *17*  234:*13*
236:5, *13*  237:20
238:*10, 19*  240:8
241:*12*  242:8, *15,*
*23*  244:5, *10, 19*
245:*19, 22*
246:*21*  247:6, *17*
248:9, *24*  249:*16*
252:*3*  253:*17, 25*
255:*10*  256:*1, 8,*
*24*  257:*17*  258:*3,*
*16*  259:8, *18, 25*
260:*17*  262:*2, 23*
263:*13, 21*  264:6
265:*3, 14*  266:25
267:*11*  268:*3*
269:*5, 13*  270:22
271:*11*  272:*18*
273:*1, 10, 20*
274:*4, 14*  275:25

277:*3, 22*  278:8,
*24*  279:*21*  280:*4*
281:*1, 10, 23*
284:8  285:*13, 21*
287:7, *22*  288:*17*
289:*3, 9, 23*
290:6, *22*  291:6,
*12, 19*  292:*2, 13,*
*21*  293:*5, 21*
294:*5, 16*  295:*13*
296:*2, 15, 22*
297:*23*  298:*5, 15,*
*25*  299:*9, 18*
300:*1, 18, 21*
301:*3, 12, 18, 25*
302:*12, 18, 24*
303:*1, 20*
**Sadock's**  113:*3*
**sale**  12:*16*
**sales**  28:8, *10*
234:5
**SAN**  1:*16*  2:*21*
3:5, *10, 21*  8:*1,*
*11*  26:25  27:7,
*12*  35:*12, 14*
53:*19*  55:5
59:*17*  60:*3*  62:8
65:*15*  94:23
97:*11, 13*  98:9,
*10*  106:6, *7*
110:*16*  121:*18*
122:9  125:25
190:*4*  306:*3, 9*
**Santa**  26:5
**satisfaction**  81:2
**satisfactory**
270:5
**satisfied**  80:9
81:7  87:*19*
270:*14*  271:*16*
**satisfy**  80:*23*
95:*18*
**saw**  99:*10*
102:*23*  103:2
104:5  130:7, *9*
132:25  295:*11*
**saying**  70:*4*
121:*13*  129:*10*
136:*24*  149:*20,*
*23*  190:*17*
195:*21*  199:*3*
204:*17*  237:5
280:*14*
**says**  38:*23*
96:*11*  134:*12, 25*

135:4  136:4
144:*10, 16*  153:*1*
156:22  157:8
159:*11*  166:25
167:*4*  168:*14*
173:*18*  175:6
182:*12*  183:2, *4*
184:*18*  189:*11*
192:*16*  196:*3*
200:*3*  201:22
203:*14*  205:*3*
206:7  207:5
213:5  215:*12*
217:5  218:6
221:*3*  224:*16*
228:*3*  229:*11*
235:*23*  239:7, *14*
245:*10*  250:*17*
251:8  252:*12*
255:*13, 13, 14, 14*
256:*4, 18*  261:*1*
262:*12*  263:*24,*
*24*  264:*19*
267:*18*  268:8, 9,
*17*  269:*8*  270:2
271:*3, 20*  272:5,
*14*  273:25  275:6
276:*15*  278:*15*
283:*17, 21*  284:*1*
285:*3, 5, 15*
**Schedule**  5:*12*
26:7  207:*24*
208:*11*  212:*23*
260:*23*
**scheduling**  25:*16*
26:6  27:*16*
**scheduling,**  25:*19*
**Scott**  33:2
**scribe**  158:*19*
159:9
**scroll**  162:*21*
163:*1*
**se**  3:*13*  127:2
**SEC**  43:8
**second**  31:7, *8*
89:5  141:*1*
167:25  168:9, *21*
189:*10, 18*
190:*14*  191:25
195:5  200:*14*
212:22, *25*  217:5
218:2  231:7
239:*11*  264:*15*
**second-to-last**
166:5

**section**  21:*18*
134:25  168:25
169:*4*  174:9
187:*21*  190:*14*
198:*16*  237:*12*
252:*12*  266:5, *17*
278:2  280:*13*
**secured**  242:*11*
252:*16*
**securities**  25:2,
*13*
**see**  21:*19, 21*
61:25  67:6  70:*4*
74:*1*  117:2, *4*
118:*4*  121:*13*
128:*24*  130:*4, 20,*
*24*  131:7, *10*
132:*1*  134:*5, 12,*
*20, 24*  135:*14, 15,*
*25*  139:25  140:9,
*24*  143:7  144:7,
*14, 14, 18*  153:6,
*13*  166:*12, 24, 25*
167:9  169:*1*
173:*14, 24, 25*
175:*17*  177:*10,*
*15, 23*  179:25
182:*16, 19*  183:2
184:7, *13, 22*
189:*20*  190:2, *20*
193:*20, 23*  194:8,
*9*  195:*19, 20, 25*
196:*1, 9, 21*
199:2, *5*  203:*19,*
*20*  205:5, *22*
206:7, 9, *16, 17*
207:*3*  208:*1, 9*
213:*3, 4, 12, 13*
215:*15, 16*  218:8,
*11, 14*  222:*21*
227:*11, 16*  229:6,
*10*  232:23  233:5,
*10*  234:*10*  235:7
237:*13, 14*  239:9,
*10, 11, 20*  256:20,
*21*  257:4, *6*
261:*4, 5*  262:*11,*
*17*  264:*17*  266:8,
*11*  267:24, *25*
278:21  283:*1, 11,*
*18, 23, 24*  285:4
**seeing**  67:8
116:*17*  131:3, *16*
208:5, *8*  213:*14*

Justin Pannu  10/29/2018

297:*4*
**seek**  188:*14*
**seeking**  140:22
  166:7  198:6
**seen**  21:*12*  77:*4*
  102:25  115:*23*
  123:2, *17*  149:7
  168:*1*  222:*3*
  282:*11*
**sees**  182:*21*
**sell**  28:8  33:*16*,
  *19*  198:6
**selling**  146:9, *10*
**Sempra**  26:*17*,
  *19*  27:5, *9*
**send**  158:*24*
  192:*12*  228:*4*
  303:*12*
**sending**  125:*3*
  158:*10*  186:8
**senior**  27:*24*
**senior-level**
  27:*22*
**sense**  19:*22*
  52:6  73:*16*  74:6,
  *8*  88:*12*  103:*19*
  137:*1*  162:*16*
  171:*21*  223:*23*
  250:*4*, *21*, *23*
  252:*21*
**sensitivity**  236:*4*
**sent**  108:*13*
  109:*21*  124:5
  143:20  144:*15*
  153:*17*  168:2, *6*,
  *10*, *18*  186:*13*, *15*,
  *16*  192:*19*
  200:*16*, *23*  201:7
  228:*21*  283:7
  298:*23*
**sentence**  131:7
  141:*1*  154:2
  174:8  231:7
  233:*23*  265:*1*
  268:7, *22*  269:*3*,
  *7*, *12*, *25*  270:2,
  *10*, *20*  271:2, *9*,
  *20*  275:2  276:*15*
  278:*15*  279:*3*
**sentences**  174:9
  277:*1*
**separate**  64:*24*
  273:25  295:*18*
  299:*23*  300:8

