SULLIVAN HILL REZ & ENGEL
A Professional Law Corporation
Shannon D. Sweeney, SBN 204868
E-mail: Sweeney@sullivanhill.com
600 B Street, Suite 1700
San Diego, California 92101
Telephone:  (619) 233-4100
Fax Number: (619) 231-4372

Attorneys for Defendants,
MARK A. WILLIS; BEYOND REVIEW, LLC;
IMAGE ENGINE, LLC; and WILLIS GROUP, LLC

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENSOURCE INVESTMENTS LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> THOMAS P. TATHAM, an individual; MARK A. WILLIS, an individual; PDP MANAGEMENT GROUP, LLC, a Texas limited liability company; TITLE ROVER, LLC, a Texas limited liability company; BEYOND REVIEW, LLC, a Texas limited liability company; IMAGE ENGINE, LLC, a Texas limited liability company; WILLIS GROUP, LLC, a Texas limited liability company; and DOES 1-50, <br><br> Defendants. | CASE NO. 17CV0079 H LL <br><br> **WILLIS DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** <br><br> DATE:    December 9, 2019 <br> TIME:    10:30 a.m. <br> JUDGE:   Hon. Marilyn L. Huff |

1  **I.      INTRODUCTION**

2          Plaintiff has tried to create triable issues by blatantly mischaracterizing several

3  documents that it received in connection with its proposed investment in Hopewell-

4  Pilot Project LLC. The actual evidence, however, reveals that there are no genuine

5  issues in dispute. It is also apparent that Plaintiff has no evidence to support essential

6  elements of each of its claims. The Supreme Court has made it clear that "the plain

7  language of Rule 56(c) mandates the entry of summary judgment, after adequate time

8  for discovery and upon motion, against a party who fails to make a showing sufficient

9  to establish the existence of an element essential to that party's case, and on which that

10  party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

11  (1986). Summary judgment should be granted in favor of the Willis Defendants.

12  **II.     THERE IS NO GENUINE DISPUTE AS TO ANY MATERIAL FACT
       AND DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER**

13      **OF LAW**

14          Plaintiff's claims fail because it fails to present evidence sufficient for a rational

15  trier of fact to find in its favor on each element. "Where the non-moving party bears

16  the burden of proof at trial, the moving party need only prove that there is an absence

17  of evidence to support the non-moving party's case." *Dzung Chu v. Oracle Corp. (In*

18  *re Oracle Corp. Sec. Litig.)*, 627 F.3d 376, 387 (9th Cir. 2010). Such is the case here.

19          **A.      The Securities Fraud and Intentional Misrepresentation Claims Fail[1]**

20               **1.      There Were No Material Misrepresentations**

21          Summary judgment as to the Willis Group, Image Engine and Beyond Review

22  must be granted. Plaintiff does not allege, and has proffered no evidence to establish,

23  that any such entity made any representation, let alone misrepresentation, to Plaintiff.

24  The undisputed facts are that Image Engine and Beyond Review were service

---

25      [1]      Plaintiff argues that the Willis Defendants' analysis of the intentional

26  misrepresentation claim was inadequate. Not so. The elements of both species of fraud
    are virtually identical; although securities fraud requires loss causation. *Compare*

27  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-342 (2005) with *Ernst & Young,*
    *L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001). Thus, any analysis of

28  the elements of securities fraud necessarily applies to state law fraud.

1  providers to Hopewell. *See* Ex. MM.[2] The Willis Group merely provided office space

2  and IT services to Hopewell. *See* Willis Decl., ¶12.[3] It is undisputed that such

3  companies did not participate in any way with soliciting investors for Hopewell.

4  Plaintiff argues, without any evidence, that Willis acted on behalf of such companies

5  in his alleged representations and solicitation efforts, and thus his liability, if any, is

6  attributable to them. What Plaintiff is arguing is that any time one person has

7  ownership interest in multiple companies, each company is liable for statements made

8  about one of the companies by such person. In other words, the Washington Post

9  would be liable for any representations made by Jeff Bezos about Amazon. *See*

10  https://www.forbes.com/profile/jeff-bezos/#5ce17a791b23 (accessed 11/27/19)(Bezos

11  owns Amazon and the Washington Post). This is not the law.

