# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

ENSOURCE INVESTMENTS LLC, a
Delaware limited liability company,

                                                    Plaintiff,

v.

MARK A. WILLIS, et al.,

                                                    Defendants.

Case No.:  3:17-cv-00079-H-LL

**ORDER:**

**(1) GRANTING IN PART AND
DENYING IN PART WILLIS
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT; AND**

[Doc. No. 136]

**(2) DENYING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT OF PLAINTIFF'S
SECURITIES EXCHANGE ACT
CLAIM AGAINST DEFENDANT
MARK A. WILLIS**

[Doc. No. 138.]

On October 29, 2019, Defendants Beyond Review, LLC, Image Engine, LLC, Mark

A. Willis, and Willis Group, LLC (collectively, "Willis Defendants") filed a motion for

summary judgment of all claims asserted by Plaintiff.  (Doc. No. 136.)  On November 1,

2019, Plaintiff EnSource Investments, LLC ("Plaintiff") filed for summary judgment of Plaintiff's securities fraud claim against Defendant Mark A. Willis. (Doc. No. 138.) On November 25, 2019, the parties filed their respective oppositions to the motions for summary judgment. (Doc. Nos. 152, 154.) On December 2, 2019, the parties filed their respective replies. (Doc. Nos. 156, 157.)

The Court held a hearing on the motions on December 6, 2019. Richard Nawracaj and Aaron Sadock appeared for Plaintiff. Shannon D. Sweeney and Michael Zarconi appeared for Willis Defendants. For the reasons below, the Court denies Plaintiff's motion for summary judgment and grants in part and denies in part Willis Defendants' motion for summary judgment.

## Background

This case arises out of Plaintiff EnSource Investment, LLC's purchase of securities in a start-up company, the Hopewell – Pilot Project, LLC ("Hopewell"). Hopewell was formed on March 29, 2016 by Thomas Tatham and Defendant Mark A. Willis. (Doc. No. 136-2, Willis Decl. ¶ 4.) Through Hopewell, Willis and Tatham planned to use title searching technology to identify unleased lands in Texas containing oil and gas interests, purchase those leases, and use or flip those leases for a profit. (Doc. Nos. 136-2, Willis Decl. ¶¶ 2-4; 136-5, Ex. T.) Though Hopewell was the center of this enterprise, it contracted with several other entities to carry out its goals. For its technology, Hopewell contracted with Title Rover, LLC ("Title Rover"), a separate entity that Willis and Tatham formed in April 2016 to build Hopewell's title searching technology, a web-based portal to index title records and make them electronically searchable. (Doc. No. 136-2, Willis Decl. ¶ 4.) Hopewell also contracted with Beyond Review, LLC ("Beyond Review"), and Image Engine, LLC ("Image Engine"), two entities under the umbrella of the Willis Group, a company Willis founded in 2007 to provide staffing services. (Doc. No. 136-2, Willis Decl. ¶ 3.) Beyond Review provided contract and title attorneys to Hopewell, while Image Engine provided copying and imaging services. (Doc. Nos. 136-2, Willis Decl. ¶ 11; 136-7, Ex. MM.)

Willis and Tatham were the sole managers and members of Hopewell's Board of Directors, with Willis serving as CEO and President of Hopewell. (Doc. Nos. 136-4, Ex. C at 61, Ex. D at 81–82, 94; 138-4; 154-8, Ex. AH at 417.) While Tatham handled the day-to-day management of Hopewell, Defendant Willis led their efforts to solicit potential investors. (Doc. No. 154-3, Willis Decl. ¶ 8.)

From May to September 2016, Willis solicited prospective investors. (Doc. No. 136-2, Willis Decl. ¶ 6.) In May and June 2016, Willis asked one of his friends, Chad Martin, to invest in Hopewell. (Doc. No. 136-2, Willis Decl. ¶ 6; Doc. No. 138-4, Ex. D at 109–113.) Martin expressed interest and referred Willis to other investors, including Justin Pannu. (Doc. No. 136-2, Willis Decl. ¶ 6.) In August 2016, Pannu, Martin, and several others formed Plaintiff EnSource Investments, LLC, for the purpose of investing in Hopewell securities. (Id.; Doc. No. 136-6, Ex. X at 417.)

From July to August 2016, Willis and Tatham negotiated Plaintiff's investment in Hopewell. (Doc. No. 154-3, Willis Decl. ¶¶ 9–13.) During these negotiations, Willis and Tatham provided Plaintiff with Hopewell's private placement memorandum and related documents, including an executive summary, project highlights, prospect area maps, a subscription booklet, and the Third Amended Restated Company Agreement of the Hopewell — Pilot Project, LLC ("Third Amended Agreement"). (Doc. Nos. 136-4, Exs. A–D; 136-5, Ex. W.) The private placement memorandum stated that Hopewell sought investment "for the purpose of acquiring new lease and mineral interest acquisitions in the four initial areas and for working capital to continue the Company's operations and evaluation of lease acquisition opportunities." (Doc. No. 136-4, Ex. A at 3.) Similarly, the private placement memorandum's term sheet states that investment "proceeds . . . are to be used to fund all operating overhead of the Company through December 31, 2016, and for the acquisition of Mineral Interests, primarily new Oil and Gas leases, in an agreed Area of Mutual Interest ('AMI') covering Madison County, TX and the Buda Rose play ('Buda Rose' play)." (Id. at 4.) Throughout the course of negotiations between Plaintiff and Defendants, Hopewell had little to no money in its accounts, as well as ongoing monthly

3

operating expenses due and accruing. (Doc. Nos. 136-2, Willis Decl. ¶ 8; 136-4, Ex. C at 64; 136-6, Ex. BB.)

Willis and Tatham also provided Plaintiff with several webinars and presentations about the technology that Hopewell and Title Rover would employ, including three Title Rover technology slide decks prepared throughout July and August 2016. (Doc. Nos. 138-3, Ex. B Stanley Depo. at RT29:3–30:25, RT31:1–7; 138-5, Ex. F; 138-6, Exs. G–H; 154-6, Ex. F Stanley Depo. at RT53:17–54:25.) When describing Title Rover's technology, the private placement memorandum states that Hopewell was formed "for the purpose of demonstrating 'Proof of Concept' involving the refinement, use, and application of a new proprietary software technology which can geographically sort and analyze land and mineral title records and related digital data for the purpose of acquiring Oil, Gas & Mineral interests . . . ." (Doc. No. 136-4, Ex. A at 3.) A later paragraph in the memorandum, titled "Technology," continues:

> The Founders have arranged and provided a cost based contract to Hopewell for the exclusive use of new proprietary software technology owned by Title Rover, LLC, an affiltiate [sic] of the Founders. Hopewell will pay only for the direct costs of digital data purchase, direct operations and traning [sic] of Hopewell personnel related to use of Title Rover's proprietary software in an agreed AMI covering Madison County, TX. . . . The Company believes that the use of Title Rover technology in the evaluation of OG&M title will result in significant savings in both time and costs.

(Id. at 5.)

The three technology slide decks Defendants gave to Plaintiff provide more detailed descriptions of Title Rover's title searching portal. The first slide deck, dated July 25, 2016, states that "Title Rover has developed the proprietary technology, workflow and interface to power the data processing function which is the key to automating and expediting much of the work associated with traditional prospect area opportunity analysis." (Doc. No. 138-5, Ex. F.) In a subsequent slide, the presentation states that Title Rover "has developed its own proprietary technology and licensed sole rights to additional

3:17-cv-00079-H-LL

technology which delivers a 10X improvement to traditional methods of supporting data investigations and specialized analysis." (Id. at 123.) The presentation also describes the technology's key features, such as custom indexing, filtering, and grouping. (Id. at 125.) Finally, the presentation contains a slide titled "Getting Started," which lists action plans, including: "Identify commercial opportunities," "Prepare resource plan and budget," "Prepare/execute project plan," "Build out database and UI," and "Perform analytics and deliver results." (Id. at 131.)

