EXHIBIT A

EXHIBIT A

1

```
 1              IN THE UNITED STATES BANKRUPTCY COURT

 2                FOR THE SOUTHERN DISTRICT OF TEXAS

 3                        HOUSTON DIVISION

 4
    IN RE:                      §    CASE NO. 17-32880-H2-11
 5                              §    HOUSTON, TEXAS
    HOPEWELL-PILOT PROJECT, LLC §    WEDNESDAY,
 6  and TITLE ROVER, LLC        §    MARCH 28, 2018
                                §
 7           DEBTORS.           §    9:17 A.M. TO 12:42 P.M.

 8  _____

 9                          MOTION HEARING

10          Motion to Convert Case from Chapter 11
               to Chapter 7 or to Dismiss (Doc. #54);
11        Chapter 11 Plan of Reorganization (Doc. #64)

12
            BEFORE THE HONORABLE DAVID R. JONES
13               UNITED STATES BANKRUPTCY JUDGE

14

15                          APPEARANCES:

16         FOR THE PARTIES:    SEE NEXT PAGE

17         COURT RECORDER:     LINHTHU DO

18

19

20               TRANSCRIPTION SERVICE BY:

21          JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 ELDRIDGE ROAD, #144
22              SUGAR LAND, TEXAS 77478
           Tel: 281-277-5325 / Fax: 281-277-0946
23             www.judicialtranscribers.com

24
        Proceedings recorded by electronic sound recording;
25        transcript produced by transcription service.
```

2

1                              APPEARANCES

2

3    FOR THE DEBTORS                REESE W. BAKER
     HOPEWELL and TITLE ROVER       Baker & Associates
4                                   950 Echo Lane
                                    Suite 200
5                                   Houston, Texas 77024

6

7    FOR ENSOURCE                   ALAN SANFORD GERGER
     INVESTMENTS, LLC:              The Gerger Law Firm PLLC
8                                   2211 Norfolk
                                    Houston, Texas 77098
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                   JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003575

3

```
 1                          INDEX

 2
     WITNESSES:              Direct  Cross  Redirect  Recross
 3
     MARK WILLIS
 4    By Mr. Baker             12      .       96        .
      By Mr. Gerger             .     61        .       104
 5

 6

 7
     EXHIBITS:                        Identified    Received
 8
     Debtors' Exhibit No. 1               8            8
 9   Debtors' Exhibit No. 2               8            8
     Debtors' Exhibit No. 3               8            8
10   Debtors' Exhibit No. 4               8            8
     Debtors' Exhibit No. 5               8            8
11   Debtors' Exhibit No. 6               8            8

12
     Ensource Exhibit No. 1       9,81,86,96           9
13   Ensource Exhibit No. 2               9            9
     Ensource Exhibit No. 3               9            9
14   Ensource Exhibit No. 4             9,93           9
     Ensource Exhibit No. 5             9,87           9
15   Ensource Exhibit No. 6               9            9
     Ensource Exhibit No. 7               9            9
16   Ensource Exhibit No. 8            9,104           9
     Ensource Exhibit No. 9               9            9
17   Ensource Exhibit No. 10              9            9
     Ensource Exhibit No. 11            9,65           9
18   Ensource Exhibit No. 12              9            9
     Ensource Exhibit No. 13            9,79           9
19   Ensource Exhibit No. 14            9,71           9

20

21

22

23

24

25
```

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003576

4

1       HOUSTON, TEXAS; WEDNESDAY, MARCH 28, 2018, 9:17 A.M.

2              THE COURT:  On the 9:00 o'clock docket, we have

3   Case No. 17-32880, Hopewell-Pilot Project, LLC, and Title

4   Rover, LLC.  I'll take appearances, please.

5              Mr. Baker, good morning.

6              MR. BAKER:  Good morning, Your Honor.  Reese Baker

7   on behalf of Hopewell and Title Rover.

8              THE COURT:  All right, thank you.

9              MR. GERGER:  Alan Gerger on behalf of Ensource,

10  Your Honor.

11             THE COURT:  All right.  Thank you, Mr. Gerger.

12  Anyone else on the telephone --

13             MR. GERGER:  And Mack Wilson with my firm is here

14  as well.

15             THE COURT:  All right, thank you.  Good morning.

16             MR. GERGER:  And Mr. Pannu is here.  He's the

17  manager of Ensource.

18             THE COURT:  Thank you.  Is there anybody on the

19  telephone that wishes to make an appearance?

20       (No response.)

21             THE COURT:  All right.  Mr. Baker, where are we

22  this morning?

23             MR. BAKER:  Okay, Your Honor.  We have -- we

24  submitted a ballot summary last night.

25             THE COURT:  I saw that this morning.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003577

5

1          MR. BAKER:  Showing the ballots.  The only

2  opposition to the plan we have got is from Ensource, and one

3  other creditor -- one other investor, Gil Lopez, who voted

4  against it.  I have not heard anything else from him other

5  than his vote to reject it.  The only objection that we've

6  got on record at this point in time is from Ensource.

7          THE COURT:  All right.  And, Mr. Gerger, were

8  you prepared to go forward this morning?

9          MR. GERGER:  This morning, we have the plan for

10  confirmation --

11          THE COURT:  Uh-huh.

12          MR. GERGER:  -- and we have Ensource's motion to

13  convert or dismiss.

14          THE COURT:  No, I --

15          MR. GERGER:  So we are prepared to go forward on

16  both of those.

17          THE COURT:  All right.

18          MR. GERGER:  We have filed an objection to the

19  plan.  There has been no objection to the motion to convert

20  or dismiss.

21          THE COURT:  Right.  All right, Mr. Baker, do you

22  want to just proceed ahead with your evidence or do you want

23  to give an opening?  How would you like to proceed this

24  morning?

25          MR. BAKER:  We can proceed forward with putting

PLTF_003578

6

1  Mr. Willis on the stand --

2          THE COURT:  All right.

3          MR. BAKER:  -- on the confirmation issues.

4          THE COURT:  All right.  Mr. Gerger, did you want

5  to make a brief opening, do you want to reserve it for your

6  case-in-chief, or do you want to get just straight to the

7  evidence?

8          MR. GERGER:  Well, I would suggest that these

9  hearings be held contemporaneously --

10         THE COURT:  Absolutely.

11         MR. GERGER:  -- on the two matters.

12         THE COURT:  No, I'm going to take -- I'm going to

13 take everything at one time, and it would make no sense to

14 do it -- get a decision and then start over.  Given the

15 nature of the case and where we are, we'll just take all

16 the evidence together.

17         MR. GERGER:  Your Honor, we did not receive the

18 exhibits until about 4:00 o'clock Monday afternoon, and the

19 deadline was noon.

20         THE COURT:  Okay.

21         MR. GERGER:  So we'll object to the exhibits on

22 that basis.

23         THE COURT:  All right.

24         MR. GERGER:  I will say that if that objection is

25 overruled, we don't have any objection to the documents

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003579

7

1   themselves.

2              THE COURT:  Well, let me ask you this, Mr. Gerger.

3   Given -- I mean, I'm not happy any time that that rule is

4   not complied with, and I certainly want you to have ample

5   opportunity to respond to any exhibit that's offered.

6              I am not inclined -- I am not inclined to sustain

7   the objection, just given the nature of the proceeding.

8   What I am willing to do, if you are in any way surprised,

9   I am happy not to go forward today so that if you think that

10  you haven't been given an opportunity to adequately prepare,

11  I want to make sure you have that.

12             So I will put that -- you know, I will put that

13  totally in your decision.  Do you want to go forward or do

14  you want -- do you want more time?

15             MR. GERGER:  We want to go forward today.

16             THE COURT:  All right.  Then I'll note the

17  objection and I'll note that an opportunity for a

18  continuance was give and declined.  And so, with the

19  understanding -- I think you said that you have no other

20  objections to the admission of the exhibits.

21             Mr. Baker, are you offering your exhibits at this

22  point?

23             MR. BAKER:  Yes.

24             THE COURT:  All right.  I don't have a copy.

25        (Exhibits presented.)

PLTF_003580

8

1          THE COURT:  So I've got Debtor Exhibits 1

2  through 6.  Correct, Mr. Baker?

3          MR. BAKER:  Correct.

4          THE COURT:  And, Mr. Gerger, again, just to

5  confirm for the record, you have no objection to the

6  admission of Debtor Exhibits 1 through 6; correct?

7          MR. GERGER:  Correct.

8          THE COURT:  Then they are admitted.

9      (Debtors' Exhibits 1 through 6 received in evidence.)

10          THE COURT:  And let me go back.  Did you want to,

11  in terms of an opening, did you want to make an opening now

12  or do you want to reserve your opening until your case-in-

13  chief?  How did you want to proceed?

14          MR. GERGER:  I think we may make a closing

15  argument.

16          THE COURT:  Just a closing argument?

17          MR. GERGER:  I think so.

18          THE COURT:  Fair enough.  All right.  Mr. Baker,

19  your first witness?

20          MR. GERGER:  And, Your Honor, would you like our

21  exhibits at this time?

22          THE COURT:  Absolutely.  Yes, let me just go ahead

23  and take them.

24      (Exhibits presented.)

25          THE COURT:  MR. Baker, I assume you've had an

PLTF_003581

9

1   opportunity to look at Mr. Gerger's exhibits?

2           MR. BAKER:  I have.  I don't have any objections

3   to them, Your Honor.

4           THE COURT:  All right.  And, Mr. Gerger, are

5   you offering all of those exhibits -- actually, it would be

6   1 through 14 -- at this time?

7           MR. GERGER:  Yes, Your Honor.

8           THE COURT:  All right.  Then, without objection,

9   I will admit Ensource Exhibits 1 through 14.

10       (Ensource Exhibits 1 through 14 received in evidence.)

11          MR. GERGER:  All right, thank you.

12          THE COURT:  All right.  Mr. Baker, I think I

13  caught you right in the middle.  You were calling Mr.

14  Willis?

15          MR. BAKER:  Yes.

16          THE COURT:  All right.  Mr. Willis, if you'd

17  please come forward.

18          THE WITNESS:  Can I bring up a water?

19          THE COURT:  Absolutely.  And before you sit down,

20  if you'd raise your right hand.

21       (Witness sworn.)

22          THE COURT:  All right, thank you.

23          MR. GERGER:  Excuse me, Your Honor.  There's one

24  more thing.  Both the Debtors and our client listed two

25  witnesses, Mr. Willis and Mr. Tatham.  Mr. Willis is the

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003582

10

1   sole manager of the Debtors and we'd like to invoke the

2   rule --

3           THE COURT:  All right.

4           MR. GERGER:  -- with respect to Mr. Tatham.

5           THE COURT:  All right.  Mr. Baker, any objection?

6           MR. BAKER:  No objection.

7           THE COURT:  All right.  Mr. Tatham, what I need

8   for you to do -- come on up here for a second, if you would,

9   please?

10           MR. TATHAM:  (Steps forward.)

11           THE COURT:  Good morning.

12           MR. TATHAM:  Good morning.

13           THE COURT:  All right.  Are you familiar with what

14   Mr. Gerger referred to as the rule?

15           MR. TATHAM:  No.

16           THE COURT:  All right.  There is a rule of

17   evidence which says -- if invoked timely, says that, with

18   very few exceptions, that witnesses are to be excused from

19   the courtroom until after their testimony is completed.

20           So what I'm going to ask you to do, because the

21   rule has been invoked, is I want you to step outside the

22   courtroom.  There's some benches right outside.  Obviously,

23   if you want to go wander around, just don't go far.  And we

24   will do our best to get to you.

25           If anyone approaches you on a break or anything

PLTF_003583

11

1   like that, do not talk to them about this case, don't get

2   into a discussion about what's going on.  Just stay away

3   from it; it'll keep you out of trouble.

4         We'll do our best to move this along just as

5   quickly as we can.  Once we get you into the courtroom, have

6   your testimony, then obviously you'll be free to go, and

7   also stay in the courtroom and observe the rest of the

8   proceedings.  But until we get to you, I need for you to

9   step outside, okay?

10         MR. TATHAM:  Okay.

11         THE COURT:  All right.

12         MR. TATHAM:  I wasn't planning on testifying

13   today, Your Honor.  I was here simply to observe the

14   proceeding.

15         THE COURT:  Well, let me ask Mr. Baker.  Do you

16   intend to call Mr. Tatham?

17         MR. BAKER:  At this point in time, I do not in my

18   case-in-chief.  Not knowing exactly what they're going to

19   get into, he may or may not be a necessary witness on

20   rebuttal, but I was not planning on calling him in my case-

21   in-chief.

22         THE COURT:  And --

23         MR. TATHAM:  I'm not represented by counsel today,

24   anyway.  I'm sorry.

25         THE COURT:  That's irrelevant to whether or not

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

EXHIBIT A
Page 11

PLTF_003584

MARK WILLIS - DIRECT BY MR. BAKER                    12

1  you're going to testify.

2          MR. TATHAM:  Okay.

3          THE COURT:  Mr. Gerger, were you intending on

4  calling Mr. Tatham?

5          MR. GERGER:  At this stage, yes.

6          THE COURT:  All right.  Then I'm going to ask you

7  to step outside and, again, we will get to you just as

8  quickly as we possibly can.  All right?

9          MR. TATHAM:  Okay.

10          THE COURT:  All right.  Thank you, sir.

11      (Witnesses sequestered.)

12          THE COURT:  Mr. Baker, whenever you're ready.

13              MARK WILLIS - DIRECT EXAMINATION

14  BY MR. BAKER:

15  Q    Would you state your name, please?

16  A    Mark Willis.

17  Q    And how are you related to both Hopewell and Title

18  Rover?

19  A    I am the sole member of Hopewell, and there are two

20  members of -- Willis Group and myself are members of Title

21  Rover.

22  Q    And when you say you're the sole member, are you the

23  sole managing member, as opposed to the only investor?

24  A    Correct.

25  Q    Okay.  And there are other investors in Hopewell?

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003585

MARK WILLIS - DIRECT BY MR. BAKER                    13

1   A    That's correct.

2   Q    Okay.  Now, let's talk a little bit about your

3   background.  What kind of background do you have in

4   business?

5   A    Well, I've probably founded a couple dozen companies.

6   I've been everything from traditional -- as far as oil and

7   gas has been, I've been in traditional exploration, I've

8   been on the mineral and royalty side on numerous

9   transactions.

10       I was original founder of a company called Core Energy.

11  I was on the board of directors in that company.  I've also

12  founded other companies in healthcare.  My primary business

13  right now is in staffing.  I have about six different

14  staffing entities, the largest one being an IT staffing

15  company that's a national company.

16       So I kind of -- in certain respects, I've spent

17  a lifetime championing --- or the last 15 years, championing

18  entrepreneurs, looking at ideas and finding subject matter

19  experts to help me bring those ideas to a business.

20  Q    Now, with regard to Hopewell and Title Rover, first of

21  all, how are they -- they're here together.  What does

22  Hopewell do?  What was Hopewell's business?

23  A    Hopewell was brought -- the opportunity was brought to

24  me by a landman that identified -- and, you know, originally

25  -- I also have a legal staffing company that would have

PLTF_003586

MARK WILLIS - DIRECT BY MR. BAKER                    14

1  expertise in the e-discovery business so -- and I actually

2  helped manage the largest case in U.S. history, which was

3  the disaster in the Gulf.

4      So in doing so, I got a lot of exposure to a lot of the

5  e-discovery tools, that allowed you to organize documents,

6  use smart technology to search for very particular wordings

7  or phrases within documents, to help make cases a lot more

8  efficient.

9      A gentleman brought me an opportunity that was up in

10  East Texas whereby it was a large oilfield where the title

11  was very, very complicated.  And due to the dramatic turn in

12  the shale play, it felt like that even though that the field

13  had been advertised it'd be completely unitized and leased,

14  but he felt like there were some large open gaps within

15  those fields.  Not only did he feel like there were gaps in

16  those fields, he also felt like that there were potentially

17  a lot of mistakes because the title was very complicated.

18      And what happened was, when the dramatic turndown

19  happened, a lot of these oil and gas companies leveraged

20  their assets, and therefore -- leverage is a dual-edge

21  sword.  So when they appraised those assets, all of a sudden

22  drilling activity stops, leasing activity stops, and that

23  gave -- we felt like that gave us an opportunity to go in

24  and look for potential open leases within what was

25  advertised to be an oil field that was held by --

EXHIBIT A
Page 14

PLTF_003587

MARK WILLIS - DIRECT BY MR. BAKER                    15

1  production, by some pretty significant players.

