<u>Ensource Investments, LLC. v. Thomas P. Tatham, et al.</u>
<u>CASE NO. 17CV0079 H LL</u>

**<u>TABLE OF CONTENTS OF EXHIBITS</u>**
**<u>TO DECLARATION OF RICHARD E. NAWRACAJ</u>**

Exhibit A…………………………………………..Page 1-9

Exhibit B…………………………………………..Pages 10-28

Exhibit C…………………………………………. Page 29-72

Exhibit D…………………………………………. Page 73-78

Exhibit E…………………………………………. Page 79-85

# Exhibit A

1                    UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF CALIFORNIA

3

4  ENSOURCE INVESTMENTS, LLC,    )  Case No. 17CV0079-H-LL
                                 )
5          Plaintiff,            )  San Diego, California
                                 )
6  vs.                           )  Thursday,
                                 )  February 6, 2020
7  TATHAM, et al.,               )  9:00 a.m.
                                 )
8          Defendants.           )  VOLUME III
   _____ )
9

10                     TRANSCRIPT OF TRIAL
             BEFORE THE HONORABLE MARILYN L. HUFF
11          UNITED STATES DISTRICT JUDGE, and a jury

12 APPEARANCES:

13 For the Plaintiff:        VERONICA MCKNIGHT, ESQ.
                             AARON D. SADOCK, ESQ.
14                           Panakos Law, APC
                             555 West Beech Street
15                           Suite 500
                             San Diego, California 92101
16                           (619) 800-0529

17                           RICHARD E. NAWRACAJ, ESQ.
                             Law Offices of Richard E.
18                            Nawracaj
                             155 North Wacker Drive
19                           Suite 4250
                             Chicago, Illinois 60606
20                           (312) 803-4837

21

22

23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

*Echo Reporting, Inc.*

```
                                                        III-ii
 1 APPEARANCES:  (Cont'd.)

 2 For the Defendants:          SHANNON D. SWEENEY, ESQ.
                                MICHAEL ZARCONI, ESQ.
 3                              ROBERT P. ALLENBY, ESQ.
                                Sullivan, Hill, Rez & Engel,
 4                                APLC
                                600 B Street, Suite 1700
 5                              San Diego, California 92101
                                (619) 233-4100
 6
   Transcript Ordered by:       SHANNON D. SWEENEY, ESQ./
 7                              VERONICA MCKNIGHT, ESQ.

 8 Court Recorder:              Lynnette Lawrence
                                United States District Court
 9                              333 West Broadway
                                San Diego, California 92101
10
   Transcriber:                 L. Caldwell/Jordan Keilty
11                              Echo Reporting, Inc.
                                2160 Fletcher Parkway
12                              Suite 209
                                El Cajon, California 92020
13                              (858) 453-7590

14

15

16

17

18

19

20

21

22

23

24

25
```

*Echo Reporting, Inc.*

III-iii

1                    I N D E X

2 WITNESSES              DIRECT   CROSS   REDIRECT   RECROSS

3 James Dibble            --     III- 4     --        --
  (recalled)
4
  Michelle Hansen       III- 9  III-21   III- 26     --
5
  Mark Willis           III-28  III-57     --        --
6
  Chad Martin          III-174  III-189  III-205     --
7
  Harry Gamble         III-210  III-224  III-229     --
8

9

10 EXHIBITS                        IDENTIFIED   RECEIVED

11 Defendant's

12 006.1    Settlement agreement      III-93      III-93

13 81       6/7/16 e-mail             III-67      III-67

14 862      Lawsuit filed by Image    III-38      III-40
            Engine
15
   863      Affidavit of Mark Willis  III-40      III-40
16
   K        September 2, 2016 email from III-134  III-134
17          Nawracaj to Tatham

18 AB       Hopewell general ledger   III-14      III-15
            as of 12/31/16
19
   AL       September 12, 2015 email  III-133     III-133
20          from Willis to Pannu

21 AO       June 23, 2016 email from  III-120     III-120
            Chad Martin to Mark Willis
22
   BG       10/27 e-mail chain        III-101     III-101
23
   BH       8/23/16 e-mail from       III-98      III-98
24          Stanley to Willis

25

*Echo Reporting, Inc.*

III-iv

| | EXHIBITS: (Cont'd.) | | IDENTIFIED | RECEIVED |
|---|---|---|---|---|
| | **Defendant's** | | | |
| BY | December 18, 2016 email from Nawracaj to Willis | | III-143 | III-143 |
| CN.002 | Text messages between Mark Willis and Chad Martin | | III-174 | III-174 |
| CN.004 | Text messages between Mark Willis and Chad Martin | | III-175 | III-176 |
| CN.011 | Text messages between Mark Willis and Chad Martin | | III-178 | III-178 |
| CN.014 | Text messages between Mark Willis and Chad Martin | | III-180 | III-180 |
| CN.016 | Text messages between Mark Willis and Chad Martin | | III-180 | III-181 |
| CN.023 | Text messages between Mark Willis and Chad Martin | | III-184 | III-184 |
| EI | 7/24/16 e-mail from Martin to Willis and Tatham | | III-97 | III-97 |
| EN | 9/9/16 e-mail from Martin to Stanley | | III-99 | III-99 |
| ET | 10/23/16 e-mail from Willis to Stanley and Martin | | III-100 | III-100 |
| HB | December 7, 2016 email from Tatham to Willis | | III-140 | III-140 |
| HS.034 | Text message | | III-121 | III-121 |
| HS.081 | Text message | | III-126 | III-126 |
| HS.152 | Text message | | III-148 | III-148 |
| HS.076 | Text message | | III-193 | III-193 |
| HS.141 | Text message | | III-199 | III-199 |
| HY | Document | | III-108 | III-109 |

*Echo Reporting, Inc.*

III-44

1 wasn't it?

2 A    I believe around that time frame.

3 Q    And in connection with the bankruptcy filing, you had a

4 schedule of assets and financial information of Hopewell.

5 Isn't that correct?

6 A    The company had financial information.  That's correct.

7 Q    But when you submitted the bankruptcy filing, as part of

8 that filing, you had to state some financial information of

9 Hopewell.  Isn't that correct?

10          MS. SWEENEY:  Objection, 402, your Honor.

11          THE COURT:  Overruled.

12          THE WITNESS:  Can you ask the question again?

13 BY MR. NAWRACAJ:

14 Q    Sure.  When you submit a bankruptcy petition, asking the

15 Court to put a company in bankruptcy, you have to also submit

16 certain financial information for that company that's about to

17 go bankrupt.  Isn't that true?

18 A    That's correct.

19 Q    Okay.  And didn't you -- weren't you the one that

20 submitted that sort of information on behalf of Hopewell, as

21 its manager?

22 A    No.  I had Tom Tatham skillful of getting that

23 information, and worked with my bookkeeper, Michelle Hansen.

24 Q    But on the actual bankruptcy petition of Hopewell, isn't

25 it true that on May 14th, 2017, it had been submitted by Mark

III-45

1 Willis as president of Hopewell?

2 A    Yes.  I actually filed it.

3 Q    Thank you.  And that submission was made under oath,

4 wasn't it?

5 A    Yes, sir.

6 Q    That all the information that you're providing is true

7 and correct, including the financials?

8 A    To the best of my knowledge, absolutely.

9 Q    And in connection with those financial statements, you

10 filed what's called a "balance sheet" for Hopewell, isn't that

11 correct, dated March 31st, 2017?

12 A    Yes.  The company filed a balance sheet as well.

13 Q    Balance sheets, among other things, list assets of the

14 company.  Isn't that correct?

15 A    That's correct.

16 Q    Things that are valuable?

17 A    Yes, sir.

18 Q    That's an asset, right?

19 A    Correct.

20 Q    Okay.  And in the schedule, one asset listed is "IT

21 license rights, project data," on this balance sheet that you

22 submitted dated March 31st, 2017.  Isn't that correct?

23 A    I'll take your word for it.

24 Q    Thank you.  And that included the rights that Hopewell

25 had to use of TR technology, isn't that correct, under that

III-46

1 pocket?

2 A    That would be an accounting question, but I believe
3 that's correct.

4 Q    And isn't it correct that that asset value was listed on
5 that balance sheet as worth one dollar?

6 A    Mr. Tatham put that together.  If that's what it said,
7 that's what it said.

8 Q    No, but you signed.  You signed the petition, saying
9 everything was true and correct, didn't you?

10 A    To the best of my knowledge, I believe it was.

11 Q    Okay.  So it stated it was one dollar, the license
12 rights?

13 A    If you're saying that's what it says, then that's what
14 it says.

15 Q    But yet, eight months earlier, when you were soliciting
16 my client to invest into Hopewell, wasn't it a big deal that
17 Hopewell had this licensing right from Title Rover that was
18 extremely valuable?

19 A    I believe it was valuable, correct.

20 Q    But, in eight months, it's reduced to a value of one
21 dollar?

22 A    Again, that's an accounting question, and so, when I say
23 "for accounting purposes," it has nothing to with what its
24 value is worth --

25 Q    On the balance sheet --

III-154

1 could still utilize all the search functions and everything

2 else that we want.

3      The part that I thought got damaged is the indexing

4 piece which constantly has to be updated in the databases,

5 have to have that constantly have that effort.  If we go back

6 and do that, yes, it meant a lot more expense to do that but

7 less than it did when we started because you only have to go

8 back three months, six months, to get wherever that time

9 period is, but it's still going back and having to pull that

10 history back together and then read it and make it current.

11 Q    How much did -- how much money did Ensource lose in the

12 investment?

13 A    Ensource lost $430,000 in the investment.

14 Q    How much money did you lose in the investment?

15 A    Collectively?

16 Q    Yes.

17 A    Probably similar amount, not including legal fees to

18 date, double the amount.

19 Q    Double the amount of Ensource?

20 A    Double sure.

21 Q    How many investors decided to exercise their share

22 exchange warrants to convert their Hopewell shares to Title

23 Rover?

24 A    I believe all the other shareholders after the

25 shareholder meeting, when Tom communicated that there was a

*Echo Reporting, Inc.*

# Exhibit B

1                    UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF CALIFORNIA

3

4   ENSOURCE INVESTMENTS, LLC,      )  Case No. 17CV0079-H-LL
                                    )
5            Plaintiff,             )  San Diego, California
                                    )
6   vs.                             )  Wednesday,
                                    )  February 5, 2020
7   TATHAM, et al.,                 )  9:00 a.m.
                                    )
8            Defendants.            )  VOLUME II
    _____)

9

10                      TRANSCRIPT OF TRIAL
              BEFORE THE HONORABLE MARILYN L. HUFF
11          UNITED STATES DISTRICT JUDGE, and a jury

12  APPEARANCES:

13  For the Plaintiff:             VERONICA MCKNIGHT, ESQ.
                                   AARON D. SADOCK, ESQ.
14                                 Panakos Law, APC
                                   555 West Beech Street
15                                 Suite 500
                                   San Diego, California 92101
16                                 (619) 800-0529

17                                 RICHARD E. NAWRACAJ, ESQ.
                                   Law Offices of Richard E.
18                                   Nawracaj
                                   155 North Wacker Drive
19                                 Suite 4250
                                   Chicago, Illinois 60606
20                                 (312) 803-4837

21

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

*Echo Reporting, Inc.*



II-ii

1 APPEARANCES:   (Cont'd.)

2 For the Defendants:              SHANNON D. SWEENEY, ESQ.
                                  MICHAEL ZARCONI, ESQ.
3                                 ROBERT P. ALLENBY, ESQ.
                                  Sullivan, Hill, Rez & Engel,
4                                    APLC
                                  600 B Street, Suite 1700
5                                 San Diego, California 92101
                                  (619) 233-4100
6
  Transcript Ordered by:         SHANNON D. SWEENEY, ESQ./
7                                 VERONICA MCKNIGHT, ESQ.