**September**  6:9,
  *12*, *18*  39:2
  232:22  235:5
  236:2, *10*  237:*3*
  240:*17*  241:*4*, 7
  245:7  251:5, *17*
  254:*13*, *18*, *23*
  255:*1*, *1*  260:*25*
**series**  115:*19*
  254:*14*
**service**  11:5, *8*, 9
  26:6  29:*21*
  135:7
**Services**  3:*19*, *20*
  8:8  205:*3*, *19*
  206:*12*, *23*  207:2,
  *6*, *8*, *14*  208:*16*
  213:8
**set**  156:*12*
  164:*24*  165:9
  190:*18*, *23*  200:*1*
  202:5  210:2
  240:*22*  241:7
  264:*22*  267:*22*
  268:*12*  276:*22*
  282:*3*
**sets**  166:7
**setting**  164:*16*
  203:22
**settle**  12:*19*
**settled**  11:*17*
  12:*18*
**settlement**  259:*1*
**SHANNON**  3:9
  8:*24*
**share**  130:8
  131:*4*  194:2
**Shares**  4:20
  6:*11*, *23*  71:*23*
  130:5, *22*, *22*
  131:22  132:22
  133:*14*, *22*  134:2
  135:*1*, *18*  136:*4*
  153:5  154:*17*
  166:*11*  175:8
  194:2  196:*11*, *18*,
  *25*  198:7  221:*16*,
  *17*  222:6  281:*21*
**Sharp**  33:*1*
  39:*12*  41:*12*
  284:*21*  285:2
**sheet**  128:*22*
  129:*11*, *12*, *14*, *20*,
  *23*  131:*3*  132:*1*,

*7*, 8  134:*11*
  139:7  177:*20*
**shelf**  32:*19*
  40:*19*
**short**  191:5
  303:9
**Shorthand**  2:22
**shots**  90:22
**show**  87:*16*
  90:*4*  178:*23*, *25*
**showed**  102:*23*
**showing**  99:8
**shown**  63:*25*
  103:*14*, *18*
**shuttle**  11:9
  29:*21*
**SIBREL**  3:*20*
  8:7
**side**  218:*17*, *17*
**sign**  139:*25*
  250:*19*
**signature**  180:*25*
  261:7, *8*, *11*, *13*,
  *23*  262:9  280:*10*
  306:*20*
**signed**  143:*10*,
  *12*  161:*20*
  162:*19*  256:*18*,
  *22*  262:*1*, *21*
  265:2  268:2
  269:*10*, *24*  270:9,
  *19*  271:*8*, *25*
  272:*16*  274:*3*
  275:*13*  277:2
  278:*7*, *10*, *22*
  279:*13*
**significant**  55:*23*
  56:2, *3*  57:*24*
**signing**  161:*4*
  261:*16*  264:*4*
  272:*25*  273:*19*
  278:*4*  279:*15*, *18*
**similar**  185:*24*
**simple**  270:*18*
**Singh**  9:*20*
**S-I-N-G-H**  9:*20*
**single**  47:*21*
  210:9
**Sir**  268:6  279:2
**sit**  64:*11*  100:*21*
  101:7  104:*20*
  205:7  209:6
  290:9
**site**  190:*18*, *19*

**sitting**  96:*15*
  100:*14*  151:*21*,
  *23*  196:*24*  197:*4*,
  *5*
**six**  26:*10*
**skim**  187:*19*
**skimmed**  187:*17*
**Skype**  46:*24*
**slow**  44:*14*
  45:*16*  142:9, *9*
  164:7  180:6
  240:*10*
**SMW**  240:*18*, *19*
  241:*19*  242:7
  244:*17*
**social**  110:*1*
**socialize**  110:6,
  *12*
**sold**  196:*18*
**sole**  162:6
**solely**  102:*3*
  162:*13*
**solicitation**
  291:*18*
**solicited**  13:*24*
  161:8
**soliciting**  49:*12*
**Solutions**  26:*15*,
  *16*, *17*, *19*, *20*, *22*,
  *23*  27:*10*, *15*
  30:6  241:*1*
**somebody**  22:*13*
  23:*12*  24:7
  37:*17*  42:*19*
  50:*23*  67:*19*
  68:*14*  96:*14*
  118:*4*, *20*  147:*11*
  161:*18*  162:2
  177:6  188:6
  204:*3*  210:*10*
  248:*18*
**soon**  216:*16*
  223:*25*
**sooner**  216:8
**sophisticated**
  110:*20*, *24*
**Sorry**  9:7  13:*3*
  16:*3*, *14*  17:*14*
  24:*19*  34:*20*
  44:*16*  58:*23*
  67:*10*  76:8  81:5
  82:*10*  84:5
  100:*16*, *16*
  104:*10*  115:7
  127:*23*  129:6, *19*

142:*11*  144:8
  150:*14*  164:*11*,
  *12*  181:*25*
  196:*15*  198:*20*,
  *20*  201:*17*, *20*
  223:*14*, *24*
  224:*12*  229:7
  240:*11*  243:*25*
  245:*19*  259:*10*
  272:2  274:*17*
  280:*1*  288:*13*
  291:6
**sort**  40:*4*  41:*20*
  42:*12*  67:*11*, *11*
  73:*10*, *17*, *18*
  115:*4*  137:*25*
  178:*22*  221:*21*
  251:*21*
**sorts**  157:*25*
**sought**  72:*19*
  281:*14*
**sound**  171:*25*
  178:*11*
**sounds**  251:*12*
**SOUTHERN**  1:2
  2:2
**speak**  65:5  95:2
  155:9  249:*21*, *24*
  277:*12*  299:*13*,
  *20*
**speaking**  55:*1*
  160:7  287:2
  293:*23*
**speaks**  123:9, *11*
  140:*4*  154:6
  157:2, *3*  208:*24*
  255:*11*  256:9
**spec**  53:*14*
**special-purpose**
  153:*3*  156:*23*
  157:6
**specific**  21:*10*
  46:*12*  54:*20*
  61:*8*  63:*23*
  77:*18*  80:*15*, *15*,
  *16*  81:*21*  85:*11*,
  *14*  100:7  109:*16*
  131:*19*  148:*12*,
  *17*  151:*15*, *21*
  155:*12*, *15*, *21*
  156:2  159:2
  169:*20*  170:*1*
  176:*20*  197:*22*
  198:*1*  208:*18*
  226:5  233:*21*

Justin Pannu  10/29/2018

238:*12, 24*  240:*3*
241:*8*  247:*9*
251:*19, 19*
257:*19*  258:6, *11*
281:*14*
**specifically**  52:*7*
66:*12*  71:6
81:*24*  83:*21*
84:*12*  85:9
92:22  122:*1*
130:*15*  134:*4*
137:*4*  155:*10*
156:*11*  162:*18*
164:22  182:*12*
195:*10*  203:*17*
210:*3*  211:*21*
222:*4, 10, 19*
224:25  226:7, *18*
243:*1*  251:*15*
274:*23*  280:*7*
286:*18, 20*  288:2
293:*25*  294:*24*
296:*10, 13*  302:*3*
**specifics**  147:*16,
24*  148:*1*  158:*14*
245:*15*  246:*1*
247:*24*  293:*25*
296:6, *7*
**specified**  137:*24*
**speculation**
39:*25*  46:*7*
61:*13, 23*  64:*3*
68:*12*  71:*20*
73:*20*  75:*13*
79:*5, 12*  80:*13*
81:2  92:*18*
95:*24*  99:*23*
100:6  104:*14*
108:*3, 17*  113:*25*
114:*13*  118:*10*
119:*16*  122:*4*
123:*15*  133:*20*
141:*16*  143:*17*
145:*5*  146:*23*
149:2  154:*19*
155:6  157:2, *16*
161:*23*  174:*11,
23*  176:*18*
180:*14*  181:*11,
18*  182:6, *18*
183:*11, 18*
198:*10*  199:*12*
202:8  203:*9*
204:7  209:*23*
210:*16*  211:*11,*