12       Summary judgment as to Willis should be granted as no material

13  misrepresentations were made at all, let alone by Willis.[4] Plaintiff attempts to create a

14

_____

15  [2]     Unless otherwise identified, all "Ex." cites are to the Exhibits attached to the
    Declaration of Shannon Sweeney filed in support of the Willis Defendants' Motion for
16  Summary Judgment. *See* ROA #136-3.

17  [3]     Unless otherwise identified, all "Willis Decl." cites refer to the Declaration filed
    in support of the Willis Defendants' Motion for Summary Judgment. *See* ROA #136-
18  2.

19  [4]     With the exception of the PPM, Willis was not even the maker of the
    representations at issue. The undisputed evidence is that Brent Stanley—not Willis—
20  drafted the Title Rover Presentations. *See* Ex. F to Sweeney Decl. in opposition to
    Plaintiff's MSJ ("Opp. Decl.")(ROA #154-5)(Stanley depo., 49:11-17; 52:3-
21  53:4)(Stanley authored the power points at issue). Stanley testified that he gave the
    presentations to Willis for "feedback." *Id.* (Stanley depo., 58:1-7).  He did not testify
22  that Willis ever gave any feedback, and could not have meaningfully approved them
    given his lack of technological expertise. *See id.* (Stanley depo., 112:6-113:10) (Willis
23  relied on Stanley and the Tech Team for IT expertise. He is "not an expert" in IT or
    the "IT portion of the gas industry and oil industry"). "[M]erely participating in
24  the drafting of misleading statements is not enough to create liability under Section
    10(b) or Rule 10b-5." *In re Impini, Inc.*, 2019 U.S. Dist. LEXIS 172802, at *14-*15
25  (W.D. Wash. Oct. 3, 2019) *see also SEC v. Pocklington*, 2018 U.S. Dist. LEXIS
    227362, at *45-46 (C.D. Cal. Sep. 10, 2018)(finding that a manager was not the
26  "maker" of statements notwithstanding that he helped draft the statements, provided
    factual information for them, and reviewed them prior to distribution because he did
27  not have day-to-day control over the company); *and In re REMEC Inc. Sec. Litig.* 702
    F. Supp. 2d 1202, 1247 (S.D. Cal. 2010)("A corporate officer's job title does not prove
28  that he was personally involved with the alleged fraud.").

1    triable issue by cherry-picking portions of documents, and taking them out of context,

2    while ignoring other portions of the documents that provide the exact information that

3    Plaintiff complains is missing. For example, in the PPM, Plaintiff blatantly disregards

4    the first part of the sentence when it argues that investment proceeds would be used

5    solely for lease purchases. That is the exact opposite of what the PPM actually says.

6    The entire sentence makes it clear that the proceeds would be used <u>first</u> for "all

7    operating expenses:"

8         Hopewell-Pilot Project LLC ("Hopewell" or the "Company") is seeking
          to privately arrange the placement of 1,000,000 shares ("Initial
9         Additional Equity Shares") of the Company for $2,000,000, the proceeds
          of which are to be used to fund <u>all</u> operating overhead of the Company
10        through December 31, 2016, and for the acquisition of Mineral Interests...

11   Ex. A, Term Sheet (emphasis added). The Hopewell Company Agreement, which

12   Plaintiff received at the same time as the PPM, also made it clear that investment

13   proceeds would be used first for operating expenses ("Approximately $125,000 to

14   $175,000 per month") and the "balance of the Proceeds [would] be used for the purchase

15   of Oil, Gas, and Mineral Interests. . ." Ex. C (Exhibit A: "Application of Proceeds of

16   Capital Contributions for Initial Additional Equity Shares"). It is undisputed that, prior to

17   its investment, Plaintiff fully understood that investment proceeds would be used first for

18   operating expenses. An August 17, 2016 email from Pannu to Tatham makes this clear:

19   "**The PPM states that any *extra* funds raised over the costs of operation *may* be used**

20   **to acquire lease and/or mineral rights**." *See* Ex. P to Opp. Decl. (emphasis added). The

21   PPM contains no misrepresentation and the funds were used for operating expenses, as

22   disclosed and understood.