The second technology presentation slide deck, dated August 19, 2016, duplicates several slides or headings from the first presentation but offers screenshots further describing its technology's features. (Doc. No. 138-6, Ex. G at 133.) In its overview of key features, the presentation compares Title Rover's title searching web portal to other data services in the market. (Id. at 137–38.) Additionally, the August 19 presentation includes screenshots "which show the current version of the Title Rover Portal," and it states that Title Rover "also ha[s] a development plan which adds additional features in subsequent releases to enrich the functionality." (Id. at 139.) The screenshots of the existing version of the web portal include screenshots of the login page, the main search page, its custom grouping function applied to deed types, its custom grouping function applied to family names, and a grid "Runsheet" to display data in an alternative format. (Id. at 139–143.) The slide deck also includes a slide representing the "logical architecture" of its technology, which identifies a "partial list of the software and programming used." (Id. at 145.)

The third technology presentation slide deck, dated August 23, 2016, provides a "Technology and Intellectual Property Overview." (Doc. No. 138-6, Ex. H.) It describes the "team of experts" that Title Rover "commissioned . . . to build a web portal where users can explore the data using tools and features," and explains the technical background of each member, including Brent Stanley, whom the presentation identifies as Title Rover's "CTO," or Chief Technology Officer. (Id. at 152.) The presentation's overview also states that its technology team is "responsible for the [sic] defining the feature set used by the

portal and developing, testing and deploying the portal." (Id.)

Regarding the technology itself, the August 23, 2016 presentation's overview first describes the Title Rover "technology effort" as having two main goals: "[t]o build a portal where attorneys and other users can perform faceted searches . . ." and "[t]o build a deep index from records more quickly and cost effectively than is available in the industry." (Id.) Following this outline of goals, the presentation states, "[w]hat we have done over the last few months for Title Rover is to create v1.0 of the portal . . . ." (Id.) According to the presentation, the "new customized portal accomplishes the primary tasks" necessary for the project, including "[c]reating an automated chain of title from the data," "[c]reating a run sheet from the chain as an automated output," and "[s]upporting custom groups of instrument types, family genealogy, and geographies to enhance the searching of the data for specific interests." (Id.) Like the August 19 slide deck, the August 23 slide deck includes screenshots "which show the current version of the Title Rover Portal," and states that Title Rover "also ha[s] a development plan which adds additional features in subsequent releases to enrich the functionality." (Id. at 154.) Unlike the August 19, 2016 slide deck, the August 23, 2016 slide deck adds a description of the Title Rover's web portal's technical architecture, stating, "[t]he Title Rover portal was built by Joe Haynes in collaboration with the team and resides on servers in a secure data center. All software code in use for the portal is owned by Title Rover." (Id. at 159.)

In addition to Title Rover's web portal, the August 23 presentation explains that Title Rover has contracted with Beyond Recognition, LLC ("Beyond Recognition")[1] to index land records into data usable by the Title Rover web portal. The slide deck states that Title Rover "has commissioned [Beyond Recognition] to execute a statement of work demonstrating its ability to derive a high quality, deep index from a collection of land records from scratch . . . ." (Id. at 152.) The August 23 slide deck also specifies that data

---

[1]    Beyond Recognition, LLC, "a software company headquartered in Houston" (Doc. No. 138-6, Ex. H at 159), appears to be an entity distinct from Beyond Review, one of the Defendants in this action.

mining would be performed by Beyond Recognition, "which has developed a unique method for executing data mining on records." (Id. at 159.) Further, the slide deck states that Beyond Recognition "has developed proprietary source code and the application to leverage visual similarity for its purpose." (Id. at 160.) The August 23 presentation continues, "Title Rover has licensed technology from [Beyond Recognition] to automate data mining for this data type . . . ." and Title Rover has "both a license for use of the technology and an exclusivity option." (Id.)

These technology presentations were part of Plaintiff's due diligence review conducted in the months of July to September 2016. The review process also included communications between Plaintiff and Tatham and "online data rooms" that Defendants created to provide additional documents for Plaintiff's review. (Doc. No. 136-2, Willis Decl. ¶ 9; 136-4, Exs. H–J; 136-5, Ex. U; 136-6, Ex. GG at 511–13, Ex. HH.) On August 30, 2016, Justin Pannu sent an email to Thomas Tatham, writing, "it appears that whatever these individuals are developing currently is critically important to the success of the Madison County and Buda Rosa plays – but that such items are not yet developed." (Doc. No. 154-9, Ex. Z at 351.) Pannu then asked, "[i]s the seemingly vital technology still a work-in-process?" (Id.) In a reply email sent the same day, Tatham states, "[i]ndexing of pre 1922 digital data remains to be completed" and "[t]he technology is currently working, the Madison County digital data base [sic] needs to be fully indexed, appropriate filters need to be developed for the Top Lease Play based upon legal analysis to be completed[.]" (Id.)

On September 29, 2016, Plaintiff and Hopewell closed their deal and executed a subscription agreement. (Doc. No. 154-8, Ex. AC.) Plaintiff agreed to invest $530,000 in Hopewell in exchange for shares in the company. (Id.)

On December 7, 2016, Tatham delivered a report to Plaintiff on Hopewell's activities as of November 30, 2016. (Doc. No. 136-5, Ex. P.) Tatham reported that, though Hopewell's "initial goal was to lease 1,000 net acres collectively," "progress has been slow" and Hopewell had closed purchases of about 125.01 acres. (Doc. No. 136-5, Exs. P,

Q.)  Tatham also reported that Hopewell had pending offers for leases covering about 657.54 acres, and that Hopewell would need to complete "at least 50%" of those purchases for Hopewell "to be considered successful from an economic standpoint."  (Doc. No. 136-5, Ex. Q.)

On January 13, 2017, Plaintiff filed a complaint in this Court alleging that Defendants defrauded Plaintiff.  (Doc. No. 1.)  On December 27, 2018, Plaintiff filed an amended complaint, claiming that Defendants defrauded Plaintiff in violation of the Securities Exchange Act, 15 U.S.C. § 78j, and California's unfair competition law, California Business & Professions Code § 17200.  (Doc. No. 93.)  Plaintiff also alleges that Defendants committed common law conversion and intentional misrepresentation.  (Id.)  Specifically, Plaintiff alleges that Defendants failed to disclose Hopewell's financial insolvency, used Plaintiff's investment proceeds to cover antecedent debts instead of "go-forward" purchases of leases with oil and gas interests, and made misrepresentations about the title searching technology Plaintiff claimed to possess.  (Id.)

<strong><u>Discussion</u></strong>

## I.  Legal Standards

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1031 (9th Cir. 2010).  "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Fortune Dynamic, 618 F.3d at 1031 (internal quotation marks and citations omitted); accord Anderson, 477 U.S. at 248.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case that the nonmoving party bears the burden of proving at trial. Id. at 322–23; Jones v. Williams, 791 F.3d 1023, 1030 (9th Cir. 2015). Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" T.W. Elec. Serv., 809 F.2d at 630 (quoting former Fed. R. Civ. P. 56(e)); accord Horphag Research Ltd. v. Garcia, 475 F.3d 1029, 1035 (9th Cir. 2007). To carry this burden, the non-moving party "may not rest upon mere allegation or denials of his pleadings." Anderson, 477 U.S. at 256; see also Behrens v. Pelletier, 516 U.S. 299, 309 (1996) ("On summary judgment, . . . the plaintiff can no longer rest on the pleadings."). Rather, the nonmoving party "must present affirmative evidence . . . from which a jury might return a verdict in his favor." Anderson, 477 U.S. at 256.