2  Q     Okay.  So that's Hopewell.

3  A     That's Hopewell.

4  Q     And what part of Texas are you talking about?

5  A     I'm talking about, like, East Texas, Madison County,

6  Walker County.

7  Q     Okay.  Now, let's jump over to Title Rover for a

8  minute.  What is Title Rover?  What does that company do?

9  A     Title Rover utilized some expertise and technology that

10 we had had a small foundation in.  And, again, it kind of

11 came to life when we said, how can we utilize technology to

12 help us the same way that attorneys utilize technology to

13 sort and organize documents?  How can we use that same

14 technology to sort and organize title work and to make, you

15 know, the reviewing of land records a lot more efficient.

16     And, you know, so what Title Rover's goal was is to get

17 digital data, either try to find digital data or -- a lot of

18 courthouses provide you digital data around to the 1940's.

19 Then you have to use some instances of manual effort to go

20 in and scan some of the older title work that have been done

21 by hand.

22     And what our goal was, is to scan those documents, put

23 them into a digital format whereby they could be organized

24 and searched -- organized so they could be researched for

25 open title quicker and then search potentially for potential

PLTF_003588

MARK WILLIS - DIRECT BY MR. BAKER                    16

1   lease problems, whether that's by entity or particular

2   landmen, where we could see patterns of potential -- either

3   mistakes or open acreage.

4   Q    All right.  So you had an idea to start both of these

5   companies; is that correct?  And were other people helping

6   you out?

7   A    Yes.

8   Q    Who were some of the other people that were helping

9   you out?

10  A    I had -- on the technology side, I had a company called

11  Substantia LogiX that was going to help us on the Title

12  Rover side, build out the software.

13       There was a gentleman that -- out of Boston that has

14  a deep record in building title, you know, platforms.  He

15  looked at our existing platform and decided to help us work.

16       Also I had another gentleman that helped project

17  manage.  You know, that's two individuals, and Substantia

18  LogiX helped us kick off Title Rover.

19       Within Hopewell, I essentially reached out to a number

20  of different folks.  I reached out to, you know, several

21  people in the oil and gas field that I knew, that might have

22  some expertise up in that particular area.

23       I found one gentleman named Mark Bush, a guy with South

24  Oil who contributed, you know, a significant amount of value

25  and data and geological information that allowed us to kind

EXHIBIT A
Page 16

PLTF_003589

MARK WILLIS - DIRECT BY MR. BAKER                    17

1  of refine what areas we wanted to search, as well as kind of

2  true up the due diligence of what we thought the potential

3  play might be worth, so we brought him in.

4       Originally, we had several landmen.  We had a gentleman

5  named Steve Irby, who works as kind of a -- lives up in

6  Madison County, is very familiar with the various, you know,

7  farmers and landowners and so forth, and royalty owners up

8  in that area.  So we got some local knowledge on the ground.

9       And early on, we had a gentleman that's, you know, well

10 known, a gentleman named Greg Kane, that actually was the

11 one who initially told me about the idea.  You know, he was

12 -- we advised him.  We had another landman that -- he's in

13 the schedules right now as my -- I'm raising a blank.

14      But essentially, I surrounded myself with a lot of

15 landmen and a few attorneys, to opine on our ability to do

16 this play as it relates to Hopewell, and I tried to get as

17 much knowledge in that area to say, you know, how prolific

18 potentially is this shale play.

19      All we could really see is there was a tremendous

20 amount of infrastructure going in up there, hundreds of

21 millions of dollars were going into pipelines, storage

22 facilities, increasing valves, water retention facilities

23 and, you know, the infrastructure was all going into what

24 people thought was to produce a very significant play within

25 the shale -- you know, what's the called the Buda-Rose Play.

EXHIBIT A
Page 17

PLTF_003590

MARK WILLIS - DIRECT BY MR. BAKER                    18

1  Q    Okay.  And about what time period was this happening?

2  A    This was in -- as part of the due diligence, sometime

3  in, you know, 2015, I believe.  And then I think we kicked

4  off the company and decided to form the company in 2016.

5  Q    Okay.  So when you formed the company -- and you had

6  Hopewell and you had Title Rover.

7  A    Correct.

8  Q    Were both of those formed at about the same time?

9  A    They were.  We formed Title Rover, again to help us,

10 you know, do consultant work on the technology because we

11 felt like that that could -- if we could prove up the

12 efficiency of Title Rover within Hopewell, then we could

13 bring this to a lot of other shale plays.  So that was one

14 strategy of Title Rover.

15     With Hopewell, what we saw was a significant, again,

16 opportunity to, one, prove up the technology and, two,

17 potentially exploit a very significant area -- that seemed

18 to be, you know, kept somewhat confidential -- out there.

19     And we saw, and our research showed, that several of

20 the sales were very, very lucrative.  And in shale, unlike

21 other traditional plays are done, is typically it could be

22 valued by the acre.  So there's a lot of geological data out

23 there and engineering data out there that says there are so

24 many reserves, and if you drill a well so many feet, that

25 you potentially can have so much recovery.

PLTF_003591

MARK WILLIS - DIRECT BY MR. BAKER                    19

1   And if it comes from a viable, you know, engineering

2   firm like a Ryder Scott, then that was potentially very,

3   very bankable.

4   Q    So when you had -- when you were in the process of

5   starting these companies, where did you go to get capital to

6   get these companies going?

7   A    Well, initially when we kicked off, we came up with a

8   budget, and I also had a significant partner I brought in --

9   I'm sorry -- was Tom Tatham.  Tom Tatham, I brought in very

10  early on to help me with due diligence on, originally

11  Hopewell.

12       And I was going to utilize Title Rover really as a tool

13  and that's what -- so we kind of discussed, you know what,

14  why don't we develop that also, because if it proves up,

15  this tool could be, you know, very valuable as well.

16       So Tom kind of helped me, he came in, he helped me

17  structure the company.  And the reason why I brought him in

18  -- and I paid Tom, you know, typically a little bit more

19  than what you'd wind up paying in a start-up, as Tom has run

20  several hundred million dollar type companies.  I thought he

21  was a guy of high integrity.  His office -- you know, he had

22  an office with me in that particular time.

23       So when Greg Kane came in and pitched me the deal, I

24  let Tom kind of sit in on it, and we both, you know -- so he

25  was in on it with me very, very early.  So Tom Tatham was a

PLTF_003592

MARK WILLIS - DIRECT BY MR. BAKER                    20

1  partner as well.  And I'm sorry, I lost your -- what the

2  question was.

3  Q    Okay.  So you formed both of these companies.  Hopewell

4  has a number of investors.

5  A    Correct.

6  Q    How did you -- what did you do to solicit those

7  investors?

8  A    Sure.  You know, we put together a business plan.  You

9  know, first we did our own due diligence.  I funded that due

10 diligence, recognizing that that's obviously the riskiest,

11 you know, putting money into the particular deal because it

12 could have -- I did some legal work, I got title records,

13 you know, I hired landmen.

14     Anyway, I funded that personally out of my pocket,

15 or some of my entities' pockets.  For example, I have a

16 family partnership called Jabco that funded some funds.

17 I personally funded funds.  Willis Group put in some funds,

18 whereby I'm a fifty-fifty partner in Willis Group with my

19 father, Mike Willis, and Mike Willis personally put in some

20 funds.

21     So we all put in some funds, recognizing that, you

22 know, we needed to raise some bigger dollars to go out and

23 potentially tap this play.

24     Because of Tom's background and experience, we felt

25 like he had the ability to go out and raise anywhere from,

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

EXHIBIT A
Page 20

PLTF_003593

MARK WILLIS - DIRECT BY MR. BAKER                    21

1  you know, 5 to $25 million potentially to go out and execute

2  this play as it related to Hopewell.

3  Q    Okay.  So in the process of fund-raising, one of the

4  investor groups that came in was a company called Ensource.

5  A    Correct.

6  Q    How did the company -- how did you get connected up

7  with Ensource?

8  A    Sure.  Tom helped put together a business plan.  We did

9  a private placement memorandum.  I'm good friends with a guy

10 here in town named Chad Martin.  Chad and I were getting

11 together on a regular basis, discussing opportunities and

12 what he was doing and what I was doing. I kind of explained

13 to him, high level, what I was doing -- and along with a

14 handful of other guys.  So I had quite a bit of interest

15 from folks that wanted to invest.

16     We put together a business plan that we decided we

17 needed about $2 million to go out and execute what we called

18 the Hopewell-Pilot Project, recognizing that, you know, this

19 was somewhat speculative.  It had a lot of risk associated

20 with it but it had a lot of return associated with it as

21 well.

22     So we said, let's raise a million dollars to go out --

23 for the operating expenses, to go out and pay for, you know,

24 the -- you know, organizing the title, doing the title

25 research, getting the land, doing the legal, doing all

MARK WILLIS - DIRECT BY MR. BAKER                    22

1   the operating expenses necessary for Hopewell, and then

2   also reserving a million dollars to go out and do a lease

3   acquisition.

4        So utilizing that to hopefully go out and acquire

5   somewhere between, you know, 500 and 1,000 acres, whereby

6   we had research showing comparables out there where acreage

7   had sold anywhere between 5,000 and 40,000 an acre once it

8   was aggregated.  So that was the arbitrage that we were

9   looking to exploit.

10  Q    Okay.  So with the million dollars for the operating

11  expenses, what did the company take -- or what kind of steps

12  did you take to get that, and what kind of --

13  A    Sure.

14  Q    -- information did you have on any of that --

15  A    Sure.  Again, put together the business plan, got the

16  PPM, shopped it around, had several interested parties to --

17  you know, because of the risk, it was somewhere between 100

18  and $200,000 a party.

19       Chad Martin, when I told him the play, he said, hey,

20  you know what, I've got a bunch of guys that would love to

21  invest in this, a bunch of friends of mine, we invest in

22  other things together.  He goes, you know, they'll probably

23  want to take it all.

24       So I thought to myself, well, if we could do it with

25  one group, that's a lot better than, you know, dealing with

PLTF_003595

MARK WILLIS - DIRECT BY MR. BAKER                          23

1  a few.  I think he introduced me to three or four guys that

2  -- I think I talked to them on the phone.  I showed them,

3  you know, a map of the area.  I think Tom was still putting

4  -- you know, putting the finishing touches on the business

5  plan and so forth.

6       Anyway, I had initial conversations with everybody,

7  told them the high level play, that there's an oilfield that

8  we felt like because the title was very choppy, meaning it

9  had a lot of different landowners out there, that we felt

10 like there were some good opportunities.  And they all

11 understood what the play was and expressed an interest to

12 invest.

13 Q    So after they expressed an interest to invest, what

14 happened next?

15 A    I think I talked to at least four or five members of

16 Ensoure.  I think I talked to a few of them over the phone

17 maybe one time.  I actually had my niece -- which was down

18 in San Diego for a camp that I put her into to help control

19 her weight for four weeks over the summer.

20      There happened to be one of the investors who's in the

21 courtroom today, Justin Pannu, that lived in San Diego.  And

22 I told Chad, you know what, I'll be down there.  If you'd

23 like to meet, I could meet him and, you know, shake his

24 hand and, you know, so he understands who he might be doing

25 business with.

EXHIBIT A
Page 23

PLTF_003596

MARK WILLIS - DIRECT BY MR. BAKER                    24

1      So I went down and met with Justin.  I think we met

2  twice.  We met -- well, actually we met three times.

3  I think we met in the afternoon for about an hour or two

4  at a beach restaurant.  We met later at a bar, and then

5  the next night we met at a club for a couple hours.

6      So other than -- you know, again, I gave him kind of a

7  high level pitch of what the opportunity was.  He expressed

8  an interest, and I think that they kind of gave us a range

9  at that particular time that we might be interested in

10  investing somewhere between 300 and $600,000.  They didn't

11  know exactly what it was, but their -- somewhere within

12  that particular range, depending on how due diligence

13  kind of panned out.

14      And on that basis, I introduced him to Tom.  I came

15  back and said these guys are interested.  Tom was the

16  custodian of, you know, all the legal documents, of all

17  the records.  Tom ran all the day-to-day business.  Again,

18  I made the introduction because they were all friends of

19  Chad Martin's.

20  Q    So what kind of information was provided to Ensource

21  or any of the other investors?

22  A    Well, other investors got our business plan, the PPM,

23  and kind of our high level pitch.  The Ensource group had a

24  gentleman representing them at that time, Richard Navieu

25  (phonetic) or something.  I can't pronounce his last name.

EXHIBIT A
Page 24

PLTF_003597

MARK WILLIS - DIRECT BY MR. BAKER                    25

1      But they had a gentleman that initially I thought was

2  their business advisor that was also an attorney.  He

3  represented he has an MBA and a law degree.  And they sent

4  us a very extensive due diligence list, which I handed over

5  to Tom.  And I think at that particular time they set up a

6  data room, and they started requesting information and data

7  to go back and forth and get loaded into that room.

8      So they had a checklist, they worked with Tom making

9  sure that they got all the information that was needed prior

10  to them making the investment.

11  Q   Approximately how long did it take the Ensource group

12  to go through the data before they came to invest in --

13  A   Oh, months.  I mean, a couple --

14          MR. GERGER:  Objection, Your Honor.  This is

15  really not relevant to the plan or conversion.  The history

16  is important but we really need to get to our confirmation

17  elements.

18          THE COURT:  Mr. Baker?  The objection is one of

19  relevance.

20          MR. BAKER:  Your Honor, I think all of this is

21  relevant to the background.  I'll keep it short on that

22  area, but I'll move on.

23          THE COURT:  All right.

24          MR. BAKER:  I think it is relevant to what's --

25  for the confirmation of this case, we're looking at the

PLTF_003598

MARK WILLIS - DIRECT BY MR. BAKER                    26

1   feasibility and the ability to move forward.  This all ties

2   into where the company is right now.

3          THE COURT:  All right.  I'll overrule the

4   objection.

5          MR. BAKER:  Okay.

6   BY MR. BAKER:

7   Q    About how long do you think it took at that point in

8   time?

9   A    It took a couple months.  Like I said, they sent us

10  several pages -- I mean, it was almost like for what you'd

11  do for a public offering, sending this, you know, six, seven

12  pages of due diligence information.

13         Again, I had quarterbacked that end of the process.

14  That all went to Tom.  And from that particular point, you

15  know, I was cc'd on information, but I was not in the due

16  diligence.

17         They would ask for things like -- they understood that

18  there were relationships between our different entities.

19  They asked if any of those entities could convert any of the

20  funds that they -- or expenses that they were potentially

21  owed, into equity.

22         So they had very specific agreements that they wanted

23  in place, that were all quarterbacked primarily by their

24  attorney/business advisor, Justin Pannu.  So they had

25  extensive due diligence.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003599

MARK WILLIS - DIRECT BY MR. BAKER                27

1  Q    So at some point, investment money came in.

2  A    At some point, the assumption is they were satisfied

3  with all the information that they got.  And even though

4  that the timeline was dragging out, I explained to them

5  that, look, I had other folks interested.  Because of the

6  extensive time that it took to do due diligence, I said,

7  look, I'm going to lose my technology team because they're

8  not getting paid and we have other -- you know, we're

9  bringing the company to a halt.

10       And they said, fine, what if we set up a bridge loan?

11  And they ended up setting up a bridge loan of $205,000, that

12  I had to personally guarantee, while they continued to have

13  their due diligence and make sure that everything was in

14  place prior to them making the equity investment.

15       So they did a bridge loan while they did further due

16  diligence prior to them deciding if they were going to put

17  their next slug of cash in and convert it to equity.

18  Q    Okay.  Now, at this point, the companies are operating,

19  I presume, or moving forward.

20  A    Correct.

21  Q    And then in kind of the fall 2016, about that time

22  period, what was going on with Hopewell and Title Rover, and

23  what kind of funding did they need at that time, and what

24  was happening with the funding issues?

25  A    Well, in the fall of 2016, we were still, you know,

EXHIBIT A
Page 27

PLTF_003600

MARK WILLIS - DIRECT BY MR. BAKER                    28

 1  looking for opportunities to lease.  We had -- we were

 2  setting up -- I think we were just closing our million

 3  dollar acquisition facility with a group called Sanders,

 4  Morris & Harris.

 5      So we were finalizing -- and we were finalizing our

 6  discussions with in Ensource, so we felt like that we had

 7  achieved our budget, which our budget was -- I mean,

 8  Hopewell was never going to be an operating company.

 9  It was a holding company.

10      Hopewell never had any employees in its organization.

11  It only had 1099 and consultants, because the play was, is

12  you go out and you acquire all these assets, and then either

13  of two things happen.  We go out and try to bundle those

14  assets and sell them, we love what we're doing so we raise

15  some more capital and try to acquire more assets, or we hold

16  those assets and wait for them to be drilled, where we feel

17  like that we can accumulate a lot of long-term wealth

18  through royalty and mineral interests.  So there were

19  several ways to potentially win.