8 Court Recorder:                 Lynnette Lawrence
                                  United States District Court
9                                 333 West Broadway, 15th Floor
                                  San Diego, California 92101
10
  Transcriber:                    L. Caldwell/Jordan Keilty
11                                Echo Reporting, Inc.
                                  2160 Fletcher Parkway
12                                Suite 209
                                  El Cajon, California 92020
13                                (858) 453-7590

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

```
                                                              II-iii
```

```
 1                          I N D E X

 2  WITNESSES                  DIRECT   CROSS   REDIRECT   RECROSS

 3  Justin Pannu                 --     II- 1    II-13       --
    (recalled)
 4
    Jason Frankovitz           II-20   II-45    II-58       --
 5
    James Dibble               II-64   II-97     --         --
 6
    Thomas Tatham              II-113  II-133   II-201      --
 7
 8  EXHIBITS                            IDENTIFIED     RECEIVED

 9  Defendant's

10  HC    1/13/17 minutes of                II- 5       II- 5
          Hopewell-Pilot Project,
11        LLC, annual meeting

12  704.20    Frankovitz curriculum         II- 23        --
              vitae
13
    D     Amended and restated company      II-166      II-166
14        agreement of Hopewell-Pilot
          Project, LLC
15
    Q     December 8, 2016 email from Tatham II-193     II-193
16        to Pannu

17  CW    Statement of work for data        II-145      II-145
          services presented to Title Rover,
18        LLC

19  DD    July 27, 2016 email from Tatham to II-149     II-149
          Stanley regarding webinar dates for
20        Title Rover presentation

21  DM    November 1, 2016 email from        II-159     II-159
          Stanley to Tatham
22
    DN    Undated preliminary report on BR   II-159     II-160
23        extraction data

24  EW    November 23, 2016 email from       II-162     II-162
          Tatham to Mark
25
```

```
                                                        II-iv
```

1 EXHIBITS: (Cont'd.)                    IDENTIFIED   RECEIVED

2 Defendant's

3

  EZ    December 7, 2016 email from Tatham   II-191     II-191
4       to Willis

5 FC    April 19, 2016 Title Rover web portal II-151    II-152
        user Guide Version 1.0
6
  GD    July 28, 2016 email from Willis to    II-181     II-185
7       Stanley

8 HE    November 7, 2017 email from Tatham to II-189     II-189
        Jennifer Burkhardt
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

II-67

1 just mentioned, including the demo, what was your initial

2 impression of what Title Rover had to offer?

3 A    I had questions.  I had lots of questions.  There's some

4 words in there that are fun to hear.  They're used a lot, but

5 they mean different things to different people, so there's a

6 lot of clarity that needed to be gathered on these words.

7        In general, looking at the concept, I have a lot of

8 experience doing work similar to this, just not in this

9 application.  I've built applications that do form processing

10 for subscriptions to magazines and stuff, my company hired to

11 that, so I am all too familiar with the problems with OCR, the

12 manual and intensive labor that goes into it, the time and

13 cost.

14        The people cost so much.  Technology is expensive to

15 build, but it's cheap to run.  People are expensive.  It takes

16 a lot of time.  It's a lot of cost, and the accuracies are not

17 so great.  So I had a lot of experience with the problems you

18 face at the core that they were looking at, and so, to me, it

19 was intriguing.  I just needed to find out more.

20 Q    Okay.  Let's turn our attention to what's already been

21 admitted as Exhibit CO.  Do you recognize this document?

22 A    I do.

23 Q    And what is it?

24 A    This is one of the materials that was giving to me to

25 review.

II-68

1  Q     Do you recall when you reviewed it?

2  A     It would have been about the time that it was received,

3  so it would be in the time frame that you see published on it.

4        I'm sorry.  Is that better?  Okay.

5  Q     All right.  And let's go to the second page of Exhibit

6  CO --

7  A     Yes, ma'am.

8  Q     -- and is there anything about this page that intrigued

9  you?

10 A     It's comforting.  When you're dealing with startup, it

11 could be anything from a guy in his garage, which is not

12 necessarily a bad thing.  Some of the most valuable companies

13 in the world started off with a guy in a garage, but it's

14 difficult.  It is difficult.

15       Looking at this, the first thing that I see that I like

16 is I see a CTO.  That's a chief technology officer.  This is

17 the guy.  This shows a level of sophistication, and this shows

18 a level of accountability for somebody that you can go and get

19 answers to about technology.

20       You're not going to deal with, you know, "We've got this

21 guy over there that does that part, and this guy that does

22 that part, and we're not really sure about this person," and

23 not all developers communicate very well.  You have some that

24 have got pretty good personalities, but some not so good at

25 public speaking or explaining what they're doing, really good

II-69

1  at their job, but they have a real hard time communicating.

2      When you have a CTO, that problem is kind of resolved.

3  This is a person that can communicate effectively about what's

4  going on below him, and tell you what to expect and what

5  they're doing, and so seeing this was comforting to me,

6  because it tells me I don't have to go through the process of

7  going deeper into an organization and talking to people that

8  maybe aren't so good with that.  So I'm happy to see this.  It

9  means it's going to make my job easier.  It's going to be more

10 efficient.

11 Q    Okay.  And besides the CTO, is there anything else on

12 the screen that you found interesting?

13 A    Of course.  It has "Developed proprietary technology."

14 That means they got something.

15 Q    Okay.  So let's talk about the term "developed."  In

16 your experience, what does it mean when a technology -- or a

17 company is saying that they have "developed technology"?

18 A    It means they have something.  "Developed" is an

19 interesting word in this context.  If you were to ask me the

20 staff in my company that are directly managed, they're called

21 "developers."

22      That doesn't mean they make brand-new software every day

23 they show up.  It just means that some of them do.  Some of

24 them manage and maintain software.  Some of them do fixes,

25 odds and ends.  It's kind of a -- it's a broad term with IT.

1 Maybe it's more specific when you're talking about, like,

2 building, construction, but, in IT, developers develop.  It

3 means they work.

4 Q    Okay.  Let's move on.  Let's look at page three of

5 Exhibit CO.

6 A    Yes, ma'am.

7 Q    Is there anything on this page that stands out to you?

8 A    Yes.

9 Q    And what is that?

10 A    The graph, of course.  I've lived this pain.  The arrow

11 that goes like this (indicating) is terrible.  This is the

12 arrow that says that "We don't have very good systems, and we

13 use a lot of people and a lot of time, and there's a lot of

14 heartache in trying to get your job done."

15      The one that goes high cost down to low cost, with high

16 volume, that's the one that's interesting.  That's what makes

17 people's lives better.  This is when you spend less time doing

18 work that's not important so you can spend more time doing

19 work that is important.  This is what IT companies strive to

20 do.  This is the goal of computers.  So, when I see this, this

21 reaffirms to me, "Yes, this is what we want."

22      On the other side, it has developed its own proprietary

23 technology.  That means they own it, "I've got something.  It

24 belongs to me, and I have it, and it does this, delivers 10

25 times improvement from traditional methods."  Ten times is

II-71

1 good.  I mean, if you can do that, great.  I'm interested.

2 Q     And when we talked earlier about the arrow going up, you

3 were referring to the black arrow that says, "Manual

4 processing," correct?

5 A     Yes, ma'am.

6 Q     And that means more people have to be involved, and it's

7 more expensive.  Is that correct?

8 A     Yes.  There's more people, and over the long term, it

9 becomes very unsustainable.  A lot of times, when you're

10 dealing with records, it's not a linear progression of

11 problems.  It gets exponential.  Eventually, you get so many

12 of them you can't keep up with it.  You can't hire more people

13 to deal with the problems that are compounding each other.

14      So what ends up happening is you just limit yourself, "I

15 can only do this.  I can only get this big.  I can only

16 process this much, and I'm finished."  I can't have more

17 people.  We've got turnover.  Not everybody is as good at

18 doing their job, or as quick.  And so that line, that's the

19 enemy.  That's the enemy of every company.

20 Q     And so the light gray line, that's the one that you're

21 striving to achieve.  That's what interested you most?

22 A     That's what computer technology is about.

23 Q     Let's go to the fifth slide of Exhibit CO.  Now, we

24 talked about this slide a lot --

25 A     Yes, we have.

1 Q     -- but, in your experience, what are your -- what is

2 most important to you when you look at this slide?

3 A     Okay.  I would say, from top to bottom, there's your

4 importance.  The most important by far would be the first one.

5 This is the work.  This is the job.  Everything else really

6 builds on that to demonstrate that the job is done right.

7      If you can't get all the data pulled in, and you can't

8 make sense out of it, all the other stuff doesn't matter.

9 It's like a paint job.  It's like a shiny thing on the card.

10 It doesn't matter.  If you can't get quality data in, computer

11 systems are no good.

12      Computer systems are always about the quality of data

13 that's inside of them, and you can have a fantastic piece of

14 software, and if all the data is bad, it doesn't work.

15 There's no value to it.  So that was the biggest and the most

16 important part.  If you can't do this, everything else has no

17 value.

18      Now, the other ones have values later on, assuming that

19 it works.  If the first part is good, then the second part is

20 good, third part is good, and the last one, that's the one

21 that demonstrates everything was successful.  So they kind of

22 build on each other, and that's the way they're laid out, and

23 I'd say that's my value proposition from top to bottom.

24 Q     Okay.  And looking at page nine of Exhibit CO, is there

25 anything in this slide that stands out to you, based on your

*Echo Reporting, Inc.*

II-73

1 experience, in deciding whether to invest in Hopewell?

2 A     Yes.  This is one of those slides where you just have to

3 giggle.  It's got a lot of words, but you don't know what they

4 mean.  They could mean different things to different people.

5 Depends on their experience and level of sophistication.

6      This was a slide that, obviously, I'm going to have to

7 spend a lot of time on, because I need to understand what it

8 says.  What did they intend to convey to me when they said

9 this?  The key parts were the technology, artificial

10 intelligence, and the analytics.  Analytics is something

11 inherent to just about everything you do, but the artificial

12 intelligence, that's a big deal to me, especially going back

13 at this point in time.

14      There's a lot of movement in our industry about how to

15 apply artificial intelligence.  To set the stage for it,

16 there's basically -- there's three categories.  There's

17 artificial intelligence which is considered in the category of

18 super intelligence, and that's going to be the stuff you see

19 in the movies, with the robots talking to you, and, you know,

20 you're interacting with a keyboard or something like that,

21 and it's gotten -- that's not real.  It's going to happen,

22 I'm pretty sure, one day, but that's not what we're looking

23 at.

24      The second category would be general, and that's

25 probably a little more applicable to us in the near future.

II-74

1 Where we're seeing that right now is games that play against

2 us.  Historically, programmers can go write algorithms to play

3 chess with you, or certain games, but they can only get it to

4 a certain level of competency.

5      So they can get to an amateur level, but a professional

6 would beat them every day.  A master chess player would always

7 be in the game.  Here, in the last few years, they've actually

8 been able to create general intelligence that can beat people

9 in games at a master's level.  We're not talking about that,

10 either.

11          The last one is narrow.  Narrow artificial

12 intelligence is about doing a job.  It's a task.  As it

13 suggests, it's very narrow.  I know I've got to do this, and I

14 really want to do it well.  I want to take the human factor

15 out of it, and I want the machine to do it for me.  While it

16 sounds like something that's, like, farfetched, it's really

17 not.  It's getting to be quite common.

18      There's lots of tools and technologies that help you go

19 it.  There's a lot of companies that employ it.  Alexa uses

20 it.  It's used quite a bit in speech recognition.  It's in a

21 lot of places that you probably wouldn't think, but it's out

22 there.