*24*  212:2  213:*18,
23*  215:*21*  216:2,
*11*  219:*3, 14*
221:*14*  222:*8*
224:*3*  225:*20*
227:*21*  228:*13*
229:*19*  230:*3*
236:6, *14*  238:*21*
241:*13*  245:*24*
246:22  247:*7*
253:*18*  255:*12*
256:9, *25*  258:*4*
259:*9, 19*  260:*1*
263:*22*  267:*1*
272:*19*  281:*3, 11*
288:*18*  289:*4*
294:6  296:*16*
302:*19*
**speculative**
173:*20*
**speed**  261:22
**spent**  61:*15*
89:*19*  114:*10*
135:*25*  175:*11*
176:*9*
**spoken**  286:*8*
**spokesperson**
23:6, *19*
**spooked**  36:*13*
**sports**  36:*11*
**spreadsheet**
87:*16*
**ss**  306:2
**stand**  71:2
215:*13*  216:*3*
**standing**  44:*4*
**Stanley**  149:6
**start**  34:*14*
100:*19*  105:*18*
191:*24*  203:*7*
204:*17*
**started**  169:*17*
253:*3*
**starting**  272:*5*
**starts**  189:*11*
195:*21*  199:2
227:*8*  235:*21*
237:*5*  280:*14*
**start-up**  87:*24*
88:*3, 13*  200:*18*
288:*7*
**State**  2:*23*  8:*19*
9:*18*  294:22
305:2  306:*1, 7*

**stated**  65:*21*
162:*16*  238:*13*
**statement**  57:*3*
60:24  61:*3*  70:*8*
71:*10*  76:7  77:*3,
9*  82:*21*  92:*14*
95:*19*  100:*3, 12,
13, 15, 18*  101:*8,
13, 15, 16*  102:*3,
10*  120:*13*
154:*24*  156:*25*
244:*18*  248:*25*
249:*1, 17*  265:*10*
272:*1, 15*  274:2
275:*12*  277:*19*
286:2, *3, 4*
**statements**  90:*3*
91:*11*  92:8
**STATES**  1:*1*  2:*1*
**stayed**  18:*3*
26:*13*  27:7
**steal**  88:*21, 22*
**stealing**  89:*8*
**step**  84:6
113:*17*  205:*14*
**stipulated**
303:*20, 21*
**stipulation**  303:*1*
**stock**  35:22
**Stoller**  50:*20*
**stood**  215:*18*
**stop**  54:*12*  94:*3*
105:*16*
**stopping**  105:*16*
**storage**  29:2, *2*
**straight**  25:*16*
**strain**  88:*17*
270:*14*
**Street**  2:*20*  3:*4,
9, 14, 21*  8:*11*
306:*9*
**strike**  133:*11*
181:*25*  201:*20*
202:*23*  282:*18*
**structure,**  130:*21*
**stuff**  151:*13*
160:*9*
**subject**  184:*4*
192:2  193:*15*
240:*17*  251:*20*
**subjective**  233:*24*
**Subparagraph**
275:*5*
**subpart**  173:*18*
**subscribe**  216:*23*

**subscribed**  71:*24*
135:*1*  196:*4, 11,
17*  198:*15*  199:*8*
257:*14*  260:*11,
13*
**subscribed,**  199:*4*
**Subscription**
4:20  6:*12, 24*
42:*23*  65:*23*
67:9  116:*24*
139:*10*  153:*10*
162:*7*  228:*4, 8,
10*  230:*5, 8*
237:6, *8*  238:*4*
245:*9, 13*  246:*6*
247:*15*  248:*6*
252:*14*  260:*23*
261:2, *18, 21, 25*
262:*5*  264:*4, 16*
265:2  266:*3*
269:*11, 24*  270:*9,
19*  271:*8, 25*
272:*16*  274:*3*
275:*13*  277:2
278:22  281:*9*
**subscriptions**
229:*14, 16, 24*
**Subsection**
239:*12*  264:*17,
19*  266:*16*
267:*15*  268:*7*
271:*19*
**Subsidiaries**
213:2, *6*
**substance**  24:*14*
118:*13, 19*
**substantial**
173:*21*
**substantiate**
66:*16*
**substantive**  20:*11*
**substantively**
28:*21*  52:*4*
**successful**  56:*3*
58:*4*
**successfully**
171:*15*
**sued**  13:*14*
**sufficient**  226:25
**suggesting**
123:*23*
**suing**  52:*16, 21*
**suit**  13:*12, 13, 15,
18*  15:*6, 25*
**suitability**  276:*19*

**suitable**  135:*9*
276:*17*
**Suite**  2:*21*  3:*4,
9, 21*  8:*11*  306:*9*
**SULLIVAN**  3:*7*
**summarize**
224:*17*
**Summary**  4:*15*
140:2, *8, 13, 18,
21*  141:*11*
165:*25*  166:*6*
168:*1, 2, 15, 18*
177:*18*  251:*9*
**Sunday**  151:*4, 5,
6, 8*
**supervision**
306:*16*
**supplement**  35:*1*
**support**  253:6, *23*
**supporting**
301:*16*
**supposed**  71:*7*
74:*17*  148:2
296:*5*
**supposedly**  61:*9*
74:*10*
**sure**  18:*21*
19:*19*  22:25
23:*5*  24:*5*  26:*21*
27:*19*  47:*10*
56:*8*  57:*12*
58:*25*  75:*19*
76:*9*  77:*17*  79:*7*
86:*4*  114:*16*
119:6  134:*19*
152:*5*  169:*13*
180:*17*  190:*13*
198:22  199:*24*
203:*7*  216:*15*
233:*23*  235:*1*
259:*20*  277:*17,
18, 20, 24*  286:*10*
**surprise**  257:*21*
**swear**  9:*5*
**SWEENEY**  3:*9*
4:*5*  8:*24, 24*  9:*7,
15*  15:*21*  17:*8*
21:*8*  23:*4*  34:*3*
37:*2*  38:*8, 24*
40:*3*  42:*18*
43:*11*  44:*7, 17,
22*  45:22  46:*10,
20*  48:22  49:*5,
20*  50:*13*  51:*20*
52:*3, 9, 15*  54:*11*

Justin Pannu   10/29/2018

56:24  57:11, 15
58:25  59:6, 8
61:16, 24  63:13
64:5, 22  66:24
67:20  68:6, 16
69:19  70:16
71:3, 16, 22  74:5
75:16  77:1
78:14  79:8, 14
80:17  81:6  83:1
84:24  86:16
87:11  88:8  89:7,
14, 23  91:17
92:23  93:3, 17,
21  94:3, 13
95:13  96:1  97:1,
8  98:21  100:2,
11  101:6, 14
102:1, 7, 15, 19
103:9  104:3, 8,
17  105:3, 15
106:1  107:24
108:7, 20  109:1,
17  111:1, 11, 18
112:21  113:2
114:4, 15  115:17
116:9  117:9, 22
118:3, 12  119:13,
19  120:1, 12, 20
121:3, 24  122:6,
24  123:12, 18
124:12  125:1, 13
128:11, 15, 18
130:19  131:3, 6
132:6, 15  133:10,
17, 23  136:2, 13
137:3, 16  138:2,
14, 24  139:16, 20
140:6, 19  141:20
142:4, 10  143:2,
21  145:8  147:4
149:3, 19  150:7,
17, 23  152:6, 9,
11, 17, 21  154:1,
8, 23  155:13
156:7, 21  157:9,
18  158:12
160:21  161:6
162:5, 20  163:12,
23  164:10  165:6,
17, 23  166:22
167:24  168:8
169:8  170:3, 18,
23  171:6  172:22
173:7  174:7, 16