23        Plaintiff also claims that the Title Rover presentations (which were created by

24   Brent Stanley) were misleading because they implied that the technology was

25   "completed" or "fully functional." In the case of the July 25, 2016 presentation,

26   Plaintiff claims that there is not a statement that says the technology was a work-in-

27   process or incomplete. In so arguing, Plaintiff *ignores* the last page of that

28   presentation entitled "Getting Started" which lists <u>things to do</u>, including

1   "prepare/execute project plan," "build out database" and "perform analytics and

2   deliver results." *See* Ex. E to Plaintiff's Opposition, p.11. How does a "to do" list not

3   communicate that there is still work "to do"?

4         In both the August 19, 2016 and August 23, 2016 presentations, there is a page

5   that discusses "the current version of the Title Rover Portal." The page further

6   discloses that there is a "development plan which adds additional features in

7   subsequent releases to enrich the functionality." *See* Ex. F to Plaintiff's Opposition,

8   p.7 and Ex. Y, p.4 to Opp. Decl. Again, such disclosures reveal that Title Rover was a

9   work in progress ("current version" ≠ "final version"). For Plaintiff to claim otherwise

10   does not create a triable issue.[5] Wilful misreading of documents and/or the

11   advancement of misleading arguments cannot be the basis for denying summary

12   judgment. *See Scott v. Harris*, 550 U.S. 372, 380 (2007)("When opposing parties tell

13   different stories, one of which is blatantly contradicted by the record, so that no

14   reasonable jury could believe it, a court should not adopt that version of the facts for

15   purposes of ruling on a motion for summary judgment").

16         Even if the Title Rover presentations did not explicitly disclose that the

17   technology was a work in progress, multiples of many documents and

18   communications during that time did. *See* Exs. A, J, T, U, V, KK (documents and

19   communications disclosing that the technology is being tested, developed, refined,

20   validated and benchmarked). "To fulfill the materiality requirement there must be a

21   substantial likelihood that the disclosure of the omitted fact would have been viewed

---

22   [5]   It is important to remember that, in connection with the Hopewell investment,

23   the stated goal of Title Rover was to make title searching easier and faster. *See* Ex. A §III ("The Company believes that the use of Title Rover technology in the evaluation

24   of OG&M title will result in significant savings in both time and costs.") There is no evidence that Plaintiff understood or cared *how* the technology worked prior to its

25   investment, or that its technological interworkings were material to the investment. It simply wanted the technology to accomplish the stated goals. *See* Ex. T to Opp. Decl.

26   (82:2-7) (Plaintiff testified that its investment was made because "the manual effort would be absolved by [the] proprietary technology"). And according to Brent

27   Stanley, the technology *did* accomplish its goals. *See* Ex. K to Opp. Decl. (Title Rover Technology Update—2016 YTD Accomplishments) *and* Ex. F to Opp. Decl. (Stanley

28   depo., 87:12-88:2).

407485-v1                           4                       Case No. 17CV0079-H-LL

1  by the reasonable investor as having significantly altered the "total mix" of

2  information made available" *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

3  Given the total mix of information available here, a reasonable investor would have

4  known that Title Rover was not a completed product and that work was still

5  underway. If there is any doubt, the Court need only look to what Plaintiff testified it

6  actually understood about Title Rover before it made its investment:

7  
8  I—personally I thought—and I don't know what other members
   thought—that that was—you know, Willis represented that it—you
   know, it was the technology that **just needed to be refined** for the use of
   finding problem areas for any of the chain of title issues. So it—you
9  know, it was something that was very convincing to us."

10  Ex. F (78:16-25)(emphasis added); *see also id.* (61:2-7)(" that technology is something

11  that he just needed to refine"). Because the claimed misrepresentations were not

12  misrepresentations at all, and because Plaintiff has had the opportunity and has failed

13  to present evidence of other material misrepresentations, Plaintiff cannot satisfy the

14  first element of its fraud claims.