When ruling on a summary judgment motion, the court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007). The court should not weigh the evidence or make credibility determinations. See Anderson, 477 U.S. at 255. "The evidence of the non-movant is to be believed." Id. Further, the Court may consider other materials in the record not cited to by the parties, but it is not required to do so. See Fed. R. Civ. P. 56(c)(3); Simmons v. Navajo Cnty., 609 F.3d 1011, 1017 (9th Cir. 2010).

## II. Analysis

### A. Securities Fraud

Willis Defendants seek summary judgment of Plaintiff's claim that the Willis Defendants committed securities fraud under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. (Doc. No. 136.) Plaintiff, meanwhile,

seeks summary judgment of their securities fraud claim against Defendant Mark A. Willis. (Doc. No. 138.)

Section 10(b) of the Securities Exchange Act prohibits fraud in the sale of securities, including "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange] Commission may prescribe." 15 U.S.C. § 78j. Rule 10b-5, promulgated by the Securities Exchange Commission under Section 10(b), makes it unlawful, in connection with the purchase or sale of a security, to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. To assert a private claim for relief under Rule 10b-5, a plaintiff must prove six elements: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 267 n.1 (2014) (citing Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds, 568 U.S. 455, 461 (2013)).

A party makes a material misrepresentation if it "would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co., 845 F.3d 1268, 1275 (9th Cir. 2017) (quoting Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 985 (9th Cir. 2008)). "To be misleading, a statement must be capable of objective verification." Id. Even if a statement is not false, "it may be misleading if it omits material information." Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1009 (9th Cir. 2018), cert. denied sub nom. Hagan v. Khoja, 139 S. Ct. 2615 (2019). The omitted information is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

**Hopewell's Representations about its Finances and Use of Investment Capital**

Plaintiff argues that Defendant Mark Willis made material misrepresentations about the state of Hopewell's finances and how Hopewell would use Plaintiff's investment money. Willis Defendants contend that Hopewell did not misrepresent Hopewell's finances or spending because Hopewell stated that investment funds would be used on operating expenses, disclosed general estimates of its monthly expenses, and provided a 2016 Cash Forecast that revealed the extent of the company's undercapitalization. The Court agrees with Willis Defendants.

First, Willis Defendants did not misrepresent how it would use Plaintiff's investment money because the record shows that funds were used for the agreed upon purpose of covering Hopewell's operating expenses, in addition to purchasing lands or leases. The private placement memorandum's executive summary states that Hopewell sought investment "for the purpose of acquiring new lease and mineral interest acquisitions in the four initial areas and for working capital to continue the Company's operations and evaluation of lease acquisition opportunities." (Doc. No. 138-4, Ex. A at 3; see also Doc. No. 154-7, Ex. P.) Plaintiff emphasizes "new lease and mineral interest acquisitions" but overlooks the second part of the sentence, which states that investment proceeds would also be used as "working capital to continue the Company's operations . . . ." (Id.) Likewise, the private placement memorandum's term sheet states that investment "proceeds . . . are to be used to fund all operating overhead of the Company through December 31, 2016, and for the acquisition of Mineral Interests, primarily new Oil and Gas leases, in an agreed Area of Mutual Interest ('AMI') covering Madison County, TX and the Buda Rose play ('Buda Rose' play)." (Id. at 4.) These terms expressly state that Defendants would utilize the money invested in them to pay for "the Company's operations" and "all operating overhead," generally. Moreover, the 2016 Cash Forecast attached to the parties' Third Amended Agreement states that operating expenses would be paid prior to acquisition of leases with mineral interests (Doc. No. 136-4, Ex. C at 63–

64), and Hopewell's accounting ledger and invoices indicate that funds were spent in this manner. (Doc. Nos. 136-6, Ex. BB; 136-7, Ex. MM.)

Plaintiff appears to believe that "antecedent debts" are distinct from operating expenses and therefore fall outside the scope of the parties' agreement. (Doc. Nos. 138-1 at 15, 19–20; 152 at 5, 12–13.) However, Plaintiff does not identify any language in the private placement memorandum or Third Amended Agreement that draws such a distinction. The language in the private placement memorandum and Third Amended Agreement does not condition use of funds solely for present or future operating expenses. (Doc. No. 136-4, Exs. A, D.) Rather, the private placement memorandum broadly states that investment funds will be used for "the Company's operations" and "all operating overhead." (Doc. No. 136-4, Ex. A at 3–4.) Since the "antecedent debts" that Plaintiff refers to arose out of "the Company's operations" and "operating overhead" (see Doc. Nos. 136-6, Ex. BB; 136-7, Ex. MM), Defendants' use of investment money to cover these costs was within the scope of the parties' agreement. Thus, Defendants did not make any misrepresentations about use of the investment funds, since the funds were used to cover "all operating overhead" as Defendants stated. (Doc. No. 136-4, Ex. A at 3–4.)

Plaintiff also claims that Defendants made misrepresentations because "none" of Plaintiff's investment proceeds were used to purchase leases with oil, gas, or mineral interests. (Doc. No. 138-1 at 15; 152 at 5.) Even assuming that the language of the parties' agreement requires at least some purchase of leases with oil, gas, or mineral interests, Plaintiff's claim is contradicted by the record. Hopewell's general ledger, as of December 31, 2016, shows at least two expenditures relating to mineral leases. (Doc. No. 136-6, Ex. BB at 468.) And on December 7 and 8, 2016, Tatham emailed Plaintiff with Hopewell's progress report as of November 30, 2016, reporting that Hopewell closed purchases of about 125.01 acres. (Doc. No. 136-5, Exs. P–R.) Though this may have been a smaller purchase of lands than either Plaintiff or Defendants had hoped, neither the private placement memorandum nor the Third Amended Agreement delineates any minimum of leases to be purchased or proportion of funds that had to be dedicated to purchasing leases.

(Doc. No. 136-4, Exs. A, D.)  And as noted above, the 2016 Cash Forecast indicated the significant operating expenses Hopewell had to cover before it could use funds for the purchase of leases with mineral interests.  (Doc. No. 136-4, Ex. C at 63–64.)

Second, Willis Defendants did not, by omission, make misrepresentations about Hopewell's financial condition because Willis Defendants did not make any representations about the financial condition of Hopewell.   From the outset, Defendants correctly note that Plaintiff does not identify any statement Defendants affirmatively made that would be rendered a misrepresentation due to Defendants' failure to disclose their financial condition.  Khoja, 899 F.3d at 1009.

To the extent that Willis Defendants did make any statements about its finances, Defendants did disclose Hopewell's operating costs and lack of capital to Plaintiff.  On August 2, 2016, Tatham emailed Plaintiff Hopewell's subscription booklet, private placement memorandum, and amended and restated company agreement.  (Doc. No. 136-5, Ex. W.)  The amended and restated company agreement sent in the email included a description of the application of capital contributions:

> Approximately $125,000 to $175,000 per month to be spent as per Exhibit B covering estimated current operating requirements through end of calendar 2016; the balance of the Proceeds will be used for the purchase of Oil, Gas, and Mineral Interests within Prospect Areas with early emphasis on Areas One and Two.