20  Q    Okay.  So I'm going to come back.  You said you'd

21  gotten -- there were two different -- there was a million

22  dollars for operating expenses you testified to and a

23  million dollars for lease acquisitions.

24  A    Right.

25  Q    You mentioned something about a million dollars in

EXHIBIT A
Page 28

PLTF_003601

MARK WILLIS - DIRECT BY MR. BAKER                    29

1   lease acquisitions.  Exactly what was that?  Go over that

2   in a little more detail, what you had to have.

3   A    Sure.  Sanders, Morris & Harris -- actually a group

4   that Tom's really good friends with, one of the principals

5   there -- agreed to initially fund a million dollars to help

6   prove up the acquisition play.

7        So they ended up funding a million dollars for that.

8   And let me put the relationship in context, is that Sanders,

9   Morris & Harris, along with others, recognized that, one,

10  we're developing technology within Title Rover, and we're

11  also looking at proving up an area.  Second --

12            MR. GERGER:  Objection.  This is hearsay, what

13  someone else --

14            THE COURT:  Sustained.

15            THE WITNESS:  Okay.  So what the play was, is for

16  us to -- we gave Hopewell an option.  If Hopewell did not

17  work out, if we were unable to prove up our ability to

18  actually purchase acreage and potentially bring it to a

19  liquidating event, that folks could actually convert their

20  Hopewell interest into the technology play.

21            So that's how the two companies were somewhat

22  related, and they could do that on a share-per-share basis.

23  So, in other words, if Ensource has 18 percent of Hopewell

24  and they're not happy with our ability to acquire acreage or

25  what's going in Hopewell, they could have a second bite of

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003602

MARK WILLIS - DIRECT BY MR. BAKER                    30

1   the apple and say, you know what, I don't like it over here,

2   I'm going to convert, you know, some of my invest or all of

3   my investment -- a portion or all of it -- into Title Rover.

4            So when we look at those two companies, it's

5   important to recognize that they're very closely linked,

6   and both parties had the benefit -- to benefit if, again,

7   Hopewell wasn't working well, Hopewell-Pilot Project, at the

8   end of the year we'd call a time out.  If no one's happy

9   with that, then they could invest in the technology, where

10  that could still continue to be refined to be utilized as a

11  tool to go out and more efficiently lease oil and gas

12  prospects.

13  BY MR. BAKER:

14  Q    Okay.  So, again, in the fall of 2016, what type of

15  expectations did you have for funds coming in from

16  investors?  About what --

17  A    Our total expectations were exactly what we raised.

18  You know, we -- when it came down to the fall, coming into

19  the winter, we had another $100,000 of a budget, still, that

20  needed to be -- that was committed to come into the company.

21  And we felt like that we had a lot of leasing opportunities

22  that still were available.

23       I'd say that we were a little bit behind, in my

24  view, on -- you know, we worked very, very hard on a very

25  significant tract, that fell out of bed sometime in October,

EXHIBIT A
Page 30

PLTF_003603

MARK WILLIS - DIRECT BY MR. BAKER                    31

1  November.  We thought we were going to acquire -- probably

2  spend $600,000 or so of the funds that Mr. -- that SMH had,

3  for the benefit of all the shareholders.

4      We actually went through due diligence, went through,

5  I think, documentation, all the legal work, and the seller

6  ended up taking a pause and a right turn, and ended up

7  trying to renegotiate the deal at the closing table.

8      So ultimately that, you know, pause -- when it paused,

9  that small delay, I think a couple weeks later they cut a

10 deal with another party.  So unfortunately, we lost that

11 opportunity, but we had several others lined up.

12     But, you know, when we found out that the final

13 $100,000 wasn't coming in, we were running -- you know,

14 we were going to be running really tight on funds for the

15 operating company to continue to be able to pay the landmen

16 and the technology to use those continued tools in our

17 leasing efforts.

18 Q   Okay.  You made a comment about the remaining $100,000

19 didn't come in.  What are you talking about?

20 A   Well, Ensource agreed to fund in a couple phases.  So

21 they funded, I think, $205,000 sometime in September, they

22 funded another -- you know, they funded some small amounts,

23 20,000, some smaller amounts along the way to help us out,

24 you know, because we were funding and paying our expenses

25 real-time.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003604

MARK WILLIS - DIRECT BY MR. BAKER                32

1        And the last 100,000 was committed to come in sometime

2   in, I think, late November of early December.  And then we

3   got word from them that they had no intentions of funding

4   that last 100,000.  So we had some expenses that were

5   accrued that we were then not going to be able to pay.

6   Q    Okay.  What kind of effect did that have on the

7   operation of the company?

8   A    Well, it pretty impactful because if you don't pay

9   your -- you know, if we couldn't pay our fees to Substantia

10  LogiX, then -- you know, they needed monthly income, they're

11  going to go find another job.  So if they find another job

12  or another project, they're project guys, their projects

13  could last, you know, a week or two years.

14       So, you know, we were trying our best to protect at

15  least the technology guys that we had on staff, if nothing

16  else, while we worked our way -- while we worked our way

17  through that issue.

18       So when we found out that last 100,000 wasn't funded,

19  I think I personally stepped up.  One of my companies

20  actually paid Substantia LogiX, I think, for a couple months

21  of their work.  You know, I think I paid for some other

22  expenses to try to keep the company alive while we go out

23  and determine, you know, if we could get Substantia LogiX

24  to fund their last $100,000.

25  Q    Okay.  And moving forward a little bit, in early 2017,

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003605

MARK WILLIS - DIRECT BY MR. BAKER                    33

1  what happened -- what did Ensource do?

2  A    Well, I think it was actually late 2016, where we are

3  -- you know, we've got a number of potential acquisitions

4  lined up.  We still have an SMH acquisition line where we --

5  I think we executed on $100,000 of that line.  We had about

6  $900,000 left.

7      And Ensource threatened a lawsuit, demanded their

8  money back, really without looking at any of the technology,

9  didn't care to look at any of the technology, didn't care to

10 look at any of the pipeline of opportunities that we had

11 lined up, didn't want to look at any of the detail.

12     The only thing that they asked for is, send us the

13 financial information and send us the checkbooks and, you

14 know --which I think I said -- I think I was involved in the

15 communication.  I said, look -- I think they called us on a

16 Thursday or Friday, demanded all the information that day.

17     I said Tom's out in the field.  He'll prepare all the

18 information for you and all the other shareholders sometime

19 next week, and if you guys have any questions, you can come

20 down and you can audit the books, you can come sit down, you

21 can look at everything that you wanted.

22     Again, at that particular point, they looked at

23 their information, at least the checkbook and the financial

24 information, and they didn't want to look at anything else.

25 Basically they said, that's it, we're done.  Either send us

EXHIBIT A
Page 33

PLTF_003606

MARK WILLIS - DIRECT BY MR. BAKER                           34

1   our money back or we're filing a lawsuit on you.

2        Recognizing that we're -- that we don't have any --

3   that we have very little funds and our business plan is to

4   go out and raise capital and prove up the technology, and so

5   they actually filed a lawsuit on us in California and which,

6   at that particular point, everything -- it brought

7   everything to a halt.

8   Q    So what did the lawsuit pending -- what effect did that

9   have on the companies to raise any further capital?

10  A    Well, if you look at the lawsuit, they filed on all

11  the -- you know, they filed them on Title Rover and they

12  threatened on Hopewell.  And what that did is that that

13  took -- SMH obviously took pause.

14       We had a line of credit in place that was coming up to

15  expire.  With a threat of litigation, they said, we're not

16  going to renew.  Obviously they don't want to go out and

17  spend money and throw their assets into opportunities that

18  could be clouded by all types of claims or fraud claims or

19  litigation that could --

20            MR. GERGER:  Objection, Your Honor.  Hearsay.

21            THE WITNESS:  -- you know, could extend out for a

22  long period of time.

23            THE COURT:  Sustained.

24  BY MR. BAKER:

25  Q    Okay.  So the lawsuit's filed in California.  What

PLTF_003607

MARK WILLIS - DIRECT BY MR. BAKER                    35

1  happened with the companies at that point in time?

2  A    I'm sorry, what happened to what?

3  Q    What happened with the companies at that point, and

4  after the lawsuit was filed?

5  A    Well, you know, at that particular time, we were

6  somewhat dead in the water as far as our ability to go out

7  and raise any capital.  I think Tom was in discussions with

8  a couple companies about doing a test pilot on leasing,

9  using Title Rover as a tool to lease -- do some leases in

10 some other areas.

11       And so, you know, it was going to be in Madison County

12 and they were going to give us a nice fee.  Unfortunately,

13 that came to a halt when Sanders, Morris & Harris pulled

14 back.  So we didn't have any -- we didn't have any capital

15 at that particular point.  And, you know, it made no sense

16 in putting any money into those entities pending the outcome

17 of the threat of litigation.

18 Q    Okay.  So at this point in time, if the plans get

19 approved, what abilities does Hopewell and Title Rover --

20 what abilities does Hopewell have to move forward and what

21 do you see going forward potentially with Hopewell if you

22 can get -- if the plan gets approved?

23 A    Sure.  I mean, Hopewell right now is pretty much in

24 mothballs.  I mean, it's got assets, and that's all it was

25 ever going to really have.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003608

MARK WILLIS - DIRECT BY MR. BAKER                    36

1      It's got extensive data as it relates to what South Oil

2   contributed.  It's got a lot of intellectual knowledge as it

3   relates to that area, because obviously we spent, you know,

4   a million dollars getting educated to that area.

5      It's got organized title records that -- you know, that

6   have been organized and digitized and allows us to search

7   things relatively quickly.  So we have a lot of the title

8   work done there.

9      You know, we've got -- we've got targeted operators

10   that we have knowledge on that have made potential mistakes

11   in that particular area, that we could go back and research

12   into those records.

13      So it's got a lot of assets that we could go back

14   and -- as we know here in Houston, that the energy market's

15   gotten better.  It still hasn't created a huge flurry of

16   activity up there, but it is fairly active in our target

17   area.

18      Fortunately, there's been some areas up in West Texas

19   right now that are a lot more prolific, that the same

20   companies that are operating in that area seem to be --

21   have more focus on.  They're still preserving all their

22   assets in this area so they will come back to them.  At

23   least that's what the conventional wisdom is.

24      So, you know, at the moment, there's -- that play could

25   be fired back up, but it's going to take some additional

PLTF_003609

MARK WILLIS - DIRECT BY MR. BAKER                37

1   effort.  It's going to take some additional capital.

2        Unfortunately, with the pending litigation, you know,

3   we're not able to go out and raise the capital necessary,

4   nor is anybody willing to put in any capital, including

5   myself, you know, until that issue is resolved.

6   Q    Now, based upon your significant experience in

7   entrepreneurial businesses, what is your opinion if this

8   plan is approved for Hopewell, if Hopewell can go forward

9   and potentially raise some money?

10  A    I think it's got -- I think that there is more

11  compelling reasons to do the play now than there was before,

12  because of the head start that Hopewell potentially has.

13  As far as some of the qualified leads that we had, they're

14  going to have to be dusted off and have to be reviewed.

15       I'm not a landman or an attorney, so those would

16  have to be, you know, revisited.  But, you know, it could

17  certainly be fired -- the play is still there.  You know,

18  it's a three-county play and, you know, again it's a highly

19  fragmented play because this was a high -- this was -- there

20  were a lot of land grants that were given back in the '40s

21  to -- you know, it's a large cotton farming area, so it was

22  consumed by a lot of minorities.

23       When cotton farming kind of dried up, a lot of the

24  minorities came to inner cities and left that title behind,

25  and it's very, very difficult to find them.  So there's a

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

EXHIBIT A
Page 37                                        PLTF_003610

MARK WILLIS - DIRECT BY MR. BAKER                    38

1  lot of small tracts out there that whereby there's still

2  open titles.  But if you can follow the lineage correctly,

3  using technology, it's more efficient and more cost-

4  effective to do that.  Then, you know, there can be some

5  interesting buying opportunities.  And I think that that

6  play probably still exists.

7  Q    Okay.  So, now, Hopewell does have some acreage at

8  this point in time; correct?

9  A    It's got one lease it executed on and -- you know,

10 it's one small lease but, yes, it does.

11 Q    And how much was paid for that lease?  Approximately.

12 A    I think approximately $12,000 as far as the base of the

13 lease, of what the actual lease amount was.

14 Q    Okay.

15 A    12,500 or --

16 Q    Now, it's been valued in your schedules, I think,

17 around $200,000.  What was the basis of that valuation?

18 A    Well, when you look at the comps in the area, things

19 have gone from anywhere from 5,000 to 40,000 an acre, and

20 this one happens to have a drill site location on it.  And

21 that's part of the play.

22     You know, you have a lot more leverage if you

23 potentially can lease under a drill site location, because

24 you can really force your way into a well, you know, by the

25 laws.  At least, that's what I've been told.  And so if you

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003611

MARK WILLIS - DIRECT BY MR. BAKER                    39

1  get -- what we did is we had one particular operator --

2          MR. GERGER:  Objection, hearsay.

3          THE WITNESS:  We had one particular operator out

4  there that --

5          THE COURT:  Sorry, hold on a second.

6          MR. GERGER:  He just said, as I've been told by

7  somebody else.

8          THE COURT:  Agreed.  I'll sustain the objection.

9          THE WITNESS:  Oh, yeah, I'm not a pro -- I'm

10  not a professional so I don't -- I mean, anything that

11  you're going to ask me on as it relates to, you know,

12  opportunities, as it relates to geological or geophysical

13  areas, then, you know, I'm going to have to state that it's

14  going to be from people that I have had to consult with in

15  the industry.

16          So it's the whole -- that's basically what the

17  opportunity was.  So I don't know if I'm supposed to answer

18  right now or not.

19          MR. BAKER:  Well, let me ask it again.

20  BY MR. BAKER:

21  Q    There's a valuation in your schedules of around

22  $200,000.

23  A    Yup.

24  Q    Would you view that as a fair valuation of --

25  A    Yeah, that sounds -- I mean, what I could look at are


JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003612

MARK WILLIS - DIRECT BY MR. BAKER                    40

1  comps in that area, and that's -- we have two public comps

2  and we have a bunch of private comps on transactions, and

3  the public comps are going to be one for 5,000 and one for

4  40,000.  They're documented on what they've sold for.

5       And then when you look at the math, we've also done --

6  you know, we've done the math on what the operators have

7  actually paid to play.  The play out here, so it's clear, is

8  when this play heated up, there was a land grab.  Several

9  companies, Burke, OCG, and a bunch of small companies went

10  out and drilled the cheapest well they could, down to a gas

11  zone, and formed what they called --

12            MR. GERGER:  Your Honor, I don't think Mr. Willis

13  has any personal knowledge of anything he's talking about,

14  and I object to his testimony as certainly hearsay.

15            THE COURT:  Mr. Baker?  You asked a fairly

16  discrete question, and what I've gotten was just sort of

17  a litany of, "here's what I think," most of it not even

18  relevant to the question that you asked.  But I do have

19  a specific objection at this point.  Do you want to respond?

20            MR. BAKER:  Let me go back and re-ask the

21  question.

22            THE COURT:  All right.

23            MR. BAKER:  Okay.

24            HE COURT:  Then, Mr. Willis, I'm going to

25  caution --


                    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003613

MARK WILLIS - DIRECT BY MR. BAKER                    41

1              THE WITNESS:  I'll try to listen better.

2              THE COURT:  I'm going to caution you, for the

3    first time, that you should answer the question that is

4    asked of you, and only that question.  Understood?

5              THE WITNESS:  Yes, sir.

6              THE COURT:  All right.  Go ahead, Mr. Baker.

7              MR. BAKER:  Okay.

8    BY MR. BAKER:

9    Q    So let me go back and just try to say -- from trying

10   to determine the valuation of that property, what steps did

11   you take?  Just kind of in a summary, what did you do to

12   come up with what you thought was a fair value for that

13   acreage?

14   A    Sure.  There were two methodologies.  One, we looked at

15   public data and, again, I've already described that.  The

16   other one is we did an analysis of what it cost for the --

17   for what we believed that the oil and gas companies actually

18   spent on drilling and forming and holding one of the units,

19   and backing into that number.

20        So when we backed into that number, we believed that

21   those companies spent north of $5,000 an acre to hold those

22   units so they could go back in and sell them to more

23   sophisticated companies like EOG to do horizontal drilling

24   programs to exploit them, and that was the play.