23      There's courses in the university that dedicate to

24 learning how to do this.  As a matter of fact, even when I was

25 in school, which was oh, so long ago, there were courses on

II-75

1 neural networks and artificial intelligence.  That wasn't very

2 exciting, and it took a lot of work to do a very little bit,

3 but it was there.

4       So, when I see this, and I understand the problems faced

5 with OCR and the number of people, I'm seeing that we're

6 looking for reducing costs, and I'm thinking, "Okay.  This is

7 probably what they mean, but I don't know."  I'm going to have

8 to ask.

9       "Big data" does have meanings, but there's a lot of

10 different ones.  If you go with a textbook, it really is just

11 about having large quantities of mass data.  In my

12 organization, we deal with meter data.

13       If you can imagine the meters that are connected to the

14 side of your house, they register how much electricity you're

15 using, maybe 15 minutes, 30 minutes, five minutes, an hour.

16 My systems collect that for all of California, all of New

17 York, all of Texas.  That's a lot of data.  Being able to pull

18 all that data in is part of it.  That's the big part.

19       The essence behind it is being able to make it useful.

20 So, like, anybody can collect a bunch of stuff, but it's

21 really hard to do something with it.  This is what you see

22 Google and Facebook spending all their time and money on.

23 They've got all these people with all that information, but

24 how do they turn it into some kind of revenue, because they've

25 got to make their money somehow?

1     That's what big data is about.  It's about taking all

2 this massive load of information and then applying analytics

3 to turn it into something that people can find useful.  In the

4 case of somebody like Google or Facebook, they're using it for

5 marketing purposes.  For us, in my business, they're using it

6 to go identify people that are consuming too much, too little,

7 try to find what the right packages are for them for their

8 electricity purchases.

9     In this case, it makes perfect sense.  They're like,

10 "Look.  We've got all this large data.  Now we've got to

11 figure out a way, without people, to pull it all together so

12 we can chain these things."  We've got to figure out how to

13 take all this rich information and make sense out of it.  So

14 this is what my assumption is in reading this.  Ultimately,

15 when I had the opportunity to talk to Brent Stanley, we

16 probably spent the most time on this one.

17 Q     Right.  So I was just going to say that you mentioned

18 you had a lot of questions from this slide, and so how did you

19 address those questions?

20 A     With Brent Stanley directly.

21 Q     Okay.  And was that over the phone or through what

22 means?

23 A     We were given a demo to go through.  The demo consisted

24 of two parts, to show some screens, which was really

25 inconsequential to me, but mostly to go through what the

1 technology was.  This is what's important.

2 Q     Okay.  And what were you told about what the technology

3 was?

4 A     Well, for this part, this is where Beyond Recognition

5 was supposed to have the answer.  It was supposed to be able

6 to go and do what regular OCR could not do.  OCR's been out

7 there.  Google gives it away for free.  The Tesseract product,

8 which is listed later in here, I've used it a long time ago.

9 It's free for a reason.

10      You can go buy one, and they have some that are pretty

11 expensive, but, if you're, you know, a small company, trying

12 to just get by, and maybe you've got simple forms you want to

13 read it (sic), you go hire a programmer.  He'd come in, tie

14 that thing together, and scan some documents.  It works okay.

15 You know, they make it for free for a reason.

16      So I'm familiar with the problems with that, and I'm

17 kind of going through it, and he's like, "Yes, this is what

18 Beyond Recognition does.  It solves that problem."  You're

19 able to get all these different formats from all these

20 different places.  It pulls the information together and it

21 makes sense out of it.

22      It replaces the need to go hire a whole roomful of

23 people to sit here and look at these documents and go, "That's

24 what that was" or "That's what this is," or people use -- if

25 you consider, like, the programs that go through the schools,

II-78

1 where you go do a fund raising, and you get the little seats,

2 and you fill in the bubbles with the thing that you're going

3 to buy for the children, the handwriting is awful.  Most of

4 them, it can't be read.

5      So the OCR can't figure it out.  So then it goes into

6 the room with all the people, and then somebody looks at it

7 and goes, "That's two, three, two board (sic)," and they type

8 it in, and the orders get processed.  So it fixes -- this was

9 the point.  It was like, "We can do this," which means data is

10 money.

11      The more data I can process, the more valuable it is.

12 When you're talking about an entire state, or applications in

13 other places, the more data you can process without people,

14 the more valuable it is.  That goes back to the chart.  It's

15 expensive to build, but it processes a lot of data.  It

16 becomes very efficient.

17      This is what I was told, and the big data portion was

18 tied into it as well, was "Not only do we scan it, but we help

19 make sense out of it."  So this is what I was interested in,

20 and Brent Stanley said this was what this Beyond Recognition

21 product was doing.

22 Q    Right.  A lot of questions were asked about asking for

23 the developer.

24 A    Yes.

25 Q    I know you covered earlier about, you know, you would

*Echo Reporting, Inc.*

II-79

1 talk to a CPO, but some people might be asking themselves,

2 "Well, why didn't he talk to the developer?  Why didn't he

3 talk to Joseph Haynes?"  And why didn't you?

4 A    You know, me, too.  I have the CTO.  He's the officer.

5 He's in charge of technology.  This is the boss.  If you come

6 to my company and you want to talk to my developers, I'll tell

7 you no.  Why do you want to talk to them?  You can talk to me.

8 If I don't know the answers, I go get the answers, and I'll

9 give them back to you.

10      Most of my developers don't even want to talk to

11 anybody, so I would never go ask, "Who's all your employees,

12 and where do they sit?," and go cherry-pick who I want to go

13 have interviews with.  That doesn't make any sense.  I have

14 the CTO.  They have one, which I was quite happy to.  I

15 wouldn't go any further in the organization.

16 Q    Okay.  I want to turn your attention to a different

17 slide.  Sorry.  It's really a tiny font.  Okay.  This is still

18 part of CO, Exhibit CO.  Do you recognize this document?

19 A    Yes, ma'am, I do.

20 Q    And have you seen this document -- or have you read this

21 document before?

22 A    Yes, ma'am, I have.

23 Q    Okay.  So a major area that was discussed yesterday was

24 this section of the document, and it reads:

25           "The Title Rover technology effort has

II-80

1          two main thrusts, one, to build a portal

2          where attorneys and other users can

3          perform faceted searched using more data,

4          on a variety of topics, more efficiently

5          than any other means, and, two, to build

6          a deep index from records more quickly

7          and cost-effectively than is available in

8          the industry."

9  A     Yes, ma'am.

10 Q     How do you interpret that, based on your experience?

11 A     Okay.  Well, this is what needs to be done to validate

12 that everything is working.  This is how you use it.  A portal

13 has got to be made so people can see the data.  You've got to

14 have something that shows it to you because, if it's all

15 sitting on a hard drive, it doesn't really help you do your

16 job.  You've got to have some way of getting it out, which is

17 really not very important.  Portals and interfaces to data are

18 a dime a dozen.  You can go buy them without any problem.

19      Build the deep index and records, that's what's

20 important.  That's my data.  Build me my data set.  I need to

21 have my data.  I need to have it full of all the information

22 that's required to get the answer, and I need to have it

23 accurate, and I need to have it quick.  This is the part that

24 is the most important.  Assuming number two is done, then the

25 portal part is easy.  You'll get good answers.  If you build a

*Echo Reporting, Inc.*

# Exhibit C

1                    UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF CALIFORNIA

3

4  ENSOURCE INVESTMENTS, LLC,      )  Case No. 17CV0079-H-LL
                                   )
5           Plaintiff,             )  San Diego, California
                                   )
6  vs.                             )  Tuesday,
                                   )  February 4, 2020
7  TATHAM, et al.,                 )  9:00 a.m.
                                   )
8           Defendants.            )  VOLUME I
                                   )
9  _____ )

10                       TRANSCRIPT OF TRIAL
               BEFORE THE HONORABLE MARILYN L. HUFF
11           UNITED STATES DISTRICT JUDGE, and a jury

12  APPEARANCES:

13  For the Plaintiff:            VERONICA MCKNIGHT, ESQ.
                                  AARON D. SADOCK, ESQ.
14                                Panakos Law, APC
                                  555 West Beech Street
15                                Suite 500
                                  San Diego, California 92101
16                                (619) 800-0529

17                                RICHARD E. NAWRACAJ, ESQ.
                                  Law Offices of Richard E.
18                                  Nawracaj
                                  155 North Wacker Drive
19                                Suite 4250
                                  Chicago, Illinois 60606
20                                (312) 803-4837

21

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

Exhibit C
Page 30

*Echo Reporting, Inc.*

I-ii

1 APPEARANCES:   (Cont'd.)

2 For the Defendants:            SHANNON D. SWEENEY, ESQ.
                               MICHAEL ZARCONI, ESQ.
3                              ROBERT P. ALLENBY, ESQ.
                               Sullivan, Hill, Rez & Engel,
4                                 APLC
                               600 B Street, Suite 1700
5                              San Diego, California 92101
                               (619) 233-4100
6
  Transcript Ordered by:        SHANNON D. SWEENEY, ESQ.
7
  Court Recorder:               Lynnette Lawrence
8                              United States District Court
                               333 West Broadway, 15th Floor
9                              San Diego, California 92101

10 Transcriber:                 L. Caldwell/Jordan Keilty
                               Echo Reporting, Inc.
11                             2160 Fletcher Parkway
                               Suite 209
12                             El Cajon, California 92020
                               (858) 453-7590
13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit C

Page 31

*Echo Reporting, Inc.*

I-iii

1                                I N D E X

2 WITNESSES              DIRECT    CROSS    REDIRECT    RECROSS

3 Jerome E. Johns        I-50      I-113    I-146       --

4 Justin Pannu           I-148     I-166    --          --

5

6 EXHIBITS                          IDENTIFIED      RECEIVED

7 Plaintiff's

8 120.21    PPM for Hopewell-Pilot       I-66        I-67
            Project
9
  681       8/19/16 pitch deck          I-85        I-85
10
  698       8/23/16 pitch deck          I-87        --
11
  CO        Pitch deck                  I-73        I-73
12
  848       Email from Brent Stanley    I-121       I-121
13
  Defendants'
14
  A    Hopewell-Pilot Project,          I-210       I-210
15     private placement memorandum

16 H    August 16, 2016 email from       I-184       I-185
        Pannu to Tatham
17
  J    August 2016 due diligence        I-213       I-213
18     questions from Richard Nawracaj

19 L    Second amended and restated      I-210       I-211
        company agreement of Title Rover
20
  M    September 29, 2016 Hopewell-Pilot I-143       I-144
21     Project, LLC initial additional
        equity shares subscription agreement
22
  P    December 7, 2016 Hopewell-Pilot   I-250       I-250
23     Progress Report, November 30, 2016

24 R    December 8, 2016 email from Pannu I-253       I-254
        to Willis
25

Exhibit C
Page 32

*Echo Reporting, Inc.*

I-iv

| | EXHIBITS (Cont'd.) | IDENTIFIED | RECEIVED |
|---|---|---|---|
| T | August 8, 2016 email from Tatham to Pannu | I-212 | I-212 |
| U | August 29, 2016 email discussion between Pannu and Tatham | I-219 | I-219 |
| V | The Title Rover, LLC preliminary business and exploitation plan | I-211 | I-211 |
| W | August 2, 2016 email from Tatham | I-174 | I-175 |
| X | August 27, 2016 email from Pannu to Tatham | I-218 | I-218 |
| AG | August 18, 2016 email discussion between Tatham and Pannu | I-191 | I-192 |
| AI | Internal Title Rover email discussion regarding two-year equity positions | I-221 | I-223 |
| AK | Memorandum of Agreement between Hopewell and Title Rover | I-209 | I-209 |
| BW | December 16, 2016 email from Pannu to Willis | I-258 | I-258 |
| CD | January 6, 2017 email from Johns to Willis | I-266 | I-266 |
| CK | Justin Pannu Deposition Exhibit 36 | I-253 | I-268 |
| CX | June 24, 2016 Statement of Work | I-240 | I-240 |
| GI | August 28, 2016 email from Stanley to Pannu | I-200 | I-200 |
| HP015 | Text messages between Willis and Pannu | I-267 | I-268 |
| HQ005 | Text message between Tatham and Pannu | I-181 | I-181 |

Exhibit C
Page 33

*Echo Reporting, Inc.*

I-v

| | EXHIBITS (Cont'd.) | IDENTIFIED | RECEIVED |
|---|---|---|---|
| DV | Data Mining for Mineral Resource Investigations; Capabilities Summary and Overview, August 19, 2016 | I-126 | I-128 |

Exhibit C

Page 34

1 Q    Thank you.  Mr. Johns, what is the Kilimanjaro Group,

2 LLC?

3 A    So the Kilimanjaro Group is a company that was formed --

4 as I mentioned, two of my partners at Intelometry were members

5 of the Kilimanjaro Group, and we formed it specifically with

6 the express purpose of being able to pool money to do (sic)

7 into technology investments.