175:2  176:1, 7,
21  177:4  178:15,
21  179:11, 17
180:9, 16, 24
181:14, 19, 23
182:10, 20  183:1,
6, 14, 20  184:1
185:15, 21  186:7
187:3  188:4, 20
189:17, 24  191:4,
7, 18  193:24
195:15  196:16,
23  197:20  198:2,
12, 21  199:16, 20
200:6, 14, 19
201:4  202:1, 10,
15, 20  203:11
204:2, 8, 12
206:1  207:20
208:3  209:5, 18
210:8, 19  211:7,
13  212:5, 14
213:21  214:1, 9,
17, 21  215:1, 5,
24  216:5, 14
217:22  218:1, 19
219:5, 15, 23
220:5, 13, 24
221:23  222:11,
20  223:8, 16
224:5, 9  225:1,
12, 21  226:22
227:5  228:1, 15,
18  229:5, 9, 22
230:6  231:1, 4,
24  232:7, 15, 18
233:11, 22
234:16, 22
235:10, 17  236:9,
18  237:1  238:1,
14  239:2  240:12,
15  241:15
242:12, 20  243:3
244:8, 15, 24
245:6, 21  246:2,
14  247:1, 11
248:2, 13  249:1
250:10, 13, 16
251:7  252:6
253:21  254:8, 12
255:15  256:3, 12,
16  257:3, 20
258:7, 22  259:11,
22  260:4, 20
262:7  263:1, 18

264:1, 11  265:9,
17  266:1  267:8,
14  268:5  269:9,
20  271:1, 18
272:22  273:7, 14,
23  274:8, 16
276:7  277:7
278:1, 11  279:1,
23  280:9  281:6,
19  282:2, 22
284:12, 24
285:18  286:1
287:9  288:1, 20
289:7, 13  290:3,
12  291:3, 8, 15,
23  292:8, 18
293:2, 11  294:3,
9, 22  295:5, 16
296:9, 19  297:1
298:2, 10, 18
299:2, 15, 22
300:7, 19, 24
301:5, 14, 22
302:4, 16, 22, 25
303:2, 9, 21
**sworn**  9:12
306:11
**system**  15:19

**< T >**
**t.619.233.4100**
3:10
**t.619.800.0529**
3:5
**table**  190:12
**take**  20:6  34:6
58:20, 22, 24, 25
65:23  66:6, 17
113:17  123:19
152:7  181:3
190:11  191:5
205:14  234:24
235:8  249:2
255:24  287:20
288:21  294:17
**taken**  2:17  8:16
14:5  48:1  59:5
94:9  105:21
152:14  191:13
204:20  235:14
251:16  265:22
294:13  307:3
**talk**  21:10
52:11  84:12
127:1  128:16

155:9  204:14
220:2  246:16
247:13  248:1
289:15  292:2
295:6  302:20
**talked**  53:10
73:3, 14  126:21
146:14  157:8
192:14  222:1
280:23
**talking**  17:10, 11,
17  34:16  48:20,
23  54:15  66:22
69:2, 3  77:20
90:15  100:17
102:21  106:5
109:18  126:2
129:18  142:2, 2,
3, 5  152:2
160:21  166:21
192:2, 4, 4, 16
195:6  208:21
230:16  233:3
243:5  245:20
253:3  274:17
276:12  289:1
**talks**  144:5
196:2  255:4
279:15
**tape**  265:18
**Target**  234:1
**targeted**  141:4
**tasked**  90:6
**tasks**  206:10
**TATHAM**  1:8
2:7  3:14  8:15
9:8  52:17  59:22
60:11  65:20
80:2  84:4, 5
86:18, 19  87:2
88:1, 7, 20  89:6
90:6, 8, 14, 22
91:24  92:4  99:1
115:21  125:2, 3,
10, 20, 23, 24
126:4, 9  127:15
128:3, 7  130:12
136:17  139:5, 21
140:8  142:21
143:5  144:3, 9
149:4  152:23
157:7  161:25
162:9  165:16, 19
167:21  168:7
174:21  176:11

177:6  179:1, 4
184:4  185:1
188:7, 7, 25
190:15  191:23
192:1  193:3
194:23  195:10
198:23  199:21
202:11, 23, 24
203:15, 16
204:15  205:20
211:3, 9  215:7,
10, 12  217:8
219:1  220:15, 18,
21  223:2  224:22
225:17  226:14
228:7, 20  229:11,
16  232:20  233:5
235:5, 20  237:4
240:22  241:10,
21  242:1  245:8
254:14, 17  256:4
261:1  269:18
282:11  283:3, 8,
17  294:18, 25
295:12
**Tatham's**  164:20
173:5  193:13
195:17  205:16
206:2  207:5
228:2  283:12, 12,
15  295:1
**taught**  30:14, 18
**team**  69:7
204:24, 25  209:3
210:5, 6
**tech**  35:24  54:1,
9  55:20  57:21
83:3, 13, 25  84:9,
17, 19  85:3, 4, 5,
25  86:6, 9  89:17
137:13, 18
138:13  141:18
253:2, 9, 14
292:25
**technology**  55:7,
16  56:12  57:7,
17, 18  58:15
59:15  60:9, 19
61:4, 5, 7, 20
62:2  63:7, 19
64:1, 8, 16  65:2
77:10, 21, 22
78:19  79:16, 23
80:4, 6, 10, 18, 24
81:9, 18, 20, 23

Justin Pannu  10/29/2018

82:6, *12*  86:*3*
96:*21*  99:*13*, *16*
100:*4*  126:*24*
127:6, *8*  144:6,
*13*  145:*10*, *11*, *12*,
*18*, *19*, *21*  146:*5*,
*13*  147:6, *11*, *14*,
*17*, *22*, *23*  148:*2*,
*18*  157:*23*
169:*14*  209:*15*
276:*13*  295:*18*
296:*1*, *5*, *12*
**telephone**  47:*3*,
*13*  49:*17*
**tell**  19:*17*  22:*15*,
*19*  23:*11*, *20*
24:7, *15*  25:9
40:*12*  54:*21*
59:*15*  73:*10*
118:*13*  151:*19*
153:*19*  155:*18*
192:9  245:*12*
252:25  285:*24*
290:9, *10*, *14*
292:9
**telling**  60:*10*
137:*12*  161:*25*
236:*21*
**tells**  193:*14*
**ten**  40:*12*  47:*18*
303:*13*
**tender**  11:2, *4*, *6*,
*7*, *8*
**term**  128:*22*
129:*11*, *12*, *14*, *20*,
*23*  132:7, *8*
134:*11*  139:7
158:*6*  177:*20*
**Terms**  5:*16*
11:*17*  29:*10*
87:*15*  145:*23*
147:*24*  150:*4*
158:*19*  165:9
207:*10*  212:*20*
232:*4*  243:*10*
**territory**  147:*20*
**test**  146:*3*
295:*25*  296:*3*, *6*,
*23*
**testified**  9:*12*
102:*22*
**testify**  306:*11*
**testifying**  8:*14*
**testimony**  15:*14*
19:*2*  20:*1*, *13*