15  **2.     There is No Evidence of Scienter**

16  "Scienter . . . is a subjective inquiry. It turns on the defendant's actual state of

17  mind." *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1093 (9th Cir. 2010). It

18  requires deliberately reckless conduct. *See Hollinger v. Titan Capital Corp.*, 914 F.2d

19  1564, 1569 (9th Cir. 1990). "[I]n opposing a motion for summary judgment the plaintiff

20  must present significant probative evidence relevant to the issue of intent…" *Provenz v.*

21  *Miller*, 102 F.3d 1478, 1489-90 (9th Cir. 1996). It hasn't. Plaintiff merely argues that

22  Willis "knew or should have known" that certain statements made were false (as shown

23  above, they were not) and that he "stood to profit" from the allegedly false statements.

24  It proffers no evidence to support such arguments. Summary judgment should be

25  entered against a party who fails to make a showing sufficient to establish the existence

26  of an element essential to that party's case. *See Celotex*, 477 U.S. at 322; *see also In re*

27  *Oracle Corp. Sec. Litig.*, 627 F.3d at 387 (when there is an absence of evidence to

28  support the non-moving party's case summary judgment is proper).

### 3.   Plaintiff's Evidence of Reliance Is Negated By Valid Disclaimers Of Reliance And Plaintiff's Own Testimony

In its Opposition, for the first time, Plaintiff proffers evidence in support of its argument that it made its investment on reliance on representations made by Hopewell and/or Willis. *See* Opposition, p.14 (citing to portions of Pannu's deposition: Pages 60-61, 77-79, 82-86, 161-165). The cited testimony does not establish reliance sufficient to defeat summary judgment, however, because it is contradicted by Plaintiff's own testimony. *See Sorensen v. AMTRAK*, No. 17-56611, 2019 U.S. App. LEXIS 27680, at *6 (9th Cir. Sep. 13, 2019)("a party cannot create an issue of fact by contradicting his prior testimony")(quotations omitted). The cited testimony discusses Pannu's reliance on oral representations made by Willis during the early Pannu/Willis meeting. *See* Plaintiff's Ex. I, Pages 60-61, 77-79, 82-86.[6] Plaintiff explicitly testified, however, that such representations DID NOT cause Plaintiff to invest. *See* Ex. F, 62:20-63:3 (Q: "did you decide to invest in Hopewell after that first meeting?" A: "No"). It is undisputed that in the months after such meeting, Plaintiff engaged in a lengthy and comprehensive due diligence process, guided by counsel, and even required the Hopewell and Title Rover company agreements be negotiated and revised as a condition to investment. Plaintiff's decision to invest was made after much time, thought and deliberation. *See* Ex. F, 236:15-17 ("I believe as a group we weren't going to invest—I don't know if we felt rushed or not—until we were comfortable").

Further, it cannot be ignored that Plaintiff expressly and decisively represented that it **did not rely** on anything Willis represented when it entered the Subscription Agreement. *See* Ex. M, §5(k)(It had "not relied upon any representations or other information (whether oral or written) other than that [set forth in the Subscription Agreement], the Memorandum, the Company Agreement, the other agreements and

---

[6]   The cited portions of testimony actually demonstrate that no misrepresentations were made. *See* p.60-61 ("the technology is something that he just needed to refine"); p. 77-79 ("Willis represented that it—you know, it was the technology that just needed to be refined"); p. 82-86 (Q: "Mark specifically told you there was no debt?" A: "No, we concluded that there was—that the—so if he said that he was using it—their tech commitment were waiting on us to fund, we just assumed that there would be no debt").

1   independent investigations made by it or [its] representatives."). While Plaintiff argues

2   that disclaimers of reliance do not always shield a defendant from liability, it fails to

3   cite to a single Ninth Circuit or Texas authority to support such position. It simply

4   cannot escape that disclaimers of reliance are, in fact, binding and enforceable. *See*

5   *Bank of the West v. Valley Nat'l Bank of Arizona*, 41 F.3d 471, 478 (9th Cir. 1994); *see*

6   *also Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 332

7   (Tex. 2011)("when sophisticated parties represented by counsel disclaim reliance on

8   representations about a specific matter in dispute, such a disclaimer may be binding,

9   conclusively negating the element of reliance in a suit for fraudulent inducement."); *and*

10   *Kelter v. Forrest*, 2009 U.S. Dist. LEXIS 136364, at *11 (C.D. Cal. Feb. 23,

11   2009)(plaintiff bound by representations made in a Subscription Agreement). Plaintiff's

12   disclaimers of reliance are binding herein and negate any claims of reliance to the

13   contrary (especially ones that are refuted by Plaintiff's own testimony).