(Id. at 407.)  Additionally, the Third Amended Agreement included a "2016 Cash Forecast & Budget."  (Doc. No. 136-4, Ex. C at 63-64.)  The Cash Forecast, covering June to December 2016, itemizes all of Hopewell's monthly operating costs "Prior to Acquisition of Mineral Interests."  (Id.)  It breaks down costs by category, identifying costs for contract land services, IT services, legal, "GG&RE," management, and general administration.  (Id.)  The Cash Forecast also enumerates Hopewell's cash prior to and after operating costs, indicating that Hopewell would have zero dollars in capital from June to December 2016.  (Id.)   In fact, the Cash Forecast states that Hopewell needed $997,350.00 in equity investment over the course of June to December 2016 just to remain "cash neutral," i.e.

3:17-cv-00079-H-LL

ensure that the company's balance did not drop below zero dollars. (Id. at 64.) Other communications between Defendants and Plaintiff also reference these costs or disclosures. In an email from Tatham to Plaintiff on August 18, 2016, Tatham explains that Hopewell's expenses will amount to $150,000 a month. (Doc. No. 136-6, Ex. GG at 96-97.) On October 25, 2016, Willis sent an email to Plaintiff stating that Plaintiff needs to provide prompt payment given Defendants' "cash forecast" and the "number of obligations coming due by end of the month in addition to payment for the purchase of the new . . . leases."[2] (Doc. No. 136-6, Ex. CC at 491.) Thus, the record shows that Defendants did disclose the state of Hopewell's finances to Plaintiff.

Because Defendants disclosed Hopewell's undercapitalization, and because Defendants did not make any misrepresentations when stating that investment funds would be used to cover operating expenses, the Court grants Willis Defendants summary judgment of Plaintiff's securities fraud claim with respect to Hopewell's financial condition and the manner in which it spent investment funds.

### ii. Hopewell's Representations about Title Rover Technology

Plaintiff also contends that Defendants misrepresented the Title Rover title searching technology that Hopewell would employ in its enterprise. (Doc. No. 138-1 at 8.) Specifically, Plaintiff argues that Title Rover's technology was neither proprietary, nor fully functional, as represented by Defendants. (Id.) Willis Defendants claim that they made no misrepresentations because Hopewell described the technology "aspirationally" and "disclosed that the Title Rover's technology was being developed." (Doc. No. 136-1 at 14-15.) Willis Defendants also argue that there is no evidence that "Willis himself made any material misrepresentation at all." (Id. at 15.) The Court concludes that triable issues of fact remain concerning whether Defendants, including Willis, made material misrepresentations about whether Hopewell's title searching technology was proprietary

---

[2]    Though this communication was made after the securities transaction occurred, Willis's reference to the cash forecast further supports Willis Defendants' argument that Plaintiff was familiar with the cash forecast that was provided as part of the Third Amended Agreement prior to the close of the transaction.

and fully functional.  Moreover, there remain triable issues of fact on whether Defendants acted with the requisite scienter, whether Plaintiff justifiably relied upon those misrepresentations, and whether those misrepresentations caused Plaintiff's losses.

Plaintiff presents sufficient evidence to raise a triable issue of fact on whether Willis Defendants made misrepresentations about the proprietary nature of Title Rover's technology.  In both the private placement memorandum and the technology slide decks Defendants gave to Plaintiff, Defendants repeatedly characterized Title Rover's technology as "proprietary" technology.  (Doc. Nos. 136-4, Ex. A at 3, 5; 138-5, Ex. F; 138-6, Exs. G–H.)  However, Joe Haynes, the senior developer who led Title Rover's efforts to build its title searching web portal (Doc. Nos. 138-3, Ex. C at 39:20–40:13; 138-6, Ex. G at 152, 159), testified that the web portal was not, in fact, Title Rover's proprietary technology. (Doc. No. 138-3, Ex. C Haynes Depo. at RT40:12–41:21.)  Specifically, Haynes testified that he did not believe that the title searching web portal was anybody's proprietary technology since he used third-party tools to create it, and that "[i]f it's anyone's," it would be "AIT's[3] intellectual property."  (Id. at 41:4–11.)  Willis Defendants argue that Haynes' testimony was an "outlier" and point to other testimony stating that the technology was proprietary to Title Rover.  (Doc. No. 154 at 16) (citing Doc. Nos. 154-6, Ex. F Stanley Depo. at RT83:18–24; RT191:22–192:3; 154-7, Ex. V Willard-Killen Depo. at RT66:3–67:14.)  Because the conflicting testimony raises a genuine dispute of material fact over whether Title Rover's technology was proprietary, the Court denies Willis Defendants summary judgment on this issue.

Additionally, Defendants concede that Hopewell made a misrepresentation when stating that Brent Stanley was the Chief Technology Officer at Title Rover, when Stanley was in fact an independent contractor. (Doc. Nos. 136-1 at 15 n.17.  See also Doc. Nos.

---

[3]     AIT is the entity that employs Joe Haynes, the independent contractor Title Rover retained to create Title Rover's title searching web portal.  (Doc. Nos. 154-3, Willis Decl. ¶ 5; 154-7, Ex. J Stanley Depo. at RT24:8–20.)

138-3, Ex. B at 49:21–50:7; 138-6, Ex. G at 134, Ex. H at 152; 154-8 Ex. Y at 333–34.) Defendants, however, dispute Stanley's testimony that Willis directed him to make this misrepresentation, and they also argue that this misrepresentation was not material to Plaintiff's decision to invest in Hopewell. (Doc. Nos. 136-1 at 15 n.17; 154 at 3 n.4.) Thus, there remain triable issues of fact on whether Defendants' misrepresentation of Stanley's role at Hopewell creates grounds for Rule 10b-5 liability.

There are also triable issues of fact on whether Willis Defendants misrepresented the functionality of their title searching technology. Plaintiff argues that Defendants' statement that they possessed a "new proprietary software technology" was a material misrepresentation because "the TR Technology was never fully functional but, rather, was a work in progress that was never finished." (Doc. No. 152 at 5; see also Doc. No. 138-1 at 10.) The record is mixed on whether Defendants purported to have a fully functional title searching technology and whether their technology lived up to their representations.

Hopewell's title searching technology appears to consist of two main components: Title Rover's web portal and Beyond Recognition's image-reading software. Title Rover's web portal is the interface that a user would employ to search, sort, and produce graph or grid representations of land title data. (Doc. No. 138-6, Ex. H.) Beyond Recognition's data mining software provides the underlying title data by indexing or translating images or scans of leases into usable digital data.[4] (Id.)

With respect to Title Rover's title searching web portal, Defendants made multiple statements detailing an existing, functioning title searching technology. (Doc. Nos. 138-5, Ex. F; 138-6, Ex. G–H.) The private placement memorandum states that Defendants arranged a contract with Title Rover "for the exclusive use of new proprietary software technology owned by Title Rover, LLC . . . ." (Doc. No. 136-4, Ex. A at 5.) This language,

---

[4]    Despite the distinct functions performed by each component of the software, both parties refer to Title Rover and Beyond Recognition's technology interchangeably when discussing the functionality of Defendants' technology and the alleged misrepresentations relating to it. (See, e.g., Doc. Nos. 152 at 7; 154 at 11–16.)

arranging for "use of new proprietary software technology," necessarily implies that such technology functions and can be used. In the technology slide decks, Defendants state several times that Title Rover "has developed" its technology, using the past tense. (Doc. No. 138-5, Ex. F at 122–23; 138-6, Ex. G at 134–35, Ex. H at 154.) In the August 23, 2016 presentation, Defendants also state that what they "have done over the last few months for Title Rover is to create v1.0 of the portal . . . ." (Doc. No. 138-6, Ex. H at 152.) Additionally, Defendants describe the technology's particular performance characteristics with great detail. The presentations summarize, using present tense, the technology's key features, such as indexing, filtering, grouping, integrated viewing, and automatic title chaining. (Doc. No. 138-5, Ex. F at 125; 138-6, Ex. G at 138.) The August technology presentations also display screenshots delving into the specifics of what Title Rover's technology can do. (Doc. No. 138-6, Ex. G at 140–143; Ex. H at 154–158.)