25        So the original well was drilled by companies like

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003614

MARK WILLIS - DIRECT BY MR. BAKER                    42

 1  Burke that are very barely economic.  So when you look at

 2  those wells out there, they're not drilled -- they didn't

 3  drill them to produce the wells that are holding the acreage

 4  at the moment.

 5          MR. GERGER:  Objection; speculation by Mr. Willis.

 6          THE COURT:  Sustained.

 7          THE WITNESS:  That's not speculation.  That's

 8  fact.

 9          THE COURT:  Mr. Willis, this is twice.

10          THE WITNESS:  But he asked -- I answered the

11  question.

12          THE COURT:  Mr. Willis, don't make me get to

13  strike three.

14          THE WITNESS:  Okay.

15          THE COURT:  Are we clear?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  Sit up in your chair.  You're in a

18  courtroom.

19          THE WITNESS:  Okay.  I couldn't see you.  That's

20  why I moved back.

21          THE COURT:  Mr. Willis, playing a word game with

22  me is the wrong way to do.  Answer the questions that are

23  asked of you, and you'd better change the tone just a tad

24  and be a bit a bit more respectful.  Are we clear?

25          THE WITNESS:  Yes, sir.


                    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003615

MARK WILLIS - DIRECT BY MR. BAKER                    43

1              THE COURT:  Mr. Baker, go ahead.

2              MR. BAKER:  All right.

3  BY THE COURT:

4  Q    Okay.  We talked briefly about moving forward with

5  Hopewell.  Now, let's shift over to Title Rover.  What do

6  you believe are the prospects, if the plan is approved, for

7  Title Rover to go forward?

8  A    The prospects are -- well, again, there's -- the only

9  expenses associated with Title Rover are continuing to

10 develop.  And with technology, you're constantly refining

11 and you're constantly developing technology.

12      So Title Rover, you know, still -- as a tool, that

13 is very functional and useful and, you know, we could fire

14 that back up with the same individuals if they're available.

15 They currently are consultants, so whenever they're

16 available and not on a project, they have an interest

17 in coming back in and working with Title Rover.

18             MR. GERGER:  Objection, hearsay.

19             THE COURT:  Sustained.

20             MR. BAKER:  Okay.

21 BY MR. BAKER:

22 Q    With regard to continuing Title Rover and the

23 technology, do you have other opportunities to get other

24 people to assist if other -- if the people that have done

25 it are not available?


                   JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003616

                    MARK WILLIS - DIRECT BY MR. BAKER                    44

1    A    Sure.  We've got other folks available.  We also have

2    identified numerous other RG digitized data sets that we

3    could drop in and, you know, process a lot quicker.

4         This particular project, we had to -- we actually had

5    to do quite a bit of scanning of some of the older title

6    records, where we had to actually go out and send flatbed

7    scanners out to Madison County and put feet on the ground

8    scanning, you know, older documents so they could -- so we

9    could put them in a digital format so they could be

10   searchable.

11            MR. GERGER:  Objection, nonresponsive.

12            THE COURT:  Sustained.

13            MR. BAKER:  Okay.

14   BY MR. BAKER:

15   Q    What type of assets does Title Rover have that could be

16   utilized going forward?

17   A    Well, the only thing it primarily has is the software

18   and, you know, the tool.  And it's got, you know, some

19   data that it's acquired, you know, for several different

20   counties.  And those are the primary assets right now of

21   Title Rover.

22   Q    The same thing for Hopewell.  What type of assets does

23   Hopewell have right now that you can utilize in moving

24   forward?

25   A    Sure.  It's got -- again, it's got process data for

MARK WILLIS - DIRECT BY MR. BAKER                45

1  Madison County that's organized.  It's got tons of legal

2  research.  It's got, you know, drilling data and geological

3  data that it got from South Oil, and it's got, you know, a

4  handful of prospects that would have to be dusted off and

5  requalified.

6  Q    Okay.  Now, as part of your plan of reorganization,

7  you submitted some projections.  Do you remember those

8  projections?

9  A    Yes, sir.

10  Q    Okay.

11         MR. BAKER:  Your Honor, if I may approach?  These

12  are the ones that were filed with the plan.

13         THE COURT:  Yes, I'm looking at them right now.

14         MR. BAKER:  Okay.  (Presenting documents to

15  witness.)

16         THE WITNESS:  Okay.

17  BY MR. BAKER:

18  Q    All right.  I'd like to go over these projections.

19  You've got the projections.

20         MR. GERGER:  Are those the ones -- excuse me,

21  I don't have a copy.

22         MR. BAKER:  Here's a copy.  (Presenting documents

23  to counsel.)  And these are the ones that were filed with

24  the plan and disclosure.

25         MR. GERGER:  Thank you.

PLTF_003618

MARK WILLIS - DIRECT BY MR. BAKER                      46

1  BY MR. BAKER:

2  Q    Okay.  So there are two pages, one page for Hopewell

3  and one page for Title Rover.  I'd like to go over each

4  one of them separately and talk about what you believe the

5  prospects are going forward.  And let's start off up at the

6  top of the Hopewell page.

7       This has got revenue, and then profit, expenses,

8  operating income.  How did you put these -- or first of all,

9  did you put these together?

10 A    I worked with my financial officers to put this

11 together.

12 Q    Okay.  And were they done under your supervision and

13 control?

14 A    Yes, under my supervision.

15 Q    Okay.  So can you explain how you came up with these

16 projections and with the basis of the plan?

17 A    Sure.  Your know, based on kind of the knowledge that

18 we had of the area, what lease bonuses were going by, I did

19 notice that there was a bust in 2019, 2020, as it didn't

20 capture the Walker County additional acreage.  So the cost

21 of those '19 and '20, that should be about 500,000, so which

22 is going to change the bottom line in 2019 and 2020 by about

23 250,000.

24      But we used an assumption of, you know, $500 an acre.

25 We've been able to identify acreage out there from --

EXHIBIT A
Page 46

PLTF_003619

MARK WILLIS - DIRECT BY MR. BAKER                47

1   anywhere from 300 to $1,000 an acre.  The $1,000 an acre

2   are typically tracts that are very, very large.  Most of

3   the tracts that we've identified are a lot smaller, so we

4   believe that, you know, our average is going to be somewhere

5   around $500 an acre, and that's what we used for the small

6   ones, as it relates to cost.

7       We used -- for a revenue assumption, we used it --

8   that we could sell it for $5,000 an acre.

9   Q   Okay.

10  A   So that gets you to the revenue, the cost of goods

11  sold.  That brings you down to the gross profit, and then we

12  have some assumptions that relate to what we think the staff

13  expense would be to execute on those, a commission to Title

14  Rover, you know, success commission that would be in there

15  as well, and then all the other operating expenses as

16  they're outlined in the agreement -- or in the income

17  statement.

18  Q   All right.  So you had mentioned that there was a bust

19  in there.  When we go down to operating income, how would

20  that positively or negatively affect the numbers for the

21  operating income on the bottom line?

22  A   By -- well, in 2019 and 2020, the cost of goods sold

23  is actually understated by about $250,000 in each of those

24  columns because if we assume that we're going to acquire

25  1,000 new acres at $500, that's 500,000.  So it looks like

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003620

MARK WILLIS - DIRECT BY MR. BAKER                    48

1   the formula only hit the top line of Madison and not the

2   Walker County number, so it didn't -- it didn't catch.

3       That was a bust, but so the cost of goods sold for

4   '19 and 2000 [sic], if we just -- you know, again, these

5   are assumptions.  If we just acquire 1,000 acres, with the

6   assumption of 500 an acre, the cost would be 500,000.

7   Q    Okay.  And so that then results in the operating income

8   for 2019 and 2020 being about $250,000 less?

9   A    That's correct.

10  Q    Okay.

11  A    The gross profit would be 250 less and the operating

12  income would be 250 less.

13  Q    Okay.  Now, let's go over to Title Rover.  How did you

14  -- first of all, were these projections done under your

15  supervision and control?

16  A    Yes.

17  Q    Okay.  Now, how did you -- how did you put together

18  these projections, and what is the basis for these?

19  A    We made some assumptions based on getting some new

20  clients and some service fees.  And we've got, you know,

21  obviously the Hopewell, because we fired that back up, along

22  with Title Rover.  We've got, you know, the Hopewell fee,

23  the Hopewell commission fee, and then we assume that we pick

24  up some new clients.

25      So in 2018, we would pick up two new clients, which

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003621

MARK WILLIS - DIRECT BY MR. BAKER                         49

1  it's going to average about 1.5 for the year and, you know,

2  -- so that's the assumptions that we used.  So if we

3  generated 441 in revenue, we'd have the cost of goods sold,

4  gross profit of 171, back out the expenses and, you know,

5  we're modestly profitable.

6  Q    Okay.  And so let's go back to Hopewell.  With regard

7  to Hopewell, and if you're able to achieve something in the

8  same area for the operating income, how would that affect

9  the investors, and what would that mean to the investors?

10 A    Well, it -- you know, meaning that everyone would make

11 their investment back with a decent return.

12 Q    Okay.  For example, then Ensource should get its

13 investment back plus a return; is that correct?

14 A    Yes.

15 Q    Okay.  And how quickly do you think you could actually

16 get the -- both of these entities started if a plan is

17 approved?

18 A    Probably 60 -- probably 60, 90 days once the plan is

19 approved, to get it started.  Maybe a little bit quicker.

20 But we'd want to dust off the records, I'd have to put some

21 -- you know, I'd put, again, some personal money in to, you

22 know, help re-polish off the business plan and raise some

23 dollars, because this is a -- from my perspective, it's a --

24 it could be a capital intensive play when it comes to

25 acquiring the leases.

EXHIBIT A
Page 49

PLTF_003622

MARK WILLIS - DIRECT BY MR. BAKER                    50

1       In certain respects, the more you have, the more

2   opportunities I find under one particular operator, the more

3   incentive they have to buy you out.  And the more incentive

4   they have is quicker and more money.

5   Q    So going forward with Hopewell -- and now let's talk

6   about these separately.  With Hopewell, are you expecting to

7   have to raise about how much money to actually get it back

8   started again?

9   A    Well, to get Hopewell started again, we'd need another

10  acquisition facility.  It's -- you know, I understand from

11  Mike Ivan, that spoke to SMH, but they have deferred any

12  further funding of any acquisitions pending the litigation.

13  But they were a particular funding source.

14      Again, they might not have an appetite based on, again,

15  what's been going on and -- you know, with the current state

16  of affairs and this particular lawsuit and so forth.  But,

17  you know, I have several others that might have an interest

18  in investing as well, so I --

19  Q    And that's for the lease acquisition side.  What about

20  from the operating cost side?

21  A    Oh, from the operating cost side, it's going to be a

22  lot less because we've spent a lot on information.  We've

23  spent a lot of money on that already.  But, again, some

24  money is still going to have to be spent on there.

25      I'd say somewhere between -- you know, if Ensoure

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003623

MARK WILLIS - DIRECT BY MR. BAKER                51

1   would pay their $100,000 and we're successful at collecting

2   the $100,00 as it relates to this, you know, somewhere

3   between 100 and $200,000, I think we could -- you know,

4   that's probably sufficient operating expenses to identify,

5   you know, another 500 acres, as I have outlined here.

6   Q    If Ensource does not put in the additional $100,000,

7   what do you believe are the opportunities for Hopewell to

8   raise additional money from other sources?

9   A    I think, as well, I might fund the additional capital.

10  Q    Okay.  Okay, let's talk about Title Rover.  What do you

11  believe would be an amount, or amounts, or range of amounts,

12  that would be necessary to actually get Title Rover going

13  again?

14  A    That is not going to need a lot.  Title Rover could --

15  it could need one client.  We could dust off a couple of the

16  companies that we've spoke to about providing services with,

17  that would start providing some income.

18       So, you know, before, Title Rover was up and running

19  for, I think it's -- you know, we had operating expenses

20  of about 25,000, $26,000 a month, $24,000 a month, so --

21  and it's not significant for the two individuals.  That's

22  primarily what we'd need to get it going.

23       I could probably get them started, where they're not

24  working full time initially, where they're working half

25  time, and maybe even, you know, reduce that particular

EXHIBIT A
Page 51

PLTF_003624

MARK WILLIS - DIRECT BY MR. BAKER                    52

1   expense.

2            MR. GERGER:  Objection, spec --

3            THE WITNESS:  I've got this expense in here as it

4   is today --

5            THE COURT:  Hold on.

6            THE WITNESS:  -- because I don't know if I can

7   recruit --

8            THE COURT:  Stop.

9            MR. GERGER:  Objection that --

10           THE COURT:  What's the objection?

11           MR. GERGER:  Purely speculative testimony about

12  who will do what as to whether they're part-time or full-

13  time.

14           THE COURT:  Mr. Baker?

15           MR. BAKER:  I didn't quite understand what he

16  said.

17           THE COURT:  His objection is, is this is just pure

18  speculation with no basis whatsoever.

19           MR. BAKER:  Okay.  Let me go back and ask.

20           THE COURT:  All right.  Then I'll -- we'll just

21  note the withdrawal of the question as well as the answer.

22           MR. BAKER:  Okay.

23  BY MR. BAKER:

24  Q    With regard to potentially getting additional funding

25  for both Hopewell and Title Rover, what type of basis do you

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003625

MARK WILLIS - DIRECT BY MR. BAKER                    53

1    believe you've got to get funds for both of those companies?

2        For example, have you actually -- do you actually have

3    people that may invest?  Might you invest?  Where might

4    those funds come from?

5             MR. GERGER:  Objection; leading.

6             THE WITNESS:  My --

7             THE COURT:  Overruled.

8             THE WITNESS:  Yeah, I've got a network of people,

9    like I have done in -- I've got a track record in numerous

10   other entities of raising capital and starting up companies.

11            So I would do that in the same fashion that I've

12   done probably in dozens of companies, is I would, you know,

13   tap first the people that I know to see if they have any

14   interest in investing.  And then I'd tap the people that I

15   know that might know someone that has an interest in

16   investing, and start with that approach.

17            MR. BAKER:  Okay.

18            THE WITNESS:  And, again, me personally, would

19   invest as well.

20            MR. BAKER:  Okay.

21   BY MR. BAKER:

22   Q    Okay, I'm going to shift over to some other questions

23   we have to go through for confirmation.  We've kind of

24   talked about these things in going through.  Hopewell and

25   Title Rover had submitted a plan, and it's a joint plan but

EXHIBIT A
Page 53

PLTF_003626

MARK WILLIS - DIRECT BY MR. BAKER                     54

1  there are two separate companies; correct?

2  A    Correct.

3  Q    Okay.  Now, just to kind of clarify this.  With regards

4  to Title Rover, did Ensource invest any money in Title

5  Rover?

6  A    No.

7  Q    Okay.  Did Ensource take any actions to convert its

8  interest in Hopewell to Title Rover, as you discussed that

9  investors could?

10 A    No, they did not.

11 Q    Okay.  So at least at this point in time, Ensource

12 really has no connection with Title Rover; does it?

13 A    That's correct.

14 Q    And its connection is solely with Hopewell.

15 A    Yes, sir.

16 Q    Okay.  Okay.  Now, the plan that has been proposed,

17 to your knowledge, does that comply with the provisions of

18 Title 11, Chapter 11 of the Bankruptcy Code?

19 A    As far as I understand it from our visit.

20 Q    Now, as far as you know, have the Debtors complied with

21 Title 11 and Chapter 11?

22 A    To the best of my knowledge.

23 Q    Okay.  To the best of your knowledge, has the plan been

24 proposed in good faith and not by any means forbidden by

25 law?

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003627

MARK WILLIS - DIRECT BY MR. BAKER                     55

1  A    Yes, sir.

2  Q    Okay.  Now, does the plan provide that any

3  administrative expenses, like my fees or any other

4  administrative expenses, would have to first be approved

5  by this Court before they could get paid?

6  A    I believe so.

7  Q    Okay.  And does the plan identify, at this point in

8  time that you're aware of, anybody that's going to continue

9  on in operating and managing both Title Rover and Hopewell

10  after confirmation?

11  A    Is there -- say that again, sir.

12  Q    Okay.  Does the plan disclose the entities or the

13  people who are going to continue to operate Hopewell and

14  Title Rover --

15  A    Yes.

16  Q    -- after confirmation?  Okay.  And at least there's not

17  anybody else that you know of right now, that's not listed

18  in the disclosure statement, that will be involved in the

19  companies?

20  A    Correct.

21  Q    Okay.  Are there any governmental agencies with

22  regulatory jurisdiction over either Hopewell or Title Rover?

23  A    Not that I'm aware of.

24  Q    Okay.  Now, is it your understanding, the way the plan

25  has been proposed, that every person that has a claim in the

EXHIBIT A
Page 55

PLTF_003628

MARK WILLIS - DIRECT BY MR. BAKER                56

1  company will receive, through the plan and confirmation, a

2  value that is equal to what they would get if the company

3  were liquidated?