8 Q    Thank you.  And can you let us know what one of those

9 investments had been?

10 A    Right.  So we invested our money in Ensource, with the

11 express purpose of seeing Ensource invest in Title Rover and

12 the Hopewell-Pilot Project, which is why we're here today.

13 Q    Thank you.  Can you describe with a little bit more

14 detail the structure of the investment that you made?

15 A    When you say "structure," can you clarify, please?

16 Q    Yes.  Did you invest in Hopewell technology, or

17 Hopewell-Pilot Program?

18 A    So we invested in the Hopewell-Pilot Program, but the

19 Hopewell-Pilot Program was a pilot program.  So, as I stated,

20 what I do today, what my area of specialization is, is related

21 to building software, specifically commercial software.  So

22 the interest that we had as investors was a software

23 technology that was built.  It was being applied in a pilot

24 project to showcase how that software could perform in one

25 industry segment.

Exhibit C

Page 35

*Echo Reporting, Inc.*

I-54

1       So, understand that our viewpoint of this is coming from
2  the technology space, and also understand that when you see
3  technology, technology has so many different applications.  I
4  mean, you can look at just about anything in the various
5  industries that are out there today.  So I'll use some terms
6  that you may or may not be familiar with, but call centers are
7  a good example.

8       So I can have technology that helps me run a call
9  center, but I can do that in a format to support a consumer
10 who's calling in and asking for assistance because their cell
11 phone isn't working, or who placed an order on Amazon, and
12 they'd like assistance with an order that is defunct, and they
13 want to find out how to return it.

14      So, when we look at -- as a group, when we look at
15 technology investments, we're looking at technology and
16 understanding, does it have a specific application that can be
17 utilized, and can it be utilized universally?

18      So, for us, first and foremost, going into this
19 investment, we understood the apparent risks with what the
20 Hopewell business was presented with, because you've got to
21 basically comb through land records, identify possible breaks
22 in chain and title, which, you know, that may or may not
23 exist, but what was interesting about this was the technology.

24      What was interesting about this was the presence of
25 artificial intelligence that was being used in this

Exhibit C
Page 36

*Echo Reporting, Inc.*

I-55

1 technology, the presence of big data, and those are two things

2 that we know have portability across industries.

3 Q    Thank you.

4 A    Yes.

5 Q    Mr. Johns, who is Chad Martin?

6 A    So Chad Martin is an investor in Ensource, and is also

7 somebody that I'm acquainted with, and is a friend who -- I

8 was originally introduced to him through a previous investment

9 that myself, Justin Pannu, James Dibble, and Chris Arkid

10 (phonetic) had done several years earlier.

11 Q    Thank you.  When did you first learn of the potential

12 investment in Hopewell-Pilot Program?

13 A    So I remember this predominantly because Chad called me

14 excited on July 4th, and July 4th is a holiday that my family

15 and I, my wife and four kids and I, we do very specific things

16 on that holiday, and we rotate between two different families

17 and grandparents.

18      So I remember Chad calling me on the 4th, telling me

19 about something that he had that we all had to listen to and

20 had to entertain, and specifically, you know, I told him -- I

21 said, "Look.  We'll have to talk about it, but we're busy.

22 We're doing family things.  So, you know, we'll talk later."

23 Q    Do you remember asking Chad Martin any questions as far

24 as how he became familiar with this potential investment?

25 A    Can you repeat the question, please?

Exhibit C

Page 37

*Echo Reporting, Inc.*

I-56

1 Q    Yes.  Do you remember asking Chad Martin any questions

2 as far as he came to discover this potential investment in

3 Hopewell-Pilot programming/

4 A    So Chad was introduced to this investment through Mark

5 Willis, which Chad, you know, told us -- or told me

6 specifically -- he told as well Justin and some of the other

7 investors -- of a deep relationship he had with Mark Willis.

8 Specifically, he talked about Mark as a special individual,

9 not just so much having known him, having been a neighbor.

10 Something that Chad recognized Mark for was an individual who

11 was instrumental in helping him through a very difficult

12 personal time.

13       Chad had suffered the loss of a child.  That particular

14 loss did a lot of damage to his marriage, and eventually, I'm

15 certain, was a cause for the breakup of his marriage, and he

16 recognized Mark as somebody who helped him through that, and

17 spoke very clearly and obviously about that with us as a way

18 to talk about, you know, what he meant to him individually

19 and, you know, personally, and as a friend.

20       He also talked about Mark in the context of Mark's

21 history as a businessman, and, you know, he talked about

22 Mark's prowess in various spaces, technology being

23 specifically one of them, and the oil and gas industry being

24 one, and how successful Mark has been, you know, through his

25 career with the technology space.

Exhibit C

Page 38

*Echo Reporting, Inc.*

1 Q    Thank you.  At that time, did you believe the depiction

2 that Chad Martin provided you of Defendant Willis?

3 A    Yes.  I mean, I had no reason not to.  Chad is a trusted

4 person, somebody that, you know, like I said, I'd been through

5 an investment before, and, you know, he's been -- as far as

6 character, he's been 100 percent solid.  He's gone above and

7 beyond, quite frankly, where most people wouldn't have.

8      In our previous investment, Chad was the person who

9 introduced the previous investment through Resolute Capital.

10 We invested in a company called Fantasy Hub.  So Chad was the

11 one who brought this to us, and the investment didn't pan out.

12 Chad felt bad about it.

13      We had done our first round of investing in Fantasy Hub.

14 We didn't do the second round, and so Resolute Capital was

15 refunding investors, and Chad offered to just allow all the

16 other investors to take his share on a pro rata basis, based

17 on what they put in, just because he felt bad about bringing

18 the investment and not having it pan out.

19 Q    Thank you.

20 A    Yes.

21 Q    You mentioned that all this happened three-plus years

22 ago.  Looking back, and as you sit here today, do you have an

23 opinion on whether or not the description that had been

24 provided you of Mr. Willis was accurate?

25 A    Of course.  I mean, so what Chad represented then, what

Exhibit C
Page 39

I-58

1 I know now, they're polar opposites.  Mark Willis, you know,

2 he's a dynamic individual when you talk to him on the phone.

3 You know, he tells you about his experience.

4     He throws around terms like, you know, "I've leveraged

5 my experience in a $200,000,000 engagement we had with BP and

6 the oil spill, and how we're going to utilize that experience

7 specifically to be able to take us to the next level."  He

8 talked about the technology that they were able to build, and

9 they employed it in Title Rover.

10     So Mark very specifically represents how successful he

11 was, and what I know now is that, you know, everything that

12 Mark tells you is to lead you to a certain path and

13 conclusion, and he's very good about doing it, but he

14 certainly omits or leaves out very specific items that I think

15 he's fully knowledgeable or going to be involved in, or going

16 to be critical to you making a decision.

17 Q    Thank you.  That's quite a difference.  If you had known

18 this fact in 2016, when you were introduced with the

19 investment, what would you have done?

20 A    I wouldn't have invested.  There's no possible way.

21 Q    Thank you.  Who were the other owners of Ensource

22 Investments, LLC?

23 A    So there was Chad Martin, as we stated.  There was Cliff

24 Sharp, and the Kilimanjaro Group.

25 Q    And how do you know Cliff Sharp?

Exhibit C
Page 40

*Echo Reporting, Inc.*

I-59

1 A    So I know Cliff through the Resolute Capital investment,

2 as well as through Chad Martin.  Cliff and Chad worked

3 together, or Cliff may have worked for Chad -- I can't

4 remember which one it was -- at an energy brokerage firm, and

5 Cliff was introduced to us back then by Chad.  You know, Chad

6 vouched for him, and talked about how long he'd known Cliff,

7 and been through -- been a business associate of his.  So, you

8 know, that was the start of it, and we've operated as an

9 investment team ever since.

10 Q    Thank you.  Who is Justin Pannu?

11 A    So Justin is a friend of mine.  I met Justin because he

12 worked for my largest customer, which is here, based in San

13 Diego, and I've known Justin probably -- or let's say roughly

14 12, 11 years, at least.  I met him originally in 2004, while I

15 was working here in San Diego for this customer, and over

16 time, Justin and I just developed a friendship.  You know,

17 we'd do various things together while I was traveling out

18 here, and eventually we started to become, you know,

19 investment partners in looking for various investment

20 opportunities that existed outside of our industry.

21 Q    Thank you.  Earlier you mentioned that you had a

22 different investment through a company called Resolute

23 Capital, I believe?

24 A    Yes.

25 Q    Can you describe the investment that Resolute Capital

Exhibit C

Page 41

*Echo Reporting, Inc.*

I-60

1 made in more detail?

2 A     Yes.  So Resolute was essentially focused on a company

3 called Fantasy Hub.  So, if you're familiar with Fandor or

4 DraftTeam -- you see a lot of the ads out there -- it's

5 essentially a web site that allows you to go in, put money in,

6 and they have a creative way to bet on sporting events,

7 essentially.

8      So, you know, if it's basketball, I think you can go in

9 and pick your players, and you form your own basketball team,

10 and then they have algorithms that compute whether you won

11 against another individual who picked a basketball team.  So

12 it's almost like fantasy sports betting, in a way.  I think

13 they have more classic betting that you can do.

14     Fantasy Hub was an interesting notion because it had a

15 different spin on it.  They allowed somebody to go in and

16 essentially do the same thing, but you had to earmark a

17 charity for part of your winnings.  So the idea was "Hey.  You

18 know, while we're doing this, let's see if we can generate

19 some critical mass for some really good causes, and maybe we

20 can get celebrity personalities or sports personalities to

21 sponsor or to showcase the charities that they sponsor."

22 Q     Thank you.  What ever happened with that investment in

23 Fantasy Hub?  What was the result?

24 A     We lost all our money.

25 Q     Was the amount of money that you lost in that investment

Exhibit C
Page 42

*Echo Reporting, Inc.*

I-61

1 more or less than the amount of money you lost in the

2 investment in Hopewell?

3 A     It was the same.

4 Q     About the same.  With respect to the Fantasy Hub

5 investment, was there any litigation that ensued?

6 A     No.

7 Q     Why was that?

8 A     You know, when you do these types of investments,

9 there's always an element of risk.  You have to go into them

10 assuming that you're going to lose everything that you put in.

11 So, whatever you're putting up, you have to recognize you have

12 that possibility.

13     With Fantasy Hub, it was a matter of circumstances.

14 There wasn't an issue with the people that operated the

15 company.  It was a regulatory event.  Many of you may have

16 heard this or seen it in the news.