21:*23*  48:*16*
56:*21*  57:*10*
60:*2*  68:*4*  82:*23*
96:*24*  97:*4*
104:*25*  137:*20*
141:*25*  162:*12*
163:*19*  164:9, *13*
165:*3*  168:*5*
174:*23*  182:*6*
183:*22*  200:*13*
201:*1*  208:*23*
212:*10*  223:*6*, *11*
232:*11*  242:*16*
244:*11*  247:*18*
248:*10*  249:*4*, *7*,
*14*, *19*  255:*11*
273:*8*, *11*  284:9
289:*10*  290:7
292:*22*  293:6
306:*17*
**testing**  296:*11*
**Texas**  1:9, *10*, *10*,
*11*  2:*8*, 9, *10*, *11*
*3:15*  110:*10*, *11*
295:*21*
**text**  54:*3*, *10*, *18*
60:*17*  83:*10*
84:*8*  85:*2*, *11*, *22*
128:*4*, *5*, *7*, *12*
137:*13*  151:*14*,
*23*  162:*1*  178:*24*,
*25*  179:*2*  253:*12*
**texted**  85:*3*
**texting**  85:*11*
**texts**  128:*1*, *8*, *17*
**Thank**  9:*4*
17:*23*  24:*13*
59:*2*  191:*6*
204:*17*  224:*17*
245:*22*  250:*15*
302:*24*  303:*22*
**Thanks**  227:*8*
283:*17*  284:*1*
**theme**  54:*2*
85:*24*  253:*8*
**thereof**  267:*21*
268:*12*
**thicker**  162:*22*
**thing**  85:*12*, *14*
88:*1*  127:7
169:*14*  176:*20*
190:*18*  268:*18*
277:*12*
**things**  15:7, *20*
18:*5*  21:7, *10*

29:9  37:9  70:*22*
83:*14*  87:*18*
108:*13*  126:*25*
135:*19*  147:*19*
150:*2*  151:*24*
155:*23*  157:*25*
159:6  160:*4*, *6*
161:*3*  162:*14*
186:*21*  273:*5*, 9
284:*2*
**think**  10:*12*
12:*21*, *21*  22:*24*
24:*2*, 5  26:*21*
28:*24*  29:*15*
30:*4*, *24*  34:*19*,
*21*  35:*3*  37:*12*
40:*11*, *12*  42:*3*
43:*18*  47:7, *7*, *21*
48:*2*  49:*16*
58:*17*  64:*10*
67:*18*  68:*13*
70:*21*  71:*13*
72:*20*  73:*14*, *24*
77:*5*  78:9, *13*
79:*13*  81:*20*
82:*14*  90:*10*
101:*4*  102:*21*
114:*17*  121:*13*
122:*20*  124:9
125:7, *15*  145:*16*
152:*5*  154:7
156:*2*  157:*4*
158:*7*, *21*  159:*4*,
*8*  167:*19*  184:*15*
195:*8*  201:*23*
210:*17*  211:*19*
212:*11*  214:*8*
222:*1*  225:*19*
228:7  231:*16*
233:*1*  297:6
**thinking**  154:*3*
**third**  180:*25*
189:*10*, *19*
233:*23*  282:*25*
**Thirty-five**
260:*17*
**Thirty-four**
260:*18*
**THOMAS**  1:*8*
2:7  3:*14*  8:*15*
**thoroughly**  162:*3*
**thought**  51:*19*
66:*8*  70:*22*
78:*11*, *16*, *17*
82:*15*  99:*10*

100:*17*  104:*19*
108:*19*  146:*21*
147:*10*  156:*19*
174:*17*  190:*17*
196:*22*  219:*22*
253:*11*  254:*5*
**threatened**
119:*14*  120:*5*, *10*
**three**  10:*18*
32:*25*  41:9  89:*3*
110:*16*  135:*14*,
*19*  244:*4*  273:*4*,
*9*
**three-million-doll**
**ar**  61:*19*
**three-quarters**
218:*4*
**time**  8:*4*  10:*1*, *3*
11:*13*  16:*12*
20:6  23:*3*  26:*18*
27:*8*, *12*, *19*
30:*15*, *16*  38:*2*
40:7  42:*3*, *14*
43:*8*  44:*20*
46:*19*  47:*15*
48:*2*, *16*  49:*17*
59:*4*, 7, *12*, *22*
60:7, *21*  62:9, *17*
65:*19*, *24*  66:*8*
67:*16*  69:*25*
70:*2*, *12*  71:*18*
72:*8*, 9, *14*, *18*, *20*
73:6, *12*  75:7, *11*
76:*5*, *10*  78:*2*, *12*
81:*17*  86:*11*
87:9  89:*15*, *19*,
*22*, *24*  90:*2*
91:*18*, *19*, *21*
92:7  94:7, *11*, *24*
95:*3*, *10*  97:*21*
98:9, *10*, *23*
103:*24*  105:*20*,
*24*  108:*8*, *12*, *14*
109:*13*, *16*
110:*17*  114:*13*
116:7  117:7, *19*,
*25*  118:*14*
119:*18*  120:*16*
122:*8*, *14*  125:*24*
126:*5*  127:*18*
129:*2*, 7, *25*
130:*10*, *14*  131:*1*,
*16*  132:*2*, 9, *22*,
*24*, *25*  134:*15*
135:*17*, *21*  136:9

137:*2*, 9, *15*
138:7, *19*  139:9,
*12*  140:*15*
141:*10*, *15*  142:*2*,
*19*  149:*10*
152:*13*, *16*
154:*22*  155:*11*
156:*15*  158:*5*
159:*1*, *24*  160:*13*
163:9, *21*  164:9
165:*22*  167:*11*,
*20*, *25*  168:9, *17*,
*21*  171:*2*  172:*17*
174:*1*, *23*  176:*5*
179:*8*  180:*8*
185:*19*  186:*5*, *12*,
*23*  188:*1*  191:*5*,
7, *12*, *16*  196:*19*,
*22*  197:6  198:*4*,
*18*  202:*14*
203:*24*  204:*18*,
*19*  206:*13*  208:*5*,
6  209:*10*, *23*
211:*5*, *15*  214:*4*,
*11*, *24*  215:*23*
227:*24*  228:*13*
230:*19*  232:6
234:*11*  235:*12*,
*16*  236:*4*, *8*, *20*,
*22*  237:*18*, *21*
239:*16*  242:9, *16*,
*24*  244:*5*  250:*15*
252:*1*  253:*16*
255:*20*  256:*1*
258:*17*  259:*1*
262:*3*, *19*  263:*8*
265:*15*, *21*, *25*
268:*1*  269:*10*
270:9, *11*, *25*
271:*13*, *13*, *25*
274:*2*, *18*  275:*12*
277:*2*  279:*3*, *17*
281:*24*  282:*1*
283:*22*  286:7
288:*15*  294:*12*,
*15*  295:*14*  296:*2*,
*22*  298:*5*, *25*
299:*4*, *5*  301:*25*
303:*5*, *8*, *17*, *25*
**times**  9:*24*  17:*1*
41:9  47:*11*, *16*
71:*1*  97:*10*  98:7,
*11*, *22*  110:*16*, *18*
151:*1*, *2*  159:*3*

**TITLE** 1:9 2:9
5:16 6:9 53:11
55:7 56:10, 12
58:14 59:15
60:9, 18 61:19
62:1 63:6, 19, 25
64:8, 16 65:2
78:21 80:19
81:24 86:3
93:15 96:21
97:6, 18 100:24
101:8, 18 102:24
103:20 104:6, 21
126:23 127:10
135:7 144:6, 13
145:11, 12, 14, 22,
23 146:6 147:11,
21, 23 149:23
151:25 153:12
169:14, 22, 25
170:5, 6, 9, 25
171:10 174:15
175:6 177:21, 22
184:11, 21 187:9,
23 188:15
193:16 195:3, 4
200:1 206:5
207:8, 23 208:14
212:19, 23 213:5
224:19 225:4
226:24 228:23
229:1 230:17
231:15 235:4
237:11 238:7, 17
239:18 247:4
255:2 276:13
281:22 282:16
295:18, 25
296:11, 21, 23, 25
**titling** 82:5
**today** 8:9 18:24
19:13, 24 20:16
21:11, 23 22:12
23:6, 19 49:25
64:11 79:9
96:16 100:14, 21
101:7 104:20
150:9 156:5
179:24 182:15
196:25 197:4, 5
205:7 209:6
224:18 249:19
250:2
**Today's** 8:5
303:24