14             **4.**     **Plaintiff Cannot Demonstrate Loss Causation**

15        Plaintiff has utterly failed to appreciate the difference between reliance

16   (transactional causation) and loss causation. The former requires a plaintiff to

17   demonstrate that it would not have entered the transaction but for the alleged

18   misrepresentation. The latter requires, when private securities are at issue, that the

19   plaintiff show that the value of the securities decreased because of the alleged

20   misrepresentations (as opposed to other market reasons). *See Nuveen Mun. High Income*

21   *Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1123 (9th Cir. 2013). It is not

22   enough to simply state, as Plaintiff does here, that it was damaged because it purchased

23   the securities. *See* Opposition, p. 17 ("such misrepresentations comprised the entire basis

24   upon which Plaintiff decided to make the Investment in Hopewell"); *see also Nuveen*,

25   730 F.3d at 1121 ("We have consistently rejected loss causation arguments like

26   Nuveen's—that a defendant's fraud caused plaintiffs a loss because it 'induced them to

27   buy the shares'—because the argument 'renders the concept of loss causation

28   meaningless by collapsing it into transaction causation.'")(internal citation omitted). It

1   must instead show that the Hopewell shares decreased as a result of the alleged

2   misrepresentations. Plaintiff has not even attempted to make such a showing. Nor will it

3   be able to. The Hopewell pilot project was deemed a failure for a multitude of reasons,

4   including: it ran out of money; the private placement did not raise as much as was its

5   goal; Plaintiff failed to deliver its entire pledged investment; the threat of litigation by

6   Plaintiff prevented further fundraising;  prospective sellers did not accept the offers made

7   by Hopewell; etc. Plaintiff's inability to show that the value of the securities decreased

8   because of the alleged misrepresentations renders this element unprovable. *See id.* at

9   1123 ("evidence that certain misrepresented risks are responsible for a loss must

10  reasonably distinguish the impact of those risks from other economic factors").

11          While Plaintiff is correct that it doesn't have to prove its case at this stage, it

12  does have to demonstrate with admissible evidence that it can support each element of

13  its claim. *See Celotex*, 477 U.S. at 322 ("[A] complete failure of proof concerning an

14  essential element of the nonmoving party's case necessarily renders all other facts

15  immaterial."). When, as here, the defendant has shown there is "an absence of

16  evidence to support the non-moving party's case" summary judgment for the

17  defendant is appropriate. *See In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387.

18          **B.      Plaintiff Cannot Establish Conversion**

19          In their Motion for Summary Judgment, the Willis Defendants assert three

20  bases for why they are entitled to judgment as a matter of law on Plaintiff's

21  conversion claim: (1) there can be no conversion when the owner assented to the

22  taking; (2) Hopewell "took" the money from Plaintiff; not the Willis Defendants; and

23  (3) the money "taken" from Plaintiff is unidentifiable and there was no breach of an

24  obligation to treat the money a certain way. In its Opposition, Plaintiff only

25  substantively responds to the third argument, and then only partially. The other two

26  bases thus remain uncontroverted.

27          It is undisputed that money can be the subject of conversion only when

28  "identification of the money is possible and there is a breach of an obligation to

1  deliver the specific money in question or to otherwise treat specific money." *Sw.*

2  *Indus. Inv. Co. v. Berkeley House Inv'rs*, 685 S.W.2d 615, 617 (Tex App. 1985); *see*

3  *also Houston Nat. Bank v. Biber*, 613 S.W.2d 771, 774 (Tex. Civ. App. 1981)(money

4  cannot generally be the subject of conversion).[7] Here, identification of the invested

5  money is not possible. Money is fungible. Plaintiff's money was not the only money

6  to come into Hopewell between September 13, 2016 and October 28, 2016 (the first

7  and last dates of Plaintiff's investment). *See* Ex. BB. Further, documentary evidence

8  establishes that the invested money was treated the way intended and disclosed. The

9  PPM clearly and unequivocally provides that invested money was intended to be used

10 first for "all operating overhead." Ex. A, Term Sheet. Plaintiff's deliberate misreading

11 of the PPM does not create a triable issue on this point.