Besides Title Rover's web portal, Willis Defendants also describe Beyond Recognition's data mining software and its capabilities. The August 23, 2016 slide deck specifies that data from leases or land titles would be collected by Beyond Recognition, "which has developed a unique method for executing data mining on records." (Id. at 159.) Further, the slide deck states that Beyond Recognition "has developed proprietary source code and the application to leverage visual similarity for its purpose." (Id. at 160.) The presentation continues, stating that "Title Rover has licensed technology from [Beyond Recognition] to automate data mining for this data type" and that Title Rover has "both a license for use of the technology and an exclusivity option." (Id.) As with Hopewell's contract with Title Rover, Title Rover's license to use Beyond Recognition's technology necessarily implies the existence and functionality of Beyond Recognition's data mining software.

However, Willis Defendants identify multiple statements they provided to Plaintiff indicating that their technology, or certain components, are still undergoing development. (See Doc. Nos. 136-4, Ex. A at 3; 154-7, Ex. T Pannu Depo. 8:16–25; 154-9, Ex. AA at 354.) Defendants stated that Hopewell was formed "to test and refine new IT software in

an existing contemporary oil and gas play." (Doc. No. 154-9, Ex. AA at 354.) Defendants' July 25, 2016 technology presentation concludes with a slide titled, "Getting Started," with several bullet points that appear to outline broad action plans, including one to "[b]uild out database and U[ser] I[nterface]." (Doc. No. 136-5, Ex. F at 131.) And while the August 23, 2016 presentation explains that Title Rover has contracted with Beyond Recognition to index land records into data usable by the Title Rover web portal, it also states that Title Rover "has commissioned [Beyond Recognition] to execute a statement of work demonstrating its ability to derive a high quality, deep index from a collection of land records from scratch . . . ." (Id. at 152.) The "statement of work demonstrating its ability to derive a high quality, deep index" suggests a proposed or working project to accomplish this goal, rather than a technology already fully capable of doing so.

Finally, Defendants refer to email communications between the parties on August 30, 2016, where Justin Pannu writes, "it appears that whatever these individuals are developing currently is critically important to the success of the Madison County and Buda Rosa plays – but that such items are not yet developed." (Doc. No. 154-9, Ex. Z at 351.) Pannu then asks, "[i]s the seemingly vital technology still a work-in-process?" (Id.) In response, Tatham states, "[i]ndexing of pre 1922 digital data remains to be completed" and "[t]he technology is currently working, the Madison County digital data base needs to be fully indexed, appropriate filters need to be developed for the Top Lease Play based upon legal analysis to be completed[.]" (Id.)

In short, the record shows that Defendants represented Title Rover and Beyond Recognition as having, at minimum, working versions of their title searching web portal and data mining software, but qualified these representations with statements that Defendants planned to continue refining and enhancing the software. (Doc. Nos. 136-4, Ex. A at 3; 154-7, Ex. T Pannu Depo. 8:16-25; 154-9, Ex. AA at 354.) Thus, the technology was neither nonexistent nor fully complete, but at some point between the two extremes. The issue, then, is whether Defendants described their technology's capabilities inconsistent with what their technology could do at its level of development. Given the

parties' dispute over the functionality of Title Rover's and Beyond Recognition's software, there remain triable issues of fact over both the extent to which Defendants represented the completion of their title searching technology and the extent to which the technology could perform as represented by Defendants. (See Doc. Nos. 138-3, Ex. A Willis Depo. at RT8:11–12; 154-6, Ex. F Stanley Depo. at RT52:7–17, RT60:15–65:7, Ex. K at 215–17; 154-8, Ex. V Willard-Killen Depo. at 68:6–23.)

Plaintiff argues that this case resembles S.E.C. v. Platforms Wireless Int'l Corp., 617 F.3d 1072 (9th Cir. 2010). In Platforms Wireless, the defendant "was working to develop a new technology, called the 'ARC System,' to provide cellular communications services to large geographic territories." Id. at 1081. The SEC alleged that the defendant's press release fraudulently advertised its possession of a viable ARC system. Id. at 1094. The Ninth Circuit agreed. In doing so, the Ninth Circuit noted how the press release "speaks in the present tense" and "discusses, in detail, five specific models" and "their particular performance characteristics," despite the fact that the company "had only a design of the system, had no operational prototype, and did not have the money to build a prototype." Id. at 1094–95. This case, however, is a closer question than Platforms Wireless because here, Defendants did have at least an operational prototype of their technology. (Doc. Nos. 138-6, Ex. H at 152; 154-6, Ex. F Stanley Depo. at RT60:14–65:7; 154-7, Ex. K.) Unlike the easy case of Platforms Wireless, where a party claimed to have an existing technology when it did not, this case asks whether Defendants' technology could perform as described. This question is factual one best left for the jury.

Additionally, to the extent Defendants made misrepresentations about Title Rover's technology, there remain triable issues of fact on the remaining elements of Rule 10b-5 fraud. Namely, there are triable issues of fact on whether Defendants acted with scienter, whether the misrepresentations were material, whether Plaintiff justifiably relied upon those representations, and whether these misrepresentations caused Plaintiff's injury.

Determining materiality in securities fraud cases "should ordinarily be left to the trier of fact." S.E.C. v. Phan, 500 F.3d 895, 908 (9th Cir. 2007) (quoting In re Apple

19

Computer Secs. Litig., 886 F.2d 1109, 1113 (9th Cir.1989)). This judgment is best left to a jury because it "requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." United States v. Gaudin, 515 U.S. 506, 512 (1995) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450, (1976)). Similarly, whether Plaintiff justifiably relied upon Defendants' misrepresentations, and whether Defendants acted with scienter, are matters best left for the trier of fact because the determination of justifiable or reasonable behavior is a fact-bound inquiry. See TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 n.12 (1976) ("In an analogous context, the jury's unique competence in applying the 'reasonable [person]' standard is thought ordinarily to preclude summary judgment in negligence cases."); Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1568-69 (9th Cir, 1990) (defining recklessness in securities fraud as "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care"). Likewise, the causation element, which requires a showing of loss-causation, involves a "context-dependent inquiry" because there are "an infinite variety of ways for a tort to cause a loss." Lloyd v. CVB Fin. Corp., 811 F.3d 1200, 1210 (9th Cir. 2016) (internal citations and quotation marks omitted). Since "loss causation is simply a variant of proximate cause," this questions of fact is also best left for the jury. Id. Thus, the remaining elements of securities fraud remain triable issues of fact.

Willis Defendants argue that even if they made misrepresentations relating to Hopewell's technology, they are entitled to summary judgment because Plaintiff could not have justifiably relied on those misrepresentations since Plaintiff: (1) conducted its own due diligence process (Doc. No. 136-1 at 18) and (2) signed a subscription agreement stating that Plaintiff did not rely on any of Defendants' representations beyond the subscription agreement, private placement memorandum, company agreement, and Plaintiff's independent investigations. (Id. at 18–19.) Willis Defendants cite Bank of the West v. Valley Nat. Bank of Arizona to assert that a plaintiff cannot justifiably rely on

3:17-cv-00079-H-LL

another's representation if the plaintiff signed an agreement stating that the plaintiff would exercise judgment "independently and without reliance upon any representations of [the defendant] . . . ." 41 F.3d 471, 477–78 (9th Cir. 1994).