4  A    I think a lot more value than if it was just

5  liquidated.

6  Q    Okay.  And that's based on the projections that we've

7  gone over?

8  A    That's correct.

9  Q    Okay.  Okay, so there are several classes in here.

10 One of the classes is the Texas Comptroller filed a claim

11 for, I think, a little less than $1,000, okay.  Now, the

12 plan provides either to pay that or get that resolved;

13 correct?

14 A    Correct.

15 Q    And at least you plan on paying -- if money is owed to

16 the comptroller, that would be paid off in full.  Is that

17 correct?

18 A    That's correct.

19 Q    Okay.  Now, the plan also provides for a class for SMW,

20 the entity that had loaned the money.

21 A    Yes.

22 Q    And how much is outstanding on the loan right now?

23 A    $100,000.

24 Q    Okay.  And what is -- do you recall what the plan

25 provides for addressing that amount that's owed?

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003629

MARK WILLIS - DIRECT BY MR. BAKER                    57

1   A    It gives us, you know, 270-something days, I think, to

2   pay it or to allow them to take their asset and -- take back

3   their asset if we're unable to do that in that period of

4   time.

5   Q    Okay.  And is your opinion, based upon what you know,

6   that that asset has more value than what is owed to SMW

7   or not?

8   A    Correct.

9   Q    Okay.  So at least from the perspective of that class,

10  they would be paid in full, as far as what you understand

11  about the way the plan is set up?

12  A    Yes, sir.

13  Q    Okay.  Now, you have got -- with regard to the ballots

14  that have been cast, you went over the ballot summary that

15  were filed with this court.  Do you remember looking at

16  that?

17  A    Yes, sir.

18  Q    And to your knowledge, that ballot summary is true and

19  correct.

20  A    Yes, sir.

21  Q    Okay.  And the only two people that voted against the

22  plan were a Gil Lopez -- and he's an investor in the

23  investor class; is that correct?

24  A    Correct.

25  Q    And Ensource, who isn't in any investor class; correct?

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003630

MARK WILLIS - DIRECT BY MR. BAKER                    58

1   A     That's correct.

2   Q     Did several people vote in the unsecured creditor

3   class?  The law firm, Jackson, Sjoberg and Patterson --

4   A     Yes.

5   Q     They voted for the plan.

6   A     Yes, sir.

7   Q     So at least as far as the people voting in the

8   unsecured class, everybody who voted, voted for the plan;

9   correct?

10  A     Yes.

11  Q     Okay.  Now, do you think that, moving forward, that

12  there would -- do you believe that there would be any need

13  for further liquidation or do you think the company's going

14  to be able to be successful, at least as far as moving

15  forward and reorganizing?

16  A     I believe the company could be successful in moving

17  forward and reorganizing.

18  Q     Okay.  Now, to your knowledge, have all the fees to

19  the U.S. Trustee been paid at this point in time?

20  A     I did not look, but I believe they have been.

21  Q     Okay.  If they have not been, are you willing to make

22  sure that those fees are paid completely current through the

23  date of confirmation?

24  A     Yes, sir.

25  Q     Now, neither one of these entities provides -- or do

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003631

MARK WILLIS - DIRECT BY MR. BAKER                     59

1  they provide any retirement benefits to anybody?

2  A    No, sir.

3  Q    Okay.  And if there are any transfers in the plan,

4  those transfers would be made under applicable state law?

5  A    Correct.

6  Q    Okay.  To your knowledge, the only plan that's been

7  filed at this point in time is the plan that's been proposed

8  by the two Debtors.  Is that correct?

9  A    That's correct.

10 Q    And you're not filing this plan, or the plans for both

11 of these companies, to avoid any tax issues; are you?

12 A    No, sir.

13 Q    And to the best of your knowledge, in fact neither one

14 of the entities owes any taxes; does it?

15 A    To the best of my knowledge, no.

16 Q    Okay.  Now, with regard to the two creditors -- or the

17 two investor creditors -- investor contractors or investors

18 that voted against the plan, what are they entitled to

19 retain in the plan?

20 A    In the plan, they're entitled to retain their equity.

21 And after the various classes are paid back, then they too

22 can receive, you know, potential distributions based on

23 their potential equity stake.

24 Q    And they would be treated the same as all the other

25 investors?

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003632

MARK WILLIS - DIRECT BY MR. BAKER                              60

1   A    That's correct.

2   Q    Okay.  And there is no junior equity holder or any

3   other class lower than the two investors that voted against

4   it; is there?

5   A    That's correct.

6   Q    Okay.  One of the arguments that has been made by

7   Ensource is that the principals of Hopewell and Title Rover

8   are accused of committing fraud.  Are you aware of any fraud

9   that you have committed?

10  A    No, sir.

11  Q    Okay.  And with regard to disclosure, what actions have

12  you taken to try to ensure that everything was disclosed to

13  that entity?

14  A    Well, we've offered to open books, we've -- you know,

15  again, prior to investing, we had all of our agreements made

16  readily available, pushed onto electronic format.  After

17  our accountant accumulated information, we asked any of the

18  shareholders -- we offered that any of the shareholders to

19  come in and have any audit rights that they'd like.  So

20  we've tried to have full transparency, you know, at the

21  appropriate times.

22  Q    Okay.

23         MR. BAKER:  No further questions at this time,

24  Your Honor.

25         THE COURT:  All right, thank you.  Mr. Gerger,

PLTF_003633

MARK WILLIS - CROSS BY MR. GERGER                    61

1  any cross?

2          MR. GERGER:  Yes, Your Honor.

3              MARK WILLIS - CROSS-EXAMINATION

4  BY MR. GERGER:

5  Q   Mr. Willis, you are the sole manager of Hopewell-Pilot;

6  correct?

7  A   That's correct.

8  Q   You are the sole manager of Title Rover; correct?

9  A   That's correct.

10 Q   Are you the only one authorized to sign checks on

11 behalf of Hopewell and Title Rover?

12 A   As it relates to postpetition?  That's correct.

13 Q   Yes.  Yes.  So have you signed any checks payable to

14 the United States Trustee since this case has been filed?

15 A   I have signed checks; I couldn't tell you which ones

16 they were.  Also, I have a bookkeeper and I run multiple

17 businesses, so I don't recall, as I sit here today, whether

18 I've written a check to the Trustee or not.

19 Q   How much revenue has --

20          THE COURT:  Hold on, Mr. Gerger.  Who paid the

21 U.S. Trustee's fees?

22          THE WITNESS:  Well, I've got a bookkeeper that,

23 again, I --

24          THE COURT:  Which entity paid --

25          THE WITNESS:  Oh.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003634

MARK WILLIS - CROSS BY MR. GERGER                    62

1       THE COURT:  -- the U.S. Trustee's fees?

2       THE WITNESS:  It would have been -- how the

3  transfers work, the entities don't have any cash.  I asked

4  my bookkeeper to consult with my attorney as it relates to

5  how funds should flow to either him or to -- any of the

6  funds that are due.  And however that he described to my

7  bookkeeper is --

8       THE COURT:  So when you answered the question that

9  all U.S. Trustee's fees had been paid, who paid them?

10       THE WITNESS:  No, I -- if I could correct that, I

11  said to the best of my knowledge they have been paid based

12  on --

13       THE COURT:  You're the only one who knows, so have

14  they been paid or haven't they?

15       THE WITNESS:  As I sit here today, I don't know.

16  To the best of my knowledge, everything that --

17       THE COURT:  Well, that's different than what you

18  said.  So have they been paid or not?

19       THE WITNESS:  I don't know.  Can I qualify that?

20       THE COURT:  Go ahead, Mr. Gerger.

21  BY MR. GERGER:

22  Q    How much revenue has Hopewell-Pilot realized since this

23  bankruptcy case has been filed?

24  A    Zero.

25  Q    How much revenue has Title Rover realized since this

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003635

MARK WILLIS - CROSS BY MR. GERGER                    63

1  bankruptcy case has been filed?

2  A    Zero.

3  Q    How many employees does Title Rover have since this

4  bankruptcy case has been filed?

5  A    The same as prior.  Zero.

6  Q    How many employees has Hopewell-Pilot had since this

7  bankruptcy case has been filed?

8  A    It's never had any employees and still doesn't have

9  any.

10 Q    Hopewell-Pilot has a contract with Title Rover to use

11 its intellectual property; correct?

12 A    Correct.

13 Q    How much has Hopewell paid Title Rover under that

14 contract since the bankruptcy case has been filed?

15 A    Zero.

16 Q    That contract is a contract that you want to be assumed

17 during this bankruptcy -- in this confirmation order; is

18 that correct?

19 A    That's correct.

20 Q    And how much is owed to Title Rover under the contract

21 with Hopewell?

22 A    I don't believe there's any funds owed to Title Rover

23 through Hopewell.

24 Q    Does the contract provide for monthly payments to Title

25 Rover?

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003636

                  MARK WILLIS - CROSS BY MR. GERGER                64

1            THE COURT:  He actually reversed the order of the

2    entities.  You need to go back and clean that up.

3            You need to listen very carefully to what he's

4    saying.

5            MR. GERGER:  I'll ask the question again.

6    BY MR. GERGER:

7    Q    Mr. Willis, Hopewell has a contract with Title Rover to

8    use the Title Rover intellectual property.  Is that correct?

9    A    That's correct.

10   Q    And that contract calls for monthly payments; is that

11   correct?

12   A    That's correct.

13   Q    And how much has been paid during the course of this

14   bankruptcy from Hopewell to Title Rover?

15   A    Zero.

16   Q    And how much is the monthly payment that's supposed to

17   be paid under the contract?

18   A    I believe zero.

19   Q    The contract says zero?

20   A    I'd have to look at it, but I believe that if they're

21   not doing the work that's available, meaning that we're not

22   -- I don't have Substantia LogiX billing. The only funds

23   that were paid into Sub -- from Hopewell to Title Rover was

24   a pass-through from the work that was delivered through

25   Substantia LogiX.

                  JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003637

MARK WILLIS - CROSS BY MR. GERGER                    65

1      So Title Rover didn't ever hold any funds.  It got

2   invoices from Substantia LogiX, and those invoices were

3   tendered to Hopewell and Hopewell paid those invoices.

4            MR. GERGER:  Your Honor, may I approach the

5   witness with exhibits?

6            THE COURT:  Yes, sir.

7            MR. GERGER:  (Presenting documents.)

8   BY MR. GERGER:

9   Q   Mr. Willis, would you turn to Exhibit 11, please?  And

10  tell me when you're there.

11  A   I'm there.

12  Q   Is this a memorandum agreement between Title Rover and

13  Hopewell?

14  A   (Reviewing document.)  Yes, it appears to be.

15  Q   And is this the contract that allows Hopewell to use

16  the Title Rover intellectual property?

17  A   I believe so.

18  Q   And would you read paragraph 3?

19  A   (Reviewing document.)  Yes.

20  Q   Would you read it out loud, please?

21  A   "Hopewell shall pay TR the sum of $17,500 per month as

22  a basic licensing fee covering the exclusive use of Title

23  rover technology in the AMI, which shall cover Madison

24  County, Walker and all" -- I mean, "all located in Texas."

25  "Madison, Houston and Walker counties, all located in

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003638

MARK WILLIS - CROSS BY MR. GERGER                    66

1  Texas."

2  Q    Under this contract, does Hopewell-Title -- does

3  Hopewell Project owe title Rover $17,500 a month during this

4  bankruptcy case?

5  A    Well, I don't know.  Paragraph 9 says, "All sums of

6  Hopewell to Title Rover under this agreement shall be

7  payable by Hopewell within ten days of receipt of an

8  invoice."  And I don't believe that there's been any

9  invoices sent out.

10 Q    There have been no invoices from Title Rover to

11 Hopewell during the course of this bankruptcy case.

12 A    That's correct.

13 Q    Are you the manager of Title Rover?

14 A    I am.

15 Q    Why didn't Title Rover send invoices to Hopewell?

16 A    Well, Hopewell is in bankruptcy with no money, the same

17 as Title Rover with no money.  So invoicing -- you know, if

18 someone is in bankruptcy with no capital, it doesn't seem

19 to make much sense.

20 Q    So the money is not owed because Title Rover did not

21 send an invoice.  Is that correct?

22 A    Let me read it.  (Reviewing document.)  I'm sorry,

23 would you ask the question again?

24 Q    Is it your testimony that there was no money owed by

25 Hopewell to Title Rover because Title Rover did not send an

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003639

MARK WILLIS - CROSS BY MR. GERGER                    67

1  invoice?

2  A    One, it didn't -- it did not provide an invoice nor did

3  it provide any services.

4  Q    And those are the reasons why no money is owed.

5  A    That's correct.  Nor was Hopewell utilizing the tool

6  or any of the assets of Title Rover.

7  Q    And is that because both of the Debtors had been

8  mothballed?

9  A    Because of the pending litigation in California and

10 none of the Debtors had any access to capital.  Hence,

11 therefore we had to file both companies in bankruptcy.

12           MR. GERGER:  Objection, nonresponsive.

13           THE COURT:  Sustained.  Answer the question.

14           THE WITNESS:  Will you ask the question again?

15 BY MR. GERGER:

16 Q    Are both Debtors mothballed?

17 A    Correct.  I could relate to that term.

18 Q    Does Title Rover owe anybody any money?

19 A    I don't recall.

20 Q    Where is the software of Title Rover residing?

21 A    It resides with our technologist in Boston.

22 Q    What does it cost for the software to reside in Boston?

23 A    He's not charging us any fees.

24 Q    Is there a contract with him?

25 A    I believe there is a contract with Substantia -- there

EXHIBIT A
Page 67

PLTF_003640

MARK WILLIS - CROSS BY MR. GERGER                    68

1  is a contract with Substantia LogiX.  It was negotiated and

2  managed by Tom.

3  Q    Is anyone other than Title Rover paying for the

4  software to reside in Boston --

5  A    No.

6  Q    -- or Massachusetts?

7  A    No, sir.

8  Q    Does he have a lien on the intellectual property that's

9  sitting and residing in Boston?

10  A    I don't believe so.  I'm not certain if you can lien

11  software.

12  Q    I'm sorry?

13  A    I'm not certain if you can lien software.  I think it's

14  only real property.

15  Q    How much cash are you prepared today to put into Title

16  Rover?

17  A    I'm willing to participate in the funding of Title

18  Rover.  You know, I've got several potential liquidity

19  events that are coming up.  So depending on the outcome of

20  those liquidity events will determine my ability and how

21  much I can fund into Title Rover.

22          MR. GERGER:  Objection, nonresponsive.

23          THE COURT:  Sustained.

24  BY MR. GERGER:

25  Q    Mr. Willis, how much cash are you willing to put into

EXHIBIT A
Page 68

PLTF_003641

MARK WILLIS - CROSS BY MR. GERGER                    69

1  Title Rover today?

2  A     Today.  I'd be willing to put $50,000 into Title Rover

3  today, to jump start it and get it back going.  Today.

4  Q     How much money are you willing to put into Hopewell-

5  Pilot today?

6  A     I'd probably consider somewhere around the same.

7  Today.

8  Q     Why haven't you disclosed that in your plan?

9  A     You'd have to ask my counsel.  I wasn't asked to

10 disclose that in my plan.  May I add something to that as

11 well?  I didn't know we also were going to be confirming

12 today.

13          THE COURT:  Why did you think we were here?

14          THE WITNESS:  Well, I didn't know that there was

15 a resolution today.  But I figured that, from my perspective

16 -- again, my transaction that I have pending is five weeks

17 away.  That's going to determine what my liquidity is.

18          THE COURT:  So when you came to court this

19 morning, what did you think that you were here for?

20          THE WITNESS:  Well, I thought this was one of

21 the steps in the process.

22          THE COURT:  So no one ever told you your

23 confirmation hearing was today?

24          THE WITNESS:  Was today, but I didn't know that we

25 were having to fund a reorganization today and that I was

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003642

MARK WILLIS - CROSS BY MR. GERGER                    70

1  bringing my checkbook today.

2            THE COURT:  Go ahead, Mr. Gerger.

3  BY MR. GERGER:

4  Q    Mr. Willis, you testified that it'll take 60 to 90 days

5  to get Hopewell back up and running, so to speak.  Is that

6  correct?

7  A    That's correct.

8  Q    Do you know how long your case has been in bankruptcy?

9  A    I'd be guessing.  I don't recall the exact date that we

10 filed.

11 Q    You also testified about prospects that needed to be

12 dusted off.