17     Essentially, it was an employee of, I believe, FanDuel,

18 used some of their betting algorithms to bet on the DraftTeam

19 web site, and they won, and they won big, and this surfaced,

20 and it blew up nationally, to the point where state attorney

21 generals had -- essentially, I think it was in New York, was

22 the primary one, and then Nevada followed, and then a number

23 of others followed, but they basically said, "We need to have

24 more regulation."

25     The long-term ramifications or implications of this are

Exhibit C
Page 43

*Echo Reporting, Inc.*

I-62

1 that the states were going to start seeking betting licenses

2 from these gaming companies or these web companies, and those

3 licenses could range anywhere from a quarter of a million to a

4 million dollars.  So, from our perspective, our second round

5 that we were potentially going to look at had no way of

6 sustaining this business with this cloud looming over the

7 industry.

8 Q     Thank you.  We'll go through the technology in more

9 detail later, but, at a high level, can you give us your

10 opinion on whether or not you believed that the technology was

11 accurately represented to you with respect to Title Rover?

12 A     I do not.

13 Q     Can you elaborate?

14 A     Sure.  You know, Title Rover, in its base form, using a

15 technology called OCR, optical character recognition.  So

16 you're going to scan something, and then it's going to tell

17 you, "Here are what the characters are that I saw."  In its

18 evolved form, it's going to say, "I can even do certain things

19 with pictures."

20      So I can take an image of a document, and I can say,

21 "Hey.  Jerome Johns is the grantor.  Rich Nawracaj is the

22 grantee," and I can place those into a database, and it has

23 relevance, or some kind of relationship, so that then an

24 application can take that and make sense of it.  Right?

25      So that's essentially the artificial intelligence

Exhibit C

Page 44

*Echo Reporting, Inc.*

I-63

1 component of it, or the start of the artificial intelligence.

2 So, as you put, Rich, in your opening statement, the eyes are

3 the OCR.  Title Rover has the brains to be able to recognize

4 and start to understand what this information, this

5 association with this name and another word, means.

6 Q    Thank you.  With respect to Hopewell-Pilot Project, were

7 you very interested in the amount of money you could make

8 finding breaks in chain of title and making some profit on

9 that, or was there a different driver for you?

10 A    So that is a secondary item, right, in terms of the way

11 you look at the industry.  The primary driver is the

12 technology.  So just to very put it (sic) simply, we

13 negotiated an option to convert our shares from Hopewell to

14 Title Rover.

15     We did that because, without the technology, you would

16 be a fool to invest in Hopewell.  I mean, that's a crapshoot

17 right there.  So you have to have the technology, no matter

18 what, in this equation.  There's no two ways about it, and,

19 coming from my background, I have no interest in just purely

20 putting my money on a pilot project that's based on somebody's

21 ability to negotiate a lease and, hopefully, it works out.

22 No.

23 Q    Thank you.  In your mind, what was the purpose of

24 Hopewell-Pilot Project?

25 A    The Hopewell-Pilot Project was exactly what it was

Exhibit C
Page 45

*Echo Reporting, Inc.*

I-64

1 defined as.  It's a pilot.  So, as a software provider, some
2 aspects of our software can cost a lot of money, and some of
3 them don't, but, at the end of the day, the way you work with
4 a buyer to be able to prove out that your software does what
5 you say it does is you organize a pilot.

6      So what that means is "Hey.  Give me some of your data,
7 Mr. Customer.  I'll put it in the application, and we'll run a
8 project here to showcase that it actually does what you say it
9 does, or what I say it does, the way you want it to."

10      So, to me, that's what Hopewell is.  It's loading up
11 Madison County data into a software program that was built to
12 be able to find change in title, or to define change in title,
13 and then find requisite breaks, so that you could identify
14 opportunities.

15      It's a great pilot project for this technology.  It
16 allows me to showcase that it can stand.  It allows me to
17 showcase that it can automate a process.  It allows me to
18 identify, you know, efficiencies that can be gained from this.
19 There's a lot of great merits to a pilot project.

20 Q    Thank you.  And in your experience as a technology
21 professional, are there any industry terms of art that, you
22 know, come to mind with respect to the purpose of
23 Hopewell-Pilot?

24 A    Yes.  I mean, look.  I keep using the term "apply" or
25 "application."  So what you're looking at from a pilot project

Exhibit C
Page 46

Echo Reporting, Inc.

I-65

1 is perspective in terms of our industry, probably some very

2 specific terms of art that you probably want to be aware of.

3 It's common just for people to talk about applying technology,

4 right?

5        The context is really important, because it's whether it

6 infers that you have a product that you're trying to apply to

7 a business need.  In this case, that's what the Hopewell-Pilot

8 was.  I had the Title Rover software, and how do I know that I

9 have software in a product?  Because there's a license that

10 exists between Title Rover and Hopewell.  So this pilot, in

11 essence, is a showcase, to show me how this product can

12 perform and to confirm its performance, frankly.

13        Probably another one that we're going to see going

14 through the decks is the reference to "development," and, you

15 know, I know you guys, you and counsel over here, were already

16 debating it in the introductions.  I'll just be clear.  It's

17 an industry standard term, and "development" is applied to

18 products all the time.  Right?

19        So my software has been around since 2004.  We started

20 in '03.  We got its first model done in '04, and we've been

21 refining it ever since.  Refinement is -- you see that with

22 the applications you download on your phones, right?  You get

23 a new version.  They happen all the time.  That's refinement.

24 Does development go into that refinement?  Sure, it does.  It

25 doesn't mean it's not a product.

Exhibit C
Page 47

*Echo Reporting, Inc.*

1    In our industry, the major difference from our

2 perspective, and the standard, and the term that's used, is

3 "custom development."  So, you know, you asked me earlier

4 about representations.  I did not believe we were

5 custom-building technology in Hopewell.  I believed, as it was

6 represented, there was a product here, and it was being

7 refined, and you do that because, when you use a product in

8 any instance, in a live instance, you have bugs.

9    We've been doing this, like I said, for a long, long

10 time, as product people, and when we release new versions,

11 they always have bugs, and you have to refine those bugs and

12 iron them out, because you can't anticipate everything, but

13 that's not what this way.

14         MR. NAWRACAJ:  Thank you.

15         Co-counsel Sadock, can you please put on the

16 monitor stipulated Exhibit 120.21.

17         THE WITNESS:  Rich, can I qualify something?

18 BY MR. NAWRACAJ:

19 Q    Go ahead.

20 A    So I remember, with hearing about the notion of the

21 investment on July 4th, what I actually was thinking about --

22 it might have been Justin who contacted me.  I can't remember

23 offhand, but I remember actually having the conversation with

24 Chad, Justin, and the group shortly thereafter.

25 Q    Thank you.

Exhibit C
Page 48

*Echo Reporting, Inc.*

I-67

1            THE COURT:  This is received, 120.21, correct?

2            MR. NAWRACAJ:  Thank you, your Honor.

3            THE COURT:  From the defense?  Can I hear?

4            MS. SWEENEY:  Yes, yes.

5            THE COURT:  Thank you.

6            MR. NAWRACAJ:  We'd like to admit Exhibit 120.21

7 into evidence, please.

8            THE COURT:  It's received.

9            MR. NAWRACAJ:  Thank you.

10 BY MR. NAWRACAJ:

11 Q    Mr. Johns, can you take a look at the monitor in front

12 of you, and let me know if you recognize that document?

13 A    I do.

14 Q    And what is that document?

15 A    This is the PPM, or the private placement memorandum,

16 for the Hopewell-Pilot Project.

17 Q    In your experience, what is a PPM?

18 A    So this is a document where you're essentially going to

19 use it to represent what you know, what the known risks are,

20 to tell kind of factual things about the product or the

21 investment itself.  So it's essentially, you know, a

22 disclaimer, and a way for everybody to have an honest

23 understanding of what they're all getting into.

24 Q    Thank you.  Do you ever remember receiving a copy of

25 this PPM?

Exhibit C
Page 49

*Echo Reporting, Inc.*

I-68

1 A      I do.

2 Q      Do you recall about when?

3 A      I think this was in late July.  I think it was roughly

4 when I had access to the data room, was maybe where I first

5 saw it.

6 Q      Okay.  You mentioned the data room.  What is all that?

7 A      So, when we were discussing this investment, a data room

8 is no different than, say, Dropbox today, but it's secured.

9 So we would -- as members who were looking to invest in this

10 technology, we were given access to a data room which had a

11 series of documents, PPM being one of them, presentations

12 being another, or the "pitch decks," I guess I should call

13 them, you know.

14      It just would have various relevant material that would

15 be important to read, and you'd want to spend time with each

16 individual on the investment group, you know, utilizing their

17 core competence used to break down this data, and take a look

18 at it, and make sure you understood everything you could about

19 the investment you're getting into.

20 Q      Thank you.  When you received the PPM, what did you do

21 with it?

22 A      I read it.

23 Q      The entire thing?

24 A      Yes.

25 Q      Thank you.  Let's turn to the second page of the PPM,

Exhibit C
Page 50

*Echo Reporting, Inc.*

1 TAT3281.  Do you see that on your screen, Mr. Johns?

2 A     I do.

3 Q     Can you read the first paragraph at the top of that page

4 aloud to everyone?

5 A     Sure:

6           "The Hopewell-Pilot Project, LLC, was

7           formed in March 2016 for the purpose of

8           demonstrating proof of concept involving

9           the refinement, use, and application of a

10          new proprietary software technology which

11          can geographically sort and analyze land

12          and mineral title records and related

13          digital data for the purpose of acquiring

14          oil, gas, and mineral interests in the

15          most contemporary type sand and shale

16          place."

17 Q     Thank you.

18 A     Yes.

19 Q     Do you remember, when you read this for the first time,

20 anything catching your attention?

21 A     Of course.  It's just reconfirming the proof of concept

22 is essentially focused on refinement, use, and application of

23 a new proprietary software technology, so essentially saying,

24 "We're going to take a proprietary software technology,

25 utilize it, and apply it to demonstrate its features of

Exhibit C
Page 51

*Echo Reporting, Inc.*

I-70

1 geographic sorting and analyzing land and mineral title

2 records, as well as related digital data."  So the idea is --

3 it's got a stated goal, "We're going to look at areas of

4 opportunity related to oil and gas mineral interests.  We're

5 going to use our product to demonstrate how efficiently it

6 does that."

7 Q      Was there anything else that jumped out at you when you

8 read this paragraph?

9 A      Yes, I mean, the use of the word "can."  It obviously is

10 stating that the software is actively doing something now.

11 Q      Thank you.

12 A      I'd probably add "proprietary," too.  That's probably

13 unique in this case.  Right?  So this isn't something that you

14 can just go grab off the shelf.  "Proprietary" infers

15 something that you've created.  So the software that we build

16 as a company, that James and myself and some of our other

17 partners -- we build proprietary software.  It's something

18 that we did from the ground up.

19 Q      Thank you.  And as you sit here today, when you look at

20 that first paragraph, is it your understanding that the

21 software did all those things that it says it does in that

22 paragraph?

23 A      I would say it is my understanding that it did not do

24 all those things.

25 Q      Thank you.  Let's go towards the bottom of that same

Exhibit C
Page 52

*Echo Reporting, Inc.*

I-71

1 page of the PPM, to the second paragraph from the bottom,

2 starting with the phrase "Hopewell is seeking," and if you

3 would, Mr. Johns, can you please read that paragraph out loud?

4 A    Yes:

5           "Hopewell is seeking qualified debt and

6           equity investors to provide up to

7           2,000,000 in new funds from placement of

8           up to 1,000,000 initial additional equity

9           shares for the purposes of acquiring new

10          lease and mineral interest acquisitions

11          in the four initial target areas and for

12          working capital" -- pardon me -- "to

13          continue the company's operations and

14          evaluation of lease acquisition

15          opportunities."