**told** 35:4 40:17
53:14 54:14
59:22 60:2, 8, 11,
14, 17 61:9, 11,
15 67:18 72:4
73:22 74:12
75:18, 20, 23
83:22 90:24
103:11 118:18
124:16 135:24
174:13 178:9
243:13, 23
244:13 295:19
**Tom** 9:8 52:17
86:18 88:1
115:21 116:4
125:10 128:7
136:17 139:21
142:21 143:5, 20
144:3, 9 153:18
157:7, 8 162:9
165:16, 19
169:11 176:20
177:6 185:1
190:15 191:2, 23
192:1, 3 194:23
198:23 200:17
204:15 205:16
210:1 215:7
218:5, 6 224:12,
12, 15 227:7, 8
228:21 235:5
237:4 241:10
245:8 254:14
283:17 284:1
285:7 297:5
**tomorrow** 236:1
250:20
**Tom's** 126:21
139:25 194:14
231:19
**top** 74:25
115:20 127:21
140:7 143:3
184:3 191:20, 21
194:7 195:17
202:21 203:15
215:6 220:14
223:22 224:10
229:10 245:21
246:16 262:11
284:21
**topic** 22:12
267:5

**topics** 21:19, 24
22:3, 8, 10
147:15 155:22
158:15 249:5, 15
250:1 293:24
**torn** 33:20
**total** 34:18
255:6 260:10, 11,
13
**touching** 306:13
**Tower** 55:4
65:17 106:12
**to-wit** 306:10
**town** 159:4
**tpt@Ingpartners.**
**com** 3:15
**TR** 213:6, 8
**TR,** 213:5
**trade** 25:21
26:7 28:7, 11, 13
**trader** 29:16, 17
**traders** 25:21
**trading** 25:12,
13, 15, 18 28:4,
19
**train** 51:19
**tranche** 89:4, 5
**transcribing**
303:12
**transcript** 20:7
303:15, 19
**transfer** 236:1
**transferred**
13:19 260:9
**transfers** 145:24
**translated** 74:2
**transport** 25:23
29:3
**transportation**
11:5
**transported**
29:14
**trial** 20:11
**true** 71:10 77:3
80:11, 18, 22
81:7 82:21 95:5,
8, 19 100:3, 12,
13, 23 101:16
120:13 154:24
174:9 189:13, 21
212:8 227:19, 24
233:14 238:13,
25 244:18
247:12 265:10
272:1, 15 274:2

275:12 277:18
305:3 306:17
**trust** 54:7 62:6,
12, 20 63:22
74:15 282:10, 17
**trusted** 61:14
62:15, 25 63:3
70:12 88:6
138:11 161:5
244:6 254:3
269:17
**trustworthy**
53:16
**truth** 76:6
102:9 306:12, 12,
12
**truthful** 19:2
81:9
**truthfully** 19:12
**try** 17:22 19:18,
18 23:16, 23
66:15 76:8
153:22 160:22
256:19
**trying** 17:9
60:13 68:17
69:11 71:4, 8, 17
72:2 88:17
113:15 248:20
277:11 284:3
**turn** 21:17
129:14 131:12
184:15 220:25
239:4 261:6
266:4
**turned** 162:24
**turning** 129:23
165:24 175:5
201:14 212:25
218:2 227:6
235:18 264:15
266:16
**Twice** 9:25
106:8 150:25
**two** 17:19 18:6
30:23 32:10
37:13 41:9
43:19 44:3
47:11 66:25
85:20 126:6
128:20 150:16
174:9 184:9
200:1 206:3
224:18 226:10

229:21 261:10
277:1
**two-page** 212:16
245:7 260:21, 22
**two-year** 30:21
**type** 10:25 24:8
83:19 206:19
285:8
**types** 33:10
126:25
**typewriting**
306:16

< U >
**Uh-huh** 78:15
139:23 142:25
143:6 144:4
262:10
**ultimately** 60:25
114:19 190:22
195:2 260:8
**unaware** 38:13
270:24 290:4
**unbeknownst**
14:4
**unclear** 250:7
**underlying**
135:11
**under-promise**
285:8
**undersigned**
262:12, 13
**understand** 15:9
17:21 18:23
19:3, 5, 9, 10, 17,
18, 19 20:14, 20,
21 22:1, 22 43:4
52:5, 16 66:2
81:14 82:8 90:7
101:4 134:1, 4
135:17 145:22
146:11 148:16
163:24 169:16
174:8 194:19
196:8 199:9, 14
238:2, 3, 5, 6
240:24 243:25
244:12 247:23
262:6, 19 263:16,
23 264:2, 9, 12
268:9, 14, 17
273:4, 6 274:19,
23 277:11 278:2
279:17 280:22
281:7 284:3

Justin Pannu  10/29/2018

**understanding**
49:*10*  63:*23*
72:*17*  102:*9*
108:*21*  132:*21*
137:*5, 7, 11, 14,*
*17*  141:*13*
142:*14, 15*
143:*22*  147:*13,*
*15*  148:2  165:*8*
167:*12*  172:2
200:*17*  205:*8, 9*
210:7  213:*15*
214:*3*  216:7, *19*
221:*18*  236:*3*
253:*14*  263:*5, 6*
266:*22*  291:*4*
292:*20, 23*
**understands**
264:*20*  280:*15*
**understood**
19:*21*  107:*16*
108:*8, 11*  129:*13,*
*19*  141:*17*  161:7
164:*6, 13, 14, 23*
166:*14*  169:*13*
176:*13*  194:*11,*
*12*  196:*10, 17*
199:*15*  233:*12*
262:*20*  263:*3, 7,*
*9, 15, 19*  265:*12*
268:*1*  281:*20, 25*
**undertake**
173:*23*
**undertaken**
206:*11*
**undertaking**
173:*20*
**underway**  190:*25*
**unexecuted**  160:2
**unhappiness**
120:*22*  121:*1*
**unhappy**  120:*14*
**unit**  29:6
**UNITED**  1:*1*
2:*1*
**units**  131:*5*
135:*11*  146:*9*
177:*19*  193:*6*
234:*3*  254:*22*
**University**  24:*18,*
*21*
**unrelated**  238:*15*
**unsuccessful**
172:*11*

**untrue**  100:*15,*
*17*  101:*8, 13, 15*
102:2  275:*3*
277:*1*
**update**  221:*5*
**updating**  179:*24*
**upside**  198:*24*
**use**  29:9  53:*23*
55:*19*  59:*19*
78:*20*  83:*8, 18*
85:*7, 16*  86:*2, 3*
88:*7*  134:*12, 25*
136:*3*  139:*7*
185:*23*  192:*4*
235:*9*  250:*14*
291:*10, 17*
292:*24*  303:*18*
**uses**  213:6
**usually**  53:*22*

**< V >**
**Vague**  38:*1*
40:*16*  42:*14*
44:*20*  46:*19*
48:*16*  63:*8*
66:*21*  67:*16*
78:*12*  81:2
86:*11*  87:*9*
89:*20*  93:*1*
95:*10*  101:*2, 3*
103:*23*  109:*13*
111:*16*  114:*13*
116:7  117:*7, 25*
119:*18*  120:*16*
121:*21*  125:*11*
130:*25*  131:*1*
133:*15, 19*
135:*21*  136:*9*
137:*9, 10*  138:*7,*
*8, 19*  140:*15, 16*
141:*15*  143:*16*
156:*15*  158:*5, 6*
160:*15, 18, 25*
161:*1, 22*  163:*9*
164:*8*  165:*22*
169:*24*  171:*2*
172:*17*  174:*23*
176:*5*  179:*7*
180:*8*  185:*18, 19*
186:*5, 23, 24*
188:*1*  195:*12*
196:*19*  198:*18*
202:*14*  203:*24,*
*24*  208:*23*
209:*10, 11, 23, 23*