12      It is undisputed that the investment proceeds were used to pay, among other

13 payees, Title Rover, service providers and Tatham. *See* Ex. BB. It is also undisputed that

14 such payees were expressly disclosed as "operating expenses" in the solicitation

15 documents received by Plaintiff. *See* Ex. C (Exhibit A)("Approximately $125,000 to

16 $175,000 per month to be spent as per Exhibit B covering estimated current operating

17 requirements"); *see also id.* (Exhibit B) (Operating expenses were disclosed and itemized

18 in the 2016 Cash Forecast). Because the invested money was used exactly as disclosed,

19 no exception applies and there can be no conversion for the alleged taking of money.

20      **C.     The Unfair Competition Law Claim Fails As a Matter of Law**

21      Plaintiff's case undisputedly arises from "the purchase and sale of securities."

22 FAC, ¶1. Thus, the UCL does not apply. *See Bowen v. Ziasun Technologies, Inc.*, 116

23 Cal. App. 4th 777, 788 (2004)( the UCL "does not apply to securities transactions.").

24 Plaintiff's reliance on *Roskind v. Morgan Stanley Dean Witter & Co.*, 80 Cal. App.

---

25 [7]     Plaintiff is correct that this Court recognized this exception in its ruling on
26 Defendants' motion to dismiss. *See* March 9, 2017 Order on Motion to Dismiss (ROA
   #15). The Court's prior ruling addressed conversion at the pleading stage. The Court
27 determined that "Plaintiff has stated a claim for conversion." *Id.* The Court did not,
   however, make any findings about whether Plaintiff's money had been treated
28 improperly. *See id.*

407485-v1                                    9                          Case No. 17CV0079-H-LL

4th 345 (2000) and federal cases "limiting the reach of *Bowen*" (*see* Oppo. ln. 26 at 23 to ln. 8 at 24) ignores the fact that the transaction at issue here fits squarely within the narrow construction of *Bowen* that all such cases left intact. *See e.g., Benson v. JPMorgan Chase Bank, N.A.*, 2010 U.S. Dist. LEXIS 37465, \*19-27 (N.D. Cal. Apr. 15, 2010)(recognizing *Overstock*, "limited *Bowen's* reach by asserting that *Bowen's* holding excluding securities transactions from coverage of the UCL **only 'bars lawsuits based on deceptive conduct in the sale and purchase of securities**, nothing more'")(quoting *Overstock.com v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 715 (2007)(emphasis added)). Declining to extend the holding in *Bowen* to a claim based upon alleged *aiding and abetting* liability, the *Benson* court explained, "[h]ad this suit been brought against [defendants] for fraud, *Bowen* would apply since the sale of fraudulent CDs would constitute a securities transaction." *Id.* at 27. Here, Ensource's UCL claim against Mr. Willis is based entirely upon alleged fraud in connection with the sale of securities. *See* FAC, ¶¶62-71. Even under the strictest reading of *Bowen* and courts limiting its holding, Plaintiff's UCL claim is barred. [8]

## III. **CONCLUSION**

Plaintiff's "complete failure of proof" on essential elements of each stated claim dooms its case and makes summary judgment for the Willis Defendants appropriate. *See Celotex*, 477 U.S. at 322.

Dated:   December 2, 2019            SULLIVAN HILL REZ & ENGEL
                                     A Professional Law Corporation

                                     By:   */s/Shannon D. Sweeney*
                                           Shannon D. Sweeney
                                           Attorneys for Defendants

---

[8]   Indeed, each of Plaintiff's cases distinguishing *Bowen* involved claims only tangentially related to alleged fraud in connection with the purchase or sale of securities. *See Overstock*, 151 Cal. App. 4th at 715 (allegedly defamatory report); *Strigliabotti v. Franklin Resources, Inc.*, 2005 U.S. Dist. LEXIS 9625 (N.D. Cal. Mar. 7, 2005)(allegedly excessive investment fees); *In re Charles Schwab Corp. Secs. Litig.*, 257 F.R.D. 534 (N.D. Cal. 2009)(alleged deviation from policies without necessary vote). These cases are inapposite because they do not involve, as here, a claim based entirely upon fraud in the purchase or sale of securities.

407485-v1                              10                     Case No. 17CV0079-H-LL