This case is distinguishable from Bank of the West. In Bank of the West, the parties were two banks who agreed to invest in a third party. 41 F.3d at 471. Thus, the agreement between the banks stated that the parties would exercise their own independent judgment regarding the creditworthiness of a third party, whom either bank could investigate independently. Id. Here, however, Plaintiff's investigation of Defendants depended upon Defendants furnishing truthful and accurate information in response to Plaintiff's requests. The subscription agreement states:

> The Investor has had access to such information concerning the Company as the Investor deems necessary to enable the Investor to make an informed decision concerning the acquisition of the Interest. The Investor has had access to the designated representatives of the Company, its Managers and the opportunity to ask questions of, and receive answers satisfactory to the Investor from, the Managers and or such designated representatives concerning the offering of interests in the Company generally. The Investor has obtained all additional information requested by the Investor to verify the accuracy of all information furnished in connection with the offering of Interests in the Company.

(Doc. No. 136-5, Ex. M at 284.) Thus, Defendants cannot escape possible liability for allegedly fraudulent statements that Defendants supplied to Plaintiff during Plaintiff's efforts to conduct due diligence. In other words, Defendants cannot say that Plaintiff did not rely on Defendants' statements due to Plaintiff's own independent investigation, because Plaintiff's investigation depended upon Defendant providing truthful responses to Plaintiff's inquiries.

Similarly, the subscription agreement's reliance provision does not immunize Defendant from Plaintiff's fraud claim because the provision acknowledges that Plaintiff may rely upon its own investigation, and Defendants supplied the allegedly fraudulent statements to Plaintiff in the course of that investigation. (Doc. No. 136-5, Ex. M at 285)

3:17-cv-00079-H-LL

(Plaintiff "has not relied upon any representations or other information (whether oral or written) other than as set forth herein, in the Memorandum, the Company Agreement, the other agreements and independent investigations made by the Investor or representative(s) of the Investor.")

Accordingly, there are genuine disputes of material fact over whether Defendants made misrepresentations about Defendants' technology when describing it as "proprietary" or fully functional. And to the extent Defendants made misrepresentations, there remain triable issues of fact over whether Defendants acted with scienter, whether the misrepresentations were material, whether Plaintiff justifiably relied upon them, and whether the misrepresentations caused Plaintiff's injury.

### iii. Defendant Mark A. Willis's Personal Liability

Additionally, Willis Defendants argue that Defendant Mark A. Willis cannot be personally liable for any of plaintiff's securities fraud claims because his representations were "made on behalf of Hopewell, not Willis personally." (Doc. No. 136-1 at 11.) Willis Defendants also cite the indemnification provisions of the Third Amended Agreement to argue that Willis cannot be held liable under the terms of the agreement.[5] (Id. at 11 n.12.) Neither argument persuades the Court.

First, Willis cannot avoid potential liability from statements he made as a manager of Hopewell. Liability for securities fraud attaches to parties who "make" misstatements of fact. Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 142–43 (2011). "For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. One who prepares or publishes a statement on behalf of another is not its maker." Id.

---

[5] Willis Defendants cite § 9.2 of the Third Amended Agreement, which provides a "right to indemnification," but § 9.2 merely states that Hopewell would indemnify covered persons against "judgments, penalties . . ., fines, settlements and reasonable expenses . . . actually incurred by such Manager in connection with such Proceeding . . . ." (Doc. No. 136-4, ex. C at 86.) Thus, § 9.2 only refers to Willis's right to receive compensation for the costs of litigation, and it does not address the question of liability.

at 142. Generally, "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." Id. at 142-43. Here, the record shows that Willis had ultimate authority over the statements he made to Plaintiff surrounding the securities transaction. (See, e.g., Doc. Nos. 136-2, Willis Decl. ¶¶ 1, 4; 138-3, Exs. A at 12–13, 16–18, B at 31–34.)

Willis Defendants emphasize that "[o]ne who prepares or publishes a statement on behalf of another is not its maker." (Doc. No. 136-1 at 11) (quoting Janus Capital Grp., Inc., 564 U.S. at 142.) From this, Willis Defendants claim that Willis's statements were "on behalf of" Hopewell, arguing that any liability attaches to Hopewell and not Willis, personally. But this conclusion does not follow from Janus. As noted above, a person who "prepares or publishes a statement on behalf of another" does not "make" the statement because the person does so under the direction of another. Janus, 564 U.S. at 142. Thus, when Janus refers to a person who "publishes a statement on behalf of another," Janus was considering the "actor" delivering "a playwright['s] . . . lines," such as an employee who publishes the press release dictated by a company director. Id. at 145. Here, it is fiction to claim that Hopewell, a legal entity, directed Willis to make the statements he did when Willis was the president and one of two founding managers directing Hopewell's operations. (Doc. No. 136-2, Willis Decl. ¶¶ 1, 4; Doc. No. 136-4, Ex. C at 81, 94; Doc. No. 138-3, Ex. A Willis Depo. at RT74:16–20.) Because Willis had ultimate authority over the statements he made on behalf of Hopewell, he can be held liable for any misrepresentations he made in his transactions with Plaintiff. See ESG Capital Partners, LP v. Stratos, 828 F.3d 1023, 1033 (9th Cir. 2016) (individual attorney may be the maker of false statements under Rule 10b-5, notwithstanding attorney's inclusion of "a short, easy preface" asserting that attorney was not communicating "his own" personal understanding

of the transaction).[6]

Second, the Third Amended Agreement does not shield Willis from Plaintiff's claims. Section 9.1 of the Third Amended Agreement states,

> Neither any Manager, any Member, nor any Person appointed to act as liquidator . . . shall be liable to the Company or any Member under any theory of law, including tort, contract or otherwise . . . for any loss, damage or claim incurred by reason of any act or omission by such Covered Person in good faith on behalf of the Company and in any manner reasonably believed to be within the scope of authority conferred on such Covered Person . . . except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of gross negligence, willful misconduct, intentional misrepresentation or breach of duty of loyalty of such Covered Person.

(Doc. No. 136-4, Ex. D at 85.) Thus, the Third Amended Agreement does not protect Willis from liability if the claim asserts injury due to Willis's "gross negligence, willful, misconduct, intentional misrepresentation or breach of duty of loyalty." Id. Here, Plaintiff alleges that Willis intentionally or recklessly committed fraud. (Doc. No. 93 at 16–21.) Thus, the Third Amended Agreement does not immunize Willis from Plaintiff's claims.

Accordingly, Willis may be liable for fraud to the extent that Willis made fraudulent statements under Rule 10b-5 or the common law tort of intentional misrepresentation. The parties dispute whether Willis directed Stanley to make various representations in the technology presentations given to Plaintiff. (See Doc Nos. 138-1 at 20; 152 at 10–11; 154 at 15; 156 at 3–4.) Whether the particular statements at issue were made by Willis or under

---

[6] Though ESG Capital Partners, LP v. Stratos ultimately concluded that the individual attorney could be liable due to "other false statements" he made "on his own behalf," the Ninth Circuit noted that the attorney's false statements on behalf of a limited liability company could give grounds for § 10(b) liability, notwithstanding the attorney's use of a "short, easy preface" that the attorney was not communicating "his own" understanding of the transaction. 828 F.3d 1023, 1033–34 (2016) ("While it is true that attributing a statement to another party generally indicates that party as the 'maker' of the statement, see id. at 142–43, 131 S.Ct. 2296, we are not convinced that such a short, easy preface could shield a messenger from liability in all circumstances."). The possibility of personal liability is stronger here than in ESG Capital Partners because this case concerns statements by the president and CEO of the company, not the company's attorney, and the statements at issue here are not prefaced by any disclaimers explaining that the statements represent the views of company, rather than those of the speaker, personally.

his direction is a question of fact that remains for the jury.