13 A    Correct.

14 Q    Do you recall that?

15 A    I do.

16 Q    And are those prospects for various oil and gas

17 interests in Madison County?

18 A    Correct.

19 Q    And today, do you know whether those prospects are

20 available?

21 A    I've done no research.  As I said, that's why they'd

22 have to be dusted off.

23 Q    They may have been taken by someone else; correct?

24 A    They might have been taken by someone else, or the

25 original operator might have recognized that they had an

                    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003643

MARK WILLIS - CROSS BY MR. GERGER                    71

1   open hole within their AMI.

2   Q    And that would have eliminated the opportunity for

3   Hopewell to acquire those interests --

4   A    That --

5   Q    -- correct?

6   A    That's correct.

7   Q    You understand that Ensource disputes that it owes any

8   money to Hopewell.

9   A    I understand that.

10  Q    And you understand that you and Mr. Tatham and Title

11  Rover are sued for securities fraud in California.

12  A    That's correct.

13  Q    When you attempt to raise money for Hopewell from other

14  parties, are you going to disclose to them that you are

15  being sued for securities fraud in California?

16  A    Well, that's -- if I could, I'd like to clean up the

17  record.  That would --

18          MR. GERGER:  Objection, Your Honor.

19          THE WITNESS:  Could I answer the --

20          THE COURT:  Sustained.

21          THE WITNESS:  Okay.  Shall I answer the question?

22  Well, absolutely, I would disclose that.

23  BY MR. GERGER:

24  Q    Would you turn to Exhibit 14, please?

25  A    (Locating document.)


                    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003644

MARK WILLIS - CROSS BY MR. GERGER                72

1  Q    And, Mr. Willis, this states at the top, it is minutes

2  of a meeting in the Willis Group offices on the second floor

3  presentation room on April 13th, 2017 at 10:00 a.m.

4       Is that what it says at the top?

5  A    Yes, sir.  That's what it says.

6  Q    This was a special meeting of the members of Hopewell-

7  Pilot Project.

8  A    Correct.

9  Q    Was it also a meeting of the members of Title Rover,

10 do you remember?

11 A    I don't recall.  I don't believe it was but I do not

12 recall.

13 Q    Okay.  Would you turn to the second page, please?

14 A    (Locating page.)

15 Q    There is a paragraph, I would say the third full

16 paragraph down, starting with the words, "The primary

17 purpose."  Do you see that?

18 A    I do.

19 Q    Go ahead and read that to yourself, please.

20 A    (Reviewing document.)  Okay.

21 Q    In the middle of that paragraph, it says, "Both

22 Hopewell and Title Rover are out of funds and facing

23 significant further expenditures to proceed with the

24 pending litigation."  That's a true statement.

25 A    That's a true statement.


JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003645

MARK WILLIS - CROSS BY MR. GERGER                    73

1  Q    It was true then and it's true now.

2  A    That's correct.

3  Q    Next, "Title Rover's counsel has estimated that it

4  will cost $250,000 to $300,000 to cover all costs through

5  the trial of the Ensoure federal court claim filed in San

6  Diego."  Is that correctly read?

7  A    That's what it says.

8  Q    The next sentence says, "The cost of trying Hopewell's

9  federal court claim in Houston are yet to be determined."

10 Did I read that correctly?

11 A    You did.

12 Q    Now, I want to talk about the federal court claim with

13 you, please.

14 A    Okay.

15 Q    Are you aware that Hopewell filed a lawsuit against

16 Ensoure in Federal District Court in Houston, Texas?

17 A    Yes, I am.

18 Q    And that was before Hopewell filed its bankruptcy case;

19 correct?

20 A    I would have to look at the dates.  I'm not certain as

21 I sit here.

22 Q    And just as an aside, you know that there were two

23 lawsuits filed in the Bankruptcy Court, one by Hopewell, one

24 by Title Rover, both against Ensoure and their members?

25 A    Yes.


JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003646

MARK WILLIS - CROSS BY MR. GERGER                    74

1  Q    The last sentence of this paragraph says, "Resolution

2  of the pending claims is essential and it would appear at

3  this juncture that we will get an earlier trial setting in

4  Houston with the Hopewell claim."  And that's regarding the

5  federal case; correct?

6  A    I believe so.

7  Q    And do you recall Judge Jones ordering us to file a

8  paper in the Federal District Court case to reopen that

9  case?

10 A    I don't recall.

11 Q    Do you recall that Ensource filed such a motion?

12 A    Again, I don't recall that.

13 Q    Do you recall that Hopewell has not filed that motion

14 in Federal District Court?

15 A    No.

16 Q    Who is your lawyer in the Federal District Court case?

17 A    I hired a young lady out of California.  I don't have

18 her name.

19 Q    Let me clarify the question.  Who did -- who was hired

20 to represent Hopewell in the Houston Federal District Court

21 case?

22 A    Oh.  Mr. Patterson.

23 Q    And is he the lawyer for Hopewell-Title in that case?

24 A    He was a lawyer in that case.

25 Q    Is there a lawyer now for that case?

MARK WILLIS - CROSS BY MR. GERGER                    75

```
 1   A    I don't believe that we have one at this particular
 2   time because our lawyer --
 3   Q    Now, on the two bankruptcy adversary proceedings, that
 4   they're called, you mentioned you remember those; correct?
 5   A    Correct.
 6   Q    Do you recall that Hopewell has filed a motion to
 7   dismiss the members of Ensource from its adversary
 8   proceeding?
 9   A    I don't recall that.
10   Q    Do you recall that Title Rover has filed a motion to
11   dismiss the members of Ensource from the adversary
12   proceeding it filed?
13   A    I don't recall that.
14   Q    Does your lawyer send you copies of all the pleadings
15   filed in this case?
16   A    I believe so.
17   Q    Do you read them?
18   A    I have read them.
19   Q    If you look at the bottom of that page 2, where it
20   says, "Tom Tatham states 430,000 was funded."  Do you see
21   that?
22   A    I see that.
23   Q    Continuing on to the end, in the middle of that line,
24   it says, "Mark and I are considering adding some personal
25   responsibility of the Ensource managers under the Hopewell
```

EXHIBIT A
Page 75

PLTF_003648

MARK WILLIS - CROSS BY MR. GERGER                    76

1   claim, as their actions in being responsible as managers are

2   no different than ours, and we have been named personally in

3   the San Diego proceeding."  Did I read that correctly?

4   A    Yes.

5   Q    And those managers were sued in the Bankruptcy Court;

6   correct?

7   A    I believe so.

8   Q    And there's a pending motion to dismiss in those two

9   adversary proceedings.  Is that correct?

10  A    I'm not certain.

11  Q    Would you go to the next page, please?

12  A    (Locating page.)

13  Q    At the very bottom, it says, "Tom Tatham, if you were

14  in an aggressive lease acquisition."  Do you see that?

15  A    I see that.

16  Q    I'm going to read it.  And this is in response to your

17  question to him, which is above.

18       You say, "Pick a wild number as to how valuable it

19  could be under a great or most optimistic scenario."  Do

20  you see that?  Did I read that right?

21  A    Where are you at?

22  Q    I'm sorry.  I'm on the bottom of the third page.

23  At the bottom, it says "Mike Willis:  "If these 40K [sic]

24  acres."

25            MR. BAKER:  Your Honor, I'd just like to point

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003649

MARK WILLIS - CROSS BY MR. GERGER                    77

1  out, Mike Willis is a different person than the person

2  testifying now.

3            THE COURT:  I agree.

4            MR. BAKER:  I just wanted to make that clear for

5  the record.

6            THE COURT:  And, Mr. Gerger, because you did make

7  reference to the Mr. Willis on the stand as being Mike, so

8  let's clean that up.

9            MR. GERGER:  Okay.

10  BY MR. GERGER:

11  Q    You attended the meeting?

12  A    I did.

13  Q    All right.  And I'm on the third page at the bottom,

14  "Mike Willis."  Do you see that?

15  A    I see that now.

16  Q    And it says, "If these 40 acres could be valuable, pick

17  a wild number as to how valuable it could be under a great

18  or most optimistic scenario."  Did I read that right?

19  A    You did.

20  Q    And Mr. Tatham gives an answer.  And his answer is

21  that, "They're worth $5,000 an acre with the Knight drill

22  site tract included."  Right?

23  A    No, sir.

24  Q    Sorry?

25  A    No, sir.

PLTF_003650

MARK WILLIS - CROSS BY MR. GERGER                    78

1  Q    Well, flip over to the next page as well.

2  A    Do you want me to say what it says?  Or just flip over?

3  Q    Well, does the answer include a valuation of "$5,000 an

4  acre with the Knight drill site tract included"?

5  A    (Reviewing document.)  Are you asking me specifically

6  what it says?

7  Q    Yes, that's all.

8  A    It says -- if you're asking me what the last sentence

9  says, that's what it says.

10 Q    All right.

11 A    If you're not going to put the stuff in the middle,

12 then it's --

13 Q    All right.  So I'm getting to another point.  "And,

14 Mr. Willis, This $5,000 an acre is for the 40 acres that

15 Hopewell currently owns."

16 A    Well, if you're referencing the $5,000 on the low end

17 and the $50,000 on the high end to the -- as to the 40

18 acres, it says it could yield around $2 million for 40

19 acres.  The likelihood is that the lease is probably worth

20 $5,000 with the Knight --

21 Q    Yes.

22 A    Yes.

23 Q    And the bankruptcy schedules state that the value is

24 $200,000; correct?

25 A    That's correct.


JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003651

MARK WILLIS - CROSS BY MR. GERGER                    79

1  Q    So what's 40 times $5,000?

2  A    200,000.

3  Q    And how much was the lender owed?

4  A    100,000.

5  Q    And you needed 100,000 to make your company work.  Is

6  that right?

7  A    We needed 100,000 once the SMH line of credit was

8  pulled back and we had our six months to decide whether they

9  were going to convert their interest into equity or they

10  wanted to be paid.  So that was a critical time frame.

11  Q    So if you would turn to Exhibit No. 13.

12  A    (Locating document.)

13  Q    What is Exhibit 13, please?

14  A    It says a Hopewell term sheet for oil and gas -- lease

15  for SMH Investments, LLC, granting Simms and related

16  parties.

17  Q    And this is a document you produced to Ensource in

18  response to a discovery request; correct?

19  A    I believe this document was produced by Ensource and

20  pushed into the data room, although I never entered the data

21  room.  But, yes, this is one of the documents that they got

22  also through discovery, I assume.

23  Q    And is this the document that memorializes the million

24  dollar commitment from SWM [sic] Investments to Hopewell?

25  A    This is the term sheet that does that.


JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003652

MARK WILLIS - CROSS BY MR. GERGER                    80

1  Q    Okay.  And Commercial Term No. 1.  Can you give me your

2  understanding of that?

3  A    (Reviewing document.)  Okay.

4  Q    What's your understanding of it?

5  A    My understanding is that they can either take 9 percent

6  on their money or convert it into equity.

7  Q    And of the million dollar line of credit, Mr. Willis,

8  what's the maximum that was taken down from SMW?  What was

9  the most borrowed from SMW?

10  A    I believe that Tom took down a half a million dollars

11  in the preparation of closing one particular transaction.

12  Q    Did that transaction close?

13  A    It ultimately did not close.

14  Q    And how much went back to SMW?

15  A    I believe $400,000 went back to SMW.

16  Q    And the bankruptcy schedules list a claim against

17  Mr. Tatham; correct?

18  A    Correct.

19  Q    And is that claim related to this $100,000 that was

20  not repaid?

21  A    It is.

22  Q    What is your relationship to Mr. Tatham?

23  A    Well, we had a business relationship.  He's also

24  married to my step-sister -- or my half sister.

25  Q    Has Hopewell hired a lawyer to sue Mr. Tatham?

EXHIBIT A
Page 80

PLTF_003653

MARK WILLIS - CROSS BY MR. GERGER                    81

1   A    We have -- yes, we have an attorney here today that has

2   sued Mr. Tatham here in Bankruptcy Court.

3   Q    That lawsuit has been filed, is that what you're

4   telling me?

5   A    We have put a claim in.  Whatever advice I've gotten

6   from my counsel, I followed my counsel's advice in that

7   recovery.

8   Q    All right.  Would you please turn to Exhibit No. 1?

9   A    (Locating document.)

10  Q    Now, Mr. Willis, at the top of Exhibit No. 1 on the

11  right-hand side, it has page numbers.  Do you see that?

12  A    Yes, I do.

13  Q    All right.  Would you please turn to page 8?

14  A    (Locating page.)  Okay.

15  Q    Do you see there that it lists SMW Investments 1,

16  LLC with an address of 600 Travis, Suite 5900, Houston,

17  Texas?

18  A    I see that.

19  Q    Would you turn to page 21, please?

20  A    (Locating page.)

21  Q    Are you there?

22  A    I am.

23  Q    Do you see where it -- at the top, it says, "Debtor,

24  Hopewell-Pilot Project, LLC"?

25  A    I see that.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003654

MARK WILLIS - CROSS BY MR. GERGER                    82

1  Q    And do you see just below it, it says, "No. 4, payments

2  or other transfers of property made within one year before

3  the filing of this case that benefitted any insider."

4  A    Correct.

5  Q    Item No. 4.3 is PDP Management Group, LLC, with an

6  address of 600 Travis Street, Suite 5900 --

7  A    I see that.

8  Q    -- Houston, Texas 77002.  Correct?

9  A    Correct.

10 Q    That's the same address as SMW?

11 A    (Reviewing document.)

12 Q    That was page 8, if you need to double-check it.

13 A    Page 8?  I'll take your word for it.  I believe that's

14 correct.

15 Q    Well, look at page -- I don't want you to take my word

16 for it.  Look at page 8.

17 A    (Reviewing page.)  Yes, correct.

18 Q    Who owns PDP Management?

19 A    Thomas owned that.  Well, to the best of my knowledge,

20 Thomas Tatham.

21 Q    And how much did he receive within the one year before?

22 A    I don't have that number off the top of my head.

23 Q    Okay.  Take a look at No. 4.3.

24 A    Yup.

25 Q    And you see the name of PDP Management.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003655

MARK WILLIS - CROSS BY MR. GERGER                    83

1  A    Correct.

2  Q    And look just to the right, and there's a series of

3  dates.  Do you see that?

4  A    I see that.

5  Q    And just to the right of that is a number.  Do you see

6  that?

7  A    I see that.

8  Q    And this is supposed to be payments or other transfers

9  of property.  And then, total amount or value of that

10 property.  Is that $283,500?

11 A    That's correct.

12 Q    Okay.  And this was prepetition.

13 A    Correct.

14 Q    Prepetition, meaning before the date of the Hopewell

15 bankruptcy.

16 A    That's correct.

17 Q    And at that time, you were -- you and Mr. Tatham were

18 managers of Hopewell; is that correct?

19 A    Correct.

20 Q    Now, let's go to 4.1.  4.1 refers to Willis Group, LLC,

21 Jabco.

22 A    Correct.

23 Q    And to the far right, it shows that Willis Group, LLC

24 is owned half by you and half by Michael T. Willis.

25 A    Correct.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003656

MARK WILLIS - CROSS BY MR. GERGER                    84

1  Q    And it received $15,000; correct?

2  A    That's correct.

3  Q    And you -- the next one, 4.2, you received $24,000;

4  correct?

5  A    Correct.

6  Q    At least that's what it says.

7  A    That's what it says.

8  Q    Let's jump to 4.4.  That's Beyond Review, LLC; correct?

9  A    Correct.

10  Q    And that's owned in part by Willis Group, LLC?

11  Correct?

12  A    That's correct.

13  Q    And you're a part owner of Willis Group, LLC?

14  A    That's correct.

15  Q    And how much did it receive?

16  A    66,928.50

17  Q    And turn to the next page, please.  We have transfers

18  to Thomas Tatham, we have transfers to Image Engine, LLC,

19  80 percent owned by you.  Correct?  That's what it says.

20  A    Oh, if you're asking what it says, that's what it says.

21  Q    I'm just asking what it says.

22  A    That's what it says.

23  Q    All right.  And Mr. Tatham received $6,846.33, and

24  Image Engine received $24,000; correct?

25  A    That's what it says.

PLTF_003657

MARK WILLIS - CROSS BY MR. GERGER                85

1   Q    All right.  And these are correct.

2           THE COURT:  Well, hold on.  Mr. Willis, you signed

3   these under penalty of perjury; did you not?