16 Q    Thank you.  Do you remember, when you first read this

17 paragraph, if anything jumped out at you, anything caught your

18 attention?

19 A    Yes.  I mean, I think, probably, the focal point here is

20 that they're securing or looking for additional debt and

21 equity investors.  The thing for me that's important as an

22 investor is, it's talking about how they're going to "apply

23 working capital to continue company's operations," and it's

24 focused on "evaluation of lease acquisition opportunities."

25          THE COURT:  We're focusing on the Title Rover

Exhibit C
Page 53

*Echo Reporting, Inc.*

I-72

1 technology here, and not the capital issue.

2          MR. NAWRACAJ:  Thank you, your Honor.

3          THE COURT:  Is there a motion to strike?

4          MS. SWEENEY:  Yes, your Honor, motion to strike

5 that last answer.

6          THE COURT:  The Court strikes the last comment by

7 the witness.

8 BY MR. NAWRACAJ:

9 Q    I would like to go to the fourth page of the private

10 placement memorandum, Bates stamp TAT3283.  Do you see that

11 page on your monitor, Mr. Johns?

12 A    I do.

13 Q    Can you take a moment and read the risk factors?  You

14 don't have to read them out loud, but read risk factors A

15 through G.

16          THE COURT:  Let's continue.

17 BY MR. NAWRACAJ:

18 Q    Okay.  Mr. Johns, after reading those risk factors, are

19 there any risk factors that you can identify that discuss the

20 risk of the technology not being developed?

21 A    There are none.

22 Q    What are the risk factors about?

23 A    These risk factors are specifically related to the

24 business goal of Hopewell-Pilot Project, so it's speaking

25 essentially to the risk of being able to secure a lease,

Exhibit C
Page 54

*Echo Reporting, Inc.*

I-73

1 potentially looking at the opportunity going away if the

2 prices in gas decline.  It covers various business risks, is

3 how I would classify it.

4          MR. NAWRACAJ:  Thank you.

5          Co-Counsel Sadock, can you please put on the

6 monitor stipulated Exhibit C as in Charlie, O as in Oscar?

7          THE COURT:  This is received?

8          MR. NAWRACAJ:  Thank you, your Honor.

9          THE COURT:  Is this received?

10         MS. SWEENEY:  Yes, it is, your Honor.

11         THE COURT:  It's received.  Thank you.

12 BY MR. NAWRACAJ:

13 Q    Mr. Johns, have you seen this document before?

14 A    I have.

15 Q    And can you tell us what it is?

16 A    Yes.  This is the first pitch deck, I believe, that I

17 saw.

18 Q    What is a pitch deck?

19 A    It's essentially collateral used for being able to

20 summarize and define the technology in this case.  So it's

21 something that's given to investors to give you kind of a view

22 into the highlights, differentiators, the key value

23 proposition for the investment that you're looking into.

24 Q    Thank you.

25 A    Yes.

Exhibit C

Page 55

*Echo Reporting, Inc.*

I-74

1 Q    Do you remember when you first saw this pitch deck?

2 A    Yes.  It was around the date that's on the material.  It

3 may have been that date or just a little after, so July 25th

4 or close to it.

5 Q    Do you remember how you received it?

6 A    I believe -- this I think I procured from the data room.

7 I'm not 100 percent certain on that.  I know that a lot of the

8 materials were loaded into the data room, so I can't remember

9 which ones were related to specific presentations, but I know

10 that I went in and pulled each of these out of the data room

11 and saw them.

12 Q    Thank you.  And when you pulled this document out of the

13 data room, what did you do?

14 A    I read it.

15 Q    The entire thing?

16 A    I did.

17 Q    Thank you.  Let's please go to the second page of the

18 pitch deck, page 671.  Mr. Johns, take a second to review this

19 page.

20 A    Okay.

21 Q    Do you remember, when you first saw this page, if

22 anything jumped out at you, anything draw your attention?

23 A    Right.  I mean, it's stating right away that Title Rover

24 is an affiliate of the Willis Group, headquartered in Houston,

25 Texas, so we know that it's part of the Willis family.

Exhibit C
Page 56

*Echo Reporting, Inc.*

1 Q     If I could stop you, why would that catch your

2 attention?

3 A     It's important because, first off, the Willis Group is a

4 successful organization.  It's recognized as a successful

5 organization.  It confirms everything that, you know, Chad

6 talked about, right, so that we know that we have backing

7 behind this investment that we're going to put money into.

8 Q     Thank you.  Was there anything else that jumped out at

9 you when you looked at this page?

10 A     Yes.  I'd say probably the right side of the page is

11 important, because you obviously see that Mark is managing

12 partner.  He's heading this up, this guy that we were first

13 introduced to.  This is the guy that handed us to some of

14 these people here in this list to vet out what he said and

15 represented.  So yes, this is -- and, in addition to this, it

16 shows that you've got, you know, significant resources

17 participating in the Title Rover company.

18 Q     Did that give you any sort of impression as far as the

19 depth of the company?

20 A     Yes, of course.  I mean, you know, when you start a

21 company -- when we started our company, we had three people,

22 and we had three people for a year, right?  So you understand,

23 when you're in startup mode, there are certain watermarks when

24 you get to so many people.  The one, being five, is a hard one

25 to get to, and once you get to five, and into the next one,

Exhibit C
Page 57

I-76

1 and 20 is the next hurdle.  So, right away, when you kind of

2 look at this, they've gotten by, roughly, the first two

3 hurdles, which are fairly critical.  So this wouldn't -- for a

4 startup, not so much.

5 Q    Is there anything else on this slide that caught your

6 attention?

7 A    You know, the fact that Tom was recognized as also a

8 managing partner, which that was communicated to us.  They had

9 a CPO in Brent Stanley.  You know, I think, more or less,

10 though, I'd say it was more about the depth on the right side.

11 The other thing that I would have looked at here, that would

12 have drawn my attention, is that it clearly states that:

13          "Title Rover has developed proprietary

14          technology, work flow and interface to

15          power data processing function key to

16          automating and expediting much of the

17          work associated with traditional areas."

18      So I'm looking at this and, right, they've got a

19 proprietary technology they've developed, and it automates key

20 functions.

21 Q    Thank you.  I'd like to go the next page, Plaintiff's

22 672.  Mr. Johns, if you'd take a quick look at this page.

23 When you first saw this page, was there anything that caught

24 your attention, anything that jumped out?

25 A    Yes.  I mean, obviously, on the right hand, the

Exhibit C
Page 58

I-77

1 graphics, the first thing you're going to see, which is just

2 inferring that it is reducing costs by employing top

3 technology to drive higher and heavier data analysis, and it

4 talks a little bit about that in the first paragraph.

5      The second paragraph again confirms that the company has

6 developed its own proprietary technology, and what's really

7 interesting about this is that it has licensed full rights to

8 technology that delivers a 10X improvement to traditional

9 methods of supporting data investigations and specialized

10 analysis.  So somebody looking at technology, and knowing that

11 it's proprietary, now, when you start to talk about an

12 improvement on a multiple of 10, that's significant.

13 Q    Thank you.  As a technology professional, have you

14 prepared pitch decks?

15 A    I have.

16 Q    Would you prepare a pitch deck any differently than this

17 pitch deck if the software was not fully developed from

18 Intelometry?

19 A    Absolutely.

20 Q    And how would you do that?

21 A    You would state what you have built, and you would state

22 where you're trying to build.

23 Q    Thank you.  Let's go to the fifth slide, please,

24 Plaintiff's Bates stamp 674.  Do you see that page, Mr. Johns,

25 on your screen?

Exhibit C

Page 59

*Echo Reporting, Inc.*

1 A     I do.

2 Q     What's the title of this slide?

3 A     "Key Title Rover Features."

4 Q     Thank you.  When you saw this slide for the first time,

5 again, was there anything that jumped out at you, anything

6 that caught your attention?

7 A     Yes.  I mean, all of these features are important.  The

8 first one relates back to the previous slide that we just

9 looked at, the first line item, that is, "Custom indexing

10 using Beyond Recognition."  So this is where the 10X

11 improvement comes from.  It's critical.

12          MR. ZARCONI:  Objection, foundation.

13          THE COURT:  Overruled.

14          THE WITNESS:  So this is critical because you're

15 talking about a performance improvement that's significant,

16 and the Beyond Recognition technology, furthermore, has a

17 capability in this deck that it is:

18          "Using visual similarity and

19          (indiscernible)-based image recognition

20          to classify attribute records."

21          So, right there, what that's telling you is that I

22 can go in and scan an image, and I can recognize who is buying

23 and selling, and I can positionally put them in a database and

24 establish a relationship, huge, huge differentiator.  I mean,

25 understand, this did not exist, to our knowledge, at that

Exhibit C
Page 60

I-79

1 time, anywhere.  It does today, but it didn't then.

2 BY MR. NAWRACAJ:

3 Q     Thank you.  As you sit here today, do you have an

4 opinion as to whether or not, at the time that you saw this

5 document, that that feature existed and operated?

6 A     Did I think then that it existed?

7 Q     No, as you sit here today.

8 A     Today.  Sorry.  My bad.

9 Q     Yes.  As you sit here today.

10 A     Yes.  That feature did not exist.  It's clear that it

11 didn't.  It's clear this is blatantly wrong.

12 Q     And in your mind, was that an important feature to have

13 in the technology?

14 A     Absolutely.  I mean, this is your first step, right?  If

15 you can move those images, you can deliver on the 10X value

16 proposition.  You know, so, if you can move them, understand

17 what they are, relate them, you're on your way to doing

18 something very, very special.

19 Q     Thank you.  Let's go to the second row.

20 A     Sure.

21 Q     The feature is called "custom filtering."  Can you read

22 out loud the description, please?

23 A     "Ability to dynamically slice data a number of ways."

24 Q     And as a technology professional, what was your

25 understanding of that?

Exhibit C
Page 61

*Echo Reporting, Inc.*

I-80

1 A    So "dynamically slice data a number of ways" would then

2 start to complement the foundation that you were looking at.

3 It would also give a user the ability to do certain things

4 dynamically, so meaning like, through the product, I might be

5 able to give it certain requests and get data returned, and it

6 could potentially offer different reads of that data, or I

7 could basically set up -- if you or anybody is familiar with a

8 pivot table in Excel, I could ask it to rearrange columns and

9 move data around in those ways.

10 Q    Was that an important feature to you?

11 A    It's a good one, for sure.  It's important because it's

12 recognized as, again, a key feature.  It was relevant back

13 then because artificial intelligence, big data, data

14 visualization were becoming really big things, so how you

15 could put data together and look at it in various ways was

16 becoming a main focal point for a lot of different companies,

17 for a lot of different reasons.

18 Q    Thank you.  And as you sit here today, do you have any

19 opinion on whether or not that feature existed?

20 A    I think this feature might have offered -- there may

21 have been some ability, but I believe most of this was

22 manually done.

23 Q    Thank you.  Let's go to the third row.

24 A    Okay.

25 Q    The feature is called "Custom grouping."

Exhibit C
Page 62

Echo Reporting, Inc.

I-81

1 A     Right.

2 Q     Can you please read out loud the stated description?

3 A     "Create prospect area of surname or other types of

4 custom groups to create smaller A steps."

5 Q     And as a technology professional, can you describe what

6 that meant to you?

7 A     Yes, of course.  I mean, so, once you understand the

8 relationship of the data, now you can perform other types of

9 opinions about that data, by assigning more attribute

10 definitions to it and creating groups that are smaller, that

11 you think have very specific relationships.

12 Q     Thank you.  And as you sit here today, do you have any

13 opinion on whether or not that key feature existed when you

14 read this slide?