211:*4, 5*  214:*11,*
*12, 24*  223:*11*
228:*13*  234:*13*
237:*21*  242:*9, 16,*
*24*  244:*5, 19, 20*
258:*17, 17*  262:2
265:*15*  281:2, *10,*
*24*  285:*21*
295:*13*  296:2, 2,
*22, 23*  297:*23*
298:*5, 6, 25*
301:*25*
**valid**  46:*4*
**validate**  194:6
**validity**  135:*10*
**valuation**  53:*23*
55:*6, 9*  59:*21*
60:6  87:*13*
193:7
**Valuations**  6:6
232:*21*  233:*15*
**value**  198:*14*
231:*9*  234:*4*
**values**  172:*20*
**Vancouver**
25:*12*  30:*9, 15*
**various**  27:*9, 10*
52:*17*  59:*10*
94:*15*  123:*6*
184:*25*  227:*13*
**VC**  55:*13*  75:*1*
76:2
**venture**  56:*18*
74:*20*  76:*11*
171:*21*
**Ventures**  32:*7, 9,*
*17, 22*
**verbal**  162:*1*
164:*20*
**verify**  271:*4*
**versions**  160:2
**versus**  8:*15*
10:*23*  11:*22*
**vest**  155:*14*
**vice**  27:*23*
**Victoria**  24:*18*
**VIDEO**  3:*20*
8:8  9:2, *9*  46:*25*
**VIDEOGRAPHE**
**R**  8:*4*  9:*4*  59:*3*
94:6, *10*  105:*19,*
*23*  152:*12, 15*
191:*10, 14*
235:*12, 15*
265:*19, 23*

294:*11, 14*  303:*4,*
*7, 23*
**Videography**
3:*19*
**videotape**  94:*4*
**VIDEOTAPED**
1:*15*  2:*16*  4:*8*
8:*13*  21:*15*
303:*24*
**visit**  73:*23, 24*
106:7  107:*22, 23,*
*25*  108:*13*
109:*18*
**visited**  53:8  55:*5*
**visiting**  73:*22*
**vote**  48:*1*  49:*13*
**voting**  48:*17*

**< W >**
**wait**  108:6
**waiting**  55:*13*
56:*19*  74:*20*
75:2  76:*12*
83:*17, 20, 25*
236:*19*
**waives**  294:*20*
**want**  21:*1, 9*
24:*4, 5*  32:*21*
34:5  39:6  49:6
52:*11*  54:*19, 19*
57:9  59:*24*
63:*14*  70:5  71:*5*
74:8  98:*5*
112:*17*  120:*18*
134:*18*  150:*14*
152:6  160:*24*
204:*14*  205:*1*
221:*21*  224:*13*
231:*10, 13, 16, 22*
246:*16*  248:*11*
249:*24*  250:*14*
267:*16*  294:*17*
295:6
**wanted**  55:*9*
56:*14*  65:*9, 23*
66:*4*  69:*23*  74:*7,*
*13, 15*  149:*11*
180:*17*  185:*4*
188:*24*  189:2
216:*16, 22*  233:*1*
238:*16*  245:*12,*
*15, 18*  256:*4*
**wanting**  74:*3*
**warrant**  282:*4*

**warranties**
267:*19*  268:*10,*
*20*  280:*17, 18*
**warranty**  278:*18*
279:*10*
**warrantying**
268:*18*
**Watch**  105:*18*
**way**  50:*3*  51:*21*
65:*19*  88:*16*
89:*12*  102:*20*
153:*21*  172:8
178:*16*  182:*25*
186:*17*  203:*10*
218:*4*  224:*4*
227:*14*  230:*13*
238:*15*  285:*10,*
*19*  286:*3*
**ways**  66:*25*
**webinar**  79:*25*
80:8  99:*14, 18*
144:*5, 13, 17, 19,*
*20*  145:*3, 14*
146:*13, 22*  147:*7*
148:6, *13, 21, 24*
149:9, *10*  152:2,
*4, 5*
**week**  115:*25*
116:*1, 12*  123:*3,*
*17*  126:6  132:*14*
144:*12*  150:*12*
151:*1, 2*  206:*15*
208:*9*
**weekend**  30:8,
*10, 17*  31:2, *6, 7,*
*8*  151:*5, 8, 9*
204:*19*
**weekends**  30:*11,*
*18*
**weeks**  126:6
**Well**  13:*11, 14*
18:8  21:6  22:8
23:*17*  30:8  31:7
32:*22*  35:*17*
43:*24*  44:*1*  56:*1*
62:*3*  68:*14*
72:*10*  73:*21*
74:*24*  75:*23, 23*
77:*4*  79:*3*  85:*7,*
*10*  89:*1, 11*  95:*1*
103:*19*  110:*3*
111:8  160:2, *8*
164:*21*  182:*11,*
*15, 23*  184:*19*
188:*10*  192:*11*

Justin Pannu  10/29/2018

233:*3*  244:25
254:*2*  261:*13*
291:*1*  296:*4*
300:*5*
**wells**  28:22
29:*10*
**went**  48:*9*  59:*11*
62:*7*  89:*5*
114:22  200:22
296:*6*  297:*6, 8*
**we're**  22:*3*
26:*21*  49:*24*
91:*3*  115:*18*
128:*13*  152:*2*
167:20  207:22
212:*15*  215:*2*
234:20  245:*3*
249:*23*  266:*2*
276:*12*
**West**  3:*4*
**we've**  37:*10, 11*
41:*19, 24*  106:*5*
126:*1*  176:*24*
195:*5*  242:*2*
265:*18*  280:*23*
297:*12*  303:*10*
**wife**  126:*10*
**WIL**  4:*10, 12, 22*
5:*6, 8, 11, 12, 25*
6:*7, 9, 12, 15, 20,*
24  261:*7, 23*
**willing**  239:*25*
**WILLIS**  1:*8, 11*
2:*8, 11, 18, 19*
3:*7, 7, 17*  8:*25*
9:*1, 2*  19:*6*  22:*4,*
5  52:*17, 21*  53:*2,*
*15, 15, 25*  54:*8,*
22  56:*1*  59:*11,*
*14, 25*  60:*2, 8, 10,*
*11, 14, 17*  61:*14*
62:*5, 7, 20, 24*
65:*8, 13, 20, 25*
67:*25*  69:22
70:*12*  72:*23*
73:*3*  74:*7, 18*
75:*6, 9*  76:*13*
77:*21*  78:*1, 18*
80:*2*  84:*5, 7, 11,*
*15*  87:*23, 24*
88:*20, 23*  89:*6,*
*15*  90:*9, 15, 18*
91:*5, 24*  94:*15*
96:*4, 19*  98:*6, 23*
105:*8*  106:*6*