### iv.  Defendants Beyond Review, Image Engine, and Willis Group

Willis Defendants contend that there is no evidence in the record showing that Image Engine, Beyond Review, or the Willis Group "ever made representations to Ensource, let alone misrepresentations," meaning that Plaintiff's securities fraud claim against these entities should be denied as a matter of law.  (Doc. No. 136-1 at 10.)

Plaintiff does not challenge Defendants' claim that there is no evidence showing that Image Engine, Beyond Review, or the Willis Group made misrepresentations.  Rather, Plaintiff argues that Willis acted "on behalf of" Beyond Review, Image Engine, and the Willis Group, and therefore Willis's misrepresentations are attributable to those entities under Lorenzo v. SEC, 139 S. Ct. 1094, 1101 (2019).  (Doc. No. 152 at 17–18.)  But Lorenzo v. SEC does not apply to this case.  Lorenzo considered the circumstances when an individual could be liable for securities fraud merely for disseminating a misrepresentation, even if that person was not the person who created the misrepresentation in the first place.  139 S. Ct. 1094, 1101.  Lorenzo held that a petitioner was liable, even when he did not make the false statements, because "the petitioner in this case sent false statements directly to investors, invited them to follow up with questions, and did so in his capacity as vice president of an investment banking company."  Id.  Those facts have no bearing on this case.  Plaintiff does not argue that Beyond Review, Image Engine, or the Willis Group disseminated any false statements.[7]  Because there is no evidence that Beyond Review, Image Engine, or the Willis Group made or disseminated misrepresentations, the

---

[7]     Plaintiff does allege, in their amended complaint, that Beyond Review, Image Engine, and the Willis Group are mere "alter egos" of Defendant Willis.  (Doc. No. 93 at 7.)  However, on a motion for summary judgment, once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to "present affirmative evidence . . . from which a jury might return a verdict in his favor."  Anderson, 477 U.S. at 256.  At this stage, the non-moving party "may not rest upon mere allegation or denials of his pleadings."  Anderson, 477 U.S. at 256; see also Behrens v. Pelletier, 516 U.S. 299, 309 (1996) ("On summary judgment, . . . the plaintiff can no longer rest on the pleadings.").  Thus, the alter ego allegations in Plaintiff's amended complaint are insufficient to withstand summary judgment.

Court grants Willis Defendants' motion with respect to Image Engine, Beyond Review, and the Willis Group.

## B. Intentional Misrepresentation

Plaintiff also argues that the Willis Defendants committed intentional misrepresentation. Intentional misrepresentation occurs if[8]: (1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation; and (4) the plaintiff suffered an injury by actively and justifiably relying on that representation. JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C., 546 S.W.3d 648, 653 (Tex. 2018), reh'g denied (June 15, 2018).[9]

The elements of intentional misrepresentation and securities fraud are closely

---

[8] This Court has already determined that Texas law governs the common law claims. (See Doc. No. 15 at 8–10.) Since this Court exercises supplemental jurisdiction over the conversion claim, "the federal court applies the choice-of-law rules of the forum state," in this case, California. Douglas v. U.S. Dist. Court for Cent. Dist. of California, 495 F.3d 1062, 1067 n.2 (9th Cir. 2007) (quoting Paracor Fin., Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1164 (9th Cir.1996)). In California, when parties have executed a contract containing a choice-of-law provision, courts apply "[t]he law of the state chosen by the parties to govern their contractual rights and duties . . ., even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue." Nedlloyd Lines B.V. v. Superior Court, 3 Cal. 4th 459, 465 (1992) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2) (1971)). This rule applies unless there is no reasonable basis for the parties' choice or it would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state. Id. Here, the parties executed an agreement specifying the rights and duties of the members of the Hopewell project. (Doc. No. 8-7.) That agreement contains a choice of law provision stating that the agreement shall be construed in accordance with the law of the State of Texas. (Id. at 27.) The alleged conversion may not be covered by an explicit provision of the contract, but the allegations arise from rights and duties created by the contract. Because Hopewell is a Texas company seeking to do business in Texas, there is a reasonable basis for applying Texas law. Applying Texas law to this conversion claim also would not harm any fundamental policy of California. Thus, the Court reviews the intentional misrepresentation and conversion claims under Texas law.

[9] Though Texas cases also refer to these as the elements of fraud, "[i]ntentional misrepresentation is essentially fraud." Barrand, Inc. v. Whataburger, Inc., 214 S.W.3d 122, 141 n.5 (Tex. App. 2006).

related.  See Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 286 n.1 (2014) ("As the private Rule 10b–5 action has evolved, the Court has drawn on the common-law action of deceit to identify six elements a private plaintiff must prove . . . ."); Foster v. Wilson, 504 F.3d 1046, 1050 (9th Cir. 2007) ("Federal securities fraud, like its common law fraud ancestor, requires knowingly making a false statement with intent to deceive, reliance upon which injures the victim.").  Thus, the analysis of the securities fraud claims above applies to Plaintiff's intentional misrepresentation claims as well.  Accordingly, there remains triable issues of fact regarding whether the Willis Defendants intentionally misrepresented Title Rover's technology in their communications with Plaintiff: namely, whether the technology was proprietary, whether it functioned as represented, whether Willis directed Brent Stanley to falsely claim that he was CTO of Hopewell, whether these purportedly false claims were material, and whether Plaintiff suffered injury by justifiably relying on those representations.

## C.   Conversion

Willis Defendants seek summary judgment of Plaintiff's conversion claim.  An "action for conversion will not lie for money represented by a general debt." Houston Nat. Bank v. Biber, 613 S.W.2d 771, 774 (Tex. Civ. App. 1981), writ refused NRE (June 30, 1981).  But an "action will lie for conversion of money when identification of the money is possible and there is a breach of an obligation to deliver the specific money in question or to otherwise treat specific money."  Sw. Indus. Inv. Co. v. Berkeley House Inv'rs, 695 S.W.2d 615, 617 (Tex. App. 1985), writ refused NRE (Nov. 27, 1985) (citations omitted). "When a person has designated a particular use for proceeds . . ., those proceeds count as 'specific money,' capable of identification . . . . and capable of conversion."  Id. (citing Biber, 613 S.W. 2d at774); accord Intermarkets U.S.A., Inc. v. C-E Natco, a Div. of Combustion Eng'g, Inc., 749 S.W.2d 603, 604 (Tex. App. 1988), writ denied (Jan. 11, 1989).

Thus, Texas courts allow actions for conversion when a party breaches its  obligation to treat money in a specific manner.  In Berkeley House, plaintiffs purchased property and

provided money that was meant to cover payments on the property's note as well as property taxes. Berkeley House, 695 S.W.2d at 616. The defendant kept the money and did not use any of it to pay the property taxes. Id. There, a judgment of conversion was appropriate because the defendant breached its obligation to treat the money in a specific manner and instead converted the funds to the defendant's own use. Id. at 616-17; see also Texas State Title Co. v. Sawicki, No. 01-94-00915-CV, 1995 WL 555853, at *2 (Tex. App. Sept. 21, 1995) (conversion could lie where defendants allegedly breached obligation to use specific funds to pay lienholders and instead converted the money to their own use). Similarly, in Intermarkets, the defendant purchased equipment from the plaintiff. Intermarkets, 749 S.W.2d at 604. The defendant had received a letter of credit from a third party, which was supposed to be used to pay for the equipment. Id. However, the defendant never paid for the equipment. Id. The defendant was liable for converting the money because the defendant violated its obligation to use the money for the specific purpose of paying for the equipment. Id.