4           THE WITNESS:  Yes, that is correct.

5           THE COURT:  So I assume you believe it to be true.

6           THE WITNESS:  Yes.  That's the number that -- I do

7   see one thing that, I mean, it's -- at the time --

8           THE COURT:  I didn't ask --

9           THE WITNESS:  Okay.

10           THE COURT:  I didn't ask you a question.

11           THE WITNESS:  Okay, yes, that's correct.

12           THE COURT:  I just asked -- you keep saying you --

13   "It appears to be," "it might be," but you signed these

14   under penalty of perjury.

15           THE WITNESS:  That's right.

16           THE COURT:  All right.  Go ahead, Mr. Gerger.

17           THE WITNESS:  Well, one thing I want to know is --

18   you know, is this my documents or his document?  I didn't

19   know who prepared this one and I didn't memorize which ones

20   that came in, either if these were his exhibits prepared or

21   mine.

22           THE COURT:  Go ahead, Mr. Gerger.

23           THE WITNESS:  I need that clarification, Your

24   Honor.

25   BY MR. GERGER:

EXHIBIT A
Page 85

PLTF_003658

MARK WILLIS - CROSS BY MR. GERGER                    86

1  Q    Mr. Willis, will you take the time to look at

2  Exhibit 1, and tell us if this is the document you signed

3  under penalty of perjury --

4  A    Thank you.

5  Q    -- and was filed with the Bankruptcy Court.

6  A    (Reviewing document.)

7          MR. GERGER:  Your Honor, while Mr. Willis is

8  looking, can we take a --

9          THE WITNESS:  Correct.

10         MR. GERGER:  -- restroom break?

11         THE COURT:  Well, I think you got an answer to the

12 question.  Now, do you need a restroom break?

13         MR. GERGER:  Someone at our table needs a restroom

14 break.

15         THE COURT:  And I wasn't trying to embarrass

16 anybody.  I was just -- you need to tell me --

17         MR. GERGER:  Yes.

18         THE COURT:  -- because you know I won't stop.

19 Does ten minutes work for you?

20         MR. GERGER:  Yes.

21         THE COURT:  All right.  Then we'll adjourn until

22 11:25.

23         THE CLERK:  All rise.

24     (Recess taken from 11:13 a.m. to 11:29 a.m.)

25         THE CLERK:  All rise.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003659

MARK WILLIS - CROSS BY MR. GERGER                 87

1          THE COURT:  All right.  Thank you everyone.

2  Please be seated.  All right, Mr. Gerger.

3          MR. GERGER:  I think Mr. Willis was going to tell

4  us whether this was a document that he read and signed under

5  penalty of perjury and authorized to be filed with the

6  court.

7          THE WITNESS:  Yes, I -- now, I understand what

8  the document is.

9          MR. GERGER:  Sorry, Your Honor.  I'll be right

10  there.

11          THE COURT:  No, it's fine.

12  BY MR. GERGER:

13  Q   All right.  Mr. Willis, would you please turn to

14  Exhibit No. 5, please?

15          THE COURT:  Mr. --

16          MR. GERGER:  Would you please turn to Exhibit 5?

17          THE COURT:  5, all right.  I just -- I didn't hear

18  you.

19          MR. GERGER:  No one heard me, Your Honor.

20  BY MR. GERGER:

21  Q   Are you at Exhibit 5.

22  A   Yes, sir.  I am.

23  Q   Would you look at this and tell me whether this is a

24  paper that you read and signed under penalty of perjury and

25  filed with the Bankruptcy Court?

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

EXHIBIT A
Page 87

PLTF_003660

MARK WILLIS - CROSS BY MR. GERGER                    88

1   A     (Reviewing document.)

2             MR. BAKER:  Your Honor, if I may just point to

3   him?  On page 26, it's got your signature on the very last

4   page.

5             THE WITNESS:  Oh, great.

6             MR. BAKER:  And just look for that.

7             THE WITNESS:  (Locating page.)  Correct.

8   BY MR. GERGER:

9   Q     Would you please turn to page 3?

10  A     (Locating page.)

11  Q     And on Item 21, it mentions Digital Images and related

12  entities for Madison County, Texas.  Do you see that?

13  A     Yes, sir.

14            MR. BAKER:  If I may, you'd mentioned 21.  I think

15  you're talking about -- are you talking about 22?

16            MR. GERGER:  Item No. 22, Mr. Willis.

17            MR. BAKER:  Okay, thank you.  All right.

18  BY MR. GERGER:

19  Q     It says Other Inventory or Supplies:  Digital Images

20  and related entities?

21  A     Correct.

22  Q     And there's a value of $75,000; correct?

23  A     Correct.

24  Q     Is this usable only by Title Rover?

25  A     No, sir.


                 JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003661

MARK WILLIS - CROSS BY MR. GERGER                    89

1  Q     Who else could use it?

2  A     Anyone else that wanted to have leasing activity in

3  Madison County could utilize the work that's already been

4  done.

5  Q     During the course of this bankruptcy case, what efforts

6  have you undertaken to find others who might be interested

7  in acquiring or using these digital images?

8  A     Since the case has been filed, I've had no effort in

9  doing that.

10  Q     Do you recall attending a meeting of creditors for the

11  Title Rover bankruptcy case and Mr. Glen Otto conducted the

12  meeting?

13  A     I do.

14  Q     Do you recall he asked you a question, "Are all

15  insurable assets insured?"

16  A     I don't recall that question.

17  Q     Are they insured today?

18  A     I do not believe so.  I do not know.

19  Q     Are there backups of the data?

20  A     I believe -- we've asked for backups.  I've been told

21  that they're -- that we do have two backups of data.

22             MR. GERGER:  Objection, hearsay.

23             THE COURT:  Well, Mr. Willis, do you know or do

24  you not know?  You are the president, or you're the person

25  responsible for this entity.  It's the most valuable asset.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003662

MARK WILLIS - CROSS BY MR. GERGER                    90

1   Do you know if a backup exists or not?

2            THE WITNESS:  Can I qualify that?  Yes -- yes.

3            THE COURT:  So you've seen them.

4            THE WITNESS:  I'm not an IT guy, so I haven't

5   fired it up.  I've been told by my IT guy that we have a

6   backup.  I take him at his word for that.

7            THE COURT:  Okay.

8   BY MR. GERGER:

9   Q    Who is the IT guy?

10  A    Brent Stanley.

11  Q    Is he an employee of Title Rover?

12  A    Title Rover has never had any employees.

13  Q    Well, does he have a contract to provide IT services to

14  Title Rover?

15  A    Technical services, correct.

16  Q    What's the terms of that contract?

17  A    It's the same contract -- if you'll look at Substantia

18  LogiX, that's Brent Stanley.

19  Q    I'd like to ask you a question about monthly operating

20  reports.

21  A    Okay.

22  Q    You are aware that monthly operating reports are to be

23  filed monthly; correct?

24  A    Correct.

25  Q    Can you tell me why the monthly operating reports for

EXHIBIT A
Page 90

PLTF_003663

MARK WILLIS - CROSS BY MR. GERGER                    91

1  both these cases were usually filed late?

2  A    There's probably different reasons at different times.

3  I think we had sent operating reports over to our attorney's

4  office and I think sometimes that, you know, that his

5  assistant, a gentleman there, might not have communicated

6  that he had them to our attorney.

7       There might be other reasons at different times, but I

8  don't recall all the -- all the instances.

9  Q    Is it your testimony that every monthly operating

10 report was prepared timely and sent to your lawyer's office

11 in time to be filed with the Bankruptcy Court?

12 A    No.

13 Q    Mr. Willis, your plan provides that the Debtor has

14 identified preferential transfers.  The Debtor anticipates

15 bringing a claim for preferential transfer upon

16 confirmation.  Do you recall that?

17 A    Yes.

18 Q    Has Hopewell engaged any third party independent source

19 to review the transfers made to you and Mr. Tatham and the

20 companies you own, to see if there are preferential

21 transfers?

22 A    Other than my bankruptcy counsel, no.

23            THE COURT:  How are you going to sue yourself?

24            THE WITNESS:  For?

25            THE COURT:  Preference.


                    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003664

MARK WILLIS - CROSS BY MR. GERGER                    92

1          THE WITNESS:  I don't believe there are any

2    preference issues.

3          THE COURT:  Well, how are you going to decide

4    that?

5          THE WITNESS:  Well, I believe this Court will

6    decide that.

7          THE COURT:  No.

8          THE WITNESS:  I've hired bankruptcy counsel

9          THE COURT:  I decide who wins if there's a dispute

10   filed.

11         THE WITNESS:  Okay.

12         THE COURT:  You've said that you're going to file

13   preferences.  You've identified a preference against

14   yourself.  How are you going to sue yourself?

15         THE WITNESS:  I did not identify -- I'm confused

16   because I didn't realize I identified a preference to

17   myself.

18         THE COURT:  We just went over that.  Both you and

19   your entities.

20         THE WITNESS:  Those were dates that were paid to

21   insiders.  That's my understanding of that schedule.  Those

22   weren't preference payments.

23         THE COURT:  Okay.  So if there is a preference or

24   fraudulent transfer, how are you going to sue yourself?

25         THE WITNESS:  Well, the company could sue myself


                   JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003665

MARK WILLIS - CROSS BY MR. GERGER                    93

1   and the funds will come back into the company?

2           THE COURT:  Well, who makes the decision?  You're

3   the decision maker.  Am I supposed to believe that you're

4   going to make a business decision as to whether or not to

5   sue yourself?

6           THE WITNESS:  No.  My understanding is this Court

7   will determine if there were preference issues.  If there

8   are preference issues, that would be enforced against the

9   company.  That's how I -- maybe I don't understand the

10  process, Your Honor.

11          THE COURT:  No, that's clear.

12          THE WITNESS:  Yeah.  That's why I have attorneys.

13          THE COURT:  All right.  Mr. Gerger, go ahead,

14  please.

15  BY MR. GERGER:

16  Q    Mr. Willis, would you turn to Exhibit 4, please?

17  A    Sure.  (Locating document.)

18  Q    And what is Exhibit 4?

19  A    It's a Hopewell Project P&L.

20  Q    For what period?

21  A    March 20th of '16 through March of 2017.

22  Q    And is this a correct copy of the Hopewell-Pilot

23  Project profit and loss for that period?

24  A    Yes, it is.

25  Q    And it shows no income; correct?


                    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003666

MARK WILLIS - CROSS BY MR. GERGER                      94

1  A     Correct.

2  Q     And it shows total expenses were just under a million

3  dollars; correct?

4  A     That's correct.

5  Q     And what are the assets it has to show for itself?

6  A     Well, it's got process data, identifiable projects.

7  It's got data that's committed, you know, through South Oil,

8  and it's got a lot of intellectual property and knowledge

9  for that area.

10 Q     And can all of that be sold?

11 A     All of that could be utilized.  Can it be sold?  It

12 can be sold for something.  What, you know, I wouldn't --

13 I couldn't speculate.

14 Q     And it also has 40 acres.

15 A     Correct.

16 Q     And that could be sold.

17 A     That could be sold.

18 Q     With respect to Hopewell-Pilot, during the course of

19 the case, what new funding have you sought to fund the

20 operations of Hopewell-Pilot?

21 A     Since the bankruptcy case?

22 Q     Correct.

23 A     I have -- I've had general discussions with a handful

24 of people.  And the target date hasn't been necessarily just

25 the confirmation of the bankruptcy case, but the resolution

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003667

MARK WILLIS - CROSS BY MR. GERGER                    95

1  of the litigation potentially in California, whether or not

2  that this -- that we leave those claims behind as relates to

3  the entities, that allows us to raise capital and take the

4  companies forward or not.

5  Q    So the securities fraud case in California needs to be

6  resolved before there will be a third party investor into

7  Hopewell-Pilot Project?

8  A    Not any of the individual claims, because those are

9  separate.  You know, that's not going to affect the

10 company's ability to go forward, but certainly any the

11 claims brought against the entity would.  Or any potential

12 claims that might be outstanding that have been brought

13 against the entities, if they had been threatened, would

14 be a problem.

15 Q    Well, Title Rover is a party in the suit in California;

16 correct?

17 A    That is correct.

18 Q    And it filed a motion to dismiss the claims against it;

19 didn't it?

20 A    I believe so.

21 Q    And that motion was not granted by the judge in

22 California; is that correct?

23 A    I believe so.

24         MR. GERGER:  Pass the witness, Your Honor.

25         THE COURT:  All right.  Mr. Baker, any redirect?


JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003668

MARK WILLIS - REDIRECT BY MR. BAKER                    96

1            MR. BAKER:  Yes, Your Honor.

2            THE COURT:  All right.  Please.

3               MARK WILLIS - REDIRECT EXAMINATION

4    BY MR. BAKER:

5    Q    Okay, I want to go back to Exhibit 1, pages -- let's

6    start on page 21.

7    A    (Locating document.)  Okay.

8    Q    Okay.  First of all, the -- in 4.1, the $15,000.

9    About -- what is the date that that money was reimbursed?

10   A    Well, the date says 10/28/2015.  There were funds

11   advanced by Willis Group, you know, that were ultimately

12   reimbursed to Willis Group.

13            MR. GERGER:  Objection, nonresponsive.

14            THE COURT:  Sustained.

15            MR. BAKER:  Okay.

16   BY MR. GERGER:

17   Q    What were those funds paid for?

18   A    Reimbursement of funds advanced by Willis Group, as

19   noted in the footnotes.

20   Q    Okay.  And those funds were -- what type of

21   reimbursements were those for?

22   A    I don't recall.  I think we advanced $15,000 to help

23   fund timely some of the technology, and so Willis Group made

24   an advance of $15,000 -- loaned the company $15,000 to meet

25   an obligation that we said we'd pay it back.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003669

MARK WILLIS - REDIRECT BY MR. BAKER                    97

1  Q    Okay.

2  A    We, as in Hopewell.

3  Q    Okay.  Let's go to 4.2, the $24,000.  What was that

4  paid for?

5  A    That was -- those were paid -- those were for fees.

6  I accrued a bunch of fees for the work that I did, same as

7  Tom, and so those were paid back, you know, sometime in

8  7/31, 8/31, prior to, you know, any investments made after

9  that, including Ensource.

10  Q    Okay.  Do you remember what use you made of that

11  $24,000?

12  A    I'm sorry?

13  Q    What did you do with that $24,000?

14  A    That $24,000 was ultimately used to offset the

15  liability owed to Image Engine.  Image Engine was owed funds

16  as well.  We settled that out.  They were owed about 40 some

17  thousand dollars.  We agreed to just settle it out and just,

18  you know, have me pay for the work that Image Engine did,

19  for the 24,000.  So it cancelled it out, which is the 24,000

20  that you see on 4.6.

21  Q    Okay.  Okay, in 4.3, the PDP Management Group, the

22  $283,500, what were those funds paid for, to your knowledge?

23  A    Those were monthly invoices sent by PDP Management,

24  which is owned by Tom Tatham, who managed the day-to-day

25  operations of the business.


JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003670

MARK WILLIS - REDIRECT BY MR. BAKER                98

1  Q     Okay.

2  A     And I'm sorry.  The operations and fund-raising

3  efforts, and other efforts and everything else.

4  Q     And so those were, what, his hourly fees you were

5  paying on a monthly basis for the services he was providing?

6  A     That's correct.

7  Q     Okay.  The 4.4, Beyond Review, what were those funds

8  paid for?

9  A     Those were a portion of the funds that were paid to

10 Beyond Review.  Beyond Review provides legal services to

11 multiple folks, so they actually identified talent,

12 payrolled the talent, paid all the FICA, FUTA, and any

13 potential employment issues related to them.

14      So I believe that they did work of about $110,000.

15 Beyond Review actually had two people that it hired

16 and probably paid out $88,000 timely to each of those

17 individuals and got left with a $45,000 or so bill that

18 was not paid.

19      So, in essence, you know, Beyond Review paid out

20 $20,000 more for the legal services than it actually

21 collected from Title Rover, so it's a portion of the

22 services that were rendered.

23 Q     How long has Beyond Review been in business?

24 A     Seven years.

25 Q     Let's go to the next page.

EXHIBIT A
Page 98

PLTF_003671

MARK WILLIS - REDIRECT BY MR. BAKER                    99

1  A    (Locating page.)

2  Q    4.5, Thomas Tatham, $6,846.  What was that for?

3  A    Those were for expenses that got reimbursed to Tom.

4  Q    Okay.  Now, you sort of talked about 4.6, the Image

5  Engine, $24,000.  Image Engine was paid that -- or got

6  credit for that $24,000?

7  A    Yes.

8  Q    Okay.  And I think that what you indicated was that's

9  actually the same 24,000 you got paid under 4.2.

10  A    That's correct.

11  Q    So that really was not -- okay.  Then 4.7, Title Rover.

12  The amounts paid to Title Rover, what were those for?

13  A    Those were for the consulting fees and development of

14  the software that -- invoices that were sent to Title Rover

15  and that Hopewell had agreed to pay in exchange for the

16  license and the services that it was providing.