15 A     I don't think this feature existed in the --

16          MR. ZARCONI:  Objection, your Honor, foundation.

17          THE COURT:  Overruled.

18 BY MR. NAWRACAJ:

19 Q     You can continue.

20 A     Yes.  I don't believe this feature existed,

21 specifically, again, because of how the data was being input

22 into the database.  We know that it was manually being done.

23 Joe Haynes, the mechanic, the developer of this software

24 product, clearly tells us he was loading data.  He was

25 interacting with people telling him about the views that they

Exhibit C
Page 63

I-82

1 needed to see.  He was doing the organization of this so they

2 could see those views, and he said, "You have hundreds of

3 e-mails about this."

4 Q    Thank you.  Let's go to the fourth row on this slide.

5 The feature is entitled "Integrated Production Permitting

6 Appraisal District Probate."  Can you please read the

7 description of that feature out loud?

8 A    "Single view of multiple data sources."

9 Q    And in your professional opinion, what did that mean to

10 you?

11 A    So what this meant to me is that I'm going to give you a

12 view for all the data that you have that you're interested in,

13 so that you can have a consolidated way to investigate the

14 areas of opportunity that you think exist.  It's

15 essentially -- these things kind of compound on one another,

16 so this could really basically give you -- take that custom

17 grouping and allow you to do more with it, so to speak.

18 Q    And was this key feature important to you?

19 A    You know, again, this probably wasn't like a huge one,

20 in our opinion.  A single view of multiple data sources is

21 nice to have, but this is kind of after the intelligence has

22 been applied to the organization there.  So the single view is

23 convenient, but it makes the user more efficient, but probably

24 not more critical than some of the ones we've just gone

25 through.

Exhibit C

Page 64

I-83

1 Q     Thank you.  And as you sit here today, do you have an
2 understanding as to whether or not, when you read this slide,
3 that feature existed?
4 A     I think that the feature may have existed, in part,
5 purely from a portal perspective in what we saw.
6 Q     Thank you.  Let's go to the fifth row.  The feature is
7 entitled "Automated Title Chain."  Can you please read the
8 description of that feature?
9 A     "System-driven tree graph of related beads and other
10 instruments."
11 Q     And what did this mean to you?
12 A     So what this means to me is that, once these custom
13 groups and everything has been formulated and pulled together
14 by the application, by the product, it can now generate a
15 graph, and it can show you the lineage of how properties were
16 owned, specifically, and potentially show you where you could
17 have breaks in that chain of title.
18 Q     And was this key feature important to you?
19 A     It was, because this started to allow you to see from a
20 Hopewell perspective.  You can see some of what it was meant
21 to accomplish, which was putting together and utilizing the
22 groupings and the intelligence to identify the tree, but it
23 was probably not the most critical one.
24 Q     And as you sit here today, what is your understanding as
25 to whether that feature existed when you read this deck?

Exhibit C
Page 65

*Echo Reporting, Inc.*

I-84

1 A    I don't believe this was system-driven.  I think this

2 was manually put together.

3 Q    And why do you say that?

4 A    I say that because of what I heard from Joe Haynes.  I

5 say that because the tree graph that's being generated is

6 being done by an off-the-shelf product, so there's really

7 nothing special about this.

8 Q    Thank you.  I'd like to go to the ninth slide of this

9 deck, Plaintiff's 678.  Do you see that on your screen, Mr.

10 Johns?

11 A    I do.

12 Q    And what is the title of this slide?

13 A    "Differentiators."

14 Q    In the technology world, what is a differentiator?

15 A    I mean, these are the things that make you special.

16 Right?  These are the things that separate you from everybody

17 else.

18 Q    Thank you.  Can you please read the second

19 differentiator that's stated on this slide?

20 A    Sure.  "Technology.  We leverage the latest tools using

21 artificial intelligence and analytics."

22 Q    Thank you.  As you sit here today, what is your

23 understanding as to whether any artificial intelligence was

24 incorporated in the technology?

25 A    It was not.

Exhibit C

Page 66

*Echo Reporting, Inc.*

I-85

1          MR. NAWRACAJ:  Thank you.

2          Co-Counsel Sadock, I would like to go to

3 Plaintiff's Bates stamp 681.

4 BY MR. NAWRACAJ:

5 Q    Do you see this on your screen, Mr. Johns?

6 A    I do.

7 Q    Do you remember seeing a copy of this document?

8 A    I do.

9 Q    What is it?

10 A    Again, another pitch deck.  It was later generated, per

11 the date here, August 19th, 2016.

12          THE COURT:  Is this offered?

13          MR. NAWRACAJ:  It is, your Honor.  I'm sorry.

14          THE COURT:  Received.

15          MS. SWEENEY:  No objection.

16          THE COURT:  Okay.  It's received.

17 BY MR. NAWRACAJ:

18 Q    Do you recall about when you received this?

19 A    Mid to late August.  I'm not exactly 100 percent

20 certain.

21 Q    So was that before or after the decision to invest?

22 A    This would have been slightly before.

23 Q    Thank you.  When you received the document, do you

24 remember what you did?

25 A    I read it.

Exhibit C

Page 67

*Echo Reporting, Inc.*

I-86

1 Q     The entire thing?

2 A     Yes.

3 Q     Thank you.  Let's go to page two of the document, Bates

4 stamp Plaintiff's 682.  Do you see that page on your screen,

5 Mr. Johns?

6 A     I do.

7 Q     Do you remember, when you first read it, anything that

8 jumped out at you, anything that drew your attention in

9 particular?

10 A     I mean, similar to the same page two in the previous

11 pitch deck, it's the same items that I'm going to focus on.

12 It's confirming what I was told, which is it's an affiliate of

13 the Willis Group.  It's developed proprietary technology.

14 It's repeating a lot of the same key themes, which is, you

15 know, it's an established product.  It's got a management

16 team.  It's got depth of resources in the organization.

17 Q     Thank you.  Let's go to the next page, Bates stamp 683.

18 Mr. Johns, when you read this page for the first time, was

19 there anything that caught your attention?

20 A     So this one is similar, again.  It's just a restatement,

21 talking about what Title Rover does special, so "Leverages its

22 technology prowess to reduce cost and shorten the time frame."

23 Ultimately, it's back to the same key themes, right?  It's

24 developed its own proprietary technology, and it has licensed

25 sole rights to additional technology which delivers a 10X

Exhibit C
Page 68

I-87

1 improvement.

2 Q    So, when you read this page, along with the others that

3 we've talked about, was it your impression that this was

4 something that was in progress, being developed?

5 A    No.

6 Q    What was your impression?

7 A    This is software that is present and ready to go.

8 Q    Thank you.  I'd like to go to the August 23rd, 2016,

9 pitch deck, Bates stamp Plaintiff's 698.  Mr. Johns, do you

10 see --

11            THE COURT:  Are you offering this?

12            MR. NAWRACAJ:  I am offering it, your Honor, into

13 evidence.

14            THE COURT:  Any objection?

15            MR. NAWRACAJ:  Yes, yes.  I think the entire

16 Exhibit CO was originally entered, and this is part of it.

17            THE COURT:  All right.  Thank you.

18            MR. NAWRACAJ:  Thank you.

19            THE COURT:  Over the break, you're going to need to

20 correlate the exhibit numbers with the things you're offering.

21 BY MR. NAWRACAJ:

22 Q    Mr. Johns, do you see your screen?  Can you tell us what

23 you see?

24 A    Again, it's another pitch deck, third one, dated August

25 23rd, 2016.

Exhibit C
Page 69

*Echo Reporting, Inc.*

I-88

1 Q    Do you ever remember getting a copy of this?

2 A    I do.

3 Q    Do you know about when you may have received a copy of

4 it?

5 A    It was on or around the 23rd, or shortly thereafter.

6 All of these were deposited in the data room.

7 Q    When you received a copy --

8 A    I think we did get a copy via e-mail as well --

9 Q    Got it.

10 A    -- but I'm pretty sure they were all put in the data

11 room at some point.

12 Q    When you received a copy of this document, what did you

13 do with it?

14 A    I read it, just like the others.

15 Q    The entire thing?

16 A    Yes.

17 Q    Thank you.  I'd like to go to page one.

18 A    Okay.

19 Q    Mr. Johns, could you please read the third bullet point

20 at the top of that page?

21 A    Sure:

22          "John Martin, the founder of Beyond

23          Recognition, LLC, whose software performs

24          visual classification and delivers

25          consistent enterprise-scale

Exhibit C
Page 70

Echo Reporting, Inc.

I-89

1           classification of all of an

2           organization's documents, both electronic

3           and paper, and serves as a knowledge base

4           of decisions made for each cluster

5           regarding retention, document type

6           designations, and attributes extracted."

7 Q    Thank you.  At the time this pitch deck was presented to

8 you, what was your understanding of how Mr. Martin and/or his

9 software figured into the Title Rover, the TR technology?

10 A    Well, Mr. Martin's software is Beyond Recognition, and,

11 as we've gone through each of these decks, ad nauseam, Beyond

12 Recognition is the mechanism that delivers the 10-times

13 performance, and it is the technology that Title Rover had a

14 licensed rights to use.  So it's a force-multiplier, if you

15 will.  You add this technology into the equation, you have an

16 even better technology that you can go to market with.

17 Q    Thank you.  After Ensource made its investments, did you

18 learn anything about Mr. Martin and/or Beyond Recognition

19 which, had you known prior to the investment, you may have had

20 a difference in opinion?

21 A    Yes.  So maybe it's probably good to talk about what we

22 knew about Beyond Recognition at the time of forming the

23 investment, which is what I'm talking about here, right?  It's

24 a critical technology in this overall package.  We knew that

25 there was a settlement agreement between Mark Willis and -- or

Exhibit C

Page 71

*Echo Reporting, Inc.*

I-90

1 Title Rover and Beyond Recognition.

2      What we didn't know what that specifically was, because
3 it was mostly redacted.  We were assured that was an agreement
4 to give Title Rover the ability to leverage this technology in
5 an exclusive manner.  So "exclusive" is really important
6 because, if you have exclusive rights to something, no one
7 else can use it.  So that's what we knew at the time.

8      What we later found out is that, before or on the time,
9 at the time of soliciting our investment, Mark Willis sued
10 John Martin and Beyond Recognition for the technology's
11 inability to perform the exact, same functions that they were
12 telling us they did.

13           MS. SWEENEY:  Objection, lacks foundation.

14           THE COURT:  Overruled.

15           THE WITNESS:  So we find out afterwards that he's
16 suing this company because the product didn't perform the way
17 it's supposed to perform, when he's selling it to us.

18           In addition to that, we find out that Joe Haynes,
19 the developer of this Title Rover software, the guy that's
20 going to spread in and evaluate Beyond Recognition technology,
21 makes a recommendation at the time that they're soliciting our
22 investment that he believed this technology may not be a fit
23 to the Title Rover solution.  So here we are.  The guy that's
24 building the car is saying, "Hey, everybody, over here.  I
25 think we've got a problem."