108:*15*  109:*3, 11*
110:*6, 14*  115:*21*
117:20  118:*20,*
25  121:*18*  122:*8,*
*18*  123:*1*  124:*7*
125:*10, 17, 19*
128:*7*  130:*12*
135:*24*  138:*11*
142:*21*  148:*23*
152:24  161:*25*
162:*9*  165:*16, 19*
167:*21*  168:*7*
171:*22*  173:*2*
174:*12, 21*
178:*10*  179:*5, 19*
203:22  211:*15,*
*21*  213:*7, 11, 15*
214:*5*  217:*11*
225:*13*  226:*4, 6,*
*18*  240:22
241:*16, 21*  242:*1*
243:*6, 13, 22*
244:*1, 2, 7*
246:*17*  250:*17*
251:*5, 13*  252:*2,*
*8*  253:*5*  254:*4,*
*23*  269:*16, 17*
270:*13*  282:*11,*
*12*  283:20  284:*1,*
*7*  287:*17, 18, 20*
288:*3, 5, 21*
289:*21*  290:*5, 15,*
*20*  291:*9, 17*
292:*10, 24*
294:*24*  301:*17,*
*21, 24*
**Willis's**  95:22
108:22  254:*3*
**wings**  55:*14*
56:*19*  74:21
75:*2*  76:*12*
**wire**  235:25
256:*19*
**withdrawn**
245:*11, 13, 16*
246:*7*
**WITNESS**  4:*1*
7:*6*  9:*6*  15:*15*
17:*7*  21:*1*  22:*24*
23:*2*  35:*15*  38:*3,*
*21*  40:*1*  42:*16*
43:*7*  44:*16, 21*
45:*17*  46:*8*
48:*18*  49:*4, 16*
51:*18*  52:*24*

56:22  57:*14*
59:*2*  61:*14*
63:*10*  64:*4, 21*
66:*23*  67:*17*
68:*5, 13*  69:*18*
70:*12, 21*  71:*13,*
*21*  73:*21*  75:*14*
76:24  78:*13*
79:*6, 13*  80:*14*
81:*4*  82:*24*
84:*23*  86:*13*
87:*10, 23*  89:*1,*
*11, 22*  91:*15*
92:*19*  93:*13, 25*
95:*11, 25*  97:*5*
99:*24*  100:*7*
101:*4, 12, 23*
102:*6*  103:*7, 25*
104:*12, 15*  105:*1*
107:*21*  108:*4, 18,*
*25*  109:*15*
110:*23*  111:*10,*
*17*  114:*1, 6, 14*
116:*8*  117:*8, 19*
118:*1, 11*  119:*12,*
*17, 23*  120:*9, 17*
121:*1, 23*  122:*5*
123:*11, 16*  124:*9*
130:*17*  131:*2*
132:*4, 13*  133:*9,*
*21*  135:*23*
136:*11, 23*
137:*11, 21*  138:*9,*
*20*  139:*15*
140:*17*  141:*17*
142:*1*  143:*19*
145:*6*  147:*2*
149:*16*  150:*1, 19*
153:*24*  154:*7, 21*
155:*3, 8*  156:*5,*
*18*  157:*3, 17*
158:*7*  160:*16, 20*
161:*2, 24*  162:*13*
163:*10, 20*  165:*4,*
*13*  166:*19*
167:*19*  168:*6*
169:*7*  170:*1, 14*
171:*4*  172:*18*
173:*2*  174:*5, 12,*
*25*  175:*23*  176:*6,*
*19*  178:*20*  179:*9*
180:*15*  181:*13,*
*22*  182:*8, 19*
183:*5, 12, 19*
185:*11, 14, 20*

186:25  188:*2, 18*
189:*16, 23*  191:*6,*
*9*  193:*23*  195:*14*
196:*14, 21*
197:*15, 17, 25*
198:*11, 19*
199:*13*  200:*15*
201:*2, 24*  202:*9*
203:*10, 25*
207:*18*  208:*25*
209:*12, 25*
210:*17*  211:*6, 12,*
*25*  212:*3, 11*
213:*19, 24*  214:*8,*
*13*  215:22  216:*3,*
*12*  217:*21*  219:*4,*
*21*  221:*15*  222:*9,*
*18*  223:*7, 13*
224:*4, 24*  225:*9,*
*19*  226:*21*  227:*4,*
*23*  228:*14*
229:20  230:*4, 23*
232:*3, 12*  233:*10,*
*20*  234:*15*  236:*7,*
*15*  237:22
238:*12, 22*
240:*11*  241:*14*
242:*10, 17, 25*
244:*6, 12, 21*
245:*25*  246:*13,*
*24*  247:*8, 19, 21*
248:*10*  252:*5*
253:*19*  254:*2*
255:*13*  256:*2, 11*
257:*1, 18*  258:*5,*
*19*  259:*3, 10, 20*
260:*2*  262:*4*
263:*15, 23*  264:*8*
265:*5, 16*  267:*2,*
*13*  269:*7, 15*
270:*24*  271:*13*
272:20  273:*3, 12,*
*22*  274:*6*  276:*2*
277:*5, 23*  278:*9*
280:*6*  281:*4, 13,*
*25*  284:*10*
285:*15, 24*
287:*25*  288:*19*
289:*5, 11*  290:*1,*
*8*  291:*1, 14, 21*
292:*6, 15, 23*
293:*8, 23*  294:*7*
295:*15*  296:*4, 17,*
*24*  297:*25*  298:*7*
299:*1, 13, 20*

300:*5, 23*  301:*4,*
*13, 20*  302:*2, 14,*
*20*  306:*18*
**wonder**  17:*2*
**wondering**  69:*15*
115:*23*
**Woodthorpe**
32:*12*  33:*3, 4*
**Word**  5:*20*
40:20  62:*7*
63:*21*  66:*13, 17*
76:*13*  77:*8*
82:*18*  88:*4, 15*
138:*11*  164:*20*
192:*4*  218:*6, 12,*
*20, 25*  244:*7*
254:*3*
**words**  52:*20*
145:*19*  162:*9*
164:*20*
**work**  25:*9*  26:*2,*
*5, 24, 25*  27:*1*
30:20  37:22
64:*19*  76:*23*
101:22  103:*6*
146:*4*  206:*10, 20*
287:*24*  289:*25*
290:*24*  296:*21,*
*23, 25*  298:*17, 19*
299:*11*  300:*9*
**work-client**
290:*11*
**worked**  27:*8*
206:*14*
**working**  29:20
30:*13*  141:*5, 14*
142:*15*  145:*18*
146:*19*  150:*2*
162:*16*  167:*6, 13,*
*17*  194:*16*
202:*12*  219:*16*
**worried**  39:*3*
243:*8*  285:*9, 16,*
*20, 23, 25*  286:*3,*
*12, 14, 17, 23*
287:*4*
**worry**  217:*24*
**worth**  42:*20, 23*
43:*13*  267:*9*
**writing**  78:*6*
87:*4*  98:*1, 2, 16*
195:*9*
**written**  60:*16*
125:*9*  187:*5*
276:*21*  278:*6*

Justin Pannu  10/29/2018

wrote  38:*14*
227:*23*  287:*25*
291:*25*

< Y >
**Yeah**  12:*24*
15:25  17:*16*
18:*16*  30:*11*
41:*16*  42:7
43:*15*  48:6, *18*
50:4  52:8  57:8
70:5  100:*13, 19,*
*20*  125:7  128:*11*
129:22  130:*1*
136:*12, 14*
142:*18*  152:8
157:*3*  158:*14*
160:*20*  165:*21*
168:*3*  179:2
202:25  217:*16,*
*22*  272:*4, 8*
277:*23*  285:*24*
303:*2*
**year**  16:*10, 12*
25:24  26:3
30:24  31:*1, 3*
45:*1*
**years**  11:*21*
12:*23, 24*  16:*12*
30:*23*  36:6
40:*11*  43:*19*
44:*3*  47:*12*
229:*21*
**yellow**  193:2, *14*
205:*15*
**Yep**  140:*25*
**yes-or-no**  170:*19*
269:*23*  270:*18*
271:7  299:25
**Yesterday**  151:7
**you,**  185:*19*

< Z >
**zero**  13:5
**ZOOM**  3:*12, 17*