Here, Plaintiff's conversion claim fails as a matter of law. The parties agreed that Plaintiff's investment proceeds would be used for both operating expenses and purchases of leases with mineral interests, and nothing in the record suggests that Defendants used the investment proceeds beyond those stated purposes. The private placement memorandum's executive summary states that Hopewell sought investment "for the purpose of acquiring new lease and mineral interest acquisitions in the four initial areas and for working capital to continue the Company's operations and evaluation of lease acquisition opportunities." (Doc. No. 136-4, Ex. A at 3.) Similarly, the private placement memorandum's term sheet states that investment "proceeds . . . are to be used to fund all operating overhead of the Company through December 31, 2016, and for the acquisition of Mineral Interests, primarily new Oil and Gas leases, in an agreed Area of Mutual Interest ('AMI') covering Madison County, TX and the Buda Rose play ('Buda Rose' play)." (Id. at 4.) These terms expressly state that Defendants would utilize the money invested in them to pay for "operations" and "all operating overhead," generally, and does not

condition the use of funds solely for present or future expenses. Additionally, the 2016 Cash Forecast indicated that operating expenses would be paid prior to acquisition of leases with mineral interests. (Doc. No. 136-4, Ex. C at 63–64.) As noted above, Hopewell's accounting ledger and collection of invoices establish that funds were spent to cover Hopewell's operating expenses. (Doc. Nos. 136-6, Ex. BB; 136-7, Ex. MM.) Since Defendants did not breach any obligation to treat the investment proceeds in a certain manner, Plaintiff's conversion claim fails as a matter of law.

### D. Unfair Competition, California Business & Professions Code §§ 17200-17208

Willis Defendants also seek summary judgment of Plaintiff's unfair competition claim under California Business & Professions Code § 17200, arguing that the statute does not apply to securities transactions. (Doc. No. 136-1 at 24.) Plaintiff contends that California cases have interpreted § 17200 to apply broadly to reach "securities-based claims," citing Roskind v. Morgan Stanley Dean Witter & Co., 95 Cal. Rptr. 2d 258 (Cal. Ct. App. 2000), as modified on denial of reh'g (May 26, 2000) and Overstock.com, Inc. v. Gradient Analytics, Inc., 61 Cal. Rptr. 3d at 29. The Court agrees with Willis Defendants.

In Bowen v. Ziasun Techs., Inc., 11 Cal. Rptr. 3d 522, 530-33 (2004), as modified on denial of reh'g (Apr. 7, 2004), the California Court of Appeal concluded that "section 17200 does not apply to securities transactions . . . ." Id. Since Bowen, federal and California courts have narrowed Bowen's scope to allow § 17200 claims to proceed where the claims were tangentially related to securities transactions. See, e.g., Benson v. JPMorgan Chase Bank, N.A., No. C-09-5272 EMC, 2010 WL 1526394, at *7 (N.D. Cal. Apr. 15, 2010) (permitting § 17200 claim to proceed against banks for aiding and abetting securities fraud by allowing the individuals who committed the fraud to create and maintain accounts for the fraudulently induced funds); In re Charles Schwab Corp. Sec. Litig., 257 F.R.D. 534, 553 (N.D. Cal. 2009) (permitting § 17200 claim to proceed where the claim asserts "not a misrepresentation but rather that defendants changed [an investment] policy without a majority vote of the shareholders"); Overstock.com, Inc. v. Gradient Analytics,

*Inc.*, 61 Cal. Rptr. 3d 29, 51 (Cal. Ct. App. 2007) (holding § 17200 applicable because claims "*do not arise from any stock transactions between the parties*" but "from the allegedly defamatory reports published . . . ." (emphasis in original)). "No court, however, has allowed Section 17200 claims to proceed where, as here, the predicate acts are securities transactions." <u>Betz v. Trainer Wortham & Co.</u>, 829 F. Supp. 2d 860, 866 (N.D. Cal. 2011); <u>see also</u> <u>Siegal v. Gamble</u>, No. 13-CV-03570-RS, 2016 WL 1085787, at *7-8 (N.D. Cal. Mar. 21, 2016). Since this case revolves around "the purchase and sales of securities of Defendant Hopewell — Pilot Project, LLC" (Doc. No. 93 ¶ 1), the predicate acts are securities transactions and California's unfair competition law does not apply.

Plaintiff's cited cases, <u>Roskind</u> and <u>Overstock.com, Inc.</u>, are unavailing. <u>Roskind</u> predates <u>Bowen</u>, and <u>Bowen</u> rejected the same argument that Plaintiff makes here, concluding that "[i]n *Roskind*, the court only held that securities laws do not *preempt* section 17200 claims," and therefore "[t]he *Roskind* case is inapplicable and does not support the conclusion that section 17200 applies to securities transactions." 11 Cal. Rptr. 3d at 532–33 (emphasis in original). Similarly, <u>Overstock.com, Inc.</u> does not apply. <u>Overstock.com, Inc.</u> recognized <u>Bowen</u>'s holding that "securities transactions are not covered under the UCL," but distinguished its case because "*Overstock's claims do not arise from any stock transactions between the parties*. Rather, they arise from the allegedly defamatory reports published by Gradient . . . ." 61 Cal. Rptr. 3d at 51 (emphasis in original). Here, unlike <u>Overstock.com, Inc.</u>, Plaintiff's claims arise from the securities transaction between Plaintiff and Defendants. Consequently, this case falls squarely within <u>Bowen</u>, meaning that § 17200 does not apply. Thus, Plaintiff's unfair competition claim fails as a matter of law, and the Court grants the Willis Defendant's motion for summary judgment of Plaintiff's § 17200 claim.

## Conclusion

For the reasons above, the Court grants in part and denies in part the Willis Defendants' motion for summary judgment. Specifically, the Court grants summary judgment in favor of Beyond Review, Image Engine, and Willis Group on all of Plaintiff's

claims. The Court also grants summary judgment in favor of Defendant Mark A. Willis on: (1) Plaintiff's securities fraud claim with respect to Defendants' statements about how they would use Plaintiff's investment funds; (2) the securities fraud claim with respect to alleged omissions regarding Hopewell's finances; (3) Plaintiff's intentional misrepresentation claim with respect to Defendants' statements about how they would use Plaintiff's investment funds; (4) the intentional misrepresentation claim with respect to alleged omissions regarding Hopewell's finances; (5) Plaintiff's conversion claim; and (6) Plaintiff's California unfair competition law claim. The Court denies Willis Defendants' motion for summary judgment of: (1) Plaintiff's securities fraud claim against Defendant Mark A. Willis with respect to Defendants' statements concerning the Title Rover technology and Brent Stanley's title as CTO of Hopewell; and (2) Plaintiff's intentional misrepresentation claim against Defendant Mark A. Willis with respect to Defendants' statements describing the Title Rover technology and Brent Stanley's title as CTO of Hopewell. Finally, the Court denies Plaintiff's motion for summary judgment of its securities fraud claims as to Defendant Mark A. Willis.[10]

**IT IS SO ORDERED.**

DATED: December 6, 2019

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

---

[10]    In Willis Defendants' opposition to the Plaintiff's motion for summary judgment, Willis Defendants also request that the Court strike the declaration of Thomas Tatham, citing Federal Rules of Evidence 403 and 802. (Doc. No. 154-4.) The Court, exercising its discretion, declines to strike the declaration. The Court overrules Willis Defendants' Rule 403 objection, and to the extent sections of the declaration contain inadmissible hearsay, the Court refrains from considering those portions of the declaration.