17  Q    Okay.  So, to your knowledge, were these amounts paid

18  out on a regular basis in exchange for the services that

19  were provided?

20  A    Yes.  Well, if I can correct that.  I was not paid on a

21  regular basis.  I got paid a one-time fee, which I was not

22  even aware of at the time.  But, you know, I was not paid on

23  a regular basis.

24      I got paid, you know, sometime in, you know, the July

25  10 time frame, and I was not paid any other fees, which is

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003672

MARK WILLIS - REDIRECT BY MR. BAKER                    100

1  an unsecured claim --

2  Q    Okay.

3  A    -- in the bankruptcy.

4  Q    Now, it's got on here that -- for example, Beyond

5  Review, you own part of that company.

6  A    Correct.

7  Q    And that -- or actually it was owned in part by Willis

8  Group.

9  A    By Willis Group, which I own half of Willis Group.

10 Q    Okay.  And so the monies that were paid to Beyond

11 Review were paid for the services that Beyond Review

12 provided; is that --

13 A    It only paid for a portion of the services that Beyond

14 Review provided.  It left -- it did not pay the last 44 --

15 $45,000 that Beyond Review provided, which was a large chunk

16 of the services.

17 Q    Now, the -- when Ensource came in to invest, was

18 Beyond Review one of the vendors that was getting paid?

19 A    Yes.  Beyond Review -- all the vendors that were

20 doing business with the company -- that are listed here,

21 were doing business with the company prior to the Ensource

22 investment.

23 Q    Okay.  And PDP Management Group payments to the

24 services of Tom Tatham, those were disclosed and Ensource

25 was made aware of all those?


                     JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003673

MARK WILLIS - REDIRECT BY MR. BAKER                101

1    A     To the best of my knowledge, everything was disclosed

2    in the deal room that was loaded up.  I personally never

3    went into the deal room, but I'm assuming they got

4    everything they needed.

5    Q     Okay.  And there was some confusion earlier about

6    understanding that today was confirmation hearing and --

7    versus some other things.  What was your confusion?  Can

8    you explain that a little bit?

9    A     Well, my confusion was that there were still open

10   issues as it related to claims, as it relates to the

11   potential issue that we have with Mr. Tatham, with the

12   potential issue that we have with Ensource.

13        I thought all of those -- that this was a step in

14   confirming the case along with those actions, and then to

15   follow up.  So I didn't realize today was actually -- that

16   all those issues were going to be resolved here, as it sits

17   today.  And that was my belief that when you confirm, all

18   those things are settled.  Again, I'm not an expert and I

19   apologize for the confusion.

20   Q     Okay.  Okay, so there were questions asked about --

21   or a question asked about why you did not do anything -- or

22   why Hopewell did not do anything with the data that it have

23   -- or has and owns right now during the course of the

24   bankruptcy case.  So why has Hopewell not done anything

25   with that data?

EXHIBIT A
Page 101

PLTF_003674

MARK WILLIS - REDIRECT BY MR. BAKER                    102

1   A    Well, our plan is to emerge out of bankruptcy and

2   utilize the data.  Our plan isn't to sell the data or

3   liquidate the data at this particular time.  Our plan is to

4   emerge out of bankruptcy and continue to utilize it as an

5   asset to go out and exploit this area.

6   Q    Okay.  And then why hasn't the company -- or Hopewell

7   taken any steps to do something with the property, the

8   acreage that it owns at this point in time, while the

9   bankruptcy case is ongoing?

10  A    Well, I believe that that acreage will have a lot

11  more value aggregated with a larger piece of acreage.

12  Again, that's a pretty valuable piece of acreage because

13  it actually has a drill site location on it.

14       But to the extent we can aggregate that with other

15  acreage and other drill site acreage with the same operator,

16  it becomes a lot more valuable to them than just, you know,

17  having the drill site location under one of 40 prospects.

18       If I could identify more acreage under the same

19  prospect, that makes it more meaningful, or if we could

20  identify and we've -- and this particular operator, we

21  believe that there's a lot of open acreage and a lot of

22  mistakes around their leasing activity.

23       So our strategy would be to aggregate those leases.

24  When we aggregate it, we believe that that gives us more

25  leverage to make an offering to the operator.

PLTF_003675

MARK WILLIS - REDIRECT BY MR. BAKER                103

1  Q    Okay.  Now, the fact that Hopewell has not paid

2  Title Rover during the course of this bankruptcy, is that

3  something at this point in time that Title Rover -- what has

4  Title Rover done about that, or why hasn't it done anything

5  about that?

6  A    Title Rover doesn't believe that it's provided any

7  services or any value to Hopewell, so therefore Title

8  Rover's got, you know, no intention of invoicing or trying

9  to collect any funds whereby it had no value.

10 Q    Okay.  So at least during the time of the bankruptcy

11 case -- the bankruptcy plan is that Title Rover's not

12 planning on going back and invoicing Hopewell for the last

13 nine or ten or whatever -- however many months they were not

14 paying.

15 A    No, sir.

16 Q    Okay.  With regard to the potential claims against --

17 if there are -- against Mr. Tatham, are you prepared to go

18 forward and have some other third party analyze those and

19 make a recommendation to you?

20 A    Sure.  We're anxious to sit down with Mr. Tatham and

21 working something out.

22         MR. BAKER:  No further questions, Your Honor.

23         THE COURT:  Okay.  Thank you.  Mr. Gerger, any

24 recross?

25         MR. GERGER:  Yes, Your Honor.


JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003676

MARK WILLIS - RECROSS BY MR. GERGER                    104

1          THE COURT:  All right.  Go ahead, please.

2              MARK WILLIS - RECROSS-EXAMINATION

3   BY MR. GERGER:

4   Q    Mr. Willis, would you turn to Exhibit 8, please?

5   A    8?

6   Q    Yes, please.

7   A    Sure.  (Locating document.)

8   Q    Can you tell me what Exhibit 8 is, please?

9   A    It's the Hopewell-Pilot Project transactions by account

10  on an accrual basis.

11  Q    All right.  Turn to page, what's marked as -- as you

12  see, the first page of Exhibit 8 has page 2 in the bottom

13  right-hand corner.  Do you see that?

14  A    Yes, sir.

15  Q    Turn to page 3, please.

16  A    (Locating page.)  Okay.

17  Q    Now, if you'd follow down to a deposit of $205,000, do

18  you see that?

19  A    Correct.

20  Q    Who is that from?

21  A    That was, I believe, from Ensource.

22  Q    And what was the bank balance before it received the

23  $205,000?

24  A    On an accrual basis, it was $7,500.

25  Q    Okay.  Or three ninety-seven fifty-two?


                  JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003677

MARK WILLIS - RECROSS BY MR. GERGER                      105

1   A    Correct.  Well -- that's correct.  It wasn't -- the

2   balance -- yeah, that's correct, three ninety-seven fifty-

3   two.

4   Q    Okay.  And the expenses that were -- there were

5   expenses paid after receipt of the 205,000; correct?

6   A    Correct.

7   Q    Did you approve these payments?

8   A    No, I did not.

9   Q    Who approved these payments?

10  A    Mr. Tatham, who was operating the business.

11  Q    Okay.  There's a payment six or seven down, accounts

12  payable, 29,250, to PDP Management.  $29,250, do you see

13  that?

14  A    Yes, sir.

15  Q    And do you see the 15,000 to you?

16  A    No, sir.

17  Q    Two lines above.

18  A    That's not to me.

19  Q    Well, to Willis Group.

20  A    That's correct.

21  Q    All right.  Has Title Rover been solvent during the

22  entire bankruptcy case?

23  A    Has it been solvent?  Your definition of solvent is --

24  Q    I'll re-ask the question.  Do you believe Title Rover's

25  assets exceeded its liabilities?


JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003678

MARK WILLIS - RECROSS BY MR. GERGER                106

1          MR. BAKER:  Your Honor, I'm going to object to

2    this as exceeding the scope of cross.

3          THE COURT:  I agree.  Sustained.

4          MR. GERGER:  Pass the witness, Your Honor.

5          THE COURT:  All right.  Mr. Baker, anything else?

6          MR. BAKER:  No, Your Honor.

7          THE COURT:  All right.  You can step down.

8          THE WITNESS:  Thank you.

9       (Witness stands down.)

10         THE COURT:  Mr. Baker, do you intend to call any

11   additional witnesses?

12         MR. BAKER:  I'm not going to call any additional

13   witnesses.

14         THE COURT:  All right.  Let me ask -- I'm prepared

15   to rule.  Do you all wish to have a discussion before I

16   rule?

17         Mr. Baker?

18         MR. BAKER:  I'm not completely sure if I want to

19   have some discussion.

20         THE COURT:  I am prepared to rule.  You've

21   completed your case-in-chief on confirmation.  I am prepared

22   to render a ruling.  I simply asked if counsel wanted to

23   talk before I gave my ruling.  Obviously, talking after

24   would probably be a little late.  That's all I was doing.

25         MR. BAKER:  Okay.  I didn't know if you meant all

PLTF_003679

107

1  of us having discussions at this time --

2          THE COURT:  Oh, no, no, no.  Fair enough.  I did

3  not direct the question specifically.  I was actually

4  talking to Mr. Gerger and Mr. Baker.

5          MR. BAKER:  Okay.  Okay.  Yes, I would be open to

6  talking to Mr. Gerger for a few minutes.

7          THE COURT:  Mr. Gerger?

8          MR. GERGER:  We will listen and talk for a short

9  time.

10          THE COURT:  All right.  I will step down for

11  15 minutes.  If there is progress, let Ms. Do know, and I'm

12  happy to give you some additional time.  If not, I will come

13  out at 12:15 and I will give you a ruling.  All right?

14          MR. BAKER:  Right.  Thank you.

15          THE COURT:  All right, thank you.  We'll be in

16  adjourned.

17          THE CLERK:  All rise.

18      (Recess taken from 12:02 p.m. to 12:34 p.m.)

19          THE CLERK:  All rise.

20          THE COURT:  Please be seated.  Gentlemen, where

21  are we?

22          MR. BAKER:  Your Honor, we did have some

23  discussions.  I think the parameters of the discussions

24  would require a lot more than a few minutes, and so there

25  was really no progress made.

108

1          THE COURT:  Got it.  All right.  Mr. Gerger, do

2    you agree with that assessment?

3          MR. GERGER:  Yes, Your Honor.

4          THE COURT:  All right.  Thank you.  All right,

5    then.  I have before me the proposed confirmation of the

6    plan of reorganization submitted by the joint Debtors.

7          I do find that I have jurisdiction over the

8    matter pursuant to 28 U.S.C. Section 1334.  I find that

9    confirmation of a proposed plan constitutes a core

10   proceeding under 28 U.S.C. Section 157.  I further find

11   that I have the requisite constitutional authority to enter

12   a final order with respect to confirmation.

13         In order to confirm a plan, a proposed plan must

14   satisfy the requirements of 1123 of the Bankruptcy Code,

15   as well as Section 1129 of the Bankruptcy Code.  And in

16   looking at a plan, the Bankruptcy Code sets forth a number

17   of requirements that must be satisfied in order to confirm a

18   plan.

19         In this case, I have, in support of the proposed

20   plan, the testimony of the principal of the Debtors, Mark

21   Willis.  There has been no testimony in opposition to the

22   proposed confirmation, quite frankly because I didn't give

23   Mr. Gerger an opportunity to put on that testimony.  He

24   limited his case to the cross examination of Mr. Willis.

25         In terms of looking at the plan, this plan is

PLTF_003681

1   based upon a set of projections which have no basis in

2   reality.  It is something, the best I can tell, that someone

3   sat down with an Excel spreadsheet and simply created out

4   of whole cloth.  There is simply no tie to reality, no basis

5   for it, no legitimate reason for the choices that were made.

6   And to compound matters even worse, the math doesn't work.

7           It is purely hypothetical, it is purely

8   speculative.  There is no reason to believe that any of

9   the stated goals, to the extent that you can find them

10  within the plan, are ever going to be met.

11          I find that the proposed plan was never intended

12  to be a good faith attempt to reorganize the debts of the

13  Debtor.  This process has been nothing more than an attempt

14  to satisfy the concerns of the principal, not the Debtor.

15  Some of the answers to the questions to Mr. Willis, quite

16  frankly, were just shocking to me.

17          As a witness, I find him to be wholly non-

18  credible.  As a fiduciary, even if the requirements for

19  confirmation had been met, I could not allow him to continue

20  as a fiduciary for the Debtor.  He has too many conflicts.

21  He has exhibited no desire to actually understand the

22  process or what his obligations are or what he's required

23  to do on behalf of the Debtor.

24          I've got monthly operating reports which are

25  just false.  I have looked at January and February.  Not

110

1   even a good faith attempt at being truthful.  I've got a

2   plan that proposes to do things not justified by history,

3   not justified by any changed events.

4          And I want to be very clear that a Chapter 11

5   plan, it's not a platform to peddle snake oil.  A Chapter 11

6   plan is intended to be a well-reasoned, well-thought-out,

7   based-in-reality attempt to say, here's what we can do to

8   address our debts.  And there's been no attempt to do that.

9          I do not find that the plan -- or I find that the

10  plan does not comply with Title 11.  I find that the Debtor

11  has not complied with the provisions of Title 11.  I find

12  that the plan has not been proposed in good faith.  I find

13  that the plan is not feasible, that there's simply no --

14  there's simply no legitimate plan of reorganization that's

15  set forth within the document that I've been asked to

16  approve.

17         Therefore, I will deny confirmation of the

18  proposed plan.  The actions of the Debtors' principal make

19  it very clear to me that I cannot leave him in control of

20  this process.  There is simply a lack of transparency, a

21  lack of being candid both with the Court as well as the

22  constituents.

23         There is sufficient evidence of a breach of

24  fiduciary duty.  There is ample evidence that management of

25  the Debtor is not being performed in the best interest of

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003683

111

1    the Debtor, but third parties.  That constitutes sufficient

2    cause.  I am converting the case to a Chapter 7 effective

3    immediately.

4            Mr. Gerger, what I would like you to do is to

5    coordinate the preparation of a proposed order for the

6    appointment of a Trustee.  I'd like for you to notify the

7    U.S. Trustee today.  I want somebody taking control of

8    whatever it is that's there immediately.

9            I want -- whatever the software is, I want to

10   make sure that all copies, all source code, everything

11   having to do with this Debtor, I want possession of it taken

12   immediately.

13           I want something filed in the real property

14   records to preserve whatever it is that exists in terms of

15   real property.  I want the Trustee to understand that I have

16   zero confidence in the Debtor and I want prompt action taken

17   immediately because I doubt the veracity of what's been

18   said.

19           If you will prepare form of that order, talk to

20   Mr. Duran, get that done, and let Mr. Alonzo know as soon as

21   those orders have been uploaded, then I will immediately

22   sign them, and we'll see where things are going go.

23           Any questions, Mr. Baker?

24           MR. BAKER:  No, Your Honor.

25           THE COURT:  All right.  Mr. Gerger?

PLTF_003684

112

```
 1              MR. GERGER:  The order I prepare will be --

 2              THE COURT:  With respect to the conversion.  I'll

 3    take care of the --

 4              MR. GERGER:  -- a simple con --

 5              THE COURT:  I'll take care of confirmation.

 6              MR. GERGER:  And so there's a conversion to 7 --

 7              THE COURT:  To a chapter 7.

 8              MR. GERGER:  -- in both cases?

 9              THE COURT:  Yes, sir.

10              MR. GERGER:  All right.  I understand.  We'll just

11    run down to the U.S. Trustee right after this hearing.

12              THE COURT:  All right, thank you.  And also,

13    Mr. Baker, you're certainly welcome to participate in that

14    discussion as well.  I wasn't trying to exclude you at all.

15    If there are things that need to be addressed, I certainly

16    want you to convey them, but I want this process to happen

17    immediately, simply because I have no confidence that there

18    is any status quo.  All right?

19              Thank you, we'll be adjourned until -- (conferring

20    regarding unrelated case).  And gentlemen, you're all

21    excused.  Thank you.

22         (Proceedings adjourned at 12:42 p.m.)

23                        *  *  *  *  *

24         *I certify that the foregoing is a correct*

25    *transcript to the best of my ability produced from the*
```

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

PLTF_003685

113

1   *electronic sound recording of the proceedings in the above-*

2   *entitled matter.*

3   */S/ MARY D. HENRY*

4   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

5   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET\*\*D-337*

6   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

7   *JTT TRANSCRIPT #58432*

8   *DATE:  APRIL 27, 2018*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PLTF_003686