Exhibit C

Page 72

*Echo Reporting, Inc.*

# Exhibit D

```
 1                    UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF CALIFORNIA

 3

 4 ENSOURCE INVESTMENTS, LLC,      )  Case No. 17CV0079-H-LL
                                   )
 5          Plaintiff,             )  San Diego, California
                                   )
 6 vs.                             )  Thursday,
                                   )  February 6, 2020
 7 TATHAM, et al.,                 )  9:00 a.m.
                                   )
 8          Defendants.            )  VOLUME III
                                   )
 9 _____ )

10                      TRANSCRIPT OF TRIAL
                BEFORE THE HONORABLE MARILYN L. HUFF
11           UNITED STATES DISTRICT JUDGE, and a jury

12 APPEARANCES:

13 For the Plaintiff:            VERONICA MCKNIGHT, ESQ.
                                 AARON D. SADOCK, ESQ.
14                               Panakos Law, APC
                                 555 West Beech Street
15                               Suite 500
                                 San Diego, California 92101
16                               (619) 800-0529

17                               RICHARD E. NAWRACAJ, ESQ.
                                 Law Offices of Richard E.
18                                 Nawracaj
                                 155 North Wacker Drive
19                               Suite 4250
                                 Chicago, Illinois 60606
20                               (312) 803-4837

21

22

23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.
```

```
                                                        III-ii
 1 APPEARANCES:   (Cont'd.)

 2 For the Defendants:           SHANNON D. SWEENEY, ESQ.
                                 MICHAEL ZARCONI, ESQ.
 3                               ROBERT P. ALLENBY, ESQ.
                                 Sullivan, Hill, Rez & Engel,
 4                                  APLC
                                 600 B Street, Suite 1700
 5                               San Diego, California 92101
                                 (619) 233-4100
 6
   Transcript Ordered by:        SHANNON D. SWEENEY, ESQ./
 7                               VERONICA MCKNIGHT, ESQ.

 8 Court Recorder:               Lynnette Lawrence
                                 United States District Court
 9                               333 West Broadway
                                 San Diego, California 92101
10
   Transcriber:                  L. Caldwell/Jordan Keilty
11                               Echo Reporting, Inc.
                                 2160 Fletcher Parkway
12                               Suite 209
                                 El Cajon, California 92020
13                               (858) 453-7590

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                                    III-iii
 1                        I N D E X

 2  WITNESSES              DIRECT   CROSS    REDIRECT   RECROSS

 3  James Dibble            --      III- 4     --         --
    (recalled)
 4
    Michelle Hansen        III- 9  III-21   III- 26      --
 5
    Mark Willis            III-28  III-57     --         --
 6
    Chad Martin            III-174 III-189  III-205      --
 7
    Harry Gamble           III-210 III-224  III-229      --
 8

 9

10  EXHIBITS                          IDENTIFIED   RECEIVED

11  Defendant's

12  006.1     Settlement agreement     III-93      III-93

13  81        6/7/16 e-mail            III-67      III-67

14  862       Lawsuit filed by Image   III-38      III-40
              Engine
15
    863       Affidavit of Mark Willis III-40      III-40
16
    K         September 2, 2016 email from III-134  III-134
17            Nawracaj to Tatham

18  AB        Hopewell general ledger  III-14      III-15
              as of 12/31/16
19
    AL        September 12, 2015 email III-133     III-133
20            from Willis to Pannu

21  AO        June 23, 2016 email from III-120     III-120
              Chad Martin to Mark Willis
22
    BG        10/27 e-mail chain       III-101     III-101
23
    BH        8/23/16 e-mail from      III-98      III-98
24            Stanley to Willis

25
```

III-iv

| EXHIBITS: (Cont'd.) | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| Defendant's | | | |
| BY | December 18, 2016 email from Nawracaj to Willis | III-143 | III-143 |
| CN.002 | Text messages between Mark Willis and Chad Martin | III-174 | III-174 |
| CN.004 | Text messages between Mark Willis and Chad Martin | III-175 | III-176 |
| CN.011 | Text messages between Mark Willis and Chad Martin | III-178 | III-178 |
| CN.014 | Text messages between Mark Willis and Chad Martin | III-180 | III-180 |
| CN.016 | Text messages between Mark Willis and Chad Martin | III-180 | III-181 |
| CN.023 | Text messages between Mark Willis and Chad Martin | III-184 | III-184 |
| EI | 7/24/16 e-mail from Martin to Willis and Tatham | III-97 | III-97 |
| EN | 9/9/16 e-mail from Martin to Stanley | III-99 | III-99 |
| ET | 10/23/16 e-mail from Willis to Stanley and Martin | III-100 | III-100 |
| HB | December 7, 2016 email from Tatham to Willis | III-140 | III-140 |
| HS.034 | Text message | III-121 | III-121 |
| HS.081 | Text message | III-126 | III-126 |
| HS.152 | Text message | III-148 | III-148 |
| HS.076 | Text message | III-193 | III-193 |
| HS.141 | Text message | III-199 | III-199 |
| HY | Document | III-108 | III-109 |

III-216

1 own minerals that have the right to participate in production
2 that comes out of a well that's drilled within this unit.  And
3 so it's -- what -- what we attempted to do and what we did do,
4 we were successful at it, was acquire interest that we found
5 in the open, which meant that Burke Royalty, who's the main
6 operator, or EOG was another operator in this area, had
7 thought that they had leased all of the interest within and
8 underneath these wells, but they missed -- they missed
9 interests, and they missed interests that were not leased, and
10 so I -- our whole business plan was to go acquire these leases
11 that were open and hadn't been leased by the current
12 operators.
13 Q     Is this something that you would have needed the Title
14 Rover Technology to do?
15 A     Yes.  You need to have -- you need to be able to
16 research the title on a particular track or tracks of land and
17 run it back all the way into the 20's and teens even, and then
18 you run the title forward in which to -- to determine who owns
19 the present mineral rights, and in Texas, for instance, it's
20 Perpetual.  It's Perpetual Minerals, meaning that if someone
21 -- if I went and sold a  piece of property back in 1940 and I
22 reserved the minerals underneath that track of land, then at
23 -- those minerals flow with the land and flow -- keep in my
24 name or my heirs' names, okay, as years go by.  And so you
25 have to run title in order to determine where those interests

# Exhibit E

```
 1                 UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF CALIFORNIA

 3

 4 ENSOURCE INVESTMENTS, LLC,    )  Case No. 17CV0079-H-LL
                                 )
 5          Plaintiff,           )  San Diego, California
                                 )
 6 vs.                           )  Wednesday,
                                 )  February 5, 2020
 7 TATHAM, et al.,               )  9:00 a.m.
                                 )
 8          Defendants.          )  VOLUME II
                                 )
 9 _____)

10                    TRANSCRIPT OF TRIAL
              BEFORE THE HONORABLE MARILYN L. HUFF
11           UNITED STATES DISTRICT JUDGE, and a jury

12 APPEARANCES:

13 For the Plaintiff:          VERONICA MCKNIGHT, ESQ.
                               AARON D. SADOCK, ESQ.
14                             Panakos Law, APC
                               555 West Beech Street
15                             Suite 500
                               San Diego, California 92101
16                             (619) 800-0529

17                             RICHARD E. NAWRACAJ, ESQ.
                               Law Offices of Richard E.
18                                Nawracaj
                               155 North Wacker Drive
19                             Suite 4250
                               Chicago, Illinois 60606
20                             (312) 803-4837

21

22

23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.
```

```
                                                                II-ii

 1 APPEARANCES:   (Cont'd.)

 2 For the Defendants:              SHANNON D. SWEENEY, ESQ.
                                    MICHAEL ZARCONI, ESQ.
 3                                  ROBERT P. ALLENBY, ESQ.
                                    Sullivan, Hill, Rez & Engel,
 4                                    APLC
                                    600 B Street, Suite 1700
 5                                  San Diego, California 92101
                                    (619) 233-4100
 6
    Transcript Ordered by:          SHANNON D. SWEENEY, ESQ./
 7                                  VERONICA MCKNIGHT, ESQ.

 8 Court Recorder:                  Lynnette Lawrence
                                    United States District Court
 9                                  333 West Broadway, 15th Floor
                                    San Diego, California 92101
10
    Transcriber:                    L. Caldwell/Jordan Keilty
11                                  Echo Reporting, Inc.
                                    2160 Fletcher Parkway
12                                  Suite 209
                                    El Cajon, California 92020
13                                  (858) 453-7590

14

15

16

17

18

19

20

21

22

23

24

25
```

II-iii

I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Justin Pannu (recalled) | -- | II- 1 | II-13 | -- |
| Jason Frankovitz | II-20 | II-45 | II-58 | -- |
| James Dibble | II-64 | II-97 | -- | -- |
| Thomas Tatham | II-113 | II-133 | II-201 | -- |

| EXHIBITS | | IDENTIFIED | RECEIVED |
|---|---|---|---|

Defendant's

| | | | IDENTIFIED | RECEIVED |
|---|---|---|---|---|
| HC | 1/13/17 minutes of Hopewell-Pilot Project, LLC, annual meeting | | II- 5 | II- 5 |
| 704.20 | Frankovitz curriculum vitae | | II- 23 | -- |
| D | Amended and restated company agreement of Hopewell-Pilot Project, LLC | | II-166 | II-166 |
| Q | December 8, 2016 email from Tatham to Pannu | | II-193 | II-193 |
| CW | Statement of work for data services presented to Title Rover, LLC | | II-145 | II-145 |
| DD | July 27, 2016 email from Tatham to Stanley regarding webinar dates for Title Rover presentation | | II-149 | II-149 |
| DM | November 1, 2016 email from Stanley to Tatham | | II-159 | II-159 |
| DN | Undated preliminary report on BR extraction data | | II-159 | II-160 |
| EW | November 23, 2016 email from Tatham to Mark | | II-162 | II-162 |

*Echo Reporting, Inc.*

```
                                                              II-iv
 1 EXHIBITS: (Cont'd.)                  IDENTIFIED   RECEIVED

 2 Defendant's

 3
   EZ    December 7, 2016 email from Tatham   II-191      II-191
 4       to Willis

 5 FC    April 19, 2016 Title Rover web portal II-151     II-152
         user Guide Version 1.0
 6
   GD    July 28, 2016 email from Willis to   II-181      II-185
 7       Stanley

 8 HE    November 7, 2017 email from Tatham to II-189     II-189
         Jennifer Burkhardt
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

II-127

1 Q    If Beyond Recognition did what it says in this

2 presentation, it would definitely increase the value of the

3 company, correct?

4 A    Absolutely.

5 Q    It definitely would be enticing to potential investors

6 in this presentation, wouldn't it be?

7 A    Yes.

8 Q    Mr. Willis definitely brought up these features to

9 potential investors, correct?

10 A    (No audible response.)

11 Q    Were you on every call with Mr. Willis and potential

12 investors?

13 A    No.

14 Q    Were you on some calls?

15 A    I was on a few calls with -- with Mr. Willis.  Early on,

16 prior to any discussions with your clients, I had been

17 involved in joint presentations, and I -- the optimism and the

18 degree of aggressive statements was -- was -- if not

19 troubling, I was uncomfortable with it.  So generally I would

20 visit with the prospective investors in the course of their

21 due diligence.

22 Q    You were uncomfortable because it wasn't really true

23 what Mr. Willis was presenting to investors as it pertains to

24 these features, correct?

25 A    In some cases, but I think in other cases it was just

II-139

1  A     Yes.

2  Q     And it's true that there wouldn't be a return on

3  investment for anybody unless the project worked out, correct?

4  A     When you say the project worked out, there are scenarios

5  that we could have failed within Hopewell by not buying enough

6  leases or buying enough leases to recover everybody's

7  investment.  But to the extent that the technology was refined

8  and improved to where its commercial value could be captured

9  in other projects or subsequent business in the same area.

10       There were scenarios where Hopewell could have failed

11  and it still would have been a rewarding endeavor for the

12  investors.

13  Q     And that's why the share exchange warrant idea was --

14  had some merit, correct, because there was an opportunity to

15  convert shares from Hopewell to Title Rover if it looked like

16  Title Rover might at some point get to the commercialization

17  phase, right?

18  A     Or be a better bet at that point.

19  Q     And that was -- that was your idea, to include it in the

20  -- in the -- the deal that investors would get, right?

21  A     Yes, well, I think the -- to a degree, yes.  Mark

22  reluctantly or maybe a little bit later embraced the concept

23  as one that we thought -- both thought was fair.

24  Q     Do you think he was -- I'm not asking you to speculate,

25  but do you think that he was reluctant because he thought

*Echo Reporting, Inc.*